**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>   Plaintiff,<br><br>  v.<br><br>Changpeng Zhao, Binance Holdings Limited, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited, and Samuel Lim,<br><br>   Defendants. | Case No. 1:23-cv-1887<br><br>Judge Manish S. Shah |

**BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED,
BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS
LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

    I.      Launch of Binance.com in 2017 ................................................................................ 3

    II.     The Binance.com Platform .......................................................................................... 5

    III.    Binance.com Restricts and Off-Boards Potential U.S. Users .................................... 6

    IV.    The CFTC Sues the Foreign Binance Entities, Mr. Zhao, and Mr. Lim ................... 7

LEGAL STANDARD ................................................................................................................. 8

ARGUMENT .............................................................................................................................. 9

    I.      THE CFTC FAILS TO PLEAD PERSONAL JURISDICTION OVER THE
          FOREIGN BINANCE ENTITIES AND MR. ZHAO............................................... 9

          A.     The CFTC Fails to Plead Specific Jurisdiction as to the Foreign
                 Binance Entities .................................................................................... 10

          B.     The Complaint Fails to Plead Specific Jurisdiction as to Mr. Zhao ............. 11

    II.     THE CFTC CANNOT EXPAND ITS REGULATORY REACH THROUGH
          IMPERMISSIBLY EXTRATERRITORIAL CLAIMS............................................. 16

          A.     Extraterritoriality Principles ............................................................... 16

          B.     Counts I-VI Fail to Allege the Required Domestic Transactions ................. 18

          C.     Counts II-IV Fail to Allege a "Direct and Significant Connection with
                 Activities in, or Effect on, Commerce of the United States"........................ 22

    III.    COUNTS I, III, V, AND VI SUFFER FROM ADDITIONAL PLEADING
          FAILURES ............................................................................................................... 27

          A.     The Unregistered Board of Trade Claim in Count I Fails ............................ 27

          B.     Counts III, V, and VI Fail Because the Complaint Does Not Establish
                 that the Foreign Binance Entities Acted as an FCM...................................... 30

    IV.    THE CFTC'S NOVEL ANTI-EVASION CHARGE SHOULD BE
          DISMISSED ............................................................................................................. 35

CONCLUSION.......................................................................................................................... 37

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
2023 WL 4239255 (U.S. June 29, 2023)....................................................17, 21, 22

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)..........................................................................19, 20

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
751 F.3d 796 (7th Cir. 2014) .......................................................................13, 14

*Allman v. McGann*,
2003 WL 1811531 (N.D. Ill. Apr. 4, 2003) ...................................................14

*In re Amaranth Nat. Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013)...........................................................................22

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*,
480 U.S. 102 (1987).........................................................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................9, 32, 34

*Bd. of Trs. of Auto. Mechs.' Loc. No. 701 Union & Indus. Pension Fund v. Joyce*,
2015 U.S. Dist. LEXIS 53800 (N.D. Ill. Apr. 24, 2015) ..............................36

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)...........................................................12

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*,
582 U.S. 255 (2017).......................................................................................10

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).......................................................................................10

*Burke v. 401 N. Wabash Venture, LLC*,
714 F.3d 501 (7th Cir. 2013) ..........................................................................9

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000) ........................................................................15

*CFTC v. Baragosh*,
278 F.3d 319 (4th Cir. 2002) ........................................................................13

*CFTC v. Garofalo*,
2010 WL 11245430 (N.D. Ill. Dec. 21, 2010)...........................................17, 19

*CFTC v. Gorman*,
2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ...............................................23

*CFTC v. Lake Shore Asset Mgmt. Ltd.*,
  2008 WL 1883308 (N.D. Ill. Apr. 24, 2008) ...................................................................10

*CFTC v. Sentinel Mgmt. Grp., Inc.*,
  2012 WL 1080166 (N.D. Ill. Mar. 30, 2012) ..................................................................13

*Choi v. Tower Rsch. Cap. LLC*,
  890 F.3d 60 (2d Cir. 2018) ..............................................................................................20

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ..........................................................................................12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ......................................................................................19, 20

*Deneen v. Wyndham Vacation Resorts, Inc.*,
  2020 WL 704793 (N.D. Ill. Feb. 12, 2020) ....................................................................13

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) .........................................................................................................16

*Ennenga v. Starns*,
  677 F.3d 766 (7th Cir. 2012) .............................................................................................4

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) .........................................................................................................24

*FEC v. Cruz*,
  142 S. Ct. 1638 (2022) .....................................................................................................36

*First Commodity Corp. of Bos. v. CFTC*,
  676 F.2d 1 (1st Cir. 1982) ...............................................................................................28

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ................................................................20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ......................................................................................................9, 11

*Grede v. FCStone, LLC*,
  867 F.3d 767 (7th Cir. 2017) ...........................................................................................31

*Harold M. Pitman Co. v. Typecraft Software Ltd.*,
  626 F. Supp. 305 (N.D. Ill. 1986) ...................................................................................14

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) .........................................................................................................10

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) .........................................................................................................15

*John Crane, Inc. v. Shein L. Ctr., Ltd.*,
  891 F.3d 692 (7th Cir. 2018) .............................................................................................8

-iii-

*Keeton v. Hustler Mag., Inc.*,
   465 U.S. 770 (1984).................................................................................................10, 11, 14

*Kopff v. Battaglia*,
   425 F. Supp. 2d 76 (D.D.C. 2006) .........................................................................................10

*Loginovskaya v. Batratchenko*,
   764 F.3d 266 (2d Cir. 2014).............................................................................................17, 20

*Menominee Indian Tribe of Wisc. v. Thompson*,
   161 F.3d 449 (7th Cir. 1998) ...................................................................................................4

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)..................................................................................................................1

*Minn-Chem, Inc. v. Agrium, Inc.*,
   683 F.3d 845 (7th Cir. 2012)..................................................................................................24

*Mohammed v. Uber Techs., Inc.*,
   237 F. Supp. 3d 719 (N.D. Ill. 2017) .....................................................................................12

*Monieson v. CFTC*,
   996 F.2d 852 (7th Cir. 1993) ..................................................................................................13

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)......................................................................................................17, 19, 20

*Nestle USA, Inc. v. Doe*,
   141 S. Ct. 1931 (2021) ............................................................................................................17

*North v. Ubiquity, Inc.*,
   72 F.4th 221 (7th Cir. 2023) ...................................................................................................10

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada*,
   149 F.3d 1086 (10th Cir. 1998) ..............................................................................................14

*Prime Int'l Trading, Ltd. v. BP PLC*,
   937 F.3d 94 (2d Cir. 2019)..............................................................................17, 18, 21, 22

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) ....................................................................................................8

*RAR, Inc. v. Turner Diesel, Ltd.*,
   107 F.3d 1272 (7th Cir. 1997) ................................................................................................15

*Ratzlaf v. United States*,
   510 U.S. 135 (1994).................................................................................................................37

*Redd v. Amazon Web Servs., Inc.*,
   2023 WL 3505264 (N.D. Ill. May 17, 2023) ..........................................................................14

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992)...........................................................................................................23, 24

-iv-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE
(SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016).............................................................2, 16, 17

*Rush v. Savchuk*,
   444 U.S. 320 (1980)...............................................................10

*Saccameno v. Ocwen Loan Servicing, LLC*,
   372 F. Supp. 3d 609 (N.D. Ill. 2019).....................................4

*Salkauskaite v. Sephora USA, Inc.*,
   2020 WL 2796122 (N.D. Ill. May 30, 2020)........................10

*SEC v. Battoo*,
   158 F. Supp. 3d 676 (N.D. Ill. 2016).....................................19

*Sevugan v. Direct Energy Servs., LLC*,
   931 F.3d 610 (7th Cir. 2019)..................................................9

*In re Sheehan*,
   48 F.4th 513 (7th Cir. 2022)..................................................12

*Singer v. Sunbeam Prod., Inc.*,
   2015 WL 4555188 (N.D. Ill. July 28, 2015).........................29

*Strobl v. N.Y. Mercantile Exch.*,
   768 F.2d 22 (2d Cir. 1985).....................................................22

*Sullivan v. Barclays PLC*,
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)........................21

*Tamari v. Bache & Co. (Lebanon) S.A.L.*,
   730 F.2d 1103 (7th Cir. 1984)................................................17

*United States v. Collins*,
   685 F.3d 651 (7th Cir. 2012)...........................................36, 37

*United States v. Jarrett*,
   494 F. App'x 615 (7th Cir. 2012)..........................................37

*United States v. Reed*,
   No. 20-cr-500 (S.D.N.Y. Feb. 28, 2022)..............................32

*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014)..................................32

*In re Voyager Digit. Holdings, Inc.*,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023)....................................6

**Statutes**

7 U.S.C. § 1a ...................................................................22, 30, 34

7 U.S.C. § 2..............................................2, 16, 17, 18, 22, 23, 34, 35

7 U.S.C. § 6....................................................................................2, 3, 16, 19, 27, 28, 29

7 U.S.C. § 6c.................................................................................................................19

7 U.S.C. § 6d.............................................................................................................3, 19

7 U.S.C. § 7b-3............................................................................................................19

7 U.S.C. § 13a-1...........................................................................................................10

7 U.S.C. § 13c.........................................................................................................13, 16

31 U.S.C. § 5324.........................................................................................................37

**Regulations**

17 C.F.R. § 1.3........................................................................................................30, 34

17 C.F.R. § 1.6................................................................................................3, 35, 36

17 C.F.R. § 23.23.......................................................................................25, 26, 27

17 C.F.R. § 37.200......................................................................................................33

17 C.F.R. § 38.150......................................................................................................33

17 C.F.R. § 42.2.....................................................................................21, 22, 34

17 C.F.R. § 48.2...........................................................................................................28

17 C.F.R. § 48.3....................................................................................19, 28, 29

17 C.F.R. § 166.3.....................................................................................21, 22, 34

**Administrative Materials**

*In re Blockratize, Inc. d/b/a Polymarket.com*,
    CFTC Dkt. No. 22-09 (Jan. 3, 2022) ...............................................................31

CFTC, *Foreign Boards of Trade (FBOT)*, bit.ly/3DvmdiM (last visited July 27,
    2023) ...................................................................................................................32

CFTC, *Intermediaries*, bit.ly/KdM9TK (last visited July 27, 2023) ...........................31

CFTC, *Trading Organizations*, bit.ly/3rLoTpT (last visited July 27, 2023) ................31

Commodities or Commodity Futures Contracts; Leverage Contracts for Gold and
    Silver; Domestic Sales of Foreign Futures Contracts, 40 Fed. Reg. 18,187
    (Apr. 25, 1975)...................................................................................................28

Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement
    Action Against Payward Ventures, Inc. (d/b/a Kraken), CFTC (Sept. 28,
    2021), bit.ly/q3aIvE .......................................................................................6, 33

Cross-Border Application of the Registration Thresholds and Certain
  Requirements Applicable to Swap Dealers and Major Swap Participants, 85
  Fed. Reg. 56,924 (Sept. 14, 2020) ...............................................................................7, 24, 25

