**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| Commodity Futures Trading Commission, | ) ) ) | Case Number 1:23-cv-1887 |
| Plaintiff, | ) ) |  |
| v. | ) ) | Hon. Manish Shah |
| Changpeng Zhao, Binance Holdings Limited, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited, and Samuel Lim, | ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S
CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF FACTUAL ALLEGATIONS AND CHARGES ............................... 3

    A.   Overview of Relevant Allegations. ................................................................ 3

    B.   Summary of the Claims in the Complaint. ...................................................... 7

III.    ARGUMENT ..................................................................................................... 8

    A.   Applicable Legal Standards. ......................................................................... 8

    B.   The Complaint Sufficiently Alleges All Defendants Have Violated Regulation 1.6. ...... 9

      1.   Regulation 1.6 applies to Defendants' evasive conduct. ................................ 10

      2.   Regulation 1.6 requires proof of intentional or reckless conduct. .................. 11

      3.   Binance offers swaps. .............................................................................. 12

      4.   Binance has offered swaps and futures to U.S. customers. ........................... 14

      5.   Defendants have engaged in activities constituting evasion. ........................ 19

      6.   Zhao's evasive activities. .......................................................................... 21

      7.   Lim's evasive activities. ............................................................................ 22

    C.   The Complaint Sufficiently Alleges the Court May Exercise Personal Jurisdiction Over All Defendants. ............................................................... 23

      1.   The Complaint plausibly alleges the Court has jurisdiction over the Entity Defendants. .......................................................................................... 24

      2.   The Complaint plausibly alleges the Court has jurisdiction over Zhao. .......... 29

      3.   The Complaint plausibly alleges the Court has jurisdiction over Lim. ............ 33

    D.   The Complaint Alleges Claims Arising Under Provisions of the CEA That Apply to Foreign Conduct or are Proper Domestic Applications of the Statute. ......................................................................................... 36

      1.   *Morrison*'s two-step framework. ............................................................... 36

      2.   Count I plausibly alleges that *Morrison* is satisfied because 7 U.S.C. § 6(b) explicitly applies to foreign conduct. ............................................... 36

3.    Counts II, III, and IV plausibly allege that *Morrison* is satisfied because 7 U.S.C. § 2(i) expressly applies the CEA's swaps provisions to foreign conduct ................................ 38

4.    Defendants' foreign conduct is subject to Subtitle A based on 17 C.F.R. § 1.6(c) ........ 44

5.    The alternative pleading theories in Counts I and III reflect proper domestic applications of the relevant statutory provisions. .......................................................... 44

E.    Counts V and VI Are Sufficiently Alleged to the Same Extent as Count III ................. 47

F.    The Complaint Sufficiently Alleges That Binance Has Acted as a Futures Commission Merchant Without Registration, in Violation of 7 U.S.C. § 6d(a) ................................ 47

1.    Statutory definition of the term "futures commission merchant." ................................ 48

2.    The Complaint plausibly alleges Binance meets the definition of an FCM .................. 50

IV.    CONCLUSION ............................................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412 (2023) ............................................. 46

*Anderson v. Sportmart, Inc.*, 179 F.R.D. 236 (N.D. Ind. 1998)..................................................... 35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2007) ........................................................................................... 5

*Ayala v. BWAY Corp.*, No. 17 C 4665, 2017 WL 11562406 (N.D. Ill. Aug. 31, 2017) .............. 16

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ........................................................... 38

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir. 2000) ..................................................................................................................................... 24

*Big Shoulders Capital LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560 (7th Cir. 2021) . 15

*Bilek v. Fed. Ins. Co.*, 8 F.4th 581 (7th Cir. 2021)..................................................... 31, 32, 38, 44

*Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378 (7th Cir. 2020) ........................................... 11

*C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837 (N.D. Ill. 2009) ....... 32

*Central States, Se. & Sw. Areas Pension Fund v. Reimer Exp. World Corp.*, 230 F.3d 934 (7th Cir. 2000) ..................................................................................................................................... 27

*CFTC v. HDR Global Trading Ltd.*, No. 1:20-cv-8132 (S.D.N.Y.) ............................................. 49

*CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311 (S.D. Fla. 2014) .................. 23, 24

*CFTC v. Int'l Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004) .............. 23, 25

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ....................................... 12

*CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2007 WL 2659990 (N.D. Ill. Aug. 28, 2007) ......... 23, 25

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018)....................................................... 12

*CFTC v. Monex Credit Co.*, No. 8:17-cv-1868, 2021 WL 6102524 (C.D. Cal. Oct. 28, 2021).. 24, 49

*CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371 (S.D.N.Y. 2019)................................................ 31

*CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260 (D. Kan. 2003) .................. 23, 25

*CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004) .......................................................................... 13

*Chi. Merc. Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) ..................................................... 13

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010)................................. 32

*City of Chicago v. Purdue Pharma L.P.*, No. 14-cv-4361, 2021 WL 1208971 (N.D. Ill. Mar. 31, 2021) ........................................................................................................................... 38

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) ................ 32

*Curry v. Revolution Labs., LLC*, 949 F.3d 385 (7th Cir. 2020).............................................. 9, 27

*Dick v. Conseco, Inc.*, 458 F.3d 573 (7th Cir. 2006) ............................................................. 13

*Ellis v. Fortune Seas, Ltd.*, 175 F.R.D. 308 (S.D. Ind. 1997)................................................ 9, 35

*Felland v. Clifton*, 682 F.3d 665 (7th Cir. 2012) .................................................................. 23

*Flag Co. v. Maynard*, 376 F. Supp. 2d 849 (N.D. Ill. 2005) ................................................. 26

*Flaxman v. CFTC*, 697 F.2d 782 (7th Cir. 1983) ............................................................... 1, 11

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767 (Ill. App. Ct. 2005) ..................................... 17

*Freiburger v. Timmerman*, 2016 WL 4493448 (N.D. Ill. Aug. 26, 2016)................................. 13

*FTC v. The Tax Club, Inc.*, 994 F. Supp. 2d 461 (S.D.N.Y. 2014) ......................................... 24

*Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990) .................................................... 36

*Gonzalez v. Raich*, 545 U.S. 1 (2005)................................................................................. 40

*Hertz Corp. v. Friend*, 559 U.S. 77, 92–97 (2010).............................................................. 15

*Illinois v. Hemi Grp. LLC*, 622 F.3d 754 (7th Cir. 2010) ..................................................... 28

*In re Alstom SA*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ....................................................... 17

*In re Bamaodah*, 1986 WL 68382 (CFTC Apr. 18, 1986) ..................................................... 11

*In re BlockFi Inc.*, No. 22-19361 (D.N.J.)........................................................................... 44

*In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017)................................... 32

*In re Celsius Network LLC*, No. 22-10964 (S.D.N.Y.)........................................................... 44

*In re Cinar Corp. Secs. Litig.*, 186 F. Supp. 279 (E.D.N.Y. 2002) ......................................... 33

*In re FTX Global Markets, Ltd.*, No. 22-11516 (S.D.N.Y) ..................................................... 44

*In re Genesis Global Holdco, LLC*, No. 23-10063 (S.D.N.Y.) ................................................ 44

iv

*In re Grain Land Coop.*, 2003 WL 22803511 (CFTC Nov. 25, 2003)........................................ 13

*In re Lincolnwood Commodities*, *Inc.*, 1984 WL 48104 (CFTC Jan. 31, 1984).......................... 11

*In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023)................................. 26

*In re Spiegel*, 1988 WL 232212 (CFTC Jan. 12, 1988)........................................................... 11

*In re Three Arrows Capital, Ltd.*, No. 22-10920 (S.D.N.Y.)................................................... 44

*In re Voyager Digital Ltd.*, No. 22-10944 (S.D.N.Y.)............................................................ 44

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).............................................................. 24

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ............................................................................... 11

*Levin v. Posen Found.*, 62 F. Supp. 3d 733 (N.D. Ill. 2014) ................................................ 30

*Loginovskoya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014) .............................................. 45

*Master Tech Prods., Inc. v. Smith*, 181 F. Supp. 910 (N.D. Ill. 2002) .................................. 34

*Miller v. Herman*, 600 F.3d 726 (7th Cir. 2010)................................................................... 39

*Minn-Chem, Inc. v. Agrium Inc*, 683 F.3d 845 (7th Cir. 2012) ............................................ 41

*Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719 (N.D. Ill. 2017)................................. 32

*Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859 (7th Cir. 1998)............................. 32

*Morrison v. National Australian Bank Ltd.*, 561 U.S. 247 (2010) .................................... 36, 38

*Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018)........................... 45

*Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135 (1st Cir. 2021) ............................................... 32

*NBA Props., Inc. v. Hanwjh*, 46 F.4th 614 (7th Cir. 2022).............................................. 27, 29

*Obartuch v. Meadows of Wickenburg, Inc.*, No. 18-c-280, 2019 WL 330473 (N.D. Ill. Jan. 25, 2019) .................................................................................................................................. 29

*Pable v. Chi. Transit Auth.*, No. 19-cv-7868, 2023 WL 2333414 (N.D. Ill. Mar. 2, 2023) ........ 30

*Pennoyer v. Neff*, 95 U.S. 714 (1877) .................................................................................. 23

*Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019)....................................... 45

*RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272 (7th Cir. 1997)........................................... 29

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ..................................................................... 11

*Robles v. City of Chicago*, 354 F. Supp. 3d 873 (N.D. Ill. 2019) .................................................. 26

*Saberi v. CFTC*, 488 F.3d 1207 (9th Cir. 2007) ........................................................................ 12

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)................................................................... 11

*SEC v. Benger*, No. 09-cv-676, 2009 WL 1851186 (N.D. Ill. June 29, 2009) ........................... 23

*SEC v. Binance Holdings Ltd.*, No. 1:23-cv-1599 (D.D.C.) ...................................................... 49

*SEC v. Bittrex, Inc.*, No. 2:23-cv-580 (W.D. Wash.)................................................................ 49

*SEC v. Homa*, 514 F.3d 661 (7th Cir. 2008) ............................................................................ 23

*SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021) .......................................................................... 45

*SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013) .............................................................. 24

*SEC v. Syndicated Foods Servs. Int'l, Inc.*, No. 04-cv-1303, 2010 WL 3528406 (S.D.N.Y. Sept. 3, 2010) ..................................................................................................................................... 33

*Sher v. Johnson*, 911 F.2d 1357 (9th Cir. 1990) ...................................................................... 32

*Skidmore v. Swift*, 323 U.S. 134 (1944) .................................................................................. 39

*Sloan v. Am. Brain Tumor Assoc.*, 901 F.3d 891 (7th Cir. 2018) .............................................. 8

*Stauffacher v. Bennett*, 969 F.2d 455 (7th Cir. 1992) ............................................................... 27

*Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018) ........................................................ 36, 45

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008)......................................................... 8, 14

*Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387 (7th Cir. 1983).............................. 26, 27

*uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421 (7th Cir. 2010)............................................... 24

*United States v. Collins*, 685 F.3d 651 (7th Cir. 2010)............................................................. 11

*United States v. Dish Network LLC*, 954 F.3d 970 (7th Cir. 2020)............................................ 32

*United States v. Leslie*, 103 F.3d 1093 (2d Cir. 1997).............................................................. 40

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................................. 39

*United States v. Reed*, 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022)........................................... 48

*United States v. Stephenson*, 53 F.3d 836 (7th Cir. 1995) ........................................................ 27

*United States v. Sumeru*, 449 F. App'x 617 (9th Cir. 2011)...................................................... 47

*United States v. Sutton*, 337 F.3d 792 (7th Cir. 2003) .................................................. 49

*United States v. Trudeau*, 812 F.3d 578 (7th Cir. 2016) ............................................... 11

*United States v. Vaughn*, 722 F.3d 918 (7th Cir. 2013) ................................................ 48

*United States v. Vorley*, 420 F. Supp. 3d 784 (N.D. Ill. 2019) ..................................... 19

*Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021 (N.D. Ill. 2009) .................. 26

*WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ......................... 45

*Wickard v. Filburn*, 317 U.S. 111 (1942) ...................................................................... 40

*Zurich Capital Markets, Inc. v. Cogliese*, 388 F. Supp. 2d 847 (N.D. Ill. 2004) .................. 33

**Statutes**

7 U.S.C. §§ 1–26 ............................................................................................................. 1

7 U.S.C. § 1a(18) ............................................................................................................ 4

7 U.S.C. § 1a(28)(A)(i)(I)(aa) ...................................................................................... 48

7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA) ............................................................................. 46

7 U.S.C. § 1a(28)(A)(i)(I)(bb) ................................................................................ 38, 49

7 U.S.C. § 1a(47)(A)(i) ................................................................................................ 12

7 U.S.C. § 1a(47)(A)(iii) .............................................................................................. 13

7 U.S.C. § 1a(47)(B)(i) ................................................................................................ 13

7 U.S.C. § 2(a)(1)(A), 2(c)(2)(D) .................................................................................. 4

7 U.S.C. § 2(e) ................................................................................................................ 1

7 U.S.C. § 2(i)(1) ............................................................................................... 38, 41, 42

7 U.S.C. § 2(i)(2) ............................................................................................................ 2

7 U.S.C. § 6(a) ........................................................................................................... 1, 37

7 U.S.C. § 6(b) ......................................................................................................... 10, 37

7 U.S.C. § 6(b)(1)(A) ................................................................................................... 37

7 U.S.C. § 6c(b) .............................................................................................................. 7

7 U.S.C. § 6d ................................................................................................................ 7

7 U.S.C. § 7 .................................................................................................................... 1

7 U.S.C. § 7b-3(1) ......................................................................................................... 8

7 U.S.C. § 13c(b) ........................................................................................................... 7

15 U.S.C. § 6a .............................................................................................................. 41

Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. 111-203, Title VII,
    Sections 701-720 (2010) ......................................................................................... 1

**Regulations**

17 C.F.R. § 1.6 ........................................................................................................ 9, 15