Financial Surveillance Examination Program Requirements for Self-Regulatory
  Organizations, 84 Fed. Reg. 12,882 (Apr. 3, 2019)...................................................................31

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
  Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
  77 Fed. Reg. 48,208 (Aug. 13, 2012)..........................................................................35, 36, 37

Interpretive Guidance and Policy Statement Regarding Compliance with Certain
  Swap Regulations, 78 Fed. Reg. 45,292 (July 26, 2013)..........................23, 24, 25, 26, 27, 35

Order of Designation, *In re Application of HedgeStreet, Inc. for Designation as a
  Contract Market* (CFTC Feb. 18, 2004), bit.ly/KfFHf3 .........................................................32

Order of Designation, *In re Application of KalshiEX LLC for Designation as a
  Contract Market* (CFTC Nov. 3, 2020), bit.ly/QdpF9o...........................................................32

Order of Designation, *In re Application of LedgerX LLC for Designation as a
  Contract Market* (CFTC June 24, 2019), bit.ly/rJ8cv6............................................................32

*In re Payward Ventures, Inc. (d/b/a Kraken)*,
  CFTC Dkt. No. 21-20 (Sept. 28, 2021) ..................................................................................33

Remarks of Commissioner Summer K. Mersinger at the International Women of
  Blockchain 2023 Web3 and Metaverse Conference, CFTC (Mar. 24, 2023),
  bit.ly/3DlZMwo ..........................................................................................................................7

Request for Comment on the Impact of Affiliations on Certain CFTC-Regulated
  Entities, CFTC (June 27, 2023), bit.ly/DvMAoQ....................................................................33

Retail Commodity Transactions Involving Certain Digital Assets, 85 Fed. Reg.
  37,734 (June 24, 2020)................................................................................................................7

*In re XBT Corp. SARL d/b/a First Global Credit*,
  CFTC Dkt. No. 20-04 (Oct. 31, 2019)......................................................................................32

**Rules**

Fed. R. Civ. P. 4 .............................................................................................................................10

Fed. R. Civ. P. 9 .............................................................................................................................36

Fed. R. Civ. P. 12 .........................................................................................................................8, 9

**Other Authorities**

American Heritage Dictionary (5th ed. 2012) ...............................................................................23

Black's Law Dictionary (10th ed. 2015).......................................................................................23

*Changpeng Zhao-Success Story of the Binance Founder*, Startup Talky (Jan. 11, 2022), bit.ly/3D7iiZj ...................................................................................................3

*How Can Third-World Countries Counter Inflation Using Bitcoin*?, Cointelegraph, bit.ly/44J9NPE (last visited July 27, 2023)....................................................4

*Licenses, Registrations and Other Legal Matters*, Binance.com, bit.ly/3DlTVHm (last visited July 27, 2023)....................................................................................4

National Futures Association, *Basic* (last visited July 27, 2023) ................................................32

*Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission: Hearing Before the S. Comm. on Banking, Hous., and Urban Affs.*, 115th Cong. 4 (2018).......................................................................................................................5

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

## INTRODUCTION

It is a bedrock principle of our legal order that, as a general rule, "United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007). Yet the Commodity Futures Trading Commission ("CFTC") is not content to stop at the water's edge. In this case, the CFTC seeks to regulate foreign individuals and corporations that reside and operate *outside* the United States—outstripping the limits of its statutory authority and treading on deep-rooted principles of comity with foreign sovereigns. In addition to stretching the territorial reach of its jurisdiction, the CFTC further resorts to a hodge-podge of legal theories that rely on competing and inconsistent registration categories, assert a novel and unsound claim under a regulatory provision that has never been used before, and rely on allegations that are irrelevant under the agency's own guidance. The Court should reject the CFTC's attempt at regulation by enforcement and return the agency to shore.

Founded in Asia in 2017, Binance.com quickly rose to become the world's largest platform for cryptocurrency spot trading—buying and selling cryptocurrency at its current market price. There is no dispute that the CFTC has no regulatory authority over spot trading even in the United States, let alone abroad. The issue posed by the CFTC's complaint is whether, when Binance.com began offering additional products in or after 2019—by which point it had already begun to restrict and off-board potential U.S. users—it became subject to certain registration and regulatory compliance provisions of the Commodity Exchange Act ("CEA") and CFTC regulations. Despite 236 paragraphs of allegations—which followed a multi-year investigation in which defendants provided extensive information voluntarily—the CFTC's complaint fails at the outset. The claims against Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited (the "Foreign Binance Entities") and Changpeng Zhao, the founder and CEO of Binance Holdings Limited ("Mr. Zhao"), must be dismissed for at least four reasons.

*First*, the CFTC's complaint should be dismissed because it has failed to plead that the Foreign Binance Entities and Mr. Zhao are subject to personal jurisdiction. The complaint is built entirely on group pleading, referring to the Foreign Binance Entities by the undifferentiated term "Binance." But the law makes clear that each defendant's contacts with the forum must be assessed individually. The CFTC has therefore failed to meet its burden to show that each corporate defendant (or any of them) is amenable to suit in this Court. The CFTC has also failed to allege that Mr. Zhao had sufficient claim-related contacts with the United States.

*Second*, Counts I through VI should be dismissed as impermissibly extraterritorial. Each of these counts is based on statutes and regulations that do not apply to the foreign conduct alleged here. Several of the provisions at issue govern only domestic transactions, *see RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016), but the CFTC fails to allege that the defendants engaged in any domestic transactions. And even if other provisions may apply to certain foreign activities, the CFTC still fails to state a claim because it does not allege the necessary "direct and significant" connection to or effect on commerce of the United States, 7 U.S.C. § 2(i)(1), despite the complaint's inapt allegations about real economic parties and algorithms, which underscore the regulatory overreach of these claims.

*Third*, Counts I, III, V, and VI should also be dismissed because the CFTC has failed to plead the elements necessary to bring those claims. The kitchen-sink approach of the CFTC's complaint does not tie its registration categories, which were developed for traditional financial markets, to the Binance.com crypto exchange. Should the CFTC wish to expand the scope of these registration categories, its recourse lies with Congress or its own rulemaking authority, not in ignoring the language of existing provisions or stretching them to apply where they do not. As such, Count I fails because the CFTC does not and cannot allege that Binance.com is a *domestic* board of trade, as 7

U.S.C. § 6(a) requires; instead, it concedes that Binance.com was launched and operated outside the United States. Nor does Count I show that any defendants operated as a foreign board of trade as required under 7 U.S.C. § 6(b), because the CFTC does not allege that Binance.com provided access to customers in a manner that could warrant this kind of registration. Count III fails to allege that any defendant meets the statutory definition of a futures commission merchant ("FCM") under 7 U.S.C. § 6d, because the complaint does not adequately allege that the Binance.com platform acts as an intermediary or a counterparty. Counts V and VI fail as a result of the deficiencies in Count III, as the only registrant category at issue that could support those claims, FCM, does not apply.

*Finally*, the Court should dismiss Count VII's claim of willful evasion of provisions of the CEA and its regulations. *See* 17 C.F.R. § 1.6. Tellingly, the CFTC has never before brought a claim under this provision. By shoehorning it into this complaint, the CFTC has chosen to test this anti-evasion claim for the first time against a novel industry and products that did not even exist and were not remotely contemplated in 2012 when the regulation was promulgated. Its sweeping assertion of this inapposite rule ignores that Rule 1.6 applies only to certain types of transactions (swaps), and to the extent the complaint alleges swaps-related activity, it fails to identify any statutory provision or regulation that the defendants allegedly sought to evade, let alone by willful conduct.

For these reasons, the Court should dismiss the complaint against the Foreign Binance Entities and Mr. Zhao for lack of personal jurisdiction and failure to state a claim.

## BACKGROUND

### I. Launch of Binance.com in 2017

Defendant Changpeng Zhao was born in China, raised in Canada, and resides in the United Arab Emirates. Compl. ¶ 14.[1] He emigrated to Canada at the age of 12 with his parents and studied

---

[1] *See also Changpeng Zhao—Success Story of the Binance Founder*, Startup Talky (Jan. 11, 2022), bit.ly/3D7iiZj. The Court may take judicial notice of facts which are stated for background purposes only.

computer science at McGill University in Montreal. *See supra* note 1. After working for established businesses, Mr. Zhao was struck by cryptocurrency's potential as a transformational technology and began pursuing opportunities in the cryptocurrency industry in Asia. *Id.* In 2017, Mr. Zhao and colleagues launched Binance.com in Shanghai. Compl. ¶¶ 14, 41.

Binance.com has grown over the last six years to become the world's leading cryptocurrency exchange. Today, it has millions of registered users around the world, Compl. ¶ 40, and is registered or licensed in seventeen countries.[2] Among other services, Binance.com provides much-needed banking alternatives to the unbanked, the underbanked, and individuals in countries with relatively unstable currencies and underdeveloped banking infrastructures.[3]

The complaint makes allegations concerning several distinct foreign corporate entities. *See* Compl. ¶¶ 15-17.[4] The complaint alleges that: Binance IE is incorporated in Ireland and owns entities that act as Binance.com's digital asset and virtual asset service provider; Binance Holdings is incorporated in the Cayman Islands and holds some of Binance.com's intellectual property; and Binance Services is incorporated in Ireland and owns Binance Holdings. *Id.* ¶¶ 15-17. The CFTC states that each of the Foreign Binance Entities is separately incorporated and serves a distinct

---

*See Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012); *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 643 n.18 (N.D. Ill. 2019) (taking judicial notice of information "solely by way of background and context").

[2] *Licenses, Registrations and Other Legal Matters*, Binance.com, bit.ly/3DlTVHm (last visited July 27, 2023). The Court may take judicial notice of the administrative records summarized on the cited webpage. *See Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

[3] *See How Can Third-World Countries Counter Inflation Using Bitcoin*?, Cointelegraph, bit.ly/44J9NPE (last visited July 27, 2023).

[4] In 2019, a Delaware corporation, BAM Trading Services Inc., was established to run a new platform in the United States, Binance.US. Compl. ¶¶ 22, 81, 93. The Binance.US platform launched in 2019. *Id.* ¶ 81. Binance.US offers its services to U.S. residents, but the CFTC does not allege that any of those services fall within its regulatory jurisdiction. *Id.* ¶ 22.

business purpose, *id.* ¶¶ 15–17, and yet the complaint attempts to treat them as a single entity, which is unavailing for jurisdictional purposes.

## II.  The Binance.com Platform

Binance.com is a "centralized, web-based 'crypto-products platform'" on which various digital asset products are traded and services are provided.  Compl. ¶ 40.  To conduct trades on Binance.com, customers "transmit[] orders to buy or sell into" Binance.com's "order books," which "execute transactions based generally on price-time priority pursuant to non-discretionary order matching methodology."  *Id.* ¶ 42.