17 C.F.R. § 1.6(a) (2022) ....................................................................................... 8, 10

17 C.F.R. § 1.6(b) ........................................................................................................ 13

17 C.F.R. § 11.4(a) ...................................................................................................... 35

17 C.F.R. § 166.1(a) ...................................................................................................... 8

17 C.F.R. § 166.3 (2022) .............................................................................................. 8

17 C.F.R. § 23.23(a)(2) ............................................................................................... 16

17 C.F.R. § 23.23(a)(23)(ii) ........................................................................................ 15

17 C.F.R. § 3.4(a) ........................................................................................................ 49

17 C.F.R. § 42.2 ............................................................................................................ 5

17 C.F.R. § 42.2 (2022) ................................................................................................ 8

17 C.F.R. Part 48 ........................................................................................................ 37

17 C.F.R. Parts 1–190 (2022) ...................................................................................... 1

Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable
    to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924 (Sept. 14, 2020)..... passim

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement";
    Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule, 77 Fed. Reg.
    48,208 (Aug. 13, 2012)...................................................................................... passim

Interpretive Guidance and Policy Statements Regarding Compliance with Certain Swap
   Regulations, 78 Fed. Reg. 45,292 (July 26, 2013)........................................................... passim

# I.   INTRODUCTION

Through the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–26,[1] Congress has long prohibited the offering of certain financial derivatives unless the persons offering those products comply with applicable statutory and regulatory requirements. *See, e.g.*, 7 U.S.C. § 6(a) (futures transactions may only take place on certain venues); 7 U.S.C. § 6c(b) (options transactions must comply with CFTC regulations); 7 U.S.C. § 2(e) (retail swaps transactions may only occur on certain venues). Congress also established a registration framework that the CFTC implemented through its Regulations, 17 C.F.R. Parts 1–190 (2022), which requires persons that perform various roles in U.S. derivatives markets to register with the CFTC and comply with operational requirements designed to promote the integrity of those markets. The CEA's restrictions on offering certain financial products and related registration requirements are not technicalities. They encompass widely varying duties concerning topics such as capital adequacy, disaster preparedness, and the prevention of market manipulation. *See generally* 7 U.S.C. § 7. The CEA's registration requirements are the "kingpin" of the statute because they are the bedrock upon which rests all other regulation of the nation's derivatives markets. *See Flaxman v. CFTC*, 697 F.2d 782, 787 (7th Cir. 1983). This case is about Defendants' intentional evasion of these requirements.

The CEA's core registration and designation frameworks have existed for decades and were expanded and strengthened by Congress via Subtitle A of the Wall Street Transparency and Accountability Act of 2010 ("Subtitle A"; Platt Decl. Ex A.) A goal of Subtitle A was "to reduce systemic risk, increase transparency, and promote market integrity within the financial system."

---

[1] The CEA's section numbering sometimes but not always matches the numbering of the relevant sections of Title 7 of the U.S. Code. For the Court's reference, a conversion chart is available on the CFTC's website at https://www.cftc.gov/LawRegulation/ceaconvchart.html.

Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924, 56,925 (Sept. 14, 2020) (hereinafter "Cross-Border Application"; Platt Decl. Ex. B). As relevant to this case, Subtitle A enacted a regulatory framework applicable to swaps transactions, substantively amended the text of 7 U.S.C. § 6(b) to require foreign boards of trade ("FBOTs") that have participants located in the United States to register with the CFTC, and added 7 U.S.C § 2(i)(2), which authorizes the CFTC to "prescribe or promulgate [rules or regulations] as are necessary or appropriate to prevent the evasion of any provision of [the CEA] that was enacted by [Subtitle A]."

The Complaint, (ECF No. 1), details the many ways that Defendant Changpeng Zhao ("Zhao") and three of his companies, Defendants Binance Holdings Limited, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited (collectively the "Entity Defendants"), have violated the CEA, aided and abetted by Binance's former Chief Compliance Offer, Defendant Samuel Lim ("Lim"). The Entity Defendants, doing business along with dozens of other Zhao-owned corporate vehicles as a common enterprise, operate the web-based digital asset exchange that is known as "Binance." As a matter of corporate policy and strategy devised by Zhao (who is Binance's CEO), Binance purposefully tries to avoid complying with applicable U.S. laws, including the CEA. As explained by Lim, Zhao's strategy of non-compliance has been a "biz decision."

Zhao, Binance, and Lim filed motions to dismiss the Complaint. Binance and Zhao take a kitchen-sink approach with their joint motion, ("Binance Motion," ECF No. 59), contending (1) they are not subject to personal jurisdiction in the United States; (2) the CFTC's claims are impermissibly extraterritorial; (3) Binance is not a board of trade that is required to register with the CFTC; (4) Binance is not a futures commission merchant ("FCM"); and (5) Defendants

should be immune to suit under Regulation 1.6 because this is the first case in which the CFTC has charged a violation of that rule. Defendant Samuel Lim's motion to dismiss, ("Lim Motion," ECF No. 61), contends the Complaint fails to allege that Lim has sufficient jurisdictional contacts with the forum and adopts the Binance Motion's arguments concerning extraterritoriality.

None of Zhao's, Binance's, or Lim's arguments have any merit. They misunderstand the nature and scope of the CFTC's claims in this action; misstate or misapply various provisions of the CEA and CFTC Regulations; and ignore, attempt to minimize, or contradict the Complaint. The Complaint details Defendants' intentionally evasive activities in violation of Regulation 1.6(a). The Complaint plausibly alleges a prima facie case of personal jurisdiction as to each Defendant. The CFTC's claims are not impermissibly extraterritorial because they arise under provisions of the CEA that explicitly apply to foreign conduct or are sufficiently pled domestic claims. Binance has acted as an FCM without being registered as such. And Binance failed to obtain designation as a contract market or registration as a swap execution facility, even though it facilitates futures, options, and swaps transactions. Defendants' compliance with the law is long overdue. The Court should deny both motions.

## II.   SUMMARY OF FACTUAL ALLEGATIONS AND CHARGES

### A.  Overview of Relevant Allegations.

Binance (the trade name of the entities that collectively operate the Binance platform) is a web-based, centralized digital asset trading facility—and it is a big one. Binance processes over $18 billion in derivatives transactions every day as measured by notional volume, which is more than the next two largest exchanges' volumes combined.[2]  (*See* Compl. ¶ 1.)

---

[2]  These volumes are drawn from data published on the CoinMarketCap website, which is owned by Binance. *See* https://coinmarketcap.com/rankings/exchanges/derivatives/ (visited September 22, 2023 at 2:46 pm Central Time).

Consistent with Zhao's design, Binance performs numerous functions that in regulated markets are often conducted by different market participants. For example, Binance solicits and accepts orders for financial derivatives, (Compl. ¶ 2), maintains anonymous central limit order books that display its customers' orders to other market participants, (*id.* ¶ 42), facilitates, processes, and confirms derivatives transactions between its customers, (*id.* ¶ 43), custodies its customers' funds for the purpose of margining derivatives transactions, (*id.* ¶ 2), provides leverage to its customers in connection with derivatives and spot market transactions, (*id.* ¶¶ 56, 66), and transacts in its own markets, acting as counterparty to derivatives and spot market transactions with its customers, (*id.* ¶ 69).

Binance's financial derivatives include products within CFTC jurisdiction. *See, e.g.*, 7 U.S.C. §§ 2(a)(1)(A), 2(c)(2)(D). For example, Binance offers and executes derivatives contracts that have a predetermined expiration date and derivatives contracts that do not have a predetermined expiration date. (Compl. ¶¶ 60–64.) Binance also offers a product that it calls "Binance options." (*Id.* ¶¶ 58–59.) And Binance has traded against retail customers in its spot markets under circumstances in which it provides leverage to the customer. (*See id.* ¶¶ 41, 56, 57, 69–71, 189.)

Binance's customers include both eligible contract participants ("ECPs") and non-ECPs.[3] (*See id.* ¶¶ 48, 56.) Binance refers to its bigger customers, which are often ECPs or institutional market participants, as "VIPs" because those customers pay Binance a lot of fees and supply liquidity to Binance's markets. (*Id.* ¶ 48.) Binance has solicited customers from around the world, including from the United States. (*Id.* ¶¶ 1, 2, 72, 74.) However, Binance cannot lawfully

---

[3] The criteria for a person to be categorized as an ECP under the CEA, generally speaking, are that they have a liquid net worth of greater than $5 M (for natural persons) or assets in excess of $10 M (for non-natural persons). *See* 7 U.S.C. § 1a(18). Non-ECPs are sometimes referred to as retail customers and this brief refers to retail and non-ECP customers synonymously.

service U.S. customers without being registered so it has pretended not to have any, in an to attempt to feign regulatory compliance. Specifically, Binance has purported to "restrict" customers from the United States and certain other jurisdictions. Those purported efforts have been ineffective in large part because Binance intended for them to be ineffective and actively took steps to ensure they would not be effective. (*E.g.*, *id.* ¶¶ 3, 99, 103.)

The Complaint details how Binance intentionally sabotaged its own efforts to "restrict" certain customers from accessing the Binance platform by, among other methods, purporting to block internet protocol ("IP") addresses linked to certain jurisdictions while at the same time publishing a guide on its website that taught customers how to evade IP-based controls by using a virtual private network ("VPN"). (Compl. ¶¶ 115–19.) Another example of control subversion: Binance created and relied on a loophole to its onboarding processes, through which a customer did not have to submit any identity-verifying information as long as they did not withdraw assets that exceeded the value of two bitcoin in one day.[4] (*Id.* ¶¶ 91–92.) A third example: when Binance identified VIP customers as being located in the United States, it instructed and assisted—including pursuant to a set of corporate procedures devised by Zhao— the U.S. VIP customer on how to paper up "new" accounts using "offshore" nominee companies to attempt to obscure the fact that the customer was truly located in the United States. (*Id.* ¶¶ 127–31.)

Binance's intentional control subversion has been a strategic decision by Zhao, who knows that if Binance's compliance controls actually restrict U.S. customers then Binance will

---

[4] Binance's know-your-customer procedures ("KYC"), or lack thereof, are an important issue in this case for at least two reasons. First, because Binance is an FCM, 17 C.F.R. § 42.2 requires that it implement an effective anti-money laundering ("AML") program, which in turn requires effective KYC procedures. Second, Binance's corporate strategy is to avoid regulation rather than comply with it, and the only way for an enterprise like Binance to lawfully avoid CFTC jurisdiction is to actually know the true identity of its customers so it in fact restricts U.S. persons from trading on the platform.

make less money.  (*See* Compl. ¶¶ 118, 135.)  This sentiment was well-known to Lim, who in February 2020 wrote in an internal communication that Zhao believed that if Binance's compliance controls were "too stringent" then "[n]o users will come."  (*Id.* ¶ 100.)  And Zhao explained to his lieutenants in October 2020 that if Binance forced mandatory KYC (that is, required customers to submit identify-verifying information rather than allow the two BTC-no KYC loophole to persist), then it would lead to a competitive disadvantage.  (*See id.* ¶ 96.)

Contrary to its cri de coeur that the CFTC is engaged in something Binance calls "regulation by enforcement," (Binance Mot. 1), Zhao, Binance, and Lim have recognized at all relevant times that the solicitation and acceptance of U.S. customers subjected Binance to CFTC regulation.  For example, in February 2019, one of Zhao's top aides explained to Zhao that "US users, with US, non international KYC" was where Binance would "get nailed."  (Compl. ¶ 125; *see also id.* ¶ 113 (Zhao explaining the impact of "a bunch of laws in the US" that in Zhao's view are "very unreasonable").)  Similarly, Lim chatted to a colleague in October 2020:  "US users = CFTC = civil case can pay fine and settle."  (*Id.* ¶ 112.)  Because they knew that their conduct violated U.S. law, Zhao and Binance have attempted to cover their tracks by, for example, setting communications applications to automatically destroy evidence of Binance's illegal conduct, (*see id.* ¶¶ 53–55, 132, 134), and scrubbing internal Binance documents and data that reflect customers' geographic locations by ham-handedly replacing references to "US" with the code word "UNKNWN," (*id.* ¶¶ 138–40).  Demonstrating consciousness of wrongdoing, Zhao informed his management team that Binance "cannot be held accountable" for its efforts to retain U.S. customers.  (*Id.* ¶ 128.)

As the Complaint describes, Binance's climb to commercial success has been marked by opacity, misdirection, and secrecy.  Binance refuses to publicly explain where the company is

located.  (Compl. ¶ 5.)  Binance operates through a tangled thicket of corporate entities that Binance calls the "Binance operators," while at the same time failing to indicate which of those entities is the counterparty to its customer-facing Terms of Use.  (*Id.* ¶ 83.)  Binance has at all times embraced a wink-and-nod corporate ethos toward getting U.S. customers through "creative means."  (*See id.* ¶¶ 119–22.)  And Zhao, Binance, and Lim have intentionally caused the dissemination of corporate "messaging" concerning regulatory compliance that they have known does not reflect the truth.  (*See id.* ¶¶ 94, 98, 99, 101–03, 107, 128, 136.)  Binance and Zhao's fetish for secrecy and refusal to comply with regulatory requirements have made Binance a haven for dark net users, criminals, and terrorists that wish to move their assets around the globe. (*See id.* ¶¶ 104, 105.)

**B.  Summary of the Claims in the Complaint.**

Counts I–IV generally arise out of the different roles Binance plays in facilitating derivatives transactions on the Binance platform.[5]  Count I alleges that Binance violated 7 U.S.C. § 6 because it has facilitated futures transactions for U.S. persons without appropriate registration.  Count II alleges that Binance violated 7 U.S.C. § 6c(b) by facilitating illegal off-exchange commodity options transactions for U.S. persons that, as discussed below, qualify as swaps under the CEA.  Count III alleges that Binance violated 7 U.S.C. § 6d because it has acted as an FCM by soliciting and accepting orders for futures, options, and swaps from U.S. persons while custodying customer assets to margin derivatives trading activity, without required registration.  Count IV alleges Binance violated 7 U.S.C. § 7b-3(1) by facilitating swaps

---

[5]  Counts I–VI allege that Binance is directly liable, Zhao is liable for all these violations as Binance's control person, *see* 7 U.S.C. § 13c(b), and Lim is liable for all these violations for aiding and abetting Binance's violations, *id.* § 13c(a).

transactions (its perpetual contracts meet the statutory definition for swap, as charged and discussed below) without required registration.