The complaint alleges that two types of trading occur on Binance.com.  *First*, the complaint alleges that people have engaged in "transactions in digital asset spot markets"—*i.e.*, buying and selling certain cryptocurrency assets at current market prices—since 2017.  Compl. ¶ 41.  The CFTC does not have regulatory jurisdiction over spot trading.[5]  *Second*, the complaint alleges that Binance.com "began offering digital asset derivative products"—*i.e.*, products priced in relation to an underlying cryptocurrency—in 2019.  *Id.*  The CFTC asserts that Binance.com has offered four types of digital asset products over which it purportedly has jurisdiction: (1) "leveraged transactions" to "retail customers . . . trading in its spot market," *id.* ¶ 56 (alleging that such transactions began "in July 2019"); (2) "quarterly futures," which are contracts to buy an item at a particular price and at a "pre-determined expiration date[]," *id.* ¶¶ 60-61 (alleging that these products began "in or around September 2019"); (3) "perpetual futures," which are "contracts that do not have an expiration date" and which require counterparties to exchange a "funding fee" to "ensure the price of the perpetual contract stays sufficiently correlated to the price of the

---

[5] *See, e.g.*, *Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission: Hearing Before the S. Comm. on Banking, Hous., and Urban Affs.*, 115th Cong. 4 (2018) (statement of then-CFTC Chair J. Christopher Giancarlo) ("the CFTC does not have authority to conduct regulatory oversight over spot virtual currency platforms").

underlying digital asset," *id.* ¶¶ 62-63 (alleging that these products began in "at least September 2019"); and (4) "Binance Options," which permit (but do not require) someone to buy an item at a particular price in the future, *id.* ¶ 58 (alleging that these products began "in April 2020").

### III. Binance.com Restricts and Off-Boards Potential U.S. Users

By June 2019, Binance.com began implementing steps to restrict and off-board potential U.S. users and ensure that new users were not U.S. persons. Compl. ¶¶ 93-94. Importantly, Binance.com did not begin to offer the alleged digital asset derivative products until July 2019 and later—*after* it began to restrict and off-board potential U.S. users. *Id.* ¶¶ 41, 93.

As Binance.com has grown and evolved, including by prohibiting potential U.S. users from accessing its platform, it has done so without the benefit of clear guidance from U.S. regulators. Indeed, the applicability of traditional regulatory frameworks, which were created for fiat-based financial models using analog technology, are ill-fitted to the blockchain-based digital asset industry—something even CFTC Commissioners have recognized.[6] When Binance.com launched in 2017—with the cryptocurrency industry in its infancy—there was almost no regulatory guidance regarding digital assets at all. And the intervening years have hardly clarified matters, as demonstrated by the ongoing regulatory tug-of-war between the Securities and Exchange Commission and the CFTC over cryptocurrency regulation and enforcement. *See, e.g.*, *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023) ("Regulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to

---

[6] *See, e.g.*, Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken), CFTC (Sept. 28, 2021), bit.ly/3q3aIvE ("[M]any of the Commission's rules governing its regulation of traditional FCMs do not fit [a crypto platform's] role as an exchange. . . . The application of the Commission's FCM rules to an exchange on which [crypto] retail commodity transactions are traded is uncharted territory at this time.").

-6-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

regulation by the CFTC, or whether they are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision.").

Even where the CFTC has provided guidance, it has been incomplete or unrelated to the conduct alleged to be at issue here. For example, only *after* Binance.com had initiated its efforts to keep potential U.S. users off the Binance.com platform did the CFTC issue final interpretive guidance related to digital assets or cross-border transactions[7] (and even then, the digital asset guidance was limited in scope, and the cross-border guidance not directly applicable here). The industry therefore operated without clear regulatory guidance for years.[8]

## IV. The CFTC Sues the Foreign Binance Entities, Mr. Zhao, and Mr. Lim

In March 2023, after a multi-year investigation in which defendants provided extensive information voluntarily to the CFTC, the agency filed suit against the Foreign Binance Entities, Mr. Zhao, and former Chief Compliance Officer Samuel Lim, alleging that they violated registration and regulatory requirements under the CEA and its implementing regulations.

The theory underlying the CFTC's complaint is that "Binance's solicitation of and reliance on customers located in the United States" "subjected Binance to registration and regulatory requirements under U.S. law." Compl. ¶¶ 3, 7. The complaint alleges that Binance.com had "U.S. customers" or "customers located in the United States," *id.* ¶¶ 3, 6, 72, 76, 95, that "Binance has instructed U.S. customers to evade" its IP address-based compliance controls "by using [virtual private networks] to conceal their true location," *id.* ¶ 116, and that an alleged "loophole" in the

---

[7] Retail Commodity Transactions Involving Certain Digital Assets, 85 Fed. Reg. 37,734 (June 24, 2020); Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924 (Sept. 14, 2020).

[8] Meanwhile, the agency has sought to expand its regulatory reach, including attempting to enforce its preexisting rules and regulations in new ways against a novel industry and products, via hindsight enforcement actions—a practice recognized as "fundamentally unfair" by one of the CFTC's own Commissioners. Remarks of Commissioner Summer K. Mersinger at the International Women of Blockchain 2023 Web3 and Metaverse Conference, CFTC (Mar. 24, 2023), bit.ly/3DlZMwo.

platform's Know-Your-Customer procedures "allow[ed] U.S. customers to access the platform," *id.* ¶ 92. The complaint also asserts that several U.S. trading firms were Binance.com customers. *Id.* ¶¶ 153, 176, 182. Although the complaint concedes that many transactions supposedly associated with those firms were made by non-U.S. entities, the CFTC bases its purported regulatory authority on the novel argument that U.S.-based firms were the "real economic party" behind all of those transactions. *Id.* ¶¶ 153, 176, 182. The CFTC does not allege for any transaction that market participants' liability for trades was incurred, or that title transferred, in the United States.

The CFTC alleges claims that fall within three categories: *first*, that the defendants were required to register under certain CEA provisions and CFTC regulations, including as a foreign board of trade ("FBOT") (Count I), FCM (Count III), and designated contract market ("DCM") or swap execution facility ("SEF") (Count IV), or offered certain regulated products without registration (Counts I and II); *second*, that the defendants failed to satisfy certain regulatory obligations as a purported FCM (Counts V and VI); and *third*, that the defendants violated a CFTC "anti-evasion" rule (Count VII). With respect to Mr. Zhao, Counts I through VI assert liability only as a control person, based on his role as a founder and CEO, Compl. ¶¶ 193, 200, 207, 215, 222, 228; only Count VII purports to assign direct liability, *id.* ¶ 232.

## LEGAL STANDARD

When a court evaluates personal jurisdiction on the pleadings, a complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(2) where the plaintiff fails to "make out a *prima facie* case of personal jurisdiction." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation omitted). The plaintiff has the burden of proving personal jurisdiction. *John Crane, Inc. v. Shein L. Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018).

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must plead more than conclusions; it must allege sufficient facts that make the plaintiff's claim plausible." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019). If the complaint, on its face, does not allege a legally viable cause of action, it must be dismissed. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to . . . [t]hreadbare recitals of the elements of a cause of action[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, mere "conclusions" are "not entitled to the assumption of truth." *Id.* at 679.

## ARGUMENT

The CFTC seeks to regulate the overseas activities of foreign corporations and individuals based on conclusory allegations that fail to establish jurisdiction over the defendants, fail to establish that the CFTC can enforce the provisions cited in the complaint extraterritorially, and fail to plead essential elements of its claims. The Court should dismiss the complaint in its entirety.

## I. THE CFTC FAILS TO PLEAD PERSONAL JURISDICTION OVER THE FOREIGN BINANCE ENTITIES AND MR. ZHAO

Under the Due Process Clause, the CFTC cannot maintain this suit unless the Court has personal jurisdiction over the defendants. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918-19 (2011). Personal jurisdiction comes in two forms: general jurisdiction and specific jurisdiction. *See id.* at 919.

A court may assert general jurisdiction over a corporate defendant only if it is "essentially at home in the forum," which occurs in the corporation's place of incorporation and principal place of business. *Id.* at 919, 924. The CFTC does not allege that the Foreign Binance Entities are "essentially at home" in this district. Compl. ¶ 15 (Binance Holdings is incorporated in the Cayman Islands; no principal place of business alleged); *id.* ¶ 16 (Binance IE is incorporated in

Ireland; no principal place of business alleged); *id.* ¶ 17 (Binance Services is incorporated in Ireland; no principal place of business alleged). Nor can the CFTC establish general personal jurisdiction over Mr. Zhao, because he does not and is not alleged to reside in the United States, let alone in this district. *See North v. Ubiquity, Inc.*, 72 F.4th 221, 225 (7th Cir. 2023). Thus, the complaint does not allege general jurisdiction over the Foreign Binance Entities or Mr. Zhao.

Specific jurisdiction requires "a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 265 (2017). A court may assert specific jurisdiction over a defendant only if the defendant maintains "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). A plaintiff bears the burden of demonstrating that (1) the defendant has purposefully availed itself of conducting activities in the forum, (2) the plaintiff's claim "'arise[s] out of or relate[s] to'" those purposeful contacts, and (3) exercising jurisdiction is fair and reasonable to the defendant. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475-78 (1985) (citation omitted).[9] "Each defendant's contacts with the forum . . . must be assessed individually." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984). A court may not "aggregat[e]" the forum contacts of co-defendants in determining whether it has jurisdiction. *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980); *accord Salkauskaite v. Sephora USA, Inc.*, 2020 WL 2796122, at *4 (N.D. Ill. May 30, 2020); *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 81 (D.D.C. 2006).

## A. The CFTC Fails to Plead Specific Jurisdiction as to the Foreign Binance Entities

The CFTC has failed to plead that any of the Foreign Binance Entities has the requisite

---

[9] In a suit brought under 7 U.S.C. § 13a-1, the relevant "forum" is the United States as a whole, so courts look to a defendant's suit-related contacts with the United States in assessing specific jurisdiction. *See* Fed. R. Civ. P. 4(k); *CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2008 WL 1883308, at *5 (N.D. Ill. Apr. 24, 2008).

minimum contacts with the forum because the CFTC has engaged in improper group pleading. The CFTC acknowledges that each of the Foreign Binance Entities plays a separate role: Binance Holdings owns "intellectual property . . . including trademarks and domain names"; Binance IE "is a holding company" for "digital asset and virtual asset service providers"; and Binance Services "is a holding company" for "companies that conduct technology and operations services," own different intellectual property, and "enter into contracts with vendors." Compl. ¶¶ 15-17. Yet, in all but one of the jurisdictional allegations in the complaint, the CFTC lumps all Foreign Binance Entities into the amorphous term "Binance"—defined to mean collectively Binance Holdings, Binance IE, and Binance Services. *See id.* ¶¶ 40, 72-81, 89-107, 123-36, 141-86 (alleging only that "Binance" has ties to the United States).[10]

The CFTC's failure to distinguish between the Foreign Binance Entities dooms its effort to establish personal jurisdiction over any of them. The complaint identifies the distinct function of each company, information the agency obtained during its years-long investigation, but it does not provide a reason why the companies can be treated as a single entity for jurisdictional purposes, and its conclusory assertion of a "common enterprise," Compl. ¶ 82, does not suffice. Without alleging minimum contacts with the United States by any of the Foreign Binance Entities, the CFTC cannot establish personal jurisdiction over any of them. *See Keeton*, 465 U.S. at 781 n.13.