Counts V and VI are based on Binance's violations of duties that apply to FCMs, including Binance's failure to diligently supervise its activities to ensure they comply with the law and failure to implement an effective anti-money laundering program, as required by 17 C.F.R. § 166.3 (2022) and 17 C.F.R. § 42.2 (2022), respectively.[6]

Count VII asserts that all Defendants violated 17 C.F.R. § 1.6(a) (2022) by conducting activities for the purpose of evading provisions of the CEA that were added by Subtitle A. The Complaint is jam-packed with allegations that show Zhao, Binance, and Lim acted with the intent to avoid U.S. regulation, including applicable provisions of the CEA.

## III.    ARGUMENT

### A. Applicable Legal Standards.

At the motion to dismiss stage, courts accept a complaint's allegations as true and draw all reasonable inferences in the plaintiff's favor.[7] *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). To survive a motion to dismiss brought under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face," which means "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sloan v. Am. Brain Tumor Assoc.*, 901 F.3d 891, 894 (7th Cir. 2018).

To assess a motion brought under Rule 12(b)(2) for lack of personal jurisdiction based on the pleadings, as is the case here, the plaintiff "bears only the burden of making a prima facie case for personal jurisdiction." *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 392–93 (7th Cir.

---

[6] These regulatory requirements apply to FCMs that are required to register with the CFTC, like Binance, as well as persons that are actually so registered. *See* 17 C.F.R. § 166.1(a).

[7] The Court should ignore Defendants' injection of matters outside the pleadings, including Binance's self-serving citations to its own website, (*see* Binance Mot. 4 (touting purported provision of services to the "unbanked")).

2020). A prima facie case for personal jurisdiction means "a threshold showing . . . of a plausible basis for exercising jurisdiction over the defendant." *Ellis v. Fortune Seas, Ltd.*, 175 F.R.D. 308, 312 (S.D. Ind. 1997) (Hamilton, J.). In this context, "all well-pleaded facts are taken as true and all factual disputes are resolved in the plaintiff's favor."[8] *Curry*, 949 F.3d at 392–93.

### B. The Complaint Sufficiently Alleges All Defendants Have Violated Regulation 1.6.

Faced with the Complaint's allegations displaying each Defendant's intent to break the law—many of which are direct quotations from Defendants' own communications—Binance makes four scattershot arguments for dismissal of Count VII, which charges all Defendants with directly violating 17 C.F.R. § 1.6 by conducting activities outside the United States to evade CFTC jurisdiction. First, Binance erroneously contends the Complaint "fails to identify any swaps in connection with this count." (Binance Mot. 35–36.) Second, Binance argues that the Complaint fails to allege Binance has evaded any regulations and that instructing customers to evade Binance's compliance controls does not violate Regulation 1.6. (*Id.* at 36.) Third, Binance contends that the anti-evasion charges are "duplicative" of the Complaint's registration violations. (*Id.* at 37.) Finally, Zhao theorizes the Complaint does not allege he acted with knowledge that his conduct violated a specific provision of the CEA. (*Id.* at 37.)

Each of these arguments fails. By its plain text, Regulation 1.6 applies broadly to "activities" intended to evade the regulatory scope of Subtitle A; Regulation 1.6 requires only proof of recklessness; Binance offers derivatives that implicate Regulation 1.6; Binance has offered those products to U.S. persons; and each Defendant engaged in specific activities with the intent to evade U.S. law, including the provisions of the CEA enacted by Subtitle A.

---

[8] No Defendant has offered any evidence to challenge personal jurisdiction. Accordingly, the Court should limit its review to the allegations in the Complaint.

**1. Regulation 1.6 applies to Defendants' evasive conduct.**

In attempting to argue that the Complaint fails to identify "any swaps rules or regulations" that they evaded, (Binance Mot. 36), Zhao and Binance misstate the scope of Regulation 1.6(a), which provides:

> It shall be unlawful to *conduct activities* outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade *any provision* of the Commodity Exchange Act as enacted by Subtitle A of the Wall Street Transparency and Accountability Act of 2010 or the rules, regulations, and orders of the Commission promulgated thereunder (Subtitle A).

17 C.F.R. § 1.6(a) (emphases added). Subtitle A added swaps-related provisions to the CEA, including the swaps provisions Defendants are alleged to have violated in Counts II–IV. (*See generally* Platt Decl. Ex. A.) Subtitle A also substantively amended Section 4(b) of the CEA, codified at 7 U.S.C. § 6(b), to require FBOTs that have U.S. participants to register with the CFTC. (*Id.* at Sec. 738.) Count I alleges that Binance violated 7 U.S.C. § 6(b). (Compl. ¶¶ 187–95.)

The text of the authorizing statute and implementing regulation are clear: Regulation 1.6 applies broadly to any activities conducted outside the United States with the intent to evade any provision of the CEA as enacted by Subtitle A.[9] Accordingly, the CFTC's Regulation 1.6 charge reaches Defendants' evasive conduct concerning swaps and activities concerning Binance's status as an unregistered FBOT.

---

[9] The CFTC promulgated Regulation 1.6 through a notice-and-comment rulemaking. The final rule was published in the Federal Register at 77 Fed. Reg. 48,208–366 (Aug. 13, 2012) under the title, Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule (hereafter "Further Definition of 'Swap'"; Platt Decl. Ex. C).

## 2. Regulation 1.6 requires proof of intentional or reckless conduct.

Contrary to Zhao's argument, Regulation 1.6(a) does not require proof that a defendant knew he was violating a specific legal provision. (*See* Binance Mot. 37 (citing criminal cases such as *United States v. Collins*, 685 F.3d 651 (7th Cir. 2010) (mistake of law is a potential defense to certain criminal tax charges), and *Ratzlaf v. United States*, 510 U.S. 135 (1994) (same, as to offenses concerning structuring transactions).)[10] "Where willfulness is a statutory condition of civil liability, [the Supreme Court has] generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007); *see also Flaxman*, 697 F.2d at 787–88 (in the context of 7 U.S.C. § 9, "willful" means "1) intentionally do[ing] an act which is prohibited,—irrespective of evil motive or reliance on erroneous advice, or 2) act[ing] with careless disregard of statutory requirements"). This is the standard that applies to Regulation 1.6(a). *See* Further Definition of "Swap," 77 Fed. Reg. at 48,302 & n.1056. In some criminal matters, "willfulness" may have multiple meanings. *See United States v. Trudeau*, 812 F.3d 578, 588–89 (7th Cir. 2016) (rejecting argument in criminal contempt case that "willful" standard required proof that a defendant knew that his conduct violated the law). To the extent the Court finds the term "willful" as used in Regulation 1.6(a) is ambiguous, it should follow the CFTC's reasonable interpretation of the term (i.e., intentional or reckless conduct). *See Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382–83 (7th Cir. 2020) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412–18 (2019), and explaining, "[i]f the

---

[10] Zhao has not cited any provision of the CEA, or any civil statute for that matter, that requires proof that a defendant knew he was violating a specific legal provision. In fact, the CFTC has previously held that knowledge of the unlawful character of conduct is not an element of scienter for violations of the CEA. *See In re Lincolnwood Commodities, Inc.,* 1984 WL 48104, at *27 (CFTC Jan. 31, 1984) (aiding and abetting liability); *In re Spiegel*, 1988 WL 232212, at *4–7 (CFTC Jan. 12, 1988) (controlling person liability); *In re Bamaodah*, 1986 WL 68382, at *5 (CFTC Apr. 18, 1986) (respondent's "unawareness and misunderstanding of CFTC requirements" theoretically could bear only on mitigation of sanctions, not liability).

[regulatory] language is ambiguous, we may consult the rulemaking record"); *cf. CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1014–15 (N.D. Ill. 2015) (adopting CFTC's interpretation of the mental state in then-new Regulation 180.1).

### 3. Binance offers swaps.

Defendants also seek dismissal of Count VII on the basis that the "the complaint fails to identify any swaps in connection with this count." (Binance Mot. 35). This argument ignores the factual allegations in the Complaint that demonstrate at least two of Binance's derivatives are swaps under the CEA: Binance options and Binance's perpetual contracts.[11]

The Complaint plausibly alleges Binance options are swaps. 7 U.S.C. § 1a(47)(A)(i) defines swap to include "a put, call . . . or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . commodities."[12] "Options" include any agreement, contract, or transaction that is "of the character of, or is commonly known to the trade as, an option." *Id.* § 1a(36); *see also Saberi v. CFTC*, 488 F.3d 1207, 1210 n.2 (9th Cir. 2007) (options include instruments that give "the holder the right, but not the obligation, to buy or sell" an underlying asset at some point in the future). Binance options are financial derivatives that give traders the right but not the obligation to buy or sell an underlying digital asset upon the expiration of the options contract. (Compl. ¶ 58.) Because Binance options are called "options" and they have the basic attributes of options, Binance options are swaps under the CEA.

The Complaint also plausibly alleges Binance's perpetual contracts are swaps under the CEA, despite the fact that Binance sometimes calls these instruments "perpetual futures," (*see*

---

[11] Binance does not dispute that its quarterly-expiration derivatives contracts, (*see* Compl. ¶ 64), are futures contracts, which are relevant to Binance's violation of 7 U.S.C. § 6(b) and therefore also implicate Regulation 1.6. Binance also does not dispute that the assets underlying all its derivatives, as alleged to include for example BTC, ETH, and BNB, are commodities under the CEA. *See* 7 U.S.C. § 1a(9); *see also, e.g.*, *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228–29 (E.D.N.Y. 2018) (virtual currencies are commodities).

[12] 7 U.S.C. § 1a(47)(A)(i) was added to the CEA by Subtitle A. (*See* Platt Decl. Ex. A, Sec. 721(21).)

12

Compl. ¶¶ 60–62). *See In re Grain Land Coop.*, 2003 WL 22803511, at *14 (CFTC Nov. 25, 2003) (explaining that a contract's substance is entitled to at least as much weight as its form in analyzing a derivative); *cf.* 17 C.F.R. § 1.6(b). 7 U.S.C. § 1a(47)(A)(iii) provides that a swap includes any agreement, contract, or transaction:

> [T]hat provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates . . . [or] indices . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred . . . .

Binance customers do not exchange the underlying digital asset when they transact in a perpetual; instead, they own a contract with synthetic exposure to a digital asset that is later "cash settled" in whatever digital asset the customer uses to collateralize their trading. (Compl. ¶¶ 62, 64.) According to the contract specifications, every eight hours Binance causes the counterparties to a perpetuals transaction to swap a payment based on a price index calculated by Binance that it calls a "funding fee." (*Id.* ¶ 63.) Thus, Binance's perpetuals are alleged to be swaps under § 1a(47)(A)(iii) because they are contracts that provide, on an executory basis,[13] that the counterparties periodically exchange payments based on a price index without exchanging an asset that incorporates the transferred risk.[14]

---

[13] An executory contract "is a contract on which performance remains due to some extent" after formation. *See Dick v. Conseco, Inc.*, 458 F.3d 573, 577 (7th Cir. 2006) (interpreting bankruptcy code).

[14] In an afterthought, Binance contends that its perpetuals are futures contracts and therefore cannot be swaps based on a statutory exclusion located at 7 U.S.C. § 1a(47)(B)(i). (Binance Mot. 22 n.19.) The Court should reject this argument because it is undeveloped. *See Freiburger v. Timmerman*, 2016 WL 4493448, at *16 (N.D. Ill. Aug. 26, 2016) (undeveloped arguments are waived). The Court should also reject this argument because it ignores applicable Seventh Circuit case law and elides the factual and legal complexity required to analyze whether a financial product is a futures contract. *See, e.g., CFTC v. Zelener*, 373 F.3d 861, 864–66 (7th Cir. 2004); *Chi. Merc. Exch. v. SEC*, 883 F.2d 537, 542–43 (7th Cir. 1989). This argument also fails both on account of its brevity—its logical reasoning is limited to one vague sentence—and imprecision—it proves too much because the apparent premise (that a position in perpetuals may be closed by an offsetting transaction so perpetuals are therefore futures contracts) applies to essentially any financial instrument, from futures to options to swaps to forex to treasuries to equities to bonds.

Binance's perpetuals are also plausibly alleged to be swaps because they strongly resemble contracts for differences ("CFDs"), which are swaps under 7 U.S.C. § 1a(47). *See Further Definition of "Swap,"* 77 Fed. Reg. at 48,259–60. A CFD "generally is an agreement to exchange the difference in value of an underlying asset between the time at which a CFD position is established and the time at which it is terminated." *Id.* This definition closely tracks the economics of a perpetuals trade, pursuant to which the counterparties place open-ended directional bets on the price of the underlying digital asset. (*See* Compl. ¶¶ 62–64.)

### 4. Binance has offered swaps and futures to U.S. customers.

During the Relevant Period, Binance's internal records evidence that U.S. retail and institutional customers entered into derivative transactions on the platform. (Compl. ¶¶ 76, 77, 95, 137–40.) Binance has never taken any steps to limit the categories of financial products that it has made available for U.S. customers to trade. (*See id.* ¶¶ 3, 4, 137.) Therefore, the Complaint plausibly alleges that Binance has offered trading in swaps and futures to U.S. customers.[15]

But there is much more. As alleged, U.S. VIP customers continued to trade swaps on Binance through both direct accounts and intermediated "sub-accounts" at least through the date the Complaint was filed. (*See* Compl. ¶¶ 143–46 (describing access through a prime broker) and

---

The Court should reject this cursory argument for the separate reason that Rule 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Thus, even if Binance's perpetuals are allegedly swaps and futures contracts that would not provide a valid basis for dismissal at this stage of the litigation. *See Tamayo*, 526 F.3d at 1086 (pleading rules permit "inconsistencies in legal theories").