**B. The Complaint Fails to Plead Specific Jurisdiction as to Mr. Zhao**

The CFTC also fails to set forth sufficient minimum contacts by Mr. Zhao related to the

---

[10] The complaint alleges that Binance Holdings filed certain trademark applications with the assistance of American attorneys. Compl. ¶ 80. But that makes no difference to the personal jurisdiction analysis because the claims have nothing to do with trademarks. *See Goodyear*, 564 U.S. at 919 ("specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction' " (citation omitted)). Moreover, that the CFTC makes an individual allegation about Binance Holdings in one instance only highlights its failure to allege defendant-specific facts sufficient to establish personal jurisdiction related to the conduct challenged in the complaint.

-11-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

control person claims predicated on alleged registration violations by the Foreign Binance Entities or to the anti-evasion claim. *See In re Sheehan*, 48 F.4th 513, 522 (7th Cir. 2022) ("The relationship between the defendant and the forum 'must arise out of contacts that the defendant *himself* creates with the forum State.'" (citation omitted)). Nowhere in the complaint does the CFTC allege that Mr. Zhao lived in, traveled to, or conducted any activities (let alone any that gave rise to the claims at issue) in the United States. Instead, the complaint relies impermissibly on allegations about the Foreign Binance Entities' supposed contacts with the United States, rather than Mr. Zhao's, and its allegations about his own purported contacts are insufficient to establish personal jurisdiction.

First, the complaint broadly incants that Mr. Zhao directed or "controlled" the Foreign Binance Entities, citing examples of this purported control. *See, e.g.*, Compl. ¶¶ 82, 85-87. But control attendant to being a corporate officer or director does not allow a plaintiff to establish personal jurisdiction over an individual based on the entity's alleged forum contacts. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667 (6th Cir. 2005) (explaining, in the context of securities laws, that "[t]he broad understanding of control person liability . . . cannot on its own support personal jurisdiction" because such an approach would "'impermissibly conflate[] statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair'" (alteration in original) (citation omitted)); *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 734-35 (N.D. Ill. 2017) (allegations that foreign chairman of Uber was "'the mastermind'" behind the launch of Uber in the forum and that he "derived personal income" from Uber's in-forum activities insufficient to establish personal jurisdiction (citation omitted)); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) (allegation that defendant "'control[led] . . . the decision-making of the Company,'"

including the dissemination of allegedly misleading statements at issue, was "not enough to support personal jurisdiction" (citation omitted)).[11]

Second, the CFTC attempts to establish jurisdiction by alleging that Mr. Zhao knew of the presence of U.S. customers on Binance.com. Compl. ¶ 107. As the Seventh Circuit has held, however, operating an "interactive" website "should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible," even if a defendant knows that users are accessing that website in a certain forum. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802, 803 (7th Cir. 2014) (explaining that "the operation of an interactive website does not show that the *defendant* has formed a contact with the forum state," even where defendant knew the plaintiff "was an [in-forum] company"). Indeed, in such a circumstance, Mr. Zhao did not create the contacts, "the [users] did." *Deneen v. Wyndham Vacation Resorts, Inc.*, 2020 WL 704793, at *4 & n.3 (N.D. Ill. Feb. 12, 2020) (interactive website insufficient to establish specific jurisdiction over defendant even if the defendant knew in-forum user "would be harmed there," an allegation not found here).

Nor can the CFTC rely on spurious allegations about two incidents in which Mr. Zhao allegedly interacted by email with potential U.S. users. Compl. ¶ 75. Those interactions are alleged to have occurred in 2017 and 2018, both more than a year before Binance.com ever began offering the alleged derivatives products at issue in the complaint. *Id.* ¶¶ 56, 58, 61-63. Moreover, "random, isolated, or fortuitous" communications such as these cannot form the basis for specific

---

[11] The claims against Mr. Zhao for control person liability must be dismissed for lack of personal jurisdiction, as well as for the impermissible extraterritoriality and pleading failures addressed below. *See infra* Parts II and III; *CFTC v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 1080166, at *4, *8 (N.D. Ill. Mar. 30, 2012), *amended in part, adhered to in part*, 2012 WL 3234277 (N.D. Ill. Aug. 6, 2012) (primary violation required to establish control person liability). In addition, Mr. Zhao reserves all rights to contest control person liability on a full record, including on the basis that the CFTC does not meet its burden of proving bad faith or knowing inducement of the alleged violations. *See* 7 U.S.C. § 13c(b); *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002); *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993).

-13-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

jurisdiction, *Redd v. Amazon Web Servs., Inc.*, 2023 WL 3505264, at *2 (N.D. Ill. May 17, 2023), nor would even more extensive interaction with users, *see Advanced Tactical*, 751 F.3d at 799, 802 (no personal jurisdiction where defendant fulfilled orders for forum-based customers, knew plaintiff was a forum-based company, and sent emails to forum residents).

The CFTC also impermissibly groups Mr. Zhao with other defendants when describing purported decisions to allow U.S. users to stay on the platform, without setting forth conduct by Mr. Zhao. *See, e.g.*, Compl. ¶ 96 (alleging that "Binance and Zhao" allowed a loophole to persist that would allow U.S. customers to access the platform). When assessed individually, as they must be, *Keeton*, 465 U.S. at 781 n.13, the allegations relating to Mr. Zhao are too attenuated to establish the required minimum contacts. The allegations relate either to statements by others about their purported interpretation of Mr. Zhao's state of mind, Compl. ¶¶ 100, 110, or to statements allegedly made by others to Mr. Zhao, *id.* ¶¶ 124-29. These allegations do not show conduct by Mr. Zhao, but rather are used to allege purported failures to act, which do not meet the CFTC's burden to establish personal jurisdiction. *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1094 (10th Cir. 1998) ("[P]lac[ing] great weight on what the defendant did not do . . . is clearly at odds with the Supreme Court's mandate that minimum contacts be based on the defendant's affirmative actions"); *Harold M. Pitman Co. v. Typecraft Software Ltd.*, 626 F. Supp. 305, 313 (N.D. Ill. 1986) (defendant must have "some minimum contacts with the state resulting from an affirmative act"). Nor could such allegations establish personal jurisdiction over an individual executive for the actions of a company. *See Allman v. McGann*, 2003 WL 1811531, at *3-5 (N.D. Ill. Apr. 4, 2003) (no personal jurisdiction over defendant vice president who allegedly knowingly permitted his company to violate Illinois state law but who himself had few contacts with Illinois). As the Supreme Court has made clear, "it is the defendant's actions, not his

expectations," that are relevant for purposes of determining personal jurisdiction. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883 (2011).

Finally, the remaining allegations about Mr. Zhao's forum contacts—relating to the launch of Binance.US (which has never offered derivatives products), Compl. ¶ 81; or that Mr. Zhao "participated in" "industry conferences in the United States" (without alleging how Mr. Zhao supposedly participated or whether he even traveled to the United States), *id.* ¶ 78; or that Mr. Zhao paid for Amazon Web Services (from the largest global provider of such services in the world), *id.* ¶ 79—fare no better, because such contacts have no sufficient connection with the United States or with the claims at issue. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) (holding that courts "cannot simply aggregate all of a defendant's contacts with a state—no matter how dissimilar in terms of geography, time, or substance—as evidence of the constitutionally-required minimum contacts"). Such allegations are insufficient to establish specific jurisdiction over an individual foreign defendant.[12]

The CFTC's failure to include allegations sufficient to establish personal jurisdiction requires dismissal.[13]

---

[12] Exercise of personal jurisdiction over Mr. Zhao would likewise not comport with traditional notions of fair play and substantial justice. Among other things, Mr. Zhao is not alleged to have engaged in any conduct within the United States, and witnesses and evidence in this case about a foreign business would be predominantly overseas. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." (citation omitted)).

[13] Any request from the CFTC for jurisdictional discovery (which, per the Court's order, would require a separate motion, *see* ECF No. 57) would be premature when the complaint fails to establish "a colorable or prima facie showing of personal jurisdiction." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000), which the complaint does not for the reasons stated herein. Such a request would be particularly unavailing, and the burdens it imposes on foreign defendants inappropriate, in light of the CFTC's lengthy pre-suit investigation and 236-paragraph complaint.

## II. THE CFTC CANNOT EXPAND ITS REGULATORY REACH THROUGH IMPERMISSIBLY EXTRATERRITORIAL CLAIMS

The CFTC's attempt to expand the CEA's territorial scope fails under established precedent. The CEA generally has no extraterritorial application, save for certain types of transactions (swaps) that fall within the scope of 7 U.S.C. § 2(i). Because the CEA treats swaps differently from other products under the CFTC's jurisdiction, the analysis is two-fold: (1) for a claim that is not related to swaps, the CFTC must allege a "domestic application of the statute," *RJR Nabisco*, 579 U.S. at 337; whereas (2) for a swaps-related claim, the CFTC must allege a "direct and significant connection with" U.S. commerce under Section 2(i).

Under this framework, each of the following claims fails because the CFTC does not and cannot allege domestic transactions: Count I (as brought under 7 U.S.C. § 6(a), relating to domestic boards of trade), and non-swaps claims under Counts III (FCM), IV (DCM/SEF), V (FCM supervision), and VI (implementation of an FCM's KYC and AML procedures). Second, any swaps-related claims under Counts II (off-exchange options), III, and IV fail because the CFTC does not sufficiently allege a "direct and significant connection with" U.S. commerce as required by 7 U.S.C. § 2(i)(1).[14]

### A. Extraterritoriality Principles

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (citation omitted). Courts engage in a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco*, 579 U.S.

---

[14] Control person liability under Section 13(b) depends on and extends no further than the alleged underlying violations by the purported controlled entity. *See* 7 U.S.C. § 13c(b) (providing only that an alleged control person may be held liable "to the same extent as such controlled person"). Thus, the control person liability claims against Mr. Zhao also fail, among other reasons, for impermissible extraterritoriality.

at 337. *First*, courts ask "whether the presumption against extraterritoriality has been rebutted," which requires a "clear, affirmative indication that [the statute] applies extraterritorially." *Id.* Absent a "clear statement" that a statute applies to conduct outside of the United States, the statute does not apply abroad. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). *Second*, if the statute does not expressly apply abroad, courts evaluate whether the case turns on domestic activity that implicates the statute's "focus." *Id.* at 266; *see Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 2023 WL 4239255, at *6 (U.S. June 29, 2023). For a case to involve a domestic application of a statute, the plaintiff must establish that "the conduct relevant to the statute's focus occurred in the United States." *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936 (2021) (citation omitted). As *Morrison* explained in the context of a Section 10(b) claim under the Securities Exchange Act, a complaint must allege "transactions in securities listed on domestic exchanges, [or] domestic transactions in other securities." *See* 561 U.S. at 266-68 (explaining that the focus of the Securities Exchange Act is "upon purchases and sales of securities in the United States," otherwise known as "domestic transactions"). To satisfy this test, the plaintiff must "allege not only a domestic transaction, but also domestic—not extraterritorial—*conduct* by Defendants that is violative of a substantive provision." *Prime Int'l Trading, Ltd. v. BP PLC*, 937 F.3d 94, 105 (2d Cir. 2019).