Finally, and most pragmatically, regardless of whether Binance's perpetuals are futures or swaps, the Regulation 1.6 claims survive based on Binance's options and FBOT activities, the claim arising under 7 U.S.C. § 6 survives based on Binance's FBOT activities, the claim arising under 7 U.S.C. § 6d survives based on Binance's soliciting orders for any of the alleged jurisdictional products, and the claim arising under 7 U.S.C. § 5h survives based on Binance's options trading facility because options are swaps under the CEA.

[15] Binance addresses this issue in the section of its brief challenging extraterritoriality. (Binance Mot. 24–27.) Because this issue is relevant to multiple aspects of the motions, the CFTC will address it here.

¶¶ 162–76 (example of a U.S VIP customer trading swaps through a direct Binance account).)

As Binance recognizes, (*see* Binance Mot. 24–27), whether an entity is located in the United

States turns on the location of its principal place of business (among other non-exclusive

methodologies). *Cf.* 17 C.F.R. § 23.23(a)(23) (2022). In this context, principal place of business

"means the location from which the officers, partners, or managers of the legal person primarily

direct, control, and coordinate the activities of the legal person." 17 C.F.R. § 23.23(a)(23)(ii).

The "nerve center" test from diversity jurisdiction case law provides relevant guideposts. *See*

*Hertz Corp. v. Friend*, 559 U.S. 77, 92–97 (2010) (interpreting the term "principal place of

business" under 28 U.S.C. § 1332(c)); *see also* Cross-Border Application, 85 Fed. Reg. at

56,936–37.

In this case, Defendants have instructed Binance's U.S. VIP customers to paper up "new"

accounts using "offshore" nominee companies. (*See* Compl. ¶¶ 127–31.) Under the nerve center

test, if "a subsidiary does not have any high-level operations outside of the state where its parent

resides and it is directed and controlled from the state where the parent has its headquarters, the

subsidiary's principal place of business should be in the same state as its parent." *Big Shoulders*

*Capital LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560, 573 (7th Cir. 2021). While

corporate formalities are generally respected in determining a company's nerve center, *see id*, 13

F.4th at 573, courts will focus on the "place of actual direction, control, and coordination" in the

presence of efforts to obscure the truth, such as those alleged in this case, *see Hertz*, 559 U.S. at

97; *see also* 17 C.F.R. § 1.6.

Binance's biggest VIP customers are proprietary trading firms. (*See* Compl. ¶ 134.)

Proprietary trading firms are in the business of trading. After stripping away the sophistication

with which these companies operate, the business of trading focuses on placing and canceling

orders for financial instruments.  As alleged, these customers typically trade via automated trading strategies programmed into computer algorithms developed in the United States and owned by U.S.-based parent companies.  (*See id.* ¶¶ 152, 163, 179.)  Algorithmic trading strategies generally place and cancel orders without human intervention based on instructions that are embedded in their computer code.  (*Id.*)  Creating algorithmic trading strategies relies on cutting edge technology and big brain personnel such as quantitative developers (sometimes called technologists or just quants) to gain an edge in the markets.[16]  (*See id.* ¶¶ 152, 154, 163, 165, 179, 180, 181.)  Binance's VIP customers zealously protect the computer code that they create and incorporate into their algorithms as important intellectual property.  (*Id.* ¶¶ 153, 163.)  The work that goes into devising, testing, and refining these algorithmic strategies, and the management of the various functions that contribute to them, are therefore key considerations in determining the principal place of business of a trading company.  *See Ayala v. BWAY Corp.*, 2017 WL 11562406, at *1–2 (N.D. Ill. Aug. 31, 2017) (distinguishing routine, day-to-day operating functions from actual direction and control).

Other factors that may be relevant to the locus of actual control of a wholly owned subsidiary that has no or few employees or assets of its own include the location of the parent company's executive management, (*see* Compl. ¶¶ 151, 162, 164, 178, 180), and how the subsidiary is capitalized and what it does with its operating profits, (*id.* ¶¶ 153, 176, 182). Perhaps the best proxy for control of a closely held company is the location of its ultimate owner(s), although ownership is not dispositive under Regulation 23.23(a)(23).  *See* 17 C.F.R. § 23.23(a)(2) ("Control" means the "possession, direct or indirect, of the power to direct or cause

---

[16]  To seemingly attempt to rebut or minimize these allegations, Binance and Zhao label quantitative technologists as "computer programmers."  (*See* Binance Mot. 27.)

the direction of the management and policies of a person, whether through the ownership of voting shares, by contract, or otherwise"); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 469 (S.D.N.Y. 2005) ("Stock ownership is one method of demonstrating control."); *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005) ("by definition, a parent corporation is a corporation that has working control of the subsidiary corporation through stock ownership").

The Complaint plausibly alleges Trading Firm A's nominee account-holding entity is a U.S. person because its principal place of business is Chicago. After Binance told Trading Firm A to "switch the account KYC," Trading Firm A changed the name on its account to a nominee entity that was incorporated in the Cayman Islands. (Compl. ¶ 156.) This Cayman nominee is wholly owned by Trading Firm A, substantially all personnel that perform work for the Cayman nominee are employees of Trading Firm A or its subsidiaries, and Trading Firm A controls all aspects of its Cayman nominee. (*Id.*) Quantitative technologists that develop Trading Firm A's algorithmic trading strategies work from Trading Firm A's Chicago headquarters, as do its owners, who are its chief technology officer and chief risk officer, respectively. (*Id.* ¶ 150–52.) Although Trading Firm A's nominee was incorporated in the Cayman Islands, the Complaint plausibly alleges that the personnel and managers that develop and oversee its algorithmic trading strategies—the personnel who primarily direct and control the company's activities—are located in Chicago. Accordingly, the Complaint plausibly alleges the principal place of business of Trading Firm A's Cayman nominee is Chicago.

The Complaint plausibly alleges Trading Firm B's nominee account-holding entity is a U.S. person because its principal place of business is New York. Binance told Trading Firm B to trade through a "personal account" held in the name of a U.K.-based employee between approximately February 2020 and October 2022 as a workaround to Binance's compliance

controls after senior Binance personnel concluded that Trading Firm B was a "US entity in [Binance's] system." (Compl. ¶¶ 167–70.) In approximately October 2022, Trading Firm B switched the name on its Binance account from the U.K.-based employee to a newly formed entity that was incorporated in Jersey and purported to be "owned" by a company that has no affiliation with Trading Firm B. (*Id.* ¶¶ 170–71.) Trading Firm B's nominee has no employees, plant, equipment, or capital of its own, and relies on computer code that is owned and personnel that are employed by Trading Firm B or its other subsidiaries, including the New York-based head of Trading Firm B's digital asset trading desk, to develop its trading strategies. (*Id.* ¶¶ 162, 164, 172.) Trading Firm B's nominee sends its Binance-derived trading profits back to Trading Firm B. (*Id.* ¶ 172.) Although Trading Firm B's nominee was incorporated in Jersey, the Complaint plausibly alleges that its principal place of business is New York because the personnel who primarily direct its activities are located there.

The Complaint plausibly alleges Trading Firm C's account-holding nominee entity is a U.S. person because its principal place of business is New York. In approximately October 2021, Trading Firm C changed the name on its Binance account from a Singapore-incorporated subsidiary to a Cayman Islands entity to "comply with" Binance's onboarding requirements. (Compl. ¶¶ 183–84.) Trading Firm C informed Binance that "all economic interest [in the Cayman nominee] flows through [a holding company] and then to [Trading Firm C's commonly owned domestic affiliate] as the sole shareholder of the participating shares" so Trading Firm C "retains all decision making power and economic interest" in its Binance account. (*Id.* ¶ 184.) This is sufficient to plausibly allege that Trading Firm C's Cayman nominee shares the principal place of business of its wholly-controlling ultimate parent, which is New York, (*see id.* ¶ 177).

### 5. Defendants have engaged in activities constituting evasion.

Defendants ask the Court to find they just helped their customers evade Binance's own "access controls" but "not any swaps rules or regulations" and therefore the Complaint fails to allege any evasive activities. (Binance Mot. 36.) Binance's argument misconstrues Regulation 1.6 and ignores the allegations detailing Defendants' evasion.

Defendants' control sabotage violates Regulation 1.6 because it has enabled Binance to do business in the United States while evading compliance with U.S. law. (*See* Compl. ¶ 121 (Lim explaining: "No we cannot change their status to non us if they are us" because "That[']s fraud").) The text of Regulation 1.6 does not contain any limitation on the broad term "activity," and with good reason: the CFTC recognized that evasive conduct can take myriad forms and attempting to delimit categories of conduct that constitute evasion invites attempts to circumvent those boundaries. *See* Further Definition of "Swap," 77 Fed. Reg. at 48,298; *cf., e.g.*, *United States v. Vorley*, 420 F. Supp. 3d 784, 807 (N.D. Ill. 2019) ("fraud is as versable as human ingenuity"). The Complaint plausibly alleges that Zhao, Binance, and Lim intended their actions to evade U.S. regulatory duties, including those set out in the provisions of the CEA enacted by Subtitle A. Although Defendants knew they were subject to U.S. regulation due to the fact that Binance actively courted and serviced U.S. customers, (Compl. ¶¶ 109–14, 120, 125), they have taken numerous steps to solicit and retain U.S. customers despite pretending to "restrict" those customers from the Binance platform. (*See id.* ¶¶ 91–92 (two BTC-no KYC loophole); 116–22 (VPN guide and other "creative" workarounds); 128–36 (Zhao's secret plot to teach U.S. VIP customers to create "new" accounts with "offshore" entities).) And Binance has been successful in helping its U.S. customers stay on the platform, continuing to reap commercial benefits from their participation without complying with applicable regulatory requirements. (*Id.* ¶¶ 150–86

(examples of U.S. VIPs that successfully followed Binance's instructions to create "new" accounts with "offshore" vehicles).)

Even if Regulation 1.6 requires proof of an evasive contract or transaction, Binance's contracts with its customers are a key part of Defendants' evasion. Each time Binance onboards a customer it enters into a contract that is governed by the Binance Terms of Use. (*See* Compl. ¶¶ 5, 83, 93.) Pursuant to that contract, Binance solicits orders from and facilitates transactions for the customer, which are activities that require one or more registrations under the CEA if conducted with U.S. persons. After Binance's U.S. VIP customers follow Binance's instructions to paper up "new" accounts with "offshore" entities, Binance has entered into a contract with a "new" customer that purports to be located somewhere other than the United States. But Binance knows that the "new" customer is the exact same customer it previously identified as being located in the United States. (*See id.* ¶¶ 127, 156, 157, 169, 174, 175, 183 (Binance transfers existing positions, accumulated VIP benefits, and account settings to "new" accountholder after customer changes name on account).) After this sleight of hand, Binance pretends that it has no U.S. customers and need not comply with applicable U.S. regulatory requirements including those arising under Subtitle A.

Binance also contends that the Complaint fails to identify evasive conduct apart from its unlawful activities that form the basis for its registration violations, so the Regulation 1.6 charge is "duplicative" of other charges. (Binance Mot. 36.) That is not a valid basis to dismiss the claim because as a factual matter, Zhao, Binance, and Lim's control subversion as set forth above is not the conduct that forms the basis for Defendants' registration violations. The failure-to-register and illegal offering charges are generally based on Binance's functioning as a trading facility and soliciting and accepting orders for CFTC jurisdictional products. The activities

constituting evasion include at a minimum Zhao and Lim teaching Binance customers how to get around Binance's compliance controls.  As a result, the Court should reject this argument. [17]

### 6.  Zhao's evasive activities.

Zhao argues the CFTC has not alleged that he engaged in activities with the intent to evade regulation.  The Complaint contains numerous, specific allegations concerning Zhao's strategic decision to evade U.S. regulation while reaping the benefits of Binance's U.S. customer base.

Binance's secret plot to instruct its U.S. VIP customers to create "new" accounts was Zhao's brainchild.  (*See* Compl. ¶ 128.)  Around the time Binance purported to launch a new exchange that would be available to U.S. customers, Zhao held a series of strategy sessions with senior managers to devise a scheme by which Binance could retain its VIPs on the main exchange.  (*Id.* ¶¶ 126–28.)  Zhao's ploy to instruct U.S. VIP customers to "change their KYC" was documented in a corporate policy and Zhao personally oversaw the implementation of his plan.  (*Id.* ¶¶ 128–31.)  Zhao also required Binance personnel to disseminate the KYC-changing instructions to U.S. VIPs using an application that would destroy all evidence of those communications.  (*See id.* ¶¶ 132, 134.)  Taken together, these facts plausibly allege that by devising and overseeing the implementation of the corporate scheme to instruct U.S. VIP customers to "change the KYC on Binance.com and continue to use it," Zhao intended to evade U.S. regulation, including the swaps and FBOT provisions that apply to Binance's conduct.

---

[17]  The CFTC's rulemaking release for Regulation 1.6 references certain tax law matters.  Contrary to Binance's arguments, (*see* Binance Mot. 36–37), those references are not related to the issue of whether a claim is "duplicative" of a Regulation 1.6 violation.  Instead, the CFTC cited tax law matters for the proposition that the extent to which a transaction has a legitimate business purpose may be relevant to assessing evasive intent.  *See* Further Definition of "Swap," 77 Fed. Reg. at 48,301 & nn.1,047–49.

Accordingly, the Complaint plausibly alleges that Zhao knew Binance was violating legal duties arising under U.S. law and instructed Binance personnel to take steps to try to avoid those laws.