At step one, the CEA contains no clear statement of extraterritorial application. *See Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1107 (7th Cir. 1984);[15] *Loginovskaya v. Batratchenko*, 764 F.3d 266, 271 (2d Cir. 2014) (holding that the CEA "as a whole . . . is silent as to extraterritorial reach"). There is one exception. 7 U.S.C. § 2(i) provides:

> The provisions of this chapter relating to swaps that were enacted by the Wall Street Transparency and Accountability Act of 2010 (including any rule prescribed or regulation promulgated under that Act), shall not apply to activities outside the

---

[15] Although part of *Tamari* has since been abrogated by *Morrison*, *Tamari*'s conclusion "that neither the CEA nor its legislative history specifically authorizes extraterritorial application of the statute" "remains binding." *CFTC v. Garofalo*, 2010 WL 11245430, at *5 (N.D. Ill. Dec. 21, 2010).

United States unless those activities—(1) have a direct and significant connection with activities in, or effect on, commerce of the United States . . . .[16]

In other words, the statutory provisions of the CEA (and implementing regulations) do not apply extraterritorially unless, under Section 2(i)(1), (1) they "relat[e] to swaps," (2) they arise under provisions enacted by or promulgated under the Wall Street Transparency and Accountability Act of 2010 (the "2010 Act"), and (3) the alleged "activities outside the United States" "have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1).

As addressed in Part II.B below, all claims not alleged to "relat[e] to swaps" fail because Section 2(i) does not apply and the CFTC has failed to allege the required "domestic transaction." *Prime Int'l*, 937 F.3d at 105. And as addressed in Part II.C below, the only claims that could allegedly be tied to swaps—and therefore may apply extraterritorially under Section 2(i)—are part of Counts II (*see* Compl. ¶¶ 197-99), III (*see id.* ¶ 204.b), and IV (*id.* ¶¶ 211-13). But for these counts (or any others), the complaint fails to plead the required "direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1). Thus, swaps-related allegations under Counts II through IV must be dismissed as impermissibly extraterritorial.

### B. Counts I-VI Fail to Allege the Required Domestic Transactions

Because the CEA has no clear statement of extraterritorial application other than a narrow exception for certain swaps provisions, *Morrison*'s "domestic application" test applies to (1) the

---

[16] The second sub-paragraph of this provision, which provides that the CEA's swaps-related provisions "shall not apply to activities outside the United States unless those activities . . . contravene" regulations promulgated "to prevent the evasion of" those provisions, 7 U.S.C. § 2(i)(2), is inapplicable because, as set forth *infra* in Part IV, the complaint does not plausibly allege activities that contravene the only regulation of that kind, Rule 1.6.

part of Count I alleging transactions that require registration as a domestic exchange,[17] (2) the non-swaps allegations of Counts II-IV, and (3) Counts V and VI. Under this test, the CFTC must plead that those claims allege domestic transactions and conduct implicating the "focus" of the underlying statutes or regulations—in other words, domestic conduct that the laws at issue "seek[ ] to 'regulate.' " *Morrison*, 561 U.S. at 266-67 (citation omitted).

**Counts I-IV:** The "focus" of the statutory provisions underlying Counts I through IV—7 U.S.C. §§ 6, 6c, 6d, and 7b-3—is on transactions. *See Morrison*, 561 U.S. at 267-68 (holding Section 10(b) of the Securities Exchange Act applies "only [to] transactions in securities listed on domestic exchanges, and domestic transactions in other securities" where the "exclusive focus" is on "*domestic* purchases and sales"); *Garofalo*, 2010 WL 11245430, at *6 (adopting *Morrison*'s transactional test and concluding that CEA provisions in 7 U.S.C. § 6c [regulating option trading and "offer[ing] to enter into, enter[ing] into, or confirm[ing] the execution of" certain prohibited transactions] "are concerned with where the underlying options contracts were actually traded").

Courts in this district have followed the Second Circuit's test for determining whether a transaction is domestic. *See SEC v. Battoo*, 158 F. Supp. 3d 676, 693 (N.D. Ill. 2016) (citing cases). The Second Circuit has held that "transactions . . . are domestic if *irrevocable liability is incurred or title passes within the United States*." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) (emphasis added). Under that test, "a purchaser's citizenship or residency" does not matter. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (citation omitted). And the fact that an order was placed in the United States does not "establish that [the buyer] incurred irrevocable liability in the

---

[17] The rest of Count I alleges as an "alternative" theory that Binance.com should have registered with the CFTC as an FBOT. Compl. ¶ 191. The provisions cited there, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3, concern registration of foreign entities that meet certain criteria that do not apply here. *See infra* Part III.A.

United States." *Id.* This "domestic transaction" analysis has been extended to actions brought under Section 22 of the CEA. *See Loginovskaya*, 764 F.3d at 273 (holding that "the transaction at issue—the conduct underlying the [Section 22 claim]—must have occurred within the United States"). The Second Circuit has confirmed that a commodity futures transaction occurs—and irrevocable liability is incurred—where the trades are "matched," forming a binding contract. *Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67-68 (2d Cir. 2018).

Here, the CFTC has failed to allege that transactions on Binance.com were "domestic," as it has not alleged that the relevant trades matched in the United States, *see Choi*, 890 F.3d at 67, or that "irrevocable liability" was incurred here, *see Absolute Activist*, 677 F.3d at 67; *City of Pontiac*, 752 F.3d at 181. Nor does the complaint allege where Binance.com servers are located, what any purchase agreements or terms of service state about the place where a contract is formed, where title passes, or any other information that might permit an inference that the transactions at issue were domestic.

At most, the CFTC asserts that U.S. customers placed orders on Binance.com, *see, e.g.*, Compl. ¶¶ 45, 143, 146, or allegedly comprised a certain percentage of the Foreign Binance Entities' revenue, *id.* ¶¶ 1, 45, 137-38. But a transaction is not domestic just because an order is placed by a customer in the United States. *See City of Pontiac*, 752 F.3d at 181. That is decidedly not the right standard, as the "conduct and effects test" has been replaced by the transactional test adopted in *Morrison*. *See, e.g.*, *Absolute Activist*, 677 F.3d at 70 ("[A]llegations that the Funds were heavily marketed in the United States and that United States investors were harmed by the defendants' actions, while potentially satisfying the now-defunct conduct and effects test . . . , do not satisfy the transactional test announced in *Morrison*." (citing *Morrison*, 547 F.3d at 171)); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *26 (S.D.N.Y. Sept. 20,

2016) (rejecting argument that transactions were domestic when the alleged conduct occurred on "foreign exchanges that are made available to American investors through electronic trading platforms accessible on the Internet"); *see also Sullivan v. Barclays PLC*, 2017 WL 685570, at *29 (S.D.N.Y. Feb. 21, 2017) (futures transactions alleged to have been placed on a company's "terminals located in the United States" were not deemed to be domestic transactions absent allegations "concerning the location of the transactions themselves or the structure of [the company's] transactions"). The complaint thus fails to plead domestic transactions and Counts I through IV must be dismissed in whole or in part as impermissibly extraterritorial.

Further, the CFTC must also allege "domestic—not extraterritorial—*conduct* by Defendants that is violative of a substantive provision." *Prime Int'l*, 937 F.3d at 105; *see Abitron*, 2023 WL 4239255, at *6. Thus, even if the transactions were domestic, which they are not, the CFTC still must allege that the defendants engaged in conduct in the United States that violated the substantive provisions of the CEA at issue. But the CFTC fails to assert that any defendants engaged in domestic conduct relevant to the CEA's focus. The complaint alleges only that "Binance" employees communicated with customers in the United States (from an unspecified location). Compl. ¶¶ 6, 55, 167. That does not show a violation and does not make the conduct at issue domestic. *Cf. Prime Int'l*, 937 F.3d at 106 ("the mere fact that . . . 'some' domestic activity [] is involved" does not "rebut the presumption against extraterritoriality" (citation omitted)).

**Counts V & VI:** The CFTC also fails to satisfy the focus test as to Counts V and VI. The "focus" of the regulatory provisions underlying those counts—17 C.F.R. §§ 42.2, 166.3—is on recordkeeping and other aspects of regulatory compliance.[18] Regulation 166.3 requires a company to "diligently supervise" its "partners, officers, employees and agents" related to "its business as a

---

[18] To the extent that those regulations are also transaction focused, the CFTC fails to allege a domestic application for the same reasons noted above.

Commission registrant." 17 C.F.R. § 166.3. Regulation 42.2 requires FCMs to have customer information programs pursuant to the Bank Secrecy Act. *Id.* § 42.2. Both are concerned with "market integrity" and sound governance more generally rather than "the geographical coordinates of the transaction." *Prime Int'l*, 937 F.3d at 107.

The CFTC does not allege any domestic administrative conduct (or misconduct), as it must under controlling law. *See Abitron*, 2023 WL 4239255, at *6. While the complaint contains numerous allegations about things that the defendants did or failed to do, it does not allege that they—or any other senior management—undertook any of those activities in the United States. The CFTC therefore fails to allege that Counts V and VI involve domestic conduct implicating the "focus" of the respective regulations.

### C. Counts II-IV Fail to Allege a "Direct and Significant Connection with Activities in, or Effect on, Commerce of the United States"

Any swaps-based claims in the complaint must be analyzed under Section 2(i)'s "direct and significant connection" test for extraterritorial application. 7 U.S.C. § 2(i). The complaint does not meet this test. Thus, to the extent they involve swaps, the claims in Counts II-IV must be dismissed as impermissibly extraterritorial.[19]

---

[19] The only purported "swaps" identified in the complaint are Binance.com's "perpetual" contracts. Compl. ¶¶ 62-63. But based on the CFTC's own allegations, these products are a type of futures contract, *id.* ¶¶ 68, 213, and futures are excluded from the definition of "swap" under the CEA, *see* 7 U.S.C. § 1a(47)(B)(i) ("The term 'swap' does not include . . . any contract of sale of a commodity for future delivery . . . ."). Specifically, the CFTC states that a trader in a perpetual contract closes a position "by entering into an offsetting transaction, at which time the trade settles in whatever digital asset the customer use[d] to collateralize their trading." Compl. ¶ 62. This description aligns with how courts have described conventional futures contracts. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173-74 (2d Cir. 2013) ("A commodities futures contract is an executory contract for the sale of a commodity executed at a specific point in time with delivery of the commodity postponed to a future date. . . . It is the rare case when buyers and sellers settle their obligations under futures contracts by actually delivering the commodity[;] . . . sometime before delivery is due, they offset or liquidate their positions by entering the market again and purchasing an equal number of opposite contracts . . . . In this way their obligations under the original liquidating contracts offset each other." (quoting *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 24 (2d Cir. 1985)). The CFTC thus has not alleged any "swaps" that could trigger Section 2(i).