### 7. Lim's evasive activities.

Lim also appears to argue that the CFTC has not plausibly alleged that he engaged in activities intending to evade CFTC regulation. (Lim Mot. 10–12.) As the company's Chief Compliance Officer, Lim instructed Binance employees to use "creative means" to solicit and retain U.S. customers, including, for example, by:

- informing third parties to post that customers from "restricted" jurisdictions could "use vpn," (Compl. ¶ 119);

- asking U.S. customers to use VPN or to provide (if they are an entity) non-US documents, (*id.* ¶ 120);

- giving Binance's biggest traders/VIPs "SPECIAL treatment" by overriding limitations on non-KYC accounts, (*id.* ¶ 121); and

- onboarding U.S. customers to Binance.US with the expectation that if they did sufficiently "sick ass" volumes then the customers could be "backdoored" onto Binance, (*id.* ¶ 122).

Lim also sent a letter to a State regulator in August 2019, (*id.* ¶ 101), that Lim knew was false and misleading because the letter stated that Binance ensured the "safe and legitimate use of" the platform, (*but see id.* ¶¶ 104, 105), and screened "all its customers prior to the establishment of a business relations[hip]," (*but see id.* ¶¶ 92, 96).

The Complaint plausibly alleges Lim violated Regulation 1.6 because he intentionally took steps designed to retain U.S. customers on Binance even though Lim knew that the presence of U.S. customers on Binance would lead to a CFTC regulatory enforcement action, (*id.* ¶ 112), and Lim actively misled a State financial regulator about the purported effectiveness of Binance's compliance program.

**C. The Complaint Sufficiently Alleges the Court May Exercise Personal Jurisdiction Over All Defendants.**

Each Defendant contends the Court lacks personal jurisdiction over them because they do not reside in this country (Zhao and Lim) or are incorporated in foreign jurisdictions (Entity Defendants). The Court should reject these arguments because they are based on a territorial conception of personal jurisdiction, *see Pennoyer v. Neff*, 95 U.S. 714 (1877), that federal courts abandoned in the 1940s. Zhao, Binance, and Lim have sufficient minimum contacts with the forum and exercising personal jurisdiction is not unreasonable.

In this case, the Court may exercise personal jurisdiction over Defendants to the extent permitted by the due process clause of the Fifth Amendment. *See SEC v. Benger*, 2009 WL 1851186, at *7 (N.D. Ill. June 29, 2009). In the context of specific jurisdiction, the due process clause requires that (1) Defendants "purposefully availed [themselves] of the privilege of conducting business in the forum state or purposefully directed [their] activities at the state, . . . (2) the alleged injury must have arisen from [their] forum-related activities . . . ; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice."[18] *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012); *see also SEC v. Homa*, 514 F.3d 661, 675 (7th Cir. 2008) ("[W]hen an individual undertakes activity designed to have a purpose and effect in the forum, the forum may exercise personal jurisdiction over that person with respect to those activities."). Defendants' contacts with the United States as a whole are relevant because 7 U.S.C. § 13a–1(e) authorizes nationwide service of process. *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035 (7th Cir. 2000). The touchstone of specific personal jurisdiction is reasonableness. *See uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010) (citing *Int'l Shoe Co. v. Washington*, 326

---

[18] The CFTC does not contend the doctrine of general personal jurisdiction applies in this case

U.S. 310 (1945)); *see also SEC v. Straub*, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013) (minimum contacts present where the defendants "allegedly engaged in conduct that was designed to violate United States securities regulations and was thus necessarily directed toward the United States").

### 1. The Complaint plausibly alleges the Court has jurisdiction over the Entity Defendants.

Binance contends the CFTC has not sufficiently alleged personal jurisdiction as to the Entity Defendants because the Complaint "lumps" them together. (Binance Mot. 11.) That is exactly the point. As explained immediately below, Binance functions as a common enterprise so inter-affiliate imputation of jurisdictional contacts is appropriate.

#### a. The Complaint plausibly alleges Binance operates as a common enterprise.

The common enterprise doctrine allows regulatory agencies like the CFTC to hold "each entity within a set of interrelated companies . . . jointly and severally liable for the actions of other entities that are part of the group." *FTC v. The Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014). Relevant factors that inform whether entities constitute a common enterprise include common control; conducting business through a maze of interrelated companies; commingled funds; shared office space or information and communications systems; and unified advertising. *See CFTC v. Monex Credit Co.*, 2021 WL 6102524, at *11–12 (C.D. Cal. Oct. 28, 2021).[19]

The Complaint plausibly alleges that Binance is a common enterprise. Zhao owns and controls all the entities that participate in the operation of the Binance platform. (Compl. ¶¶ 14,

---

[19] Federal courts have applied the common enterprise doctrine in numerous contested litigations arising under the CEA. *See, e.g.*, *CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311, 1324–25 (S.D. Fla. 2014); *CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2007 WL 2659990, at *22 (N.D. Ill. Aug. 28, 2007), *aff'd in part and vacated in part*, 511 F.3d 762 (7th Cir 2007); *CFTC v. Int'l Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482, 508–11 (S.D.N.Y. 2004); *CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003).

82.)  According to Binance's convoluted Terms of Use, Binance makes no attempt to distinguish among the vehicles that collectively run the trading platform.  Instead, the Terms of Use define "Binance" as "an ecosystem comprising Binance websites . . . mobile applications, clients, applets and other applications that are developed to offer Binance Services, and includes independently-operated platforms, websites and clients within the ecosystem." (*Id.* ¶ 83.)  The Terms of Use also state that "Binance" equals something called "Binance operators," which it defines as "all parties that run Binance, including but not limited to legal persons . . . ." (*Id.*)  This opacity is intentional and strategic; Zhao created Binance's byzantine structure for the purpose of attempting to avoid accountability.  (*See id.* ¶¶ 5, 83, 84.)

Because Binance's own Terms of Use provide that all the commonly-owned entities that participate in the operation of Binance are, together, Binance, the Complaint plausibly alleges that Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited are members of a common enterprise.[20]  Each of the Entity Defendants plays an important role in the Binance common enterprise, (*see id.* ¶¶ 15–17), but because Zhao intentionally obscures the true nature of his venture it is impossible to discern at this stage which of the "Binance operators" is responsible for conducting the various aspects of Binance's operations.  Therefore, Binance's conduct should be imputed to each of the Entity Defendants. *Cf. Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019) (allegations against "Defendant-Officers" provided fair notice to each defendant of the alleged misconduct because

---

[20]  The facts cited above, concerning Zhao's total control over Binance and Binance's own description of "Binance" and "Binance operators," plausibly allege a common enterprise, but the Complaint contains numerous other relevant factual allegations, for example the entities in the Binance common enterprise are alleged to share employees (Compl. ¶¶ 50, 73) and communication systems, (*id.* ¶¶ 52–55, 79), and pool revenue and share expenses, (*id.* ¶¶ 77, 82).

that phrase applied to all the defendants). Binance's status as a common enterprise has jurisdictional implications.

### b. The Court should impute Binance's jurisdictional contacts to each Entity Defendant.

Attributing the contacts of a common enterprise to its members is consistent with Seventh Circuit case law that permits jurisdictional attribution among members of a conspiracy. *See Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392–93 (7th Cir. 1983) ("The conspiracy theory of personal jurisdiction is based on the time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy."); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269–73 & n.8 (2d Cir. 2023) (rejecting argument that conspiracy jurisdiction doctrine violates due process and affirming exercise of jurisdiction over foreign defendants in private litigation arising in part under CEA); *Flag Co. v. Maynard*, 376 F. Supp. 2d 849, 854–55 (N.D. Ill. 2005) (inter-defendant jurisdictional attribution appropriate in civil RICO conspiracy action); *cf. Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1030 (N.D. Ill. 2009) ("Where two or more companies enter a joint venture, the minimum contacts of one co-venturer are attributable to other co-venturers such that personal jurisdiction over one means personal jurisdiction over all.).[21] The reason courts impute jurisdictional contacts among co-conspirators applies with even

---

[21] The Seventh Circuit has explained the logic behind the conspiracy jurisdiction doctrine:

> If through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction. The analogy to agency is even more direct here, because the complaint alleges that [two co-conspirators] were leagued in a RICO enterprise, and if [a third] was the agent of the enterprise, what more should be necessary to bring the enterprise, and hence [one of the co-conspirators], a principal in it, within the long arm of the long-arm statute?

*Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992), *superseded on other grounds by rule*, *see Central States, Se. & Sw. Areas Pension Fund v. Reimer Exp. World Corp.*, 230 F.3d 934 (7th Cir. 2000). The rationale expressed in this typically lucid Posnerian dicta is directly applicable here, because Zhao has controlled a sprawling and unimaginably lucrative web-based exchange through an intentionally opaque corporate structure.

greater force for a common enterprise because the interrelation among common enterprise members (i.e., a maze of commonly owned and controlled entities holding itself out as a single thing) is necessarily as close or closer than in a conspiracy (which does not even require proof that a conspirator know the identities of the other members of the conspiracy, *see United States v. Stephenson*, 53 F.3d 836, 846 (7th Cir. 1995)).

The Court should attribute Binance's jurisdictional contacts to Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited because the CFTC has plausibly alleged Binance is a common enterprise that engaged in numerous, long-running, purposeful contacts with the United States. *See Textor*, 711 F.2d at 1392–93.

Binance has exploited the United States market. Throughout the Relevant Period, Binance has had U.S. customers open accounts and transact on Binance's web-based exchange. (Compl. ¶¶ 92, 95, 107, 120, 121, 128, 129, 134.) Binance kept track of the revenues that it attributed to U.S. customers, including in periodic revenue reports sent directly to Zhao. (*Id.* ¶¶ 137–39.) Binance's September 2020 revenue report reflects 2.51 million customer accounts in the United States, for example. (*Id.* ¶ 138; *see also id.* ¶¶ 77, 95, 107.) The fact that Binance has had millions of U.S. customers on its platform generating tens of millions of dollars per month in revenue, standing alone, suffices to satisfy the minimum contacts test. *See NBA Props., Inc. v. Hanwjh*, 46 F.4th 614, 623 (7th Cir. 2022) ("If the defendant exploits the forum market, it is subject to the jurisdiction of the forum."); *see also Curry*, 949 F.3d at 399–400 (finding that 767 web-based sales by defendant to in-forum purchasers satisfied minimum contacts test even though defendant's "advertising was not especially aimed at the [forum]"); *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 757–58 (7th Cir. 2010) (defendant's argument that it did not purposefully avail itself of doing business in Illinois "r[ang] particularly hollow" given that it "did do business

with Illinois residents" via a website through which customers could "create accounts" to engage in commercial transactions).

Binance's targeting of the United States amplifies the contacts described above. *See uBid*, 623 F.3d at 427 ("[The defendant] has thoroughly, deliberately, and successfully exploited the [United States] market. Its attempt to portray itself . . . as a mindless collection of servers is unconvincing."). Binance has also engaged in extensive, targeted solicitation of U.S. customers including through the "Binance Angels" program, Twitter and other social media, and industry events like the Binance-hosted "Grammy party" in Las Vegas to which Binance invited its "largest accounts," such as "top heavy weights of [high-frequency trading firms], prime brokerage, [and] vcs." (Compl. ¶¶ 72, 74, 78.) Binance contracted with U.S.-based Amazon Web Services to provide a "Global content delivery network" that reaches the United States among other places. (*Id.* ¶ 79.) And Binance secured U.S. trademarks to protect the intellectual property that it has used in marketing itself to U.S. customers (including a mark for the term "Binance"). (*Id.* ¶ 80, 81.)

And Binance knew that having U.S. customers could subject it to suit in the United States. *See Hemi Grp.*, 622 F.3d at 758 (the defendant "knew that conducting business with residents of a particular state could subject it to jurisdiction there and also that it knew how to protect itself from being haled into court in any particular state"). Beginning in July 2019, Binance engaged in a set of superficial and ineffective steps to purport to "restrict" U.S. customers. (Compl. ¶¶ 93–95.) Binance plotted to accompany these steps with a public relations campaign that would falsely message that Binance "never had any US users." (*Id.* ¶¶ 107, 128.) Underscoring Binance's actual awareness that its retention of U.S. customers was illegal, Zhao and Binance conducted their communications concerning U.S. customers using an auto-destroy

messaging application and doctored internal Binance records to remove references to "US." (*Id.* ¶¶ 132, 134, 138–40; *see also id.* ¶ 114 (Zhao explaining: "let me see [data with references to U.S. customers] first then, and not distribute it, especially [to] guys who have to deal with US regulators").) Binance's purported restrictions on U.S. customers while continuing to solicit and service those customers, and the calculated steps it has taken to destroy and conceal evidence of its U.S. customers after the fact, confirm that Binance "should have foreseen being subject to litigation in [the United States] as a result of" its reliance on U.S. customers. *See Hemi Grp.*, 622 F.3d at 758.

Binance's contacts with the United States are related to the CFTC's claims. Relatedness requires that a defendant's "contacts involving the forum state should . . . bear on the substantive legal dispute." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997); *see also Obartuch v. Meadows of Wickenburg, Inc.*, 2019 WL 330473, at *3 (N.D. Ill. Jan. 25, 2019) (jurisdictional contacts must "relate to the operative facts of the case"). A key issue in this litigation is the extent to which Binance has solicited and continues to actively court U.S. customers. Accordingly, Binance's interactions with its U.S. customers bear on the substantive legal dispute and the CFTC has alleged a prima facie case for personal jurisdiction over the Entity Defendants.

### 2. The Complaint plausibly alleges the Court has jurisdiction over Zhao.

Zhao mainly seems to contend that the Court lacks jurisdiction over him because the Complaint does not allege that Zhao traveled to the United States. (Binance Mot. 11–15.) But "physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state." *NBA Props.*, 46 F.4th at 624. Zhao's arguments ignore or minimize the many specific allegations of Zhao's own actions and Zhao's control over Binance that subject him to jurisdiction in the United States.