-22-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

Even crediting the CFTC's conclusory allegations of "swaps," the only counts that could be read to involve "swaps" are Counts II, III, and IV. For these counts, however, the CFTC fails to allege a "direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1). Conduct is "direct and significant" under Section 2(i)(1) only if it poses " 'systemic risks' to the U.S. financial system." *CFTC v. Gorman*, 2023 WL 2632111, at *9 n.9 (S.D.N.Y. Mar. 24, 2023) (citation omitted). Or, as the CFTC itself has stated, the provision addresses acts that "result in or contribute to substantial losses to U.S. persons and threaten the financial stability of the entire U.S. financial system." Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45,292, 45,295 (July 26, 2013). This view from the CFTC's prior guidance makes sense—the term "direct," as used by Congress to define the contours of extraterritorial reach, means that one thing must follow another as an "immediate consequence." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 618 (1992) (interpreting provision of Foreign Sovereign Immunities Act permitting regulation "outside the territory of the United States" if an activity "causes a direct effect" (citation omitted)). The connection must also be significant, meaning that it must be sizable or of sufficient import. *See* Significant, American Heritage Dictionary 768 (5th ed. 2012) ("Having a major effect; important"); Significant, Black's Law Dictionary 1369 (10th ed. 2015) ("Of special importance; momentous").

The complaint fails to allege that the activities at issue pose any risk to the stability of the American economy, much less a systemic one. There are no allegations that tie any trading on Binance.com to risks to the U.S. financial system, like "during the 2008 Financial Crisis, where foreign affiliates of U.S. institutions engaged in risky swap trades" that led to the collapse. *Gorman*, 2023 WL 2632111, at *9 n.9. Again, while the complaint alleges that "U.S. customers" entered orders on Binance.com and accounted for a certain portion of the Foreign Binance Entities'

revenue, the complaint does not even allege that those "U.S. customers" suffered any harm. This does not meet Section 2(i)'s high direct-and-significant bar.

The fact that some employees allegedly communicated with "U.S. customers" regarding orders does not change the calculus. The complaint does not allege, for example, that the defendants' conduct changed prices in the United States or otherwise had "widespread" influence on the market or market participants. *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 859 (7th Cir. 2012) (en banc). As noted above, there are no allegations that suggest that any contract was formed in the United States or that obligations had to be performed in the United States. *See Weltover*, 504 U.S. at 618-19 (changing the bonds' maturity date had a direct effect in the United States because New York was the place of performance). Interpreting Section 2(i)(1) to apply whenever a foreign company has U.S.-based customers who engage with company personnel on occasion would significantly broaden the CFTC's reach beyond what Congress intended, permitting an administrative agency to "interfere[ ] with the sovereign authority of other nations." *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).

Moreover, importantly, the CFTC's vague assertions that there were "U.S. customers" on Binance.com are inconsistent with the agency's own definition of "U.S. person." The CFTC uses the term "U.S. person" to identify "those persons who, under the Commission's interpretation, could be expected to satisfy the jurisdictional nexus under section 2(i) of the CEA." Interpretive Guidance, 78 Fed. Reg. at 45,301; *see also* Cross-Border Application of the Registration Thresholds, 85 Fed. Reg. at 56,931-32. For that purpose, its guidance has defined "U.S. person" to include, in relevant part, a "natural person who is a resident of the United States," corporate entities that are either "organized or incorporated under the laws of a state or other jurisdiction in the United States or hav[e] [their] principal place of business in the United States," and "any legal

entity (other than a limited liability company, limited liability partnership or similar entity where all of the owners of the entity have limited liability) that is directly or indirectly majority-owned by one or more [U.S. persons] and in which such person(s) bears unlimited responsibility for the obligation and liabilities of the legal entity."  Interpretive Guidance, 78 Fed. Reg. at 45,316-17. Similarly, for certain swaps-related registration requirements, the CFTC has a regulation that defines "U.S. person" even more narrowly as a "natural person resident in the United States" or a corporate entity "organized, incorporated, or established under the laws of the United States or having its principal place of business in the United States."  17 C.F.R. § 23.23(a)(23)(i)(A), (B).[20]

In the complaint, however, the CFTC abandons its own defined term "U.S. person" and instead refers generally to "U.S. customers" or "customers located in the United States."  *See, e.g.*, Compl. ¶¶ 3, 6, 76, 123.  Accordingly, the complaint does not allege that any "U.S. person" transacted on Binance.com.  Indeed, the complaint rarely identifies whether the supposed "U.S. customer" is a natural or corporate person, though that fact matters in determining whether a customer is a "U.S. person" under both the agency's guidance and its regulation.  *See* Interpretive Guidance, 78 Fed. Reg. at 45,316; 17 C.F.R. § 23.23(a)(23)(i)(A), (B).  And in many instances, *see, e.g.*, Compl. ¶¶ 3, 6, 72, 76, 95, the complaint does not allege customers' residence or place of incorporation—facts essential to determining the existence of a "U.S. person."  *See* Interpretive Guidance, 78 Fed. Reg. at 45,316; 17 C.F.R. § 23.23(a)(23)(i)(A), (B).

The CFTC also relies on transactions by companies that it admits are foreign entities.  In

---

[20] While 17 C.F.R. § 23.23 is not directly at issue here, the CFTC itself "intended" that regulation's definition of "U.S. person" "to identify persons whose activities have a significant nexus to the United States."  Cross-Border Application of the Registration Thresholds, 85 Fed. Reg. at 56,933.  The regulation narrowed the definition of "U.S. person" even further by eliminating entities that are simply majority U.S.-owned.  *See id.* at 56,935-36 (noting the CFTC "has determined that the majority-ownership test should not be included in the definition of 'U.S. person'").  The CFTC's own definition of "U.S. person" has thus always been carefully circumscribed.

order to claim those transactions are domestic, the CFTC asserts that their U.S.-based affiliates are the "real economic party." For example, the complaint insists that "Trading Firm C . . . ha[s] been the real economic party to [its] trading activity on Binance at all times, regardless of whether it traded through accounts held by wholly-owned corporate subsidiaries or an off-shore nominee company." Compl. ¶ 182; *see also id.* ¶ 153 (similar as to Trading Firm A); *id.* ¶ 176 (similar as to Trading Firm B). But this "real economic party" theory finds no support in any statute, regulation, guidance, or case law.

Indeed, the complaint's "real economic party" theory itself ignores the CFTC's definition of "U.S. person." The complaint alleges that Trading Firms A, B, and C are incorporated in the United States. Compl. ¶¶ 150, 162, 177. But it attributes to those firms transactions undertaken by separate legal entities that are undisputedly *not* "organized or incorporated" in the United States, *do not* "hav[e] [their] principal place of business in the United States," and *are* "entit[ies] where all of the owners of the entity have limited liability." Interpretive Guidance, 78 Fed. Reg. at 45,316-17; *see also* 17 C.F.R. § 23.23(a)(23)(i)(B). For example, the CFTC admits that any trades purportedly connected with Trading Firm C were actually made by a subsidiary incorporated in Singapore or a nominee incorporated in the Cayman Islands. Compl. ¶ 183; *see also id.* ¶ 156 (similar allegations about Trading Firm A and a Cayman Islands-incorporated subsidiary); *id.* ¶ 171 (similar allegations about Trading Firm B and a Jersey company). Under the CFTC's own definition, the complaint's allegations about Trading Firms A, B, and C cannot justify its assertion of regulatory authority over the defendants.

Similarly, the CFTC notes that the transactions supposedly connected with Trading Firms A, B, and C were conducted through algorithms allegedly developed in the United States. Compl. ¶¶ 152, 163, 179. But neither the CFTC's interpretive guidance nor its regulation so much as

*mentions* algorithms, much less makes the location in which they are developed a pertinent consideration in determining the scope of Section 2(i). *See* Interpretive Guidance, 78 Fed. Reg. at 45,316; 17 C.F.R. § 23.23(a)(23)(i)(A), (B). The CFTC's attempt to expand its jurisdictional reach to trading firms that use U.S. computer programmers is contrary to its own interpretive guidance and is a clear instance of the complaint's regulatory overreach.[21]

Because the CEA and its regulations do not reach the defendants' alleged conduct, any swaps-related allegations under Counts II, III, and IV should also be dismissed.

## III. COUNTS I, III, V, AND VI SUFFER FROM ADDITIONAL PLEADING FAILURES

In addition to the lack of personal jurisdiction and impermissible extraterritoriality, several of the CFTC's claims suffer from additional pleading deficiencies that independently warrant dismissal. The complaint does not properly apply the CFTC's regulatory framework to the Binance.com crypto exchange. Instead, the CFTC relies on overreaching and internally inconsistent theories that stretch the registration provisions beyond their legal authority.

### A. The Unregistered Board of Trade Claim in Count I Fails

Count I alleges that the defendants violated 7 U.S.C. § 6(a) or, in the alternative, 7 U.S.C. § 6(b) and Regulation 48.3. Both versions of this claim should be dismissed: the CFTC does not allege that any of the Foreign Binance Entities operated a domestic "board of trade," rendering Section 6(a) inapplicable; nor does the CFTC allege that they provided an "explicit grant of

---

[21] Throughout the complaint, the CFTC alleges that each act in violation of the CEA or its regulations "is alleged as a separate and distinct violation." Compl. ¶¶ 192, 199, 206, 214, 221, 227, 233. If that is true, each act requires a separate application of the relevant statute or regulation—and therefore its own extraterritorial analysis. The CFTC may attempt to blur this inquiry by focusing on the connection to the United States of the sum of the defendants' activities. While even that approach does not help the CFTC in this case, it still wrongly frames the question. Under that broad view, an act could—on its own, "separate[ly] and distinct[ly]"—violate the CEA or its regulations even if that act does not by itself satisfy the statute's "direct and significant" test. That would contravene Congress's clear direction that the CEA may apply abroad only in limited instances.

authority" to participants in the United States to "enter trades directly into the trade matching system," as necessary to show operation as a "foreign board of trade" under Section 6(b).

*First*, Section 6(a) applies only to *domestic* boards of trade, which the Foreign Binance Entities are not alleged to operate. To the contrary, the CFTC alleges that Binance.com launched and operated abroad and that the Foreign Binance Entities are incorporated outside the United States. Compl. ¶¶ 14-17. *See First Commodity Corp. of Bos. v. CFTC,* 676 F.2d 1, 5 n.6 (1st Cir. 1982) ("[I]t is reasonable to assume . . . that the Commission's power to designate a board of trade as a 'contract market' [under § 6(a)] is limited to domestic boards of trade."); *see also* Commodities or Commodity Futures Contracts; Leverage Contracts for Gold and Silver; Domestic Sales of Foreign Futures Contracts, 40 Fed. Reg. 18,187, 18,188 (Apr. 25, 1975) ("7 U.S.C. 6[a] refers to boards of trade located in the United States.").[22]

*Second*, the CFTC's claim under Section 6(b) fails because it does not plead the necessary requirements of the statutory definition for an FBOT. Section 6(b) requires registration "for a foreign board of trade that provides the members of the foreign board of trade or other participants located in the United States with direct access to the electronic trading and order matching system of the foreign board of trade[.]" 7 U.S.C. § 6(b)(1)(A); *see also* 17 C.F.R. § 48.3. The CFTC parrots this language in its complaint, *see* Compl. ¶ 191, but it ignores the next line of the statute, which makes clear that "direct access" has a specific meaning not applicable here: "For purposes of this paragraph, 'direct access' refers to an explicit grant of authority by a foreign board of trade to an identified member or other participant located in the United States to enter trades directly into the trade matching system of the foreign board of trade." 7 U.S.C. § 6(b)(1)(A); *see also* 17

---

[22] Insofar as the CFTC's claim under Section 6(a) purports to charge the defendants with offering futures products that should have been traded on a registered DCM, such claim fails on extraterritoriality grounds because the complaint alleges no domestic transactions. *See supra* Part II.B.