### a. Zhao's personal contacts with the forum.

The Complaint plausibly alleges that Zhao is subject to personal jurisdiction based on his personal contacts with the forum. For example, Zhao is alleged to have participated in industry events in the United States, (Compl. ¶ 78), communicated directly with Binance's U.S. VIP customers, including receiving an email with the passport and KYC-documentation of the owner of one of the most well-known Chicago-based proprietary trading firms, (*id.* ¶ 75), and exchanged Signal messages with the CEO of New York-headquartered Trading Firm C about its account settings, (*id.* ¶ 178).[22] These communications with some of Binance's largest and most commercially important U.S. customers—both in substance and manner of communication—relate to the CFTC's claims because the case centers around Binance providing services to U.S. customers without complying with applicable regulations.[23] *See Levin v. Posen Found.*, 62 F. Supp. 3d 733, 740 (N.D. Ill. 2014) ("[E]mails may be properly considered in minimum contacts analyses, especially if they were purposefully sent to a forum resident knowing that they would most likely be read in the forum."). In addition, Zhao interacted with a U.S. resident with respect to an English language Binance customer support channel. (Compl. ¶ 75.) These

---

[22] Zhao labels these allegations "spurious," (Binance Mot. 13), which is a word that means inauthentic, false, or fake. These portions of the Complaint—like much of that document—are direct quotations or faithful summaries of Zhao's own communications, a small sub-set of which were produced by Binance Holdings Limited during the CFTC's pre-suit investigation.

[23] Zhao also claims these communications are "random, isolated, or fortuitous." (Binance Mot. 13.) The Complaint plausibly alleges that Zhao—savvy to his personal regulatory exposure—generally and deftly insulated himself and acted through others. (*See* Compl. ¶¶ 128, 129, 132, 134.) As such, the Court should not infer that a lack of additional allegations reflecting direct contact between Zhao and his U.S. VIP customers displays "randomness" in any sense; in fact, it buttresses the argument that Binance's contacts should be imputed to Zhao, as set forth below. Further, throughout the Relevant Period (including after receiving document requests and subpoenas from the CFTC) Zhao set his communications applications to auto-delete and had his aides carry out his bidding using similar channels. (*Id.* ¶¶ 53–55, 132, 134.) Thus, the Court should draw the reasonable inference that Zhao, or underlings acting at Zhao's direction, have communicated with additional U.S. customers and intentionally destroyed evidence of such communications. *See Pable v. Chi. Transit Auth.*, 2023 WL 2333414, at *26–30 (N.D. Ill. Mar. 2, 2023) ("by enabling the Disappearing Messages setting, [a party] took deliberate action to ensure that these messages would not be preserved").

communications show Zhao carefully cultivating the U.S. customer base that Binance has relied on to provide valuable liquidity and revenue to the platform. That some of these communications occurred before the start of the Relevant Period does not impact whether or not they are jurisdictional contacts because Binance's reliance on U.S. customers (no matter when they were initially recruited) goes to the heart of all the CFTC's claims. *See CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 383–84 (S.D.N.Y. 2019) ("[T]here is no set time period for which [the defendant's] contacts with the forum can be used to support the Court's exercise of personal jurisdiction over him. Instead, the guiding principle is whether the suit relates to the defendant's contacts with the forum.").

Zhao also gave his personal credit card to U.S.-based Amazon Web Services, (Compl. ¶ 79), which provides Binance with its content distribution network. This relates to the CFTC's claims for two independent reasons. First, without Amazon Web Services, there is no Binance.com website—no website, no exchange. Second, the referenced content distribution network reaches the United States. (*Id.*)

Taken together, Zhao's personal contacts show he deliberately targeted the United States and bear directly on Zhao's violations of the CEA, which arise out of Binance's solicitation of U.S. customers.

### b. Binance's contacts are attributable to Zhao.

The Court also should impute Binance's contacts to Zhao because agent-principal attribution is well established in the context of specific jurisdiction. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 589–91 (7th Cir. 2021) ("the attribution of an agent's conduct to a principal to establish specific personal jurisdiction comports with federal due process"); *see also, e.g., Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135, 150–52 (1st Cir. 2021); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169–73 (2d Cir. 2010); *Sher v. Johnson*, 911 F.2d 1357, 1362

(9th Cir. 1990) ("For purposes of personal jurisdiction, the actions of an agent are attributable to the principal.").[24]

The Complaint plausibly alleges that Binance is Zhao's agent. An agency relationship exists under federal law if the principal controls the agent concerning the matter at issue. *See United States v. Dish Network LLC*, 954 F.3d 970, 975 (7th Cir. 2020); *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998). Here, Binance is the agent and Zhao is the principal because Zhao owns and controls Binance, (Compl. ¶¶ 5, 14, 85–88), Zhao micromanages all aspects of Binance's operations, (*see id.* ¶¶ 54, 67, 85), and Zhao personally devised and oversaw the implementation of the secret plot pursuant to which Binance has attempted to retain U.S. VIP customers, (*see id.* ¶¶ 107, 128, 134). For these reasons, the Complaint plausibly alleges that Binance is Zhao's agent. Therefore, Binance's extensive jurisdictional contacts, detailed above, should be imputed to Zhao.[25] *See Chloe*, 616 F.3d at 162, 167–69 (attributing company's contacts to a controlling individual on agent-principal theory).

---

[24] The cases cited above generally deal with state law long-arm statutes. *See Bilek*, 8 F. 4th at 590. Because the Fourteenth Amendment's due process clause is interpreted in the same way as the Fifth Amendment's in this context, *see C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 845 n.4 (N.D. Ill. 2009), the normal agent-principal attribution rule is appropriate in this case.

[25] Zhao protests that agent-principal attribution collapses control person liability, *see* 7 U.S.C. § 13c(b), with the personal jurisdiction analysis. (Binance Mot. 12.) The CFTC is not arguing that Zhao is subject to personal jurisdiction because he is substantively liable as a control person of Binance (although the CFTC will prove that he surely is); rather, Binance's contacts should be attributed to Zhao under the well-established agent-principal theory, described above. Moreover, none of the cases Zhao cites in support are even remotely analogous. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 666–69 (6th Cir. 2005), holds that a retired Japanese citizen was not subject to suit on "reasonableness" grounds and did not address whether that defendant was a control person. *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 735 (N.D. Ill. 2017), holds that (1) a pro se plaintiff's vague and conclusory allegations could not establish a prima facie case for jurisdiction against a defendant's undisputed affidavit and (2) the plaintiff did not allege the out-of-state director's involvement in the misconduct at issue. And *In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017), holds that a foreign executive was not subject to suit in a case arising out of a company's false SEC filings because the complaint did not allege that the executive "played *any* role in making, proposing, editing or approving" the filings at issue. Here, unlike in *Mohammed* and *In re Braskem*, Zhao has not submitted any evidence and the Complaint contains ample, detailed allegations concerning Zhao's specific control over Binance's exploitation of the U.S. market.

The Court should exercise jurisdiction over Zhao because his own contacts and those of his closely held company, which can and should be imputed to Zhao, satisfy the minimum contacts analysis.[26]

### 3. The Complaint plausibly alleges the Court has jurisdiction over Lim.

Lim contends that the Complaint does not allege that he has sufficient contacts with the forum. (Lim Mot. 4–6.) Lim's arguments fail on the facts and the law.

#### a. Lim's contacts with the forum.

Lim's suit-related interactions with the United States satisfy the minimum contacts test.

First, as set forth above Lim sent a letter to a State regulator that Lim knew contained false statements concerning the effectiveness of Binance's compliance program. (Compl. ¶ 101.) Lim's letter, standing alone, satisfies the minimum contacts test. *See In re Cinar Corp. Secs. Litig.*, 186 F. Supp. 279, 304–06 (E.D.N.Y. 2002) (finding jurisdiction over a Canadian general counsel defendant who signed an allegedly fraudulent registration statement because she "must have known that the statement was made to comply with the laws governing securities offerings in American markets").

Next, Lim had extensive contacts with the United States related to the BUSD "stablecoin." (Compl. ¶¶ 47, 103.) Lim interacted with Paxos, the New York trust company that issued BUSD, including reassuring Paxos that Binance would undergo a "compliance audit" to purportedly document the effectiveness of the company's control environment. (*Id.* ¶ 103.) Lim intended to mislead Paxos; he knew the "compliance audit" was "half assed" and was being

---

[26] Exercising jurisdiction over Zhao is not unreasonable, (*see* Binance Mot. 15 n.12), because the CFTC has a "substantial interest in the enforcement" of the CEA and the protection of the U.S. financial markets. *See Zurich Capital Markets, Inc. v. Coglianese*, 388 F. Supp. 2d 847, 859 (N.D. Ill. 2004); *see also SEC v. Syndicated Foods Servs. Int'l, Inc.*, No. 04-cv-1303, 2010 WL 3528406, at *3 (S.D.N.Y. Sept. 3, 2010) ("The reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved.").

conducted for delay. (*Id.*) Lim lulled Paxos to ensure Paxos would continue to support BUSD, in turn benefiting Binance. Because BUSD has been integral to many components of the exchange, (*see id.* ¶¶ 49, 62, 65), the Court should reasonably infer that the promotion of BUSD furthered Binance's exploitation of the U.S. market.

Lim's contacts relate to the suit because a core issue in this case is the ineffectiveness of Binance's compliance controls and the false statements Binance has made about those controls. Because Lim actively misled both a State regulator and U.S.-based Paxos concerning the purported effectiveness of Binance's compliance program to gain commercial benefit for Binance, his own contacts independently satisfy the minimum contacts test.

### b. Binance's contacts are attributable to Lim.

The Court also should impute certain of Binance's contacts to Lim because as the company's Chief Compliance Officer Lim directed Binance employees, including through the promulgation of policies and procedures, to target the United States. *See Master Tech Prods., Inc. v. Smith*, 181 F. Supp. 2d 910, 912–13 (N.D. Ill. 2002) (contacts of employee-agents imputed to corporate officer-principal where foreign corporate officer "directed" and "instructed" employees to gather confidential information from in-forum competitors that was used for impermissible purposes).

Although the scope of imputation is narrower for Lim than for Zhao, the attributable contacts more than suffice to establish jurisdiction. As a Binance corporate officer, Lim directed Binance employees to use "creative means" to solicit and retain U.S. customers. (Compl. ¶¶ 119–22.) These allegations reflect that Lim had the authority (either actually or impliedly) to provide guidance on these matters and, pursuant to this authority, Lim directed Binance employees to solicit and retain U.S. customers on a programmatic basis. Therefore, it is fair to impute Binance's resulting contacts with U.S. customers to Lim. Further, Lim gave these

directions when he knew that Binance's continued solicitation of U.S. customers would subject it to regulatory enforcement in the United States.  (*Id.* ¶¶ 109, 112, 120.)

Based on Lim's own contacts, and Binance's contacts that may fairly be attributed to him, the Complaint plausibly alleges a prima facie case for jurisdiction over Lim.

### 4. Alternatively, the Court should grant the CFTC leave to file a motion seeking jurisdictional discovery.

To the extent the Court grants any Defendant's request for dismissal based on a lack of personal jurisdiction, the CFTC respectfully requests that it do so without prejudice and grant the CFTC leave to file a motion for targeted jurisdictional discovery.  (*See* ECF No. 57.)  Such discovery would be appropriate in this case because Defendants stymied the CFTC's efforts to gather jurisdictionally relevant information during its pre-suit investigation.  *See Ellis*, 175 F.R.D. at 311 ("It is well established that a federal district court has the power to require a defendant to respond to discovery requests relevant to his or her motion to dismiss for lack of personal jurisdiction.").  Discovery is warranted if a plaintiff demonstrates that "personal jurisdiction might exist."  *Anderson v. Sportmart, Inc.*, 179 F.R.D. 236, 241 (N.D. Ind. 1998). Here, both Zhao and Lim refused to provide investigative testimony, *see* 17 C.F.R. § 11.4(a), and Binance Holdings Limited, testifying through a corporate representative, refused or was unable to state which of the scores of "Binance operators" actually runs the trading platform (despite receiving a list of topics for testimony in advance), among other critical pieces of information sought.  (*See* Platt Decl. ¶¶ 7–13 & Exs. F–I.)  Given Defendants' contumacy during the pre-suit investigation, it would be appropriate to permit targeted jurisdictional discovery concerning matters such as the roles of the various "Binance operators" in running the Binance platform and the nature of Zhao's visits to the United States.

### D. The Complaint Alleges Claims Arising Under Provisions of the CEA That Apply to Foreign Conduct or are Proper Domestic Applications of the Statute.

Next, relying on *Morrison v. National Australian Bank Ltd.*, 561 U.S. 247 (2010), Defendants argue that each of the claims rests on foreign conduct that falls outside the scope of the CEA. (Binance Mot. 16–27.) Not so; the Complaint plausibly alleges that each count meets the *Morrison* standard.[27]

#### 1. *Morrison*'s two-step framework.

*Morrison* reaffirmed the presumption that federal statutes do not apply to foreign conduct absent a clear statement of such application and created two-step test to assess whether a federal claim is impermissibly extraterritorial: (1) does a statute expressly set out the extraterritorial reach of the relevant provision; and, if not, (2) does the claim rest on a domestic application of that statutory provision in light of the provision's "focus." 561 U.S. at 255, 266–67; *see also Stoyas v. Toshiba Corp.*, 896 F.3d 933, 943–50 (9th Cir. 2018) (summarizing post-*Morrison* doctrinal developments). The counts in the Complaint arise under statutory provisions that have express extraterritorial reach so the analysis ends at step 1. To the extent any claim rises or falls solely on a provision of the CEA that does not expressly apply to foreign conduct (although there are no such claims in the Complaint), the Complaint adequately alleges a domestic application of the statutory provision at issue.

#### 2. Count I plausibly alleges that *Morrison* is satisfied because 7 U.S.C. § 6(b) explicitly applies to foreign conduct.

Count I arises out of Binance's functioning as a board of trade that unlawfully deals in futures transactions without required designation or registration. "Board of trade" is a general

---

[27] Issues concerning extraterritoriality relate to the merits of a claim and do not implicate subject matter jurisdiction, (*i.e.*, a court's "power to hear a case"), *see Morrison*, 561 U.S. at 254, so should rarely be resolved on a Rule 12(b)(6) motion. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) ("The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits.").

term that means "any organized exchange or trading facility." 7 U.S.C. § 1a(5). The Complaint plausibly alleges that Binance is a board of trade that offers futures contracts to participants located in the United States. (Compl. ¶¶ 42, 56, 61.)[28] The only question, then, is whether Binance violated 7 U.S.C. § 6(a) (because Binance is not a DCM) or violated 7 U.S.C. § 6(b) (because Binance is not registered with the CFTC as an FBOT). (*Id.* ¶¶ 187–95.)