-28-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

C.F.R. § 48.2(c).  The complaint does not allege that the Foreign Binance Entities provided an "explicit grant of authority" to a member or other participant in the United States.  To the contrary, the complaint acknowledges that Binance.com's Terms of Use have provided since at least June 2019 that the platform does *not* provide services to U.S. persons.  Compl. ¶ 93.  At most, the complaint alleges that the Foreign Binance Entities knew about or enabled users circumventing the platform's restrictions, but that is not an "explicit grant of authority" to trade.  *See Singer v. Sunbeam Prod., Inc.*, 2015 WL 4555188, at *3 (N.D. Ill. July 28, 2015) (interpreting the word "explicit" under an Illinois statute as meaning "not implied or conveyed by implication; distinctly stated; plain in language; clear; not ambiguous; express; unequivocal").  And to the extent the complaint focuses on particular customers, it fails to allege adequately that they are "located in the United States," or that any U.S. customers—as opposed to their foreign affiliates—entered trades "*directly* into the trade matching system of" Binance.com.  *See supra* Part II.C.  Thus, the complaint does not state a claim for violating the narrow registration provision for FBOTs.

Of all the claims in the complaint, the CFTC's allegation that the Foreign Binance Entities should have registered as an FBOT may seem to have the most appeal, since the relevant provisions at least concern foreign entities.  *See* 7 U.S.C. § 6(b); 17 C.F.R. § 48.3.  But the CFTC's drive to apply one of its registration categories to the Foreign Binance Entities does not excuse the complaint's failure to allege the basic requirements for this category.  Should the CFTC wish to expand the scope of the FBOT category, its recourse lies with Congress or in its own rulemaking authority (to the extent consistent with the CEA provision).  It cannot ignore the language of existing provisions or stretch them to apply when they do not.

**B. Counts III, V, and VI Fail Because the Complaint Does Not Establish that the Foreign Binance Entities Acted as an FCM**

The CFTC has not established that any Foreign Binance Entity falls within the statutory definition of an FCM. An FCM is a business that, among other requirements, is either (1) "[e]ngaged in soliciting or in accepting orders for" transactions in certain enumerated types of instruments, *i.e.*, an intermediary between customers and a derivatives exchange; or (2) "acting as a counterparty" in one particular type of instrument, retail commodity transactions as described in Section 2(c)(2)(C)(i) or Section 2(c)(2)(D)(i) of the CEA, which are spot purchases on a leveraged or margined basis. 7 U.S.C. § 1a(28)(A)(i)(I)(aa), (bb). The complaint fails to allege that the Foreign Binance Entities meet either prong of this definition, because it does not allege that Binance.com had an intermediary role, nor that it acted as a counterparty to customers in retail commodity transactions.

*First*, the complaint does not allege that the Foreign Binance Entities "[e]ngaged in soliciting or in accepting orders," *see* 7 U.S.C. § 1a(28)(A)(i)(I)(aa)—that is, that the Foreign Binance Entities traded on behalf of customers and acted as an intermediary between customers and a derivatives exchange. Rather, the complaint consistently alleges that Binance.com is a centralized, direct-access trading platform. In alleging conclusorily that the Foreign Binance Entities acted as an FCM by "engaging in soliciting and accepting orders," Compl. ¶ 204, the CFTC ignores its own definition of "order." Under CFTC regulations, an "order" is "an *instruction* or *authorization* provided by a customer to a futures commission merchant . . . regarding trading . . . *on behalf of the customer*." 17 C.F.R. § 1.3 (emphasis added). Thus, to be "engaged in soliciting or in accepting orders," 7 U.S.C. § 1a(28)(A)(i)(I)(aa), a corporation must solicit or accept "instruction or authorization . . . regarding trading . . . on behalf of the customer." 17 C.F.R. § 1.3. But the complaint is devoid of any allegations that the Foreign Binance Entities accepted or

solicited instructions or authorization from a customer to trade on behalf of the customer.

Consistent with the regulatory definition of "order," courts have long considered FCMs to be trading intermediaries. *See, e.g.*, *Grede v. FCStone, LLC*, 867 F.3d 767, 771 (7th Cir. 2017) ("FCMs act as financial intermediaries between investors and futures markets."). The CFTC too has recognized that FCMs are intermediaries. *See, e.g.*, Financial Surveillance Examination Program Requirements for Self-Regulatory Organizations, 84 Fed. Reg. 12,882, 12,883 (Apr. 3, 2019) ("FCMs are market intermediaries, standing between customers trading futures and swaps transactions on one side and designated contract markets ('DCMs'), swap execution facilities, and derivatives clearing organizations ('DCOs') on the other side."). In fact, the CFTC's website specifically lists the FCM registration category on its "Intermediaries" page, and distinguishes those intermediaries from "Trading Organizations," which include DCMs and SEFs.[23]

Rather than allege that Binance.com is an intermediary taking instructions from customers to trade on their behalf, the CFTC alleges that Binance.com is the place trading occurs: its "core offering is to act as a centralized trading platform at which market participants (*i.e.*, customers) may transact in digital assets or digital asset derivatives by transmitting orders to buy or sell into what Binance calls order books," which "execute transactions based generally on price-time priority pursuant to non-discretionary order matching technology." Compl. ¶ 42; *see also id.* ¶ 40 ("Binance is a centralized, web-based . . . 'platform' that has offered trading").

These allegations do not plausibly allege that any Foreign Binance Entity acted as an FCM under the statutory definition. If anything, they describe a direct-access exchange, which, if required to register with the CFTC at all, would register as a DCM, SEF, or FBOT. *Compare In*

---

[23] *Compare* CFTC, *Intermediaries*, bit.ly/3KdM9TK (last visited July 27, 2023), *with* CFTC, *Trading Organizations*, bit.ly/3rLoTpT (last visited July 27, 2023). The "Intermediaries" page further defines an "intermediary" as a "person who acts *on behalf of* another person in connection with futures, swaps, or options trading." *Intermediaries*, bit.ly/3KdM9TK (emphasis added).

*re Blockratize, Inc. d/b/a Polymarket.com*, CFTC Dkt. No. 22-09, at 3-4 (Jan. 3, 2022) (charging Polymarket.com for failure to register as a DCM or SEF, but not as an FCM, based on allegations that it was "an online trading platform" whose "website allows market participants to select" a contract and "transmit an order"), *with In re XBT Corp. SARL d/b/a First Global Credit*, CFTC Dkt. No. 20-04, at 2-3 (Oct. 31, 2019) (finding online platform failed to register as an FCM when it solicited or accepted orders for trading in contracts *on a registered exchange*).[24]  Tellingly, no direct-access derivatives exchange that has registered with the CFTC in recent years has done so as an FCM.[25]  And no FBOT—which, as discussed *supra*, has an inherent direct access component—has ever registered with the CFTC as an FCM.[26]

---

[24] The only adjudicated decision ever to consider allegations that a direct-access exchange is an FCM is inapposite, as it was decided under a substantially lower criminal pleading standard.  In *United States v. Reed*, No. 20-cr-500 (S.D.N.Y. Feb. 28, 2022), Dkt. No. 291, the defendants were charged with violations of the Bank Secrecy Act, which allegedly applied to their cryptocurrency platform as an FCM.  The district court denied a motion to dismiss the indictment for lack of fair notice, accepting as true the indictment's conclusory allegation that the platform was an FCM, which simply parroted the statutory definition that the trading platform "solicits and accepts orders" for futures contracts.  *Id.* at 2-3, 7.  However, the pleading standard applicable in *Reed* required only that the indictment "contain[ ] the elements of the offense charged." *United States v. Smith*, 985 F. Supp. 2d 547, 561-62 (S.D.N.Y. 2014) (citation omitted) ("It bears recalling that [the Second Circuit has] consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (alteration in original) (citation omitted)).  Here, by contrast, under *Iqbal*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  556 U.S. at 678.  Accordingly, the CFTC's conclusory allegations that the Foreign Binance Entities "engag[e] in soliciting and accepting orders," Compl. ¶ 204, fall short of the CFTC's pleading burden.  As explained above, the CFTC's own allegations of how Binance's platform operates show that the Foreign Binance Entities do not solicit or accept "orders" within the meaning of the CEA (*i.e.*, instructions or authorizations to trade on behalf of customers), but rather that Binance.com is a centralized platform for direct trading by customers.

[25] *See, e.g.*, Order of Designation, *In re Application of KalshiEX LLC for Designation as a Contract Market* (CFTC Nov. 3, 2020), bit.ly/3QdpF9o; Order of Designation, *In re Application of LedgerX LLC for Designation as a Contract Market* (CFTC June 24, 2019), bit.ly/3rJ8cv6; Order of Designation, *In re Application of HedgeStreet, Inc. for Designation as a Contract Market* (CFTC Feb. 18, 2004), bit.ly/3KfFHf3.

[26] *Compare* CFTC, *Foreign Boards of Trade (FBOT)*, bit.ly/3DvmdiM (last visited July 27, 2023) (listing all registered FBOTs), *with* National Futures Association, *Basic*, bit.ly/3Ocb8rw (last visited July 27, 2023) (searches for registered FBOTs show no FCM registrations).

There is good reason for this lack of precedent: the CFTC cannot take a scattershot approach and assert that the business model of Binance.com was both an FCM (*i.e.*, an intermediary) and a SEF/DCM/FBOT (*i.e.*, a trading platform). The CEA's regulatory structure imposes different—and sometimes incompatible—requirements on FCMs and on FBOTs, DCMs, and SEFs. *See* Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken), CFTC (Sept. 28, 2021), bit.ly/3q3aIvE (explaining that it "would be unprecedented for an entity to register as both a DCM and an FCM," and "it is incumbent upon the Commission to explain in a transparent manner the relevant legal requirements for such an entity that seeks to register as an FCM").[27] As one example, DCMs and SEFs are self-regulatory organizations that must establish and enforce rules to regulate their members, *including FCMs*, which are not self-regulatory organizations. *See, e.g.*, 17 C.F.R. § 37.200 (SEFs); *id.* § 38.150 (DCMs). A CFTC request for public comment just last month highlighted that there is no precedent, and it would make no sense, for the same entity to be both the regulator and the entity being regulated. *See* Request for Comment on the Impact of Affiliations on Certain CFTC-Regulated Entities, CFTC (June 27, 2023), bit.ly/3DvMAoQ (seeking public comment on nearly forty questions about how to address regulatory ambiguities). Such regulatory incompatibilities belie the CFTC's assertion that the Foreign Binance Entities should have—or could have—simultaneously registered as both an FCM and a DCM or SEF.[28] The CFTC thus cannot establish that the Foreign Binance Entities fit within the first prong of the FCM definition describing an intermediary.