Count I plausibly alleges that *Morrison* is satisfied at step 1 because 7 U.S.C. § 6(b) expressly applies to foreign conduct. This sub-section is titled "REGULATION OF FOREIGN TRANSACTIONS BY UNITED STATES PERSONS" and authorizes the CFTC to "adopt rules and regulations requiring registration with the Commission for a foreign board of trade that provides . . . participants located in the United States with direct access to the electronic trading or order matching system." 7 U.S.C. § 6(b)(1)(A). The CFTC has adopted such rules. *See* 17 C.F.R. Part 48. For example, 17 C.F.R. § 48.2 defines "Foreign board of trade" as "any board of trade, exchange or market located outside the United States, its territories or possessions, whether incorporated or unincorporated" and 17 C.F.R. § 48.3 requires FBOTs to register with the CFTC.

Because Count I satisfies *Morrison* at step 1, it should not be dismissed on this basis because "a motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissal of parts of claims." *Bilek*, 8 F.4th at 587 (complaint plausibly alleged actual authority so court declined to

---

[28] Binance contends that Count I does not plausibly allege violations of 7 U.S.C. §§ 6(a) or 6(b). (Binance Mot. 27–29.) As explained in this section, the Complaint plausibly alleges that Binance is an unregistered FBOT, in violation of 7 U.S.C. § 6(b). The Court may reasonably infer that Binance has provided explicit grants of authority to U.S. persons to access the exchange because (at least) Binance had no geography-based access restrictions for the first two years of its operations; tracked the nature of its U.S. customer base in regular reporting; knew that the two BTC-no KYC loophole let U.S. customers access the platform; and implemented corporate policies that were designed to retain U.S. VIP customers. (*See* Compl. ¶¶ 90, 92, 130–140.)

The Complaint also plausibly alleges that Binance "conduct[s] any office or business anywhere in the United States . . . for the purpose of soliciting or accepting any order for" futures. *See* 7 U.S.C. § 6(a). Binance conducts business in the United States by (at least) targeting its marketing toward the United States; hosting industry events for VIP customers in the United States; employing an ever-increasing number of U.S.-based personnel including senior corporate officers; engaging with U.S.-based "Binance Angels"; and relying on U.S. vendors, professional services, and legal protections. (Compl. ¶¶ 72–75, 78–80.)

address alternative pleading theories of agency); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) (summary judgment, not a motion to dismiss, is the stage to attempt to carve up claims); *City of Chicago v. Purdue Pharma L.P.*, 2021 WL 1208971, at *6 (N.D. Ill. Mar. 31, 2021) ("the critical question at the pleading stage is simply whether the plaintiff has stated a plausible claim under some theory, regardless of whether the plaintiff might later choose to focus on certain facts rather than others").

### 3. Counts II, III, and IV plausibly allege that *Morrison* is satisfied because 7 U.S.C. § 2(i) expressly applies the CEA's swaps provisions to foreign conduct.

Like Count I, Counts II, III, and IV satisfy *Morrison* at step 1. The unifying theme of these claims, as it relates to *Morrison*, is that each involves swaps provisions that were enacted by Subtitle A. They arise out of Binance's illegally offering an options trading facility, illegally acting as a futures commission merchant that solicits orders for swaps,[29] and illegally offering a swaps trading facility, respectively. The Complaint plausibly alleges that Binance's options and perpetuals are swaps under the CEA, *see* Section III.B.3.

Defendants recognize that 7 U.S.C. § 2(i)(1) explicitly applies the CEA's swaps provisions to foreign conduct that has a "direct and significant connection with activities in, or effect on, commerce of the United States." (Binance Mot. 22.) Nevertheless, they contend that Counts II, III, and IV fail to allege that Binance's activities satisfy § 2(i)(1) for two main reasons. First, that "direct and significant" requires proof that the activities pose "systemic risks to the U.S. financial system," which in their view includes a jumbled mixture of elements such as "immediate consequences" and customer harm. (*Id.* at 23–24.) Second, the Complaint does not allege that Binance had U.S. customers during the Relevant Period. (*Id.* at 24–27.)

---

[29] Subtitle A expanded the definition of FCM to include among other things soliciting and accepting orders for swaps, *see* 7 U.S.C. §§ 1a(28)(A)(i)(I)(bb). (*See* Platt Decl. Ex. A, Sec. 721(13).)

As explained below, the CFTC has interpreted the term "direct" in § 2(i)(1) through the notice-and-comment process and the Court should defer to that interpretation. Apart from that interpretation, Binance's arguments misconstrue the law and ignore or contradict the Complaint's factual allegations about Binance's activities concerning the United States.

### a. The CFTC's interpretation of 7 U.S.C. § 2(i)(1) should be afforded *Skidmore* deference.

The Court should apply the CFTC's interpretation of 7 U.S.C. § 2(i)(1) based on the rule of *Skidmore v. Swift*, 323 U.S. 134 (1944), because that interpretation is reasoned and persuasive. *Skidmore* deference provides that a court should adopt an agency's interpretation of a statute to the extent it has the power to persuade. *See Miller v. Herman*, 600 F.3d 726 (7th Cir. 2010). Markers of persuasiveness include "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements." *Id.* at 734.

The CFTC construed § 2(i)(1) through the notice-and-comment process (although the interpretation did not result in a rule).[30] *See* Cross-Border Application, 85 Fed. Reg. at 56,927–30. During this process, the CFTC received and responded to public comments; considered § 2(i)(1)'s text, structure, and legislative history; incorporated analysis from case law that deals with analogous provisions in other federal statutes; and ultimately published its interpretation in the Federal Register. *Id.* The thoroughness, formality, and expertise applied to the CFTC's interpretation of § 2(i)(1) therefore satisfies *Skidmore*'s standard.

---

[30] The CFTC's interpretation of § 2(i)(1), described above, does not have the force of law, so *Chevron* deference is not applicable. *See United States v. Mead Corp.*, 533 U.S. 218, 227–33 (2001).

### b. In the context of § 2(i)(1), "direct" means "a reasonably proximate causal nexus" with United States commerce.

The CFTC has interpreted "the term 'direct' in section 2(i) to require a reasonably proximate causal nexus, and not to require foreseeability, substantiality, or immediacy." Cross-Border Application, 85 Fed. Reg. at 56,930.

To determine whether a person's activities are proximately connected to U.S. commerce, courts should consider the aggregate impact of the class of activities to which they belong, rather than on a transaction-by-transaction basis. *See* Cross-Border Application, 85 Fed. Reg. at 56,930. Commerce clause case law guides the way; for example, a farmer's wheat grown for his own consumption had a "substantial effect" on the price of wheat because similarly situated home growers would in the aggregate purchase less wheat in the national market. *See Wickard v. Filburn*, 317 U.S. 111, 128 (1942); *see also Gonzalez v. Raich*, 545 U.S. 1, 17–18 (2005) (reaffirming *Wickard*'s aggregation approach to determine an activity's effect on interstate commerce); *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997) (recognizing that AML-related statutes concern activities that "while in isolation may not affect interstate commerce, undoubtedly will have ramifications in interstate commerce when taken in the aggregate"). Therefore, the analysis here looks to whether Binance's digital asset derivatives activities, aggregated with all other digital asset derivatives activities, are connected to U.S. commerce.

The CFTC's interpretation of § 2(i) is consistent with case law that construes other federal statutes with similar extraterritoriality provisions, such as the Foreign Trade Antitrust Improvements Act ("FTAIA"), which governs the extraterritorial application of the Sherman Act. *See* Cross-Border Application, 85 Fed. Reg. at 56,928–29; 15 U.S.C. § 6a. Similar to 7 U.S.C. § 2(i)(1), the FTAIA states that the Sherman Act does not apply to foreign conduct absent a "direct, substantial, and reasonably foreseeable effect" on imports or domestic

commerce.  *Compare* 15 U.S.C. § 6a, *with* 7 U.S.C. § 2(i)(1).  *Minn-Chem, Inc. v. Agrium Inc.*
holds that the term "direct" in the FTAIA means foreign conduct that has a "reasonably
proximate causal nexus" with domestic competition.  683 F.3d 845, 855 (7th Cir. 2012).  *Minn-Chem* rejected the argument Defendants make here that "direct" requires proof of "immediate
consequences" because it found that "[s]uperimposing the idea of immediate consequence"
would result "in a stricter test than the complete text of the statute can bear."  *Id*. at 858.

The CFTC independently rejected an "immediate consequence" or harm requirement as
well in interpreting § 2(i) because the "direct and significant" standard deals with risks.  *See*
Cross-Border Application, 85 Fed. Reg. at 56,929 ("Dodd-Frank Act gave the Commission new
and broad authority to regulate the swap market to address and mitigate risks arising from swap
activities").  Through this risk-based lens, section 2(i)(1) thus recognizes the interconnectedness
between cross-border derivatives markets and transactions and that "a firm's failure, or trading
losses overseas, can quickly spill over to the United States and affect activities in U.S. commerce
and the stability of the U.S. financial system."  *Id.*  These policy statements confirm that
imposing an extratextual "immediate consequences" or harm requirement would frustrate
Congress's efforts to implement anti-systemic risk standards (such as registration requirements),
which by their nature are preventive and should be imposed before any harm is imminent.

Based on these principles, section 2(i)(1)'s standard isn't that foreign activities must
cause harm or create immediate risk of catastrophic systemic failure before they may be subject
to regulation, and there is no need for the Complaint to tether Binance's charged violations to
impacts comparable to the 2008 financial crisis.  (*See* Binance Mot. 23.)  Instead, section 2(i)(1)
considers whether the relevant activities belong to a class of conduct that has the potential to
impact the risk profiles of the U.S. financial markets and their interrelated participants.

### c. Binance's activities satisfy 7 U.S.C. § 2(i)(1).

Binance's digital asset-based swaps activities have a reasonably proximate causal nexus with activities in, and effects on, U.S. commerce.

First, Binance's "activities in" U.S. commerce as a centralized digital asset swaps trading facility that serves U.S. persons, standing alone, satisfy 7 U.S.C. § 2(i)(1). *See* Interpretive Guidance and Policy Statements Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45,292 (July 26, 2013) (Platt Decl. Ex. D). Following Dodd-Frank, the CFTC issued (following notice-and-comment) guidance concerning "how section 2(i) of the CEA provides for the application of the swaps provisions of the CEA and Commission regulations to cross-border activities." *See id.* at 45,297. The CFTC made clear that certain transaction-level swaps requirements, including requirements related to trade execution that are analogous to those Binance has violated, apply via § 2(i)(1) to foreign persons when transacting with U.S. persons. *See id.* at 45,338–40 (transaction-level swaps requirements generally would not apply to non-U.S. persons transacting swaps with non-U.S. persons); *see also id.* at 45,369.[31] Even setting aside the continued participation of U.S. VIPs that Binance retained through its secret plot to direct those customers to "change the kyc," the Complaint plausibly alleges that Binance facilitated swaps transactions for U.S. persons because Binance recognized that up to 30% of its "traffic comes from the US" and attributed hundreds of millions of dollars in revenue to "US" customers. (Compl. ¶¶ 77, 107, 137–38.) Therefore, the fact that Binance solicited and facilitated swaps transactions to and for U.S. persons satisfies § 2(i)(1)'s requirement that Binance's activities have a direct connection with U.S. commerce.

---

[31] (*See also* Platt Decl. Ex. E (CFTC-published summary of "Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations").)

Second, the Complaint sufficiently alleges that Binance's swaps activities are part of a class of activities connected to U.S. commerce. Defendants seem to suggest that their activities do not have the potential to impact U.S. markets, but offer no substantive support and ignore the lessons of recent history. (Binance Mot. 23–24.) The global market for digital asset derivatives is large. In an August 2020 blog post, Zhao boasted that Binance hit an "all time high of $13 billion in daily futures volume." (Compl. ¶ 68.) And Binance describes itself as "the world's leading cryptocurrency exchange," (Binance Mot. 4), has had over 100 million customers worldwide, and has reportedly captured over half the global market for digital asset exchange activity, (Compl. ¶ 40).

Not only are digital asset derivative markets large, they are increasingly integrated with the U.S. financial system and markets. As alleged, U.S. persons have constituted up to "20% to 30%" of Binance's customer base. (*See* Compl. ¶¶ 77, 95, 107.) These customers include major institutional market participants such as trading firms and prime brokers. (*Id.* ¶¶ 141–86.) The failure of two national banks that serviced digital asset market participants underscores the connection between digital asset markets and the traditional U.S. financial system.[32] And a recent string of bankruptcies currently clogging the federal docket further demonstrates the interrelationship of U.S. market participants and how global digital asset derivatives markets—in which Binance is the largest player—have the potential to, and in fact do, impact U.S. markets and market participants. *See, e.g., In re FTX Global Markets, Ltd.*, No. 22-11516 (S.D.N.Y) (bankruptcy matter concerning purportedly foreign digital asset derivatives exchange); *In re Genesis Global Holdco, LLC*, No. 23-10063 (S.D.N.Y.) (bankruptcy matter concerning domestic

---

[32]  See https://www.federalreserve.gov/newsevents/pressreleases/enforcement20230601a.htm (link to Federal Reserve Board's liquidation order concerning Silvergate Bank); https://www.fdic.gov/news/press-releases/2023/pr23018.html (press release concerning FDIC's takeover of Signature Bank).

digital assets company); *In re BlockFi Inc.*, No. 22-19361 (D.N.J.) (same); *In re Celsius Network LLC*, No. 22-10964 (S.D.N.Y.) (same); *In re Voyager Digital Ltd.*, No. 22-10944 (S.D.N.Y.) (same); *In re Three Arrows Capital, Ltd.*, No. 22-10920 (S.D.N.Y.) (Chapter 15 proceeding concerning purportedly foreign digital asset-focused "hedge fund").