---

[27] Although the CFTC settlement order in *Kraken* labeled the business at issue an FCM, it did not include an inconsistent charge of being a DCM, SEF, or FBOT, as the CFTC's kitchen-sink approach does here. *See In re Payward Ventures, Inc. (d/b/a Kraken)*, CFTC Dkt. No. 21-20, at 2-4 (Sept. 28, 2021).

[28] To the extent the CFTC has alleged that the Foreign Binance Entities acted as a DCM or SEF, such allegations are impermissibly extraterritorial. *See supra* Part II.B-C.

*Second*, the CFTC's allegations also do not satisfy the narrow alternative prong for "acting as a counterparty" in retail commodity transactions. 7 U.S.C. § 1a(28)(A)(i)(I)(bb). As alleged in the complaint, "retail commodity transactions" are a specific type of transaction: "commodity transactions that are entered into with, or offered to persons that are not eligible contract participants 'on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.'" Compl. ¶ 30 (quoting 7 U.S.C. § 2(c)(2)(D)(i)). While the CFTC conclusorily alleges that Binance.com acted as a "counterparty" in trades against its customers, *see* Compl. ¶¶ 43, 59, *none* of its allegations specify that Binance.com was a "counterparty" to customers *in retail commodity transactions*. The CFTC's one-off allegation reciting the statutory definition of retail commodity transactions falls short. *Compare* Compl. ¶ 189 ("Binance's retail commodity transactions are and were offered, entered into on a leveraged or margined basis, or are and were financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."), *with Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action . . . do not suffice"). This path to establishing an FCM registration requirement is thus foreclosed as well.[29]

Relatedly, Counts V and VI fail along with Count III, because FCM is the only registration category alleged in the complaint for which the regulations at issue in those counts apply. *See* Compl. ¶ 220 (alleging violation of 17 C.F.R. § 166.3); *id.* ¶ 229 (alleging violation of 17 C.F.R. § 42.2); *see also* 17 C.F.R. § 1.3 (defining "registrant" to include FCM but no other registration categories alleged against the defendants in this case). As the complaint does not establish that the Foreign Binance Entities acted as an FCM, these claims fail too.

---

[29] Moreover, because retail commodity transactions are excluded from the definition of swaps, *see* 7 U.S.C. § 1a(47)(A), and are treated as if they are futures contracts under 7 U.S.C. § 2(c)(2)(D)(iii), this prong of the FCM definition does not involve swaps and does not fall within 7 U.S.C. § 2(i). Therefore, it has no extraterritorial application. *See supra* Part II.A.

## IV.  THE CFTC'S NOVEL ANTI-EVASION CHARGE SHOULD BE DISMISSED

Count VII broadly alleges that the defendants violated CFTC Rule 1.6, 17 C.F.R. § 1.6, by "conducting activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade provisions of the Act and its Regulations."  Compl. ¶ 232.  But this broad application of Rule 1.6—the CFTC's very first charge ever brought under this provision—must be rejected for failure to state a claim.  Rule 1.6 reaches only swaps-related activities.  To the extent the complaint alleges swaps at all, it fails to identify any relevant provisions of the Act or regulations that the defendants allegedly evaded, focusing instead on the purported evasion of Binance.com's own "access controls."  Compl. ¶ 3; *see id.* ¶¶ 6, 116.  Even if true, that conduct would not violate Rule 1.6.

Rule 1.6 makes it "unlawful to conduct activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade any provision of the [CEA] *as enacted by Subtitle A of the Wall Street Transparency and Accountability Act of 2010 or the rules, regulations, and orders of the Commission promulgated thereunder (Subtitle A)*."  17 C.F.R. § 1.6(a) (emphasis added).  By its terms, then, the rule reaches only activities undertaken to evade the provisions of Subtitle A of the 2010 Act, which added swaps-market regulation to the CFTC's portfolio.  *See* Interpretive Guidance, 78 Fed. Reg. at 45,293 (the 2010 Act "amended the CEA to establish a new regulatory framework for swaps").  Indeed, the statutory provision that gave the CFTC authority to promulgate Regulation 1.6—7 U.S.C. § 2(i)(2)—only authorizes the CFTC to adopt regulations "to prevent the evasion of any provision" that "relat[es] to swaps" and was "enacted by [the 2010 Act]."[30]  To the extent the complaint fails to identify any swaps in connection with this count, the

---

[30] *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,298-99 (Aug. 13,

-35-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887

Rule 1.6 claim fails because it can only apply to swaps-related activities.

Even if the complaint does allege swaps, it fails to allege any conduct by the defendants that "evade[d] or attempt[ed] to evade" any swaps provisions or regulations enacted by or promulgated under the 2010 Act. 17 C.F.R. § 1.6(a).[31] Indeed, the complaint does not identify (1) any swaps rules or regulations that the defendants allegedly evaded, or (2) any relevant evasive conduct. *See* Compl. ¶ 232 (cursory allegation that the defendants attempted to evade "provisions of the Act and its Regulations"). The only allegations that can be said to pertain to evasion at all concern "help[ing] customers evade Binance's access controls," *id.* ¶ 3; *see, e.g.*, ¶¶ 6, 116, 123, and not any swaps rules or regulations. The complaint's conclusory allegations are untethered to any of the swaps-related provisions enacted by the 2010 Act. This alone warrants dismissal.

Further, to the extent the anti-evasion claim is predicated on any alleged attempt to evade registration requirements, such a claim should be dismissed as duplicative of the failure to register claims themselves. Similar anti-evasion provisions contained in the Internal Revenue Code ("IRC") and the Bank Secrecy Act ("BSA"), which the CFTC considered when "developing its interpretation" of the CEA's anti-evasion provision, *see* Further Definition of "Swap," 77 Fed. Reg. at 48,301, confirm this understanding. Anti-evasion claims brought under the IRC, for example, require that the defendant take an "affirmative step to 'evade or defeat' his tax obligations" beyond simply failing to file a tax return. *United States v. Collins*, 685 F.3d 651, 656

---

2012) (acknowledging that Section 2(i) provides the statutory basis for the regulation). An agency "'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) (citation omitted).

[31] Here, the Court should apply Fed. R. Civ. P. 9(b)'s heightened pleading standard. While there is no precedent addressing the pleading standard applicable to claims under Regulation 1.6, courts have applied Rule 9(b) under analogous circumstances. *See, e.g., Bd. of Trs. of Auto. Mechs.' Loc. No. 701 Union & Indus. Pension Fund v. Joyce*, 2015 U.S. Dist. LEXIS 53800, at *6 (N.D. Ill. Apr. 24, 2015) ("Evade and avoid claims [under ERISA] are subject to the heightened pleading standard for fraud claims set forth in Rule 9(b)."). Regardless, the complaint fails to adequately allege willful evasive conduct under either any pleading standard.

(7th Cir. 2012) (citation omitted). Similarly, structuring claims brought under the BSA's anti-evasion provision require deliberately structuring a transaction to avoid obligations under the BSA. *See United States v. Jarrett*, 494 F. App'x 615, 618 (7th Cir. 2012) (violation of 31 U.S.C. § 5324(a)(1) requires proof that defendant "structured his transactions" to evade reporting obligations). In other words, the CFTC must do more than allege that the defendants violated the underlying CEA registration requirements pertaining to swaps; it must specify affirmative activities designed to evade those specific regulations, and it has failed to do so.

Finally, and particularly in regard to Mr. Zhao, the CFTC also falls short of pleading the required willfulness for this claim. The adopting release for Rule 1.6 explains that a person acts willfully when they act "intentionally or with reckless disregard." Further Definition of "Swap," 77 Fed. Reg. at 48,302. The CFTC has not adequately alleged that Mr. Zhao intentionally evaded any swaps-related provisions or recklessly disregarded a known legal obligation under any such provision. At most, the complaint alleges that Mr. Zhao "has known that U.S. customers trade on the platform," Compl. ¶ 75, and has been "keenly aware of U.S. laws that apply to Binance's activities," *id.* ¶ 113. But the CFTC has not alleged that Mr. Zhao was even aware of any specific obligation under the CEA, let alone relevant "swap provisions" as enacted by Subtitle A of the 2010 Act. *Cf. Collins*, 685 F.3d at 655 (in tax evasion context, "the term 'willfully' means the voluntary and intentional violation *of a known legal duty*" (emphasis added)); *see also Ratzlaf v. United States*, 510 U.S. 135, 146-47 (1994) ("willfully" evading the reporting requirements of the BSA by structuring transactions requires "proof that the defendant knew not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report"). For all of these reasons, Count VII should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint with prejudice.

Dated: July 27, 2023

Respectfully submitted,

/s/ *Michael Celio*
Michael Celio*
Jessica Valenzuela*
**GIBSON, DUNN & CRUTCHER LLP**
310 University Avenue
Palo Alto, CA 94301
Tel: 650-849-5300
Fax: 650-849-5333

Stephanie Brooker*
M. Kendall Day*
Richard Grime*
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: 202-887-3502
Fax: 202-530-4216

Mary Beth Maloney*
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
Tel: 212-351-4000
Fax: 212-351-4035

John K. Theis (ARDC No. 6287528)
Erin P. Gasparka (ARDC No. 6320655)
**RILEY SAFER HOLMES & CANCILA LLP**
70 West Madison Street, Suite 2900
Chicago, IL 60602
Tel: 312-471-8700

*Admitted pro hac vice

*Attorneys for Binance Holdings Limited,
Binance Holdings (IE) Limited, Binance
(Services) Holdings Limited*

*/s/ Douglas K. Yatter*
Douglas K. Yatter*
Benjamin Naftalis*
Iris Xie*
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: 212-906-1200

Heather A. Waller (ARDC No. 6302537)
Kirsten C. Lee (ARDC No. 6330011)
**LATHAM & WATKINS LLP**
330 N Wabash Ave, Suite 2800
Chicago, IL 60611
Tel: 312-876-7700

*Admitted pro hac vice

*Attorneys for Changpeng Zhao*

**CERTIFICATE OF SERVICE**

I certify that on July 27, 2023, I electronically filed the foregoing brief with the Clerk of the United States District Court, Northern District of Illinois using the CM/ECF system, which sent notification of such filing to the registered CM/ECF participants.

*/s/ Michael Celio*
Michael Celio

*Attorney for Binance Holdings Limited,*
*Binance Holdings (IE) Limited, Binance*
*(Services) Holdings Limited*

-40-

BRIEF IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE
(SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS – CASE NO. 23-cv-1887