For these reasons, the Complaint plausibly alleges that Binance's swaps activities have a direct and significant connection with activities in U.S. commerce and are therefore subject to Subtitle A via § 2(i)(1).

### 4. Defendants' foreign conduct is subject to Subtitle A based on 17 C.F.R. § 1.6(c).

By operation of Regulation 1.6(c), Defendants' intentionally evasive conduct subjects their foreign activities to Subtitle A. Because the Complaint plausibly alleges each Defendant violated Regulation 1.6(a), extraterritoriality does not provide a basis for dismissal for any of the claims in the Complaint, because they all are at least partially based on provisions of Subtitle A.

For all these reasons, no portion of the Complaint should be dismissed at this stage of the case based on extraterritoriality.

### 5. The alternative pleading theories in Counts I and III reflect proper domestic applications of the relevant statutory provisions.

As set forth above, Counts I and III plausibly allege violations of provisions of the CEA that contain express grants of extraterritoriality so the Court need not address all the potential ways in which the CFTC can prove those claims at this stage of the case. *See Bilek*, 8 F.4th at 587. To the extent the Court does address the alternative theories of relief in Counts I and III that do not expressly apply to foreign conduct, they each satisfy *Morrison*'s step 2 because they allege domestic applications of the relevant provisions.

As set out above, *Morrison*'s step 2 requires a threshold determination of the "focus" of the relevant statutory provision.[33]  561 U.S. at 262.  In *Morrison*, the Supreme Court held that Section 10(b) of the Securities Exchange Act is transaction focused because it applies to deceptive conduct "in connection with the purchase or sale" of a security.  *Id.* at 266.  Binance incorrectly assumes that, like § 10(b) of the Securities Exchange Act, the focus of the Counts I and III "is on transactions" and argues that since the Complaint does not allege the location of Binance's servers, then it does not plausibly allege that Counts I and III arise out of domestic transactions.  (Binance Mot. 19–21.)

To determine the focus of a particular statutory provision, federal courts take "great pains" to assess "the particular statutory provision at issue," *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 67 (2d Cir. 2018), and look to the interests the statutory provision seeks to protect or vindicate, *see WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018).[34]  Therefore, as to Counts I and III (the only claims that are partially based on non-swaps activities), the Court should look to the text of the specific provisions at issue and the interests these sections seek to protect, both of which Defendants ignore.  The text of both 7 U.S.C. §§ 6(a) and 6d(a) reflect a focus that is broader than specific transactions and, unlike § 10(b) of the Securities Exchange Act, not limited to the "purchase or sale" of an asset.

---

[33]  The Second Circuit has adopted an additional requirement at *Morrison* step 2.  Namely, that the defendant's conduct not be "predominately foreign."  *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019).  This gloss is inconsistent with *Morrison* and other circuits have rejected it.  *See SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021); *Stoyas*, 896 F.3d at 950.  To the extent the Court reaches the second step of the *Morrison* test in this case, it should not adopt the Second Circuit's analytical framework for the reasons set out in *Morrone*.
[34]  Many of the cases dealing with the extraterritorial application of the CEA are inapposite here because they are private rights of action arising under 7 U.S.C. § 25(a)(1), which provides a cause of action to any person who is damaged by a violation of the CEA "resulting from one or more" specified "transactions."  *See Loginovskoya v. Batratchenko*, 764 F.3d 266, 270, 272 (2d Cir. 2014) ("A private right of action is afforded by CEA § 22, *see* 7 U.S.C. § 25(a)(1), limited to four circumstances, each of them explicitly transactional in nature . . . .").

First, as to Count I, one of its alternative theories of relief is that Binance violated

7 U.S.C. § 6(a), which provides:

> [I]t shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions) unless—
>
> Such transaction is conducted on or subject to the rules of a [DCM] . . . .

The focus of this provision is "dealing in" futures contracts, which according to the CEA's text can come in many forms including offering to enter into, executing, or "conducting any office or business anywhere in the United States" for the purpose of soliciting orders for futures. The Complaint plausibly alleges that Binance deals in futures contracts in the United States because, as noted above, it conducts business in the United States for the purpose of soliciting orders for futures.[35] Accordingly, Count I plausibly alleges a domestic application of 7 U.S.C. § 6(a).

Second, Count III's primary alternative theory of relief is that Binance violated 7 U.S.C. § 6d by soliciting and accepting orders for futures contracts or leveraged retail commodity transactions without registration as an FCM. As relevant here, the definition of FCM focuses on "soliciting or accepting" orders for futures contracts. 7 U.S.C. §§ 1a(28)(A)(i)(I)(aa)(AA), (DD). Solicitations occur at the location of the recipient, in this case Binance's customers. *See United States v. Sumeru*, 449 F. App'x 617, 621 (9th Cir. 2011) (defendant's conduct was not

---

[35] *Abitron Austria GmbH v. Hetronic Int'l, Inc.* states that *Morrison*'s step 2 also requires analysis of "the location of the conduct relevant to the focus" of the statute. 600 U.S. 412, 419 (2023) (analyzing Lanham Act claims, where the conduct relevant to statute's focus was use of an infringing mark in commerce). In the context of this case, the conduct that is relevant to the focus of 7 U.S.C. §§ 6(a) and 6d occurred in the United States because Binance conducts business in the United States and Binance solicits orders for financial derivatives from its U.S. customers via its web-based trading platform (among other ways).

impermissibly foreign where he made "numerous domestic offers of securities by soliciting potential investors in the United States" including "through the U.S. mail"). Because Binance had U.S. customers during the Relevant Period and solicited orders from those customers via the dissemination of its website throughout the United States and in person at industry events that took place in the United States, (Compl. ¶¶ 78, 79), the Complaint plausibly alleges domestic conduct by Binance within the focus of 7 U.S.C. § 6d

### E. Counts V and VI Are Sufficiently Alleged to the Same Extent as Count III.

Binance contends that Counts V and VI do not satisfy *Morrison*'s step 2 because the Complaint fails to allege "any domestic administrative conduct (or misconduct)." (Binance Mot. 22.) As discussed above, Counts V and VI rest on 17 C.F.R. §§ 166.3 and 42.2, which impose regulatory duties on persons that act as FCMs to diligently supervise their activities concerning commodity interests and to implement effective AML programs, respectively. Because the CFTC has plausibly alleged Binance is an FCM, these duties automatically apply no matter where they are or are not conducted.

Accepting Binance's premise that an FCM only needs to comply with 17 C.F.R. §§ 166.3 or 42.2 if it performs the relevant activities in the United States would lead to absurd results. An FCM could unilaterally opt to avoid complying with federal law by moving applicable back office functions to a location outside the United States, contracting with an overseas vendor to purport to conduct the relevant activities, or simply not performing required activities at all.

### F. The Complaint Sufficiently Alleges That Binance Has Acted as a Futures Commission Merchant Without Registration, in Violation of 7 U.S.C. § 6d(a).

In Defendants' opinion, the Complaint does not allege that Binance is an FCM because Binance is not characterized as an "intermediary." (Binance Mot. 30–34.) The Court should decline Binance's invitation to amend the text of the CEA to include such a requirement. The

47

Complaint plausibly alleges that Binance satisfies the statutory definition of an FCM, 7 U.S.C. § 1a(28), and that Binance was not registered in that capacity.

### 1. Statutory definition of the term "futures commission merchant."

As relevant here, the CEA defines FCM to include an entity that is: (1) engaged in soliciting or accepting orders for futures, options, swaps, or leveraged retail commodity transactions, *see* 7 U.S.C. § 1a(28)(A)(i)(I)(aa), or (2) acting as a counterparty to leveraged retail commodity transactions, *id.* § 1a(28)(A)(i)(I)(bb), and in connection with either of these activities, accepts money, securities, or property to margin, guarantee, or secure any trades or contracts that result or may result therefrom, *id.* § 1a(28)(A)(i)(II). If an entity meets this definition, it must register as an FCM with the CFTC, 7 U.S.C. § 6d(a)(1), and comply with applicable operational, supervisory, and recordkeeping requirements.

The CEA's FCM definition does not include a requirement that the entity be an "intermediary." Binance's atextual analysis was recently rejected in an analogous criminal case. *See United States v. Reed*, 2022 WL 597180, at *2–3 (S.D.N.Y. Feb. 28, 2022) ("the defendant points to no limitation in the definition of an FCM that requires that an FCM be an intermediary").[36] Different registration categories under the CEA serve different purposes to protect or further different interests. Binance aggregates many functions, including soliciting customers, custodying customer property, margin lending, and processing and confirming derivatives transactions. Many of the things Binance does require registration (or a valid

---

[36] Binance incorrectly attempts to distinguish *Reed* on the basis that it decided a motion to dismiss a criminal indictment rather than a civil complaint. (Binance Mot. 32 n.24.) The two standards differ on the level of factual specificity required by Federal Rule of Civil Procedure 8(a) and Federal Rule of Criminal Procedure 7(c). *See United States v. Vaughn*, 722 F.3d 918, 925–26 (7th Cir. 2013). But the issue teed up in *Reed* was a pure question of law—what is the correct construction of the statutory FCM definition. *See United States v. Sutton*, 337 F.3d 792, 802 (7th Cir. 2003) ("Statutory interpretation is a matter of law."). Because the issue here is exactly the same—how should the Court interpret 7 U.S.C. § 1a(28)—*Reed* is applicable, persuasive authority.

exemption) based on a determination by Congress that the function is sufficiently important that the prophylaxis of registration is appropriate. It is a violation for Binance to avoid registering in each required capacity. *See id.* ("even if BitMEX might have also fallen within another registration category, the registration categories are not exclusive of one another"); *see also* 17 C.F.R. § 3.4(a) ("registration in one capacity under the [CEA] shall not include registration in any other capacity"). Binance's argument reduces to: we do many things wrong but we should only be held accountable for one of those things. The Court should reject that approach to regulatory compliance.[37]

Not only does Binance's argument rely on an extratextual premise, it directly contradicts the statutory text. One prong of the FCM definition can be met if a person acts as a counterparty to certain customer-facing transactions. 7 U.S.C. § 1a(28)(A)(i)(I)(bb). If the Court paints Binance's "intermediary" gloss on § 1a(28), it would effectively delete a portion of the statute.

Finally, Binance's reliance on the regulatory definition of "order," 17 C.F.R. § 1.3, to attempt to graft the term "intermediary" onto the statutory FCM definition does not withstand scrutiny. That definition states that an order is an instruction given to an FCM by a customer "regarding trading in a commodity interest on behalf of the customer." But whether a third party stands between the customer and Binance, each customer order is intended to be placed and executed on Binance on the customer's behalf, not on behalf of some unrelated account.

---

[37] It is common for regulatory agencies to allege multiple registration violations against financial services companies that perform multiple functions under one roof. *See, e.g., CFTC v. Monex Credit Co.*, 931 F.3d 966, 971–72 (9th Cir. 2019) (precious metals dealer sued for illegal off-exchange futures transactions and acting as an unregistered FCM, among other violations); *CFTC v. HDR Global Trading Ltd.*, No. 1:20-cv-8132 (S.D.N.Y.) (complaint alleging direct-access digital asset exchange acted as an unregistered exchange and FCM, among other violations); *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-1599 (D.D.C.) (SEC action alleging Binance acted as an unregistered broker-dealer, exchange, and clearing agency, among other violations); *SEC v. Bittrex, Inc.*, No. 2:23-cv-580 (W.D. Wash.) (SEC action alleging direct-access digital asset exchange acted as an unregistered broker-dealer, exchange, and clearing agency, among other violations).

### 2. The Complaint plausibly alleges Binance meets the definition of an FCM.

The Complaint plausibly alleges that Binance solicits and accepts orders for futures, options, swaps, and leveraged retail commodity transactions. (Compl. ¶¶ 42, 44, 58, 60, 72, 74.) It also plausibly alleges that Binance acts as counterparty to leveraged retail commodity transactions that are financed by Binance because Binance trades in its spot markets (the platform on which leveraged retail commodity transactions occur) through approximately 300 proprietary accounts. (*See id.* ¶¶ 56, 57, 69.) The Court should draw the reasonable inference that at least some U.S. retail customers' leveraged commodity transactions matched against a Binance-controlled account during the years-long Relevant Period. And the Complaint plausibly alleges that Binance holds customer property to margin or guarantee customer trading in futures, options, swaps, and leveraged retail commodity transactions. (*See id.* ¶¶ 65, 66.)

Therefore, the Complaint sufficiently alleges that Binance satisfies the elements of the statutory FCM definition.

## IV. CONCLUSION

For the reasons set forth above, the Court should DENY both motions to dismiss.

Dated: September 22, 2023

Respectfully submitted,

Commodity Futures Trading Commission
By its attorneys:

*/s/ Joseph Platt*

Joseph Platt
Trial Attorney
*jplatt@cftc.gov*
312-596-0562 (office)
773-241-1543 (cell)

Candice Haan
Senior Trial Attorney
*chaan@cftc.gov*

Katherine S. Paulson
Trial Attorney
*kpaulson@cftc.gov*

Elizabeth N. Pendleton
Chief Trial Attorney
*ependleton@cftc.gov*

Scott R. Williamson
Deputy Regional Counsel
*swilliamson@cftc.gov*

Robert T. Howell
Deputy Director
*rhowell@cftc.gov*

Commodity Futures Trading Commission
Ralph Metcalfe Federal Building
77 West Jackson Boulevard, Suite 800
Chicago, Illinois 60604
(312) 596-0700
(312) 596-0714 (fax)
*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*

**CERTIFICATE OF SERVICE**

I certify that I served the CFTC's Consolidated Response to Defendants' Motions to Dismiss on all counsel that have appeared in this action by filing it with the Court's electronic-filing system.

September 22, 2023                                    *Joseph C. Platt*