IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| Commodity Futures Trading Commission, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Changpeng Zhao, Binance Holdings Limited, )<br>Binance Holdings (IE) Limited, Binance )<br>(Services) Holdings Limited, and Samuel )<br>Lim, )<br>)<br>Defendants. )<br>) | Case Number: 1:23-cv-1887<br><br>Hon. Manish S. Shah |

## <u>DECLARATION OF JOSEPH C. PLATT</u>

I submit this declaration pursuant to 28 U.S.C. § 1746 in connection with Plaintiff

Commodity Futures Trading Commission's ("CFTC") consolidated response to Defendants'

motions to dismiss the complaint.

1.    I am employed by the CFTC as a trial attorney and I have appeared on behalf of

the CFTC in this action.

2.    A true and accurate copy of the table of contents and Subtitle A of Title VII of the

Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. 111-203, Sections 701–

754 (2010) is attached as **Exhibit A**.  The full text of this law is available at:

https://www.congress.gov/bill/111th-congress/house-bill/4173/text.

3.    A true and accurate copy of Cross-Border Application of the Registration

Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants,

85 Fed. Reg. 56,924 (Sept. 14, 2020) is attached as **Exhibit B**.

4. A true and accurate copy of Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule, 77 Fed. Reg. 48,208 (Aug. 13, 2012) is attached as **Exhibit C**.

5. A true and accurate copy of Interpretive Guidance and Policy Statements Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45,292 (July 26, 2013) is attached as **Exhibit D**.

6. A true and accurate copy of a CFTC-prepared summary of Interpretive Guidance and Policy Statements Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45,292 (July 26, 2013) is attached as **Exhibit E**.

7. The following materials are provided for the limited purpose of supporting the CFTC's alternative request for leave to file a motion to seek jurisdictional discovery. (*See* CFTC Resp. 35.)

8. A true and accurate copy of portions of the transcript of the February 10, 2022 testimony of Binance Holdings Limited is attached as **Exhibit F**.

9. A true and accurate copy of exhibit 2 from the February 10, 2022 testimony of Binance Holdings Limited is attached as **Exhibit G**.

10. A true and accurate copy of a document produced to the CFTC by Binance Holdings Limited with production label BHL-CFTC-O-000009809 is attached as **Exhibit H**.

11. A true and accurate copy of an April 21, 2022 letter from Justin Schur (the U.S.-based lawyer who represented Defendant Samuel Lim in the CFTC's pre-suit investigation and represents him in this action) to Candy Haan (a CFTC attorney) is attached as **Exhibit I**. In his April 21, 2022 letter, Mr. Schur wrote that he was "not authorized to accept service" of a subpoena for investigative testimony on Lim's behalf.

12.     On multiple occasions during the CFTC's pre-suit investigation, the U.S.-based lawyer who represented Defendant Changpeng Zhao (who is the same lawyer that represents Zhao in this action) stated that he would not accept a subpoena for investigative testimony on Zhao's behalf because, in substance and among other reasons, the CFTC did not have jurisdiction over Zhao.

13.     Because the U.S.-based attorneys that represented Zhao and Lim during the CFTC's pre-suit investigation (who are the same lawyers that represent those Defendants in this case) refused to accept service of subpoenas on their clients' behalves or present them for investigative testimony, the CFTC was not able to take testimony from Zhao or Lim before filing the complaint.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 22, 2023.                    *Joseph C. Platt*

# EXHIBIT A



# DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT

Public Law 111–203
111th Congress

## An Act

July 21, 2010
[H.R. 4173]

To promote the financial stability of the United States by improving accountability and transparency in the financial system, to end "too big to fail", to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Dodd-Frank Wall Street Reform and Consumer Protection Act. 12 USC 5301 note.

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Dodd-Frank Wall Street Reform and Consumer Protection Act".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.
Sec. 3. Severability.
Sec. 4. Effective date.
Sec. 5. Budgetary effects.
Sec. 6. Antitrust savings clause.

TITLE I—FINANCIAL STABILITY

Sec. 101. Short title.
Sec. 102. Definitions.

Subtitle A—Financial Stability Oversight Council

Sec. 111. Financial Stability Oversight Council established.
Sec. 112. Council authority.
Sec. 113. Authority to require supervision and regulation of certain nonbank financial companies.
Sec. 114. Registration of nonbank financial companies supervised by the Board of Governors.
Sec. 115. Enhanced supervision and prudential standards for nonbank financial companies supervised by the Board of Governors and certain bank holding companies.
Sec. 116. Reports.
Sec. 117. Treatment of certain companies that cease to be bank holding companies.
Sec. 118. Council funding.
Sec. 119. Resolution of supervisory jurisdictional disputes among member agencies.
Sec. 120. Additional standards applicable to activities or practices for financial stability purposes.
Sec. 121. Mitigation of risks to financial stability.
Sec. 122. GAO Audit of Council.
Sec. 123. Study of the effects of size and complexity of financial institutions on capital market efficiency and economic growth.

Subtitle B—Office of Financial Research

Sec. 151. Definitions.
Sec. 152. Office of Financial Research established.
Sec. 153. Purpose and duties of the Office.
Sec. 154. Organizational structure; responsibilities of primary programmatic units.
Sec. 155. Funding.
Sec. 156. Transition oversight.

Subtitle C—Additional Board of Governors Authority for Certain Nonbank Financial
                    Companies and Bank Holding Companies

Sec. 161. Reports by and examinations of nonbank financial companies by the
          Board of Governors.
Sec. 162. Enforcement.
Sec. 163. Acquisitions.
Sec. 164. Prohibition against management interlocks between certain financial
          companies.
Sec. 165. Enhanced supervision and prudential standards for nonbank financial
          companies supervised by the Board of Governors and certain bank hold-
          ing companies.
Sec. 166. Early remediation requirements.
Sec. 167. Affiliations.
Sec. 168. Regulations.
Sec. 169. Avoiding duplication.
Sec. 170. Safe harbor.
Sec. 171. Leverage and risk-based capital requirements.
Sec. 172. Examination and enforcement actions for insurance and orderly liquida-
          tion purposes.
Sec. 173. Access to United States financial market by foreign institutions.
Sec. 174. Studies and reports on holding company capital requirements.
Sec. 175. International policy coordination.
Sec. 176. Rule of construction.

                 TITLE II—ORDERLY LIQUIDATION AUTHORITY

Sec. 201. Definitions.
Sec. 202. Judicial review.
Sec. 203. Systemic risk determination.
Sec. 204. Orderly liquidation of covered financial companies.
Sec. 205. Orderly liquidation of covered brokers and dealers.
Sec. 206. Mandatory terms and conditions for all orderly liquidation actions.
Sec. 207. Directors not liable for acquiescing in appointment of receiver.
Sec. 208. Dismissal and exclusion of other actions.
Sec. 209. Rulemaking; non-conflicting law.
Sec. 210. Powers and duties of the Corporation.
Sec. 211. Miscellaneous provisions.
Sec. 212. Prohibition of circumvention and prevention of conflicts of interest.
Sec. 213. Ban on certain activities by senior executives and directors.
Sec. 214. Prohibition on taxpayer funding.
Sec. 215. Study on secured creditor haircuts.
Sec. 216. Study on bankruptcy process for financial and nonbank financial institu-
          tions
Sec. 217. Study on international coordination relating to bankruptcy process for
          nonbank financial institutions

           TITLE III—TRANSFER OF POWERS TO THE COMPTROLLER OF THE
            CURRENCY, THE CORPORATION, AND THE BOARD OF GOVERNORS

Sec. 300. Short title.
Sec. 301. Purposes.
Sec. 302. Definition.

                  Subtitle A—Transfer of Powers and Duties

Sec. 311. Transfer date.
Sec. 312. Powers and duties transferred.
Sec. 313. Abolishment.
Sec. 314. Amendments to the Revised Statutes.
Sec. 315. Federal information policy.
Sec. 316. Savings provisions.
Sec. 317. References in Federal law to Federal banking agencies.
Sec. 318. Funding.
Sec. 319. Contracting and leasing authority.

                    Subtitle B—Transitional Provisions

Sec. 321. Interim use of funds, personnel, and property of the Office of Thrift Su-
          pervision.
Sec. 322. Transfer of employees.
Sec. 323. Property transferred.
Sec. 324. Funds transferred.
Sec. 325. Disposition of affairs.
Sec. 326. Continuation of services.

Sec. 327. Implementation plan and reports.

Subtitle C—Federal Deposit Insurance Corporation

Sec. 331. Deposit insurance reforms.
Sec. 332. Elimination of procyclical assessments.
Sec. 333. Enhanced access to information for deposit insurance purposes.
Sec. 334. Transition reserve ratio requirements to reflect new assessment base.
Sec. 335. Permanent increase in deposit and share insurance.
Sec. 336. Management of the Federal Deposit Insurance Corporation.

Subtitle D—Other Matters

Sec. 341. Branching.
Sec. 342. Office of Minority and Women Inclusion.
Sec. 343. Insurance of transaction accounts.

Subtitle E—Technical and Conforming Amendments

Sec. 351. Effective date.
Sec. 352. Balanced Budget and Emergency Deficit Control Act of 1985.
Sec. 353. Bank Enterprise Act of 1991.
Sec. 354. Bank Holding Company Act of 1956.
Sec. 355. Bank Holding Company Act Amendments of 1970.
Sec. 356. Bank Protection Act of 1968.
Sec. 357. Bank Service Company Act.
Sec. 358. Community Reinvestment Act of 1977.
Sec. 359. Crime Control Act of 1990.
Sec. 360. Depository Institution Management Interlocks Act.
Sec. 361. Emergency Homeowners' Relief Act.
Sec. 362. Federal Credit Union Act.
Sec. 363. Federal Deposit Insurance Act.
Sec. 364. Federal Home Loan Bank Act.
Sec. 365. Federal Housing Enterprises Financial Safety and Soundness Act of 1992.
Sec. 366. Federal Reserve Act.
Sec. 367. Financial Institutions Reform, Recovery, and Enforcement Act of 1989.
Sec. 368. Flood Disaster Protection Act of 1973.
Sec. 369. Home Owners' Loan Act.
Sec. 370. Housing Act of 1948.
Sec. 371. Housing and Community Development Act of 1992.
Sec. 372. Housing and Urban-Rural Recovery Act of 1983.
Sec. 373. National Housing Act.
Sec. 374. Neighborhood Reinvestment Corporation Act.
Sec. 375. Public Law 93–100.
Sec. 376. Securities Exchange Act of 1934.
Sec. 377. Title 18, United States Code.
Sec. 378. Title 31, United States Code.

TITLE IV—REGULATION OF ADVISERS TO HEDGE FUNDS AND OTHERS

Sec. 401. Short title.
Sec. 402. Definitions.
Sec. 403. Elimination of private adviser exemption; limited exemption for foreign private advisers; limited intrastate exemption.
Sec. 404. Collection of systemic risk data; reports; examinations; disclosures.
Sec. 405. Disclosure provision amendment.
Sec. 406. Clarification of rulemaking authority.
Sec. 407. Exemption of venture capital fund advisers.
Sec. 408. Exemption of and record keeping by private equity fund advisers.
Sec. 409. Family offices.
Sec. 410. State and Federal responsibilities; asset threshold for Federal registration of investment advisers.
Sec. 411. Custody of client assets.
Sec. 412. Adjusting the accredited investor standard.
Sec. 413. GAO study and report on accredited investors.
Sec. 414. GAO study on self-regulatory organization for private funds.
Sec. 415. Commission study and report on short selling.
Sec. 416. Transition period.

TITLE V—INSURANCE

Subtitle A—Office of National Insurance

Sec. 501. Short title.
Sec. 502. Federal Insurance Office.

Subtitle B—State-Based Insurance Reform

Sec. 511. Short title.

Sec. 512. Effective date.

PART I—NONADMITTED INSURANCE

Sec. 521. Reporting, payment, and allocation of premium taxes.
Sec. 522. Regulation of nonadmitted insurance by insured's home State.
Sec. 523. Participation in national producer database.
Sec. 524. Uniform standards for surplus lines eligibility.
Sec. 525. Streamlined application for commercial purchasers.
Sec. 526. GAO study of nonadmitted insurance market.
Sec. 527. Definitions.

PART II—REINSURANCE

Sec. 531. Regulation of credit for reinsurance and reinsurance agreements.
Sec. 532. Regulation of reinsurer solvency.
Sec. 533. Definitions.

PART III—RULE OF CONSTRUCTION

Sec. 541. Rule of construction.
Sec. 542. Severability.

TITLE VI—IMPROVEMENTS TO REGULATION OF BANK AND SAVINGS
ASSOCIATION HOLDING COMPANIES AND DEPOSITORY INSTITUTIONS

Sec. 601. Short title.
Sec. 602. Definition.
Sec. 603. Moratorium and study on treatment of credit card banks, industrial loan
          companies, and certain other companies under the Bank Holding Com-
          pany Act of 1956.
Sec. 604. Reports and examinations of holding companies; regulation of functionally
          regulated subsidiaries.
Sec. 605. Assuring consistent oversight of permissible activities of depository insti-
          tution subsidiaries of holding companies.
Sec. 606. Requirements for financial holding companies to remain well capitalized
          and well managed.
Sec. 607. Standards for interstate acquisitions.
Sec. 608. Enhancing existing restrictions on bank transactions with affiliates.
Sec. 609. Eliminating exceptions for transactions with financial subsidiaries.
Sec. 610. Lending limits applicable to credit exposure on derivative transactions,
          repurchase agreements, reverse repurchase agreements, and securities
          lending and borrowing transactions.
Sec. 611. Consistent treatment of derivative transactions in lending limits.
Sec. 612. Restriction on conversions of troubled banks.
Sec. 613. De novo branching into States.
Sec. 614. Lending limits to insiders.
Sec. 615. Limitations on purchases of assets from insiders.
Sec. 616. Regulations regarding capital levels.
Sec. 617. Elimination of elective investment bank holding company framework.
Sec. 618. Securities holding companies.
Sec. 619. Prohibitions on proprietary trading and certain relationships with hedge
          funds and private equity funds.
Sec. 620. Study of bank investment activities.
Sec. 621. Conflicts of interest.
Sec. 622. Concentration limits on large financial firms.
Sec. 623. Interstate merger transactions.
Sec. 624. Qualified thrift lenders.
Sec. 625. Treatment of dividends by certain mutual holding companies.
Sec. 626. Intermediate holding companies.
Sec. 627. Interest-bearing transaction accounts authorized.
Sec. 628. Credit card bank small business lending.

TITLE VII—WALL STREET TRANSPARENCY AND ACCOUNTABILITY

Sec. 701. Short title.

Subtitle A—Regulation of Over-the-Counter Swaps Markets

PART I—REGULATORY AUTHORITY

Sec. 711. Definitions.
Sec. 712. Review of regulatory authority.
Sec. 713. Portfolio margining conforming changes.
Sec. 714. Abusive swaps.
Sec. 715. Authority to prohibit participation in swap activities.

Sec. 716. Prohibition against Federal Government bailouts of swaps entities.
Sec. 717. New product approval CFTC—SEC process.
Sec. 718. Determining status of novel derivative products.
Sec. 719. Studies.
Sec. 720. Memorandum.

PART II—REGULATION OF SWAP MARKETS

Sec. 721. Definitions.
Sec. 722. Jurisdiction.
Sec. 723. Clearing.
Sec. 724. Swaps; segregation and bankruptcy treatment.
Sec. 725. Derivatives clearing organizations.
Sec. 726. Rulemaking on conflict of interest.
Sec. 727. Public reporting of swap transaction data.
Sec. 728. Swap data repositories.
Sec. 729. Reporting and recordkeeping.
Sec. 730. Large swap trader reporting.
Sec. 731. Registration and regulation of swap dealers and major swap participants.
Sec. 732. Conflicts of interest.
Sec. 733. Swap execution facilities.
Sec. 734. Derivatives transaction execution facilities and exempt boards of trade.
Sec. 735. Designated contract markets.
Sec. 736. Margin.
Sec. 737. Position limits.
Sec. 738. Foreign boards of trade.
Sec. 739. Legal certainty for swaps.
Sec. 740. Multilateral clearing organizations.
Sec. 741. Enforcement.
Sec. 742. Retail commodity transactions.
Sec. 743. Other authority.
Sec. 744. Restitution remedies.
Sec. 745. Enhanced compliance by registered entities.
Sec. 746. Insider trading.
Sec. 747. Antidisruptive practices authority.
Sec. 748. Commodity whistleblower incentives and protection.
Sec. 749. Conforming amendments.
Sec. 750. Study on oversight of carbon markets.
Sec. 751. Energy and environmental markets advisory committee.
Sec. 752. International harmonization.
Sec. 753. Anti-manipulation authority.
Sec. 754. Effective date.

Subtitle B—Regulation of Security-Based Swap Markets

Sec. 761. Definitions under the Securities Exchange Act of 1934.
Sec. 762. Repeal of prohibition on regulation of security-based swap agreements.
Sec. 763. Amendments to the Securities Exchange Act of 1934.
Sec. 764. Registration and regulation of security-based swap dealers and major security-based swap participants.
Sec. 765. Rulemaking on conflict of interest.
Sec. 766. Reporting and recordkeeping.
Sec. 767. State gaming and bucket shop laws.
Sec. 768. Amendments to the Securities Act of 1933; treatment of security-based swaps.
Sec. 769. Definitions under the Investment Company Act of 1940.
Sec. 770. Definitions under the Investment Advisers Act of 1940.
Sec. 771. Other authority.
Sec. 772. Jurisdiction.
Sec. 773. Civil penalties.
Sec. 774. Effective date.

TITLE VIII—PAYMENT, CLEARING, AND SETTLEMENT SUPERVISION

Sec. 801. Short title.
Sec. 802. Findings and purposes.
Sec. 803. Definitions.
Sec. 804. Designation of systemic importance.
Sec. 805. Standards for systemically important financial market utilities and payment, clearing, or settlement activities.
Sec. 806. Operations of designated financial market utilities.
Sec. 807. Examination of and enforcement actions against designated financial market utilities.
Sec. 808. Examination of and enforcement actions against financial institutions subject to standards for designated activities.

Sec. 809. Requests for information, reports, or records.
Sec. 810. Rulemaking.
Sec. 811. Other authority.
Sec. 812. Consultation.
Sec. 813. Common framework for designated clearing entity risk management.
Sec. 814. Effective date.

TITLE IX—INVESTOR PROTECTIONS AND IMPROVEMENTS TO THE
REGULATION OF SECURITIES

Sec. 901. Short title.

Subtitle A—Increasing Investor Protection

Sec. 911. Investor Advisory Committee established.
Sec. 912. Clarification of authority of the Commission to engage in investor testing.
Sec. 913. Study and rulemaking regarding obligations of brokers, dealers, and in-
vestment advisers.
Sec. 914. Study on enhancing investment adviser examinations.
Sec. 915. Office of the Investor Advocate.
Sec. 916. Streamlining of filing procedures for self-regulatory organizations.
Sec. 917. Study regarding financial literacy among investors.
Sec. 918. Study regarding mutual fund advertising.
Sec. 919. Clarification of Commission authority to require investor disclosures be-
fore purchase of investment products and services.
Sec. 919A. Study on conflicts of interest.
Sec. 919B. Study on improved investor access to information on investment advis-
ers and broker-dealers.
Sec. 919C. Study on financial planners and the use of financial designations.
Sec. 919D. Ombudsman.

Subtitle B—Increasing Regulatory Enforcement and Remedies

Sec. 921. Authority to restrict mandatory pre-dispute arbitration.
Sec. 922. Whistleblower protection.
Sec. 923. Conforming amendments for whistleblower protection.
Sec. 924. Implementation and transition provisions for whistleblower protection.
Sec. 925. Collateral bars.
Sec. 926. Disqualifying felons and other "bad actors" from Regulation D offerings.
Sec. 927. Equal treatment of self-regulatory organization rules.
Sec. 928. Clarification that section 205 of the Investment Advisers Act of 1940 does
not apply to State-registered advisers.
Sec. 929. Unlawful margin lending.
Sec. 929A. Protection for employees of subsidiaries and affiliates of publicly traded
companies.
Sec. 929B. Fair Fund amendments.
Sec. 929C. Increasing the borrowing limit on Treasury loans.
Sec. 929D. Lost and stolen securities.
Sec. 929E. Nationwide service of subpoenas.
Sec. 929F. Formerly associated persons.
Sec. 929G. Streamlined hiring authority for market specialists.
Sec. 929H. SIPC Reforms.
Sec. 929I. Protecting confidentiality of materials submitted to the Commission.
Sec. 929J. Expansion of audit information to be produced and exchanged.
Sec. 929K. Sharing privileged information with other authorities.
Sec. 929L. Enhanced application of antifraud provisions.
Sec. 929M. Aiding and abetting authority under the Securities Act and the Invest-
ment Company Act.
Sec. 929N. Authority to impose penalties for aiding and abetting violations of the
Investment Advisers Act.
Sec. 929O. Aiding and abetting standard of knowledge satisfied by recklessness.
Sec. 929P. Strengthening enforcement by the Commission.
Sec. 929Q. Revision to recordkeeping rule.
Sec. 929R. Beneficial ownership and short-swing profit reporting.
Sec. 929S. Fingerprinting.
Sec. 929T. Equal treatment of self-regulatory organization rules.
Sec. 929U. Deadline for completing examinations, inspections and enforcement ac-
tions.
Sec. 929V. Security Investor Protection Act amendments.
Sec. 929W. Notice to missing security holders.
Sec. 929X. Short sale reforms.
Sec. 929Y. Study on extraterritorial private rights of action.
Sec. 929Z. GAO study on securities litigation.

Subtitle C—Improvements to the Regulation of Credit Rating Agencies

Sec. 931. Findings.

Sec. 932. Enhanced regulation, accountability, and transparency of nationally recognized statistical rating organizations.
Sec. 933. State of mind in private actions.
Sec. 934. Referring tips to law enforcement or regulatory authorities.
Sec. 935. Consideration of information from sources other than the issuer in rating decisions.
Sec. 936. Qualification standards for credit rating analysts.
Sec. 937. Timing of regulations.
Sec. 938. Universal ratings symbols.
Sec. 939. Removal of statutory references to credit ratings.
Sec. 939A. Review of reliance on ratings.
Sec. 939B. Elimination of exemption from fair disclosure rule.
Sec. 939C. Securities and Exchange Commission study on strengthening credit rating agency independence.
Sec. 939D. Government Accountability Office study on alternative business models.
Sec. 939E. Government Accountability Office study on the creation of an independent professional analyst organization.
Sec. 939F. Study and rulemaking on assigned credit ratings.
Sec. 939G. Effect of Rule 436(g).
Sec. 939H. Sense of Congress.

Subtitle D—Improvements to the Asset-Backed Securitization Process

Sec. 941. Regulation of credit risk retention.
Sec. 942. Disclosures and reporting for asset-backed securities.
Sec. 943. Representations and warranties in asset-backed offerings.
Sec. 944. Exempted transactions under the Securities Act of 1933.
Sec. 945. Due diligence analysis and disclosure in asset-backed securities issues.
Sec. 946. Study on the macroeconomic effects of risk retention requirements.

Subtitle E—Accountability and Executive Compensation

Sec. 951. Shareholder vote on executive compensation disclosures.
Sec. 952. Compensation committee independence.
Sec. 953. Executive compensation disclosures.
Sec. 954. Recovery of erroneously awarded compensation.
Sec. 955. Disclosure regarding employee and director hedging.
Sec. 956. Enhanced compensation structure reporting.
Sec. 957. Voting by brokers.

Subtitle F—Improvements to the Management of the Securities and Exchange Commission

Sec. 961. Report and certification of internal supervisory controls.
Sec. 962. Triennial report on personnel management.
Sec. 963. Annual financial controls audit.
Sec. 964. Report on oversight of national securities associations.
Sec. 965. Compliance examiners.
Sec. 966. Suggestion program for employees of the Commission.
Sec. 967. Commission organizational study and reform.
Sec. 968. Study on SEC revolving door.

Subtitle G—Strengthening Corporate Governance

Sec. 971. Proxy access.
Sec. 972. Disclosures regarding chairman and CEO structures.

Subtitle H—Municipal Securities

Sec. 975. Regulation of municipal securities and changes to the board of the MSRB.
Sec. 976. Government Accountability Office study of increased disclosure to investors.
Sec. 977. Government Accountability Office study on the municipal securities markets.
Sec. 978. Funding for Governmental Accounting Standards Board.
Sec. 979. Commission Office of Municipal Securities.

Subtitle I—Public Company Accounting Oversight Board, Portfolio Margining, and Other Matters

Sec. 981. Authority to share certain information with foreign authorities.
Sec. 982. Oversight of brokers and dealers.
Sec. 983. Portfolio margining.
Sec. 984. Loan or borrowing of securities.
Sec. 985. Technical corrections to Federal securities laws.
Sec. 986. Conforming amendments relating to repeal of the Public Utility Holding Company Act of 1935.

Sec. 987. Amendment to definition of material loss and nonmaterial losses to the
           Deposit Insurance Fund for purposes of Inspector General reviews.
Sec. 988. Amendment to definition of material loss and nonmaterial losses to the
           National Credit Union Share Insurance Fund for purposes of Inspector
           General reviews.
Sec. 989. Government Accountability Office study on proprietary trading.
Sec. 989A. Senior investor protections.
Sec. 989B. Designated Federal entity inspectors general independence.
Sec. 989C. Strengthening Inspector General accountability.
Sec. 989D. Removal of Inspectors General of designated Federal entities.
Sec. 989E. Additional oversight of financial regulatory system.
Sec. 989F. GAO study of person to person lending.
Sec. 989G. Exemption for nonaccelerated filers.
Sec. 989H. Corrective responses by heads of certain establishments to deficiencies
           identified by Inspectors General.
Sec. 989I. GAO study regarding exemption for smaller issuers.
Sec. 989J. Further promoting the adoption of the NAIC Model Regulations that en-
           hance protection of seniors and other consumers.

### Subtitle J—Securities and Exchange Commission Match Funding

Sec. 991. Securities and Exchange Commission match funding.

### TITLE X—BUREAU OF CONSUMER FINANCIAL PROTECTION

Sec. 1001. Short title.
Sec. 1002. Definitions.

#### Subtitle A—Bureau of Consumer Financial Protection

Sec. 1011. Establishment of the Bureau of Consumer Financial Protection.
Sec. 1012. Executive and administrative powers.
Sec. 1013. Administration.
Sec. 1014. Consumer Advisory Board.
Sec. 1015. Coordination.
Sec. 1016. Appearances before and reports to Congress.
Sec. 1017. Funding; penalties and fines.
Sec. 1018. Effective date.

#### Subtitle B—General Powers of the Bureau

Sec. 1021. Purpose, objectives, and functions.
Sec. 1022. Rulemaking authority.
Sec. 1023. Review of Bureau regulations.
Sec. 1024. Supervision of nondepository covered persons.
Sec. 1025. Supervision of very large banks, savings associations, and credit unions.
Sec. 1026. Other banks, savings associations, and credit unions.
Sec. 1027. Limitations on authorities of the Bureau; preservation of authorities.
Sec. 1028. Authority to restrict mandatory pre-dispute arbitration.
Sec. 1029. Exclusion for auto dealers.
Sec. 1029A. Effective date.

#### Subtitle C—Specific Bureau Authorities

Sec. 1031. Prohibiting unfair, deceptive, or abusive acts or practices.
Sec. 1032. Disclosures.
Sec. 1033. Consumer rights to access information.
Sec. 1034. Response to consumer complaints and inquiries.
Sec. 1035. Private education loan ombudsman.
Sec. 1036. Prohibited acts.
Sec. 1037. Effective date.

#### Subtitle D—Preservation of State Law

Sec. 1041. Relation to State law.
Sec. 1042. Preservation of enforcement powers of States.
Sec. 1043. Preservation of existing contracts.
Sec. 1044. State law preemption standards for national banks and subsidiaries
           clarified.
Sec. 1045. Clarification of law applicable to nondepository institution subsidiaries.
Sec. 1046. State law preemption standards for Federal savings associations and
           subsidiaries clarified.
Sec. 1047. Visitorial standards for national banks and savings associations.
Sec. 1048. Effective date.

#### Subtitle E—Enforcement Powers

Sec. 1051. Definitions.

Sec. 1052. Investigations and administrative discovery.
Sec. 1053. Hearings and adjudication proceedings.
Sec. 1054. Litigation authority.
Sec. 1055. Relief available.
Sec. 1056. Referrals for criminal proceedings.
Sec. 1057. Employee protection.
Sec. 1058. Effective date.

Subtitle F—Transfer of Functions and Personnel; Transitional Provisions

Sec. 1061. Transfer of consumer financial protection functions.
Sec. 1062. Designated transfer date.
Sec. 1063. Savings provisions.
Sec. 1064. Transfer of certain personnel.
Sec. 1065. Incidental transfers.
Sec. 1066. Interim authority of the Secretary.
Sec. 1067. Transition oversight.

Subtitle G—Regulatory Improvements

Sec. 1071. Small business data collection.
Sec. 1072. Assistance for economically vulnerable individuals and families.
Sec. 1073. Remittance transfers.
Sec. 1074. Department of the Treasury study on ending the conservatorship of
          Fannie Mae, Freddie Mac, and reforming the housing finance system.
Sec. 1075. Reasonable fees and rules for payment card transactions.
Sec. 1076. Reverse mortgage study and regulations.
Sec. 1077. Report on private education loans and private educational lenders.
Sec. 1078. Study and report on credit scores.
Sec. 1079. Review, report, and program with respect to exchange facilitators.
Sec. 1079A. Financial fraud provisions.

Subtitle H—Conforming Amendments

Sec. 1081. Amendments to the Inspector General Act.
Sec. 1082. Amendments to the Privacy Act of 1974.
Sec. 1083. Amendments to the Alternative Mortgage Transaction Parity Act of
          1982.
Sec. 1084. Amendments to the Electronic Fund Transfer Act.
Sec. 1085. Amendments to the Equal Credit Opportunity Act.
Sec. 1086. Amendments to the Expedited Funds Availability Act.
Sec. 1087. Amendments to the Fair Credit Billing Act.
Sec. 1088. Amendments to the Fair Credit Reporting Act and the Fair and Accu-
          rate Credit Transactions Act of 2003.
Sec. 1089. Amendments to the Fair Debt Collection Practices Act.
Sec. 1090. Amendments to the Federal Deposit Insurance Act.
Sec. 1091. Amendment to Federal Financial Institutions Examination Council Act
          of 1978.
Sec. 1092. Amendments to the Federal Trade Commission Act.
Sec. 1093. Amendments to the Gramm-Leach-Bliley Act.
Sec. 1094. Amendments to the Home Mortgage Disclosure Act of 1975.
Sec. 1095. Amendments to the Homeowners Protection Act of 1998.
Sec. 1096. Amendments to the Home Ownership and Equity Protection Act of 1994.
Sec. 1097. Amendments to the Omnibus Appropriations Act, 2009.
Sec. 1098. Amendments to the Real Estate Settlement Procedures Act of 1974.
Sec. 1098A. Amendments to the Interstate Land Sales Full Disclosure Act.
Sec. 1099. Amendments to the Right to Financial Privacy Act of 1978.
Sec. 1100. Amendments to the Secure and Fair Enforcement for Mortgage Licens-
          ing Act of 2008.
Sec. 1100A. Amendments to the Truth in Lending Act.
Sec. 1100B. Amendments to the Truth in Savings Act.
Sec. 1100C. Amendments to the Telemarketing and Consumer Fraud and Abuse
          Prevention Act.
Sec. 1100D. Amendments to the Paperwork Reduction Act.
Sec. 1100E. Adjustments for inflation in the Truth in Lending Act.
Sec. 1100F. Use of consumer reports.
Sec. 1100G. Small business fairness and regulatory transparency.
Sec. 1100H. Effective date.

TITLE XI—FEDERAL RESERVE SYSTEM PROVISIONS

Sec. 1101. Federal Reserve Act amendments on emergency lending authority.
Sec. 1102. Reviews of special Federal reserve credit facilities.
Sec. 1103. Public access to information.
Sec. 1104. Liquidity event determination.

Sec. 1105. Emergency financial stabilization.
Sec. 1106. Additional related amendments.
Sec. 1107. Federal Reserve Act amendments on Federal reserve bank governance.
Sec. 1108. Federal Reserve Act amendments on supervision and regulation policy.
Sec. 1109. GAO audit of the Federal Reserve facilities; publication of Board actions.

### TITLE XII—IMPROVING ACCESS TO MAINSTREAM FINANCIAL INSTITUTIONS

Sec. 1201. Short title.
Sec. 1202. Purpose.
Sec. 1203. Definitions.
Sec. 1204. Expanded access to mainstream financial institutions.
Sec. 1205. Low-cost alternatives to payday loans.
Sec. 1206. Grants to establish loan-loss reserve funds.
Sec. 1207. Procedural provisions.
Sec. 1208. Authorization of appropriations.
Sec. 1209. Regulations.
Sec. 1210. Evaluation and reports to Congress.

### TITLE XIII—PAY IT BACK ACT

Sec. 1301. Short title.
Sec. 1302. Amendment to reduce TARP authorization.
Sec. 1303. Report.
Sec. 1304. Amendments to Housing and Economic Recovery Act of 2008.
Sec. 1305. Federal Housing Finance Agency report.
Sec. 1306. Repayment of unobligated ARRA funds.

### TITLE XIV—MORTGAGE REFORM AND ANTI-PREDATORY LENDING ACT

Sec. 1400. Short title; designation as enumerated consumer law.

#### Subtitle A—Residential Mortgage Loan Origination Standards

Sec. 1401. Definitions.
Sec. 1402. Residential mortgage loan origination.
Sec. 1403. Prohibition on steering incentives.
Sec. 1404. Liability.
Sec. 1405. Regulations.
Sec. 1406. Study of shared appreciation mortgages.

#### Subtitle B—Minimum Standards For Mortgages

Sec. 1411. Ability to repay.
Sec. 1412. Safe harbor and rebuttable presumption.
Sec. 1413. Defense to foreclosure.
Sec. 1414. Additional standards and requirements.
Sec. 1415. Rule of construction.
Sec. 1416. Amendments to civil liability provisions.
Sec. 1417. Lender rights in the context of borrower deception.
Sec. 1418. Six-month notice required before reset of hybrid adjustable rate mortgages.
Sec. 1419. Required disclosures.
Sec. 1420. Disclosures required in monthly statements for residential mortgage loans.
Sec. 1421. Report by the GAO.
Sec. 1422. State attorney general enforcement authority.

#### Subtitle C—High-Cost Mortgages

Sec. 1431. Definitions relating to high-cost mortgages.
Sec. 1432. Amendments to existing requirements for certain mortgages.
Sec. 1433. Additional requirements for certain mortgages.

#### Subtitle D—Office of Housing Counseling

Sec. 1441. Short title.
Sec. 1442. Establishment of Office of Housing Counseling.
Sec. 1443. Counseling procedures.
Sec. 1444. Grants for housing counseling assistance.
Sec. 1445. Requirements to use HUD-certified counselors under HUD programs.
Sec. 1446. Study of defaults and foreclosures.
Sec. 1447. Default and foreclosure database.
Sec. 1448. Definitions for counseling-related programs.
Sec. 1449. Accountability and transparency for grant recipients.
Sec. 1450. Updating and simplification of mortgage information booklet.

Sec. 1451. Home inspection counseling.
Sec. 1452. Warnings to homeowners of foreclosure rescue scams.

### Subtitle E—Mortgage Servicing

Sec. 1461. Escrow and impound accounts relating to certain consumer credit trans-
          actions.
Sec. 1462. Disclosure notice required for consumers who waive escrow services.
Sec. 1463. Real Estate Settlement Procedures Act of 1974 amendments.
Sec. 1464. Truth in Lending Act amendments.
Sec. 1465. Escrows included in repayment analysis.

### Subtitle F—Appraisal Activities

Sec. 1471. Property appraisal requirements.
Sec. 1472. Appraisal independence requirements.
Sec. 1473. Amendments relating to Appraisal Subcommittee of FFIEC, Appraiser
          Independence Monitoring, Approved Appraiser Education, Appraisal
          Management Companies, Appraiser Complaint Hotline, Automated
          Valuation Models, and Broker Price Opinions.
Sec. 1474. Equal Credit Opportunity Act amendment.
Sec. 1475. Real Estate Settlement Procedures Act of 1974 amendment relating to
          certain appraisal fees.
Sec. 1476. GAO study on the effectiveness and impact of various appraisal meth-
          ods, valuation models and distributions channels, and on the Home
          Valuation Code of conduct and the Appraisal Subcommittee.

### Subtitle G—Mortgage Resolution and Modification

Sec. 1481. Multifamily mortgage resolution program.
Sec. 1482. Home Affordable Modification Program guidelines.
Sec. 1483. Public availability of information of Making Home Affordable Program.
Sec. 1484. Protecting tenants at foreclosure extension and clarification.

### Subtitle H—Miscellaneous Provisions

Sec. 1491. Sense of Congress regarding the importance of government-sponsored
          enterprises reform to enhance the protection, limitation, and regulation
          of the terms of residential mortgage credit.
Sec. 1492. GAO study report on government efforts to combat mortgage foreclosure
          rescue scams and loan modification fraud.
Sec. 1493. Reporting of mortgage data by State.
Sec. 1494. Study of effect of drywall presence on foreclosures.
Sec. 1495. Definition.
Sec. 1496. Emergency mortgage relief.
Sec. 1497. Additional assistance for Neighborhood Stabilization Program.
Sec. 1498. Legal assistance for foreclosure-related issues.

### TITLE XV—MISCELLANEOUS PROVISIONS

Sec. 1501. Restrictions on use of United States funds for foreign governments; pro-
          tection of American taxpayers.
Sec. 1502. Conflict minerals.
Sec. 1503. Reporting requirements regarding coal or other mine safety.
Sec. 1504. Disclosure of payments by resource extraction issuers.
Sec. 1505. Study by the Comptroller General.
Sec. 1506. Study on core deposits and brokered deposits.

### TITLE XVI—SECTION 1256 CONTRACTS

Sec. 1601. Certain swaps, etc., not treated as section 1256 contracts.

12 USC 5301.

**SEC. 2. DEFINITIONS.**

As used in this Act, the following definitions shall apply, except as the context otherwise requires or as otherwise specifically provided in this Act:

(1) AFFILIATE.—The term "affiliate" has the same meaning as in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813).

(2) APPROPRIATE FEDERAL BANKING AGENCY.—On and after the transfer date, the term "appropriate Federal banking agency" has the same meaning as in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), as amended by title III.

period the following: ", other than credit card loans that are made to businesses that meet the criteria for a small business concern to be eligible for business loans under regulations established by the Small Business Administration under part 121 of title 13, Code of Federal Regulations".

# TITLE VII—WALL STREET TRANSPARENCY AND ACCOUNTABILITY

<div style="float:right">Wall Street Transparency and Accountability Act of 2010. 15 USC 8301 note.</div>

### SEC. 701. SHORT TITLE.

This title may be cited as the "Wall Street Transparency and Accountability Act of 2010".

## Subtitle A—Regulation of Over-the-Counter Swaps Markets

### PART I—REGULATORY AUTHORITY

### SEC. 711. DEFINITIONS.

<div style="float:right">15 USC 8301.</div>

In this subtitle, the terms "prudential regulator", "swap", "swap dealer", "major swap participant", "swap data repository", "associated person of a swap dealer or major swap participant", "eligible contract participant", "swap execution facility", "security-based swap", "security-based swap dealer", "major security-based swap participant", and "associated person of a security-based swap dealer or major security-based swap participant" have the meanings given the terms in section 1a of the Commodity Exchange Act (7 U.S.C. 1a), including any modification of the meanings under section 721(b) of this Act.

### SEC. 712. REVIEW OF REGULATORY AUTHORITY.

<div style="float:right">15 USC 8302.</div>

(a) CONSULTATION.—

(1) COMMODITY FUTURES TRADING COMMISSION.—Before commencing any rulemaking or issuing an order regarding swaps, swap dealers, major swap participants, swap data repositories, derivative clearing organizations with regard to swaps, persons associated with a swap dealer or major swap participant, eligible contract participants, or swap execution facilities pursuant to this subtitle, the Commodity Futures Trading Commission shall consult and coordinate to the extent possible with the Securities and Exchange Commission and the prudential regulators for the purposes of assuring regulatory consistency and comparability, to the extent possible.

(2) SECURITIES AND EXCHANGE COMMISSION.—Before commencing any rulemaking or issuing an order regarding security-based swaps, security-based swap dealers, major security-based swap participants, security-based swap data repositories, clearing agencies with regard to security-based swaps, persons associated with a security-based swap dealer or major security-based swap participant, eligible contract participants with regard to security-based swaps, or security-based swap execution facilities pursuant to subtitle B, the Securities and Exchange Commission shall consult and coordinate to the

extent possible with the Commodity Futures Trading Commission and the prudential regulators for the purposes of assuring regulatory consistency and comparability, to the extent possible.

(3) PROCEDURES AND DEADLINE.—Such regulations shall be prescribed in accordance with applicable requirements of title 5, United States Code, and shall be issued in final form not later than 360 days after the date of enactment of this Act.

(4) APPLICABILITY.—The requirements of paragraphs (1) and (2) shall not apply to an order issued—

(A) in connection with or arising from a violation or potential violation of any provision of the Commodity Exchange Act (7 U.S.C. 1 et seq.);

(B) in connection with or arising from a violation or potential violation of any provision of the securities laws; or

(C) in any proceeding that is conducted on the record in accordance with sections 556 and 557 of title 5, United States Code.

(5) EFFECT.—Nothing in this subsection authorizes any consultation or procedure for consultation that is not consistent with the requirements of subchapter II of chapter 5, and chapter 7, of title 5, United States Code (commonly known as the "Administrative Procedure Act").

(6) RULES; ORDERS.—In developing and promulgating rules or orders pursuant to this subsection, each Commission shall consider the views of the prudential regulators.

(7) TREATMENT OF SIMILAR PRODUCTS AND ENTITIES.—

(A) IN GENERAL.—In adopting rules and orders under this subsection, the Commodity Futures Trading Commission and the Securities and Exchange Commission shall treat functionally or economically similar products or entities described in paragraphs (1) and (2) in a similar manner.

(B) EFFECT.—Nothing in this subtitle requires the Commodity Futures Trading Commission or the Securities and Exchange Commission to adopt joint rules or orders that treat functionally or economically similar products or entities described in paragraphs (1) and (2) in an identical manner.

(8) MIXED SWAPS.—The Commodity Futures Trading Commission and the Securities and Exchange Commission, after consultation with the Board of Governors, shall jointly prescribe such regulations regarding mixed swaps, as described in section 1a(47)(D) of the Commodity Exchange Act (7 U.S.C. 1a(47)(D)) and in section 3(a)(68)(D) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(D)), as may be necessary to carry out the purposes of this title.

(b) LIMITATION.—

(1) COMMODITY FUTURES TRADING COMMISSION.—Nothing in this title, unless specifically provided, confers jurisdiction on the Commodity Futures Trading Commission to issue a rule, regulation, or order providing for oversight or regulation of—

(A) security-based swaps; or

(B) with regard to its activities or functions concerning security-based swaps—

(i) security-based swap dealers;

(ii) major security-based swap participants;

(iii) security-based swap data repositories;

(iv) associated persons of a security-based swap dealer or major security-based swap participant;

(v) eligible contract participants with respect to security-based swaps; or

(vi) swap execution facilities with respect to security-based swaps.

(2) SECURITIES AND EXCHANGE COMMISSION.—Nothing in this title, unless specifically provided, confers jurisdiction on the Securities and Exchange Commission or State securities regulators to issue a rule, regulation, or order providing for oversight or regulation of—

(A) swaps; or

(B) with regard to its activities or functions concerning swaps—

(i) swap dealers;

(ii) major swap participants;

(iii) swap data repositories;

(iv) persons associated with a swap dealer or major swap participant;

(v) eligible contract participants with respect to swaps; or

(vi) swap execution facilities with respect to swaps.

(3) PROHIBITION ON CERTAIN FUTURES ASSOCIATIONS AND NATIONAL SECURITIES ASSOCIATIONS.—

(A) FUTURES ASSOCIATIONS.—Notwithstanding any other provision of law (including regulations), unless otherwise authorized by this title, no futures association registered under section 17 of the Commodity Exchange Act (7 U.S.C. 21) may issue a rule, regulation, or order for the oversight or regulation of, or otherwise assert jurisdiction over, for any purpose, any security-based swap, except that this subparagraph shall not limit the authority of a registered futures association to examine for compliance with, and enforce, its rules on capital adequacy.

(B) NATIONAL SECURITIES ASSOCIATIONS.—Notwithstanding any other provision of law (including regulations), unless otherwise authorized by this title, no national securities association registered under section 15A of the Securities Exchange Act of 1934 (15 U.S.C. 78o–3) may issue a rule, regulation, or order for the oversight or regulation of, or otherwise assert jurisdiction over, for any purpose, any swap, except that this subparagraph shall not limit the authority of a national securities association to examine for compliance with, and enforce, its rules on capital adequacy.

(c) OBJECTION TO COMMISSION REGULATION.—

(1) FILING OF PETITION FOR REVIEW.—

(A) IN GENERAL.—If either Commission referred to in this section determines that a final rule, regulation, or order of the other Commission conflicts with subsection (a)(7) or (b), then the complaining Commission may obtain review of the final rule, regulation, or order in the United States Court of Appeals for the District of Columbia Circuit by filing in the court, not later than 60 days after the

Deadline.

date of publication of the final rule, regulation, or order, a written petition requesting that the rule, regulation, or order be set aside.

(B) EXPEDITED PROCEEDING.—A proceeding described in subparagraph (A) shall be expedited by the United States Court of Appeals for the District of Columbia Circuit.

(2) TRANSMITTAL OF PETITION AND RECORD.—

Deadline.

(A) IN GENERAL.—A copy of a petition described in paragraph (1) shall be transmitted not later than 1 business day after the date of filing by the complaining Commission to the Secretary of the responding Commission.

(B) DUTY OF RESPONDING COMMISSION.—On receipt of the copy of a petition described in paragraph (1), the responding Commission shall file with the United States Court of Appeals for the District of Columbia Circuit—

(i) a copy of the rule, regulation, or order under review (including any documents referred to therein); and

(ii) any other materials prescribed by the United States Court of Appeals for the District of Columbia Circuit.

(3) STANDARD OF REVIEW.—The United States Court of Appeals for the District of Columbia Circuit shall—

(A) give deference to the views of neither Commission; and

(B) determine to affirm or set aside a rule, regulation, or order of the responding Commission under this subsection, based on the determination of the court as to whether the rule, regulation, or order is in conflict with subsection (a)(7) or (b), as applicable.

(4) JUDICIAL STAY.—The filing of a petition by the complaining Commission pursuant to paragraph (1) shall operate as a stay of the rule, regulation, or order until the date on which the determination of the United States Court of Appeals for the District of Columbia Circuit is final (including any appeal of the determination).

(d) JOINT RULEMAKING.—

(1) IN GENERAL.—Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 3(a)(78) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(78)).

(2) AUTHORITY OF THE COMMISSIONS.—

(A) IN GENERAL.—Notwithstanding any other provision of this title, the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall jointly adopt such other rules regarding such definitions as the Commodity Futures Trading Commission and the Securities and

Exchange Commission determine are necessary and appropriate, in the public interest, and for the protection of investors.

(B) TRADE REPOSITORY RECORDKEEPING.—Notwithstanding any other provision of this title, the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall engage in joint rulemaking to jointly adopt a rule or rules governing the books and records that are required to be kept and maintained regarding security-based swap agreements by persons that are registered as swap data repositories under the Commodity Exchange Act, including uniform rules that specify the data elements that shall be collected and maintained by each repository.

(C) BOOKS AND RECORDS.—Notwithstanding any other provision of this title, the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall engage in joint rulemaking to jointly adopt a rule or rules governing books and records regarding security-based swap agreements, including daily trading records, for swap dealers, major swap participants, security-based swap dealers, and security-based swap participants.

(D) COMPARABLE RULES.—Rules and regulations prescribed jointly under this title by the Commodity Futures Trading Commission and the Securities and Exchange Commission shall be comparable to the maximum extent possible, taking into consideration differences in instruments and in the applicable statutory requirements.

(E) TRACKING UNCLEARED TRANSACTIONS.—Any rules prescribed under subparagraph (A) shall require the maintenance of records of all activities relating to security-based swap agreement transactions defined under subparagraph (A) that are not cleared.

(F) SHARING OF INFORMATION.—The Commodity Futures Trading Commission shall make available to the Securities and Exchange Commission information relating to security-based swap agreement transactions defined in subparagraph (A) that are not cleared.

(3) FINANCIAL STABILITY OVERSIGHT COUNCIL.—In the event that the Commodity Futures Trading Commission and the Securities and Exchange Commission fail to jointly prescribe rules pursuant to paragraph (1) or (2) in a timely manner, at the request of either Commission, the Financial Stability Oversight Council shall resolve the dispute—

(A) within a reasonable time after receiving the request;

(B) after consideration of relevant information provided by each Commission; and

(C) by agreeing with 1 of the Commissions regarding the entirety of the matter or by determining a compromise position.

(4) JOINT INTERPRETATION.—Any interpretation of, or guidance by either Commission regarding, a provision of this title, shall be effective only if issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission, after consultation with the Board of Governors,

if this title requires the Commodity Futures Trading Commission and the Securities and Exchange Commission to issue joint regulations to implement the provision.

Deadline.

(e) GLOBAL RULEMAKING TIMEFRAME.—Unless otherwise provided in this title, or an amendment made by this title, the Commodity Futures Trading Commission or the Securities and Exchange Commission, or both, shall individually, and not jointly, promulgate rules and regulations required of each Commission under this title or an amendment made by this title not later than 360 days after the date of enactment of this Act.

(f) RULES AND REGISTRATION BEFORE FINAL EFFECTIVE DATES.—Beginning on the date of enactment of this Act and notwithstanding the effective date of any provision of this Act, the Commodity Futures Trading Commission and the Securities and Exchange Commission may, in order to prepare for the effective dates of the provisions of this Act—

(1) promulgate rules, regulations, or orders permitted or required by this Act;

(2) conduct studies and prepare reports and recommendations required by this Act;

(3) register persons under the provisions of this Act; and

(4) exempt persons, agreements, contracts, or transactions from provisions of this Act, under the terms contained in this Act,

provided, however, that no action by the Commodity Futures Trading Commission or the Securities and Exchange Commission described in paragraphs (1) through (4) shall become effective prior to the effective date applicable to such action under the provisions of this Act.

### SEC. 713. PORTFOLIO MARGINING CONFORMING CHANGES.

(a) SECURITIES EXCHANGE ACT OF 1934.—Section 15(c)(3) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(3)) is amended by adding at the end the following:

"(C) Notwithstanding any provision of sections 2(a)(1)(C)(i) or 4d(a)(2) of the Commodity Exchange Act and the rules and regulations thereunder, and pursuant to an exemption granted by the Commission under section 36 of this title or pursuant to a rule or regulation, cash and securities may be held by a broker or dealer registered pursuant to subsection (b)(1) and also registered as a futures commission merchant pursuant to section 4f(a)(1) of the Commodity Exchange Act, in a portfolio margining account carried as a futures account subject to section 4d of the Commodity Exchange Act and the rules and regulations thereunder, pursuant to a portfolio margining program approved by the Commodity Futures Trading Commission, and subject to subchapter IV of chapter 7 of title 11 of the United States Code and the rules and regulations thereunder. The Commission shall consult with the Commodity Futures Trading Commission to adopt rules to ensure that such transactions and accounts are subject to comparable requirements to the extent practicable for similar products.".

Consultation.

(b) COMMODITY EXCHANGE ACT.—Section 4d of the Commodity Exchange Act (7 U.S.C. 6d) is amended by adding at the end the following:

"(h) Notwithstanding subsection (a)(2) or the rules and regulations thereunder, and pursuant to an exemption granted by the Commission under section 4(c) of this Act or pursuant to a rule or regulation, a futures commission merchant that is registered pursuant to section 4f(a)(1) of this Act and also registered as a broker or dealer pursuant to section 15(b)(1) of the Securities Exchange Act of 1934 may, pursuant to a portfolio margining program approved by the Securities and Exchange Commission pursuant to section 19(b) of the Securities Exchange Act of 1934, hold in a portfolio margining account carried as a securities account subject to section 15(c)(3) of the Securities Exchange Act of 1934 and the rules and regulations thereunder, a contract for the purchase or sale of a commodity for future delivery or an option on such a contract, and any money, securities or other property received from a customer to margin, guarantee or secure such a contract, or accruing to a customer as the result of such a contract. The Commission shall consult with the Securities and Exchange Commission to adopt rules to ensure that such transactions and accounts are subject to comparable requirements to the extent practical for similar products.".

(c) DUTY OF COMMODITY FUTURES TRADING COMMISSION.—Section 20 of the Commodity Exchange Act (7 U.S.C. 24) is amended by adding at the end the following:

"(c) The Commission shall exercise its authority to ensure that securities held in a portfolio margining account carried as a futures account are customer property and the owners of those accounts are customers for the purposes of subchapter IV of chapter 7 of title 11 of the United States Code.".

**SEC. 714. ABUSIVE SWAPS.**

The Commodity Futures Trading Commission or the Securities and Exchange Commission, or both, individually may, by rule or order—

(1) collect information as may be necessary concerning the markets for any types of—

(A) swap (as defined in section 1a of the Commodity Exchange Act (7 U.S.C. 1a)); or

(B) security-based swap (as defined in section 1a of the Commodity Exchange Act (7 U.S.C. 1a)); and

(2) issue a report with respect to any types of swaps or security-based swaps that the Commodity Futures Trading Commission or the Securities and Exchange Commission determines to be detrimental to—

(A) the stability of a financial market; or

(B) participants in a financial market.

**SEC. 715. AUTHORITY TO PROHIBIT PARTICIPATION IN SWAP ACTIVITIES.**

Except as provided in section 4 of the Commodity Exchange Act (7 U.S.C. 6), if the Commodity Futures Trading Commission or the Securities and Exchange Commission determines that the regulation of swaps or security-based swaps markets in a foreign country undermines the stability of the United States financial system, either Commission, in consultation with the Secretary of the Treasury, may prohibit an entity domiciled in the foreign country from participating in the United States in any swap or security-based swap activities.

Contracts.

Consultation.

15 USC 8303.

Reports.

15 USC 8304.

15 USC 8305.

**SEC. 716. PROHIBITION AGAINST FEDERAL GOVERNMENT BAILOUTS OF SWAPS ENTITIES.**

(a) PROHIBITION ON FEDERAL ASSISTANCE.—Notwithstanding any other provision of law (including regulations), no Federal assistance may be provided to any swaps entity with respect to any swap, security-based swap, or other activity of the swaps entity.

(b) DEFINITIONS.—In this section:

(1) FEDERAL ASSISTANCE.—The term "Federal assistance" means the use of any advances from any Federal Reserve credit facility or discount window that is not part of a program or facility with broad-based eligibility under section 13(3)(A) of the Federal Reserve Act, Federal Deposit Insurance Corporation insurance or guarantees for the purpose of—

(A) making any loan to, or purchasing any stock, equity interest, or debt obligation of, any swaps entity;

(B) purchasing the assets of any swaps entity;

(C) guaranteeing any loan or debt issuance of any swaps entity; or

(D) entering into any assistance arrangement (including tax breaks), loss sharing, or profit sharing with any swaps entity.

(2) SWAPS ENTITY.—

(A) IN GENERAL.—The term "swaps entity" means any swap dealer, security-based swap dealer, major swap participant, major security-based swap participant, that is registered under—

(i) the Commodity Exchange Act (7 U.S.C. 1 et seq.); or

(ii) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.).

(B) EXCLUSION.—The term "swaps entity" does not include any major swap participant or major security-based swap participant that is an insured depository institution.

(c) AFFILIATES OF INSURED DEPOSITORY INSTITUTIONS.—The prohibition on Federal assistance contained in subsection (a) does not apply to and shall not prevent an insured depository institution from having or establishing an affiliate which is a swaps entity, as long as such insured depository institution is part of a bank holding company, or savings and loan holding company, that is supervised by the Federal Reserve and such swaps entity affiliate complies with sections 23A and 23B of the Federal Reserve Act and such other requirements as the Commodity Futures Trading Commission or the Securities Exchange Commission, as appropriate, and the Board of Governors of the Federal Reserve System, may determine to be necessary and appropriate.

Applicability.

(d) ONLY BONA FIDE HEDGING AND TRADITIONAL BANK ACTIVITIES PERMITTED.—The prohibition in subsection (a) shall apply to any insured depository institution unless the insured depository institution limits its swap or security-based swap activities to:

(1) Hedging and other similar risk mitigating activities directly related to the insured depository institution's activities.

(2) Acting as a swaps entity for swaps or security-based swaps involving rates or reference assets that are permissible for investment by a national bank under the paragraph designated as "Seventh." of section 5136 of the Revised Statutes of the United States ( 12 U.S.C. 24), other than as described in paragraph (3).

(3) LIMITATION ON CREDIT DEFAULT SWAPS.—Acting as a swaps entity for credit default swaps, including swaps or security-based swaps referencing the credit risk of asset-backed securities as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)) (as amended by this Act)) shall not be considered a bank permissible activity for purposes of subsection (d)(2) unless such swaps or security-based swaps are cleared by a derivatives clearing organization (as such term is defined in section la of the Commodity Exchange Act (7 U.S.C. la)) or a clearing agency (as such term is defined in section 3 of the Securities Exchange Act (15 U.S.C. 78c)) that is registered, or exempt from registration, as a derivatives clearing organization under the Commodity Exchange Act or as a clearing agency under the Securities Exchange Act, respectively.

(e) EXISTING SWAPS AND SECURITY-BASED SWAPS.—The prohibition in subsection (a) shall only apply to swaps or security-based swaps entered into by an insured depository institution after the end of the transition period described in subsection (f).

*Applicability.*

(f) TRANSITION PERIOD.—To the extent an insured depository institution qualifies as a "swaps entity" and would be subject to the Federal assistance prohibition in subsection (a), the appropriate Federal banking agency, after consulting with and considering the views of the Commodity Futures Trading Commission or the Securities Exchange Commission, as appropriate, shall permit the insured depository institution up to 24 months to divest the swaps entity or cease the activities that require registration as a swaps entity. In establishing the appropriate transition period to effect such divestiture or cessation of activities, which may include making the swaps entity an affiliate of the insured depository institution, the appropriate Federal banking agency shall take into account and make written findings regarding the potential impact of such divestiture or cessation of activities on the insured depository institution's (1) mortgage lending, (2) small business lending, (3) job creation, and (4) capital formation versus the potential negative impact on insured depositors and the Deposit Insurance Fund of the Federal Deposit Insurance Corporation. The appropriate Federal banking agency may consider such other factors as may be appropriate. The appropriate Federal banking agency may place such conditions on the insured depository institution's divestiture or ceasing of activities of the swaps entity as it deems necessary and appropriate. The transition period under this subsection may be extended by the appropriate Federal banking agency, after consultation with the Commodity Futures Trading Commission and the Securities and Exchange Commission, for a period of up to 1 additional year.

(g) EXCLUDED ENTITIES.—For purposes of this section, the term "swaps entity" shall not include any insured depository institution under the Federal Deposit Insurance Act or a covered financial company under title II which is in a conservatorship, receivership, or a bridge bank operated by the Federal Deposit Insurance Corporation.

(h) EFFECTIVE DATE.—The prohibition in subsection (a) shall be effective 2 years following the date on which this Act is effective.

(i) LIQUIDATION REQUIRED.—

(1) IN GENERAL.—

(A) FDIC INSURED INSTITUTIONS.—All swaps entities that are FDIC insured institutions that are put into receivership or declared insolvent as a result of swap or security-based swap activity of the swaps entities shall be subject to the termination or transfer of that swap or security-based swap activity in accordance with applicable law prescribing the treatment of those contracts. No taxpayer funds shall be used to prevent the receivership of any swap entity resulting from swap or security-based swap activity of the swaps entity.

(B) INSTITUTIONS THAT POSE A SYSTEMIC RISK AND ARE SUBJECT TO HEIGHTENED PRUDENTIAL SUPERVISION AS REGULATED UNDER SECTION 113.—All swaps entities that are institutions that pose a systemic risk and are subject to heightened prudential supervision as regulated under section 113, that are put into receivership or declared insolvent as a result of swap or security-based swap activity of the swaps entities shall be subject to the termination or transfer of that swap or security-based swap activity in accordance with applicable law prescribing the treatment of those contracts. No taxpayer funds shall be used to prevent the receivership of any swap entity resulting from swap or security-based swap activity of the swaps entity.

(C) NON-FDIC INSURED, NON-SYSTEMICALLY SIGNIFICANT INSTITUTIONS NOT SUBJECT TO HEIGHTENED PRUDENTIAL SUPERVISION AS REGULATED UNDER SECTION 113.—No taxpayer resources shall be used for the orderly liquidation of any swaps entities that are non-FDIC insured, non-systemically significant institutions not subject to heightened prudential supervision as regulated under section 113.

(2) RECOVERY OF FUNDS.—All funds expended on the termination or transfer of the swap or security-based swap activity of the swaps entity shall be recovered in accordance with applicable law from the disposition of assets of such swap entity or through assessments, including on the financial sector as provided under applicable law.

(3) NO LOSSES TO TAXPAYERS.—Taxpayers shall bear no losses from the exercise of any authority under this title.

(j) PROHIBITION ON UNREGULATED COMBINATION OF SWAPS ENTITIES AND BANKING.—At no time following adoption of the rules in subsection (k) may a bank or bank holding company be permitted to be or become a swap entity unless it conducts its swap or security-based swap activity in compliance with such minimum standards set by its prudential regulator as are reasonably calculated to permit the swaps entity to conduct its swap or security-based swap activities in a safe and sound manner and mitigate systemic risk.

(k) RULES.—In prescribing rules, the prudential regulator for a swaps entity shall consider the following factors:

(1) The expertise and managerial strength of the swaps entity, including systems for effective oversight.

(2) The financial strength of the swaps entity.

(3) Systems for identifying, measuring and controlling risks arising from the swaps entity's operations.

(4) Systems for identifying, measuring and controlling the swaps entity's participation in existing markets.

(5) Systems for controlling the swaps entity's participation or entry into in new markets and products.

(l) AUTHORITY OF THE FINANCIAL STABILITY OVERSIGHT COUNCIL.—The Financial Stability Oversight Council may determine that, when other provisions established by this Act are insufficient to effectively mitigate systemic risk and protect taxpayers, that swaps entities may no longer access Federal assistance with respect to any swap, security-based swap, or other activity of the swaps entity. Any such determination by the Financial Stability Oversight Council of a prohibition of federal assistance shall be made on an institution-by-institution basis, and shall require the vote of not fewer than two-thirds of the members of the Financial Stability Oversight Council, which must include the vote by the Chairman of the Council, the Chairman of the Board of Governors of the Federal Reserve System, and the Chairperson of the Federal Deposit Insurance Corporation. Notice and hearing requirements for such determinations shall be consistent with the standards provided in title I.

(m) BAN ON PROPRIETARY TRADING IN DERIVATIVES.—An insured depository institution shall comply with the prohibition on proprietary trading in derivatives as required by section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

### SEC. 717. NEW PRODUCT APPROVAL CFTC—SEC PROCESS.

(a) AMENDMENTS TO THE COMMODITY EXCHANGE ACT.—Section 2(a)(1)(C) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)(C)) is amended—

(1) in clause (i) by striking "This" and inserting "(I) Except as provided in subclause (II), this"; and

(2) by adding at the end of clause (i) the following:

"(II) This Act shall apply to and the Commission shall have jurisdiction with respect to accounts, agreements, and transactions involving, and may permit the listing for trading pursuant to section 5c(c) of, a put, call, or other option on 1 or more securities (as defined in section 2(a)(1) of the Securities Act of 1933 or section 3(a)(10) of the Securities Exchange Act of 1934 on the date of enactment of the Futures Trading Act of 1982), including any group or index of such securities, or any interest therein or based on the value thereof, that is exempted by the Securities and Exchange Commission pursuant to section 36(a)(1) of the Securities Exchange Act of 1934 with the condition that the Commission exercise concurrent jurisdiction over such put, call, or other option; provided, however, that nothing in this paragraph shall be construed to affect the jurisdiction and authority of the Securities and Exchange Commission over such put, call, or other option.".

(b) AMENDMENTS TO THE SECURITIES EXCHANGE ACT OF 1934.— The Securities Exchange Act of 1934 is amended by adding the following section after section 3A (15 U.S.C. 78c–1):

### "SEC. 3B. SECURITIES-RELATED DERIVATIVES.

15 USC 78c–2.

"(a) Any agreement, contract, or transaction (or class thereof) that is exempted by the Commodity Futures Trading Commission

pursuant to section 4(c)(1) of the Commodity Exchange Act (7 U.S.C. 6(c)(1)) with the condition that the Commission exercise concurrent jurisdiction over such agreement, contract, or transaction (or class thereof) shall be deemed a security for purposes of the securities laws.

"(b) With respect to any agreement, contract, or transaction (or class thereof) that is exempted by the Commodity Futures Trading Commission pursuant to section 4(c)(1) of the Commodity Exchange Act (7 U.S.C. 6(c)(1)) with the condition that the Commission exercise concurrent jurisdiction over such agreement, contract, or transaction (or class thereof), references in the securities laws to the 'purchase' or 'sale' of a security shall be deemed to include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under such agreement, contract, or transaction, as the context may require.".

(c) AMENDMENT TO SECURITIES EXCHANGE ACT OF 1934.—Section 19(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78s(b)) is amended by adding at the end the following:

"(10) Notwithstanding paragraph (2), the time period within which the Commission is required by order to approve a proposed rule change or institute proceedings to determine whether the proposed rule change should be disapproved is stayed pending a determination by the Commission upon the request of the Commodity Futures Trading Commission or its Chairman that the Commission issue a determination as to whether a product that is the subject of such proposed rule change is a security pursuant to section 718 of the Wall Street Transparency and Accountability Act of 2010.".

(d) AMENDMENT TO COMMODITY EXCHANGE ACT.—Section 5c(c)(1) of the Commodity Exchange Act (7 U.S.C. 7a–2(c)(1)) is amended—

(1) by striking "Subject to paragraph (2)" and inserting the following:

"(A) ELECTION.—Subject to paragraph (2)"; and

(2) by adding at the end the following:

"(B) CERTIFICATION.—The certification of a product pursuant to this paragraph shall be stayed pending a determination by the Commission upon the request of the Securities and Exchange Commission or its Chairman that the Commission issue a determination as to whether the product that is the subject of such certification is a contract of sale of a commodity for future delivery, an option on such a contract, or an option on a commodity pursuant to section 718 of the Wall Street Transparency and Accountability Act of 2010.".

15 USC 8306.

**SEC. 718. DETERMINING STATUS OF NOVEL DERIVATIVE PRODUCTS.**

(a) PROCESS FOR DETERMINING THE STATUS OF A NOVEL DERIVATIVE PRODUCT.—

(1) NOTICE.—

(A) IN GENERAL.—Any person filing a proposal to list or trade a novel derivative product that may have elements of both securities and contracts of sale of a commodity for future delivery (or options on such contracts or options on commodities) may concurrently provide notice and furnish a copy of such filing with the Securities and Exchange

Commission and the Commodity Futures Trading Commission. Any such notice shall state that notice has been made with both Commissions.

(B) NOTIFICATION.—If no concurrent notice is made pursuant to subparagraph (A), within 5 business days after determining that a proposal that seeks to list or trade a novel derivative product may have elements of both securities and contracts of sale of a commodity for future delivery (or options on such contracts or options on commodities), the Securities and Exchange Commission or the Commodity Futures Trading Commission, as applicable, shall notify the other Commission and provide a copy of such filing to the other Commission.

(2) REQUEST FOR DETERMINATION.—

(A) IN GENERAL.—No later than 21 days after receipt of a notice under paragraph (1), or upon its own initiative if no such notice is received, the Commodity Futures Trading Commission may request that the Securities and Exchange Commission issue a determination as to whether a product is a security, as defined in section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(10)).

(B) REQUEST.—No later than 21 days after receipt of a notice under paragraph (1), or upon its own initiative if no such notice is received, the Securities and Exchange Commission may request that the Commodity Futures Trading Commission issue a determination as to whether a product is a contract of sale of a commodity for future delivery, an option on such a contract, or an option on a commodity subject to the Commodity Futures Trading Commission's exclusive jurisdiction under section 2(a)(1)(A) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)(A)).

(C) REQUIREMENT RELATING TO REQUEST.—A request under subparagraph (A) or (B) shall be made by submitting such request, in writing, to the Securities and Exchange Commission or the Commodity Futures Trading Commission, as applicable.

(D) EFFECT.—Nothing in this paragraph shall be construed to prevent—

(i) the Commodity Futures Trading Commission from requesting that the Securities and Exchange Commission grant an exemption pursuant to section 36(a)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78mm(a)(1)) with respect to a product that is the subject of a filing under paragraph (1); or

(ii) the Securities and Exchange Commission from requesting that the Commodity Futures Trading Commission grant an exemption pursuant to section 4(c)(1) of the Commodity Exchange Act (7 U.S.C. 6(c)(1)) with respect to a product that is the subject of a filing under paragraph (1),

*Provided*, however, that nothing in this subparagraph shall be construed to require the Commodity Futures Trading Commission or the Securities and Exchange Commission to issue an exemption requested pursuant to this subparagraph; *provided further*, That an order granting or denying an exemption described in this subparagraph and issued

*[margin notes: Deadline. Deadline. Deadline.]*

under paragraph (3)(B) shall not be subject to judicial review pursuant to subsection (b).

(E) WITHDRAWAL OF REQUEST.—A request under subparagraph (A) or (B) may be withdrawn by the Commission making the request at any time prior to a determination being made pursuant to paragraph (3) for any reason by providing written notice to the head of the other Commission.

Deadline.

(3) DETERMINATION.—Notwithstanding any other provision of law, no later than 120 days after the date of receipt of a request—

(A) under subparagraph (A) or (B) of paragraph (2), unless such request has been withdrawn pursuant to paragraph (2)(E), the Securities and Exchange Commission or the Commodity Futures Trading Commission, as applicable, shall, by order, issue the determination requested in subparagraph (A) or (B) of paragraph (2), as applicable, and the reasons therefor; or

(B) under paragraph (2)(D), unless such request has been withdrawn, the Securities and Exchange Commission or the Commodity Futures Trading Commission, as applicable, shall grant an exemption or provide reasons for not granting such exemption, provided that any decision by the Securities and Exchange Commission not to grant such exemption shall not be reviewable under section 25 of the Securities Exchange Act of 1934 (15 U.S.C. 78y).

(b) JUDICIAL RESOLUTION.—

Deadline.

(1) IN GENERAL.—The Commodity Futures Trading Commission or the Securities and Exchange Commission may petition the United States Court of Appeals for the District of Columbia Circuit for review of a final order of the other Commission issued pursuant to subsection (a)(3)(A), with respect to a novel derivative product that may have elements of both securities and contracts of sale of a commodity for future delivery (or options on such contracts or options on commodities) that it believes affects its statutory jurisdiction within 60 days after the date of entry of such order, a written petition requesting a review of the order. Any such proceeding shall be expedited by the Court of Appeals.

Deadline.

(2) TRANSMITTAL OF PETITION AND RECORD.—A copy of a petition described in paragraph (1) shall be transmitted not later than 1 business day after filing by the complaining Commission to the responding Commission. On receipt of the petition, the responding Commission shall file with the court a copy of the order under review and any documents referred to therein, and any other materials prescribed by the court.

(3) STANDARD OF REVIEW.—The court, in considering a petition filed pursuant to paragraph (1), shall give no deference to, or presumption in favor of, the views of either Commission.

(4) JUDICIAL STAY.—The filing of a petition by the complaining Commission pursuant to paragraph (1) shall operate as a stay of the order, until the date on which the determination of the court is final (including any appeal of the determination).

15 USC 8307.

## SEC. 719. STUDIES.

(a) STUDY ON EFFECTS OF POSITION LIMITS ON TRADING ON EXCHANGES IN THE UNITED STATES.—

(1) STUDY.—The Commodity Futures Trading Commission, in consultation with each entity that is a designated contract market under the Commodity Exchange Act, shall conduct a study of the effects (if any) of the position limits imposed pursuant to the other provisions of this title on excessive speculation and on the movement of transactions from exchanges in the United States to trading venues outside the United States.

(2) REPORT TO THE CONGRESS.—Within 12 months after the imposition of position limits pursuant to the other provisions of this title, the Commodity Futures Trading Commission, in consultation with each entity that is a designated contract market under the Commodity Exchange Act, shall submit to the Congress a report on the matters described in paragraph (1).

(3) REQUIRED HEARING.—Within 30 legislative days after the submission to the Congress of the report described in paragraph (2), the Committee on Agriculture of the House of Representatives shall hold a hearing examining the findings of the report.

Deadline.

(4) BIENNIAL REPORTING.—In addition to the study required in paragraph (1), the Chairman of the Commodity Futures Trading Commission shall prepare and submit to the Congress biennial reports on the growth or decline of the derivatives markets in the United States and abroad, which shall include assessments of the causes of any such growth or decline, the effectiveness of regulatory regimes in managing systemic risk, a comparison of the costs of compliance at the time of the report for market participants subject to regulation by the United States with the costs of compliance in December 2008 for the market participants, and the quality of the available data. In preparing the report, the Chairman shall solicit the views of, consult with, and address the concerns raised by, market participants, regulators, legislators, and other interested parties.

(b) STUDY ON FEASIBILITY OF REQUIRING USE OF STANDARDIZED ALGORITHMIC DESCRIPTIONS FOR FINANCIAL DERIVATIVES.—

(1) IN GENERAL.—The Securities and Exchange Commission and the Commodity Futures Trading Commission shall conduct a joint study of the feasibility of requiring the derivatives industry to adopt standardized computer-readable algorithmic descriptions which may be used to describe complex and standardized financial derivatives.

(2) GOALS.—The algorithmic descriptions defined in the study shall be designed to facilitate computerized analysis of individual derivative contracts and to calculate net exposures to complex derivatives. The algorithmic descriptions shall be optimized for simultaneous use by—

(A) commercial users and traders of derivatives;

(B) derivative clearing houses, exchanges and electronic trading platforms;

(C) trade repositories and regulator investigations of market activities; and

(D) systemic risk regulators.

The study will also examine the extent to which the algorithmic description, together with standardized and extensible legal

definitions, may serve as the binding legal definition of derivative contracts. The study will examine the logistics of possible implementations of standardized algorithmic descriptions for derivatives contracts. The study shall be limited to electronic formats for exchange of derivative contract descriptions and will not contemplate disclosure of proprietary valuation models.

(3) INTERNATIONAL COORDINATION.—In conducting the study, the Securities and Exchange Commission and the Commodity Futures Trading Commission shall coordinate the study with international financial institutions and regulators as appropriate and practical.

(4) REPORT.—Within 8 months after the date of the enactment of this Act, the Securities and Exchange Commission and the Commodity Futures Trading Commission shall jointly submit to the Committees on Agriculture and on Financial Services of the House of Representatives and the Committees on Agriculture, Nutrition, and Forestry and on Banking, Housing, and Urban Affairs of the Senate a written report which contains the results of the study required by paragraphs (1) through (3).

(c) INTERNATIONAL SWAP REGULATION.—

Study.

(1) IN GENERAL.—The Commodity Futures Trading Commission and the Securities and Exchange Commission shall jointly conduct a study—

(A) relating to—

(i) swap regulation in the United States, Asia, and Europe; and

(ii) clearing house and clearing agency regulation in the United States, Asia, and Europe; and

(B) that identifies areas of regulation that are similar in the United States, Asia and Europe and other areas of regulation that could be harmonized

(2) REPORT.—Not later than 18 months after the date of enactment of this Act, the Commodity Futures Trading Commission and the Securities and Exchange Commission shall submit to the Committee on Agriculture, Nutrition, and Forestry and the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Agriculture and the Committee on Financial Services of the House of Representatives a report that includes a description of the results of the study under subsection (a), including—

(A) identification of the major exchanges and their regulator in each geographic area for the trading of swaps and security-based swaps including a listing of the major contracts and their trading volumes and notional values as well as identification of the major swap dealers participating in such markets;

(B) identification of the major clearing houses and clearing agencies and their regulator in each geographic area for the clearing of swaps and security-based swaps, including a listing of the major contracts and the clearing volumes and notional values as well as identification of the major clearing members of such clearing houses and clearing agencies in such markets;

(C) a description of the comparative methods of clearing swaps in the United States, Asia, and Europe; and

(D) a description of the various systems used for establishing margin on individual swaps, security-based swaps, and swap portfolios.

(d) STABLE VALUE CONTRACTS.—

(1) DETERMINATION.—

(A) STATUS.—Not later than 15 months after the date of the enactment of this Act, the Securities and Exchange Commission and the Commodity Futures Trading Commission shall, jointly, conduct a study to determine whether stable value contracts fall within the definition of a swap. In making the determination required under this subparagraph, the Commissions jointly shall consult with the Department of Labor, the Department of the Treasury, and the State entities that regulate the issuers of stable value contracts.

Deadline.
Study.

(B) REGULATIONS.—If the Commissions determine that stable value contracts fall within the definition of a swap, the Commissions jointly shall determine if an exemption for stable value contracts from the definition of swap is appropriate and in the public interest. The Commissions shall issue regulations implementing the determinations required under this paragraph. Until the effective date of such regulations, and notwithstanding any other provision of this title, the requirements of this title shall not apply to stable value contracts.

(C) LEGAL CERTAINTY.—Stable value contracts in effect prior to the effective date of the regulations described in subparagraph (B) shall not be considered swaps.

(2) DEFINITION.—For purposes of this subsection, the term "stable value contract" means any contract, agreement, or transaction that provides a crediting interest rate and guaranty or financial assurance of liquidity at contract or book value prior to maturity offered by a bank, insurance company, or other State or federally regulated financial institution for the benefit of any individual or commingled fund available as an investment in an employee benefit plan (as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, including plans described in section 3(32) of such Act) subject to participant direction, an eligible deferred compensation plan (as defined in section 457(b) of the Internal Revenue Code of 1986) that is maintained by an eligible employer described in section 457(e)(1)(A) of such Code, an arrangement described in section 403(b) of such Code, or a qualified tuition program (as defined in section 529 of such Code).

**SEC. 720. MEMORANDUM.**

15 USC 8308.
Deadline.

(a)(1) The Commodity Futures Trading Commission and the Federal Energy Regulatory Commission shall, not later than 180 days after the date of the enactment of this Act, negotiate a memorandum of understanding to establish procedures for—

(A) applying their respective authorities in a manner so as to ensure effective and efficient regulation in the public interest;

(B) resolving conflicts concerning overlapping jurisdiction between the 2 agencies; and

(C) avoiding, to the extent possible, conflicting or duplicative regulation.

(2) Such memorandum and any subsequent amendments to the memorandum shall be promptly submitted to the appropriate committees of Congress.

Deadline.

(b) The Commodity Futures Trading Commission and the Federal Energy Regulatory Commission shall, not later than 180 days after the date of the enactment of this section, negotiate a memorandum of understanding that may be requested where either Commission is conducting an investigation into potential manipulation, fraud, or market power abuse in markets subject to such Commission's regulation or oversight. Shared information shall remain subject to the same restrictions on disclosure applicable to the Commission initially holding the information.

# PART II—REGULATION OF SWAP MARKETS

## SEC. 721. DEFINITIONS.

(a) In General.—Section 1a of the Commodity Exchange Act (7 U.S.C. 1a) is amended—

(1) by redesignating paragraphs (2), (3) and (4), (5) through (17), (18) through (23), (24) through (28), (29), (30), (31) through (33), and (34) as paragraphs (6), (8) and (9), (11) through (23), (26) through (31), (34) through (38), (40), (41), (44) through (46), and (51), respectively;

(2) by inserting after paragraph (1) the following:

"(2) Appropriate federal banking agency.—The term 'appropriate Federal banking agency'—

"(A) has the meaning given the term in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

"(B) means the Board in the case of a noninsured State bank; and

"(C) is the Farm Credit Administration for farm credit system institutions.

"(3) Associated person of a security-based swap dealer or major security-based swap participant.—The term 'associated person of a security-based swap dealer or major security-based swap participant' has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

"(4) Associated person of a swap dealer or major swap participant.—

"(A) In general.—The term 'associated person of a swap dealer or major swap participant' means a person who is associated with a swap dealer or major swap participant as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves—

"(i) the solicitation or acceptance of swaps; or

"(ii) the supervision of any person or persons so engaged.

"(B) Exclusion.—Other than for purposes of section 4s(b)(6), the term 'associated person of a swap dealer or major swap participant' does not include any person associated with a swap dealer or major swap participant the functions of which are solely clerical or ministerial.

"(5) Board.—The term 'Board' means the Board of Governors of the Federal Reserve System.";

(3) by inserting after paragraph (6) (as redesignated by paragraph (1)) the following:

"(7) CLEARED SWAP.—The term 'cleared swap' means any swap that is, directly or indirectly, submitted to and cleared by a derivatives clearing organization registered with the Commission.";

(4) in paragraph (9) (as redesignated by paragraph (1)), by striking "except onions" and all that follows through the period at the end and inserting the following: "except onions (as provided by the first section of Public Law 85–839 (7 U.S.C. 13–1)) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.";

(5) by inserting after paragraph (9) (as redesignated by paragraph (1)) the following:

"(10) COMMODITY POOL.—

"(A) IN GENERAL.—The term 'commodity pool' means any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any—

"(i) commodity for future delivery, security futures product, or swap;

"(ii) agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i);

"(iii) commodity option authorized under section 4c; or

"(iv) leverage transaction authorized under section 19.

"(B) FURTHER DEFINITION.—The Commission, by rule or regulation, may include within, or exclude from, the term 'commodity pool' any investment trust, syndicate, or similar form of enterprise if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(6) by striking paragraph (11) (as redesignated by paragraph (1)) and inserting the following:

"(11) COMMODITY POOL OPERATOR.—

"(A) IN GENERAL.—The term 'commodity pool operator' means any person—

"(i) engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

"(I) commodity for future delivery, security futures product, or swap;

"(II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i);

"(III) commodity option authorized under section 4c; or

"(IV) leverage transaction authorized under section 19; or

"(ii) who is registered with the Commission as a commodity pool operator.

"(B) FURTHER DEFINITION.—The Commission, by rule or regulation, may include within, or exclude from, the term 'commodity pool operator' any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(7) in paragraph (12) (as redesignated by paragraph (1)), in subparagraph (A)—

(A) in clause (i)—

(i) in subclause (I), by striking "made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility" and inserting ", security futures product, or swap";

(ii) by redesignating subclauses (II) and (III) as subclauses (III) and (IV);

(iii) by inserting after subclause (I) the following:

"(II) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i)"; and

(iv) in subclause (IV) (as so redesignated), by striking "or";

(B) in clause (ii), by striking the period at the end and inserting a semicolon; and

(C) by adding at the end the following:

"(iii) is registered with the Commission as a commodity trading advisor; or

"(iv) the Commission, by rule or regulation, may include if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(8) in paragraph (17) (as redesignated by paragraph (1)), in subparagraph (A), in the matter preceding clause (i), by striking "paragraph (12)(A)" and inserting "paragraph (18)(A)";

(9) in paragraph (18) (as redesignated by paragraph (1))—

(A) in subparagraph (A)—

(i) in the matter following clause (vii)(III)—

(I) by striking "section 1a (11)(A)" and inserting "paragraph (17)(A)"; and

(II) by striking "$25,000,000" and inserting "$50,000,000"; and

(ii) in clause (xi), in the matter preceding subclause (I), by striking "total assets in an amount" and inserting "amounts invested on a discretionary basis, the aggregate of which is";

(10) by striking paragraph (22) (as redesignated by paragraph (1)) and inserting the following:

"(22) FLOOR BROKER.—

"(A) IN GENERAL.—The term 'floor broker' means any person—

"(i) who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, shall purchase or sell for any other person—

"(I) any commodity for future delivery, security futures product, or swap; or

"(II) any commodity option authorized under section 4c; or

"(ii) who is registered with the Commission as a floor broker.

"(B) FURTHER DEFINITION.—The Commission, by rule or regulation, may include within, or exclude from, the term 'floor broker' any person in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged who trades for any other person if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(11) by striking paragraph (23) (as redesignated by paragraph (1)) and inserting the following:

"(23) FLOOR TRADER.—

"(A) IN GENERAL.—The term 'floor trader' means any person—

"(i) who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases, or sells solely for such person's own account—

"(I) any commodity for future delivery, security futures product, or swap; or

"(II) any commodity option authorized under section 4c; or

"(ii) who is registered with the Commission as a floor trader.

"(B) FURTHER DEFINITION.—The Commission, by rule or regulation, may include within, or exclude from, the term 'floor trader' any person in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged who trades solely for such person's own account if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(12) by inserting after paragraph (23) (as redesignated by paragraph (1)) the following:

"(24) FOREIGN EXCHANGE FORWARD.—The term 'foreign exchange forward' means a transaction that solely involves the exchange of 2 different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange.

"(25) FOREIGN EXCHANGE SWAP.—The term 'foreign exchange swap' means a transaction that solely involves—

"(A) an exchange of 2 different currencies on a specific date at a fixed rate that is agreed upon on the inception of the contract covering the exchange; and

"(B) a reverse exchange of the 2 currencies described in subparagraph (A) at a later date and at a fixed rate that is agreed upon on the inception of the contract covering the exchange.";

(13) by striking paragraph (28) (as redesignated by paragraph (1)) and inserting the following:

"(28) FUTURES COMMISSION MERCHANT.—

"(A) IN GENERAL.—The term 'futures commission merchant' means an individual, association, partnership, corporation, or trust—

"(i) that—

"(I) is—

"(aa) engaged in soliciting or in accepting orders for—

"(AA) the purchase or sale of a commodity for future delivery;

"(BB) a security futures product;

"(CC) a swap;

"(DD) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i);

"(EE) any commodity option authorized under section 4c; or

"(FF) any leverage transaction authorized under section 19; or

"(bb) acting as a counterparty in any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i); and

"(II) in or in connection with the activities described in items (aa) or (bb) of subclause (I), accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or

"(ii) that is registered with the Commission as a futures commission merchant.

"(B) FURTHER DEFINITION.—The Commission, by rule or regulation, may include within, or exclude from, the term 'futures commission merchant' any person who engages in soliciting or accepting orders for, or acting as a counterparty in, any agreement, contract, or transaction subject to this Act, and who accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom, if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(14) in paragraph (30) (as redesignated by paragraph (1)), in subparagraph (B), by striking "state" and inserting "State";

(15) by striking paragraph (31) (as redesignated by paragraph (1)) and inserting the following:

"(31) INTRODUCING BROKER.—

"(A) IN GENERAL.—The term 'introducing broker' means any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant)—

"(i) who—

"(I) is engaged in soliciting or in accepting orders for—

"(aa) the purchase or sale of any commodity for future delivery, security futures product, or swap;

"(bb) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i);

"(cc) any commodity option authorized under section 4c; or

"(dd) any leverage transaction authorized under section 19; and

"(II) does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or

"(ii) who is registered with the Commission as an introducing broker.

"(B) FURTHER DEFINITION.—The Commission, by rule or regulation, may include within, or exclude from, the term 'introducing broker' any person who engages in soliciting or accepting orders for any agreement, contract, or transaction subject to this Act, and who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom, if the Commission determines that the rule or regulation will effectuate the purposes of this Act.";

(16) by inserting after paragraph (31) (as redesignated by paragraph (1)) the following:

"(32) MAJOR SECURITY-BASED SWAP PARTICIPANT.—The term 'major security-based swap participant' has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

"(33) MAJOR SWAP PARTICIPANT.—

"(A) IN GENERAL.—The term 'major swap participant' means any person who is not a swap dealer, and—

"(i) maintains a substantial position in swaps for any of the major swap categories as determined by the Commission, excluding—

"(I) positions held for hedging or mitigating commercial risk; and

"(II) positions maintained by any employee benefit plan (or any contract held by such a plan) as defined in paragraphs (3) and (32) of section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002) for the primary purpose of hedging or mitigating any risk directly associated with the operation of the plan;

"(ii) whose outstanding swaps create substantial counterparty exposure that could have serious adverse effects on the financial stability of the United States banking system or financial markets; or

"(iii)(I) is a financial entity that is highly leveraged relative to the amount of capital it holds and that is not subject to capital requirements established by an appropriate Federal banking agency; and

"(II) maintains a substantial position in outstanding swaps in any major swap category as determined by the Commission.

"(B) DEFINITION OF SUBSTANTIAL POSITION.—For purposes of subparagraph (A), the Commission shall define

Regulations.

by rule or regulation the term 'substantial position' at the threshold that the Commission determines to be prudent for the effective monitoring, management, and oversight of entities that are systemically important or can significantly impact the financial system of the United States. In setting the definition under this subparagraph, the Commission shall consider the person's relative position in uncleared as opposed to cleared swaps and may take into consideration the value and quality of collateral held against counterparty exposures.

"(C) SCOPE OF DESIGNATION.—For purposes of subparagraph (A), a person may be designated as a major swap participant for 1 or more categories of swaps without being classified as a major swap participant for all classes of swaps.

"(D) EXCLUSIONS.—The definition under this paragraph shall not include an entity whose primary business is providing financing, and uses derivatives for the purpose of hedging underlying commercial risks related to interest rate and foreign currency exposures, 90 percent or more of which arise from financing that facilitates the purchase or lease of products, 90 percent or more of which are manufactured by the parent company or another subsidiary of the parent company.";

(17) by inserting after paragraph (38) (as redesignated by paragraph (1)) the following:

"(39) PRUDENTIAL REGULATOR.—The term 'prudential regulator' means—

"(A) the Board in the case of a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant that is—

"(i) a State-chartered bank that is a member of the Federal Reserve System;

"(ii) a State-chartered branch or agency of a foreign bank;

"(iii) any foreign bank which does not operate an insured branch;

"(iv) any organization operating under section 25A of the Federal Reserve Act or having an agreement with the Board under section 225 of the Federal Reserve Act;

"(v) any bank holding company (as defined in section 2 of the Bank Holding Company Act of 1965 (12 U.S.C. 1841)), any foreign bank (as defined in section 1(b)(7) of the International Banking Act of 1978 (12 U.S.C. 3101(b)(7)) that is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)), and any subsidiary of such a company or foreign bank (other than a subsidiary that is described in subparagraph (A) or (B) or that is required to be registered with the Commission as a swap dealer or major swap participant under this Act or with the Securities and Exchange Commission as a security-based swap dealer or major security-based swap participant);

"(vi) after the transfer date (as defined in section 311 of the Dodd-Frank Wall Street Reform and Consumer Protection Act), any savings and loan holding company (as defined in section 10 of the Home Owners' Loan Act (12 U.S.C. 1467a)) and any subsidiary of such company (other than a subsidiary that is described in subparagraph (A) or (B) or that is required to be registered as a swap dealer or major swap participant with the Commission under this Act or with the Securities and Exchange Commission as a security-based swap dealer or major security-based swap participant); or

"(vii) any organization operating under section 25A of the Federal Reserve Act (12U.S.C. 611 et seq.) or having an agreement with the Board under section 25 of the Federal Reserve Act (12 U.S.C. 601 et seq.);

"(B) the Office of the Comptroller of the Currency in the case of a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant that is—

"(i) a national bank;

"(ii) a federally chartered branch or agency of a foreign bank; or

"(iii) any Federal savings association;

"(C) the Federal Deposit Insurance Corporation in the case of a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant that is—

"(i) a State-chartered bank that is not a member of the Federal Reserve System; or

"(ii) any State savings association;

"(D) the Farm Credit Administration, in the case of a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant that is an institution chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.); and

"(E) the Federal Housing Finance Agency in the case of a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant that is a regulated entity (as such term is defined in section 1303 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992).";

(18) in paragraph (40) (as redesignated by paragraph (1))—

(A) by striking subparagraph (B);

(B) by redesignating subparagraphs (C), (D), and (E) as subparagraphs (B), (C), and (F), respectively;

(C) in subparagraph (C) (as so redesignated), by striking "and"; and

(D) by inserting after subparagraph (C) (as so redesignated) the following:

"(D) a swap execution facility registered under section 5h;

"(E) a swap data repository registered under section 21; and";

(19) by inserting after paragraph (41) (as redesignated by paragraph (1)) the following:

"(42) SECURITY-BASED SWAP.—The term 'security-based swap' has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

"(43) SECURITY-BASED SWAP DEALER.—The term 'security-based swap dealer' has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).";

(20) in paragraph (46) (as redesignated by paragraph (1)), by striking "subject to section 2(h)(7)" and inserting "subject to section 2(h)(5)";

(21) by inserting after paragraph (46) (as redesignated by paragraph (1)) the following:

"(47) SWAP.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the term 'swap' means any agreement, contract, or transaction—

"(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

"(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

"(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

"(I) an interest rate swap;
"(II) a rate floor;
"(III) a rate cap;
"(IV) a rate collar;
"(V) a cross-currency rate swap;
"(VI) a basis swap;
"(VII) a currency swap;
"(VIII) a foreign exchange swap;
"(IX) a total return swap;
"(X) an equity index swap;
"(XI) an equity swap;
"(XII) a debt index swap;
"(XIII) a debt swap;

"(XIV) a credit spread;

"(XV) a credit default swap;

"(XVI) a credit swap;

"(XVII) a weather swap;

"(XVIII) an energy swap;

"(XIX) a metal swap;

"(XX) an agricultural swap;

"(XXI) an emissions swap; and

"(XXII) a commodity swap;

"(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

"(v) including any security-based swap agreement which meets the definition of 'swap agreement' as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

"(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

"(B) EXCLUSIONS.—The term 'swap' does not include—

"(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 19, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i);

"(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

"(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

"(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

"(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

"(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

"(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

"(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

"(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

"(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the

purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

"(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

"(viii) any agreement, contract, or transaction that is—

"(I) based on a security; and

"(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

"(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

"(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

"(C) RULE OF CONSTRUCTION REGARDING MASTER AGREEMENTS.—

"(i) IN GENERAL.—Except as provided in clause (ii), the term 'swap' includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

"(ii) EXCEPTION.—For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

"(D) MIXED SWAP.—The term 'security-based swap' includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

"(E) TREATMENT OF FOREIGN EXCHANGE SWAPS AND FORWARDS.—

Determination.

"(i) IN GENERAL.—Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a

written determination under section 1b that either foreign exchange swaps or foreign exchange forwards or both—

"(I) should be not be regulated as swaps under this Act; and

"(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

"(ii) CONGRESSIONAL NOTICE; EFFECTIVENESS.—The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

"(iii) REPORTING.—Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 4r within such time period as the Commission may by rule or regulation prescribe.

"(iv) BUSINESS STANDARDS.—Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 4s(h).

"(v) SECRETARY.—For purposes of this subparagraph, the term 'Secretary' means the Secretary of the Treasury.

"(F) EXCEPTION FOR CERTAIN FOREIGN EXCHANGE SWAPS AND FORWARDS.—

"(i) REGISTERED ENTITIES.—Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this Act or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

"(ii) RETAIL TRANSACTIONS.—Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this Act or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2).

"(48) SWAP DATA REPOSITORY.—The term 'swap data repository' means any person that collects and maintains information or records with respect to transactions or positions in, or the terms and conditions of, swaps entered into by third parties

for the purpose of providing a centralized recordkeeping facility for swaps.

"(49) SWAP DEALER.—

"(A) IN GENERAL.—The term 'swap dealer' means any person who—

"(i) holds itself out as a dealer in swaps;

"(ii) makes a market in swaps;

"(iii) regularly enters into swaps with counterparties as an ordinary course of business for its own account; or

"(iv) engages in any activity causing the person to be commonly known in the trade as a dealer or market maker in swaps,

provided however, in no event shall an insured depository institution be considered to be a swap dealer to the extent it offers to enter into a swap with a customer in connection with originating a loan with that customer.

"(B) INCLUSION.—A person may be designated as a swap dealer for a single type or single class or category of swap or activities and considered not to be a swap dealer for other types, classes, or categories of swaps or activities.

"(C) EXCEPTION.—The term 'swap dealer' does not include a person that enters into swaps for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.

"(D) DE MINIMIS EXCEPTION.—The Commission shall exempt from designation as a swap dealer an entity that engages in a de minimis quantity of swap dealing in connection with transactions with or on behalf of its customers. The Commission shall promulgate regulations to establish factors with respect to the making of this determination to exempt.

"(50) SWAP EXECUTION FACILITY.—The term 'swap execution facility' means a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system, through any means of interstate commerce, including any trading facility, that—

"(A) facilitates the execution of swaps between persons; and

"(B) is not a designated contract market.".

(22) in paragraph (51) (as redesignated by paragraph (1)), in subparagraph (A)(i), by striking "partipants" and inserting "participants".

15 USC 8321.    (b) AUTHORITY TO DEFINE TERMS.—The Commodity Futures Trading Commission may adopt a rule to define—

(1) the term "commercial risk"; and

(2) any other term included in an amendment to the Commodity Exchange Act (7 U.S.C. 1 et seq.) made by this subtitle.

15 USC 8321.    (c) MODIFICATION OF DEFINITIONS.—To include transactions and entities that have been structured to evade this subtitle (or an amendment made by this subtitle), the Commodity Futures Trading Commission shall adopt a rule to further define the terms "swap", "swap dealer", "major swap participant", and "eligible contract participant".

(d) EXEMPTIONS.—Section 4(c)(1) of the Commodity Exchange Act (7 U.S.C. 6(c)(1)) is amended by striking "except that" and all that follows through the period at the end and inserting the following: "except that—

"(A) unless the Commission is expressly authorized by any provision described in this subparagraph to grant exemptions, with respect to amendments made by subtitle A of the Wall Street Transparency and Accountability Act of 2010—

"(i) with respect to—

"(I) paragraphs (2), (3), (4), (5), and (7), paragraph (18)(A)(vii)(III), paragraphs (23), (24), (31), (32), (38), (39), (41), (42), (46), (47), (48), and (49) of section 1a, and sections 2(a)(13), 2(c)(1)(D), 4a(a), 4a(b), 4d(c), 4d(d), 4r, 4s, 5b(a), 5b(b), 5(d), 5(g), 5(h), 5b(c), 5b(i), 8e, and 21; and

"(II) section 206(e) of the Gramm-Leach-Bliley Act (Public Law 106–102; 15 U.S.C. 78c note); and

"(ii) in sections 721(c) and 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; and

"(B) the Commission and the Securities and Exchange Commission may by rule, regulation, or order jointly exclude any agreement, contract, or transaction from section 2(a)(1)(D)) if the Commissions determine that the exemption would be consistent with the public interest.".

(e) CONFORMING AMENDMENTS.—

(1) Section 2(c)(2)(B)(i)(II) of the Commodity Exchange Act (7 U.S.C. 2(c)(2)(B)(i)(II)) is amended—

(A) in item (cc)—

(i) in subitem (AA), by striking "section 1a(20)" and inserting "section 1a"; and

(ii) in subitem (BB), by striking "section 1a(20)" and inserting "section 1a"; and

(B) in item (dd), by striking "section 1a(12)(A)(ii)" and inserting "section 1a(18)(A)(ii)".

(2) Section 4m(3) of the Commodity Exchange Act (7 U.S.C. 6m(3)) is amended by striking "section 1a(6)" and inserting "section 1a".

(3) Section 4q(a)(1) of the Commodity Exchange Act (7 U.S.C. 6o–1(a)(1)) is amended by striking "section 1a(4)" and inserting "section 1a(9)".

7 USC 6q.

(4) Section 5(e)(1) of the Commodity Exchange Act (7 U.S.C. 7(e)(1)) is amended by striking "section 1a(4)" and inserting "section 1a(9)".

(5) Section 5a(b)(2)(F) of the Commodity Exchange Act (7 U.S.C. 7a(b)(2)(F)) is amended by striking "section 1a(4)" and inserting "section 1a(9)".

(6) Section 5b(a) of the Commodity Exchange Act (7 U.S.C. 7a–1(a)) is amended, in the matter preceding paragraph (1), by striking "section 1a(9)" and inserting "section 1a".

(7) Section 5c(c)(2)(B) of the Commodity Exchange Act (7 U.S.C. 7a–2(c)(2)(B)) is amended by striking "section 1a(4)" and inserting "section 1a(9)".

(8) Section 6(g)(5)(B)(i) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(g)(5)(B)(i)) is amended—

(A) in subclause (I), by striking "section 1a(12)(B)(ii)" and inserting "section 1a(18)(B)(ii)"; and

(B) in subclause (II), by striking "section 1a(12)" and inserting "section 1a(18)".

7 USC 27.

(9) Section 402 of the Legal Certainty for Bank Products Act of 2000 (7 U.S.C. 27 et seq.) is amended—

(A) in subsection (a)(7), by striking "section 1a(20)" and inserting "section 1a";

(B) in subsection (b)(2), by striking "section 1a(12)" and inserting "section 1a"; and

(C) in subsection (c), by striking "section 1a(4)" and inserting "section 1a".

(10) The first section of Public Law 85–839 (7 U.S.C. 13–1) is amended in subsection (a), in the first sentence, by inserting "motion picture box office receipts (or any index, measure, value, or data related to such receipts) or" after "sale of".

7 USC 1a note.

(f) EFFECTIVE DATE.—Notwithstanding any other provision of this Act, the amendments made by subsection (a)(4) shall take effect on June 1, 2010.

## SEC. 722. JURISDICTION.

(a) EXCLUSIVE JURISDICTION.—Section 2(a)(1) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)) is amended—

(1) in subparagraph (A), in the first sentence—

(A) by inserting "the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and" after "otherwise provided in";

(B) by striking "(C) and (D)" and inserting "(C), (D), and (I)";

(C) by striking "(c) through (i) of this section" and inserting "(c) and (f)";

(D) by striking "contracts of sale" and inserting "swaps or contracts of sale"; and

(E) by striking "or derivatives transaction execution facility registered pursuant to section 5 or 5a" and inserting "pursuant to section 5 or a swap execution facility pursuant to section 5h"; and

(2) by adding at the end the following:

"(G)(i) Nothing in this paragraph shall limit the jurisdiction conferred on the Securities and Exchange Commission by the Wall Street Transparency and Accountability Act of 2010 with regard to security-based swap agreements as defined pursuant to section 3(a)(78) of the Securities Exchange Act of 1934, and security-based swaps.

"(ii) In addition to the authority of the Securities and Exchange Commission described in clause (i), nothing in this subparagraph shall limit or affect any statutory authority of the Commission with respect to an agreement, contract, or transaction described in clause (i).

"(H) Notwithstanding any other provision of law, the Wall Street Transparency and Accountability Act of 2010 shall not apply to, and the Commodity Futures Trading Commission shall have no jurisdiction under such Act (or any amendments to the Commodity Exchange Act made by such Act) with respect to, any security other than a security-based swap.".

(b) REGULATION OF SWAPS UNDER FEDERAL AND STATE LAW.—
Section 12 of the Commodity Exchange Act (7 U.S.C. 16) is amended
by adding at the end the following:

"(h) REGULATION OF SWAPS AS INSURANCE UNDER STATE LAW.—
A swap—

"(1) shall not be considered to be insurance; and
"(2) may not be regulated as an insurance contract under
the law of any State.".

(c) AGREEMENTS, CONTRACTS, AND TRANSACTIONS TRADED ON
AN ORGANIZED EXCHANGE.—Section 2(c)(2)(A) of the Commodity
Exchange Act (7 U.S.C. 2(c)(2)(A)) is amended—

(1) in clause (i), by striking "or" at the end;
(2) by redesignating clause (ii) as clause (iii); and
(3) by inserting after clause (i) the following:

"(ii) a swap; or".

(d) APPLICABILITY.—Section 2 of the Commodity Exchange Act
(7 U.S.C. 2) (as amended by section 723(a)(3)) is amended by adding
at the end the following:

"(i) APPLICABILITY.—The provisions of this Act relating to swaps
that were enacted by the Wall Street Transparency and Account-
ability Act of 2010 (including any rule prescribed or regulation
promulgated under that Act), shall not apply to activities outside
the United States unless those activities—

"(1) have a direct and significant connection with activities
in, or effect on, commerce of the United States; or
"(2) contravene such rules or regulations as the Commission
may prescribe or promulgate as are necessary or appropriate
to prevent the evasion of any provision of this Act that was
enacted by the Wall Street Transparency and Accountability
Act of 2010.".

(e) FEDERAL ENERGY REGULATORY COMMISSION.—Section
2(a)(1) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)) is amended
by adding at the end the following:

"(I)(i) Nothing in this Act shall limit or affect any
statutory authority of the Federal Energy Regulatory
Commission or a State regulatory authority (as defined
in section 3(21) of the Federal Power Act (16 U.S.C. 796(21))
with respect to an agreement, contract, or transaction that
is entered into pursuant to a tariff or rate schedule
approved by the Federal Energy Regulatory Commission
or a State regulatory authority and is—

"(I) not executed, traded, or cleared on a registered
entity or trading facility; or
"(II) executed, traded, or cleared on a registered
entity or trading facility owned or operated by a
regional transmission organization or independent
system operator.

"(ii) In addition to the authority of the Federal Energy
Regulatory Commission or a State regulatory authority
described in clause (i), nothing in this subparagraph shall
limit or affect—

"(I) any statutory authority of the Commission
with respect to an agreement, contract, or transaction
described in clause (i); or
"(II) the jurisdiction of the Commission under
subparagraph (A) with respect to an agreement, con-
tract, or transaction that is executed, traded, or cleared

on a registered entity or trading facility that is not owned or operated by a regional transmission organization or independent system operator (as defined by sections 3(27) and (28) of the Federal Power Act (16 U.S.C. 796(27), 796(28)).''.

(f) PUBLIC INTEREST WAIVER.—Section 4(c) of the Commodity Exchange Act (7 U.S.C. 6(c)) (as amended by section 721(d)) is amended by adding at the end the following:

''(6) If the Commission determines that the exemption would be consistent with the public interest and the purposes of this Act, the Commission shall, in accordance with paragraphs (1) and (2), exempt from the requirements of this Act an agreement, contract, or transaction that is entered into—

''(A) pursuant to a tariff or rate schedule approved or permitted to take effect by the Federal Energy Regulatory Commission;

''(B) pursuant to a tariff or rate schedule establishing rates or charges for, or protocols governing, the sale of electric energy approved or permitted to take effect by the regulatory authority of the State or municipality having jurisdiction to regulate rates and charges for the sale of electric energy within the State or municipality; or

''(C) between entities described in section 201(f) of the Federal Power Act (16 U.S.C. 824(f)).''.

15 USC 8322.

(g) AUTHORITY OF FERC.—Nothing in the Wall Street Transparency and Accountability Act of 2010 or the amendments to the Commodity Exchange Act made by such Act shall limit or affect any statutory enforcement authority of the Federal Energy Regulatory Commission pursuant to section 222 of the Federal Power Act and section 4A of the Natural Gas Act that existed prior to the date of enactment of the Wall Street Transparency and Accountability Act of 2010.

(h) DETERMINATION.—The Commodity Exchange Act is amended by inserting after section 1a (7 U.S.C. 1a) the following:

7 USC 1b.

**''SEC. 1b. REQUIREMENTS OF SECRETARY OF THE TREASURY REGARDING EXEMPTION OF FOREIGN EXCHANGE SWAPS AND FOREIGN EXCHANGE FORWARDS FROM DEFINITION OF THE TERM 'SWAP'.**

''(a) REQUIRED CONSIDERATIONS.—In determining whether to exempt foreign exchange swaps and foreign exchange forwards from the definition of the term 'swap', the Secretary of the Treasury (referred to in this section as the 'Secretary') shall consider—

''(1) whether the required trading and clearing of foreign exchange swaps and foreign exchange forwards would create systemic risk, lower transparency, or threaten the financial stability of the United States;

''(2) whether foreign exchange swaps and foreign exchange forwards are already subject to a regulatory scheme that is materially comparable to that established by this Act for other classes of swaps;

''(3) the extent to which bank regulators of participants in the foreign exchange market provide adequate supervision, including capital and margin requirements;

''(4) the extent of adequate payment and settlement systems; and

"(5) the use of a potential exemption of foreign exchange swaps and foreign exchange forwards to evade otherwise applicable regulatory requirements.

"(b) DETERMINATION.—If the Secretary makes a determination to exempt foreign exchange swaps and foreign exchange forwards from the definition of the term 'swap', the Secretary shall submit to the appropriate committees of Congress a determination that contains—

"(1) an explanation regarding why foreign exchange swaps and foreign exchange forwards are qualitatively different from other classes of swaps in a way that would make the foreign exchange swaps and foreign exchange forwards ill-suited for regulation as swaps; and

"(2) an identification of the objective differences of foreign exchange swaps and foreign exchange forwards with respect to standard swaps that warrant an exempted status.

"(c) EFFECT OF DETERMINATION.—A determination by the Secretary under subsection (b) shall not exempt any foreign exchange swaps and foreign exchange forwards traded on a designated contract market or swap execution facility from any applicable anti-fraud and antimanipulation provision under this title.".

## SEC. 723. CLEARING.

(a) CLEARING REQUIREMENT.—

(1) IN GENERAL.—Section 2 of the Commodity Exchange Act (7 U.S.C. 2) is amended—

(A) by striking subsections (d), (e), (g), and (h); and

(B) by redesignating subsection (i) as subsection (g).

(2) SWAPS; LIMITATION ON PARTICIPATION.—Section 2 of the Commodity Exchange Act (7 U.S.C. 2) (as amended by paragraph (1)) is amended by inserting after subsection (c) the following:

"(d) SWAPS.—Nothing in this Act (other than subparagraphs (A), (B), (C), (D), (G), and (H) of subsection (a)(1), subsections (f) and (g), sections 1a, 2(a)(13), 2(c)(2)(A)(ii), 2(e), 2(h), 4(c), 4a, 4b, and 4b–1, subsections (a), (b), and (g) of section 4c, sections 4d, 4e, 4f, 4g, 4h, 4i, 4j, 4k, 4l, 4m, 4n, 4o, 4p, 4r, 4s, 4t, 5, 5b, 5c, 5e, and 5h, subsections (c) and (d) of section 6, sections 6c, 6d, 8, 8a, and 9, subsections (e)(2), (f), and (h) of section 12, subsections (a) and (b) of section 13, sections 17, 20, 21, and 22(a)(4), and any other provision of this Act that is applicable to registered entities or Commission registrants) governs or applies to a swap.

"(e) LIMITATION ON PARTICIPATION.—It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 5.".

(3) MANDATORY CLEARING OF SWAPS.—Section 2 of the Commodity Exchange Act (7 U.S.C. 2) is amended by inserting after subsection (g) (as redesignated by paragraph (1)(B)) the following:

"(h) CLEARING REQUIREMENT.—

"(1) IN GENERAL.—

"(A) STANDARD FOR CLEARING.—It shall be unlawful for any person to engage in a swap unless that person submits such swap for clearing to a derivatives clearing

organization that is registered under this Act or a derivatives clearing organization that is exempt from registration under this Act if the swap is required to be cleared.

"(B) OPEN ACCESS.—The rules of a derivatives clearing organization described in subparagraph (A) shall—

"(i) prescribe that all swaps (but not contracts of sale of a commodity for future delivery or options on such contracts) submitted to the derivatives clearing organization with the same terms and conditions are economically equivalent within the derivatives clearing organization and may be offset with each other within the derivatives clearing organization; and

"(ii) provide for non-discriminatory clearing of a swap (but not a contract of sale of a commodity for future delivery or option on such contract) executed bilaterally or on or through the rules of an unaffiliated designated contract market or swap execution facility.

"(2) COMMISSION REVIEW.—

"(A) COMMISSION-INITIATED REVIEW.—

"(i) The Commission on an ongoing basis shall review each swap, or any group, category, type, or class of swaps to make a determination as to whether the swap or group, category, type, or class of swaps should be required to be cleared.

Public comment.
Time period.

"(ii) The Commission shall provide at least a 30-day public comment period regarding any determination made under clause (i).

"(B) SWAP SUBMISSIONS.—

Notice.

"(i) A derivatives clearing organization shall submit to the Commission each swap, or any group, category, type, or class of swaps that it plans to accept for clearing, and provide notice to its members (in a manner to be determined by the Commission) of the submission.

"(ii) Any swap or group, category, type, or class of swaps listed for clearing by a derivative clearing organization as of the date of enactment of this subsection shall be considered submitted to the Commission.

Public
information.

"(iii) The Commission shall—

"(I) make available to the public submissions received under clauses (i) and (ii);

"(II) review each submission made under clauses (i) and (ii), and determine whether the swap, or group, category, type, or class of swaps described in the submission is required to be cleared; and

Public comment.
Time period.

"(III) provide at least a 30-day public comment period regarding its determination as to whether the clearing requirement under paragraph (1)(A) shall apply to the submission.

"(C) DEADLINE.—The Commission shall make its determination under subparagraph (B)(iii) not later than 90 days after receiving a submission made under subparagraphs (B)(i) and (B)(ii), unless the submitting derivatives clearing organization agrees to an extension for the time limitation established under this subparagraph.

"(D) DETERMINATION.—

"(i) In reviewing a submission made under subparagraph (B), the Commission shall review whether the submission is consistent with section 5b(c)(2).

"(ii) In reviewing a swap, group of swaps, or class of swaps pursuant to subparagraph (A) or a submission made under subparagraph (B), the Commission shall take into account the following factors:

"(I) The existence of significant outstanding notional exposures, trading liquidity, and adequate pricing data.

"(II) The availability of rule framework, capacity, operational expertise and resources, and credit support infrastructure to clear the contract on terms that are consistent with the material terms and trading conventions on which the contract is then traded.

"(III) The effect on the mitigation of systemic risk, taking into account the size of the market for such contract and the resources of the derivatives clearing organization available to clear the contract.

"(IV) The effect on competition, including appropriate fees and charges applied to clearing.

"(V) The existence of reasonable legal certainty in the event of the insolvency of the relevant derivatives clearing organization or 1 or more of its clearing members with regard to the treatment of customer and swap counterparty positions, funds, and property.

"(iii) In making a determination under subparagraph (A) or (B)(iii) that the clearing requirement shall apply, the Commission may require such terms and conditions to the requirement as the Commission determines to be appropriate.

"(E) RULES.—Not later than 1 year after the date of the enactment of this subsection, the Commission shall adopt rules for a derivatives clearing organization's submission for review, pursuant to this paragraph, of a swap, or a group, category, type, or class of swaps, that it seeks to accept for clearing. Nothing in this subparagraph limits the Commission from making a determination under subparagraph (B)(iii) for swaps described in subparagraph (B)(ii).

Deadline.

"(3) STAY OF CLEARING REQUIREMENT.—

"(A) IN GENERAL.—After making a determination pursuant to paragraph (2)(B), the Commission, on application of a counterparty to a swap or on its own initiative, may stay the clearing requirement of paragraph (1) until the Commission completes a review of the terms of the swap (or the group, category, type, or class of swaps) and the clearing arrangement.

"(B) DEADLINE.—The Commission shall complete a review undertaken pursuant to subparagraph (A) not later than 90 days after issuance of the stay, unless the derivatives clearing organization that clears the swap, or group,

category, type, or class of swaps agrees to an extension of the time limitation established under this subparagraph.

"(C) DETERMINATION.—Upon completion of the review undertaken pursuant to subparagraph (A), the Commission may—

"(i) determine, unconditionally or subject to such terms and conditions as the Commission determines to be appropriate, that the swap, or group, category, type, or class of swaps must be cleared pursuant to this subsection if it finds that such clearing is consistent with paragraph (2)(D); or

"(ii) determine that the clearing requirement of paragraph (1) shall not apply to the swap, or group, category, type, or class of swaps.

"(D) RULES.—Not later than 1 year after the date of the enactment of the Wall Street Transparency and Accountability Act of 2010, the Commission shall adopt rules for reviewing, pursuant to this paragraph, a derivatives clearing organization's clearing of a swap, or a group, category, type, or class of swaps, that it has accepted for clearing.

"(4) PREVENTION OF EVASION.—

"(A) IN GENERAL.—The Commission shall prescribe rules under this subsection (and issue interpretations of rules prescribed under this subsection) as determined by the Commission to be necessary to prevent evasions of the mandatory clearing requirements under this Act.

"(B) DUTY OF COMMISSION TO INVESTIGATE AND TAKE CERTAIN ACTIONS.—To the extent the Commission finds that a particular swap, group, category, type, or class of swaps would otherwise be subject to mandatory clearing but no derivatives clearing organization has listed the swap, group, category, type, or class of swaps for clearing, the Commission shall—

"(i) investigate the relevant facts and circumstances;

"(ii) within 30 days issue a public report containing the results of the investigation; and

"(iii) take such actions as the Commission determines to be necessary and in the public interest, which may include requiring the retaining of adequate margin or capital by parties to the swap, group, category, type, or class of swaps.

"(C) EFFECT ON AUTHORITY.—Nothing in this paragraph—

"(i) authorizes the Commission to adopt rules requiring a derivatives clearing organization to list for clearing a swap, group, category, type, or class of swaps if the clearing of the swap, group, category, type, or class of swaps would threaten the financial integrity of the derivatives clearing organization; and

"(ii) affects the authority of the Commission to enforce the open access provisions of paragraph (1)(B) with respect to a swap, group, category, type, or class of swaps that is listed for clearing by a derivatives clearing organization.

Deadline.

Regulations.

Deadline.
Public
information.
Reports.

"(5) REPORTING TRANSITION RULES.—Rules adopted by the Commission under this section shall provide for the reporting of data, as follows:

"(A) Swaps entered into before the date of the enactment of this subsection shall be reported to a registered swap data repository or the Commission no later than 180 days after the effective date of this subsection.

"(B) Swaps entered into on or after such date of enactment shall be reported to a registered swap data repository or the Commission no later than the later of—

"(i) 90 days after such effective date; or

"(ii) such other time after entering into the swap as the Commission may prescribe by rule or regulation.

"(6) CLEARING TRANSITION RULES.—

"(A) Swaps entered into before the date of the enactment of this subsection are exempt from the clearing requirements of this subsection if reported pursuant to paragraph (5)(A).

"(B) Swaps entered into before application of the clearing requirement pursuant to this subsection are exempt from the clearing requirements of this subsection if reported pursuant to paragraph (5)(B).

"(7) EXCEPTIONS.—

"(A) IN GENERAL.—The requirements of paragraph (1)(A) shall not apply to a swap if 1 of the counterparties to the swap—

"(i) is not a financial entity;

"(ii) is using swaps to hedge or mitigate commercial risk; and

"(iii) notifies the Commission, in a manner set forth by the Commission, how it generally meets its financial obligations associated with entering into noncleared swaps.

*Notification.*

"(B) OPTION TO CLEAR.—The application of the clearing exception in subparagraph (A) is solely at the discretion of the counterparty to the swap that meets the conditions of clauses (i) through (iii) of subparagraph (A).

"(C) FINANCIAL ENTITY DEFINITION.—

"(i) IN GENERAL.—For the purposes of this paragraph, the term 'financial entity' means—

"(I) a swap dealer;

"(II) a security-based swap dealer;

"(III) a major swap participant;

"(IV) a major security-based swap participant;

"(V) a commodity pool;

"(VI) a private fund as defined in section 202(a) of the Investment Advisers Act of 1940 (15 U.S.C. 80-b-2(a));

"(VII) an employee benefit plan as defined in paragraphs (3) and (32) of section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002);

"(VIII) a person predominantly engaged in activities that are in the business of banking, or in activities that are financial in nature, as defined in section 4(k) of the Bank Holding Company Act of 1956.

"(ii) EXCLUSION.—The Commission shall consider whether to exempt small banks, savings associations, farm credit system institutions, and credit unions, including—

"(I) depository institutions with total assets of $10,000,000,000 or less;

"(II) farm credit system institutions with total assets of $10,000,000,000 or less; or

"(III) credit unions with total assets of $10,000,000,000 or less.

"(iii) LIMITATION.—Such definition shall not include an entity whose primary business is providing financing, and uses derivatives for the purpose of hedging underlying commercial risks related to interest rate and foreign currency exposures, 90 percent or more of which arise from financing that facilitates the purchase or lease of products, 90 percent or more of which are manufactured by the parent company or another subsidiary of the parent company.

"(D) TREATMENT OF AFFILIATES.—

"(i) IN GENERAL.—An affiliate of a person that qualifies for an exception under subparagraph (A) (including affiliate entities predominantly engaged in providing financing for the purchase of the merchandise or manufactured goods of the person) may qualify for the exception only if the affiliate, acting on behalf of the person and as an agent, uses the swap to hedge or mitigate the commercial risk of the person or other affiliate of the person that is not a financial entity.

"(ii) PROHIBITION RELATING TO CERTAIN AFFILIATES.—The exception in clause (i) shall not apply if the affiliate is—

"(I) a swap dealer;

"(II) a security-based swap dealer;

"(III) a major swap participant;

"(IV) a major security-based swap participant;

"(V) an issuer that would be an investment company, as defined in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a–3), but for paragraph (1) or (7) of subsection (c) of that Act (15 U.S.C. 80a–3(c));

"(VI) a commodity pool; or

"(VII) a bank holding company with over $50,000,000,000 in consolidated assets.

Exemption.
Time period.

"(iii) TRANSITION RULE FOR AFFILIATES.—An affiliate, subsidiary, or a wholly owned entity of a person that qualifies for an exception under subparagraph (A) and is predominantly engaged in providing financing for the purchase or lease of merchandise or manufactured goods of the person shall be exempt from the margin requirement described in section 4s(e) and the clearing requirement described in paragraph (1) with regard to swaps entered into to mitigate the risk of the financing activities for not less than a 2-year period beginning on the date of enactment of this clause.

"(E) ELECTION OF COUNTERPARTY.—

"(i) SWAPS REQUIRED TO BE CLEARED.—With respect to any swap that is subject to the mandatory clearing requirement under this subsection and entered into by a swap dealer or a major swap participant with a counterparty that is not a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant, the counterparty shall have the sole right to select the derivatives clearing organization at which the swap will be cleared.

"(ii) SWAPS NOT REQUIRED TO BE CLEARED.—With respect to any swap that is not subject to the mandatory clearing requirement under this subsection and entered into by a swap dealer or a major swap participant with a counterparty that is not a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant, the counterparty—

"(I) may elect to require clearing of the swap; and

"(II) shall have the sole right to select the derivatives clearing organization at which the swap will be cleared.

"(F) ABUSE OF EXCEPTION.—The Commission may prescribe such rules or issue interpretations of the rules as the Commission determines to be necessary to prevent abuse of the exceptions described in this paragraph. The Commission may also request information from those persons claiming the clearing exception as necessary to prevent abuse of the exceptions described in this paragraph.

"(8) TRADE EXECUTION.—

"(A) IN GENERAL.—With respect to transactions involving swaps subject to the clearing requirement of paragraph (1), counterparties shall—

"(i) execute the transaction on a board of trade designated as a contract market under section 5; or

"(ii) execute the transaction on a swap execution facility registered under 5h or a swap execution facility that is exempt from registration under section 5h(f) of this Act.

"(B) EXCEPTION.—The requirements of clauses (i) and (ii) of subparagraph (A) shall not apply if no board of trade or swap execution facility makes the swap available to trade or for swap transactions subject to the clearing exception under paragraph (7).".

(b) COMMODITY EXCHANGE ACT.—Section 2 of the Commodity Exchange Act (7 U.S.C. 2) is amended by adding at the end the following:

"(j) COMMITTEE APPROVAL BY BOARD.—Exemptions from the requirements of subsection (h)(1) to clear a swap and subsection (h)(8) to execute a swap through a board of trade or swap execution facility shall be available to a counterparty that is an issuer of securities that are registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that is required to file reports pursuant to section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o) only if an appropriate committee of the issuer's board or governing body has reviewed and approved its decision to enter into swaps that are subject to such exemptions.".

7 USC 2 note.

Deadline.

(c) GRANDFATHER PROVISIONS.—

(1) LEGAL CERTAINTY FOR CERTAIN TRANSACTIONS IN EXEMPT COMMODITIES.—Not later than 60 days after the date of enactment of this Act, a person may submit to the Commodity Futures Trading Commission a petition to remain subject to section 2(h) of the Commodity Exchange Act (7 U.S.C. 2(h)) (as in effect on the day before the date of enactment of this Act).

(2) CONSIDERATION; AUTHORITY OF COMMODITY FUTURES TRADING COMMISSION.—The Commodity Futures Trading Commission—

(A) shall consider any petition submitted under subparagraph (A) in a prompt manner; and

(B) may allow a person to continue operating subject to section 2(h) of the Commodity Exchange Act (7 U.S.C. 2(h)) (as in effect on the day before the date of enactment of this Act) for not longer than a 1-year period.

(3) AGRICULTURAL SWAPS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), no person shall offer to enter into, enter into, or confirm the execution of, any swap in an agricultural commodity (as defined by the Commodity Futures Trading Commission).

Regulations.

(B) EXCEPTION.—Notwithstanding subparagraph (A), a person may offer to enter into, enter into, or confirm the execution of, any swap in an agricultural commodity pursuant to section 4(c) of the Commodity Exchange Act (7 U.S.C. 6(c)) or any rule, regulation, or order issued thereunder (including any rule, regulation, or order in effect as of the date of enactment of this Act) by the Commodity Futures Trading Commission to allow swaps under such terms and conditions as the Commission shall prescribe.

Compliance.
Records.

(4) REQUIRED REPORTING.—If the exception described in section 2(h)(8)(B) of the Commodity Exchange Act applies, the counterparties shall comply with any recordkeeping and transaction reporting requirements that may be prescribed by the Commission with respect to swaps subject to section 2(h)(8)(B) of the Commodity Exchange Act.

**SEC. 724. SWAPS; SEGREGATION AND BANKRUPTCY TREATMENT.**

(a) SEGREGATION REQUIREMENTS FOR CLEARED SWAPS.—Section 4d of the Commodity Exchange Act (7 U.S.C. 6d) (as amended by section 732) is amended by adding at the end the following:

"(f) SWAPS.—

"(1) REGISTRATION REQUIREMENT.—It shall be unlawful for any person to accept any money, securities, or property (or to extend any credit in lieu of money, securities, or property) from, for, or on behalf of a swaps customer to margin, guarantee, or secure a swap cleared by or through a derivatives clearing organization (including money, securities, or property accruing to the customer as the result of such a swap), unless the person shall have registered under this Act with the Commission as a futures commission merchant, and the registration shall not have expired nor been suspended nor revoked.

"(2) CLEARED SWAPS.—

"(A) SEGREGATION REQUIRED.—A futures commission merchant shall treat and deal with all money, securities, and property of any swaps customer received to margin, guarantee, or secure a swap cleared by or though a derivatives clearing organization (including money, securities, or property accruing to the swaps customer as the result of such a swap) as belonging to the swaps customer.

"(B) COMMINGLING PROHIBITED.—Money, securities, and property of a swaps customer described in subparagraph (A) shall be separately accounted for and shall not be commingled with the funds of the futures commission merchant or be used to margin, secure, or guarantee any trades or contracts of any swaps customer or person other than the person for whom the same are held.

"(3) EXCEPTIONS.—

"(A) USE OF FUNDS.—

"(i) IN GENERAL.—Notwithstanding paragraph (2), money, securities, and property of swap customers of a futures commission merchant described in paragraph (2) may, for convenience, be commingled and deposited in the same account or accounts with any bank or trust company or with a derivatives clearing organization.

"(ii) WITHDRAWAL.—Notwithstanding paragraph (2), such share of the money, securities, and property described in clause (i) as in the normal course of business shall be necessary to margin, guarantee, secure, transfer, adjust, or settle a cleared swap with a derivatives clearing organization, or with any member of the derivatives clearing organization, may be withdrawn and applied to such purposes, including the payment of commissions, brokerage, interest, taxes, storage, and other charges, lawfully accruing in connection with the cleared swap.

"(B) COMMISSION ACTION.—Notwithstanding paragraph (2), in accordance with such terms and conditions as the Commission may prescribe by rule, regulation, or order, any money, securities, or property of the swaps customers of a futures commission merchant described in paragraph (2) may be commingled and deposited in customer accounts with any other money, securities, or property received by the futures commission merchant and required by the Commission to be separately accounted for and treated and dealt with as belonging to the swaps customer of the futures commission merchant.

"(4) PERMITTED INVESTMENTS.—Money described in paragraph (2) may be invested in obligations of the United States, in general obligations of any State or of any political subdivision of a State, and in obligations fully guaranteed as to principal and interest by the United States, or in any other investment that the Commission may by rule or regulation prescribe, and such investments shall be made in accordance with such rules and regulations and subject to such conditions as the Commission may prescribe.

"(5) COMMODITY CONTRACT.—A swap cleared by or through a derivatives clearing organization shall be considered to be a commodity contract as such term is defined in section 761

of title 11, United States Code, with regard to all money, securities, and property of any swaps customer received by a futures commission merchant or a derivatives clearing organization to margin, guarantee, or secure the swap (including money, securities, or property accruing to the customer as the result of the swap).

"(6) PROHIBITION.—It shall be unlawful for any person, including any derivatives clearing organization and any depository institution, that has received any money, securities, or property for deposit in a separate account or accounts as provided in paragraph (2) to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the swaps customer of the futures commission merchant.".

(b) BANKRUPTCY TREATMENT OF CLEARED SWAPS.—Section 761 of title 11, United States Code, is amended—

(1) in paragraph (4), by striking subparagraph (F) and inserting the following:

"(F)(i) any other contract, option, agreement, or transaction that is similar to a contract, option, agreement, or transaction referred to in this paragraph; and

"(ii) with respect to a futures commission merchant or a clearing organization, any other contract, option, agreement, or transaction, in each case, that is cleared by a clearing organization;"; and

(2) in paragraph (9)(A)(i), by striking "the commodity futures account" and inserting "a commodity contract account".

(c) SEGREGATION REQUIREMENTS FOR UNCLEARED SWAPS.—Section 4s of the Commodity Exchange Act (as added by section 731) is amended by adding at the end the following:

7 USC 6s.

"(l) SEGREGATION REQUIREMENTS.—

"(1) SEGREGATION OF ASSETS HELD AS COLLATERAL IN UNCLEARED SWAP TRANSACTIONS.—

"(A) NOTIFICATION.—A swap dealer or major swap participant shall be required to notify the counterparty of the swap dealer or major swap participant at the beginning of a swap transaction that the counterparty has the right to require segregation of the funds or other property supplied to margin, guarantee, or secure the obligations of the counterparty.

"(B) SEGREGATION AND MAINTENANCE OF FUNDS.—At the request of a counterparty to a swap that provides funds or other property to a swap dealer or major swap participant to margin, guarantee, or secure the obligations of the counterparty, the swap dealer or major swap participant shall—

"(i) segregate the funds or other property for the benefit of the counterparty; and

"(ii) in accordance with such rules and regulations as the Commission may promulgate, maintain the funds or other property in a segregated account separate from the assets and other interests of the swap dealer or major swap participant.

"(2) APPLICABILITY.—The requirements described in paragraph (1) shall—

"(A) apply only to a swap between a counterparty and a swap dealer or major swap participant that is not submitted for clearing to a derivatives clearing organization; and

"(B)(i) not apply to variation margin payments; or

"(ii) not preclude any commercial arrangement regarding—

"(I) the investment of segregated funds or other property that may only be invested in such investments as the Commission may permit by rule or regulation; and

"(II) the related allocation of gains and losses resulting from any investment of the segregated funds or other property.

"(3) USE OF INDEPENDENT THIRD-PARTY CUSTODIANS.—The segregated account described in paragraph (1) shall be—

"(A) carried by an independent third-party custodian; and

"(B) designated as a segregated account for and on behalf of the counterparty.

"(4) REPORTING REQUIREMENT.—If the counterparty does not choose to require segregation of the funds or other property supplied to margin, guarantee, or secure the obligations of the counterparty, the swap dealer or major swap participant shall report to the counterparty of the swap dealer or major swap participant on a quarterly basis that the back office procedures of the swap dealer or major swap participant relating to margin and collateral requirements are in compliance with the agreement of the counterparties.".

## SEC. 725. DERIVATIVES CLEARING ORGANIZATIONS.

(a) REGISTRATION REQUIREMENT.—Section 5b of the Commodity Exchange Act (7 U.S.C. 7a–1) is amended by striking subsections (a) and (b) and inserting the following:

"(a) REGISTRATION REQUIREMENT.—

"(1) IN GENERAL.—Except as provided in paragraph (2), it shall be unlawful for a derivatives clearing organization, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a derivatives clearing organization with respect to—

"(A) a contract of sale of a commodity for future delivery (or an option on the contract of sale) or option on a commodity, in each case, unless the contract or option is—

"(i) excluded from this Act by subsection (a)(1)(C)(i), (c), or (f) of section 2; or

"(ii) a security futures product cleared by a clearing agency registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.); or

"(B) a swap.

"(2) EXCEPTION.—Paragraph (1) shall not apply to a derivatives clearing organization that is registered with the Commission.

"(b) VOLUNTARY REGISTRATION.—A person that clears 1 or more agreements, contracts, or transactions that are not required to

Contracts.

be cleared under this Act may register with the Commission as a derivatives clearing organization.''.

(b) REGISTRATION FOR DEPOSITORY INSTITUTIONS AND CLEARING AGENCIES; EXEMPTIONS; COMPLIANCE OFFICER; ANNUAL REPORTS.—Section 5b of the Commodity Exchange Act (7 U.S.C. 7a–1) is amended by adding at the end the following:

''(g) EXISTING DEPOSITORY INSTITUTIONS AND CLEARING AGENCIES.—

''(1) IN GENERAL.—A depository institution or clearing agency registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) that is required to be registered as a derivatives clearing organization under this section is deemed to be registered under this section to the extent that, before the date of enactment of this subsection—

''(A) the depository institution cleared swaps as a multilateral clearing organization; or

''(B) the clearing agency cleared swaps.

''(2) CONVERSION OF DEPOSITORY INSTITUTIONS.—A depository institution to which this subsection applies may, by the vote of the shareholders owning not less than 51 percent of the voting interests of the depository institution, be converted into a State corporation, partnership, limited liability company, or similar legal form pursuant to a plan of conversion, if the conversion is not in contravention of applicable State law.

''(3) SHARING OF INFORMATION.—The Securities and Exchange Commission shall make available to the Commission, upon request, all information determined to be relevant by the Securities and Exchange Commission regarding a clearing agency deemed to be registered with the Commission under paragraph (1).

''(h) EXEMPTIONS.—The Commission may exempt, conditionally or unconditionally, a derivatives clearing organization from registration under this section for the clearing of swaps if the Commission determines that the derivatives clearing organization is subject to comparable, comprehensive supervision and regulation by the Securities and Exchange Commission or the appropriate government authorities in the home country of the organization. Such conditions may include, but are not limited to, requiring that the derivatives clearing organization be available for inspection by the Commission and make available all information requested by the Commission.

''(i) DESIGNATION OF CHIEF COMPLIANCE OFFICER.—

''(1) IN GENERAL.—Each derivatives clearing organization shall designate an individual to serve as a chief compliance officer.

''(2) DUTIES.—The chief compliance officer shall—

''(A) report directly to the board or to the senior officer of the derivatives clearing organization;

''(B) review the compliance of the derivatives clearing organization with respect to the core principles described in subsection (c)(2);

''(C) in consultation with the board of the derivatives clearing organization, a body performing a function similar to the board of the derivatives clearing organization, or the senior officer of the derivatives clearing organization, resolve any conflicts of interest that may arise;

"(D) be responsible for administering each policy and procedure that is required to be established pursuant to this section;

"(E) ensure compliance with this Act (including regulations) relating to agreements, contracts, or transactions, including each rule prescribed by the Commission under this section;

"(F) establish procedures for the remediation of noncompliance issues identified by the compliance officer through any—

"(i) compliance office review;

"(ii) look-back;

"(iii) internal or external audit finding;

"(iv) self-reported error; or

"(v) validated complaint; and

"(G) establish and follow appropriate procedures for the handling, management response, remediation, retesting, and closing of noncompliance issues.

"(3) ANNUAL REPORTS.—

"(A) IN GENERAL.—In accordance with rules prescribed by the Commission, the chief compliance officer shall annually prepare and sign a report that contains a description of—

"(i) the compliance of the derivatives clearing organization of the compliance officer with respect to this Act (including regulations); and

"(ii) each policy and procedure of the derivatives clearing organization of the compliance officer (including the code of ethics and conflict of interest policies of the derivatives clearing organization).

"(B) REQUIREMENTS.—A compliance report under subparagraph (A) shall—

"(i) accompany each appropriate financial report of the derivatives clearing organization that is required to be furnished to the Commission pursuant to this section; and

"(ii) include a certification that, under penalty of law, the compliance report is accurate and complete.".

Certification.

(c) CORE PRINCIPLES FOR DERIVATIVES CLEARING ORGANIZATIONS.—Section 5b(c) of the Commodity Exchange Act (7 U.S.C. 7a–1(c)) is amended by striking paragraph (2) and inserting the following:

"(2) CORE PRINCIPLES FOR DERIVATIVES CLEARING ORGANIZATIONS.—

"(A) COMPLIANCE.—

"(i) IN GENERAL.—To be registered and to maintain registration as a derivatives clearing organization, a derivatives clearing organization shall comply with each core principle described in this paragraph and any requirement that the Commission may impose by rule or regulation pursuant to section 8a(5).

"(ii) DISCRETION OF DERIVATIVES CLEARING ORGANIZATION.—Subject to any rule or regulation prescribed by the Commission, a derivatives clearing organization shall have reasonable discretion in establishing the manner by which the derivatives clearing

organization complies with each core principle described in this paragraph.

"(B) FINANCIAL RESOURCES.—

"(i) IN GENERAL.—Each derivatives clearing organization shall have adequate financial, operational, and managerial resources, as determined by the Commission, to discharge each responsibility of the derivatives clearing organization.

"(ii) MINIMUM AMOUNT OF FINANCIAL RESOURCES.— Each derivatives clearing organization shall possess financial resources that, at a minimum, exceed the total amount that would—

"(I) enable the organization to meet its financial obligations to its members and participants notwithstanding a default by the member or participant creating the largest financial exposure for that organization in extreme but plausible market conditions; and

"(II) enable the derivatives clearing organization to cover the operating costs of the derivatives clearing organization for a period of 1 year (as calculated on a rolling basis).

"(C) PARTICIPANT AND PRODUCT ELIGIBILITY.—

"(i) IN GENERAL.—Each derivatives clearing organization shall establish—

"(I) appropriate admission and continuing eligibility standards (including sufficient financial resources and operational capacity to meet obligations arising from participation in the derivatives clearing organization) for members of, and participants in, the derivatives clearing organization; and

"(II) appropriate standards for determining the eligibility of agreements, contracts, or transactions submitted to the derivatives clearing organization for clearing.

"(ii) REQUIRED PROCEDURES.—Each derivatives clearing organization shall establish and implement procedures to verify, on an ongoing basis, the compliance of each participation and membership requirement of the derivatives clearing organization.

"(iii) REQUIREMENTS.—The participation and membership requirements of each derivatives clearing organization shall—

"(I) be objective;

"(II) be publicly disclosed; and

"(III) permit fair and open access.

"(D) RISK MANAGEMENT.—

"(i) IN GENERAL.—Each derivatives clearing organization shall ensure that the derivatives clearing organization possesses the ability to manage the risks associated with discharging the responsibilities of the derivatives clearing organization through the use of appropriate tools and procedures.

"(ii) MEASUREMENT OF CREDIT EXPOSURE.—Each derivatives clearing organization shall—

"(I) not less than once during each business day of the derivatives clearing organization,

measure the credit exposures of the derivatives clearing organization to each member and participant of the derivatives clearing organization; and

"(II) monitor each exposure described in subclause (I) periodically during the business day of the derivatives clearing organization.

"(iii) LIMITATION OF EXPOSURE TO POTENTIAL LOSSES FROM DEFAULTS.—Each derivatives clearing organization, through margin requirements and other risk control mechanisms, shall limit the exposure of the derivatives clearing organization to potential losses from defaults by members and participants of the derivatives clearing organization to ensure that—

"(I) the operations of the derivatives clearing organization would not be disrupted; and

"(II) nondefaulting members or participants would not be exposed to losses that nondefaulting members or participants cannot anticipate or control.

"(iv) MARGIN REQUIREMENTS.—The margin required from each member and participant of a derivatives clearing organization shall be sufficient to cover potential exposures in normal market conditions.

"(v) REQUIREMENTS REGARDING MODELS AND PARAMETERS.—Each model and parameter used in setting margin requirements under clause (iv) shall be—

"(I) risk-based; and

"(II) reviewed on a regular basis.

"(E) SETTLEMENT PROCEDURES.—Each derivatives clearing organization shall—

"(i) complete money settlements on a timely basis (but not less frequently than once each business day);

"(ii) employ money settlement arrangements to eliminate or strictly limit the exposure of the derivatives clearing organization to settlement bank risks (including credit and liquidity risks from the use of banks to effect money settlements);

"(iii) ensure that money settlements are final when effected;

"(iv) maintain an accurate record of the flow of funds associated with each money settlement;

"(v) possess the ability to comply with each term and condition of any permitted netting or offset arrangement with any other clearing organization;

"(vi) regarding physical settlements, establish rules that clearly state each obligation of the derivatives clearing organization with respect to physical deliveries; and

"(vii) ensure that each risk arising from an obligation described in clause (vi) is identified and managed.

"(F) TREATMENT OF FUNDS.—

"(i) REQUIRED STANDARDS AND PROCEDURES.—Each derivatives clearing organization shall establish standards and procedures that are designed to protect and ensure the safety of member and participant funds and assets.

"(ii) HOLDING OF FUNDS AND ASSETS.—Each derivatives clearing organization shall hold member and participant funds and assets in a manner by which to minimize the risk of loss or of delay in the access by the derivatives clearing organization to the assets and funds.

"(iii) PERMISSIBLE INVESTMENTS.—Funds and assets invested by a derivatives clearing organization shall be held in instruments with minimal credit, market, and liquidity risks.

"(G) DEFAULT RULES AND PROCEDURES.—

"(i) IN GENERAL.—Each derivatives clearing organization shall have rules and procedures designed to allow for the efficient, fair, and safe management of events during which members or participants—

"(I) become insolvent; or

"(II) otherwise default on the obligations of the members or participants to the derivatives clearing organization.

"(ii) DEFAULT PROCEDURES.—Each derivatives clearing organization shall—

"(I) clearly state the default procedures of the derivatives clearing organization;

*Public information.*

"(II) make publicly available the default rules of the derivatives clearing organization; and

"(III) ensure that the derivatives clearing organization may take timely action—

"(aa) to contain losses and liquidity pressures; and

"(bb) to continue meeting each obligation of the derivatives clearing organization.

"(H) RULE ENFORCEMENT.—Each derivatives clearing organization shall—

"(i) maintain adequate arrangements and resources for—

"(I) the effective monitoring and enforcement of compliance with the rules of the derivatives clearing organization; and

"(II) the resolution of disputes;

"(ii) have the authority and ability to discipline, limit, suspend, or terminate the activities of a member or participant due to a violation by the member or participant of any rule of the derivatives clearing organization; and

*Reports.*

"(iii) report to the Commission regarding rule enforcement activities and sanctions imposed against members and participants as provided in clause (ii).

"(I) SYSTEM SAFEGUARDS.—Each derivatives clearing organization shall—

"(i) establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk through the development of appropriate controls and procedures, and automated systems, that are reliable, secure, and have adequate scalable capacity;

"(ii) establish and maintain emergency procedures, backup facilities, and a plan for disaster recovery that allows for—

"(I) the timely recovery and resumption of operations of the derivatives clearing organization; and

"(II) the fulfillment of each obligation and responsibility of the derivatives clearing organization; and

"(iii) periodically conduct tests to verify that the backup resources of the derivatives clearing organization are sufficient to ensure daily processing, clearing, and settlement.

"(J) REPORTING.—Each derivatives clearing organization shall provide to the Commission all information that the Commission determines to be necessary to conduct oversight of the derivatives clearing organization.

"(K) RECORDKEEPING.—Each derivatives clearing organization shall maintain records of all activities related to the business of the derivatives clearing organization as a derivatives clearing organization—

"(i) in a form and manner that is acceptable to the Commission; and

"(ii) for a period of not less than 5 years.

"(L) PUBLIC INFORMATION.—

"(i) IN GENERAL.—Each derivatives clearing organization shall provide to market participants sufficient information to enable the market participants to identify and evaluate accurately the risks and costs associated with using the services of the derivatives clearing organization.

"(ii) AVAILABILITY OF INFORMATION.—Each derivatives clearing organization shall make information concerning the rules and operating and default procedures governing the clearing and settlement systems of the derivatives clearing organization available to market participants.

"(iii) PUBLIC DISCLOSURE.—Each derivatives clearing organization shall disclose publicly and to the Commission information concerning—

"(I) the terms and conditions of each contract, agreement, and transaction cleared and settled by the derivatives clearing organization;

"(II) each clearing and other fee that the derivatives clearing organization charges the members and participants of the derivatives clearing organization;

"(III) the margin-setting methodology, and the size and composition, of the financial resource package of the derivatives clearing organization;

"(IV) daily settlement prices, volume, and open interest for each contract settled or cleared by the derivatives clearing organization; and

"(V) any other matter relevant to participation in the settlement and clearing activities of the derivatives clearing organization.

Procedures.

Tests.

Time period.

"(M) INFORMATION-SHARING.—Each derivatives clearing organization shall—

Contracts.

"(i) enter into, and abide by the terms of, each appropriate and applicable domestic and international information-sharing agreement; and

"(ii) use relevant information obtained from each agreement described in clause (i) in carrying out the risk management program of the derivatives clearing organization.

"(N) ANTITRUST CONSIDERATIONS.—Unless necessary or appropriate to achieve the purposes of this Act, a derivatives clearing organization shall not—

"(i) adopt any rule or take any action that results in any unreasonable restraint of trade; or

"(ii) impose any material anticompetitive burden.

"(O) GOVERNANCE FITNESS STANDARDS.—

"(i) GOVERNANCE ARRANGEMENTS.—Each derivatives clearing organization shall establish governance arrangements that are transparent—

"(I) to fulfill public interest requirements; and

"(II) to permit the consideration of the views of owners and participants.

"(ii) FITNESS STANDARDS.—Each derivatives clearing organization shall establish and enforce appropriate fitness standards for—

"(I) directors;

"(II) members of any disciplinary committee;

"(III) members of the derivatives clearing organization;

"(IV) any other individual or entity with direct access to the settlement or clearing activities of the derivatives clearing organization; and

"(V) any party affiliated with any individual or entity described in this clause.

"(P) CONFLICTS OF INTEREST.—Each derivatives clearing organization shall—

Regulations.

"(i) establish and enforce rules to minimize conflicts of interest in the decision-making process of the derivatives clearing organization; and

"(ii) establish a process for resolving conflicts of interest described in clause (i).

"(Q) COMPOSITION OF GOVERNING BOARDS.—Each derivatives clearing organization shall ensure that the composition of the governing board or committee of the derivatives clearing organization includes market participants.

"(R) LEGAL RISK.—Each derivatives clearing organization shall have a well-founded, transparent, and enforceable legal framework for each aspect of the activities of the derivatives clearing organization.".

Regulations.
7 USC 7a–1 note.

(d) CONFLICTS OF INTEREST.—The Commodity Futures Trading Commission shall adopt rules mitigating conflicts of interest in connection with the conduct of business by a swap dealer or a major swap participant with a derivatives clearing organization, board of trade, or a swap execution facility that clears or trades swaps in which the swap dealer or major swap participant has a material debt or material equity investment.

(e) REPORTING REQUIREMENTS.—Section 5b of the Commodity Exchange Act (7 U.S.C. 7a–1) (as amended by subsection (b)) is amended by adding at the end the following:

"(k) REPORTING REQUIREMENTS.—

"(1) DUTY OF DERIVATIVES CLEARING ORGANIZATIONS.—Each derivatives clearing organization that clears swaps shall provide to the Commission all information that is determined by the Commission to be necessary to perform each responsibility of the Commission under this Act.

"(2) DATA COLLECTION AND MAINTENANCE REQUIREMENTS.— The Commission shall adopt data collection and maintenance requirements for swaps cleared by derivatives clearing organizations that are comparable to the corresponding requirements for—

"(A) swaps data reported to swap data repositories; and

"(B) swaps traded on swap execution facilities.

"(3) REPORTS ON SECURITY-BASED SWAP AGREEMENTS TO BE SHARED WITH THE SECURITIES AND EXCHANGE COMMISSION.—

"(A) IN GENERAL.—A derivatives clearing organization that clears security-based swap agreements (as defined in section 1a(47)(A)(v)) shall, upon request, open to inspection and examination to the Securities and Exchange Commission all books and records relating to such security-based swap agreements, consistent with the confidentiality and disclosure requirements of section 8.

"(B) JURISDICTION.—Nothing in this paragraph shall affect the exclusive jurisdiction of the Commission to prescribe recordkeeping and reporting requirements for a derivatives clearing organization that is registered with the Commission.

"(4) INFORMATION SHARING.—Subject to section 8, and upon request, the Commission shall share information collected under paragraph (2) with—

"(A) the Board;

"(B) the Securities and Exchange Commission;

"(C) each appropriate prudential regulator;

"(D) the Financial Stability Oversight Council;

"(E) the Department of Justice; and

"(F) any other person that the Commission determines to be appropriate, including—

"(i) foreign financial supervisors (including foreign futures authorities);

"(ii) foreign central banks; and

"(iii) foreign ministries.

"(5) CONFIDENTIALITY AND INDEMNIFICATION AGREEMENT.— Before the Commission may share information with any entity described in paragraph (4)—

"(A) the Commission shall receive a written agreement from each entity stating that the entity shall abide by the confidentiality requirements described in section 8 relating to the information on swap transactions that is provided; and

"(B) each entity shall agree to indemnify the Commission for any expenses arising from litigation relating to the information provided under section 8.

"(6) PUBLIC INFORMATION.—Each derivatives clearing organization that clears swaps shall provide to the Commission (including any designee of the Commission) information under paragraph (2) in such form and at such frequency as is required by the Commission to comply with the public reporting requirements contained in section 2(a)(13).".

(f) PUBLIC DISCLOSURE.—Section 8(e) of the Commodity Exchange Act (7 U.S.C. 12(e)) is amended in the last sentence—

(1) by inserting ", central bank and ministries," after "department" each place it appears; and

(2) by striking ". is a party." and inserting ", is a party.".

(g) LEGAL CERTAINTY FOR IDENTIFIED BANKING PRODUCTS.—

(1) REPEALS.—The Legal Certainty for Bank Products Act of 2000 (7 U.S.C. 27 et seq.) is amended—

(A) by striking sections 404 and 407 (7 U.S.C. 27b, 27e);

(B) in section 402 (7 U.S.C. 27), by striking subsection (d); and

(C) in section 408 (7 U.S.C. 27f)—

(i) in subsection (c)—

(I) by striking "in the case" and all that follows through "a hybrid" and inserting "in the case of a hybrid";

(II) by striking "; or" and inserting a period; and

(III) by striking paragraph (2);

(ii) by striking subsection (b); and

(iii) by redesignating subsection (c) as subsection (b).

(2) LEGAL CERTAINTY FOR BANK PRODUCTS ACT OF 2000.— Section 403 of the Legal Certainty for Bank Products Act of 2000 (7 U.S.C. 27a) is amended to read as follows:

**"SEC. 403. EXCLUSION OF IDENTIFIED BANKING PRODUCT.**

"(a) EXCLUSION.—Except as provided in subsection (b) or (c)—

"(1) the Commodity Exchange Act (7 U.S.C. 1 et seq.) shall not apply to, and the Commodity Futures Trading Commission shall not exercise regulatory authority under the Commodity Exchange Act (7 U.S.C. 1 et seq.) with respect to, an identified banking product; and

"(2) the definitions of 'security-based swap' in section 3(a)(68) of the Securities Exchange Act of 1934 and 'security-based swap agreement' in section 1a(47)(A)(v) of the Commodity Exchange Act and section 3(a)(78) of the Securities Exchange Act of 1934 do not include any identified bank product.

"(b) EXCEPTION.—An appropriate Federal banking agency may except an identified banking product of a bank under its regulatory jurisdiction from the exclusion in subsection (a) if the agency determines, in consultation with the Commodity Futures Trading Commission and the Securities and Exchange Commission, that the product—

"(1) would meet the definition of a 'swap' under section 1a(47) of the Commodity Exchange Act (7 U.S.C. 1a) or a 'security-based swap' under that section 3(a)(68) of the Securities Exchange Act of 1934; and

"(2) has become known to the trade as a swap or security-based swap, or otherwise has been structured as an identified

banking product for the purpose of evading the provisions of the Commodity Exchange Act (7 U.S.C. 1 et seq.), the Securities Act of 1933 (15 U.S.C. 77a et seq.), or the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.).

"(c) EXCEPTION.—The exclusions in subsection (a) shall not apply to an identified bank product that—

"(1) is a product of a bank that is not under the regulatory jurisdiction of an appropriate Federal banking agency;

"(2) meets the definition of swap in section 1a(47) of the Commodity Exchange Act or security-based swap in section 3(a)(68) of the Securities Exchange Act of 1934; and

"(3) has become known to the trade as a swap or security-based swap, or otherwise has been structured as an identified banking product for the purpose of evading the provisions of the Commodity Exchange Act (7 U.S.C. 1 et seq.), the Securities Act of 1933 (15 U.S.C. 77a et seq.), or the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.).".

(h) REDUCING CLEARING SYSTEMIC RISK.—Section 5b(f)(1) of the Commodity Exchange Act (7 U.S.C. 7a-1(F)(i)) is amended by adding at the end the following: "In order to minimize systemic risk, under no circumstances shall a derivatives clearing organization be compelled to accept the counterparty credit risk of another clearing organization.".

## SEC. 726. RULEMAKING ON CONFLICT OF INTEREST.

15 USC 8323.

Deadline.

(a) IN GENERAL.—In order to mitigate conflicts of interest, not later than 180 days after the date of enactment of the Wall Street Transparency and Accountability Act of 2010, the Commodity Futures Trading Commission shall adopt rules which may include numerical limits on the control of, or the voting rights with respect to, any derivatives clearing organization that clears swaps, or swap execution facility or board of trade designated as a contract market that posts swaps or makes swaps available for trading, by a bank holding company (as defined in section 2 of the Bank Holding Company Act of 1956 (12 U.S.C. 1841)) with total consolidated assets of $50,000,000,000 or more, a nonbank financial company (as defined in section 102) supervised by the Board, an affiliate of such a bank holding company or nonbank financial company, a swap dealer, major swap participant, or associated person of a swap dealer or major swap participant.

(b) PURPOSES.—The Commission shall adopt rules if it determines, after the review described in subsection (a), that such rules are necessary or appropriate to improve the governance of, or to mitigate systemic risk, promote competition, or mitigate conflicts of interest in connection with a swap dealer or major swap participant's conduct of business with, a derivatives clearing organization, contract market, or swap execution facility that clears or posts swaps or makes swaps available for trading and in which such swap dealer or major swap participant has a material debt or equity investment.

(c) CONSIDERATIONS.—In adopting rules pursuant to this section, the Commodity Futures Trading Commission shall consider any conflicts of interest arising from the amount of equity owned by a single investor, the ability to vote, cause the vote of, or withhold votes entitled to be cast on any matters by the holders of the ownership interest, and the governance arrangements of any derivatives clearing organization that clears swaps, or swap

execution facility or board of trade designated as a contract market that posts swaps or makes swaps available for trading.

**SEC. 727. PUBLIC REPORTING OF SWAP TRANSACTION DATA.**

Section 2(a) of the Commodity Exchange Act (7 U.S.C. 2(a)) is amended by adding at the end the following:

"(13) PUBLIC AVAILABILITY OF SWAP TRANSACTION DATA.—

"(A) DEFINITION OF REAL-TIME PUBLIC REPORTING.— In this paragraph, the term 'real-time public reporting' means to report data relating to a swap transaction, including price and volume, as soon as technologically practicable after the time at which the swap transaction has been executed.

"(B) PURPOSE.—The purpose of this section is to authorize the Commission to make swap transaction and pricing data available to the public in such form and at such times as the Commission determines appropriate to enhance price discovery.

"(C) GENERAL RULE.—The Commission is authorized and required to provide by rule for the public availability of swap transaction and pricing data as follows:

"(i) With respect to those swaps that are subject to the mandatory clearing requirement described in subsection (h)(1) (including those swaps that are excepted from the requirement pursuant to subsection (h)(7)), the Commission shall require real-time public reporting for such transactions.

"(ii) With respect to those swaps that are not subject to the mandatory clearing requirement described in subsection (h)(1), but are cleared at a registered derivatives clearing organization, the Commission shall require real-time public reporting for such transactions.

"(iii) With respect to swaps that are not cleared at a registered derivatives clearing organization and which are reported to a swap data repository or the Commission under subsection (h)(6), the Commission shall require real-time public reporting for such transactions, in a manner that does not disclose the business transactions and market positions of any person.

"(iv) With respect to swaps that are determined to be required to be cleared under subsection (h)(2) but are not cleared, the Commission shall require real-time public reporting for such transactions.

"(D) REGISTERED ENTITIES AND PUBLIC REPORTING.— The Commission may require registered entities to publicly disseminate the swap transaction and pricing data required to be reported under this paragraph.

"(E) RULEMAKING REQUIRED.—With respect to the rule providing for the public availability of transaction and pricing data for swaps described in clauses (i) and (ii) of subparagraph (C), the rule promulgated by the Commission shall contain provisions—

"(i) to ensure such information does not identify the participants;

"(ii) to specify the criteria for determining what constitutes a large notional swap transaction (block trade) for particular markets and contracts;

"(iii) to specify the appropriate time delay for reporting large notional swap transactions (block trades) to the public; and

"(iv) that take into account whether the public disclosure will materially reduce market liquidity.

"(F) TIMELINESS OF REPORTING.—Parties to a swap (including agents of the parties to a swap) shall be responsible for reporting swap transaction information to the appropriate registered entity in a timely manner as may be prescribed by the Commission.

"(G) REPORTING OF SWAPS TO REGISTERED SWAP DATA REPOSITORIES.—Each swap (whether cleared or uncleared) shall be reported to a registered swap data repository.

"(14) SEMIANNUAL AND ANNUAL PUBLIC REPORTING OF AGGREGATE SWAP DATA.—

"(A) IN GENERAL.—In accordance with subparagraph (B), the Commission shall issue a written report on a semiannual and annual basis to make available to the public information relating to—

"(i) the trading and clearing in the major swap categories; and

"(ii) the market participants and developments in new products.

"(B) USE; CONSULTATION.—In preparing a report under subparagraph (A), the Commission shall—

"(i) use information from swap data repositories and derivatives clearing organizations; and

"(ii) consult with the Office of the Comptroller of the Currency, the Bank for International Settlements, and such other regulatory bodies as may be necessary.

"(C) AUTHORITY OF THE COMMISSION.—The Commission may, by rule, regulation, or order, delegate the public reporting responsibilities of the Commission under this paragraph in accordance with such terms and conditions as the Commission determines to be appropriate and in the public interest.".

## SEC. 728. SWAP DATA REPOSITORIES.

The Commodity Exchange Act is amended by inserting after section 20 (7 U.S.C. 24) the following:

## "SEC. 21. SWAP DATA REPOSITORIES.

7 USC 24a.

"(a) REGISTRATION REQUIREMENT.—

"(1) REQUIREMENT; AUTHORITY OF DERIVATIVES CLEARING ORGANIZATION.—

"(A) IN GENERAL.—It shall be unlawful for any person, unless registered with the Commission, directly or indirectly to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a swap data repository.

"(B) REGISTRATION OF DERIVATIVES CLEARING ORGANIZATIONS.—A derivatives clearing organization may register as a swap data repository.

"(2) INSPECTION AND EXAMINATION.—Each registered swap data repository shall be subject to inspection and examination by any representative of the Commission.

"(3) COMPLIANCE WITH CORE PRINCIPLES.—

"(A) IN GENERAL.—To be registered, and maintain registration, as a swap data repository, the swap data repository shall comply with—

"(i) the requirements and core principles described in this section; and

"(ii) any requirement that the Commission may impose by rule or regulation pursuant to section 8a(5).

"(B) REASONABLE DISCRETION OF SWAP DATA REPOSITORY.—Unless otherwise determined by the Commission by rule or regulation, a swap data repository described in subparagraph (A) shall have reasonable discretion in establishing the manner in which the swap data repository complies with the core principles described in this section.

"(b) STANDARD SETTING.—

"(1) DATA IDENTIFICATION.—

"(A) IN GENERAL.—In accordance with subparagraph (B), the Commission shall prescribe standards that specify the data elements for each swap that shall be collected and maintained by each registered swap data repository.

"(B) REQUIREMENT.—In carrying out subparagraph (A), the Commission shall prescribe consistent data element standards applicable to registered entities and reporting counterparties.

"(2) DATA COLLECTION AND MAINTENANCE.—The Commission shall prescribe data collection and data maintenance standards for swap data repositories.

"(3) COMPARABILITY.—The standards prescribed by the Commission under this subsection shall be comparable to the data standards imposed by the Commission on derivatives clearing organizations in connection with their clearing of swaps.

"(c) DUTIES.—A swap data repository shall—

"(1) accept data prescribed by the Commission for each swap under subsection (b);

"(2) confirm with both counterparties to the swap the accuracy of the data that was submitted;

"(3) maintain the data described in paragraph (1) in such form, in such manner, and for such period as may be required by the Commission;

"(4)(A) provide direct electronic access to the Commission (or any designee of the Commission, including another registered entity); and

"(B) provide the information described in paragraph (1) in such form and at such frequency as the Commission may require to comply with the public reporting requirements contained in section 2(a)(13);

"(5) at the direction of the Commission, establish automated systems for monitoring, screening, and analyzing swap data, including compliance and frequency of end user clearing exemption claims by individual and affiliated entities;

"(6) maintain the privacy of any and all swap transaction information that the swap data repository receives from a swap dealer, counterparty, or any other registered entity; and

"(7) on a confidential basis pursuant to section 8, upon request, and after notifying the Commission of the request, make available all data obtained by the swap data repository, including individual counterparty trade and position data, to—
        "(A) each appropriate prudential regulator;
        "(B) the Financial Stability Oversight Council;
        "(C) the Securities and Exchange Commission;
        "(D) the Department of Justice; and
        "(E) any other person that the Commission determines to be appropriate, including—
                "(i) foreign financial supervisors (including foreign futures authorities);
                "(ii) foreign central banks; and
                "(iii) foreign ministries; and
        "(8) establish and maintain emergency procedures, backup facilities, and a plan for disaster recovery that allows for the timely recovery and resumption of operations and the fulfillment of the responsibilities and obligations of the organization.

"(d) CONFIDENTIALITY AND INDEMNIFICATION AGREEMENT.— Before the swap data repository may share information with any entity described in subsection (c)(7)—
        "(1) the swap data repository shall receive a written agreement from each entity stating that the entity shall abide by the confidentiality requirements described in section 8 relating to the information on swap transactions that is provided; and
        "(2) each entity shall agree to indemnify the swap data repository and the Commission for any expenses arising from litigation relating to the information provided under section 8.

"(e) DESIGNATION OF CHIEF COMPLIANCE OFFICER.—
        "(1) IN GENERAL.—Each swap data repository shall designate an individual to serve as a chief compliance officer.
        "(2) DUTIES.—The chief compliance officer shall—
                "(A) report directly to the board or to the senior officer of the swap data repository;
                "(B) review the compliance of the swap data repository with respect to the requirements and core principles described in this section;
                "(C) in consultation with the board of the swap data repository, a body performing a function similar to the board of the swap data repository, or the senior officer of the swap data repository, resolve any conflicts of interest that may arise;
                "(D) be responsible for administering each policy and procedure that is required to be established pursuant to this section;
                "(E) ensure compliance with this Act (including regulations) relating to agreements, contracts, or transactions, including each rule prescribed by the Commission under this section;
                "(F) establish procedures for the remediation of noncompliance issues identified by the chief compliance officer through any—
                        "(i) compliance office review;
                        "(ii) look-back;
                        "(iii) internal or external audit finding;
                        "(iv) self-reported error; or

"(v) validated complaint; and

"(G) establish and follow appropriate procedures for the handling, management response, remediation, re-testing, and closing of noncompliance issues.

"(3) ANNUAL REPORTS.—

"(A) IN GENERAL.—In accordance with rules prescribed by the Commission, the chief compliance officer shall annually prepare and sign a report that contains a description of—

"(i) the compliance of the swap data repository of the chief compliance officer with respect to this Act (including regulations); and

"(ii) each policy and procedure of the swap data repository of the chief compliance officer (including the code of ethics and conflict of interest policies of the swap data repository).

"(B) REQUIREMENTS.—A compliance report under subparagraph (A) shall—

"(i) accompany each appropriate financial report of the swap data repository that is required to be furnished to the Commission pursuant to this section; and

Certification.

"(ii) include a certification that, under penalty of law, the compliance report is accurate and complete.

"(f) CORE PRINCIPLES APPLICABLE TO SWAP DATA REPOSITORIES.—

"(1) ANTITRUST CONSIDERATIONS.—Unless necessary or appropriate to achieve the purposes of this Act, a swap data repository shall not—

"(A) adopt any rule or take any action that results in any unreasonable restraint of trade; or

"(B) impose any material anticompetitive burden on the trading, clearing, or reporting of transactions.

"(2) GOVERNANCE ARRANGEMENTS.—Each swap data repository shall establish governance arrangements that are transparent—

"(A) to fulfill public interest requirements; and

"(B) to support the objectives of the Federal Government, owners, and participants.

"(3) CONFLICTS OF INTEREST.—Each swap data repository shall—

Regulations.

"(A) establish and enforce rules to minimize conflicts of interest in the decision-making process of the swap data repository; and

"(B) establish a process for resolving conflicts of interest described in subparagraph (A).

"(4) ADDITIONAL DUTIES DEVELOPED BY COMMISSION.—

"(A) IN GENERAL.—The Commission may develop 1 or more additional duties applicable to swap data repositories.

"(B) CONSIDERATION OF EVOLVING STANDARDS.—In developing additional duties under subparagraph (A), the Commission may take into consideration any evolving standard of the United States or the international community.

"(C) ADDITIONAL DUTIES FOR COMMISSION DESIGNEES.—The Commission shall establish additional duties for any registrant described in section 1a(48) in order to minimize

conflicts of interest, protect data, ensure compliance, and guarantee the safety and security of the swap data repository.

"(g) REQUIRED REGISTRATION FOR SWAP DATA REPOSITORIES.—Any person that is required to be registered as a swap data repository under this section shall register with the Commission regardless of whether that person is also licensed as a bank or registered with the Securities and Exchange Commission as a swap data repository.

"(h) RULES.—The Commission shall adopt rules governing persons that are registered under this section.".

**SEC. 729. REPORTING AND RECORDKEEPING.**

The Commodity Exchange Act is amended by inserting after section 4q (7 U.S.C. 6o–1) the following:                              7 USC 6q.

**"SEC. 4r. REPORTING AND RECORDKEEPING FOR UNCLEARED SWAPS.**    7 USC 6r.

"(a) REQUIRED REPORTING OF SWAPS NOT ACCEPTED BY ANY DERIVATIVES CLEARING ORGANIZATION.—

"(1) IN GENERAL.—Each swap that is not accepted for clearing by any derivatives clearing organization shall be reported to—

"(A) a swap data repository described in section 21; or

"(B) in the case in which there is no swap data repository that would accept the swap, to the Commission pursuant to this section within such time period as the Commission may by rule or regulation prescribe.

"(2) TRANSITION RULE FOR PREENACTMENT SWAPS.—

"(A) SWAPS ENTERED INTO BEFORE THE DATE OF ENACTMENT OF THE WALL STREET TRANSPARENCY AND ACCOUNTABILITY ACT OF 2010.—Each swap entered into before the date of enactment of the Wall Street Transparency and Accountability Act of 2010, the terms of which have not expired as of the date of enactment of that Act, shall be reported to a registered swap data repository or the Commission by a date that is not later than—

"(i) 30 days after issuance of the interim final rule; or

"(ii) such other period as the Commission determines to be appropriate.

"(B) COMMISSION RULEMAKING.—The Commission shall promulgate an interim final rule within 90 days of the date of enactment of this section providing for the reporting of each swap entered into before the date of enactment as referenced in subparagraph (A).

"(C) EFFECTIVE DATE.—The reporting provisions described in this section shall be effective upon the enactment of this section.

"(3) REPORTING OBLIGATIONS.—

"(A) SWAPS IN WHICH ONLY 1 COUNTERPARTY IS A SWAP DEALER OR MAJOR SWAP PARTICIPANT.—With respect to a swap in which only 1 counterparty is a swap dealer or major swap participant, the swap dealer or major swap participant shall report the swap as required under paragraphs (1) and (2).

"(B) SWAPS IN WHICH 1 COUNTERPARTY IS A SWAP DEALER AND THE OTHER A MAJOR SWAP PARTICIPANT.—With

respect to a swap in which 1 counterparty is a swap dealer and the other a major swap participant, the swap dealer shall report the swap as required under paragraphs (1) and (2).

"(C) OTHER SWAPS.—With respect to any other swap not described in subparagraph (A) or (B), the counterparties to the swap shall select a counterparty to report the swap as required under paragraphs (1) and (2).

"(b) DUTIES OF CERTAIN INDIVIDUALS.—Any individual or entity that enters into a swap shall meet each requirement described in subsection (c) if the individual or entity did not—

"(1) clear the swap in accordance with section 2(h)(1); or

"(2) have the data regarding the swap accepted by a swap data repository in accordance with rules (including timeframes) adopted by the Commission under section 21.

"(c) REQUIREMENTS.—An individual or entity described in subsection (b) shall—

"(1) upon written request from the Commission, provide reports regarding the swaps held by the individual or entity to the Commission in such form and in such manner as the Commission may request; and

"(2) maintain books and records pertaining to the swaps held by the individual or entity in such form, in such manner, and for such period as the Commission may require, which shall be open to inspection by—

"(A) any representative of the Commission;

"(B) an appropriate prudential regulator;

"(C) the Securities and Exchange Commission;

"(D) the Financial Stability Oversight Council; and

"(E) the Department of Justice.

"(d) IDENTICAL DATA.—In prescribing rules under this section, the Commission shall require individuals and entities described in subsection (b) to submit to the Commission a report that contains data that is not less comprehensive than the data required to be collected by swap data repositories under section 21.".

### SEC. 730. LARGE SWAP TRADER REPORTING.

The Commodity Exchange Act (7 U.S.C. 1 et seq.) is amended by adding after section 4s (as added by section 731) the following:

7 USC 6t.

### "SEC. 4t. LARGE SWAP TRADER REPORTING.

"(a) PROHIBITION.—

"(1) IN GENERAL.—Except as provided in paragraph (2), it shall be unlawful for any person to enter into any swap that the Commission determines to perform a significant price discovery function with respect to registered entities if—

"(A) the person directly or indirectly enters into the swap during any 1 day in an amount equal to or in excess of such amount as shall be established periodically by the Commission; and

"(B) the person directly or indirectly has or obtains a position in the swap equal to or in excess of such amount as shall be established periodically by the Commission.

"(2) EXCEPTION.—Paragraph (1) shall not apply if—

"(A) the person files or causes to be filed with the properly designated officer of the Commission such reports

regarding any transactions or positions described in sub-paragraphs (A) and (B) of paragraph (1) as the Commission may require by rule or regulation; and

"(B) in accordance with the rules and regulations of the Commission, the person keeps books and records of all such swaps and any transactions and positions in any related commodity traded on or subject to the rules of any designated contract market or swap execution facility, and of cash or spot transactions in, inventories of, and purchase and sale commitments of, such a commodity.

"(b) REQUIREMENTS.—     Records.

"(1) IN GENERAL.—Books and records described in subsection (a)(2)(B) shall—

"(A) show such complete details concerning all transactions and positions as the Commission may prescribe by rule or regulation;

"(B) be open at all times to inspection and examination by any representative of the Commission; and

"(C) be open at all times to inspection and examination by the Securities and Exchange Commission, to the extent such books and records relate to transactions in swaps (as that term is defined in section 1a(47)(A)(v)), and consistent with the confidentiality and disclosure requirements of section 8.

"(2) JURISDICTION.—Nothing in paragraph (1) shall affect the exclusive jurisdiction of the Commission to prescribe record-keeping and reporting requirements for large swap traders under this section.

"(c) APPLICABILITY.—For purposes of this section, the swaps, futures, and cash or spot transactions and positions of any person shall include the swaps, futures, and cash or spot transactions and positions of any persons directly or indirectly controlled by the person.

"(d) SIGNIFICANT PRICE DISCOVERY FUNCTION.—In making a determination as to whether a swap performs or affects a significant price discovery function with respect to registered entities, the Commission shall consider the factors described in section 4a(a)(3).".

## SEC. 731. REGISTRATION AND REGULATION OF SWAP DEALERS AND MAJOR SWAP PARTICIPANTS.

The Commodity Exchange Act (7 U.S.C. 1 et seq.) is amended by inserting after section 4r (as added by section 729) the following:

"SEC. 4s. REGISTRATION AND REGULATION OF SWAP DEALERS AND     7 USC 6s.
MAJOR SWAP PARTICIPANTS.

"(a) REGISTRATION.—

"(1) SWAP DEALERS.—It shall be unlawful for any person to act as a swap dealer unless the person is registered as a swap dealer with the Commission.

"(2) MAJOR SWAP PARTICIPANTS.—It shall be unlawful for any person to act as a major swap participant unless the person is registered as a major swap participant with the Commission.

"(b) REQUIREMENTS.—

"(1) IN GENERAL.—A person shall register as a swap dealer or major swap participant by filing a registration application with the Commission.

"(2) CONTENTS.—

"(A) IN GENERAL.—The application shall be made in such form and manner as prescribed by the Commission, and shall contain such information, as the Commission considers necessary concerning the business in which the applicant is or will be engaged.

"(B) CONTINUAL REPORTING.—A person that is registered as a swap dealer or major swap participant shall continue to submit to the Commission reports that contain such information pertaining to the business of the person as the Commission may require.

"(3) EXPIRATION.—Each registration under this section shall expire at such time as the Commission may prescribe by rule or regulation.

"(4) RULES.—Except as provided in subsections (d) and (e), the Commission may prescribe rules applicable to swap dealers and major swap participants, including rules that limit the activities of swap dealers and major swap participants.

Regulations.
Deadline.

"(5) TRANSITION.—Rules under this section shall provide for the registration of swap dealers and major swap participants not later than 1 year after the date of enactment of the Wall Street Transparency and Accountability Act of 2010.

"(6) STATUTORY DISQUALIFICATION.—Except to the extent otherwise specifically provided by rule, regulation, or order, it shall be unlawful for a swap dealer or a major swap participant to permit any person associated with a swap dealer or a major swap participant who is subject to a statutory disqualification to effect or be involved in effecting swaps on behalf of the swap dealer or major swap participant, if the swap dealer or major swap participant knew, or in the exercise of reasonable care should have known, of the statutory disqualification.

"(c) DUAL REGISTRATION.—

"(1) SWAP DEALER.—Any person that is required to be registered as a swap dealer under this section shall register with the Commission regardless of whether the person also is a depository institution or is registered with the Securities and Exchange Commission as a security-based swap dealer.

"(2) MAJOR SWAP PARTICIPANT.—Any person that is required to be registered as a major swap participant under this section shall register with the Commission regardless of whether the person also is a depository institution or is registered with the Securities and Exchange Commission as a major security-based swap participant.

"(d) RULEMAKINGS.—

"(1) IN GENERAL.—The Commission shall adopt rules for persons that are registered as swap dealers or major swap participants under this section.

"(2) EXCEPTION FOR PRUDENTIAL REQUIREMENTS.—

"(A) IN GENERAL.—The Commission may not prescribe rules imposing prudential requirements on swap dealers or major swap participants for which there is a prudential regulator.

"(B) APPLICABILITY.—Subparagraph (A) does not limit the authority of the Commission to prescribe rules as directed under this section.

"(e) CAPITAL AND MARGIN REQUIREMENTS.—

Regulations.

"(1) IN GENERAL.—

"(A) SWAP DEALERS AND MAJOR SWAP PARTICIPANTS THAT ARE BANKS.—Each registered swap dealer and major swap participant for which there is a prudential regulator shall meet such minimum capital requirements and minimum initial and variation margin requirements as the prudential regulator shall by rule or regulation prescribe under paragraph (2)(A).

"(B) SWAP DEALERS AND MAJOR SWAP PARTICIPANTS THAT ARE NOT BANKS.—Each registered swap dealer and major swap participant for which there is not a prudential regulator shall meet such minimum capital requirements and minimum initial and variation margin requirements as the Commission shall by rule or regulation prescribe under paragraph (2)(B).

"(2) RULES.—

"(A) SWAP DEALERS AND MAJOR SWAP PARTICIPANTS THAT ARE BANKS.—The prudential regulators, in consultation with the Commission and the Securities and Exchange Commission, shall jointly adopt rules for swap dealers and major swap participants, with respect to their activities as a swap dealer or major swap participant, for which there is a prudential regulator imposing—

"(i) capital requirements; and

"(ii) both initial and variation margin requirements on all swaps that are not cleared by a registered derivatives clearing organization.

"(B) SWAP DEALERS AND MAJOR SWAP PARTICIPANTS THAT ARE NOT BANKS.—The Commission shall adopt rules for swap dealers and major swap participants, with respect to their activities as a swap dealer or major swap participant, for which there is not a prudential regulator imposing—

"(i) capital requirements; and

"(ii) both initial and variation margin requirements on all swaps that are not cleared by a registered derivatives clearing organization.

"(C) CAPITAL.—In setting capital requirements for a person that is designated as a swap dealer or a major swap participant for a single type or single class or category of swap or activities, the prudential regulator and the Commission shall take into account the risks associated with other types of swaps or classes of swaps or categories of swaps engaged in and the other activities conducted by that person that are not otherwise subject to regulation applicable to that person by virtue of the status of the person as a swap dealer or a major swap participant.

"(3) STANDARDS FOR CAPITAL AND MARGIN.—

"(A) IN GENERAL.—To offset the greater risk to the swap dealer or major swap participant and the financial system arising from the use of swaps that are not cleared, the requirements imposed under paragraph (2) shall—

"(i) help ensure the safety and soundness of the swap dealer or major swap participant; and

"(ii) be appropriate for the risk associated with the non-cleared swaps held as a swap dealer or major swap participant.

"(B) RULE OF CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this section shall limit, or be construed to limit, the authority—

"(I) of the Commission to set financial responsibility rules for a futures commission merchant or introducing broker registered pursuant to section 4f(a) (except for section 4f(a)(3)) in accordance with section 4f(b); or

"(II) of the Securities and Exchange Commission to set financial responsibility rules for a broker or dealer registered pursuant to section 15(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b)) (except for section 15(b)(11) of that Act (15 U.S.C. 78o(b)(11)) in accordance with section 15(c)(3) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(3)).

"(ii) FUTURES COMMISSION MERCHANTS AND OTHER DEALERS.—A futures commission merchant, introducing broker, broker, or dealer shall maintain sufficient capital to comply with the stricter of any applicable capital requirements to which such futures commission merchant, introducing broker, broker, or dealer is subject to under this Act or the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.).

"(C) MARGIN REQUIREMENTS.—In prescribing margin requirements under this subsection, the prudential regulator with respect to swap dealers and major swap participants for which it is the prudential regulator and the Commission with respect to swap dealers and major swap participants for which there is no prudential regulator shall permit the use of noncash collateral, as the regulator or the Commission determines to be consistent with—

"(i) preserving the financial integrity of markets trading swaps; and

"(ii) preserving the stability of the United States financial system.

"(D) COMPARABILITY OF CAPITAL AND MARGIN REQUIREMENTS.—

Consultation.

"(i) IN GENERAL.—The prudential regulators, the Commission, and the Securities and Exchange Commission shall periodically (but not less frequently than annually) consult on minimum capital requirements and minimum initial and variation margin requirements.

"(ii) COMPARABILITY.—The entities described in clause (i) shall, to the maximum extent practicable, establish and maintain comparable minimum capital requirements and minimum initial and variation margin requirements, including the use of non cash collateral, for—

"(I) swap dealers; and

"(II) major swap participants.

"(f) REPORTING AND RECORDKEEPING.—

"(1) IN GENERAL.—Each registered swap dealer and major swap participant—

Reports.
Regulations.

"(A) shall make such reports as are required by the Commission by rule or regulation regarding the transactions and positions and financial condition of the registered swap dealer or major swap participant;

"(B)(i) for which there is a prudential regulator, shall keep books and records of all activities related to the business as a swap dealer or major swap participant in such form and manner and for such period as may be prescribed by the Commission by rule or regulation; and

"(ii) for which there is no prudential regulator, shall keep books and records in such form and manner and for such period as may be prescribed by the Commission by rule or regulation;

"(C) shall keep books and records described in subparagraph (B) open to inspection and examination by any representative of the Commission; and

"(D) shall keep any such books and records relating to swaps defined in section 1a(47)(A)(v) open to inspection and examination by the Securities and Exchange Commission.

"(2) RULES.—The Commission shall adopt rules governing reporting and recordkeeping for swap dealers and major swap participants.

"(g) DAILY TRADING RECORDS.—

"(1) IN GENERAL.—Each registered swap dealer and major swap participant shall maintain daily trading records of the swaps of the registered swap dealer and major swap participant and all related records (including related cash or forward transactions) and recorded communications, including electronic mail, instant messages, and recordings of telephone calls, for such period as may be required by the Commission by rule or regulation.

"(2) INFORMATION REQUIREMENTS.—The daily trading records shall include such information as the Commission shall require by rule or regulation.

"(3) COUNTERPARTY RECORDS.—Each registered swap dealer and major swap participant shall maintain daily trading records for each counterparty in a manner and form that is identifiable with each swap transaction.

"(4) AUDIT TRAIL.—Each registered swap dealer and major swap participant shall maintain a complete audit trail for conducting comprehensive and accurate trade reconstructions.

"(5) RULES.—The Commission shall adopt rules governing daily trading records for swap dealers and major swap participants.

"(h) BUSINESS CONDUCT STANDARDS.—

"(1) IN GENERAL.—Each registered swap dealer and major swap participant shall conform with such business conduct standards as prescribed in paragraph (3) and as may be prescribed by the Commission by rule or regulation that relate to—

"(A) fraud, manipulation, and other abusive practices involving swaps (including swaps that are offered but not entered into);

"(B) diligent supervision of the business of the registered swap dealer and major swap participant;

"(C) adherence to all applicable position limits; and

"(D) such other matters as the Commission determines to be appropriate.

"(2) RESPONSIBILITIES WITH RESPECT TO SPECIAL ENTITIES.—

"(A) ADVISING SPECIAL ENTITIES.—A swap dealer or major swap participant that acts as an advisor to a special entity regarding a swap shall comply with the requirements of subparagraph (4) with respect to such Special Entity.

Compliance.

"(B) ENTERING OF SWAPS WITH RESPECT TO SPECIAL ENTITIES.—A swap dealer that enters into or offers to enter into swap with a Special Entity shall comply with the requirements of subparagraph (5) with respect to such Special Entity.

"(C) SPECIAL ENTITY DEFINED.—For purposes of this subsection, the term 'special entity' means—

"(i) a Federal agency;

"(ii) a State, State agency, city, county, municipality, or other political subdivision of a State;

"(iii) any employee benefit plan, as defined in section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002);

"(iv) any governmental plan, as defined in section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002); or

"(v) any endowment, including an endowment that is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986.

"(3) BUSINESS CONDUCT REQUIREMENTS.—Business conduct requirements adopted by the Commission shall—

"(A) establish a duty for a swap dealer or major swap participant to verify that any counterparty meets the eligibility standards for an eligible contract participant;

"(B) require disclosure by the swap dealer or major swap participant to any counterparty to the transaction (other than a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant) of—

"(i) information about the material risks and characteristics of the swap;

"(ii) any material incentives or conflicts of interest that the swap dealer or major swap participant may have in connection with the swap; and

"(iii)(I) for cleared swaps, upon the request of the counterparty, receipt of the daily mark of the transaction from the appropriate derivatives clearing organization; and

"(II) for uncleared swaps, receipt of the daily mark of the transaction from the swap dealer or the major swap participant;

"(C) establish a duty for a swap dealer or major swap participant to communicate in a fair and balanced manner based on principles of fair dealing and good faith; and

"(D) establish such other standards and requirements as the Commission may determine are appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this Act.

"(4) SPECIAL REQUIREMENTS FOR SWAP DEALERS ACTING AS ADVISORS.—

"(A) IN GENERAL.—It shall be unlawful for a swap dealer or major swap participant—

"(i) to employ any device, scheme, or artifice to defraud any Special Entity or prospective customer who is a Special Entity;

"(ii) to engage in any transaction, practice, or course of business that operates as a fraud or deceit on any Special Entity or prospective customer who is a Special Entity; or

"(iii) to engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative.

"(B) DUTY.—Any swap dealer that acts as an advisor to a Special Entity shall have a duty to act in the best interests of the Special Entity.

"(C) REASONABLE EFFORTS.—Any swap dealer that acts as an advisor to a Special Entity shall make reasonable efforts to obtain such information as is necessary to make a reasonable determination that any swap recommended by the swap dealer is in the best interests of the Special Entity, including information relating to—

"(i) the financial status of the Special Entity;

"(ii) the tax status of the Special Entity;

"(iii) the investment or financing objectives of the Special Entity; and

"(iv) any other information that the Commission may prescribe by rule or regulation.

"(5) SPECIAL REQUIREMENTS FOR SWAP DEALERS AS COUNTERPARTIES TO SPECIAL ENTITIES.—

"(A) Any swap dealer or major swap participant that offers to enter or enters into a swap with a Special Entity shall—

"(i) comply with any duty established by the Commission for a swap dealer or major swap participant, with respect to a counterparty that is an eligible contract participant within the meaning of subclause (I) or (II) of clause (vii) of section 1a(18) of this Act, that requires the swap dealer or major swap participant to have a reasonable basis to believe that the counterparty that is a Special Entity has an independent representative that—

"(I) has sufficient knowledge to evaluate the transaction and risks;

"(II) is not subject to a statutory disqualification;

"(III) is independent of the swap dealer or major swap participant;

"(IV) undertakes a duty to act in the best interests of the counterparty it represents;

"(V) makes appropriate disclosures;

"(VI) will provide written representations to the Special Entity regarding fair pricing and the appropriateness of the transaction; and

"(VII) in the case of employee benefit plans subject to the Employee Retirement Income Security act of 1974, is a fiduciary as defined in section 3 of that Act (29 U.S.C. 1002); and

"(ii) before the initiation of the transaction, disclose to the Special Entity in writing the capacity in which the swap dealer is acting; and

"(B) the Commission may establish such other standards and requirements as the Commission may determine are appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this Act.

"(6) RULES.—The Commission shall prescribe rules under this subsection governing business conduct standards for swap dealers and major swap participants.

"(7) APPLICABILITY.—This section shall not apply with respect to a transaction that is—

"(A) initiated by a Special Entity on an exchange or swap execution facility; and

"(B) one in which the swap dealer or major swap participant does not know the identity of the counterparty to the transaction.

"(i) DOCUMENTATION STANDARDS.—

"(1) IN GENERAL.—Each registered swap dealer and major swap participant shall conform with such standards as may be prescribed by the Commission by rule or regulation that relate to timely and accurate confirmation, processing, netting, documentation, and valuation of all swaps.

"(2) RULES.—The Commission shall adopt rules governing documentation standards for swap dealers and major swap participants.

"(j) DUTIES.—Each registered swap dealer and major swap participant at all times shall comply with the following requirements:

"(1) MONITORING OF TRADING.—The swap dealer or major swap participant shall monitor its trading in swaps to prevent violations of applicable position limits.

"(2) RISK MANAGEMENT PROCEDURES.—The swap dealer or major swap participant shall establish robust and professional risk management systems adequate for managing the day-to-day business of the swap dealer or major swap participant.

"(3) DISCLOSURE OF GENERAL INFORMATION.—The swap dealer or major swap participant shall disclose to the Commission and to the prudential regulator for the swap dealer or major swap participant, as applicable, information concerning—

"(A) terms and conditions of its swaps;

"(B) swap trading operations, mechanisms, and practices;

"(C) financial integrity protections relating to swaps; and

"(D) other information relevant to its trading in swaps.

"(4) ABILITY TO OBTAIN INFORMATION.—The swap dealer or major swap participant shall—

"(A) establish and enforce internal systems and procedures to obtain any necessary information to perform any of the functions described in this section; and

"(B) provide the information to the Commission and to the prudential regulator for the swap dealer or major swap participant, as applicable, on request.

"(5) CONFLICTS OF INTEREST.—The swap dealer and major swap participant shall implement conflict-of-interest systems and procedures that—

"(A) establish structural and institutional safeguards to ensure that the activities of any person within the firm relating to research or analysis of the price or market for any commodity or swap or acting in a role of providing clearing activities or making determinations as to accepting clearing customers are separated by appropriate informational partitions within the firm from the review, pressure, or oversight of persons whose involvement in pricing, trading, or clearing activities might potentially bias their judgment or supervision and contravene the core principles of open access and the business conduct standards described in this Act; and

"(B) address such other issues as the Commission determines to be appropriate.

"(6) ANTITRUST CONSIDERATIONS.—Unless necessary or appropriate to achieve the purposes of this Act, a swap dealer or major swap participant shall not—

"(A) adopt any process or take any action that results in any unreasonable restraint of trade; or

"(B) impose any material anticompetitive burden on trading or clearing.

"(7) RULES.—The Commission shall prescribe rules under this subsection governing duties of swap dealers and major swap participants.

"(k) DESIGNATION OF CHIEF COMPLIANCE OFFICER.—

"(1) IN GENERAL.—Each swap dealer and major swap participant shall designate an individual to serve as a chief compliance officer.

"(2) DUTIES.—The chief compliance officer shall—

"(A) report directly to the board or to the senior officer of the swap dealer or major swap participant;

"(B) review the compliance of the swap dealer or major swap participant with respect to the swap dealer and major swap participant requirements described in this section;

"(C) in consultation with the board of directors, a body performing a function similar to the board, or the senior officer of the organization, resolve any conflicts of interest that may arise;

"(D) be responsible for administering each policy and procedure that is required to be established pursuant to this section;

"(E) ensure compliance with this Act (including regulations) relating to swaps, including each rule prescribed by the Commission under this section;

"(F) establish procedures for the remediation of noncompliance issues identified by the chief compliance officer through any—

"(i) compliance office review;

"(ii) look-back;

"(iii) internal or external audit finding;

"(iv) self-reported error; or

"(v) validated complaint; and

"(G) establish and follow appropriate procedures for the handling, management response, remediation, retesting, and closing of noncompliance issues.

"(3) ANNUAL REPORTS.—

"(A) IN GENERAL.—In accordance with rules prescribed by the Commission, the chief compliance officer shall annually prepare and sign a report that contains a description of—

"(i) the compliance of the swap dealer or major swap participant with respect to this Act (including regulations); and

"(ii) each policy and procedure of the swap dealer or major swap participant of the chief compliance officer (including the code of ethics and conflict of interest policies).

"(B) REQUIREMENTS.—A compliance report under subparagraph (A) shall—

"(i) accompany each appropriate financial report of the swap dealer or major swap participant that is required to be furnished to the Commission pursuant to this section; and

Certification.

"(ii) include a certification that, under penalty of law, the compliance report is accurate and complete.".

### SEC. 732. CONFLICTS OF INTEREST.

Section 4d of the Commodity Exchange Act (7 U.S.C. 6d) is amended—

(1) by redesignating subsection (c) as subsection (e); and
(2) by inserting after subsection (b) the following:

Procedures.

"(c) CONFLICTS OF INTEREST.—The Commission shall require that futures commission merchants and introducing brokers implement conflict-of-interest systems and procedures that—

"(1) establish structural and institutional safeguards to ensure that the activities of any person within the firm relating to research or analysis of the price or market for any commodity are separated by appropriate informational partitions within the firm from the review, pressure, or oversight of persons whose involvement in trading or clearing activities might potentially bias the judgment or supervision of the persons; and

"(2) address such other issues as the Commission determines to be appropriate.

Regulations.

"(d) DESIGNATION OF CHIEF COMPLIANCE OFFICER.—Each futures commission merchant shall designate an individual to serve as its Chief Compliance Officer and perform such duties and responsibilities as shall be set forth in regulations to be adopted by the Commission or rules to be adopted by a futures association registered under section 17.".

### SEC. 733. SWAP EXECUTION FACILITIES.

The Commodity Exchange Act is amended by inserting after section 5g (7 U.S.C. 7b–2) the following:

7 USC 7b–3.

### "SEC. 5h. SWAP EXECUTION FACILITIES.

"(a) REGISTRATION.—

"(1) IN GENERAL.—No person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market under this section.

"(2) DUAL REGISTRATION.—Any person that is registered as a swap execution facility under this section shall register with the Commission regardless of whether the person also is registered with the Securities and Exchange Commission as a swap execution facility.

"(b) TRADING AND TRADE PROCESSING.—

"(1) IN GENERAL.—Except as specified in paragraph (2), a swap execution facility that is registered under subsection (a) may—

"(A) make available for trading any swap; and

"(B) facilitate trade processing of any swap.

"(2) AGRICULTURAL SWAPS.—A swap execution facility may not list for trading or confirm the execution of any swap in an agricultural commodity (as defined by the Commission) except pursuant to a rule or regulation of the Commission allowing the swap under such terms and conditions as the Commission shall prescribe.

"(c) IDENTIFICATION OF FACILITY USED TO TRADE SWAPS BY CONTRACT MARKETS.—A board of trade that operates a contract market shall, to the extent that the board of trade also operates a swap execution facility and uses the same electronic trade execution system for listing and executing trades of swaps on or through the contract market and the swap execution facility, identify whether the electronic trading of such swaps is taking place on or through the contract market or the swap execution facility.

"(d) RULE-WRITING.—

"(1) The Securities and Exchange Commission and Commodity Futures Trading Commission may promulgate rules defining the universe of swaps that can be executed on a swap execution facility. These rules shall take into account the price and nonprice requirements of the counterparties to a swap and the goal of this section as set forth in subsection (e).

"(2) For all swaps that are not required to be executed through a swap execution facility as defined in paragraph (1), such trades may be executed through any other available means of interstate commerce.

"(3) The Securities and Exchange Commission and Commodity Futures Trading Commission shall update these rules as necessary to account for technological and other innovation.

"(e) RULE OF CONSTRUCTION.—The goal of this section is to promote the trading of swaps on swap execution facilities and to promote pre-trade price transparency in the swaps market.

"(f) CORE PRINCIPLES FOR SWAP EXECUTION FACILITIES.—     Regulations.

"(1) COMPLIANCE WITH CORE PRINCIPLES.—

"(A) IN GENERAL.—To be registered, and maintain registration, as a swap execution facility, the swap execution facility shall comply with—

"(i) the core principles described in this subsection; and

"(ii) any requirement that the Commission may impose by rule or regulation pursuant to section 8a(5).

"(B) REASONABLE DISCRETION OF SWAP EXECUTION FACILITY.—Unless otherwise determined by the Commission by rule or regulation, a swap execution facility

described in subparagraph (A) shall have reasonable discretion in establishing the manner in which the swap execution facility complies with the core principles described in this subsection.

"(2) COMPLIANCE WITH RULES.—A swap execution facility shall—

"(A) establish and enforce compliance with any rule of the swap execution facility, including—

"(i) the terms and conditions of the swaps traded or processed on or through the swap execution facility; and

"(ii) any limitation on access to the swap execution facility;

"(B) establish and enforce trading, trade processing, and participation rules that will deter abuses and have the capacity to detect, investigate, and enforce those rules, including means—

"(i) to provide market participants with impartial access to the market; and

"(ii) to capture information that may be used in establishing whether rule violations have occurred;

"(C) establish rules governing the operation of the facility, including rules specifying trading procedures to be used in entering and executing orders traded or posted on the facility, including block trades; and

"(D) provide by its rules that when a swap dealer or major swap participant enters into or facilitates a swap that is subject to the mandatory clearing requirement of section 2(h), the swap dealer or major swap participant shall be responsible for compliance with the mandatory trading requirement under section 2(h)(8).

"(3) SWAPS NOT READILY SUSCEPTIBLE TO MANIPULATION.— The swap execution facility shall permit trading only in swaps that are not readily susceptible to manipulation.

"(4) MONITORING OF TRADING AND TRADE PROCESSING.— The swap execution facility shall—

"(A) establish and enforce rules or terms and conditions defining, or specifications detailing—

"(i) trading procedures to be used in entering and executing orders traded on or through the facilities of the swap execution facility; and

"(ii) procedures for trade processing of swaps on or through the facilities of the swap execution facility; and

"(B) monitor trading in swaps to prevent manipulation, price distortion, and disruptions of the delivery or cash settlement process through surveillance, compliance, and disciplinary practices and procedures, including methods for conducting real-time monitoring of trading and comprehensive and accurate trade reconstructions.

"(5) ABILITY TO OBTAIN INFORMATION.—The swap execution facility shall—

"(A) establish and enforce rules that will allow the facility to obtain any necessary information to perform any of the functions described in this section;

"(B) provide the information to the Commission on request; and

"(C) have the capacity to carry out such international information-sharing agreements as the Commission may require.

"(6) POSITION LIMITS OR ACCOUNTABILITY.—

"(A) IN GENERAL.—To reduce the potential threat of market manipulation or congestion, especially during trading in the delivery month, a swap execution facility that is a trading facility shall adopt for each of the contracts of the facility, as is necessary and appropriate, position limitations or position accountability for speculators.

"(B) POSITION LIMITS.—For any contract that is subject to a position limitation established by the Commission pursuant to section 4a(a), the swap execution facility shall—

Contracts.

"(i) set its position limitation at a level no higher than the Commission limitation; and

"(ii) monitor positions established on or through the swap execution facility for compliance with the limit set by the Commission and the limit, if any, set by the swap execution facility.

"(7) FINANCIAL INTEGRITY OF TRANSACTIONS.—The swap execution facility shall establish and enforce rules and procedures for ensuring the financial integrity of swaps entered on or through the facilities of the swap execution facility, including the clearance and settlement of the swaps pursuant to section 2(h)(1).

Procedures.

"(8) EMERGENCY AUTHORITY.—The swap execution facility shall adopt rules to provide for the exercise of emergency authority, in consultation or cooperation with the Commission, as is necessary and appropriate, including the authority to liquidate or transfer open positions in any swap or to suspend or curtail trading in a swap.

"(9) TIMELY PUBLICATION OF TRADING INFORMATION.—

"(A) IN GENERAL.—The swap execution facility shall make public timely information on price, trading volume, and other trading data on swaps to the extent prescribed by the Commission.

Public information.

"(B) CAPACITY OF SWAP EXECUTION FACILITY.—The swap execution facility shall be required to have the capacity to electronically capture and transmit trade information with respect to transactions executed on the facility.

"(10) RECORDKEEPING AND REPORTING.—

"(A) IN GENERAL.—A swap execution facility shall—

"(i) maintain records of all activities relating to the business of the facility, including a complete audit trail, in a form and manner acceptable to the Commission for a period of 5 years;

Time period.

"(ii) report to the Commission, in a form and manner acceptable to the Commission, such information as the Commission determines to be necessary or appropriate for the Commission to perform the duties of the Commission under this Act; and

"(iii) shall keep any such records relating to swaps defined in section 1a(47)(A)(v) open to inspection and examination by the Securities and Exchange Commission."

"(B) REQUIREMENTS.—The Commission shall adopt data collection and reporting requirements for swap execution facilities that are comparable to corresponding requirements for derivatives clearing organizations and swap data repositories.

"(11) ANTITRUST CONSIDERATIONS.—Unless necessary or appropriate to achieve the purposes of this Act, the swap execution facility shall not—

"(A) adopt any rules or taking any actions that result in any unreasonable restraint of trade; or

"(B) impose any material anticompetitive burden on trading or clearing.

"(12) CONFLICTS OF INTEREST.—The swap execution facility shall—

"(A) establish and enforce rules to minimize conflicts of interest in its decision-making process; and

"(B) establish a process for resolving the conflicts of interest.

"(13) FINANCIAL RESOURCES.—

"(A) IN GENERAL.—The swap execution facility shall have adequate financial, operational, and managerial resources to discharge each responsibility of the swap execution facility.

Time period.

"(B DETERMINATION OF RESOURCE ADEQUACY.—The financial resources of a swap execution facility shall be considered to be adequate if the value of the financial resources exceeds the total amount that would enable the swap execution facility to cover the operating costs of the swap execution facility for a 1-year period, as calculated on a rolling basis.

"(14) SYSTEM SAFEGUARDS.—The swap execution facility shall—

"(A) establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk, through the development of appropriate controls and procedures, and automated systems, that—

"(i) are reliable and secure; and

"(ii) have adequate scalable capacity;

"(B) establish and maintain emergency procedures, backup facilities, and a plan for disaster recovery that allow for—

"(i) the timely recovery and resumption of operations; and

"(ii) the fulfillment of the responsibilities and obligations of the swap execution facility; and

"(C) periodically conduct tests to verify that the backup resources of the swap execution facility are sufficient to ensure continued—

"(i) order processing and trade matching;

"(ii) price reporting;

"(iii) market surveillance and

"(iv) maintenance of a comprehensive and accurate audit trail.

"(15) DESIGNATION OF CHIEF COMPLIANCE OFFICER.—

"(A) IN GENERAL.—Each swap execution facility shall designate an individual to serve as a chief compliance officer.

"(B) DUTIES.—The chief compliance officer shall—

"(i) report directly to the board or to the senior officer of the facility;

"(ii) review compliance with the core principles in this subsection;

"(iii) in consultation with the board of the facility, a body performing a function similar to that of a board, or the senior officer of the facility, resolve any conflicts of interest that may arise;

"(iv) be responsible for establishing and administering the policies and procedures required to be established pursuant to this section;

"(v) ensure compliance with this Act and the rules and regulations issued under this Act, including rules prescribed by the Commission pursuant to this section; and

"(vi) establish procedures for the remediation of noncompliance issues found during compliance office reviews, look backs, internal or external audit findings, self-reported errors, or through validated complaints.

"(C) REQUIREMENTS FOR PROCEDURES.—In establishing procedures under subparagraph (B)(vi), the chief compliance officer shall design the procedures to establish the handling, management response, remediation, retesting, and closing of noncompliance issues.

"(D) ANNUAL REPORTS.—

"(i) IN GENERAL.—In accordance with rules prescribed by the Commission, the chief compliance officer shall annually prepare and sign a report that contains a description of—

"(I) the compliance of the swap execution facility with this Act; and

"(II) the policies and procedures, including the code of ethics and conflict of interest policies, of the swap execution facility.

"(ii) REQUIREMENTS.—The chief compliance officer shall—

"(I) submit each report described in clause (i) with the appropriate financial report of the swap execution facility that is required to be submitted to the Commission pursuant to this section; and

"(II) include in the report a certification that, under penalty of law, the report is accurate and complete.

*Certification.*

"(g) EXEMPTIONS.—The Commission may exempt, conditionally or unconditionally, a swap execution facility from registration under this section if the Commission finds that the facility is subject to comparable, comprehensive supervision and regulation on a consolidated basis by the Securities and Exchange Commission, a prudential regulator, or the appropriate governmental authorities in the home country of the facility.

"(h) RULES.—The Commission shall prescribe rules governing the regulation of alternative swap execution facilities under this section.".

## SEC. 734. DERIVATIVES TRANSACTION EXECUTION FACILITIES AND EXEMPT BOARDS OF TRADE.

Repeal.

(a) IN GENERAL.—Sections 5a and 5d of the Commodity Exchange Act (7 U.S.C. 7a, 7a–3) are repealed.

(b) CONFORMING AMENDMENTS.—

(1) Section 2 of the Commodity Exchange Act (7 U.S.C. 2) is amended—

(A) in subsection (a)(1)(A), in the first sentence, by striking "or 5a"; and

(B) in paragraph (2) of subsection (g) (as redesignated by section 723(a)(1)(B)), by striking "section 5a of this Act" and all that follows through "5d of this Act" and inserting "section 5b of this Act".

(2) Section 6(g)(1)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(g)(1)(A)) is amended—

(A) by striking "that—" and all that follows through "(i) has been designated" and inserting "that has been designated";

(B) by striking "; or" and inserting "; and" and

(C) by striking clause (ii).

7 USC 7a–3 note.

(c) ABILITY TO PETITION COMMISSION.—

(1) IN GENERAL.—Prior to the final effective dates in this title, a person may petition the Commodity Futures Trading Commission to remain subject to the provisions of section 5d of the Commodity Exchange Act, as such provisions existed prior to the effective date of this subtitle.

(2) CONSIDERATION OF PETITION.—The Commodity Futures Trading Commission shall consider any petition submitted under paragraph (1) in a prompt manner and may allow a person to continue operating subject to the provisions of section 5d of the Commodity Exchange Act for up to 1 year after the effective date of this subtitle.

Regulations.
Procedures.

## SEC. 735. DESIGNATED CONTRACT MARKETS.

(a) CRITERIA FOR DESIGNATION.—Section 5 of the Commodity Exchange Act (7 U.S.C. 7) is amended by striking subsection (b).

(b) CORE PRINCIPLES FOR CONTRACT MARKETS.—Section 5 of the Commodity Exchange Act (7 U.S.C. 7) is amended by striking subsection (d) and inserting the following:

"(d) CORE PRINCIPLES FOR CONTRACT MARKETS.—

"(1) DESIGNATION AS CONTRACT MARKET.—

"(A) IN GENERAL.—To be designated, and maintain a designation, as a contract market, a board of trade shall comply with—

"(i) any core principle described in this subsection; and

"(ii) any requirement that the Commission may impose by rule or regulation pursuant to section 8a(5).

"(B) REASONABLE DISCRETION OF CONTRACT MARKET.— Unless otherwise determined by the Commission by rule or regulation, a board of trade described in subparagraph (A) shall have reasonable discretion in establishing the manner in which the board of trade complies with the core principles described in this subsection.

"(2) COMPLIANCE WITH RULES.—

"(A) IN GENERAL.—The board of trade shall establish, monitor, and enforce compliance with the rules of the contract market, including—

"(i) access requirements;

"(ii) the terms and conditions of any contracts to be traded on the contract market; and

"(iii) rules prohibiting abusive trade practices on the contract market.

"(B) CAPACITY OF CONTRACT MARKET.—The board of trade shall have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market.

"(C) REQUIREMENT OF RULES.—The rules of the contract market shall provide the board of trade with the ability and authority to obtain any necessary information to perform any function described in this subsection, including the capacity to carry out such international information-sharing agreements as the Commission may require.

"(3) CONTRACTS NOT READILY SUBJECT TO MANIPULATION.—The board of trade shall list on the contract market only contracts that are not readily susceptible to manipulation.

"(4) PREVENTION OF MARKET DISRUPTION.—The board of trade shall have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—

"(A) methods for conducting real-time monitoring of trading; and

"(B) comprehensive and accurate trade reconstructions.

"(5) POSITION LIMITATIONS OR ACCOUNTABILITY.—

"(A) IN GENERAL.—To reduce the potential threat of market manipulation or congestion (especially during trading in the delivery month), the board of trade shall adopt for each contract of the board of trade, as is necessary and appropriate, position limitations or position accountability for speculators.

"(B) MAXIMUM ALLOWABLE POSITION LIMITATION.—For any contract that is subject to a position limitation established by the Commission pursuant to section 4a(a), the board of trade shall set the position limitation of the board of trade at a level not higher than the position limitation established by the Commission.

"(6) EMERGENCY AUTHORITY.—The board of trade, in consultation or cooperation with the Commission, shall adopt rules to provide for the exercise of emergency authority, as is necessary and appropriate, including the authority—

"(A) to liquidate or transfer open positions in any contract;

"(B) to suspend or curtail trading in any contract; and

"(C) to require market participants in any contract to meet special margin requirements.

"(7) AVAILABILITY OF GENERAL INFORMATION.—The board of trade shall make available to market authorities, market participants, and the public accurate information concerning—

"(A) the terms and conditions of the contracts of the contract market; and

"(B)(i) the rules, regulations, and mechanisms for executing transactions on or through the facilities of the contract market; and

"(ii) the rules and specifications describing the operation of the contract market's—

"(I) electronic matching platform; or

"(II) trade execution facility.

"(8) DAILY PUBLICATION OF TRADING INFORMATION.—The board of trade shall make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts on the contract market.

"(9) EXECUTION OF TRANSACTIONS.—

"(A) IN GENERAL.—The board of trade shall provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market of the board of trade.

"(B) RULES.—The rules of the board of trade may authorize, for bona fide business purposes—

"(i) transfer trades or office trades;

"(ii) an exchange of—

"(I) futures in connection with a cash commodity transaction;

"(II) futures for cash commodities; or

"(III) futures for swaps; or

"(iii) a futures commission merchant, acting as principal or agent, to enter into or confirm the execution of a contract for the purchase or sale of a commodity for future delivery if the contract is reported, recorded, or cleared in accordance with the rules of the contract market or a derivatives clearing organization.

"(10) TRADE INFORMATION.—The board of trade shall maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—

"(A) to assist in the prevention of customer and market abuses; and

"(B) to provide evidence of any violations of the rules of the contract market.

"(11) FINANCIAL INTEGRITY OF TRANSACTIONS.—The board of trade shall establish and enforce—

"(A) rules and procedures for ensuring the financial integrity of transactions entered into on or through the facilities of the contract market (including the clearance and settlement of the transactions with a derivatives clearing organization); and

"(B) rules to ensure—

"(i) the financial integrity of any—

"(I) futures commission merchant; and

"(II) introducing broker; and

"(ii) the protection of customer funds.

"(12) PROTECTION OF MARKETS AND MARKET PARTICIPANTS.—The board of trade shall establish and enforce rules—

Public information.

Records.

"(A) to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant; and

"(B) to promote fair and equitable trading on the contract market.

"(13) DISCIPLINARY PROCEDURES.—The board of trade shall establish and enforce disciplinary procedures that authorize the board of trade to discipline, suspend, or expel members or market participants that violate the rules of the board of trade, or similar methods for performing the same functions, including delegation of the functions to third parties.

"(14) DISPUTE RESOLUTION.—The board of trade shall establish and enforce rules regarding, and provide facilities for alternative dispute resolution as appropriate for, market participants and any market intermediaries.

"(15) GOVERNANCE FITNESS STANDARDS.—The board of trade shall establish and enforce appropriate fitness standards for directors, members of any disciplinary committee, members of the contract market, and any other person with direct access to the facility (including any party affiliated with any person described in this paragraph).

"(16) CONFLICTS OF INTEREST.—The board of trade shall establish and enforce rules—

"(A) to minimize conflicts of interest in the decision-making process of the contract market; and

"(B) to establish a process for resolving conflicts of interest described in subparagraph (A).

"(17) COMPOSITION OF GOVERNING BOARDS OF CONTRACT MARKETS.—The governance arrangements of the board of trade shall be designed to permit consideration of the views of market participants.

"(18) RECORDKEEPING.—The board of trade shall maintain records of all activities relating to the business of the contract market—

"(A) in a form and manner that is acceptable to the Commission; and

"(B) for a period of at least 5 years.

Time period.

"(19) ANTITRUST CONSIDERATIONS.—Unless necessary or appropriate to achieve the purposes of this Act, the board of trade shall not—

"(A) adopt any rule or taking any action that results in any unreasonable restraint of trade; or

"(B) impose any material anticompetitive burden on trading on the contract market.

"(20) SYSTEM SAFEGUARDS.—The board of trade shall—

"(A) establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk, through the development of appropriate controls and procedures, and the development of automated systems, that are reliable, secure, and have adequate scalable capacity;

"(B) establish and maintain emergency procedures, backup facilities, and a plan for disaster recovery that allow for the timely recovery and resumption of operations and the fulfillment of the responsibilities and obligations of the board of trade; and

"(C) periodically conduct tests to verify that backup resources are sufficient to ensure continued order processing and trade matching, price reporting, market surveillance, and maintenance of a comprehensive and accurate audit trail.

"(21) FINANCIAL RESOURCES.—

"(A) IN GENERAL.—The board of trade shall have adequate financial, operational, and managerial resources to discharge each responsibility of the board of trade.

"(B) DETERMINATION OF ADEQUACY.—The financial resources of the board of trade shall be considered to be adequate if the value of the financial resources exceeds the total amount that would enable the contract market to cover the operating costs of the contract market for a 1-year period, as calculated on a rolling basis.

"(22) DIVERSITY OF BOARD OF DIRECTORS.—The board of trade, if a publicly traded company, shall endeavor to recruit individuals to serve on the board of directors and the other decision-making bodies (as determined by the Commission) of the board of trade from among, and to have the composition of the bodies reflect, a broad and culturally diverse pool of qualified candidates.

Records.

"(23) SECURITIES AND EXCHANGE COMMISSION.—The board of trade shall keep any such records relating to swaps defined in section 1a(47)(A)(v) open to inspection and examination by the Securities and Exchange Commission.".

**SEC. 736. MARGIN.**

Section 8a(7) of the Commodity Exchange Act (7 U.S.C. 12a(7)) is amended—

(1) in subparagraph (C), by striking ", excepting the setting of levels of margin";

(2) by redesignating subparagraphs (D) through (F) as subparagraphs (E) through (G), respectively; and

(3) by inserting after subparagraph (C) the following:

"(D) margin requirements, provided that the rules, regulations, or orders shall—

"(i) be limited to protecting the financial integrity of the derivatives clearing organization;

"(ii) be designed for risk management purposes to protect the financial integrity of transactions; and

"(iii) not set specific margin amounts;".

**SEC. 737. POSITION LIMITS.**

(a) AGGREGATE POSITION LIMITS.—Section 4a(a) of the Commodity Exchange Act (7 U.S.C. 6a(a)) is amended—

(1) by inserting after "(a)" the following:

"(1) IN GENERAL.—";

(2) in the first sentence, by striking "on electronic trading facilities with respect to a significant price discovery contract" and inserting "swaps that perform or affect a significant price discovery function with respect to registered entities";

(3) in the second sentence—

(A) by inserting ", including any group or class of traders," after "held by any person"; and

(B) by striking "on an electronic trading facility with respect to a significant price discovery contract," and inserting "swaps traded on or subject to the rules of a

designated contract market or a swap execution facility, or swaps not traded on or subject to the rules of a designated contract market or a swap execution facility that performs a significant price discovery function with respect to a registered entity,"; and

(4) by adding at the end the following:

"(2) ESTABLISHMENT OF LIMITATIONS.—

"(A) IN GENERAL.—In accordance with the standards set forth in paragraph (1) of this subsection and consistent with the good faith exception cited in subsection (b)(2), with respect to physical commodities other than excluded commodities as defined by the Commission, the Commission shall by rule, regulation, or order establish limits on the amount of positions, as appropriate, other than bona fide hedge positions, that may be held by any person with respect to contracts of sale for future delivery or with respect to options on the contracts or commodities traded on or subject to the rules of a designated contract market.

Regulations.
Contracts.

"(B) TIMING.—

"(i) EXEMPT COMMODITIES.—For exempt commodities, the limits required under subparagraph (A) shall be established within 180 days after the date of the enactment of this paragraph.

"(ii) AGRICULTURAL COMMODITIES.—For agricultural commodities, the limits required under subparagraph (A) shall be established within 270 days after the date of the enactment of this paragraph.

"(C) GOAL.—In establishing the limits required under subparagraph (A), the Commission shall strive to ensure that trading on foreign boards of trade in the same commodity will be subject to comparable limits and that any limits to be imposed by the Commission will not cause price discovery in the commodity to shift to trading on the foreign boards of trade.

"(3) SPECIFIC LIMITATIONS.—In establishing the limits required in paragraph (2), the Commission, as appropriate, shall set limits—

"(A) on the number of positions that may be held by any person for the spot month, each other month, and the aggregate number of positions that may be held by any person for all months; and

"(B) to the maximum extent practicable, in its discretion—

"(i) to diminish, eliminate, or prevent excessive speculation as described under this section;

"(ii) to deter and prevent market manipulation, squeezes, and corners;

"(iii) to ensure sufficient market liquidity for bona fide hedgers; and

"(iv) to ensure that the price discovery function of the underlying market is not disrupted.

"(4) SIGNIFICANT PRICE DISCOVERY FUNCTION.—In making a determination whether a swap performs or affects a significant price discovery function with respect to regulated markets, the Commission shall consider, as appropriate:

"(A) PRICE LINKAGE.—The extent to which the swap uses or otherwise relies on a daily or final settlement price, or other major price parameter, of another contract traded on a regulated market based upon the same underlying commodity, to value a position, transfer or convert a position, financially settle a position, or close out a position.

"(B) ARBITRAGE.—The extent to which the price for the swap is sufficiently related to the price of another contract traded on a regulated market based upon the same underlying commodity so as to permit market participants to effectively arbitrage between the markets by simultaneously maintaining positions or executing trades in the swaps on a frequent and recurring basis.

"(C) MATERIAL PRICE REFERENCE.—The extent to which, on a frequent and recurring basis, bids, offers, or transactions in a contract traded on a regulated market are directly based on, or are determined by referencing, the price generated by the swap.

"(D) MATERIAL LIQUIDITY.—The extent to which the volume of swaps being traded in the commodity is sufficient to have a material effect on another contract traded on a regulated market.

"(E) OTHER MATERIAL FACTORS.—Such other material factors as the Commission specifies by rule or regulation as relevant to determine whether a swap serves a significant price discovery function with respect to a regulated market.

"(5) ECONOMICALLY EQUIVALENT CONTRACTS.—

"(A) Notwithstanding any other provision of this section, the Commission shall establish limits on the amount of positions, including aggregate position limits, as appropriate, other than bona fide hedge positions, that may be held by any person with respect to swaps that are economically equivalent to contracts of sale for future delivery or to options on the contracts or commodities traded on or subject to the rules of a designated contract market subject to paragraph (2).

"(B) In establishing limits pursuant to subparagraph (A), the Commission shall—

"(i) develop the limits concurrently with limits established under paragraph (2), and the limits shall have similar requirements as under paragraph (3)(B); and

"(ii) establish the limits simultaneously with limits established under paragraph (2).

Contracts.

"(6) AGGREGATE POSITION LIMITS.—The Commission shall, by rule or regulation, establish limits (including related hedge exemption provisions) on the aggregate number or amount of positions in contracts based upon the same underlying commodity (as defined by the Commission) that may be held by any person, including any group or class of traders, for each month across—

"(A) contracts listed by designated contract markets;

"(B) with respect to an agreement contract, or transaction that settles against any price (including the daily or final settlement price) of 1 or more contracts listed

for trading on a registered entity, contracts traded on a foreign board of trade that provides members or other participants located in the United States with direct access to its electronic trading and order matching system; and

"(C) swap contracts that perform or affect a significant price discovery function with respect to regulated entities.

"(7) EXEMPTIONS.—The Commission, by rule, regulation, or order, may exempt, conditionally or unconditionally, any person or class of persons, any swap or class of swaps, any contract of sale of a commodity for future delivery or class of such contracts, any option or class of options, or any transaction or class of transactions from any requirement it may establish under this section with respect to position limits.".

(b) CONFORMING AMENDMENTS.—Section 4a(b) of the Commodity Exchange Act (7 U.S.C. 6a(b)) is amended—

(1) in paragraph (1), by striking "or derivatives transaction execution facility or facilities or electronic trading facility" and inserting "or swap execution facility or facilities"; and

(2) in paragraph (2), by striking "or derivatives transaction execution facility or facilities or electronic trading facility" and inserting "or swap execution facility".

(c) BONA FIDE HEDGING TRANSACTION.—Section 4a(c) of the Commodity Exchange Act is amended—

(1) by inserting "(1)" after "(c)"; and

(2) by adding at the end the following:

"(2) For the purposes of implementation of subsection (a)(2) for contracts of sale for future delivery or options on the contracts or commodities, the Commission shall define what constitutes a bona fide hedging transaction or position as a transaction or position that— *Contracts.*

"(A)(i) represents a substitute for transactions made or to be made or positions taken or to be taken at a later time in a physical marketing channel;

"(ii) is economically appropriate to the reduction of risks in the conduct and management of a commercial enterprise; and

"(iii) arises from the potential change in the value of—

"(I) assets that a person owns, produces, manufactures, processes, or merchandises or anticipates owning, producing, manufacturing, processing, or merchandising;

"(II) liabilities that a person owns or anticipates incurring; or

"(III) services that a person provides, purchases, or anticipates providing or purchasing; or

"(B) reduces risks attendant to a position resulting from a swap that—

"(i) was executed opposite a counterparty for which the transaction would qualify as a bona fide hedging transaction pursuant to subparagraph (A); or

"(ii) meets the requirements of subparagraph (A).".

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on the date of the enactment of this section. *7 USC 6a note.*

## SEC. 738. FOREIGN BOARDS OF TRADE.

(a) IN GENERAL.—Section 4(b) of the Commodity Exchange Act (7 U.S.C. 6(b)) is amended—

(1) in the first sentence, by striking "The Commission" and inserting the following:

"(2) PERSONS LOCATED IN THE UNITED STATES.—

"(A) IN GENERAL.—The Commission";

(2) in the second sentence, by striking "Such rules and regulations" and inserting the following:

"(B) DIFFERENT REQUIREMENTS.—Rules and regulations described in subparagraph (A)";

(3) in the third sentence—

(A) by striking "No rule or regulation" and inserting the following:

"(C) PROHIBITION.—Except as provided in paragraphs (1) and (2), no rule or regulation";

(B) by striking "that (1) requires" and inserting the following: "that—

"(i) requires"; and

(C) by striking "market, or (2) governs" and inserting the following: "market; or

"(ii) governs"; and

(4) by inserting before paragraph (2) (as designated by paragraph (1)) the following:

"(1) FOREIGN BOARDS OF TRADE.—

"(A) REGISTRATION.—The Commission may adopt rules and regulations requiring registration with the Commission for a foreign board of trade that provides the members of the foreign board of trade or other participants located in the United States with direct access to the electronic trading and order matching system of the foreign board of trade, including rules and regulations prescribing procedures and requirements applicable to the registration of such foreign boards of trade. For purposes of this paragraph, 'direct access' refers to an explicit grant of authority by a foreign board of trade to an identified member or other participant located in the United States to enter trades directly into the trade matching system of the foreign board of trade. In adopting such rules and regulations, the commission shall consider—

"(i) whether any such foreign board of trade is subject to comparable, comprehensive supervision and regulation by the appropriate governmental authorities in the foreign board of trade's home country; and

"(ii) any previous commission findings that the foreign board of trade is subject to comparable comprehensive supervision and regulation by the appropriate government authorities in the foreign board of trade's home country.

"(B) LINKED CONTRACTS.—The Commission may not permit a foreign board of trade to provide to the members of the foreign board of trade or other participants located in the United States direct access to the electronic trading and order-matching system of the foreign board of trade with respect to an agreement, contract, or transaction that settles against any price (including the daily or final settlement price) of 1 or more contracts listed for trading on

a registered entity, unless the Commission determines that—

"(i) the foreign board of trade makes public daily trading information regarding the agreement, contract, or transaction that is comparable to the daily trading information published by the registered entity for the 1 or more contracts against which the agreement, contract, or transaction traded on the foreign board of trade settles; and

"(ii) the foreign board of trade (or the foreign futures authority that oversees the foreign board of trade)—

"(I) adopts position limits (including related hedge exemption provisions) for the agreement, contract, or transaction that are comparable to the position limits (including related hedge exemption provisions) adopted by the registered entity for the 1 or more contracts against which the agreement, contract, or transaction traded on the foreign board of trade settles;

"(II) has the authority to require or direct market participants to limit, reduce, or liquidate any position the foreign board of trade (or the foreign futures authority that oversees the foreign board of trade) determines to be necessary to prevent or reduce the threat of price manipulation, excessive speculation as described in section 4a, price distortion, or disruption of delivery or the cash settlement process;

"(III) agrees to promptly notify the Commission, with regard to the agreement, contract, or transaction that settles against any price (including the daily or final settlement price) of 1 or more contracts listed for trading on a registered entity, of any change regarding— *Notification.*

"(aa) the information that the foreign board of trade will make publicly available; *Public information.*

"(bb) the position limits that the foreign board of trade or foreign futures authority will adopt and enforce;

"(cc) the position reductions required to prevent manipulation, excessive speculation as described in section 4a, price distortion, or disruption of delivery or the cash settlement process; and

"(dd) any other area of interest expressed by the Commission to the foreign board of trade or foreign futures authority;

"(IV) provides information to the Commission regarding large trader positions in the agreement, contract, or transaction that is comparable to the large trader position information collected by the Commission for the 1 or more contracts against which the agreement, contract, or transaction traded on the foreign board of trade settles; and

"(V) provides the Commission such information as is necessary to publish reports on aggregate *Reports.*

trader positions for the agreement, contract, or transaction traded on the foreign board of trade that are comparable to such reports on aggregate trader positions for the 1 or more contracts against which the agreement, contract, or transaction traded on the foreign board of trade settles.

Effective date.

"(C) EXISTING FOREIGN BOARDS OF TRADE.—Subparagraphs (A) and (B) shall not be effective with respect to any foreign board of trade to which, prior to the date of enactment of this paragraph, the Commission granted direct access permission until the date that is 180 days after that date of enactment.".

(b) LIABILITY OF REGISTERED PERSONS TRADING ON A FOREIGN BOARD OF TRADE.—Section 4 of the Commodity Exchange Act (7 U.S.C. 6) is amended—

(1) in subsection (a), in the matter preceding paragraph (1), by inserting "or by subsection (e)" after "Unless exempted by the Commission pursuant to subsection (c)"; and

(2) by adding at the end the following:

"(e) LIABILITY OF REGISTERED PERSONS TRADING ON A FOREIGN BOARD OF TRADE.—

"(1) IN GENERAL.—A person registered with the Commission, or exempt from registration by the Commission, under this Act may not be found to have violated subsection (a) with respect to a transaction in, or in connection with, a contract of sale of a commodity for future delivery if the person—

"(A) has reason to believe that the transaction and the contract is made on or subject to the rules of a foreign board of trade that is—

"(i) legally organized under the laws of a foreign country;

"(ii) authorized to act as a board of trade by a foreign futures authority; and

"(iii) subject to regulation by the foreign futures authority; and

"(B) has not been determined by the Commission to be operating in violation of subsection (a).

"(2) RULE OF CONSTRUCTION.—Nothing in this subsection shall be construed as implying or creating any presumption that a board of trade, exchange, or market is located outside the United States, or its territories or possessions, for purposes of subsection (a).".

(c) CONTRACT ENFORCEMENT FOR FOREIGN FUTURES CONTRACTS.—Section 22(a) of the Commodity Exchange Act (7 U.S.C. 25(a)) (as amended by section 739) is amended by adding at the end the following:

"(6) CONTRACT ENFORCEMENT FOR FOREIGN FUTURES CONTRACTS.—A contract of sale of a commodity for future delivery traded or executed on or through the facilities of a board of trade, exchange, or market located outside the United States for purposes of section 4(a) shall not be void, voidable, or unenforceable, and a party to such a contract shall not be entitled to rescind or recover any payment made with respect to the contract, based on the failure of the foreign board of trade to comply with any provision of this Act.".

**SEC. 739. LEGAL CERTAINTY FOR SWAPS.**

Section 22(a) of the Commodity Exchange Act (7 U.S.C. 25(a)) is amended by striking paragraph (4) and inserting the following:

"(4) CONTRACT ENFORCEMENT BETWEEN ELIGIBLE COUNTERPARTIES.—

"(A) IN GENERAL.—No hybrid instrument sold to any investor shall be void, voidable, or unenforceable, and no party to a hybrid instrument shall be entitled to rescind, or recover any payment made with respect to, the hybrid instrument under this section or any other provision of Federal or State law, based solely on the failure of the hybrid instrument to comply with the terms or conditions of section 2(f) or regulations of the Commission.

"(B) SWAPS.—No agreement, contract, or transaction between eligible contract participants or persons reasonably believed to be eligible contract participants shall be void, voidable, or unenforceable, and no party to such agreement, contract, or transaction shall be entitled to rescind, or recover any payment made with respect to, the agreement, contract, or transaction under this section or any other provision of Federal or State law, based solely on the failure of the agreement, contract, or transaction—

"(i) to meet the definition of a swap under section 1a; or

"(ii) to be cleared in accordance with section 2(h)(1).

"(5) LEGAL CERTAINTY FOR LONG-TERM SWAPS ENTERED INTO BEFORE THE DATE OF ENACTMENT OF THE WALL STREET TRANSPARENCY AND ACCOUNTABILITY ACT OF 2010.—

"(A) EFFECT ON SWAPS.—Unless specifically reserved in the applicable swap, neither the enactment of the Wall Street Transparency and Accountability Act of 2010, nor any requirement under that Act or an amendment made by that Act, shall constitute a termination event, force majeure, illegality, increased costs, regulatory change, or similar event under a swap (including any related credit support arrangement) that would permit a party to terminate, renegotiate, modify, amend, or supplement 1 or more transactions under the swap.

"(B) POSITION LIMITS.—Any position limit established under the Wall Street Transparency and Accountability Act of 2010 shall not apply to a position acquired in good faith prior to the effective date of any rule, regulation, or order under the Act that establishes the position limit; provided, however, that such positions shall be attributed to the trader if the trader's position is increased after the effective date of such position limit rule, regulation, or order.".

**SEC. 740. MULTILATERAL CLEARING ORGANIZATIONS.**

Sections 408 and 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 4421, 4422) are repealed.

Repeal.

**SEC. 741. ENFORCEMENT.**

(a) ENFORCEMENT AUTHORITY.—The Commodity Exchange Act is amended by inserting after section 4b (7 U.S.C. 6b) the following:

**"SEC. 4b–1. ENFORCEMENT AUTHORITY.**

7 USC 6b–1.

"(a) COMMODITY FUTURES TRADING COMMISSION.—Except as provided in subsections (b), (c), and (d), the Commission shall have exclusive authority to enforce the provisions of subtitle A of the

Wall Street Transparency and Accountability Act of 2010 with respect to any person.

"(b) PRUDENTIAL REGULATORS.—The prudential regulators shall have exclusive authority to enforce the provisions of section 4s(e) with respect to swap dealers or major swap participants for which they are the prudential regulator.

"(c) REFERRALS.—

"(1) PRUDENTIAL REGULATORS.—If the prudential regulator for a swap dealer or major swap participant has cause to believe that the swap dealer or major swap participant, or any affiliate or division of the swap dealer or major swap participant, may have engaged in conduct that constitutes a violation of the nonprudential requirements of this Act (including section 4s or rules adopted by the Commission under that section), the prudential regulator may promptly notify the Commission in a written report that includes—

"(A) a request that the Commission initiate an enforcement proceeding under this Act; and

"(B) an explanation of the facts and circumstances that led to the preparation of the written report.

"(2) COMMISSION.—If the Commission has cause to believe that a swap dealer or major swap participant that has a prudential regulator may have engaged in conduct that constitutes a violation of any prudential requirement of section 4s or rules adopted by the Commission under that section, the Commission may notify the prudential regulator of the conduct in a written report that includes—

"(A) a request that the prudential regulator initiate an enforcement proceeding under this Act or any other Federal law (including regulations); and

"(B) an explanation of the concerns of the Commission, and a description of the facts and circumstances, that led to the preparation of the written report.

"(d) BACKSTOP ENFORCEMENT AUTHORITY.—

Time period.

"(1) INITIATION OF ENFORCEMENT PROCEEDING BY PRUDENTIAL REGULATOR.—If the Commission does not initiate an enforcement proceeding before the end of the 90-day period beginning on the date on which the Commission receives a written report under subsection (c)(1), the prudential regulator may initiate an enforcement proceeding.

"(2) INITIATION OF ENFORCEMENT PROCEEDING BY COMMISSION.—If the prudential regulator does not initiate an enforcement proceeding before the end of the 90-day period beginning on the date on which the prudential regulator receives a written report under subsection (c)(2), the Commission may initiate an enforcement proceeding.".

(b) CONFORMING AMENDMENTS.—

(1) Section 4b of the Commodity Exchange Act (7 U.S.C. 6b) is amended—

(A) in subsection (a)(2), by striking "or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g)," and inserting "or swap,";

(B) in subsection (b), by striking "or other agreement, contract or transaction subject to paragraphs (1) and (2) of section 5a(g)," and inserting "or swap,"; and

(C) by adding at the end the following:

"(e) It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any registered entity, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery (or option on such a contract), or any swap, on a group or index of securities (or any interest therein or based on the value thereof)—

"(1) to employ any device, scheme, or artifice to defraud;

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.".

(2) Section 4c(a)(1) of the Commodity Exchange Act (7 U.S.C. 6c(a)(1)) is amended by inserting "or swap" before "if the transaction is used or may be used".

(3) Section 6(c) of the Commodity Exchange Act (7 U.S.C. 9) is amended in the first sentence by inserting "or of any swap," before "or has willfully made".

(4) Section 6(d) of the Commodity Exchange Act (7 U.S.C. 13b) is amended in the first sentence, in the matter preceding the proviso, by inserting "or of any swap," before "or otherwise is violating".

(5) Section 6c(a) of the Commodity Exchange Act (7 U.S.C. 13a–1(a)) is amended in the matter preceding the proviso by inserting "or any swap" after "commodity for future delivery".

(6) Section 9 of the Commodity Exchange Act (7 U.S.C. 13) is amended—

    (A) in subsection (a)—

        (i) in paragraph (2), by inserting "or of any swap," before "or to corner"; and

        (ii) in paragraph (4), by inserting "swap data repository," before "or futures association" and

    (B) in subsection (e)(1)—

        (i) by inserting "swap data repository," before "or registered futures association"; and

        (ii) by inserting ", or swaps," before "on the basis".

(7) Section 9(a) of the Commodity Exchange Act (7 U.S.C. 13(a)) is amended by adding at the end the following:

"(6) Any person to abuse the end user clearing exemption under section 2(h)(4), as determined by the Commission.".

(8) Section 2(c)(2)(B) of the Commodity Exchange Act (7 U.S.C. 2(c)(2)(B)) is amended—

    (A) by striking "(dd)," each place it appears;

    (B) in clause (iii), by inserting ", and accounts or pooled investment vehicles described in clause (vi)," before "shall be subject to"; and

    (C) by adding at the end the following:

    "(vi) This Act applies to, and the Commission shall have jurisdiction over, an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause (i).". *Applicability.*

(9) Section 2(c)(2)(C) of the Commodity Exchange Act (7 U.S.C. 2(c)(2)(C)) is amended—

(A) by striking "(dd)," each place it appears;

(B) in clause (ii)(I), by inserting ", and accounts or pooled investment vehicles described in clause (vii)," before "shall be subject to"; and

(C) by adding at the end the following:

*Applicability.*

"(vii) This Act applies to, and the Commission shall have jurisdiction over, an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause (i).".

(10) Section 1a(19)(A)(iv)(II) of the Commodity Exchange Act (7 U.S.C. 1a(19)(A)(iv)(II)) (as redesignated by section 721(a)(1)) is amended by inserting before the semicolon at the end the following: "provided, however, that for purposes of section 2(c)(2)(B)(vi) and section 2(c)(2)(C)(vii), the term 'eligible contract participant' shall not include a commodity pool in which any participant is not otherwise an eligible contract participant".

(11) Section 6(e) of the Commodity Exchange Act (7 U.S.C. 9a) is amended by adding at the end the following:

*Penalty.*

"(4) Any designated clearing organization that knowingly or recklessly evades or participates in or facilitates an evasion of the requirements of section 2(h) shall be liable for a civil money penalty in twice the amount otherwise available for a violation of section 2(h).

*Penalty.*

"(5) Any swap dealer or major swap participant that knowingly or recklessly evades or participates in or facilitates an evasion of the requirements of section 2(h) shall be liable for a civil money penalty in twice the amount otherwise available for a violation of section 2(h).".

*15 USC 8324.*

(c) SAVINGS CLAUSE.—Notwithstanding any other provision of this title, nothing in this subtitle shall be construed as divesting any appropriate Federal banking agency of any authority it may have to establish or enforce, with respect to a person for which such agency is the appropriate Federal banking agency, prudential or other standards pursuant to authority granted by Federal law other than this title.

## SEC. 742. RETAIL COMMODITY TRANSACTIONS.

(a) IN GENERAL.—Section 2(c) of the Commodity Exchange Act (7 U.S.C. 2(c)) is amended—

(1) in paragraph (1), by striking "5a (to the extent provided in section 5a(g)), 5b, 5d, or 12(e)(2)(B))" and inserting ", 5b, or 12(e)(2)(B))"; and

(2) in paragraph (2), by adding at the end the following:

*Contracts.*

"(D) RETAIL COMMODITY TRANSACTIONS.—

"(i) APPLICABILITY.—Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is—

"(I) entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

"(II) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or

a person acting in concert with the offeror or counterparty on a similar basis.

"(ii) EXCEPTIONS.—This subparagraph shall not apply to—

"(I) an agreement, contract, or transaction described in paragraph (1) or subparagraphs (A), (B), or (C), including any agreement, contract, or transaction specifically excluded from subparagraph (A), (B), or (C);

"(II) any security;

"(III) a contract of sale that—

"(aa) results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved; or

"(bb) creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer; or

"(IV) an agreement, contract, or transaction that is listed on a national securities exchange registered under section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)); or

"(V) an identified banking product, as defined in section 402(b) of the Legal Certainty for Bank Products Act of 2000 (7 U.S.C. 27(b)).

"(iii) ENFORCEMENT.—Sections 4(a), 4(b), and 4b apply to any agreement, contract, or transaction described in clause (i), as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery.

Applicability.

"(iv) ELIGIBLE COMMERCIAL ENTITY.—For purposes of this subparagraph, an agricultural producer, packer, or handler shall be considered to be an eligible commercial entity for any agreement, contract, or transaction for a commodity in connection with the line of business of the agricultural producer, packer, or handler.".

(b) GRAMM-LEACH-BLILEY ACT.—Section 206(a) of the Gramm-Leach-Bliley Act (Public Law 106–102; 15 U.S.C. 78c note) is amended, in the matter preceding paragraph (1), by striking "For purposes of" and inserting "Except as provided in subsection (e), for purposes of".

(c) CONFORMING AMENDMENTS RELATING TO RETAIL FOREIGN EXCHANGE TRANSACTIONS.—

(1) Section 2(c)(2)(B)(i)(II) of the Commodity Exchange Act (7 U.S.C. 2(c)(2)(B)(i)(II)) is amended—

(A) in item (aa), by inserting "United States" before "financial institution";

(B) by striking items (dd) and (ff);

(C) by redesignating items (ee) and (gg) as items (dd) and (ff), respectively; and

(D) in item (dd) (as so redesignated), by striking the semicolon and inserting "; or".

(2) Section 2(c)(2) of the Commodity Exchange Act (7 U.S.C. 2(c)(2)) (as amended by subsection (a)(2)) is amended by adding at the end the following:

"(E) PROHIBITION.—

"(i) DEFINITION OF FEDERAL REGULATORY AGENCY.—In this subparagraph, the term 'Federal regulatory agency' means—

"(I) the Commission;

"(II) the Securities and Exchange Commission;

"(III) an appropriate Federal banking agency;

"(IV) the National Credit Union Association; and

"(V) the Farm Credit Administration.

Contracts.

"(ii) PROHIBITION.—

"(I) IN GENERAL.—Except as provided in sub-clause (II), a person described in subparagraph (B)(i)(II) for which there is a Federal regulatory agency shall not offer to, or enter into with, a person that is not an eligible contract participant, any agreement, contract, or transaction in foreign currency described in subparagraph (B)(i)(I) except pursuant to a rule or regulation of a Federal regulatory agency allowing the agreement, contract, or transaction under such terms and conditions as the Federal regulatory agency shall prescribe.

"(II) EFFECTIVE DATE.—With regard to persons described in subparagraph (B)(i)(II) for which a Federal regulatory agency has issued a proposed rule concerning agreements, contracts, or trans-actions in foreign currency described in subpara-graph (B)(i)(I) prior to the date of enactment of this subclause, subclause (I) shall take effect 90 days after the date of enactment of this subclause.

"(iii) REQUIREMENTS OF RULES AND REGULATIONS.—

"(I) IN GENERAL.—The rules and regulations described in clause (ii) shall prescribe appropriate requirements with respect to—

"(aa) disclosure;

"(bb) recordkeeping;

"(cc) capital and margin;

"(dd) reporting;

"(ee) business conduct;

"(ff) documentation; and

Determination.

"(gg) such other standards or require-ments as the Federal regulatory agency shall determine to be necessary.

"(II) TREATMENT.—The rules or regulations described in clause (ii) shall treat all agreements, contracts, and transactions in foreign currency described in subparagraph (B)(i)(I), and all agree-ments, contracts, and transactions in foreign cur-rency that are functionally or economically similar to agreements, contracts, or transactions described in subparagraph (B)(i)(I), similarly.".

**SEC. 743. OTHER AUTHORITY.**                                    7 USC 1a note.

Unless otherwise provided by the amendments made by this subtitle, the amendments made by this subtitle do not divest any appropriate Federal banking agency, the Commodity Futures Trading Commission, the Securities and Exchange Commission, or other Federal or State agency of any authority derived from any other applicable law.

**SEC. 744. RESTITUTION REMEDIES.**

Section 6c(d) of the Commodity Exchange Act (7 U.S.C. 13a–1(d)) is amended by adding at the end the following:

"(3) EQUITABLE REMEDIES.—In any action brought under this section, the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including—

"(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and

"(B) disgorgement of gains received in connection with such violation.".

**SEC. 745. ENHANCED COMPLIANCE BY REGISTERED ENTITIES.**

(a) EFFECT OF INTERPRETATION.—Section 5c(a) of the Commodity Exchange Act (7 U.S.C. 7a–2(a)) is amended by striking paragraph (2) and inserting the following:

"(2) EFFECT OF INTERPRETATION.—An interpretation issued under paragraph (1) may provide the exclusive means for complying with each section described in paragraph (1).".

(b) NEW CONTRACTS, NEW RULES, AND RULE AMENDMENTS.—Section 5c of the Commodity Exchange Act (7 U.S.C. 7a–2) is amended by striking subsection (c) and inserting the following:

"(c) NEW CONTRACTS, NEW RULES, AND RULE AMENDMENTS.—          Certification.

"(1) IN GENERAL.—A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this Act (including regulations under this Act).

"(2) RULE REVIEW.—The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this Act (including regulations under this Act).

Effective date.
Notification.
Determination.

Notification.
Time period.

"(3) STAY OF CERTIFICATION FOR RULES.—

"(A) A notification by the Commission pursuant to paragraph (2) shall stay the certification of the new rule or rule amendment for up to an additional 90 days from the date of the notification.

Effective date.

"(B) A rule or rule amendment subject to a stay pursuant to subparagraph (A) shall become effective, pursuant to the certification of the registered entity, at the expiration of the period described in subparagraph (A) unless the Commission—

"(i) withdraws the stay prior to that time; or

"(ii) notifies the registered entity during such period that it objects to the proposed certification on the grounds that it is inconsistent with this Act (including regulations under this Act).

Public comment.

"(C) The Commission shall provide a not less than 30-day public comment period, within the 90-day period in which the stay is in effect as described in subparagraph (A), whenever the Commission reviews a rule or rule amendment pursuant to a notification by the Commission under this paragraph.

"(4) PRIOR APPROVAL.—

"(A) IN GENERAL.—A registered entity may request that the Commission grant prior approval to any new contract or other instrument, new rule, or rule amendment.

"(B) PRIOR APPROVAL REQUIRED.—Notwithstanding any other provision of this section, a designated contract market shall submit to the Commission for prior approval each rule amendment that materially changes the terms and conditions, as determined by the Commission, in any contract of sale for future delivery of a commodity specifically enumerated in section 1a(10) (or any option thereon) traded through its facilities if the rule amendment applies to contracts and delivery months which have already been listed for trading and have open interest.

"(C) DEADLINE.—If prior approval is requested under subparagraph (A), the Commission shall take final action on the request not later than 90 days after submission of the request, unless the person submitting the request agrees to an extension of the time limitation established under this subparagraph.

"(5) APPROVAL.—

"(A) RULES.—The Commission shall approve a new rule, or rule amendment, of a registered entity unless the Commission finds that the new rule, or rule amendment, is inconsistent with this subtitle (including regulations).

"(B) CONTRACTS AND INSTRUMENTS.—The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this Act (including regulations).

"(C) SPECIAL RULE FOR REVIEW AND APPROVAL OF EVENT CONTRACTS AND SWAPS CONTRACTS.—

"(i) EVENT CONTRACTS.—In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of

a commodity described in section 1a(2)(i)), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

"(I) activity that is unlawful under any Federal or State law;

"(II) terrorism;

"(III) assassination;

"(IV) war;

"(V) gaming; or

"(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

"(ii) PROHIBITION.—No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

"(iii) SWAPS CONTRACTS.—

"(I) IN GENERAL.—In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

Determination.

"(II) REQUIREMENTS.—Any such criteria, conditions, or rules shall consider—

"(aa) the financial integrity of the derivatives clearing organization; and

"(bb) any other factors which the Commission determines may be appropriate.

"(iv) DEADLINE.—The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.".

(c) VIOLATION OF CORE PRINCIPLES.—Section 5c of the Commodity Exchange Act (7 U.S.C. 7a–2) is amended by striking subsection (d).

## SEC. 746. INSIDER TRADING.

Section 4c(a) of the Commodity Exchange Act (7 U.S.C. 6c(a)) is amended by adding at the end the following:

"(3) CONTRACT OF SALE.—It shall be unlawful for any employee or agent of any department or agency of the Federal Government who, by virtue of the employment or position of the employee or agent, acquires information that may affect or tend to affect the price of any commodity in interstate commerce, or for future delivery, or any swap, and which information has not been disseminated by the department or agency of the Federal Government holding or creating the information in a manner which makes it generally available to the trading public, or disclosed in a criminal, civil, or

administrative hearing, or in a congressional, administrative, or Government Accountability Office report, hearing, audit, or investigation, to use the information in his personal capacity and for personal gain to enter into, or offer to enter into—

"(A) a contract of sale of a commodity for future delivery (or option on such a contract);

"(B) an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)); or

"(C) a swap.

"(4) NONPUBLIC INFORMATION.—

"(A) IMPARTING OF NONPUBLIC INFORMATION.—It shall be unlawful for any employee or agent of any department or agency of the Federal Government who, by virtue of the employment or position of the employee or agent, acquires information that may affect or tend to affect the price of any commodity in interstate commerce, or for future delivery, or any swap, and which information has not been disseminated by the department or agency of the Federal Government holding or creating the information in a manner which makes it generally available to the trading public, or disclosed in a criminal, civil, or administrative hearing, or in a congressional, administrative, or Government Accountability Office report, hearing, audit, or investigation, to impart the information in his personal capacity and for personal gain with intent to assist another person, directly or indirectly, to use the information to enter into, or offer to enter into—

"(i) a contract of sale of a commodity for future delivery (or option on such a contract);

"(ii) an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)); or

"(iii) a swap.

"(B) KNOWING USE.—It shall be unlawful for any person who receives information imparted by any employee or agent of any department or agency of the Federal Government as described in subparagraph (A) to knowingly use such information to enter into, or offer to enter into—

"(i) a contract of sale of a commodity for future delivery (or option on such a contract);

"(ii) an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)); or

"(iii) a swap.

"(C) THEFT OF NONPUBLIC INFORMATION.—It shall be unlawful for any person to steal, convert, or misappropriate, by any means whatsoever, information held or created by any department or agency of the Federal Government that may affect or tend to affect the price of any commodity in interstate commerce, or for future delivery, or any swap, where such person knows, or acts in reckless disregard of the fact, that such information has not been disseminated by the department or agency of the Federal Government

holding or creating the information in a manner which makes it generally available to the trading public, or disclosed in a criminal, civil, or administrative hearing, or in a congressional, administrative, or Government Accountability Office report, hearing, audit, or investigation, and to use such information, or to impart such information with the intent to assist another person, directly or indirectly, to use such information to enter into, or offer to enter into—

"(i) a contract of sale of a commodity for future delivery (or option on such a contract);

"(ii) an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)); or

"(iii) a swap, provided, however, that nothing in this subparagraph shall preclude a person that has provided information concerning, or generated by, the person, its operations or activities, to any employee or agent of any department or agency of the Federal Government, voluntarily or as required by law, from using such information to enter into, or offer to enter into, a contract of sale, option, or swap described in clauses (i), (ii), or (iii).".

## SEC. 747. ANTIDISRUPTIVE PRACTICES AUTHORITY.

Section 4c(a) of the Commodity Exchange Act (7 U.S.C. 6c(a)) (as amended by section 746) is amended by adding at the end the following:

"(5) DISRUPTIVE PRACTICES.—It shall be unlawful for any person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that—

"(A) violates bids or offers;

"(B) demonstrates intentional or reckless disregard for the orderly execution of transactions during the closing period; or

"(C) is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution).

"(6) RULEMAKING AUTHORITY.—The Commission may make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to prohibit the trading practices described in paragraph (5) and any other trading practice that is disruptive of fair and equitable trading.

"(7) USE OF SWAPS TO DEFRAUD.—It shall be unlawful for any person to enter into a swap knowing, or acting in reckless disregard of the fact, that its counterparty will use the swap as part of a device, scheme, or artifice to defraud any third party.".

## SEC. 748. COMMODITY WHISTLEBLOWER INCENTIVES AND PROTECTION.

The Commodity Exchange Act (7 U.S.C. 1 et seq.) is amended by adding at the end the following:

"SEC. 23. COMMODITY WHISTLEBLOWER INCENTIVES AND PROTECTION.          7 USC 26.

"(a) DEFINITIONS.—In this section:

"(1) COVERED JUDICIAL OR ADMINISTRATIVE ACTION.—The term 'covered judicial or administrative action' means any judicial or administrative action brought by the Commission under this Act that results in monetary sanctions exceeding $1,000,000.

"(2) FUND.—The term 'Fund' means the Commodity Futures Trading Commission Customer Protection Fund established under subsection (g).

"(3) MONETARY SANCTIONS.—The term 'monetary sanctions', when used with respect to any judicial or administrative action means—

"(A) any monies, including penalties, disgorgement, restitution, and interest ordered to be paid; and

"(B) any monies deposited into a disgorgement fund or other fund pursuant to section 308(b) of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(b)), as a result of such action or any settlement of such action.

"(4) ORIGINAL INFORMATION.—The term 'original information' means information that—

"(A) is derived from the independent knowledge or analysis of a whistleblower;

"(B) is not known to the Commission from any other source, unless the whistleblower is the original source of the information; and

"(C) is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information.

"(5) RELATED ACTION.—The term 'related action', when used with respect to any judicial or administrative action brought by the Commission under this Act, means any judicial or administrative action brought by an entity described in subclauses (I) through (VI) of subsection (h)(2)(C) that is based upon the original information provided by a whistleblower pursuant to subsection (a) that led to the successful enforcement of the Commission action.

"(6) SUCCESSFUL RESOLUTION.—The term 'successful resolution', when used with respect to any judicial or administrative action brought by the Commission under this Act, includes any settlement of such action.

"(7) WHISTLEBLOWER.—The term 'whistleblower' means any individual, or 2 or more individuals acting jointly, who provides information relating to a violation of this Act to the Commission, in a manner established by rule or regulation by the Commission.

"(b) AWARDS.—

Regulations.

"(1) IN GENERAL.—In any covered judicial or administrative action, or related action, the Commission, under regulations prescribed by the Commission and subject to subsection (c), shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action, in an aggregate amount equal to—

"(A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and

"(B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions.

"(2) PAYMENT OF AWARDS.—Any amount paid under paragraph (1) shall be paid from the Fund.

"(c) DETERMINATION OF AMOUNT OF AWARD; DENIAL OF AWARD.—

"(1) DETERMINATION OF AMOUNT OF AWARD.—

"(A) DISCRETION.—The determination of the amount of an award made under subsection (b) shall be in the discretion of the Commission.

"(B) CRITERIA.—In determining the amount of an award made under subsection (b), the Commission—

"(i) shall take into consideration—

"(I) the significance of the information provided by the whistleblower to the success of the covered judicial or administrative action;

"(II) the degree of assistance provided by the whistleblower and any legal representative of the whistleblower in a covered judicial or administrative action;

"(III) the programmatic interest of the Commission in deterring violations of the Act (including regulations under the Act) by making awards to whistleblowers who provide information that leads to the successful enforcement of such laws; and

"(IV) such additional relevant factors as the Commission may establish by rule or regulation; and

"(ii) shall not take into consideration the balance of the Fund.

"(2) DENIAL OF AWARD.—No award under subsection (b) shall be made—

"(A) to any whistleblower who is, or was at the time the whistleblower acquired the original information submitted to the Commission, a member, officer, or employee of—

"(i) a appropriate regulatory agency;

"(ii) the Department of Justice;

"(iii) a registered entity;

"(iv) a registered futures association;

"(v) a self-regulatory organization as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)); or

"(vi) a law enforcement organization;

"(B) to any whistleblower who is convicted of a criminal violation related to the judicial or administrative action for which the whistleblower otherwise could receive an award under this section;

"(C) to any whistleblower who submits information to the Commission that is based on the facts underlying the covered action submitted previously by another whistleblower;

"(D) to any whistleblower who fails to submit information to the Commission in such form as the Commission may, by rule or regulation, require.

"(d) REPRESENTATION.—

"(1) PERMITTED REPRESENTATION.—Any whistleblower who makes a claim for an award under subsection (b) may be represented by counsel.

"(2) REQUIRED REPRESENTATION.—

"(A) IN GENERAL.—Any whistleblower who anonymously makes a claim for an award under subsection (b) shall be represented by counsel if the whistleblower submits the information upon which the claim is based.

"(B) DISCLOSURE OF IDENTITY.—Prior to the payment of an award, a whistleblower shall disclose the identity of the whistleblower and provide such other information as the Commission may require, directly or through counsel for the whistleblower.

"(e) NO CONTRACT NECESSARY.—No contract with the Commission is necessary for any whistleblower to receive an award under subsection (b), unless otherwise required by the Commission, by rule or regulation.

"(f) APPEALS.—

"(1) IN GENERAL.—Any determination made under this section, including whether, to whom, or in what amount to make awards, shall be in the discretion of the Commission.

Deadline.

"(2) APPEALS.—Any determination described in paragraph (1) may be appealed to the appropriate court of appeals of the United States not more than 30 days after the determination is issued by the Commission.

"(3) REVIEW.—The court shall review the determination made by the Commission in accordance with section 7064 of title 5, United States Code.

"(g) COMMODITY FUTURES TRADING COMMISSION CUSTOMER PROTECTION FUND.—

"(1) ESTABLISHMENT.—There is established in the Treasury of the United States a revolving fund to be known as the 'Commodity Futures Trading Commission Customer Protection Fund'.

"(2) USE OF FUND.—The Fund shall be available to the Commission, without further appropriation or fiscal year limitation, for—

"(A) the payment of awards to whistleblowers as provided in subsection (a); and

"(B) the funding of customer education initiatives designed to help customers protect themselves against fraud or other violations of this Act, or the rules and regulations thereunder.

"(3) DEPOSITS AND CREDITS.—There shall be deposited into or credited to the Fund:

"(A) MONETARY SANCTIONS.—Any monetary sanctions collected by the Commission in any covered judicial or administrative action that is not otherwise distributed to victims of a violation of this Act or the rules and regulations thereunder underlying such action, unless the balance of the Fund at the time the monetary judgment is collected exceeds $100,000,000.

"(B) ADDITIONAL AMOUNTS.—If the amounts deposited into or credited to the Fund under subparagraph (A) are not sufficient to satisfy an award made under subsection (b), there shall be deposited into or credited to the Fund an amount equal to the unsatisfied portion of the award from any monetary sanction collected by the Commission in any judicial or administrative action brought by the Commission under this Act that is based on information provided by a whistleblower.

"(C) INVESTMENT INCOME.—All income from investments made under paragraph (4).

"(4) INVESTMENTS.—

"(A) AMOUNTS IN FUND MAY BE INVESTED.—The Commission may request the Secretary of the Treasury to invest the portion of the Fund that is not, in the Commission's judgment, required to meet the current needs of the Fund.

"(B) ELIGIBLE INVESTMENTS.—Investments shall be made by the Secretary of the Treasury in obligations of the United States or obligations that are guaranteed as to principal and interest by the United States, with maturities suitable to the needs of the Fund as determined by the Commission.

"(C) INTEREST AND PROCEEDS CREDITED.—The interest on, and the proceeds from the sale or redemption of, any obligations held in the Fund shall be credited to, and form a part of, the Fund.

"(5) REPORTS TO CONGRESS.—Not later than October 30 of each year, the Commission shall transmit to the Committee on Agriculture, Nutrition, and Forestry of the Senate, and the Committee on Agriculture of the House of Representatives a report on—

"(A) the Commission's whistleblower award program under this section, including a description of the number of awards granted and the types of cases in which awards were granted during the preceding fiscal year;

"(B) customer education initiatives described in paragraph (2)(B) that were funded by the Fund during the preceding fiscal year;

"(C) the balance of the Fund at the beginning of the preceding fiscal year;

"(D) the amounts deposited into or credited to the Fund during the preceding fiscal year;

"(E) the amount of earnings on investments of amounts in the Fund during the preceding fiscal year;

"(F) the amount paid from the Fund during the preceding fiscal year to whistleblowers pursuant to subsection (b);

"(G) the amount paid from the Fund during the preceding fiscal year for customer education initiatives described in paragraph (2)(B);

"(H) the balance of the Fund at the end of the preceding fiscal year; and

"(I) a complete set of audited financial statements, including a balance sheet, income statement, and cash flow analysis.

"(h) PROTECTION OF WHISTLEBLOWERS.—

"(1) PROHIBITION AGAINST RETALIATION.—

"(A) IN GENERAL.—No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower—

"(i) in providing information to the Commission in accordance with subsection (b); or

"(ii) in assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information.

"(B) ENFORCEMENT.—

"(i) CAUSE OF ACTION.—An individual who alleges discharge or other discrimination in violation of subparagraph (A) may bring an action under this subsection in the appropriate district court of the United States for the relief provided in subparagraph (C), unless the individual who is alleging discharge or other discrimination in violation of subparagraph (A) is an employee of the Federal Government, in which case the individual shall only bring an action under section 1221 of title 5, United States Code.

"(ii) SUBPOENAS.—A subpoena requiring the attendance of a witness at a trial or hearing conducted under this subsection may be served at any place in the United States.

"(iii) STATUTE OF LIMITATIONS.—An action under this subsection may not be brought more than 2 years after the date on which the violation reported in subparagraph (A) is committed.

"(C) RELIEF.—Relief for an individual prevailing in an action brought under subparagraph (B) shall include—

"(i) reinstatement with the same seniority status that the individual would have had, but for the discrimination;

"(ii) the amount of back pay otherwise owed to the individual, with interest; and

"(iii) compensation for any special damages sustained as a result of the discharge or discrimination, including litigation costs, expert witness fees, and reasonable attorney's fees.

"(2) CONFIDENTIALITY.—

"(A) IN GENERAL.—Except as provided in subparagraphs (B) and (C), the Commission, and any officer or employee of the Commission, shall not disclose any information, including information provided by a whistleblower to the Commission, which could reasonably be expected to reveal the identity of a whistleblower, except in accordance with the provisions of section 552a of title 5, United States Code, unless and until required to be disclosed to a defendant or respondent in connection with a public proceeding instituted by the Commission or any entity described in subparagraph (C). For purposes of section 552 of title 5, United States Code, this paragraph shall be considered a statute described in subsection (b)(3)(B) of such section 552.

"(B) EFFECT.—Nothing in this paragraph is intended to limit the ability of the Attorney General to present such evidence to a grand jury or to share such evidence with potential witnesses or defendants in the course of an ongoing criminal investigation.

"(C) AVAILABILITY TO GOVERNMENT AGENCIES.—

"(i) IN GENERAL.—Without the loss of its status as confidential in the hands of the Commission, all information referred to in subparagraph (A) may, in the discretion of the Commission, when determined by the Commission to be necessary or appropriate to accomplish the purposes of this Act and protect customers and in accordance with clause (ii), be made available to—

"(I) the Department of Justice;

"(II) an appropriate department or agency of the Federal Government, acting within the scope of its jurisdiction;

"(III) a registered entity, registered futures association, or self-regulatory organization as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a));

"(IV) a State attorney general in connection with any criminal investigation;

"(V) an appropriate department or agency of any State, acting within the scope of its jurisdiction; and

"(VI) a foreign futures authority.

"(ii) MAINTENANCE OF INFORMATION.—Each of the entities, agencies, or persons described in clause (i) shall maintain information described in that clause as confidential, in accordance with the requirements in subparagraph (A).

"(iii) STUDY ON IMPACT OF FOIA EXEMPTION ON COMMODITY FUTURES TRADING COMMISSION.—

"(I) STUDY.—The Inspector General of the Commission shall conduct a study—

"(aa) on whether the exemption under section 552(b)(3) of title 5, United States Code (known as the Freedom of Information Act) established in paragraph (2)(A) aids whistleblowers in disclosing information to the Commission;

"(bb) on what impact the exemption has had on the public's ability to access information about the Commission's regulation of commodity futures and option markets; and

"(cc) to make any recommendations on whether the Commission should continue to use the exemption.

"(II) REPORT.—Not later than 30 months after the date of enactment of this clause, the Inspector General shall—

"(aa) submit a report on the findings of the study required under this clause to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on

Financial Services of the House of Representatives; and

"(bb) make the report available to the public through publication of a report on the website of the Commission.

Public information. Web posting.

"(3) RIGHTS RETAINED.—Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any whistleblower under any Federal or State law, or under any collective bargaining agreement.

"(i) RULEMAKING AUTHORITY.—The Commission shall have the authority to issue such rules and regulations as may be necessary or appropriate to implement the provisions of this section consistent with the purposes of this section.

"(j) IMPLEMENTING RULES.—The Commission shall issue final rules or regulations implementing the provisions of this section not later than 270 days after the date of enactment of the Wall Street Transparency and Accountability Act of 2010.

Deadline.

"(k) ORIGINAL INFORMATION.—Information submitted to the Commission by a whistleblower in accordance with rules or regulations implementing this section shall not lose its status as original information solely because the whistleblower submitted such information prior to the effective date of such rules or regulations, provided such information was submitted after the date of enactment of the Wall Street Transparency and Accountability Act of 2010.

"(l) AWARDS.—A whistleblower may receive an award pursuant to this section regardless of whether any violation of a provision of this Act, or a rule or regulation thereunder, underlying the judicial or administrative action upon which the award is based occurred prior to the date of enactment of the Wall Street Transparency and Accountability Act of 2010.

"(m) PROVISION OF FALSE INFORMATION.—A whistleblower who knowingly and willfully makes any false, fictitious, or fraudulent statement or representation, or who makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall not be entitled to an award under this section and shall be subject to prosecution under section 1001 of title 18, United States Code.

"(n) NONENFORCEABILITY OF CERTAIN PROVISIONS WAIVING RIGHTS AND REMEDIES OR REQUIRING ARBITRATION OF DISPUTES.—

"(1) WAIVER OF RIGHTS AND REMEDIES.—The rights and remedies provided for in this section may not be waived by any agreement, policy form, or condition of employment including by a predispute arbitration agreement.

"(2) PREDISPUTE ARBITRATION AGREEMENTS.—No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section.".

## SEC. 749. CONFORMING AMENDMENTS.

(a) Section 4d of the Commodity Exchange Act (7 U.S.C. 6d) (as amended by section 724) is amended—

(1) in subsection (a)—

(A) in the matter preceding paragraph (1)—

(i) by striking "engage as" and inserting "be a"; and

(ii) by striking "or introducing broker" and all that follows through "or derivatives transaction execution facility";

(B) in paragraph (1), by striking "or introducing broker"; and

(C) in paragraph (2), by striking "if a futures commission merchant,"; and

(2) by adding at the end the following:

"(g) It shall be unlawful for any person to be an introducing broker unless such person shall have registered under this Act with the Commission as an introducing broker and such registration shall not have expired nor been suspended nor revoked.".

(b) Section 4m(3) of the Commodity Exchange Act (7 U.S.C. 6m(3)) is amended—

(1) by striking "(3) Subsection (1) of this section" and inserting the following:

"(3) EXCEPTION.—

"(A) IN GENERAL.—Paragraph (1)"; and

(2) by striking "to any investment trust" and all that follows through the period at the end and inserting the following: "to any commodity pool that is engaged primarily in trading commodity interests.

"(B) ENGAGED PRIMARILY.—For purposes of subparagraph (A), a commodity trading advisor or a commodity pool shall be considered to be 'engaged primarily' in the business of being a commodity trading advisor or commodity pool if it is or holds itself out to the public as being engaged primarily, or proposes to engage primarily, in the business of advising on commodity interests or investing, reinvesting, owning, holding, or trading in commodity interests, respectively.

"(C) COMMODITY INTERESTS.—For purposes of this paragraph, commodity interests shall include contracts of sale of a commodity for future delivery, options on such contracts, security futures, swaps, leverage contracts, foreign exchange, spot and forward contracts on physical commodities, and any monies held in an account used for trading commodity interests.".

(c) Section 5c of the Commodity Exchange Act (7 U.S.C. 7a–2) is amended—

(1) in subsection (a)(1)—

(A) by striking ", 5a(d),"; and

(B) by striking "and section (2)(h)(7) with respect to significant price discovery contracts,"; and

(2) in subsection (f)(1), by striking "section 4d(c) of this Act" and inserting "section 4d(e)".

(d) Section 5e of the Commodity Exchange Act (7 U.S.C. 7b) is amended by striking "or revocation of the right of an electronic trading facility to rely on the exemption set forth in section 2(h)(3) with respect to a significant price discovery contract,".

(e) Section 6(b) of the Commodity Exchange Act (7 U.S.C. 8(b)) is amended in the first sentence by striking ", or to revoke the right of an electronic trading facility to rely on the exemption set forth in section 2(h)(3) with respect to a significant price discovery contract,".

(f) Section 12(e)(2)(B) of the Commodity Exchange Act (7 U.S.C. 16(e)(2)(B)) is amended—

(1) by striking "section 2(c), 2(d), 2(f), or 2(g) of this Act" and inserting "section 2(c) or 2(f) of this Act"; and

(2) by striking "2(h) or".

(g) Section 17(r)(1) of the Commodity Exchange Act (7 U.S.C. 21(r)(1)) is amended by striking "section 4d(c) of this Act" and inserting "section 4d(e)".

7 USC 25.

(h) Section 22 of the Commodity Exchange Act is amended—

(1) in subsection (a)(1)(B), by—

(A) inserting "or any swap" after "commodity)"; and

(B) inserting "or any swap" after "such contract";

(2) in subsection (a)(1)(C), by adding at the end the following:

"(iv) a swap; or"; and

(3) in subsection (b)(1)(A), by striking "section 2(h)(7) or sections 5 through 5c" and inserting "section 5, 5b, 5c, 5h, or 21".

(i) Section 408(2)(C) of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 4421(2)(C)) is amended—

(1) by striking "section 2(c), 2(d), 2(f), or (2)(g) of such Act" and inserting "section 2(c), 2(f), or 2(i) of that Act"; and

(2) by striking "2(h) or".

## SEC. 750. STUDY ON OVERSIGHT OF CARBON MARKETS.

Establishment.

(a) INTERAGENCY WORKING GROUP.—There is established to carry out this section an interagency working group (referred to in this section as the "interagency group") composed of the following members or designees:

(1) The Chairman of the Commodity Futures Trading Commission (referred to in this section as the "Commission"), who shall serve as Chairman of the interagency group.

(2) The Secretary of Agriculture.

(3) The Secretary of the Treasury.

(4) The Chairman of the Securities and Exchange Commission.

(5) The Administrator of the Environmental Protection Agency.

(6) The Chairman of the Federal Energy Regulatory Commission.

(7) The Commissioner of the Federal Trade Commission.

(8) The Administrator of the Energy Information Administration.

(b) ADMINISTRATIVE SUPPORT.—The Commission shall provide the interagency group such administrative support services as are necessary to enable the interagency group to carry out the functions of the interagency group under this section.

(c) CONSULTATION.—In carrying out this section, the interagency group shall consult with representatives of exchanges, clearinghouses, self-regulatory bodies, major carbon market participants, consumers, and the general public, as the interagency group determines to be appropriate.

(d) STUDY.—The interagency group shall conduct a study on the oversight of existing and prospective carbon markets to ensure an efficient, secure, and transparent carbon market, including oversight of spot markets and derivative markets.

(e) REPORT.—Not later than 180 days after the date of enactment of this Act, the interagency group shall submit to Congress a report on the results of the study conducted under subsection

(b), including recommendations for the oversight of existing and prospective carbon markets to ensure an efficient, secure, and transparent carbon market, including oversight of spot markets and derivative markets.

### SEC. 751. ENERGY AND ENVIRONMENTAL MARKETS ADVISORY COMMITTEE.

Section 2(a) of the Commodity Exchange Act (7 U.S.C. 2(a)) (as amended by section 727) is amended by adding at the end the following:

"(15) ENERGY AND ENVIRONMENTAL MARKETS ADVISORY COMMITTEE.—

"(A) ESTABLISHMENT.—

"(i) IN GENERAL.—An Energy and Environmental Markets Advisory Committee is hereby established.

"(ii) MEMBERSHIP.—The Committee shall have 9 members.

"(iii) ACTIVITIES.—The Committee's objectives and scope of activities shall be—

"(I) to conduct public meetings;

"(II) to submit reports and recommendations to the Commission (including dissenting or minority views, if any); and

"(III) otherwise to serve as a vehicle for discussion and communication on matters of concern to exchanges, firms, end users, and regulators regarding energy and environmental markets and their regulation by the Commission.

"(B) REQUIREMENTS.—

"(i) IN GENERAL.—The Committee shall hold public meetings at such intervals as are necessary to carry out the functions of the Committee, but not less frequently than 2 times per year.

"(ii) MEMBERS.—Members shall be appointed to 3-year terms, but may be removed for cause by vote of the Commission.

"(C) APPOINTMENT.—The Commission shall appoint members with a wide diversity of opinion and who represent a broad spectrum of interests, including hedgers and consumers.

"(D) REIMBURSEMENT.—Members shall be entitled to per diem and travel expense reimbursement by the Commission.

"(E) FACA.—The Committee shall not be subject to the Federal Advisory Committee Act (5 U.S.C. App.).".

*Public meetings.*

### SEC. 752. INTERNATIONAL HARMONIZATION.

(a) In order to promote effective and consistent global regulation of swaps and security-based swaps, the Commodity Futures Trading Commission, the Securities and Exchange Commission, and the prudential regulators (as that term is defined in section 1a(39) of the Commodity Exchange Act), as appropriate, shall consult and coordinate with foreign regulatory authorities on the establishment of consistent international standards with respect to the regulation (including fees) of swaps, security-based swaps, swap entities, and security-based swap entities and may agree to such information-sharing arrangements as may be deemed to be necessary or

*Consultation.*
*Standards.*
*15 USC 8325.*
*Securities.*

appropriate in the public interest or for the protection of investors, swap counterparties, and security-based swap counterparties.

Contracts.

(b) In order to promote effective and consistent global regulation of contracts of sale of a commodity for future delivery and options on such contracts, the Commodity Futures Trading Commission shall consult and coordinate with foreign regulatory authorities on the establishment of consistent international standards with respect to the regulation of contracts of sale of a commodity for future delivery and options on such contracts, and may agree to such information-sharing arrangements as may be deemed necessary or appropriate in the public interest for the protection of users of contracts of sale of a commodity for future delivery.

## SEC. 753. ANTI-MANIPULATION AUTHORITY.

(a) PROHIBITION REGARDING MANIPULATION AND FALSE INFORMATION.—Subsection (c) of section 6 of the Commodity Exchange Act (7 U.S.C. 9, 15) is amended to read as follows:

"(c) PROHIBITION REGARDING MANIPULATION AND FALSE INFORMATION.—

Regulations.
Deadline.

"(1) PROHIBITION AGAINST MANIPULATION.—It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.

"(A) SPECIAL PROVISION FOR MANIPULATION BY FALSE REPORTING.—Unlawful manipulation for purposes of this paragraph shall include, but not be limited to, delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

"(B) EFFECT ON OTHER LAW.—Nothing in this paragraph shall affect, or be construed to affect, the applicability of section 9(a)(2).

"(C) GOOD FAITH MISTAKES.—Mistakenly transmitting, in good faith, false or misleading or inaccurate information to a price reporting service would not be sufficient to violate subsection (c)(1)(A).

"(2) PROHIBITION REGARDING FALSE INFORMATION.—It shall be unlawful for any person to make any false or misleading statement of a material fact to the Commission, including in any registration application or any report filed with the

Commission under this Act, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

"(3) OTHER MANIPULATION.—In addition to the prohibition in paragraph (1), it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.

"(4) ENFORCEMENT.—

"(A) AUTHORITY OF COMMISSION.—If the Commission has reason to believe that any person (other than a registered entity) is violating or has violated this subsection, or any other provision of this Act (including any rule, regulation, or order of the Commission promulgated in accordance with this subsection or any other provision of this Act), the Commission may serve upon the person a complaint.

"(B) CONTENTS OF COMPLAINT.—A complaint under subparagraph (A) shall—

"(i) contain a description of the charges against the person that is the subject of the complaint; and

"(ii) have attached or contain a notice of hearing that specifies the date and location of the hearing regarding the complaint.

"(C) HEARING.—A hearing described in subparagraph (B)(ii)—

"(i) shall be held not later than 3 days after service of the complaint described in subparagraph (A); [Deadline.]

"(ii) shall require the person to show cause regarding why—

"(I) an order should not be made—

"(aa) to prohibit the person from trading on, or subject to the rules of, any registered entity; and

"(bb) to direct all registered entities to refuse all privileges to the person until further notice of the Commission; and

"(II) the registration of the person, if registered with the Commission in any capacity, should not be suspended or revoked; and

"(iii) may be held before—

"(I) the Commission; or

"(II) an administrative law judge designated by the Commission, under which the administrative law judge shall ensure that all evidence is recorded in written form and submitted to the Commission. [Records.]

"(5) SUBPOENA.—For the purpose of securing effective enforcement of the provisions of this Act, for the purpose of any investigation or proceeding under this Act, and for the purpose of any action taken under section 12(f), any member

of the Commission or any Administrative Law Judge or other officer designated by the Commission (except as provided in paragraph (7)) may administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records that the Commission deems relevant or material to the inquiry.

"(6) WITNESSES.—The attendance of witnesses and the production of any such records may be required from any place in the United States, any State, or any foreign country or jurisdiction at any designated place of hearing.

"(7) SERVICE.—A subpoena issued under this section may be served upon any person who is not to be found within the territorial jurisdiction of any court of the United States in such manner as the Federal Rules of Civil Procedure prescribe for service of process in a foreign country, except that a subpoena to be served on a person who is not to be found within the territorial jurisdiction of any court of the United States may be issued only on the prior approval of the Commission.

"(8) REFUSAL TO OBEY.—In case of contumacy by, or refusal to obey a subpoena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction in which the investigation or proceeding is conducted, or where such person resides or transacts business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. Such court may issue an order requiring such person to appear before the Commission or member or Administrative Law Judge or other officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question.

"(9) FAILURE TO OBEY.—Any failure to obey such order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in the judicial district wherein such person is an inhabitant or transacts business or wherever such person may be found.

"(10) EVIDENCE.—On the receipt of evidence under paragraph (4)(C)(iii), the Commission may—

"(A) prohibit the person that is the subject of the hearing from trading on, or subject to the rules of, any registered entity and require all registered entities to refuse the person all privileges on the registered entities for such period as the Commission may require in the order;

"(B) if the person is registered with the Commission in any capacity, suspend, for a period not to exceed 180 days, or revoke, the registration of the person;

"(C) assess such person—

"(i) a civil penalty of not more than an amount equal to the greater of—

"(I) $140,000; or

"(II) triple the monetary gain to such person for each such violation; or

"(ii) in any case of manipulation or attempted manipulation in violation of this subsection or section

9(a)(2), a civil penalty of not more than an amount equal to the greater of—

"(I) $1,000,000; or

"(II) triple the monetary gain to the person for each such violation; and

"(D) require restitution to customers of damages proximately caused by violations of the person.

"(11) ORDERS.—

"(A) NOTICE.—The Commission shall provide to a person described in paragraph (10) and the appropriate governing board of the registered entity notice of the order described in paragraph (10) by—

"(i) registered mail;

"(ii) certified mail; or

"(iii) personal delivery.

"(B) REVIEW.—

"(i) IN GENERAL.—A person described in paragraph (10) may obtain a review of the order or such other equitable relief as determined to be appropriate by a court described in clause (ii).

"(ii) PETITION.—To obtain a review or other relief under clause (i), a person may, not later than 15 days after notice is given to the person under clause (i), file a written petition to set aside the order with the United States Court of Appeals—

"(I) for the circuit in which the petitioner carries out the business of the petitioner; or

"(II) in the case of an order denying registration, the circuit in which the principal place of business of the petitioner is located, as listed on the application for registration of the petitioner.

"(C) PROCEDURE.—

Records.

"(i) DUTY OF CLERK OF APPROPRIATE COURT.—The clerk of the appropriate court under subparagraph (B)(ii) shall transmit to the Commission a copy of a petition filed under subparagraph (B)(ii).

"(ii) DUTY OF COMMISSION.—In accordance with section 2112 of title 28, United States Code, the Commission shall file in the appropriate court described in subparagraph (B)(ii) the record theretofore made.

"(iii) JURISDICTION OF APPROPRIATE COURT.—Upon the filing of a petition under subparagraph (B)(ii), the appropriate court described in subparagraph (B)(ii) may affirm, set aside, or modify the order of the Commission.".

(b) CEASE AND DESIST ORDERS, FINES.—Section 6(d) of the Commodity Exchange Act (7 U.S.C. 13b) is amended to read as follows:

"(d) If any person (other than a registered entity), is violating    Penalty.
or has violated subsection (c) or any other provisions of this Act or of the rules, regulations, or orders of the Commission thereunder, the Commission may, upon notice and hearing, and subject to appeal as in other cases provided for in subsection (c), make and enter an order directing that such person shall cease and desist therefrom and, if such person thereafter and after the lapse of the period allowed for appeal of such order or after the affirmance

of such order, shall knowingly fail or refuse to obey or comply with such order, such person, upon conviction thereof, shall be fined not more than the higher of $140,000 or triple the monetary gain to such person, or imprisoned for not more than 1 year, or both, except that if such knowing failure or refusal to obey or comply with such order involves any offense within subsection (a) or (b) of section 9, such person, upon conviction thereof, shall be subject to the penalties of said subsection (a) or (b): *Provided*, That any such cease and desist order under this subsection against any respondent in any case of manipulation shall be issued only in conjunction with an order issued against such respondent under subsection (c).".

(c) MANIPULATIONS; PRIVATE RIGHTS OF ACTION.—Section 22(a)(1) of the Commodity Exchange Act (7 U.S.C. 25(a)(1)) is amended by striking subparagraph (D) and inserting the following:

"(D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes—

"(i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act; or

"(ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.".

7 USC 9 note.        (d) EFFECTIVE DATE.—

(1) The amendments made by this section shall take effect on the date on which the final rule promulgated by the Commodity Futures Trading Commission pursuant to this Act takes effect.

(2) Paragraph (1) shall not preclude the Commission from undertaking prior to the effective date any rulemaking necessary to implement the amendments contained in this section.

7 USC 7a note.        **SEC. 754. EFFECTIVE DATE.**

Unless otherwise provided in this title, the provisions of this subtitle shall take effect on the later of 360 days after the date of the enactment of this subtitle or, to the extent a provision of this subtitle requires a rulemaking, not less than 60 days after publication of the final rule or regulation implementing such provision of this subtitle.

# Subtitle B—Regulation of Security-Based Swap Markets

**SEC. 761. DEFINITIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934.**

(a) DEFINITIONS.—Section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)) is amended—

# EXHIBIT B



**COMMODITY FUTURES TRADING COMMISSION**

**17 CFR Part 23**

**RIN 3038–AE84**

**Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Final rule.

**SUMMARY:** The Commodity Futures Trading Commission ("Commission" or "CFTC") is adopting a final rule ("Final Rule") addressing the cross-border application of certain swap provisions of the Commodity Exchange Act ("CEA or "Act"), as added by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). The Final Rule addresses the cross-border application of the registration thresholds and certain requirements applicable to swap dealers ("SDs") and major swap participants ("MSPs"), and establishes a formal process for requesting comparability determinations for such requirements from the Commission. The Final Rule adopts a risk-based approach that, consistent with the applicable section of the CEA, and with due consideration of international comity principles and the Commission's interest in focusing its authority on potential significant risks to the U.S. financial system, advances the goals of the Dodd-Frank Act's swap reforms, while fostering greater liquidity and competitive markets, promoting enhanced regulatory cooperation, and improving the global harmonization of swap regulation.

**DATES:** The Final Rule is effective November 13, 2020. Specific compliance dates are set forth in the Final Rule.

**FOR FURTHER INFORMATION CONTACT:** Joshua Sterling, Director, (202) 418–6056, *jsterling@cftc.gov;* Frank Fisanich, Chief Counsel, (202) 418–5949, *ffisanich@cftc.gov;* Amanda Olear, Deputy Director, (202) 418–5283, *aolear@cftc.gov;* Rajal Patel, Associate Director, 202–418–5261, *rpatel@cftc.gov;* Lauren Bennett, Special Counsel, 202–418–5290, *lbennett@cftc.gov;* Jacob Chachkin, Special Counsel, (202) 418–5496, *jchachkin@cftc.gov;* or Owen Kopon, Special Counsel, *okopon@cftc.gov,* 202–418–5360, Division of Swap Dealer and Intermediary Oversight ("DSIO"), Commodity Futures Trading Commission, Three Lafayette Centre,

1155 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
  A. Statutory Authority and Prior Commission Action
  B. Proposed Rule and Brief Summary of Comments Received
  C. Global Regulatory and Market Structure
  D. Interpretation of CEA Section 2(i)
    1. Proposed Rule and Discussion of Comments
    2. Final Interpretation
  E. Final Rule
II. Key Definitions
  A. Reliance on Representations—Generally
  B. U.S. Person, Non-U.S. Person, and United States
    1. Generally
    2. Prongs
    3. Principal Place of Business
    4. Exception for International Financial Institutions
    5. Reliance on Prior Representations
    6. Other
  C. Guarantee
    1. Proposed Rule
    2. Summary of Comments
    3. Final Rule
  D. Significant Risk Subsidiary, Significant Subsidiary, Subsidiary, Parent Entity, and U.S. GAAP
    1. Proposed Rule
    2. Summary of Comments
    3. Final Rule and Commission Response
  E. Foreign Branch and Swap Conducted Through a Foreign Branch
    1. Proposed Rule
    2. Summary of Comments
    3. Final Rule and Commission Response
  F. Swap Entity, U.S. Swap Entity, and Non-U.S. Swap Entity
  G. U.S. Branch
  H. Swap Conducted Through a U.S. Branch
    1. Proposed Rule
    2. Summary of Comments
    3. Final Rule—Swap Booked in a U.S. Branch
  I. Foreign-Based Swap and Foreign Counterparty
    1. Proposed Rule
    2. Summary of Comments
    3. Final Rule
III. Cross-Border Application of the Swap Dealer Registration Threshold
  A. U.S. Persons
  B. Non-U.S. Persons
    1. Swaps by a Significant Risk Subsidiary
    2. Swaps With a U.S. Person
    3. Guaranteed Swaps
  C. Aggregation Requirement
  D. Certain Exchange-Traded and Cleared Swaps
IV. Cross-Border Application of the Major Swap Participant Registration Tests
  A. U.S. Persons
  B. Non-U.S. Persons
    1. Swaps by a Significant Risk Subsidiary
    2. Swap Positions With a U.S. Person
    3. Guaranteed Swap Positions
  C. Attribution Requirement

  D. Certain Exchange-Traded and Cleared Swaps
V. ANE Transactions
  A. Background and Proposed Approach
  B. Summary of Comments
  C. Commission Determination
VI. Exceptions From Group B and Group C Requirements, Substituted Compliance for Group A and Group B Requirements, and Comparability Determinations
  A. Classification and Application of Certain Regulatory Requirements—Group A, Group B, and Group C Requirements
    1. Group A Requirements
    2. Group B Requirements
    3. Group C Requirements
  B. Exceptions From Group B and Group C Requirements
    1. Proposed Exceptions, Generally
    2. Exchange-Traded Exception
    3. Foreign Swap Group C Exception
    4. Limited Foreign Branch Group B Exception
    5. Non-U.S. Swap Entity Group B Exception
  C. Substituted Compliance
    1. Proposed Rule
    2. Summary of Comments
    3. Final Rule
  D. Comparability Determinations
    1. Standard of Review
    2. Supervision of Swap Entities Relying on Substituted Compliance
    3. Effect on Existing Comparability Determinations
    4. Eligibility Requirements
    5. Submission Requirements
VII. Recordkeeping
VIII. Other Comments
IX. Compliance Dates and Transition Issues
  A. Summary of Comments
  B. Commission Determination
X. Related Matters
  A. Regulatory Flexibility Act
  B. Paperwork Reduction Act
  C. Cost-Benefit Considerations
    1. Benefits
    2. Assessment Costs
    3. Cross-Border Application of the SD Registration Threshold
    4. Cross-Border Application of the MSP Registration Thresholds
    5. Monitoring Costs
    6. Registration Costs
    7. Programmatic Costs
    8. Exceptions From Group B and Group C Requirements, Availability of Substituted Compliance, and Comparability Determinations
    9. Recordkeeping
    10. Alternatives Considered
    11. Section 15(a) Factors
  D. Antitrust Laws
XI. Preamble Summary Tables
  A. Table A—Cross-Border Application of the SD De Minimis Threshold
  B. Table B—Cross-Border Application of the MSP Threshold
  C. Table C—Cross-Border Application of the Group B Requirements in Consideration of Related Exceptions and Substituted Compliance
  D. Table D—Cross-Border Application of the Group C Requirements in Consideration of Related Exceptions

## I. Background

*A. Statutory Authority and Prior Commission Action*

In 2010, the Dodd-Frank Act[1] amended the CEA[2] to, among other things, establish a new regulatory framework for swaps. Added in the wake of the 2008 financial crisis, the Dodd-Frank Act was enacted to reduce systemic risk, increase transparency, and promote market integrity within the financial system. Given the global nature of the swap market, the Dodd-Frank Act amended the CEA by adding section 2(i) to provide that the swap provisions of the CEA enacted by Title VII of the Dodd-Frank Act ("Title VII"), including any rule prescribed or regulation promulgated under the CEA, shall not apply to activities outside the United States ("U.S.") unless those activities have a direct and significant connection with activities in, or effect on, commerce of the United States, or they contravene Commission rules or regulations as are necessary or appropriate to prevent evasion of the swap provisions of the CEA enacted under Title VII.[3]

In May 2012, the CFTC and Securities and Exchange Commission ("SEC") jointly issued an adopting release that, among other things, further defined and provided registration thresholds for SDs and MSPs in § 1.3 of the CFTC's regulations ("Entities Rule").[4]

In July 2013, the Commission published interpretive guidance and a policy statement regarding the cross-border application of certain swap provisions of the CEA ("Guidance").[5] The Guidance included the Commission's interpretation of the "direct and significant" prong of section 2(i) of the CEA.[6] In addition, the Guidance established a general, non-binding framework for the cross-border application of many substantive Dodd-Frank Act requirements, including registration and business conduct requirements for SDs and MSPs, as well as a process for making substituted compliance determinations. Given the

complex and dynamic nature of the global swap market, the Guidance was intended to be a flexible and efficient way to provide the Commission's views on cross-border issues raised by market participants, allowing the Commission to adapt in response to changes in the global regulatory and market landscape.[7] The Commission accordingly stated that it would review and modify its cross-border policies as the global swap market continued to evolve and consider codifying the cross-border application of the Dodd-Frank Act swap provisions in future rulemakings, as appropriate.[8] At the time that it adopted the Guidance, the Commission was tasked with regulating a market that grew to a global scale without any meaningful regulation in the United States or overseas, and the United States was the first member country of the Group of 20 ("G20") to adopt most of the swap reforms agreed to at the G20 Pittsburgh Summit in 2009.[9] Developing a regulatory framework to fit that market necessarily requires adapting and responding to changes in the global market, including developments resulting from requirements imposed on market participants under the Dodd-Frank Act and the Commission's implementing regulations in the U.S., as well as those that have been imposed by non-U.S. regulatory authorities since the Guidance was issued.

On November 14, 2013, DSIO issued a staff advisory ("ANE Staff Advisory") stating that a non-U.S. SD that regularly uses personnel or agents located in the United States to arrange, negotiate, or execute a swap with a non-U.S. person ("ANE Transactions") would generally be required to comply with "Transaction-Level Requirements," as the term was used in the Guidance (discussed in section V.A).[10] On November 26, 2013, Commission staff issued certain no-action relief to non-U.S. SDs registered with the Commission from these requirements in connection with ANE Transactions

("ANE No-Action Relief").[11] In January 2014, the Commission published a request for comment on all aspects of the ANE Staff Advisory ("ANE Request for Comment").[12]

In May 2016, the Commission issued a final rule on the cross-border application of the Commission's margin requirements for uncleared swaps ("Cross-Border Margin Rule").[13] Among other things, the Cross-Border Margin Rule addressed the availability of substituted compliance by outlining the circumstances under which certain SDs and MSPs could satisfy the Commission's margin requirements for uncleared swaps by complying with comparable foreign margin requirements. The Cross-Border Margin Rule also established a framework by which the Commission assesses whether a foreign jurisdiction's margin requirements are comparable.

In October 2016, the Commission proposed regulations regarding the cross-border application of certain requirements under the Dodd-Frank Act regulatory framework for SDs and MSPs ("2016 Proposal").[14] The 2016 Proposal incorporated various aspects of the Cross-Border Margin Rule and addressed when U.S. and non-U.S. persons, such as foreign consolidated subsidiaries ("FCSs") and non-U.S. persons whose swap obligations are guaranteed by a U.S. person, would be required to include swaps or swap positions in their SD or MSP registration threshold calculations, respectively.[15] The 2016 Proposal also addressed the extent to which SDs and MSPs would be required to comply with the Commission's business conduct standards governing their conduct with swap counterparties ("external business conduct standards") in cross-border

---

[1] Public Law 111–203, 124 Stat. 1376 (2010).

[2] 7 U.S.C. 1 *et seq.*

[3] 7 U.S.C. 2(i).

[4] *See* 17 CFR 1.3; "Swap dealer" and "Major swap participant"; Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," 77 FR 30596 (May 23, 2012). Commission regulations referred to herein are found at 17 CFR chapter I.

[5] *See* Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 FR 45292 (Jul. 26, 2013).

[6] *Id.* at 45297–45301. The Commission is now restating this interpretation, as discussed in section I.D.2 *infra.*

[7] *Id.* at 45297 n.39.

[8] *See id.*

[9] *See* G20 Leaders' Statement: The Pittsburgh Summit, A Framework for Strong, Sustainable, and Balanced Growth (Sep. 24–25, 2009), *available at https://www.treasury.gov/resource-center/international/g7-g20/Documents/pittsburgh_summit_leaders_statement_250909.pdf.*

[10] *See* CFTC Staff Advisory No. 13–69, Applicability of Transaction-Level Requirements to Activity in the United States (Nov. 14, 2013), *available at http://www.cftc.gov/idc/groups/public/@lrlettergeneral/documents/letter/13-69.pdf.* All Commission staff letters are available at *https://www.cftc.gov/LawRegulation/CFTCStaffLetters/index.htm.*

[11] CFTC Staff Letter No. 13–71, No-Action Relief: Certain Transaction-Level Requirements for Non-U.S. Swap Dealers (Nov. 26, 2013), *available at https://www.cftc.gov/csl/13-71/download.* Commission staff subsequently extended this relief in CFTC Letter Nos. 14–01, 14–74, 14–140, 15–48, 16–64, and 17–36.

[12] Request for Comment on Application of Commission Regulations to Swaps Between Non-U.S. Swap Dealers and Non-U.S. Counterparties Involving Personnel or Agents of the Non-U.S. Swap Dealers Located in the United States, 79 FR 1347, 1348–49 (Jan. 8, 2014).

[13] Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants—Cross-Border Application of the Margin Requirements, 81 FR 34818 (May 31, 2016).

[14] Cross-Border Application of the Registration Thresholds and External Business Conduct Standards Applicable to Swap Dealers and Major Swap Participants, 81 FR 71946 (proposed Oct. 18, 2016).

[15] *Id.* at 71947. As noted above, the SD and MSP registration thresholds are codified in the definitions of those terms at 17 CFR 1.3.

transactions.[16] In addition, the 2016 Proposal addressed ANE Transactions, including the types of activities that would constitute arranging, negotiating, and executing within the context of the 2016 Proposal, the treatment of such transactions with respect to the SD registration threshold, and the application of external business conduct standards with respect to such transactions.[17]

## B. Proposed Rule and Brief Summary of Comments Received

In January 2020, the Commission published a notice of proposed rulemaking ("Proposed Rule"), which proposed to: (1) Address the cross-border application of the registration thresholds and certain requirements applicable to SDs and MSPs; and (2) establish a formal process for requesting comparability determinations for such requirements from the Commission.[18] In the Proposed Rule, the Commission also withdrew the 2016 Proposal, stating that the Proposed Rule reflected the Commission's current views on the matters addressed in the 2016 Proposal, which had evolved since the 2016 Proposal as a result of market and regulatory developments in the swap markets and in the interest of international comity.[19] The Commission requested comments generally on all aspects of the Proposed Rule and on many specific questions.

The Commission received 18 relevant comment letters.[20] Though AFR and IATP did not support the Commission adopting the Proposed Rule in its entirety, most commenters were supportive of the Proposed Rule, generally, or supportive of specific elements of the Proposed Rule. However, many of these commenters suggested modifications to portions of the Proposed Rule, which are discussed in the relevant sections discussing the Final Rule below. In addition, several commenters requested Commission action beyond the scope of the Proposed Rule.[21] Further, IIB/SIFMA requested that the Commission re-visit in the Final Rule the applicability of the Commission's cross-border uncleared swap margin requirements that were addressed in the Cross-Border Margin Rule. The Commission addressed those requirements in the Cross-Border Margin Rule, did not propose modifying them in the Proposed Rule, and therefore is not making any changes to the Cross-Border Margin Rule in this Final Rule.

## C. Global Regulatory and Market Structure

As noted in the Proposed Rule, the regulatory landscape is far different now than it was when the Dodd-Frank Act was enacted in 2010.[22] When the CFTC published the Guidance in 2013, very few jurisdictions had made significant progress in implementing the global swap reforms to which the G20 leaders agreed at the Pittsburgh G20 Summit. Today, however, as a result of the cumulative implementation efforts by regulators throughout the world, significant progress has been made in the world's primary swap trading jurisdictions to implement the G20 commitments.[23] Since the enactment of the Dodd-Frank Act, regulators in a number of large developed markets have adopted regulatory regimes that are designed to mitigate systemic risks associated with a global swap market. These regimes include central clearing requirements, margin requirements for non-cleared derivatives, and other risk mitigation requirements.[24]

Many swaps involve at least one counterparty that is located in the United States or another jurisdiction that has adopted comprehensive swap regulations.[25] Conflicting and duplicative requirements between U.S. and foreign regimes can contribute to potential market inefficiencies and regulatory arbitrage, as well as competitive disparities that undermine the relative positions of U.S. SDs and their counterparties. This may result in market fragmentation, which can lead to significant inefficiencies that result in additional costs to end-users and other market participants. Market fragmentation can also reduce the capacity of financial firms to serve both domestic and international customers.[26] The Final Rule supports a cross-border framework that promotes the integrity, resilience, and vibrancy of the swap market while furthering the important policy goals of the Dodd-Frank Act. In that regard, it is important to consider how market practices have evolved since the publication of the Guidance. As certain market participants may have conformed their practices to the Guidance, the Final Rule will ideally cause limited additional costs and burdens for these market participants, while supporting the continued operation of markets that are much more comprehensively regulated than they were before the Dodd-Frank Act and the actions of governments worldwide taken in response to the Pittsburgh G20 Summit.

The approach described below is informed by the Commission's understanding of current market practices of global financial institutions under the Guidance. For business and regulatory reasons, a financial group that is active in the swap market often operates in multiple market centers around the world and carries out swap activity with geographically-diverse counterparties using a number of different operational structures.[27]

---

[16] *Id.* The Commission's external business conduct standards are codified in 17 CFR part 23, subpart H (17 CFR 23.400 through 23.451).

[17] 2016 Proposal, 81 FR at 71947.

[18] Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 FR 952 (proposed Jan. 8, 2020).

[19] *Id.* at 954.

[20] The Commission received comments from Alternative Investment Management Association ("AIMA"); Americans for Financial Reform Education Fund ("AFR"); Associated Foreign Exchange, Inc. & GPS Capital Markets, Inc. ("AFEX/GPS"); Chris Barnard ("Barnard"); Better Markets, Inc. ("Better Markets"); BGC Partners & Tradition America Holdings, Inc. ("BGC/Tradition"); Chatham Financial ("Chatham"); Citadel ("Citadel"); Commercial Energy Working Group ("Working Group"); Credit Suisse ("CS"); Futures Industry Association ("FIA"); Japan Financial Markets Council & International Bankers Association of Japan ("JFMC/IBAJ"); Institute for Agriculture and Trade Policy ("IATP"); Institute of International Bankers & Securities Industry and Financial Markets Association ("IIB/SIFMA"); International Swaps and Derivatives Association ("ISDA"); Japanese Bankers Association ("JBA"); Japan Securities Clearing Corporation ("JSCC"); and State Street Corporation ("State Street"). The Commission also received letters from PT Arba Sinar Jaya, Robert Ware (UIUC), and William Harrington that were not relevant to the Proposed Rule. All comments on the Proposed Rule are available at *https://comments.cftc.gov/PublicComments/CommentList.aspx?id=3067.*

[21] *See infra* section VIII for a discussion of these comments.

[22] Proposed Rule, 85 FR at 954–955.

[23] *See, e.g.,* Financial Stability Board ("FSB"), OTC Derivatives Market Reforms: 2019 Progress Report on Implementation (Oct. 15, 2019) ("2019 FSB Progress Report"), available at *https://www.fsb.org/wp-content/uploads/P151019.pdf;* FSB, Implementation and Effects of the G20 Financial Regulatory Reforms: Fourth Annual Report (Nov. 28, 2018), available at *http://www.fsb.org/wp-content/uploads/P281118-1.pdf.*

[24] For example, at the end of September 2019, 16 FSB member jurisdictions had comprehensive swap margin requirements in force. *See* 2019 FSB Progress Report, at 2.

[25] *See, e.g.,* 2019 FSB Progress Report; Bank of International Settlements ("BIS"), Triennial Central Bank Survey of Foreign Exchange and Over-the-counter Derivatives Markets in 2019 (Sep. 16, 2019), available at *https://www.bis.org/statistics/rpfx19.htm.*

[26] *See, e.g.,* Institute of International Finance, Addressing Market Fragmentation: The Need for Enhanced Global Regulatory Cooperation (Jan. 2019), available at *https://www.iif.com/Portals/0/Files/IIF%20FSB%20Fragmentation%20Report.pdf.*

[27] *See* BIS, Committee on the Global Financial System, No. 46, The macrofinancial implications of alternative configurations for access to central counterparties in OTC derivatives markets, at 1 (Nov. 2011), available at *http://www.bis.org/publ/cgfs46.pdf* (stating that "[t]he configuration of access must take account of the globalised nature of the market, in which a significant proportion of OTC derivatives trading is undertaken across borders").

Financial groups often prefer to operate their swap dealing businesses and manage their swap portfolios in the jurisdiction where the swaps and the underlying assets have the deepest and most liquid markets. In operating their swap dealing businesses in these market centers, financial groups seek to take advantage of expertise in products traded in those centers and obtain access to greater liquidity. These arrangements permit them to price products more efficiently and compete more effectively in the global swap market, including in jurisdictions different from the market center in which the swap is traded.

In this sense, a global financial enterprise effectively operates as a single business, with a highly integrated network of business lines and services conducted through various branches or affiliated legal entities that are under the control of the parent entity.[28] Branches and affiliates in a global financial enterprise are highly interdependent, with separate entities in the group providing financial or credit support to each other, such as in the form of a guarantee or the ability to transfer risk through inter-affiliate trades or other offsetting transactions. Even in the absence of an explicit arrangement or guarantee, a parent entity may, for reputational or other reasons, choose to assume the risk incurred by its affiliates located overseas. Swaps are also traded by an entity in one jurisdiction, but booked and risk-managed by an affiliate in another jurisdiction. The Final Rule recognizes that these and similar arrangements among global financial enterprises create channels through which swap-related risks can have a direct and significant connection with activities in, or effect on, commerce of the United States.

### D. Interpretation of CEA Section 2(i)

1. Proposed Rule and Discussion of Comments

The Proposed Rule set forth the Commission's interpretation of CEA section 2(i), which mirrored the approach that the Commission took in the Guidance.

Several commenters provided their views on the Commission's interpretation of CEA section 2(i). Better Markets agreed with the Commission's description of the Commission's

authority to regulate swaps activities outside of the United States, recognizing that CEA section 2(i)'s mandatory exclusion of only certain, limited non-U.S. activities (*i.e.,* those that do not have a direct and significant connection with activities in, or effect on, U.S. commerce) evidences clear congressional intent to preserve jurisdiction with respect to others. Better Markets stated its belief that this reflects an intent to ensure U.S. law broadly applies to non-U.S. activities having requisite U.S. connections or effects. Better Markets argued, however, that the Commission does not have the discretion to determine whether and when to apply U.S. regulatory requirements based on vague principles of international comity, stating that the Commission has not cited a legally valid basis for its repeated reliance on international comity, where it simultaneously acknowledges direct and significant risks to the U.S. financial system.

BGC/Tradition supported the Commission's analysis related to CEA section 2(i) and what constitutes "direct and significant." Specifically, BGC/Tradition agreed that the appropriate approach is "to apply the swap provisions of the CEA to activities outside the United States that have either: (1) A direct and significant effect on U.S. commerce; or, in the alternative, (2) a direct and significant connection with activities in U.S. commerce, and through such connection present the type of risks to the U.S. financial system and markets that Title VII directed the Commission to address."

IIB/SIFMA discussed the Commission's interpretation of "direct" in CEA section 2(i) and argued that the Commission should have followed Supreme Court precedent interpreting the "direct effect" test found in the Foreign Sovereign Immunities Act of 1976, which the Court has interpreted to be satisfied only by conduct abroad that has "an immediate consequence" in the United States.[29] IIB/SIFMA argued that a case cited by the Commission as a factor in its interpretation, the Seventh Circuit *en banc* decision in *Minn-Chem, Inc.* v. *Agrium, Inc.,* was based on considerations that are relevant to the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"),[30]—but *not* section 2(i)—namely that (a) because the FTAIA includes the word "foreseeable" along with "direct," the word "direct" should be interpreted as part of an integrated phrase that includes

"foreseeable" effects, and (b) the FTAIA already addresses foreign conduct that has an immediate consequence in the United States through its separate provision for import commerce.[31] But, IIB/SIFMA argued, CEA section 2(i) does not include the word "foreseeable," nor does it include any other provisions addressing foreign conduct that have an immediate consequence within the United States, so the *Minn-Chem* Court's reasoning does not support the Commission's decision to discount the Supreme Court's interpretation of the word "direct" in *Weltover.*

IATP argued that the Commission did not provide a sufficient "international comity" argument to justify deviating from the plain meaning of "direct," nor a sufficient argument to rely on FTAIA case law to interpret "direct." IATP stated its belief that the Commission's reliance on cross-border anti-trust trade law to interpret its statutory authority under CEA section 2(i) is an inconsistent and unreliable foundation for a rule that proposes no measures to prevent or discipline SDs' unreasonable restraint of trade. IATP recommended that the Commission abandon its "restatement" of its CEA section 2(i) authority and rely on a plain reading of CEA section 2(i).

In response to Better Markets' contention that the Commission does not have the discretion to determine whether and when to apply U.S. regulatory requirements based on principles of international comity where it simultaneously acknowledges direct and significant risks to the U.S. financial system, the Commission has followed the Restatement of Foreign Relations law in striving to minimize conflicts with the laws of other jurisdictions while seeking, pursuant to CEA section 2(i), to apply the swaps requirements of Title VII to activities outside the United States that have a direct and significant connection with activities in, or effect on, U.S. commerce. The Commission has determined that the rule appropriately accounts for these competing interests, ensuring that the Commission can discharge its responsibilities to protect the U.S. markets, market participants, and financial system, consistent with international comity, as set forth in the Restatement.

With respect to IIB/SIFMA's contention that the Commission erred in its interpretation of the meaning of "direct" in CEA section 2(i), IIB/SIFMA incorrectly asserted that the

---

[28] The largest U.S. banks have thousands of affiliated global entities, as shown in data from the National Information Center ("NIC"), a repository of financial data and institutional characteristics of banks and other institutions for which the Federal Reserve Board has a supervisory, regulatory, or research interest. *See* NIC, available at *https://www.ffiec.gov/npw.*

[29] *See Republic of Argentina* v. *Weltover,* 504 U.S. 607, 618 (1992).

[30] 15 U.S.C. 6a.

[31] *See Minn-Chem, Inc.* v. *Agrium, Inc.,* 683 F.3d 845, 857 (7th Cir. 2012).

Commission relied on the Seventh Circuit *en banc* decision in *Minn-Chem, Inc.* v. *Agrium, Inc.* Rather, the Commission was clear that its interpretation of CEA section 2(i) is not reliant on the reasoning of any individual judicial decision, but instead is drawn from a holistic understanding of both the statutory text *and* legal analysis applied by courts to analogous statutes and circumstances, specifically noting that the Commission's interpretation of CEA section 2(i) is not solely dependent on one's view of the Seventh Circuit's *Minn-Chem* decision,[32] but informed by its overall understanding of the relevant legal principles.

Finally, the Commission disagrees with IATP's advice that the Commission should abandon its interpretation of CEA section 2(i) and proceed with a "plain reading" of the statute. The Commission believes that IATP's assertion that the extraterritorial provisions of FTAIA and the case law construing such provisions are not relevant to CEA section 2(i) because the rule is not concerned with the regulation of anti-competitive behavior misconstrues the use that the Commission's interpretation has made of the Federal case law construing the meaning of the word "direct" in CEA section 2(i).[33]

### 2. Final Interpretation

In light of the foregoing, the Commission is restating its interpretation of section 2(i) of the CEA with its adoption of the Final Rule in substantially the same form as appeared in the Proposed Rule.

CEA section 2(i) provides that the swap provisions of Title VII shall not apply to activities outside the United States unless those activities—

• Have a direct and significant connection with activities in, or effect on, commerce of the United States; or

• Contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of the CEA that was enacted by the Dodd-Frank Act.

The Commission believes that section 2(i) provides it express authority over swap activities outside the United States when certain conditions are met, but it does not require the Commission to extend its reach to the outer bounds of that authorization. Rather, in exercising its authority with respect to swap activities outside the United States, the Commission will be guided by

international comity principles and will focus its authority on potential significant risks to the U.S. financial system.

### (i) Statutory Analysis

In interpreting the phrase "direct and significant," the Commission has examined the plain language of the statutory provision, similar language in other statutes with cross-border application, and the legislative history of section 2(i).

The statutory language in CEA section 2(i) is structured similarly to the statutory language in the FTAIA,[34] which provides the standard for the cross-border application of the Sherman Antitrust Act ("Sherman Act"). The FTAIA, like CEA section 2(i), excludes certain non-U.S. commercial transactions from the reach of U.S. law. Specifically, the FTAIA provides that the antitrust provisions of the Sherman Act shall not apply to anti-competitive conduct involving trade or commerce with foreign nations.[36] However, like paragraph (1) of CEA section 2(i), the FTAIA also creates exceptions to the general exclusionary rule and thus brings back within antitrust coverage any conduct that: (1) Has a direct, substantial, and reasonably foreseeable effect on U.S. commerce; [37] and (2) such effect gives rise to a Sherman Act claim.[38] In *F. Hoffman-LaRoche, Ltd.* v. *Empagran S.A.,* the U.S. Supreme Court stated that "this technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.,* it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.,* the 'effect' must 'giv[e] rise to a [Sherman Act] claim.' "[39]

It is appropriate, therefore, to read section 2(i) of the CEA as a clear expression of congressional intent that the swap provisions of Title VII of the Dodd-Frank Act apply to activities beyond the borders of the United States when certain circumstances are present.[40] These circumstances include,

pursuant to paragraph (1) of section 2(i), when activities outside the United States meet the statutory test of having a "direct and significant connection with activities in, or effect on," U.S. commerce.

An examination of the language in the FTAIA, however, does not provide an unambiguous roadmap for the Commission in interpreting section 2(i) of the CEA because there are both similarities, and a number of significant differences, between the language in CEA section 2(i) and the language in the FTAIA. Further, the Supreme Court has not provided definitive guidance as to the meaning of the direct, substantial, and reasonably foreseeable test in the FTAIA, and the lower courts have interpreted the individual terms in the FTAIA differently.

Although a number of courts have interpreted the various terms in the FTAIA, only the term "direct" appears in both CEA section 2(i) and the FTAIA.[41] Relying upon the Supreme Court's definition of the term "direct" in the Foreign Sovereign Immunities Act ("FSIA"),[42] the U.S. Court of Appeals for the Ninth Circuit construed the term "direct" in the FTAIA as requiring a "relationship of logical causation," [43] such that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity." [44] However, in an *en banc* decision, *Minn-Chem, Inc.* v. *Agrium, Inc.,* the U.S. Court of Appeals for the Seventh Circuit held that "the Ninth Circuit jumped too quickly on the assumption that the FSIA and the FTAIA use the word 'direct' in the same way." [45] After examining the text of the FTAIA as well as its history and

---

[32] *See* Proposed Rule, 85 FR at 956.

[33] *See infra* notes 41–51, and accompanying text.

[34] 15 U.S.C. 6a.

[35] 15 U.S.C. 1–7.

[36] 15 U.S.C. 6a.

[37] 15 U.S.C. 6a(1).

[38] 15 U.S.C. 6a(2).

[39] 542 U.S. 155, 162 (2004) (emphasis in original).

[40] *SIFMA* v. *CFTC,* 67 F.Supp.3d 373, 425–26 (D.D.C. 2014) ("The plain text of this provision 'clearly expresse[s]' Congress's 'affirmative

intention' to give extraterritorial effect to Title VII's statutory requirements, as well as to the Title VII rules or regulations prescribed by the CFTC, whenever the provision's jurisdictional nexus is satisfied."). *See also Prime Int'l Trading, Ltd.* v. *BP P.L.C.,* 937 F.3d 94, 103 (2d Cir. 2019) (stating that "Section 2(i) contains, on its face, a 'clear statement,' *Morrison,* 561 U.S. at 265, 130 S.Ct. 2869, of extraterritorial application" and describing it as "an enumerated extraterritorial command").

[41] Guidance, 78 FR at 45299.

[42] *See* 28 U.S.C. 1605(a)(2).

[43] *United States* v. *LSL Biotechnologies,* 379 F.3d 672, 693 (9th Cir. 2004). "As a threshold matter, many courts have debated whether the FTAIA established a new jurisdictional standard or merely codified the standard applied in [*United States* v. *Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir. 1945)] and its progeny. Several courts have raised this question without answering it. The Supreme Court did as much in [*Harford Fire Ins. Co.* v. *California,* 509 U.S. 764 (1993)]." *Id.* at 678.

[44] *Id.* at 692–93, *quoting Republic of Argentina* v. *Weltover, Inc.,* 504 U.S. 607, 618 (1992) (providing that, pursuant to the FSIA, 28 U.S.C. 1605(a)(2), immunity does not extend to commercial conduct outside the United States that "causes a direct effect in the United States").

[45] *Minn-Chem, Inc.* v. *Agrium, Inc.,* 683 F.3d 845, 857 (7th Cir. 2012) (*en banc*).

purpose, the Seventh Circuit found persuasive the "other school of thought [that] has been articulated by the Department of Justice's Antitrust Division, which takes the position that, for FTAIA purposes, the term 'direct' means only 'a reasonably proximate causal nexus.' " [46] The Seventh Circuit rejected interpretations of the term "direct" that included any requirement that the consequences be foreseeable, substantial, or immediate.[47] In 2014, the U.S. Court of Appeals for the Second Circuit followed the reasoning of the Seventh Circuit in the *Minn-Chem* decision.[48] That said, the Commission would like to make clear that its interpretation of CEA section 2(i) is not reliant on the reasoning of any individual judicial decision, but instead is drawn from a holistic understanding of both the statutory text *and* legal analysis applied by courts to analogous statutes and circumstances. In short, as the discussion below will illustrate, the Commission's interpretation of section 2(i) is not solely dependent on one's view of the Seventh Circuit's *Minn-Chem* decision, but informed by its overall understanding of the relevant legal principles.

Other terms in the FTAIA differ from the terms used in section 2(i) of the CEA. First, the FTAIA test explicitly requires that the effect on U.S. commerce be a "reasonably foreseeable" result of the conduct,[49] whereas section 2(i) of the CEA, by contrast, does not provide that the effect on U.S. commerce must be foreseeable. Second, whereas the FTAIA solely relies on the "effects" on U.S. commerce to determine cross-border application of the Sherman Act, section 2(i) of the CEA refers to both "effect" and "connection." "The FTAIA says that the Sherman Act applies to foreign 'conduct' with a certain kind of harmful domestic effect." [50] Section 2(i), by contrast, applies more broadly—not only to particular instances of conduct that have an effect on U.S. commerce, but also to activities that have a direct and significant "connection with activities in" U.S. commerce. Unlike the FTAIA, section 2(i) applies the swap provisions of the CEA to activities outside the United States that have the

requisite connection with activities in U.S. commerce, regardless of whether a "harmful domestic effect" has occurred.

As the foregoing textual analysis of the relevant statutory language indicates, section 2(i) differs from its analogue in the antitrust laws. Congress delineated the cross-border scope of the Sherman Act in section 6a of the FTAIA as applying to conduct that has a "direct," "substantial," and "reasonably foreseeable" "effect" on U.S. commerce. In section 2(i), on the other hand, Congress did not include a requirement that the effects or connections of the activities outside the United States be "reasonably foreseeable" for the Dodd-Frank Act swap provisions to apply. Further, Congress included language in section 2(i) to apply the Dodd-Frank Act swap provisions in circumstances in which there is a direct and significant connection with activities in U.S. commerce, regardless of whether there is an effect on U.S. commerce. The different words that Congress used in paragraph (1) of section 2(i), as compared to its closest statutory analogue in section 6a of the FTAIA, inform the Commission in construing the boundaries of its cross-border authority over swap activities under the CEA.[51] Accordingly, the Commission believes it is appropriate to interpret section 2(i) such that it applies to activities outside the United States in circumstances in addition to those that would be reached under the FTAIA standard.

One of the principal rationales for the Dodd-Frank Act was the need for a comprehensive scheme of systemic risk regulation. More particularly, a primary purpose of Title VII of the Dodd-Frank Act is to address risk to the U.S. financial system created by interconnections in the swap market.[52]

Title VII of the Dodd-Frank Act gave the Commission new and broad authority to regulate the swap market to address and mitigate risks arising from swap activities that could adversely affect the resiliency of the financial system in the future.

In global markets, the source of such risk is not confined to activities within U.S. borders. Due to the interconnectedness between firms, traders, and markets in the U.S. and abroad, a firm's failure, or trading losses overseas, can quickly spill over to the United States and affect activities in U.S. commerce and the stability of the U.S. financial system. Accordingly, Congress explicitly provided for cross-border application of Title VII to activities outside the United States that pose risks to the U.S. financial system.[53] Therefore, the Commission construes section 2(i) to apply the swap provisions of the CEA to activities outside the United States that have either: (1) A direct and significant effect on U.S. commerce; or, in the alternative, (2) a direct and significant connection with activities in U.S. commerce, and through such connection present the

---

[46] *Id.*

[47] *Id.* at 856–57.

[48] *Lotes Co., Ltd.* v. *Hon Hai Precision Industry Co.,* 753 F.3d 395, 406–08 (2d Cir. 2014).

[49] *See, e.g., Animal Sciences Products.* v. *China Minmetals Corp.,* 654 F.3d 462, 471 (3d Cir. 2011) ("[T]he FTAIA's 'reasonably foreseeable' language imposes an objective standard: the requisite 'direct' and 'substantial' effect must have been 'foreseeable' to an objectively reasonable person.").

[50] *Hoffman-LaRoche,* 452 U.S. at 173.

[51] The provision that ultimately became section 722(d) of the Dodd-Frank Act was added during consideration of the legislation in the House of Representatives. *See* 155 Cong. Rec. H14685 (Dec. 10, 2009). The version of what became Title VII that was reported by the House Agriculture Committee and the House Financial Services Committee did not include any provision addressing cross-border application. *See* 155 Cong. Rec. H14549 (Dec. 10, 2009). The Commission finds it significant that, in adding the cross-border provision before final passage, the House did so in terms that, as discussed in text, were different from, and broader than, the terms used in the analogous provision of the FTAIA.

[52] *Cf.* 156 Cong. Rec. S5818 (July 14, 2010) (statement of Sen. Lincoln) ("In 2008, our Nation's economy was on the brink of collapse. America was being held captive by a financial system that was so interconnected, so large, and so irresponsible that our economy and our way of life were about to be destroyed."), available at *http://www.gpo.gov/fdsys/pkg/CREC-2010-07-14/pdf/CREC-2010-07-14.pdf;* 156 Cong. Rec. S5888 (July 15, 2010) (statement of Sen. Shaheen) ("We need to put in

place reforms to stop Wall Street firms from growing so big and so interconnected that they can threaten our entire economy."), available at *http://www.gpo.gov/fdsys/pkg/CREC-2010-07-15/pdf/CREC-2010-07-15-senate.pdf;* 156 Cong. Rec. S5905 (July 15, 2010) (statement of Sen. Stabenow) ("For too long the over-the-counter derivatives market has been unregulated, transferring risk between firms and creating a web of fragility in a system where entities became too interconnected to fail."), available at *http://www.gpo.gov/fdsys/pkg/CREC-2010-07-15/pdf/CREC-2010-07-15-senate.pdf.*

[53] The legislative history of the Dodd-Frank Act shows that in the fall of 2009, neither the Over-the-Counter Derivatives Markets Act of 2009, H.R. 3795, 111th Cong. (1st Sess. 2009), reported by the Financial Services Committee chaired by Rep. Barney Frank, nor the Derivatives Markets Transparency and Accountability Act of 2009, H.R. 977, 111th Cong. (1st Sess. 2009), reported by the Agriculture Committee chaired by Rep. Collin Peterson, included a general territoriality limitation that would have restricted Commission regulation of transactions between two foreign persons located outside of the United States. During the House Financial Services Committee markup on October 14, 2009, Rep. Spencer Bachus offered an amendment that would have restricted the jurisdiction of the Commission over swaps between non-U.S. resident persons transacted without the use of the mails or any other means or instrumentality of interstate commerce. Chairman Frank opposed the amendment, noting that there may well be cases where non-U.S. residents are engaging in transactions that have an effect on the United States and that are insufficiently regulated internationally and that he would not want to prevent U.S. regulators from stepping in. Chairman Frank expressed his commitment to work with Rep. Bachus going forward, and Rep. Bachus withdrew the amendment. *See* H. Fin. Serv. Comm. Mark Up on Discussion Draft of the Over-the-Counter Derivatives Markets Act of 2009, 111th Cong., 1st Sess. (Oct. 14, 2009) (statements of Rep. Bachus and Rep. Frank), available at *http://financialservices.house.gov/calendar/eventsingle.aspx?EventID=231922.*

type of risks to the U.S. financial system and markets that Title VII directed the Commission to address. The Commission interprets section 2(i) in a manner consistent with the overall goal of the Dodd-Frank Act to reduce risks to the resiliency and integrity of the U.S. financial system arising from swap market activities.[54] Consistent with this interpretation, the Commission interprets the term ''direct'' in section 2(i) to require a reasonably proximate causal nexus, and not to require foreseeability, substantiality, or immediacy.

Further, the Commission does not interpret section 2(i) to require a transaction-by-transaction determination that a specific swap outside the United States has a direct and significant connection with activities, or effect on, commerce of the United States to apply the swap provisions of the CEA to such transaction. Rather, it is the connection of swap activities, viewed as a class or in the aggregate, to activities in commerce of the United States that must be assessed to determine whether application of the CEA swap provisions is warranted.[55]

Similar interpretations of other federal statutes regulating interstate commerce support the Commission's interpretation here. For example, the Supreme Court has long supported a similar ''aggregate effects'' approach when analyzing the reach of U.S. authority under the Commerce Clause.[56] The Court phrased the holding in the seminal ''aggregate effects'' decision, *Wickard* v. *Filburn,*[57] in this way: ''[The farmer's] decision, when considered in the aggregate along with similar decisions of others, would have had a substantial effect on the interstate market for wheat.''[58] In another relevant decision, *Gonzales* v. *Raich,*[59] the Court adopted similar reasoning to uphold the application of the Controlled Substances Act[60] to prohibit the intrastate use of medical marijuana for medicinal purposes. In *Raich,* the Court held that Congress could regulate purely intrastate activity if the failure to do so would ''leave a gaping hole'' in the federal regulatory structure. These cases support the Commission's cross-border authority over swap activities that as a class, or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce—whether or not an individual swap may satisfy the statutory standard.[61]

(ii) Principles of International Comity

Principles of international comity counsel the government in one country to act reasonably in exercising its jurisdiction with respect to activity that takes place in another country. Statutes should be construed to ''avoid unreasonable interference with the sovereign authority of other nations.''[62] This rule of construction ''reflects customary principles of international law'' and ''helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world.''[63]

The Restatement (Third) of Foreign Relations Law of the United States,[64] together with the Restatement (Fourth) of Foreign Relations Law of the United States[65] (collectively, the ''Restatement''), states that a country has jurisdiction to prescribe law with respect to ''conduct outside its territory that has or is intended to have substantial effect within its territory.''[66] The Restatement also counsels that even where a country has a basis for extraterritorial jurisdiction, it should not prescribe law with respect to a person or activity in another country when the exercise of such jurisdiction is unreasonable.[67]

As a general matter, the Fourth Restatement indicates that the concept of reasonableness as it relates to foreign relations law is ''a principle of statutory interpretation'' that ''operates in conjunction with other principles of statutory interpretation.''[68] More specifically, the Fourth Restatement characterizes the inquiry into the reasonableness of exercising extraterritorial jurisdiction as an examination into whether ''a genuine connection exists between the state seeking to regulate and the persons, property, or conduct being regulated.''[69] The Restatement explicitly indicates that the ''genuine connection'' between the state and the person, property, or conduct to be regulated can derive from the effects of the particular conduct or activities in question.[70]

Consistent with the Restatement, the Commission has carefully considered, among other things, the level of the foreign jurisdiction's supervisory interests over the subject activity and the extent to which the activity takes place within the foreign territory. In doing so, the Commission has strived to

---

[54] The Commission also notes that the Supreme Court has indicated that the FTAIA may be interpreted more broadly when the government is seeking to protect the public from anticompetitive conduct than when a private plaintiff brings suit. *See Hoffman-LaRoche,* 452 U.S. at 170 (''A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out its mission.'').

[55] The Commission believes this interpretation is supported by Congress's use of the plural term ''activities'' in CEA section 2(i), rather than the singular term ''activity.'' The Commission believes it is reasonable to interpret the use of the plural term ''activities'' in section 2(i) to require not that each particular activity have the requisite connection with U.S. commerce, but rather that such activities in the aggregate, or a class of activity, have the requisite nexus with U.S. commerce. This interpretation is consistent with the overall objectives of Title VII, as described above. Further, the Commission believes that a swap-by-swap approach to jurisdiction would be ''too complex to prove workable.'' *See Hoffman-LaRoche,* 542 U.S. at 168.

[56] *Nat'l Fed'n of Indep. Bus.* v. *Sebelius,* 567 U.S. 519 (2012).

[57] 317 U.S. 111 (1942).

[58] 567 U.S. at 552–53. At issue in *Wickard* was the regulation of a farmer's production and use of wheat even though the wheat was ''not intended in any part for commerce but wholly for consumption on the farm.'' 317 U.S. at 118. The Supreme Court upheld the application of the regulation, stating that although the farmer's ''own contribution to the demand for wheat may be trivial by itself,'' the federal regulation could be applied when his contribution ''taken together with that of many others similarly situated, is far from trivial.'' *Id.* at 128–29. The Court also stated it had ''no doubt that Congress may properly have considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose . . . .'' *Id.*

[59] 545 U.S. 1 (2005).

[60] 21 U.S.C. 801 *et seq.*

[61] In *Sebelius,* the Court stated in dicta, ''Where the class of activities is regulated, and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'' 567 U.S. at 551 (*quoting Perez* v. *United States,* 402 U.S. 146, 154 (1971)). *See also Taylor* v. *U.S.*136 S. Ct. 2074, 2079 (2016) (''[A]ctivities . . . that ''substantially affect'' commerce . . . may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal.'')

[62] *Hoffman-LaRoche,* 542 U.S. at 164.

[63] *Id.* at 165.

[64] Restatement (Third) section 402 cmt. d (1987).

[65] Julian Ku, American Law Institute Approves First Portions of Restatement on Foreign Relations Law (Fourth), OpinioJuris.com, May 22, 2017, *http://opiniojuris.org/2017/05/22/american-law-institute-approves-first-portions-of-restatement-on-foreign-relations-law-fourth/*; Jennifer Morinigo, U.S. Foreign Relations Law, Jurisdiction Approved, ALI Adviser, May 22, 2017, *http://www.thealiadviser.org/us-foreign-relations-law/jurisdiction-approved/*; Restatement (Fourth) of Foreign Relations Law Intro. (Westlaw 2018) (explaining that ''this is only a partial revision'' of the Third Restatement).

[66] Restatement (Fourth) section 409 (Westlaw 2018).

[67] Restatement (Fourth) section 405 cmt. a (Westlaw 2018); *see id.* at section 407 Reporters' Note 3 (''Reasonableness, in the sense of showing a genuine connection, is an important touchstone for determining whether an exercise of jurisdiction is permissible under international law.'').

[68] *Id.* at section 405 cmt. a.

[69] *Id.* at section 407 cmt. a; *see id.* at section 407 Reporters' Note 3.

[70] *Id.* at section 407.

minimize conflicts with the laws of other jurisdictions while seeking, pursuant to section 2(i), to apply the swaps requirements of Title VII to activities outside the United States that have a direct and significant connection with activities in, or effect on, U.S. commerce.

The Commission believes the Final Rule appropriately accounts for these competing interests, ensuring that the Commission can discharge its responsibilities to protect the U.S. markets, market participants, and financial system, consistent with international comity, as set forth in the Restatement. Of particular relevance is the Commission's approach to substituted compliance in the Final Rule, which mitigates burdens associated with potentially conflicting foreign laws and regulations in light of the supervisory interests of foreign regulators in entities domiciled and operating in their own jurisdictions.

### E. Final Rule

The Final Rule identifies which cross-border swaps or swap positions a person will need to consider when determining whether it needs to register with the Commission as an SD or MSP, as well as related classifications of swap market participants and swaps (*e.g.*, U.S. person, foreign branch, swap conducted through a foreign branch).[71] Further, the Commission is adopting several tailored exceptions from, and a substituted compliance process for, certain regulations applicable to registered SDs and MSPs. The Final Rule also creates a framework for comparability determinations for such regulations that emphasizes a holistic, outcomes-based approach that is grounded in principles of international comity. Finally, the Final Rule requires SDs and MSPs to create a record of their compliance with the Final Rule and to retain such records in accordance with § 23.203.[72] The Final Rule supersedes the Commission's policy views as set forth in the Guidance with respect to its interpretation and application of section 2(i) of the CEA and the swap provisions addressed in the Final Rule.[73]

Some commenters provided their views on the Proposed Rule generally. AFR and IATP both argued that, in sum, the Proposed Rule would fatally weaken the implementation of Title VII of the Dodd-Frank Act and its application to CFTC-regulated derivatives markets,

and urged the Commission to step back from the course outlined in the Proposed Rule and restore elements of the Guidance and the 2016 Proposal that, they maintained, offered better oversight of derivatives markets. The Commission has considered these comments but believes that the Final Rule generally reflects the approach outlined by the Commission in the Guidance, and has determined that it takes account of conflicts with the laws of other jurisdictions when applying the swaps requirements of Title VII to activities outside the United States that have a direct and significant connection with activities in, or effect on, U.S. commerce, permitting the Commission to discharge its responsibilities to protect the U.S. markets, market participants, and financial system, consistent with international comity.

More specifically, the Final Rule takes into account the Commission's experience implementing the Dodd-Frank Act reforms, including its experience with the Guidance and the Cross-Border Margin Rule, comments submitted in connection with the ANE Request for Comment and the Proposed Rule, as well as discussions that the Commission and its staff have had with market participants,[74] other domestic [75] and foreign regulators, and other interested parties. It is essential that a cross-border framework recognize the global nature of the swap market and the supervisory interests of foreign regulators with respect to entities and transactions covered by the Commission's swap regime. In determining the extent to which the Dodd-Frank Act swap provisions addressed by the Final Rule apply to activities outside the United States, the Commission has strived to protect U.S. interests as contemplated by Congress in Title VII, and minimize conflicts with the laws of other jurisdictions. The Commission has carefully considered, among other things, the level of a home

jurisdiction's supervisory interests over the subject activity and the extent to which the activity takes place within the home country's territory.[76] At the same time, the Commission has also considered the potential for cross-border activities to have a significant connection with activities in, or effect on, commerce of the United States, as well as the global, highly integrated nature of today's swap markets.

To fulfill the purposes of the Dodd-Frank Act swap reforms, the Commission's supervisory oversight cannot be confined to activities strictly within the territory of the United States. Rather, the Commission will exercise its supervisory authority outside the United States in order to reduce risk to the resiliency and integrity of the U.S. financial system.[77] The Commission will also strive to show deference to non-U.S. regulation when such regulation achieves comparable outcomes to mitigate unnecessary conflict with effective non-U.S. regulatory frameworks and limits fragmentation of the global marketplace.

The Commission has also sought to target those classes of entities whose activities—due to the nature of their relationship with a U.S. person or U.S. commerce—most clearly present the risks addressed by the Dodd-Frank Act provisions, and related regulations covered by the Final Rule. The Final Rule is designed to limit opportunities for regulatory arbitrage by applying the registration thresholds in a consistent manner to differing organizational structures that serve similar economic functions or have similar economic effects. At the same time, the Commission is mindful of the effect of its choices on market efficiency and competition, as well as the importance of international comity when exercising the Commission's authority. The Commission believes that the Final Rule reflects a measured approach that advances the goals underlying SD and MSP regulation, consistent with the Commission's statutory authority, while mitigating market distortions and inefficiencies, and avoiding fragmentation.

### II. Key Definitions

The Commission is adopting definitions for certain terms for the purpose of applying the Dodd-Frank Act swap provisions addressed by the Final Rule to cross-border transactions. Certain of these definitions are relevant

---

[71] There were no MSPs registered with the Commission as of the date of the Final Rule.

[72] *See* Final § 23.23(h)(1).

[73] *See infra* section V for a discussion of certain swap provisions not addressed in the Final Rule.

[74] Summaries of such discussions with market participants are included in the relevant public comment file, available on the Commission's website at *https://comments.cftc.gov/ PublicComments/CommentList.aspx?id=3067.*

[75] The Commission has consulted with the Securities and Exchange Commission ("SEC") and prudential regulators regarding the Final Rule, as required by section 712(a)(1) of the Dodd-Frank Act for the purposes of assuring regulatory consistency and comparability, to the extent possible. Dodd-Frank Act, section 712(a)(1); 15 U.S.C. 8302(a)(1). SEC staff was consulted to increase understanding of each other's regulatory approaches and to harmonize the cross-border approaches of the two agencies to the extent possible, consistent with their respective statutory mandates. As noted in the Entities Rule, the CFTC and SEC intended to address the cross-border application of Title VII in separate releases. *See* Entities Rule, 77 FR at 30628 n.407.

[76] The terms "home jurisdiction" or "home country" are used interchangeably in this release and refer to the jurisdiction in which the person or entity is established, including the European Union.

[77] *See supra* section I.D.

in assessing whether a person's activities have the requisite "direct and significant" connection with activities in, or effect on, U.S. commerce within the meaning of CEA section 2(i). Specifically, the definitions are relevant in determining whether certain swaps or swap positions need to be counted toward a person's SD or MSP threshold and in addressing the cross-border application of certain Dodd-Frank Act requirements (as discussed below in sections III through VII).

### A. Reliance on Representations—Generally

The Commission acknowledges that the information necessary for a swap counterparty to accurately assess whether its counterparty or a specific swap meets one or more of the definitions discussed below may be unavailable, or available only through overly burdensome due diligence. For this reason, the Commission believes that a market participant should generally be permitted to reasonably rely on written counterparty representations in each of these respects.[78] Therefore, the Commission proposed that a person may rely on a written representation from its counterparty that the counterparty does or does not satisfy the criteria for one or more of the definitions below, unless such person knows or has reason to know that the representation is not accurate.[79] AFEX/GPS supported the proposed written representation language and noted that it would facilitate compliance with the rules.

The Commission is adopting the "reliance on representations" language as proposed.[80] For the purposes of this rule, a person would have reason to know the representation is not accurate if a reasonable person should know, under all of the facts of which the person is aware, that it is not accurate. This language is consistent with: (1) The reliance standard articulated in the Commission's external business conduct rules;[81] (2) the Commission's approach in the Cross-Border Margin Rule;[82] and (3) the reliance standard articulated in the "U.S. person" and "transaction conducted through a foreign branch" definitions adopted by the SEC in its rule addressing the regulation of cross-border securities-based swap activities

("SEC Cross-Border Rule").[83] A number of commenters also specifically addressed reliance on representations obtained under the Cross-Border Margin Rule or the Guidance for the "U.S. person" and "Guarantee" definitions. These comments are addressed below in sections II.B.5 and II.C.

### B. U.S. Person, Non-U.S. Person, and United States

#### 1. Generally

(i) Proposed Rule

As discussed in more detail below, the Commission proposed defining "U.S. person" consistent with the definition of "U.S. person" in the SEC Cross-Border Rule.[84] The proposed definition of "U.S. person" was also consistent with the Commission's statutory mandate under the CEA, and in this regard was largely consistent with the definition of "U.S. person" in the Cross-Border Margin Rule.[85] Specifically, the Commission proposed to define "U.S. person" as:

(1) A natural person resident in the United States;

(2) A partnership, corporation, trust, investment vehicle, or other legal person organized, incorporated, or established under the laws of the United States or having its principal place of business in the United States;

(3) An account (whether discretionary or non-discretionary) of a U.S. person; or

(4) An estate of a decedent who was a resident of the United States at the time of death.[86]

As noted in the Cross-Border Margin Rule,[87] and consistent with the SEC[88] definition of "U.S. person," proposed § 23.23(a)(22)(ii) provided that the principal place of business means the location from which the officers, partners, or managers of the legal person primarily direct, control, and coordinate the activities of the legal person. Consistent with the SEC, the Commission noted that the principal place of business for a collective investment vehicle ("CIV") would be in the United States if the senior personnel

responsible for the implementation of the CIV's investment strategy are located in the United States, depending on the facts and circumstances that are relevant to determining the center of direction, control, and coordination of the CIV.[89]

Additionally, in consideration of the discretionary and appropriate exercise of international comity-based doctrines, proposed § 23.23(a)(22)(iii) stated that the term "U.S. person" would not include certain international financial institutions.[90] Specifically, consistent with the SEC's definition,[91] the term U.S. person would not include the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies and pension plans, and any other similar international organizations, their agencies, and pension plans.

Further, to provide certainty to market participants, proposed § 23.23(a)(22)(iv) permitted reliance, until December 31, 2025, on any U.S. person-related representations that were obtained to comply with the Cross-Border Margin Rule.[92]

(ii) Summary of Comments

In general, AIMA, AFEX/GPS, Barnard, Chatham, CS, IIB/SIFMA, JFMC/IBAJ, JBA, JSCC, and State Street supported the proposed "U.S. person" definition, while IATP generally opposed the proposed definition. Additional comments and suggestions are discussed below.

AIMA, Barnard,[93] Chatham, CS, IIB/SIFMA, JFMC/IBAJ, JSCC, and State Street generally supported the Commission's view that aligning with the SEC's definition of "U.S. person" provided consistency to market participants, noting that the harmonized definition would: (1) Provide a consistent approach from operational and compliance perspectives; (2) help avoid undue regulatory complexity for purposes of firms' swaps and security-based swaps businesses; and/or (3) simplify market practice and reduce complexity. AFEX/GPS, Chatham, CS, JFMC/IBAJ, JSCC, and State Street generally stated that the simpler and

---

[78] Proposed Rule, 85 FR at 958–59; Cross-Border Margin Rule, 81 FR at 34827; Guidance, 78 FR at 45315.

[79] Proposed § 23.23(a); Proposed Rule, 85 FR at 958–59, 1002.

[80] Final § 23.23(a).

[81] See 17 CFR 23.402(d).

[82] See Cross-Border Margin Rule, 81 FR at 34827.

[83] See 17 CFR 240.3a71–3(a)(3)(ii) & (4)(iv); Application of "Security-Based Swap Dealer" and "Major Security-Based Swap Participant" Definitions to Cross-Border Security-Based Swap Activities; Republication, 79 FR 47278, 47313 (Aug. 12, 2014).

[84] Proposed § 23.23(a)(22); Proposed Rule, 85 FR at 959–63, 1003. See 17 CFR 240.3a71–3(a)(4); SEC Cross-Border Rule, 79 FR at 47303–13.

[85] See 17 CFR 23.160(a)(10); Cross-Border Margin Rule, 81 FR at 34821–24.

[86] Proposed § 23.23(a)(22)(i); Proposed Rule, 85 FR at 959–63, 1003.

[87] Cross-Border Margin Rule, 81 FR at 34823.

[88] 17 CFR 240.3a71–3(a)(4)(ii).

[89] Proposed § 23.23(a)(22)(ii); Proposed Rule, 85 FR at 960, 1003.

[90] Proposed § 23.23(a)(22)(iii); Proposed Rule, 85 FR at 961–62, 1003.

[91] 17 CFR 240.3a71–3(a)(4)(iii).

[92] Proposed § 23.23(a)(22)(iv); Proposed Rule, 85 FR at 962, 1003.

[93] However, as noted below, Barnard expressed concern regarding other proposed definitions and treatments.

streamlined prongs in the proposed ''U.S. person'' definition allowed for more straightforward application of the definition as compared to the Guidance. Chatham also noted that the proposed definition of ''U.S. person'' establishes a significant nexus to the United States.

FIA recommended that the Commission explicitly state that the scope of the proposed definition of a ''U.S. person'' would not extend to provisions of the CEA governing futures commission merchants (''FCMs'') with respect to both: (1) Exchange-traded futures, whether executed on a designated contract market or a foreign board of trade; and (2) cleared swaps.

IATP suggested restoring the ''U.S. person'' definition from the Guidance and 2016 Proposal. IATP argued that the SEC definition applies to the relatively small universe of security-based swaps, and therefore, the Commission should adopt the ''U.S. person'' and other definitions from the 2016 Proposal for the much larger universe of physical and financial commodity swaps the Commission is authorized to regulate. IATP also asserted that adopting the SEC definition for harmonization purposes was not necessary because SDs and MSPs should have the personnel and information technology resources to comply effectively with reporting and recordkeeping of swaps and security-based swaps. Further, any reduced efficiency would be compensated for by having the ''U.S. person'' definition apply not only to enumerated entities but to a non-exhaustive listing that anticipates the creation of new legal entities engaged in swaps activities.

### (iii) Final Rule

As discussed in more detail below, the Commission is adopting the ''U.S. person'' definition as proposed, with certain clarifications.[94] In response to IATP, the Commission continues to be of the view that harmonization of the ''U.S. person'' definition with the SEC is the appropriate approach given that it is straightforward to apply compared to the Guidance definition, and will capture substantially the same types of entities as the ''U.S. person'' definition in the Cross-Border Margin Rule.[95] In addition, harmonizing with the definition in the SEC Cross-Border Rule is not only consistent with section 2(i) of the CEA,[96] but is also expected to

reduce undue compliance costs for market participants. Therefore, as noted by several commenters, the definition will reduce complexity for entities that are participants in the swaps and security-based swaps markets and may register both as SDs with the Commission and as security-based swap dealers with the SEC. The Commission is also of the view that the ''U.S. person'' definition in the Cross-Border Margin Rule largely encompasses the same universe of persons as the definition used in the SEC Cross-Border Rule and the Final Rule.[97]

In response to FIA, pursuant to § 23.23(a), ''U.S. person'' only has the meaning in the definition for the purposes of § 23.23. However, to be clear that the definition of ''U.S. person'' is only applicable for purposes of the Final Rule, the rule now includes the word ''solely'' and reads ''*Solely* for purposes of this section . . . .''

Generally, the Commission believes that the definition offers a clear, objective basis for determining which individuals or entities should be identified as U.S. persons for purposes of the swap requirements addressed by the Final Rule. Specifically, the various prongs, as discussed in more detail below, are intended to identify persons whose activities have a significant nexus to the United States by virtue of their organization or domicile in the United States.[98]

Additionally, the Commission is adopting as proposed the definitions for ''non-U.S. person,'' ''United States,'' and ''U.S.'' The term ''non-U.S. person'' means any person that is not a U.S. person.[99] Further, the Final Rule defines ''United States'' and ''U.S.'' as the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.[100] The Commission did not receive any comments regarding these definitions.

### 2. Prongs

As the Commission noted in the Proposed Rule, paragraph (i) of the ''U.S. person'' definition identifies

certain persons as a ''U.S. person'' by virtue of their domicile or organization within the United States.[101] The Commission has traditionally looked to where legal entities are organized or incorporated (or in the case of natural persons, where they reside) to determine whether they are U.S. persons.[102] In the Commission's view, these persons—by virtue of their decision to organize or locate in the United States and because they are likely to have significant financial and legal relationships in the United States—are appropriately included within the definition of ''U.S. person.''[103]

### (i) § 23.23(a)(23)(i)(A) and (B)

Paragraphs (i)(A) and (B) of the ''U.S. person'' definition generally incorporate a ''territorial'' concept of a U.S. person.[104] That is, these are natural persons and legal entities that are physically located or incorporated within U.S. territory, and thus are subject to the Commission's jurisdiction. Further, the Commission generally considers swap activities where such persons are counterparties, as a class and in the aggregate, as satisfying the ''direct and significant'' test under CEA section 2(i). Consistent with the ''U.S. person'' definition in the Cross-Border Margin Rule[105] and the SEC Cross-Border Rule,[106] the definition encompasses both foreign and domestic branches of an entity. As discussed below, a branch does not have a legal identity apart from its principal entity.[107]

---

[94] Final § 23.23(a)(23). Note that due to renumbering, the paragraph references for the definitions in § 23.23(a) of the Final Rule vary from the paragraph references in the Proposed Rule.

[95] *See* Proposed Rule, 85 FR at 959.

[96] Harmonizing the Commission's definition of ''U.S. person'' with the definition in the SEC Cross-Border Rule also is consistent with the dictate in

section 712(a)(7) of the Dodd-Frank Act that the CFTC and SEC ''treat functionally or economically similar'' SDs, MSPs, security-based swap dealers, and major security-based swap participants ''in a similar manner.'' Dodd-Frank Act, section 712(a)(7)(A); 15 U.S.C. 8307(a)(7)(A). *See* Proposed Rule, 85 FR at 959.

[97] *See* Cross-Border Margin Rule, 81 FR at 34824. The Final Rule defines ''U.S. person'' in a manner that is substantially similar to the definition used by the SEC in the context of cross-border regulation of security-based swaps. Proposed Rule, 85 FR at 959.

[98] Proposed Rule, 85 FR at 959.

[99] Final § 23.23(a)(10).

[100] Final § 23.23(a)(20).

[101] Proposed Rule, 85 FR at 959.

[102] Cross-Border Margin Rule, 81 FR at 34823; Proposed Rule, 85 FR at 959. *See also* 17 CFR 4.7(a)(1)(iv) (defining ''Non-United States person'' for purposes of part 4 of the Commission regulations relating to commodity pool operators (''CPOs'')).

[103] Proposed Rule, 85 FR at 959.

[104] *Id.*

[105] *See* 17 CFR 23.160(a)(10)(iii) (U.S. person includes a corporation, partnership, limited liability company, business or other trust, association, joint-stock company, fund or any form of entity similar to any of the foregoing (other than an entity described in paragraph (a)(10)(iv) or (v) of this section) (a legal entity), in each case that is organized or incorporated under the laws of the United States or that has its principal place of business in the United States, *including any branch of such legal entity*) (emphasis added).

[106] *See* SEC Cross-Border Rule, 79 FR at 47308 (''[T]he final definition determines a legal person's status at the entity level and thus applies to the entire legal person, including any foreign operations that are part of the U.S. legal person. Consistent with this approach, a foreign branch, agency, or office of a U.S. person is treated as part of a U.S. person, as it lacks the legal independence to be considered a non-U.S. person for purposes of Title VII even if its head office is physically located within the United States.'').

[107] *See* Proposed Rule, 85 FR at 959.

The first prong of the proposed definition stated that a natural person resident in the United States would be considered a U.S. person. No comments were received regarding the first prong of the "U.S. person" definition and the Commission is adopting it as proposed.[108]

The second prong of the proposed definition stated that a partnership, corporation, trust, investment vehicle, or other legal person organized, incorporated, or established under the laws of the United States or having its principal place of business in the United States would be considered a U.S. person. In the Proposed Rule, the Commission stated that the second prong of the definition would subsume the pension fund and trust prongs of the "U.S. person" definition in the Cross-Border Margin Rule.[109] No comments were received regarding this aspect of the Proposed Rule and the Commission is adopting it as proposed.[110]

Specifically, the Commission is of the view that, as adopted, § 23.23(a)(23)(i)(B) includes in the definition of the term "U.S. person" pension plans for the employees, officers, or principals of a legal entity described in § 23.23(a)(23)(i)(B), which is a separate prong in the Cross-Border Margin Rule.[111] Although the SEC Cross-Border Rule directly addresses pension funds only in the context of international financial institutions, discussed below, the Commission believes it is important to clarify that pension funds in other contexts could meet the requirements of § 23.23(a)(23)(i)(B).[112]

Additionally, § 23.23(a)(23)(i)(B) subsumes the trust prong of the "U.S. person" definition in the Cross-Border Margin Rule.[113] With respect to trusts addressed in § 23.23(a)(23)(i)(B), the Commission expects that its approach is consistent with the manner in which trusts are treated for other purposes under the law. The Commission has considered that each trust is governed by the laws of a particular jurisdiction, which may depend on steps taken when the trust was created or other circumstances surrounding the trust. The Commission believes that if a trust is governed by U.S. law (*i.e.*, the law of a state or other jurisdiction in the United States), then it is generally reasonable to treat the trust as a U.S.

person for purposes of the Final Rule. Another relevant element in this regard is whether a court within the United States is able to exercise primary supervision over the administration of the trust. The Commission expects that this aspect of the definition generally aligns the treatment of the trust for purposes of the Final Rule with how the trust is treated for other legal purposes. For example, the Commission expects that if a person could bring suit against the trustee for breach of fiduciary duty in a U.S. court (and, as noted above, the trust is governed by U.S. law), then treating the trust as a U.S. person is generally consistent with its treatment for other purposes.[114]

### (ii) § 23.23(a)(23)(i)(D)

Under the fourth prong of the proposed definition, an estate of a decedent who was a resident of the United States at the time of death would be included in the definition of "U.S. person." No comments were received regarding this aspect of the Proposed Rule and the Commission is adopting it as proposed.[115] With respect to § 23.23(a)(23)(i)(D), the Commission believes that the swaps of a decedent's estate should generally be treated the same as the swaps entered into by the decedent during their life.[116] If the decedent was a party to any swaps at the time of death, then those swaps should generally continue to be treated in the same way after the decedent's death, at which time the swaps would most likely pass to the decedent's estate. Also, the Commission expects that this prong will be predictable and straightforward to apply for natural persons planning for how their swaps will be treated after death, for executors and administrators of estates, and for the swap counterparties to natural persons and estates.

### (iii) § 23.23(a)(23)(i)(C)

The third prong of the definition, the "account" prong, was proposed to ensure that persons described in prongs (A), (B), and (D) of the definition would be treated as U.S. persons even if they use discretionary or non-discretionary accounts to enter into swaps, irrespective of whether the person at which the account is held or maintained is a U.S. person.[117] Consistent with the Cross-Border Margin Rule, the Commission stated that this prong would apply for individual or joint

accounts.[118] IIB/SIFMA recommended that, consistent with the SEC, the Commission clarify that under the "account" prong of the definition, an account's U.S. person status should depend on whether any U.S.-person owner of the account actually incurs obligations under the swap in question.

The Commission is adopting this aspect of the U.S. person definition as proposed, with a clarification.[119] In response to the IIB/SIFMA comment, the Commission is clarifying that an account's U.S. person status depends on whether any U.S. person owner of the account actually incurs obligations under the swap in question. Consistent with the SEC Cross-Border Rule, where an account is owned by both U.S. persons and non-U.S. persons, the U.S.-person status of the account, as a general matter, turns on whether any U.S.-person owner of the account incurs obligations under the swap.[120] Neither the status of the fiduciary or other person managing the account, nor the discretionary or non-discretionary nature of the account, nor the status of the person at which the account is held or maintained, are relevant in determining the account's U.S.-person status.

### (iv) Exclusion of Unlimited U.S. Responsibility Prong

Unlike the Cross-Border Margin Rule, the proposed definition of "U.S. person" did not include certain legal entities that are owned by one or more U.S. person(s) and for which such person(s) bear unlimited responsibility for the obligations and liabilities of the legal entity ("unlimited U.S. responsibility" prong).[121] The Commission invited comment on whether it should include an unlimited U.S. responsibility prong in the definition of "U.S. person," and if not, whether it should revise its interpretation of "guarantee" in a manner consistent with the SEC such that persons that would have been considered U.S. persons pursuant to an unlimited U.S. responsibility prong would instead be considered entities with guarantees from a U.S. person.[122]

Chatham and IIB/SIFMA agreed that the Commission should not include an unlimited U.S. responsibility prong in the "U.S. Person" definition, noting that

[108] Final § 23.23(a)(23)(i)(A).

[109] Proposed Rule, 85 FR at 959–60. *See* 17 CFR 23.160(a)(10)(iv) and (v).

[110] Final § 23.23(a)(23)(i)(B).

[111] *See* 17 CFR 23.160(a)(10)(iv).

[112] Proposed Rule, 85 FR at 959.

[113] *See* 17 CFR 23.160(a)(10)(v).

[114] Proposed Rule, 85 FR at 959–60.

[115] Final § 23.23(a)(23)(i)(D).

[116] Proposed Rule, 85 FR at 960.

[117] *Id.*

[118] *Id. See* 17 CFR 23.160(a)(10)(vii).

[119] Final § 23.23(a)(23)(i)(C).

[120] *See* SEC Cross-Border Rule, 79 FR at 47312.

[121] Proposed Rule, 85 FR at 961. *See* 17 CFR 23.160(a)(10)(vi); Cross-Border Margin Rule, 81 FR at 34823–34824. *See also* Guidance, 78 FR at 45312–13 (discussing the unlimited U.S. responsibility prong for purposes of the Guidance).

[122] Proposed Rule, 85 FR at 969.

the persons that would be captured under the prong are corporate structures that are not commonly in use in the marketplace (*e.g.*, unlimited liability corporations, general partnerships, and sole proprietorships). IIB/SIFMA added that to the extent a firm uses this structure, the Commission can sufficiently address the resulting risks to the United States by treating the firm as having a guarantee from a U.S. person, as the SEC does.

The Commission is adopting as proposed a definition of "U.S. person" that does not include an unlimited U.S. responsibility prong. Although this corporate structure may exist in some limited form, the Commission does not believe that justifies the cost of classification as a "U.S. person." This prong was designed to capture persons that could give rise to risk to the U.S. financial system in the same manner as with non-U.S. persons whose swap transactions are subject to explicit financial support arrangements from U.S. persons.[123] Rather than including this prong in its "U.S. person" definition, the SEC took the view that when a non-U.S. person's counterparty has recourse to a U.S. person for the performance of the non-U.S. person's obligations under a security-based swap by virtue of the U.S. person's unlimited responsibility for the non-U.S. person, the non-U.S. person would be required to include the security-based swap in its security-based swap dealer (if it is a dealing security-based swap) and major security-based swap participant threshold calculations as a guarantee.[124] Therefore, as discussed below with respect to the definition of "guarantee," the Commission is clarifying that legal entities that are owned by one or more U.S. person(s) and for which such person(s) bear unlimited responsibility for the obligations and liabilities will be considered as having a guarantee from a U.S. person, similar to the approach in the SEC Cross-Border Rule. The CFTC's anti-evasion rules address concerns that persons may structure transactions to avoid classification as a U.S. person.[125]

The treatment of the unlimited U.S. liability prong in the Final Rule does not affect an entity's obligations with respect to the Cross-Border Margin Rule. To the extent that entities are considered U.S. persons for purposes of the Cross-Border Margin Rule as a result of the unlimited U.S. liability prong, the Commission believes that the different purpose of the registration-related rules

justifies this potentially different treatment.[126]

(v) Exclusion of Collective Investment Vehicle Prong

Consistent with the definition of "U.S. person" in the Cross-Border Margin Rule and the SEC Cross-Border Rule, the proposed definition did not include a commodity pool, pooled account, investment fund, or other CIV that is majority-owned by one or more U.S. persons.[127] This prong was included in the Guidance definition. The Commission invited comment on whether it is appropriate that commodity pools, pooled accounts, investment funds, or other CIVs that are majority-owned by U.S. persons would not be included in the proposed definition of "U.S. person."[128]

AIMA, Chatham, IIB/SIFMA, JFMC/IBAJ,[129] JBA, and State Street supported not including this prong in the "U.S. person" definition. They generally noted that there are practical difficulties in tracking the beneficial ownership in CIVs, and therefore, including a CIV prong would increase the complexity of the "U.S. person" definition. AIMA stated that this could necessitate conservative assumptions being made to avoid the risk of breaching regulatory requirements that depend on the status of investors in the vehicle. JBA noted that non-U.S. persons may choose not to enter into transactions with CIVs in which U.S. persons are involved to avoid the practical burdens of identifying and tracking the beneficial ownership of funds in real-time and the excessive cost arising from the registration threshold calculations. JFMC/IBAJ elaborated that ownership composition can change throughout the life of the vehicle due to redemptions and additional investments.

AIMA, Chatham, and State Street also noted that there are limited benefits to including a requirement to "look-through" non-U.S. CIVs to identify and track U.S. beneficial owners of such vehicles. AIMA stated that it is reasonable to assume that the potential investment losses to which U.S. investors in CIVs are exposed are limited to their initial capital investment. Chatham stated that the composition of a CIV's beneficial

owners is not likely to have a significant bearing on the degree of risk that the CIV's swap activity poses to the U.S. financial system, noting that CIVs organized or having a principal place of business in the U.S. would be under the Commission's authority, and majority-owned CIVs may be subject to margin requirements in foreign jurisdictions.

AIMA added that the definition of "U.S. person" in the Guidance is problematic for certain funds managed by investment managers because they are subject to European rules on clearing, margining, and risk mitigation.

After consideration of the comments, and consistent with the definition of "U.S. person" in the Cross-Border Margin Rule and the SEC Cross-Border Rule, the Commission is adopting as proposed a "U.S. person" definition that does not include a commodity pool, pooled account, investment fund, or other CIV that is majority-owned by one or more U.S. persons.[130] Similar to the SEC, the Commission is of the view that including majority-owned CIVs within the definition of "U.S. person" for the purposes of the Final Rule would likely cause more CIVs to incur additional programmatic costs associated with the relevant Title VII requirements and ongoing assessments, while not significantly increasing programmatic benefits given that the composition of a CIV's beneficial owners is not likely to have significant bearing on the degree of risk that the CIV's swap activity poses to the U.S. financial system.[131] Although many of these CIVs have U.S. participants that could be adversely affected in the event of a counterparty default, systemic risk concerns are mitigated to the extent these CIVs are subject to margin requirements in foreign jurisdictions. In addition, the exposure of participants to losses in CIVs is typically limited to their investment amount, and it is unlikely that a participant in a CIV would make counterparties whole in the event of a default.[132] Further, the Commission continues to believe that identifying and tracking a CIV's beneficial ownership may pose a significant challenge, particularly in certain circumstances such as fund-of-funds or master-feeder structures.[133] Therefore, although the U.S. participants in such CIVs may be adversely affected in the event of a counterparty default, the Commission has determined that the majority-

---

[123] *Id.* at 960–961.

[124] SEC Cross-Border Rule, 79 FR at 47308 n.255, 47316–47317.

[125] *See* 17 CFR 1.6.

[126] Proposed Rule, 85 FR at 961.

[127] *Id. See* Cross-Border Margin Rule, 81 FR at 34824; SEC Cross-Border Rule, 79 FR at 47311, 47337.

[128] Proposed Rule, 85 FR at 969.

[129] JFMC/IBAJ also requested that conforming amendments be made to the "U.S. person" definition under the Cross-Border Margin Rule. However, this comment is outside of the scope of the Final Rule.

[130] *See* Cross-Border Margin Rule, 81 FR at 34824; SEC Cross-Border Rule, 79 FR at 47311, 47337.

[131] Proposed Rule, 85 FR at 961. *See* SEC Cross-Border Rule, 79 FR at 47337.

[132] Proposed Rule, 85 FR at 961; SEC Cross-Border Rule, 79 FR at 47311.

[133] *See* Cross-Border Margin Rule, 81 FR at 34824.

ownership test should not be included in the definition of "U.S. person."

A CIV fitting within the majority U.S. ownership prong may also be a U.S. person within the scope of § 23.23(a)(23)(i)(B) of the Final Rule (entities organized or having a principal place of business in the United States). As the Commission clarified in the Cross-Border Margin Rule, whether a pool, fund, or other CIV is publicly offered only to non-U.S. persons and not offered to U.S. persons is not relevant in determining whether it falls within the scope of the "U.S. person" definition.[134]

(vi) Exclusion of Catch-All Prong

Unlike the non-exhaustive "U.S. person" definition provided in the Guidance,[135] the Commission proposed that the definition of "U.S. person" be limited to persons enumerated in the rule, consistent with the Cross-Border Margin Rule and the SEC Cross-Border Rule.[136] The Commission invited comment on whether the "U.S. person" definition should include a catch-all provision.[137]

AFEX/GPS, Chatham, IIB/SIFMA, and JBA supported elimination of the "include, but not limited to" language from the Guidance. AFEX/GPS stated that this approach should help facilitate compliance with Commission rules. Chatham stated that the catch-all prong works against the core purposes of the cross-border rules, to enhance regulatory cooperation and transparency. IIB/SIFMA stated that market participants have lacked any practical way to delineate the scope of that catch-all phrase, leading to legal uncertainty. JBA stated that the provision is difficult to interpret and leads to uncertainty, and potentially reduced transactions by market participants, leading to increased bifurcation in the market.

The Commission is adopting this aspect of the "U.S. person" definition as proposed.[138] Unlike the non-exhaustive "U.S. person" definition provided in the Guidance, the definition of "U.S. person" is limited to persons enumerated in the rule, consistent with the Cross-Border Margin Rule and the SEC Cross-Border Rule.[139] The

Commission believes that the prongs adopted in the Final Rule capture those persons with sufficient jurisdictional nexus to the U.S. financial system and commerce in the United States that they should be categorized as "U.S. persons."[140]

3. Principal Place of Business

The Commission proposed to define "principal place of business" as the location from which the officers, partners, or managers of the legal person primarily direct, control, and coordinate the activities of the legal person, consistent with the SEC definition of "U.S. person."[141] Additionally, with respect to a CIV, the Proposed Rule stated that this location is the office from which the manager of the CIV primarily directs, controls, and coordinates the investment activities of the CIV, and noted that activities such as formation of the CIV, absent an ongoing role by the person performing those activities in directing, controlling, and coordinating the investment activities of the CIV, generally would not be as indicative of activities, financial and legal relationships, and risks within the United States of the type that Title VII is intended to address as the location of a CIV manager.[142] The Commission invited comment on whether, when determining the principal place of business for a CIV, the Commission should consider including as a factor whether the senior personnel responsible for the formation and promotion of the CIV are located in the United States, similar to the approach in the Cross-Border Margin Rule.[143]

AIMA supported the proposed definition of "principal place of business" and stated that there are more relevant indicia of U.S. nexus than the activities of forming and promoting a CIV, such as the location of staff who control the investment activities of the CIV. Similarly, IIB/SIFMA supported adopting the SEC's "principal place of business" test for CIVs because it better captures business reality by focusing more on investment strategy rather than the location of promoters who do not have an ongoing responsibility for the vehicle.

The Commission is adopting the "principal place of business" aspect of the "U.S. person" definition as proposed.[144] As noted in the Cross-Border Margin Rule,[145] and consistent

with the SEC definition of "U.S. person," [146] § 23.23(a)(23)(ii) provides that the principal place of business means the location from which the officers, partners, or managers of the legal person primarily direct, control, and coordinate the activities of the legal person. With the exception of externally managed entities, as discussed below, the Commission is of the view that for most entities, the location of these officers, partners, or managers generally corresponds to the location of the person's headquarters or main office. However, the Commission believes that a definition that focuses exclusively on whether a legal person is organized, incorporated, or established in the United States could encourage some entities to move their place of incorporation to a non-U.S. jurisdiction to avoid complying with the relevant Dodd-Frank Act requirements, while maintaining their principal place of business—and therefore, risks arising from their swap transactions—in the United States. Moreover, a "U.S. person" definition that does not include a "principal place of business" element could result in certain entities falling outside the scope of the relevant Dodd-Frank Act-related requirements, even though the nature of their legal and financial relationships in the United States is, as a general matter, indistinguishable from that of entities incorporated, organized, or established in the United States. Therefore, the Commission is of the view that it is appropriate to treat such entities as U.S. persons for purposes of the Final Rule.[147]

However, determining the principal place of business of a CIV, such as an investment fund or commodity pool, may require consideration of additional factors beyond those applicable to operating companies.[148] The Commission interprets that, for an externally managed investment vehicle, this location is the office from which the manager of the vehicle primarily directs, controls, and coordinates the investment activities of the vehicle.[149] This interpretation is consistent with the Supreme Court's decision in *Hertz Corp.* v. *Friend,* which described a corporation's principal place of business, for purposes of diversity jurisdiction, as the "place where the corporation's high level officers direct, control, and coordinate the

---

[134] *Id.* at 34824 n.62.

[135] *See* Guidance, 78 FR at 45316.

[136] Proposed Rule, 85 FR at 961. *See* 17 CFR 23.160(a)(10); 17 CFR 240.3a71–3(a)(4); Cross-Border Margin Rule, 81 FR at 34824.

[137] Proposed Rule, 85 FR at 969.

[138] *Id.* at 961.

[139] *See* 17 CFR 23.160(a)(10); 17 CFR 240.3a71–3(a)(4); Cross-Border Margin Rule, 81 FR at 34824; Guidance, 78 FR at 45316 (discussing the inclusion of the prefatory phrase "include, but not limited to" in the interpretation of "U.S. person" in the Guidance).

[140] Proposed Rule, 85 FR at 961.

[141] Proposed § 23.23(a)(22)(ii); Proposed Rule, 85 FR at 960, 1003. *See* 17 CFR 240.3a71–3(a)(4)(ii).

[142] Proposed Rule, 85 FR at 960.

[143] *Id.* at 969.

[144] Final § 23.23(a)(23)(ii).

[145] Cross-Border Margin Rule, 81 FR at 34823.

[146] 17 CFR 240.3a71–3(a)(4)(ii).

[147] *See* Proposed Rule, 85 FR at 960; SEC Cross-Border Rule, 79 FR at 47309.

[148] Proposed Rule, 85 FR at 960.

[149] Final § 23.23(a)(23)(ii).

corporation's activities.'' [150] In the case of a CIV, the senior personnel that direct, control, and coordinate a CIV's activities are generally not the named directors or officers of the CIV, but rather persons employed by the CIV's investment advisor or promoter, or in the case of a commodity pool, its CPO. Therefore, consistent with the SEC Cross-Border Rule,[151] when a primary manager is responsible for directing, controlling, and coordinating the overall activity of a CIV, the CIV's principal place of business under the Final Rule is the location from which the manager carries out those responsibilities.

Under the Cross-Border Margin Rule,[152] the Commission generally considers the principal place of business of a CIV to be in the United States if the senior personnel responsible for either: (1) The formation and promotion of the CIV; or (2) the implementation of the CIV's investment strategy are located in the United States, depending on the facts and circumstances that are relevant to determining the center of direction, control, and coordination of the CIV. Although the second prong is consistent with the approach discussed above, the Commission does not believe that activities such as formation of the CIV, absent an ongoing role by the person performing those activities in directing, controlling, and coordinating the investment activities of the CIV, generally will be as indicative of activities, financial and legal relationships, and risks within the United States of the type that Title VII is intended to address as the location of a CIV manager.[153] The Commission may also consider amending the "U.S. person" definition in the Cross-Border Margin Rule in the future.

4. Exception for International Financial Institutions

The Commission proposed that, in consideration of the discretionary and appropriate exercise of international comity-based doctrines, the term "U.S. person" would not include certain multilateral and other international financial institutions.[154]

IIB/SIFMA supported the proposed exception for certain international financial institutions, noting that the Commission has routinely recognized

the special status afforded these institutions under the traditions of the international system by effectively treating them as non-U.S. persons for most purposes, and it is therefore appropriate for the Commission to codify this treatment through this exception. IIB/SIFMA also stated that the catch-all for "similar international organizations" appropriately addresses the international comity considerations that underlie this exception.

The Commission is adopting this aspect of the "U.S. person" definition as proposed, with a technical modification as discussed below.[155] Consistent with the SEC's definition,[156] the term "U.S. person" does not include the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies and pension plans, and any other similar international organizations, and their agencies and pension plans. The Commission believes that although such foreign entities are not necessarily immune from U.S. jurisdiction for commercial activities undertaken with U.S. counterparties or in U.S. markets, the sovereign or international status of such international financial institutions that themselves participate in the swap markets in a commercial manner is relevant in determining whether such entities should be treated as U.S. persons, regardless of whether any of the prongs of the definition apply.[157] There is nothing in the text or history of the swap-related provisions of Title VII to suggest that Congress intended to deviate from the traditions of the international system by including such international financial institutions within the definitions of the term "U.S. person."

Consistent with the Entities Rule and the Guidance, the Commission interprets the term "international financial institutions" to include the "international financial institutions" that are defined in 22 U.S.C. 262r(c)(2) and institutions defined as "multilateral development banks" in the European Union's regulation on "OTC derivatives, central counterparties and trade

repositories." [158] Reference to 22 U.S.C. 262r(c)(2) and the European Union definition is consistent with Commission precedent in the Entities Rule.[159] Both of those definitions identify many of the entities for which discretionary and appropriate exercise of international comity-based doctrines is appropriate with respect to the "U.S. person" definition.[160] This prong also includes institutions identified in CFTC Staff Letters 17–34 [161] and 18–13.[162] In CFTC Staff Letter 17–34, Commission staff provided relief from CFTC margin requirements to swaps between SDs and the European Stability Mechanism ("ESM"),[163] and in CFTC Staff Letter

---

[150] 559 U.S. 77, 80 (2010). *See* Proposed Rule, 85 FR at 960; Cross-Border Margin Rule, 81 FR at 34823.

[151] *See* SEC Cross-Border Rule, 79 FR at 47310–47311.

[152] Cross-Border Margin Rule, 81 FR at 34823.

[153] Proposed Rule, 85 FR at 960.

[154] Proposed § 23.23(a)(22)(iii); Proposed Rule, 85 FR at 961–962, 1003.

[155] Final § 23.23(a)(23)(iii).

[156] *See* 17 CFR 240.3a71–3(a)(4)(iii).

[157] Proposed Rule, 85 FR at 961–962. *See, e.g.,* Entities Rule, 77 FR at 30692–30693 (discussing the application of the "swap dealer" and "major swap participant" definitions to foreign governments, foreign central banks, and international financial institutions). *See also* Guidance, 78 FR at 45353 n.531.

[158] Regulation (EU) No 648/2012 of the European Parliament and of the Council on OTC Derivative Transactions, Central Counterparties and Trade Repositories, Article 1(5(a)) (July 4, 2012), available at *https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32012R0648.* Article 1(5(a)) references Section 4.2 of Part 1 of Annex VI to Directive 2006/48/EC, available at *https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32006L0048.*

[159] Entities Rule, 77 FR at 30692 n.1180. The Guidance referenced the Entities Rule's interpretation as well. Guidance, 78 FR at 45353 n.531.

[160] The definitions overlap but together include the following: The International Monetary Fund, International Bank for Reconstruction and Development, European Bank for Reconstruction and Development, International Development Association, International Finance Corporation, Multilateral Investment Guarantee Agency, African Development Bank, African Development Fund, Asian Development Bank, Inter-American Development Bank, Bank for Economic Cooperation and Development in the Middle East and North Africa, Inter-American Investment Corporation, Council of Europe Development Bank, Nordic Investment Bank, Caribbean Development Bank, European Investment Bank and European Investment Fund. Note that the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, and the Multilateral Investment Guarantee Agency are parts of the World Bank Group.

[161] *See* CFTC Staff Letter No. 17–34, Commission Regulations 23.150–159, 161: No-Action Position with Respect to Uncleared Swaps with the European Stability Mechanism (Jul. 24, 2017), available at *https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/17-34.pdf. See also* CFTC Staff Letter No. 19–22, Commission Regulations 23.150–159, 23.161: Revised No-Action Position with Respect to Uncleared Swaps with the European Stability Mechanism (Oct. 16, 2019), available at *https://www.cftc.gov/csl/19-22/download.*

[162] *See* CFTC Staff Letter No. 18–13, No-Action Position: Relief for Certain Non-U.S. Persons from Including Swaps with International Financial Institutions in Determining Swap Dealer and Major Swap Participant Status (May 16, 2018), available at *https://www.cftc.gov/sites/default/files/csl/pdfs/18-13.pdf.*

[163] *See* CFTC Staff Letter No. 17–34. In addition, in May 2020, the Commission adopted an amendment to § 23.151 to exclude ESM from the definition of "financial end user," which will have the effect of excluding swaps between certain SDs and ESM from the Commission's uncleared swap margin requirements. *See* Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants, 85 FR 27674 (May 11, 2020).

18–13, Commission staff identified the North American Development Bank ("NADB") as an additional entity that should be considered an international financial institution for purposes of applying the SD and MSP definitions.[164] Interpreting the definition to include the two entities identified in CFTC Staff Letters 17–34 and 18–13 is consistent with the discretionary and appropriate exercise of international comity because the status of both entities is similar to that of the other international financial institutions identified in the Entities Rule. Consistent with the SEC definition of "U.S. person," the Final Rule lists specific international financial institutions but also provides a catch-all for "any other similar international organizations, and their agencies and pension plans." As a technical edit, the Commission notes that the catch-all for international financial institutions in the Final Rule now includes "and" in the clause "*and* their agencies and pension plans." The catch-all provision extends to any of the entities discussed above that are not explicitly listed in the Final Rule.[165]

5. Reliance on Prior Representations

As noted above in section II.A, the Final Rule states that a person may rely on a written representation from its counterparty that the counterparty does or does not satisfy the criteria for one or more of the definitions, unless such person knows or has reason to know that the representation is not accurate.[166]

Further, with respect to the "U.S. person" definition, to provide certainty to market participants, the Commission proposed to permit reliance, until December 31, 2025, on any U.S. person-related representations that were obtained to comply with the Cross-Border Margin Rule.[167] The Commission also stated that any person designated as a "U.S. person" under the Proposed Rule would also be a "U.S. person" under the Guidance, and therefore, market participants would also be able to rely on representations previously obtained under the "U.S. person" definition in the Guidance.[168]

IIB/SIFMA and State Street recommended that the reliance on U.S.

person representations made with respect to the Cross-Border Margin Rule should be permitted on a permanent basis. State Street asserted that permanent relief raises no new policy considerations, eliminates a "cliff effect" in 2025, and eliminates the potential need for market participants to seek Commission extension of the 2025 deadline should circumstances arise where seeking new representations is impractical or unduly burdensome. Additionally, IIB/SIFMA, ISDA, JFMC/IBAJ, and State Street stated that reliance should explicitly be permitted with respect to representations made pursuant to the Guidance. JFMC/IBAJ stated that this would be appropriate given the compliance burdens associated with obtaining representations. State Street noted that the Commission would increase clarity and market efficiency by explicitly providing for Guidance-related representations in final rule text.

In response to these comments, the Commission notes that it proposed temporary reliance on prior representations in the Proposed Rule because it assumed that SDs and MSPs somewhat routinely amend swap trading relationship documentation and thus updated representations based on the proposed U.S. person definition could be obtained in the course of these routine amendments. Permitting temporary reliance to facilitate this method of updating representations is less burdensome and more cost efficient than requiring all affected SDs and MSPs to update representations within a relatively brief compliance period. The Commission has determined that permanent reliance on representations obtained under the Guidance or the Cross-Border Margin Rule would be contrary to good recordkeeping practices, particularly for dormant relationships, which require updated representations within a set time period. Additionally, there are a variety of circumstances that routinely lead SDs and MSPs to amend counterparty trading relationship documentation, such as address changes, payment detail updates, ISDA definition changes, and LIBOR amendments.

To relieve concerns that the December 31, 2025 deadline is burdensome, the Commission is adopting an approximately seven year time limit, until December 31, 2027, for reliance on "U.S. person" representations made pursuant to the Cross-Border Margin Rule, instead of the five year limit that was proposed.[169] Thus, for those counterparties for whom a person has

already obtained U.S. person-related representations under the Cross-Border Margin Rule, U.S. person-related representations under the Final Rule will only be required from those counterparties with whom swaps are entered after December 31, 2027. Nevertheless, best practice is to obtain updated representations as soon as practicable.

In addition, the Commission has adjusted the rule text of § 23.23(a)(23)(iv) to clarify that reliance is only permitted for representations obtained prior to the effective date of the Final Rule.[170] Persons should not be permitted to rely on representations obtained pursuant to the Cross-Border Margin Rule after the effective date of the Final Rule when such persons could have also obtained representations pursuant to the Final Rule contemporaneously therewith.

The Commission reiterates that it believes that any person designated as a "U.S. person" under the Final Rule is also a "U.S. person" under the Guidance definition, as the Final Rule's definition is narrower in scope. Therefore, the Commission is of the view that market participants may also rely on representations previously obtained using the "U.S. person" definition in the Guidance.[171] A representation obtained under the Guidance should not be relied on permanently, and new representations should be obtained as soon as practicable, but in the Commission's view it would not be appropriate to rely on representations under the Guidance after the December 31, 2027 deadline for similar representations made under the Cross-Border Margin Rule. Thus, for those counterparties for whom a person has already obtained U.S. person-related representations under the Guidance, U.S. person-related representations under the Final Rule will only be required from those counterparties with whom swaps are entered after December 31, 2027.

In response to commenters, the Commission has determined to add rule text permitting reliance on representations obtained under the Guidance.[172] The Commission understands that while the Guidance is non-binding, many market participants have chosen to develop policies and practices that take into account the views expressed therein, including expending time and resources to classify counterparties in accordance with the interpretation of the term "U.S. person"

---

[164] *See* CFTC Staff Letter 18–13. *See also* CFTC Staff Letter 17–59 (Nov. 17, 2017) (providing no-action relief to NADB from the swap clearing requirement of section 2(h)(1) of the CEA), available at *https://www.cftc.gov/idc/groups/public/%40lrlettergeneral/documents/letter/17-59.pdf*.

[165] Proposed Rule, 85 FR at 962.

[166] Final § 23.23(a).

[167] Proposed § 23.23(a)(22)(iv); Proposed Rule, 85 FR at 962, 1003.

[168] Proposed Rule, 85 FR at 962.

[169] Final § 23.23(a)(23)(iv).

[170] Final § 23.23(a)(23)(iv)(A).

[171] Proposed Rule, 85 FR at 962.

[172] Final § 23.23(a)(23)(iv)(B).

as set forth in the Guidance. Adding rule text permitting reliance on representations obtained under the Guidance recognizes, and should reduce, the practical burdens of compliance with the Final Rule by enhancing regulatory certainty.

Finally, the rule text of § 23.23(a)(23)(iv)(B) clarifies that reliance is only permitted for representations obtained prior to the effective date of the Final Rule. As with U.S. person-related representations obtained pursuant to the Cross-Border Margin Rule, persons should not be permitted to rely on representations obtained pursuant to the Guidance after the effective date of the Final Rule when such persons could have also obtained representations pursuant to the Final Rule contemporaneously therewith.

### 6. Other

The Commission considers the following comments in connection with the proposed "U.S. person" definition beyond the scope of this rulemaking and is not addressing them in the Final Rule. However, the Commission takes these comments under advisement for any relevant future Commission action.

AIMA encouraged the CFTC to use the proposed "U.S. person" definition universally across all Title VII requirements and the CEA, including in part 4 for CPOs, commodity pools, and commodity trading advisors ("CTAs"). CS encouraged further harmonization of the "U.S. person" definition, to the extent possible, within the context of SD activity, including the CFTC's capital and margin rules. IIB/SIFMA recommended making conforming changes to the "U.S. person" definition under the Cross-Border Margin Rule to avoid the confusion that will arise from using different definitions of the same term in a single, comprehensive regulatory regime. Finally, JFMC/IBAJ and JSCC requested that the Commission specify that the "U.S. person" definition would also apply to, and supersede, the definition referenced in the CFTC's Orders of Exemption from Registration granted to the Japan Securities Clearing Corporation.[173]

### C. Guarantee

#### 1. Proposed Rule

The Commission proposed defining "guarantee" as an arrangement, pursuant to which one party to a swap has rights of recourse against a

guarantor, with respect to its counterparty's obligations under the swap.[174] For these purposes, a party to a swap would have rights of recourse against a guarantor if the party has a conditional or unconditional legally enforceable right to receive or otherwise collect, in whole or in part, payments from the guarantor with respect to its counterparty's obligations under the swap. Also, the term "guarantee" would encompass any arrangement pursuant to which the guarantor itself has a conditional or unconditional legally enforceable right to receive or otherwise collect, in whole or in part, payments from any other guarantor with respect to the counterparty's obligations under the swap.

#### 2. Summary of Comments

In general, AFEX/GPS, Chatham, IIB/SIFMA, and JFMC/IBAJ supported the proposed "guarantee" definition, while AFR, Barnard, and Better Markets opposed the proposed definition.

AFEX/GPS, Chatham, and JFMC/IBAJ supported the consistency of the proposed definition with the definition in the Cross-Border Margin Rule. JFMC/IBAJ also supported the consistency with the SEC Cross-Border Rule. AFEX/GPS and Chatham noted that the consistency would make the definition more workable.

AFEX/GPS stated that using the broad and vague definition of guarantee in the Guidance, which includes consideration of "facts and circumstances" and a non-exclusive list of examples, would not be appropriate, while the proposed definition would be objective and should facilitate compliance without sacrificing concerns about systemic risk flowing back to the United States. Chatham stated that the proposed definition would provide greater legal certainty around what is considered to be a guarantee and focuses the Commission's authority on potential significant risks to the U.S. financial system. IIB/SIFMA noted that the proposed definition would promote legal certainty by establishing a clearer test for when a non-U.S. person is considered to have financial support from a U.S. person, eliminating coverage of certain risk-shifting arrangements (*e.g.,* keepwells and liquidity puts) that do not provide a non-U.S. person's counterparty with recourse against a U.S. guarantor. IIB/SIFMA added that to the extent a firm uses the unlimited U.S. responsibility structure (discussed in section II.B.2.iv above), the Commission could sufficiently address the resulting

risks to the United States by treating the firm as having a guarantee from a U.S. person, as the SEC does, rather than considering such an entity a U.S. person. JFMC/IBAJ stated that the definition under the Guidance introduced compliance challenges to market participants globally, including difficulties in confirming or obtaining representations from counterparties regarding whether certain arrangements, particularly purely internal arrangements within a counterparty's corporate group, constituted a "guarantee." JFMC/IBAJ also supported the clarification that a non-U.S. person would be considered a "guaranteed entity," as described below, only with respect to swaps that are guaranteed by a U.S. person.

ISDA, IIB/SIFMA, JFMC/IBAJ, and State Street also recommended that the Commission permit reliance on guarantee-related representations received pursuant to the Cross-Border Margin Rule and Guidance, analogous to the Proposed Rule and related comments with respect to the "U.S. person" definition, discussed above. IIB/SIFMA and State Street stated that such reliance should not be time limited.

AFR asserted that the narrower definition of guarantee, as compared to the Guidance, would permit numerous informal or even formal forms of guarantees between U.S. parent corporations and their subsidiaries to escape the definition. Barnard stated that the narrower definition would allow significant risk to be transferred back to the U.S. financial system over time. Barnard noted that economic implications are just as important as legal considerations, as confirmed and intended by CEA section 2(i)(1). Similarly, Better Markets recommended that the Commission revise its proposed definition of "guarantee" to include all forms of U.S. financial support used to facilitate dealing through non-U.S. affiliates because financial arrangements posing potential risks to U.S. persons and the U.S. financial system include more than solely contractual guarantees contained in swap trading relationship documentation between non-U.S. counterparties.

Better Markets added that a narrower definition of "guarantee" would elevate form over substance and have possible significant adverse effects on the U.S. financial system. Better Markets did not agree that a definition posing possible significant adverse effects on the U.S. financial system nevertheless should be adopted, merely because the proposed "guarantee" definition mirrors the definition in the Cross-Border Margin

---

[173] *See* Amended Order of Exemption from Registration issued for JSCC (May 15, 2017), available at *https://www.cftc.gov/idc/groups/public/@otherif/documents/ifdocs/jsccdcoexemptamdorder5-15-17.pdf.*

[174] Proposed § 23.23(a)(8); Proposed Rule, 85 FR at 963–64, 1002–03.

Rule and therefore would not demand "a separate independent assessment." Better Markets asserted that it is neither a valid statutory purpose nor a benefit that outweighs, or even reasonably approximates, its costs. Better Markets added that CEA section 5(b) and related provisions make clear that the CFTC's core statutory policy objectives are to protect the safety and soundness of SDs, prevent disruptions to the integrity of derivatives markets, ensure the financial integrity of swaps transactions and the avoidance of systemic risk, and preserve the stability of the U.S. financial system.

Better Markets also stated that the CFTC's use of the margin-related "guarantee" definition is not appropriate. Its view was that margin requirements on uncleared swaps are market and credit risk mitigants that are imposed on specific portfolios of derivatives with specific counterparties, while the proposed definition would address broader systemic risk reduction and other policy objectives, including statutory concerns about the evasion of U.S. law through legal entity booking strategies. Further, Better Markets asserted that the narrower definition would increase risks to U.S. persons, because the definition would result in fewer swaps transactions being treated as "guaranteed," opening a loophole for dealing conducted through unregistered affiliates of U.S. banks that nevertheless benefit from direct U.S. financial support.

### 3. Final Rule

After carefully considering the comments received, the Commission is adopting the definition of "guarantee" as proposed, with certain modifications and clarifications as discussed below.[175]

Consistent with the Cross-Border Margin Rule, the term "guarantee" applies regardless of whether the right of recourse is conditioned upon the non-U.S. person's insolvency or failure to meet its obligations under the relevant swap, and regardless of whether the counterparty seeking to enforce the guarantee is required to make a demand for payment or performance from the non-U.S. person before proceeding against the U.S. guarantor.[176] The terms of the guarantee need not necessarily be included within the swap documentation or even otherwise reduced to writing, provided that, under the laws of the relevant jurisdiction, a swap counterparty has a conditional or unconditional legally enforceable right, in whole or in part, to receive payments from, or otherwise collect from, the U.S. person in connection with the non-U.S. person's obligations under the swap. For purposes of the Final Rule, the Commission generally considers swap activities involving guarantees from U.S. persons to satisfy the "direct and significant" test under CEA section 2(i).[177]

However, in contrast to the Cross-Border Margin Rule and the Proposed Rule, but consistent with the recommendation by IIB/SIFMA, the Commission is interpreting "guarantee" in a manner similar to the SEC, specifically with respect to the unlimited U.S. responsibility prong. Similar to the SEC, when a non-U.S. person's counterparty has recourse to a U.S. person for the performance of the non-U.S. person's obligations under a swap by virtue of the U.S. person's unlimited responsibility for the non-U.S. person, such an arrangement is considered a guarantee, and as discussed in sections III.B.3.i and IV.B.3.i below, the non-U.S. person is required to include the swap in its SD and MSP threshold calculations, respectively.[178] As noted above, the Commission is not including the unlimited U.S. responsibility prong in the "U.S. person" definition, but interprets such relationships as guarantees to ensure they are appropriately covered by the Final Rule.

The term "guarantee" also encompasses any arrangement pursuant to which the counterparty to the swap has rights of recourse, regardless of the form of the arrangement, against at least one U.S. person (either individually, jointly, and/or severally with others) for the non-U.S. person's obligations under the swap. This addresses concerns that swaps could be structured such that they would not count toward a non-U.S. person's threshold calculations. For example, consider a swap between two non-U.S. persons ("Party A" and "Party B"), where Party B's obligations to Party A under the swap are guaranteed by a non-U.S. affiliate ("Party C"), and where Party C's obligations under the guarantee are further guaranteed by a U.S. parent entity ("Parent D"). The definition of "guarantee" deems a guarantee to exist between Party B and Parent D with respect to Party B's obligations under the swap with Party A.[179]

The Commission's definition of guarantee is not affected by whether the U.S. guarantor is an affiliate of the non-U.S. person because, regardless of affiliation, the swap counterparty has a conditional or unconditional legally enforceable right, in whole or in part, to receive payments from, or otherwise collect from, the U.S. person in connection with the non-U.S. person's obligations.

Also, the "guarantee" definition does not apply when a non-U.S. person has a right to be compensated by a U.S. person with respect to the non-U.S. person's own obligations under the swap. For example, consider a swap between two non-U.S. persons ("Party E" and "Party F"), where Party E enters into a back-to-back swap with a U.S. person ("Party G"), or enters into an agreement with Party G to be compensated for any payments made by Party E under the swap in return for passing along any payments received. In such an arrangement, a guarantee does not exist because Party F does not have a right to collect payments from Party G with respect to Party E's obligations under the swap (assuming no other agreements exist).[180]

As with the Cross-Border Margin Rule, the definition of "guarantee" in the Final Rule is narrower in scope than the one used in the Guidance.[181] Under the Guidance, the Commission advised that it would interpret the term "guarantee" generally to include not only traditional guarantees of payment or performance of the related swaps, but also other formal arrangements that, in view of all the facts and circumstances, support the non-U.S. person's ability to pay or perform its swap obligations. The Commission stated that it believed that it was necessary to interpret the term "guarantee" to include the different financial arrangements and structures that transfer risk directly back to the United States.[182] The Commission is aware that many other types of financial arrangements or support, other than a guarantee as defined in the Final Rule, may be provided by a U.S. person to a non-U.S. person (e.g., keepwells and liquidity puts, certain types of indemnity agreements, master trust agreements, liability or loss transfer or sharing agreements). The Commission understands that these other financial arrangements or support transfer risk directly back to the U.S. financial system, with possible adverse effects, in a manner similar to a guarantee with a

---

[175] Final § 23.23(a)(9).

[176] Proposed Rule, 85 FR at 963–64. *See* 17 CFR 23.160(a)(2); Cross-Border Margin Rule, 81 FR at 34825.

[177] Proposed Rule, 85 FR at 963.

[178] *See* SEC Cross-Border Rule, 79 FR at 47316–47317, 47344.

[179] Proposed Rule, 85 FR at 963. *See* Cross-Border Margin Rule, 81 FR at 34825.

[180] Proposed Rule, 85 FR at 963. *See* Cross-Border Margin Rule, 81 FR at 34825.

[181] *See* Cross-Border Margin Rule, 81 FR at 34824.

[182] Guidance, 78 FR at 45320.

direct recourse to a U.S. person. However, the Commission has determined that a narrower definition of guarantee than that in the Guidance achieves a more workable framework for non-U.S. persons, particularly because the Final Rule's definition of "guarantee" is consistent with the Cross-Border Margin Rule, and therefore does not require a separate independent assessment, without undermining the protection of U.S. persons and the U.S. financial system. The Commission is sympathetic to comments regarding, and is independently aware of, the difficulty in confirming or obtaining representations from counterparties regarding whether certain arrangements, particularly purely internal arrangements within a counterparty's corporate group, constitute a "guarantee." However, such difficulty does not extend to classifying as guarantees arrangements that provide a non-U.S. person's counterparty with recourse to a U.S. person for the performance of the non-U.S. person's obligations under a swap.

A broad definition of guarantee, as recommended by AFR, Barnard, and Better Markets, would make it difficult for certain entities to determine whether their counterparty is guaranteed or not. General consistency with the Cross-Border Margin Rule definition means no additional burden for market participants. Additionally, though the definition of "guarantee" in the Guidance was broader, having a specific standard in a rule is preferable to an open-ended interpretation. The Commission recognizes that the definition of "guarantee" could lead to certain entities counting fewer swaps towards their SD or MSP thresholds or qualify additional counterparties for exceptions to certain regulatory requirements as compared to the definition in the Guidance. However, such concerns could be mitigated to the extent such non-U.S. persons meet the definition of a "significant risk subsidiary," and thus, as discussed below, are required to count certain swaps or swap positions toward their SD or MSP registration thresholds. In this way, non-U.S. persons receiving support from a U.S. person and representing a significant risk to the U.S. financial system are captured by the Final Rule. Accordingly, the Final Rule achieves the dual goals of protecting the U.S. markets and promoting a workable cross-border framework.

In response to comments, the Commission is adopting language in the "guarantee" definition that is parallel to the language for "U.S. persons,"

allowing persons to rely on counterparty representations with respect to a counterparty's "guarantee" status obtained pursuant to the Cross-Border Margin Rule. As discussed above, permitting temporary reliance to facilitate this method of updating representations is less burdensome and more cost efficient than requiring all affected SDs to update representations within a relatively brief compliance period. However, permanent reliance on representations obtained under the Guidance or the Cross-Border Margin Rule would be inconsistent with good recordkeeping practices, particularly for dormant relationships, thus, the Commission has determined to require an updated representation within a set time period. The Commission is thus adopting an approximately seven year time limit, until December 31, 2027, on counterparty representations with respect to a counterparty's "guarantee" status obtained pursuant to the Cross-Border Margin Rule, the same as is permitted for reliance on the "U.S. person" representations. Thus, for those counterparties for whom a person has already obtained guarantee-related representations under the Cross-Border Margin Rule, guarantee-related representations under the Final Rule will only be required from those counterparties with whom swaps are entered after December 31, 2027. Nevertheless, best practice is to obtain updated representations as soon as practicable.

In addition, the Commission has adjusted the rule text of § 23.23(a)(9) to clarify that reliance is only permitted for representations obtained prior to the effective date of the Final Rule.[183] Persons should not be permitted to rely on representations obtained pursuant to the Cross-Border Margin Rule after the effective date of the Final Rule when such persons could have also obtained representations pursuant to the Final Rule contemporaneously therewith.

The Commission believes that any "guarantee" related representation received under the Guidance definition would also apply under the Final Rule, as the Final Rule's definition is generally narrower in scope. Therefore, the Commission is of the view that market participants may also rely on representations previously obtained using the "guarantee" definition in the Guidance.[184] Nevertheless, a

representation obtained under the Guidance should not be relied on permanently and should be obtained as soon as practicable, but in the Commission's view it would not be appropriate to rely on representations under the Guidance after the December 31, 2027 deadline for similar representations made under the Cross-Border Margin Rule. Thus, for those counterparties for whom a person has already obtained guarantee-related representations under the Guidance, guarantee-related representations under the Final Rule will only be required from those counterparties with whom swaps are entered after December 31, 2027.

In response to commenters, the Commission has determined to add rule text permitting reliance on representations obtained under the Guidance.[185] The Commission understands that while the Guidance is non-binding, many market participants have chosen to develop policies and practices that take into account the views expressed therein, including expending time and resources to classify counterparties in accordance with the interpretation of the term "guarantee" as set forth in the Guidance. Adding rule text permitting reliance on representations obtained under the Guidance recognizes, and should reduce, the practical burdens of compliance with the Final Rule by enhancing regulatory certainty.

Finally, the rule text of § 23.23(a)(9)(ii) clarifies that reliance is only permitted for representations obtained prior to the effective date of the Final Rule. As with guarantee-related representations obtained pursuant to the Cross-Border Margin Rule, persons should not be permitted to rely on representations obtained pursuant to the Guidance after the effective date of the Final Rule when such persons could have also obtained representations pursuant to the Final Rule contemporaneously therewith.

For ease of understanding, the discussion in this release uses the term "Guaranteed Entity" to refer to a non-U.S. person whose swaps are guaranteed by a U.S. person, but only with respect to the swaps that are so guaranteed. Thus, a non-U.S. person may be a Guaranteed Entity with respect to its swaps with certain counterparties because the non-U.S. person's swaps with those counterparties are guaranteed, but would not be a Guaranteed Entity with respect to its

---

[183] Final § 23.23(a)(9)(i).

[184] An SD or MSP may not rely on a representation obtained for purposes of the Guidance that a counterparty's swaps are not guaranteed by a U.S. person if the SD or MSP has classified the counterparty as a U.S. person under

the unlimited U.S. responsibility prong of the U.S. person definition in the Guidance.

[185] Final § 23.23(a)(9)(ii).

swaps with other counterparties if the non-U.S. person's swaps with the other counterparties are not guaranteed by a U.S. person. In other words, depending on the nature of the trading relationship, a single entity could be a Guaranteed Entity with respect to some of its swaps, but not others.

Additionally, this release uses the term "Other Non-U.S. Person" to refer to a non-U.S. person that is neither a Guaranteed Entity nor a significant risk subsidiary (as defined below).[186] Depending on an entity's corporate structure and financial relationships, a single entity could be both a Guaranteed Entity and a significant risk subsidiary and, as noted above, it may be a Guaranteed Entity for certain of its swaps and an Other Non-U.S. Person for others.

## D. Significant Risk Subsidiary, Significant Subsidiary, Subsidiary, Parent Entity, and U.S. GAAP

### 1. Proposed Rule

The Commission proposed a new category of entity termed a significant risk subsidiary ("SRS"). Under the Proposed Rule, a non-U.S. person would be considered an SRS if: (1) The non-U.S. person is a "significant subsidiary" of an "ultimate U.S. parent entity," as those terms were proposed to be defined; (2) the "ultimate U.S. parent entity" has more than $50 billion in global consolidated assets, as determined in accordance with U.S. generally accepted accounting principles ("GAAP") at the end of the most recently completed fiscal year; and (3) the non-U.S. person is not subject to either: (a) Consolidated supervision and regulation by the Board of Governors of the Federal Reserve System ("Federal Reserve Board") as a subsidiary of a U.S. bank holding company ("BHC"); or (b) capital standards and oversight by the non-U.S. person's home country regulator that are consistent with the Basel Committee on Banking Supervision's "International Regulatory Framework for Banks" ("Basel III") and margin requirements for uncleared swaps in a jurisdiction for which the Commission has issued a comparability determination ("CFTC Margin Determination") with respect to uncleared swap margin requirements.[187] If an entity is determined to be an SRS, the Commission proposed to apply certain regulations to the entity in the same manner as a U.S. person in some instances, for example in the application of the SD and MSP

registration threshold calculations, and in the same manner as a Guaranteed Entity in other instances, for example in the application of group B and C requirements.

With respect to conduit affiliates, the Guidance included a discussion of factors that would be taken into account when determining whether an entity was a conduit affiliate of a U.S. person. The Proposed Rule stated that this concept was not being included in the proposed regulations because the concerns posed by a conduit affiliate were intended to be addressed through the proposed definition and regulation of SRSs.

### 2. Summary of Comments

In the Proposed Rule, the Commission asked whether it should use the concept of a conduit affiliate, as was done in the Guidance, in order to harmonize with the SEC.[188] AEFX/GPS, Chatham, JFMC/IBAJ, and IIB/SIFMA all stated that they prefer the SRS entity definition to the use of the conduit affiliate concept from the Guidance. AFEX/GPS, Chatham, and IIB/SIFMA stated that the objective criteria in the SRS definition are preferable to the conduit affiliate concept in the Guidance, which is more difficult to apply. JFMC/IBAJ and IIB/SIFMA also commented that the SRS definition is an improvement over the FCS concept previously proposed in the 2016 Proposal because the SRS definition excludes those subsidiaries that are not significant to their parent entities. Better Markets stated that the proposed SRS definition does not address the avoidance and evasion risks addressed by the conduit affiliate concept in the Guidance. IATP suggested that the previously proposed FCS concept be retained in place of the SRS definition. JBA stated that market participants have already assessed, under the Guidance, whether their activities are subject to the swap rules based on the attributes of their counterparties and requiring them to re-assess will create significant burdens on market participants. ISDA suggested that with respect to SRSs, entities should be permitted to rely on counterparty representations pertaining to conduit affiliates as described in the Guidance.

CS and IIB/SIFMA stated that the exclusion for subsidiaries of BHCs in the SRS definition should be expanded to include those entities that are subsidiaries of intermediate holding companies ("IHCs"). These commenters noted that IHCs are subject to prudential regulation, including Basel III capital

requirements, stress testing, liquidity, and risk management requirements.

JFMC/IBAJ and IIB/SIFMA suggested that accounting consolidation does not create a sufficient jurisdictional nexus to the United States because there is no requirement that the U.S. entity be directly liable for the foreign subsidiary's swaps. These commenters stated that if the SRS definition is nevertheless retained then the proposed significance tests should also be retained. IIB/SIFMA and the Working Group stated that the definition of ultimate U.S. parent entity should be limited to those groups of entities where the top-tier ultimate parent company is a U.S. person.

With respect to the exception in § 23.23(a)(13)(i) for subsidiaries of BHCs, AFR and Better Markets stated that the Commission should eliminate this exception because deference to the prudential regulators in this way is not justified. AFR noted the failure of prudential supervision of banks to adequately address derivatives markets risks prior to the 2008 financial crisis. IATP, AFR, and Barnard stated that the broad exemptions would exclude almost all foreign subsidiaries of U.S. companies and be a significant reduction in the application of the Commission's swap regulations. Better Markets stated that the Commission does not have the discretion to determine whether and when to apply U.S. regulatory requirements based on principles of international comity when there is a direct and significant risk to U.S. BHCs and the U.S. financial system.

Better Markets suggested that if the SRS definition is retained then there should be two additional significance tests added to those in § 23.23(a)(14). This commenter proposed that if an entity were to meet a risk transfer test, measuring the notional amount of swaps that are back-to-back with U.S. entities, or a risk acceptance test, measuring the trading activity of the subsidiary over a three month time period, then the entity would be considered a significant subsidiary.

The Working Group suggested that the proposed SRS definition should be modified to limit the applicability to only those entities that qualify as financial entities because the systemic risk associated with non-financial entities is mitigated because their activities primarily take place outside of the financial system. The Working Group agreed with the Commission's proposal to exclude from the SRS definition those entities that are subject to oversight by the non-U.S. person's home country regulator and capital

---

[186] Note that an Other Non-U.S. Person can include a registered SD or MSP.

[187] Proposed Rule, 85 FR at 964–968.

[188] Proposed Rule, 85 FR at 969–970.

standards consistent with Basel III. However, the commenter added that to the extent a regulator has exempted a particular type of entity from capital requirements otherwise consistent with Basel III, the CFTC should defer to such exemption and consider such entity as subject to comparable capital requirements.

3. Final Rule and Commission Response

The Commission is adopting the SRS definition as proposed, with two modifications as discussed below. First, the Final Rule adds IHCs to the exclusion in § 23.23(a)(13)(i) for those companies that are subject to consolidated supervision and regulation by the Federal Reserve Board. Second, with respect to the carve-out in § 23.23(a)(13)(ii), the Final Rule makes a clarifying revision to the margin requirements aspect of that provision.

(i) Non-U.S. Persons With U.S. Parent Entities

As discussed in the Proposed Rule, in addition to the U.S. persons described above in section II.B, the Commission understands that U.S. persons may organize the operations of their businesses through the use of one or more subsidiaries that are organized and operated outside the United States.[189] Through consolidation, non-U.S. subsidiaries of U.S. persons may permit U.S. persons to accrue risk through the swap activities of their non-U.S. subsidiaries. This risk, in the aggregate, may have a significant effect on the U.S. financial system. Therefore, the Commission may subject consolidated non-U.S. subsidiaries of U.S. persons to Commission regulation due to their direct and significant relationship to their U.S. parent entities. Further, consolidated non-U.S. subsidiaries of U.S. parent entities present a greater supervisory interest to the CFTC, relative to Other Non-U.S. Persons.[190] Moreover, because U.S. persons have regulatory obligations under the CEA that Other Non-U.S. Persons may not have, consolidated non-U.S. subsidiaries of U.S. parent entities present a greater supervisory interest to the CFTC relative to Other Non-U.S. Persons due to the Commission's interest in preventing the evasion of obligations under the CEA.

Pursuant to the consolidation requirements of U.S. GAAP, the financial statements of a U.S. parent entity reflect the financial position and results of operations of that parent entity, together with the network of branches and subsidiaries in which the U.S. parent entity has a controlling interest, including non-U.S. subsidiaries, which is an indication of connection and potential risk to the U.S. parent entity. Consolidation under U.S. GAAP is predicated on the financial control of the reporting entity. Therefore, an entity within a financial group that is consolidated with its parent entity for accounting purposes in accordance with U.S. GAAP is subject to the financial control of that parent entity. By virtue of consolidation then, a non-U.S. subsidiary's swap activity creates direct risk to the U.S. parent.[191] That is, as a result of consolidation and financial control, the financial position, operating results, and statement of cash flows of a non-U.S. subsidiary are included in the financial statements of its U.S. parent and therefore affect the financial condition, risk profile, and market value of the parent. Because of that relationship, risks taken by a non-U.S. subsidiary can have a direct effect on the U.S. parent entity. Furthermore, a non-U.S. subsidiary's counterparties may generally look to both the subsidiary and its U.S. parent for fulfillment of the subsidiary's obligations under a swap, even without any explicit guarantee. In many cases, counterparties would not enter into the transaction with the subsidiary (or would not do so on the same terms), and the subsidiary would not be able to engage in a swap business, absent this close relationship with a parent entity. In addition, a non-U.S. subsidiary may enter into offsetting swaps or other arrangements with its U.S. parent entity or other affiliate(s) to transfer the risks and benefits of swaps with non-U.S. persons to its U.S. affiliates, which could also lead to risk for the U.S. parent entity. Because such swap activities may have a direct effect on the financial position, risk profile, and market value of a U.S. parent entity, they can lead to spill-over effects on the U.S. financial system.

IIB/SIFMA and JFMC/IBAJ stated that there is no legal basis to apply swap regulations based on accounting consolidation. The Commission continues to believe, as it stated in its Cross-Border Margin Rule, by virtue of an entity having its financial statements consolidated with those of its U.S. ultimate parent, the financial position, operating results, and statement of cash flows of the entity are included in the financial statements of its U.S. ultimate parent entity and therefore affect the financial position, risk profile, and market value of the U.S. ultimate parent. Because of the entity's direct relationship with, and the possible negative effect of its swap activities on, its U.S. ultimate parent entity and the U.S. financial system, the entity raises greater supervisory concern in the United States relative to other non-U.S. swap entities.[192] Accordingly, it is appropriate to apply certain swap regulations to certain entities that have financial statements consolidated with U.S. parent entities.

However, the principles of international comity militate against applying the Commission's swap regulations to all non-U.S. subsidiaries of U.S. parent entities. Rather, it is consistent with such principles to apply a risk-based approach to determining which of such entities should be required to comply with the Commission's swap requirements. The Commission's approach in the Final Rule, as discussed further below with respect to the exclusion for subsidiaries of BHCs and IHCs, makes that determination in a manner that accounts for the risk that non-U.S. subsidiaries may pose to the U.S. financial system and the ability of large global entities to operate efficiently outside the United States. The Commission's risk-based approach is embodied in the definition of an SRS, which, as discussed above, captures entities whose obligations under swaps may not be guaranteed by U.S. persons, but nonetheless raise particular supervisory concerns in the United States due to the possible negative effect on their ultimate U.S. parent entities and thus the U.S. financial system.

(ii) Preliminary Definitions

For purposes of the SRS definition, the term "subsidiary" means an affiliate of a person controlled by such person directly, or indirectly through one or more intermediaries.[193] The definition of "subsidiary" has been revised in the Final Rule for clarity. For purposes of this definition, an affiliate of, or a person affiliated with, a specific person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.[194] In the Final Rule, the definition of "affiliate" has been moved out of the definition of "subsidiary" and into its own definition for added clarity, since the term "affiliate" is relevant for other provisions of the Final Rule, as

---

[189] Proposed Rule, 85 FR at 964.
[190] This release uses the term "Other Non-U.S. Person" to refer to a non-U.S. person that is neither a Guaranteed Entity nor an SRS.

[191] Proposed Rule, 85 FR at 964.

[192] *See* Cross-Border Margin Rule, 81 FR at 34827.
[193] Final § 23.23(a)(15).
[194] Final § 23.23(a)(1).

discussed in this release. The term "control," including controlling, controlled by, and under common control with, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract, or otherwise.[195] The definition of "control" is also relevant to other provisions of the Final Rule, as discussed in this release. The definitions of subsidiary, affiliate, and control are substantially similar to the definitions found in SEC Regulation S–X.[196] Further, under the Final Rule, the term "parent entity" means any entity in a consolidated group that has one or more subsidiaries in which the entity has a controlling interest, in accordance with U.S. GAAP.[197] U.S. GAAP is defined in the Final Rule as U.S. generally accepted accounting principles.[198]

Notably, a U.S. parent entity for purposes of the definition of SRS need not be a non-U.S. subsidiary's ultimate parent entity. The SRS definition encompasses U.S. parent entities that may be intermediate entities in a consolidated corporate family with an ultimate parent entity located outside the U.S. To differentiate between multiple possible U.S. parent entities, the Final Rule defines an "ultimate U.S. parent entity" for purposes of the significant subsidiary test. A non-U.S. person's "ultimate U.S. parent entity" is the U.S. parent entity that is not a subsidiary of any other U.S. parent entity.[199] Risk of a non-U.S. subsidiary that flows to its U.S. parent entity may not flow back out of the U.S. to a non-U.S. ultimate or intermediate parent entity. Because the risk may ultimately stop in the United States, the Commission is basing the SRS definition on whether a non-U.S. person has any U.S. parent entity, subject to certain risk-based thresholds.

IIB/SIFMA and the Working Group stated that the SRS definition should be limited to subsidiaries that have a "top-tier" U.S. person parent entity, rather than including subsidiaries that have a U.S. parent entity that may not be the ultimate parent entity. The Commission is including subsidiaries that have non-"top-tier" U.S. parent entities because the risk that the subsidiary poses may be consolidated in the United States. The

Final Rule treats all subsidiaries of U.S. parent entities equally, regardless of where the U.S. parent entity sits in the corporate structure.

### (iii) Significant Risk Subsidiaries

In addition to the definitions discussed above, whether an entity is an SRS depends on the size of its ultimate U.S. parent entity, the significance of the subsidiary to its ultimate U.S. parent entity, and the regulatory oversight of its ultimate U.S. parent entity or the regulatory oversight of the non-U.S. subsidiary in the jurisdiction in which it is regulated.

Under the Final Rule, the ultimate U.S. parent entity must exceed a $50 billion consolidated asset threshold.[200] The Commission is adopting the $50 billion threshold after considering both the Commission's interest in adequately overseeing those non-U.S. persons that may have a significant effect on their ultimate U.S. parent entity—and, by extension—the U.S. financial system, and also its interest in avoiding unnecessary burdens on those non-U.S. persons that would not have such an effect.[201] The $50 billion threshold limits the burden of the SRS definition to only those entities whose ultimate U.S. parent entity may pose a systemic risk to the U.S. financial system.

In addition, before a non-U.S. subsidiary of an ultimate U.S. parent entity that meets the $50 billion consolidated asset threshold is an SRS, the subsidiary needs to constitute a significant part of its ultimate U.S. parent entity. This concept of a "significant subsidiary" borrows from the SEC's definition of "significant subsidiary" in Regulation S–X, as well as the Federal Reserve Board in its financial statement filing requirements for foreign subsidiaries of U.S. banking organizations.[202] The Commission is focusing on only those subsidiaries that are significant to their ultimate U.S. parent entities, in order to capture those subsidiaries that have a significant effect on their large ultimate U.S. parent entities. To provide certainty to market participants as to what constitutes a significant subsidiary, the Final Rule includes a set of quantitative

significance tests. Although not identical, the SEC includes similar revenue and asset significance tests in its definition of significant subsidiary in Regulation S–X.[203] In this case, in order to determine whether a subsidiary meets such significance, the Final Rule measures the significance of a subsidiary's equity capital, revenue, and assets relative to its ultimate U.S. parent entity.

Under the Final Rule, the term "significant subsidiary" means a subsidiary, including its own subsidiaries, where: (1) The three year rolling average of the subsidiary's equity capital is equal to or greater than five percent of the three year rolling average of its ultimate U.S. parent entity's consolidated equity capital, as determined in accordance with U.S. GAAP at the end of the most recently completed fiscal year (the "equity capital significance test"); (2) the three year rolling average of the subsidiary's revenue is equal to or greater than ten percent of the three year rolling average of its ultimate U.S. parent entity's consolidated revenue, as determined in accordance with U.S. GAAP at the end of the most recently completed fiscal year (the "revenue significance test"); or (3) the three year rolling average of the subsidiary's assets is equal to or greater than ten percent of the three year rolling average of its ultimate U.S. parent entity's consolidated assets, as determined in accordance with U.S. GAAP at the end of the most recently completed fiscal year (the "asset significance test").[204] For the equity capital significance test, equity capital includes perpetual preferred stock, common stock, capital surplus, retained earnings, accumulated other comprehensive income, and other equity capital components and is calculated in accordance with U.S. GAAP.

The Final Rule results in an entity being a significant subsidiary only if it passes at least one of these significance tests. The equity capital test is used to measure a subsidiary's significance to its ultimate U.S. parent entity and is used in the context of financial statement reporting of foreign subsidiaries.[205] If a subsidiary constitutes more than ten percent of its ultimate U.S. parent entity's assets or revenues, it is of significant importance to its ultimate U.S. parent entity such that swap activity by the subsidiary may

---

[195] Final § 23.23(a)(2).

[196] *See* 17 CFR 210.1–02. Regulation S–X generally covers the form and content requirements for financial statements.

[197] Final § 23.23(a)(12).

[198] Final § 23.23(a)(22).

[199] Final § 23.23(a)(19).

[200] Final § 23.23(a)(13).

[201] Proposed Rule, 85 FR at 965.

[202] *See e.g.,* Instructions for Preparation of Financial Statements of Foreign Subsidiaries of U.S. Banking Organizations FR 2314 and FR 2314S, at GEN–2 (Sept. 2016), available at *https://www.federalreserve.gov/reportforms/forms/FR_2314--FR_2314S20190331_i.pdf* ("FR 2314 and FR 2314S Instructions") (identifying equity capital significance test applicable to subsidiaries). *See also* SEC rule 210.1–02(w), 17 CFR 210.1–02(w) (identifying asset and income significance tests applicable in definition of significant subsidiaries).

[203] 17 CFR 210.1–02(w)(1)–(3) (setting out a ten percent significance threshold with respect to total assets and income).

[204] Final § 23.23(a)(14).

[205] *See* FR 2314 and FR 2314S Instructions, at Gen-2.

have a material effect on its ultimate U.S. parent entity and, consequently, the U.S. financial system. The Commission is using a three year rolling average throughout its significance tests in order to mitigate the potential for frequent changes in an entity's SRS status based on fluctuations in its share of equity capital, revenue, or assets of its ultimate U.S. parent entity. If a subsidiary satisfies any one of the three significance tests, then it is of sufficient significance to its ultimate U.S. parent entity, which under § 23.23(a)(13) has consolidated assets of more than $50 billion, to warrant the application of requirements addressed by the Final Rule if such subsidiary otherwise meets the definition of SRS.

As noted above, Better Markets suggested that the Commission add two activity-based tests to the proposed significant subsidiary definition: A risk transfer test and a risk acceptance test. The Commission declines to include these two tests because they do not consider the risk to the broader financial system of the entities that are potentially captured by the Final Rule. Better Markets' proposed tests are activity-based, rather than risk-based, whereas the Commission has determined to apply swap requirements to foreign entities using a risk-based test. Better Markets' proposed tests would set thresholds above which an entity would be deemed to be significant subsidiaries, however these tests do not provide any measure that is relative to the parent entity. Such notional-based thresholds may be a measure of activity, but they are not a measure of risk that a subsidiary poses to a parent entity.[206] The significance tests adopted here to identify SRSs include those entities that meet the commenters' proposed tests to the extent those entities pose what the Commission considers a significant risk to the financial system.

### (iv) Exclusions From the Definition of SRS

As indicated above, under the Final Rule, a non-U.S. person will not be an SRS to the extent the entity is subject to prudential regulation as a subsidiary of a U.S. BHC or IHC, or is subject to comparable capital and margin standards.[207] An entity that meets either of those two exceptions, in the Commission's view, is subject to a level of regulatory oversight that is sufficiently comparable to the Dodd-Frank Act swap regime with respect to prudential oversight. Non-U.S. subsidiaries that are part of BHCs are already subject to consolidated supervision and regulation by the Federal Reserve Board,[208] including with respect to capital and risk management requirements, and therefore their swap activity poses less risk to the financial position and risk profile of the ultimate U.S. parent entity, and thus less risk to the U.S. financial system than the swap activity of a non-U.S. subsidiary of an ultimate U.S. parent entity that is not a BHC.[209] In this case, deference to the foreign regulatory regime is appropriate because the swap activity is occurring within an organization that is under the umbrella of U.S. prudential regulation with certain regulatory protections already in place.

The exclusion from the SRS definition for subsidiaries of IHCs is being added to the Final Rule in response to comments. IHCs are subject to prudential standards of the Federal Reserve Board that are similar to those that apply to BHCs. In general, IHCs and BHCs of similar size are subject to similar liquidity, risk management, stress testing, and credit limit standards.[210] Therefore, for the same risk-based reasons that the Commission proposed to exclude subsidiaries of BHCs from the definition of SRS,[211] the Commission is expanding the SRS exclusion to include subsidiaries of both BHCs and IHCs in § 23.23(a)(13)(i).

In response to comments from AFR and Better Markets that the Commission should not defer to the prudential regulators with respect to the regulation of derivative market activity of BHCs and those entities subject to the required non-U.S. capital and margin regimes, under the Guidance, absent a guarantee, the Commission had generally not expected these entities to count their swaps or swap positions with non-US persons towards the SD or MSP thresholds or, if registered as swap entities, comply with Transaction-Level Requirements (discussed in section VI below) when transacting with non-U.S. persons that were not guaranteed by a U.S. person nor acting as conduit affiliates. Thus, the deference to U.S. and non-U.S. prudential regulators in the Final Rule maintains the status quo of the last seven years rather than representing a relinquishment of existing regulatory oversight by the Commission. Moreover, the SRS definition does not defer to prudential regulators to regulate derivatives market activity, which is carried on by the foreign subsidiary, but rather defers to the role of prudential regulation in the consolidated oversight of prudential risk in evaluating the extent to which the Commission should expand its oversight of non-U.S. entities that are not guaranteed by a U.S. person beyond the Guidance. For the reasons noted above, the Commission has determined not to apply the Final Rule on the basis of accounting consolidation alone, but rather, in exercising its oversight of non-U.S. entities, has taken a risk-based approach to determining which foreign subsidiaries present a significant risk to their ultimate U.S. parent and thus to the U.S. financial system. The Commission thus has determined that because the risk presented by foreign subsidiaries that are consolidated with a BHC or IHC, or are subject to the specified prudential regulation in their local jurisdiction, is already being adequately monitored, such foreign subsidiaries should not also be subject to the Commission's oversight.

With respect to the BHC exception, Better Markets suggested that the Commission does not have the legal discretion to defer to prudential regulators because of the requirements in CEA section 2(i). As the Commission stated in the Proposed Rule, CEA section 2(i) does not require the Commission to extend its reach to the outer bounds of the authorization provided in CEA section 2(i).[212] In determining how to exercise its authority, the Commission stated that it will be guided by principles of international comity and will focus its authority on potential significant risks to the U.S. financial system. The Commission noted that the Restatement also provides that even where a country has a basis for extraterritorial jurisdiction, it should not prescribe law with respect to a person or activity in another country when the exercise of

---

[206] The Commission also has noted in the past that such notional amount-based thresholds are not measures of the exposure or risk of particular swap positions. *See* Entities Rule, 77 FR at 30630.

[207] Final § 23.23(a)(13)(i)–(ii).

[208] *See e.g.,* Board of Governors of the Federal Reserve System, Bank Holding Company Supervision Manual, section 2100.0.1 Foreign Operations of U.S. Banking Organizations, available at *https://www.federalreserve.gov/publications/files/bhc.pdf* ("The Federal Reserve has broad discretionary powers to regulate the foreign activities of member banks and [BHCs] so that, in financing U.S. trade and investments abroad, these U.S. banking organizations can be competitive with institutions of the host country without compromising the safety and soundness of their U.S. operations."); FR 2314 and FR 2314S Instructions, at GEN 2.

[209] Proposed Rule, 85 FR at 966.

[210] *See e.g.,* Prudential Standards for Large Bank Holding Companies, Savings and Loan Holding Companies, and Foreign Banking Organizations, 84 FR 59032 (Nov. 2019).

[211] Proposed Rule, 85 FR at 966.

[212] *Id.* at 955.

such jurisdiction is unreasonable.[213] In the context of the SRS definition, the risk-based approach to limiting the application of the Commission's requirements extraterritorially focuses its requirements on those entities that pose significant risk to the U.S. financial system, as discussed above.

Similarly, in the case of entities that are subject to capital standards and oversight by their home country regulators that are consistent with Basel III and subject to a CFTC Margin Determination, the Commission will defer to the home country regulator.[214] In cases where entities are subject to capital standards and oversight by home country regulators that are consistent with Basel III and subject to a CFTC Margin Determination, the potential risk that the entity might pose to the U.S. financial system is adequately addressed through these home country capital and margin requirements. Further, such an approach is consistent with the Commission's historical commitment to show deference to non-U.S. regulators whose requirements are comparable to the CFTC's requirements. To make clear that the CFTC Margin Determination must be a positive determination of comparability, the provision in § 23.23(a)(13)(ii) has been modified to read "and margin requirements for uncleared swaps in a jurisdiction that the Commission has found comparable pursuant to a published comparability determination with respect to uncleared swap margin requirements." For margin purposes, the Commission has issued a number of determinations that entities can look to in order to determine if they satisfy this aspect of the exception.[215] For capital

standards and oversight consistent with Basel III, entities should look to whether the BIS has determined the jurisdiction is in compliance as of the relevant Basel Committee on Banking Supervision deadline set forth in its most recent progress report.[216] The Commission is excluding these entities from the definition of SRS, in large part, because the swaps entered into by such entities are already subject to significant regulation, either by the Federal Reserve Board or by the entity's home country.

The Working Group suggested that where a jurisdiction has capital and margin requirements consistent with Basel III requirements, but certain entities located in that jurisdiction are exempted from those requirements, such entities should nonetheless be considered as subject to sufficient capital and margin requirements for the purpose of the proposed SRS exclusion. The Commission is declining to adopt this suggestion here, but it may warrant further consideration in the future. It is not clear whether a foreign jurisdiction's exemption from capital and margin requirements would be based on a risk assessment of the exempted entities, whether such exemptions are granted on a case-by-case basis or provided to entire classes or categories, or whether such exemptions are based on deference to some other form of prudential regulation. Under the Final Rule, where an entity is exempt from a country's capital and margin requirements, such an entity will not be considered to be subject to sufficient capital and margin requirements for the purpose of the SRS exclusion. As noted above, if a non-U.S. subsidiary of an ultimate U.S. parent entity does not fall into either of the exceptions in § 23.23(a)(13)(i) through (ii), the Final Rule classifies the subsidiary as a SRS only if its ultimate U.S. parent entity has more than $50 billion in global consolidated assets and if the subsidiary meets the definition of a significant subsidiary, set forth in § 23.23(a)(14).

With respect to the Working Group comment that the SRS definition should not apply to non-financial entities, the Commission has determined to apply the SRS definition to those non-financial entities that satisfy the risk-based tests contained in the definition.

Those entities are not subject to prudential regulation and are, by definition, significant subsidiaries of large U.S. parent entities that may pose a risk to the U.S. financial system, and therefore the Commission believes that such entities should not be excluded from the SRS definition. Accordingly, the Commission is not adding an exception for non-financial entities to the SRS definition. However, Other Non-U.S. Person counterparties to SRSs are not required to include such swaps in either their SD or MSP registration threshold calculations, as discussed below. The Commission has also determined for the Final Rule that non-U.S. swap entities that are neither SRSs nor Guaranteed Entities are not required to comply with the group B and group C requirements (as defined in section VI.A.2 and VI.A.3 below) when entering into foreign-based swaps with certain foreign counterparties, including SRSs that are neither swap entities nor Guaranteed Entities ("SRS End Users").[217] This application of the Final Rule should assuage the commenter's concerns about the effect SRS status will have on the swap trading relationships of a non-financial entity that is an SRS but does not engage in swap dealing or meet the definition of MSP.

In response to Better Markets' comment that the SRS definition does not address evasion and avoidance concerns that are addressed by the conduit affiliate concept, the Commission believes that the SRS definition adequately addresses those concerns within a risk-based framework. The Commission believes that to the extent an off-shore entity is entering into transactions with non-U.S. entities and subsequently back-to-backing those transactions to a U.S. entity, it is appropriate to subject such an entity to certain of the Commission's swap requirements if that entity meets the definition of an SRS and is consequently a significant subsidiary of a U.S. parent entity that is significant to the U.S. financial system. This approach is a risk-based assessment rather than merely a structural or activity-based assessment. Without this risk-based approach, the SD de minimis threshold, which is a strictly activity-based test (*i.e.,* a test based on the aggregate gross notional amount of dealing activity), becomes the de facto risk test of when an entity would be subject to the Commission's swap requirements as an SD. The Commission continues to believe that the risk-based SRS test is better-suited to make such a determination.

[213] *Id.* at 957.

[214] Final § 23.23(a)(13)(ii).

[215] *See* Comparability Determination for Japan: Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants, 81 FR 63376 (Sep. 15, 2016); Comparability Determination for the European Union: Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants, 82 FR 48394 (Oct. 13, 2017) ("Margin Comparability Determination for the European Union"); Amendment to Comparability Determination for Japan: Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants, 84 FR 12074 (Apr. 1, 2019); Comparability Determination for Australia: Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants, 84 FR 12908 (Apr. 3, 2019), DSIO and the Division of Market Oversight ("DMO") issued a letter jointly to provide time-limited no-action relief in connection with, among other things, the Margin Comparability Determination for the European Union, in order to account for the anticipated withdrawal of the United Kingdom from the European Union. *See* CFTC Staff Letter 19–08, No-Action Relief in Connection With Certain Previously Granted Commission Determinations and Exemptions, in Order to Account for the Anticipated Withdrawal of the United Kingdom

From the European Union (Apr. 5, 2019), available at *https://www.cftc.gov/csl/19-08/download.*

[216] The most current report was issued in July 2020. Basel Committee on Banking Supervision, Eighteenth progress report on adoption of the Basel regulatory framework (July 2020), available at *https://www.bis.org/bcbs/publl/d506.pdf.* Current and historical reports are available at *https://www.bis.org/bcbs/implementation/rcap_reports.htm?m=3%7C14%7C656%7C59.*

[217] *See infra* section VI.B.

(v) Counterparty Status and Representations

The Commission acknowledges comments that the implementation of the SRS definition may require entities to reevaluate the status of their counterparties. The Commission understands that SDs may have to re-document whether their counterparties are SRS entities and that this could require, for example, a new industry protocol, which may be an additional burden resulting from the adoption of this rule. The potential burden of this re-assessment of counterparties is considered in the cost-benefit considerations section of this adopting release.

Regarding the ISDA comment that the Commission should permit swap entities to rely on representations obtained under the Guidance with respect to the status of counterparties as conduit affiliates, the Commission responds that the representations made by counterparties with respect to the conduit affiliate concept in the Guidance are not applicable to the SRS definition. Because the definition of an SRS is new and substantially differs from the conduit affiliate concept, such conduit affiliate representations do not capture all counterparties that may be SRSs and may capture entities that fall within the conduit affiliate concept but are excluded from the definition of SRS.

### E. Foreign Branch and Swap Conducted Through a Foreign Branch

#### 1. Proposed Rule

The Commission proposed that the term "foreign branch" would mean an office of a U.S. person that is a bank that: (1) Is located outside the United States; (2) operates for valid business reasons; (3) maintains accounts independently of the home office and of the accounts of other foreign branches, with the profit or loss accrued at each branch determined as a separate item for each foreign branch; and (4) is engaged in the business of banking or finance and is subject to substantive regulation in banking or financing in the jurisdiction where it is located.[218]

The Commission also proposed that the term "swap conducted through a foreign branch" would mean a swap entered into by a foreign branch where: (1) The foreign branch or another foreign branch is the office through which the U.S. person makes and receives payments and deliveries under the swap pursuant to a master netting or similar trading agreement, and the

documentation of the swap specifies that the office for the U.S. person is such foreign branch; (2) the swap is entered into by such foreign branch in its normal course of business; and (3) the swap is reflected in the local accounts of the foreign branch.[219] In the Proposed Rule, the Commission stated that the second prong of the definition (whether the swap is entered into by such foreign branch in the normal course of business) is intended as an anti-evasion measure to prevent a U.S. bank from simply routing swaps for booking in a foreign branch so that the swap would be treated as a swap conducted through a foreign branch for purposes of the SD and MSP registration thresholds or for purposes of certain regulatory requirements applicable to registered SDs or MSPs. To satisfy this prong, the Commission proposed that it must be the normal course of business for employees located in the branch (or another foreign branch of the U.S. bank) to enter into the type of swap in question. The Commission stated that this requirement would not prevent personnel of the U.S. bank located in the U.S. from participating in the negotiation or execution of the swap so long as the swaps that are booked in the foreign branch are primarily entered into by personnel located in the branch (or another foreign branch of the U.S. bank).[220]

#### 2. Summary of Comments

While IIB/SIFMA and JFMC/IBAJ supported the proposed definition of "foreign branch," noting that it was consistent with the definition given to the term in the Guidance, Better Markets recommended that the definition include a requirement that the foreign branch be operated pursuant to U.S. banking laws and regulations and in compliance with applicable restrictions. Better Markets stated that the addition of this prong adds no additional burden and ensures a foreign branch cannot be established outside of the considered restrictions and substantive requirements of U.S. law.

With respect to the proposed definition of a "swap conducted through a foreign branch," Better Markets recommended that the Commission require that the swap be arranged, negotiated, and executed on behalf of the foreign branch solely by persons located outside the United States, rather than permit personnel of the U.S. bank located in the U.S. to participate in the negotiation or

execution of a swap so long as the swaps that are booked in the foreign branch are primarily entered into by personnel located in the branch (or another foreign branch of the U.S. bank). Better Markets believes that this formulation defers too significantly to the foreign branches themselves to decide whether the "primarily" restriction has been met, and, instead recommends that the Commission adopt a foreign branch booking restriction that harmonizes with the SEC's approach. Better Markets argues that such restriction is necessary because foreign branches remain part of the U.S. person in the most critical, risk-related respects.

IIB/SIFMA and JFMC/IBAJ, on the other hand, supported the proposed definition, noting that a requirement that the personnel agreeing to a swap be located in the foreign branch is not necessary because the location of a U.S. bank's employees in connection with a particular swap does not determine whether that swap presents risks to the United States. IIB/SIFMA further argued that because foreign branches of a U.S. bank are generally subject to foreign rules when transacting with non-U.S. counterparties regardless of whether the bank's U.S. personnel are involved, applying additional U.S. rules to swaps with non-U.S. counterparties based on the involvement of U.S. personnel causes market distortions by discouraging non-U.S. counterparties from interacting with U.S. personnel. IIB/SIFMA stated further that since 2013 many U.S. banks have had to rearrange their front office coverage of non-U.S. counterparties in order to address this concern and adoption of the proposed definition would help to reverse this damaging trend.

#### 3. Final Rule and Commission Response

Having considered the foregoing comments, the Commission has determined to adopt the definitions of "foreign branch" and "swap conducted through a foreign branch" as proposed.[221] Regarding Better Markets' recommendation that a fifth prong be added to the definition of "foreign branch" to more closely align the definition with the definitions used by the prudential regulators, as noted below, the definition of "foreign branch" proposed by the Commission is consistent with the definitions of "foreign branch" in the regulations of the Federal Reserve Board, the Office of the Comptroller of the Currency

---

[218] Proposed § 23.23(a)(2). *See* Proposed Rule, 85 FR at 966–968.

[219] Proposed § 23.23(a)(16). *See* Proposed Rule, 85 FR at 966–968.

[220] *See* Proposed Rule, 85 FR at 968.

[221] Final § 23.23(a)(2) and (16).

("OCC"), and the Federal Deposit Insurance Corporation ("FDIC").[222]

Regarding Better Markets' comment that a foreign branch should be treated as a U.S. person unless the employees negotiating and agreeing to the terms of the swap are exclusively located in a foreign branch, the Commission responds that such a prescriptive limitation is not required to prevent evasion of the Commission's swap requirements through booking strategies. By requiring swaps to be entered into by a foreign branch in its normal course of business, primarily by personnel located in the foreign branch, the definition proposed by the Commission provides a workable standard of review that will permit the Commission to detect evasive booking strategies while not discouraging non-U.S. counterparties from interacting with U.S. personnel.

The Commission is adopting the factors listed in the proposed definition of "foreign branch" for determining when an entity is considered a foreign branch for purposes of the Final Rule.[223] The requirement that the foreign branch be located outside of the United States is consistent with the stated goal of identifying certain swap activity that is not conducted within the United States. The requirements that the foreign branch maintain accounts independent of the U.S. entity,[224] operate for valid business reasons, and be engaged in the business of banking or finance and be subject to substantive banking or financing regulation in its non-U.S. jurisdiction will prevent an entity from setting up shell companies outside the United States in a jurisdiction without substantive banking or financial regulation in order to evade Dodd-Frank Act requirements and CFTC regulations.[225] This definition

incorporates concepts from the Federal Reserve Board's Regulation K,[226] the FDIC's international banking regulation,[227] and the OCC's "foreign branch" definition.[228]

The definition of "foreign branch" in the Final Rule is also consistent with the SEC's approach, which, for purposes of security-based swap dealer regulation, defines a foreign branch as any branch of a U.S. bank that: (1) Is located outside the United States; (2) operates for valid business reasons; and (3) is engaged in the business of banking and is subject to substantive banking regulation in the jurisdiction where located.[229] The Commission's intention is to ensure that the definition provides sufficient clarity as to what constitutes a "foreign branch"—specifically, an office outside of the U.S. that has independent accounts from the home office and other branches—while striving for greater regulatory harmony with the SEC.

A foreign branch does not include an affiliate of a U.S. bank that is incorporated or organized as a separate legal entity.[230] For similar reasons, the Commission declines in the Final Rule to recognize foreign branches of U.S. persons separately from their U.S. principal for purposes of registration.[231] That is, if the foreign branch engages in swap activity in excess of the relevant SD or MSP registration thresholds, as discussed further below, the U.S. person

would be required to register, and the registration would encompass the foreign branch. However, upon consideration of principles of international comity and the factors set forth in the Restatement, rather than broadly excluding foreign branches from the "U.S. person" definition, the Commission is calibrating the requirements for counting certain swaps entered into through a foreign branch, as described in sections III.B.2 and IV.B.2, and calibrating the requirements otherwise applicable to foreign branches of a registered U.S. SD, as discussed in section VI. One of the benefits, as discussed below, will be to enable foreign branches of U.S. banks to have greater access to foreign markets.

The definition of "swap conducted through a foreign branch" identifies the type of swap activity for which the foreign branch performs key dealing functions outside the United States. Because a foreign branch of a U.S. bank is not a separate legal entity, the first prong of the definition clarifies that the foreign branch must be the office of the U.S. bank through which payments and deliveries under the swap are made. This approach is consistent with the standard ISDA Master Agreement, which requires that each party specify an "office" for each swap, which is generally where a party "books" a swap and/or the office through which the party makes and receives payments and deliveries.[232]

The second prong of the definition (whether the swap is entered into by such foreign branch in the normal course of business) is intended as an anti-evasion measure to prevent a U.S. bank from simply routing swaps for booking in a foreign branch so that the swap would be treated as a swap conducted through a foreign branch for purposes of the SD and MSP registration thresholds or for purposes of certain regulatory requirements applicable to registered SDs or MSPs. To satisfy this prong, it must be the normal course of business for employees located in the branch (or another foreign branch of the U.S. bank) to enter into the type of swap in question. This requirement should not prevent personnel of the U.S. bank located in the U.S. from participating in the negotiation or execution of the swap so long as the swaps that are booked in the foreign branch are primarily entered into by personnel located in the branch (or another foreign branch of the U.S. bank). As noted above, the Commission

---

[222] *See infra* notes 226–228, and accompanying text.

[223] As discussed in sections III.B.2 and IV.B.2, *infra,* the Final Rule does not require an Other Non-U.S. Person to count toward its SD and MSP threshold calculations swaps conducted through a foreign branch of a registered U.S. SD.

[224] The Commission notes that national banks operating foreign branches are required under section 25 of the Federal Reserve Act ("FRA") to conduct the accounts of each foreign branch independently of the accounts of other foreign branches established by it and of its home office, and are required at the end of each fiscal period to transfer to their general ledgers the profit or loss accrued at each branch as a separate item. 12 U.S.C. 604. The FRA is codified at 12 U.S.C. 221 *et seq.*

[225] As discussed below, the Commission is concerned that the material terms of a swap would be negotiated or agreed to by employees of the U.S. bank that are located in the United States and then be routed to a foreign branch so that the swap would be treated as a swap with the foreign branch for purposes of the SD and MSP registration thresholds or for purposes of certain regulatory requirements applicable to registered SDs or MSPs.

[226] Regulation K is a regulation issued by the Federal Reserve Board under the authority of the FRA; the Bank Holding Company Act of 1956 ("BHC Act") (12 U.S.C. 1841 *et seq.*); and the International Banking Act of 1978 ("IBA") (12 U.S.C. 3101 *et seq.*). Regulation K sets forth rules governing the international and foreign activities of U.S. banking organizations, including procedures for establishing foreign branches to engage in international banking. 12 CFR part 211. Under Regulation K, a "foreign branch" is defined as "an office of an organization (other than a representative office) that is located outside the country in which the organization is legally established and at which a banking or financing business is conducted." 12 CFR 211.2(k).

[227] 12 CFR part 347 is a regulation issued by the FDIC under the authority of the Federal Deposit Insurance Act (12 U.S.C. 1828(d)(2)), which sets forth rules governing the operation of foreign branches of insured state nonmember banks. Under 12 CFR 347.102(j), a "foreign branch" is defined as an office or place of business located outside the United States, its territories, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, or the Virgin Islands, at which banking operations are conducted, but does not include a representative office.

[228] 12 CFR 28.2 (defining "foreign branch" as an office of a national bank (other than a representative office) that is located outside the United States at which banking or financing business is conducted).

[229] *See* 17 CFR 240.3a71–3(a)(2).

[230] This is similar to the approach described in the Guidance. *See* Guidance, 78 FR at 45328–45329.

[231] This is similar to the approach described in the Guidance. *See id.* at 45315, 45328–45329.

[232] The ISDA Master Agreement defines "office" as a branch or office of a party, which may be such party's head or home office. *See* 2002 ISDA Master Agreement, available at *https://www.isda.org/book/2002-isda-master-agreement-english/library.*

believes this is a workable standard of review that will permit the Commission to detect evasive booking strategies by examining the types of swaps booked in the foreign branch and determining whether any type of swap is primarily entered into by personnel located in the United States.

With respect to the third prong, where a swap is with the foreign branch of a U.S. bank, it generally would be reflected in the foreign branch's accounts.

## F. Swap Entity, U.S. Swap Entity, and Non-U.S. Swap Entity

The Commission proposed that the term "swap entity" would mean a person that is registered with the Commission as a SD or MSP pursuant to the CEA.[233] In addition, the Commission proposed to define "U.S. swap entity" as a swap entity that is a U.S. person, and "non-U.S. swap entity" as a swap entity that is not a U.S swap entity.[234]

The Commission did not receive any comments on these proposed definitions, and is adopting them as proposed.[235]

## G. U.S. Branch

The Commission proposed that the term "U.S. branch" would mean a branch or agency of a non-U.S. banking organization where such branch or agency: (1) Is located in the United States; (2) maintains accounts independently of the home office and other U.S. branches, with the profit or loss accrued at each branch determined as a separate item for each U.S. branch; and (3) engages in the business of banking and is subject to substantive banking regulation in the state or district where located.[236]

The only comment the Commission received on this definition was from JFMC/IBAJ, stating that they generally supported the proposed new definition, as they believe it provides a clear and objective standard and provides market participants with legal certainty. Thus, the Commission is adopting the definition of "U.S. branch" as proposed.[237]

## H. Swap Conducted Through a U.S. Branch

### 1. Proposed Rule

The Commission proposed that the term "swap conducted through a U.S. branch" would mean a swap entered into by a U.S. branch where: (1) The U.S. branch is the office through which the non-U.S. person makes and receives payments and deliveries under the swap pursuant to a master netting or similar trading agreement, and the documentation of the swap specifies that the office for the non-U.S. person is such U.S. branch; or (2) the swap is reflected in the local accounts of the U.S. branch.[238]

### 2. Summary of Comments

The same as for the definition of "U.S. branch" above, JFMC/IBAJ generally supported the proposed definition of "swap conducted through a U.S. branch," as they believe it provides a clear and objective standard and provides market participants with legal certainty. However, JFMC/IBAJ, CS, and IIB/SIFMA asked the Commission to conform the definition to the definition of "swap conducted through a foreign branch" by (1) including a "normal course of business" prong, and (2) applying the definition conjunctively rather than disjunctively. JFMC/IBAJ stated that they see no policy rationale or countervailing policy benefit of these inconsistencies. CS agreed, stating that, as a matter of policy, it encourages the CFTC to provide consistent flexibility for U.S. branches and foreign branches. IIB/SIFMA stated that, in accordance with principles of international comity, the Commission should instead take a balanced and symmetric approach to recognizing when home versus host country regulators have an interest in applying their rules and that the Proposed Rule offers no justification for this asymmetric approach. ISDA also requested that the Commission apply the definition conjunctively, stating that only when a swap is booked at a particular entity can it be considered a swap transaction that is attributed to such an entity.

### 3. Final Rule—Swap Booked in a U.S. Branch

After carefully considering the comments, the Commission is adopting the definition with certain modifications reflected in the rule text in this release.[239] The Commission is removing the first prong of the

definition such that the only relevant factor is whether the swap is reflected in the local accounts of the U.S. branch, meaning swaps for which the U.S. branch holds the risks and rewards, with the swap being accounted for as an obligation of the branch on the balance sheet of the U.S. branch under applicable accounting standards [240] and under regulatory reporting requirements [241] (*i.e.,* the swap is "booked" in the U.S. branch). This standard captures activity of non-U.S. banking organizations taking place in their U.S. branches that should be treated as taking place in the United States to prevent evasion of CFTC rules by such organizations. As discussed in the Proposed Rule, in the case of the swap activities of the U.S. branches of non-U.S. banking organizations, the Commission has determined that the location of personnel involved in arranging, negotiating, and execution activities will not be relevant for application of the Final Rule.[242] For this reason, the Commission had intended in the Proposed Rule only to reach swaps that are booked in the United States under the definition of "swap conducted through a U.S. branch."

The Commission now understands that a U.S. branch may be listed as the office through which a non-U.S. person makes and receives deliveries under a swap or as the office identified in the master, netting, or similar trading agreement without the swap being booked in a U.S. branch. Commenters explained, for example, that the U.S. branch is often listed for payments and deliveries for swaps denominated in U.S. Dollars even where the risk/benefit of the swap resides outside the United States.

Further, to emphasize that booking is the focus of the definition, the Commission is changing the term from "swap conducted through a U.S. branch" to "swap booked in a U.S. branch" (and, accordingly, revising the definitions of "foreign-based swap" and "foreign counterparty" below to reflect this change in terminology).

In response to comments objecting to the differences in the proposed definitions of "swap conducted through a foreign branch" and "swap conducted through a U.S. branch," the Commission

[233] *See* Proposed § 23.23(a)(15); Proposed Rule, 85 FR at 968, 1003.

[234] *See* Proposed § 23.23(a)(10) and (23); Proposed Rule, 85 FR at 968, 1003.

[235] Final § 23.23(a)(11), (18), and (24).

[236] *See* Proposed § 23.23(a)(20); Proposed Rule, 85 FR at 968, 1003.

[237] Final § 23.23(a)(21).

[238] *See* Proposed § 23.23(a)(17); Proposed Rule, 85 FR at 968, 1003.

[239] Final § 23.23(a)(16).

[240] Or would be accounted for on its balance sheet under applicable accounting standards if the U.S. branch were a separate legal entity.

[241] For example, the swap is included in the non-U.S. person's Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks published by the Federal Financial Institution Examinations Council (FFIEC 002).

[242] *See infra* section V; Proposed Rule, 85 FR at 978.

is retaining these differences because, as a general matter, U.S. swap entities should be subject to all of the Commission's Title VII requirements set forth in the Final Rule. Because classifying a swap as a "swap conducted through a foreign branch" makes a U.S. swap entity eligible for certain exceptions from these requirements and substituted compliance for the swap under the Final Rule, merely booking a swap in the foreign branch is not sufficient for a U.S. swap entity to qualify for these exceptions and substituted compliance. Rather, the U.S. swap entity is required also to show that the swap is a transaction of a type that is endemic to the foreign market (*i.e.*, that it is a type of transaction entered into by personnel in the foreign branch in the normal course of the business of the branch, rather than a transaction more normally entered into in a different location and merely booked in the foreign branch to evade CFTC regulatory requirements). Hence, as discussed above, the Commission is including a "normal course of business" prong in the definition of "a swap conducted through a foreign branch" and requiring that all three prongs of the definition be satisfied.

As noted in the Proposed Rule and consistent with the Commission's approach to foreign branches, a U.S. branch of a non-U.S. banking organization does not include a U.S. affiliate of the organization that is incorporated or organized as a separate legal entity. Also consistent with this approach, the Commission declines in the Final Rule to recognize U.S. branches of non-U.S. banking organization separately from their non-U.S. principal for purposes of registration.

### I. Foreign-Based Swap and Foreign Counterparty

#### 1. Proposed Rule

The Commission proposed that the term "foreign-based swap" would mean: (1) A swap by a non-U.S. swap entity, except for a swap conducted through a U.S. branch; or (2) a swap conducted through a foreign branch.[243] Further, the term "foreign counterparty" would mean: (1) A non-U.S. person, except with respect to a swap conducted through a U.S. branch of that non-U.S. person; or (2) a foreign branch where it enters into a swap in a manner that satisfies the definition of a swap conducted through a foreign branch.[244] Under the Proposed Rule, together with

the proposed defined terms "foreign branch," "swap conducted through a foreign branch," "U.S. branch," and "swap conducted through a U.S. branch," these terms were to be used to determine which swaps would be foreign swaps of non-U.S. swap entities and foreign branches of U.S. swap entities, for which certain relief from Commission requirements would be available under the Proposed Rule, and which swaps would be treated as domestic swaps not eligible for such relief.

#### 2. Summary of Comments

AIMA was supportive of the definition of "foreign counterparty" and, in particular, its application to CIVs. However, JFMC/IBAJ requested that the Commission expand the definition of "foreign-based swap" and "foreign counterparty" under the proposed exceptions from the group B and C requirements (described in sections VI.A.2 and VI.A.3 below) to cover swaps conducted through the U.S. branch of a non-U.S. swap entity. JFMC/IBAJ stated that these are swap trades between two non-U.S. persons and thus should be governed by the home country regulation of the non-U.S. persons according to principles of international comity, and that there is no material importation of risk to the U.S. financial system and hence a lack of sufficient jurisdictional nexus for purposes of CEA section 2(i). JBA similarly requested that, generally, swap requirements not apply to U.S. branches in a different manner than the related non-U.S person.

#### 3. Final Rule

After carefully considering the comments, the Commission is adopting the definitions of "foreign-based swap" and "foreign counterparty" as proposed, with a minor technical modification included in the rule text in this release.[245] Specifically, to reflect that the term "swap conducted through a U.S. branch" is being replaced with the term "swap booked in a U.S. branch," each of the definitions of "foreign-based swap" and "foreign counterparty" is being revised to replace the term "swap conducted through a U.S. branch" with the term "swap booked in a U.S. branch."

When a swap is booked in a U.S. branch of a non-U.S. swap entity, that swap is part of the U.S. swap market, and, accordingly, the group B and group C requirements (described in sections VI.A.2 and VI.A.3 below) should

generally apply.[246] Therefore, the Commission has determined to carve out a swap booked in a U.S. branch from the definitions of "foreign-based swap" and "foreign counterparty."

As discussed in the Proposed Rule, the Commission is using the terms "foreign-based swap" and "foreign counterparty" to identify the types of swaps that are eligible for certain relief, consistent with section 2(i) of the CEA, in order that swaps that demonstrate sufficient indicia of being domestic generally remain subject to the Commission's requirements under the Final Rule, notwithstanding that the swap is entered into by a non-U.S. swap entity or a foreign branch of a U.S. swap entity. Otherwise, an entity or branch might simply be established outside of the United States to evade Dodd-Frank Act requirements and CFTC regulations.

As the Commission has previously stated, it has a strong supervisory interest in regulating swap activities that occur in the United States.[247] However, consistent with section 2(i) of the CEA, foreign swaps of non-U.S. swap entities and foreign branches of U.S. swap entities should be eligible for relief from certain of the Commission's requirements. Accordingly, certain exceptions from the group B and group C requirements and portions of the Commission's substituted compliance regime (discussed below in sections VI.B and VI.C), are designed to apply only to certain foreign swaps of non-U.S. swap entities and foreign branches of U.S. swap entities that the Commission believes should be treated as occurring outside the United States. Specifically, these provisions are applicable only to a swap by a non-U.S. swap entity—except for a swap booked in a U.S. branch—and a swap conducted through a foreign branch such that it satisfies the definition of a "foreign-based swap" above. They are generally not applicable to swaps of non-U.S. swap entities that are booked in a U.S. branch of that swap entity, and swaps of foreign branches of U.S. swap entities where the foreign branch does not enter into the swaps in a manner that satisfies the definition of a swap conducted through a foreign branch, because the

---

[243] *See* Proposed § 23.23(a)(4); Proposed Rule, 85 FR at 968–969, 1002.

[244] *Id.*

[245] Final § 23.23(a)(4) and (5).

[246] The Commission notes that swap activities of the U.S. branches of non-U.S. banking organizations take place inside the United States and, thus, section 2(i)'s applicability (*i.e.*, to activities "outside the U.S.") is not implicated. Nevertheless, as discussed in sections VI.B and VI.C, *infra*, the Commission has determined under the Final Rule to provide certain exceptions from application of the group C requirements and the availability of substituted compliance for the group B requirements for certain swaps booked in the U.S. branches of non-U.S. swap entities.

[247] *See* Guidance, 78 FR at 45350, n.513.

entrance into a swap by a U.S. swap entity (through its foreign branch) or a U.S. branch of a non-U.S. swap entity under these circumstances, demonstrates sufficient indicia of being a domestic swap to be treated as such for purposes of the Final Rule. Similarly, in certain cases, the availability of an exception or substituted compliance for a swap depends on whether the counterparty to such a swap qualifies as a "foreign counterparty" under the Final Rule. The Commission is establishing this requirement to ensure that foreign-based swaps of swap entities in which their counterparties demonstrate sufficient indicia of being domestic and, thus, trigger the Commission's supervisory interest in domestic swaps, remain subject to the Commission requirements under the Final Rule.

The Commission's approach in the Final Rule to limit certain relief for U.S. branches of non-U.S. swap entities is parallel to the Commission's approach in the Final Rule to provide certain exceptions from Commission requirements or substituted compliance for certain transactions of foreign branches of U.S. swap entities to take into account the supervisory interest of local regulators, as discussed below in section VI.

## III. Cross-Border Application of the Swap Dealer Registration Threshold

CEA section 1a(49) defines the term "swap dealer" to include any person that: (1) Holds itself out as a dealer in swaps; (2) makes a market in swaps; (3) regularly enters into swaps with counterparties as an ordinary course of business for its own account; or (4) engages in any activity causing the person to be commonly known in the trade as a dealer or market maker in swaps (collectively referred to as "swap dealing," "swap dealing activity," or "dealing activity").[248] The statute also requires the Commission to promulgate regulations to establish factors with respect to the making of a determination to exempt from designation as an SD an entity engaged in a de minimis quantity of swap dealing.[249]

In accordance with CEA section 1a(49), the Commission issued the Entities Rule,[250] which, among other things, further defined the term "swap dealer" and excluded from designation as an SD any entity that engages in a de minimis quantity of swap dealing with

or on behalf of its customers.[251] Specifically, the definition of "swap dealer" in § 1.3 provides that a person shall not be deemed to be an SD as a result of its swap dealing activity involving counterparties unless, during the preceding 12 months, the aggregate gross notional amount of the swaps connected with those dealing activities exceeds the de minimis threshold.[252] Paragraph (4) of that definition further requires that, in determining whether its swap dealing activity exceeds the de minimis threshold, a person must include the aggregate gross notional amount of the swaps connected with the dealing activities of its affiliates under common control.[253] For purposes of the Commission's interpretation of the aggregation requirement in the cross-border context as set forth in this release, the Commission construes "affiliates under common control" by reference to the Entities Rule, which defined control as the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.[254] Accordingly, any reference in the Commission's aggregation interpretation to "affiliates under common control" with a person includes affiliates that are controlling, controlled by, or under common control with such person.

The Commission is now adopting rules to address how the de minimis threshold should apply to the cross-border swap dealing transactions of U.S. and non-U.S. persons. Specifically, the Final Rule identifies when a potential SD's cross-border dealing activities should be included in its de minimis threshold calculation and when they may properly be excluded. As discussed below, whether a potential SD includes a particular swap in its de minimis threshold calculation depends on how the entity and its counterparty are classified (*e.g.,* U.S. person, SRS, etc.) and, in some cases, the jurisdiction in which a non-U.S. person is regulated.

### A. U.S. Persons

The Commission is adopting, as proposed and consistent with the Guidance, the requirement that a U.S. person include all of its swap dealing

transactions in its de minimis threshold calculation without exception.[255] The Commission did not receive comments regarding this requirement. As discussed in section II.B above, the term "U.S. person" encompasses a person that, by virtue of being domiciled, organized, or having its principal place of business in the United States, raises the concerns intended to be addressed by the Dodd-Frank Act, regardless of the U.S. person status of its counterparty. In addition, a person's status as a U.S. person is determined at the entity level and, thus, a U.S. person includes the swap dealing activity of operations that are part of the same legal person, including those of its foreign branches. Therefore, a U.S. person includes in its SD de minimis threshold calculation dealing swaps entered into by a foreign branch of the U.S. person.[256]

### B. Non-U.S. Persons

Under the Final Rule, as discussed in more detail below, whether a non-U.S. person needs to include a swap in its de minimis threshold calculation depends on the non-U.S. person's status, the status of its counterparty, and, in some cases, the jurisdiction in which the non-U.S. person is regulated. Specifically, the Final Rule requires a person that is a Guaranteed Entity or an SRS to count all of its dealing swaps towards the de minimis threshold.[257] In addition, an Other Non-U.S. Person is required to count dealing swaps with a U.S. person toward its de minimis threshold calculation, except for swaps conducted through a foreign branch of a registered U.S. SD.[258] Further, subject to certain exceptions, the Final Rule requires an

---

[248] 7 U.S.C. 1a(49)(A). In general, a person that satisfies any one of these prongs is deemed to be engaged in swap dealing activity.

[249] 7 U.S.C. 1a(49)(D).

[250] Entities Rule, 77 FR 30596.

[251] 17 CFR 1.3, Swap dealer, paragraph (4); Entities Rule, 77 FR 30596.

[252] 17 CFR 1.3, Swap dealer, paragraph (4)(i)(A). The de minimis threshold is set at $8 billion, except with regard to swaps with special entities for which the threshold is $25 million. *See id.,* paragraphs (4)(i)(A)–(B). *See generally* De Minimis Exception to the Swap Dealer Definition, 83 FR 56666 (Nov. 13, 2018).

[253] 17 CFR 1.3, Swap dealer, paragraph (4)(i)(A).

[254] *See* Entities Rule, 77 FR at 30631 n.437.

[255] Final § 23.23(b)(1). *See* Proposed Rule, 85 FR 970–971, 1004; Guidance, 78 FR at 45326.

[256] Proposed Rule, 85 FR at 970–971. This approach mirrors the SEC's approach in its cross-border rule. *See* 17 CFR 240.3a71–3(b)(1)(i); SEC Cross-Border Rule, 79 FR at 47302, 47371.

[257] As discussed in section II.C, *supra,* for purposes of this release and ease of reading, a non-U.S. person whose obligations under a swap are subject to a guarantee by a U.S. person is being referred to as a "Guaranteed Entity." A non-U.S. person may be a Guaranteed Entity with respect to certain swaps and not others (including, *e.g.,* where the non-U.S. person is guaranteed only with respect to its swaps with certain counterparties). Thus, a non-U.S. person could be a Guaranteed Entity or an Other Non-U.S. Person, depending on the specific swap.

[258] As stated, "swap conducted through a foreign branch" means a swap entered into by a foreign branch where: (1) The foreign branch or another foreign branch is the office through which the U.S. person makes and receives payments and deliveries under the swap pursuant to a master netting or similar trading agreement, and the documentation of the swap specifies that the office for the U.S. person is such foreign branch; (2) the swap is entered into by such foreign branch in its normal course of business; and (3) the swap is reflected in the local accounts of the foreign branch.

Other Non-U.S. Person to count dealing swaps toward its de minimis threshold calculation if the counterparty to such swaps is a Guaranteed Entity.

1. Swaps by a Significant Risk Subsidiary

The Commission proposed to require an SRS to include all of its dealing swaps in its de minimis threshold calculation without exception.[259]

IIB/SIFMA stated that, generally, the Commission should not require a non-U.S. person, whether or not it is an SRS or other FCS, to include dealing swaps with a non-U.S. person in its SD de minimis threshold calculation when the risk of such swaps is transferred to an affiliated, registered U.S. SD. In such a situation, IIB/SIFMA asserted that there is no significant potential for risk to the United States or evasion of the Dodd-Frank Act because the Commission already can exercise appropriate regulatory oversight through direct regulation of the registered SD, which is subject to Dodd-Frank Act provisions such as risk management requirements and Commission or prudential regulator margin and capital requirements. IIB/SIFMA argued that this consideration underlies the Commission's decision to exclude affiliates of a registered SD from the ''conduit affiliate'' definition in the Guidance, as well as the similar approach taken by the SEC in its implementation of the Dodd-Frank Act.

After considering this comment, the Commission is adopting this requirement as proposed.[260] As discussed in section II.D above, the SRS test identifies a person that, by virtue of being a significant subsidiary of a U.S. person, and not being subject to prudential supervision as a subsidiary of a BHC or IHC, or subject to comparable capital and margin rules, raises the concerns intended to be addressed by the Dodd-Frank Act requirements addressed by the Final Rule, regardless of the status of its counterparty as a U.S. person or non-U.S. person. The Commission believes that treating an SRS differently from a U.S. person could create a substantial regulatory loophole, incentivizing U.S. persons to conduct their dealing business with non-U.S. persons through SRSs to avoid application of the Dodd-Frank Act SD requirements. Allowing swaps entered into by SRSs, which have the potential to affect the ultimate U.S. parent entity and U.S. commerce, to be treated differently depending on how the parties structure their transactions

could undermine the effectiveness of the Dodd-Frank Act swaps provisions and related Commission regulations addressed by the Final Rule. Applying the same standard to similar transactions helps to limit those incentives and regulatory implications. Because the SRS definition is a risk-based test, the Commission has determined not to include a carve-out for back-to-back swaps to SDs, as was provided in the Guidance for conduit affiliates. Additionally, the SRS definition, as adopted in the Final Rule, already includes a carve-out for affiliates of BHCs and IHCs. This approach allows for streamlined application of the rule, and the comment letters have not identified specific downsides to this approach.[261]

In addition, a person's status as an SRS is determined at the entity level and, thus, an SRS is required to include in its SD de minimis threshold calculation the dealing swaps of its operations that are part of the same legal person, including those of its branches.[262]

The Proposed Rule also provided that an Other Non-U.S. Person would not be required to count a dealing swap with an SRS toward its de minimis threshold calculation, unless the SRS was also a Guaranteed Entity (and no exception applied).[263] JFMC/IBAJ supported this approach, while JBA asserted that an Other Non-U.S. Person should not have to count a swap entered into with a non-U.S. person in any circumstance. As noted above, an SRS is required to count all of its dealing swaps. However, the Commission continues to believe that where an Other Non-U.S. Person is entering into a dealing swap with an SRS, requiring the Other Non-U.S. Person to count the swap towards its de minimis threshold could cause the Other Non-U.S. Person to stop engaging in swap activities with SRSs. Though an SRS is required to count all of its dealing swaps, for the reasons stated above, the Commission believes that it is important to ensure that SRSs, particularly ones that are a commercial or non-financial entity that do not engage in swap dealing activities, continue to have access to swap liquidity from Other Non-U.S. Persons for hedging or other non-dealing purposes.

2. Swaps With a U.S. Person

Consistent with the Guidance, the Commission proposed to require a non-U.S. person to count all dealing swaps

with a counterparty that is a U.S. person toward its de minimis threshold calculation, except for swaps with a counterparty that is a foreign branch of a registered U.S. SD if such swaps meet the definition of being ''conducted through a foreign branch'' of such registered SD.[264]

IIB/SIFMA, JFMC/IBAJ, and JBA supported allowing an Other Non-U.S. Person to exclude swap dealing transactions conducted through a foreign branch of a registered SD counterparty. IIB/SIFMA agreed that the Commission's regulatory interest in these swaps is not sufficient to warrant a competitive disadvantage for foreign branches of U.S. SDs, especially considering that other Dodd-Frank Act requirements, such as margin, mitigate the risk of these swaps to the U.S. SD. Additionally, IIB/SIFMA stated that the exclusion helps prevent market fragmentation by enabling Other Non-U.S. Persons to access liquidity provided by U.S. SDs through their foreign branches. On the other hand, AFR asserted that the Proposed Rule would allow branches of U.S. persons, which are actually formally and legally part of the parent U.S. organization, to effectively act as non-U.S. persons.

After considering the comments, the Commission is adopting this aspect of the cross-border application of the SD registration threshold as proposed.[265] As discussed in section II.B, the term ''U.S. person'' encompasses persons that inherently raise the concerns intended to be addressed by the Dodd-Frank Act regardless of the U.S. person status of their counterparty. In the event of a default or insolvency of a non-U.S. SD, the SD's U.S. counterparties could be adversely affected. A credit event, including funding and liquidity problems, downgrades, default, or insolvency at a non-U.S. SD could therefore have a direct and significant adverse effect on its U.S. counterparties, which could in turn create the risk of disruptions to the U.S. financial system.[266]

Allowing a non-U.S. person to exclude swaps conducted through a foreign branch of a registered SD counterparty from its de minimis threshold calculation is consistent with the Guidance.[267] In response to AFR's comment that the Proposed Rule allows foreign branches of U.S. persons to effectively act as non-U.S. persons, the

[259] Proposed § 23.23(b)(1); Proposed Rule, 85 FR at 971, 1004.

[260] Final § 23.23(b)(1).

[261] *See* Proposed Rule, 85 FR at 971.

[262] *Id.*

[263] *Id.*

[264] Proposed § 23.23(b)(2)(i); Proposed Rule, 85 FR at 971–972, 1004. *See* Guidance, 78 FR at 45323–45324.

[265] Final § 23.23(b)(2)(i).

[266] Proposed Rule, 85 FR at 971–972.

[267] *Id. See* Guidance, 78 FR at 45323–45324.

Commission continues to believe that its regulatory interest in these swaps is not sufficient to warrant creating a potential competitive disadvantage for foreign branches of U.S. SDs with respect to their foreign entity competitors by requiring non-U.S. persons to count trades with them toward their de minimis threshold calculations. In this regard, a swap conducted through a foreign branch of a registered SD triggers certain Dodd-Frank Act transactional requirements (or comparable requirements), particularly margin requirements, and thus, such swap activity is not conducted fully outside the Dodd-Frank Act regime. Moreover, in addition to certain Dodd-Frank Act requirements that apply to such swaps, other foreign regulatory requirements may also apply similar transactional requirements to the transactions.[268] Accordingly, the Commission believes that it is appropriate and consistent with section 2(i) of the CEA to allow non-U.S. persons to exclude from their de minimis calculation any swap dealing transactions conducted through a foreign branch of a registered SD counterparty. However, this exception does not apply to Guaranteed Entities (discussed below) or SRSs (discussed above), who have to count all of their dealing swaps.

The Commission also requested comment on whether it would be appropriate to require a U.S. branch to include in its SD de minimis threshold calculation all of its swap dealing transactions, as if they were swaps entered into by a U.S. person, and whether it would be appropriate to require an Other Non-U.S. Person to include in its SD de minimis threshold calculation dealing swaps conducted through a U.S. branch of its counterparty.[269] IIB/SIFMA supported not requiring a U.S. branch of a non-U.S. banking organization to include all of its swap dealing transactions in its SD de minimis threshold calculation as if they were swaps entered into by a U.S. person or to require an Other Non-U.S. Person to include in its SD de minimis threshold calculation dealing swaps conducted through such a branch of its counterparty. IIB/SIFMA stated that swaps between a U.S. branch and an Other Non-U.S. Person do not present risks to the United States that would justify applying the Commission's SD

requirements. JBA also stated that Other Non-U.S. Persons should not have to count swaps conducted through a U.S. branch of a counterparty since such an approach may lead to Other Non-U.S. Persons decreasing activity with U.S. branches.

Having considered the foregoing comments, in this Final Rule, the Commission is not requiring a U.S. branch of an Other Non-U.S. Person to count all of its swap dealing transactions in its SD threshold calculation, as if they were swaps entered into by a U.S. person. Rather, a U.S. branch is required to count swaps pursuant to the requirements for Other Non-U.S. Persons (*e.g.,* count swaps with U.S. persons, Guaranteed Entities subject to certain exceptions, etc.). Additionally, an Other Non-U.S. Person is not required to include in its SD de minimis threshold calculation dealing swaps booked in a U.S. branch of a counterparty, unless that swap has to be counted pursuant to other requirements of this Final Rule.

### 3. Guaranteed Swaps

#### (i) Swaps Entered Into by a Guaranteed Entity

In an approach that is generally consistent with the Guidance, the Commission proposed to require a non-U.S. person to include in its de minimis threshold calculation swap dealing transactions where its obligations under the swaps are guaranteed by a U.S. person.[270] No comments were received regarding this aspect of the Proposed Rule.

The Commission is adopting this requirement as proposed,[271] because the swap obligations of a Guaranteed Entity are identical, in relevant aspects, to a swap entered into directly by a U.S. person. As a result of the guarantee, the U.S. guarantor generally bears risk arising out of the swap as if it had entered into the swap directly. The U.S. guarantor's financial resources in turn enable the Guaranteed Entity to engage in dealing activity, because the Guaranteed Entity's counterparties will

look to both the Guaranteed Entity and its U.S. guarantor to ensure performance of the swap. Absent the guarantee from the U.S. person, a counterparty may choose not to enter into the swap or may not do so on the same terms. In this way, the Guaranteed Entity and the U.S. guarantor effectively act together to engage in the dealing activity.[272]

Further, treating a Guaranteed Entity differently from a U.S. person could create a substantial regulatory loophole, incentivizing U.S. persons to conduct their dealing business with non-U.S. persons through non-U.S. affiliates, with a U.S. guarantee, to avoid application of the Dodd-Frank Act SD requirements. Allowing transactions that have a similar economic reality with respect to U.S. commerce to be treated differently depending on how the parties structure their transactions could undermine the effectiveness of the Dodd-Frank Act swap provisions and related Commission regulations addressed by the Final Rule. Applying the same standard to similar transactions helps to limit those incentives and regulatory implications.[273]

#### (ii) Swaps Entered Into With a Guaranteed Entity

The Commission also proposed to require a non-U.S. person to count dealing swaps with a Guaranteed Entity in its SD de minimis threshold calculation, except when: (1) The Guaranteed Entity is registered as an SD; or (2) the Guaranteed Entity's swaps are subject to a guarantee by a U.S. person that is a non-financial entity.[274] The Commission also invited comment on whether it should the follow the SEC's approach, which does not require a non-U.S. person that is not guaranteed by a U.S. person to count dealing swaps with a Guaranteed Entity.[275]

IIB/SIFMA, ISDA, JFMC/IBAJ, and JBA recommended that the Commission further conform this provision with the Guidance by expanding the exceptions to also cover a Guaranteed Entity that engages in de minimis swap dealing activity and is affiliated with a

---

[268] As noted in section I.C, *supra,* significant and substantial progress has been made in the world's primary swaps trading jurisdictions to implement the G20 swaps reform commitments.

[269] Proposed Rule, 85 FR at 973. *See* discussion of the modification of the definition of a "swap conducted through a U.S. branch" to be a "swap booked in a U.S. branch" in section II.H.3, *supra.*

[270] Proposed § 23.23(b)(2)(ii); Proposed Rule, 85 FR at 972, 1004. The Guidance stated that where a non-U.S. affiliate of a U.S. person has its swap dealing obligations with non-U.S. persons guaranteed by a U.S. person, the guaranteed affiliate generally would be required to count those swap dealing transactions with non-U.S. persons (in addition to its swap dealing transactions with U.S. persons) for purposes of determining whether the affiliate exceeds a de minimis amount of swap dealing activity and must register as an SD. Guidance, 78 FR at 45312–45313. As discussed above, the Final Rule does not require that the guarantor be an affiliate of the guaranteed person for that person to be a Guaranteed Entity.

[271] Final § 23.23(b)(2)(ii).

[272] Proposed Rule, 85 FR at 972. This view is consistent with the SEC's approach in its cross-border rule. *See* SEC Cross-Border Rule, 79 FR at 47289.

[273] Proposed Rule, 85 FR at 972.

[274] Proposed § 23.23(b)(2)(iii); Proposed Rule, 85 FR at 973, 1004.

[275] Proposed Rule, 85 FR at 974. The SEC noted that "concerns regarding the risk posed to the United States by such security-based swaps, and regarding the potential use of such guaranteed affiliates to evade the Dodd-Frank Act . . . are addressed by the requirement that guaranteed affiliates count their own dealing activity against the de minimis thresholds when the counterparty has recourse to a U.S. person." SEC Cross-Border Rule, 79 FR at 47322.

registered SD. IIB/SIFMA and ISDA noted that the Commission's regulatory concerns are addressed because the Guaranteed Entity would already be required to count the swap towards its de minimis threshold. IIB/SIFMA, ISDA, and JFMC/IBAJ noted that absent this exception, Other Non-U.S. Persons may choose not to trade with Guaranteed Entities, leading to increased market fragmentation or competitive disadvantages. JFMC/IBAJ also stated that there has been no material change in the swaps market since issuance of the Guidance warranting removing this exception. JBA commented that Other Non-U.S. Persons should not have to count swaps where the non-U.S. counterparty transfers risks to an affiliated U.S. SD because of the burdens associated with such an approach, and the limited risks arising from transactions between two non-U.S. persons. JBA also recommended that the CFTC follow the SEC approach and not require a non-U.S. person to count a swap with a Guaranteed Entity because it is burdensome to assess whether a guarantee exists.

Consistent with the Guidance, the Commission is adopting, as proposed, the requirement that a non-U.S. person must count dealing swaps with a Guaranteed Entity in its SD de minimis threshold calculation, except when: (1) The Guaranteed Entity is registered as an SD; or (2) the Guaranteed Entity's swaps are subject to a guarantee by a U.S. person that is a non-financial entity.[276] Additionally, after carefully considering the comments, and to maintain consistency with the Guidance, the Commission is also adopting an exception that allows a non-U.S. person to exclude from its de minimis calculation swaps entered into with a Guaranteed Entity that is itself below the de minimis threshold and is affiliated with a registered SD.[277]

The guarantee of a swap is an integral part of the swap and, as discussed above, counterparties may not be willing to enter into a swap with a Guaranteed Entity in the absence of the guarantee. The Commission recognizes that, given the highly integrated corporate structures of global financial enterprises described above, financial groups may elect to conduct their swap dealing activity in a number of different ways, including through a U.S. person or through a non-U.S. affiliate that benefits from a guarantee from a U.S.

person. Therefore, in order to avoid creating a regulatory loophole, swaps of a non-U.S. person with a Guaranteed Entity should receive the same treatment as swaps with a U.S. person. The exceptions are intended to address those situations where the risk of the swap between the non-U.S. person and the Guaranteed Entity is otherwise managed under the Dodd-Frank Act swap regime or is primarily outside the U.S. financial industry.[278] JBA supported the SEC's approach, which, as noted, does not require a non-U.S. person that is not a conduit affiliate or guaranteed by a U.S. person to count dealing swaps with any guaranteed entity toward its de minimis threshold in any case.[279] Given the broader global scope of the swaps market regulated under the Commission's swap regime versus the relatively more limited U.S.-focused scope of the security-based swap market regulated under the SEC's security-based swap regime, the Commission has determined to treat swaps with Guaranteed Entities differently.

Where an Other Non-U.S. Person enters into swap dealing transactions with a Guaranteed Entity that is a registered SD, the Commission will permit the non-U.S. person not to count its dealing transactions with the Guaranteed Entity against the non-U.S. person's de minimis threshold for two principal reasons. First, requiring the non-U.S. person to count such swaps may incentivize them to not engage in dealing activity with Guaranteed Entities, thereby contributing to market fragmentation and competitive disadvantages for entities wishing to access foreign markets. Second, one counterparty to the swap is a registered SD, and therefore is subject to comprehensive swap regulation under the oversight of the Commission.[280]

In addition, an Other Non-U.S. Person need not include in its de minimis threshold calculation its swap dealing transactions with a Guaranteed Entity where the Guaranteed Entity is guaranteed by a non-financial entity. In these circumstances, systemic risk to U.S. financial markets is mitigated because the U.S. guarantor is a non-financial entity whose primary business activities are not related to financial products and such activities primarily occur outside the U.S. financial sector.[281] For purposes of the Final

Rule, the Commission interprets "non-financial entity" to mean a counterparty that is not an SD, an MSP, or a financial end-user (as defined in the SD and MSP margin rule in § 23.151).[282]

Lastly, as discussed, the Commission requested comment on whether it should expand the exception to not require a non-U.S. person that is not a Guaranteed Entity to count dealing swaps with a Guaranteed Entity, consistent with the SEC. IIB/SIFMA, ISDA, JFMC/IBAJ, and JBA requested a narrower version of this exception, noting that the Guidance allowed a non-U.S. person to exclude from its de minimis calculation swaps entered into with a Guaranteed Entity that is itself below the de minimis threshold and is affiliated with a registered SD. The Guidance reflected the Commission's view that when the aggregate level of swap dealing by a non-U.S. person that is not a guaranteed affiliate, considering both swaps with U.S. persons and swaps with unregistered guaranteed affiliates, exceeds the de minimis level of swap dealing, the non-U.S. person's swap dealing transactions have the requisite direct and significant connection with activities in, or effect on, commerce of the United States.[283] The Commission believes, however, that where the counterparty to a swap is a Guaranteed Entity and is not a registered SD, the Commission's regulatory concerns, such as systemic risk to U.S. financial markets, are addressed because the Guaranteed Entity engages in a level of swap dealing below the de minimis threshold and is part of an affiliated group with an SD.[284] Risk to the Guaranteed Entity should be mitigated by the SD's risk management program, which under Commission rules must take account of risks posed by affiliates and must be integrated into risk management at the consolidated entity level.[285] Including this exception also addresses concern that its elimination would discourage Other Non-U.S. Persons from entering into swaps with Guaranteed Entities, creating competitive disadvantages.

### C. Aggregation Requirement

Paragraph (4) of the SD definition in § 1.3 requires that, in determining whether its swap dealing transactions exceed the de minimis threshold, a person must include the aggregate notional amount of any swap dealing transactions entered into by its affiliates

---

[276] Final § 23.23(b)(2)(iii)(A) and (B). *See* Guidance, 78 FR at 45324.

[277] Final § 23.23(b)(2)(iii)(C). *See* Guidance, 78 FR at 45324.

[278] Proposed Rule, 85 FR at 972.

[279] SEC Cross-Border Rule, 79 FR at 47322.

[280] Proposed Rule, 85 FR at 972.

[281] Moreover, the SRS definition includes those non-financial U.S. parent entities that meet the risk-based thresholds set out in section II.D, *supra*.

[282] Proposed Rule, 85 FR at 972.

[283] Guidance, 78 FR at 45324.

[284] *Id.*

[285] 17 CFR 23.600(c)(1)(ii).

under common control.[286] Consistent with CEA section 2(i), the Commission interprets this aggregation requirement in a manner that applies the same aggregation principles to all affiliates in a corporate group, whether they are U.S. or non-U.S. persons.

Accordingly, consistent with the Guidance, the Commission proposed to require a potential SD, whether a U.S. or non-U.S. person, to aggregate all swaps connected with its dealing activity with those of persons controlling, controlled by, or under common control with the potential SD to the extent that these affiliated persons are themselves required to include those swaps in their own de minimis threshold calculations, unless the affiliated person is itself a registered SD.[287]

Better Markets supported the proposed aggregation requirement because it would prevent structuring to avoid or evade the de minimis threshold. As discussed above in connection with the definition of "significant risk subsidiary," AFR stated that it would be simple for large international banks and other significant actors to conduct dealing through foreign subsidiaries that need not be counted toward de minimis thresholds at the subsidiary level. AFR claimed that the aggregation provision is negated by the fact that affiliates which are not SRSs would not have to count non-guaranteed swaps with other non-U.S., non-SRS persons toward their own de minimis calculations. In this way, it argued that the weakness of the other definitions in the Proposed Rule affects the calculation of the de minimis registration thresholds.

Having considered these comments, the Commission is adopting this interpretation of the cross-border application of the SD registration threshold as proposed, and consistent with the Guidance.[288] Stated in general terms, the Commission's approach allows both U.S. persons and non-U.S. persons in an affiliated group to engage in swap dealing activity up to the de minimis threshold. When the affiliated group meets the de minimis threshold in the aggregate, one or more affiliate(s) (a U.S. affiliate or a non-U.S. affiliate) have to register as an SD so that the relevant swap dealing activity of the unregistered affiliates remains below the threshold. The Commission recognizes the borderless nature of swap dealing

activities, in which a dealer may conduct swap dealing business through its various affiliates in different jurisdictions, and believes that its approach addresses the concern that an affiliated group of U.S. and non-U.S. persons engaged in swap dealing transactions with a significant connection to the United States may not be required to register solely because such swap dealing activities are divided among affiliates that all individually fall below the de minimis threshold. The Commission's approach ensures that the aggregate gross notional amount of applicable swap dealing transactions of all such unregistered U.S. and non-U.S. affiliates does not exceed the de minimis level.[289]

In response to AFR's comment, pursuant to the status quo under the aggregation policy set forth in the Guidance, foreign subsidiaries of U.S. persons (that are not "conduit affiliates" as described in the Guidance) have not counted non-guaranteed swaps with other non-U.S. persons toward their de minimis calculations and U.S. person parent entities have therefore not aggregated such swaps with their own or their affiliates' de minimis calculations. Thus, the new SRS category expands the swaps included by the aggregation requirement rather than "negating the aggregation provision" as claimed by AFR.

### D. Certain Exchange-Traded and Cleared Swaps

The Commission proposed, in an approach that is generally consistent with the Guidance, to allow an Other Non-U.S. Person to exclude from its de minimis threshold calculation any swap that it anonymously enters into on a designated contract market ("DCM"), a swap execution facility ("SEF") that is registered with the Commission or exempted by the Commission from SEF registration pursuant to section 5h(g) of the CEA, or a foreign board of trade ("FBOT") that is registered with the Commission pursuant to part 48 of its regulations,[290] if such swap is also cleared through a registered or exempt derivatives clearing organization ("DCO").[291]

IIB/SIFMA recommended that this exception be expanded to cover swaps executed anonymously by an Other

Non-U.S. Person on a non-U.S. trading venue and cleared by a non-U.S. clearing organization, regardless of whether the trading venue and clearing organization are registered or exempt from registration with the Commission. IIB/SIFMA stated that: (1) With such trades, the Other Non-U.S. Person cannot determine whether the swaps would count towards the SD de minimis threshold; (2) even if the Other Non-U.S. Person was registered as an SD, the swaps generally would not be subject to the Commission's external business conduct rules; and (3) a non-U.S. clearing organization becomes the counterparty to the Other Non-U.S. Person, and therefore the swaps do not present risk to the U.S. that would justify application of the Commission's risk mitigation rules. IIB/SIFMA stated that if the Other Non-U.S. Person's original counterparty was a U.S. person, the Commission's SEF and DCO registration requirements would independently require the trading venue and clearing organization to register with the Commission or obtain an exemption from registration and, therefore, it is not necessary for the Commission to limit this exception in a manner that would indirectly expand the SEF and DCO registration requirements to non-U.S. trading venues and clearing organizations with Other Non-U.S. Person participants.

Similarly, JFMC/IBAJ generally supported the exception, but also requested that the Commission not require the clearing organization or trading venue to be registered or exempt from registration with the CFTC because, in their view, the same policy rationale of exempting cleared swaps executed anonymously on a SEF or DCM applies to swaps executed on non-U.S. trading venues or clearing organizations operating without a CFTC registration or exemption. JFMC/IBAJ also recommended that the scope be expanded to include cleared swaps executed bilaterally outside a trading venue. JBA generally supported the proposal but also recommended that the exclusion be available for all cleared swaps, regardless of whether they are anonymously entered into on a DCM, registered or exempt SEF, or an FBOT, because risk to the U.S. would be limited after the swap is cleared. JSCC recommended that a non-U.S. person should be able to exclude swaps entered into with a U.S. person from the de minimis threshold calculation, if the swap is cleared with a registered DCO or exempt DCO because any non-U.S. person-related risk arising from the

---

[286] 17 CFR 1.3, Swap dealer, paragraph (4).

[287] Proposed Rule, 85 FR at 972–973; Guidance, 78 FR at 45323.

[288] Proposed Rule, 85 FR at 972–973; Guidance, 78 FR at 45323.

[289] Proposed Rule, 85 FR at 972–973.

[290] The Commission considers the exception described herein also to apply with respect to an FBOT that provides direct access to its order entry and trade matching system from within the U.S. pursuant to no-action relief issued by Commission staff.

[291] Proposed § 23.23(d); Proposed Rule, 85 FR at 973, 1004. *See* Guidance, 78 FR at 45325.

swap will be replaced and instead managed by the DCO.

Better Markets stated that the exception must be amended to limit the exclusion to DCO-cleared, anonymously SEF or DCM-executed swaps in which neither counterparty is subsequently disclosed through the practice of post-trade name give-up. Additionally, Better Markets objected to the expansion of the exchange-trading exclusion for any swaps anonymously executed or cleared through an exempted intermediary.

Having considered these comments, the Commission is adopting this exception as proposed.[292] When a non-U.S. person enters into a swap that is executed anonymously on a registered or exempt SEF, DCM, or registered FBOT, the Commission recognizes that the non-U.S. person does not have the necessary information about its counterparty to determine whether the swap should be included in its SD de minimis threshold calculation. The Commission therefore has determined that in this case the swap should be excluded altogether due to these practical difficulties.[293] However, the exception is limited to Other Non-U.S. Persons since, as discussed, Guaranteed Entities and SRSs have to count all of their dealing swaps towards the threshold, so the practical obstacles that would challenge Other Non-U.S. Persons are not relevant for Guaranteed Entities and SRSs.

The Final Rule expands the exception as it appeared in the Guidance to include SEFs and DCOs that are exempt from registration under the CEA, and also states that SRSs do not qualify for this exception. The CEA provides that the Commission may grant an exemption from registration if it finds that a foreign SEF or DCO is subject to comparable, comprehensive supervision and regulation by the appropriate governmental authorities in the SEF or DCO's home country.[294] The

Commission believes that the policy rationale for providing relief to swaps anonymously executed on a SEF, DCM, or FBOT and then cleared also extends to swaps executed on a foreign SEF and/or cleared through a foreign DCO that has been granted an exemption from registration. As noted, the foreign SEF or DCO is subject to comprehensive regulation that is comparable to that applicable to registered SEFs and DCOs.

The Commission has determined not to expand at this time the exception to allow an Other Non-U.S. Person to exclude swaps executed anonymously on an exchange and which are subsequently cleared, regardless of whether the exchange and clearing organization are registered or exempt from registration with the Commission. Commenters argued that if the Other Non-U.S. Person's original counterparty was a U.S. person, the Commission's SEF and DCO registration requirements would independently require the trading venue and clearing organization to register with the Commission or obtain an exemption from registration. While guidance from DMO has suggested that this might be the case with respect to SEFs and DCMs,[295] the Commission has not taken a formal position on whether registration of a SEF or DCM is required where a U.S. person participates on the trading facility, and has stated that it will do so in the future.[296] The Commission may consider expanding the exception pending other amendments to the SEF/DCO regulations and registration requirements.

In response to comments that anonymity should not be required, the Commission proposed this exception (and included it in the Guidance) because when a trade is entered into anonymously on an exchange, the non-U.S. person would not have the

necessary information about its counterparty to determine whether the swap should be included in its de minimis threshold calculation.[297] Therefore, these practical difficulties justify the exclusion of the swap altogether. However, if the identity of the counterparty is known to be a U.S. person, then the Other Non-U.S. Person should be seen to be participating in the U.S. swap market. Thus, the Commission has determined that such a non-U.S. person should count such swaps towards its de minimis threshold as otherwise required. Where the U.S. person status of a counterparty is known to the non-U.S. person, the Commission sees no reason to treat a cleared swap differently in the cross-border context than such swap is treated in the domestic U.S. context where cleared swaps entered into in a dealing capacity, whether executed anonymously or otherwise, count toward the SD de minimis threshold.

## IV. Cross-Border Application of the Major Swap Participant Registration Tests

CEA section 1a(33) defines the term "major swap participant" to include persons that are not SDs but that nevertheless pose a high degree of risk to the U.S. financial system by virtue of the "substantial" nature of their swap positions.[298] In accordance with the Dodd-Frank Act and CEA section 1a(33)(B), the Commission adopted rules further defining "major swap participant" and providing that a person shall not be deemed an MSP unless its swap positions exceed one of several thresholds.[299] The thresholds were designed to take into account default-related credit risk, the risk of multiple market participants failing close in time, and the risk posed by a market participant's swap positions on an aggregate level.[300] The Commission also adopted interpretive guidance stating

---

[292] Final § 23.23(d).

[293] See Proposed Rule, 85 FR at 973. Additionally, as the Commission has clarified in the past, when a non-U.S. person clears a swap through a registered or exempt DCO, such non-U.S. person would not have to include the resulting swap (i.e., the novated swap) in its de minimis threshold calculation. See, e.g., 2016 Proposal, 81 FR at 71957 n.88. A swap that is submitted for clearing is extinguished upon novation and replaced by new swap(s) that result from novation. See 17 CFR 39.12(b)(6). See also Derivatives Clearing Organization General Provisions and Core Principles, 76 FR 69334, 69361 (Nov. 8, 2011). Where a swap is created by virtue of novation, such swap does not implicate swap dealing, and therefore it would not be appropriate to include such swaps in determining whether a non-U.S. person should register as an SD.

[294] See CEA sections 5h(g) for the SEF exemption provision and 5b(h) for the DCO exemption provision.

[295] Division of Market Oversight Guidance on Application of Certain Commission Regulations to Swap Execution Facilities, at 2 n.8 (Nov. 15, 2013) ("[DMO] expects that a multilateral swaps trading platform located outside the United States that provides U.S. persons . . . with the ability to trade or execute swaps on or pursuant to the rules of the platform, either directly or indirectly through an intermediary, will register as a SEF or DCM.").

[296] See Swap Execution Facilities and Trade Execution Requirement, 83 FR 61946, 61961 n.106 ("[T]he Commission learned that many foreign multilateral swaps trading facilities prohibited U.S. persons and U.S.-located persons from accessing their facilities due to the uncertainty that the guidance created with respect to SEF registration. The Commission understands that these prohibitions reflect concerns that U.S. persons and U.S.-located persons accessing their facilities would trigger the SEF registration requirement. . . . [T]he Commission expects to address the application of CEA section 2(i) to foreign multilateral swaps trading facilities, including foreign swaps broking entities, in the future.").

[297] Proposed Rule, 85 FR at 973; Guidance, 78 FR 45325.

[298] 7 U.S.C. 1a(33)(A) (defining "major swap participant" to mean any person that is not an SD and either: (1) Maintains a substantial position in swaps for any of the major swap categories, subject to certain exclusions; (2) whose outstanding swaps create substantial counterparty exposure that could have serious effects on the U.S. financial system; or (3) is a highly leveraged financial entity that is not subject to prudential capital requirements and that maintains a substantial position in swaps for any of the major swap categories).

[299] 17 CFR 1.3, Major swap participant, paragraph (1). See generally Entities Rule, 77 FR 30596.

[300] Entities Rule, 77 FR at 30666 (discussing the guiding principles behind the Commission's definition of "substantial position" in 17 CFR 1.3); id. at 30683 (noting that the Commission's definition of "substantial counterparty exposure" in 17 CFR 1.3 is founded on similar principles as its definition of "substantial position").

that, for purposes of the MSP analysis, an entity's swap positions are attributable to a parent, other affiliate, or guarantor to the extent that the counterparty has recourse to the parent, other affiliate, or guarantor and the parent or guarantor is not subject to capital regulation by the Commission, SEC, or a prudential regulator ("attribution requirement").[301]

The Commission is now adopting rules to address the cross-border application of the MSP thresholds to the swap positions of U.S. and non-U.S. persons.[302] Applying CEA section 2(i) and principles of international comity, the Final Rule identifies when a potential MSP's cross-border swap positions apply toward the MSP thresholds and when they may be properly excluded. As discussed below, whether a potential MSP includes a particular swap in its MSP threshold calculations depends on how the entity and its counterparty are classified (*e.g.,* U.S. person, SRS, etc.) and, in some cases, the jurisdiction in which a non-U.S. person is regulated.[303] The Final Rule's approach for the cross-border application of the MSP thresholds is similar to the approach described above for the SD threshold.

## A. U.S. Persons

The Commission is adopting, as proposed, the requirement that a U.S. person include all of its swap positions in its MSP registration threshold calculations without exception.[304] The Commission did not receive comments regarding this requirement. As discussed in the context of the Final Rule's approach to applying the SD de minimis registration threshold, by virtue of it being domiciled or organized in the United States, or the inherent nature of its connection to the United States, all of a U.S. person's activities have a significant nexus to U.S. markets, giving the Commission a particularly strong regulatory interest in its swap activities.[305] Accordingly, the Commission believes that all of a U.S. person's swap positions, regardless of where they occur or the U.S. person status of the counterparty, should count toward the MSP thresholds.

## B. Non-U.S. Persons

Under the Final Rule, as discussed in more detail below, whether a non-U.S. person includes a swap position in its MSP threshold calculations depends on its status, the status of its counterparty, or the characteristics of the swap. Specifically, the Final Rule requires a person that is a Guaranteed Entity or an SRS to count all of its swap positions. In addition, an Other Non-U.S. Person is required to count all swap positions with a U.S. person, except for swaps conducted through a foreign branch of a registered U.S. SD. Subject to an exception, the Final Rule also requires an Other Non-U.S. Person to count all swap positions if the counterparty to such swaps is a Guaranteed Entity.[306]

### 1. Swaps by a Significant Risk Subsidiary

The Commission proposed to require an SRS to include all of its swap positions in its MSP threshold calculations.[307]

IIB/SIFMA recommended that the Commission not adopt the proposal, asserting that absent a guarantee or other form of direct risk transfer to a U.S. person, a foreign subsidiary does not present sufficiently "direct" risk to the United States to justify extraterritorial application of the MSP registration requirement under section 2(i). IIB/SIFMA stated that permitting foreign subsidiaries to transact in swaps without registering as MSPs also would not create a substantial regulatory loophole, as there is no evidence of sufficiently substantial non-dealing swap activity occurring in foreign subsidiaries at present when SRSs are not subject to MSP registration (just as there are no U.S. persons currently registered as MSPs).

After considering the comment, the Commission is adopting this aspect of the cross-border application of the MSP registration thresholds as proposed.[308] As noted in section II.D, the term SRS encompasses a person that, by virtue of being a significant subsidiary of a U.S. person, and not being subject to prudential supervision as a subsidiary of a BHC or IHC or subject to comparable capital and margin rules, raises the concerns intended to be addressed by the Dodd-Frank Act requirements addressed by the Final Rule, regardless of the U.S. person status of its counterparty. Further, the Commission believes that treating an SRS differently from a U.S. person could create a substantial regulatory loophole by incentivizing U.S. persons to conduct their swap business with non-U.S. persons through SRSs to avoid application of the Dodd-Frank Act MSP requirements. Allowing swaps entered into by SRSs, which have the potential to affect the ultimate U.S. parent entity and U.S. commerce, to be treated differently depending on how the parties structure their transactions could undermine the effectiveness of the Dodd-Frank Act swap provisions and related Commission regulations addressed by the Final Rule. Applying the same standard to similar swap positions helps to limit those incentives and regulatory implications.[309] Additionally, the SRS definition already includes a carve-out for affiliates of U.S. BHCs and IHCs. This approach allows for streamlined application of the rule, and the comment letters have not identified specific problems caused by applying the same standard to similar swap positions.

In addition, a person's status as an SRS is determined at the entity level and, thus, an SRS is required to include in its MSP threshold calculations the swap positions of its operations that are part of the same legal person, including those of its branches.[310]

For added clarity, the Commission also notes that an Other Non-U.S. Person is not be required to include swap positions entered into with an SRS in its MSP threshold calculations, unless the SRS is also a Guaranteed Entity and no other exception applies.

### 2. Swap Positions With a U.S. Person

The Commission proposed to require an Other Non-U.S. Person to count toward its MSP registration thresholds swap positions where the counterparty is a U.S. person, other than swaps with a foreign branch of a registered U.S. SD if such swaps are conducted through a foreign branch of such registered SD.[311]

IIB/SIFMA supported this approach, stating that it is consistent with the Guidance, except that it does not require that swaps with a foreign branch of a registered SD be subject to daily variation margin in order to be excluded from an Other Non-U.S. Person's MSP

---

[301] *Id.* at 30689.

[302] Final § 23.23(c).

[303] As indicated above, for purposes of the Final Rule, an "Other Non-U.S. Person" refers to a non-U.S. person that is neither a Guaranteed Entity nor an SRS.

[304] Final § 23.23(c)(1); Proposed Rule, 85 FR 974, 1004.

[305] *See supra* section III.A; Proposed Rule, 85 FR at 974.

[306] As discussed in sections II.C and III.B, *supra,* for purposes of this release and ease of reading, such a non-U.S. person whose obligations under the swaps are subject to a guarantee by a U.S. person is being referred to as a "Guaranteed Entity." Depending on the characteristics of the swap, a non-U.S. person may be a Guaranteed Entity with respect to swaps with certain counterparties, but not be deemed a Guaranteed Entity with respect to swaps with other counterparties.

[307] Proposed § 23.23(c)(1); Proposed Rule, 85 FR at 974–975, 1004.

[308] Final § 23.23(c)(1).

[309] Proposed Rule, 85 FR at 974–975.

[310] *Id.*

[311] Proposed § 23.23(c)(2)(i); Proposed Rule, 85 FR at 975, 1004.

registration thresholds. IIB/SIFMA noted that this was appropriate because the Dodd-Frank Act's margin requirements independently impose variation margin requirements on SDs where appropriate. Further, they stated that the change removes the complexity of non-U.S. persons having to determine their own "financial entity" status in order to evaluate whether variation margin was required now that the uncleared swap margin rules use a slightly different "financial end user" definition.

After considering this comment, the Commission is adopting this aspect of the cross-border application of the MSP registration thresholds as proposed.[312] Generally, a potential MSP must include in its MSP threshold calculations any swap position with a U.S. person. As discussed above, the term "U.S. person" encompasses persons that inherently raise the concerns intended to be addressed by the Dodd-Frank Act, regardless of the U.S. person status of their counterparty. The default or insolvency of the non-U.S. person would have a direct and significant adverse effect on a U.S. person and, by virtue of the U.S. person's significant nexus to the U.S. financial system, potentially could result in adverse effects or disruption to the U.S. financial system as a whole, particularly if the non-U.S. person's swap positions are substantial enough to exceed an MSP registration threshold.[313]

The Final Rule's approach in allowing a non-U.S. person to exclude swap positions conducted through a foreign branch of a registered SD counterparty is consistent with the approach described in section III.B.2 for cross-border treatment with respect to SDs.[314] In this regard, a swap conducted through a foreign branch of a registered SD triggers certain Dodd-Frank Act transactional requirements (or comparable requirements), particularly margin requirements, and therefore mitigates concern that this exclusion could be used to engage in swap activities outside the Dodd-Frank Act regime.

Accordingly, the Commission has determined that it is appropriate and consistent with section 2(i) of the CEA to allow a non-U.S. person, which is not a Guaranteed Entity or SRS, to exclude from its MSP threshold calculations any swaps conducted through a foreign branch of a registered SD counterparty. The Commission recognizes that such swaps

would need to be cleared or that the documentation of the swaps would have to require the foreign branch to collect daily variation margin, with no threshold, on its swaps with such non-U.S. person.[315] The Final Rule does not include such a requirement because the foreign branch of the registered SD is nevertheless required to post and collect margin, as required by the SD margin rules. In addition, a non-U.S. person's swaps conducted through a foreign branch of a registered SD counterparty must be addressed in the SD's risk management program. Such program must account for, among other things, overall credit exposures to non-U.S. persons.[316]

In response to a request for comment,[317] IIB/SIFMA supported not requiring a U.S. branch of a non-U.S. banking organization to include all of its swap positions in its MSP calculation as if they were swaps entered into by a U.S. person or to require an Other Non-U.S. Person to include in its MSP calculation dealing swaps conducted through such a branch. IIB/SIFMA stated that swaps between a U.S. branch and an Other Non-U.S. Person do not present risks to the United States that would justify applying the Commission's MSP requirements. Consistent with the Proposed Rule, the Commission has determined not to require a U.S. branch to include swaps with Other Non-U.S. Persons in its MSP threshold calculations as if they were swaps entered into by a U.S. person. Similarly, the Final Rule does not require an Other Non-U.S. Person to include in its MSP calculation dealing swaps booked in a U.S. branch.

### 3. Guaranteed Swap Positions

#### (i) Swaps Positions Entered Into by a Guaranteed Entity

The Commission proposed to require a non-U.S. person to include in its MSP calculation each swap position with respect to which it is a Guaranteed Entity.[318] No comments were received regarding this aspect of the Proposed Rule, and the Commission is adopting

this aspect of the cross-border application of the MSP registration thresholds as proposed.[319]

As explained in the context of the SD de minimis threshold calculation, the Commission believes that the swap positions of a Guaranteed Entity are identical, in relevant aspects, to those entered into directly by a U.S. person and thus present similar risks to the stability of the U.S. financial system or of U.S. entities.[320] As a result of the guarantee, the U.S. guarantor generally bears risk arising out of the swap as if it had entered into the swap directly. Absent the guarantee from the U.S. person, a counterparty may choose not to enter into the swap or may not do so on the same terms. Treating Guaranteed Entities differently from U.S. persons could also create a substantial regulatory loophole, allowing transactions that have a similar connection to or effect on U.S. commerce to be treated differently depending on how the parties are structured and thereby undermining the effectiveness of the Dodd-Frank Act swap provisions and related Commission regulations.

#### (ii) Swaps Positions Entered Into With a Guaranteed Entity

The Commission also proposed to require an Other Non-U.S. Person to count toward its MSP registration thresholds swap positions with a counterparty that is a Guaranteed Entity, except when the counterparty is registered as an SD.[321]

IIB/SIFMA supported this approach, stating that it is consistent with the Guidance, except that it does not require that swaps with a Guaranteed Entity be subject to daily variation margin in order to be excluded from an Other Non-U.S. Person's MSP registration thresholds. IIB/SIFMA noted that this was appropriate because the Dodd-Frank Act's margin requirements independently impose variation margin requirements on SDs where appropriate. Further, they stated that the change removes the complexity of non-U.S. persons having to determine their own "financial entity" status in order to evaluate whether variation margin was required now that the uncleared swap margin rules use a slightly different "financial end user" definition.

The Commission is adopting as proposed the requirement that a non-U.S. person must count swap positions

---

[312] Final § 23.23(c)(2)(i).

[313] Proposed Rule, 85 FR at 975.

[314] *Id.*

[315] Guidance, 78 FR at 45324–45325.

[316] *See* 17 CFR 23.600(c)(4)(ii), requiring registered SDs and MSPs to have credit risk policies and procedures that account for daily measurement of overall credit exposure to comply with counterparty credit limits, and monitoring and reporting of violations of counterparty credit limits performed by personnel that are independent of the business trading unit. *See also* 17 CFR 23.600(c)(1)(i), requiring the senior management and the governing body of each SD and MSP to review and approve credit risk tolerance limits for the SD or MSP.

[317] Proposed Rule, 85 FR at 977.

[318] Proposed § 23.23(c)(2)(ii); Proposed Rule, 85 FR at 975, 1004.

[319] Final § 23.23(c)(2)(ii).

[320] *See supra* section III.B.3.i; Proposed Rule, 85 FR at 975.

[321] Proposed § 23.23(c)(2)(iii); Proposed Rule, 85 FR at 975–976, 1004.

with a Guaranteed Entity counterparty, except when the counterparty is registered as an SD.[322] The guarantee of a swap is an integral part of the swap and, as discussed above, counterparties may not be willing to enter into a swap with a Guaranteed Entity in the absence of the guarantee. The Commission also recognizes that, given the highly integrated corporate structures of global financial enterprises, financial groups may elect to conduct their swap activity in a number of different ways, including through a U.S. person or through a non-U.S. affiliate that benefits from a guarantee from a U.S. person. Therefore, in order to avoid creating a substantial regulatory loophole, the Commission has determined that swap positions of a non-U.S. person with a counterparty whose obligations under the swaps are guaranteed by a U.S. person must receive the same treatment as swap positions with a U.S. person.[323]

However, similar to the discussion regarding SDs in section III.B.3.ii, where an Other Non-U.S. Person enters into a swap with a Guaranteed Entity that is a registered SD, it is appropriate to permit the non-U.S. person not to count its swap position with the Guaranteed Entity against the non-U.S. person's MSP thresholds, because one counterparty to the swap is a registered SD subject to comprehensive swap regulation and operating under the oversight of the Commission. For example, the swap position must be addressed in the SD's risk management program and account for, among other things, overall credit exposures to non-U.S. persons.[324] In addition, a non-U.S. person's swap positions with a Guaranteed Entity that is an SD are included in exposure calculations and attributed to the U.S. guarantor for purposes of determining whether the U.S. guarantor's swap exposures are systemically important on a portfolio basis and therefore require the protections provided by MSP registration. Therefore, in these circumstances, the Commission has determined that the non-U.S. person need not count such a swap position toward its MSP thresholds.[325]

### C. Attribution Requirement

In the Entities Rule, the Commission and the SEC provided a joint interpretation that an entity's swap positions in general are attributed to a parent, other affiliate, or guarantor for purposes of the MSP analysis to the extent that the counterparties to those positions have recourse to the parent, other affiliate, or guarantor in connection with the position, such that no attribution is required in the absence of recourse.[326] Even in the presence of recourse, however, attribution of a person's swap positions to a parent, other affiliate, or guarantor is not necessary if the person is already subject to capital regulation by the Commission or the SEC or is a U.S. entity regulated as a bank in the United States (and is therefore subject to capital regulation by a prudential regulator).[327]

The Commission proposed to address the cross-border application of the attribution requirement in a manner consistent with the Entities Rule and CEA section 2(i) and generally comparable to the approach adopted by the SEC.[328] Specifically, the Commission stated that the swap positions of an entity, whether a U.S. or non-U.S. person, should not be attributed to a parent, other affiliate, or guarantor for purposes of the MSP analysis in the absence of a guarantee. The Commission stated that even in the presence of a guarantee, attribution would not be required if the entity that entered into the swap directly is subject to capital regulation by the Commission or the SEC or is regulated as a bank in the United States.[329] Additionally, the Commission invited comment on whether it should modify its interpretation with regard to the attribution requirement to provide that attribution of a person's swap positions to a parent, other affiliate, or guarantor would not be required if the person is subject to capital standards that are comparable to and as comprehensive as the capital regulations and oversight by the Commission, SEC, or a U.S. prudential regulator.[330]

IIB/SIFMA stated that the Guidance clarified that the exception for entities subject to capital regulation also includes entities subject to non-U.S. capital standards that are comparable to, and as comprehensive as, the capital regulations and oversight by the Commission, SEC, or a U.S. prudential

regulator (*i.e.,* Basel compliant capital standards and oversight by a G20 prudential supervisor). Therefore, IIB/SIFMA recommended that the attribution requirement in the MSP threshold context should exclude entities subject to Basel compliant capital standards and oversight by a G20 prudential supervisor, as those entities should pose no higher risk than entities subject to capital regulation by the Commission, SEC, or a prudential regulator.

The Commission is adopting the interpretation of the attribution requirement as discussed in the Proposed Rule, with a clarification. The Commission has determined that, in addition to entities that are subject to capital regulation by the Commission, SEC, or U.S. prudential regulators, the attribution requirement in the MSP threshold context also excludes entities subject to Basel compliant capital standards and oversight by a G20 prudential supervisor. As noted by IIB/ SIFMA in response to a request for comment, this approach is consistent with the Guidance, and is recommended because those entities pose no higher risk than entities subject to capital regulation by the Commission, SEC, or a prudential regulator. The Commission has further determined that the swap positions of an entity that is required to register as an MSP, or whose MSP registration is pending, are not subject to the attribution requirement.

Generally, if a guarantee is present, however, and the entity being guaranteed is not subject to capital regulation (as described above), whether the attribution requirement applies depends on the U.S. person status of the person to whom there is recourse under the guarantee (*i.e.,* the U.S. person status of the guarantor). Specifically, a U.S. person guarantor attributes to itself any swap position of an entity subject to a guarantee, whether a U.S. person or a non-U.S. person, for which the counterparty to the swap has recourse against that U.S. person guarantor. The Commission finds that when a U.S. person acts as a guarantor of a swap position, the guarantee creates risk within the United States of the type that MSP regulation is intended to address, regardless of the U.S. person status of the entity subject to a guarantee or its counterparty.[331]

A non-U.S. person attributes to itself any swap position of an entity for which the counterparty to the swap has

---

[322] Final § 23.23(c)(2)(iii). The MSP provision does not include an exception for swap positions with non-U.S. persons guaranteed by a non-financial entity, or for swap positions with a Guaranteed Entity where such Guaranteed Entity is itself below the SD de minimis threshold under paragraph (4)(i) of the "swap dealer" definition in § 1.3 and is affiliated with a registered SD, similar to the carve-outs in the SD provision. *See* Final § 23.23(b)(2)(iii)(B) and (C); *supra* section III.B.3.ii.

[323] Proposed Rule, 85 FR at 975–976.

[324] *See* 17 CFR 23.600(c)(4)(ii). *See also* 17 CFR 23.600(c)(1)(i).

[325] Proposed Rule, 85 FR at 975–976.

[326] Entities Rule, 77 FR at 30689.

[327] *Id.*

[328] Proposed Rule, 85 FR at 976. *See* SEC Cross-Border Rule, 79 FR at 47346–47348.

[329] Proposed Rule, 85 FR at 976.

[330] *Id.* at 977.

[331] *Id.* at 976. *See* Entities Rule, 77 FR at 30689 (attribution is intended to reflect the risk posed to the U.S. financial system when a counterparty to a position has recourse against a U.S. person).

recourse against the non-U.S. person unless all relevant persons (*i.e.,* the non-U.S. person guarantor, the entity whose swap positions are guaranteed, and its counterparty) are non-U.S. persons that are not Guaranteed Entities.[332] In this regard, the Commission finds that when a non-U.S. person provides a guarantee with respect to the swap position of a particular entity, the economic reality of the swap position is substantially identical, in relevant respects, to a position entered into directly by the non-U.S. person.

In addition, the Commission believes that entities subject to a guarantee are able to enter into significantly more swap positions (and take on significantly more risk) as a result of the guarantee than they can otherwise, amplifying the risk of the non-U.S. person guarantor's inability to carry out its obligations under the guarantee. Given the types of risk that MSP regulation is intended to address, the Commission has a strong regulatory interest in ensuring that the attribution requirement applies to non-U.S. persons that provide guarantees to U.S. persons and Guaranteed Entities. Accordingly, the Commission has determined that a non-U.S. person must attribute to itself the swap positions of any entity for which it provides a guarantee unless it, the entity subject to the guarantee, and its counterparty are all non-U.S. persons that are not Guaranteed Entities.

### D. Certain Exchange-Traded and Cleared Swaps

Consistent with its approach for SDs, the Commission proposed to allow a non-U.S. person that is not a Guaranteed Entity or an SRS to exclude from its MSP calculation any swap position that it anonymously enters into on a DCM, a registered SEF or a SEF exempted from registration by the Commission pursuant to section 5h(g) of the CEA, or an FBOT registered with the Commission pursuant to part 48 of its regulations,[333] if such swap is also cleared through a registered or exempt DCO.[334]

As discussed in section III.D in connection with the cross-border application of the SD registration threshold, as compared to the Proposed Rule, IIB/SIFMA, JFMC/IBAJ, JBA, and JSCC advocated for expansion of this exception, while Better Markets stated that the proposed exception should be narrowed.

Consistent with the cross-border application of the SD registration threshold, the Commission is adopting this exception as proposed.[335] When a non-U.S. person enters into a swap position that is executed anonymously on a registered or exempt SEF, DCM, or registered FBOT, the Commission recognizes that the non-U.S. person does not have the necessary information about its counterparty to determine whether the swap position should be included in its MSP calculation. The Commission has determined that in this case the swap position should be excluded altogether due to these practical difficulties.[336] However, the exception is limited to Other Non-U.S. Persons since, as discussed, Guaranteed Entities and SRSs have to count all of their swap positions towards the threshold, so the practical obstacles that would challenge Other Non-U.S. Persons are not relevant for Guaranteed Entities and SRSs.

The Final Rule expands the exception as it appeared in the Guidance to include SEFs and DCOs that are exempt from registration under the CEA, and also states that SRSs do not qualify for this exception. The CEA provides that the Commission may grant an exemption from registration if it finds that a foreign SEF or DCO is subject to comparable, comprehensive supervision and regulation by the appropriate governmental authorities in the SEF or DCO's home country.[337] The policy rationale for providing relief to swap positions anonymously executed on a SEF, DCM, or FBOT and then cleared also extends to swaps executed on a foreign SEF and/or cleared through a foreign DCO that has been granted an exemption from registration. As noted, the foreign SEF or DCO is subject to comprehensive regulation that is comparable to that applicable to registered SEFs and DCOs.

The Commission is not at this time expanding the exception to allow an Other Non-U.S. Person to exclude swap positions executed anonymously on an exchange and which are subsequently cleared, regardless of whether the exchange and clearing organization are registered or exempt from registration with the Commission. Commenters argued that if the Other Non-U.S.

Person's original counterparty was a U.S. person, the Commission's SEF and DCO registration requirements would independently require the trading venue and clearing organization to register with the Commission or obtain an exemption from registration. While guidance from DMO has suggested that this might be the case with respect to SEFs and DCMs,[338] the Commission has not taken a formal position on whether registration of a SEF or DCM is required where a U.S. person participates on the trading facility, and has stated that it will do so in the future.[339] The Commission may consider expanding the exception pending other amendments to the SEF/DCO regulations.

In response to comments that anonymity should not be required, the Commission proposed this exception (and included it in the Guidance) because when a trade is entered into anonymously on an exchange, the non-U.S. person would not have the necessary information about its counterparty to determine whether the swap position should be included in its MSP calculation.[340] Therefore, these practical difficulties justify exclusion of the swap position altogether. However, if the identity of the counterparty is known to be a U.S. person, then the Other Non-U.S. Person should be seen to be participating in the U.S. swap market. Thus, the Commission has determined that such a non-U.S. person should count such swap positions towards its MSP calculation as otherwise required. As stated above, where the U.S. person status of a counterparty is known to the non-U.S. person, the Commission sees no reason to treat a cleared swap differently in the cross-border context than such swap

---

[332] As noted above, the term Guaranteed Entity is limited to entities that are guaranteed by a U.S. person.

[333] The Commission considers the exception described herein also to apply with respect to an FBOT that provides direct access to its order entry and trade matching system from within the U.S. pursuant to no-action relief issued by Commission staff.

[334] Proposed § 23.23(d); Proposed Rule, 85 FR at 976, 1004.

[335] Final § 23.23(d).

[336] *See* Proposed Rule, 85 FR at 976.

[337] *See* CEA sections 5h(g) for the SEF exemption provision and 5b(h) for the DCO exemption provision.

[338] Division of Market Oversight Guidance on Application of Certain Commission Regulations to Swap Execution Facilities, at 2 n.8 (Nov. 15, 2013) ("[DMO] expects that a multilateral swaps trading platform located outside the United States that provides U.S. persons . . . with the ability to trade or execute swaps on or pursuant to the rules of the platform, either directly or indirectly through an intermediary, will register as a SEF or DCM.").

[339] *See* Swap Execution Facilities and Trade Execution Requirement, 83 FR 61946, 61961 n.106 ("[T]he Commission learned that many foreign multilateral swaps trading facilities prohibited U.S. persons and U.S-located persons from accessing their facilities due to the uncertainty that the guidance created with respect to SEF registration. The Commission understands that these prohibitions reflect concerns that U.S. persons and U.S.-located persons accessing their facilities would trigger the SEF registration requirement. . . . [T]he Commission expects to address the application of CEA section 2(i) to foreign multilateral swaps trading facilities, including foreign swaps broking entities, in the future.").

[340] Proposed Rule, 85 FR at 976; Guidance, 78 FR 45325.

position is treated in the domestic U.S. context.

## V. ANE Transactions

### A. Background and Proposed Approach

The ANE Staff Advisory provided that a non-U.S. SD would generally be required to comply with Transaction-Level Requirements (as that term was used in the Guidance) when entering into ANE Transactions.[341]

In the Proposed Rule the Commission stated that, based on the Commission's consideration of its experience under the Guidance, the comments it had received pursuant to the ANE Request for Comment,[342] respect for international comity, and the Commission's desire to focus its authority on potential significant risks to the U.S. financial system, the Commission had determined that ANE Transactions will not be considered a relevant factor for purposes of applying the Proposed Rule.[343] Therefore, under the Proposed Rule, all foreign-based swaps entered into between a non-U.S. swap entity and a non-U.S. person would be treated the same regardless of whether the swap is an ANE Transaction. The Commission further noted that, to the extent the Proposed Rule is finalized, this treatment would effectively supersede the ANE Staff Advisory with respect to the application of the group B and C requirements (discussed in sections VI.A.2 and VI.A.3 below) to ANE Transactions.

With respect to its experience, the Commission noted that the ANE No-Action Relief, which went into effect immediately after issuance of the ANE Staff Advisory, generally relieved non-U.S. swap entities from the obligation to comply with most Transaction-Level Requirements when entering into swaps with most non-U.S. persons.[344] The Commission also noted that in the intervening period, the Commission had not found a negative effect on either its ability to effectively oversee non-U.S. swap entities, or the integrity and transparency of U.S. derivatives markets.

Noting its interest in international comity, the Commission observed that ANE Transactions involve swaps between non-U.S. persons, and thus the Commission considered whether the U.S. aspect of ANE Transactions should override its general view that such transactions should qualify for the same relief provided under the Proposed Rule (and the Guidance) for swaps between certain non-U.S. persons (*e.g.,* an exception from compliance with Transaction-Level Requirements under the Guidance and group B and C requirements under the Proposed Rule, as discussed below). The Commission expressly recognized that a person that, in connection with its dealing activity using personnel located in the United States is conducting a substantial aspect of its dealing business in the United States. But, because the transactions involve two non-U.S. persons, and the financial risk of the transactions lies outside the United States, the Commission considered the extent to which the underlying regulatory objectives of the Dodd-Frank Act would be advanced in light of other policy considerations, including undue market distortions and international comity, when making a determination of the extent to which the Dodd-Frank Act swap requirements would apply to ANE Transactions.

The Commission noted that the consequences of not applying the Dodd-Frank Act swap requirements would be mitigated in two respects. First, persons engaging in any aspect of swap transactions within the U.S. remain subject to the CEA and Commission regulations prohibiting the employment, or attempted employment, of manipulative, fraudulent, or deceptive devices, such as section 6(c)(1) of the CEA,[345] and § 180.1.[346] The Commission thus would retain anti-fraud and anti-manipulation authority, and would continue to monitor the trading practices of non-U.S. persons that occur within the territory of the United States in order to enforce a high standard of customer protection and market integrity. Even where a swap is entered into by two non-U.S. persons, the United States has a significant interest in deterring fraudulent or manipulative conduct occurring within its borders and cannot be a haven for such activity.

Second, with respect to more specific regulation of swap dealing in accordance with the Commission's swap regime, the Commission noted that, in most cases, non-U.S. persons entering into ANE Transactions would be subject to regulation and oversight in their home jurisdictions similar to the Commission's Transaction-Level Requirements as most of the major swap trading centers have implemented similar risk mitigation requirements.[347]

With respect to market distortion, the Commission gave weight to comments submitted in response to the ANE Request for Comment, who argued that application of Transaction-Level Requirements to ANE Transactions would cause non-U.S. SDs to relocate personnel to other countries (or otherwise terminate agency contracts with U.S.-based agents) in order to avoid Dodd-Frank Act swap regulation or to have to interpret and apply what the commenters considered a challenging ANE analysis, thereby potentially increasing market fragmentation.[348]

The Commission also gave weight to the regulatory interests of the home jurisdictions of non-U.S. persons engaged in ANE Transactions. Because the risk of the resulting swaps lies in those home countries and not the U.S. financial system, the Commission recognized that, with the exception of enforcing the prohibition on fraudulent or manipulative conduct taking place in the United States, non-U.S. regulators will have a greater incentive to regulate the swap dealing activities of such non-U.S. persons—such as, for example, with respect to business conduct standards with counterparties, appropriate documentation, and recordkeeping. In these circumstances, where the risk lies outside the U.S. financial system, the Commission recognized the greater supervisory interest of the authorities in the home jurisdictions of the non-U.S. persons. The Commission also noted that no major swap regulatory jurisdiction applies its regulatory regime to U.S. entities engaging in ANE Transactions within its territory.

In light of the foregoing, the Commission determined that the mitigating effect of the anti-fraud and anti-manipulation authority retained by

---

[341] *See* ANE Staff Advisory. The ANE Staff Advisory represented the views of DSIO only, and not necessarily those of the Commission or any other office or division thereof. As discussed in section VI.A, *infra,* the Transaction-Level Requirements are: (1) Required clearing and swap processing; (2) margining (and segregation) for uncleared swaps; (3) mandatory trade execution; (4) swap trading relationship documentation; (5) portfolio reconciliation and compression; (6) real-time public reporting; (7) trade confirmation; (8) daily trading records; and (9) external business conduct standards.

[342] In the January 2014 ANE Request for Comment, the Commission requested comments on all aspects of the ANE Staff Advisory, including: (1) The scope and meaning of the phrase "regularly arranging, negotiating, or executing" and what characteristics or factors distinguish "core, front-office" activity from other activities; and (2) whether the Commission should adopt the ANE Staff Advisory as Commission policy, in whole or in part.

[343] *See* Proposed Rule, 85 FR at 977–979.

[344] Specifically, non-U.S. persons that are neither guaranteed nor conduit affiliates, as described in the Guidance.

[345] 7 U.S.C. 9(1).

[346] 17 CFR 180.1.

[347] *See* 2019 FSB Progress Report, Table M.

[348] Proposed Rule, 85 FR at 977.

the Commission and the prevalence of applicable regulatory requirements similar to the Commission's own, the likelihood of market fragmentation and disruption, the Commission's respect for the regulatory interests of the foreign jurisdictions where the actual financial risks of ANE Transactions primarily lie in accordance with the principles of international comity, and the awareness that application of its swap requirements in the ANE context would make the Commission an outlier among the major swap regulatory jurisdictions, outweighed the Commission's regulatory interest in applying its swap requirements to ANE Transactions differently than such were otherwise proposed to be applied to swaps between Other Non-U.S. Persons. The Commission invited comment on all aspects of the proposed treatment of ANE Transactions.

*B. Summary of Comments*

Neither Better Markets nor AFR supported the Commission's determination to disregard ANE Transactions and commented that the Commission should not permit U.S.-located personnel to arrange, negotiate, or execute swaps on behalf of the non-U.S. affiliates of U.S. BHCs (and others) without being subject to the full panoply of U.S. regulations. Better Markets stated its belief that any such policy facilitates avoidance, if not evasion, and regulatory arbitrage. Better Markets specifically disputed the Commission's contention in the Proposed Rule that "the financial risk of the [ANE] transactions [only] lie outside of the United States," which Better Markets contends is demonstrably untrue and conflicts with the Commission's own views elsewhere in the Proposed Rule, presumably referring to the proposed treatment of swaps of non-U.S. persons with Guaranteed Entities and SRSs, which are also non-U.S. persons that the Commission nevertheless proposed generally would be subject to certain Dodd-Frank Act requirements.[349]

On the other hand, AIMA, Chatham Financial, CS, IIB/SIFMA, ISDA, and JFMC/IBAJ supported the Commission's decision in the Proposed Rule to only apply anti-fraud and anti-manipulation rules to ANE Transactions, agreeing in

various respects with the Commission's analysis that:

1. ANE Transactions do not present direct financial risk to the United States;

2. The Commission's anti-fraud and anti-manipulation rules that would remain applicable would mitigate potential concerns associated with any potential misconduct occurring in connection with ANE Transactions and any other conduct subject to the jurisdiction of the CEA;

3. Most ANE Transactions are expected to be subject to foreign regulatory requirements similar to the Commission's own, unlike at the time of the adoption of the Guidance; and

4. Applying the Commission's rules to ANE Transactions would likely result in disruptive and unnecessary market fragmentation as transactions ordinarily arranged, negotiated, or executed by U.S. personnel would shift to non-U.S. locations, resulting in decreased Commission oversight.

Commenting on specific aspects of the Commission's proposed treatment of ANE Transactions, AIMA encouraged the CFTC to adopt the SEC's approach and require counting of ANE Transactions toward the SD registration threshold and to apply reporting requirements to ensure that a baseline level of transparency is maintained.

IIB/SIFMA recognized that the Proposed Rule's approach to ANE Transactions would deviate from that taken by the SEC, but argued that this deviation is justified. They argued that the relationship of the security-based swap market to the cash securities markets, and Congress's decision to define security-based swaps as "securities," presents some justification for the SEC to apply a test for use of U.S. jurisdictional means to conduct security-based swap business that is similar to the test that applies in connection with existing, pre-Dodd-Frank Act securities broker-dealer regulation, while no similar justification applies in connection with swaps regulation by the Commission, as the swaps market generally trades independently of the U.S. futures market, and Congress did not define swaps to be a type of futures contract.

IIB/SIFMA, CS, JFMC/IBAJ, and ISDA also commented on the continuing viability of the ANE Staff Advisory. These commenters stated that, currently, ANE Transactions are subject to the ANE Staff Advisory and related ANE No-Action Relief, noting that, if adopted, the Proposed Rule would supersede the ANE Staff Advisory, but only with respect to those requirements covered by the Proposed Rule. These commenters noted that certain other

Commission requirements—mandatory clearing, mandatory trade execution, and real-time public reporting—would remain subject to the ANE Staff Advisory and related ANE No-Action Relief, pending further Commission action. To achieve a coherent, Commission-driven ANE Transaction policy, these commenters all requested that the Commission immediately direct staff to withdraw the ANE Staff Advisory (which, in their view, would render the ANE No-Action Relief moot).

ISDA noted that the ANE No-Action Relief was issued two weeks after the ANE Staff Advisory and that market participants have operated under this relief for almost seven years. ISDA argued that, during this time, to ISDA's knowledge, there have been no regulatory concerns associated with these transactions that would warrant a change in course. Thus, should the Commission decide to switch gears and apply clearing, trading, and real-time reporting requirements to ANE Transactions, market participants would incur significant compliance costs without commensurate benefit to the Commission's regulatory oversight.

Although Citadel agreed that the Commission should apply its jurisdiction over ANE Transactions in a targeted manner, taking into account principles of international comity, as well as its supervisory interests and statutory objectives, Citadel argued that because the Commission's relevant statutory objectives include not only mitigating systemic risk, but also increasing transparency, competition, and market integrity, the Commission should, at a minimum, apply regulatory and public reporting requirements to ANE Transactions. AIMA also encouraged the Commission to apply reporting requirements to ensure that a baseline level of transparency is maintained. Citadel stated that application of reporting requirements to these transactions would enable the Commission to better monitor for disruptive trading practices and provide the necessary data regarding overall market trading activity to allow the Commission to evaluate market trends and accurately assess the effect of other reforms implemented in the swaps market.

Stating that ANE Transactions could account for a material portion of total swap dealing activity in the United States, Citadel claimed that market transparency in EUR interest rate swaps for U.S. investors has been greatly reduced based on data showing that, following issuance of the ANE No-Action Relief, interdealer trading activity in EUR interest rate swaps

---

[349] As discussed below, the Final Rule excepts certain transactions with "SRS End-Users" from the Group B requirements, excepts certain transactions with Guaranteed Entities and SRSs from the Group C requirements, and provides a limited exception from the Group B requirements for transactions entered into by Guaranteed Entities and SRSs that are swap entities with certain non-U.S. persons. *See infra* sections VI.B.3 and VI.B.5.

began to be booked almost exclusively to non-U.S. entities, a fact pattern that Citadel believes is "consistent with (although not direct proof of) swap dealers strategically choosing the location of the desk executing a particular trade in order to avoid trading in a more transparent and competitive setting." Citadel further noted that applying regulatory and public reporting requirements to ANE Transactions would be consistent with the SEC's approach.

*C. Commission Determination*

Having considered the comments received, the Commission's consideration of its experience under the Guidance, respect for international comity, and the Commission's desire to focus its authority on potential significant risks to the U.S. financial system, the Commission has determined that, consistent with its rationale expressed in the Proposed Rule summarized above, ANE Transactions will not be considered a relevant factor for purposes of applying the Final Rule.

Regarding the many comments and suggestions received regarding whether the Commission should withdraw the ANE Staff Advisory and related ANE No-Action Relief and extend its proposed treatment of ANE Transactions to requirements in addition to the group B and group C requirements, in 2014, subsequent to the publication of the ANE Staff Advisory, the Commission, citing the complex legal and policy issues raised by the statements in the ANE Staff Advisory, requested comments on whether the Transaction-Level Requirements should apply to swap transactions between certain non-U.S. SDs and non-U.S. counterparties that are "arranged, negotiated, or executed" by the SDs' personnel or agents located in the United States.[350] The Commission did not follow-up on the request for comment. In this rulemaking, the Commission is addressing the issue with respect to the group B and group C requirements; the Commission intends to address the issue with respect to the remaining Transaction-Level Requirements (the "Unaddressed TLRs") in connection with future cross-border rulemakings relating to such requirements. Until such time, the Commission will not consider, as a matter of policy, a non-U.S. swap entity's use of their personnel or agents located in the United States to "arrange, negotiate, or execute" swap transactions with non-U.S. counterparties for purposes of determining whether

Unaddressed TLRs apply to such transactions. As part of any such rulemaking, the Commission expects to first engage in fact-finding to determine the extent to which ANE Transactions raise policy concerns that are not otherwise addressed by the CEA or Commission regulations. In this connection, DSIO is withdrawing the ANE Staff Advisory and, together with the Division of Clearing and Risk and DMO, is withdrawing the ANE No-Action Relief and granting certain non-U.S. SDs no-action relief with respect to the applicability of the Unaddressed TLRs to their transactions with non-U.S. counterparties that are arranged, negotiated, or executed in the United States.

The Commission will take AIMA and Citadel's comments regarding the advisability of applying the Commission's regulatory and real-time reporting requirements to ANE Transactions under advisement when considering the cross-border application of those requirements in a future rulemaking.

With respect to AFR and Better Markets' contentions that the Commission should not permit derivatives dealers located within the U.S. to engage in transactions using U.S. personnel on U.S. soil without being subject to U.S. law, the Proposed Rule clearly stated that the Commission recognized that a person that, in connection with its dealing activity, engages in market-facing activity using personnel located in the United States is conducting a substantial aspect of its dealing business in the United States and is subject to U.S. law. But, because the transactions involve two non-U.S. persons, and the financial risk of the transactions lies primarily outside the United States, the Commission also recognized that it must consider the extent to which the underlying regulatory objectives of the Dodd-Frank Act would be advanced in light of other policy considerations, including undue market distortions and international comity, when making a determination of the extent to which the Dodd-Frank Act swap requirements should apply to ANE Transactions.

With respect to AIMA's comment encouraging the CFTC to adopt the SEC's approach with respect to ANE Transactions by requiring counting of ANE Transactions toward the SD registration threshold, the Commission sees little value in requiring counting of ANE Transactions when, if such counting resulted in SD registration, such ANE Transactions would not be subject to most of the SD requirements. ANE Transactions by definition are

swaps between non-U.S. persons, the risk of which lies primarily outside of the U.S., and which, in accordance with the Commission's determination above and the regulatory exceptions discussed immediately below, are generally excepted from the group B and C requirements.

## VI. Exceptions From Group B and Group C Requirements, Substituted Compliance for Group A and Group B Requirements, and Comparability Determinations

As discussed in the Proposed Rule, Title VII of the Dodd-Frank Act and Commission regulations thereunder establish a broad range of requirements applicable to SDs and MSPs, including requirements regarding risk management and internal and external business conduct.[351] These requirements are designed to reduce systemic risk, increase counterparty protections, and increase market efficiency, orderliness, and transparency.[352] Consistent with the Guidance,[353] SDs and MSPs (whether or not U.S. persons) are subject to all of the Commission regulations described below by virtue of their status as Commission registrants. Put differently, the Commission's view is that if an entity is required to register as an SD or MSP under the Commission's interpretation of section 2(i) of the CEA, then such entity should be subject to these regulations with respect to all of its swap activities. As explained further below, such an approach is necessary because of the important role that the SD and MSP requirements play in the proper operation of a registrant.

However, consistent with section 2(i) of the CEA, in the interest of international comity, and for other reasons discussed in this release, the Commission is providing exceptions from, and a substituted compliance process for, certain regulations applicable to registered SDs and MSPs, as appropriate.[354] Further, the Final

---

[350] *See* ANE Request for Comment, *supra* note 12.

[351] *See* Proposed Rule, 85 FR at 979–980.

[352] *See, e.g.,* Entities Rule, 77 FR at 30629, 30703.

[353] *See* Guidance, 78 FR at 45342. The Commission notes that while the Guidance states that all swap entities (wherever located) are subject to all of the CFTC's Title VII requirements, the Guidance went on to describe how and when the Commission would expect swap entities to comply with specific requirements and when substituted compliance would be available under its non-binding framework.

[354] As noted in the Proposed Rule, the Commission intends to separately address the cross-border application of Title VII requirements not addressed in the Final Rule (*e.g.,* capital adequacy, clearing and swap processing, mandatory trade execution, swap data repository reporting, large trader reporting, and real-time public reporting)

Continued

Rule creates a framework for comparability determinations that emphasizes a holistic, outcomes-based approach that is grounded in principles of international comity.

*A. Classification and Application of Certain Regulatory Requirements—Group A, Group B, and Group C Requirements*

As discussed in the Proposed Rule, the Guidance applied a bifurcated approach to the classification of certain regulatory requirements applicable to SDs and MSPs, based on whether the requirement applies to the firm as a whole ("Entity-Level Requirement" or "ELR") or to the individual swap or trading relationship ("Transaction-Level Requirement" or "TLR").[355]

The Guidance categorized the following regulatory requirements as ELRs: (1) Capital adequacy; (2) chief compliance officer ("CCO"); (3) risk management; (4) swap data recordkeeping; (5) swap data repository ("SDR") reporting; and (6) large trader reporting.[356] The Guidance further divided ELRs into two subcategories.[357] The first category of ELRs includes: (1) Capital adequacy; (2) CCO; (3) risk management; and (4) certain swap data recordkeeping requirements [358] ("First Category ELRs").[359] The second category of ELRs includes: (1) SDR reporting; (2) certain aspects of swap data recordkeeping relating to complaints and marketing and sales materials under § 23.201(b)(3) and (4); and (3) large trader reporting ("Second Category ELRs").[360]

The Guidance categorized the following regulatory requirements as TLRs: (1) Required clearing and swap processing; (2) margin (and segregation) for uncleared swaps; (3) mandatory trade execution; (4) swap trading relationship documentation; (5) portfolio reconciliation and compression; (6) real-time public reporting; (7) trade confirmation; (8) daily trading records; and (9) external business conduct standards.[361] As with the ELRs, the Guidance similarly subdivided TLRs into two

subcategories.[362] The Commission determined that all TLRs, other than external business conduct standards, address risk mitigation and market transparency.[363] Accordingly, under the Guidance, all TLRs except external business conduct standards are classified as "Category A TLRs," whereas external business conduct standards are classified as "Category B TLRs." [364] Under the Guidance, generally, whether a specific Commission requirement applies to a swap entity and a swap and whether substituted compliance is available depends on the classification of the requirement as an ELR or TLR and the sub-classification of each and the type of swap entity and, in certain cases, the counterparty to a specific swap.[365]

To avoid confusion that may have arisen from using the ELR/TLR classification in the Proposed Rule, given that the Proposed Rule did not address the same set of Commission regulations as the Guidance, the Commission proposed to classify certain of its regulations as group A, group B, and group C requirements for purposes of determining the availability of certain exceptions from, and/or substituted compliance for, such regulations. The Commission requested comment on the group A, group B, and group C requirement classifications and on whether any modifications should be made to the set of requirements in such groups.[366]

The Commission received several comments on its proposed use of the group A, group B, and group C requirements classifications. IIB/SIFMA and JFMC/IBAJ generally supported the Proposed Rule's classification of swap entity requirements. However, IIB/SIFMA requested that the Commission expand and clarify such categorization in certain respects (discussed in the relevant sections below) to align the cross-border application of the Commission's requirements with the policy objectives for those requirements. AIMA stated its belief that any swap involving a non-U.S. person (even where its counterparty is a U.S. person) should also be able to use substituted compliance and encouraged the CFTC to review the group B and group C requirements with this approach in mind, but did not provide any specific recommended changes to those classifications. IATP stated that it was not clear which set of regulations were

covered by the Proposed Rule that are not covered by the Guidance and that, without a comparative summary of the different set of regulations covered by each, there is no grounds to judge readily why the Commission proposed to abandon the readily understood "entity level" and "transaction level" requirement classifications to compare for granting substituted compliance to foreign regulatory regimes.

After considering the comments, the Commission continues to believe that classifying certain of its regulations as group A, group B, and group C requirements is appropriate and helpful for purposes of determining the availability of certain exceptions from, and/or substituted compliance for, such regulations.[367] The proposed and final group A, group B, and group C requirements are discussed below.

1. Group A Requirements

(i) Proposed Rule

The Commission proposed that the group A requirements would include: (1) CCO; (2) risk management; (3) swap data recordkeeping; and (4) antitrust considerations. Specifically, under the Proposed Rule, the group A requirements consisted of the requirements set forth in §§ 3.3, 23.201, 23.203, 23.600, 23.601, 23.602, 23.603, 23.605, 23.606, 23.607, and 23.609.[368] As discussed in the Proposed Rule, the Commission believes that the group A requirements would be impractical to apply only to specific transactions or counterparty relationships and are most effective when applied consistently across the entire enterprise, noting that they ensure that swap entities implement and maintain a comprehensive and robust system of internal controls to ensure the financial integrity of the firm, and, in turn, the protection of the financial system. Further, the Commission noted that, together with other Commission requirements, the proposed group A requirements constitute an important line of defense against financial, operational, and compliance risks that could lead to a firm's default; and, further, that requiring swap entities to rigorously monitor and address the risks they incur as part of their day-to-day businesses lowers the registrants' risk of default—and ultimately protects the public and the financial system. For this reason, the Commission stated that it

---

(hereinafter, the "Unaddressed Requirements"). In that regard, the Commission notes that it adopted capital adequacy and related financial reporting requirements for SDs and MSPs at its open meeting on July 22, 2020.

[355] *See, e.g.,* Guidance, 78 FR at 45331.

[356] *See, e.g., id.*

[357] *See, e.g., id.*

[358] Swap data recordkeeping under 17 CFR 23.201 and 23.203 (except certain aspects of swap data recordkeeping relating to complaints and sales materials).

[359] *See, e.g.,* Guidance, 78 FR at 45331.

[360] *See, e.g., id.*

[361] *See, e.g., id.* at 45333.

[362] *See, e.g., id.*

[363] *See, e.g., id.*

[364] *See, e.g., id.*

[365] *See, e.g., id.* at 45337–45338.

[366] Proposed Rule, 85 FR at 982.

[367] With respect to AIMA's comment, the Commission notes that the Proposed Rule provided a summary of all of the requirements addressed by the Guidance and which requirements were addressed in the Proposed Rule.

[368] 17 CFR 3.3, 23.201, 23.203, 23.600, 23.601, 23.602, 23.603, 23.605, 23.606, 23.607, and 23.609.

has strong supervisory interests in ensuring that swap entities (whether domestic or foreign) are subject to the group A requirements or comparably rigorous standards.[369]

Each of the proposed group A requirements is discussed in more detail below.

(a) Chief Compliance Officer

Section 4s(k) of the CEA requires that each SD and MSP designate an individual to serve as its CCO and specifies certain duties of the CCO.[370] Pursuant to section 4s(k), the Commission adopted § 3.3,[371] which requires SDs and MSPs to designate a CCO responsible for administering the firm's compliance policies and procedures, reporting directly to the board of directors or a senior officer of the SD or MSP, as well as preparing and filing with the Commission a certified annual report discussing the registrant's compliance policies and activities. The CCO function is an integral element of a firm's risk management and oversight, as well as the Commission's effort to foster a strong culture of compliance within SDs and MSPs.

(b) Risk Management

Section 4s(j) of the CEA requires each SD and MSP to establish internal policies and procedures designed to, among other things, address risk management, monitor compliance with position limits, prevent conflicts of interest, and promote diligent supervision, as well as maintain business continuity and disaster recovery programs.[372] The Commission implemented these provisions in §§ 23.600, 23.601, 23.602, 23.603, 23.605, and 23.606.[373] The Commission also adopted § 23.609,[374] which requires certain risk management procedures for

SDs or MSPs that are clearing members of a DCO.[375] Collectively, these requirements help to establish a comprehensive internal risk management program for SDs and MSPs, which is critical to effective systemic risk management for the overall swap market.

(c) Swap Data Recordkeeping

CEA section 4s(f)(1)(B) requires SDs and MSPs to keep books and records for all activities related to their swap business.[376] Sections 4s(g)(1) and (4) require SDs and MSPs to maintain trading records for each swap and all related records, as well as a complete audit trail for comprehensive trade reconstructions.[377] Additionally, CEA section 4s(f)(1) requires SDs and MSPs to "make such reports as are required by the Commission by rule or regulation regarding the transactions and positions and financial condition of" the registered SD or MSP.[378] Further, CEA section 4s(h) requires SDs and MSPs to "conform with such business conduct standards . . . as may be prescribed by the Commission by rule or regulation." [379]

Pursuant to these provisions, the Commission promulgated final rules that set forth certain reporting and recordkeeping requirements for SDs and MSPs.[380] Specifically, §§ 23.201 and 23.203[381] require SDs and MSPs to keep records including complete transaction and position information for all swap activities (e.g., documentation on which trade information is originally recorded). In particular, § 23.201 states that each SD and MSP shall keep full, complete, and systematic records of all activities related to its business as a SD or MSP.[382] Such records must include, among other things, a record of each complaint received by the SD or MSP concerning any partner, member, officer, employee, or agent,[383] as well as all marketing and sales presentations, advertisements, literature, and communications.[384] Commission regulation 23.203[385] requires, among other things, that records (other than swap data reported in accordance with

part 45 of the Commission's regulations[386]) be maintained in accordance with § 1.31.[387] Commission regulation 1.31 requires that records relating to swaps be maintained for specific durations, including that records of swaps be maintained for a minimum of five years and as much as the life of the swap plus five years, and that most records be "readily accessible" for the entire recordkeeping period.[388]

(d) Antitrust Considerations

Section 4s(j)(6) of the CEA prohibits an SD or MSP from adopting any process or taking any action that results in any unreasonable restraint of trade or imposes any material anticompetitive burden on trading or clearing, unless necessary or appropriate to achieve the purposes of the CEA.[389] The Commission promulgated this requirement in § 23.607(a)[390] and also adopted § 23.607(b), which requires SDs and MSPs to adopt policies and procedures to prevent actions that result in unreasonable restraints of trade or impose any material anticompetitive burden on trading or clearing.[391]

(ii) Summary of Comments

JFMC/IBAJ and IIB/SIFMA were supportive of the streamlining of the Commission's recordkeeping requirements under § 23.201 as group A requirements (which the Guidance separated into two different subcategories). JFMC/IBAJ also requested the Commission explicitly categorize § 1.31 as a group A requirement in furtherance of the goal of providing legal certainty and streamlining recordkeeping requirements. IIB/SIFMA requested that the Commission include §§ 1.31 and 45.2 as group A requirements, which they stated would be consistent with categorizing § 23.203 as a group A requirement. IIB/SIFMA also was supportive of including the Commission's antitrust rules (which were not addressed by the Guidance) as a group A requirement.

(iii) Final Rule

After carefully considering the comments, the Commission is adopting the proposed group A requirements and adding § 45.2(a) to the group A requirements to the extent it duplicates § 23.201, as shown in the rule text in

---

[369] See Proposed Rule, 85 FR at 980–981.

[370] 7 U.S.C. 6s(k).

[371] 17 CFR 3.3. See Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 FR 20128 (Apr. 3, 2012) ("Final SD and MSP Recordkeeping, Reporting, and Duties Rule"). In 2018, the Commission adopted amendments to the CCO requirements. See Chief Compliance Officer Duties and Annual Report Requirements for Futures Commission Merchants, Swap Dealers, and Major Swap Participants, 83 FR 43510 (Aug. 27, 2018).

[372] 7 U.S.C. 6s(j).

[373] 17 CFR 23.600, 23.601, 23.602, 23.603, 23.605, and 23.606. See Final SD and MSP Recordkeeping, Reporting, and Duties Rule, 77 FR 20128 (addressing rules related to risk management programs, monitoring of position limits, diligent supervision, business continuity and disaster recovery, conflicts of interest policies and procedures, and general information availability).

[374] 17 CFR 23.609.

[375] See Customer Clearing Documentation, Timing of Acceptance for Clearing, and Clearing Member Risk Management, 77 FR 21278 (Apr. 9, 2012).

[376] 7 U.S.C. 6s(f)(1)(B).

[377] 7 U.S.C. 6s(g)(1) and (4).

[378] 7 U.S.C. 6s(f)(1).

[379] 7 U.S.C. 6s(h)(1). See 7 U.S.C. 6s(h)(3).

[380] See Final SD and MSP Recordkeeping, Reporting, and Duties Rule, 77 FR 20128.

[381] 17 CFR 23.201 and 203.

[382] 17 CFR 23.201(b).

[383] 17 CFR 23.201(b)(3)(i).

[384] 17 CFR 23.201(b)(4).

[385] 17 CFR 23.203.

[386] 17 CFR 45.

[387] 17 CFR 1.31.

[388] 17 CFR 1.31(b).

[389] 7 U.S.C. 6s(j)(6).

[390] 17 CFR 23.607(a).

[391] 17 CFR 23.607(b).

this release.[392] The Commission is making this addition to clarify that, to the extent the same substantive recordkeeping requirement is included in both §§ 23.201 and 45.2(a),[393] each is a group A requirement for which substituted compliance may be available, as discussed in section VI.C below.[394]

Regarding the comments to include § 1.31 as a group A requirement, § 1.31 is a general requirement providing maintenance and access requirements for many regulatory records, and not only those required under the group A requirements. Further, to the extent an SD/MSP receives substituted compliance for a group A requirement, such as § 23.203, that incorporates § 1.31's recordkeeping requirements for certain regulatory records, the Commission's view is that § 1.31 would also not apply to such regulatory records. Therefore, the Commission is declining to include § 1.31 as a group A requirement.

### 2. Group B Requirements

(i) Proposed Rule

The Commission proposed that the group B requirements would include: (1) Swap trading relationship documentation; (2) portfolio reconciliation and compression; (3) trade confirmation; and (4) daily trading records. Specifically, under the Proposed Rule, the group B requirements consist of the requirements set forth in §§ 23.202, 23.501, 23.502, 23.503, and 23.504.[395] As discussed in the Proposed Rule, the group B requirements relate to risk mitigation and the maintenance of good recordkeeping and business practices.[396] The Commission stated

that, unlike for the group A requirements, it believes that the group B requirements can practically be applied on a bifurcated basis between domestic and foreign transactions or counterparty relationships and, thus, do not need to be applied uniformly across an entire enterprise. Therefore, the Commission stated that it can have greater flexibility with respect to the application of these requirements to non-U.S. swap entities and foreign branches of U.S. swap entities.[397]

Each of the proposed group B requirements is discussed in more detail below.

(a) Swap Trading Relationship Documentation

CEA section 4s(i) requires each SD and MSP to conform to Commission standards for the timely and accurate confirmation, processing, netting, documentation, and valuation of swaps.[398] Pursuant to section 4s(i), the Commission adopted, among other regulations, § 23.504.[399] Regulation 23.504(a) requires SDs and MSPs to "establish, maintain and follow written policies and procedures" to ensure that the SD or MSP executes written swap trading relationship documentation, and § 23.504(c) requires that documentation policies and procedures be audited periodically by an independent auditor to identify material weaknesses.[400] Under § 23.504(b), the swap trading relationship documentation must include, among other things: (1) All terms governing the trading relationship between the SD or MSP and its counterparty; (2) credit support arrangements; (3) investment and re-hypothecation terms for assets used as margin for uncleared swaps; and (4) custodial arrangements.[401] Swap documentation standards facilitate sound risk management and may promote standardization of documents and transactions, which are key conditions for central clearing, and lead to other operational efficiencies, including improved valuation.

(b) Portfolio Reconciliation and Compression

CEA section 4s(i) directs the Commission to prescribe regulations for the timely and accurate processing and netting of all swaps entered into by SDs and MSPs.[402] Pursuant to CEA section 4s(i), the Commission adopted §§ 23.502 and 23.503,[403] which require SDs and MSPs to perform portfolio reconciliation and compression for their swaps.[404] Portfolio reconciliation is a post-execution risk management tool designed to ensure accurate confirmation of a swap's terms and to identify and resolve any discrepancies between counterparties regarding the valuation of the swap. Portfolio compression is a post-trade processing and netting mechanism that is intended to ensure timely, accurate processing and netting of swaps.[405] Further, § 23.503 requires all SDs and MSPs to establish policies and procedures for terminating fully offsetting uncleared swaps, when appropriate, and periodically participating in bilateral and/or multilateral portfolio compression exercises for uncleared swaps with other SDs or MSPs or through a third party.[406] The rule also requires policies and procedures for engaging in such exercises for uncleared swaps with non-SDs and non-MSPs upon request.[407]

(c) Trade Confirmation

Section 4s(i) of the CEA requires that each SD and MSP must comply with the Commission's regulations prescribing timely and accurate confirmation of swaps.[408] The Commission adopted § 23.501,[409] which requires, among other things, timely and accurate confirmation of swap transactions (which includes execution, termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights or obligations of a swap) among SDs and MSPs by the end of the first business day following the day of execution.[410] Timely and accurate confirmation of swaps—together with portfolio reconciliation and compression—is an important post-

---

[392] Final § 23.23(a)(6).

[393] Commission regulation 23.201 requires, in relevant part, that each SD and MSP keep full, complete, and systematic records, together with all pertinent data and memoranda, of all its swap activities and its activities related to its business as a SD or MSP. Commission regulation 45.2(a) requires, in relevant part, that each SD and MSP subject to the jurisdiction of the Commission shall keep full, complete, and systematic records, together with all pertinent data and memoranda, of all activities relating to the business of such entity or person with respect to swaps, as prescribed by the Commission.

[394] Similarly, the Commission will view any previously issued comparability determination that allows substituted compliance for § 23.201 to also allow for substituted compliance with § 45.2(a) to the extent it duplicates § 23.201.

[395] 17 CFR 23.202, 23.501, 23.502, 23.503, and 23.504.

[396] See, e.g., Int'l Org. of Sec. Comm'ns, Risk Mitigation Standards for Non-Centrally Cleared OTC Derivatives, IOSCO Doc. FR01/2015 (Jan. 28, 2015) ("IOSCO Risk Management Standards"), available at *https://www.iosco.org/library/pubdocs/pdf/IOSCOPD469.pdf* (discussing, among other

things, the objectives and benefits of trading relationship documentation, trade confirmation, reconciliation, and portfolio compression requirements). In addition, the group B requirements also provide customer protection and market transparency benefits.

[397] See Proposed Rule, 85 FR at 981–982.

[398] 7 U.S.C. 6s(i).

[399] 17 CFR 23.504. See Confirmation, Portfolio Reconciliation, Portfolio Compression, and Swap Trading Relationship Documentation Requirements for Swap Dealers and Major Swap Participants, 77 FR 55904 (Sept. 11, 2012) ("Final Confirmation, Risk Mitigation, and Documentation Rules").

[400] 17 CFR 23.504(a)(2) and (c).

[401] 17 CFR 23.504(b).

[402] 7 U.S.C. 6s(i).

[403] 17 CFR 23.502 and 503. See Final Confirmation, Risk Mitigation, and Documentation Rules, 77 FR 55904.

[404] See 17 CFR 23.502 and 503.

[405] For example, the reduced transaction count may decrease operational risk as there are fewer trades to maintain, process, and settle.

[406] See 17 CFR 23.503(a).

[407] 17 CFR 23.503(b).

[408] 7 U.S.C. 6s(i).

[409] 17 CFR 23.501. See Final Confirmation, Risk Mitigation, and Documentation Rules, 77 FR 55904.

[410] 17 CFR 23.501(a)(1).

trade processing mechanism for reducing risks and improving operational efficiency.[411]

### (d) Daily Trading Records

Pursuant to CEA section 4s(g),[412] the Commission adopted § 23.202,[413] which requires SDs and MSPs to maintain daily trading records, including records of trade information related to pre-execution, execution, and post-execution data that is needed to conduct a comprehensive and accurate trade reconstruction for each swap. The regulation also requires that records be kept of cash or forward transactions used to hedge, mitigate the risk of, or offset any swap held by the SD or MSP.[414] Accurate and timely records regarding all phases of a swap transaction can serve to greatly enhance a firm's internal supervision, as well as the Commission's ability to detect and address market or regulatory abuses or evasion.

### (ii) Summary of Comments

IIB/SIFMA stated that they support the Commission's proposed categorization of the group B requirements, but requested that the Commission recategorize its pre-execution daily trading records requirements under § 23.202 as group C requirements instead of group B requirements. IIB/SIFMA asserted that pre-execution information generally has no nexus to the risk management of the swap entity or to the Commission's risk mitigation rules and instead relate to a swap entity's sales practices.

### (iii) Final Rule

After carefully considering the comments, the Commission is adopting the group B requirements as proposed.[415] With respect to the request to make pre-execution trading records requirements a group C requirement, accurate and timely records regarding all phases of a swap transaction (including pre-execution trading records) can serve to greatly enhance a firm's internal supervision, as well as the Commission's ability to detect and address market or regulatory abuses or evasion. Because these records relate to market integrity (and not only customer protection), the Commission believes

the pre-execution trading records requirements should continue to be group B requirements and not be eligible for the exceptions the Final Rule provides from the group C requirements.

### 3. Group C Requirements

### (i) Proposed Rule

Pursuant to CEA section 4s(h),[416] the Commission adopted external business conduct rules, which establish certain additional business conduct standards governing the conduct of SDs and MSPs in dealing with their swap counterparties.[417] The Commission proposed that the group C requirements would consist of these rules, which are set forth in §§ 23.400 through 23.451.[418] As discussed in the Proposed Rule, broadly speaking, these rules are designed to enhance counterparty protections by establishing robust requirements regarding SDs' and MSPs' conduct with their counterparties. Under these rules, SDs and MSPs are required to, among other things, conduct due diligence on their counterparties to verify eligibility to trade (including eligible contract participant ("ECP") status), refrain from engaging in abusive market practices, provide disclosure of material information about the swap to their counterparties, provide a daily mid-market mark for uncleared swaps, and, when recommending a swap to a counterparty, make a determination as to the suitability of the swap for the counterparty based on reasonable diligence concerning the counterparty.

As the Commission discussed in the Proposed Rule, the group C requirements have a more attenuated link to, and are therefore distinguishable from, systemic and market-oriented protections in the group A and group B requirements. Additionally, the Commission noted its belief that the foreign jurisdictions in which non-U.S. persons and foreign branches of U.S. swap entities are located are likely to have a significant interest in the type of business conduct standards that would be applicable to transactions with such non-U.S. persons and foreign branches within their jurisdiction, and, consistent with section 2(i) of the CEA and in the interest of international comity, it is generally appropriate to defer to such jurisdictions in applying, or not applying, such standards to foreign-

based swaps with foreign counterparties.[419]

### (ii) Summary of Comments

IIB/SIFMA supported the Proposed Rule's categorization of the Commission's external business conduct standards as group C requirements because the approach is consistent with the Guidance, and these requirements focus on counterparty protection. However, IIB/SIFMA requested that the Commission add its rules for elective initial margin segregation to the list of group C requirements.[420] They argued that these rules found in part 23, subpart L (§§ 23.700–23.704) ("Subpart L"),[421] like the proposed group C requirements, are largely focused on customer protection rather than risk mitigation.

### (iii) Final Rule

After careful consideration of the comments, the Commission is adopting the group C requirements as proposed and adding the requirements of Subpart L as group C requirements, as shown in the rule text in this release.[422]

Section 724(c) of the Dodd-Frank Act amended the CEA to add section 4s(l),[423] which addresses segregation of initial margin held as collateral in uncleared swap transactions (*i.e.*, swaps not submitted for clearing on a DCO). Section 4s(l) was implemented in Subpart L, which imposes requirements on SDs and MSPs with respect to the treatment of collateral posted by their counterparties to margin, guarantee, or secure certain uncleared swaps.[424] Specifically, § 23.701 requires, except in those circumstances where segregation is mandatory under the Margin Rules,

---

[411] Additionally, the Commission notes that § 23.504(b)(2) requires that the swap trading relationship documentation of SDs and MSPs must include all confirmations of swap transactions. 17 CFR 23.504(b)(2).

[412] 7 U.S.C. 6s(g).

[413] 17 CFR 23.202. *See* Final SD and MSP Recordkeeping, Reporting, and Duties Rule, 77 FR 20128.

[414] 17 CFR 23.202(b).

[415] Final § 23.23(a)(7).

[416] 7 U.S.C. 6s(h).

[417] *See* Business Conduct Standards for Swap Dealers and Major Swap Participants with Counterparties, 77 FR 9734 (Feb. 17, 2012).

[418] 17 CFR 23.400–23.451.

[419] *See* Proposed Rule, 85 FR at 982.

[420] As noted in the discussion of the group B requirements, IIB/SIFMA also requested that the Commission recategorize pre-execution daily trading records rules as group C requirements (not group B requirements).

[421] 17 CFR part 23, subpart L.

[422] Final § 23.23(a)(8).

[423] 7 U.S.C. 6s(l).

[424] Protection of Collateral of Counterparties to Uncleared Swaps; Treatment of Securities in a Portfolio Margining Account in a Commodity Broker Bankruptcy, 78 FR 66621 (Nov. 2013). The Commission later amended Subpart L in light of the Commission's adoption of subpart E of part 23 (Capital and Margin Requirements for Swap Dealers and Major Swap Participants) in January 2016 and the prudential regulators' adoption of similar rules in November 2015 (together, "Margin Rules"), which, among other things, established initial margin requirements applicable to SDs and MSPs. As a result, Subpart L's segregation requirements apply only when the Margin Rules' segregation requirements do not. Further, the Commission understands that counterparties have elected segregation under Subpart L very rarely. *See, e.g.,* Segregation of Assets Held as Collateral in Uncleared Swap Transactions, 84 FR 12894 (Apr. 2019).

that a SD/MSP provide notice to its counterparty of its right to have Initial Margin ("IM")[425] provided by it to the SD/MSP segregated in accordance with §§ 23.702 and 23.703.[426] Commission regulations 23.702 and 23.703 provide requirements for segregation and investment of IM where the counterparty elects such segregation,[427] and § 23.704 requires that each SD/MSP report quarterly to each counterparty that does not choose to require IM segregation that the back office procedures of the SD/MSP relating to margin and collateral requirements are in compliance with the agreement of the counterparties.[428]

The Commission agrees with IIB/SIFMA that these requirements are focused on customer protection rather than risk mitigation and are appropriately included as group C requirements. In this regard, the Commission notes, specifically, that Subpart L leaves to the discretion of the counterparty to the SD/MSP whether IM is segregated, rather than mandating its segregation, and has largely been superseded by the Margin Rules, which specifically address systemic risk in relation to margin for uncleared swaps.

### B. Exceptions From Group B and Group C Requirements

#### 1. Proposed Exceptions, Generally

#### (i) Proposed Rule

Consistent with section 2(i) of the CEA, the Commission proposed four exceptions from certain Commission regulations for foreign-based swaps in the Proposed Rule.[429]

First, the Commission proposed an exception from certain group B and C requirements for certain anonymous, exchange-traded, and cleared foreign-based swaps ("Exchange-Traded Exception").

Second, the Commission proposed an exception from the group C requirements for certain foreign-based swaps with foreign counterparties ("Foreign Swap Group C Exception").

Third, the Commission proposed an exception from the group B requirements for certain foreign-based swaps of foreign branches of U.S. swap entities with certain foreign counterparties, subject to certain limitations, including a quarterly cap on the amount of such swaps ("Limited Foreign Branch Group B Exception").[430]

Fourth, the Commission proposed an exception from the group B requirements for the foreign-based swaps of certain non-U.S. swap entities with certain foreign counterparties ("Non-U.S. Swap Entity Group B Exception").

While these exceptions each have different eligibility requirements, a common requirement is that they would be available only to foreign-based swaps,[431] as other swaps would be treated as domestic swaps for purposes of applying the group B and group C requirements and, therefore, would not be eligible for the above exceptions. Further, swap entities that avail themselves of these exceptions for their foreign-based swaps would be required to comply with the applicable laws of the foreign jurisdiction(s) to which they are subject, rather than the relevant Commission requirements, for such swaps; however, notwithstanding these exceptions, swap entities would remain subject to the CEA and Commission regulations not covered by the exceptions, including the prohibition on the employment, or attempted employment, of manipulative and deceptive devices in § 180.1.[432] The Commission also would expect swap entities to address any significant risk that may arise as a result of the utilization of one or more exceptions in their risk management programs required pursuant to § 23.600.[433]

The Commission requested comments on whether, in light of the Commission's supervisory interests, the proposed exceptions were appropriate or whether they should be broadened or narrowed.[434]

#### (ii) Summary of Comments

JFMC/IBAJ generally supported the proposed exceptions to the application of group B and C requirements under the Proposed Rule, stating that they believe the exceptions generally strike the right balance in protecting the integrity, safety, and soundness of the U.S. financial system while recognizing the principles of international comity.

ISDA stated that it supported the Commission's intent to place non-U.S. swap entities (that are Other Non-U.S. Persons) and foreign branches of U.S. swap entities on equal footing with respect to the cross-border application of certain CFTC requirements, noting that foreign branches of U.S. swap entities are subject to the laws of the foreign jurisdictions in which they operate and, thus, imposing U.S. requirements on these entities results in duplicative regulation—increasing compliance costs, complexity, and inefficiencies. However, JFMC/IBAJ, ISDA, and IIB/SIFMA requested that the Commission expand and clarify the Proposed Rule's exceptions in certain specific respects, which are discussed in the relevant sections below. AFR asserted that the Proposed Rule would allow branches of U.S. persons, which are actually formally and legally part of the parent U.S. organization, to effectively act as non-U.S. persons.[435] IATP stated that it only understands the Exchange-Traded Exception and did not comment on the other proposed exceptions. Its comment on the proposed Exchange-Traded Exception is discussed below.

#### 2. Exchange-Traded Exception

#### (i) Proposed Rule

The Commission proposed that, with respect to its foreign-based swaps, each non-U.S. swap entity and foreign branch of a U.S. swap entity would be excepted from the group B requirements (other than the daily trading records requirements in §§ 23.202(a) through 23.202(a)(1)[436]) and the group C requirements with respect to any swap entered into on a DCM, a registered SEF or a SEF exempted from registration by the Commission pursuant to section 5h(g) of the CEA, or an FBOT registered with the Commission pursuant to part 48 of its regulations[437] where, in each case, the swap is cleared through a registered DCO or a clearing organization that has been exempted from registration by the Commission

---

[425] "Initial Margin" is defined in § 23.700 for purposes of Subpart L as money, securities, or property posted by a party to a swap as performance bond to cover potential future exposures arising from changes in the market value of the position. 17 CFR 23.700.

[426] 17 CFR 23.701.

[427] 17 CFR 23.702 and 703.

[428] 17 CFR 23.704.

[429] *See* Proposed Rule, 85 FR at 982–984.

[430] This exception was defined as the "Foreign Branch Group B Exception" in the Proposed Rule. The Commission is adding the word "Limited" to the beginning of the defined term, to reflect the conditions that apply to the use of the exception, including the cap on its use in a calendar quarter.

[431] As discussed in section II.I, *supra,* a foreign-based swap means: (1) A swap by a non-U.S. swap entity, except for a swap booked in a U.S. branch; or (2) A swap conducted through a foreign branch.

[432] 17 CFR 180.1.

[433] 17 CFR 23.600.

[434] Proposed Rule, 85 FR at 984.

[435] The Commission disagrees with this assertion. For example, under the Proposed Rule, group B requirements apply more broadly to foreign branches than to non-U.S. persons due to the limited scope of the Limited Foreign Branch Group B Exception as compared to the Non-U.S. Swap Entity Group B Exception (each discussed below), and foreign branches (as a part of a U.S. person) are not eligible for substituted compliance for the group A requirements.

[436] 17 CFR 23.202(a) through (a)(1).

[437] The Commission stated that it would consider the proposed exception also to apply with respect to an FBOT that provides direct access to its order entry and trade matching system from within the U.S. pursuant to no-action relief issued by Commission staff.

pursuant to section 5b(h) of the CEA, and the swap entity does not know the identity of the counterparty to the swap prior to execution.[438]

With respect to the group B trade confirmation requirement, the Commission noted that where a cleared swap is executed anonymously on a DCM or SEF (as discussed above), independent requirements that apply to DCM and SEF transactions pursuant to the Commission's regulations should ensure that these requirements are met.[439] And, for a combination of reasons, including the fact that a registered FBOT is analogous to a DCM and is expected to be subject to comprehensive supervision and regulation in its home country,[440] and the fact that the swap will be cleared, the Commission believes that the Commission's trade confirmation requirements should not apply to foreign-based swaps that meet the requirements of the exception and are traded on registered FBOTs.

Of the remaining group B requirements, the Commission noted that the portfolio reconciliation and compression and swap trading relationship documentation requirements would not apply to the cleared DCM, SEF, or FBOT transactions described above because the Commission regulations that establish those requirements make clear that they do not apply to cleared transactions.[441] For the last group B requirement—the daily trading records requirement [442]—the Commission stated that it believes that, as a matter of international comity and recognizing the supervisory interests of foreign regulators who may have their own trading records requirements, it is appropriate to except such foreign-based swaps from certain of the Commission's daily trading records requirements. However, the Commission stated that the requirements of § 23.202(a) through (a)(1) should continue to apply, as all swap entities should be required to maintain, among other things, sufficient records to conduct a comprehensive and accurate trade reconstruction for each swap. The Commission noted that, in particular, for certain pre-execution trade information under § 23.202(a)(1),[443] the swap entity may be the best, or only, source for such

records, and for this reason, paragraphs (a) through (a)(1) of § 23.202 are carved out from the group B requirements in the proposed exception.

Additionally, the Commission noted that, given that this exception is predicated on anonymity, many of the group C requirements would be inapplicable.[444] Further, because the Commission believes a registered FBOT is analogous to a DCM for these purposes and is expected to be subject to comprehensive supervision and regulation in its home country, and because a SEF is exempted from registration by the Commission pursuant to section 5h(g) of the CEA must be subject to supervision and regulation that is comparable to that to which Commission-registered SEFs are subject, the Commission also proposed that these group C requirements would not be applicable where such a swap is executed anonymously on a registered FBOT, or a SEF that has been exempted from registration with the Commission pursuant to section 5h(g) of the CEA, and cleared. In the interest of international comity and because the proposed exception requires that the swap be exchange-traded and cleared, the Commission proposed that foreign-based swaps would also be excepted from the remaining group C requirements in these circumstances. The Commission noted that it expects that the requirements that the swaps be exchange-traded and cleared will generally limit swaps that benefit from the exception to standardized and commonly-traded, foreign-based swaps, for which the Commission believes application of the remaining group C requirements is not necessary.

(ii) Summary of Comments

IIB/SIFMA requested that the Commission expand the exception to apply to all anonymous cleared swaps (whether or not the trading venue and clearing organization are registered or exempt from registration with the Commission), in light of the risk mitigating effects of central clearing and the regulatory compliance and market integrity protections of trading anonymously on a regulated platform. They stated that it is not necessary for the Commission to limit this exception for anonymous cleared swaps in a manner that would indirectly expand the SEF and DCO registration requirements to non-U.S. trading venues and clearing organizations with non-U.S. swap entity participants. Further, they asserted that if the counterparty to

a swap was a U.S. person, the Commission's SEF and DCO registration requirements would independently require the trading venue and clearing organization to register with the Commission or obtain an exemption from registration. Additionally, IIB/SIFMA requested the exception be made available to U.S. swap entities, as well, except for daily trading records rules, arguing that the interposition of clearing organizations reduces risk to the United States, thereby obviating the need to apply the risk mitigation rules (where applicable). They also noted that SEFs provide market participants with the regulatory compliance protections associated with centralized trading and that many group C requirements already do not apply to a swap entity in connection with swaps executed anonymously, regardless of the U.S. person status of the swap entity.[445]

ISDA was supportive of the proposed exception, but requested that it be extended to cover: (1) All relevant group B and C requirements; and (2) U.S. and non-U.S. entities' transactions that are SEF- (or exempt SEF-) executed and cleared at a DCO, exempt DCO, or clearinghouse subject to CFTC no-action relief, regardless of whether they are anonymously executed. ISDA noted that one of the regulatory benefits of SEF trading is that market participants receive the necessary regulatory compliance protections associated with centralized trading, and that, as self-regulatory organizations, SEFs (and exempt SEFs) are expected to keep daily trading records and audit trails of each transaction executed on their platforms, so it makes sense to allow counterparties not to comply with group B requirements when executing trades on SEFs (or exempt SEFs), and restricting this exemption to a particular method of execution on a SEF does not serve any regulatory purpose. Moreover, ISDA argued that imposing CFTC external business conduct standards to centrally-executed and cleared trades also creates redundancies, as counterparties that trade on SEFs (or exempt SEFs) receive necessary disclosures as part of the onboarding process and regulatory required pre-trade credit checks ensure that counterparties have sufficient credit to execute transactions.

IATP stated that the biggest exception, in terms of the notional amount of swaps and the number of group B and C requirements that would be exempted

[438] *See* Proposed Rule, 85 FR at 982–983. This approach is similar to the Guidance. *See* Guidance, 78 FR at 45351–45352 and 45360–45361.

[439] *See* 17 CFR 23.501(a)(4)(i) and 37.6(b).

[440] *See* 17 CFR 48.5(d)(2).

[441] *See* 17 CFR 23.502(d), 23.503(c), 23.504(a)(1)(iii).

[442] *See* 17 CFR 23.202.

[443] *See* 17 CFR 23.202(a)(1).

[444] *See* 17 CFR 23.402(b)–(c), 23.430(e), 23.431(c), 23.450(h), 23.451(b)(2)(iii).

[445] In addition to noting the exceptions in the regulations themselves, IIB/SIFMA reference the relief provided by Staff Letter 13–70 for intended to be cleared swaps ("Staff ITBC Letter").

from compliance, is the Exchange-Traded Exception, and that this exception would comport generally with G20 reform objectives to centrally clear swaps and trade them anonymously (preferably post-trade as well as pre-trade) on regulated exchanges. However, IATP objected to the granting of the exception for foreign SEFs and clearing organizations that have not qualified for registration with the Commission, but have been granted exemptions from registration, presumably in the interest of international comity, noting that if the Exchange-Traded Exception results in disapplication of Commission requirements to customized foreign affiliate swaps traded and cleared on exempted entities, the risks to U.S. ultimate parents could be most unexpected.

(iii) Final Rule

After carefully considering the comments, the Commission is adopting the exception as proposed.[446]

Regarding requests to expand the exception to include all anonymous foreign-based swaps entered into on an exchange and which are subsequently cleared, regardless of whether the exchange and clearing organization are registered or exempt from registration with the Commission, or to include swaps that are cleared on a DCO that has received staff no-action relief from registration requirements, the Commission is declining to expand the exception. As noted in the Proposed Rule, the exception is based, in part, on the swaps eligible for it being subject to independent requirements that apply to transactions on a DCM or registered SEF pursuant to Commission regulations or, with respect to exempt SEFs and registered FBOTs, to comprehensive supervision and regulation in their home countries. Similarly, the Commission believes that limiting the exception to DCOs that are registered or exempt provides assurance that the DCOs clearing swaps eligible for the exception will be subject to comprehensive supervision and regulation. Further, as explained above, the Commission does not find persuasive IIB/SIFMA's argument that if

the counterparty to a foreign-based swap is a U.S. person, other Commission rules require that the trade be executed on a registered or exempt SEF and cleared through a registered or exempt DCO.[447] The Commission will consider expanding the exception pending other amendments to the SEF/DCO regulations.

Regarding the request not to require that eligible foreign-based swaps be anonymous, the Commission declines to expand the exception in this manner. The other exceptions in the Final Rule provide relief where appropriate for foreign-based swaps where the counterparty is known, and this limited exception, as in the Guidance, is only meant to provide relief from certain of the group B and group C requirements where the counterparty is unknown and, thus, it would be impractical to comply with such requirements.

Regarding the request to allow U.S. swap entities (other than their foreign branches) to utilize the exception, the Commission declines to expand the exception in this manner. The Commission is of the view, consistent with the Guidance, that where a U.S. swap entity (other than its foreign branch) enters into a swap, that swap is part of the U.S. swap market. And, accordingly, the group B and group C requirements should generally apply fully to such swap entity.[448] In addition, the Commission is generally of the view that the Final Rule is not the appropriate place to make changes to the regulation of the U.S. swap market. Expanding the exception to cover swaps in the U.S. swaps market would require amendments to the underlying group B and group C requirements that apply to all covered swaps rather than creating a limited exception to them for certain foreign swaps. However, as comments were supportive of extending the exception to U.S. swap entities, the Commission will continue to analyze this issue and take these comments into consideration when next considering changes to the group B and group C requirements.

With respect to the request to include pre-execution trading records (*i.e.,* by revising the exception to apply to all group B requirements), the Commission declines to expand the exception in this manner. Excluding pre-execution trading records requirements is consistent with the Guidance and, as

noted in the Proposed Rule, these requirements should continue to apply, as all swap entities should be required to maintain, among other things, sufficient records to conduct a comprehensive and accurate trade reconstruction for each swap, and the swap entity may be the best, or only, source for pre-execution trading records.

3. Foreign Swap Group C Exception

(i) Proposed Rule

The Commission proposed that each non-U.S. swap entity and foreign branch of a U.S. swap entity would be excepted from the group C requirements with respect to its foreign-based swaps with a foreign counterparty.[449] The Commission noted that such swaps would not include as a party a U.S. person (other than a foreign branch where the swap is conducted through such foreign branch) or be conducted through a U.S. branch,[450] and, given that the group C requirements are intended to promote counterparty protections in the context of local market sales practices, foreign regulators may have a relatively stronger supervisory interest than the Commission in regulating such swaps in relation to the group C requirements. Accordingly, the Commission stated that it believed applying the group C requirements to these transactions may not be warranted.

The Commission noted that, just as the Commission has a strong supervisory interest in regulating and enforcing the group C requirements associated with swaps taking place in the United States, foreign regulators would have a similar interest in overseeing sales practices for swaps occurring within their jurisdictions. Further, given the scope of section 2(i) of the CEA with respect to the Commission's regulation of swap activities outside the United States, the Commission stated that it believes imposing its group C requirements on a foreign-based swap between a non-U.S. swap entity or foreign branch of a U.S. swap entity, on one hand, and a foreign counterparty, on the other, is generally not necessary to advance the customer protection goals of the Dodd-Frank Act embodied in the group C requirements.

---

[446] Final § 23.23(e)(1)(i). The Commission notes that the addition of the Subpart L requirements to the group C requirements under the Final Rule will not substantively expand the Exchange-Traded Exception as the Subpart L requirements do not apply to swaps cleared by a DCO. Also, as stated in the Proposed Rule, the Commission considers the exception also to apply with respect to an FBOT that provides direct access to its order entry and trade matching system from within the U.S. pursuant to no-action relief issued by Commission staff.

[447] *See supra* sections III.D and IV.D.

[448] The Commission notes that, as referenced by IIB/SIFMA and subject to certain specified conditions, the Staff ITBC Letter provides relief to all swap entities from certain of the group B and group C requirements for intended to be cleared swaps.

[449] *See* Proposed Rule, 85 FR at 983–984. This approach is similar to the Guidance. *See* Guidance, 78 FR at 45360–45361. As used herein, the term swap includes transactions in swaps as well as swaps that are offered but not entered into, as applicable.

[450] *See* discussion of the modification of the definition of a "swap conducted through a U.S. branch" to be a "swap booked in a U.S. branch" in section II.H.3, *supra.*

By contrast, the Commission stated that whenever a swap involves at least one party that is a U.S. person (other than a foreign branch where the swap is conducted through such foreign branch) or is a swap conducted through a U.S. branch, the Commission believes it has a strong supervisory interest in regulating and enforcing the group C requirements, as a major purpose of Title VII is to control the potential harm to U.S. markets that can arise from risks that are magnified or transferred between parties via swaps. Therefore, the Commission concluded that exercise of U.S. jurisdiction with respect to the group C requirements over such swaps is reasonable because of the strong U.S. interest in minimizing the potential risks that may flow to the U.S. economy as a result of such swaps.[451]

(ii) Summary of Comments

ISDA stated that it fully agrees with the Commission that there is no policy benefit in subjecting non-U.S. market participants to the CFTC's extensive customer protection regime,[452] and therefore, believes that these rules should be left within the remit of home country regulators. Further, ISDA stated that it agrees that foreign branch ANE Transactions should not be subject to group C Requirements.[453] IIB/SIFMA also supported the proposed exception. However, ISDA and IIB/SIFMA requested specific changes to the underlying group C requirements, including that certain of the group C requirements apply only on an "opt-in" basis.

Specifically, ISDA stated that non-U.S. persons should be allowed to opt-in to receiving external business conduct disclosures from U.S. persons. Under ISDA's proposed alternative, unless a non-U.S. client chooses to "opt-in" into the full spectrum of the CFTC requirements, U.S swap entities and U.S. branches of non-U.S. swap entities would only have the obligation to provide disclosures related to: (1) Prohibition on fraud, manipulation, and other abusive practices; (2) verification of ECP status; (3) material risks, excluding requirements to provide daily mark and scenario analysis; (4) fair dealing communications; and (5) brief descriptions of other external business conduct disclosures, including the option to opt-in to receiving such disclosures.

IIB/SIFMA similarly requested that, to better balance counterparty protection interests against the market fragmentation that results when swap entities ask their non-U.S. counterparties to enter into documentation designed to satisfy U.S. legal requirements, the Commission refine how the group C requirements apply to all swaps entered into by U.S. swap entities and U.S. branches of non-U.S. swap entities when they transact with non-U.S. counterparties, including swaps entered into by U.S. swap entities in the United States. IIB/SIFMA argued that, because the business conduct requirements are designed to provide customer protection rather than to mitigate risk to the United States, the Commission has a limited regulatory interest in mandating full application of its customer protection requirements to all swap transactions between swap entities and their non-U.S. counterparties. Further, IIB/SIFMA asserted that, in other contexts, the Commission has recognized that non-U.S persons do not generally implicate U.S. investor protection concerns (e.g., in its CPO and CTA rules). They proposed that only the following requirements would apply to a U.S. swap entity (including its U.S. branches or when it otherwise trades in the United States) or U.S. branch of a non-U.S. swap entity when it trades with a non-U.S. counterparty unless otherwise opted into by a non-U.S. person counterparty: (1) The prohibition on fraud, manipulation, and other abusive practices (but not additional confidentiality requirements under § 23.410(c)); (2) verification of ECP status (although in their view such verification should not require a written representation regarding a specific prong of the ECP definition, as it does for U.S. persons); (3) disclosure of material risks (but not scenario analysis under § 23.431(b)), material characteristics and economic terms, and material conflicts of interest and incentives (but not pre-trade mid-market marks under § 23.431(a)(3)(i)), without requiring the counterparty to agree in writing to the manner of disclosure as under § 23.402(e) and (f); (4) fair and balanced communications; and (5) a one-time notification prior to entering into a new trading relationship with a non-U.S. counterparty that the non-U.S. counterparty may opt in to the additional customer protections provided by the remaining external business conduct rules along with a summary description of those rules. Further, IIB/SIFMA requested that the Commission clarify that non-U.S.

persons are not "Special Entities" (as defined in CEA section 4s(h)(2)(C) and § 23.401(c)), considering that Congress was not seeking to protect foreign pension plans and endowments.

(iii) Final Rule—Foreign Swap Group C Exception and U.S. Branch Group C Exception

After carefully considering the comments, the Commission is adopting the exception as proposed.[454] The Commission recognizes that, although the exception is being adopted as proposed, the scope of the exception is being expanded because the Subpart L requirements have been added to the group C requirements under the Final Rule. For the reasons discussed in section VI.A.3, the Commission believes that the Subpart L requirements are appropriately classified as group C requirements and, thus, the expansion of the exception in this manner is appropriate.

In addition, based on the comments received, the Commission is adopting an additional exception from the group C requirements for certain swaps of U.S. branches of non-U.S. swap entities ("U.S. Branch Group C Exception"), as shown in the rule text in this release.[455] Specifically, under the U.S. Branch Group C Exception, a non-U.S. swap entity is excepted from the group C requirements with respect to any swap booked in a U.S. branch with a foreign counterparty that is neither a foreign branch nor a Guaranteed Entity. The Commission is adopting this exception because, although the swaps benefiting from the exception are part of the U.S. swap market, the Commission believes that foreign regulators have a stronger interest in such swaps with respect to the group C requirements—which relate to counterparty protection rather than risk mitigation—because they are between a non-U.S. swap entity (by definition, a non-U.S. person) and certain foreign counterparties that have a limited nexus to the United States (i.e., non-U.S. persons, including SRSs that are not Guaranteed Entities). The Commission is not providing this exception to swaps booked in a U.S. branch of a non-U.S. swap entity with a foreign branch of a U.S. swap entity, Guaranteed Entity, or U.S. branch counterparty (where, for the U.S. branch, the swap is booked in the U.S. branch of the counterparty). A foreign branch (which is, by definition, a part of U.S. person), a Guaranteed Entity, and a U.S. branch counterparty have a closer nexus to the United States, and,

---

[451] See supra section I.D.2.

[452] As explained more fully below, the Commission notes that it did not make such a statement in the Proposed Rule.

[453] As explained more fully below, this statement does not wholly comport with the Commission's position as set forth in the Proposed Rule.

[454] Final § 23.23(e)(1)(ii).

[455] Final § 23.23(e)(2).

thus, the Commission believes that the group C requirements should continue to apply to swaps with such counterparties.

Regarding the requests to change the application of some or all of the group C requirements to swaps entered into by U.S. swap entities and U.S. branches of non-U.S. swap entities when they transact with non-U.S. counterparties such that certain of the requirements would apply only where non-US counterparties "opt-in" to such treatment, the Commission is of the view that where a U.S. swap entity (other than its foreign branch) enters into a swap or where a swap is booked in a U.S. branch of a non-U.S. swap entity, those swaps are part of the U.S. swap market, and, accordingly, other than as provided in the U.S. Branch Group C Exception, the group C requirements should generally apply fully to such swap entities, regardless of the U.S. person status of its counterparty.

In response to IIB/SIFMA's comment that adopting their requested change is in line with the Commission's recognition in the CPO/CTA context that non-U.S persons do not generally implicate U.S. investor protection concerns, the Commission has never stated that U.S.-based CPOs/CTAs do not need to register or comply with the Commission's applicable rules. Rather, under § 3.10(c)(3), a foreign person is not required to register as a CPO/CTA (or comply with most Commission regulations) in connection with commodity interest transactions on behalf of persons located outside the United States that are submitted for clearing through a registered futures commission merchant. Moreover, a CPO/CTA advising a customer on the investment of their funds or managing such investment is in a fundamentally different position than a swap entity that is acting as a counterparty under a swap. In addition, as noted above, the Commission is of the view that, generally, the Final Rule is not the appropriate place to make changes to the regulation of the U.S. swap market. Making the group C requirements an "opt-in" regime would require changing the underlying group C requirements that apply to all covered swaps rather than creating a limited exception to them for certain foreign swaps.

On the request of IIB/SIFMA that the Commission "clarify" that non-U.S. persons are not Special Entities because "Congress was not seeking to protect foreign pension plans and endowments," the Commission received similar comments when it adopted the definition of "Special Entity" in its final rule on external business conduct standards for swap entities and addressed them in that rulemaking.[456] First, the Commission, in interpreting the CEA, refined the definition of "Special Entity" to remove, among other things, certain foreign employee benefit plans from the scope of the definition.[457] Second, the Commission expressly addressed foreign endowments potentially being classified as Special Entities, saying that because "the statute does not distinguish between foreign and domestic counterparties in Section 4s(h) . . . the Commission has determined that prong (v) of Section 4s(h)(2)(C) and § 23.401(c)(5) [the endowment prongs of the definitions] will apply to any endowment, whether foreign or domestic." [458] Therefore, the Commission is declining to provide the clarification that IIB/SIFMA requested.

Regarding ISDA's statement that it fully agrees with the Commission that there is no policy benefit in subjecting non-U.S. market participants to the CFTC's extensive customer protection regime and, therefore, believes that these rules should be left within the remit of home country regulators, this statement does not wholly comport with the Commission's position as set forth in the Proposed Rule. Rather, the Commission proposed that only certain foreign-based swaps meeting the eligibility criteria for the exception would be excepted from the group C requirements. ISDA also stated that it agrees that foreign branch ANE Transactions should not be subject to group C Requirements. The Commission notes that this would only be true to the extent the swap is conducted through the relevant foreign branch or branches, which would require, among other things, that the swap be entered into by each relevant foreign branch in its normal course of business. To satisfy this prong, it must be the normal course of business for employees located in the branch (or another foreign branch of the U.S. bank) to enter into the type of swap in question. Under the Final Rule (and as proposed), where the swap is primarily entered into by personnel not located in a foreign branch of the U.S. bank, this requirement would not be satisfied.

### 4. Limited Foreign Branch Group B Exception

#### (i) Proposed Rule

The Commission proposed that each foreign branch of a U.S. swap entity would be excepted from the group B requirements with respect to any foreign-based swap with a foreign counterparty that is an Other Non-U.S. Person, subject to certain limitations.[459] Specifically, under the Proposed Rule: (1) The exception would not be available with respect to any group B requirement for which substituted compliance (discussed in section VI.C below) is available for the relevant swap; and (2) in any calendar quarter, the aggregate gross notional amount of swaps conducted by a swap entity in reliance on the exception may not exceed five percent of the aggregate gross notional amount of all its swaps in that calendar quarter.

As discussed in the Proposed Rule, the Commission proposed the Limited Foreign Branch Group B Exception to allow the foreign branches of U.S. swap entities to continue to access swap markets for which substituted compliance may not be available under limited circumstances.[460] The Commission stated that it believes the Limited Foreign Branch Group B Exception is appropriate because U.S. swap entities' activities through foreign branches in these markets, though not significant in volume in many cases, may nevertheless be an integral element of a U.S. swap entity's global business. Additionally, although not the Commission's main purpose, the Commission noted that it endeavors to preserve liquidity in the emerging markets in which it expects this exception to be utilized, which may further encourage the global use and development of swap markets. Further, because of the proposed five percent cap on the use of the exception, the Commission stated that it preliminarily believed that the swap activity that would be excepted from the group B requirements would not raise significant supervisory concerns.

#### (ii) Summary of Comments

IIB/SIFMA generally supported this exception, but requested that the Commission clarify that: (1) The exception applies on a swap-by-swap,

---

[456] Business Conduct Standards for Swap Dealers and Major Swap Participants With Counterparties, 77 FR 9733, 9774–75 (Feb. 2012).

[457] Id. at 9776.

[458] Id.

[459] See Proposed Rule, 85 FR at 984. This is similar to a limited exception for transactions by foreign branches in certain specified jurisdictions in the Guidance. See Guidance, 78 FR at 45351.

[460] As noted above, under the Proposed Rule, where substituted compliance is available for a particular group B requirement and swap, the exception would not be available.

requirement-by-requirement basis; (2) that it is optional for a U.S. swap entity to rely on the exception for any given swap; and (3) that the five percent notional amount cap would only cover transactions entered into "in reliance on" the exception, not all swaps eligible for the exception. In a subsequent discussion with Commission staff, IIB/SIFMA further clarified their request that the exception should apply on a "requirement-by-requirement basis" to mean that the exception should have a separate five percent gross notional amount cap applicable to each requirement, rather than a single five percent gross notional amount cap where any swap that relied on the exception for any group B requirement would count towards the cap. State Street also supported the proposed exception; however, it requested that the Commission provide further guidance on the calculation of the notional amount cap.

IIB/SIFMA also asked that, consistent with its other requests, the exception be available when a foreign branch transacts with an SRS that is not a swap entity or with a U.S. branch of a foreign bank. With respect to such an entity, IIB/SIFMA noted that the group B requirements indirectly regulate the end user (*i.e.,* non-swap entity) counterparties of swap entities by requiring them to execute documentation and engage in portfolio reconciliation and compression exercises, when they trade with swap entities subject to the requirements. IIB/SIFMA asserted that many more end users will qualify as SRSs than swap entities under the proposed definition because, unlike swap entities, commercial and non-financial end users generally will not qualify for the exclusions from the SRS definition and that, as a result, significant foreign subsidiaries of large U.S. multinational companies would find themselves subject to group B requirements when they trade with non-U.S. swap entities. IIB/SIFMA noted that the indirect application of the group B requirements would pose particular problems for significant subsidiaries doing business in emerging market jurisdictions that have not yet adopted comparable rules to the group B requirements because swap entities' operations in those jurisdictions might not be set up to apply the group B requirements to trading with those subsidiaries, and that this could cause those subsidiaries to lose access to key interest or currency hedging products and face increased hedging and risk management costs relative to their foreign competitors. IIB/

SIFMA also stated that subjecting an SRS that is not a swap entity to group B requirements would impose undue costs on non-U.S. swap entities, noting that because the SRS test depends on a non-U.S. counterparty's internal organizational structure and financial metrics, it generally would not be possible for a swap entity to determine whether its non-U.S. counterparty is an SRS without obtaining an affirmative representation and, because it would be difficult for a swap entity categorically to rule out any class of non-U.S. counterparties from being an SRS, swap entities would be forced to obtain relevant representations from nearly their entire global client bases.

Further, IIB/SIFMA noted that any credit or legal risks arising from swaps conducted in reliance on the exception should already be addressed through existing provisions of § 23.600 and, accordingly, they assume the Proposed Rule was not meant to imply some additional risk management program requirement in connection with reliance on the exception.

JBA asked that the Commission review the Proposed Rule from the perspective of ensuring symmetric application of requirements between U.S. swap entities and non-U.S. swap entities. Specifically, JBA requested that an exception consistent with the Limited Foreign Branch Group B Exception should be applicable to the non-U.S. swap entities even when their counterparty is a foreign branch of a U.S. person. As an example, JBA stated that when the Seoul branch of a U.S. bank that is registered as an SD enters into a swap with the Tokyo headquarters of a Japanese bank that is registered as an SD, the U.S. bank SD may rely on the Limited Foreign Branch Group B Exception, whereas the Japanese bank SD may not rely on an exception from the group B requirements.

ISDA stated that it agrees that foreign branch ANE Transactions should not be subject to group B requirements where substituted compliance is available.[461]

### (iii) Final Rule

After carefully considering the comments, the Commission is adopting the exception with certain modifications, as shown in the rule text in this release.[462] Specifically, the Commission is: (1) Adjusting the exception such that it is not available for swaps between swap entities; (2) broadening the exception to apply to

foreign-based swaps with an SRS End User; and (3) making some minor technical changes to the text of the Final Rule.

The Commission believes that a swap between the foreign branch of a U.S. swap entity and a non-U.S. swap entity should generally be subject to the group B requirements. Where both parties to a swap are swap entities, the rationale for the Limited Foreign Branch Group B Exception is not present. As discussed in the Proposed Rule and the Guidance, as well as above, the exception is designed to allow the foreign branches of U.S. swap entities to continue to access swap markets for which substituted compliance may not be available under limited circumstances (a) because U.S. swap entities' activities through foreign branches in these markets, though not significant in volume in many cases, may nevertheless be an integral element of a U.S. swap entity's global business, and (b) to preserve liquidity in the emerging markets in which it expects this exception to be utilized. Where both parties to a swap are registered swap entities, the Commission sees no impediment to compliance with the group B requirements.

With respect to SRS End Users, the Commission acknowledges that applying the group B requirements to a swap entity's swaps indirectly affects their counterparties, including SRS End User counterparties, by requiring them to execute documentation (*e.g.,* compliant swap trading relationship documentation), and engage in portfolio reconciliation and compression exercises as a condition to entering into swaps with swap entity counterparties. As noted by IIB/SIFMA, requiring compliance with these obligations may cause counterparties, including SRS End Users, to face increased costs relative to their competitors not affected by the application of the group B requirements (*e.g.,* for legal fees or as a result of costs being passed on to them by their swap entity counterparties), and/or to potentially lose access to key interest or currency hedging products. Also, the Commission recognizes that, as IIB/SIFMA notes, because the SRS test depends on a non-U.S. counterparty's internal organizational structure and financial metrics and it would be difficult to rule out any category of non-U.S. counterparties as being an SRS, the proposed application of group B requirements to all SRSs may cause swap entities to obtain SRS representations from nearly their entire non-U.S. client bases, potentially increasing costs for all of these clients.

---

[461] As discussed more fully below, this statement is not an accurate description of the Proposed Rule.
[462] Final § 23.23(e)(4).

Taking this into account and the Commission's belief that it is important to ensure that an SRS, particularly a commercial or non-financial entity, continues to have access to swap liquidity for hedging or other non-dealing purposes, the Commission is expanding the exception only to SRS End Users (and not to SRSs that are swap entities ("SRS Swap Entities") or Guaranteed Entities). The Commission believes that an SRS End User does not pose as significant a risk to the United States as an SRS Swap Entity or a Guaranteed Entity, because an SRS End User: (1) Has a less direct connection to the United States than a Guaranteed Entity; and (2) has been involved, at most, in only a de minimis amount of swap dealing activity, or has swap positions below the MSP thresholds, such that it is not required to register as an SD or MSP, respectively. In addition, because the SRS category was first considered in the Proposed Rule, unlike for Guaranteed Entities, there is no precedent in the Guidance to apply the group B requirements to all SRSs as originally proposed. Moreover, treating SRSs End Users and Guaranteed Entities differently under the exception is consistent with the differences in swap counting requirements under the Final Rule.[463] For example, an Other Non-U.S. Person is generally not required to count a dealing swap with an SRS toward its de minimis threshold calculation for SD registration, whereas an Other Non-U.S. Person is (absent certain exceptions) generally required to count its dealing swaps with a Guaranteed Entity.

In addition, in response to commenters requesting further guidance on the application of the exception, the Commission is clarifying that the five percent gross notional amount cap applies only to swaps entered into in reliance on the exception. This does not include situations where a foreign branch of a U.S. swap entity complies with all of the group B requirements, either directly or through substituted compliance, with respect to a swap that is eligible for the exception. In such situation, though the swap is eligible for the exception for the requirements not addressed by substituted compliance, it does not count toward the five percent gross notional amount cap for swaps entered into in reliance on the exception because compliance with the applicable group B requirements was achieved. On the other hand, where a foreign branch relies on the exception with respect to

any group B requirement for a swap, the notional amount of that swap counts toward the five percent gross notional amount cap for the relevant calendar quarter. The Commission is declining to expand the five percent cap as requested by IIB/SIFMA such that there would be a separate five percent gross notional amount cap for each group B requirement, because it believes such an exception would potentially allow a much greater percentage of swaps by notional amount to be eligible for the exception, and it would be difficult for a swap entity to track and for the Commission and the National Futures Association ("NFA") to monitor compliance with such a standard. Accordingly, the five percent cap applies on a swap-by-swap basis, but does not apply on a requirement-by-requirement basis such that a foreign branch may rely on the exception for greater than five percent of its swaps by gross notional amount in any calendar quarter.

Regarding the request to expand the exception to make it available to swaps of a foreign branch with U.S. branches of foreign banks, the Commission does not believe that such an expansion is appropriate. As noted above, the exception is designed to allow the foreign branches of U.S. swap entities to continue to access swap markets for which substituted compliance may not be available under limited circumstances. It is not designed to allow foreign branches to transact with U.S. branches of non-U.S. banking organizations without complying with the group B requirements. A foreign branch of a U.S. bank is a U.S. person, and, as noted above, the Commission is of the view that where a swap is booked in a U.S. branch, that swap is part of the U.S. swap market. Accordingly, the Commission retains a supervisory interest in swaps between a foreign branch and a U.S. branch such that the group B requirements should generally apply to such swaps.

Regarding ISDA's statement that it agrees that foreign branch ANE Transactions should not be subject to group B requirements where substituted compliance is available, the Commission notes that this statement is not accurate as the Limited Foreign Branch Group B Exception does not apply where substituted compliance is available. Also, as discussed above, even where substituted compliance is not available, this statement would only be true to the extent the swap is conducted through the relevant foreign branch or branches, which would require, among other things, that the swap be entered into by each relevant

foreign branch in its normal course of business. To satisfy this prong, it must be the normal course of business for employees located in the branch (or another foreign branch of the U.S. bank) to enter into the type of swap in question. Under the Final Rule (and as proposed), where the swap is primarily entered into by personnel not located in a foreign branch of the U.S. bank, this requirement would not be satisfied.

Further, in line with IIB/SIFMA's comment, the Commission confirms that its stated expectation that swap entities will address any significant risk that may arise as a result of the utilization of one or more exceptions in their risk management programs required pursuant to § 23.600 is not meant to imply an additional risk management program requirement, but rather to remind swap entities of their obligations under § 23.600.

### 5. Non-U.S. Swap Entity Group B Exception

#### (i) Proposed Rule

The Commission also proposed that each non-U.S. swap entity that is an Other Non-U.S. Person would be excepted from the group B requirements with respect to any foreign-based swap with a foreign counterparty that is also an Other Non-U.S. Person.[464] The Commission stated that, in these circumstances, where no party to the foreign-based swap is a U.S. person, a Guaranteed Entity, or an SRS, and, the particular swap is not conducted through a U.S. branch [465] of a party, notwithstanding that one or both parties to such swap may be a swap entity, the Commission believes that foreign regulators may have a relatively stronger supervisory interest in regulating such swaps with respect to the subject matter covered by the group B requirements, and that, in the interest of international comity, applying the group B requirements to these foreign-based swaps is not warranted.

The Commission noted that, generally, it would expect that swap entities that rely on this exception are subject to risk mitigation standards in the foreign jurisdictions in which they reside similar to those included in the group B requirements, as most

---

[463] *See* discussion of counting requirements of swaps with SRSs in sections III.B.1 and IV.B.1, *supra.*

[464] *See* Proposed Rule, 85 FR at 984. This approach is similar to the Guidance; however, the Commission notes that the Proposed Rule limited the non-U.S. swap entities eligible for this exception to those that are Other Non-U.S. Persons, and the Guidance did not contain a similar limitation. See Guidance, 78 FR at 45352–45353.

[465] *See* discussion of the modification of the definition of a "swap conducted through a U.S. branch" to be a "swap booked in a U.S. branch" in section II.H.3, *supra.*

jurisdictions surveyed by the FSB in respect of their swaps trading have implemented such standards.[466]

(ii) Summary of Comments

IIB/SIFMA agreed with the Commission that foreign regulators have a stronger supervisory interest in these swaps than the Commission in regards to the risk mitigation matters covered by the group B requirements, but recommended that the Commission expand the proposed exception by: (1) Applying the exception to swaps with an SRS that is not a swap entity, so as to avoid inappropriately burdening the foreign subsidiaries of U.S. multinational corporations and their counterparties (as discussed in section VI.B.4 above); (2) conforming the treatment of a non-U.S. swap entity that either is an SRS Swap Entity or benefits from a U.S. guarantee for the relevant swap ("Guaranteed Swap Entity") to the Guidance[467] (or, at a minimum, adopting an exception for de minimis trading by these entities in jurisdictions not eligible for substituted compliance similar to the Limited Foreign Branch Group B Exception where, for SRS Swap Entities, the five percent notional amount cap would apply at the level of the ultimate U.S. parent entity), so as to minimize the competitive disadvantages faced by such swap entities and their counterparties when they are subject to U.S. rules extraterritorially; and (3) permitting a U.S. branch to rely on the exception when it trades with a non-U.S. person that is neither a Guaranteed Entity nor another U.S. branch, which, in their view, would appropriately recognize that such swaps do not present risks to the United States, are generally unnecessary due to home country regulation, and align the scope of the exception to be consistent with analogous EU rules.

JFMC/IBAJ similarly requested that the Commission exclude transactions between a Guaranteed Swap Entity or an SRS Swap Entity and an Other Non-U.S. Person from the application of group B requirements, stating that these requirements would not apply to such transactions under the Guidance and they see no justification for the change in Commission policy. They argued that the expanded extraterritorial application will indirectly impose regulatory compliance burdens on Japanese market participants, most of which are Other Non-U.S. Persons, when trading swaps

with Guaranteed Swap Entities, especially where a Guaranteed Swap Entity cannot rely on substituted compliance with local Japanese regulations to satisfy group B requirements, and that Japanese market participants will likely refrain from trading swaps with a Guaranteed Swap Entity to avoid the indirect imposition of the Commission's swaps regulations and the costs associated therewith. They noted that this may diminish the ability of U.S.-headquartered firms to compete or access liquidity in the Japanese swaps market, which could result in fragmented global swaps markets comprised of small and disconnected liquidity pools, leading to exacerbation of systemic risk.

ISDA requested that, in line with the Proposed Rule's intent to give deference to home country regulators where there are applicable foreign regulatory requirements, the Commission not apply the proposed group B requirements to transactions between: (1) U.S. branches of non-U.S. swap entities and Other Non-U.S. Persons; and (2) Guaranteed Entities and Other Non-U.S. Persons, supporting the position and rationale of IIB/SIFMA on this topic. ISDA noted that the Commission has set a precedent for taking this approach by providing an exemption in the Guidance to Guaranteed Entities from compliance with group B requirements when transacting with Other Non-U.S. Persons.[468]

(iii) Final Rule—Non-U.S. Swap Entity Group B Exception and Limited Swap Entity SRS/Guaranteed Entity Group B Exception

After carefully considering the comments, the Commission is adopting the Non-U.S. Swap Entity Group B Exception with certain modifications, as shown in the rule text in this release.[469] Specifically, for the same reasons that the Commission is expanding the Limited Foreign Branch Group B Exception to include swaps with SRS End Users,[470] the Commission is also expanding the Non-U.S. Swap Entity Group B Exception to include swaps with SRS End Users.

In addition, based on the comments received, the Commission is adopting an additional limited exception from the group B requirements similar to the

Limited Foreign Branch Group B Exception in the Final Rule (discussed above), for trading by an SRS Swap Entity or a Guaranteed Swap Entity, on the one hand, and certain non-U.S. persons, on the other ("Limited Swap Entity SRS/Guaranteed Entity Group B Exception"), as shown in the rule text in this release.[471] As commenters noted, under the Guidance, a Guaranteed Swap Entity or a non-U.S. swap entity that was a conduit affiliate would not have been expected to comply with the group B requirements when transacting with a non-U.S. person that was not a conduit or guaranteed affiliate, so the Proposed Rule deviated from the Guidance and would have disadvantaged SRS Swap Entities and Guaranteed Swap Entities relative to foreign branches of U.S. swap entities in the application of the group B requirements. Thus, the Commission believes a limited exception is warranted because, as a policy matter, it has determined that Guaranteed Swap Entities and SRS Swap Entities (who, by definition, are non-U.S. persons) should not be subject to stricter application of the group B requirements than foreign branches of U.S swap entities (who are U.S. persons). Under the Limited Swap Entity SRS/Guaranteed Entity Group B Exception, each Guaranteed Swap Entity and SRS Swap Entity is excepted from the group B requirements, with respect to any foreign-based swap with a foreign counterparty (other than a foreign branch) that is neither a swap entity[472] nor a Guaranteed Entity, subject to certain conditions. Specifically, (1) the exception is not available with respect to any group B requirement if the requirement as applicable to the swap is eligible for substituted compliance pursuant to a comparability determination issued by the Commission prior to the execution of the swap (discussed in sections VI.C and VI.D below); and (2) in any calendar quarter, the aggregate gross notional amount of swaps conducted by an SRS Swap Entity or a Guaranteed Swap Entity in reliance on this exception aggregated with the gross notional amount of swaps conducted by all affiliated SRS Swap Entities and Guaranteed Swap Entities in reliance on

---

[466] See 2019 FSB Progress Report, Table M.

[467] The Commission notes that SRSs were not contemplated by the Guidance, so the Commission assumes that the comment requested that the Commission conform the treatment of SRSs to conduit affiliates under the Guidance.

[468] The Commission assumes that ISDA was referring to non-U.S. Persons that are not a guaranteed or conduit affiliate of a U.S. Person (each as defined or described in the Guidance), as the term "Other Non-U.S. Person" is not used in the Guidance.

[469] Final § 23.23(e)(3).

[470] See supra section VI.B.4.iii.

[471] Final § 23.23(e)(5). As noted above, the Commission, generally, expects that swap entities that rely on this exception are subject to risk mitigation standards in the foreign jurisdictions in which they reside similar to those included in the group B requirements, as most jurisdictions surveyed by the FSB in respect of their swaps trading have implemented such standards. See 2019 FSB Progress Report, Table M.

[472] As discussed above, the Commission is also excluding swaps with a swap entity counterparty from the Limited Foreign Branch Group B Exception.

this exception does not exceed five percent of the aggregate gross notional amount of all swaps entered into by the SRS Swap Entity or a Guaranteed Swap Entity and all affiliated swap entities.[473]

With respect to the request to disapply fully the group B requirements to swaps between an SRS Swap Entity or Guaranteed Swap Entity, on the one hand, and an Other Non-U.S. Person on the other, the Commission believes that the group B requirements should generally continue to apply to these swaps, as these requirements relate to risk mitigation, and SRS Swap Entities and Guaranteed Swap Entities may pose significant risk to the United States. Other than the Limited Foreign Branch Group B Exception, this matches the treatment of swaps between a foreign branch of a U.S. swap entity and an Other Non-U.S. Person under the Proposed Rule. Therefore, it is the Commission's view that providing the Limited Swap Entity SRS/Guaranteed Entity Group B Exception (discussed above) to put these entities on a substantially similar footing as such foreign branches under the group B requirements under the Final Rule is the better approach.

Regarding the requests to expand the exception to include transactions between U.S. branches and certain non-U.S. persons, the Commission declines such an expansion. As noted above, the Commission believes that where a swap is booked in a U.S. branch of a non-U.S. swap entity, that swap is part of the U.S. swap market, and, accordingly, the group B requirements should generally apply.

### C. Substituted Compliance

As discussed in the Proposed Rule, substituted compliance is a fundamental component of the Commission's cross-border framework.[474] It is intended to promote the benefits of integrated global markets by reducing the degree to which market participants will be subject to duplicative regulations. Substituted compliance also fosters international harmonization by encouraging U.S. and foreign regulators to adopt consistent and comparable regulatory regimes that

can result in deference to each other's regime. Substituted compliance, therefore, also is consistent with the directive of Congress in the Dodd-Frank Act that the Commission "coordinate with foreign regulatory authorities on the establishment of consistent international standards with respect to the regulation" of swaps and swap entities.[475] When properly calibrated, substituted compliance promotes open, transparent, and competitive markets without compromising market integrity. On the other hand, if construed too broadly, substituted compliance could defer important regulatory interests to foreign regulators that have not implemented comparably robust regulatory frameworks.

The Commission has determined that, in order to achieve the important policy goals of the Dodd-Frank Act, U.S. swap entities (excluding their foreign branches) must be fully subject to the Dodd-Frank Act requirements addressed by the Final Rule, without regard to whether their counterparty is a U.S. or non-U.S. person. Given that such firms are U.S. persons conducting their business within the United States, their activities inherently have a direct and significant connection with activities in, or effect on, U.S. commerce. However, the Commission recognizes that, in certain circumstances, non-U.S. swap entities' and foreign branches' swaps with non-U.S. persons have a more attenuated nexus to U.S. commerce. Further, the Commission acknowledges that foreign jurisdictions also have a supervisory interest in such swaps. The Commission therefore believes that substituted compliance is appropriate for non-U.S. swap entities and foreign branches of U.S. swap entities in certain circumstances.

In light of the interconnectedness of the global swap market and consistent with CEA section 2(i) and principles of international comity, the Commission is implementing a substituted compliance regime with respect to the group A and group B requirements that builds upon the Commission's prior substituted compliance framework and aims to promote diverse markets without compromising the central tenets of the Dodd-Frank Act. As discussed below, the Final Rule outlines the circumstances in which a non-U.S. swap entity or foreign branch of a U.S. swap entity is permitted to comply with the group A and/or group B requirements by complying with comparable standards in its home jurisdiction.

#### 1. Proposed Rule

The Commission proposed to permit a non-U.S. swap entity to avail itself of substituted compliance with respect to the group A requirements on an entity-wide basis.[476] The Commission also proposed to permit a non-U.S. swap entity or a foreign branch of a U.S. swap entity to avail itself of substituted compliance with respect to the group B requirements for its foreign-based swaps with foreign counterparties.[477] The Commission did not propose to permit substituted compliance for the group C requirements, where broader exceptions for swaps with foreign counterparties would be available.

#### 2. Summary of Comments

Chatham, JFMC/IBAJ, and BGC/Tradition generally supported the Proposed Rule's approach to substituted compliance, stating that it is consistent with the principles of international comity. The Commission also received two comments requesting that the Commission expand the proposed scope of substituted compliance. Specifically, AIMA stated that the Commission should expand the availability of substituted compliance by making it available to cross-border transactions as far as possible, including any swap involving a non-U.S. person, even swaps with U.S. persons. AIMA stated that the Commission's supervisory interest in the swap activities of U.S. persons should not prelude the availability of substituted compliance for U.S. persons. AIMA also supported a universal, entity-wide approach to substituted compliance, whereby substituted compliance would be fully available for cross-border transactions.

In addition, IIB/SIFMA stated that the Commission should expand the availability of substituted compliance for the group B requirements to: (1) All swaps entered into by a non-U.S. swap entity or foreign branch, including swaps with U.S. persons; and (2) swaps conducted through a U.S. branch.[478] IIB/SIFMA further requested that the Commission make substituted compliance available for the group C requirements where such requirements apply. IIB/SIFMA noted that the SEC permits substituted compliance for U.S.-facing transactions with respect to its external business conduct standards.

---

[473] Final § 23.23(e)(5)(i) and (ii). As described above for the Limited Foreign Branch Group B Exception, a swap entered into by a SRS Swap Entity or Guaranteed Swap Entity will only count toward the gross notional amount cap where it is entered into in reliance on the Limited Swap Entity SRS/Guaranteed Entity Group B Exception.

[474] For example, in addition to the Guidance, the Commission has provided substituted compliance with respect to foreign futures and options transactions (*see, e.g.,* Foreign Futures and Options Transactions, 67 FR 30785 (May 8, 2002); Foreign Futures and Options Transactions, 71 FR 6759 (Feb. 9, 2006)); and margin for uncleared swaps (*see* Cross-Border Margin Rule, 81 FR 34818).

[475] *See* Dodd-Frank Act, section 752(a); 15 U.S.C. 8325.

[476] *See* Proposed § 23.23(f)(1); Proposed Rule, 85 FR at 985.

[477] *See* Proposed § 23.23(f)(2); Proposed Rule, 85 FR at 985.

[478] *See* discussion of the modification of the definition of a "swap conducted through a U.S. branch" to be a "swap booked in a U.S. branch" in section II.H.3, *supra.*

## 3. Final Rule

After carefully considering the comments, the Commission is adopting the scope of substituted compliance largely as proposed. The Commission continues to believe that the group A requirements, which relate to compliance programs, risk management, and swap data recordkeeping, cannot be effectively applied on a fragmented jurisdictional basis. Accordingly, it is not practical to limit substituted compliance for the group A requirements to only those transactions involving non-U.S. persons. Therefore, in furtherance of international comity, the Final Rule permits a non-U.S. swap entity, subject to the terms of the relevant comparability determination, to satisfy any applicable group A requirement on an entity-wide basis by complying with the applicable standards of a foreign jurisdiction.[479]

Unlike the group A requirements, the group B requirements, which relate to counterparty relationship documentation, portfolio reconciliation and compression, trade confirmation, and daily trading records, are more closely tied to local market conventions and can be effectively implemented on a transaction-by-transaction or relationship basis. As noted above, the Commission believes that Congress intended for the Dodd-Frank Act to apply fully to U.S. persons (other than their foreign branches) with no substituted compliance available; therefore, an expansion of substituted compliance for the group B requirements for U.S. persons is not appropriate. However, in light of the comments received, the Commission has reconsidered the availability of substituted compliance for U.S. branches of non-U.S. swap entities. In the Proposed Rule, the Commission treated a swap conducted through a U.S. branch[480] in the same manner as a swap of a U.S. swap entity for the purposes of substituted compliance. The Commission acknowledges, however, that a swap booked in a U.S. branch of a non-U.S. swap entity with a foreign counterparty that is neither a foreign branch nor a Guaranteed Entity has a comparatively smaller nexus to U.S. commerce than a swap booked in a U.S. branch with a U.S. person, Guaranteed Entity, or another U.S. branch.

Accordingly, subject to the terms of the relevant comparability determination, the Final Rule permits a

non-U.S. swap entity or foreign branch of a U.S. swap entity to avail itself of substituted compliance for the group B requirements in certain circumstances, depending on the nature of its counterparty. Specifically, given the Commission's interest in promoting international comity and market liquidity, the Final Rule allows a non-U.S. swap entity or foreign branch of a U.S. swap entity, subject to the terms of the relevant comparability determination, to satisfy any applicable group B requirement for a foreign-based swap with a foreign counterparty by complying with the applicable standards of a foreign jurisdiction.[481] Further, the Final Rule allows a non-U.S. swap entity, subject to the terms of the relevant comparability determination, to satisfy any applicable group B requirement for any swap booked in a U.S. branch with a foreign counterparty that is neither a foreign branch nor a Guaranteed Entity by complying with the applicable standards of a foreign jurisdiction.[482]

The Commission is also modifying the text of § 23.23(f)(1) and (2) as shown in the rule text in this release (and including rule text in § 23.23(f)(3)) to clarify that substituted compliance is only available to a non-U.S. swap entity or foreign branch of a U.S. swap entity to the extent permitted by, and subject to any conditions specified in, a comparability determination, and only where it complies with the standards of a foreign jurisdiction applicable to it, as opposed to other foreign standards to which it is not subject.[483]

With respect to the group C requirements, the Commission reiterates its longstanding position that it has a strong supervisory interest in ensuring that the counterparty protections of the group C requirements generally apply to swaps with U.S. persons with no substituted compliance available.

## D. Comparability Determinations

The Commission is also implementing a process pursuant to which it will, in connection with certain requirements addressed by the Final Rule, conduct comparability determinations regarding a foreign jurisdiction's regulation of swap entities. This approach builds upon the Commission's prior substituted compliance regime and aims to promote international comity and market liquidity without compromising the Commission's interests in reducing

systemic risk, increasing market transparency, enhancing market integrity, and promoting counterparty protections. Specifically, the Final Rule outlines procedures for initiating comparability determinations, including eligibility and submission requirements, with respect to certain requirements addressed by the Final Rule. The Final Rule also establishes a standard of review that the Commission will apply to such comparability determinations that emphasizes a holistic, outcomes-based approach. The Final Rule does not affect the effectiveness of any existing Commission comparability determinations that were issued consistent with the Guidance, which will remain effective pursuant to their terms.[484] The Commission may, however, reevaluate prior comparability determinations in due course pursuant to the terms of the Final Rule.

As discussed above, the Final Rule permits a non-U.S. swap entity or foreign branch of a U.S. swap entity to comply with a foreign jurisdiction's swap standards in lieu of the Commission's corresponding requirements in certain cases, provided that the Commission determines that such foreign standards are comparable to the Commission's requirements. All swap entities, regardless of whether they rely on such a comparability determination, will remain subject to the Commission's examination and enforcement authority.[485] Accordingly, if a swap entity fails to comply with a foreign jurisdiction's relevant standards, or the terms of the applicable comparability determination, the Commission may initiate an action for a violation of the Commission's corresponding requirements.

---

[479] Final § 23.23(f)(1).

[480] *See* discussion of the modification of the definition of a "swap conducted through a U.S. branch" to be a "swap booked in a U.S. branch" in section II.H.3, *supra.*

[481] Final § 23.23(f)(2). Thus, substituted compliance is not available for a swap booked in the U.S. branch of a non-U.S. swap entity entered into with a foreign branch of a U.S. swap entity.

[482] Final § 23.23(f)(3).

[483] Final § 23.23(f)(1) through (3).

[484] *See, e.g.,* Comparability Determination for Australia: Certain Entity-Level Requirements, 78 FR 78864 (Dec. 27, 2013); Comparability Determination for Canada: Certain Entity-Level Requirements, 78 FR 78839 (Dec. 27, 2013); Comparability Determination for the European Union: Certain Entity-Level Requirements, 78 FR 78923 (Dec. 27, 2013); Comparability Determination for Hong Kong: Certain Entity-Level Requirements, 78 FR 78852 (Dec. 27, 2013); Comparability Determination for Japan: Certain Entity-Level Requirements, 78 FR 78910 (Dec. 27, 2013); Comparability Determination for Switzerland: Certain Entity-Level Requirements, 78 FR 78899 (Dec. 27, 2013); Comparability Determination for the European Union: Certain Transaction-Level Requirements, 78 FR 78878 (Dec. 27, 2013); Comparability Determination for Japan: Certain Transaction-Level Requirements, 78 FR 78890 (Dec. 27, 2013).

[485] Final § 23.23(g)(5). The Commission notes that NFA has certain delegated authority with respect to SDs and MSPs. Additionally, all registered SDs and MSPs are required to be members of the NFA and are subject to examination by the NFA.

1. Standard of Review

(i) Proposed Rule

The Commission proposed a flexible outcomes-based approach that emphasized comparable regulatory outcomes over identical regulatory approaches. Specifically, the Commission proposed a standard of review that was designed to allow the Commission to consider all relevant elements of a foreign jurisdiction's regulatory regime, thereby permitting the Commission to tailor its assessment to a broad range of foreign regulatory approaches.[486] Accordingly, pursuant to the Proposed Rule, a foreign jurisdiction's regulatory regime did not need to be identical to the relevant Commission requirements, so long as both regulatory frameworks are comparable in terms of holistic outcome. The Proposed Rule permitted the Commission to consider any factor it deems appropriate when assessing comparability.[487]

(ii) Summary of Comments

The Commission received five comments that generally supported the proposed standard of review. However, of those commenters, JFMC/IBAJ and ISDA stated that the Commission should not consider whether a foreign jurisdiction has issued a reciprocal comparability determination in its assessment.

Further, the Commission received four comments opposing the proposed standard of review. Specifically, AFR, Better Markets, Citadel, and IATP stated that the proposed standard provides the Commission with overly-broad discretion that undermines objectivity in the assessment process. Citadel contended that the proposed standard may harm U.S. investors as a result of an overall reduction in market transparency and liquidity if trading activity is permitted to migrate to less transparent jurisdictions as a result of inaccurate comparability determinations.

IATP stated that the Commission should not base comparability on a foreign jurisdiction's supervisory guidelines or voluntary standards. IATP stated that if a foreign jurisdiction lacks a standard that compares to a Commission requirement, the Commission should issue a more limited comparability determination until such time as the foreign jurisdiction has published a standard that would result in a regulatory

outcome comparable to the Commission's requirements. IATP also stated that regulatory deference to jurisdictions whose rules the Commission finds to produce regulatory outcomes comparable to those of the Commission must not be vague, unconditional, nor of indefinite duration. IATP noted that during market events or credit events, or in the event of swaps trading data anomalies, the Commission must retain the means to verify that the foreign affiliate swaps trading of U.S. parents does not result in losses that the U.S. parent must guarantee, either as a matter of law or a matter of market practice.

Citadel also recommended that the Commission provide an opportunity for public comment prior to finalizing a comparability determination to ensure that all relevant costs and benefits are considered.

(iii) Final Rule

After carefully considering the comments, the Commission is adopting the standard of review as proposed, with certain modifications as shown in the rule text in this release.[488] Specifically, the Commission is making some technical changes to the standard of review to clarify, as stated in the Proposed Rule[489] and discussed below, that the Commission may issue a comparability determination based on its determination that some or all of the relevant foreign jurisdiction's standards would result in outcomes comparable to those of the Commission's corresponding requirements or group of requirements.[490]

The Commission believes that this standard of review appropriately reflects a flexible, outcomes-based approach that emphasizes comparable regulatory outcomes over identical regulatory approaches. Accordingly, pursuant to the Final Rule, the Commission may consider any factor it deems appropriate in assessing comparability, which may include: (1) The scope and objectives of the relevant foreign jurisdiction's regulatory standards; (2) whether, despite differences, a foreign jurisdiction's regulatory standards achieve comparable regulatory outcomes to the Commission's corresponding requirements; (3) the ability of the relevant regulatory authority or authorities to supervise and enforce compliance with the relevant foreign jurisdiction's regulatory standards; and (4) whether the relevant foreign jurisdiction's regulatory

authorities have entered into a memorandum of understanding or similar cooperative arrangement with the Commission regarding the oversight of swap entities.[491] In assessing comparability, the Commission need not find that a foreign jurisdiction has a comparable regulatory standard that corresponds to each group A or group B requirement. Rather, the Commission may find a foreign jurisdiction's standards comparable if, viewed holistically, the foreign jurisdiction's standards achieve a regulatory outcome that adequately serves the same regulatory purpose as the group A or group B requirements as a whole.

Further, given that some foreign jurisdictions may implement prudential supervisory guidelines in the regulation of swaps, the Final Rule allows the Commission to base comparability on a foreign jurisdiction's regulatory standards, rather than regulatory requirements. The Guidance similarly provided that the Commission has broad discretion to consider "all relevant factors" in assessing comparability, in addition to a non-exhaustive list of elements of comparability.[492] However, this standard of review is broader than the Guidance in that it explicitly allows the Commission to consider a foreign jurisdiction's regulatory standards (as opposed to regulatory requirements) comparable to the CEA and Commission regulations, as experience has demonstrated that such standards are often implemented in a similar manner as the Commission's swaps regime.

Although, when assessed against the relevant Commission requirements, the Commission may find comparability with respect to some, but not all, of a foreign jurisdiction's regulatory standards, it may also make a holistic finding of comparability that considers the broader context of a foreign jurisdiction's related regulatory standards. Accordingly, a comparability determination need not contain a standalone assessment of comparability for each relevant regulatory requirement, so long as it clearly indicates the scope of regulatory requirements that are covered by the determination. Further, the Commission may impose any terms and conditions on a comparability determination that it deems appropriate.[493]

The Final Rule adopts many of the Commission's existing practices with respect to comparability determinations, and does not reflect a significant change in policy. Accordingly, the phrasing of

---

[486] *See* Proposed § 23.23(g)(4); Proposed Rule, 85 FR at 986–987.

[487] *Id.*

[488] § 23.23(g)(4).

[489] See Proposed Rule, 85 FR at 986.

[490] *Id.*

[491] Final § 23.23(g)(4).

[492] Guidance, 78 FR at 45353.

[493] Final § 23.23(g)(6).

the standard of review is primarily intended to clarify, rather than change, the standard of review articulated in the Guidance. Reciprocity is only one of many non-determinative factors that the Commission may consider when assessing comparability. However, absence of a reciprocal comparability determination would not preclude a finding of comparability on the part of the Commission. Further, the Commission may, at its own discretion, seek public comment on any comparability determination issued pursuant to the Final Rule.

2. Supervision of Swap Entities Relying on Substituted Compliance

The Commission proposed to retain its examination and enforcement authority with respect to all swap entities relying on substituted compliance.[494] Accordingly, if a swap entity failed to comply with a foreign jurisdiction's relevant standards, or the terms of an applicable comparability determination, the Commission could initiate an action for a violation of the Commission's corresponding requirements.

IIB/SIFMA requested that the Commission state that it and NFA would not independently examine for or otherwise assess whether a swap entity is complying with foreign standards, but would instead look to the relevant foreign regulatory authority to conduct such examinations or assessments. IIB/SIFMA contended that the Commission and NFA lack the subject-matter expertise to interpret and apply foreign laws.

After carefully considering IIB/SIFMA's comment, the Commission is adopting this aspect of the rule as proposed.[495] In considering IIB/SIFMA's comment, and the broader issue of the Commission's supervision of non-U.S. swap entities, the Commission notes the various manifestations of international comity, deference, and supervisory cooperation presently taking place in the examination practices of the Commission and NFA. As a preliminary matter, the Commission's and NFA's examinations of non-U.S. swap entities occur with appropriate notice and consultation with the relevant foreign authority in the foreign jurisdiction that has primary oversight of the non-U.S swap entity. The Commission continues to be open to further ways to cooperate

with such authorities in the supervision of non-U.S. swap entities.

Moreover, the Commission generally relies upon the relevant foreign regulator's oversight of a non-U.S. swap entity in relation to the application of a foreign jurisdiction's standards where a non-U.S. swap entity complies with such standards pursuant to a comparability determination issued by the Commission. To briefly recount these instances, a foreign swap entity may demonstrate compliance with a Commission requirement in group A through substituted compliance (*i.e.,* complying with comparable standards in its home jurisdiction that the Commission has determined to be comparable), regardless of whether the transactions involve a U.S. person.[496] Given the Commission's interest in promoting international comity and market liquidity, the Final Rule allows a non-U.S. swap entity (unless booking a transaction in a U.S. branch or Guaranteed Entity), or a U.S. swap entity transacting through a foreign branch, to avail itself of substituted compliance with respect to the group B requirements for swaps with foreign counterparties. Further, the Final Rule allows a non-U.S. swap entity, subject to the terms of the relevant comparability determination, to satisfy any applicable group B requirement for any swap booked in a U.S. branch with a foreign counterparty that is neither a foreign branch nor a Guaranteed Entity by complying with an applicable corresponding standard of a foreign jurisdiction. With regard to the group C requirements, the Commission considers that it is generally appropriate to defer to foreign jurisdictions and thus provides an exception from application of the business conduct standards to foreign-based swaps with foreign counterparties. The Commission has also noted above certain exceptions from the group B requirements in the Final Rule for certain foreign-based swaps; non-U.S. swap entities that avail themselves of these exceptions for their eligible swaps would only be required to comply with the applicable laws of the foreign jurisdiction(s) to which they are subject, rather than the relevant Commission requirements, for such swaps.

With regard to exams of non-U.S. swap entities and access to their books and records by the Commission and NFA, the general focus is on assessing

compliance with any of the Commission's group A requirements for which substituted compliance is not found, group B requirements for transactions involving a U.S. person, and group C requirements as to transactions where the counterparty customer is in the U.S. Both the Commission and NFA retain examination and enforcement authority over swap entities to assess compliance with any Commission requirements in appropriate circumstances.[497]

3. Effect on Existing Comparability Determinations

In the Proposed Rule, the Commission stated that this rulemaking would not have any impact on the effectiveness of existing Commission comparability determinations that were issued consistent with the Guidance, which would remain effective pursuant to their terms.[498] Three commenters requested that the Commission revisit prior comparability determinations in light of this rulemaking. Specifically, ISDA stated that the Commission should recalibrate existing comparability determinations with the aim of issuing holistic, outcomes-based substituted compliance and clarify in the meantime that existing determinations would continue to be valid under the Commission's new cross-border framework. Further, IIB/SIFMA and JFMC/IBAJ requested that the Commission amend its previously-issued comparability determinations for Australia, Canada, the EU, Hong Kong, Japan, and Switzerland to include § 23.607 (antitrust requirements), which the Commission is adding to the scope of the group A requirements. The Commission has carefully considered these comments and is adopting this aspect of the rule as proposed. The Commission will consider applications to amend existing comparability determinations in due course. However, the Commission will view any previously issued comparability determination that allows for substituted compliance for § 23.201 to also allow for substituted compliance with § 45.2(a) to the extent it duplicates § 23.201.

4. Eligibility Requirements

The Proposed Rule outlined eligibility requirements to allow a comparability determination to be initiated by the Commission itself or certain outside

---

[494] *See* Proposed § 23.23(g)(5); Proposed Rule, 85 FR at 986. The Commission notes that it similarly retained its examination and enforcement authority in comparability determinations that were issued pursuant to the Guidance.

[495] Final § 23.23(g)(5).

[496] Moreover, to the extent a foreign swap entity receives substituted compliance for a group A requirement that incorporates § 1.31's recordkeeping requirements for certain regulatory records, § 1.31 would also not apply to such regulatory records.

[497] A non-U.S. swap entity remains subject to the Commission's anti-fraud and anti-manipulation authority, which may entail access to books and records covering transactions and/or activities not involving a U.S. person.

[498] *See* Proposed Rule, 85 FR at 986.

parties, including: (1) Swap entities that are eligible for substituted compliance; (2) trade associations whose members are such swap entities; or (3) foreign regulatory authorities that have direct supervisory authority over such swap entities and are responsible for administering the relevant swap standards in the foreign jurisdiction.[499] The Commission did not receive any comments regarding eligibility, and is therefore adopting this aspect of the rule as proposed.[500]

5. Submission Requirements

The Proposed Rule also outlined submission requirements in connection with a comparability determination with respect to some or all of the group A and group B requirements. Specifically, the Proposed Rule stated that applicants would be required to furnish certain information to the Commission that provides a comprehensive understanding of the foreign jurisdiction's relevant swap standards, including how they might differ from the corresponding requirements in the CEA and Commission regulations.[501] Further, the Proposed Rule stated that applicants would be expected to provide an explanation as to how any such differences may nonetheless achieve comparable outcomes to the Commission's attendant regulatory requirements.[502] The Commission did not receive any comments regarding submission requirements, and is therefore adopting this aspect of the rule substantially as proposed and shown in the rule text in this release.[503] Specifically, to provide the Commission additional information to use in making its comparability determinations, the Commission is revising § 23.23(g)(3)(ii) to require that the submission address how the relevant foreign jurisdiction's standards address the elements or goals of the Commission's corresponding requirements or group of requirements.[504]

**VII. Recordkeeping**

The Commission proposed to require a SD or MSP to create a record of its compliance with all provisions of the Proposed Rule, and retain those records

in accordance with § 23.203.[505] The Commission received no comments on this provision. The Commission is therefore adopting this provision as proposed.[506] The Commission reiterates that registrants' records are a fundamental element of an entity's compliance program, as well as the Commission's oversight function. Accordingly, such records should be sufficiently detailed to allow compliance officers and regulators to assess compliance with the Final Rule.

**VIII. Other Comments**

The Commission received several comments that it considers beyond the scope of this rulemaking.

BGC/Tradition, IIB/SIFMA, and ISDA requested that the Commission include certain of the Unaddressed Requirements as group A requirements, group B requirements, and group C requirements.

ISDA requested that the Commission take a number of actions regarding the cross-border application of regulatory reporting requirements prior to finalizing the Proposed Rule. These included codifying an SDR reporting obligation no-action letter (CFTC Staff Letter 17–64),[507] providing substituted compliance for SDR reporting obligations for certain transactions, eliminating the Commission's large trader reporting requirements with respect to certain cross-border transactions, and revisiting the group C requirements in their entirety.

State Street recommended that the Commission address fragmentation of global non-deliverable forward liquidity pools created by Commission rulemaking and guidance in future Commission rulemaking.

JBA requested guidance on how swap requirements will apply to a non-U.S. person that is not a swap entity similar to Appendix F of the Guidance.

BGC/Tradition requested that the Commission confirm that non-U.S. introducing brokers ("IBs") engaged in soliciting or accepting swap orders from customers, including U.S. person SDs, may comply with the applicable rules in the relevant non-U.S. jurisdictions without duplicative regulatory liability under the CEA and Commission regulations. BGC/Tradition requests that the CFTC provide guidance on how these foreign operations may avail themselves of relief through substituted compliance or another form of mutual recognition.

As noted above, these comments are beyond the scope of this rulemaking. Although not addressed in this rulemaking, the Commission appreciates the information provided by commenters and will take the requests and suggestions under advisement in the context of any relevant future Commission action.

**IX. Compliance Dates and Transition Issues**

*A. Summary of Comments*

IIB/SIFMA commented that, if adopted, the Proposed Rule would bring significant changes to portions of the Commission's cross-border framework and thus, the Commission should consider making the following clarifications and conforming changes to ensure an orderly transition process:

1. The Commission should clarify that any no-action relief or guidance that applies to the requirements not addressed in the Proposed Rule will remain effective, and that any no-action letter or guidance not specifically revoked by the Proposed Rule remains in effect.

2. If the Commission plans to amend or revoke any applicable letters, guidance, or other relief not specifically addressed in the Proposed Rule, the Commission should only do so following adequate notice and opportunity for comment.

3. The Commission should grandfather transactions entered into prior to the compliance date of any final cross-border rules adopted by the Commission.

4. The Commission should continue the codification exercise reflected by the Proposed Rule further by codifying the cross-border application of the Unaddressed Requirements.

5. The Commission should delay the compliance date for the changes set forth in the Proposed Rule until it has codified the cross-border application of the swap-related requirements not covered by the Proposed Rule. Until that time, market participants could continue to follow the Guidance.

JBA requested that the Commission clarify as soon as possible the cross-border treatment of other requirements not addressed in the Proposed Rule, and consider harmonizing the timing of application of all requirements such that they are applied simultaneously.

*B. Commission Determination*

As requested by IIB/SIFMA, the Commission hereby clarifies that any no-action relief or guidance that applies to the Unaddressed Requirements will remain effective, and that any no-action

---

[499] Proposed § 23.23(g)(2); Proposed Rule, 85 FR at 987.

[500] Final § 23.23(g)(2).

[501] Proposed § 23.23(g)(3); Proposed Rule, 85 FR at 987.

[502] Proposed § 23.23(g)(3)(iii); Proposed Rule, 85 FR at 987.

[503] Final § 23.23(g)(3).

[504] Final § 23.23(g)(3)(ii).

[505] Proposed § 23.23(h); Proposed Rule, 85 FR at 987.

[506] Final § 23.23(h)(1).

[507] CS also requested codification of CFTC Staff Letter 17–64.

letter or guidance not specifically revoked remains in effect.[508]

Regarding the scope of application of the Final Rule, as requested by commenters the Commission has provided in the Final Rule that it will only apply to swaps entered into on or after the specified compliance date.

The effective date of the Final Rule will be the date that is 60 days after publication of the Final Rule in the **Federal Register**.

The Commission has provided under paragraph (h) of the Final Rule that the exceptions provided in paragraph (e) of the Final Rule will be effective upon the effective date of the rule, provided that SDs and MSPs comply with the recordkeeping requirements set forth in paragraph (h)(1) of the Final Rule.

Otherwise, affected market participants must comply with § 23.23 on or before September 14, 2021. Given the similarity of the Final Rule to the Guidance with which market participants have been familiar since 2013, the Commission believes that a compliance period of one year is adequate for market participants to come into compliance, especially given that the Final Rule permits reliance on representations received from counterparties pursuant to the Cross-Border Margin Rule and the Guidance for many aspects of the Final Rule.

## X. Related Matters

### A. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires that agencies consider whether the regulations they propose will have a significant economic impact on a substantial number of small entities.[509] In the Proposed Rule, the Commission certified that the Proposed Rule would not have a significant economic impact on a substantial number of small entities. The Commission received no comments with respect to the RFA.

The Commission previously established definitions of "small entities" to be used in evaluating the impact of its regulations on small entities in accordance with the RFA.[510] The Final Rule addresses when U.S. persons and non-U.S. persons are

required to include their cross-border swap dealing transactions or swap positions in their SD or MSP registration threshold calculations, respectively,[511] and the extent to which SDs or MSPs are required to comply with certain of the Commission's regulations in connection with their cross-border swap transactions or swap positions.[512]

The Commission previously determined that SDs and MSPs are not small entities for purposes of the RFA.[513] The Commission believes, based on its information about the swap dealer and its market participants, that: (1) The types of entities that may engage in more than a de minimis amount of swap dealing activity such that they would be required to register as an SD—which generally would be large financial institutions or other large entities—would not be "small entities" for purposes of the RFA, and (2) the types of entities that may have swap positions such that they would be required to register as an MSP would not be "small entities" for purposes of the RFA. Thus, to the extent such entities are large financial institutions or other large entities that would be required to register as SDs or MSPs with the Commission by virtue of their cross-border swap dealing transactions and swap positions, they would not be considered small entities.[514]

To the extent that there are any affected small entities under the Final Rule, they would need to assess how they are classified under the Final Rule (i.e., U.S. person, SRS, Guaranteed Entity, and Other Non-U.S. Person) and monitor their swap activities in order to determine whether they are required to register as an SD or MSP under the Final Rule. The Commission believes that, with the adoption of the Final Rule, market participants will only incur incremental costs, which are expected

to be small, in modifying their existing systems and policies and procedures resulting from changes to the status quo made by the Final Rule.[515]

Accordingly, for the foregoing reasons, the Commission finds that there will not be a substantial number of small entities impacted by the Final Rule. Therefore, the Chairman, on behalf of the Commission, hereby certifies pursuant to 5 U.S.C. 605(b) that the Final Rule will not have a significant economic impact on a substantial number of small entities.

### B. Paperwork Reduction Act

The Paperwork Reduction Act of 1995 ("PRA")[516] imposes certain requirements on Federal agencies, including the Commission, in connection with their conducting or sponsoring any collection of information, as defined by the PRA. The Final Rule provides for the cross-border application of the SD and MSP registration thresholds and the group A, group B, and group C requirements.

Commission regulations 23.23(b) and (c), which address the cross-border application of the SD and MSP registration thresholds, respectively, potentially could lead to non-U.S. persons that are currently not registered as SDs or MSPs to exceed the relevant registration thresholds, therefore requiring the non-U.S. persons to register as SDs or MSPs. However, the Commission believes that the Final Rule will not result in any new registered SDs or MSPs or the deregistration of registered SDs,[517] and therefore, it does not believe an amendment to any existing collection of information is necessary as a result of § 23.23(b) and (c). Specifically, the Commission does not believe the Final Rule will change the number of respondents under the existing collection of information, "Registration of Swap Dealers and Major Swap Participants," Office of Management and Budget ("OMB") Control No. 3038–0072.

Similarly, § 23.23(h)(1) contains collection of information requirements within the meaning of the PRA as it requires that swap entities create a record of their compliance with § 23.23 and retain records in accordance with § 23.203; however, the Commission believes that records suitable to demonstrate compliance are already required to be created and maintained under the collections related to the

---

[508] As noted in section V, *supra,* the ANE Staff Advisory and related ANE No-Action Relief have been withdrawn contemporaneously with promulgation of the Final Rule, while Commission staff has provided new no-action relief concerning the Unaddressed TLRs in the context of ANE Transactions.

[509] See 5 U.S.C. 601 *et seq.*

[510] See Policy Statement and Establishment of Definitions of "Small Entities" for Purposes of the Regulatory Flexibility Act, 47 FR 18618 (Apr. 30, 1982) (finding that DCMs, FCMs, CPOs, and large traders are not small entities for RFA purposes).

[511] Final § 23.23(b) through (d).

[512] Final § 23.23(e) through (g).

[513] See Entities Rule, 77 FR at 30701; Registration of Swap Dealers and Major Swap Participants, 77 FR 2613, 2620 (Jan. 19, 2012) (noting that like FCMs, SDs will be subject to minimum capital requirements, and are expected to be comprised of large firms, and that MSPs should not be considered to be small entities for essentially the same reasons that it previously had determined large traders not to be small entities).

[514] The SBA's Small Business Size Regulations, codified at 13 CFR 121.201, identifies (through North American Industry Classification System codes) a small business size standard of $38.5 million or less in annual receipts for Sector 52, Subsector 523—Securities, Commodity Contracts, and Other Financial Investments and Related Activities. Entities that are affected by the Final Rule are generally large financial institutions or other large entities that are required to include their cross-border swap dealing transactions or swap positions toward the SD and MSP registration thresholds, respectively, as specified in the Final Rule.

[515] The Final Rule addresses the cross-border application of the registration and certain other regulations. The Final Rule does not change such regulations.

[516] 44 U.S.C. 3501 *et seq.*

[517] There are not currently any registered MSPs.

Commission's swap entity registration, and group B and group C requirements. Specifically, existing collections of information, "Confirmation, Portfolio Reconciliation, and Portfolio Compression Requirements for Swap Dealers and Major Swap Participants," OMB Control No. 3038–0068; "Registration of Swap Dealers and Major Swap Participants," OMB Control No. 3038–0072; "Swap Dealer and Major Swap Participant Conflicts of Interest and Business Conduct Standards with Counterparties," OMB Control No. 3038–0079; "Confirmation, Portfolio Reconciliation, Portfolio Compression, and Swap Trading Relationship Documentation Requirements for Swap Dealers and Major Swap Participants," OMB Control No. 3038–0083; "Reporting, Recordkeeping, and Daily Trading Records Requirements for Swap Dealers and Major Participants," OMB Control No. 3038–0087; and "Confirmation, Portfolio Reconciliation, Portfolio Compression, and Swap Trading Relationship Documentation Requirements for Swap Dealers and Major Swap Participants," OMB Control No. 3038–0088 relate to these requirements.[518] Accordingly, the Commission is not submitting to OMB an information collection request to create a new information collection in relation to § 23.23(h)(1).

Final § 23.23(g) results in collection of information requirements within the meaning of the PRA, as discussed below. The Final Rule contains collections of information for which the Commission has not previously received control numbers from the OMB. Responses to this collection of information are required to obtain or retain benefits. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. The Commission has submitted to OMB an information collection request to create a new information collection under OMB control number 3038–0072 (Registration of Swap Dealers and Major Swap Participants) for the collections contained in the Final Rule.

As discussed in section VI.C above, the Commission is permitting a non-U.S. swap entity or foreign branch of a U.S. swap entity to comply with a foreign jurisdiction's swap standards in lieu of the Commission's corresponding group A and group B requirements in certain cases, provided that the Commission determines that such foreign standards are comparable to the Commission's requirements. Commission regulation 23.23(g) implements a process pursuant to which the Commission will conduct these comparability determinations, including outlining procedures for initiating such determinations. As discussed in section VI.D above, a comparability determination could be requested by swap entities that are eligible for substituted compliance, their trade associations, and foreign regulatory authorities meeting certain requirements.[519] Applicants seeking a comparability determination are required to furnish certain information to the Commission that provides a comprehensive explanation of the foreign jurisdiction's relevant swap standards, including how they might differ from the corresponding requirements in the CEA and Commission regulations and how, notwithstanding such differences, the foreign jurisdiction's swap standards achieve comparable outcomes to those of the Commission.[520] The information collection is necessary for the Commission to consider whether the foreign jurisdiction's relevant swap standards are comparable to the Commission's requirements.

Though under the Final Rule many entities are eligible to request a comparability determination,[521] the Commission expects to receive far fewer requests because once a comparability determination is made for a jurisdiction it applies for all entities or transactions in that jurisdiction to the extent provided in the Commission's determination. Further, the Commission has already issued comparability determinations under the Guidance for certain of the Commission's requirements for Australia, Canada, the European Union, Hong Kong, Japan, and Switzerland,[522] and the effectiveness of

those determinations is not affected by the Final Rule. Nevertheless, in an effort to be conservative in its estimate for purposes of the PRA, the Commission estimates that it will receive a request for a comparability determination in relation to five (5) jurisdictions per year under the Final Rule. Further, based on the Commission's experience in issuing comparability determinations, the Commission estimates that each request would impose an average of 40 burden hours, for an aggregate estimated hour burden of 200 hours. Accordingly, the changes are estimated to result in an increase to the current burden estimates of OMB control number 3038–0072 by 5 in the number of submissions and 200 burden hours.

The frequency of responses and total new burden associated with OMB control number 3038–0072, in the aggregate, reflecting the new burden associated with all the amendments made by the Final Rule and current burden not affected by this Final Rule,[523] is as follows:

*Estimated annual number of respondents:* 770.

*Estimated aggregate annual burden hours per respondent:* 1.13 hours.

*Estimated aggregate annual burden hours for all respondents:* 872.

*Frequency of responses:* As needed.

*Information Collection Comments.* In the Proposed Rule, the Commission requested comments on the information collection requirements discussed above, including, without limitation, on the Commission's discussion of the estimated burden of the collection of information requirements in proposed § 23.23(h) (§ 23.23(h)(1) in the Final Rule). The Commission did not receive any such comments.

## C. Cost-Benefit Considerations

As detailed above, the Commission is adopting rules that define certain key terms for purposes of certain Dodd-Frank Act swap provisions and that address the cross-border application of the SD and MSP registration thresholds and the Commission's group A, group B, and group C requirements.

Since issuing the Proposed Rule, the baseline against which the costs and benefits of the Final Rule are considered is unchanged and is, in principle, current law: In other words, applicable Dodd-Frank Act swap provisions in the CEA and regulations promulgated by the Commission to date, as made applicable to cross-border transactions by Congress in CEA section 2(i), in the absence of a

---

[518] To the extent a swap entity avails itself of an exception from a group B or group C requirement under the Final Rule and, thus, is no longer required to comply with the relevant group B and/or group C requirements and related paperwork burdens, the Commission expects the paperwork burden related to that exception would be less than that of the corresponding requirement(s). However, in an effort to be conservative, because the Commission does not know how many swap entities will choose to avail themselves of the exceptions and for how many foreign-based swaps, the Commission is not changing the burden of its related collections to reflect the availability of such exceptions.

[519] Final § 23.23(g)(2).

[520] Final § 23.23(g)(3).

[521] Currently, there are approximately 108 swap entities provisionally registered with the Commission, many of which may be eligible to apply for a comparability determination as a non-U.S. swap entity or a foreign branch. Additionally, a trade association, whose members include swap entities, and certain foreign regulators may also apply for a comparability determination.

[522] *See supra* notes 215 and 484.

[523] The numbers below reflect the current burden for two separate information collections that are not affected by this rulemaking.

Commission rule establishing more precisely the application of that provision in particular situations. However, in practice, use of this baseline poses important challenges, for a number of reasons.

First, there are intrinsic difficulties in sorting out costs and benefits of the Final Rule from costs and benefits intrinsic to the application of Dodd-Frank Act requirements to cross-border transactions directly pursuant to section 2(i), given that the statute sets forth general principles for the cross-border application of Dodd-Frank Act swap requirements but does not attempt to address particular business situations in detail.

Second, the Guidance established a general, non-binding framework for the cross-border application of many substantive Dodd-Frank Act requirements. In doing so, the Guidance considered, among other factors, the regulatory objectives of the Dodd-Frank Act and principles of international comity. As is apparent from the text of the Final Rule and the discussion in this preamble, the Final Rule is in certain respects consistent with the Guidance. The Commission understands that while the Guidance is non-binding, many market participants have developed policies and practices that take into account the views expressed therein. At the same time, some market participants may currently apply CEA section 2(i), the regulatory objectives of the Dodd-Frank Act, and principles of international comity in ways that vary from the Guidance, for example because of circumstances not contemplated by the general, non-binding framework in the Guidance.

Third, in addition to the Guidance, the Commission has issued comparability determinations finding that certain provisions of the laws and regulations of other jurisdictions are comparable in outcome to certain requirements under the CEA and regulations thereunder.[524] In general, under these determinations, a market participant that complies with the specified provisions of the other jurisdiction would also be deemed to be in compliance with Commission regulations, subject to certain conditions.[525]

Fourth, the Commission staff has issued several interpretive and no-action letters that are relevant to cross-border issues.[526] As with the Guidance,

the Commission recognizes that many market participants have relied on these staff letters in framing their business practices.

Fifth, as noted above, the international regulatory landscape is far different now than it was when the Dodd-Frank Act was enacted in 2010.[527] Even in 2013, when the CFTC published the Guidance, very few jurisdictions had made significant progress in implementing the global swap reforms that were agreed to by the G20 leaders at the Pittsburgh G20 Summit. Today, however, as a result of cumulative implementation efforts by regulators throughout the world, substantial progress has been made in the world's primary swap trading jurisdictions to implement the G20 commitments. For these reasons, the actual costs and benefits of the Final Rule that are experienced by a particular market participant may vary depending on the jurisdictions in which the market participant is active and when the market participant took steps to comply with various legal requirements.

Because of these complicating factors, as well as limitations on available information, the Commission believes that a direct comparison of the costs and benefits of the Final Rule with those of a hypothetical cross-border regime based directly on section 2(i)—while theoretically the ideal approach—is infeasible in practice. As a further complication, the Commission recognizes that the Final Rule's costs and benefits would exist, regardless of whether a market participant: (1) First realized some of those costs and benefits when it conformed its business practices to provisions of the Guidance or Commission staff action that will be binding legal requirements under the Final Rule; (2) does so now for the first time; or (3) did so in stages as international requirements evolved.

In light of these considerations and given that there were no public comments regarding the baseline outlined in the Proposed Rule, the Commission has considered costs and benefits by focusing primarily on two types of information and analysis.

First, the Commission compared the Final Rule with current business practices, with the understanding that many market participants are now conducting business taking into

account, among other things, the Guidance, applicable CFTC staff letters, and existing comparability determinations. This approach, for example, included a comparison of the expected costs and benefits of conducting business under the Final Rule with those of conducting business in conformance with analogous provisions of the Guidance. In effect, this analysis included an examination of new costs and benefits that will result from the Final Rule for market participants that are currently following the relevant Dodd-Frank Act swap provisions and regulations thereunder, the Guidance, the comparability determinations, the Cross-Border Margin Rule, and applicable staff letters. This is referred to as "Baseline A."

Second, to the extent feasible, the Commission considered relevant information on costs and benefits that market participants have incurred to date in complying with the Dodd-Frank Act in cross-border transactions of the type that will be affected by the Final Rule, absent the Guidance. This second form of analysis is, to some extent, over-inclusive in that it is likely to capture some costs and benefits that flow directly from Congress's enactment of section 2(i) of the CEA or that otherwise are not strictly attributable to the Final Rule. However, since a theoretically perfect baseline for consideration of costs and benefits does not appear feasible, this second form of analysis helps ensure that costs and benefits of the Final Rules are considered as fully as possible. This is referred to as "Baseline B."

The Commission requested comments regarding all aspects of the baselines applied in this consideration of costs and benefits, including a discussion of any variances or different circumstances commenters have experienced that affect the baseline for those commenters. While no commenters questioned the Commission's defined baseline, the Commission received a few cost-benefit related comments that are addressed in the relevant sections of this discussion.

The costs associated with the key elements of the Commission's cross-border approach to the SD and MSP registration thresholds—requiring market participants to classify themselves as U.S. persons, Guaranteed Entities, or SRSs[528] and to apply the rules accordingly—fall into a few categories. Market participants will incur costs determining which category of market participant they and their counterparties fall into ("assessment

---

[524] *See supra* notes 215 and 484.

[525] *See id.*

[526] *See, e.g.,* CFTC Letter No. 13–64, No-Action Relief: Certain Swaps by Non-U.S. Persons that are Not Guaranteed or Conduit Affiliates of a U.S.

Person Not to be Considered in Calculating Aggregate Gross Notional Amount for Purposes of Swap Dealer De Minimis Exception (Oct. 17, 2013), available at *https://www.cftc.gov/idc/groups/public/@lrlettergeneral/documents/letter/13-64.pdf;* ANE Staff Advisory; ANE No-Action Relief; CFTC Staff Letter No. 18–13.

[527] *See supra* section I.C.

[528] Final § 23.23(a).

costs"), tracking their swap activities or positions to determine whether they should be included in their registration threshold calculations ("monitoring costs"), and, to the degree that their activities or positions exceed the relevant threshold, registering with the Commission as an SD or MSP ("registration costs").

Entities required to register as SDs or MSPs as a result of the Final Rule will also incur costs associated with complying with the relevant Dodd-Frank Act requirements applicable to registrants, such as the capital, margin, and business conduct requirements ("programmatic costs").[529] While only new registrants will assume these programmatic costs for the first time, the obligations of entities that are already registered as SDs may also change in the future as an indirect consequence of the Final Rule.

In developing the Final Rule, the Commission took into account the potential for creating or accentuating competitive disparities between market participants, which could contribute to market deficiencies, including market fragmentation or decreased liquidity, as more fully discussed below. Notably, competitive disparities may arise between U.S.-based financial groups and non-U.S. based financial groups as a result of differences in how the SD and MSP registration thresholds apply to the various classifications of market participants. For instance, an SRS must count all dealing swaps toward its SD de minimis calculation. Therefore, SRSs are more likely to trigger the SD registration threshold relative to Other Non-U.S. Persons, and may therefore be at a competitive disadvantage compared to Other Non-U.S. Persons when trading with non-U.S. persons, as non-U.S. persons may prefer to trade with non-registrants in order to avoid application of the Dodd-Frank Act swap regime.[530] On the other hand, certain counterparties may prefer to enter into swaps with SDs and MSPs that are subject to the robust requirements of the Dodd-Frank Act.

Other factors also create inherent challenges associated with attempting to assess costs and benefits of the Final Rule. To avoid the prospect of being regulated as an SD or MSP, or otherwise falling within the Dodd-Frank Act swap regime, some market participants may restructure their businesses or take other steps (e.g., limiting their counterparties to Other Non-U.S. Persons) to avoid exceeding the relevant registration thresholds. The degree of comparability between the approaches adopted by the Commission and foreign jurisdictions and the potential availability of substituted compliance, whereby a market participant may comply with certain Dodd-Frank Act SD or MSP requirements by complying with a comparable requirement of a foreign financial regulator, may also affect the competitive effect of the Final Rule. The Commission expects that such effects will be mitigated as the Commission continues to work with foreign and domestic regulators to achieve international harmonization and cooperation.

In the sections that follow, the Commission discusses the costs and benefits associated with the Final Rule.[531] Section 1 discusses the main benefits of the Final Rule. Section 2 begins by addressing the assessment costs associated with the Final Rule, which derive in part from the defined terms used in the Final Rule (e.g., the definitions of "U.S. person," "significant risk subsidiary," and "guarantee"). Sections 3 and 4 consider the costs and benefits associated with the Final Rule's determinations regarding how each classification of market participants applies to the SD and MSP registration thresholds, respectively. Sections 5, 6, and 7 address the monitoring, registration, and programmatic costs associated with the Final Rule's cross-border approach to the SD (and, as appropriate, MSP) registration thresholds, respectively. Section 8 addresses the costs and benefits associated with the Final Rule's exceptions from, and available substituted compliance for, the group A, group B, and group C requirements, as well as comparability determinations. Section 9 addresses the costs associated with the Final Rule's recordkeeping requirements. Section 10 discusses the

factors established in section 15(a) of the CEA.

1. Benefits

The main benefits of the Final Rule are two-fold: (1) Legal certainty; and (2) creating and continuing to maintain a harmonized regulatory framework internationally that shows deference to other countries' laws and regulations when such laws and regulations achieve comparable outcomes, a construct known as comity. The clarity of the Final Rule makes it easier for market participants to comply with the Commission's regulations, to conduct business in a well-organized, efficient way, and to re-allocate resources from compliance to other areas, such as productivity, business development, and innovation.

Congress directed the Commission in the Dodd-Frank Act to "coordinate with foreign regulatory authorities on the establishment of consistent international standards with respect to the regulation" of swaps and SDs and MSPs.[532] In doing so, the Commission is acting in the public interest and employing comity as one of the justifications for the choices the Commission is making in the Final Rule. For example, the provision of substituted compliance in the Final Rule allows some market participants to elect a regulatory jurisdiction that best suits their needs. Accordingly, some market participants may choose the U.S. as a jurisdiction in which to register and operate to achieve benefits such as robust SD requirements, third-party custodial arrangements, transparent exchanges, and bankruptcy regimes that have strong property rights and tend to lead to assets being recovered sooner than some other regimes. Therefore, the Commission believes that substituted compliance may lead to more effective regulation over time as regulators are incentivized to have their jurisdiction be chosen over other jurisdictions, and to modify ineffective or inefficient regulation as needed to adapt to market innovations and other changes that occur over time. The Commission recognizes, however, that such provision may present an opportunity for regulatory arbitrage, which could undermine the fundamental principles of the reduction of systemic risk and the promotion of market integrity.

2. Assessment Costs

As discussed above, in applying the Final Rule's cross-border approach to the SD and MSP registration thresholds,

---

[529] The Commission's discussion of programmatic costs and registration costs does not address MSPs. No entities are currently registered as MSPs, and the Commission does not expect that this status quo will change as a result of the Final Rule being adopted given the general similarities between the Final Rule's approach to the MSP registration threshold calculations and the Guidance.

[530] Dodd-Frank Act swap requirements may impose significant direct costs on participants falling within the SD or MSP definitions that are not borne by other market participants, including costs related to capital and margin requirements and business conduct requirements. To the extent that foreign jurisdictions adopt comparable requirements, these costs would be mitigated.

[531] The Commission endeavors to assess the expected costs and benefits of its rules in quantitative terms where possible. Where estimation or quantification is not feasible, the Commission provides its discussion in qualitative terms. Given a general lack of relevant data, the Commission's analysis in the Final Rule is generally provided in qualitative terms.

[532] See Dodd-Frank Act, section 752(a); 15 U.S.C. 8325.

market participants are required to first classify themselves as a U.S. person, an SRS, a Guaranteed Entity, or an Other Non-U.S. Person.

With respect to Baseline A, the Commission expects that the costs to affected market participants of assessing which classification they fall into will generally be small and incremental. In most cases, the Commission believes an entity will have performed an initial determination or assessment of its status under either the Cross-Border Margin Rule (which uses substantially similar definitions of "U.S. person" and "guarantee") or the Guidance (which interprets "U.S. person" in a manner that is similar but not identical to the Final Rule's definition of "U.S. person"). Harmonizing the "U.S. person" definition in the Final Rule with the definition in the SEC Cross-Border Rule is also expected to reduce undue compliance costs for market participants. Additionally, the Final Rule allows market participants to rely on representations from their counterparties with regard to their classifications.[533] However, the Commission acknowledges that swap entities will have to modify their existing operations to accommodate the new concept of an SRS. Specifically, market participants must determine whether they qualify as SRSs. Further, in order to rely on certain exceptions outlined in the Final Rule, swap entities must ascertain whether they or their counterparty qualify as an SRS.

With respect to Baseline B, wherein only certain market participants have previously determined their status under the similar, but not identical, Cross-Border Margin Rule (and not the Guidance), the Commission believes that their assessment costs will nonetheless be small as a result of the Final Rule's reliance on clear, objective definitions of the terms "U.S. person," "significant risk subsidiary," and "guarantee." Further, with respect to the determination of whether a market participant falls within the "significant risk subsidiary" definition,[534] the Commission believes that assessment costs are small as the definition relies, in part, on a familiar consolidation test already used by affected market participants in preparing their financial statements under U.S. GAAP. Further, only those market participants with an ultimate U.S. parent entity that has more than $50 billion in global consolidated assets and that do not fall into one of the exceptions in § 23.23(a)(13)(i) or (ii) of the Final Rule must consider if they are an SRS.

Additionally, the Final Rule primarily relies on the definition of "guarantee" provided in the Cross-Border Margin Rule, which is limited to arrangements in which one party to a swap has rights of recourse against a guarantor with respect to its counterparty's obligations under the swap.[535] The Final Rule also incorporates the concept of an entity with unlimited U.S. responsibility into the guarantee definition; however, the Commission is of the view that the corporate structure that this prong is designed to capture is not one that is commonly in use in the marketplace. Therefore, although non-U.S. persons must determine whether they are Guaranteed Entities with respect to the relevant swap on a swap-by-swap basis for purposes of the SD and MSP registration calculations, the Commission believes that this information is already known by non-U.S. persons.[536] Accordingly, with respect to both baselines, the Commission believes that the costs associated with assessing whether an entity or its counterparty is a Guaranteed Entity is small and incremental.

Better Markets commented that the proposed definition of "guarantee," which was narrower than that in the Guidance, would increase systemic risk and hinder other public interest objectives by possibly excluding certain arrangements that may import risk into the United States. In the Proposed Rule, the Commission stated that the alignment of the definitions of "guarantee" in this rulemaking and the Cross-Border Margin Rule would benefit market participants to the extent that they would not be required to make a separate independent assessment of a counterparty's guarantee status. Better Markets stated that this benefit to market participants does not outweigh or reasonably approximate the potential costs to the underlying policy objectives of the Dodd-Frank Act, including promoting the safety and soundness of SDs, preventing disruptions to the derivatives markets, ensuring the financial integrity of swaps transactions and the avoidance of systemic risk, and preserving the stability of the U.S. financial system. The Commission has carefully considered the attendant costs and benefits of narrowing the definition of "guarantee" from the Guidance, and continues to believe, however, that the alignment of the "guarantee" definitions in this Final Rule and the Cross-Border Margin Rule serves to reduce costs to market participants without sacrificing the attendant policy goals of the Dodd-Frank Act. The Commission will continue to monitor arrangements that were previously considered guarantees that could shift risk back to the U.S. swap market, in general, and take appropriate action as warranted in the future.

### 3. Cross-Border Application of the SD Registration Threshold

#### (i) U.S. Persons, Guaranteed Entities, and SRSs

Under the Final Rule, a U.S. person must include all of its swap dealing transactions in its de minimis calculation, without exception.[537] As discussed above, that includes any swap dealing transactions conducted through a U.S. person's foreign branch, as such swaps are directly attributed to, and therefore affect, the U.S. person. Given that this requirement mirrors the Guidance in this respect, the Commission believes that the Final Rule will have a negligible effect on the status quo with regard to the number of registered or potential U.S. SDs, as measured against Baseline A.[538] With respect to Baseline B, all U.S. persons would have included all of their transactions in their de minimis calculation, even absent the Guidance, pursuant to paragraph (4) of the SD definition.[539] However, the Commission acknowledges that, absent the Guidance, some U.S. persons may not have interpreted CEA section 2(i) to require them to include swap dealing transactions conducted through their foreign branches in their de minimis calculation. Accordingly, with respect

---

[533] The Commission believes that these assessment costs for the most part have already been incurred by potential SDs and MSPs as a result of adopting policies and procedures under the Guidance and Cross-Border Margin Rule (which had similar classifications), both of which permitted counterparty representations. *See* Guidance, 78 FR at 45315; Cross-Border Margin Rule, 81 FR at 34827.

[534] The "substantial risk subsidiary" definition is discussed further in section II.D, *supra.*

[535] *See supra* section II.C.

[536] Because a guarantee has a significant effect on pricing terms and on recourse in the event of a counterparty default, the Commission believes that the guarantee would already be in existence and that a non-U.S. person therefore would have knowledge of its existence before entering into a swap.

[537] Final § 23.23(b)(1).

[538] The Commission is not estimating the number of new U.S. SDs, as the methodology for including swaps in a U.S. person's SD registration calculation does not diverge from the approach included in the Guidance (*i.e.*, a U.S. person must include all of its swap dealing transactions in its de minimis threshold calculation). Further, the Commission does not expect a change in the number of SDs will result from the Final Rule's definition of U.S. person and therefore assumes that no additional entities will register as U.S. SDs, and no existing U.S.-SD registrants will deregister as a result of the Final Rule.

[539] *See* 17 CFR 1.3, Swap dealer, paragraph (4).

to Baseline B, the Commission expects that some U.S. persons may incur some incremental costs as a result of having to count swaps conducted through their foreign branches.

The Final Rule also requires Guaranteed Entities to include all of their swap dealing transactions in their de minimis threshold calculation without exception.[540] This approach, which recognizes that a Guaranteed Entity's swap dealing transactions may have the same potential to affect the U.S. financial system as a U.S. person's dealing transactions, closely parallels the approach taken in the Guidance with respect to the treatment of the swaps of "guaranteed affiliates."[541] Given that the Final Rule establishes a more limited definition of "guarantee" as compared to the Guidance, and a similar definition of guarantee as compared to the Cross-Border Margin Rule, the Commission does not expect that the Final Rule will cause more Guaranteed Entities to register with the Commission. Accordingly, the Commission believes that, in this respect, any increase in costs associated with the Final Rule, with respect to Baselines A and B, will be small.

Under the Final Rule, an SRS must include all swap dealing transactions in its de minimis threshold calculation.[542] Given that the concept of an SRS was not included in the Guidance or the Cross-Border Margin Rule, the Commission believes that this aspect of the Final Rule will have a similar effect on market participants when measured against Baseline A and Baseline B. Under the Guidance, an SRS would likely have been categorized as either a conduit affiliate (which would have been required to count all dealing swaps towards its de minimis threshold calculation) or a non-U.S. person that is

neither a conduit affiliate nor a guaranteed affiliate (which would have been required to count only a subset of its dealing swaps towards its de minimis threshold calculation). Accordingly, under the Final Rule, there may be some SRSs that will have to count more swaps towards their de minimis threshold calculation than would have been required under the Guidance.

However, as noted in sections II.D and III.B.1, the Commission believes that it is appropriate to distinguish SRSs from Other Non-U.S. Persons in determining the cross-border application of the SD de minimis threshold to such entities. As discussed above, SRSs, as a class of entities, present a greater supervisory interest to the CFTC relative to Other Non-U.S. Persons, due to the nature and extent of their relationships with their ultimate U.S. parent entities. Of the 61 non-U.S. SDs that were provisionally registered with the Commission as of July 2020, the Commission believes that few, if any, will be classified as SRSs pursuant to the Final Rule. With respect to Baseline A, any potential SRSs would have likely classified themselves as a conduit affiliate or a non-U.S. person that is neither a conduit affiliate nor a guaranteed affiliate pursuant to the Guidance. Accordingly, some may incur incremental costs associated with assessing and implementing the additional counting requirements for SRSs. With respect to Baseline B, the Commission believes that most potential SRSs would have interpreted section 2(i) so as to require them to count their dealing swaps with U.S. persons, but acknowledges that some may not have interpreted section 2(i) so as to require them to count swaps with non-U.S. persons toward their de minimis calculation. Accordingly, such non-U.S. persons will incur the incremental costs associated with the additional SRS counting requirements contained in the Final Rule. The Commission believes that the SRS de minimis calculation requirements will prevent regulatory arbitrage by ensuring that certain entities do not simply book swaps through a non-U.S. affiliate to avoid CFTC registration. Accordingly, the Commission believes that such provisions will benefit the swap market by ensuring that the Dodd-Frank Act swap provisions addressed by the Final Rule are applied specifically to entities whose activities, in the aggregate, have a direct and significant connection to, and effect on, U.S. commerce.

**(ii) Other Non-U.S. Persons**

Under the Final Rule, non-U.S. persons that are neither Guaranteed

Entities nor SRSs are required to include in their de minimis threshold calculations swap dealing activities with U.S. persons (other than swaps conducted through a foreign branch of a registered SD) and certain swaps with Guaranteed Entities.[543] The Final Rule does not, however, require Other Non-U.S. Persons to include swap dealing transactions with: (1) Guaranteed Entities that are SDs; (2) Guaranteed Entities that are affiliated with an SD and are also below the de minimis threshold; (3) Guaranteed Entities that are guaranteed by a non-financial entity; (3) SRSs (other than SRSs that are also Guaranteed Entities and no other exception applies); or (4) Other Non-U.S. Persons. Additionally, Other Non-U.S. Persons are not required to include in their de minimis calculation any transaction that is executed anonymously on a DCM, registered or exempt SEF, or registered FBOT, and cleared through a registered or exempt DCO.

The Commission believes that requiring all non-U.S. persons to include their swap dealing transactions with U.S. persons in their de minimis calculations is necessary to advance the goals of the Dodd-Frank Act SD registration regime, which focuses on U.S. market participants and the U.S. market. As discussed above, the Commission believes it is appropriate to allow Other Non-U.S. Persons to exclude swaps conducted through a foreign branch of a registered SD because, generally, such swaps would be subject to Dodd-Frank Act transactional requirements and, therefore, will not evade the Dodd-Frank Act regime.

Given that these requirements are consistent with the Guidance in most respects, the Commission believes that the Final Rule will have a negligible effect on Other Non-U.S. Persons, as measured against Baseline A. With respect to Baseline B, the Commission believes that most non-U.S. persons would have interpreted CEA section 2(i) to require them to count their dealing swaps with U.S. persons, but acknowledges that some non-U.S. persons may not have interpreted 2(i) so as to require them to count such swaps with non-U.S. persons toward their de minimis calculation. Accordingly, such non-U.S. persons will incur the incremental costs associated with the counting requirements for Other Non-U.S. Persons contained in the Final Rule.

The Commission recognizes that the Final Rule's cross-border approach to

---

[540] Final § 23.23(b)(2)(ii).

[541] While the Final Rule and the Guidance treat swaps involving Guaranteed Entities in a similar manner, they have different definitions of the term "guarantee." Under the Guidance, a "guaranteed affiliate" would generally include all swap dealing activities in its de minimis threshold calculation without exception. The Guidance interpreted "guarantee" to generally include "not only traditional guarantees of payment or performance of the related swaps, but also other formal arrangements that, in view of all the facts and circumstances, support the non-U.S. person's ability to pay or perform its swap obligations with respect to its swaps." *See* Guidance, 78 FR at 45320. In contrast, the term "guarantee" in the Final Rule has the same meaning as defined in § 23.160(a)(2) (cross-border application of the Commission's margin requirements for uncleared swaps), except that application of the definition of "guarantee" in the Final Rule is not limited to uncleared swaps, and also now incorporates the concept of "unlimited U.S. responsibility." *See supra* section II.C.

[542] Final § 23.23(b)(1).

[543] Final § 23.23(b)(2).

the de minimis threshold calculation could contribute to competitive disparities arising between U.S.-based financial groups and non-U.S. based financial groups. Potential SDs that are U.S. persons, SRSs, or Guaranteed Entities will be required to include all of their swap dealing transactions in their de minimis threshold calculations. In contrast, Other Non-U.S. Persons will be permitted to exclude certain dealing transactions from their de minimis calculations. As a result, Guaranteed Entities and SRSs may be at a competitive disadvantage, as more of their swap activity will apply toward the de minimis threshold (and thereby trigger SD registration) relative to Other Non-U.S. Persons.[544] While the Commission does not believe that any additional Other Non-U.S. Persons will be required to register as a SD under the Final Rule, the Commission acknowledges that to the extent that one does, its non-U.S. person counterparties (clients and dealers) may possibly cease transacting with it in order to operate outside the Dodd-Frank Act swap regime.[545] Additionally, unregistered non-U.S. dealers may be able to offer swaps on more favorable terms to non-U.S. persons than their registered competitors because they are not required to incur the costs associated with CFTC registration.[546]

As noted above, however, the Commission believes that these competitive disparities will be mitigated to the extent that foreign jurisdictions impose comparable requirements. Given that the Commission has found many foreign jurisdictions comparable with respect to various aspects of the Dodd-Frank Act swap requirements, the Commission believes that such competitive disparities will be negligible.[547] Further, as discussed below, the Commission is adopting a flexible standard of review for comparability determinations relating to the group A and group B requirements

that will be issued pursuant to the Final Rule, which will serve to further mitigate any competitive disparities arising out of disparate regulatory regimes. Finally, the Commission reiterates its belief that the cross-border approach to the SD registration threshold taken in the Final Rule is appropriately tailored to further the policy objectives of the Dodd-Frank Act while mitigating unnecessary burdens and disruption to market practices to the extent possible.

### (iii) Aggregation Requirement

The Final Rule also addresses the cross-border application of the aggregation requirement in a manner consistent with the Entities Rule and CEA section 2(i). Specifically, paragraph (4) of the SD definition in § 1.3 requires that, in determining whether its swap dealing transactions exceed the de minimis threshold, a person must include the aggregate notional amount of any swap dealing transactions entered into by its affiliates under common control. Consistent with CEA section 2(i), the Commission interprets this aggregation requirement in a manner that applies the same aggregation principles to all affiliates in a corporate group, whether they are U.S. or non-U.S. persons. In general, the Commission's approach allows both U.S. persons and non-U.S. persons in an affiliated group to engage in swap dealing activity up to the de minimis threshold. When the affiliated group meets the de minimis threshold in the aggregate, one or more affiliate(s) (a U.S. affiliate or a non-U.S. affiliate) have to register as an SD so that the relevant swap dealing activity of the unregistered affiliates remains below the threshold. The Commission's approach ensures that the aggregate gross notional amount of applicable swap dealing transactions of all such unregistered U.S. and non-U.S. affiliates does not exceed the de minimis level.

Given that this approach is consistent with the Guidance, the Commission believes that market participants will only incur incremental costs with respect to Baseline A in modifying their existing systems and policies and procedures in response to the Final Rule. Absent the Guidance, the Commission believes that most market participants would have relied on the interpretation of the aggregation requirement in the Entities Rule, which is similar to the approach set forth in the Final Rule. Accordingly, with respect to Baseline B, the Commission believes that market participants will only incur incremental costs in modifying their existing systems and

policies and procedures in response to the Final Rule.

### 4. Cross-Border Application of the MSP Registration Thresholds

#### (i) U.S. Persons, Guaranteed Entities, and SRSs

The Final Rule's approach to the cross-border application of the MSP registration thresholds closely mirrors the approach for the SD registration threshold. Under the Final Rule, a U.S. person must include all of its swap positions in its MSP thresholds, without exception.[548] As discussed above, that includes any swap conducted through a U.S. person's foreign branch, as such swaps are directly attributed to, and therefore affect, the U.S. person. Given that this requirement is consistent with the Guidance in this respect, the Commission believes that the Final Rule will have a minimal effect on the status quo with regard to the number of potential U.S. MSPs, as measured against Baseline A. With respect to Baseline B, all of a U.S. person's swap positions would apply toward the MSP threshold calculations, even absent the Guidance, pursuant to paragraph (6) of the MSP definition.[549] However, the Commission acknowledges that, absent the Guidance, some U.S. persons may not have interpreted CEA section 2(i) to require them to include swaps conducted through their foreign branches in their MSP threshold calculations. Accordingly, with respect to Baseline B, the Commission expects that some U.S. persons may incur incremental costs as a result of having to count swaps conducted through their foreign branches.

The Final Rule also requires Guaranteed Entities to include all of their swap positions in their MSP threshold calculations without exception.[550] This approach, which recognizes that such swap transactions may have the same potential to affect the U.S. financial system as a U.S. person's swap positions, closely parallels the approach taken in the Guidance with respect to "conduit affiliates" and "guaranteed affiliates."[551] The Commission believes that few, if any, additional MSPs will qualify as Guaranteed Entities pursuant to the Final Rule, as compared to Baseline A. Accordingly, the Commission believes that, in this

---

[544] On the other hand, as noted above, the Commission acknowledges that some market participants may prefer to enter into swaps with counterparties that are subject to the swaps provisions adopted pursuant to the Dodd-Frank Act. Further, Guaranteed Entities and SRSs may enjoy other competitive advantages due to the support of their guarantor or ultimate U.S. parent entity.

[545] Additionally, some unregistered dealers may opt to withdraw from the market, thereby contracting the number of dealers competing in the swaps market, which may have an adverse effect on competition and liquidity.

[546] These non-U.S. dealers also may be able to offer swaps on more favorable terms to U.S. persons, giving them a competitive advantage over U.S. competitors with respect to U.S. counterparties.

[547] See supra notes 215 and 484.

[548] Final § 23.23(c)(1).

[549] 17 CFR 1.3, Major swap participant, paragraph (6).

[550] Final § 23.23(c)(2)(ii).

[551] See Guidance, 78 FR at 45319–45320.

respect, any increase in costs associated with the Final Rule will be small.

Under the Final Rule, an SRS must also include all of its swap positions in its MSP threshold calculations.[552] Under the Guidance, an SRS would likely have been categorized as either a conduit affiliate (which would have been required to count all its swap positions towards its MSP threshold calculations) or a non-U.S. person that is neither a conduit affiliate nor a guaranteed affiliate (which would have been required to count only a subset of its swap positions towards its MSP threshold calculations). Unlike an Other Non-U.S. Person, SRSs will additionally be required to include in their MSP threshold calculations any transaction that is executed anonymously on a DCM, registered or exempt SEF, or registered FBOT, and cleared through a registered or exempt DCO.

As noted in sections II.D and IV.B.1, the Commission believes that it is appropriate to distinguish SRSs from Other Non-U.S. Persons in determining the cross-border application of the MSP thresholds to such entities, as well as with respect to the Dodd-Frank Act swap provisions addressed by the Final Rule more generally. As discussed above, SRSs, as a class of entities, present a greater supervisory interest to the CFTC relative to Other Non-U.S. Persons, due to the nature and extent of the their relationships with their ultimate U.S. parent entities. Therefore, the Commission believes that it is appropriate to require SRSs to include more of their swap positions in their MSP threshold calculations than Other Non-U.S. Persons do. Additionally, allowing an SRS to exclude all of its non-U.S. swap positions from its calculation could incentivize U.S. financial groups to book their non-U.S. positions into a non-U.S. subsidiary to avoid MSP registration requirements.

Given that this requirement was not included in the Guidance or the Cross-Border Margin Rule, the Commission believes that this aspect of the Final Rule will have a similar effect on market participants when measured against Baseline A and Baseline B. The Commission notes that there are no MSPs registered with the Commission, and expects that few entities will be required to undertake an assessment to determine whether they would qualify as an MSP under the Final Rule. Any such entities would likely have classified themselves as a non-U.S. person that is neither a conduit affiliate nor a guaranteed affiliate pursuant to the Guidance. Accordingly, they may

incur incremental costs associated with assessing and implementing the additional counting requirements for SRSs. With respect to Baseline B, the Commission believes that most potential SRSs would have interpreted CEA section 2(i) to require them to count their swap positions with U.S. persons, but acknowledges that some may not have interpreted CEA section 2(i) so as to require them to count swap positions with non-U.S. persons toward their MSP threshold calculations. Accordingly, such SRSs will incur the incremental costs associated with the additional SRS counting requirements contained in the Final Rule. The Commission believes that these SRS calculation requirements will mitigate regulatory arbitrage by ensuring that U.S. entities do not simply book swaps through an SRS affiliate to avoid CFTC registration. Accordingly, the Commission believes that such provisions will benefit the swap market by ensuring that the Dodd-Frank Act swap requirements that are addressed by the Final Rule are applied to entities whose activities have a direct and significant connection to, or effect on, U.S. commerce.

(ii) Other Non-U.S. Persons

Under the Final Rule, Other Non-U.S. Persons are required to include in their MSP calculations swap positions with U.S. persons (other than swaps conducted through a foreign branch of a registered SD) and certain swaps with Guaranteed Entities.[553] The Final Rule does not, however, require Other Non-U.S. Persons to include swap positions with a Guaranteed Entity that is an SD, SRSs (other than SRSs that are also Guaranteed Entities and no other exception applies), or Other Non-U.S. Persons. Additionally, Other Non-U.S. Persons will not be required to include in their MSP threshold calculations any transaction that is executed anonymously on a DCM, a registered or exempt SEF, or registered FBOT, and cleared through a registered or exempt DCO.[554]

Given that these requirements are consistent with the Guidance in most respects, the Commission believes that the Final Rule will have a minimal effect on Other Non-U.S. Persons, as measured against Baseline A. With respect to Baseline B, the Commission believes that most non-U.S. persons would have interpreted CEA section 2(i) to require them to count their swap positions with U.S. persons, but acknowledges that some non-U.S. persons may not have interpreted CEA

section 2(i) so as to require them to count swaps with non-U.S. persons toward their MSP threshold calculations. Accordingly, such non-U.S. persons will incur the incremental costs associated with the counting requirements for Other Non-U.S. Persons contained in the Final Rule.

The Commission recognizes that the Final Rule's cross-border approach to the MSP threshold calculations could contribute to competitive disparities arising between U.S.-based financial groups and non-U.S. based financial groups. Potential MSPs that are U.S. persons, SRSs, or Guaranteed Entities will be required to include all of their swap positions. In contrast, Other Non-U.S. Persons will be permitted to exclude certain swap positions from their MSP threshold calculations. As a result, SRSs and Guaranteed Entities may be at a competitive disadvantage, as more of their swap activity will apply toward the MSP calculation and trigger MSP registration relative to Other Non-U.S. Persons. While the Commission does not believe that any additional Other Non-U.S. Persons will be required to register as MSPs under the Final Rule, the Commission acknowledges that to the extent that a currently unregistered non-U.S. person is required to register as an MSP under the Final Rule, its non-U.S. person counterparties may possibly cease transacting with it in order to operate outside the Dodd-Frank Act swap regime.[555] Additionally, unregistered non-U.S. persons may be able to enter into swaps on more favorable terms to non-U.S. persons than their registered competitors because they are not required to incur the costs associated with CFTC registration.[556] As noted above, however, the Commission believes that these competitive disparities will be mitigated to the extent that foreign jurisdictions impose comparable requirements. Further, the Commission reiterates its belief that the cross-border approach to the MSP registration thresholds taken in the Final Rule aims to further the policy objectives of the Dodd-Frank Act while mitigating unnecessary burdens and disruption to market practices to the extent possible.

---

[552] Final § 23.23(c)(1).

[553] Final § 23.23(c)(2).
[554] Final § 23.23(d).

[555] Additionally, some unregistered swap market participants may opt to withdraw from the market, thereby contracting the number of competitors in the swaps market, which may have an effect on competition and liquidity.

[556] These non-U.S. market participants also may be able to offer swaps on more favorable terms to U.S. persons, giving them a competitive advantage over U.S. competitors with respect to U.S. counterparties.

(iii) Attribution Requirement

The Final Rule also addresses the cross-border application of the attribution requirement in a manner consistent with the Entities Rule and CEA section 2(i) and generally comparable to the approach adopted by the SEC. Specifically, the swap positions of an entity, whether a U.S. or non-U.S. person, should not be attributed to a parent, other affiliate, or guarantor for purposes of the MSP analysis in the absence of a guarantee. Even in the presence of a guarantee, attribution is not required if the entity that enters into the swap directly is subject to capital regulation by the Commission or the SEC, is regulated as a bank in the United States, or is subject to Basel compliant capital standards and oversight by a G20 prudential supervisor. The Final Rule also clarifies that the swap positions of an entity that is required to register as an MSP, or whose MSP registration is pending, is not subject to the attribution requirement. Given that this approach is largely consistent with the Guidance, with certain caveats, the Commission believes that market participants will only incur incremental costs with respect to Baseline A in modifying their existing systems and policies and procedures in response to the Final Rule. Absent the Guidance, the Commission believes that most market participants would have relied on the interpretation of the attribution requirement in the Entities Rule, which is similar to the approach set forth in the Final Rule. Accordingly, with respect to Baseline B, the Commission believes that market participants will only incur incremental costs in modifying their existing systems and policies and procedures in response to the Final Rule. In addition, the Commission believes that consistency with the approach in the SEC Cross-Border Rule will reduce compliance costs for market participants.

5. Monitoring Costs

Under the Final Rule, market participants must continue to monitor their swap activities in order to determine whether they are, or continue to be, required to register as an SD or MSP. With respect to Baseline A, the Commission believes that market participants have developed policies and practices consistent with the cross-border approach to the SD and MSP registration thresholds expressed in the Guidance. Therefore, the Commission believes that market participants will only incur incremental costs in modifying their existing systems and

policies and procedures in response to the Final Rule (*e.g.,* determining which swap activities or positions are required to be included in the registration threshold calculations).[557]

For example, with respect to the SD registration threshold, SRSs may have adopted policies and practices in line with the Guidance's approach to non-U.S. persons that are not guaranteed or conduit affiliates and therefore may only be currently counting (or be provisionally registered by virtue of) their swap dealing transactions with U.S. persons, other than foreign branches of U.S. SDs. Although an SRS will be required under the Final Rule to include all dealing swaps in its de minimis calculation, the Commission believes that any increase in monitoring costs for SRSs will be negligible, both initially and on an ongoing basis, because they already have systems that track swap dealing transactions with certain counterparties in place, which includes an assessment of their counterparties' status.[558] The Commission expects that any adjustments made to these systems in response to the Final Rule will be minor.

With respect to Baseline B, the Commission believes that, absent the Guidance, most market participants would have interpreted CEA section 2(i) to require them, at a minimum, to monitor their swap activities with U.S. persons to determine whether they are, or continue to be, required to register as an SD or MSP. Accordingly, such persons will incur the incremental costs in modifying their existing systems and policies and procedures in response to the Final Rule to monitor their swap activity with certain non-U.S. persons. To the extent that market participants did not interpret CEA section 2(i) in such manner, they will incur more substantial costs in implementing such monitoring activities.

6. Registration Costs

With respect to Baseline A, the Commission believes that few, if any, additional non-U.S. persons will be required to register as an SD pursuant to the Final Rule. With respect to Baseline B, the Commission acknowledges that, absent the Guidance, some non-U.S. persons may not have interpreted CEA

section 2(i) so as to require them to register with the Commission. Accordingly, a subset of such entities could be required to register with the Commission pursuant to the Final Rule.

The Commission acknowledges that if a market participant is required to register, it will incur registration costs. The Commission previously estimated registration costs in its rulemaking on registration of SDs;[559] however, the costs that may be incurred should be mitigated to the extent that any new SDs are affiliated with an existing SD, as most of these costs have already been realized by the consolidated group. While the Commission cannot anticipate the extent to which any potential new registrants will be affiliated with existing SDs, it notes that most current registrants are part of a consolidated group. The Commission has not included any discussion of registration costs for MSPs because it believes that few, if any, market participants will be required to register as an MSP under the Final Rule, as noted above.

7. Programmatic Costs

With respect to Baseline A, as noted above, the Commission believes that few, if any, additional non-U.S. persons will be required to register as an SD under the Final Rule. With respect to Baseline B, the Commission acknowledges that, absent the Guidance, some non-U.S. persons may not have interpreted CEA section 2(i) so as to require them to register with the Commission. Accordingly, a subset of such entities could be required to register with the Commission pursuant to the Final Rule.

To the extent that the Final Rule acts as a "gating" rule by affecting which entities engaged in cross-border swap activities must comply with the SD requirements, the Final Rule will result in increased costs for particular entities that otherwise would not register as an SD and comply with the swap requirements.[560]

8. Exceptions From Group B and Group C Requirements, Availability of Substituted Compliance, and Comparability Determinations

As discussed in section VI above, the Commission, consistent with section 2(i) of the CEA, is adopting exceptions

---

[557] Although the cross-border approach to the MSP registration threshold calculations in the Final Rule is not identical to the approach included in the Guidance (*see supra* section IV.B), the Commission believes that any resulting increase in monitoring costs resulting from the adoption of the Final Rule will be incremental and de minimis.

[558] *See supra* section X.C.2, for a discussion of assessment costs.

[559] *See* Registration of Swap Dealers and Major Swap Participants, 77 FR at 2623–2625.

[560] As noted above, the Commission believes that few (if any) market participants will be required to register as an MSP under the Final Rule, and therefore it has not included a separate discussion of programmatic costs for registered MSPs in this section.

from, and substituted compliance for, certain group A, group B, and group C requirements applicable to swap entities, as well as the creation of a framework for comparability determinations.

(i) Exceptions

Specifically, as discussed above in section VI, the Final Rule includes: (1) The Exchange-Traded Exception from certain group B and group C requirements for certain anonymously executed, exchange-traded, and cleared foreign-based swaps; (2) the Foreign Swap Group C Exception for certain foreign-based swaps with foreign counterparties; (3) the U.S. Branch Group C Exception, for swaps booked in a U.S. branch with certain foreign counterparties; (4) the Limited Foreign Branch Group B Exception for certain foreign-based swaps of foreign branches of U.S. swap entities with certain foreign counterparties; (5) the Non-U.S. Swap Entity Group B Exception for foreign-based swaps of non-U.S. swap entities that are Other Non-U.S. Persons with certain foreign counterparties; and (6) the Limited Swap Entity SRS/Guaranteed Entity Group B Exception for certain foreign-based swaps of SRS Swap Entities and Guaranteed Swap Entities with certain foreign counterparties.

Under the Final Rule, U.S. swap entities (other than their foreign branches) are not excepted from, or eligible for substituted compliance for, the Commission's group A, group B, and group C requirements. These requirements apply fully to registered SDs and MSPs that are U.S. persons because their swap activities are particularly likely to affect the integrity of the swap market in the United States and raise concerns about the protection of participants in those markets. With respect to both baselines, the Commission does not expect that this will impose any additional costs on market participants given that the Commission's relevant business conduct requirements already apply to U.S. SDs and MSPs pursuant to existing Commission regulations.

Pursuant to the Exchange-Traded Exception, non-U.S. swap entities and foreign branches of non-U.S. swap entities are generally excepted from most of the group B and group C requirements with respect to their foreign-based swaps that are executed anonymously on a DCM, a registered or exempt SEF, or registered FBOT, and cleared through a registered or exempt DCO.

Further, pursuant to the Foreign Swap Group C Exception, non-U.S. swap entities and foreign branches of U.S. swap entities are excepted from the group C requirements with respect to their foreign-based swaps with foreign counterparties.

Under the U.S. Branch Group C Exception, a non-U.S. swap entity is excepted from the group C requirements with respect to any swap booked in a U.S. branch with a foreign counterparty that is neither a foreign branch nor a Guaranteed Entity.

Pursuant to the Limited Foreign Branch Group B Exception, foreign branches of U.S. swap entities are excepted from the group B requirements, with respect to any foreign-based swap with a foreign counterparty that is an SRS End User or an Other Non-U.S. Person that is not a swap entity, subject to certain conditions: Specifically, (1) a group B requirement is not eligible for the exception if the requirement, as applicable to the swap, is eligible for substituted compliance pursuant to a comparability determination issued by the Commission prior to the execution of the swap; and (2) in any calendar quarter, the aggregate gross notional amount of swaps conducted by a swap entity in reliance on this exception does not exceed five percent of the aggregate gross notional amount of all its swaps.

In addition, pursuant to the Non-U.S. Swap Entity Group B Exception, non-U.S. swap entities that are Other Non-U.S. Persons are excepted from the group B requirements with respect to any foreign-based swap with a foreign counterparty that is an SRS End User or Other Non-U.S. Person.

Finally, pursuant to the Limited Swap Entity SRS/Guaranteed Entity Group B Exception, each Guaranteed Swap Entity and SRS Swap Entity is excepted from the group B requirements, with respect to any foreign-based swap with a foreign counterparty that is an SRS End User or an Other Non-U.S. Person that is not a swap entity, subject to certain conditions. Specifically, under the Final Rule: (1) The exception is not available with respect to any group B requirement if the requirement as applicable to the swap is eligible for substituted compliance pursuant to a comparability determination issued by the Commission prior to the execution of the swap; and (2) in any calendar quarter, the aggregate gross notional amount of swaps conducted by an SRS Swap Entity or a Guaranteed Swap Entity in reliance on this exception aggregated with the gross notional amount of swaps conducted by all affiliated SRS Swap Entities and Guaranteed Swap Entities in reliance on this exception does not exceed five percent of the aggregate gross notional amount of all swaps entered into by the SRS Swap Entity or a Guaranteed Swap Entity and all affiliated swap entities.

The Commission acknowledges that the group B requirements may apply more broadly to swaps between non-U.S. persons than as contemplated in the Guidance. For example, the Final Rule generally requires non-U.S. swap entities that are Guaranteed Entities or SRSs to comply with the group B requirements for swaps with Other Non-U.S. Persons, whereas the Guidance stated that all non-U.S. swap entities (other than their U.S. branches) were excluded from the group B requirements with respect to swaps with a non-U.S. person that is not a guaranteed or conduit affiliate.[561] However, the Commission believes that the exceptions from the group B requirements in the Final Rule, coupled with the availability of substituted compliance, will help to alleviate any additional burdens that may arise from such application. Further, the group C requirements have been expanded to include Subpart L, which consequently expands the scope of certain of the exceptions from the group C requirements under the Final Rule. Notwithstanding the availability of these exceptions and substituted compliance, the Commission acknowledges that some non-U.S. swap entities may incur costs to the extent that a comparability determination has not yet been issued for certain jurisdictions. Further, the Commission expects that swap entities that avail themselves of the exceptions will be able to reduce their costs of compliance with respect to the excepted requirements (which, to the extent they are similar to requirements in the jurisdiction in which they are based, may be potentially duplicative or conflicting). Swap entities are not required to take any additional action to avail themselves of these exceptions (*e.g.,* notification to the Commission) that would cause them to incur additional costs. The Commission recognizes that the exceptions (and the inherent cost savings) may give certain swap entities a competitive advantage with respect to swaps that meet the requirements of the exception.[562]

The Commission nonetheless believes that it is appropriate to tailor the application of the group B and group C

---

[561] The group B requirements were categorized as Category A transaction-level requirements under the Guidance.

[562] The degree of competitive disparity will depend on the degree of disparity between the Commission's requirements and that of the relevant foreign jurisdiction.

requirements in the cross-border context, consistent with section 2(i) of the CEA and international comity principles, by providing the exceptions in the Final Rule. In doing so, the Commission is aiming to reduce market fragmentation which may result by applying certain duplicative swap requirements in non-U.S. markets, which are often subject to robust foreign regulation. Other than the U.S. Branch Group C Exception, the exceptions in the Final Rule are largely similar to those provided in the Guidance. Therefore, the Commission does not expect that the exceptions in the Final Rule will, in the aggregate, have a significant effect on the costs of, and benefits to, swap entities.

(ii) Substituted Compliance

As described in section VI.C, the extent to which substituted compliance is available under the Final Rule depends on the classification of the swap entity or branch and, in certain cases the counterparty, to a particular swap. The Commission recognizes that the decision to offer substituted compliance carries certain trade-offs. Given the global and highly-interconnected nature of the swap market, where risk is not bound by national borders, market participants are likely to be subject to the regulatory interest of more than one jurisdiction. Allowing compliance with foreign swap standards as an alternative to compliance with the Commission's requirements can therefore reduce the application of duplicative or conflicting requirements, resulting in lower compliance costs and potentially facilitating a more efficient regulatory framework over time. Substituted compliance also helps preserve the benefits of an integrated, global swap market by fostering and advancing efforts among U.S. and foreign regulators to collaborate in establishing robust regulatory standards. If substituted compliance is not properly implemented, however, the Commission's swap regime could lose some of its effectiveness. Accordingly, the ultimate costs and benefits of substituted compliance are affected by the standard under which it is granted and the extent to which it is applied. The Commission was mindful of this dynamic in structuring a substituted compliance regime for the group A and group B requirements and has determined that the Final Rule will enhance market efficiency and foster global coordination of these requirements while ensuring that swap entities (wherever located) are subject to comparable regulation.

The Commission also understands that by not offering substituted compliance equally to all swap entities, the Final Rule could lead to certain competitive disparities between swap entities. For example, to the extent that a non-U.S. swap entity can rely on substituted compliance that is not available to a U.S. swap entity, it may enjoy certain cost advantages (*e.g.,* avoiding the costs of potentially duplicative or inconsistent regulation). The non-U.S. swap entity may then be able to pass on these cost savings to its counterparties in the form of better pricing or some other benefit. U.S. swap entities, on the other hand, could, depending on the extent to which foreign swap requirements apply, be subject to both U.S. and foreign requirements, and therefore be at a competitive disadvantage. Counterparties may also be incentivized to transact with swap entities that are offered substituted compliance in order to avoid being subject to duplicative or conflicting swap requirements, which could lead to increased market deficiencies.[563]

Nevertheless, the Commission does not believe it is appropriate to make substituted compliance broadly available to all swap entities because it needs to protect market participants and the public. As discussed above, the Commission has a strong supervisory interest in the swap activity of all swap entities, including non-U.S. swap entities, by virtue of their registration with the Commission. Further, U.S. swap entities are particularly key swap market participants, and their safety and soundness is critical to a well-functioning U.S. swap market and the stability of the U.S. financial system. The Commission believes that losses arising from the default of a U.S. entity are more likely to be borne by other U.S. entities (including parent companies); therefore, a U.S. entity's risk to the U.S. financial system is more acute than that of a similarly situated non-U.S. entity. Accordingly, in light of the Commission's supervisory interest in the activities of U.S. persons and its statutory obligation to ensure the safety and soundness of swap entities and the U.S. swap market, the Commission believes that it is generally not appropriate for substituted compliance to be available to U.S. swap entities for purposes of the Final Rule. With respect

to non-U.S. swap entities, however, the Commission believes that, in the interest of international comity, making substituted compliance generally available for the requirements discussed in the Final Rule is appropriate.

IATP stated that the Commission should not make the costs of complying with, or economic benefits from, substituted compliance a decision criterion for comparability determinations, and that participation in U.S. markets is a privilege with consequent costs and benefits. Such costs and benefits drive the underlying policy of the substituted compliance regime as discussed in this Final Rule, rather than the decision-making that accompanies an individual comparability determination assessment.

(iii) Comparability Determinations

As noted in section VI.D above, under the Final Rule, a comparability determination may be requested by: (1) Eligible swap entities; (2) trade associations whose members are eligible swap entities; or (3) foreign regulatory authorities that have direct supervisory authority over eligible swap entities and are responsible for administering the relevant foreign jurisdiction's swap requirements.[564] Once a comparability determination is made for a jurisdiction, it applies for all entities or transactions in that jurisdiction to the extent provided in the determination, as approved by the Commission.[565] Accordingly, given that the Final Rule will have no effect on any existing comparability determinations, swap entities may continue to rely on such determinations with no effect on the costs or benefits of such reliance. To the extent that an entity wishes to request a new comparability determination pursuant to the Final Rule, it will incur costs associated with the preparation and filing of a submission request. However, the Commission anticipates that a person would not elect to incur the costs of submitting a request for a comparability determination unless such costs were exceeded by the cost savings associated with substituted compliance.

The Final Rule includes a standard of review that allows for a holistic, outcomes-based approach that enables the Commission to consider any factor it deems relevant in assessing comparability. Further, in determining whether a foreign regulatory standard is comparable to a corresponding Commission requirement, the Final Rule

---

[563] The Commission recognizes that its substituted compliance framework may impose certain initial operational costs, as in certain cases swap entities will be required to determine the status of their counterparties in order to determine the extent to which substituted compliance is available.

[564] Final § 23.23(g)(2).
[565] Final § 23.23(f).

allows the Commission to consider the broader context of a foreign jurisdiction's related regulatory requirements. Allowing for a comparability determination to be made based on comparable outcomes, notwithstanding potential differences in foreign jurisdictions' relevant standards, helps to ensure that substituted compliance is made available to the fullest extent possible. While the Commission recognizes that, to the extent that a foreign swap regime is not deemed comparable in all respects, swap entities eligible for substituted compliance may incur costs from being required to comply with more than one set of specified swap requirements, the Commission believes that this approach is preferable to an all-or-nothing approach, in which market participants may be forced to comply with both regimes in their entirety.

### 9. Recordkeeping

The Final Rule also requires swap entities to create and retain records of their compliance with the Final Rule.[566] Given that swap entities are already subject to robust recordkeeping requirements, the Commission believes that swap entities will only incur incremental costs, which are expected to be minor, in modifying their existing systems and policies and procedures resulting from changes to the status quo made by the Final Rule.

### 10. Alternatives Considered

The Commission carefully considered several alternatives to various provisions of the Final Rule. In determining whether to accept or reject each alternative, the Commission considered the potential costs and benefits associated with each alternative.

For example, the Commission considered Better Markets' suggestion that the Commission add two additional tests to determine whether an entity is a significant subsidiary. Better Markets proposed that if an entity were to meet a risk transfer test, measuring the notional amount of swaps that are back-to-backed with U.S. entities, or a risk acceptance test, measuring the trading activity of the subsidiary over a three month time period, then the entity should be considered a significant subsidiary. The Commission declined to include these two tests because these activity-based tests do not provide a measure of risk that a subsidiary poses to a parent entity, and thus would potentially subject a greater number of entities to certain Commission

regulations without providing a significant reduction in systemic risk.

Similarly, the Commission considered IIB/SIFMA's comment that the application of the group B requirements to swaps of Guaranteed Swap Entities and SRS Swap Entities should conform to the Guidance, so as to reduce the competitive disadvantages faced by such swap entities and their counterparties when they are subject to U.S. rules extraterritorially. The Commission declined to adopt this alternative, citing the fact that the group B requirements relate to risk mitigation, and SRS Swap Entities and Guaranteed Swap Entities may pose significant risk to the United States. However, the Commission acknowledged the potential competitive disadvantages that such application may pose to Guaranteed Swap Entities and SRS Swap Entities (as opposed to foreign branches of U.S. swap entities), and therefore also adopted the Limited Swap Entity SRS/Guaranteed Entity Group B Exception in an effort to reduce potential burdens to such entities without sacrificing the important risk mitigation goals associated with the group B requirements.

On the other hand, the Commission adopted certain alternatives to elements of the Proposed Rule. For example, CS and IIB/SIFMA stated that the exclusion for subsidiaries of BHCs in the SRS definition should be expanded to include those entities that are subsidiaries of IHCs. These commenters noted that IHCs are subject to prudential regulation, including Basel III capital requirements, stress testing, liquidity, and risk management requirements. The Commission determined that IHCs are subject to prudential standards by the Federal Reserve Board that are similar to those to which BHCs are subject. In general, IHCs and BHCs of similar size are subject to similar liquidity, risk management, stress testing, and credit limit standards. Therefore, for the same risk-based reasons that the Commission proposed to exclude subsidiaries of BHCs from the definition of SRS, the Commission is expanding the SRS exclusion to include subsidiaries of both BHCs and IHCs in § 23.23(a)(13)(i).

The Commission is also adopting an alternative raised by IIB/SIFMA, who recommended that the Commission expand the proposed Non-U.S. Swap Entity Group B Exception and the Limited Foreign Branch Group B Exception by applying the exceptions to swaps with an SRS that is not a swap entity, so as to avoid inappropriately burdening the foreign subsidiaries of U.S. multinational corporations and their counterparties. In doing so, the

Commission acknowledges that applying the group B requirements to a swap entity's swaps indirectly affects their counterparties, including SRS End User counterparties, by requiring them to execute documentation (*e.g.,* compliant swap trading relationship documentation), and engage in portfolio reconciliation and compression exercises as a condition to entering into swaps with swap entity counterparties. Accordingly, mandating compliance with these obligations may cause counterparties, including SRS End Users, to face increased costs relative to their competitors not affected by the application of the group B requirements (*e.g.,* for legal fees or as a result of costs being passed on to them by their swap entity counterparties) and/or to potentially lose access to key interest rate or currency hedging products. Also, because the SRS test depends on a non-U.S. counterparty's internal organizational structure and financial metrics and it would be difficult to rule out any category of non-U.S. counterparties as being an SRS, the proposed application of group B requirements to all SRSs may cause swap entities to obtain SRS representations from nearly their entire non-U.S. client bases, potentially increasing costs for all of these clients.

In light of the importance of ensuring that an SRS, particularly a commercial or non-financial entity, continues to have access to swap liquidity for hedging or other non-dealing purposes, the Commission expanded the exceptions to apply to SRS End Users. The Commission noted that an SRS End User does not pose as significant a risk to the United States as an SRS Swap Entity or a Guaranteed Entity, because an SRS End User: (1) Has a less direct connection to the United States than a Guaranteed Entity; and (2) has been involved, at most, in only a de minimis amount of swap dealing activity, or has swap positions below the MSP thresholds, such that it is not required to register as a SD or MSP, respectively.

The Commission considered several other alternatives to the Final Rule, which are discussed in detail throughout this release.[567] In each instance, the Commission considered the costs and burdens of the Final Rule and the regulatory benefits that the Final Rule seeks to achieve.

### 11. Section 15(a) Factors

Section 15(a) of the CEA [568] requires the Commission to consider the costs and benefits of its actions before

---

[566] Final § 23.23(h)(1).

[567] *See supra* sections II–VI.

[568] 7 U.S.C. 19(a).

promulgating a regulation under the CEA or issuing certain orders. Section 15(a) further specifies that the costs and benefits shall be evaluated in light of five broad areas of market and public concern: (1) Protection of market participants and the public; (2) efficiency, competitiveness, and financial integrity of futures markets; (3) price discovery; (4) sound risk management practices; and (5) other public interest considerations. The Commission considers the costs and benefits resulting from its discretionary determinations with respect to the section 15(a) factors.

(i) Protection of Market Participants and the Public

The Commission believes the Final Rule will support protection of market participants and the public. By focusing on and capturing swap dealing transactions and swap positions involving U.S. persons, SRSs, and Guaranteed Entities, the Final Rule's approach to the cross-border application of the SD and MSP registration threshold calculations works to ensure that, consistent with CEA section 2(i) and the policy objectives of the Dodd-Frank Act, significant participants in the U.S. market are subject to these requirements. The cross-border approach to the group A, group B, and group C requirements similarly ensures that these requirements apply to swap activities that are particularly likely to affect the integrity of, and raise concerns about, the protection of participants in the U.S. market while, consistent with principles of international comity, recognizing the supervisory interests of the relevant foreign jurisdictions in applying their own requirements to transactions involving non-U.S. swap entities and foreign branches of U.S. swap entities with non-U.S. persons and foreign branches of U.S. swap entities.

(ii) Efficiency, Competitiveness, and Financial Integrity of the Markets

To the extent that the Final Rule leads additional entities to register as SDs or MSPs, the Commission believes that the Final Rule will enhance the financial integrity of the markets by bringing significant U.S. swap market participants under Commission oversight, which may reduce market disruptions and foster confidence and transparency in the U.S. market. The Commission recognizes that the Final Rule's cross-border approach to the SD and MSP registration thresholds may create competitive disparities among market participants, based on the degree of their connection to the United States, that could contribute to market

deficiencies, including market fragmentation and decreased liquidity, as certain market participants may reduce their exposure to the U.S. market. As a result of reduced liquidity, counterparties may pay higher prices, in terms of bid-ask spreads. Such competitive effects and market deficiencies may, however, be mitigated by global efforts to harmonize approaches to swap regulation and by the large inter-dealer market, which may link the fragmented markets and enhance liquidity in the overall market. The Commission believes that the Final Rule's approach is necessary and appropriately tailored to ensure that the purposes of the Dodd-Frank Act swap regime and its registration requirements are advanced while still establishing a workable approach that recognizes foreign regulatory interests and reduces competitive disparities and market deficiencies to the extent possible. The Commission further believes that the Final Rule's cross-border approach to the group A, group B, and group C requirements will promote the financial integrity of the markets by fostering transparency and confidence in the significant participants in the U.S. swap markets.

(iii) Price Discovery

The Commission recognizes that the Final Rule's approach to the cross-border application of the SD and MSP registration thresholds and group A, group B, and group C requirements could have an effect on liquidity, which may in turn influence price discovery. As liquidity in the swap market is lessened and fewer dealers compete against one another, bid-ask spreads (cost of swap and cost to hedge) may widen and the ability to observe an accurate price of a swap may be hindered. However, as noted above, these negative effects will be mitigated as jurisdictions harmonize their swap regimes and global financial institutions continue to manage their swap books (*i.e.*, moving risk with little or no cost, across an institution to market centers, where there is the greatest liquidity). The Commission does not believe that the Final Rule's approach to the group A, group B, and group C requirements will have a noticeable effect on price discovery.

(iv) Sound Risk Management Practices

The Commission believes that the Final Rule's approach could promote the development of sound risk management practices by ensuring that significant participants in the U.S. market are subject to Commission oversight (via registration), including in

particular important counterparty disclosure and recordkeeping requirements that will encourage policies and practices that promote fair dealing while discouraging abusive practices in U.S. markets. On the other hand, to the extent that a registered SD or MSP relies on the exceptions in the Final Rule, and is located in a jurisdiction that does not have comparable swap requirements, the Final Rule could lead to weaker risk management practices for such entities.

(v) Other Public Interest Considerations

The Commission believes that the Final Rule is consistent with principles of international comity. The Commission has carefully considered, among other things, the level of foreign jurisdictions' supervisory interests over the subject activity and the extent to which the activity takes place within a particular foreign territory. In doing so, the Commission has strived to minimize conflicts with the laws of other jurisdictions while seeking, pursuant to section 2(i), to apply the swaps requirements of the Dodd-Frank Act to activities outside the United States that have a direct and significant connection with activities in, or effect on, U.S. commerce.

The Commission believes the Final Rule appropriately accounts for these competing interests, ensuring that the Commission can discharge its responsibilities to protect the U.S. markets, market participants, and financial system, consistent with international comity. Of particular relevance is the Commission's approach to substituted compliance in the Final Rule, which mitigates burdens associated with potentially duplicative foreign laws and regulations in light of the supervisory interests of foreign regulators in entities domiciled and operating in their own jurisdictions.

*D. Antitrust Laws*

Section 15(b) of the CEA requires the Commission to take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objectives of the CEA, as well as the policies and purposes of the CEA, in issuing any order or adopting any Commission rule or regulation (including any exemption under section 4(c) or 4c(b)), or in requiring or approving any bylaw, rule, or regulation of a contract market or registered futures association established pursuant to section 17 of the CEA.[569]

---

[569] 7 U.S.C. 19(b).

The Commission believes that the public interest to be protected by the antitrust laws is generally to protect competition. The Commission requested and did not receive any comments on whether the Proposed Rule implicated any other specific public interest to be protected by the antitrust laws.

The Commission has considered the Final Rule to determine whether it is anticompetitive and has identified no significant discretionary anticompetitive effects.[570] The Commission requested and did not receive any comments on whether the Proposed Rule was anticompetitive and, if it was, what the anticompetitive effects are.

Because the Commission has determined that the Final Rule is not anticompetitive and has no significant discretionary anticompetitive effects and received no comments on its determination on the Proposed Rule, the Commission has not identified any less anticompetitive means of achieving the purposes of the CEA.

## XI. Preamble Summary Tables

### A. Table A—Cross-Border Application of the SD De Minimis Threshold

Table A should be read in conjunction with the text of the Final Rule.

**BILLING CODE 6351–01–P**

| Counterparty → <br><br> Potential SD ↓ | | U.S. Person | Non-U.S. Person | | |
|---|---|---|---|---|---|
| | | | Guaranteed Entity | SRS | Other Non-U.S. Person |
| U.S. Person | | Include | Include | Include | Include |
| Non-U.S. Person | Guaranteed Entity | Include | Include | Include | Include |
| | SRS | Include | Include | Include | Include |
| | Other Non-U.S. Person[1] | Include[2] | Include[3] | Exclude | Exclude |

[1] Does not include swaps entered into anonymously on a DCM, a registered SEF or a SEF exempted from registration, or a registered FBOT and cleared through a registered DCO or a DCO exempted from registration.
[2] Unless the swap is conducted through a foreign branch of a registered SD.
[3] Unless the Guaranteed Entity is registered as an SD, unless the guarantor is a non-financial entity, or unless the Guaranteed Entity is itself below the de minimis threshold and is affiliated with a registered SD.

### B. Table B—Cross-Border Application of the MSP Threshold

Table B should be read in conjunction with the text of the Final Rule.

---

[570] The Final Rule is being adopted pursuant to the direction of Congress in section 2(i) of the CEA, as discussed in section I.D, that the swap provisions of the CEA enacted by Title VII of the Dodd-Frank Act, including any rule prescribed or regulation promulgated under the CEA, shall not apply to activities outside the United States unless those activities have a direct and significant connection with activities in, or effect on, commerce of the United States, or they contravene Commission rules or regulations as are necessary or appropriate to prevent evasion of the swap provisions of the CEA enacted under Title VII. As discussed above, the degree of any competitive disparity will depend on the degree of disparity between the Commission's requirements and that of the relevant foreign jurisdiction.

| Counterparty → <br><br> Potential MSP ↓ | | U.S. Person | Non-U.S. Person | | |
|---|---|---|---|---|---|
| | | | Guaranteed Entity | SRS | Other Non-U.S. Person |
| U.S. Person | | Include | Include | Include | Include |
| Non-U.S. Person | Guaranteed Entity | Include | Include | Include | Include |
| | SRS | Include | Include | Include | Include |
| | Other Non-U.S. Person[1] | Include[2] | Include[3] | Exclude | Exclude |

[1] Does not include swap positions entered into anonymously on a DCM, a registered SEF or a SEF exempted from registration, or a registered FBOT and cleared through a registered DCO or a DCO exempted from registration.
[2] Unless the swap is conducted through a foreign branch of a registered SD.
[3] Unless the Guaranteed Entity is registered as an SD.

Additionally, all swap positions that are subject to recourse should be attributed to the guarantor, whether it is a U.S. person or a non-U.S. person, unless the guarantor, the Guaranteed Entity, and its counterparty are Other Non-U.S. Persons.

*C. Table C—Cross-Border Application of the Group B Requirements in Consideration of Related Exceptions and Substituted Compliance*

Table C[571] should be read in conjunction with the text of the Final Rule.

---

[571] As discussed in section VI.A.2, *supra*, the group B requirements are set forth in §§ 23.202, 23.501, 23.502, 23.503, and 23.504 and relate to (1) swap trading relationship documentation; (2) portfolio reconciliation and compression; (3) trade confirmation; and (4) daily trading records. Exceptions from the group B requirements are discussed in sections VI.B.2, VI.B.4, and VI.B.5, *supra*. Substituted compliance for the group B requirements is discussed in section VI.C, *supra*.

| Counterparty → / Swap Entity ↓ | | U.S. Person | | Non-U.S. Person | | | |
|---|---|---|---|---|---|---|---|
| | | Non-Foreign Branch | Foreign Branch | U.S. Branch | Guaranteed Entity | Swap Entity SRS | Other Non-U.S. Person or SRS End User |
| U.S. Swap Entity | Non-Foreign Branch | Yes | Yes | Yes | Yes | Yes | Yes |
| | Foreign Branch | Yes[1] | Yes[1] *Sub. Comp. Available* | Yes[1] | Yes[1] *Sub. Comp. Available* | Yes[1] *Sub. Comp. Available* | Yes[1,2] *Sub. Comp. Available* |
| Non-U.S. Swap Entity | U.S. Branch | Yes | Yes | Yes | Yes | Yes *Sub. Comp. Available* | Yes *Sub. Comp. Available* |
| | Guaranteed Entity or SRS | Yes[1] | Yes[1] *Sub. Comp. Available* | Yes[1] | Yes[1] *Sub. Comp. Available* | Yes[1] *Sub. Comp. Available* | Yes[1,3] *Sub. Comp. Available* |
| | Other Non-U.S. Person | Yes[1] | Yes[1] *Sub. Comp. Available* | Yes[1] | Yes[1] *Sub. Comp. Available* | Yes[1] *Sub. Comp. Available* | No |

[1] The Exchange-Traded Exception is available from certain group B and C requirements for certain anonymous, exchange-traded, and cleared foreign-based swaps between the listed parties.

[2] The Limited Foreign Branch Group B Exception is available from the group B requirements for a foreign branch's foreign-based swaps with a foreign counterparty that is an SRS End User or an Other Non-U.S. Person that is not a swap entity, subject to certain conditions.

[3] The Limited Swap Entity SRS/Guaranteed Entity Group B Exception is available from the group B requirements for the foreign-based swaps of each SRS Swap Entity or Guaranteed Swap Entity with a foreign counterparty that is an SRS End User or an Other Non-U.S. Person that is not a swap entity, subject to certain conditions.

*D. Table D—Cross-Border Application of the Group C Requirements in Consideration of Related Exceptions*

Table D[572] should be read in conjunction with the text of the Final Rule.

---

[572] As discussed in section VI.A.3, *supra*, the group C requirements are set forth in §§ 23.400 through 23.451 and 23.700 through 23.704 and relate to certain business conduct standards governing the conduct of SDs and MSPs in dealing with their swap counterparties, and the segregation of assets held as collateral in certain uncleared swaps. Exceptions from the group C requirements are discussed in sections VI.B.2 and VI.B.3, *supra*.

| Counterparty → Swap Entity ↓ | | U.S. Person | | Non-U.S. Person | | | |
|---|---|---|---|---|---|---|---|
| | | Non-Foreign Branch | Foreign Branch | U.S. Branch | Guaranteed Entity | SRS | Other Non-U.S. Person |
| U.S. Swap Entity | Non-Foreign Branch | Yes | Yes | Yes | Yes | Yes | Yes |
| | Foreign Branch | Yes[1] | No | Yes[1] | No | No | No |
| Non-U.S. Swap Entity | U.S. Branch | Yes | Yes | Yes | Yes | No | No |
| | Guaranteed Entity or SRS | Yes[1] | No | Yes[1] | No | No | No |
| | Other Non-U.S. Person | Yes[1] | No | Yes[1] | No | No | No |

[1]The Exchange-Traded Exception is available from certain group B and C requirements for certain anonymous, exchange-traded, and cleared foreign-based swaps between the listed parties.

BILLING CODE 6351–01–C

**List of Subjects in 17 CFR Part 23**

Business conduct standards, Counterparties, Cross-border, Definitions, De minimis exception, Major swap participants, Swaps, Swap Dealers.

For the reasons stated in the preamble, the Commodity Futures Trading Commission amends 17 CFR part 23 as follows:

**PART 23—SWAP DEALERS AND MAJOR SWAP PARTICIPANTS**

■ 1. The authority citation for part 23 continues to read as follows:

**Authority:** 7 U.S.C. 1a, 2, 6, 6a, 6b, 6b–1, 6c, 6p, 6r, 6s, 6t, 9, 9a, 12, 12a, 13b, 13c, 16a, 18, 19, 21.

Section 23.160 also issued under 7 U.S.C. 2(i); Sec. 721(b), Public Law 111–203, 124 Stat. 1641 (2010).

■ 2. Add § 23.23 to read as follows:

**§ 23.23  Cross-border application.**

(a) *Definitions.* Solely for purposes of this section the terms listed in this paragraph (a) have the meanings set forth in paragraphs (a)(1) through (24) of this section. A person may rely on a written representation from its counterparty that the counterparty does or does not satisfy the criteria for one or more of the definitions listed in paragraphs (a)(1) through (24) of this section, unless such person knows or has reason to know that the representation is not accurate; for the purposes of this rule a person would have reason to know the representation is not accurate if a reasonable person should know, under all of the facts of which the person is aware, that it is not accurate.

(1) An *affiliate of,* or a *person affiliated with a specific person,* means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

(2) *Control* including the terms controlling, controlled by, and under common control with, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract, or otherwise.

(3) *Foreign branch* means any office of a U.S. bank that:

(i) Is located outside the United States;

(ii) Operates for valid business reasons;

(iii) Maintains accounts independently of the home office and of the accounts of other foreign branches, with the profit or loss accrued at each branch determined as a separate item for each foreign branch; and

(iv) Is engaged in the business of banking and is subject to substantive regulation in banking or financing in the jurisdiction where it is located.

(4) *Foreign-based swap* means:

(i) A swap by a non-U.S. swap entity, except for a swap booked in a U.S. branch; or

(ii) A swap conducted through a foreign branch.

(5) *Foreign counterparty* means:

(i) A non-U.S. person, except with respect to a swap booked in a U.S. branch of that non-U.S. person; or

(ii) A foreign branch where it enters into a swap in a manner that satisfies the definition of a swap conducted through a foreign branch.

(6) *Group A requirements* mean the requirements set forth in § 3.3 of this chapter, §§ 23.201, 23.203, 23.600, 23.601, 23.602, 23.603, 23.605, 23.606, 23.607, 23.609 and, to the extent it duplicates § 23.201, § 45.2(a) of this chapter.

(7) *Group B requirements* mean the requirements set forth in §§ 23.202 and 23.501 through 23.504.

(8) *Group C requirements* mean the requirements set forth in §§ 23.400 through 23.451 and 23.700 through 23.704.

(9) *Guarantee* means an arrangement pursuant to which one party to a swap has rights of recourse against a guarantor, with respect to its counterparty's obligations under the swap. For these purposes, a party to a swap has rights of recourse against a guarantor if the party has a conditional or unconditional legally enforceable right to receive or otherwise collect, in whole or in part, payments from the guarantor with respect to its counterparty's obligations under the swap. In addition, in the case of any arrangement pursuant to which the guarantor has a conditional or unconditional legally enforceable right to receive or otherwise collect, in whole or in part, payments from any other guarantor with respect to the counterparty's obligations under the swap, such arrangement will be deemed a guarantee of the counterparty's obligations under the swap by the other guarantor. Notwithstanding the foregoing, until December 31, 2027, a person may continue to classify counterparties based on:

(i) Representations that were made pursuant to the "guarantee" definition in § 23.160(a)(2) prior to the effective date of this section; or

(ii) Representations made pursuant to the interpretation of the term "guarantee" in the Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 FR 45292 (Jul. 26, 2013), prior to the effective date of this section.

(10) *Non-U.S. person* means any person that is not a U.S. person.

(11) *Non-U.S. swap entity* means a swap entity that is not a U.S. swap entity.

(12) *Parent entity* means any entity in a consolidated group that has one or more subsidiaries in which the entity has a controlling interest, as determined in accordance with U.S. GAAP.

(13) *Significant risk subsidiary* means any non-U.S. significant subsidiary of an ultimate U.S. parent entity where the ultimate U.S. parent entity has more than $50 billion in global consolidated assets, as determined in accordance with U.S. GAAP at the end of the most recently completed fiscal year, but excluding non-U.S. subsidiaries that are:

(i) Subject to consolidated supervision and regulation by the Board of Governors of the Federal Reserve System as a subsidiary of a U.S. bank holding company or an intermediate holding company; or

(ii) Subject to capital standards and oversight by the subsidiary's home country supervisor that are consistent with the Basel Committee on Banking Supervision's "International Regulatory Framework for Banks" and subject to margin requirements for uncleared swaps in a jurisdiction that the Commission has found comparable pursuant to a published comparability determination with respect to uncleared swap margin requirements.

(14) *Significant subsidiary* means a subsidiary, including its subsidiaries, which meets any of the following conditions:

(i) The three year rolling average of the subsidiary's equity capital is equal to or greater than five percent of the three year rolling average of the ultimate U.S. parent entity's consolidated equity capital, as determined in accordance with U.S. GAAP as of the end of the most recently completed fiscal year;

(ii) The three year rolling average of the subsidiary's total revenue is equal to or greater than ten percent of the three year rolling average of the ultimate U.S. parent entity's total consolidated revenue, as determined in accordance with U.S. GAAP as of the end of the most recently completed fiscal year; or

(iii) The three year rolling average of the subsidiary's total assets is equal to or greater than ten percent of the three year rolling average of the ultimate U.S. parent entity's total consolidated assets, as determined in accordance with U.S. GAAP as of the end of the most recently completed fiscal year.

(15) *Subsidiary* means an affiliate of a person controlled by such person directly, or indirectly through one or more intermediaries.

(16) *Swap booked in a U.S. branch* means a swap entered into by a U.S. branch where the swap is reflected in the local accounts of the U.S. branch.

(17) *Swap conducted through a foreign branch* means a swap entered into by a foreign branch where:

(i) The foreign branch or another foreign branch is the office through which the U.S. person makes and receives payments and deliveries under the swap pursuant to a master netting or similar trading agreement, and the documentation of the swap specifies that the office for the U.S. person is such foreign branch;

(ii) The swap is entered into by such foreign branch in its normal course of business; and

(iii) The swap is reflected in the local accounts of the foreign branch.

(18) *Swap entity* means a person that is registered with the Commission as a swap dealer or major swap participant pursuant to the Act.

(19) *Ultimate U.S. parent entity* means the U.S. parent entity that is not a subsidiary of any other U.S. parent entity.

(20) *United States and U.S.* means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

(21) *U.S. branch* means a branch or agency of a non-U.S. banking organization where such branch or agency:

(i) Is located in the United States;

(ii) Maintains accounts independently of the home office and other U.S. branches, with the profit or loss accrued at each branch determined as a separate item for each U.S. branch; and

(iii) Engages in the business of banking and is subject to substantive banking regulation in the state or district where located.

(22) *U.S. GAAP* means U.S. generally accepted accounting principles.

(23) *U.S. person:*

(i) Except as provided in paragraph (a)(23)(iii) of this section, U.S. person means any person that is:

(A) A natural person resident in the United States;

(B) A partnership, corporation, trust, investment vehicle, or other legal person organized, incorporated, or established under the laws of the United States or having its principal place of business in the United States;

(C) An account (whether discretionary or non-discretionary) of a U.S. person; or

(D) An estate of a decedent who was a resident of the United States at the time of death.

(ii) For purposes of this section, principal place of business means the location from which the officers, partners, or managers of the legal person primarily direct, control, and coordinate the activities of the legal person. With respect to an externally managed investment vehicle, this location is the office from which the manager of the vehicle primarily directs, controls, and coordinates the investment activities of the vehicle.

(iii) The term U.S. person does not include the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies and pension plans, and any other similar international organizations, and their agencies and pension plans.

(iv) Notwithstanding paragraph (a)(23)(i) of this section, until December 31, 2027, a person may continue to classify counterparties as U.S. persons based on:

(A) Representations made pursuant to the "U.S. person" definition in § 23.160(a)(10) prior to the effective date of this section; or

(B) Representations made pursuant to the interpretation of the term "U.S. person" in the Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 FR 45292 (Jul. 26, 2013), prior to the effective date of this section.

(24) *U.S. swap entity* means a swap entity that is a U.S. person.

(b) *Cross-border application of swap dealer de minimis registration threshold calculation.* For purposes of determining whether an entity engages in more than a de minimis quantity of swap dealing activity under paragraph (4)(i) of the swap dealer definition in § 1.3 of this chapter, a person shall include the following swaps (subject to paragraph (d) of this section and paragraph (6) of the swap dealer definition in § 1.3 of this chapter):

(1) If such person is a U.S. person or a significant risk subsidiary, all swaps connected with the dealing activity in which such person engages.

(2) If such person is a non-U.S. person (other than a significant risk subsidiary), all of the following swaps connected with the dealing activity in which such person engages:

(i) Swaps with a counterparty that is a U.S. person, other than swaps conducted through a foreign branch of a registered swap dealer.

(ii) Swaps where the obligations of such person under the swaps are subject to a guarantee by a U.S. person.

(iii) Swaps with a counterparty that is a non-U.S. person where the counterparty's obligations under the swaps are subject to a guarantee by a U.S. person, except when:

(A) The counterparty is registered as a swap dealer; or

(B) The counterparty's swaps are subject to a guarantee by a U.S. person that is a non-financial entity; or

(C) The counterparty is itself below the swap dealer de minimis threshold under paragraph (4)(i) of the swap dealer definition in § 1.3, and is affiliated with a registered swap dealer.

(c) *Cross-border application of major swap participant tests.* For purposes of determining a person's status as a major swap participant, as defined in § 1.3 of this chapter, a person shall include the following swap positions (subject to paragraph (d) of this section and the

major swap participant definition in § 1.3 of this chapter):

(1) If such person is a U.S. person or a significant risk subsidiary, all swap positions that are entered into by the person.

(2) If such person is a non-U.S. person (other than a significant risk subsidiary), all of the following swap positions of such person:

(i) Swap positions where the counterparty is a U.S. person, other than swaps conducted through a foreign branch of a registered swap dealer.

(ii) Swap positions where the obligations of such person under the swaps are subject to a guarantee by a U.S. person.

(iii) Swap positions with a counterparty that is a non-U.S. person where the counterparty's obligations under the swaps are subject to a guarantee by a U.S. person, except when the counterparty is registered as a swap dealer.

(d) *Exception from counting for certain exchange-traded and cleared swaps.* Notwithstanding any other provision of § 23.23, for purposes of determining whether a non-U.S. person (other than a significant risk subsidiary or a non-U.S. person whose performance under the swap is subject to a guarantee by a U.S. person) engages in more than a de minimis quantity of swap dealing activity under paragraph (4)(i) of the swap dealer definition in § 1.3 of this chapter or for determining the non-U.S. person's status as a major swap participant as defined in § 1.3 of this chapter, such non-U.S. person does not need to count any swaps or swap positions, as applicable, that are entered into by such non-U.S. person on a designated contract market, a registered swap execution facility or a swap execution facility exempted from registration by the Commission pursuant to section 5h(g) of the Act, or a registered foreign board of trade, and cleared through a registered derivatives clearing organization or a clearing organization that has been exempted from registration by the Commission pursuant to section 5b(h) of the Act, where the non-U.S. person does not know the identity of the counterparty to the swap prior to execution.

(e) *Exceptions from certain swap requirements for certain foreign swaps.* (1) With respect to its foreign-based swaps, each non-U.S. swap entity and foreign branch of a U.S. swap entity shall be excepted from:

(i) The group B requirements (other than § 23.202(a) introductory text and (a)(1)) and the group C requirements with respect to any swap—

(A) Entered into on a designated contract market, a registered swap execution facility or a swap execution facility exempted from registration by the Commission pursuant to section 5h(g) of the Act, or a registered foreign board of trade;

(B) Cleared through a registered derivatives clearing organization or a clearing organization that has been exempted from registration by the Commission pursuant to section 5b(h) of the Act; and

(C) Where the swap entity does not know the identity of the counterparty to the swap prior to execution; and

(ii) The group C requirements with respect to any swap with a foreign counterparty.

(2) A non-U.S. swap entity shall be excepted from the group C requirements with respect to any swap booked in a U.S. branch with a foreign counterparty that is neither a foreign branch nor a person whose performance under the swap is subject to a guarantee by a U.S. person.

(3) With respect to its foreign-based swaps, each non-U.S. swap entity that is neither a significant risk subsidiary nor a person whose performance under the swap is subject to a guarantee by a U.S. person shall be excepted from the group B requirements with respect to any swap with a foreign counterparty (other than a foreign branch) that is neither—

(i) A significant risk subsidiary that is a swap entity nor

(ii) A person whose performance under the swap is subject to a guarantee by a U.S. person.

(4) With respect to its foreign-based swaps, each foreign branch of a U.S. swap entity shall be excepted from the group B requirements with respect to any swap with a foreign counterparty (other than a foreign branch) that is neither a swap entity nor a person whose performance under the swap is subject to a guarantee by a U.S. person, subject to the following conditions:

(i) A group B requirement is not eligible for the exception if the requirement, as applicable to the swap, is eligible for substituted compliance pursuant to a comparability determination issued by the Commission prior to the execution of the swap; and

(ii) In any calendar quarter, the aggregate gross notional amount of swaps conducted by a swap entity in reliance on this exception does not exceed five percent (5%) of the aggregate gross notional amount of all its swaps.

(5) With respect to its foreign-based swaps, each non-U.S. swap entity that is a significant risk subsidiary (an "SRS

SE'') or a person whose performance under the swap is subject to a guarantee by a U.S. person (a ''Guaranteed SE'') shall be excepted from the group B requirements with respect to any swap with a foreign counterparty (other than a foreign branch) that is neither a swap entity nor a person whose performance under the swap is subject to a guarantee by a U.S. person, subject to the following conditions:

(i) A group B requirement is not eligible for the exception if the requirement, as applicable to the swap, is eligible for substituted compliance pursuant to a comparability determination issued by the Commission prior to the execution of the swap; and

(ii) In any calendar quarter, the aggregate gross notional amount of swaps conducted by an SRS SE or a Guaranteed SE in reliance on this exception aggregated with the gross notional amount of swaps conducted by all affiliated SRS SEs and Guaranteed SEs in reliance on this exception does not exceed five percent (5%) of the aggregate gross notional amount of all swaps entered into by the SRS SE or Guaranteed SE and all affiliated swap entities.

(f) *Substituted Compliance.* (1) A non-U.S. swap entity may satisfy any applicable group A requirement by complying with the applicable standards of a foreign jurisdiction to the extent permitted by, and subject to any conditions specified in, a comparability determination issued by the Commission under paragraph (g) of this section;

(2) With respect to its foreign-based swaps, a non-U.S. swap entity or foreign branch of a U.S. swap entity may satisfy any applicable group B requirement for a swap with a foreign counterparty by complying with the applicable standards of a foreign jurisdiction to the extent permitted by, and subject to any conditions specified in, a comparability determination issued by the Commission under paragraph (g) of this section; and

(3) A non-U.S. swap entity may satisfy any applicable group B requirement for any swap booked in a U.S. branch with a foreign counterparty that is neither a foreign branch nor a person whose performance under the swap is subject to a guarantee by a U.S. person by complying with the applicable standards of a foreign jurisdiction to the extent permitted by, and subject to any conditions specified in, a comparability determination issued by the Commission under paragraph (g) of this section.

(g) *Comparability determinations.* (1) The Commission may issue comparability determinations under this section on its own initiative.

(2) *Eligibility requirements.* The following persons may, either individually or collectively, request a comparability determination with respect to some or all of the group A requirements and group B requirements:

(i) A swap entity that is eligible, in whole or in part, for substituted compliance under this section or a trade association or other similar group on behalf of its members who are such swap entities; or

(ii) A foreign regulatory authority that has direct supervisory authority over one or more swap entities subject to the group A requirements and/or group B requirements and that is responsible for administering the relevant foreign jurisdiction's swap standards.

(3) *Submission requirements.* Persons requesting a comparability determination pursuant to this section shall electronically provide the Commission:

(i) A description of the objectives of the relevant foreign jurisdiction's standards and the products and entities subject to such standards;

(ii) A description of how the relevant foreign jurisdiction's standards address, at minimum, the elements or goals of the Commission's corresponding requirements or group of requirements. Such description should identify the specific legal and regulatory provisions that correspond to each element or goal and, if necessary, whether the relevant foreign jurisdiction's standards do not address a particular element or goal;

(iii) A description of the differences between the relevant foreign jurisdiction's standards and the Commission's corresponding requirements, and an explanation regarding how such differing approaches achieve comparable outcomes;

(iv) A description of the ability of the relevant foreign regulatory authority or authorities to supervise and enforce compliance with the relevant foreign jurisdiction's standards. Such description should discuss the powers of the foreign regulatory authority or authorities to supervise, investigate, and discipline entities for compliance with the standards and the ongoing efforts of the regulatory authority or authorities to detect and deter violations of, and ensure compliance with, the standards;

(v) Copies of the foreign jurisdiction's relevant standards (including an English translation of any foreign language document); and

(vi) Any other information and documentation that the Commission deems appropriate.

(4) *Standard of review.* The Commission may issue a comparability determination pursuant to this section to the extent that it determines that some or all of the relevant foreign jurisdiction's standards are comparable to the Commission's corresponding requirements or group of requirements, or would result in comparable outcomes as the Commission's corresponding requirements or group of requirements, after taking into account such factors as the Commission determines are appropriate, which may include:

(i) The scope and objectives of the relevant foreign jurisdiction's standards;

(ii) Whether the relevant foreign jurisdiction's standards achieve comparable outcomes to the Commission's corresponding requirements;

(iii) The ability of the relevant regulatory authority or authorities to supervise and enforce compliance with the relevant foreign jurisdiction's standards; and

(iv) Whether the relevant regulatory authority or authorities has entered into a memorandum of understanding or other arrangement with the Commission addressing information sharing, oversight, examination, and supervision of swap entities relying on such comparability determination.

(5) *Reliance.* Any swap entity that, in accordance with a comparability determination issued under this section, complies with a foreign jurisdiction's standards, would be deemed to be in compliance with the Commission's corresponding requirements. Accordingly, if a swap entity has failed to comply with the foreign jurisdiction's standards or a comparability determination, the Commission may initiate an action for a violation of the Commission's corresponding requirements. All swap entities, regardless of whether they rely on a comparability determination, remain subject to the Commission's examination and enforcement authority.

(6) *Discretion and Conditions.* The Commission may issue or decline to issue comparability determinations under this section in its sole discretion. In issuing such a comparability determination, the Commission may impose any terms and conditions it deems appropriate.

(7) *Modifications.* The Commission reserves the right to further condition, modify, suspend, terminate, or otherwise restrict a comparability determination issued under this section in the Commission's discretion.

(8) *Delegation of authority.* The Commission hereby delegates to the Director of the Division of Swap Dealer and Intermediary Oversight, or such other employee or employees as the Director may designate from time to time, the authority to request information and/or documentation in connection with the Commission's issuance of a comparability determination under this section.

(h) *Records, scope of application, effective and compliance dates*—(1) *Records.* Swap dealers and major swap participants shall create a record of their compliance with this section and shall retain records in accordance with § 23.203.

(2) *Scope of Application.* The requirements of this section shall not apply to swaps executed prior to September 14, 2021.

(3) *Effective date and compliance date.* (i) This section shall be effective on the date that is 60 days following its publication in the **Federal Register**.

(ii) Provided that swap dealers and major swap participants comply with the recordkeeping requirements in paragraph (h)(1) of this section, the exceptions in paragraph (e) of this section are effective upon the effective date of the rule.

(iii) Swap dealers and major swap participants must comply with the requirements of this section no later than September 14, 2021.

Issued in Washington, DC, on July 24, 2020, by the Commission.

**Christopher Kirkpatrick,**
*Secretary of the Commission.*

**Note:** The following appendices will not appear in the Code of Federal Regulations.

## Appendices to Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants—Commission Voting Summary, Chairman's Statement, and Commissioners' Statements

### Appendix 1—Commission Voting Summary

On this matter, Chairman Tarbert and Commissioners Quintenz and Stump voted in the affirmative. Commissioners Behnam and Berkovitz voted in the negative.

### Appendix 2—Supporting Statement of Chairman Heath P. Tarbert

President John Adams once warned: "Great is the guilt of unnecessary war."[1] While he was obviously referring to military conflicts, his admonition applies to conflicts among nations more generally. Financial regulation has not been exempt from international discord. And in recent years, the CFTC's own cross-border guidance on swaps has caused concerns about a regulatory arms race and the balkanization of global financial markets. Consider the following entreaties by our overseas allies and regulatory counterparts:

"*At a time of highly fragile economic growth, we believe that it is critical to avoid taking steps that risk withdrawal from global financial markets into inevitably less efficient regional or national markets.*"

—Letter from the Finance Ministers of the United Kingdom, France, Japan, and the European Commission to CFTC Chairman regarding the CFTC's cross-border guidance (Oct. 17, 2012)

"*We believe a failure to address [our] concerns could have unintended consequences, including increasing market fragmentation and, potentially, systemic risk in these markets, as well as unduly increasing the compliance burden on industry and regulators.*"

—Letter from the Australian Securities and Investments Commission, the Hong Kong Monetary Authority, the Monetary Authority of Singapore, the Reserve Bank of Australia, and the Securities and Futures Commission of Hong Kong to CFTC Chairman regarding the CFTC's cross-border guidance (Aug. 27, 2012)

". . . [U]sing personnel or agents located in the U.S. would not be a sufficient criterion supporting the duplication of applicable sets of rules to transactions [between non-U.S. persons,] and [we] ask you to consider not directly applying rules on this basis.*"

—Letter from Steven Maijoor, Chair, European Securities and Markets Authority to Acting CFTC Chairman regarding the CFTC staff's "ANE Advisory," No. 13–69 (Mar. 13, 2014)

I will leave it to others to debate whether the international discord caused by the CFTC's cross-border guidance[2] and related staff advisory[3] was "necessary" at the time it was introduced. Far more constructive is for us to ask whether it is necessary today. For me, there is but one conclusion: Because nearly all G20 jurisdictions have adopted similar swaps regulations pursuant to the Pittsburgh Accords,[4] it is unnecessary for the CFTC to be the world's policeman for all swaps.

On this basis, I am pleased to support the Commission's final rule on the cross-border application of registration thresholds and certain requirements for swap dealers and major swap participants ("swap entities").

This final rule provides critically needed regulatory certainty to the global swaps markets. And I believe it properly balances protection of our national interests with appropriate deference to international counterparts.

**Need for Rule-Based Finality**

As noted above, the Commission's 2013 Guidance left much to be desired by both our market participants and our regulatory colleagues overseas. The action was taken outside the standard rulemaking process under the Administrative Procedure Act,[5] so was merely "guidance" that is not technically enforceable. But because market participants as a practical matter followed it nonetheless, it had a sweeping impact on the global swaps markets. Over the intervening years, a patchwork of staff advisories and no-action letters has supplemented the 2013 Guidance. With almost seven years of experience, it is high time for the Commission to bring finality to the issues the 2013 Guidance and its progeny sought to address.

**Congressional Mandate**

We call this final rule a "cross-border" rule, and in certain respects it is. For example, the rule addresses when non-U.S. persons must count dealing swaps with U.S. persons, including foreign branches of American banks, toward the *de minimis* threshold in our swap dealer definition. More fundamentally, however, the rule answers a basic question: *What swap dealing activity outside the United States should trigger CFTC registration and other requirements?*

To answer this question, we must turn to section 2(i) of the Commodity Exchange Act ("CEA"),[6] a provision Congress added in Title VII of the Dodd-Frank Act. Section 2(i) provides that the CEA does not apply to swaps activities outside the United States except in two circumstances: (1) Where activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or (2) where they run afoul of the Commission's rules or regulations that prevent evasion of Title VII. Section 2(i) evidences Congress's clear intent for the U.S. swaps regulatory regime to stop at the water's edge, except where foreign activities either are closely and meaningfully related to U.S. markets or are vehicles to evade our laws and regulations.

I believe the final rule we issue today is a levelheaded approach to the exterritorial application of our swap dealer registration regime and related requirements, and it fully implements the congressional mandate in section 2(i). At the same time, it acknowledges the important role played by the CFTC's domestic and international counterparts in regulating parts of the global swaps markets. In short, the final rule employs neither a full-throated "intergalactic commerce clause"[7] nor an isolationist

---

[1] Letter from John Adams to Abigail Adams, 19 May 1794 [electronic edition]. *Adams Family Papers: An Electronic Archive,* Massachusetts Historical Society, *http://www.masshist.org/digitaladams/.*

[2] Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 FR 45292 (July 26, 2013) ("2013 Guidance"), *http://www.cftc.gov/idc/groups/public/@lrfederalregister/documents/file/2013-17958a.pdf.*

[3] CFTC Staff Advisory No. 13–69 (Nov. 14, 2013), *https://www.cftc.gov/node/212831.*

[4] Financial Stability Board, *Annual Report on Implementation and Effects of the G20 Financial Regulatory Reforms* 3 (Oct. 16, 2019) (showing that a very large majority of FSB jurisdictions have implemented the G20 priority reforms for over-the-counter derivatives).

[5] 5 U.S.C. 551 *et seq.*

[6] 7 U.S.C. 2(i).

[7] Commissioner Jill E. Sommers, Statement of Concurrence: (1) Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, Proposed Interpretive Guidance and
Continued

mentality. It is thoughtful and balanced, and it will avoid future unnecessary conflicts among regulators.

## Guiding Principles for Regulating Foreign Activities

As I have stated before,[8] I am guided by three additional principles in considering the extent to which the CFTC should make use of our extraterritorial powers.

### 1. Protect the National Interest

An important role of the CFTC is to protect and advance the interests of the United States. In this regard, Congress provided the CFTC with explicit extraterritorial power to safeguard the U.S. financial system where swaps activities are concerned.

It is incumbent upon us to guard against risks created outside the United States flowing back into our country. But our focus cannot be on *all* risks. Congress made that clear in section 2(i). It would be a markedly poor use of American taxpayers' dollars to regulate swaps activities in far-flung lands simply to prevent every risk that might have a nexus to the United States. It would also divert the CFTC from channeling our resources where they matter the most: To our own markets and participants. The rule therefore focuses on instances where material risks from abroad are most likely to come back to the United States and where no one but the CFTC is responsible for those risks.

Hence, guarantees of offshore swaps by U.S. parent companies are counted toward our registration requirements because that risk is effectively underwritten and borne in the United States. The same is true with the concept of a "significant risk subsidiary" ("SRS"). As explained in the rule, an SRS is a large non-U.S. subsidiary of a large U.S. company that deals in swaps outside the United States but (1) is not subject to comparable capital and margin requirements in its home country, and (2) is not a subsidiary of a holding company subject to consolidated supervision by an American regulator, namely the Federal Reserve Board. Our final cross-border rule requires an SRS to register as a swap dealer or major swap participant with the CFTC if the SRS exceeds the same registration thresholds as a U.S. firm operating within the United States. The national interest demands it.[9]

### 2. Follow Kant's Categorical Imperative

As I said when we proposed this rule, I believe cross-border rulemaking should follow Kant's "categorical imperative": We should act according to the maxim that we wish all other rational people to follow, as if it were a universal law.[10]

What I take from that is that we should ourselves establish a regulatory regime that we believe should be the global convention. How would this work? Let me start by explaining how it would not work. If we impose our regulations on non-U.S. persons whenever they have a remote nexus to the United States, then we should be willing for all other jurisdictions to do the same. The end result would be absurdity, with everyone trying to regulate everyone else. And the duplicative and overlapping regulations would inevitably lead to fragmentation in the global swaps markets—itself a potential source of systemic risk.[11] Instead, we should adopt a framework that applies CFTC regulations outside the United States only when it addresses one or more important risks to our markets.

Furthermore, we should afford comity to other regulators who have adopted comparable regulations, just as we expect them to do for us. This is especially important when we evaluate whether foreign subsidiaries of U.S. parent companies could pose a significant risk to our financial system. The categorical imperative leads us to an unavoidable result: We should not impose our regulations on the non-U.S. activities of non-U.S. companies in those jurisdictions that have comparable capital and margin requirements to our own.[12] By

the same token, when U.S. subsidiaries of foreign companies operate within our borders, we expect them to follow our laws and regulations and not simply comply with rules from their home country.

Charity, it is often said, begins at home. The categorical imperative further compels us to avoid duplicating the work of other American regulators. If a foreign subsidiary of a U.S. financial institution is subject to consolidated regulation and supervision by the Federal Reserve Board, then we should defer to our domestic counterparts on questions of dealing activity outside the United States. The Federal Reserve Board has extensive regulatory and supervisory tools to ensure a holding company is prudent in its risk-taking at home and abroad.[13] The CFTC instead should focus on regulating dealing activity within the United States or with U.S. persons.

### 3. Pursue SEC Harmonization Where Appropriate

As I said in connection with our proposal of this rule, I find it surreal that the SEC and the CFTC, two federal agencies that regulate similar products pursuant to the same title of the same statute—with an explicit mandate to "consult and coordinate" with each other—have not agreed until today on how to define "U.S. person." This failure to coordinate has unnecessarily increased operational and compliance costs for market participants.[14] I am pleased that this final rule uses the same definition of "U.S. person" as the SEC's cross-border rulemaking.

To be sure, as my colleagues have said on several occasions, we should not harmonize with the SEC merely for the sake of harmonization.[15] We should do so only if it

---

Policy Statement; (2) Notice of Proposed Exemptive Order and Request for Comment Regarding Compliance with Certain Swap Regulations (June 29, 2012), *https://www.cftc.gov/PressRoom/ SpeechesTestimony/sommerssstatement062912* (noting that "staff had been guided by what could only be called the 'Intergalactic Commerce Clause' of the United States Constitution, in that every single swap a U.S. person enters into, no matter what the swap or where it was transacted, was stated to have a direct and significant connection with activities in, or effect on, commerce of the United States").

[8] Statement of Chairman Heath P. Tarbert in Support of the Cross-Border Swaps Proposal (Dec. 18, 2019), *https://www.cftc.gov/PressRoom/ SpeechesTestimony/tarbertstatement121819*.

[9] The SRS concept is designed to address a potential situation where a U.S. entity establishes an offshore subsidiary to conduct its swap dealing business without an explicit guarantee on the swaps in order to avoid U.S. regulation. For example, the

U.S.-regulated insurance company American International Group ("AIG") nearly failed as a result of risk incurred by the London swap trading operations of its subsidiary AIG Financial Products. *See, e.g.,* Congressional Oversight Panel, June Oversight Report, *The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* (June 10, 2010), *http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT56698/pdf/CPRT-111JPRT56698.pdf.* If the Commission did not regulate SRSs, an AIG-type entity could establish a non-U.S. affiliate to conduct its swaps dealing business, and, so long as it did not explicitly guarantee the swaps, it would avoid application of the Dodd-Frank Act and bring risk created offshore back into the United States without appropriate regulatory safeguards.

[10] "Act only according to that maxim whereby you can, at the same time, will that it should become a universal law." Immanuel Kant, *Grounding for the Metaphysics of Morals* (1785) [1993], translated by James W. Ellington (3rd ed.).

[11] *See* Financial Stability Board, *Annual Report on Implementation and Effects of the G20 Financial Regulatory Reforms* 3 (Oct. 16, 2019).

[12] *See, e.g.,* Comments of the European Commission in respect of CFTC Staff Advisory No. 13–69 regarding the applicability of certain CFTC regulations to the activity in the United States of swap dealers and major swap participants established in jurisdictions other than the United States (Mar. 10, 2014), *https://comments.cftc.gov/ PublicComments/ ViewComment.aspx?id=59781&SearchText=* ("In order to ensure that cross-border activity is not inhibited by the application of inconsistent, conflicting or duplicative rules, regulators must work together to provide for the application of one set of comparable rules, where our rules achieve the same outcomes. Rules should therefore include the possibility to defer to those of the host regulator in

most cases."); FSB Fragmentation Report, *supra* note 11, at 8 (noting that the G20 "has agreed that jurisdictions and regulators should be able to defer to each other when it is justified by the quality of their respective regulatory and enforcement regimes, based on similar outcomes in a non-discriminatory way, paying due respect to home country regulation regimes").

[13] For example, the Federal Reserve Board requires all foreign branches and subsidiaries "to ensure that their operations conform to high standards of banking and financial prudence." 12 CFR 211.13(a)(1). Furthermore, they are subject to examinations on compliance. *See Bank Holding Company Supervision Manual,* Section 3550.0.9 ("The procedures involved in examining foreign subsidiaries of domestic bank holding companies are generally the same as those used in examining domestic subsidiaries engaged in similar activities.").

[14] *See, e.g.,* Futures Industry Association Letter re: Harmonization of SEC and CFTC Regulatory Frameworks (Nov. 29, 2018), *https://fia.org/articles/ fia-offers-recommendations-cftc-and-sec- harmonization*.

[15] *See, e.g.,* Dissenting Statement of Commissioner Dan M. Berkovitz, Rulemaking to Provide Exemptive Relief for Family Office CPOs: Customer Protection Should be More Important than Relief for Billionaires (Nov. 25, 2019), *https:// www.cftc.gov/PressRoom/SpeechesTestimony/ berkovitzstatement112519* ("The Commission eliminates the notice requirement largely on the basis that this will harmonize the Commission's regulations with those of the SEC. Harmonization for harmonization's sake is not a rational basis for agency action.").

is sensible. In the first instance, we must determine whether Congress has explicitly asked us to do something different or implicitly did so by giving us a different statutory mandate. We must also consider whether differences in our respective products or markets warrant a divergent approach. Just as today's final rule takes steps toward harmonization, it also diverges where appropriate.

The approach we have taken with respect to "ANE Transactions" is deliberately different than the SEC's.[16] ANE Transactions are swap (or security-based swap) transactions between two non-U.S. persons that are "arranged, negotiated, or executed" by their personnel or agents located in the United States, but booked to entities outside America. While some or all of the front-end sales activity takes place in the United States, the financial risk of the transactions resides overseas.

Here, key differences in the markets for swaps and security-based swaps are dispositive. The swaps market is far more global than the security-based swaps market. While commodities such as gold and oil are traded throughout the world, equity and debt securities trade predominantly in the jurisdictions where they were issued. For this reason, security-based swaps are inextricably tied to the underlying security, and vice versa. This is particularly the case with single-name credit default swaps, where the arranging, negotiating, or execution is typically done in the United States because the underlying reference entity is a U.S. company. More generally, security-based swaps can affect the price and liquidity of the underlying security, so the SEC has a legitimate interest in regulating transactions in those instruments. By contrast, because commodities are traded globally, there is less need for the CFTC to apply its swaps rules to ANE Transactions.[17]

Moreover, as noted above, Congress directed the CFTC to regulate foreign swaps activities outside the United States that have a "direct and significant" connection to our financial system. Congress did not give a similar mandate to the SEC. As a result, the

SEC has not crafted its cross-border rule to extend to an SRS engaged in security-based swap dealing activity offshore that may pose a systemic risk to our financial system. Our rule does work with respect to swaps, aiming to protect American taxpayers from another Enron conducting its swaps activities through a major foreign subsidiary without CFTC oversight.

The final rule addresses Transaction-Level Requirements applicable to swap entities (specifically, the Group B and Group C requirements), but does not cover other Transaction-Level Requirements, such as the reporting, clearing, and trade execution requirements. The Commission intends to address these remaining Transaction-Level Requirements (the "Unaddressed TLRs") in connection with future cross-border rulemakings. Until such time, the Commission will not consider, as a matter of policy, a non-U.S. swap entity's use of their personnel or agents located in the United States to "arrange, negotiate, or execute" swap transactions with non-U.S. counterparties for purposes of determining whether Unaddressed TLRs apply to such transactions.

In connection with the final rule, DSIO has withdrawn Staff Advisory No. 13–69,[18] and, together with the Division of Clearing and Risk and the Division of Market Oversight, granted certain non-U.S. swap dealers no-action relief with respect to the applicability of the Unaddressed TLRs to their transactions with non-U.S. counterparties that are arranged, negotiated, or executed in the United States. In Staff Advisory 13–69, the CFTC's staff applied Transaction-Level Requirements to ANE Transactions, without the Commission engaging in notice and comment rulemaking to determine whether such an application is appropriate. Going forward, I fully expect that the Commission will first conduct fact-finding to determine the extent to which ANE Transactions raise policy concerns that are not otherwise addressed by the CEA or our regulations.

**Refinements to the Proposed Rule**

In response to public comment, and consistent with the guiding principles described above, the final rule includes a number of refinements from the proposal issued last December. I will leave it to our extremely knowledgeable staff to outline all the changes in detail, but I will highlight some of the key refinements here. These principally concern the treatment of SRSs and U.S. branches of foreign swap entities.

*1. Significant Risk Subsidiaries*

As noted, the SRS concept is not intended to reach subsidiaries of holding companies that are subject to consolidated supervision by the Federal Reserve Board. The final rule recognizes that intermediate holding companies of foreign banking organizations under the Federal Reserve Board's Regulation YY are subject to such consolidated supervision, and to enhanced capital, liquidity, risk-management, and stress-testing

requirements. Accordingly, foreign subsidiaries of intermediate holding companies are excluded from the SRS definition under the final rule.

In addition, the final rule recognizes that certain SRSs may act as "customers" or "end users" in the global swaps markets, engaging in only a *de minimis* level of swap dealing or no dealing activity at all. Consistent with the principle of focusing on risk to the United States, the "Group B" category of risk-mitigating regulatory requirements will not apply to swaps between a non-U.S. swap entity and an SRS that is simply an end user.[19] This approach will help preserve end users' access to liquidity in foreign markets.

For similar reasons, the final rule also provides a limited exception from the Group B requirements for a swap entity that is an SRS or a guaranteed entity—to the extent that swap entity's counterparty is an SRS end user or an Other Non-U.S. Person that is not a swap entity. In addition, the final rule clarifies that a non-U.S. person that is not itself an SRS or a guaranteed entity need not count swaps with an SRS toward its swap dealer *de minimis* threshold, unless that SRS is a guaranteed entity.

I believe these adjustments to the proposed SRS regime will further serve to channel our regulatory resources, while offering appropriate deference to our domestic and foreign regulatory counterparts.

*2. U.S. Branches*

The final rule also includes two key changes to the treatment of U.S. branches of foreign swap entities. First, it expands the availability of substituted compliance for the Group B requirements to include swaps between such a U.S. branch, on the one hand, and an SRS or Other Non-U.S. Person, on the other.[20] And second, it creates a new exception from the "Group C" external business conduct standards for swaps between U.S. branches and foreign counterparties (other than guaranteed entities and foreign branches of U.S. swap entities). These changes recognize that U.S. branches, though located on U.S. soil, are part of a non-U.S. legal entity. Accordingly, while such branches should be subject to certain risk-mitigating regulations, they should not be subject to the full panoply of requirements applicable to true U.S. persons.

**Conclusion**

In sum, the final rule before us today provides a critical measure of regulatory certainty for the global swaps markets. I believe the rule is also a sensible and principled approach to addressing when foreign transactions should fall within the CFTC's swap entity registration and related requirements.

I have noted before President Eisenhower's observation that "The world must learn to

---

[16] *See* Securities and Exchange Commission, Final Rules and Guidance on Cross-Border Application of Certain Security-Based Swap Requirements, 85 FR 6270, 6272 (Feb. 4, 2020) (stating that "the [SEC] continues to believe the 'arranged, negotiated, or executed' basis for applying Title VII requirements in the cross-border context").

[17] Under the final rule, persons engaging in any aspect of swap transactions within the United States remain subject to the CEA provisions and Commission regulations prohibiting the employment, or attempted employment, of manipulative, fraudulent, or deceptive devices, such as section 6(c)(1) of the CEA (7 U.S.C. 9(1)) and Commission regulation 180.1 (17 CFR 180.1). The Commission thus would retain anti-fraud and anti-manipulation authority, and would continue to monitor the trading practices of non-U.S. persons that occur within the territory of the United States in order to enforce a high standard of customer protection and market integrity. Even where a swap is entered into by two non-U.S. persons, we have a significant interest in deterring fraudulent or manipulative conduct occurring within our borders, and we cannot let our country be a haven for such activity.

[18] CFTC Staff Advisory No. 13–69 (Nov. 14, 2013), *https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/13-69.pdf.*

[19] This exception applies only to "Other Non-U.S. Person" swap entities, *i.e.,* non-U.S. swap entities that are neither an SRS nor an entity subject to a U.S. person guarantee ("guaranteed entity"). A non-U.S. swap entity that is an SRS or guaranteed entity would need to rely on the limited Group B exception discussed below.

[20] This expansion of substituted compliance does not apply to swaps between two U.S. branches of non-U.S. swap entities.

work together, or finally it will not work at all.'' I sincerely hope our domestic and international counterparts will view today's action as a positive step toward further cooperation to provide sound regulation to the global swaps markets.

## Appendix 3—Supporting Statement of Commissioner Brian Quintenz

I am very pleased to support today's final rule interpreting Congress' statutory directive that the Commission may only regulate those foreign activities that ''have a direct and significant connection with activities in, or effect on commerce, of the United States.'' [1] As I noted when I supported the proposal last December, Congress deliberately placed a clear and strong limitation on the CFTC's extraterritorial reach, recognizing the need for international comity and deference in a global swaps market.[2] Today's rule provides important safeguards to the US financial markets in delineating which cross-border swap activity must be counted towards potential registration with the Commission, and which transactions should be subject to the CFTC's business conduct requirements for swaps dealers (SDs) and major swap participants (MSPs). At the same time, the final rule appropriately defers to foreign regulatory regimes to avoid duplicative regulation and disadvantaging U.S. institutions acting in foreign markets.

Today's rule achieves the goals for cross-border regulation that I articulated in a speech before the ISDA Annual Japan Conference in October of last year.[3] I stated that each jurisdiction's recognition of, and deference to, the sovereignty of other jurisdictions is crucial in avoiding market fragmentation that poses serious risks to the liquidity and health of the derivatives markets. This rule properly grants deference to other jurisdictions by limiting the extent to which non-US counterparties must comply with significant aspects of the CFTC's regulatory framework for SDs and MSPs and by providing market participants with the opportunity to comply with local laws that the Commission has deemed comparable to the CFTC's regulations (''substituted compliance'').

### Substituted Compliance

As I noted with respect to the proposal, substituted compliance is the lynchpin of a global swaps market, and the absence of regulatory deference has been the fracturing sound we hear when the global swaps market fragments. The final rule provides a framework for substituted compliance with respect to two sets of regulations, ''group A'' entity-level requirements, such as conflicts of interest policies and a risk management program, and ''group B'' transaction-level

requirements, such as daily trading records, confirmation, and portfolio reconciliation. While the Commission has issued substituted compliance determinations for entity-level requirements in six jurisdictions and for transaction-level requirements in two jurisdictions, they all contain exceptions for particular provisions of the Commission's regulations, and one of the transaction-level determinations partially addresses only two of the five regulations in group B.[4]

Today's rule provides for a flexible, outcomes-based framework for future comparability determinations that will assess the goals of the Commission's regulations against the standards of its foreign counterparts' regimes, instead of directing the Commission to focus on a rigid line-by-line or even regulation-by-regulation comparison.[5] More specifically, and a primary reason for my support of this final rule, under this new framework, the Commission can compare the goals of its regulations to the outcomes of foreign regulations on an entire group-wide basis, so that the standards of a foreign regime will be considered holistically compared to the goals of all the Commission's either group A or group B requirements.

Additionally, this final rule allows the Commission to proactively assess and issue comparability determinations without waiting for a request from a jurisdiction. I recognize that several G–20 jurisdictions have made significant progress in the area of issuing transaction-level requirements, as evidenced by a recent report by the Financial Stability Board (FSB).[6] I hope that the Commission will soon issue additional substituted compliance determinations in order that foreign firms registered as SDs with the Commission, as well as foreign branches of US SDs, can gain the efficiencies of complying with local laws for many of their transactions with non-US persons.[7] Ideally, future determinations will provide for comprehensive, holistic substituted compliance in a particular jurisdiction for all transaction-level requirements in the CFTC's group B.

### ANE

Today's rule properly eliminates the possibility that a non-US SD be required to follow many of the CFTC's transaction-level requirements for a swap opposite a non-US counterparty if US-based personnel of that SD ''arrange, negotiate, or execute'' (ANE) the swap. This action brings to a close almost seven years of uncertainty, beginning with the misguided DSIO Advisory of November

2013.[8] I note that the staff's no-action letter issued this week suspends enforcement of ANE with respect to transaction-level requirements not covered by today's rule, specifically in the areas of real-time reporting of swaps to data repositories and the clearing and trade execution requirements, pending future Commission rulemakings that address these rules in a cross-border context. I expect the Commission will issue such rules in the near future in order to provide the marketplace with legal certainty in these areas and formally dispense with the ANE construct, just as it has with respect to the requirements addressed today. I believe strongly that ANE has no place with respect to real-time reporting, the clearing requirement, or the trade execution requirement, just like it has no place with respect to the business conduct regulations.

### US Guarantees and SRS

Another important element of today's rule is that it only requires two, clearly defined classes of non-US entities to count all of their swaps towards the Commission's SD and MSP registration thresholds, and to generally comply with the Commission's SD and MSP rules if registered. The first is an entity whose obligations to a swap are guaranteed by a US person, under a standard consistent with the Commission's cross-border rule for uncleared swap margin requirements.[9] The second is an entity deemed a ''significant risk subsidiary'' (SRS) of a US firm. It is very important that subsidiaries of US bank holding companies, including intermediate subsidiaries, are carved out from the SRS definition. Those firms are subject to supervision by the Federal Reserve Board, and, therefore, it does not make sense for the CFTC to deploy its precious resources to regulating those entities.

### Helping US SDs' Foreign Branches Compete

Today's rule properly makes substituted compliance available for group B requirements to a foreign branch of a US SD similarly to how substituted compliance is available for many non-US SDs registered with the Commission. I expect that this will help these branches compete with local institutions in that they will be subject to the same rules. For example, the Commission has already granted substituted compliance to EU regulations with respect to certain group B regulations.[10] As a result, both the EU branch of a US firm registered with the Commission as an SD and an EU firm registered as an SD could comply with many of the same EU rules for swaps with a US person or with a non-US person that is either US-guaranteed or an SRS registered as an SD or MSP (''swap entity SRS''). Moreover, under the ''limited foreign branch group B exception,'' the foreign branch of a US firm would be excused from complying with any group B rules, subject to a 5% notional cap, for a swap with a non-US person that is neither US guaranteed nor a swap entity SRS. However, if substituted compliance has been provided in a jurisdiction, then instead of

---

[1] Sec. 2(i) of the Commodity Exchange Act.

[2] Supporting Statement of Commissioner Brian Quintenz Regarding Proposed Rule: Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to SDs and MSPs, *https://www.cftc.gov/PressRoom/ SpeechesTestimony/quintenzstatement121819b.*

[3] Remarks of CFTC Commissioner Brian Quintenz at 2019 ISDA Annual Japan Conference, ''Significant's Significance,'' *https://www.cftc.gov/ PressRoom/SpeechesTestimony/opaquintenz20.*

[4] The determinations are available at, *https:// www.cftc.gov/LawRegulation/DoddFrankAct/ CDSCP/index.htm.* The transaction-level determination partially addressing only two of the group B regulations is for Japan, 78 FR 78890 (Dec. 27, 2013).

[5] Regulation 23.23(g).

[6] FSB, OTC Derivatives Market Reforms: 2019 Progress Report on Implementation (Oct. 15, 2019), Table M, *https://www.fsb.org/wp-content/uploads/ P151019.pdf.*

[7] The availability of substituted compliance, depending on the status of the counterparty, is provided for in regulation 23.23(f)(1) with respect to group A regulations and in 23.23(f)(2) through (3) with respect to group B regulations.

[8] CFTC Staff Advisory 13–69 (Nov. 14, 2013).

[9] Regulation 23.160.

[10] 78 FR 78878 (Dec. 27, 2013).

being excused from the group B rules for those swaps, the foreign branch would have to comply with the local rules. Due to the fact that neither of the transaction-level determinations granted comparability for all of the group B requirements, with respect to those requirements not subject to a substituted compliance determination, the foreign branch may either comply with CFTC regulations or count the notional value of the swap towards its 5% limited group B exception. Clearly, the rules favor the possibility of substituted compliance, pursuant to which a foreign branch of a US firm would have no limitation in following local rules. I believe that group-wide comparability determinations, without any exceptions, would simplify this situation and make more consistent the treatment of US dealer's foreign branches and their local competitors.

In conclusion, I am very pleased to have been a part of the Commission that accomplished this major milestone in a long road of issuing final regulations in the area of cross-border swaps oversight. I would like to thank the staff of the Division of Swap Dealer and Intermediary Oversight for all of their work in completing this final rule and to Chairman Tarbert for his leadership on this important issue.

## Appendix 4—Dissenting Statement of Commissioner Rostin Behnam

### Introduction and Overview

Today, by approving a final rule addressing the cross-border application of the registration thresholds and certain requirements applicable to swap dealers ("SDs") and major swap participants ("MSPs") (the "Final Rule"), the Commodity Futures Trading Commission ("CFTC" or "Commission") overlooks Dodd-Frank Act[1] purposes, Congressional mandates thereunder, an opinion of the DC District Court,[2] and multiple comments raising significant concerns. The Commission instead relies on broad deference that opens a gaping hole[3] in the federal regulatory structure. I cannot support a decision to jettison a cross-border regime that has not proven unreasonable, inflexible, or ineffective in favor of an approach that fails to address the most critical concerns that the Dodd-Frank Act directed the CFTC to address in favor of "*more workable*"[4] solutions. As the Final Rule opts to address the conflicts of economic interest between the regulated

and those who are advantaged by it[5] by usurping Congressional (and congressionally delegated) authority to rethink section 2(i) of the Commodity Exchange Act ("CEA" or "Act") via prescriptive rules, I must respectfully dissent.

Almost ten years ago to the day, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act as a legislative response to the 2008 financial crisis. Driven by a series of systemic failures, the crisis laid bare that the essentially unregulated and unmonitored over-the-counter derivatives or "swaps" markets were not the bastions of efficiency, stability, and resiliency they were thought to be.[6] Title VII of the Dodd-Frank Act gave the Commission new and broad authority to regulate the swaps market to address and mitigate risks arising from swap activities.[7]

Although much of the over-the-counter derivatives market's contributions to the 2008 financial crisis completed their journey within the continental U.S., the risk originated in foreign jurisdictions.[8] Accordingly, Congress provided in CEA section 2(i) that the provisions of Title VII, as well as any rules or regulations issued by the CFTC, apply to cross-border activities when certain conditions are met.[9]

The D.C. District Court recognized that "Section 2(i) operates independently, without the need for implementing regulations, and that the CFTC is well within its discretion to proceed by case-by-case adjudications, rather than rulemaking, when applying Section 2(i)'s jurisdictional nexus."[10] The D.C. District Court also found that, because the Commission was "not required to issue *any* rules (let alone binding rules) regarding its intended enforcement policies pursuant to Section 2(i)," the CFTC's decision to issue the Guidance as a non-binding policy statement benefits market participants.[11] To the extent the CFTC interpreted the meaning of CEA section 2(i) in its 2013 cross-border Guidance, an interpretation carried forward in the Final Rule today (and in this proposal), such interpretation is permissibly drawn linguistically from the statute and, regardless, cannot substantively change the legislative reach of section 2(i) or the Title VII regime.[12] In this regard, the interpretation reinforces the direct meaning of CEA section 2(i)'s grant of authority—without implementing regulations—to enforce the Title VII rules

extraterritorially whenever activities "have a direct and significant connection with activities in, or effect on, commerce of the United States."[13] Putting aside the anti-evasion prong in CEA section 2(i)(2), it remains that CEA section 2(i) applies the swaps provisions of the CEA to certain activities, viewed in the class or aggregate, outside the United States, that meet either of two jurisdictional nexuses: (1) A direct and significant effect on U.S. commerce; or (2) a direct and significant connection with activities in U.S. commerce, and through such connection, present the type of risks to the U.S. financial system and markets that Title VII directed the Commission to address.[14]

The Dodd-Frank Act's derivatives reforms contemplate that an individual entity's systemic riskiness is a product of the interrelations among its various activities and risk-management practices. As a result, the post-crisis reforms target the activity of derivatives trading as a means to reach those entities that conduct the trading.[15] As the Commission has acknowledged, "Neither the statutory definition of 'swap dealer' nor the Commission's further definition of that term turns solely on risk to the U.S. financial system."[16] And to that end, "[T]he Commission does not believe that the location of counterparty credit risk associated with a dealing swap—which . . . is easily and often frequently moved across the globe—should be determinative of whether a person's dealing activity falls within the scope of the Dodd-Frank Act."[17] By adopting an overarching risk-based approach to cross-border regulation today, the Commission jeopardizes the integrity and soundness of the markets it regulates. The Final Rule acknowledges that systemic risk may derive from the activities of entities that do not individually generate the kind of risk that

---

[1] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank Act").

[2] *SIFMA* v. *CFTC*, 67 F.Supp.3d 373 (D.D.C. 2014).

[3] *See generally Gonzales* v. *Raich*, 545 U.S. 1 (2005) (relied on by the Commission in the Final Rule at 1.D.2.(i) and in the Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swaps Regulations, 78 FR 45292, 45300 (Jul. 26, 2013) ("Guidance") to support its interpretation of the Commission's cross-border authority over swap activities that as a class, or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce—whether or not an individual swap may satisfy the statutory standard.).

[4] *See, e.g.,* Final Rule at II.C.3.

[5] *See Wickard* v. *Filburn*, 317 U.S. 111, 129 (1942).

[6] *See SIFMA*, 67 F.Supp.3d at 385–86 (citing *Inv. Co. Inst.* v. *CFTC*, 891 F.Supp.2d 162, 171, 173 (D.D.C. 2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013)).

[7] *See* Guidance, 78 FR at 45299.

[8] *See* Guidance, 78 FR at 45293–45295; *see also SIFMA*, 67 F.Supp.3d at 387–88 (describing the "several poster children for the 2008 financial crisis" that demonstrate the impact that overseas over-the-counter derivatives swaps trading can have on a U.S. parent corporation).

[9] 7 U.S.C. 2(i).

[10] *SIFMA*, 67 F.Supp.3d at 423–25, 427; ("Although many provisions in the Dodd-Frank Act explicitly require implementing regulations, Section 2(i) does not.").

[11] *Id.* at 423 (citation omitted).

[12] *Id.* at 424.

[13] *Id.* at 426.

[14] *See* Proposal at C.1.; Guidance, 78 FR at 45292, 45300; *see also SIFMA*, 67 F.Supp.3d at 424–25, 428 n. 31 (finding that Congress addressed issue of determining which entities and activities are covered by Title VII regulations, "For Congress already addressed this 'important' issue by defining the scope of the Title VII rules' extraterritorial applications in the statute itself.").

[15] *See* Jeremy Kress et al., Regulating Entities and Activities: Complimentary Approaches to Nonbank Systemic Risk, 92 S. Cal. L. Rev. 1455, 1459–60, 1462 (Sept. 2019).

[16] Cross-Border Application of the Registration Thresholds and External Business Conduct Standards Applicable to Swap Dealers and Major Swap Participants, 81 FR 71946, 71952 (Oct. 18, 2016) ("2016 Proposal"); *see also* Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," 77 FR 30596, 30597–98 (May 23, 2012) ("SD Definition Adopting Release") (explaining how the Dodd-Frank Act definitions of "swap dealer" and "security-based swap dealer" focus on whether a person engages in particular types of activities involving swaps or security based swaps); *id.* at 30757 (In response to questions as to whether the swap dealer definition should appropriately be activities-based or relate to how an entity is classified, Chairman Gensler clarified that, "The final rule is consistent with Congressional intent that we take an activities-based approach.").

[17] 2016 Proposal, 81 FR at 71952.

would subject them to systemic risk-based regulation, but then chooses not to address that very risk. When the CFTC focuses its regulatory oversight only on individually systemically significant entities, it unavoidably leaves risky activities unregulated that due to the interconnectedness of global markets individually, and in the aggregate, can and likely will negatively impact U.S. markets.[18]

Moreover, Congress embedded a risk-based approach, appropriate to the Commission's mandate, within the Dodd-Frank Act's swap dealer definition by instructing the Commission to exempt from designation as a dealer a person that ''engages in a *de minimis* quantity of swap dealing in connection with transactions with or on behalf of its customers'' and providing that an insured depository institution is not to be considered a swap dealer ''to the extent it offers to enter into a swap with a customer in connection with originating a loan with that customer.''[19] The swap dealer definition further provides that a person may be designated as a dealer for one or more types, classes or categories of swaps or activities without being designated a dealer for other types, classes, or categories of swaps or activities,[20] further indicating that the type and level of risk a particular person's activities present are the guiding factor in determining whether they may be required to register with the Commission as an SD and comply with the requirements of Title VII. The Commission seems to have lost sight of the fact that the activity of swap dealing itself presents the type of risk addressed by Title VII.[21] The Commission's ability to establish a threshold amount of such activity that warrants direct oversight via registration does not diminish this underlying trait, which is not binary, but a measure of the scale of risk. Risk is simply in the DNA of an SD.

As recognized by the Commission, requiring registration and compliance with the requirements of the Dodd-Frank Act reduces risk and enhances operational standards and fair dealing in the swaps markets.[22] To the extent the Dodd-Frank Act was enacted to reduce systemic risk to the financial system, the CFTC's role is to individually utilize its expertise in addressing risk to the financial system created by interconnections in the swaps market as a market conduct regulator through supervisory oversight of SDs and MSPs,[23]

and to contribute as a voting member in support of the broader systemic risk oversight carried out by the Financial Stability Oversight Council (''FSOC'').[24]

Since 2013, when the Commission announced its first cross-border approach in flexible guidance as a non-binding policy statement,[25] the Commission has understood that the global scale of the swap markets and domestic scale of regulation poses significant challenges for regulators and market participants.[26] I dissented from the December 2019 proposal for the Final Rule the Commission considers today.[27] Like the Final Rule, the Proposal suggested that we can resolve all complexities in one fell swoop if we alter our lens, abandon our longstanding and literal interpretation of CEA section 2(i), and limit ourselves to the purely *risk-based approach* described therein.

Today's action ignores that, ''It is the essence of regulation that it lays a restraining hand on the self-interest of the regulated and that the advantages from the regulation commonly fall to others.''[28] The Final Rule is essentially the Proposal with a more clearly articulated intention to rethink the Commission's mandate under the Dodd-Frank Act to seize the status of primary significant risk regulator—a position the Commission was neither delegated to assume nor provided the resources to occupy—so as to limit the application of Title VII. Like the Proposal, the Final Rule acknowledges the likelihood that the chosen course will result in increased risks of the kind Title VII directs us to address flowing into the U.S., or even originating in the U.S. via ANE activities, and then states a belief that the chosen approach is either ''adequate''[29] or of no moment because our focus on significant participants in the U.S. market should ensure the appropriate persons are subject to

Commission oversight via registration, even if, ''to the extent that a registered SD or MSP relies on the exceptions in the Final Rule, and is located in a jurisdiction that does not have comparable swap requirements, the Final Rule could lead to weaker risk management practices for such entities.''.[30] This approach boils down to: ad hoc harmonizing with the Securities and Exchange Commission (''SEC''); de facto delegating to the U.S. prudential regulators; or deferring to a foreign jurisdiction under a banner of comity without ever explaining how the application of the swap dealer *de minimis* registration threshold is unreasonable.

In various statements throughout the preamble, the Commission subtly—and not so subtly—promotes its emergent ''desire to focus its authority on potential significant risks to the U.S. financial system.''[31] In one glaring instance, the Commission responds to a very clear comment on the weakness of the SRS definition in terms of addressing evasion and avoidance concerns by eviscerating Congress's very carefully crafted SD definition, stating, ''[w]ithout this risk-based approach [SRS], the SD de minimis threshold, which is a strictly activity-based test (*i.e.,* a test based on the aggregate gross notional amount of dealing activity), becomes the de facto risk test of when an entity would be subject to the Commission's swap requirements as an SD.''[32] In the past several years, I have noted the Commission's eagerness to bypass clear Congressional intent in order to address longstanding concerns with Dodd-Frank Act implementation.[33] Indeed, the Commission has at times made a concerted effort to avoid targeted amendments in favor of sweeping changes to the regulation of swap dealers without regard for the long term consequences of its fickle interpretation of the law and analysis of risk.[34] I have grave concerns that the Final Rule's motive in commandeering the role of systemic risk regulator is to provide certainty to entities that they will have sufficient paths in the future to avoid registration with the Commission, and thus fly under the radar of the FSOC and the entire Title VII regime. As the DC District Court noted, the Commission cannot second-guess Congress' decision that Title VII apply extraterritorially.[35] In layering its new approach over the CEA section 2(i) analysis, the Commission does just that.

My dissent to the Proposal expounded at length on concerns with the Commission's ''new approach,'' which seeks to improve upon and clarify the Guidance while reallocating responsibilities in a manner that

---

[18] *See* Guidance, 78 FR at 45300 (consistent with relevant case law and the purpose of Title VII to protect the U.S. financial system from the build-up of systemic risks, under CEA section 2(i), the Commission must assess the connection of swap activities, viewed as a class or in the aggregate, to activities in commerce of the United States to determine whether application of the CEA swaps provisions is warranted).

[19] *See* CEA section 1a(49)(C) through (D), 7 U.S.C. 1a(49)(C) through (D).

[20] *See* CEA section 1a(49)(B), 7 U.S.C. 1a(49)(B).

[21] *See* Final Rule at II.D.3.(iv) (identifying the SD *de minimis* threshold as ''a strictly activity-based test (*i.e.,* a test based on the aggregate gross notional amount of dealing activity).

[22] *See* SD Definition Adopting Release, 77 FR at 30599.

[23] *See* Press Release Number 8033–19, CFTC, CFTC Orders Six Financial Institutions to Pay Total

of More Than $6 Million for Reporting Failures (Oct. 1, 2019), *https://www.cftc.gov/PressRoom/ PressReleases/8033-19* (''The Commission's swap-dealer risk management rules are designed to monitor and regulate the systemic risk endemic to the swaps marke.t''); *see also,* Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies, 84 FR 71740, 71744 (Dec. 30, 2019) (explaining that the activities-based approach to identifying, assessing, and addressing potential risks and threats to U.S. financial stability reflects two priorities, one of which is ''allowing relevant financial regulatory agencies, which generally possess greater information and expertise with respect to company, product, and market risks, to address potential risks, rather than subjecting companies to new regulatory authorities.'').

[24] Among other things, the FSOC is authorized to ''issue recommendations to the primary financial regulatory agencies to apply new or heightened standards and safeguards.'' Dodd-Frank Act section 120, 124 Stat. at 1408–1410.

[25] *See* Guidance, 78 FR at 45292.

[26] *See* Hannah L. Buxbaum, *Transnational Legal Ordering and Regulatory Conflict: Lessons from the Regulation of Cross Border Derivatives,* 1 U.C. Irvine J. Int'l Transnat'l & Comp. L. 91, 92 (2016).

[27] *See* Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 FR 952, 1008 (proposed Jan. 8, 2020) (the ''Proposal'').

[28] *Wickard* v. *Filburn,* 317 U.S. 111.

[29] *See, e.g.,* Final Rule at II.D.3.(iii)–(iv).

[30] Final Rule at X.C.11.(iv).

[31] *See* Final Rule at V.C.

[32] *See* Final Rule at II.D.3.(iv).

[33] *See, e.g.,* De Minimis Exception to the Swap Dealer Definition—Swaps Entered into by Insured Depository Institutions in Connection With Loans to Customers, 84 FR 12450, 12468–12471 (Apr. 1, 2019).

[34] *See, e.g., id.*; Segregation of Assets Held as Collateral in Uncleared Swap Transactions, 84 FR 12894, 12906 (Apr. 3, 2019); De Minimis Exception to the Swap Dealer Definition, 83 FR 27444 (proposed June 12, 2018).

[35] *SIFMA,* 67 F.Supp.3d at 432.

is ill-conceived given that we are just 10 years past one crisis, and currently navigating a global pandemic. Accordingly, I will not reiterate my earlier points, but incorporate by reference my prior dissent,[36] which is still on point save for a comment I made on the "unlimited U.S. responsibility prong" to the U.S. person definition, which has been addressed, and I thank staff for addressing my concern.[37] I will, however, take the opportunity here to focus on how the Commission's approach to the cross-border application of the SD registration threshold in the Final Rule amounts to a re-write of the Dodd-Frank Act, as exemplified by the "significant risk subsidiary" or "SRS" definition.

**The Commission Does Not Have a Blank Check**

By codifying a purely and defined risk-based approach to its extraterritorial jurisdiction, exempting from the CFTC's regulatory oversight all entities but those which individually pose systemic risk to the U.S. financial system, the CFTC abdicates its Congressionally-mandated responsibility under CEA section 2(i) to regulate activities outside of the United States that meet one of the aforementioned jurisdictional nexuses.[38] The Final Rule today defies Congress' clear intent in enacting CEA section 2(i), improperly elevates comity over adhesion to the CFTC's mandate, and increases the riskiness of global swap markets.

Congress demonstrated its ability to discern between purely systemic risk-based and activities-based regulation when it designated authority to the CFTC. It directed the Commission to develop a metric to analyze which entities pose enough risk to require SD registration, creating an exception to the registration requirement for entities engaged in only a *de minimis* quantity of swap dealing.[39] It is telling that the CEA does not, under section 2(i), direct the CFTC to develop a similar threshold measurement to evaluate whether foreign entities singularly pose systemic risk to U.S. commerce. The lack of a comparable exception in CEA section 2(i) indicates that Congress intended to do exactly what the plain language of CEA section 2(i) suggests—require that the CFTC oversee *activities* outside of the U.S. that pose risk to U.S. commerce (not individual persons or entities).[40] Furthermore, nothing in the swap dealer definition or CEA section 2(i) expresses that we should defer to prudential regulators, whether U.S. or foreign; prudentially-regulated entities may be required to register as swap dealers with the CFTC.[41] If the Congress believed that

prudential regulation could sufficiently mitigate risk to the U.S. financial system, it would have chosen to delegate this function to the U.S. prudential regulators. Congress instead chose to enact a registration requirement in Title VII of the Dodd-Frank Act. Ultimately, the introduction of the concept of an "SRS" and accompanying exemptions for: (1) Entities with parents that have less than $50 billion in consolidated assets, and for entities that are already (2) prudentially regulated or (3) subject to comparable foreign regulation, is impermissible under CEA section 2(i).

Whether or not we agree with Congress, the CFTC is not free to rewrite the statute and enact rules that contravene our mandate. Agencies may not act like they have a "blank check" to proffer legislative rules outside of their delegated authority;[42] regulators have to take directives from their governing statute and not second-guess Congress.[43] Thus, the CFTC is not free to disregard its mandate in the pursuit of other objectives—such as comity, deference, adequacy, workability, or an inexplicable desire to act solely like a prudential regulator—no matter how laudable some of those objectives might be.[44] The Commission today dodges the responsibility with which it was entrusted in the wake of a crisis, impermissibly rewriting the Dodd-Frank Act to pass the buck to prudential regulators and our international counterparts.

The CFTC's implementation of the Final Rule's purely risk-based approach to regulating global swaps is neither allowable under Title VII, nor is it wise. Our current Chairman, in fulfilling his role as the CFTC's representative on the FSOC, when supporting guidance signifying that the FSOC would adopt an activities-based approach to determining risks to financial stability, stated that an entity-based approach, "inevitably leads to a 'whack-a-mole' scenario in which risky activities are transferred out of highly-regulated entities and into less-regulated

ones.".[45] Given the conglomeration of exceptions built into the Final Rule's definitions of "guarantee," and "SRS," and its determination regarding "ANE Transactions," it is hard to see how this transfer of risk to less-regulated entities—which still pose risk in the aggregate to U.S. markets—will not come to pass, inevitably leaving gaps in the CFTC's ability to oversee the activities it regulates.

With respect to our cooperation with foreign counterparts, I firmly believe that the CFTC should work diligently to coordinate oversight and elevate principles of international comity as we develop our cross-border approach—but not when doing so requires us to abdicate our mandate. To that end, I generally support the Final Rule's application of substituted compliance even if I do not fully agree with entity categorizations via the definitions. I also generally support the CFTC's deference to foreign regulators when it makes sound comparability determinations. To the extent the Final Rule grants somewhat indeterminate discretion to the CFTC to depart from an objective evaluation in making such determinations, as noted by several commenters,[46] I will remain vigilant when participating in such Commission action and be mindful of potential for slippage.

I remain concerned that the Final Rule, like the Proposal, makes vague references to "comity" to justify our resistance to regulating overseas activities that pose risk to U.S. markets. I agree that making substituted compliance available to foreign entities or subsidiaries, via sound comparability determinations, is appropriately deferential to principles of international comity. Nevertheless, we should only use comity to justify rulemaking when there is ambiguity in the governing statute,[47] or when our requirements unreasonably interfere with those of our international counterparts[48]—neither of which is overtly true regarding our statutory obligation under CEA sections 4s(a) and (c)[49] to register SDs and MSPs based on

---

[36] *See* 85 FR at 1009–1013.

[37] *Id.* at 1011.

[38] *See* 7 U.S.C. 2(i).

[39] *See* CEA section 1a(49)(D); 7 U.S.C. 1a(49)(D).

[40] *Silvers* v. *Sony Pictures Entm't, Inc.,* 402 F.3d 881, 885 (9th Cir. 2005) ("The doctrine of expressio unius est exclusio alterius 'as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.'" (quoting *Boudette* v. *Barnette,* 923 F.2d 754, 756–57 (9th Cir. 1991).

[41] *See also* CEA section 4s(c), 7 U.S.C. 4s(c) (requiring any person that is required to register as

a swap dealer or major swap participant to register with the Commission, "regardless of whether the person also is a depository institution or is registered with the Securities and Exchange Commission.").

[42] Neomi Rao, Address at the Brookings Institution: What's Next for Trump's regulatory agenda: A conversation with OIRA Administrator Neomi Rao (Jan. 26, 2018), Transcript at 10 (". . . agencies should not act as though they have a blank check from Congress to make law."), *https://www.brookings.edu/wp-content/uploads/2018/01/es_20180126_oira_transcript.pdf.*

[43] *See SIFMA,* 67 F.Supp.3d at 432 (finding that the CFTC "could not have second-guessed Congress' decision" that Title VII rules apply extraterritorially).

[44] *BP W. Coast Prods., LLC* v. *FERC,* 374 F.3d 1263 (DC Cir. 2004) (Congressional mandates to agencies to carry out "specific statutory directives define[ing] the relevant functions of [the agency] in a particular area." Such a mandate does not create for the agency "a roving commission" to achieve those or "any other laudable goal." (quoting *Michigan* v. *EPA,* 268 F.3d 1075, 1084 (DC Cir. 2001)); *see also Farmers Union Cent. Exch., Inc.* v. *FERC,* 734 F.2d 1486, 1500 (DC. Cir. 1984) ("Agency decisionmaking, of course, must be more than 'reasoned' in light of the record. It must also be true to the Congressional mandate from which it derives authority.").

[45] Heath P. Tarbert, Chairman, CFTC, Statement on the New Activities-Based Approach to Systemic Risk (Dec. 19, 2019), *https://www.cftc.gov/PressRoom/SpeechesTestimony/tarbertstatement120619.*

[46] *See* Proposal at VI.D.1.(ii.).

[47] Michael Greenberger, *Too Big to Fail—U.S. Banks' Regulatory Alchemy: Converting an Obscure Agency Footnote into an "At Will" Nullification of Dodd-Frank's Regulation of the Multi-Trillion Dollar Financial Swaps Market,* 14 J. Bus. & Tech. L. 197, 367 (2019) ("There is no legal precedent extant that defines 'international comity' as giving authority to a U.S. administrative agency to weaken unilaterally the otherwise clear Congressional statutory language or intent that the statute must be applied extraterritorially.").

[48] *See* Proposal, 85 FR at 957; Final Rule at II.D.3.(iv); Aaron D. Simowitz, *The Extraterritoriality Formalisms,* 51 Conn. L. Rev. 375, 405–6 and n. 205 (2019) (describing the principle of "prescriptive comity" in the Restatement (Fourth) of Foreign Relations Law and recognizing that "Interference with the sovereign authority of foreign states may be reasonable if such application would serve the legitimate interests of the United States." (citing Restatement (Fourth) of Foreign Relations Law § 405 cmt. (Am. Law. Inst. 2018)).

[49] CEA section 4s(a), (c), 7 U.S.C. 4s(a), (c).

their swap activities. Registration is a critical first step in determining whether a non-U.S. entity is engaged in activities covered under 2(i), and must not be disregarded for the sake of comity.

It is also pertinent to note here that by prioritizing comity and refusing to appropriately retain jurisdiction, at least to some degree, over transactions that are arranged, negotiated, or executed in the United States by non-U.S. SDs with non-U.S. counterparties ("ANE Transactions"), the Commission's abdication of Congressionally-mandated responsibility extends beyond CEA section 2(i). There is no need to even address whether these transactions have a "direct and substantial" impact on U.S. commerce, because they occur *in* the United States and accordingly fall squarely within the regulatory purview of the CFTC.[50] Ignoring all ANE Transactions invites entities to evade U.S. law, even as they avail themselves of the benefits of U.S. markets by residing in the U.S. and using U.S. personnel, as they can administratively treat transactions as booked in a foreign subsidiary based on the conclusion that any relevant risk has been shipped off. I am concerned that the CFTC is improperly fixating on comity at the expense of not only its mandate, but also at the expense of developing sound regulation that increases transparency, competition, and market integrity. The Final Rule brushes past concerns raised by a market participant that exempting ANE transactions from reporting requirements gives non-U.S. entities an advantage over U.S. SDs and jeopardizes the intended benefits of the CFTC's public reporting regime.[51] I am concerned by the Commission's response to the comment,[52] and I struggle to understand why any U.S. regulator would implement a rule that defies its statutory mandate, subjects U.S. entities to a competitive disadvantage relative to its foreign counterparts, and reduces U.S. investors' transparency into the markets.

## SRS: This Is the Way

In my dissent to the Proposal, I identified SRS as the most elaborate departure from both the Commission's interpretation of CEA section 2(i) and from our mandate under the Dodd-Frank Act, in its elimination of a large cross-section of non-U.S. subsidiaries of U.S.

parent entities from having to count their swap dealing activities toward the relevant SD or MSP registration threshold calculations.[53] The SRS replaces the conduit affiliate concept from the Guidance, which, although broader, served to (1) appropriately define the universe of entities whose risks related to swap activities may accrue and have a direct and significant connection with activities in, or effect on, U.S. commerce, and (2) harmonize with the SEC's cross-border application of the *de minimis* threshold relevant to security-based swap dealing activity.[54]

Despite a clear split among Commissioners and commenters, the Commission has determined to move forward with the SRS, which creates broad exceptions that could exclude large amounts of the swap dealing activities by foreign subsidiaries of U.S. entities from counting towards the SD and MSP registration threshold calculations and therefore, ultimately exclude them from the Commission's oversight and application of the swap dealer regulations. In support of its determination, the Commission rehashes and repeats the argument that SRS "embodies" the Commission's purely risk-based approach.[55] If "this is the way," [56] then I am afraid our new approach may not account—perhaps at all—for the risk that Congress and the Dodd-Frank Act directed the Commission to oversee. If Congress had wanted the Commission to focus its cross-border authority solely on systemically significant non-bank entities, it would have been explicit, and refrained from using language in CEA section 2(i) that was so embedded in common law.[57]

In excluding subsidiaries of bank holding companies and intermediate holding companies from the SRS definition, the Commission defers to the "role of prudential regulation in the consolidated oversight of prudential risk," again relying on "the risk-based approach to determining which foreign

subsidiaries present a significant risk to their ultimate U.S. parent and thus to the financial system." [58] In presuming that prudential oversight provides "sufficient" comparable oversight to that prescribed by Title VII, the Commission entirely ignores that history weighs against such a presumption [59] and Congress acted accordingly.[60] Under the Dodd-Frank Act, the CFTC is the "primary financial regulatory agency" for swap dealers.[61] CEA section 4s(c) [62] provides that any person that is required to be registered as an SD or MSP shall register with the CFTC regardless of whether the person also is a depository institution (*i.e.,* any bank or savings association) or is registered with the SEC as a security-based swap dealer. Moreover, to the extent SDs or MSPs have a prudential regulator, Title VII recognizes that such SDs/MSPs are to comply with capital and margin requirements established by their respective prudential regulators.[63] However, it explicitly does not recognize prudential regulation as a substitute for SD/MSP regulatory oversight by the Commission.[64]

Again, I believe that our cross-border approach must absolutely align with principles of international comity and that our rules and supervisory approach should harmonize and work in tandem with prudential regulation. However, I do not believe that the SRS definition is reasonable or consistent with the SD definition or CEA section 2(i), due to its deference to the role of prudential regulation in the consolidated oversight of prudential risk to carve out consideration of swap dealing activities of non-U.S. entities (that are not guaranteed by a U.S. person) for purposes of SD registration and Commission oversight.

The Final Rule would suggest that our consideration of the activities of non-U.S. subsidiaries of U.S. entities is an "expansion" of the Commission's oversight.[65] I disagree. The post-2010 crisis reforms require intensive oversight of entities engaged in swaps activities throughout the world. The Commission must retain in full

---

[50] *See* SIFMA, 67 F. Supp. 3d at 426 ("Section 2(i)'s ''technical language initially lays down a general rule placing all [swap] activity'' occurring outside of the United States beyond Title VII's reach. But it then expressly brings such swap activities ''back within'' Title VII's purview). ANE Transactions should not be a part of the initial exemption step required by section 2(i), because they do not occur outside of the United States.

[51] *See* Proposal at V. B.-C.; Citadel, Comment Letter on Proposed Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants (Mar. 9, 2020), *https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=62376.*

[52] *See* SIFMA, 67 F. Supp. 3d at 429 (An agency '''need not address every comment, but it must respond in a reasoned manner to those that raise significant problems.'''(citing *Covad Commc'ns Co. v. FCC,* 450 F.3d 528, 550 (D.C. Cir. 2006) (quoting *Reytblatt* v. *Nuclear Regulatory Comm'n,* 105 F.3d 715, 722 (D.C. Cir. 1997))).

[53] 85 FR at 1012; *see also* Dissenting Statement of Commissioner Dan M. Berkovitz, 85 FR at 1015 (describing the SRS construct as "an empty set.").

[54] *See* 17 CFR 240.3a71–3(a)(1).

[55] See Final Rule at II.C. 3.(iii) (in declining to incorporate risk transfer and risk acceptance test into the "significant subsidiary" definition, the Commission finds that such activity-based tests are inconsistent with the Commission's determination to apply swap requirements to foreign entities using a risk-based test to isolate entities that the Commission considers to pose a significant risk to the financial system based solely on their significance in terms of their balance sheet size relative to the parent entity).

[56] "This is the way" is identified as a Mandalorian mantra and cultural meme associated with keeping members of the group on the same wavelength without any question at all. *See* Evan Romano, *What 'This Is the Way' Explains About the Mandalorians in The Mandalorian,* Men'sHealth (Nov. 22, 2019).

[57] *See, e.g.* Proposal at I.C.1.; Guidance 81 FR at 45298–45300; see *SIFMA,* 67 F.Supp.3d at 427 ("Congress modeled Section 2(i) on other statutes with extraterritorial reach that operate without implementing regulations." (citations omitted)); *see* Larry M. Eig, Cong. Research Serv., 97–589, Statutory Interpretation: General Principles and Recent Trends 20 (2014) (Congress is presumed to legislate with knowledge of existing common law.").

[58] Notably, the Commission determined to use the $50 billion threshold for the ultimate parent entity of an SRS because the FSOC initially used a $50 billion total consolidated assets quantitative test as one threshold to apply to nonbank financial entities for purposes of designated nonbank financial companies as "systemically important financial institutions" ("SIFIs"). *See* Proposal, 85 FR at 965 n.134. The FSOC recently voted to remove the $50 billion threshold because, among other things, it was "not compatible with the prioritization of an activities-based approach" to addressing risks to financial stability. *Id.; see also* FSOC Interpretive Guidance, 84 FR at 71742.

[59] *See, e.g.,* Guidance, 78 FR at 45294; Proposal, 85 FR at 1013–1015.

[60] *Id.*

[61] Dodd-Frank Act, Public Law 111–203 section 2[12](C)(viii), 124 Stat. 1389.

[62] CEA section 4s(c), 7 U.S.C. 4s(c).

[63] CEA section 4s(e)(2)(A), 7 U.S.C. 4s(e)(2)(A)

[64] *See* Eig, *supra* note 57 at 16–17 ("where Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U.S. 427, 433 (1933))).

[65] Final Rule at II. D. 3. (iv).

its oversight and regulatory responsibilities over entities whose activities have a direct and significant connection with activities in, or effect on, U.S. commerce. To do that effectively, we must be able to apply the SD definition and *de minimis* threshold to the web of interconnections through which risk travels, not simply rely on bright line balance sheet box checking to wholesale elimination of non-U.S. subsidiaries from our scope of consideration. As I stated in my prior dissent, without a more concrete understanding as to whether SRS is truly superior to the conduit affiliate [66] concept currently outlined in the Guidance and presumably similar to the SEC's own approach, it is difficult to get behind a policy that would bring risk into the U.S. of the very type CEA Section 2(i) seeks to address.

## Complexity and Burden Should Not Direct the Outcomes

I continue to have reservations regarding the Commission's determination to discard the Guidance and the use of agency guidance and non-binding policy statements in favor of prescriptive rules.[67] As I noted with regard to the Proposal, while the Guidance is complex, it is no more complex than this Final Rule. Complexity is the hallmark of the regulation of cross-border derivatives, and "merely reflects the complexity of swaps markets, swaps transactions, and the corporate structures of the market participants that the CFTC regulates." [68] I am especially concerned that the Commission is acting in haste to nail down hard and fast rules while many pieces in the global regulatory puzzle are still in flux.

Commenters refrained from weighing in on the virtues of retaining the Guidance—or agency guidance generally. The Proposal garnered just 18 relevant comment letters.[69] It is difficult to determine why, but perhaps market participants have followed the Guidance and utilized their expertise in reviewing the overall statutory scheme and the straightforward language of CEA section 2(i) to come into compliance with Title VII either directly or via substituted compliance and have not found it prohibitive to do so.[70]

Like the Proposal, the Final Rule prides its alteration of various definitions such as "U.S. person" and "guarantee," the substitution of SRS for conduit affiliates, and the abandonment of ANE Transactions, as burden and/or cost reducing (or, "more workable"). Unfortunately, I believe the Commission in some instances has not fully evaluated the true weight of the burdens, and in other instances, not fully measured those burdens against the goals of Title VII and the benefits of the overall intent of CEA section 2(i).

A straightforward example is the Commission's determination to increase the proposed five-year time limits for reliance on representations regarding U.S. person and guarantee status to seven years to appease commenters who asked for perpetual reliance on previously obtained representations.[71] There is no indication that the Commission considered anything but providing market participants more time, in spite of recognizing that best practice would be to obtain updated representations as soon as practicable.

A more concerning example is the Commission's decision to move forward with a narrower definition of "guarantee" than that outlined in the Guidance, despite recognizing that it could lead to entities counting fewer swaps towards their *de minimis* registration threshold or "qualify additional counterparties for exceptions to certain regulatory requirements as compared to the definition in the Guidance." [72] The Commission did not address the commenter who also pointed out that the narrower definition would allow significant risk to be transferred back to the U.S. financial system over time noting that, "economic implications are just as important as legal considerations, as confirmed and intended by CEA section 2(i)(1).[73] Instead, the Final Rule offers the possibility that the SRS definition would capture some non-U.S. persons, returning to the mantra that in this way we focus on those entities that represent "material risk to the U.S. financial system," through something "workable." [74]

## Conclusion

Before I conclude, I would like to take a moment to thank staff from the Division of Swap Dealer and Intermediary Oversight for their presentations, tireless work on this rulemaking, and frequent engagement with my office over the last few weeks leading up to today's open meeting. Like all of the CFTC's work, today's discussion would not have been possible without the expertise and commitment of our dedicated staff.

As the Commission wraps up its scheduled work, before a brief summer respite, particularly on this 10th anniversary week of the Dodd-Frank Act, our work yesterday and today, although some may like to think it, is *not* the culmination of years of work towards implementing the Dodd-Frank Act. In fact, the Commission acted promptly in issuing the cross-border 2013 Guidance, only a few

years after bill passage and in the throes of dozens of other equally important Title VII rulemakings.

This week's exercise is a retrenchment of sound derivatives policy that provided the CFTC the tools necessary to monitor swap markets and protect the U.S. financial system and American taxpayers, and most importantly was steadfast to clearly articulated Congressional intent. There is always room for improvement, tweaking, and evolving—I have said as much, many times since becoming a Commissioner.

But, unfortunately, during this week that we should be lifting up the merits of financial reform, especially given the role post-crisis reforms played in absorbing massive shocks during the worst of the Covid–19 pandemic just a few months ago, we are turning back the clock to a previous era that proved to be inadequate to meeting our core responsibilities.

## Appendix 5—Statement of Commissioner Dawn D. Stump Overview

When we met together in person late last year to consider proposing cross-border rules with respect to registration thresholds and regulatory requirements applicable to swap dealers and major swap participants (the "Proposal"),[1] I stressed that because we were proposing to replace the Commission's 2013 cross-border guidance (the "Guidance") [2] with binding and enforceable rules, those rules must be clear, sensible, and workable.[3] In supporting the Proposal at the time, I concluded that the proposed rules met those standards. And I have not seen anything in the many thoughtful comment letters we received that causes me to doubt that conclusion.

The final rules that are before us today, as we meet remotely several months later, are largely the same as those we proposed. But based on public input: (1) In several places, we are providing clarifications requested by market participants;[4] (2) in a few places where the proposal deviated from the Guidance, we have been persuaded that the Guidance got it right, and thus are returning to the Guidance approach;[5] and (3) in still

---

[66] *See, e.g.,* 85 FR at 1012 (noting the Proposal's lack of explaining whether and how the conduit affiliate concept failed to achieve its purpose, is no longer relevant, resulted in loss of liquidity or market fragmentation, proved unworkable, etc.).

[67] *Id.* at 1010.

[68] *SIFMA,* 67 F.Supp.3d at 419–20 ("Indeed, the complexity of a regulatory issue is one reason an agency might choose to issue a non-binding policy statement rather than a rigid 'hard and fast rule.'" (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 202–203 (1947))).

[69] Comments to the Proposal are available at *https://comments.cftc.gov/PublicComments/CommentList.aspx?id=3067.* Of note, the proposal to the Guidance received approximately 290 comment letters. Guidance, 78 FR at 45295. The 2016 Proposal received approximately 29 substantive comment letters, available at *https://comments.cftc.gov/PublicComments/CommentList.aspx?id=1752.*

[70] Indeed, the DC District Court concluded that the CFTC need not address every facet of the overall regulatory scheme and can rely on regulated market participants to reference other controlling statutes and regulations to address issues left unresolved by a given Title VII rule. *See SIFMA,* 67 F. Supp. 3d at 428 n.31.

[71] *See* Final Rule at II.B.5. and C.3.

[72] *See* Final Rule at II.C.2. and 3.

[73] *Id.*

[74] *See* Final Rule at II.C.3.

[1] There are no registered major swap participants at this time. Accordingly, for convenience, this Statement generally will refer only to swap dealers, and not to major swap participants.

[2] Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 FR 45292 (July 26, 2013).

[3] Statement of Commissioner Dawn D. Stump Regarding Proposed Rule: Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants (December 18, 2019), available at *https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement121819.*

[4] *E.g.,* clarification that in addition to entities that are subject to capital regulation by the CFTC, Securities and Exchange Commission ("SEC"), or U.S. prudential regulators, the attribution requirement in connection with the major swap participant registration threshold also excludes entities subject to Basel-compliant capital standards and oversight by a G–20 prudential supervisor.

[5] *E.g.,* addition of a provision that was in the Guidance, but not in the Proposal, whereby a non-

Continued

other places, we are incorporating suggestions made by commenters.[6] As a result, the final rules build and improve upon the foundation laid by the Proposal. They, too, are clear, sensible, and workable, and I am pleased to support them.

I do not plan to summarize here the changes to the Proposal that are encompassed within the final rules. To those not steeped in the minutiae of *de minimis* swap dealer registration calculations and entity- and transaction-level requirements under the Guidance,[7] such a summary can become somewhat mind-numbing. Instead, I would like to place today's cross-border rulemaking in context, and explain my support from a broader perspective.

## Section 2(i) and Codifying the Guidance

We begin, as we must, with the terms of the statute—Section 2(i) of the Commodity Exchange Act ("CEA"), which was added by the Dodd-Frank Act.[8] Given the importance of this topic, please indulge my reiterating a few points that I made about the Proposal.

Section 2(i) limits the international reach of CFTC swap regulations by affirmatively stating that they "shall not apply to activities outside the United States unless those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." [9] A common-sense reading of this section is that there is a limited extraterritorial reach to the Dodd-Frank swap requirements, and to stretch them beyond the stated statutory criteria impermissibly infringes upon the rule sets of other nations.

That is, the plainly stated congressional intent is to start with US law not applying beyond our borders, and then continue to the limited conditions where extraterritoriality would be deemed appropriate. The law does not say that CFTC rules govern derivatives market activities around the world if there is *any* linkage or tie to the United States and should not be interpreted and abused as such.

In adopting rules setting out how we will apply Section 2(i) to the registration

thresholds and regulatory requirements relevant to the cross-border activities of swap dealers, we are not writing on a blank canvas. The Guidance has been in place for seven years now, and although it is non-binding,[10] market participants (both those that have registered and those that have had to determine whether they are required to register) have devoted a tremendous amount of human and financial resources to conform to its complicated contours.

Faced with that reality, although I was not a fan of the Guidance when it was issued,[11] I agree that it is appropriate to codify its basic elements into our rule set rather than start from scratch. And that is what the final rules before us today will do. The final rules codify many elements of the Guidance, while updating a few provisions to reflect current realities and incorporating some improvements based on our experience during the intervening years.[12]

Much has been made of statements in the Proposal, which are carried over into today's release, that the focus of the Commission's analysis under Section 2(i) is on risk to the U.S. financial system. But this, too, is essentially a codification of the approach taken in the Guidance. While I do not often quote then-Chairman Gary Gensler, I note that in his Statement supporting the adoption of the Guidance, he said:

There's no question to me, at least, that the words of Dodd-Frank addressed this (*i.e.*, risk importation) when they said that a direct and significant connection with activities and/or effect on commerce in the United States covers these risks that may come back to us.

I want to publicly thank Chairman Barney Frank along with Spencer Bachus, Frank Lucas, and Collin Peterson, and their staffs for reaching out to the CFTC and the public to ask how to best address offshore risks that could wash back to our economy in Dodd-Frank.[13]

Implementing our statutory cross-border mandate through a risk-based analysis that focuses on the pertinent issue of risk to the US financial system is a sensible approach, which I endorse.

For those who maintain that the final rules take too narrow a view of the Commission's

extraterritorial reach with respect to swap dealers, I note the truly remarkable fact that today, with the Guidance in effect, approximately half of the over 100 swap dealers currently registered with the CFTC are located outside the United States.[14] This percentage has stayed relatively constant since the CFTC's swap dealer registration regime "went live" at the end of 2012. Registered non-US swap dealers are located across the globe—in North and South America, Europe, Asia, and Australia.

In other words, although it is non-binding, the Commission's Guidance appears to have brought a substantial portion of global swap dealing activity into the Commission's swap dealer regulatory regime. And the record before us is devoid of evidence suggesting that the number of registered non-US swap dealers is seriously over- or under-inclusive. Given the extent to which the final rules codify the Guidance, a significant change in that number is unlikely.

Because the final rules essentially codify the Guidance, and because I support the final rules for the reasons explained herein, I accept the interpretation of CEA Section 2(i) stated in the Guidance and the final rules in the limited context of registration thresholds and regulatory requirements applicable to swap dealers. To codify the Guidance while revising the foundation on which it was based would only generate confusion—as opposed to the clarity that I hope this rulemaking will bring to one aspect of our cross-border work.

But the analysis of, in Mr. Gensler's words, "offshore risks that could wash back to our economy" may well differ in the context of other Dodd-Frank requirements. As we proceed with other aspects of our cross-border work—in areas such as clearing, trade execution, and reporting—rigorous analysis of the Section 2(i) test for each rule we adopt is necessary to ensure that the law is followed both to the letter and in spirit.

## Clear, Sensible, and Workable Rules

Transitioning from the interpretation of Section 2(i) to the rules before us, some have questioned why we are adopting rules in the first place. While it is true that Section 2(i), unlike other provisions in Dodd-Frank, does not require the Commission to adopt implementing rules, I believe it is good government to do so. Guidance has its place, of course. Given the nascent state of post-Pittsburgh derivatives reforms in 2013, reliance on guidance made sense at the time. But I have spoken before of the benefits of codifying interpretations issued by our staff where appropriate,[15] and those benefits accrue in equal measure to the codification

---

U.S. person does not have to count in its *de minimis* swap dealer registration calculation swaps entered into with an entity whose swap obligations are guaranteed by a U.S. person if the guaranteed entity is itself below the *de minimis* threshold and is affiliated with a registered swap dealer.

[6] *E.g.:* (1) While the Proposal removed the prong of the "U.S. person" definition in the Guidance that included a legal entity that is majority-owned by one or more U.S. person(s) in which such person(s) "bears unlimited responsibility for the obligations and liabilities" of the legal entity, the final rules add such a circumstance to the definition of a "guarantee;" and (2) while the Proposal excepted certain subsidiaries of bank holding companies from the definition of a "significant risk subsidiary," the final rules also except certain subsidiaries of intermediate holding companies in the same circumstances.

[7] The final rules replace the Guidance's classification of requirements imposed on registered swap dealers under the Commission's rules as entity- and transaction-level requirements with a similar (but not identical) classification into group A, group B, and group C requirements (discussed further below).

[8] Public Law 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank").

[9] CEA Section 2(i), 7 U.S.C. 2(i).

[10] *SIFMA* v. *CFTC,* 67 F. Supp.3d 373 (D.D.C. 2014).

[11] When the CFTC was considering the Guidance, I shared the view vividly articulated by then-Commissioner Jill Sommers that the Guidance, as it had been proposed, reflected "what could only be called the 'Intergalactic Commerce Clause' of the United States Constitution . . ." *See* Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 FR 41214, 41239 (proposed July 12, 2012) (Statement of Commissioner Sommers).

[12] Several commenters asked the Commission to take the opportunity of this rulemaking to significantly alter the Guidance approach to the cross-border activities of swap dealers in various respects. As noted, we have determined to codify, rather than reconstruct, most of the decisions that underlie the Guidance (although we have made some adjustments as discussed herein). While maintaining the *status quo* under the Guidance may deny affected market participants results they wish for, it does not require them to give up what they have had for the past seven years.

[13] Guidance, 78 FR at 45371 (Statement of Chairman Gary Gensler).

[14] *See* National Futures Association Membership and Directories (data as of July 22, 2020), available at *https://www.nfa.futures.org/registration-membership/membership-and-directories.html#SDRegistry.*

[15] *See* Statement of Commissioner Dawn D. Stump Regarding Amending Rule 3.10(c)(3)— Exemption from Registration for Foreign Persons Acting as Commodity Pool Operators on Behalf of Offshore Commodity Pools (May 28, 2020) ("Commissioner Stump Part 3 Statement"), available at *https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement052820.*

of Commission guidance. Replacing the prior Guidance with rules that reflect current realities and are based on experience developed during the past seven years provides certainty to the marketplace and a shared understanding of the "rules of the road."

Some may argue that in those few places where the rules of the road that we are adopting today depart from the Guidance, the Commission has retreated with respect to the extraterritorial application of its swap regulatory regime. As I shall discuss, however, such criticisms fail to take account of other, equally important, considerations relevant to the exercise of our rulemaking authority: (1) The aforementioned need for clear, sensible, and workable rules; and (2) appropriate deference to comparable regimes of our international regulatory colleagues.

*Definition of a "Guarantee"*

For example, the release accompanying the final rules acknowledges that the definition of a "guarantee" that we are adopting today is narrower than that in the Guidance. The final rules define a "guarantee" as an arrangement in which one party to a swap has rights of recourse against a guarantor with respect to its counterparty's obligations under the swap, with "rights of recourse" meaning a legally enforceable right to collect payments from the guarantor. By contrast, the Guidance interpreted a "guarantee" to include not only the foregoing, "but also other formal arrangements that, *in view of all the facts and circumstances,* support the non-U.S. person's ability to pay or perform its swap obligations with respect to its swaps." [16]

The concept of a guarantee is important to our cross-border rules for swap dealers in part because a guarantee of a non-U.S. person's swap obligations by a US person can require the non-US person—or its non-US counterparty—to count the swap towards its *de minimis* swap dealer registration threshold. But when the determination of whether an entity must register with the CFTC depends on whether the entity's or its counterparty's obligations under a swap are guaranteed by a U.S. person, the meaning of the term "guarantee" cannot be left to a review of "all the facts and circumstances."

A rule in which non-US persons must try to determine, or obtain representations from non-U.S. counterparties regarding, whether the CFTC might subsequently conclude that a particular arrangement satisfies an open-ended definition of a "guarantee" is not a workable rule. By contrast, the definition of a "guarantee" in the final rules, which is based on concepts of legal recourse and a legally enforceable right to recover, is clear and workable. Some may downplay the importance of "workability" in Commission rulemakings, but no matter how well-intentioned a rule may be, if it is not workable, it cannot deliver on its intended purpose.

*Significant Risk Subsidiaries*

Some commenters objected that the definition of a "significant risk subsidiary"

inappropriately substitutes oversight by the Board of Governors of the Federal Reserve System (the "FRB"), and/or foreign regulatory authorities, for the Commission's regulation of derivatives market activity overseas. A significant risk subsidiary, or "SRS," is a non-U.S. "significant subsidiary" (based on varioU.S. numerical metrics set out in the final rules) of an ultimate U.S. parent entity that has more than $50 billion in global consolidated assets. Excluded from the definition, however, are non-U.S. subsidiaries that are subject to either: (1) Consolidated supervision and regulation by the FRB as a subsidiary of a U.S. bank holding company ("BHC") or intermediate holding company ("IHC"); or (2) capital standards and oversight by the subsidiary's home country supervisor that are consistent with Basel requirements and subject to margin requirements for uncleared swaps in a jurisdiction for which the Commission has issued a margin comparability determination. It is these exclusions that commenters have cited as a concern.

To this, there are three responses. First, as discussed above, in exercising the Commission's oversight responsibilities with respect to an SRS (which, again, is a non-U.S. subsidiary), we look to the risk that such a subsidiary poses to its ultimate parent in the United States, and thus to the U.S. financial system. It is not that we are replacing our oversight responsibilities with those of the FRB or foreign regulators. Rather, it is that we have determined that the risk presented by foreign subsidiaries consolidated with a BHC or IHC, or subject to regulation as specified in the SRS definition in their home country, is already being adequately monitored and thus does not warrant an additional layer of regulation by the CFTC.

Second, we must compare the SRS definition in the final rules to what it replaces in the Guidance: The "conduit affiliate." The Guidance did not actually define a conduit affiliate, but rather described it in terms of certain "factors." The most critical factor, but unfortunately also the most amorphous, was the last one, which asked whether "the non-U.S. person in the regular course of business, engages in swaps with non-U.S. third-party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with its U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates." [17]

As with the definition of a "guarantee," I make no apologies for supporting the workable definition of an SRS in the final rules, which is based on objective and observable metrics, as compared to the ambiguous description of a conduit affiliate set forth in the Guidance. We owe the global swaps market the certainty that can only come from clarity in our rules, and the definition of an SRS in the final rules fits the bill.

Third, the record before us does not afford any basis on which to conclude that the definition of an SRS in the final rules will

lead to any less robust Commission oversight of the cross-border swap activities of swap dealers than does the vague description of a conduit affiliate in the Guidance. We have no evidence that the number of non-U.S. entities that have waded through the multi-faceted conduit affiliate description in the Guidance and concluded that they were a conduit affiliate, but would conclude that they are not an SRS under the definition in the final rules, is significant—or even material. If experience going forward proves otherwise, the Commission can always amend the SRS definition accordingly. But absent such evidence, hypothetical concerns are an insufficient basis on which to reject the clear and workable SRS definition in the final rules.

*ANE Transactions, Exceptions to Regulatory Requirements, and Substituted Compliance*

Finally, some may see a retreat from the Guidance in the Commission's determinations: (1) Not to apply its group A, group B, or group C requirements [18] to swaps of a non-U.S. swap dealer with a non-U.S. counterparty where the non-U.S. swap dealer uses personnel or agents in the United States to arrange, negotiate, or execute the swaps ("ANE transactions"); (2) to except certain foreign-based swaps from the group B and group C requirements; and (3) to expand the availability of substituted compliance to encompass group B requirements for swaps between a U.S. branch of a non-U.S. swap dealer and certain non-U.S. counterparties. I respectfully disagree.

First, the notion that the CFTC's swap regulatory regime should apply to ANE transactions was not stated in the Commission's Guidance; rather, it was stated in a staff Advisory published after the Guidance was adopted. The Commission has never endorsed that staff view, and it has never taken effect. [19] Second, the exceptions from swap dealer requirements that apply to the swaps of non-U.S. swap dealers with non-U.S. persons, again, generally codify

---

[16] Guidance, 78 FR at 45320 (emphasis added).

[17] Guidance, 78 FR at 45318 n.258 and 45359.

[18] Under the final rules: (1) Group A requirements for swap dealers generally relate to the Chief Compliance Officer requirement, risk management, swap data recordkeeping, and antitrust considerations; (2) group B requirements for swap dealers generally relate to swap trading relationship documentation, portfolio reconciliation and compression, trade confirmation, and daily trading records; and (3) group C requirements for swap dealers generally relate to external business conduct rules, including voluntary initial margin segregation.

[19] Today's release acknowledges that the policy the Commission is adopting with respect to the applicability of CFTC requirements to non-U.S. swap dealers' ANE transactions differs from that taken by the SEC. But as has often been said, harmonization with the SEC, while an important goal and one that Congress supported in Dodd-Frank, should not be undertaken simply for harmonization's own sake. Here, the Commission has determined that, in light of Congress' decision to define security-based swaps as "securities" in Dodd-Frank, harmonization with the SEC's determination to apply its existing, pre-Dodd-Frank securities broker-dealer regulation to ANE transactions in security-based swaps is not appropriate.

exceptions that were included in the Guidance, too.

To be sure, based on input we received in the comments, the final rules include two exceptions to swap dealer regulatory requirements that were not included in the Proposal. Yet, to take one as an example, today's release explains that the "Limited Swap Entity SRS/Guaranteed Entity Group B Exception" is: (1) *Tailored* to placing foreign swap dealer subsidiaries of U.S. firms on the same footing as foreign branches of U.S. swap dealers; (2) *consistent* with an exception in the Guidance that was not carried forward in the Proposal;[20] and (3) *limited* in terms of the amount of swaps that can be entered into in reliance on the exception, and unavailable if the parties can rely on substituted compliance instead.

But what is critically important for the treatment of ANE transactions, the exceptions to certain regulatory requirements, and substituted compliance in the final rules is to keep in mind the scenario at issue: Although in some instances activity with respect to the swap may occur in the United States, the swaps involve non-U.S. swap dealers (or foreign branches of U.S. swap dealers) and a non-U.S. counterparty (or a foreign branch of a U.S. person) and, therefore, will also be subject to regulation in another jurisdiction. Where the regulatory interest of that other jurisdiction is paramount, the CFTC should appropriately defer, just as where the Commission's regulatory interest is paramount, we expect other foreign jurisdictions to defer to our regulation. As I stated in connection with a recent Open Meeting that also addressed cross-border issues:

[T]he Commission's historical commitment to appropriate deference to our international regulatory colleagues (which also is sometimes referred to as mutual recognition), 'is a demonstration of international comity— an expression of mutual respect for the important interests of foreign sovereigns.' This deference also reflects the shared goals of global authorities seeking to achieve the most effectively regulated markets through coordination rather than duplication.[21]

The Commission's historical commitment to mutual recognition is in keeping with principles of international comity. In reviewing the comment letters, frankly, there sometimes seems to be a sense that "international comity" is simply a buzzword the Commission invokes to justify what critics believe is an improper easing of its regulation of cross-border activity. I emphatically reject the notion that appropriate deference to international regulatory authorities weakens oversight or protections of our markets, market participants, or financial system. To the contrary, our reliance on international comity is deeply rooted in several sources.

First, as discussed in greater detail in the release, the Restatement (Fourth) of Foreign Relations Law of the United States counsels that even where a country has a basis for extraterritorial jurisdiction, it should not prescribe law with respect to a person or activity in another country when the exercise of such jurisdiction is unreasonable.[22] This doctrine of reasonableness is "a principle of statutory interpretation"[23] that has been recognized in Supreme Court case law.[24]

Second, Congress in Dodd-Frank specifically directed the Commission, "[i]n order to promote effective and consistent global regulation of swaps," to "consult and coordinate with foreign regulatory authorities on the establishment of consistent international standards with respect to the regulation . . . of swaps [and] swap entities . . . ."[25] Congress recognized that global swap markets cannot function absent consistent international standards.

Third, as I have previously observed on multiple occasions, when the G–20 leaders met in Pittsburgh in the midst of the financial crisis in 2009, they, too, recognized that due to the global nature of the derivatives markets, designing a workable solution, though complicated, demands coordinated policies and cooperation.[26] To do otherwise would ignore the reality that modern markets are not bound by jurisdictional borders.

And fourth, this Commission historically has been a global leader in its commitment to applying principles of international comity, in the form of mutual recognition, in a variety of contexts. That commitment is reflected in the Commission's Part 30 rules,[27] which apply to foreign firms "with respect to the offer and sale of foreign futures and options to U.S. customers and are designed to ensure that such products offered and sold in the U.S. are subject to regulatory safeguards comparable to those applicable to transactions entered into on designated contract markets."[28] It also is reflected in our approach (initially through staff no-action relief, and later through registration after Dodd-Frank) to foreign boards of trade ("FBOTs") offering US participants "direct access" to enter trades directly into the FBOT's order entry and trade matching systems.[29] And just recently, it was reflected

in the Commission's proposal to amend Rule 3.10(c)(3) to permit non-US commodity pool operators to claim exemption from CFTC registration for offshore commodity pools with no US participants on a pool-by-pool basis.[30]

When the Commission issued the Guidance in 2013, only a few derivatives reforms had been adopted in a few other jurisdictions. How things have changed since then. Many of our fellow regulators in the world's major financial centers have implemented reforms governing the conduct of swap dealers commensurate to our own, and extensive strides have been made (and continue to be made) towards international harmonization—thereby aligning our regulatory principles, just as the G–20 envisioned. As a result, most swaps involving non-U.S. counterparties today are expected to be subject to foreign regulatory requirements similar to the Commission's own, unlike at the time the Guidance was adopted.[31] Further, our deference to the comprehensive swap regulation of our international colleagues has been demonstrated by the fact that since the Guidance was issued, the CFTC has issued 11 comparability determinations regarding the regulation of swap dealers in the European Union, Canada, Japan, Australia, Hong Kong, and Switzerland.

Thus, regulation of global swap markets that imposes overlapping and duplicative requirements on swap dealers and their cross-border activities by multiple regulators is inconsistent with: (1) Principles of statutory interpretation; (2) Congress' direction to the Commission; (3) the vision of the G–20 Leaders at the Pittsburgh Summit; and (4) the Commission's own longstanding commitment to international comity through mutual recognition of foreign regulatory regimes. In a word: It is not workable.

---

[20] The release explains that under the Guidance, a non-U.S. person that was guaranteed by a U.S. person or a conduit affiliate would not have been expected to comply with group B requirements when transacting with a non-U.S. counterparty that also was not guaranteed by a U.S. person or a conduit affiliate.

[21] *See* Commissioner Stump Part 3 Statement, n.15, *supra* (footnote omitted).

[22] Restatement (Fourth) section 405 cmt. A (Westlaw 2018).

[23] *Id.*

[24] *See F. Hoffman-LaRoche, Ltd.* v. *Empagran S.A.,* 542 U.S. 155, 164 (2004) (statutes should be construed to "avoid unreasonable interference with the sovereign authority of other nations.").

[25] Dodd-Frank, Section 752(a).

[26] *See* Leaders' Statement from the 2009 G–20 Summit in Pittsburgh, Pa. ("G–20 Pittsburgh Leaders' Statement") at 7 (Sept. 24–25, 2009) ("We are committed to take action at the national and international level to raise standards together so that our national authorities implement global standards consistently in a way that ensures a level playing field and avoids fragmentation of markets, protectionism, and regulatory arbitrage"), *available at https://www.treasury.gov/resource-center/ international/g7-g20/Documents/pittsburgh_ summit_leaders_statement_250909.pdf.*

[27] 17 CFR part 30.

[28] Foreign Futures and Options Transactions, 85 FR 15359, 15360 (March 18, 2020).

[29] *See* Statement of Commissioner Dawn D. Stump Regarding Foreign Board of Trade

Registration Applications of Euronext Amsterdam, Euronext Paris, and European Energy Exchange (November 5, 2019), available at *https:// www.cftc.gov/PressRoom/SpeechesTestimony/ stumpstatement110519.*

[30] Exemption From Registration for Certain Foreign Persons Acting as Commodity Pool Operators of Offshore Commodity Pools, 85 FR 35820 (June 12, 2020); *see also* Commissioner Stump Part 3 Statement, n.15, *supra.*

[31] As recounted in the release, CEA Section 2(i) has its origins in an amendment that Rep. Spencer Bachus offered during the House Financial Services Committee markup on October 14, 2009, that would have restricted the Commission's jurisdiction over swaps between non-U.S. resident persons. Chairman Frank opposed the amendment, noting that there may well be cases where non-U.S. residents are engaging in transactions that have an effect on the United States and that are insufficiently regulated internationally and that he would not want to prevent U.S. regulators from stepping in. Chairman Frank expressed his commitment to work with Rep. Bachus going forward, Rep. Bachus withdrew the amendment, and eventually Section 2(i) was included in Dodd-Frank. *See* H. Fin. Serv. Comm. Mark Up on Discussion Draft of the Over-the-Counter Derivatives Markets Act of 2009, 111th Cong., 1st Sess. (Oct. 14, 2009) (statements of Rep. Bachus and Rep. Frank). For the reasons discussed in text, the prospect of swaps between non-U.S. counterparties being insufficiently regulated internationally is far less today than it was when the extraterritoriality of the CFTC's jurisdiction over swaps was being debated.

## Conclusion

In conclusion, I support codifying our prior cross-border Guidance into enforceable rules. I believe that the final rules before us today are clear, sensible, and workable, and that they appropriately apply the Commission's regulations to the cross-border activities of swap dealers. They improve upon the Guidance based on our experience in administering the Dodd-Frank swap regulatory regime over the past several years, and they recognize the current state of global regulation of globally interconnected derivatives markets by carrying on this agency's established tradition of mutual recognition and substituted compliance.

I therefore support the final cross-border rules for swap dealers before us today. I want to very much thank the staff of the Division of Swap Dealer and Intermediary Oversight, the General Counsel's Office, and the Chief Economist's Office for their efforts in preparing this rulemaking. I am particularly appreciative of the time that the staff devoted to answering our diverse questions—always in a thoughtful and comprehensive manner—and reviewing and addressing the various comments and requests from me and my team.

## Appendix 6—Dissenting Statement of Commissioner Dan M. Berkovitz

### Introduction

I dissent from today's final cross-border swap rulemaking (the "Final Rule"). As described by the Chairman, this Final Rule will "pare[] back our extraterritorial application of our swap dealer regime." [1] Over the past seven years, the current cross-border regime has helped protect the U.S. financial system from risky overseas swap activity. The Commission should not be paring back these protections for the American financial system, particularly now, during a global pandemic.

The Final Rule will permit U.S. swap dealers to book their swaps with non-U.S. persons in offshore affiliates, thereby avoiding the CFTC's swap regulations, even when they conduct those swap activities from within the United States and the U.S. parent retains the risks from those swap activities. The structure of the Final Rule practically invites multinational U.S. banks and hedge funds to book their swaps in offshore affiliates to avoid our swap dealer regulations. This will permit risks to flow back into the United States with none of the intended regulatory protections.

The Commission defends its retreat by citing principles of international comity and asserting that compliance with the laws of another jurisdiction in lieu of the CFTC's requirements will be permitted only when the CFTC finds that the laws of the other jurisdiction are "comparable" to those of the CFTC. The Final Rule, however, establishes a weak and vague standard for determining when the swap regulations of another jurisdiction are comparable. Further, the Final Rule even permits substituted

compliance where the swap activity occurs within the United States—such as for swaps between a U.S. branch of a non-U.S. swap dealer and another non-U.S. person, even if those swaps are negotiated and booked in the United States. The Commission is not permitted to defer to regulators in other jurisdictions when the swap activity is conducted within the United States, nor should it do so even if such deference were permitted.

As I noted in my dissent on the proposed rule, experience has taught us that while finance may be global, global financial rescues are American. We should not loosely outsource the protection of the U.S. financial system and American taxpayers to foreign regulators that are unaccountable to the American people.

### Less Regulation of U.S. Persons Conducting Swap Activities Outside the U.S.

In the Final Rule, the Commission acknowledges that cross-border swaps activities can have a "direct and significant" connection with activities in, or effect on, U.S. commerce. The Final Rule, however, removes several key protections in the 2013 Cross-Border Guidance ("Guidance") [2] that mitigated the risks arising from such cross-border activities.[3] The Final Rule narrows the definition of "guarantee" in a legalistic manner, permitting banks to craft financing arrangements for their overseas swap activities that bring risks back into the U.S. parent organization without triggering the application of Dodd-Frank requirements for those activities. The Final Rule also discards the Guidance's firewalls that were designed to prevent banks from evading Dodd-Frank requirements by using foreign affiliates as the front office for swaps with non-U.S. persons while bringing the risk from those swaps back to the U.S. home office through back-to-back internal swaps ("affiliate conduits").

The Final Rule creates a new category of entities—the SRS—supposedly to capture the risks arising from the swap activities of very large foreign affiliates of U.S. firms. But the Commission admits that this new category likely will include "few, if any" entities.[4] Most likely, therefore, the SRS construct will provide no protections to the financial system from the swap activities of overseas affiliates of U.S. entities that bring risks to their U.S. parents and to the U.S. financial system. Each of these significant deficiencies is discussed in greater detail below.

*Swap activity outside the U.S. guaranteed by a U.S. Person.* The Guidance provided that when a swap of a non-U.S. person is guaranteed by a U.S. person, then the Dodd-Frank requirements regarding swap dealer registration and many of the attendant swap dealer regulations would apply to that non-U.S. person in the same manner as they would apply to a U.S. person. This is because a swap conducted by a non-U.S. person guaranteed by a U.S. person poses essentially the same risks to the U.S. financial system as a swap conducted by a U.S. person.[5] The Guidance adopted a functional rather than literal approach to the term "guarantee":

The Commission also is affirming that, for purposes of this Guidance, the Commission would interpret the term "guarantee" generally to include not only traditional guarantees of payment or performance of the related swaps, but also other formal arrangements that, in view of all the facts and circumstances, support the non-U.S. person's ability to pay or perform its swap obligations with respect to its swaps. The Commission believes that it is necessary to interpret the term "guarantee" to include the different financial arrangements and structures that transfer risk directly back to the United States. In this regard, it is the substance, rather than the form, of the arrangement that determines whether the arrangement should be considered a guarantee for purposes of the application of section 2(i).[6]

The Final Rule, however, adopts a narrow, legalistic definition of guarantee: "Guarantee means an arrangement pursuant to which one party to a swap has rights of recourse against a guarantor, with respect to its counterparty's obligations under the swap." [7] The Commission recognizes that this definition is "narrower" than the definition in the Guidance, and that this narrower definition could result in increased risk to the U.S. financial system.[8] The Commission further acknowledges that this narrower definition "could lead to certain entities counting fewer

---

[1] Kadhim Shubber, Financial Times, *U.S. regulator investigates oil fund disclosures* (July 15, 2020), available at *https://www.ft.com/content/1e689137-2d1f-4393-a18f-fe0da02141cc.*

[2] Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 FR 45292, 45298–45301 (July 26, 2013).

[3] The preamble to the final rule observes (Sec. I.C.):

In this sense, a global financial enterprise effectively operates as a single business, with a highly integrated network of business lines and services conducted through various branches or affiliated legal entities that are under the control of the parent entity. [footnote omitted]. Branches and affiliates in a global financial enterprise are highly interdependent, with separate entities in the group providing financial or credit support to each other, such as in the form of a guarantee or the ability to transfer risk through inter-affiliate trades or other offsetting transactions. Even in the absence of an explicit arrangement or guarantee, a parent entity may, for reputational or other reasons, choose to assume the risk incurred by its affiliates, branches, or offices located overseas. Swaps are also traded by an entity in one jurisdiction, but booked and risk-managed by an affiliate in another jurisdiction. The Final Rule recognizes that these and similar arrangements among global financial enterprises create channels through which swap-related risks can have a direct and significant connection with activities in, or effect on, commerce of the United States.

[4] Final Rule release, Sec. X.C.3.

[5] "The Commission believes that swap activities outside the U.S. that are guaranteed by U.S. persons would generally have a direct and significant connection with activities in, or effect on, U.S. commerce in a similar manner as the underlying swap would generally have a direct and significant connection with activities in, and effect on, U.S. commerce if the guaranteed counterparty to the underlying swap were a U.S. person." Cross-Border Guidance, 78 FR at 45319.

[6] *Id.* at 45320 (footnotes omitted).

[7] Final Rule release, Section 23.23(a)(9).

[8] The Commission states that arrangements that would meet the broader definition in the Guidance, but are not within the narrower scope of the Final Rule, "transfer risk directly back to the U.S. financial system, with possible adverse effects, in a manner similar to a guarantee with direct recourse to a U.S. person." Final Rule release, Sec. II.C.3.

swaps towards their de minimis threshold or qualify additional counterparties for exceptions to certain regulatory requirements as compared to the definition in the Guidance." [9]

The Commission asserts, however, that the narrower definition is "more workable" because it is consistent with the definition of guarantee in the Cross-Border Margin Rule, and therefore will not require an "independent assessment." [10] The Commission presents no evidence, however, as to why the current definition, which has now been in place for seven years, is not "workable," or why multinational financial institutions that trade hundreds of billions, and even trillions, of dollars of swaps on a daily basis are not capable of determining whether their overseas affiliates are guaranteed by a U.S. person. A global financial institution that cannot readily determine or represent whether or not the risks from its overseas swaps are guaranteed by one of its U.S. subsidiaries should not be a global financial institution.

*Affiliate conduits.* The Guidance also applied the Dodd-Frank swap dealer registration requirements, and many of the attendant swap dealer regulations, to the swap activities of "affiliate conduits" [11] of U.S. persons in the same manner as it applies to U.S. persons. Under the Guidance, a key factor in determining whether a non-U.S. person would be considered to be an affiliate conduit of a U.S. person is whether the non-U.S. person regularly enters into swaps with non-U.S. counterparties and then enters into "offsetting swaps or other arrangements with its U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third parties to its U.S. affiliates." [12]

The affiliate conduit provisions in the Guidance were designed to prevent U.S. entities from booking those swaps in their non-U.S. affiliates to escape the CFTC's Dodd-Frank requirements that would otherwise apply to the entity's swap activity in the United States. The risks and benefits of those swaps booked offshore could then be transferred back to the U.S. with back-to-back internal swaps between the U.S. parent and its non-U.S. affiliate. Ultimately, risk from the swap would reside on the books of the U.S. entity. Through this back-to-back process, the U.S. entity could still conduct the swap activity, and bear the risk of the swaps, yet would avoid the application of CFTC requirements that would apply had the swap been booked directly in the U.S. entity.

The Final Rule does not include any comparable provisions to prevent the use of affiliate conduits to avoid CFTC regulation. This is an invitation to abuse and to risk for the U.S. financial system.

*Significant risk subsidiary (SRS).* The Final Rule adopts a new construct—the "significant risk subsidiary"—to supposedly encompass overseas affiliates of U.S. entities whose swap activities pose significant risks to the U.S. financial system. An SRS is defined as any non-U.S. "significant subsidiary" of an ultimate U.S. parent entity where that ultimate parent has more than $50 billion in global consolidated assets. An entity is a "significant subsidiary" if it has a sufficient size relative to its parent, measured in terms of percentage of either revenue, equity capital, or total assets.[13] However, the definition then excludes non-U.S. subsidiaries that are either (i) prudentially regulated by the Federal Reserve; or (ii) prudentially regulated by the entity's home country prudential regulator whose regulations are consistent with the Basel Committee's capital standards, and subject to comparable margin requirements for uncleared swaps in its home country. An entity that survives the gantlet of thresholds and exclusions to be considered an SRS would then be subject to the same registration requirements as a U.S. person, and many of the same regulatory requirements that apply to U.S. swap dealers. That outcome, however, is very unlikely. The threshold criteria to be a "significant subsidiary" are high, and because entities that meet these high thresholds are typically affiliated with prudentially-regulated banks, it is likely they will be excluded from the SRS definition. It therefore is improbable that any entities will fall into the SRS category. The Cost-Benefit Considerations in the notice of proposed rulemaking for the Final Rule concede that "few, if any" entities would fall within its ambit.[14]

Furthermore, the criteria apply to each subsidiary separately. If an institution has a subsidiary that is approaching the high thresholds set in the Final Rule, it can incorporate another non-U.S. subsidiary and conduct swap dealing activity out of that entity to avoid SRS designation for any of its subsidiaries.

One commenter noted that the qualifications only indirectly address the significance of the subsidiary and suggested the test be modified to assess the extent to which swap risk is accepted by a non-U.S. subsidiary or transferred back to the subsidiary's U.S. affiliates.[15] The Commission characterized the suggested test as an activity-based test and rejected the

commenter's proposed fix. On the other hand, when other commenters noted that subsidiaries that do not engage in any swap dealing activity would potentially be captured by the SRS qualifications—because the qualifications have *nothing to do with swaps*—the Commission modified the Final Rule with an activity-based end-user test to exempt those entities from the SRS category.

Under the Final Rule, a significant subsidiary that is regulated by U.S. or foreign banking regulators is *excluded* from the SRS category. "The Commission is excluding these entities from the definition of SRS, in large part, because the swaps entered into by such entities are already subject to significant regulation, either by the Federal Reserve Board or by the entity's home country." [16]

Here the Commission forgets the lessons of the 2008 financial crisis and ignores the mandate of Congress. Following the financial crisis—and as a result of the lessons learned during the crisis—Congress subjected the swaps markets to *both* prudential and market regulation. The Commodity Futures Modernization Act of 2000, which spectacularly failed to prevent the build-up of catastrophic systemic risks within the financial system leading to the 2008 financial crisis, was based on the premise that market regulation is unnecessary to protect against systemic risks for financial entities that are subject to prudential regulation.[17] Events taught us, however, that prudential regulation alone was insufficient to prevent the build-up of those risks to the financial system. Following the crisis, Congress mandated both prudential regulation and market regulation for banks conducting swap activities. The safeguards and protections to the financial system afforded under Title VII of the Dodd-Frank Act were to be applied regardless of the extent of prudential regulation. The prudential regulation in a non-U.S. jurisdiction of an affiliate of a U.S. swap dealer whose swaps risks are transferred back into the U.S. is not an adequate substitute for the protections mandated by Title VII of the Dodd-Frank Act.

The Commission does not dispute that the Final Rule will allow affiliates currently subjected to the Guidance provisions regarding guarantees and affiliate conduits affiliates to operate free of CFTC swap regulations. The Commission also acknowledges that the activities of these entities may pose risks to the U.S. financial system.[18] Not only will the Final Rule permit

[9] *Id.*

[10] *Id.*

[11] The term "affiliate conduit" and "conduit affiliate" are used interchangeably. *See, e.g.,* Cross-Border Guidance, 78 FR at 45319.

[12] The Commission explained, "the Commission believes that swap activities outside the United States of an affiliate conduit would generally have a direct and significant connection with activities in, or effect on, U.S. commerce in a similar manner as would be the case if the affiliate conduit's U.S. affiliates entered into the swaps directly." *Id.*

[13] The Final Rule release asserts that the criteria for qualifying as a "significant subsidiary" are risk-based. The relative financial measures of revenue, equity capital, and total assets, however, are not related to the risks presented by the subsidiary's swap activity. These criteria have nothing at all to do with swaps and in no way a measure or reflect the risks posed by the subsidiary's swap activities.

[14] "Of the 61 non-U.S. SDs that were provisionally registered with the Commission in June 2020, the Commission believes that few, if any, will be classified as SRSs pursuant to the Final Rule." Final Rule release, Sec. X.C.3.

[15] Better Markets, Comment Letter, Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, at 17 (Mar. 9, 2020); available at *https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=29136.*

[16] Final Rule release, Sec. II.D.3.iv.

[17] For a more detailed discussion of the financial firm failures involving cross border activity and related U.S. government and bail outs, see my dissenting statement to the Proposed Cross-border swap regulations (Dec. 18, 2019), available at *https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement121819b.*

[18] "The Commission is aware that many other types of financial arrangements or support, other than a guarantee as defined in the Final Rule, may be provided by a U.S. person to a non-U.S. person (*e.g.,* keepwells and liquidity puts, certain types of indemnity agreements, master trust agreements, liability or loss transfer or sharing agreements). The Commission understands that these other financial arrangements or support transfer risk directly back to the U.S. financial system, with possible adverse effects, in a manner similar to a guarantee with a

risks to flow into the U.S., but it will provide an incentive for U.S. banks to move their swap activities into these foreign affiliates, where they can conduct the same activities but be free from the CFTC's regulations.

### Less Regulation of Swap Activity in the U.S.

*ANE Swaps.* In 2013, the CFTC issued a Staff Advisory addressing the applicability of the "Transaction-Level Requirements" to non-U.S. swap dealers that use persons in the U.S. to facilitate swap transactions with other non-U.S. persons. The CFTC staff observed that "persons regularly arranging, negotiating, or executing swaps for or on behalf of an SD [swap dealer] are performing core, front-office activities of that SD's dealing business," and declared that "the Commission has a strong supervisory interest in swap dealing activities that occur within the United States, regardless of the status of the counterparties." [19] The CFTC staff advised that a non-U.S. swap dealer "regularly using personnel or agents located in the U.S. to arrange, negotiate, or execute ["ANE"] a swap with a non-U.S. person generally would be required to comply with the Transaction-Level Requirements." [20]

The Staff Advisory prompted an outcry from non-U.S. swap dealers, including wholly-owned non-U.S. affiliates of U.S. financial institutions, who objected to the CFTC's imposition of its clearing, trade execution, reporting, and business conduct standards on their swaps with other non-U.S. persons. Non-U.S. dealers argued that the risks from these swap activities resided primarily in the home country, and warned that they may remove their swap dealing business from the U.S. if these requirements applied. Shortly thereafter, the CFTC staff provided no-action relief from the application of the Staff Advisory,[21] and the

Commission issued a Request for Comment on whether the Commission should adopt the Staff Advisory, in whole or in part.[22]

The Final Rule discards the ANE concept entirely. "ANE transactions will not be considered a relevant factor for purposes of applying the Final Rule." [23]

The ability of non-U.S. persons to use personnel within the U.S., without limitation, to conduct their swap activities with other non-U.S. persons without CFTC regulation or oversight could have a variety of detrimental consequences. Foremost among these is the possibility, perhaps even likelihood, that U.S. swap dealers will move the booking of their swaps with non-U.S. persons (including non-U.S. affiliates of other U.S. firms) into their own non-U.S. affiliates, while maintaining the U.S. location of the personnel conducting the swap business, in order to avoid the application of the Dodd-Frank requirements to those transactions. In fact, Citadel noted in its comments on the proposed rule that this may be happening already. Citadel stated that "market transparency in EUR interest rate swaps for U.S. investors has been greatly reduced based on data showing that, following issuance of the ANE No-Action Relief, interdealer trading activity in EUR interest rate swaps began to be booked almost exclusively to non-U.S. entities, a fact pattern that Citadel believes is 'consistent with (although not direct proof of) swap dealers strategically choosing the location of the desk executing a particular

trade in order to avoid trading in a more transparent and competitive setting.'" [24]

If more than one U.S. swap dealer were to employ this strategy, the result could be that swap activity between two U.S. swap dealers that currently takes place within the U.S. and is fully subject to the CFTC's swap regulations might then be booked in two non-U.S. affiliates outside the United States. So long as the U.S. parents do not provide explicit guarantees for the swaps of the subsidiaries,[25] the trading between these subsidiaries would not count toward the dealer registration threshold. Furthermore, even if one of those non-U.S. entities were a registered swap dealer, the trading would not be subject to any CFTC transaction-level requirements, even though the risk from those transactions is ultimately borne by the U.S. parent through consolidated accounting, and U.S. personnel would be negotiating those transactions.[26]

---

direct recourse to a U.S. person." Final Rule release, Sec.II.C.3. See also Final Rule release, Sec. II.D.3 (recognition that conduit affiliate structures may present significant risks to the U.S. financial system but determination not to apply de minimis registration threshold to a non-U.S. affiliates that is not an SRS).

[19] CFTC Staff Advisory 13–69, Division of Swap Dealer and Intermediary Oversight Advisory, Applicability of Transaction Level Requirements to Activity in the United States (Nov. 14, 2013), available at *https://www.cftc.gov/csl/13-69/download.*

[20] *Id.*

[21] CFTC No-Action Letter No. 13–71, Certain Transaction-Level Requirements for Non-U.S. Swap Dealers (Nov. 26, 2013), available at *https://www.cftc.gov/csl/13-71/download.* This no-action relief has been extended multiple times and will continue in effect until the Final Rule becomes effective. Concurrent with the issuance of the Final Rule, the CFTC staff is extending this no-action relief for transaction-level requirements not addressed by the Final Rule (which includes requirements relating to clearing, trade-execution, and real-time public reporting). At the same time, the staff is withdrawing the 2013 Staff Advisory as it applies to all transaction-level requirements, including requirements not addressed in the Final Rule. In conjunction with the Commission's consideration of the Final Rule, both of these staff actions were presented to the Commission in a single package under the "Absent Objection" process, with any objections due the day before the Commission is scheduled to vote on the Final Rule. Although I would support the extension of this no-

action relief for such transactions not covered by this rulemaking, were it issued separately, I cannot support, in conjunction with this rulemaking, the withdrawal of the ANE advisory for transactions not covered by the Final Rule. The withdrawal of the Staff Advisory for transactions not covered by the rulemaking is being taken in response to selected comments received as part of the rulemaking, yet the public was not afforded notice and opportunity for comment as to the manner in which the Commission should address transaction-level requirements not within the scope of the rulemaking. It would have been just as workable for market participants to provide the no-action relief while maintaining the Staff Advisory. Accordingly, I have objected to the "Absent Objection" package presented to the Commission that included both the withdrawal of the Staff Advisory and the extension of no-action relief for transactions not covered by the Final Rule.

[22] Request for Comment on Application of Commission Regulations to Swaps Between Non-U.S. Swap Dealers and Non-U.S. Counterparties Involving Personnel or Agents of the Non-U.S. Swap Dealers Located in the United States, 79 FR 1347 (Jan. 8, 2014).

[23] Final Rule release, Sec. V.C. The Securities and Exchange Commission ("SEC") requires a non-U.S. person to include ANE transactions in determining whether the amount of its swap dealing activity exceeds the de minimis threshold for registration. Cross-Border Application of Certain Security-Based Swap Requirements, 85 FR 6270, 6272 (Feb. 4, 2020), available at *https://www.federalregister.gov/documents/2020/02/04/2019-27760/cross-border-application-of-certain-security-based-swap-requirements.* The preamble to the Final Rule includes many statements regarding the importance of "harmonization" with the SEC rules. However, on this issue, which imposes a more stringent result for potential swap dealers, the Commission has decided *not* to harmonize with the SEC.

[24] Final Rule release, Sec. V.C. In support of this assertion, Citadel cites Evangelos Benos, Richard Payne and Michalis Vasios, Bank of England Staff Working Paper (No. 580), Centralized trading, transparency and interest rate swap market liquidity: Evidence from the implementation of the Dodd-Frank Act (May 2018), available at: *https://www.bankofengland.co.uk/-/media/boe/files/working-paper/2018/centralized-trading-transparency-and-interest-rate-swap-market-liquidity-update.* In addition to the language quoted by Citadel, this study concluded:

Additionally, we find that, for the EUR-denominated swap market, the bulk of interdealer trading previously executed between U.S. and non-U.S. trading desks is now largely executed by the non-U.S. (mostly European) trading desks of the same institutions (*i.e.* banks have shifted inter-dealer trading of their EUR swap positions from their U.S. desks to their European desks). We interpret this as an indication that swap dealers wish to avoid being captured by the SEF trading mandate and the associated impartial access requirements. Migrating the EUR inter-dealer volume off-SEFs enables dealers to choose who to trade with and (more importantly) who not to trade with. This might allow them to erect barriers to potential entrants to the dealing community. Thus this fragmentation of the global market may be interpreted as dealers trying to retain market power, where possible. Importantly, we find no evidence that customers in EUR swap markets try to avoid SEF trading and the improved liquidity it delivers.

*Id.* at 31–32.

[25] Even in the absence of an explicit guarantee or other financial support, there is likely an expectation that the U.S. parent will ensure the subsidiary has sufficient funds to pay its swap obligations. The U.S. parent has substantial reputation risk if its subsidiaries start defaulting on their swaps. The expansive definition of "guarantee" in the Guidance is perhaps one reason that U.S. banks that withdrew the explicit guarantees provided their affiliates have not yet attempted to withdraw their swap support. Further regulatory uncertainty about the viability of de-registering may have arisen from the cross-border rule proposed by the Commission in 2016 that would have treated non-U.S. affiliates that were consolidated subsidiaries of U.S. persons as U.S. persons.

[26] This strategy would be less effective if either of the non-U.S. affiliates were an SRS. However, as described above, it is likely that "few, if any," non-U.S. affiliates will be captured within this definition particularly affiliates of prudentially regulated banks, which are excepted out of the definition altogether.

U.S. banks already conduct a significant amount of inter-bank business through their non-U.S. affiliates. Data from swap data repositories shows that U.S. bank swap dealers commonly book swaps with each other through their respective non-U.S. subsidiaries. For a recent one-year period, the data shows that a number of U.S. banks booked more than 10 percent—and in some cases close to 50 percent—of the reported notional amount of swaps across their entire bank-to-bank swaps books through non-U.S. subsidiaries. In other words, a number of U.S. banks are already booking material amounts of swaps with each other through their non-U.S. wholly-owned consolidated subsidiaries.

*Non-U.S. banks conducting swap activity in the U.S.* The Final Rule reverses the position taken by the Commission in the proposed rule that would have prevented a U.S. branch of a non-U.S. swap entity from obtaining substituted compliance for various transactional requirements for swaps with non-U.S. swap entities that are booked in the U.S. branch.[27] The cross-border notice of proposed rulemaking upon which the Final Rule is based ("2019 Proposal") would have permitted substituted compliance only for the foreign-based swaps of a non-U.S. swap entity. Both under the 2019 Proposal and the Final Rule, a swap conducted by a non-U.S. swap entity through a U.S. branch would not be considered a "foreign-based swap."

Sensibly, under the 2019 Proposal, substituted compliance would be available only for foreign-based swaps. As the Commission explained in the 2019 Proposal, "[t]he Commission preliminarily believes that the requirements listed in the proposed definitions are appropriate to identify swaps of a non-U.S. banking organization operating through a foreign branch in the United States that should remain subject to Commission requirements. . . ." [28]

Although the Commission repeats nearly verbatim the rationale articulated in the 2019 Proposal for applying CFTC regulations without substituted compliance to transactions booked in the United States, conducted in the United States, and within an organization regulated under the laws of the United States, the Final Rule now excludes swaps booked in a U.S. branch of a non-U.S. swap entity from this general principle, and permits it to obtain substituted compliance for its transactions with non-U.S. persons.[29]

The Commission has no authority to grant substituted compliance for transactions occurring within the United States. The ability of the Commission to consider international comity in determining whether to apply CFTC regulations or permit substituted compliance with the laws of a foreign regulator only applies with respect to activities outside the United States. The Final Rule defines a "foreign-based swap" in a manner that does not include swaps booked in the U.S. branch of a non-U.S. swap entity. The fact that one of the counterparties to a transaction is owned by a non-U.S. entity does not transform activity conducted by that entity within the United States into foreign activity. Thus, the Final Rule not only retreats from the application of U.S. law to transactions that are arranged, negotiated, and executed in the United States, it even retreats from the application of U.S. law to transactions that are booked in the United States. This is not in accordance with either Section 2(i) of the Commodity Exchange Act ("CEA"), which limits the application of the swaps provisions of the CEA only with respect to activities outside the United States, or with the principles of international comity, which the Commission recognizes only applies with respect to activity occurring in another jurisdiction.

## Weakening the Standards for Substituted Compliance

I agree with the Commission's interpretation of CEA Section 2(i) that international comity is an important consideration in determining the extent to which the CEA and the CFTC's swap regulations should apply to cross-border swap activity occurring in another jurisdiction. I have voted for every substituted compliance determination presented to the Commission during my tenure under the standards adopted in the Guidance.

The standards established in the Final Rule for substituted compliance determinations, however, depart significantly from the current standards. The Final Rule creates a lesser standard that permits a finding of comparability if the Commission determines that "some or all of the relevant foreign jurisdiction's standards are comparable . . . or would result in comparable outcomes . . . ." [30] Under the Guidance, however, the Commission must also find that the regulations of the other jurisdiction are as "comprehensive" as the Commission's regulations. Furthermore, the Final Rule permits the Commission to consider any factors it "determines are appropriate, which *may* include" [31] any of four factors listed in the Final Rule. This "standard for review" is not a standard at all. It permits the Commission to withdraw the cross-border application of its regulations regardless of the robustness of the other jurisdiction's regulatory regime, for whatever reasons the Commission chooses. In the absence of more rigorous, objective criteria, it will be very difficult for the Commission to deny requests from other jurisdictions or market participants for comparability determinations.

## Conclusion

The Final Rule is a significant retreat from the robust yet balanced cross-border framework presented in the Guidance. The current framework has worked well to both protect the U.S. financial system from systemic risks arising from swap activities outside the U.S. and recognize the interests of other nations in regulating conduct within their own borders. The Final Rule destroys this balance.

I cannot support this abdication of responsibility to protect the U.S. financial markets and the American taxpayer.

[FR Doc. 2020–16489 Filed 9–11–20; 8:45 am]

**BILLING CODE 6351–01–P**

---

[27] 2019 Proposal, rule text, Sec. 23.23(e)(3), 85 FR 952, 1004.

[28] 2019 Proposal, 85 FR 952, 968.

[29] The Commission's adoption of the opposite of what was proposed also presents significant notice and comment issues under the Administrative Procedure Act. *See Environmental Integrity Project* v. *EPA,* 425 F.3d 992, 998 ("Whatever a "logical outgrowth" of this proposal may include, it certainly does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse."); *Chocolate Mfrs. Ass'n* v. *Block,* 755 F.2d 1098, 1104 ("An agency, however, does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period.").

[30] Final Rule, rule text, section 23.23(g)(4).

[31] *Id.*

# EXHIBIT C



## COMMODITY FUTURES TRADING COMMISSION

### 17 CFR Part 1

### RIN 3038–AD46

## SECURITIES AND EXCHANGE COMMISSION

### 17 CFR Parts 230, 240 and 241

[Release No. 33–9338; 34–67453; File No. S7–16–11]

### RIN 3235–AK65

### Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping

**AGENCY:** Commodity Futures Trading Commission; Securities and Exchange Commission.

**ACTION:** Joint final rule; interpretations; request for comment on an interpretation.

**SUMMARY:** In accordance with section 712(a)(8), section 712(d)(1), sections 712(d)(2)(B) and (C), sections 721(b) and (c), and section 761(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), the Commodity Futures Trading Commission ("CFTC") and the Securities and Exchange Commission ("SEC") (collectively, "Commissions"), in consultation with the Board of Governors of the Federal Reserve System ("Board"), are jointly adopting new rules and interpretations under the Commodity Exchange Act ("CEA") and the Securities Exchange Act of 1934 ("Exchange Act") to further define the terms "swap," "security-based swap," and "security-based swap agreement" (collectively, "Product Definitions"); regarding "mixed swaps" and governing books and records with respect to "security-based swap agreements." The CFTC requests comment on its interpretation concerning forwards with embedded volumetric optionality, contained in Section II.B.2.(b)(ii) of this release.

**DATES:** *Effective date:* October 12, 2012.

*Compliance date:* The applicable compliance dates are discussed in the section of the release titled "IX. Effective Date and Implementation".

*Comment date:* Comments on the interpretation regarding forwards with embedded volumetric optionality must be received on or before October 12, 2012.

**ADDRESSES:** You may submit comments, identified by RIN number 3038–AD46, by any of the following methods:

• *CFTC Web Site:* via its Comments Online process: *http://comments.cftc.gov.* Follow the instructions for submitting comments through the Web site.

• *Mail:* Address to David A. Stawick, Secretary of the Commission, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW., Washington, DC 20581.

• *Hand Delivery/Courier:* Same as mail above.

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

All comments must be submitted in English or, if not, accompanied by an English translation. Comments will be posted as received to *http://www.cftc.gov.* You should submit only information that you wish to make available publicly. If you wish the CFTC to consider information that is exempt from disclosure under the Freedom of Information Act, a petition for confidential treatment of the exempt information may be submitted according to the procedures established in § 145.9 of the CFTC's Regulations.[1]

The CFTC reserves the right, but shall have no obligation, to review, pre-screen, filter, redact, refuse or remove any or all of your submission from *http://www.cftc.gov* that it may deem to be inappropriate for publication, such as obscene language. All submissions that have been redacted or removed that contain comments on the merits of the interpretation will be retained in the public comment file and will be considered as required under the Administrative Procedure Act and other applicable laws, and may be accessible under the Freedom of Information Act.

**FOR FURTHER INFORMATION CONTACT:** CFTC: Julian E. Hammar, Assistant General Counsel, at 202–418–5118, *jhammar@cftc.gov*, Lee Ann Duffy, Assistant General Counsel, at 202–418–6763, *lduffy@cftc.gov*; Mark Fajfar, Assistant General Counsel, at 202–418–6636, *mfajfar@cftc.gov*, or David E. Aron, Counsel, at 202–418–6621, *daron@cftc.gov*, Office of General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW., Washington, DC 20581; SEC: Donna M. Chambers, Special Counsel, at 202–551–5870, or John Guidroz, Attorney-Adviser, at 202–551–5870, Division of Trading and Markets, or Andrew Schoeffler, Special Counsel, at 202–551–3860, Office of Capital Markets Trends, Division of Corporation Finance, or Wenchi Hu, Senior Special Counsel, at 202–551–

5870, Office of Compliance, Inspections and Examinations, Securities and Exchange Commission, 100 F Street NE., Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
II. Scope of Definitions of Swap and Security-Based Swap
  A. Introduction
  B. Rules and Interpretations Regarding Certain Transactions outside the Scope of the Definitions of the Terms "Swap" and "Security-Based Swap"
  1. Insurance Products
  (a) Types of Insurance Products
  (b) Providers of Insurance Products
  (c) Grandfather Provision for Existing Insurance Transactions
  (d) Alternative Tests
  (e) "Safe Harbor"
  (f) Applicability of Insurance Exclusion to Security-Based Swaps
  (g) Guarantees
  2. The Forward Contract Exclusion
  (a) Forward Contracts in Nonfinancial Commodities
  (i) Forward Exclusion From the Swap and Future Delivery Definitions
  (ii) Nonfinancial Commodities
  (iii) Environmental Commodities
  (iv) Physical Exchange Transactions
  (v) Fuel Delivery Agreements
  (vi) Cleared/Exchange-Traded Forwards
  (b) Commodity Options and Commodity Options Embedded in Forward Contracts
  (i) Commodity Options
  (ii) Commodity Options Embedded in Forward Contracts
  (iii) Certain Physical Commercial Agreements, Contracts or Transactions
  (iv) Effect of Interpretation on Certain Agreements, Contracts and Transactions
  (v) Liquidated Damages Provisions
  (c) Security Forwards
  3. Consumer and Commercial Agreements, Contracts, and Transactions
  C. Final Rules and Interpretations Regarding Certain Transactions Within the Scope of the Definitions of the Terms "Swap" and "Security-Based Swap"
  1. In General
  2. Foreign Exchange Products
  (a) Foreign Exchange Products Subject to the Secretary's Swap Determination: Foreign Exchange Forwards and Foreign Exchange Swaps
  (b) Foreign Exchange Products Not Subject to the Secretary's Swap Determination
  (i) Foreign Currency Options
  (ii) Non-Deliverable Forward Contracts Involving Foreign Exchange
  (iii) Currency Swaps and Cross-Currency Swaps
  (c) Interpretation Regarding Foreign Exchange Spot Transactions
  (d) Retail Foreign Currency Options
  3. Forward Rate Agreements
  4. Combinations and Permutations of, or Options on, Swaps and Security-Based Swaps
  5. Contracts for Differences
  D. Certain Interpretive Issues
  1. Agreements, Contracts, or Transactions That May Be Called, or Documented

---

[1] 17 CFR 145.9.

Using Form Contracts Typically Used for, Swaps or Security-Based Swaps
2. Transactions in Regional Transmission Organizations and Independent System Operators
III. The Relationship Between the Swap Definition and the Security-Based Swap Definition
A. Introduction
B. Title VII Instruments Based on Interest Rates, Other Monetary Rates, and Yields
1. Title VII Instruments Based on Interest Rates or Other Monetary Rates That Are Swaps
2. Title VII Instruments Based on Yields
3. Title VII Instruments Based on Government Debt Obligations
C. Total Return Swaps
D. Security-Based Swaps Based on a Single Security or Loan and Single-Name Credit Default Swaps
E. Title VII Instruments Based on Futures Contracts
F. Use of Certain Terms and Conditions in Title VII Instruments
G. The Term "Narrow-Based Security Index" in the Security-Based Swap Definition
1. Introduction
2. Applicability of the Statutory Narrow-Based Security Index Definition and Past Guidance of the Commissions to Title VII Instruments
3. Narrow-Based Security Index Criteria for Index Credit Default Swaps
(a) In General
(b) Rules Regarding the Definitions of "Issuers of Securities in a Narrow-Based Security Index" and "Narrow-Based Security Index" for Index Credit Default Swaps
(i) Number and Concentration Percentages of Reference Entities or Securities
(ii) Affiliation of Reference Entities and Issuers of Securities With Respect to Number and Concentration Criteria
(iii) Public Information Availability Regarding Reference Entities and Securities
(iv) Affiliation of Reference Entities and Issuers of Securities With Respect to Certain Criteria of the Public Information Availability Test
(v) Application of the Public Information Availability Requirements to Indexes Compiled by a Third-Party Index Provider
(vi) Treatment of Indexes Including Reference Entities That Are Issuers of Exempted Securities or Including Exempt Securities
4. Security Indexes
5. Evaluation of Title VII Instruments on Security Indexes That Move From Broad-Based to Narrow-Based or Narrow-Based to Broad-Based
(a) In General
(b) Title VII Instruments on Security Indexes Traded on Designated Contract Markets, Swap Execution Facilities, Foreign Boards of Trade, Security-Based Swap Execution Facilities, and National Securities Exchanges
H. Method of Settlement of Index CDS
I. Security-Based Swaps as Securities Under the Exchange Act and Securities Act

IV. Mixed Swaps
A. Scope of the Category of Mixed Swap
B. Regulation of Mixed Swaps
1. Introduction
2. Bilateral Uncleared Mixed Swaps Entered Into by Dually-Registered Dealers or Major Participants
3. Regulatory Treatment for Other Mixed Swaps
V. Security-Based Swap Agreements
A. Introduction
B. Swaps That Are Security-Based Swap Agreements
C. Books and Records Requirements for Security-Based Swap Agreements
VI. Process for Requesting Interpretations of the Characterization of a Title VII Instrument
VII. Anti-Evasion
A. CFTC Anti-Evasion Rules
1. CFTC's Anti-Evasion Authority
(a) Statutory Basis for the Anti-Evasion Rules
2. Final Rules
(a) Rule 1.3(xxx)(6)
(b) Rule 1.6
(c) Interpretation on the Final Rules
3. Interpretation Contained in the Proposing Release
(a) Business Purpose Test
(b) Fraud, Deceit or Unlawful Activity
B. SEC Position Regarding Anti-Evasion Rules
VIII. Miscellaneous Issues
A. Distinguishing Futures and Options From Swaps
B. Transactions Entered Into by Foreign Central Banks, Foreign Sovereigns, International Financial Institutions, and Similar Entities
C. Definition of the Terms "Swap" and "Security-Based Swap" as Used in the Securities Act
IX. Effective Date and Implementation
X. Administrative Law Matters—CEA Revisions
A. Paperwork Reduction Act
B. Regulatory Flexibility Act
C. Costs and Benefits Considerations
XI. Administrative Law Matters—Exchange Act Revisions
A. Economic Analysis
B. Paperwork Reduction Act
C. Regulatory Flexibility Act Certification
XII. Statutory Basis and Rule Text

# I. Background

On July 21, 2010, President Obama signed the Dodd-Frank Act into law.[2] Title VII of the Dodd-Frank Act[3] ("Title VII") established a comprehensive new regulatory framework for swaps and security-based swaps. The legislation was enacted, among other reasons, to reduce risk, increase transparency, and promote market integrity within the financial system, including by (i)

Providing for the registration and comprehensive regulation of swap dealers, security-based swap dealers, major swap participants, and major security-based swap participants; (ii) imposing clearing and trade execution requirements on swaps and security-based swaps, subject to certain exceptions; (iii) creating rigorous recordkeeping and real-time reporting regimes; and (iv) enhancing the rulemaking and enforcement authorities of the Commissions with respect to, among others, all registered entities and intermediaries subject to the Commissions' oversight.

Section 712(d)(1) of the Dodd-Frank Act provides that the Commissions, in consultation with the Board, shall jointly further define the terms "swap," "security-based swap," and "security-based swap agreement" ("SBSA").[4] Section 712(a)(8) of the Dodd-Frank Act provides further that the Commissions shall jointly prescribe such regulations regarding "mixed swaps" as may be necessary to carry out the purposes of Title VII. In addition, sections 721(b) and 761(b) of the Dodd-Frank Act provide that the Commissions may adopt rules to further define terms included in subtitles A and B, respectively, of Title VII, and sections 721(c) and 761(b) of the Dodd-Frank Act provide the Commissions with authority to define the terms "swap" and "security-based swap," as well as the terms "swap dealer," "major swap participant," "security-based swap dealer," and "major security-based swap participant," to include transactions and entities that have been structured to

---

[2] See Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010). The text of the Dodd-Frank Act is available at *http://www.cftc.gov/LawRegulation/OTCDERIVATIVES/index.htm.*

[3] Pursuant to section 701 of the Dodd-Frank Act, Title VII may be cited as the "Wall Street Transparency and Accountability Act of 2010."

[4] In addition, section 719(d)(1)(A) of the Dodd-Frank Act requires the Commissions to conduct a joint study, within 15 months of enactment, to determine whether stable value contracts, as defined in section 719(d)(2) of the Dodd-Frank Act, are encompassed by the swap definition. If the Commissions determine that stable value contracts are encompassed by the swap definition, section 719(d)(1)(B) of the Dodd-Frank Act requires the Commissions jointly to determine whether an exemption for those contracts from the swap definition is appropriate and in the public interest. Section 719(d)(1)(B) also requires the Commissions to issue regulations implementing the determinations made under the required study. Until the effective date of such regulations, the requirements under Title VII do not apply to stable value contracts, and stable value contracts in effect prior to the effective date of such regulations are not considered swaps. See section 719(d) of the Dodd-Frank Act. The Commissions currently are conducting the required joint study and will consider whether to propose any implementing regulations (including, if appropriate, regulations determining that stable value contracts: (i) Are not encompassed within the swap definition; or (ii) are encompassed within the definition but are exempt from the swap definition) at the conclusion of that study.

evade the requirements of subtitles A and B, respectively, of Title VII.

Section 712(d)(2)(B) of the Dodd-Frank Act requires the Commissions, in consultation with the Board, to jointly adopt rules governing books and records requirements for SBSAs by persons registered as swap data repositories ("SDRs") under the CEA,[5] including uniform rules that specify the data elements that shall be collected and maintained by each SDR.[6] Similarly, section 712(d)(2)(C) of the Dodd-Frank Act requires the Commissions, in consultation with the Board, to jointly adopt rules governing books and records for SBSAs, including daily trading records, for swap dealers, major swap participants, security-based swap dealers, and security-based swap participants.[7]

Under the comprehensive framework for regulating swaps and security-based swaps established in Title VII, the CFTC is given regulatory authority over swaps,[8] the SEC is given regulatory authority over security-based swaps,[9] and the Commissions shall jointly prescribe such regulations regarding mixed swaps as may be necessary to

carry out the purposes of Title VII.[10] In addition, the SEC is given antifraud authority over, and access to information from, certain CFTC-regulated entities regarding SBSAs, which are a type of swap related to securities over which the CFTC is given regulatory authority.[11]

To assist the Commissions in further defining the Product Definitions (as well as certain other definitions) and in prescribing regulations regarding mixed swaps as may be necessary to carry out the purposes of Title VII, the Commissions published an advance notice of proposed rulemaking ("ANPR") in the **Federal Register** on August 20, 2010.[12] The comment period

for the ANPR closed on September 20, 2010.[13] The Commissions received comments addressing the Product Definitions and/or mixed swaps in response to the ANPR, as well as comments in response to the Commissions' informal solicitations,[14] from a wide range of commenters. Taking into account comments received on the ANPR, the Commissions published a notice of proposed rulemaking in the **Federal Register** on May 23, 2011.[15] The comment period for the Proposing Release closed on July 22, 2011.[16] Together, the Commissions received approximately 86 written comment letters in response to the Proposing Release.

The Commissions have reviewed and considered the comments received, and the staffs of the Commissions have met with many market participants and other interested parties to discuss the definitions.[17] Moreover, the Commissions' staffs have consulted extensively with each other as required by sections 712(a)(1) and (2) of the Dodd-Frank Act and have consulted with staff of the Board as required by section 712(d) of the Dodd-Frank Act.

Based on this review and consultation, the Commissions are adopting rules and interpretations regarding, among other things: (i) The regulatory treatment of insurance products; (ii) the exclusion of forward contracts from the swap and security-

---

[5] 7 U.S.C. 1 *et seq.*

[6] The CFTC has issued final rules regarding SDRs and, separately, swap data recordkeeping and reporting. *See Swap Data Repositories: Registration Standards, Duties and Core Principles,* 76 FR 54538 (Sep. 1, 2011); *Swap Data Recordkeeping and Reporting Requirements,* 77 FR 2136 (Jan. 13, 2012). The SEC has also issued proposed rules regarding security-based swap data repositories ("SBSDRs"), including rules specifying data collection and maintenance standards for SBSDRs, as well as rules regarding security-based swap data recordkeeping and reporting. *See Security-Based Swap Data Repository Registration, Duties, and Core Principles,* 75 FR 77306 (Dec. 10, 2010); *Regulation SBSR—Reporting and Dissemination of Security-Based Swap Information,* 75 FR 75208 (Dec. 2, 2010).

[7] The CFTC has issued final rules regarding recordkeeping requirements for swap dealers and major swap participants. *See Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants,* 77 FR 20128 (Apr. 3, 2012).

[8] Section 721(a) of the Dodd-Frank Act defines the term "swap" by adding section 1a(47) to the CEA, 7 U.S.C. 1a(47). This new swap definition also is cross-referenced in new section 3(a)(69) of the Exchange Act, 15 U.S.C. 78c(a)(69). Citations to provisions of the CEA and the Exchange Act, 15 U.S.C. 78a *et seq.,* in this release refer to the numbering of those provisions after the effective date of Title VII, except as indicated.

[9] Section 761(a) of the Dodd-Frank Act defines the term "security-based swap" by adding new section 3a(68) to the Exchange Act, 15 U.S.C. 78c(a)(68). This new security-based swap definition also is cross-referenced in new CEA section 1a(42), 7 U.S.C. 1a(42). The Dodd-Frank Act also explicitly includes security-based swaps in the definition of security under the Exchange Act and the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77a *et seq.*

[10] Section 721(a) of the Dodd-Frank Act describes the category of "mixed swap" by adding new section 1a(47)(D) to the CEA, 7 U.S.C. 1a(47)(D). Section 761(a) of the Dodd-Frank Act also includes the category of "mixed swap" by adding new section 3(a)(68)(D) to the Exchange Act, 15 U.S.C. 78c(68)(D). A mixed swap is defined as a subset of security-based swaps that also are based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than the occurrence, non-occurrence, or extent of the occurrence of an event relating to a single issuer of a security or the issuers of securities in a narrow-based security index, provided that such event directly affects the financial statements, financial condition, or financial obligations of the issuer).

[11] Section 761(a) of the Dodd-Frank Act defines the term "security-based swap agreement" by adding new section 3(a)(78) to the Exchange Act, 15 U.S.C. 78c(a)(78). The CEA includes the definition of "security-based swap agreement" in subparagraph (A)(v) of the swap definition in CEA section 1a(47), 7 U.S.C. 1a(47). The only difference between these definitions is that the definition of SBSA in the Exchange Act specifically excludes security-based swaps (*see* section 3(a)(78)(B) of the Exchange Act, 15 U.S.C. 78c(a)(78)(B)), whereas the definition of SBSA in the CEA does not contain a similar exclusion. Instead, under the CEA, the exclusion for security-based swaps is placed in the general exclusions from the swap definition (*see* CEA section 1a(47)(B)(x), 7 U.S.C. 1a(47)(B)(x)). Although the statutes are slightly different structurally, the Commissions interpret them to have consistent meaning that the category of security-based swap agreements excludes security-based swaps.

[12] *See Definitions Contained in Title VII of Dodd-Frank Wall Street Reform and Consumer Protection Act,* 75 FR 51429 (Aug. 20, 2010). The ANPR also solicited comment regarding the definitions of the terms "swap dealer," "security-based swap dealer," "major swap participant," "major security-based swap participant," and "eligible contract participant." These definitions are the subject of a separate joint rulemaking by the Commissions. *See Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant,"* 77 FR 30596 (May 23, 2012) ("Entity Definitions Release"). The Commissions also provided the public with the ability to present their views more generally on implementation of the Dodd-Frank Act through their Web sites, dedicated electronic mailboxes, and

meetings with interested parties. *See* Public Comments on SEC Regulatory Initiatives Under the Dodd-Frank Act/Meetings with SEC Officials, located at *http://www.sec.gov/spotlight/ regreformcomments.shtml;* Public Submissions, located at *http://comments.cftc.gov/Public Comments/ReleasesWithComments.aspx;* External Meetings, located at *http://www.cftc.gov/Law Regulation/DoddFrankAct/ExternalMeetings/ index.htm.*

[13] Copies of all comments received by the SEC on the ANPR are available on the SEC's Internet Web site, located at *http://www.sec.gov/comments/s7-16-10/s71610.shtml.* Comments are also available for Web site viewing and printing in the SEC's Public Reference Room, 100 F Street NE., Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of all comments received by the CFTC on the ANPR are available on the CFTC's Internet Web site, located at *http://www. cftc.gov/LawRegulation/DoddFrankAct/OTC_2_ Definitions.html.*

[14] *See supra* note 12.

[15] *See Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,* 76 FR 29818 (May 23, 2011) ("Proposing Release").

[16] *Id.*

[17] Information about meetings that CFTC staff have had with outside organizations regarding the implementation of the Dodd-Frank Act is available at *http://www.cftc.gov/LawRegulation/DoddFrank Act/ExternalMeetings/index.htm.* Information about meetings that SEC staff have had with outside organizations regarding the product definitions is available at *http://www.sec.gov/comments/s7-16-10/s71610.shtml#meetings.*

based swap definitions; (iii) the regulatory treatment of certain consumer and commercial contracts; (iv) the regulatory treatment of certain foreign-exchange related and other instruments; (v) swaps and security-based swaps involving interest rates (or other monetary rates and yields; (vi) total return swaps ("TRS"); (vii) Title VII instruments based on futures contracts; (viii) the application of the definition of "narrow-based security index" in distinguishing between certain swaps and security-based swaps, including credit default swaps ("CDS") and index CDS; and (ix) the specification of certain swaps and security-based swaps that are, and are not, mixed swaps. In addition, the Commissions are adopting rules: (i) To clarify that there will not be additional books and records requirements applicable to SBSAs other than those required for swaps; (ii) providing a mechanism for requesting the Commissions to interpret whether a particular type of agreement, contract, or transaction (or class of agreements, contracts, or transactions) is a swap, security-based swap, or both (*i.e.*, a mixed swap); and (iii) providing a mechanism for evaluating the applicability of certain regulatory requirements to particular mixed swaps. Finally, the CFTC is adopting rules to implement the anti-evasion authority provided in the Dodd-Frank Act.

*Overall Economic Considerations*

The Commissions are sensitive to the costs and benefits of their rules. In considering the adoption of the Product Definitions, the Commissions have been mindful of the costs and benefits associated with these rules, which provide fundamental building blocks for the Title VII regulatory regime. There are costs, as well as benefits, arising from subjecting certain agreements, contracts, or transactions to the regulatory regime of Title VII.[18] Additionally, there are costs that parties will incur to assess whether certain agreements, contracts, or transactions are indeed subject to the Title VII regulatory regime, and, if so, the costs to assess whether such Title VII instrument is subject to the regulatory regime of the SEC or the CFTC.[19]

Title VII created a jurisdictional division between the CFTC and SEC. The costs and benefits flowing from an agreement, contract, or transaction being subject to the regulatory regime of the

CFTC or the SEC may be impacted by similarities and differences in the Commissions' regulatory programs for swaps and security-based swaps. Title VII calls on the SEC and the CFTC to consult and coordinate for the purposes of assuring regulatory consistency and comparability to the extent possible.[20] Title VII also calls on the agencies to treat functionally or economically similar products or entities in a similar manner, but does not require identical rules.[21] Although the Commissions may differ on certain rulemakings, as the relevant products, entities and markets are different, the Commissions believe that, as the CFTC and SEC regulatory regimes share a statutory basis in Title VII, the costs and benefits of their respective regimes should be broadly similar and complementary.

In acknowledging the economic consequences of the final rules, the Commissions recognize that the Product Definitions do not themselves establish the scope or nature of those substantive requirements or their related costs and benefits. In determining the appropriate scope of these rules, the Commissions consider the types of agreement, contract, or transaction that should be regulated as a swap, security-based swap, or mixed swap under Title VII in light of the purposes of the Dodd-Frank Act. The Commissions have sought to further define the terms "swap," "security-based swap," and "mixed swap" to include agreements, contracts, and transactions only to the extent that capturing these agreements, contracts, and transactions is necessary and appropriate given the purposes of Title VII, and to exclude agreements, contracts, and transactions to the extent that the regulation of such agreements, contracts, and transactions does not serve the statutory purposes of Title VII, so as not to impose unnecessary burdens for agreements, contracts, and transactions whose regulation may not be necessary or appropriate to further the purposes of Title VII.

## II. Scope of Definitions of Swap and Security-Based Swap

### A. Introduction

Title VII of the Dodd-Frank Act applies to a wide variety of agreements, contracts, and transactions classified as swaps or security-based swaps. The statute lists these agreements, contracts, and transactions in the definition of the

term "swap." [22] The statutory definition of the term "swap" also has various exclusions,[23] rules of construction, and other provisions for the interpretation of the definition.[24] One of the exclusions to the definition of the term "swap" is for security-based swaps.[25] The term "security-based swap," in turn, is defined as an agreement, contract, or transaction that is a "swap" (without regard to the exclusion from that definition for security-based swaps) and that also has certain characteristics specified in the statute.[26] Thus, the statutory definition of the term "swap" also determines the scope of agreements, contracts, and transactions that could be security-based swaps.

The statutory definitions of the terms "swap" and "security-based swap" are detailed and comprehensive, and the Commissions believe that extensive "further definition" of the terms by rule is not necessary. Nevertheless, the definitions could be read to include certain types of agreements, contracts, and transactions that previously have not been considered swaps or security-based swaps, and nothing in the legislative history of the Dodd-Frank Act appears to suggest that Congress intended such agreements, contracts, or transactions to be regulated as swaps or security-based swaps under Title VII. The Commissions thus believe that it is important to further clarify the treatment under the definitions of certain types of agreements, contracts, and transactions, such as insurance products and certain consumer and commercial contracts.

In addition, commenters also raised questions regarding, and the Commissions believe that it is important to clarify: (i) The exclusion for forward contracts from the definitions of the terms "swap" and "security-based swap;" and (ii) the status of certain commodity-related products (including various foreign exchange products and forward rate agreements) under the definitions of the terms "swap" and "security-based swap." Finally, the Commissions are providing

---

[18] The Commissions refer to these costs and benefits as programmatic costs and benefits.

[19] The Commissions refer to these costs as assessment costs.

[20] *See* sections 712(a)(1) and (a)(2) of the Dodd-Frank Act.

[21] *See* sections 712(a)(7)(A) and (B) of the Dodd-Frank Act.

[22] *See* CEA section 1a(47)(A), 7 U.S.C. 1a(47)(A). This swap definition is also cross-referenced in new section 3(a)(69) of the Exchange Act, 15 U.S.C. 78c(a)(69).

[23] *See* CEA section 1a(47)(B), 7 U.S.C. 1a(47)(B), clauses (i)–(x).

[24] *See* CEA sections 1a(47)(C)–(F), 7 U.S.C. 1a(47)(C)–(F).

[25] *See* CEA section 1a(47)(B)(x), 7 U.S.C. 1a(47)(B)(x).

[26] *See* section 3(a)(68) of the Exchange Act, 15 U.S.C. 78c(a)(68).

interpretations related to the definitions.[27]

*B. Rules and Interpretations Regarding Certain Transactions Outside the Scope of the Definitions of the Terms "Swap" and "Security-Based Swap"*

1. Insurance Products

The statutory definition of the term "swap" includes, in part, any agreement, contract or transaction "that provides for any purchase, sale, payment or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[28] As stated in the Proposing Release, the Commissions do not interpret this clause to mean that products historically treated as insurance products should be included within the swap or security-based swap definitions.[29] The Commissions are aware of nothing in Title VII to suggest that Congress intended for traditional insurance products to be regulated as swaps or security-based swaps. Moreover, the fact that swaps and insurance products are subject to different regulatory regimes is reflected in section 722(b) of the Dodd-Frank Act which, in new section 12(h) of the CEA,

provides that a swap "shall not be considered to be insurance" and "may not be regulated as an insurance contract under the law of any State."[30] Accordingly, the Commissions believe that state or Federally regulated insurance products that are provided by persons that are subject to state or Federal insurance supervision, that otherwise could fall within the definitions should not be considered swaps or security-based swaps so long as they satisfy the requirements of the Insurance Safe Harbor (as defined below). At the same time, however, the Commissions are concerned that certain agreements, contracts, or transactions that are swaps or security-based swaps might be characterized as insurance products to evade the regulatory regime under Title VII of the Dodd-Frank Act.

Accordingly, the Commissions are adopting final rules that (i) clarify that certain agreements, contracts, or transactions that satisfy the requirements of the Insurance Safe Harbor will not be considered to be swaps or security-based swaps, and (ii) provide an Insurance Grandfather exclusion from the swap and security-based swap definitions for any agreement, contract, or transaction entered into on or before the effective date of the Product Definitions, provided that, when the parties entered into such agreement, contract, or transaction, it was provided in accordance with the Provider Test (as defined below), including a requirement that an agreement, contract or transaction that is provided in accordance with the first prong of the

Provider Test must be regulated as insurance under applicable state law or the laws of the United States.

The final rules contain four subparts: The first subpart addresses the agreement, contract, or transaction; the second subpart addresses the person[31] providing that agreement, contract, or transaction; the third subpart includes a list of traditional insurance products that do not have to meet the requirements set out in the first subpart; and the fourth subpart contains the Insurance Grandfather exclusion (as defined below).

More specifically, with respect to the first subpart, the Commissions are adopting paragraph (i)(A) of rule 1.3(xxx)(4) under the CEA and paragraph (a)(1) of rule 3a69–1 under the Exchange Act (the "Product Test") as proposed, with certain modifications to respond to commenters' concerns. As adopted, the Product Test provides that the terms "swap" and "security-based swap" will not include an agreement, contract, or transaction that, by its terms or by law, as a condition of performance:

• Requires the beneficiary of the agreement, contract, or transaction to have an insurable interest that is the subject of the agreement, contract, or transaction and thereby carry the risk of loss with respect to that interest continuously throughout the duration of the agreement, contract, or transaction;

• Requires loss to occur and be proved, and that any payment or indemnification therefor be limited to the value of the insurable interest;

• Is not traded, separately from the insured interest, on an organized market or over the counter; and

• With respect to financial guaranty insurance only, in the event of payment default or insolvency of the obligor, any acceleration of payments under the policy is at the sole discretion of the insurer.

The Commissions are also adopting paragraph (i)(B) of rule 1.3(xxx)(4) under the CEA and paragraph (a)(2) of rule 3a69–1 under the Exchange Act (the "Provider Test") as proposed, with certain modifications to respond to commenters' concerns. As adopted, the Provider Test requires that an agreement, contract, or transaction that

---

[27] In response to the ANPR, some commenters raised concerns regarding the treatment of inter-affiliate swaps and security-based swaps. *See, e.g.,* Letter from Edward J. Rosen, Cleary Gottlieb Steen & Hamilton LLP, Sep. 21, 2010 ("Cleary ANPR Letter"); Letter from Coalition for Derivatives End Users, Sep. 20, 2010 ("CDEU ANPR Letter"); Letter from Robert Pickel, Executive Vice President, International Swaps and Derivatives Association, Inc. ("ISDA"), Sep. 20, 2010; Letter from Richard A. Miller, Vice President and Corporate Counsel, Prudential Financial Inc., Sep. 17, 2010; Letter from Richard M. Whiting, The Financial Services Roundtable, Sep. 20, 2010. A few commenters suggested that the Commissions should further define the term "swap" or "security-based swap" to exclude inter-affiliate transactions. *See* Cleary ANPR Letter and CDEU ANPR Letter. The Commissions are considering whether inter-affiliate swaps or security-based swaps should be treated differently from other swaps or security-based swaps in the context of the Commissions' other Title VII rulemakings.

[28] CEA section 1a(47)(A)(ii), 7 U.S.C. 1a(47)(A)(ii).

[29] *See* Proposing Release at 29821. The Commissions continue to believe that it was not the intent of Congress through the swap and security-based swap definitions to preclude the provision of insurance to individual homeowners and small businesses that purchase property and casualty insurance. *See* section 2(e) of the CEA, 7 U.S.C. 2(e), and section 6(l) of the Exchange Act, 15 U.S.C. 78f(l) (prohibiting individuals and small businesses that do not meet specified financial thresholds or other conditions from entering into swaps or security-based swaps other than on or subject to the rules of regulated futures and securities exchanges). Historically, insurance has not been regulated as such under the Federal securities laws or under the CEA. *See infra* note 1283.

[30] 7 U.S.C. 16(h). Moreover, other provisions of the Dodd-Frank Act address the status of insurance more directly, and more extensively, than Title VII. For example, Title V of the Dodd-Frank Act requires the newly established Federal Insurance Office to conduct a study and submit a report to Congress, within 18 months of enactment of the Dodd-Frank Act, on the regulation of insurance, including the consideration of Federal insurance regulation. Notably, the Federal Insurance Office's authority under Title V extends primarily to monitoring and information gathering; its ability to promulgate Federal insurance regulation that preempts state insurance regulation is significantly restricted. *See* section 502 of the Dodd-Frank Act (codified in various sections of 31 U.S.C.). Title V also addressed non-admitted insurance and reinsurance. Title X of the Dodd-Frank Act also specifically excludes the business of insurance from regulation by the Bureau of Consumer Financial Protection. *See* section 1027(m) of the Dodd-Frank Act, 12 U.S.C. 5517(m) ("The [Bureau of Consumer Financial Protection] may not define as a financial product or service, by regulation or otherwise, engaging in the business of insurance."); section 1027(f) of the Dodd-Frank Act, 12 U.S.C. 5517(f) (excluding persons regulated by a state insurance regulator, except to the extent they are engaged in the offering or provision of consumer financial products or services or otherwise subject to certain consumer laws as set forth in Title X of the Dodd-Frank Act).

[31] In response to commenters, the Commissions are changing the word "company" from the proposal to "person." Each of the CEA, the Securities Act, and the Exchange Act contains a definition of a "person." *See, e.g.,* Letter from Carl B. Wilkerson, Vice President & Chief Counsel, American Council of Life Insurers ("ACLI"), dated July 22, 2011 ("ACLI Letter") and Letter from John P. Mulhern, Dewey & LeBoeuf LLP ("D&L"), dated July 22, 2011 ("D&L Letter").

satisfies the Product Test must be provided:

• By a person that is subject to supervision by the insurance commissioner (or similar official or agency) of any state [32] or by the United States or an agency or instrumentality [33] thereof, and such agreement, contract, or transaction is regulated as insurance under applicable state law [34] or the laws of the United States (the "first prong");

• (i) Directly or indirectly by the United States, any state or any of their respective agencies or instrumentalities, or (ii) pursuant to a statutorily authorized program thereof ((i) and (ii) together, the "second prong"); or

• In the case of reinsurance only [35] by a person to another person that satisfies the Provider Test, provided that:

(i) Such person is not prohibited by applicable state law or the laws of the United States from offering such agreement, contract, or transaction to such person that satisfies the Provider Test;

(ii) The agreement, contract, or transaction to be reinsured satisfies the Product Test or is one of the Enumerated Products (as defined below); and

(iii) Except as otherwise permitted under applicable state law, the total amount reimbursable by all reinsurers [36] for such agreement, contract, or transaction may not exceed the claims or losses paid by the cedant [37] ((i), (ii), and (iii), collectively, the "third prong"); or

• In the case of non-admitted insurance [38] by a person who:

(i) Is located outside of the United States and listed on the Quarterly Listing of Alien Insurers as maintained by the International Insurers Department of the National Association of Insurance Commissioners; or

(ii) Meets the eligibility criteria for non-admitted insurers [39] under applicable state law ((i) and (ii) together, the "fourth prong").

In response to commenters' requests that the Commissions codify the proposed interpretation regarding certain enumerated types of traditional insurance products in the final rules,[40] the Commissions are also adopting paragraph (i)(C) of rule 1.3(xxx)(4) under the CEA and paragraph (a)(3) of rule 3a69–1 under the Exchange Act. In addition, in response to comments, the Commissions are expanding and revising the enumerated types of traditional insurance products. As adopted, the rule provides that the terms "swap" and "security-based swap" will not include an agreement, contract, or transaction that is provided in accordance with the Provider Test and is any one of the following (collectively, "Enumerated Products"): Surety bonds; fidelity bonds; life insurance; health insurance; long-term care insurance; title insurance; property and casualty insurance; annuities; disability insurance; insurance against default on individual residential mortgages (commonly known as private mortgage insurance, as distinguished from financial guaranty of mortgage pools); and reinsurance (including retrocession) of any of the foregoing. The Commissions note that the inclusion of reinsurance (including retrocession) as an Enumerated Product is meant to apply to traditional reinsurance and retrocession contracts. Specifically, traditional reinsurance and retrocession contracts that reinsure risks ceded under traditional insurance products included in the Enumerated Product list and provided in accordance with the Provider test do not fall within the swap or security-based swap definitions. An agreement, contract, or transaction that is labeled as "reinsurance" or "retrocession", but is executed as a swap or security-based swap or otherwise is structured to evade Title VII of the Dodd-Frank Act, would not satisfy the Insurance Safe Harbor, and would be a swap or security-based swap.[41]

In order for an agreement, contract, or transaction to qualify under the final rules as an insurance product that would not be a swap or security-based swap: (i) The agreement, contract, or transaction must satisfy the criteria in the Product Test or be one of the Enumerated Products and (ii) the person providing the agreement, contract or transaction must satisfy one prong of the Provider Test.[42] The fact that an agreement, contract, or transaction satisfies the Product Test or is one of the Enumerated Products does not exclude it from the swap or security-based swap definitions if it is not provided by a person that satisfies the Provider Test; nor does the fact that a product is provided by a person that satisfies the Provider Test exclude the product from the swap or security-based swap definitions if the agreement, contract, or transaction does not satisfy the criteria set forth in the Product Test or is not one of the Enumerated Products.[43]

---

[32] The term "State" is defined in section 3(a)(16) of the Exchange Act, 15 U.S.C. 78c(a)(16), to mean "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States." The CFTC is incorporating this definition into rule 1.3(xxx)(4) for purposes of ensuring consistency between the CFTC and SEC rules further defining the terms "swap" and "security-based swap."

[33] For purposes of this release, the term "instrumentality" includes publicly supported, state operated or quasi-state operated insurance programs that may not be subject to state regulatory oversight, such as the Illinois Mine Subsidence Insurance Fund and the Florida Hurricane Catastrophe Fund.

[34] For purposes of this release, the Commissions anticipate that the parties to an agreement, contract, or transaction will evaluate which state law applies prior to entering into such agreement, contract, or transaction. The Commissions do not anticipate that the parties' analysis of which state law applies will change as a result of the adoption of the Insurance Safe Harbor. In addition, the Commissions will analyze which state law applies (if necessary, in consultation with state insurance regulatory authorities) if and when such issues arise that the Commissions determine to address. The Commissions note that courts routinely determine what is the "applicable state law" when adjudicating disputes involving insurance.

[35] For purposes of this release, the term "reinsurance" means the assumption by an insurer of all or part of a risk undertaken originally by another insurer.

[36] For purposes of this release, the term "reinsurer" means any person who provides reinsurance.

[37] For purposes of this release, the term "cedant" means the person writing the risk being ceded or transferred to a reinsurer.

[38] For purposes of this release, the term "non-admitted insurance" means any property and casualty insurance permitted to be placed directly or through a surplus lines broker with a non-admitted insurer eligible to accept such insurance.

[39] For purposes of this release, the term "non-admitted insurer" means, with respect to any State, an insurer not licensed to engage in the business of insurance in such State, but does not include a risk retention group, as that term is defined in section 2(a)(4) of the Liability Risk Retention Act of 1986, 15 U.S.C. 3901(a)(4).

[40] See infra notes 88, 89, and 90 and accompanying text.

[41] For example, if a person uses a weather derivative or catastrophe swap to assume all or part of the risks contained in a portfolio of property and casualty insurance policies, that weather derivative or catastrophe swap would be a Title VII instrument that is subject to regulation under Title VII.

[42] As was discussed in the Proposing Release, see Proposing Release at 29822 n. 31, certain variable life insurance products and annuities are securities and therefore are excluded from the swap and security-based swap definitions regardless of whether they meet the requirements under the final rules. See section 1a(47)(B)(v) of the CEA, 7 U.S.C. 1a(47)(B)(v). These securities would not be swaps or security-based swaps whether or not required to be registered under the Securities Act. See SEC v. United Benefit Life Ins. Co., 387 U.S. 202 (1967) (holding that the accumulation provisions of a "flexible fund" annuity contract were not entitled to exemption under section 3(a)(8) of the Securities Act, 15 U.S.C. 77c(a)(8), for insurance and annuities); SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65 (1959) (holding that a variable annuity was not entitled to exemption under section 3(a)(8) of the Securities Act).

[43] For the purpose of determining whether an agreement, contract or transaction falls within the Insurance Safe Harbor, Title VII provides the Commissions with flexibility to address the facts and circumstances of new products that may be marketed or sold as insurance, through joint interpretations pursuant to section 712(d)(4) of the Dodd-Frank Act.

Further, in response to commenters' concerns,[44] the Commissions are confirming that the Product Test, the Provider Test and the Enumerated Products represent a non-exclusive safe harbor. None of the Product Test, the Provider Test, or the Enumerated Products (collectively, the "Insurance Safe Harbor") implies or presumes that an agreement, contract, or transaction that does not meet any of their respective requirements is a swap or security-based swap. Such an agreement, contract, or transaction will require further analysis of the applicable facts and circumstances, including the form and substance of such agreement, contract, or transaction, to determine whether it is insurance, and thus not a swap or security-based swap.

However, future market conditions or other developments may prompt the Commissions to reconsider whether a particular product that satisfies the requirements of the Insurance Safe Harbor should instead fall within the swap or security-based swap definition. Because a determination that such a product is a swap or security-based swap could potentially have an unsettling effect on the domestic insurance or financial markets, the Commissions would only consider making a determination that such a product is a swap or security-based swap through a rulemaking [45] process that would provide market participants with an opportunity to comment.[46]

(a) Types of Insurance Products

Final Rules

Product Test

The Commissions are adopting the Product Test as proposed, with certain modifications to respond to commenters' concerns. The Product Test sets forth four criteria for an agreement, contract, or transaction to be considered insurance. First, the final rules require that the beneficiary have an "insurable interest" underlying the agreement, contract, or transaction and thereby carry the risk of loss with respect to that interest continuously throughout the duration of the agreement, contract, or transaction. The

requirement that the beneficiary be at risk of loss (which could be an adverse financial, economic, or commercial consequence) with respect to the interest that is the subject of the agreement, contract, or transaction continuously throughout the duration of the agreement, contract, or transaction will ensure that an insurance contract beneficiary has a stake in the interest on which the agreement, contract, or transaction is written.[47] Similarly, the requirement that the beneficiary have the insurable interest continuously throughout the duration of the agreement, contract, or transaction is designed to ensure that payment on the insurance product is inextricably connected to both the beneficiary and the interest on which the insurance product is written. In contrast to insurance, a credit default swap ("CDS") (which may be a swap or a security-based swap) does not require the purchaser of protection to hold any underlying obligation issued by the reference entity on which the CDS is written.[48] One commenter identified the existence of an insurable interest as a material element to the existence of an insurance contract.[49] Because neither swaps nor security-based swaps require the presence of an insurable interest at all (although an insurable interest may sometimes be present coincidentally), the Commissions continue to believe that whether an insurable interest is present continuously throughout the duration of the agreement, contract, or transaction is a meaningful way to distinguish insurance from swaps and security-based swaps.

Second, the requirement that a loss occur and be proved similarly ensures that the beneficiary has a stake in the insurable interest that is the subject of the agreement, contract, or transaction. If the beneficiary can demonstrate loss, that loss would "trigger" performance by the insurer on the agreement, contract, or transaction such that, by making payment, the insurer is

indemnifying the beneficiary for such loss. In addition, limiting any payment or indemnification to the value of the insurable interest aids in distinguishing swaps and security-based swaps (where there is no such limit) from insurance.[50]

Third, the final rules require that the insurance product not be traded, separately from the insured interest, on an organized market or over the counter. As the Commissions observed in the Proposing Release, with limited exceptions,[51] insurance products traditionally have not been entered into on or subject to the rules of an organized exchange nor traded in secondary market transactions (i.e., they are not traded on an organized market or over the counter). While swaps and security-based swaps also generally have not been tradable at will in secondary market transactions (i.e., on an organized market or over the counter) without counterparty consent, the Commissions understand that all or part of swaps and security-based swaps are novated or assigned to third parties, usually pursuant to industry standard terms and documents.[52] In response to commenter concerns,[53] the Commissions are clarifying when assignments of insurance contracts and trading on "insurances exchanges" do not constitute trading the contract separately from the related insurable interest, and thus would not violate the Product Test. The Commissions do not interpret the assignment of an insurance contract as described by commenters[54]

---

[44] See infra notes 178 and 179 and accompanying text.

[45] The Commissions can engage in rulemakings in a variety of ways including an advanced notice of proposed rulemaking, a notice of proposed rulemaking, or an interim final rule.

[46] When determining whether a particular product is a swap or security-based swap instead of insurance, if such product does not meet the requirements set out in the Insurance Safe Harbor, the Commissions will consider prior regulation as an insurance contract as one factor in their respective facts and circumstances analysis.

[47] Requiring that a beneficiary of an insurance policy have a stake in the interest traditionally has been justified on public policy grounds. For example, a beneficiary that does not have a property right in a building might have an incentive to profit from arson.

[48] Standard CDS documentation stipulates that the incurrence or demonstration of a loss may not be made a condition to the payment on the CDS or the performance of any obligation pursuant to the CDS. See, e.g., ISDA, 2003 ISDA Credit Derivatives Definitions, art. 9.1(b)(i) (2003) ("2003 Definitions") (stating that "the parties will be obligated to perform * * * irrespective of the existence or amount of the parties' credit exposure to a Reference Entity, and Buyer need not suffer any loss nor provide evidence of any loss as a result of the occurrence of a Credit Event").

[49] See D&L Letter.

[50] To the extent an insurance product provides for such items as, for example, a rental car for use while the car that is the subject of an automobile insurance policy is being repaired, the Commissions would consider such items as constituting part of the value of the insurable interest.

[51] See, e.g., "Life Settlements Task Force, Staff Report to the United States Securities and Exchange Commission" ("In an effort to help make the bidding process more efficient and to facilitate trading of policies after the initial settlement occurs, some intermediaries have considered or instituted a trading platform for life settlements."), available at http://www.sec.gov/news/studies/2010/lifesettlements-report.pdf (July 22, 2010).

[52] See, e.g., ISDA, 2005 Novation Protocol, available at http://www.isda.org/2005novationprot/docs/NovationProtocol.pdf (2005); ISDA, ISDA Novation Protocol II, available at http://www.isda.org/isdanovationprotII/docs/NPII.pdf (2005); 2003 Definitions, Exhibits E (Novation Agreement) and F (Novation Confirmation).

[53] See infra notes 74 and 75 and accompanying text.

[54] See, e.g., Letter from Kim O'Brien, President & CEO, National Association for Fixed Annuities ("NAFA"), dated July 21, 2011 ("NAFA Letter"); Letter from Robert Pickel, Executive Vice Chairman, ISDA, dated July 22, 2011 ("ISDA Letter"); ACLI Letter; and Letter from Letter from Stephen E. Roth, Frederick R. Bellamy and James M. Cain, Sutherland Asbill & Brennan LLP on behalf of the Committee of Annuity Insurers ("CAI"), dated July 22, 2011 ("CAI Letter").

to be "trading" as that term is used in the Product Test.[55] Nor do the Commissions find that the examples of exchanges offered by commenters,[56] such as Federal Patient Protection and Affordable Care Act "exchanges," [57] are exchanges as that term is used in the Product Test, *e.g.,* a national securities exchange or designated contract market. Mandated insurance exchanges are more like marketplaces for the purchase of insurance, and there is no trading of insurance policies separately from the insured interest on these insurance exchanges. Thus, the assignment of an insurance contract as permitted or required by state law, or the purchase or assignment of an insurance contract on an insurance exchange or otherwise, does not constitute trading an agreement, contract, or transaction separately from the insured interest and would not violate the trading restriction in the Product Test. For the foregoing reasons as clarified, the Commissions continue to believe that lack of trading separately from the insured interest is a feature of insurance that is useful in distinguishing insurance from swaps and security-based swaps.

Fourth, the final rules provide that in the case of financial guaranty insurance policies, also known as bond insurance or bond wraps, any acceleration of payment under the policy must be at the sole discretion of the provider of the financial guaranty insurance policy in order to satisfy the Product Test.[58] Although such products can be economically similar to products such as CDS, they have certain key characteristics that distinguish them from swaps and security-based swaps.[59]

For example, under a financial guaranty policy, the insurer typically is required to make timely payment of any shortfalls in the payment of scheduled interest to the holders of the underlying guaranteed obligation. Also, for particular bonds that are covered by a financial guaranty policy, the indenture, related documentation, and/or the financial guaranty policy will provide that a default in payment of principal or interest on the underlying bond will not result in acceleration of the obligation of the insurer to make payment of the full amount of principal on the underlying guaranteed obligation unless the insurer, in its sole discretion, opts to make payment of principal prior to the final scheduled maturity date of the underlying guaranteed obligation. Conversely, under a CDS, a protection seller frequently is required to make payment of the relevant settlement amount to the protection buyer upon demand by the protection buyer after any credit event involving the issuer.[60]

As noted in the Proposing Release, the Commissions do not believe that financial guaranty policies, in general, should be regulated as swaps or security-based swaps. However, because of the close economic similarity of financial guaranty insurance policies guaranteeing payment on debt securities to CDS, in addition to the criteria noted above with respect to insurance generally, the final rules require that, in order to satisfy the Product Test, financial guaranty policies also must satisfy the requirement that they not permit the beneficiary of the policy to accelerate the payment of any principal due on the debt securities. This requirement further distinguishes financial guaranty policies from CDS because, as discussed above, the latter generally requires payment of the relevant settlement amount on the CDS after demand by the protection buyer.

Finally, in response to comments,[61] the Commissions are clarifying that reinsurance and retrocession transactions fall within the scope of the Product Test. The Commissions find that these transactions have insurable interests, as the Commissions interpret such interests in this context, if they have issued insurance policies covering the risks that they wish to insure (and reinsure). Moreover, the Commissions find that retrocession transactions are encompassed within the Product Test and the Provider Test because retrocession is reinsurance of reinsurance (provided the retrocession satisfies the other requirements of both tests). In addition, reinsurance (including retrocession) of certain types of insurance products is included in the list of Enumerated Products.[62]

Requiring all of the criteria in the Product Test will help to limit the application of the final rules to agreements, contracts, and transactions that are appropriately regulated as insurance, and help to assure that agreements, contracts, and transactions appropriately subject to the regulatory regime under Title VII of the Dodd-Frank Act are regulated as swaps or security-based swaps. As a result, the Commissions believe that these requirements will help prevent the final rules from being used to circumvent the applicability of the swap and security-based swap regulatory regimes under Title VII.

Enumerated Products

In the Proposing Release, the Commissions proposed an interpretation that certain enumerated types of insurance products would be outside the scope of the statutory definitions of swap and security-based swap under the Dodd-Frank Act if provided in accordance with the Provider Test and regulated as insurance. Based on comments received,[63] the Commissions are adding three products to the list of products as proposed (fidelity bonds, disability insurance and insurance against default on individual residential mortgages), adding reinsurance (including retrocession) of any of the traditional insurance products included in the list, deleting a requirement applicable to annuities, and codifying the Enumerated Products in the final rules. The revised list of Enumerated Products is: Surety bonds, fidelity bonds, life insurance, health insurance, long-term

---

[55] The assignment of the benefits or proceeds of an insurance contract by an owner or beneficiary does not violate the trading restriction in the Product Test. This interpretation does not extend to "stranger originated" products. The transfer of obligations for policyholder benefits between two insurance companies, such as would occur in connection with an insurance company merger or acquisition, also does not violate the trading restriction contained in the Product Test.

[56] *See* Letter from Susan E. Voss, Commissioner Iowa Insurance Division & National Association of Insurance Commissioners ("NAIC") President, and Therese M. Vaughan, NAIC Chief Executive Officer, dated July 22, 2011 ("NAIC Letter").

[57] *See Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans,* 76 FR 41866 (Jul. 15, 2011) (proposed).

[58] Financial guarantee policies are used by entities such as municipalities to provide greater assurances to potential purchasers of their bonds and thus reduce their interest costs. *See* "Report by the United States Securities and Exchange Commission on the Financial Guarantee Market: The Use of the Exemption in section 3(a)(2) of the Securities Act for Securities Guaranteed by Banks and the Use of Insurance Policies to Guarantee Debt Securities" (Aug. 28, 1987).

[59] *See, e.g.,* Letter from Sean W. McCarthy, Chairman, Association of Financial Guaranty

Insurers on the ANPR, dated Sept. 20, 2010 (explaining the differences between financial guaranty policies and CDS); Letter from James M. Michener, General Counsel, Assured Guaranty on the ANPR, dated Dec. 14, 2010 (noting that the Financial Accounting Standards Board has issued separate guidance on accounting for financial guaranty insurance and CDS); Letter from Ernest C. Goodrich, Jr., Managing Director—Legal Department, Deutsche Bank AG on the ANPR, dated Sept. 20, 2010 (noting that financial guaranty policies require the incurrence of loss for payment, whereas CDS do not).

[60] While a CDS requires payment in full on the occurrence of a credit event, the Commissions recognize that there are other financial instruments, such as corporate guarantees of commercial loans and letters of credit supporting payments on loans or debt securities, that allow for acceleration of payment obligations without such guarantees or letters of credit being swaps or security-based swaps.

[61] *See infra* note 105 and accompanying text.

[62] *See supra* note 41 and accompany text.

[63] *See infra* notes 93 and 94 and accompanying text.

care insurance, title insurance, property and casualty insurance, annuities, disability insurance, insurance against default on individual residential mortgages (commonly known as private mortgage insurance, as distinguished from financial guaranty of mortgage pools), and reinsurance (including retrocession) of any of the foregoing.[64] The Commissions believe that the Enumerated Products, as traditional insurance products, are not the types of agreements, contracts, or transactions that Congress intended to subject to the regulatory regime for swaps and security-based swaps under the Dodd-Frank Act. Codifying the Enumerated Products in the final rules appropriately places traditional insurance products outside the scope of the swap and security-based swap definition so long as such Enumerated Products are provided in accordance with the Provider Test, including a requirement that an Enumerated Product that is provided in accordance with the first prong of the Provider Test must be regulated as insurance under applicable state law or the laws of the United States.

### Comments

#### Insurable Interest

Six commenters objected to the requirement in the Product Test that the beneficiary have an insurable interest continuously throughout the duration of the contract.[65] These commenters noted that, under state law, an insurable interest may not always be required to be present continuously throughout the duration of the policy. For example, commenters noted that life insurance may only require an insurable interest at the time the policy is executed;[66] and some property and casualty or liability insurance may only require an insurable interest at the time a loss occurs.[67]

#### Indemnification for Loss

Five commenters objected to the requirement in the Product Test that a loss occur and be proven, and that any payment be limited to the value of the insurable interest, because payment under many insurance products may not be directly based upon actual losses incurred.[70] Two commenters argued that annuities do not provide

Commenters also noted that annuities and health insurance do not require the existence of an insurable interest at all.[68] Another commenter suggested that the Commissions modify the Product Test to indicate that annuities would not need to satisfy the "insurable interest" component, or to use terminology other than insurable interest to make clear that annuities are not swaps.[69]

As discussed above, the Commissions are retaining the insurable interest requirement of the Product Test. The Commissions continue to believe that this requirement is a useful tool to distinguish insurance from swaps and security-based swaps, because swaps and security-based swaps do not require the presence of an insurable interest (or require either counterparty to bear any risk of loss) at any time during the term of the agreement, contract, or transaction. While the Commissions acknowledge commenters who argued that products such as life insurance, property and casualty insurance, and annuities may fail the Product Test because of the insurable interest requirement, the Commissions do not interpret any such failure to mean that life insurance, property and casualty insurance, and annuities are not insurance products. To the contrary, as discussed above, these products are included in the list of Enumerated Products that are excluded from the swap and security-based swap definitions so long as they are provided in accordance with the Provider Test. If a life insurance, property and casualty insurance, or annuity is provided in accordance with the Provider Test, such product is not a swap or security-based swap, whether or not an insurable interest is present at all times during the term of the contract.

indemnification for loss and that life insurance products are not constrained by the value of the insurable interest.[71] Another argued that many insurance policies pay fixed amounts upon the occurrence of a loss without a requirement that the loss be tied to the value of an insurable interest.[72] Disability insurance and long-term care insurance are other products that commenters indicate would not be able to satisfy this requirement of the Product Test.[73]

As discussed above, the Commissions are retaining the requirement in the Product Test that a loss occur and be proven and that any payment for such loss be limited to the value of the insurable interest. The Commissions continue to believe that this requirement is a useful tool to distinguish insurance from swaps and security-based swaps, because payments under swaps and security-based swaps may be required when neither party incurs a loss, nor is the amount of payment limited by any such loss. While the Commissions acknowledge commenters who identified various products that may fail this part of the Product Test, the Commissions do not interpret any such failure to mean that products such as annuities, disability insurance, and long-term care insurance are not insurance products. To the contrary, as discussed above, these products are included in the list of Enumerated Products that are excluded from the swap and security-based swap definitions so long as they are provided in accordance with the Provider Test. If long-term care insurance, disability insurance, or an annuity is provided in accordance with the Provider Test, such product is not a swap or a security-based swap, whether or not a loss occurs, is proven, or indemnification for loss is limited to the value of the insurable interest.

#### Not Traded Separately

Six commenters stated that the proposed requirement that the agreement, contract, or transaction not be traded, separately from the insured interest, on an organized market or over the counter, is not an effective criterion in determining whether a product is insurance.[74] According to commenters, this criterion is ineffective and should be deleted from the Product Test because many conventional insurance

---

[64] *See supra* note 41 and accompanying text.

[65] *See* ACLI Letter; CAI Letter; ISDA Letter (objecting to the requirement that the risk of loss be held continuously throughout the contact); NAFA Letter; NAIC Letter; and Letter from Kenneth F. Spence III, Executive Vice President & General Counsel, The Travelers Companies, Inc. ("Travelers"), dated Nov. 14, 2011 ("Travelers Letter").

[66] *See* ACLI Letter; CAI Letter; ISDA Letter; NAIC Letter; and Travelers Letter. The Commissions understand that some states may define what constitutes an insurable interest with reference to personal or emotional consequence in addition to the financial, economic, or commercial consequence mentioned in the statutory swap definition.

[67] *See* NAIC Letter and Travelers Letter. However, one commenter noted that the Product and Provider Tests, as proposed, should be an effective means of helping to distinguish between those contracts that qualify for exclusion from the definition of swap and security-based swap from those contracts that will not. *See* Letter from Michael A. Bell, Senior

Counsel, Financial Policy, The Property Casualty Insurers Association of America, dated July 22, 2011.

[68] *See* CAI Letter; ISDA Letter; NAFA Letter; and NAIC Letter.

[69] *See* Letter from Nicholas D. Latrenta, Executive Vice President and General Counsel, Metropolitan Life Insurance Companies and its insurance affiliates ("MetLife"), dated July 22, 2011 ("MetLife Letter").

[70] *See* ACLI Letter; CAI Letter; ISDA Letter; NAFA Letter; and Travelers Letter.

[71] *See* ACLI Letter and Travelers Letter.

[72] *See* Travelers Letter.

[73] *See, e.g.,* ACLI Letter and CAI Letter.

[74] *See* ACLI Letter; Letter from Chris Barnard ("Barnard"), dated June 28, 2011 ("Barnard Letter"); CAI Letter; NAFA Letter; NAIC Letter; and ISDA Letter.

products, such as annuities, are assignable (and therefore tradable), which may violate the trading restriction.[75] Two commenters observed that the trading of insurance policies has already occurred and is expected to increase.[76] One commenter stated that a number of states have "insurance exchanges" that sell reinsurance and excess or surplus lines, and that the Patient Protection and Affordable Care Act requires states or the Federal government to establish health benefit "insurance exchanges" through which insurers will sell health insurance to individuals and small groups.[77] One commenter recommended that the trading restriction apply only to trading by the policyholder or beneficiary of an insurance policy.[78]

The Commissions are retaining the requirement in the Product Test that the agreement, contract, or transaction not be traded separately from the insured interest, on an organized market or over the counter, and as discussed above have provided a clarification regarding assignments and trading on insurance exchanges. The Commissions continue to believe that using this criterion is an effective way to distinguish insurance from swaps and security-based swaps because swaps and security-based swaps are traded on organized markets and over the counter.

As stated above, the Commissions do not interpret the assignment of an insurance contract as described by commenters to be "trading" as that term is used in the Product Test.[79] Nor do the Commissions find that the examples of exchanges offered by commenters, such as Federal Patient Protection and Affordable Care Act "exchanges," are exchanges as that term is used in the Product Test, e.g., a national securities exchange or designated contract market.[80] Mandated insurance exchanges are more like marketplaces for the purchase of insurance, and there is no trading of insurance policies separately from the insured interest on these insurance exchanges. Thus, the assignment of an insurance contract as permitted or required by state law, or the purchase or assignment of an insurance contract on an insurance exchange or otherwise, does not constitute trading an agreement, contract, or transaction separately from the insured interest and would not violate the trading restriction in the Product Test.

Acceleration

Three commenters believed that the proposed requirement that, in the event of payment default or insolvency of the obligor, any acceleration of payments under a financial guaranty insurance policy be at the sole discretion of the insurer, is not an effective criterion in determining whether financial guaranty insurance falls outside the swap and security-based swap definitions and should be deleted from the Product Test.[81] However, one commenter supported its inclusion, observing that the proposed requirement is "firmly based on substantive business realities."[82] Two commenters believed that the acceleration of payments requirement is not useful in distinguishing between financial guaranty insurance and swaps or security-based swaps because it is designed to protect financial guaranty insurers from insolvency.[83] They noted that the criterion is a regulatory requirement imposed by state insurance commissioners that is subject to change, and that a state could not change this regulatory requirement without converting the financial guaranty policy into a swap or security-based swap.[84] One commenter stated that the acceleration of payments criterion has been the subject of significant analysis and interpretation by state insurance regulators, and including the requirement in the rules could result in conflicting interpretations and additional legal uncertainty.[85] This commenter also stated that this uncertainty will impose significant burdens on financial guaranty insurers that insure municipal bonds.[86]

The Commissions are retaining the requirement that acceleration be at the sole option of the provider of the financial guaranty insurance policy in the Product Test. In response to commenter concerns, the Commissions are clarifying that they plan to interpret the acceleration limitation in accordance with applicable state law to the extent that it does not contradict the Commissions' rules, interpretations and/or guidance regarding what is a swap or security-based swap.[87] The Commissions continue to believe that, for purposes of further defining swaps and security-based swaps, this criterion is useful to distinguish between financial guaranty insurance on the one hand, and swaps and security-based swaps, such as CDS, on the other because, as discussed above, the latter generally requires payment of the relevant settlement amount on the CDS after demand by the protection buyer.

Enumerated Products

The Commissions proposed an interpretation that certain enumerated types of insurance products would be outside the scope of the statutory definitions of swap and security-based swap. Several commenters stated that the list of enumerated insurance products should be codified in order to enhance legal certainty.[88] In particular, one commenter stated that it is important for the Commissions to codify the interpretation because the traditional insurance products included in the enumerated list may not satisfy the Product Test.[89] The commenter also expressed concern that insurance companies and state insurance

---

[75] Id. ACLI stated that many conventional insurance products, particularly annuities, can be assigned by the owner, and often state insurance law requires such assignability as a condition for approval of the product for sale under applicable insurance law. ACLI also stated that insurance policies are frequently assigned among family members, to third parties as collateral for loans, and in a host of other situations, and does not believe that those common kinds of assignment should cause an insurance product to be characterized as a swap.

[76] See Barnard Letter and NAIC Letter.

[77] See NAIC Letter. The commenter explained that the "insurance exchanges" mandated by the Patient Protection and Affordable Care Act would be marketplaces for insurance policies. The commenter described them as "cooperatives" where people could go to buy insurance policies with standardized terms/actuaries. The commenter noted that the insurable interest would not "trade" separately from the insurance policy in these cooperatives.

[78] See Travelers Letter.

[79] See supra notes 54 and 55.

[80] See supra notes 56 and 57.

[81] See Letter from Bruce E. Stern, Chairman, Association of Financial Guaranty Insurers ("AFGI"), dated July 20, 2011 ("AFGI Letter"); ISDA Letter; and Letter from Kimberly M. Welsh, Vice President and Assistant General Counsel, Reinsurance Association of America ("RAA"), dated July 22, 2011 ("RAA Letter").

[82] See Letter from Dennis M. Kelleher, President & CEO, Better Markets Inc., dated July 22, 2011 ("Better Markets Letter").

[83] See ISDA Letter and RAA Letter.

[84] Id.

[85] See AFGI Letter.

[86] Id. The commenter argued that these burdens would (a) increase instability in the currently fragile municipal bond market and (b) decrease the availability or attractiveness of bond insurance to municipal issuers that would otherwise save money by employing bond insurance. The Commissions understand that only one member of AFGI is currently active in the municipal bond insurance market.

[87] One commenter noted that "financial guarantors, for some time and in full compliance with state insurance laws, have issued insurance policies that contemplate acceleration upon events unrelated to an issuer default, e.g., upon the downgrade of the insurer." See AFGI Letter. In response to this comment, the Commissions note that the acceleration requirement in the Product Test refers only to "payment default or insolvency of the obligor" (emphasis added), without precluding other triggers.

[88] See ACLI Letter; NAIC Letter; RAA Letter; AIA Letter; NAFA Letter; and Letter from Mark R. Thresher, Executive Vice President, Nationwide, dated July 19, 2011 ("Nationwide Letter").

[89] See Travelers Letter.

regulators would face the possibility that the Commissions could revise or withdraw the interpretation in the future, with or without undergoing a formal rulemaking process.[90] As noted above, in response to commenters' concerns, the Commissions are codifying the Enumerated Products in the final rules.

One commenter further argued that the enumerated types of insurance products included in the list should not have to additionally satisfy the requirements that the person offering such product be a U.S. domiciled insurer and that the product be regulated in the U.S. as insurance.[91] The commenter argued that this additional requirement would result in the Insurance Safe Harbor not applying to traditional insurance products offered by insurers domiciled outside of the U.S. or by insurers that are not organized as insurance companies. The Commissions are retaining the requirement that the Enumerated Products be provided in accordance with the Provider Test. The Commissions also note that, in response to commenters' concerns, the Commissions have revised the first prong of the Provider Test so that it is not limited to insurance companies or to entities that are domiciled in the U.S. A product that need not satisfy the Product Test must be provided in accordance with the Provider Test, including a requirement that products provided in accordance with the first prong of the Provider Test must be regulated as insurance.[92]

Five commenters addressed the treatment of annuities in the proposed interpretive guidance, with all recommending that all annuities be excluded from the swap and security-based definitions regardless of their status under the tax laws.[93] In response to the comments, the Commissions are eliminating the proposed requirement that annuities comply with section 72 of the Internal Revenue Code in order to qualify as an Enumerated Product. The Commissions are persuaded that the proposed reference to the Internal Revenue Code is unnecessarily limiting and does not help to distinguish insurance from swaps and security-based swaps.

Other commenters suggested adding other products to the list of enumerated types of insurance products,[94] with one suggesting that the Commissions' interpretation cover all transactions currently reportable as insurance in the provider's regulatory and financial reports under a state's or a foreign jurisdiction's insurance laws.[95] One commenter noted that the list of enumerated types of insurance products does not include other state-regulated products such as service contracts, that may not satisfy the Product Test.[96] In response to requests to expand the list of enumerated products, the Commissions are adding fidelity bonds,[97] disability insurance, and insurance against default on individual residential mortgages (commonly known as private mortgage insurance, as distinguished from financial guaranty of mortgage pools) to the list of Enumerated Products. The Commissions agree that these are traditional insurance products, and thus their inclusion in the list of Enumerated Products is appropriate. The Commissions have also added reinsurance (including retrocession) of any of the traditional insurance products to the list of Enumerated Products.[98] However, the Commissions decline at this time to expand the list of Enumerated Products to include other types of contracts such as, guaranteed investment contracts ("GICs"), synthetic GICs, funding agreements, structured settlements, deposit administration contracts, immediate participation guaranty contracts, industry loss warrants, and catastrophe bonds.[99] These products do not receive the benefit of state insurance guaranty funds; their providers are not limited to insurance companies. The Commissions received little detail on sales of these other products, and do not believe it is appropriate to determine whether particular complex, novel or still evolving products are swaps or security-based swaps in the context of a general definitional rulemaking. Rather these products should be considered in a facts and circumstances analysis. With respect to GICs, the Commissions have published a request for comment regarding the study of stable value contracts.[100]

Reliance on State Law Concepts

Two commenters noted that the Product Test relies on concepts derived from state law, such as "insurable interest" and "indemnification for loss," which do not have uniform definitions.[101] This would require the

---

[90] *Id.*

[91] *See* D&L Letter.

[92] *See infra* notes 147 and 148 and accompanying text.

[93] *See* ACLI Letter; CAI Letter; MetLife Letter; Nationwide Letter; and RAA Letter.

[94] *See* ACLI Letter; AIA Letter; CAI Letter; D&L Letter; NAIC Letter; Letter from Michael A. Bell, Senior Counsel, Financial Policy, RAA Letter; and Letter from Robert J. Duke, The Surety & Fidelity Association of America ("SFAA"), dated July 13, 2011 ("SFAA Letter"). ACLI, CAI and RAA requested the addition of other types of annuity and pension plan products, such as group annuity contracts, guaranteed investment contracts, funding agreements, structured settlements, deposit administration contracts, and immediate participation guarantee contracts. D&L requested the addition of reinsurance of any of the enumerated types of traditional insurance products. NAIC requested the addition of mortgage guaranty, accident, and disability insurance. SFAA request the addition of surety and fidelity bonds.

[95] *See* Letter from J. Stephen Zielezienski, Senior Vice President & General Counsel, American Insurance Association ("AIA"), dated July 22, 2011 ("AIA Letter").

[96] *See* NAIC Letter. The Commissions note that service contracts, although regulated as insurance in some states, comprise consumer warranties, extended service plans, and buyer protection plans of the sort purchased with major appliances, electronics, and the like. The Commissions are addressing these contracts in their interpretation regarding consumer/commercial transactions. *See infra* part II.B.3.

[97] SFAA requested that the Commissions issue specific guidance that surety and fidelity bonds are insurance products rather than swaps, noting that all states include surety and fidelity bonds as lines of insurance subject to state oversight. Surety bonds were already included in the list of enumerated insurance products contained in the Proposing Release.

[98] *See supra* note 41 and accompanying text.

[99] *See, e.g.,* RAA Letter; CAI Letter; Letter from Ian K. Shepherd, Managing Director, Alice Corp. Pty Ltd ("Alice Corp."), dated July 22, 2011. Alice Corp. stated that industry loss warrants are a contingent instrument with a somewhat illiquid secondary market but "are currently treated as a reinsurance product and require an insurable interest." Alice Corp. also stated that "[c]atastrophe bonds may reference a specific insured portfolio or a set of parameters and may be traded in a secondary market and behave like a coupon bond if there is no triggering event but have a contingent element since some or all of the principal may be lost if the referenced event or loss occurs." *Id.* The Commissions note that catastrophe bonds are "securities" under the Federal securities laws and decline to provide an interpretation regarding industry loss warrants because it is inappropriate to determine whether a complex and novel product is a swap or a security-based swap in a general definitional rulemaking.

[100] *See Acceptance of Public Submissions Regarding the Study of Stable Value Contracts,* 76 FR 53162 (Aug. 25, 2011).

[101] *See* ACLI Letter and AFGI Letter. Some states define concepts such as "insurable interest" in statute; in other states definitions have developed through common law. The Commissions recognize that the terms denoting such concepts may vary from state to state; for instance, what one state calls an "insurable interest" may be referred to as a "material interest" in another. *See, e.g.,* New York Insurance Law Section 1101 ("material interest"). The Commissions believe, however, that both the concepts and their labels are well understood by insurance professionals and that any such variations would not impede market participants from interpreting or applying the final rules. Indeed, one commenter acknowledged this and applied the concepts, labeled differently, to particular products. "The terms used in the rule's criteria are different from the terms used with respect to a surety bond. For example, the bond is generally not referred to as a 'policy.' In addition, the beneficiary of a bond typically is known as the 'obligee.' Further, the bond's limit is referred to as the 'penal sum.' Nevertheless, the criteria can be applied to surety bonds and fidelity bonds, and such application would exclude bonds from the statutory definition of swaps." *See* SFAA Letter.

Commissions to analyze state insurance law, as well as to determine which state law should apply.[102] One of these commenters also requested that such concepts be applied consistently with the historical interpretation by the applicable state.[103]

State law differences regarding these concepts should not impede the ability of market participants from interpreting or applying the final rules to distinguishing between insurance and swaps or security-based swaps, and thus the Commissions are retaining these concepts in the Product Test. The Commissions intend to interpret these concepts consistently with the existing and developing laws of the relevant state(s) governing the agreement, contract, or transaction in question. However, the Commissions note their authority to diverge from state law if the Commissions become aware of evasive conduct.[104]

### Inclusion of Reinsurance and Retrocession Transactions

Several commenters suggested that the Commissions amend the Product Test to explicitly address reinsurance and retrocession (*i.e.,* reinsurance of reinsurance) transactions.[105]

In response to these comments, the Commissions are clarifying that reinsurance and retrocession transactions may fall within the Insurance Safe Harbor; thus, it is unnecessary for the Product Test to be modified as suggested by these commenters. In addition, the Commissions have modified the final rules to include reinsurance (including retrocession) of certain types of insurance products in the list of

Enumerated Products. Reinsurance or retrocession of these Enumerated Products will fall within the Insurance Safe Harbor so long as such reinsurance or retrocession is provided in accordance with the Provider Test.[106]

### Payment Based on the Price, Rate, or Level of a Financial Instrument

In the Proposing Release, the Commissions requested comment on whether, in order for an agreement, contract, or transaction to be considered insurance under the Product Test, the Commissions should require that payment not be based on the price, rate, or level of a financial instrument, asset, or interest or any commodity. The Commissions also requested comment on whether variable annuity contracts (where the income is subject to tax treatment under section 72 of the Internal Revenue Code) and variable life insurance should be excepted from such a requirement, if adopted.[107]

Eight commenters stated that it is inappropriate to include such a requirement in the final rules because a number of traditional insurance products would not satisfy the requirement and suggested that the Commissions should instead consider whether the agreement, contract, or transaction transfers risk and argued that such a requirement is not a useful marker for distinguishing insurance from swaps and security-based swaps.[108] Several commenters also believed that the addition to the Product

Test of the criterion that payment not be based on the price, rate, or level of a financial instrument, asset, or interest or any commodity would contribute to greater legal uncertainty.[109]

Two commenters agreed that such a requirement should be included in the final rules.[110] One commenter argued that any insurance instrument that provides for payment based on the price, rate, or level of a financial instrument, asset, or interest in any commodity is in substance a swap or security-based, regardless of its label, and should be regulated as such.[111] One of these commenters further recommended that the Commissions exclude annuity and variable universal life insurance from this requirement because these products were investments with some minimal level of life insurance cover or investment guarantee rider on top.[112]

The Commissions are not adopting an additional requirement for the Product Test that payment not be based on the price, rate, or level of a financial instrument, asset, or interest or any commodity because the Commissions find the requirement to be unsuitable for distinguishing insurance from swaps and security-based swaps. While the provision might work for property and casualty insurance, as many commenters noted, it is not an effective distinction for a number of other traditional insurance products.

### Accounting Standards

In the Proposing Release, the Commissions requested comment on whether the proposed rules relating to insurance should include a provision related to whether a product is recognized at fair value on an ongoing basis with changes in fair value reflected in earnings under U.S. generally accepted accounting principles.[113]

Three commenters argued that the proposed rules should not include a provision that an insurance product is recognized at fair value under generally accepted accounting principles.[114] One commenter argued that the determinants of what is an insurance product should be the existence of an insurable interest, transfer of risk, and indemnification of covered loss.[115] Another argued that factoring accounting standards into the analysis of whether a product is a swap

---

[102] *See* ACLI Letter and AFGI Letter.

[103] *See* AFGI Letter.

[104] The Commissions may also diverge from interpretations or determinations of state law based on an analysis of applicable facts and circumstances when determining whether a particular product is a swap or security-based swap.

[105] *See* ACLI Letter; CAI Letter; D&L Letter; ISDA Letter; NAFA Letter; Nationwide Letter; and RAA Letter. ACLI noted that the Product Test does not include a reference to reinsurance and that the "insurable interest" requirement under state insurance law generally does not apply to reinsurance products which, therefore, would not satisfy the Product Test. ACLI and CAI state that reinsurance in a chain of reinsurance also should not be considered a swap or security-based swap. In addition to expressly referencing reinsurance and retrocession transactions, ACLI believes that the Product Test should be expanded to include reinsurance and retrocession of insurance risks ceded by non-U.S. insurance companies to domestic insurance companies. RAA recommended adding a new clause to the Product Test to provide that "[a]ny agreement, contract, or transaction which reinsures any agreement, contract, or transaction meeting the criteria of paragraph (xxx)(4)(i)(A)–(C) of this section is also an insurance product."

[106] *See supra* note 41 and accompanying text.

[107] *See* Proposing Release at 29824. *See also id.* at 29825, Request for Comment 7.

[108] *See* ACLI Letter; AIA Letter; AFGI Letter; CAI Letter; ISDA Letter; NAFA Letter; NAIC Letter; and Nationwide Letter (concurring with ACLI's comments).

Commenters cited several examples of products that would fail a requirement that payment not be based on the price, rate, or level of a financial instrument, asset, or interest or any commodity. ACLI, CAI and NAFA cited registered and unregistered variable annuities and variable life insurance, and certain fixed annuities and equity indexed annuities, stating that these could be construed as being based on, or related to, a price, rate or level of a financial asset. ACLI also cited financial guaranty insurance, and replacement value property and casualty insurance, where the insurer's payment obligation may be based on the current price of the insured property or adjusted to reflect inflation. ACLI and ISDA cited crop insurance, because it could call for payment to be based in some way on the market price of the covered crop on the date of loss. ISDA and RAA cited "dual trigger" insurance (such as replacement power insurance); property and casualty policies purchased by some commodity producers (*e.g.,* oil refineries, copper mines) with deductibles that increase or decrease based on the price of the commodity that the company produces; event cancellation insurance that uses commodity indices to determine claims; and weather insurance and malpractice insurance. NAIC cited guaranteed investment contracts, financial guaranty insurance, and mortgage guaranty insurance

[109] *See* AIA Letter and AFGI Letter.

[110] *See* Barnard Letter and Better Markets Letter.

[111] *See* Better Markets Letter.

[112] *See* Barnard Letter.

[113] *See* Proposing Release at 29827, Request for Comment 17.

[114] *See* AFGI Letter; D&L Letter; and ISDA Letter.

[115] *See* D&L Letter.

or insurance will introduce unnecessary complexity in most cases but that the examination of accounting standards would be useful in cases where the classification of a product as insurance or swap is unclear.[116]

After considering these comments, the Commissions are not including a reference to accounting standards in the Product Test.

(b) Providers of Insurance Products

Under the first prong of the Provider Test, the agreement, contract, or transaction must be provided by a person that is subject to supervision by the insurance commissioner (or similar official or agency) of any state[117] or by the United States.[118] In addition, such agreement, contract, or transaction also must be regulated as insurance under applicable state law[119] or the laws of the United States.

The Commissions have revised the first prong of the Provider Test from the proposal. As proposed, the first prong of the Provider Test could only be satisfied by a company that was organized as an insurance company whose primary and predominant business activity was the writing of insurance or the reinsuring of risks underwritten by insurance companies.[120] The Commissions have revised this prong of the Provider Test to address commenters' concerns that the proposed rules would exclude insurers that were not organized as "insurance companies," as well as insurers that were domiciled outside of the United States.[121] As adopted, the first prong of the Provider Test can be satisfied by any person that is subject to state or Federal insurance supervision, regardless of that person's corporate structure or domicile. The Commissions understand that, with the exception of non-admitted insurers,[122] foreign insurers are subject to supervision in the states in which they offer insurance products. The treatment of non-admitted insurers is addressed in the fourth prong of the Provider Test.

The Commissions believe that the requirement that the agreement,

contract, or transaction be provided by a person that is subject to state or Federal insurance supervision should help prevent regulatory gaps that otherwise might exist between insurance regulation and the regulation of swaps and security-based swaps by ensuring that products provided by persons that are not subject to state or Federal insurance supervision are not able to be offered by persons that avoid regulation under Title VII of the Dodd-Frank Act as well.

The first prong of the Provider Test also requires that the agreement, contract, or transaction being provided is "regulated as insurance" under applicable state law or the laws of the United States. As stated in the Proposing Release, the purpose of this requirement is that an agreement, contract, or transaction that satisfies the other conditions of the final rules must be subject to regulatory oversight as an insurance product. The Commissions believe that this condition will help prevent products that are not regulated as insurance in the states in which they are offered, and that are swaps or security-based swaps, from being characterized as insurance products in order to evade the regulatory regime under Title VII of the Dodd-Frank Act. As noted by commenters,[123] the Commissions recognize that the "regulated as insurance" limitation means that it is possible that a particular product that may not be regulated as insurance in a particular state may not qualify for the Insurance Safe Harbor.[124]

As stated in the Proposing Release, the Commissions believe that it is appropriate to exclude, from regulation under Title VII, insurance that is issued by the United States or any of its agencies or instrumentalities, or pursuant to a statutorily authorized program thereof, from regulation as swaps or security-based swaps.[125] Such insurance includes, for example, Federal insurance of funds held in banks, savings associations, and credit unions; catastrophic crop insurance; flood insurance; Federal insurance of certain pension obligations; and terrorism risk insurance. At the request of commenters,[126] the Commissions are persuaded that it is also appropriate to provide a similar exclusion for insurance that is issued by a state or any of its agencies or instrumentalities, or

pursuant to a statutorily authorized program thereof. Accordingly, the Commissions have revised the second prong of the Provider Test to provide that products meeting the Product Test are excluded from the swap and security-based swap definitions if they are provided (i) directly or indirectly by the Federal government or a state or (ii) pursuant to a statutorily authorized program of either.[127]

As stated in the Proposing Release, the Commissions believe that where an agreement, contract, or transaction qualifies for the safe harbor and therefore is considered insurance excluded from the swap and security-based swap definitions, the lawful reinsurance of that agreement, contract, or transaction similarly should be excluded.[128] Accordingly, the Commissions are adopting the third prong of the Provider Test as proposed, with certain modifications, to provide that an agreement, contract, or transaction of reinsurance will be excluded from the swap and security-based swap definitions, provided that: (i) The person offering such reinsurance is not prohibited by applicable state law or the laws of the United States from offering such reinsurance to a person that satisfies the Provider Test; (ii) the agreement, contract, or transaction to be reinsured meets the requirements under the Product Test or is one of the Enumerated Products; and (iii) except as otherwise permitted under applicable state law, the total amount reimbursable by all reinsurers for such insurance product cannot exceed the claims or losses paid by the cedant.

In response to commenters' concerns,[129] the Commissions have revised the third prong of the Provider Test from that contained in the Proposing Release. As adopted, the third prong of the Provider Test encompasses all reinsurers wherever incorporated or organized, and not just those based outside of the United States. The Commissions also have revised the third prong of the Provider Test to clarify that the total amount reimbursable by all reinsurers may not exceed the claims or losses paid by the cedant, unless otherwise permitted by applicable state law. It is not the Commissions' intent to

---

[116] See ISDA Letter.

[117] See supra note 32, regarding the definition of "State" contained in the Proposing Release.

[118] This requirement in the final rules is substantially similar to the requirement included in section 3(a)(8) of the Securities Act, 15 U.S.C. 77c(a)(8).

[119] See supra note 34.

[120] See Proposing Release at 29824.

[121] See infra notes 139, 140, and 141 and accompanying text.

[122] The Commissions understand that the surplus lines brokers who place insurance on behalf of non-admitted insurers are subject to supervision in the states in which they offer non-admitted insurance products.

[123] See infra notes 145 and 146 and accompanying text.

[124] See infra notes 147 and 148 and accompanying text.

[125] See Proposing Release at 29824.

[126] See Ex Parte Communication between NAIC and CFTC and SEC Staff on October 5, 2011, at http://sec.gov/comments/s7-16-11/s71611-61.pdf.

[127] The Commissions understand that certain types of Federal and State insurance programs, including crop insurance, are administered by third parties; as a result, the Commissions have added "directly or indirectly" to the second prong of the Provider Test to clarify that it can be satisfied even if the agreement, contract, or transaction is not provided directly by the federal government or a state. See Id.

[128] See Proposing Release at 29825.

[129] See infra notes 150, 151, 152, and 153 and accompanying text.

impose requirements that conflict with state law regarding the calculation of amounts reimbursable under reinsurance contracts.

The Commissions have added a fourth prong to the Provider Test to address commenters' concerns that the proposed Provider Test excluded entities issuing insurance products on a non-admitted basis through surplus lines brokers.[130] Non-admitted insurance is typically property and casualty insurance that is permitted to be placed through a surplus lines broker[131] by an insurer that is not licensed to do business in the state where the product is offered.[132] In practice, a provider of non-admitted insurance may not satisfy the first prong of the Provider Test because it may not be subject to state or Federal insurance supervision. The Commissions understand that non-admitted insurance plays a very important role in the insurance marketplace. In addition, Congress has explicitly recognized non-admitted insurance products as insurance and specified that a state cannot prohibit certain types of entities from offering non-admitted insurance products.[133] Because Congress recognized that certain persons qualify as non-admitted insurers, the Commissions find that it is appropriate to add the fourth prong to the Provider Test.

A person will qualify under the fourth prong of the Provider Test if it satisfies any one of the following two requirements:

• It is located outside of the United States and listed on the Quarterly Listing of Alien Insurers that is compiled and maintained by the International Insurers Department of the National Association of Insurance Commissioners;[134] or

• It meets the eligibility criteria for non-admitted insurers under applicable state law.

Comments

General

The Commissions received ten comment letters that addressed the Provider Test.[135] A few commenters recommended that the Commissions retract the Provider Test.[136] These commenters argued that if a product is subject to regulation as insurance in the United States, the regulated status of the insurer is irrelevant.[137] The Commissions are retaining the Provider Test with modifications as discussed above. The Commissions believe that insurance products should fall outside the swap or security-based swap definitions only if they are offered by persons subject to state or Federal insurance supervision or by certain reinsurers.[138] The Provider Test will help to prevent products that are swaps or security-based swaps from being characterized as insurance in order to evade the regulatory regime under Title VII of the Dodd-Frank Act. Other commenters suggested various modifications to the Provider Test and those comments are discussed in more detail below.

"Insurance Company" Limitation

Several commenters recommended that the Commissions expand the first prong of the Provider Test so that it is not limited to "insurance companies," but to all insurers because not all insurers are organized as "insurance companies,"[139] to accommodate insurers and reinsurers that are domiciled outside of the United States,[140] and to cover domestic and foreign insurance companies and other entities that issue insurance products on a non-admitted basis through surplus lines brokers.[141]

The Commissions have revised the first prong of the Provider Test to

remove the "insurance company" limitation and to clarify that any person that is subject to state or Federal insurance supervision will qualify under the first prong of the Provider Test. As noted above, the Commissions also believe that this revision should address commenters' concerns that the proposed rules could have excluded some foreign insurers since the revised test does not require that a person be domiciled in the United States; it only requires that the person be subject to state or Federal insurance supervision.

Several commenters suggested that the proposed Provider Test would permit an insurer that is not organized as an insurance company to evade state insurance oversight by deliberately failing the exemption for insurance products (that is, by issuing a contract that would fail the proposed rules because it would not be issued by an insurance company).[142] These commenters were concerned that if a product were to be considered a swap merely because it was not issued by an insurance company, this would render the regulation of such products outside of the scope of state insurance laws due to the Federal preemption of swaps regulation.[143] Commenters noted that a likely consequence of this preemption would be that the same product would be subject to substantially different regulation within a state's jurisdiction based solely on the nature of the issuing person.[144]

The Commissions have revised the first prong of Provider Test to address commenters' concerns that providers of insurance products could evade state insurance regulation by intentionally failing the Provider Test, i.e., marketing the insurance products as swaps or security-based swaps in order to avoid state insurance supervision. As adopted, any person that provides insurance products (and therefore should be subject to state or Federal insurance supervision) must, in fact, be subject to state or Federal insurance supervision in order to satisfy the first prong of the Provider Test. Persons that are organized as insurance companies or whose business activity is predominantly insurance or reinsurance, but who are not in fact subject to state or Federal insurance supervision, would not satisfy the first prong of the Provider Test.

Finally, as discussed below, the Commissions have added a fourth prong

---

[130] See infra note 146 and accompanying text.

[131] For the purposes of this release, the term "surplus lines broker" means an individual, firm, or corporation that is licensed in a state to sell, solicit, or negotiate insurance on properties, risks, or exposures located or to be performed in a state with non-admitted insurers.

[132] See supra note 39. With respect to domestic reinsurance, state insurance regulators do retain the authority to prevent or allow a non-admitted company from participating in a state market. Some states compile a list of companies that may sell as non-admitteds; other states list non-admitted companies that may not sell.

[133] See Subtitle B of Title V of the Dodd-Frank Act.

[134] Section 524 of the Nonadmitted and Reinsurance Reform Act of 2010 (15 U.S.C. 8204) provides that a state cannot prohibit a surplus lines broker from placing non-admitted insurance with a non-admitted insurer that is listed on the Quarterly Listing of Alien Insurers. According to the NAIC the non-admitted alien insurers whose names appear in the Quarterly Listing of Alien Insurers have filed financial statements, copies of auditors' reports, the names of their U.S. attorneys or other

representatives, and details of U.S. trust accounts with the NAIC's International Insurers Department and, based upon those documents and other information, appear to fulfill the criteria set forth in the International Insurers Department Plan of Operation for Listing of Alien Nonadmitted Insurers.

[135] See ACLI Letter; AIA Letter; CAI Letter; D&L Letter; ISDA Letter; NAIC Letter; NAFA Letter; Nationwide Letter; RAA Letter; and Travelers Letter.

[136] See AIA Letter; D&L Letter; and ISDA Letter.

[137] Id.

[138] See infra notes 147 and 148 and accompanying text.

[139] See AIA Letter; D&L Letter; ISDA Letter; RAA Letter; NAIC Letter; and Travelers Letter.

[140] See AIA Letter; D&L Letter; RAA Letter; and Travelers Letter.

[141] See RAA Letter and Travelers Letter.

[142] See ACLI Letter; CAI Letter; NAFA Letter; Nationwide Letter; RAA Letter; and Travelers Letter.

[143] Id.

[144] Id.

to the Provider Test to provide relief for persons that provide insurance products on a non-admitted basis through surplus lines brokers.

"Regulated as Insurance" Limitation

Two commenters recommended that the Commissions remove the provision in the first prong of the Provider Test that states "and such agreement, contract, or transaction is regulated as insurance under the laws of such state or of the United States."[145] These commenters argued that the provision should be deleted because it was redundant with the Product Test and may exclude certain reinsurers and non-admitted insurers, as well as products that may not be specifically "regulated as insurance" in all states.[146]

The Commissions have retained the requirement in the first prong of the Provider Test that an insurance product must be regulated as insurance, but have revised the provision to clarify that an insurance product must be regulated as insurance under applicable state law or the laws of the United States. As discussed above, the Commissions believe that this condition will help prevent products that are not regulated as insurance and are swaps or security-based swaps from being characterized as insurance products in order to evade the regulatory regime under the Dodd-Frank Act.

The Commissions have received conflicting comments regarding whether surety bonds are currently offered by persons who do not satisfy the Provider Test, in particular the "regulated as insurance" requirement.[147] If a person who does not satisfy the Provider Test sells a surety bond incidental to other business activity and is not subject to state or Federal insurance supervision, it does not mean that such surety bond is a swap or security-based swap. The surety bond may not satisfy the Insurance Safe Harbor, but it would be subject to a facts and circumstances analysis. Similarly, one commenter indicated that title insurance is not always subject to state insurance regulation.[148] Title insurance sold in a state that does not regulate title insurance as insurance would be in the list of Enumerated Products but would not satisfy the Provider Test and, thus would not qualify for the Insurance Safe Harbor. However, this does not mean that title insurance sold in a state that does not regulate title insurance as insurance is a swap or security-based swap. The title insurance may not satisfy the Insurance Safe Harbor, but it would be subject to a facts and circumstances analysis. The Commissions anticipate that many factors would militate against a determination that such a surety bond or title insurance that fails the Provider Test, because it cannot meet the "regulated as insurance" requirement, is a swap or security-based swap rather than insurance.

The Commissions agree that the inclusion of the "regulated as insurance" requirement in the first prong of the Provider Test will have the effect of causing non-admitted insurance products to fall within the swap and security-based swap definitions. In response to commenters' concerns about the ability of non-admitted insurers to qualify under the Provider Test, the Commissions have added a fourth prong to the Provider Test to address providers of non-admitted insurance products.[149]

Providers of Reinsurance

Several commenters recommended that the Commissions expand the third prong of the Provider Test to include domestic reinsurers.[150] One commenter requested that the Commissions remove the third prong of the Provider Test from the final rules because it appears to prohibit a reinsurer from offering a product in a state where it is permitted if any other state prohibits that product.[151] Two commenters requested revisions to the portion of the third prong of the Provider Test that addresses a cedant's reimbursable losses.[152] One commenter argued this portion of the third prong of the Provider Test may conflict with the state-based insurance receivership law.[153]

As noted above, the Commissions have revised the third prong of the Provider Test to remove the limitation that a reinsurance provider has to be located outside of the United States, and thereby address commenters' concerns that domestic reinsurers would not qualify under the reinsurance prong. In addition, in response to commenters' concerns, the Commissions have clarified the third prong of the Provider Test so that it does not prohibit a reinsurer from offering a product in a state where it is permitted, even if that product is prohibited in another state, and have revised the portion of the third prong of the Provider Test that addresses a cedant's reimbursable losses to make it subject to applicable state law so that it does not conflict with state-based insurance receivership law.

(c) Grandfather Provision for Existing Insurance Transactions

In the Proposing Release, the Commissions asked whether the proposed rules should include a provision similar to section 302(c)(1) of the Gramm-Leach-Bliley Act that any product regulated as insurance before the date the Dodd-Frank Act was signed into law and provided in accordance with the Provider Test would be considered insurance and not fall within the swap or security-based swap definitions.

In response to comments,[154] the Commissions are adding a new paragraph (ii) to rule 1.3(xxx)(4) under the CEA and new paragraph (b) to rule 3a69-1 under the Exchange Act that provides that an agreement, contract, or transaction entered into on or before the effective date of the Product Definitions will be considered insurance and not fall within the swap and security-based swap definitions, provided that, at such time it was entered into, such agreement, contract, or transaction was provided in accordance with the Provider Test (the "Insurance Grandfather").

As stated in the Proposing Release, the Commissions are aware of nothing in Title VII to suggest that Congress intended for traditional insurance products to be regulated as swaps or security-based swaps.[155] The

---

[145] *See* RAA Letter and Travelers Letter.

[146] *Id.* These commenters also recommended the addition of a new prong to the Provider Test to cover domestic or foreign entities that issue insurance products on a non-admitted basis through surplus lines brokers. *See* discussion below. The Commissions note that the first prong of the Provider Test does not apply to reinsurance contracts and the third prong of the Provider Test, which does apply to reinsurance contracts, does not contain the "regulated as insurance" limitation.

[147] *See* SFAA Letter. SFAA stated that all states include surety and fidelity bonds as lines of insurance subject to state oversight. However, Travelers stated that surety bonds may not be "specifically" regulated as insurance. *See* Travelers Letter.

[148] *See* ACLI Letter.

[149] *See supra* notes 130, 131, and 132 and accompanying text.

[150] *See* ACLI Letter; CAI Letter; NAIC Letter; and RAA Letter.

[151] *See* RAA Letter. The commenter argued that one state's prohibition on a reinsurance product should not affect the ability of the reinsurer to offer the product in a state where it is permitted.

[152] *See* RAA Letter and Travelers Letter. Both commenters suggested specific edits to the proposed rules.

[153] *See* RAA Letter. RAA stated that in an insurance receivership reinsurers are required to comply with the reinsurance contract and pay all amounts due and owing to the estate of the insolvent cedant even if the estate of the cedant may not necessarily pay the full amount of the underlying claims to the applicable policyholders.

[154] *See infra* notes 157, 158, 159, and 160 and accompanying text.

[155] *See* Proposing Release at 29821.

Commissions have designed the Insurance Safe Harbor to provide greater assurance to market participants that traditional insurance products that were regulated as insurance prior to the Dodd-Frank Act will fall outside the swap and security-based swap definitions. Nevertheless, after considering comments received, the Commissions believe that it is appropriate to adopt the Insurance Grandfather in order to assure market participants that those agreements, contracts, or transactions that meet the conditions set out in the Insurance Grandfather will not fall within the swap or security-based swap definitions.

In order to qualify for the Insurance Grandfather an agreement, contract, or transaction must meet two requirements. First, it must be entered into on or before the effective date of the Product Definitions. The Commissions are linking the Insurance Grandfather to the effective date of the Product Definitions, rather than the date that the Dodd-Frank Act was signed into law, in order to avoid unnecessary market disruption.[156] Second, such agreement, contract, or transaction must be provided in accordance with the Provider Test. In other words, the provider must be subject to state or Federal insurance supervision or be a non-admitted insurer or a reinsurer that satisfies the conditions for non-admitted insurers and reinsurers that are set out in the Provider Test. The Commissions note that an agreement, contract or transaction that is provided in accordance with the first prong of the Provider Test must also be regulated as insurance under applicable state law or the laws of the United States.

By adopting the Insurance Grandfather and the Insurance Safe Harbor, the Commissions are excluding agreements, contracts, and transactions for which the Commissions have found no evidence that Congress intended them to be regulated as swaps or security-based swaps, and are providing greater certainty regarding the treatment of agreements, contracts, and transactions currently regulated as insurance.

Comments

Four commenters addressed whether the final rules should include a grandfather provision that would exclude certain insurance products from the swap or security-based swap

definitions.[157] Two commenters suggested that a grandfather provision for all products that were regulated as insurance before the Dodd-Frank Act was signed into law would be appropriate, stating that it would reduce confusion and uncertainty in applying the swap and security-based swap definitions to products that are traditionally regulated as insurance while addressing the Commissions' stated concern that products might be structured as insurance products to evade Dodd-Frank Act requirements.[158] These commenters also stated that it is necessary to add an effective date-based grandfather provision to the final rule providing that any contract or transaction subject to state insurance regulation and entered into prior to any final rules necessary to implement Title VII, including the Product Definitions, are not swaps or security-based swaps.[159] These commenters noted that a grandfather provision based on effective date of all the Title VII rules was needed to address product development and variation that occurred between the date the Dodd-Frank Act was enacted and the effective date of the rules mandated under that statute.[160]

The Commissions believe that the combination of the Insurance Grandfather along with the Insurance Safe Harbor provides market participants with increased legal certainty with respect to existing agreements, contracts, transactions, and products. In addition, the fact that the Commissions are linking the Insurance Grandfather to the effective date of the Product Definitions, rather than the date that the Dodd-Frank Act was signed into law, takes into account product development and innovation that may have occurred between the date the Dodd-Frank Act was signed into law at the effective date of the Product Definitions. Further, the Commissions believe that a grandfather provision that would exclude all products regulated as

insurance before the Dodd-Frank Act was signed into law, as recommended by some commenters,[161] is unnecessary because non-grandfathered regulated insurance transactions generally should fall within the Insurance Safe Harbor. The Commissions believe that market participants could be incentivized to use such a broader grandfather provision to create new swap or security-based swap products with characteristics similar to those of existing categories of regulated insurance contracts for the purpose of evading the Dodd-Frank Act regulatory regime. The Commissions also believe that a broader grandfather provision would be contrary to the explicit direction of sections 722(b) and 767 of the Dodd-Frank Act which provide that swaps and security-based swaps may not be regulated as insurance contracts by any state.[162]

One commenter argued that the Provider Test should not apply to grandfathered contracts. The commenter stated that it should be enough that the product is regulated as insurance.[163] As described above, the grandfather provision will apply only to agreements, contracts, and transactions that are entered into prior to the effective date of the Product Definitions if they were provided in accordance with the Provider Test, including a requirement that an agreement, contract or transaction that is provided in accordance with the first prong of the Provider Test would be regulated as insurance under applicable State law or the laws of the United States. As the Commissions discussed in the Proposing Release, and above in describing the Provider Test, the Commissions believe the requirement that the agreement, contract, or transaction be provided in accordance with the Provider Test should help ensure that persons who are not subject to state or Federal insurance supervision are not able to avoid the oversight

---

[156] The Commissions believe that 60 days after publication of this release should be sufficient time for market participants to enter into pending agreements, contracts, or transactions for which the Insurance Grandfather may provide relief.

[157] See ACLI Letter; AFGI Letter; CAI Letter; and D&L Letter.

[158] See ACLI Letter and CAI Letter. ACLI and CAI argued that products that were regulated as insurance prior to the effective date of the Dodd-Frank Act clearly were not characterized as insurance to avoid the Title VII regulatory regime. See also AFGI Letter; AFGI argued that all insurance contracts issued by state-regulated insurance companies should be excluded from the swap definition but in the alternative, all insurance products regulated as insurance before July 21, 2010 should be grandfathered. See also D&L Letter. D&L stated that prior regulation of insurance products before July 21, 2010 could be a consideration, but not an absolute determinant for exclusion from the swap or security-based swap definitions.

[159] See ACLI Letter and CAI Letter.

[160] Id.

[161] See ACLI Letter; AGFI Letter; and CAI Letter.

[162] Section 722(b) of the Dodd-Frank Act provides, (B) Regulation of Swaps Under Federal and State Law—Section 12 of the Commodity Exchange Act (7 U.S.C. 16) is amended by adding at the end the following: "(h) Regulation of Swaps as Insurance Under Federal and State Law.—A swap—(1) Shall not be considered to be insurance; and (2) may not be regulated as an insurance contract under the law of any State." Section 767 of the Dodd-Frank Act amended section 28(a) of the Exchange Act, 15 U.S.C. 78bb(a), to provide, "A security-based swap may not be regulated as an insurance contract under any provision of State law."

[163] See CAI Letter. CAI suggested that for a product to be regulated as insurance it means that it was provided by an insurance company. See supra part II.B.1.b) for a discussion of the need for the Provider Test portion of the Insurance Safe Harbor.

provided for under Title VII of the Dodd-Frank Act.

(d) Alternative Tests

A number of commenters proposed that the Commissions adopt alternative tests to distinguish insurance from swaps and security-based swaps.[164] After considering each of these alternatives, the Commissions are not adopting them.

Several commenters suggested that the sole test for determining whether an agreement, contract, or transaction is insurance should be whether it is subject to regulation as insurance by the insurance commissioner of the applicable state(s).[165] The Commissions find this alternative to be unworkable because it does not provide a sufficient means to distinguish agreements, contracts and transactions that are insurance from those that are swaps or security-based swaps. Section 712(d) of the Dodd-Frank Act directs the Commissions to "further define" the terms swap and security-based swap. Neither swaps nor security-based swaps may be regulated as insurance contracts under the laws of any state.[166] While insurance contracts have long been subject to state regulation, swaps and security-based swaps were largely unregulated. Since the Dodd-Frank Act created a new regulatory regime for swaps and specifically provides that "swaps may not be regulated as an insurance contract under the law of any state,[167] the Commissions believe that it is important to have a test that distinguishes insurance from swaps and security-based swaps without relying entirely on the regulatory environment prior to the enactment of the Dodd-Frank Act. The Product Test is an important element of the Insurance Safe Harbor.

Several commenters suggested an approach in which insurance products that qualify for the exclusion contained in section 3(a)(8) of the Securities Act[168] would be excluded from the swap definition.[169] One commenter argued that "Section 3(a)(8) has long been recognized as the definitive provision as to where Congress intends to separate securities products that are subject to SEC regulation from 'insurance' and 'annuity' products that are to be left to state insurance regulation" and that the section 3(a)(8) criteria are well understood and have a long history of interpretation by the SEC and the courts.[170] Other commenters suggest that because section 3(a)(8) includes both a product and a provider requirement, if the Commissions include it in their final rules, it should be a requirement separate from the Product Test and the Provider Test, and should extend to insurance products that are securities.[171]

While the Commissions agree that the section 3(a)(8) criteria have a long history of interpretations by the SEC and the courts, the Commissions find that it is inappropriate to apply the section 3(a)(8) criteria in this context. Although section 3(a)(8) contains some conditions applicable to insurance providers that are similar to the prongs of the Provider Test, it does not contain any conditions that are similar to the prongs of the Product Test. Moreover, section 3(a)(8) provides an exclusion from the Securities Act and the CFTC has no jurisdiction under the Federal securities laws. Congress directed both agencies to further define the terms "swap" and "security-based swap." As such, the Commissions find that it is more appropriate to have a standalone rule that incorporates features that distinguish insurance products from swaps and security-based swaps and over which both Commissions will have joint interpretative authority.

One commenter suggested yet another approach, recommending that insurance be defined as an agreement, contract, or transaction that by its terms:

• Exists for a specified period of time;
• Where the party (the "insured") to the contract promises to make one or more payments such as money, goods or services;
• In exchange for another party's promise to provide a benefit of pecuniary value for the loss, damage, injury, or impairment of an identified interest of the insured as a result of the occurrence of a specified event or contingency outside of the parties' control; and

• Where such payment is related to a loss occurring as a result of a contingency or specified event.[172]

The Commissions do not find this alternative preferable to the Commissions' proposal for two reasons. First, the requirements of a specified term and the promise to make payments are present in both insurance products and in agreements, contracts, or transactions that are swaps or security-based swaps and therefore do not help to distinguish between them. A test based solely on these requirements, then, could be over-inclusive and exclude from the Dodd-Frank Act regulatory regime agreements, contracts, and transactions that have not traditionally been considered insurance. Further, the third and fourth requirements of this alternative test collapse into the Product Test's requirement that the loss must occur and be proved, and any payment or indemnification therefor must be limited to the value of the insurable interest.

One commenter suggested a three-part test in lieu of the Product and Provider Tests. Under this test, the terms "swap" and "security-based swap" would exclude any agreement, contract, or transaction that:

• Is issued by a person who is or is required to be organized as an insurance company and subject to state insurance regulation;
• Is the type of contract issued by insurance companies; and
• Is not of the type that the Commissions determine to regulate.[173]

This commenter stated that its approach does not contain a definition of insurance, and believes that is preferable to the Commissions' approach, which it believes creates legal uncertainty because any attempted definition of insurance has the potential to be over- or under- inclusive.[174] As discussed above, the Commissions' rules and interpretations are not intended to define insurance. Rather, they provide a safe harbor for certain types of traditional insurance products by reference to factors that may be used to distinguish insurance from swaps and security-based swaps, and a list of

---

[164] *See* ACLI Letter; AIA Letter; AFGI Letter; CAI Letter; MetLife Letter; NAFA Letter; NAIC Letter; Nationwide Letter; and Travelers Letter.

[165] *See* ACLI Letter; AIA Letter; AFGI Letter; MetLife Letter; and Travelers Letter.

[166] *See* section 12(h) of the CEA, 7 U.S.C. 16(h) (regarding swaps) and section 28(a)(4) of the Exchange Act, 15 U.S.C. 78bb(a)(4) (regarding security-based swaps).

[167] *See* section 12(h)(2) of the CEA, 7 U.S.C. 16(h)(2).

[168] Section 3(a)(8) of the Securities Act excludes the following from all provisions of the Securities Act: Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia.

*See infra* note 1283 and accompanying text.

[169] *See* ACLI Letter; CAI Letter; NAFA Letter; and Nationwide Letter.

[170] *See* NAFA Letter.

[171] *See* ACLI Letter and CAI Letter.

[172] *See* NAIC Letter.

[173] *See* ACLI Letter (Appendix 1). *See also* CAI Letter. CAI stated that it believes that the approach and test recommended by ACLI is a fundamentally sound method for determining those insurance products that are not swaps or security-based swaps and that should remain subject to state regulation, and is more appropriate than the Commissions' proposals. Nationwide suggested a three-part test to differentiate insurance products from swaps and security-based swaps similar to the test proposed by ACLI. *See also* Nationwide Letter.

[174] *See* ACLI Letter.

products that do not have to satisfy a portion of the safe harbor factors. Agreements, contracts, and transactions that do not qualify for the Insurance Safe Harbor may or may not be insurance, depending upon the facts and circumstances regarding such agreements, contracts and transactions. The Commissions find the first two requirements of the commenter's three-part test to be tautologous, and the third provides no greater certainty than the Commissions' facts and circumstances approach. In addition, the Commissions find that this alternative test could exclude from the Dodd-Frank Act regulatory regime agreements, contracts, and transactions that have not traditionally been considered insurance.

Another commenter proposed different approaches for existing products and new products.[175] Specifically, if an existing type of agreement, contract or transaction is currently reportable as insurance in the provider's regulatory and financial reports under a state or foreign jurisdiction's insurance laws, then that agreement, contract, or transaction would be insurance rather than a swap or security-based swap. On the other hand, for new products, if this approach were inconclusive, this commenter recommended that the Commissions use the Product Test of the Commissions' rules only.[176] As discussed above, rather than treating existing products and new products differently, the Commissions are providing "grandfather" protection for agreements, contracts, and transactions entered into prior to the effective date of the Products Definitions.[177] Moreover, this commenter's test would eliminate the Provider Test for new products, which the Commissions believe is important to help prevent products that are swaps or security-based swaps from being characterized as insurance.

In sum, the Commissions find that each of the alternatives proposed by commenters could exclude from the Dodd-Frank Act regulatory regime agreements, contracts, and transactions that have not historically been considered insurance, and that should, in appropriate circumstances, be regulated as swaps or security-based swaps. Accordingly, the Commissions do not find these alternatives to be appropriate for delineating the scope of the Insurance Safe Harbor from the swap and security-based swap definitions.

### (e) "Safe Harbor"

Five commenters recommended that the Product Test, the Provider Test, and related interpretations should be structured as a "safe harbor" so that they do not raise any presumption or inference that products that do not meet the Product Test, Provider Test and related interpretations are necessarily swaps or security-based swaps.[178] One commenter suggested that this safe harbor approach could be modeled after Rule 151 under the Securities Act.[179]

As discussed above, the Commissions do not intend to create a presumption that agreements, contracts, or transactions that do not fall within the Insurance Safe Harbor are necessarily swaps or security-based swaps. As stated above, the Commissions are instead adopting final rules that clarify that certain agreements, contracts, or transactions meeting the requirements of a non-exclusive "safe harbor" established by such rules will not be considered to be swaps or security-based swaps. An agreement, contract, or transaction that does not fall within the Insurance Safe Harbor will require further analysis of the applicable facts and circumstances to determine whether it is insurance, and thus not a swap or security-based swap.

### (f) Applicability of Insurance Exclusion to Security-Based Swaps

Four commenters expressed concerns that the proposed rules were unclear in their application to both swaps and security-based swaps.[180] These commenters argued that the proposed rules do not directly exclude insurance products from the term "security-based swap" because the rules explicitly state that "[t]he term 'swap' does not include" the products that meet the Product and Provider Tests, but do not make the same statement as to the term "security-based swap." [181]

The Commissions have revised rule 1.3(xxx)(4) under the CEA and rule 3a69–1 under the Exchange Act to clarify that the exclusion contained therein applies to both swaps and security-based swaps.

### (g) Guarantees

In the Proposing Release, the Commissions requested comment on whether insurance of an agreement, contract, or transaction that falls within the swap or security-based swap definitions should itself be included in the swap or security-based swap definition. The Commissions also requested comment on whether the Commissions should provide guidance as to whether swap or security-based swap guarantees offered by non-insurance companies should be considered swaps or security-based swaps.[182]

### Guarantees of Swaps.[183]

No commenter identified any product that insures swaps (that are not security-based swaps or mixed swaps) other than financial guaranty insurance. The CFTC finds that insurance of an agreement, contract, or transaction that falls within the swap definition (and is not a security-based swap or mixed swap) is functionally or economically similar to a guarantee of a swap (that is not a security-based swap or mixed swap) offered by a non-insurance company.[184] Therefore, the CFTC is treating financial guaranty insurance of swaps (that are not security-based swaps or mixed swaps) the same way it is treating all other guarantees of swaps (that are not security-based swaps or mixed swaps), as discussed below.[185]

The CFTC is persuaded that when a swap has the benefit of a guarantee,[186] the guarantee is an integral part of that swap. The CFTC finds that a guarantee of a swap (that is not a security-based swap or mixed swap) is a term of that swap that affects the price or pricing attributes of that swap.[187] When a swap

---

[175] See AIA Letter.

[176] Id.

[177] See supra part II.B.1.c)

[178] See ACLI Letter; CAI Letter; NAFA Letter (concurring with ACLI and CAI); Nationwide Letter; and Travelers Letter.

[179] See ACLI Letter.

[180] See ACLI Letter; CAI Letter; NAFA Letter (concurring with ACLI and CAI); and Nationwide Letter (concurring the ACLI and CAI).

[181] Id. The commenters suggested that this ambiguity could be resolved by making it clear in the final rules that an excluded product is neither a swap nor a security-based swap.

[182] See Proposing Release at 29827.

[183] The discussion in this subsection relates only to swaps that are not security-based swaps or mixed swaps and has no effect on the laws or regulations applicable to security-based swaps or mixed swaps.

[184] The Commissions did not express a view regarding whether financial guaranty insurance is a swap or security-based swap in the Entities Release. See Entities Release at 30689, n.1132.

[185] Subsequent references to "guarantees" in this discussion shall thus be deemed to include "financial guaranty insurance policies."

[186] For purposes of this release, the CFTC views a guarantee of a swap to be a collateral promise by a guarantor to answer for the debt or obligation of a counterparty obligor under a swap. A guarantee of a swap does not include for purposes of this release: (i) A "guarantee agreement" as defined in CFTC regulation § 1.3(nn), 17 CFR 1.3(nn); (ii) any assumption by a clearing member of financial or performance responsibility to a derivatives clearing organization ("DCO") for swaps cleared by a DCO; or (iii) any guarantee by a DCO with respect to a swap that it clears.

[187] E.g., a swap counterparty may specify that a guarantee is a Credit Support Document under an
Continued

counterparty typically provides a guarantee as credit support for its swap obligations, the market will not trade with that counterparty at the same price, on the same terms, or at all without the guarantee. The guarantor's resources are added to the analysis of the swap; if the guarantor is financially more capable than the swap counterparty, the analysis of the swap becomes more dependent on the creditworthiness of the guarantor. Therefore, the CFTC is interpreting the term "swap" (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swap position would have recourse to the guarantor in connection with the position.[188] The CFTC anticipates that a "full recourse" guarantee would have a greater effect on the price of a swap than a "limited" or "partial recourse" guarantee; nevertheless, the CFTC is determining that the presence of any guarantee with recourse, no matter how robust, is price forming and an integral part of a guaranteed swap.

The CFTC's interpretation of the term "swap" to include guarantees of swaps does not limit or otherwise affect in any way the relief provided by the Insurance Grandfather. In a separate release, the CFTC will address the practical implications of interpreting the term "swap" to include guarantees of swaps (the "separate CFTC release").[189]

## Comments

Three commenters provided comments regarding the treatment of guarantees. Two commenters[190] opposed treating insurance or guarantees of swaps as swaps. Suggesting that the products are not economically similar, one commenter noted that insurance wraps of swaps do not "necessarily replicate the economics of the underlying swap, and only following default could the wrap provider end up with the same payment obligations as a wrapped defaulting swap counterparty."[191] This commenter also stated that the non-insurance guarantees are not swaps because the result of most guarantees is that the guarantor is responsible for monetary claims against the defaulting party, which in this commenter's view is a different obligation than the arrangement provided by the underlying swap itself.[192]

One commenter supported treating financial guaranty insurance of a swap or security-based swap as itself a swap or a security-based swap. This commenter argued that financial guaranty insurance of a swap or security-based swap transfers the risk of counterparty non-performance to the guarantor, making it an embedded and essential feature of the insured swap or security-based swap. This commenter further argued that the value of such swap or security-based swap is largely determined by the likelihood that the proceeds from the financial guaranty insurance policy will be available if the counterparty does not meet its obligations.[193] This commenter maintained that financial guaranty insurance of swaps and security-based swaps serves a very similar function to credit default swaps in hedging counterparty default risk.[194]

The CFTC is persuaded that when a swap (that is not a security-based swap or mixed swap) has the benefit of a guarantee, the guarantee and related guaranteed swap must be analyzed together. The events surrounding the failure of AIG Financial Products ("AIGFP") highlight how guarantees can cause major risks to flow to the guarantor.[195] The CFTC finds that the regulation of swaps and the risk exposures associated with them, which is an essential concern of the Dodd-Frank Act, would be less effective if the CFTC did not interpret the term "swap" to include a guarantee of a swap.

Two commenters cautioned against unnecessary and duplicative regulation. One commented that, because the underlying swap, and the parties to it, will be regulated and reported to the extent required by Title VII, there is no need for regulation of non-insurance guarantees.[196] The other commented that an insurance policy on a swap would be subject to state regulation; without addressing non-insurance guarantees, this commenter stated that additional Federal regulation would be duplicative.[197] The CFTC disagrees with these arguments. As stated above, the CFTC is treating financial guaranty insurance of swaps and all other guarantees of swaps in a similar manner because they are functionally or

---

ISDA Master Agreement. If the guarantor fails to comply with or perform under such guarantee, such guarantee expires or terminates, or if such guarantee ceases to be in full force and effect, the "Credit Support Default" Event of Default under the ISDA Master Agreement would generally be triggered, potentially bringing down the entire swap trading relationship between the parties to the ISDA Master Agreement. *See generally* the standard 1992 ISDA Master Agreement and 2002 ISDA Master Agreement. However, the CFTC finds the presence of a guarantee to be an integral part of a swap and that affects the price or pricing attributes of a swap whether or not such guarantee is a Credit Support Document under an ISDA Master Agreement.

[188] This interpretation is consistent with the interpretations of the Commissions in the Entity Definitions Release. *See, e.g.*, Entity Definitions Release at 30689 ("[A]n entity's swap or security-based swap positions in general would be attributed to a parent, other affiliate or guarantor for purposes of major participant analysis to the extent that counterparties to those positions would have recourse to that other entity in connection with the position. Positions would not be attributed in the absence of recourse."). A swap backed by a partial or limited recourse guarantee will include the guarantee to the extent of such partial or limited recourse; a blanket guarantee that supports both swap and non-swap obligations will be treated as part of the guaranteed swap only to the extent that such guarantee backstops obligations under a swap or swaps.

In the Entity Definitions Release, the Commissions stated, "we do not believe that it is necessary to attribute a person's swap or security-based swap positions to a parent or other guarantor if the person is already subject to capital regulation by the CFTC or SEC (i.e., swap dealers, security-based swap dealers, major swap participants, major security-based swap participants, FCMs and broker-dealers) or if the person is a U.S. entity regulated as a bank in the United States. Positions of those regulated entities already will be subject to capital and other requirements, making it unnecessary to separately address, via major participant regulations, the risks associated with guarantees of those positions." *Id.* In a footnote, the Commissions continued, "As a result of this interpretation, holding companies will not be deemed to be major swap participants as a result of guarantees to certain U.S. entities that are already subject to capital regulation." *Id.*

As a result of interpreting the term "swap" (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swap position would have recourse to the guarantor in connection with the position, and based on the reasoning set forth above from the Entity Definitions Release in connection with major swap participants, the CFTC will not deem holding companies to be swap dealers as a result of guarantees to certain U.S. entities that are already subject to capital regulation. It may, however, be appropriate to regulate as a swap dealer a parent or other guarantor who guarantees swaps positions of persons who are not already subject to capital regulation by the CFTC (i.e., who are not swap dealers, major swap participants or FCMs). The CFTC is addressing guarantees provided to non-U.S. entities, and guarantees by non-U.S. holding companies, in its proposed interpretive guidance and policy statement regarding the cross-border application of the swaps provisions of the CEA, 77 FR 41214 (Jul. 12, 2012).

[189] Briefly, in the separate CFTC release the CFTC anticipates proposing reporting requirements with respect to guarantees of swaps under Parts 43 and 45 of the CFTC's regulations and explaining the extent to which the duties and obligations of swap dealers and major swap participants pertaining to guarantees of swaps, as an integral part of swaps, are already satisfied to the extent such obligations are satisfied with respect to the related guaranteed swaps. The CFTC also anticipates addressing in the separate CFTC release the effect, if any, of the interpretation regarding guarantees of swaps on position limits and large trader reporting requirements.

[190] *See* AFGI Letter and ISDA Letter.

[191] ISDA Letter.

[192] *Id.*

[193] *See* Better Markets Letter.

[194] *See* Better Markets Letter.

[195] "AIGFP's obligations were guaranteed by its highly rated parent company * * * an arrangement that facilitated easy money via much lower interest rates from the public markets, but ultimately made it difficult to isolate AIGFP from its parent, with disastrous consequences." Congressional Oversight Panel, *The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* 20 (2010).

[196] *See* ISDA Letter.

[197] *See* AFGI Letter.

economically similar products. If a guarantee of a swap is not treated as an integral part of the underlying swap, price forming terms of swaps and the risk exposures associated with the guarantees may remain hidden from regulators and may not be regulated appropriately. Moreover, treating guarantees of swaps as part of the underlying swaps ensures that the CFTC will be able to take appropriate action if, after evaluating information collected with respect to the guarantees and the underlying swaps, such guarantees of swaps are revealed to pose particular problems in connection with the swaps markets. In the separate CFTC release, the CFTC will clarify the limited practical effects of the CFTC's interpretation, which should address concerns regarding duplicative regulation.

One commenter also argued that regulating financial guaranty of swaps as swaps would cause monoline insurers to withdraw from the market, which could adversely affect the U.S. and international public finance, infrastructure and structured finance markets, given that insuring a related swap often is integral to the insurance of municipal bonds and other securities.[198] The CFTC finds this argument unpersuasive. The CFTC understands that the 2008 global financial crisis severely affected most monolines and only one remains active in U.S. municipal markets. Thus, it appears that the monolines have, for the most part, already exited these markets. In addition, as stated above, the CFTC will clarify in the separate CFTC release the limited practical effects of the CFTC's interpretation, which should address these concerns.

Guarantees of Security-Based Swaps

The SEC believes that a guarantee of an obligation under a security-based swap, including financial guaranty insurance of a security-based swap, is not a separate security-based swap. Further, the SEC is not adopting an interpretation that a guarantee of a security-based swap is part of the security-based swap. Instead, the SEC will consider requiring, as part of its rulemaking relating to the reporting of security-based swaps,[199] the reporting of information about any guarantees and the guarantors of obligations under security-based swaps in connection with the reporting of the security-based

swap transaction itself. In addition, the SEC will consider issues involving cross-border guarantees of security-based swaps in a separate release addressing the cross-border application of Title VII. The SEC notes that security-based swaps are included in the definition of "security" contained in the Securities Act and the Exchange Act.[200] Under the Securities Act, a guarantee of a security also is a "security."[201] Therefore, a guarantee of a security-based swap is a security subject to Federal securities law regulation.[202]

2. The Forward Contract Exclusion

As the Commissions explained in the Proposing Release, the definitions of the terms "swap" and "security-based swap" do not include forward contracts.[203] These definitions exclude "any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled."[204] The Commissions provided an interpretation in the Proposing Release regarding the applicability of the exclusion from the swap and security-based swap definition for forward contracts with respect to nonfinancial commodities [205] and securities. The Commissions are restating this interpretation as set forth in the Proposing Release with certain modifications in response to commenters.

(a) Forward Contracts in Nonfinancial Commodities

The CFTC provided an interpretation in the Proposing Release regarding the forward contract exclusion for nonfinancial commodities and is restating this interpretation with certain modifications in response to commenters. These clarifications include that the CFTC will interpret the forward contract exclusion consistent with the entire body of CFTC precedent.[206] The CFTC is also clarifying what "commercial participant" means under the "Brent

Interpretation."[207] In addition, while the CFTC is withdrawing its 1993 "Energy Exemption" [208] as proposed, it is clarifying that certain alternative delivery procedures will not disqualify a transaction from the forward contract exclusion. In response to comments, the CFTC is providing a new interpretation regarding book-out documentation, as well as additional factors that may be considered in its "facts and circumstances" analysis of whether a particular contract is a forward.

(i) Forward Exclusion From the Swap and Future Delivery Definitions

(A) Consistent Interpretation

The wording of the forward contract exclusion from the swap definition with respect to nonfinancial commodities is similar, but not identical, to the forward exclusion from the definition of the term "future delivery" that applies to futures contracts, which excludes "any sale of any cash commodity for deferred shipment or delivery."[209]

In the Proposing Release, the CFTC proposed an interpretation clarifying the scope of the exclusion of forward contracts for nonfinancial commodities from the swap definition and from the "future delivery" definition in a number of respects. After considering the comments received, the CFTC is restating substantially all of its interpretation regarding these forward exclusions set forth in the Proposing Release, but with several clarifications in response to commenters.

The CFTC is restating from the Proposing Release that the forward exclusion for nonfinancial commodities in the swap definition will be interpreted in a manner consistent with the CFTC's historical interpretation of the existing forward exclusion with respect to futures contracts, consistent with the Dodd-Frank Act's legislative history.[210] In addition, in response to a

---

[198] *See* AFGI Letter. Of the members of AFGI, only Assured Guaranty (or its affiliates) is currently writing financial guaranty insurance policies on U.S. municipal obligations.

[199] See Regulation SBSR Proposing Release *infra* note 1231.

[200] *See* sections 768(a)(1) and 761(a)(2) of the Dodd-Frank Act (amending sections 2(a)(1) of the Securities Act, 15 U.S.C. 77b(a)(1), and 3(a)(10) of the Exchange Act, 15 U.S.C. 78c(a)(10), respectively).

[201] *See* section 2(a)(1) of the Securities Act, 15 U.S.C. 77b(a)(1).

[202] The SEC has previously addressed the treatment of financial guaranty insurance under the Federal securities laws. See *supra* note 58.

[203] *See* Proposing Release at 29827.

[204] CEA section 1a(47)(B)(ii), 7 U.S.C. 1a(47)(B)(ii).

[205] The discussion in subsections (a) and (b) of this section applies solely to the exclusion of nonfinancial commodity forwards from the swap definition in the CEA.

[206] *See infra* part II.B.2(a)(i)(F).

[207] *Statutory Interpretation Concerning Forward Transactions,* 55 FR 39188 (Sep. 25, 1990) ("Brent Interpretation").

[208] *Exemption for Certain Contracts Involving Energy Products,* 58 FR 21286–02 (Apr. 20, 1993) ("Energy Exemption").

[209] CEA section 1a(27), 7 U.S.C. 1a(27).

[210] *See* 156 Cong. Rec. H5248–49 (June 30, 2010) (introducing into the record a letter authored by Senator Blanche Lincoln, Chairman of the U. S. Senate Committee on Agriculture, Nutrition and Forestry, and Christopher Dodd, Chairman U. S. Senate Committee on Banking, Housing, and Urban Affairs, stating that the CFTC is encouraged "to clarify through rulemaking that the exclusion from the definition of swap for 'any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled' is intended to be consistent with the forward contract exclusion that is currently in the [CEA] and the CFTC's established

Continued

commenter, the CFTC is clarifying that the entire body of CFTC precedent regarding forwards should apply to the forward exclusions from the swap and future delivery definitions.[211]

The CFTC's historical interpretation has been that forward contracts with respect to nonfinancial commodities are "commercial merchandising transactions." [212] The primary purpose of a forward contract is to transfer ownership of the commodity and not to transfer solely its price risk. As the CFTC has noted and reaffirms today:

The underlying postulate of the [forward] exclusion is that the [CEA's] regulatory scheme for futures trading simply should not apply to private commercial merchandising transactions which create enforceable obligations to deliver but in which delivery is deferred for reasons of commercial convenience or necessity.[213]

As noted in the Proposing Release, because a forward contract is a commercial merchandising transaction, intent to deliver historically has been an

element of the CFTC's analysis of whether a particular contract is a forward contract.[214] In assessing the parties' expectations or intent regarding delivery, the CFTC consistently has applied a "facts and circumstances" test.[215] Therefore, the CFTC reads the "intended to be physically settled" language in the swap definition with respect to nonfinancial commodities to reflect a directive that intent to deliver a physical commodity be a part of the analysis of whether a given contract is a forward contract or a swap, just as it is a part of the CFTC's analysis of whether a given contract is a forward contract or a futures contract.

(B) Brent Interpretation

In this interpretation, the CFTC is restating, with certain clarifications in response to commenters, its interpretation from the Proposing Release that the principles underlying the CFTC's "Brent Interpretation" regarding book-outs developed in connection with the forward exclusion from futures apply to the forward exclusion from the swap definition as well. Book-out transactions meeting the requirements specified in the Brent Interpretation that are effectuated through a subsequent, separately negotiated agreement qualify for the safe harbor under the forward exclusions.

As was noted in the Proposing Release, the issue of book-outs first arose in 1990 in the Brent Interpretation [216] because the parties to

the crude oil contracts in that case could individually negotiate cancellation agreements, or "book-outs," with other parties.[217] In describing these transactions, the CFTC stated:

It is noteworthy that while such [book-out] agreements may extinguish a party's delivery obligation, they are separate, individually negotiated, new agreements, there is no obligation or arrangement to enter into such agreements, they are not provided for by the terms of the contracts as initially entered into, and any party that is in a position in a distribution chain that provides for the opportunity to book-out with another party or parties in the chain is nevertheless entitled to require delivery of the commodity to be made through it, as required under the contracts.[218]

Thus, in the scenario at issue in the Brent Interpretation, the contracts created a binding obligation to make or take delivery without providing any right to offset, cancel, or settle on a payment-of-differences basis. The "parties enter[ed] into such contracts with the recognition that they may be required to make or take delivery." [219]

On these facts, the Brent Interpretation concluded that the contracts were forward contracts, not futures contracts:

Under these circumstances, the [CFTC] is of the view that transactions of this type which are entered into between commercial participants in connection with their business, which create specific delivery obligations that impose substantial economic risks of a commercial nature to these participants, but which may involve, in

---

[211] *See* Letter from Craig Donahue, Chief Executive Officer, CME Group Inc. ("CME"), dated July 22, 2011 ("CME Letter") (requesting this clarification). *But see* below regarding the CFTC's response to CME's comment concerning the Brent Interpretation that it may be inconsistent, in CME's view, with more recent CFTC adjudicatory decisions.

[212] *See, e.g.,* Brent Interpretation, *supra* note 207.

[213] *See* Brent Interpretation, *supra* note 207. The CFTC has reiterated this view in more recent adjudicative orders. *See, e.g., In re Grain Land Coop.,* [2003–2004 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 29,636 (CFTC Nov. 25, 2003); *In re Competitive Strategies for Agric., Ltd.,* [2003–2004 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 29,635 (CFTC Nov. 25, 2003). Courts have expressed this view as well. *See, e.g., Salomon Forex, Inc.* v. *Tauber,* 8 F.3d 966, 971 (4th Cir. 1993) ("[C]ash forwards are generally individually negotiated sales * * * in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity."); *CFTC* v. *Int'l Fin. Serv. (N.Y.),* 323 F. Supp. 2d 482, 495 (S.D.N.Y. 2004). *See also CFTC* v. *Co Petro Mktg. Grp., Inc.,* 680 F.2d 573, 579–580 (9th Cir. 1982); *CFTC* v. *Noble Metals Int'l, Inc.,* 67 F.3d 766, 772–773 (9th Cir. 1995; *CFTC* v. *Am. Metal Exch. Corp.,* 693 F. Supp. 168, 192 (D.N.J. 1988); *CFTC* v. *Morgan, Harris & Scott, Ltd.,* 484 F. Supp. 669, 675 (S.D.N.Y. 1979) (forward contract exclusion does not apply to speculative transactions in which delivery obligations can be extinguished under the terms of the contract or avoided for reasons other than commercial convenience or necessity).

[214] The CFTC observed in its decision in *In re Wright* that "it is well-established that the intent to make or take delivery is the critical factor in determining whether a contract qualifies as a forward." *In re Wright,* CFTC Docket No. 97–02, 2010 WL 4388247 at *3 (CFTC Oct. 25, 2010) [*citing In re Stovall, et al.,* [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941 (CFTC Dec. 6, 1979); Brent Interpretation, *supra* note 207). In *Wright,* the CFTC noted that "[i]n distinguishing futures from forwards, the [CFTC] and the courts have assessed the transaction as a whole with a critical eye toward its underlying purpose. Such an assessment entails a review of the overall effect of the transaction as well as a determination as to what the parties intended." *Id.* at *3 (quoting *Policy Statement Concerning Swap Transactions,* 54 FR 30694 (Jul. 21, 1989) ("Swap Policy Statement") (citations and internal quotations omitted)).

[215] In *Wright,* the CFTC applied its facts and circumstances test in an administrative enforcement action involving hedge-to-arrive contracts for corn, and observed that "[o]ur views of the appropriateness of a multi-factor analysis remain unchanged." *Wright,* note 214, *supra,* n.13. The CFTC let stand the administrative law judge's conclusion that the hedge-to-arrive contracts at issue in the case were forward contracts. *Id.* at **5–6. *See also Grain Land, supra* note 213; *Competitive Strategies for Agric., supra* note 213.

[216] *See* Brent Interpretation, *supra* note 207. The CFTC issued the Brent Interpretation in response to a Federal court decision that held that certain 15-day Brent system crude oil contracts were illegal off-exchange futures contracts. *See Transnor*

*(Bermuda) Ltd.* v. *BP N. Am. Petroleum,* 738 F. Supp. 1472 (S.D.N.Y. 1990). The Brent Interpretation provided clarification that the 15-day Brent system crude oil contracts were forward contracts that were excluded from the CEA definition of "future delivery," and thus were not futures contracts. *See* Brent Interpretation, *supra* note 207.

[217] The Brent Interpretation described these "book-outs" as follows: "In the course of entering into 15-day contracts for delivery of a cargo during a particular month, situations often arise in which two counterparties have multiple, offsetting positions with each other. These situations arise as a result of the effectuation of multiple, independent commercial transactions. In such circumstances, rather than requiring the effectuation of redundant deliveries and the assumption of the credit, delivery and related risks attendant thereto, the parties may, but are not obligated to and may elect not to, terminate their contracts and forego such deliveries and instead negotiate payment-of-differences pursuant to a separate, individually-negotiated cancellation agreement referred to as a 'book-out.' Similarly, situations regularly arise when participants find themselves selling and purchasing oil more than once in the delivery chain for a particular cargo. The participants comprising these 'circles' or 'loops' will frequently attempt to negotiate separate cancellation agreements among themselves for the same reasons and with the same effect described above." Brent Interpretation, *supra* note 207, at 39190.

[218] *Id.* at 39192.

[219] *Id.* at 39189.

certain circumstances, string or chain deliveries of the type described * * * are within the scope of the [forward contract] exclusion from the [CFTC's] regulatory jurisdiction.[220]

Although the CFTC did not expressly discuss intent to deliver, the Brent Interpretation concluded that transactions retained their character as commercial merchandising transactions, notwithstanding the practice of terminating commercial parties' delivery obligations through ''book-outs'' as described. At any point in the chain, one of the parties could refuse to enter into a new contract to book-out the transaction and, instead, insist upon delivery pursuant to the parties' obligations under their contract.

The CFTC also is clarifying that commercial market participants that regularly make or take delivery of the referenced commodity in the ordinary course of their business meet the commercial participant standard of the Brent Interpretation.[221] The CFTC notes that the Brent Interpretation applies to ''commercial participants in connection with their business.''[222] The CFTC intends that the interpretation in this release be consistent with the Brent Interpretation, and accordingly is adding ''commercial'' before ''market participants'' in this final interpretation. Such entities qualify for the forward exclusion from both the future delivery and swap definitions for their forward transactions in nonfinancial commodities under the Brent Interpretation even if they enter into a subsequent transaction to ''book out'' the contract rather than make or take delivery. Intent to make or take delivery can be inferred from the binding delivery obligation for the commodity referenced in the contract and the fact that the parties to the contract do, in fact, regularly make or take delivery of the referenced commodity in the ordinary course of their business.

Further, in this final interpretation, the CFTC clarifies, in response to a comment received, that an investment vehicle taking delivery of gold as part of its investment strategy would not be engaging in a commercial activity within the meaning of the Brent Interpretation.[223] By contrast, were the investment vehicle, for example, to own a gold mine and sell the output of the gold mine for forward delivery, or own a chain of jewelry stores that produces its own jewelry from raw materials and purchase a supply of gold from another entity's gold mine in order to provide raw materials for its jewelry stores, such contracts could qualify as forward contracts under the Brent Interpretation—provided that such contracts otherwise satisfy the terms thereof.

In sum, the CFTC is interpreting the term ''commercial'' in the context of the Brent Interpretation in the same way it has done since 1990: ''related to the business of a producer, processor, fabricator, refiner or merchandiser.''[224] While a market participant need not be solely engaged in ''commercial'' activity to be a ''commercial market participant'' within the meaning of the Brent Interpretation under this interpretation, the business activity in which it makes or takes delivery must be commercial activity for it to be a commercial market participant. A hedge fund's investment activity is not commercial activity within the CFTC's longstanding view of the Brent Interpretation.

In addition, the CFTC is expanding the Brent Interpretation, which applied only to oil, to all nonfinancial commodities, as proposed.[225] As a result, book-outs are permissible (where the conditions of the Brent Interpretation are satisfied) for all nonfinancial commodities with respect to the exclusions from the definition of the term ''swap'' and the definition of the term ''future delivery'' under the CEA.[226]

### (C) Withdrawal of the Energy Exemption

Because the CFTC has expanded the Brent Interpretation to nonfinancial commodities in this final interpretation, the CFTC also has determined to withdraw the Energy Exemption as proposed. In response to comments received, the CFTC is clarifying that certain alternative delivery procedures discussed in the Energy Exemption[227] will not disqualify a transaction from the Brent Interpretation safe harbor.

In the Proposing Release, the CFTC proposed to withdraw the Energy Exemption, which, among other things,

---

[220] *Id.* at 39192.

[221] *See* CME Letter (noting that, although the Brent Interpretation applies to ''commercial market participants,'' the proposed guidance in the Proposing Release was described as applying to ''market participants'' (omitting the word ''commercial'') who ''regularly make or take delivery of the referenced commodities * * * in the ordinary course of business.'' *See also* Proposing Release at 29829.

[222] Brent Interpretation, *supra* note 207, at 39192.

[223] *See* CME Letter. In connection with its comment regarding ''market participants'' described above, *see supra* note 221, the CME further requests confirmation that the CFTC intends to apply the Brent Interpretation to market participants who can demonstrate that they meet the standard in the guidance as proposed, but are not themselves commercial actors:

Because the Commission's interpretation does not explicitly refer to commercial market participants, it would seem to cover financial players as long as those entities regularly make or take delivery of the underlying commodity in connection with their business. Examples of such entities would be hedge funds or other investment vehicles that regularly make or take delivery of commodities (*e.g.* gold) in conjunction with their line of business—that is, as part of their investment strategies. [CME] asks that the [CFTC] confirm that the Brent safe harbor would be available to these types of market participants that technically are not ''commercial'' actors.

*See* CME Letter.

[224] Brent Interpretation, *supra* note 207, at 39191. *See also* dissent of Commissioner Fowler West (stating that commercial means ''in the traditional sense of those who produce, process, use or * * * handle the underlying commodity.''). Note that being a commercial market participant with respect to an agreement, contract or transaction in one commodity, or grade of a commodity, neither makes an entity, nor precludes an entity from being, a commercial market participant with respect to an agreement, contract or transaction in a different grade of the commodity or a different commodity. For example, a West Texas Intermediate oil producer may or may not also be a commercial with respect to Brent. Similarly, that same West Texas Intermediate oil producer may or may not have commercial corn operations. In determining whether an entity is a commercial market participant with respect to an agreement, contract or transaction in a commodity, the CFTC will consider the facts and circumstances, though it is not unlikely that an entity that is a commercial market participant with respect to one commodity may also be a commercial market participant with respect to either a different grade of the commodity or a closely related commodity.

[225] *See infra* part II.B.2(a)(ii), with respect to the CFTC's interpretation concerning nonfinancial commodities.

[226] The CFTC reminds market participants that this does not mean, as was noted in the Brent Interpretation, that these transactions or persons who engage in them are wholly outside the reach of the CEA for all purposes. *See, e.g.,* CEA section 8(d), 7 U.S.C. 12(d), which directs the CFTC to investigate the marketing conditions of commodities and commodity products and byproducts, including supply and demand for these commodities, cost to the consumer, and handling and transportation charges; CEA sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. 9, 13b, and 13(a)(2), which proscribe any manipulation or attempt to manipulate the price of any commodity in interstate commerce; and CEA section 6(c) as amended by section 753 of the Dodd-Frank Act, which contains prohibitions regarding manipulation and false reporting with respect to any commodity in interstate commerce, including prohibiting any person to (i) ''use or employ, or attempt to use or employ * * * any manipulative or deceptive device or contrivance'' (section 6(c)(1)); (ii) ''to make any false or misleading statement of material fact'' to the CFTC or ''omit to state in any such statement any material fact that is necessary to make any statement of material fact made not misleading in any material respect'' (section 6(c)(2)); and (iii) ''manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce * * * '' (section 6(c)(3)). *See also* Rule 180.1(a) under the CEA, 17 CFR 180.1(a) (broadly prohibiting in connection with a commodity in interstate commerce manipulation, false or misleading statements or omissions of material fact to the Commission, fraud or deceptive practices or courses of business, and false reporting).

[227] These include pre-transaction netting agreements that result in offsetting physical delivery obligations, ''bona fide termination rights,'' and certain other methods by which parties may settle their delivery obligations. *See* Energy Exemption, *supra* note 208, at 21293.

expanded the Brent Interpretation to energy commodities other than oil, on the basis that the exemption was no longer necessary in light of the extension of the Brent Interpretation to nonfinancial commodities.[228] The Energy Exemption, like the Brent Interpretation, requires binding delivery obligations at the outset, with no right to cash settle or offset transactions.[229] Each requires that book-outs be undertaken pursuant to a subsequent, separately negotiated agreement.

As discussed above, the CFTC is extending the Brent Interpretation to the swap definition and applying it to all nonfinancial commodities for both the swap and future delivery definitions, but is withdrawing the Energy Exemption. With regard to netting agreements that were expressly permitted by the Energy Exemption,[230] the CFTC clarifies that a physical netting agreement (such as, for example, the Edison Electric Institute Master Power Purchase and Sale Agreement) that contains a provision contemplating the reduction to a net delivery amount of future, unintentionally offsetting delivery obligations, is consistent with the intent of the book out provision in the Brent Interpretation—provided that the parties had a bona fide intent, when entering into the transactions, to make or take delivery (as applicable) of the commodity covered by those transactions.

The CFTC also has determined that, notwithstanding the withdrawal of the Energy Exemption, a failure to deliver as a result of the exercise by a party of a "bona fide termination right" does not render an otherwise binding delivery obligation as non-binding.[231] In the Energy Exemption, the CFTC provided the following examples of bona fide termination rights: force majeure provisions and termination rights triggered by events of default, such as counterparty insolvency, default or other inability to perform.[232] The CFTC confirms that market participants who otherwise qualify for the forward exclusion may continue to rely on the bona fide termination right concept as set forth in this interpretation, although, as was stated in the Energy Exemption,

such right must be bona fide and not for the purpose of evasion. In this regard, the CFTC further clarifies, consistent with the Energy Exemption, that a bona fide termination right must be triggered by something not expected by the parties at the time the contract is entered into.[233]

The Energy Exemption also discussed a number of methods by which parties to energy contracts settle their obligations, including: The seller's passage of title and the buyer's payment and acceptance of the underlying commodity; taking delivery of the commodity in some instances and in others instead passing title to another intermediate purchaser in a chain; and physically exchanging (i.e., delivering) one quality, grade or type of physical commodity for another quality, grade or type of physical commodity.[234] The CFTC clarifies that these settlement methods generally [235] are not inconsistent with the Brent Interpretation.[236]

---

[228] See Proposing Release at 29829. The CFTC also noted that, to avoid any uncertainty, the Dodd-Frank Act supersedes the Swap Policy Statement. *Id.* at 29829 n. 74. The CFTC reaffirms that such is the case.

[229] *Compare* Energy Exemption, *supra* note 208, at 21293 *with* Brent Interpretation, *supra* note 207, at 39192.

[230] See Energy Exemption, *supra* note 208, at 21293.

[231] *See also infra* part II.B.2(b)(v) for a discussion of liquidated damages.

[232] Energy Exemption, *supra* note 208, at 21293.

[233] *Id.*

[234] *Id.*

[235] The CFTC will carefully scrutinize whether market participants are legitimately relying on the Brent Interpretation safe harbor. For example, if non-commercial market participants are intermediate purchasers in a delivery chain, then the transaction is not actually a commercial merchandising transaction, and the parties cannot rely on the Brent Interpretation safe harbor.

[236] By definition, if two parties exchange (i.e., physically deliver) one physical commodity for another physical commodity in settlement of the parties' delivery obligations, each seller has delivered the commodity that is the subject of its delivery obligation under the relevant agreement, contract or transaction. Depending on the settlement timing, such transactions, which resemble barter transactions, would be spot transactions or forward transactions. While the most common forward transaction involves an exchange of a physical commodity for cash, neither the Brent Interpretation nor any other CFTC authority requires payment for a forward delivery to be made in cash. Thus, a physical exchange of one quality, grade or type of physical commodity for another quality, grade, or type of physical commodity does not affect the characterization of the transaction as a spot or forward transaction. As for the sellers passing title and buyers, instead of taking delivery of the commodity, passing title to another intermediate purchaser in a chain, this is consistent with the description of Brent transactions in the Brent Interpretation, provided that, as set forth therein, delivery is required and "the delivery obligations create substantial economic risk of a commercial nature to the parties required to make or take delivery * * * includ[ing, without limitation,] demurrage, damage, theft or deterioration." That description was based on the industry delivery structure as it existed prior to the Brent Interpretation. To the extent other industries are similarly structured for commercial reasons, the delivery-by-title-and-related-bill-of-lading-transfer delivery method would be able to rely on the Brent Interpretation if it otherwise satisfied the terms thereof. However, to the extent persons seek to establish such a delivery structure for new products and markets (e.g., not actually delivering the commodity to most of the participants in a chain), that could, depending on the applicable facts and

## (D) Book-Out Documentation

The CFTC has taken into consideration comments regarding the documentation of book-outs.[237] Under the Brent Interpretation, what is relevant is that the book out occur through a subsequent, separately negotiated agreement. While the CFTC is sensitive to existing recordkeeping practices for book-outs, in order to prevent abuse of the safe harbor, the CFTC clarifies that in the event of an oral agreement, such agreement must be followed in a commercially reasonable timeframe by a confirmation in some type of written or electronic form.

## (E) Minimum Contract Size and Other Contextual Factors

In the Proposing Release, the CFTC requested comment about potentially imposing additional conditions (such as, for example, a minimum contract size) in order for a transaction to qualify as a forward contract under the Brent Interpretation with respect to the future delivery and swap definitions.[238] The CFTC has determined that a minimum contract size should not be required in order for a contract to qualify as a forward contract under the Brent Interpretation.[239] However, as suggested

circumstances, be viewed as outside the Brent Interpretation safe harbor or evasion. The CFTC expects that the limitation of counterparties eligible to rely on the Brent Interpretation to those with a commercial purpose for entering into the transaction should limit the development of such markets to those with commercial reasons for such a delivery structure.

[237] *See* Letter from R. Michael Sweeney, Jr., Hunton & Williams LLP, on behalf of the Working Group of Commercial Energy Firms ("WGCEF"), dated July 22, 2011 ("WGCEF Letter").

[238] *See* Proposing Release at 29831, Request for Comment 27.

[239] Most commenters opposed adding a minimum contract size or other conditions to the CFTC's interpretation of the forward exclusion. One commenter argued that such an approach would be inconsistent with CFTC precedent, citing the fact that neither the Brent Interpretation nor subsequent CFTC precedent interpreting the forward exclusion mention contract size. *See* CME Letter. Another commenter pointed out that Congress did not impose such a requirement, and thus believes that the CFTC should not do so. *See* Letter from David M. Perlman, Partner, Bracewell & Giuliani LLP, Counsel to the Coalition of Physical Energy Companies ("COPE"), dated July 22, 2011 ("COPE Letter"). Similarly, a third commenter argued that the only condition Congress placed on the forward exclusion is intent to physically settle, and contract size is not relevant to such intent. *See* Letter from Natural Gas Supply Association/National Corn Growers Association ("NGSA/NCGA"), dated July 22, 2011 ("NGSA/NCGA Letter").

Two commenters questioned the reasonableness of instituting a minimum contract size below which a transaction would become regulated, but otherwise would not. *See* Letter from Craig G. Goodman, Esq., President, The National Energy Marketers Association ("NEMA"), dated July 21, 2011, ("NEMA Letter") and Letter from Phillip G. Lookadoo on behalf of the International Energy

by a commenter, the CFTC may consider contract size as a contextual factor in determining whether a particular contract is a forward.[240] Moreover, the CFTC may consider other contextual factors when determining whether a contract qualifies as a forward, such as a demonstrable commercial need for the product, the underlying purpose of the contract (*e.g.* whether the purpose of the claimed forward was to sell physical commodities, hedge risk, or speculate), the regular practices of the commercial entity with respect to its general commercial business and its forward and swap transactions more specifically, or whether the absence of physical settlement is based on a change in commercial circumstances. These contextual factors are consistent with the CFTC's historical facts-and-circumstances approach to the forward contract exclusion outside of the Brent Interpretation safe harbor.

Comments

Several commenters believed that the CFTC should codify its proposed interpretation regarding the Brent Interpretation in rule text to provide greater legal certainty.[241] One commenter further commented that the Dodd-Frank Act's legislative history expressly directed the CFTC to clarify through rulemaking that the

nonfinancial commodity forward contract exclusion from the swap definition is intended to be consistent with the forward contract exclusion from the term "future delivery."[242] The commenter also stated its view that the interpretation as proposed does not provide notice to the electricity industry as to how to determine whether a nonfinancial commodity agreement is a swap or a nonfinancial commodity forward contract, nor as to which factors the CFTC would consider in distinguishing between swaps and nonfinancial forward contracts.[243] Moreover, another commenter suggested that the CFTC should include in regulatory text a representative, non-exhaustive list of the kinds of contracts that are excluded from the swap definition.[244]

The CFTC has determined not to codify its interpretation in rule text. The CFTC has never codified its prior interpretations of the forward contract exclusion with respect to the future delivery definition as a rule or regulation;[245] thus, providing an interpretation is consistent with the manner in which the CFTC has interpreted the forward exclusion in the past, which in turn is consistent with the Dodd-Frank Act legislative history.[246] Moreover, Congress did not direct the CFTC to write rules regarding the forward exclusion. The Dodd-Lincoln letter, cited by a commenter in support of its argument, "encourages" the CFTC to clarify the forward exclusion "through rulemaking" in the generic sense of that term (*i.e.*, through the rulemaking process of notice and comment), not specifically through rule text.[247] Similarly, the CFTC is not providing in rule text a representative list of contracts in nonfinancial commodities that are excluded from the swap definition as forwards.

The CFTC believes that its interpretation provides sufficient clarity

with respect to the forward contract exclusion from the swap and future delivery definitions.[248] The CFTC also believes that the interpretation provides sufficient notice to the public regarding how the forward exclusions from the swap and future delivery definitions will be interpreted. As noted above, the CFTC's historical approach to the forward contract exclusion from the future delivery definition developed on a case-by-case basis, not by rule.

Commenters generally supported applying the Brent Interpretation to the forward exclusion from the swap definition and expanding it to all nonfinancial commodities for purposes of the forward exclusion from both the definitions of the terms "future delivery" and "swap."[249] However, in addition to the requests for clarification to which the CFTC has responded in its final interpretation provided above, commenters raise other requests for clarification. One commenter,[250] for example, believed that the CFTC's adjudicatory decisions in *Grain Land*[251] and *Wright*[252] should be construed to have expanded the Brent Interpretation's safe harbor. This commenter stated its view that in *Grain Land,* the CFTC recognized that cancellation provisions or an option to roll the delivery date within flexible hedge-to-arrive contracts did not render the transactions futures contracts, as opposed to forwards. As such, this commenter believed this case may be at odds with the literal terms of the Brent Interpretation regarding book-outs, which required that, to be a forward contract, any cancellation of delivery must be effected through a subsequent, separately negotiated agreement. The commenter argued that cases subsequent to the Brent Interpretation, such as *Grain Land* and *Wright,* recognized the need for flexibility and innovation in the commercial merchandising transactions that are eligible for the forward exclusion. Therefore, this commenter requested that the CFTC consider the body of

---

Credit Association ("IECA"), dated July 28, 2011 ("IECA Letter"). Two commenters believed that such an approach would be contrary to the purposes of Dodd-Frank in regulating transactions that would affect systemic risk. *See* NEMA Letter and Letter from Dan Gilligan and Michael Trunzo, Petroleum Marketers Association of America and New England Fuel Institute ("PMAA/NEFI"), dated July 22, 2011 ("PMAA/NEFI Letter"). One commenter urged that the Brent Interpretation be applied with minimal restrictive overlay. It believed that contract size is a "contextual factor" that may be considered in evaluating the existence of intent to deliver, but should not be viewed as an independent determinant. *See* ISDA Letter.

One commenter argued that the forward exclusion should be strengthened with additional conditions to preclude evasion. Its suggested conditions include defining the required regularity of delivery (such as a predominance, or "more often than not" standard); providing a quantitative test of bona fide intent to deliver (such as a demonstrable commercial need for the product and justifying non-physical settlement based on a change in commercial circumstances); and re-evaluating the book-outs aspect of the Brent Interpretation. *See* Better Markets Letter.

[240] *See* ISDA Letter.

[241] *See* Letter from Lisa Yoho, Director, Regulatory Affairs, BGA, dated July 22, 2011) ("BGA Letter"); COPE Letter; Letter from Michael Bardee, General Counsel, Federal Energy Regulatory Commission ("FERC"), dated July 22, 2011 ("FERC Staff Letter"); Letter from Stephanie Bird, Chief Financial Officer, Just Energy, dated July 22, 2011 ("Just Energy Letter"); Letter from the Electric Trade Associations (the Electric Power Supply Association, National Rural Electric Cooperative Association, Large Public Power Council, Edison Electric Institute and American Power Association) ("ETA Letter"), dated July 22, 2011.

[242] *See* ETA Letter (citing the "Lincoln-Dodd Letter" printed at 156 Cong. Rec. H5248–249].

[243] *See* ETA Letter. The commenter requests that the CFTC "further define the statutory term 'swap' by defining relevant terms in the Dodd-Frank Act, reconciling the wording used in the various provisions in the CEA as amended by the Dodd-Frank Act, and setting forth in the [CFTC's] rules the factors that are determinative in drawing the distinction between a 'swap' and a 'nonfinancial commodity forward contract.'" The commenter suggests rule text to codify the CFTC's interpretation regarding the exclusion of nonfinancial commodity forward contracts. *Id.*

[244] *See* FERC Staff Letter.

[245] *See, e.g.* Brent Interpretation, *supra* note 207; Energy Exemption, *supra* note 208; *Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options,* 50 FR 39656 (Sep. 30, 1985) ["1985 CFTC OGC Interpretation"].

[246] *See supra* note 210 and accompanying text.

[247] *See* 156 Cong. Rec. H5248–49 (June 30, 2010).

[248] This is particularly true given that the CFTC intends to interpret the forward exclusion from the swap definition consistently with its interpretation of the forward exclusion from the term "future delivery," with which market participants have had decades of experience.

[249] *See* BGA Letter; COPE Letter; ISDA Letter; IECA Letter; Letter from Stuart J. Kaswell, Executive Vice President & Managing Director, Managed Funds Association ("MFA"), dated July 22, 2011 ("MFA Letter"); NGSA/NCGA Letter; Letter from Charles F. Conner, President and CEO, National Council of Farmer Cooperatives ("NCFC"), dated July 22, 2011 ("NCFC Letter"); NEMA Letter; PMAA/NEFI Letter; WGCEF Letter.

[250] *See* CME Letter.

[251] *Grain Land, supra* note 213.

[252] *Wright, supra* note 214.

forward contract precedent as a whole and extend the Brent Interpretation's safe harbor to situations like those presented in *Grain Land,* notwithstanding the absence of a subsequent, separately-negotiated agreement.[253]

While, as noted above, the CFTC has clarified that the entire body of its precedent applies to its interpretation of the forward exclusion for nonfinancial commodities in the swap definition, the CFTC does not believe that there is a conflict between the Brent Interpretation and the *Grain Land* or *Wright* cases. In *Grain Land,* the CFTC concluded that the fact that a contract includes a termination right, standing alone, is not determinative of whether the contract is a forward. Rather, as the CFTC has always interpreted the forward exclusion, it looks to the facts and circumstances of the transaction. Similarly in *Wright,* which cited *Grain Land* with approval, the CFTC stated that ''[i]n assessing the parties' expectations or intent regarding delivery, the Commission applies a 'facts and circumstances' test rather than a bright-line test focused on the contract's terms * * * .'' In contrast, the Brent Interpretation is a safe harbor that assures commercial parties that book-out their contracts through a subsequent, separately-negotiated agreement that their contracts will not fall out of the forward exclusion. The CFTC's conclusion that application of its facts-and-circumstances approach demonstrated that the particular contracts at issue in *Grain Land* and *Wright* were forwards did not expand the scope of the safe harbor afforded by the Brent Interpretation.[254]

Several commenters suggested that the Energy Exemption should not be withdrawn. One commenter noted that the Energy Exemption, along with the Brent Interpretation, should inform the CFTC's interpretation of the forward exclusion.[255] Another commenter believed that the Energy Exemption appears entirely consistent with the Dodd-Frank Act and should be included in the rules as a non-exclusive exemption to ensure continued clarity.[256] A third commenter requested clarification that revoking the Energy Exemption will not harm market participants, stating that the Proposing Release did not sufficiently explain the

rationale for withdrawing the Energy Exemption or the possible consequences for energy market participants. This commenter sought confirmation that, despite the withdrawal of the Energy Exemption, market participants will be permitted to rely on the Brent Interpretation, as expanded by the Energy Exemption, particularly as it relates to alternative delivery procedures.[257] This commenter expressed concern that by withdrawing the Energy Exemption, the CFTC would be revoking the ability of market participants to rely on pre-transaction netting agreements to offset physical delivery obligations as an alternative to separately negotiating book-outs after entering into the transactions.[258] As discussed above, the CFTC has determined to withdraw the Energy Exemption as proposed, but has provided certain clarifications to address commenters' concerns.

One commenter suggested the deletion of ''commercial merchandising transaction'' as a descriptive term in the interpretation. Although recognizing its provenance from the Brent Interpretation, this commenter believed that the phrase was anachronistic at that time, and that it is misleading and narrow in the current evolving commercial environment.[259] Contrary to this commenter's suggestion, the CFTC has determined to retain the phrase ''commercial merchandising transaction'' in its final interpretation regarding forward contracts. The CFTC characterized forward transactions in this manner in the Brent Interpretation, as well as in its subsequent adjudications. Courts also have characterized forwards as commercial merchandising transactions or cited the CFTC's characterization with approval.[260] Accordingly, the CFTC believes that ''commercial merchandising transaction'' continues to be an accurate descriptive term for characterizing forward transactions.

Another commenter requested that the CFTC clarify that a subsequent, separately-negotiated agreement to effectuate a book-out under the Brent Interpretation may be oral or written. This commenter noted that the pace at which certain energy markets transact and the frequency with which book-outs may sometimes occur, makes formal written documentation of all book-outs

impracticable.[261] The CFTC has provided an interpretation above regarding the documentation of book-outs in response to this commenter's concerns.

(ii) Nonfinancial Commodities

In response to commenters,[262] the CFTC is providing an interpretation regarding the scope of the term ''nonfinancial commodity'' in the forward exclusion from the swap definition.[263]

The CFTC interprets the term ''nonfinancial commodity'' to mean a commodity that can be physically delivered and that is an exempt commodity[264] or an agricultural commodity.[265] Unlike excluded commodities, which generally are financial,[266] exempt and agricultural commodities by their nature generally are nonfinancial. The requirement that the commodity be able to be physically delivered is designed to prevent market participants from relying on the forward exclusion to enter into swaps based on indexes of exempt or agricultural commodities outside of the Dodd-Frank Act and settling them in cash, which would be inconsistent with the historical limitation of the forward exclusion to commercial merchandising transactions. However, to the extent that a transaction is intended to be physically settled, otherwise meets the terms of the forward contract exclusion and uses an index merely to determine the price to be paid for the nonfinancial commodity intended to be delivered,

---

[253] *See* CME Letter.

[254] As described above in the interpretation, the CFTC has addressed CME's other comments on the forward exclusion, including the interpretation's applicability to commercial market participants and CME's hedge fund example.

[255] *See* COPE Letter Appendix.

[256] *See* IECA Letter.

[257] *See* MFA Letter.

[258] Ex Parte Communication between MFA and CFTC Staff on September 15, 2011, at *http://comments.cftc.gov/PublicComments/ViewExParte.aspx?id=387&SearchText=* .

[259] *See* ISDA Letter.

[260] *See, e.g., In re Bybee,* 945 F.2d 309, 315 (9th Cir. 1991).

[261] *See* WGCEF Letter.

[262] The Commissions requested comment in the Proposing Release on whether they should provide guidance regarding the scope of the term ''nonfinancial commodity'' and, if so, how and where the line should be drawn between financial and nonfinancial commodities. *See* Proposing Release at 29832.

[263] As noted above, the CEA definition of the term ''swap'' excludes ''any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled.'' CEA section 1a(47)(B)(ii), 7 U.S.C. 1a(47)(B)(ii). Thus, the forward exclusion from the swap definition is limited to transactions in nonfinancial commodities. To the extent the CFTC uses the term ''nonfinancial commodity'' in other contexts in this release, such as in connection with the Brent Interpretation (including as it applies with respect to the ''future delivery'' definition), the term will have the same meaning as discussed in this section in those contexts.

[264] The CEA defines an ''exempt commodity'' as ''a commodity that is not an excluded commodity or an agricultural commodity.'' CEA section 1a(20), 7 U.S.C. 1a(20). A security is an excluded commodity as discussed below, and therefore is not an exempt commodity.

[265] The CFTC has defined the term ''agricultural commodity'' in its regulations at Rule 1.3(zz) under the CEA, 17 CFR 1.3(zz). *See Agricultural Commodity Definition,* 76 FR 41048 (Jul. 13, 2011).

[266] The CEA defines an ''excluded commodity'' at CEA section 1a(19), 7 U.S.C. 1a(19).

the transaction may qualify for the forward exclusion from the swap definition.

In addition, the CFTC is providing an interpretation that an intangible commodity (that is not an excluded commodity) which can be physically delivered qualifies as a nonfinancial commodity if ownership of the commodity can be conveyed in some manner and the commodity can be consumed. One example of an intangible nonfinancial commodity that qualifies under this interpretation, as discussed in greater detail below, is an environmental commodity, such as an emission allowance, that can be physically delivered and consumed (*e.g.,* by emitting the amount of pollutant specified in the allowance).[267] The interpretation provided herein recognizes that transactions in intangible commodities can, in appropriate circumstances, qualify as forwards, while setting forth certain conditions to assure that the forward exclusion may not be abused with respect to intangible commodities.

**Comments**

Several commenters believed that the CFTC should provide an interpretation regarding the meaning of the term "nonfinancial commodity" to provide clarity to market participants on the applicability of the forward exclusion.[268] The CFTC is providing the interpretation discussed above to address these commenters' concerns but, contrary to one commenter's request, declines to adopt a regulation.[269]

[267] *See supra* part II.B.2.a)iii), regarding environmental commodities. An emission allowance buyer can also consume the allowance by retiring it without emitting the permitted amount of pollutant.

[268] *See* Letter from Steven J. Mickelsen, Counsel, 3Degrees Group, Inc., dated July 22, 2011 ("3Degrees Letter"); ETA Letter; and Letter from Kari S. Larsen, General Counsel, Chief Regulatory Officer, Green Exchange LLC, dated July 22, 2011 ("GreenX Letter"). Each of these commenters proposed its own definition of "nonfinancial commodity." The interpretation above incorporates many of their suggestions.

[269] *See* ETA Letter. This is consistent with CFTC practice in providing an interpretation rather than regulations where warranted. In this context, the CFTC is providing an interpretation rather than rule text because the CFTC is not limiting the definition of "nonfinancial commodity" to exempt and agricultural commodities (the latter category includes agricultural commodity indexes (*see* 17 CFR 1.3(zz)(4))). The definition also requires physical deliverability and, with respect to intangible commodities, ownership transferability and consumability. Whether a commodity has these features may require interpretation. In any case, courts can rely on agency interpretations.

**(iii) Environmental Commodities**

The Commissions requested comment on whether environmental commodities should fall within the forward exclusion from the swap definition and, if so, subject to what parameters.[270] In response to commenters, the CFTC is providing an interpretation regarding the circumstances under which agreements, contracts or transactions in environmental commodities will satisfy the forward exclusion from the swap definition.[271] The CFTC did not propose a definition of the term "environmental commodity" in the Proposing Release and is not doing so in this release.[272] The CFTC believes it is not necessary to define the term "environmental commodity" because any intangible commodity—environmental or otherwise—that satisfies the terms of the interpretation provided herein is a nonfinancial commodity, and thus an agreement, contract or transaction in such a commodity is eligible for the forward exclusion from the swap definition.[273] The forward exclusion from the swap definition does not apply to commodities themselves, but to certain types of agreements, contracts or transactions in a specified type of commodity (i.e., a "nonfinancial" commodity).[274] Environmental commodities that meet the

[270] *See* Proposing Release at 29832, Request for Comment 32, asked: Should the forward contract exclusion from the swap definition apply to environmental commodities such as emissions allowances, carbon offsets/credits, or renewable energy certificates? If so, please describe these commodities, and explain how transactions can be physically settled where the commodity lacks a physical existence (or lacks a physical existence other than on paper)? Would application of the forward contract exclusion to such environmental commodities permit transactions that should be subject to the swap regulatory regime to fall outside the Dodd-Frank Act?

[271] Because the CFTC has determined, as discussed elsewhere in this release, to interpret the forward exclusion from the swap definition consistently with the forward exclusion from the "future delivery" definition, the discussion in this section applies equally to the forward exclusion from future delivery.

[272] *See also* Letter from Gene Grace, Senior Counsel, American Wind Energy Association ("AWEA"), dated July 22, 2011 ("AWEA Letter") (providing a general description of renewable energy credits ("RECs"), emission allowances, and offsets, which the commenter collectively termed "environmental commodities" for purposes of its letter).

[273] Thus, market participants should apply the interpretation to their facts to determine whether their specific circumstances support reliance on the forward exclusion from the swap definition.

[274] Several commenters appear to have confused these concepts. The term "commodity" is defined in CEA section 1a(9), 7 U.S.C. 1a(9). The forward exclusion in CEA section 1a(47)(B)(ii), 7 U.S.C. 1a(47)(B)(ii), excludes from the swap definition "any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled."

interpretation regarding nonfinancial commodities discussed in subsection (ii) above are nonfinancial commodities and, therefore, a sale for deferred shipment or delivery in such a commodity, so long as the transaction is intended to be physically settled, may qualify for the forward exclusion from the swap definition.

The intangible nature of environmental, or other, commodities does not disqualify contracts based on such commodities from the forward exclusion from the swap definition, notwithstanding that the core of the forward exclusion is intent to deliver the underlying commodity.[275] As commenters noted, securities are intangible (with the exception of the rare certificated security) and yet they are expressly permitted by CEA section 1a(47)(B)(ii)[276] to be the subject of the forward exclusion; this reflects recognition by Congress that the forward exclusion can apply to intangible commodities.[277]

The CFTC understands that market participants often engage in environmental commodity transactions in order to transfer ownership[278] of the environmental commodity (and not solely price risk),[279] so that the buyer

[275] *See supra* part II.B.2.a)i)(A).

[276] 7 U.S.C. 1a(47)(B)(ii).

[277] As commenters also note, each Commission or its staff has previously indicated that environmental commodities, in the CFTC's case, and securities, in the SEC's case, can be physically settled. *See* Letter from Kyle Danish, Van Ness Feldman, P.C., on behalf of Coalition for Emission Reduction Policy ("CERP"), dated July 18, 2011 ("CERP Letter") and 3Degrees Letter. Also, the recent Carbon Report suggested that the forward exclusion could apply to agreements, contracts or transactions in environmental commodities. *See* Interagency Working Group for the Study on Oversight of Carbon Markets ("Interagency Working Group"), *Report on the Oversight of Existing and Prospective Carbon Markets* (January 2011) ("Carbon Report"). The Carbon Report specifically stated that—[n]o set of laws currently exist that apply a comprehensive regulatory regime—such as that which exists for derivatives—specifically to secondary market trading of carbon allowances and offsets. Thus, for the most part, absent specific action by Congress, a secondary market for carbon allowances and offsets may operate outside the routine oversight of any market regulator.

[278] One commenter maintains that a transaction in an environmental allowance represents a physically-settled transaction because its primary purpose is to transfer ownership of the right to emit a specified unit of pollution. *See* Letter from Andrew K. Soto, American Gas Association ("AGA"), dated July 22, 2011 ("AGA Letter"). *Compare* to Proposing Release at 29828 (stating that "[t]he primary purpose of the contract is to transfer ownership of the commodity").

[279] Another commenter states that, from a practical standpoint, the buyer must take delivery to satisfy a compliance obligation, which typically requires surrender of allowances and offset credits, and likens such transactions to forward sales of more tangible commodities, noting they are not devices for transferring price risk. *See* CERP Letter.

Continued

can consume the commodity in order to comply with the terms of mandatory or voluntary environmental programs.[280] Those two features—ownership transfer and consumption—distinguish such environmental commodity transactions from other types of intangible commodity transactions that cannot be delivered, such as temperatures and interest rates. The ownership transfer and consumption features render such environmental commodity transactions similar to tangible commodity transactions that clearly can be delivered, such as wheat and gold.[281]

For such transactions, in addition to the factors discussed above, intent to deliver is readily determinable,[282] delivery failures generally result from frustration of the parties' intentions,[283] and cash-settlement is insufficient because delivery of the commodity is necessary for compliance purposes.[284] For the foregoing reasons, environmental commodities can be nonfinancial commodities that can be delivered through electronic settlement

or contractual attestation. Therefore, an agreement, contract or transaction in an environmental commodity may qualify for the forward exclusion from the swap definition if the transaction is intended to be physically settled.

## Comments

Several commenters responded to the Commission's request for comment regarding the applicability of the forward exclusion from the swap definition for agreements, contracts and transactions in environmental commodities.[285]

Most commenters responding to the Commissions' request for comment concerning the appropriate treatment of agreements, contracts or transactions in environmental commodities asserted that emission allowances, carbon offsets/credits, or RECs should be able to qualify for the forward exclusion from the swap definition. In support of this view, several commenters explained that the settlement process for environmental commodity transactions generally involves "the transfer of title

via a tracking system, registry or contractual attestation, in exchange for a cash payment." [286] One commenter stated that this form of settlement demonstrates that the lack of physical existence of a commodity is not relevant to whether a transaction in the commodity physically settles for purposes of the forward exclusion.[287] Another commenter contended that title transfer constitutes physical delivery because the settlement results in the environmental commodity being consumed to meet an environmental obligation or goal, which occurs through "retirement" of the environmental commodity.[288] Other commenters compared the settlement of a transaction in an environmental commodity through an electronic registry system to a warehouse receipt that represents title to a physical commodity.[289]

---

*Compare* to Proposing Release at 29828 (stating that "[t]he primary purpose of the contract is * * * not to transfer solely * * * price risk"). This commenter also advises that delivery of RECs and offsets is typically deferred for commercial convenience, consistent with the Brent Interpretation, because "not all of the purchased RECs and offsets are generated at the time of the transaction" and "long-term contracts with deferred delivery are important for renewable energy projects to ensure a consistent revenue stream over a long period of time." *See* CERP Letter.

[280] Consumption also can be part of a commercial merchandising transaction in the chain of commerce. *See, e.g.*, Brent Interpretation, *supra* note 207 (dissent of Commissioner Fowler West) (citing the 1985 CFTC OGC Interpretation and cases cited therein for the proposition that "parties to forward contracts * * * seek to profit in their businesses from producing, processing, distributing, storing, or consuming the commodity").

[281] Similarly, the settlement method for the types of environmental commodity transactions described by commenters such as RECs, emission allowances, and offsets are equivalent to that of physical commodities where ownership is transferred by delivering a warehouse receipt from the seller to the buyer, thereby indicating the presence in the warehouse of the contracted for commodity volume. *See* GreenXLetter. *See also* REMA letter (averring that "[i]n effect, the REC is an intangible contract right or interest in that specific quantity of energy; thus, it is quite analogous to a warehouse receipt that represents title to a physical commodity"). Another similarity between these environmental commodity transactions and tangible commodities is that it is possible to manipulate the deliverable supply of an environmental commodity just as it is for a tangible commodity. The CFTC reminds market participants of its continuing authority over forwards under the CEA's anti-manipulation provisions prohibiting manipulation, making false and misleading statements and omissions of material fact to the CFTC, fraud and deceptive practices, and false reporting. *See supra* note 226.

[282] *See* Letter from Jennifer Han, Executive Director, Center for Research Solutions ("CRS"), dated July 22, 2011 ("CRS Letter").

[283] *See* 3Degrees Letter.

[284] *See* GreenX Letter.

[285] One commenter provided a general description of renewable energy credits ("RECs"), emission allowances, offsets, (which the commenter collectively termed "environmental commodities" for purposes of its letter), and related transactions. *See* AWEA Letter. According to the commenter, RECs are created by state regulatory bodies in conjunction with the production of electricity from a qualifying renewable energy facility. The forward sale of a REC transfers ownership of the REC from the producing entity to another entity that can use the REC for compliance with an obligation to sell a certain percentage of renewable energy. Many times, this forward sale takes place prior to the construction of a project to enable developers to secure related project financing. *See* AWEA Letter. *See also* Letter from Mary Anne Mason, HoganLovells LLP on behalf of Southern California Edison Company, Pacific Gas and Electric Company and San Diego Gas and Electric Company ("California Utilities"), dated July 22, 2011 ("California Utilities Letter") (stating that the California Utilities transact in allowances, under the EPA's and anticipated California cap-and-trade programs, as well as in RECs, in order to comply with or participate in various regulatory and voluntary programs).

The CFTC understands that, in the United States, emission allowances and offsets are issued by the U.S. Environmental Protection Agency ("EPA"), state government entities and private entities. Emission allowances and offsets are transferred between counterparties, often through forward contracts, with the purchasing party obtaining the ability to use the allowances or offsets for compliance with clean air or greenhouse gas regulations. The forward sale of allowances and offsets allows market participants to hedge the compliance obligations associated with expected emissions, or to meet a voluntary emissions reduction commitment or make an environmental claim. *See, e.g.*, AWEA Letter; Letter from Henry Derwent, President and CEO, International Emissions Trading Association, dated July 22, 2011 (defining a carbon offset as a "credit[] granted by a state or regional governmental body or an independent standards organization in an amount equal to the generation of electricity from a qualifying renewable energy facility.").

[286] *See* 3Degrees Letter. *See also* WGCEF Letter (advising that "physical delivery takes place the moment that title and ownership in the environmental commodity itself is transferred from the seller to the buyer[,] whether through the execution of a legally binding contract or attestation, or submission of records to a centralized data base, such as a registry"); Letter from the Hons. Jeffrey A. Merkley, Sherrod Brown and Jeanne Shaheen, U.S. Senators, dated January 13, 2012 ("Senators Letter") (relaying that "[t]he purchase or sale of a REC is settled through the transfer of title to the REC, either electronically over a tracking system or via a paper attestation"); Letter from Harold Buchanan, Chief Executive Officer, CE2 Carbon Capital, LLC ("CE2"), dated July 22, 2011 ("CE2 Letter"); Letter from Jason M. Rosenstock, ML Strategies LLC on behalf of The Business Council for Sustainable Energy ("BCSE"), dated January 24, 2012 ("BCSE Letter"); NEMA Letter (stating that RECs must be physically settled through a REC registry, which "ensures that there is a physical megawatt hour from a green generator behind the REC").

[287] *See* 3Degrees Letter. *See also* GreenX Letter (stating that environmental commodities share the same characteristics as tangible physical commodities "in all key respects," including that they are in limited supply).

[288] *See* CRS Letter. CRS explains that retirement occurs through a registry or electronic tracking system by transfer into a retirement account (or, alternatively, an exchange of paperwork) and that, once retired, an environmental commodity cannot be resold. The CRS also argues that such environmental commodity transactions are commercial merchandising transactions, and thus may be forward contracts, because the primary purpose of the transactions is to transfer ownership so that the purchaser may comply with an applicable environmental program. *See also* 3Degrees Letter and AWEA Letter.

[289] *See* Letter from Josh Lieberman, General Manager, Renewable Energy Markets Association ("REMA"), dated July 22, 2011 ("REMA Letter") (distinguishing RECs, which allow the buyer to own environmental attributes, from a pure financial swap, where only price risk is transferred); *See also* GreenX Letter (likening the settlement of an environmental commodity transaction (where delivery typically would take place by electronic delivery from the registry account of the seller to the registry account of the buyer) to that of transactions in many tangible physical commodities, such as agricultural commodities and metals, where settlement is evidenced by an

A few commenters also analogized environmental commodities to securities, which (with the exception of certificated securities) are intangible. Some commenters, for example, asserted that the language of the forward exclusion from the swap definition means that non-physical items can be physically settled because the exclusion, which references securities, "implies that securities—which lack a strict physical existence—may be physically settled." [290]

Some commenters assured the Commissions that applying the forward exclusion to transactions in environmental commodities would not permit transactions that should be subject to the swap regulatory regime to fall outside it. One commenter submitted that intent to deliver with respect to environmental commodities will be readily determinable. [291] Another commenter contended that: environmental commodity contracts almost universally require delivery and that failure to do so is an event of default; to the best of its knowledge, it is rare for such a contract to include the right to unilaterally terminate an agreement under a pre-arranged contractual provision permitting financial settlement; [292] and defaults generally are the result of something frustrating parties' intentions. [293] Still other commenters distinguished environmental commodities from other intangible commodities, such as the nonfinancial commodities (such as interest rates and temperatures) that the CFTC referred to in its Adaptation Notice of Proposed Rulemaking, [294] because RECs and emissions allowances or offsets can be physically transferred from one account to another, whereas "it is not possible to move and physically transfer an interest rate or a temperature reading." [295]

As discussed above, the CFTC has addressed the foregoing concerns of commenters by providing an interpretation that agreements, contracts and transactions in environmental commodities may qualify for the forward exclusion from the swap definition.

One commenter stated its view that the forward exclusion from the swap definition should not be available for carbon transactions because they should be standardized and conducted on open, transparent and regulated exchanges. [296] This commenter acknowledged the possibility that carbon transactions can be physically settled (as the statute requires of excluded forward contracts) but argued that, in light of the fact that there is no cost associated with making or taking delivery of carbon, there is no cost to store it, and there is no delay in delivering it, a forward exclusion for carbon transactions may allow financial speculators to escape regulation otherwise required by the Dodd-Frank Act. The CFTC believes that if a transaction satisfies the terms of the statutory exclusion, the CFTC lacks the authority to deprive the transaction of the exclusion, absent evasion. [297]

One commenter stated that "[i]n the solar industry, RECs are often traded by an individual consumer as an assignment of a right owned by that consumer." [298] This commenter also advised that many individual consumers transact forward contracts through solar REC ("SREC") aggregators at a fixed price. The CFTC notes [299] that a transaction entered into by a consumer cannot be a forward transaction, and accordingly should not be the subject of an interpretation of the forward exclusion. [300]

One commenter takes the position that, because EPA emission allowances are issued in transactions with the EPA, only resales of such allowances (secondary market transactions) could

be swaps because the EPA's initial issuance of allowances would be excluded from the swap definition under CEA section 1a(47)(B)(ix). [301] The CFTC declines to address the commenter's legal conclusion regarding the application of CEA section 1a(47)(B)(ix), but agrees that an emission allowance created by the EPA is a nonfinancial commodity and that agreements, contracts and transactions in such allowances may fall within the forward exclusion from the swap definition.

(iv) Physical Exchange Transactions

The Commissions received a comment letter seeking clarification that physical exchange transactions are forward contracts excluded from the swap definition. [302] As described by the commenter, physical exchange transactions involve "a gas utility entering into a transaction with another gas utility or other market participant to take delivery of natural gas at one delivery point in exchange for the same quantity of gas to be delivered at an alternative delivery point * * * for the primary purpose of transferring ownership of the physical commodity in order to rationalize the delivery of physical supplies to where they are needed" at a price "generally reflecting the difference in value at the delivery points." [303] This commenter stated that "exchange transactions create binding obligations on each party to make and take delivery of physical commodities [, i]n essence constituting paired forward contracts that are intended to go to physical delivery." [304] The commenter added that, to the extent an exchange transaction payment is based on an index price, such pricing is not severable from the physical exchange. [305]

The CFTC interprets the exchange transactions described by the commenter, to the extent they are for deferred delivery, as examples of transactions in nonfinancial commodities that are within the forward exclusion from the definition of the terms "swap" and "future delivery." Based on the information supplied by the commenter, they are commercial merchandising transactions, the primary purpose of which is to transfer

---

electronic transfer of a warehouse receipt in the records of the warehouse and the underlying commodity does not move—it remains in the warehouse or vault—but its ownership changes).

[290] See Letter. *See also* CERP Letter (claiming that Congress did not intend for the phrase "physically settled" in the forward exclusion to be limited to tangible commodities because, like environmental commodities, securities only exist "on paper."). *See also* AWEA Letter.

[291] See CRS Letter ("unlike a stock or a bond, which can be resold for its cash value, purchasers of environmental commodities intend to take delivery of RECs or carbon offsets for either compliance purposes or in order to make an environmental claim regarding their renewable energy use or carbon footprint."). *See also* GreenX Letter.

[292] Such a provision would preclude reliance on the forward exclusion.

[293] See 3Degrees Letter.

[294] See *Adaptation of Regulations to Incorporate Swaps,* 76 FR 33066, June 7, 2011.

[295] See California Utilities Letter.

[296] See Letter from Michelle Chan, Director, Economic Policy Programs, Friends of the Earth, dated July 22, 2011.

[297] While the commenter contended that "the intangible nature of carbon makes it much easier for speculators or those simply seeking to hedge carbon price risk to take delivery of the carbon itself rather than enter into a derivatives transaction," as the CFTC states in section VII.A.2.c), *infra,* deciding to enter into a forward transaction rather than a swap does not constitute evasion. Thus, if the transaction in question is a forward contract, that is the end of the analysis, absent the presence of other factors that may indicate evasion. *See* AWEA Letter.

[298] See Letter from Katherine Gensler, Director, Regulatory Affairs, SEIA, dated August 5, 2011 ("SEIA Letter").

[299] See Proposing Release at 29832 n.104.

[300] However, in section II.B.3., *infra,* the Commissions provide an interpretation regarding the applicability of the swap definition to consumer transactions.

[301] See Letter from Lauren Newberry, Jeffrey C. Fort, Jeremy D. Weinstein, and Christopher B. Berendt, Environmental Markets Association, dated July 21, 2011.

[302] See AGA Letter.

[303] Id. This commenter noted that gas utilities often can receive gas at more than one interconnection or delivery point on a pipeline.

[304] Id.

[305] Id.

ownership of natural gas between two parties who intend to physically settle such transactions. That exchange transactions may involve, in addition to gas deliveries at two separate delivery points, a cash payment by one party to the other reflecting the difference in value of the gas at different delivery points, or that such payment may be based on an index, does not necessarily affect the nature of the transactions as forward transactions.[306] For an exchange transaction to fall within the forward exclusion, though, the parties to the transaction must intend for the transaction to be physically settled, and the exchange transaction must satisfy all applicable interpretations set forth herein, including that relating to book-outs.[307]

(v) Fuel Delivery Agreements

The CFTC understands that fuel delivery agreements can generally be described as agreements whereby two or more parties agree to divide the cost of acquiring fuel for generation facilities based on some formula or factors, which can include, for example, their respective financial contributions to developing the source of the fuel (*e.g.,* a natural gas field). One example of a fuel delivery agreement could involve a joint power agency providing to a municipal utility a long-term supply of natural gas from a natural gas project developed by the joint power agency and other entities to provide fuel for, among others, the joint power agency's and the municipal utility's natural gas-fired electric generating facilities. The municipal utility would pay the joint power agency through direct capital contributions to the entity formed to develop the natural gas project for the cost of developing it. In addition, the municipal utility would pay the joint power agency a monthly fee for the natural gas supplied from the natural gas project. The monthly fee would be composed of an operating cost fee component, an interstate pipeline transportation cost fee component and an operating reserve cost fee component. The municipal utility's natural gas-fired electric generating facility would be used to supply a portion of its expected retail electric load.

Such agreements are forward transactions if they otherwise meet the interpretation set forth in this release regarding the forward exclusions (*e.g.,* no optionality other than as permitted by the interpretation). Monthly or other fees that are not in the nature of option premiums do not convert the transactions from forwards to options. Because the transactions as described above do not appear to exhibit optionality as to delivery, and no other aspect of the transactions as described above seem to exhibit optionality, the fees would not seem to resemble option premiums.[308]

(vi) Cleared/Exchange-Traded Forwards

In the Proposing Release, the Commissions requested comment regarding whether forwards executed on trading platforms should fall within the forward exclusion from the swap definition and, if so, subject to what parameters.[309] One commenter requested that the CFTC adopt a non-exclusive safe harbor providing that exchange-traded contracts with respect to which more than 50 percent of contracts, on average on a rolling three-month basis, go to delivery and where 100 percent of the counterparties are commercial counterparties, are neither futures nor swaps ("50/100 Forward Safe Harbor").[310] This commenter further requested that the CFTC provide an appropriate transition period once those thresholds are breached. This commenter contended that two hallmarks of the exchange-traded forward markets, which it characterized as "a relatively new development," are that the participants generally are commercials and a high percentage of contracts go to delivery, notwithstanding netting of delivery obligations.[311] This commenter added that, while parties to such contracts intend to go to delivery when they enter into them, their delivery needs may change as time passes.

The CFTC declines to address this request for the 50/100 Forward Safe Harbor, which raises policy issues that are beyond the scope of this rulemaking. Should the CFTC consider the implications of the requested 50/100 Forward Safe Harbor, including possible additional conditions for relief, it would be appropriate for the CFTC to obtain further comment from the public on this discrete proposal. For the same reasons, the CFTC declines to address at this time the comment requesting that the CFTC take the view that cleared forwards between commercial participants fall within the scope of the forward contract exclusion.

(b) Commodity Options and Commodity Options Embedded in Forward Contracts

(i) Commodity Options [312]

The CFTC noted in the Proposing Release [313] that the statutory swap definition explicitly provides that commodity options are swaps, that it had proposed revisions to its existing options rules in parts 32 and 33 of its regulations [314] with respect to the treatment of commodity options under the Dodd-Frank Act, and that it had requested comment on those proposed revisions in that rulemaking proceeding.[315] Accordingly, the CFTC did not propose an additional interpretation in the Proposing Release with respect to commodity options.

The CFTC reaffirms that commodity options are swaps under the statutory swap definition, and is not providing an additional interpretation regarding commodity options in this release. The CFTC recently addressed commodity options in the context of a separate final rulemaking and interim final rulemaking, under its plenary options authority in CEA section 4c(b).[316] There, the CFTC adopted a modified trade option exemption, and has invited

---

[306] However, if such payment stems from an embedded option, the interpretation set forth in the embedded option section of this release, *see infra* part II.B.2(b)(v), also would be relevant to determining whether an exchange transaction were covered by the forward exclusion from the swap definition.

[307] While the commenter also states that "[g]as utilities contract with interstate pipelines for capacity rights to have their gas supplies delivered to specific delivery points," its discussion of exchange transactions appears unrelated to such capacity rights. Therefore, the CFTC's guidance on exchange transactions does not address exchange transactions with capacity elements, which, depending on their structures, may be covered by the guidance set forth in the embedded option section of this release or by the CFTC's recent Commodity Options release. *See infra* note 317. Conversely, that parties to an exchange transaction separately enter into a capacity transaction with a pipeline operator to transport natural gas delivered via an exchange transaction is not relevant to today's guidance regarding exchange transactions.

[308] This interpretation is limited to the facts and circumstances described herein; the CFTC is not opining on different facts or circumstances, which could change the CFTC's interpretation.

[309] *See* Proposing Release at 29831–29832, Request for Comment 30.

[310] *See* Letter from Peter Krenkel, President and CEO, NGX, dated Nov. 4, 2010, resubmitted by email to CFTC staff on Sept. 14, 2011 ("NGX Letter"). One other commenter addressed a related issue, asserting that the Commissions should clarify that cleared forwards between commercial participants should be permitted under the forward contract exclusion. *See* Ex Parte Communication among Evolution Markets Inc. ("Evolution"), Ogilvy Government Relations ("Ogilvy") and CFTC staff on May 18, 2011 at *http://comments.cftc.gov/Public Comments/ViewExParte.aspx?id=197& SearchText=.*

[311] *Id.*

[312] As used in this release, the term "commodity option" refers to an option that is subject to the CEA.

[313] *See* Proposing Release at 29829–30.

[314] 17 CFR Parts 32 and 33.

[315] *See Commodity Options and Agricultural Swaps,* 76 FR 6095 (Feb. 3, 2011) (proposed).

[316] 7 U.S.C. 6c(b).

public comment on the interim final rules.[317]

## Comments

Several commenters in response to the Proposing Release argued that commodity options should not be regulated as swaps.[318] In general, these commenters believed that commodity options should qualify for the forward exclusion from the swap definition, emphasizing similarities between commodity options and forward contracts on nonfinancial commodities.[319]

The CFTC is not providing an interpretation that commodity options qualify as forward contracts in nonfinancial commodities. Such an approach would be contrary to the plain language of the statutory swap definition, which explicitly provides that commodity options are swaps.[320] This approach also would be a departure from the CFTC's and its staff's longstanding interpretation of the forward exclusion with respect to the term "future delivery," [321] which the CFTC has determined above to apply to the forward exclusion from the swap definition as well.[322] Further, the CFTC notes that it has recently issued final and interim final rules adopting a modified version of the CFTC's existing trade option exemption.[323]

### (ii) Commodity Options Embedded in Forward Contracts

The CFTC is restating the interpretation regarding forwards with embedded options from the Proposing Release, but with certain modifications based on comments received. The CFTC is providing additional interpretations regarding forwards with embedded volumetric optionality, optionality in the form of evergreen and renewal provisions, and optionality with respect to delivery points and delivery dates.

As was noted in the Proposing Release, the question of the application of the forward exclusion from the swap definition with respect to nonfinancial commodities, where commodity options are embedded in forward contracts (including embedded options to cash settle such contracts), is similar to that arising under the CEA's existing forward contract exclusion from the definition of the term "future delivery." [324] The CFTC's Office of General Counsel addressed forward contracts that contained embedded options in the 1985 CFTC OGC Interpretation,[325] which recently was adhered to by the CFTC in its adjudicatory Order in the *Wright* case.[326] While both were issued prior to the effective date of the Dodd-Frank Act, the CFTC believes that, as was stated in the Proposing Release, it is appropriate to apply this interpretation to the treatment of forward contracts in nonfinancial commodities that contain embedded options under the Dodd-Frank Act.[327]

In *Wright,* the CFTC stated that it traditionally has engaged in a two-step analysis of "embedded options" in which the first step focuses on whether the option operates on the price or the delivery term of the forward contract and the second step focuses on secondary trading.[328] As was stated in the Proposing Release, these same principles can be applied with respect to the forward contract exclusion from the swap definition for nonfinancial commodities in the Dodd-Frank Act, too.[329] Utilizing these principles, the CFTC is providing a final interpretation that a forward contract that contains an embedded commodity option or options [330] will be considered an excluded nonfinancial commodity forward contract (and not a swap) if the embedded option(s):

1. May be used to adjust the forward contract price,[331] but do not undermine the overall nature of the contract as a forward contract;

2. Do not target the delivery term, so that the predominant feature of the contract is actual delivery; and

3. Cannot be severed and marketed separately from the overall forward contract in which they are embedded.[332] In evaluating whether an agreement, contract, or transaction qualifies for the forward contract exclusions from the swap definition for nonfinancial commodities, the CFTC will look to the specific facts and circumstances of the transaction as a whole to evaluate whether any embedded optionality operates on the price or delivery term of the contract, and whether an embedded commodity option is marketed or traded separately from the underlying contract.[333] Such an approach will help

---

[317] *See Commodity Options,* 77 FR 25320 (Apr. 27, 2012).

[318] *See* Letter from Brian Knapp, Policy Advisor, American Petroleum Institute ("API"), dated January 31, 2012 ("API Letter"); BGA Letter; COPE Letter; ETA Letter; Just Energy Letter; NGSA/NCGA Letter; and WGCEF Letter.

[319] For example, one commenter asserted that, similar to a forward contract on a nonfinancial commodity, a commodity option conveys no ability for a party to unilaterally require a financial settlement. Reasoning that both commodity options and forward contracts on nonfinancial commodities are intended to settle by physical delivery, this commenter contended that they should have the same regulatory treatment. *See* COPE Letter. Similarly, another commenter argued that the forward exclusion "plainly covers" commodity options because they are: (i) Contracts for the sale of physical, nonfinancial commodities, (ii) for deferred delivery, and (iii) intended to be physically settled, given that purchasers have an absolute right to physical delivery and sellers have an absolute obligation to physically deliver the amounts called for by the purchasers if the option is exercised. *See* NGSA/NCGA Letter. A third commenter recommended that the CFTC interpret the forward exclusion "broadly" to include options that, if exercised, become forwards in nonfinancial commodities in light of the particular circumstances of the electricity industry, where electric companies use commodity options to efficiently meet the demands of electric customers by hedging or mitigating commercial risks due to seasonal and geographically unique weather and load patterns and fluctuations. *See* ETA letter. In the alternative, a fourth commenter requested that the CFTC exercise its plenary options authority under CEA section 4c(b), 7 U.S.C. 6c(b), to establish a separate regulatory regime for commodity options analogous to the trade option exemption under former CFTC Rule 32.4. *See* WGCEF Letter. *See* 17 CFR 32.4 (2011).

[320] *See* CEA section 1a(47)(A)(i), 7 U.S.C. 1a(47)(A)(i) (defining a swap as, among other things, "a put, call * * * or option of any kind * * * for the purchase or sale * * * of * * * commodities") and CEA section 1a(47)(B), 7 U.S.C. 1a(47)(B) (not excluding commodity options from the swap definition).

[321] *See* 1985 CFTC OGC Interpretation, *supra* note 245. In this regard, an option cannot be a forward under the CFTC's precedent, because under the terms of the contract the optionee has the right, but not the obligation, to make or take delivery, while under a forward contract, both parties must have binding delivery obligations: one to make delivery and the other to take delivery.

[322] *See supra* part II.B.2(a)(i)(A).

[323] *See supra* note 317.

[324] *See* Proposing Release at 29830.

[325] *See* 1985 CFTC OGC Interpretation, *supra* note 245.

[326] *Wright, supra* note 214.

[327] *See* Proposing Release at 29830.

[328] *Wright, supra* note 214, at n.5. In *Wright,* the CFTC affirmed the Administrative Law Judge's holding that an option embedded in a hedge-to-arrive contract did not violate CFTC rules regarding the sale of agricultural trade options. The CFTC first concluded that the puts at issue operated to adjust the forward price and did not render the farmer's overall obligation to make delivery optional. Then, turning to the next step of the analysis, the CFTC explained that "the put and [hedge-to-arrive contract] operated as a single contract, and in most cases were issued simultaneously * * *. We do not find that any put was severed from its forward or that either of [the put or the hedge-to-arrive contract] was traded separately from the other. We hold that in these circumstances, no freestanding option came into being * * *." *Id.* at *7.

[329] *See* Proposing Release at 29830.

[330] Options in the plural would include, for example, a situation in which the embedded optionality involves option combinations, such as costless collars, that operate on the price term of the agreement, contract, or transaction.

[331] For example, a forward with an embedded option with a formulaic strike price based on an index value that may not be known until after exercise would be a forward if it meets the rest of the 3 components of this interpretation. Triggering an option to buy or sell one commodity based on the price of a different commodity reaching a specified level, such as in a cross-commodity transaction, does not constitute an adjustment to the forward contract price within the meaning of this 3-part interpretation.

[332] *See Wright, supra* note 214, at **6–7.

[333] This facts and circumstances approach to determining whether a particular embedded option

Continued

assure that commodity options that should be regulated as swaps do not circumvent the protections established in the Dodd-Frank Act through the forward contract exclusion for nonfinancial commodities instead.

The CFTC also is providing an interpretation, in response to commenters,[334] with respect to forwards with embedded volumetric optionality.[335] Several commenters asserted that agreements, contracts, and transactions that contain embedded "volumetric options," and that otherwise satisfy the terms of the forward exclusions, should qualify as excluded forwards, notwithstanding their embedded optionality.[336] The CFTC believes that agreements, contracts, and transactions with embedded volumetric optionality may satisfy the forward exclusions from the swap and future delivery definitions under certain circumstances. Accordingly, the CFTC is providing an interpretation that an agreement, contract, or transaction falls within the forward exclusion from the swap and future delivery definitions, notwithstanding that it contains embedded volumetric optionality, when:

1. The embedded optionality does not undermine the overall nature of the agreement, contract, or transaction as a forward contract;

2. The predominant feature of the agreement, contract, or transaction is actual delivery;

3. The embedded optionality cannot be severed and marketed separately from the overall agreement, contract, or transaction in which it is embedded;[337]

4. The seller of a nonfinancial commodity underlying the agreement, contract, or transaction with embedded volumetric optionality intends, at the time it enters into the agreement, contract, or transaction to deliver the underlying nonfinancial commodity if the optionality is exercised;

5. The buyer of a nonfinancial commodity underlying the agreement, contract or transaction with embedded volumetric optionality intends, at the time it enters into the agreement, contract, or transaction, to take delivery of the underlying nonfinancial commodity if it exercises the embedded volumetric optionality;

6. Both parties are commercial parties;[338] and

7. The exercise or non-exercise of the embedded volumetric optionality is based primarily on physical factors,[339] or regulatory requirements,[340] that are outside the control of the parties and are influencing demand for, or supply of, the nonfinancial commodity.[341]

The first two elements of the interpretation for embedded volumetric optionality, which mirror the CFTC's historical embedded option interpretation discussed above, have been modified to reflect that embedded volumetric optionality relates to delivery rather than price. As noted above, the predominant feature of a forward contract is a binding, albeit deferred, delivery obligation. It is essential that any embedded option in a forward contract as to volume must not undermine a forward contract's overall purpose.[342] The CFTC recognizes that the nature of commercial operations are such that supply and demand requirements cannot always be accurately predicted and that forward contracts that allow for some optionality as to the amount of a nonfinancial commodity actually delivered offer a great deal of value to commercial

---

[334] The CFTC requested comment on, among other things: whether there are other factors that should be considered in determining how to characterize forward contracts with embedded options with respect to nonfinancial commodities; and whether there are provisions in forward contracts with respect to nonfinancial commodities, other than delivery and price, containing embedded optionality. *See* Proposing Release at 29832.

[335] One commenter characterized "volumetric optionality" as the optionality in a contract settling by physical delivery and used to meet varying customer demand for a commodity." *See* WGCEF Letter. *See also* BGA Letter (stating that "it is commonplace for energy suppliers to enter into commercial transactions with customers (local distribution companies, electric utility companies, industrial, commercial and residential customers, power plants, etc.), which provide volumetric, price and delivery-related flexibility and variability"). BGA claims that commercial transactions containing embedded volumetric optionality "include, but are not limited to, full requirements contracts, interruptible load agreements, capacity contracts, tolling agreements, energy management agreements, natural gas transportation contracts and natural gas storage contracts." *Id.*

[336] *See, e.g.,* WGCEF Letter (submitting that "'volumetric optionality' is [a] separate and distinct concept from 'deliverability optionality'"); BGA Letter; AGA Letter; Letter from Jeffrey Perryman, Director, Contracts and Compliance, Atmos Energy Holdings, Inc. ("Atmos"), dated July 22, 2011 ("Atmos Letter"); NGSA/NCGA Letter; Letter from Paul M. Architzel, Wilmer Hale LLP on behalf of ONEOK, Inc. ("ONEOK"), dated July 22, 2011 ("ONEOK Letter"); COPE Letter.

[337] When a forward contract includes an embedded option that is severable from the forward contract, the forward can remain subject to the forward contract exclusion, if the parties document the severance of the embedded option component and the resulting transactions, i.e. a forward and an option. Such an option would be subject to the CFTC's regulations applicable to commodity options.

[338] *See* discussion in section II.B.2.(a)(i)(B), *supra.*

[339] *See, e.g.,* BGA Letter (advising that "[v]ariability associated with an energy customer's physical demand is influenced by factors outside the control of * * * energy suppliers (and sometimes * * * consumers) * * * including, but not limited to, load growth, weather and certain operational considerations (*e.g.,* available transportation capacity to deliver physical natural gas purchased on the spot market)").

[340] Volumetric optionality in this category would include, for example, a supply contract entered into to satisfy a regulatory requirement that a supplier procure, or be able to provide upon demand, a specified volume of commodity (*e.g.,* electricity). To the extent the optionality covers an amount of the commodity in excess of the regulatory requirement, such optionality would not necessarily be covered by this aspect of the guidance, though it may nevertheless be covered by the guidance if such excess volumetric optionality is based on physical factors within the meaning of the guidance. For example, the California Utilities explained that the California Public Utilities Commission ("CPUC") requires them to file a supply plan with the CPUC demonstrating that they have procured sufficient capacity resources (including reserves) needed to serve their aggregate system load on a monthly and yearly basis. *See* California Utilities Letter. Each utility's system requirement is 100 percent of its

peak-hourly forecast load plus a 15–17 percent reserve margin. The California Utilities enter into resource adequacy agreements to procure electric power generating capacity to meet these requirements. The ability to call on the additional 15 to 17% reserve reflected in such an agreement is covered by the regulatory requirements part of this element. To the extent the California Utilities may have a business need to procure additional capacity resources beyond the foregoing regulatory requirement (*e.g.,* because they wish to maintain a slightly larger reserve margin than required due to a recent upswing in unscheduled plant outages due to aging plants), that may be covered under the interpretation if the additional capacity is required due to physical factors beyond the control of the parties (i.e., the unscheduled outage, in the foregoing example).

[341] In other words, the predominant basis for failing to exercise the option would be that the demand or supply (as applicable) that the optionality was intended to satisfy, if needed, never materialized, materialized at a level below that for which the parties contracted or changed due to physical factors or regulatory requirements outside the parties' control. Such failure to exercise, or an exercise for a reduced amount of the underlying commodity, could, for example, be due to colder than expected weather during the summer decreasing demand for air conditioning, in turn decreasing demand for power to run the air conditioning. The Commission does not interpret this to mean that absolutely all factors involved in the decision to exercise an option must be beyond the parties' control, but rather the decision must be predominantly driven by factors affecting supply and demand that are beyond a parties control. This also means that the forward contract with embedded volumetric optionality needs to be a commercially appropriate method for securing the purchase or sale of the nonfinancial commodity for deferred shipment at the time it is entered into. The CFTC cautions market participants that, to the extent a party relies on the forward exclusion from the swap or future delivery definitions, notwithstanding that there is volumetric optionality, if that volumetric optionality is inconsistent with the seventh element of the interpretation, the agreement, contract or transaction may be an option.

[342] *See* discussion in part II.B.2.(a)(i)(B), *supra. See also supra* note 321.

participants. Where an agreement, contract, or transaction requires delivery of a non-nominal volume of a nonfinancial commodity, even if an embedded volumetric option is exercised, the CFTC believes that the predominant feature of the contract, notwithstanding the embedded volumetric optionality, is actual delivery. This is the case in many forward contracts that have an embedded option that allows a party to buy or sell an additional amount of a commodity beyond the fixed amount called for in the underlying forward contract. For instance, a forward contract could call for the delivery of 10,000 bushels of wheat and include an option for an additional 5,000 bushels of wheat.[343]

The third element is substantially the same as the third element of the interpretation above with respect to commodity options embedded in forward contracts generally.

The fourth and fifth elements are designed to ensure that both parties intend to make or take delivery (as applicable), subject to the relevant physical factors or regulatory requirements, which may lead the parties to deliver more or less than originally intended. This distinguishes a forward contract from a commodity option, where only the option seller must at all times be prepared to deliver during the term of the option. The sixth element is intended to ensure that the interpretation is not abused by market participants not engaged in a commercial business involving the nonfinancial commodity underlying the embedded volumetric optionality.[344]

The seventh element is based on comments stating that parties to agreements, contracts, and transactions with embedded volumetric optionality intend to make or take delivery (as applicable) of a commodity, and that it is merely the volume of a commodity that would be required to be delivered if the option is exercised, that varies. It is designed to ensure that the volumetric optionality is primarily driven by physical factors or regulatory requirements that influence supply and demand and that are outside the parties' control, and that the optionality is a commercially reasonable way to address uncertainty associated with those factors.[345] Element seven must be interpreted with the other elements set forth here. For instance, even if the optionality is consistent with element seven, such optionality cannot undermine the overall nature of the contract as a forward contract as discussed above.

As discussed in the interpretation regarding forwards with embedded optionality discussed above, in evaluating whether an agreement, contract or transaction with embedded volumetric optionality qualifies for the forward exclusions, the CFTC will look to the relevant facts and circumstances of the transaction as a whole to evaluate whether the transaction qualifies for the forward exclusions from the definitions of the terms "swap" and "future delivery."

The CFTC is providing further interpretations to explain how it would treat some of the specific contracts described in the comment letters. According to one commenter, a "full requirements contract" can be described as a "contract where the seller agrees to provide all requirements for a specific customer's location or delivery

point."[346] According to another commenter, "[a] full requirements contract * * * is a well-established concept in contract law" and "[i]n a requirements contract, the purchaser * * * deals exclusively with one supplier."[347] This commenter added that, while the amount of commodity delivered can vary, it is based on an objective need and that the Uniform Commercial Code imposes on the buyer "an obligation to act in good faith with respect to the varying amount that is called for delivery."[348] Based upon this description, the CFTC believes that a going commercial concern with an exclusive supply contract has no option but to get its supply requirements met through that exclusive supplier consistent with the terms of the contract. Any instance where nominal or zero delivery occurred would have to be because the commercial requirements changed or did not materialize. Furthermore, any variability in delivery amounts under the contract appears to be driven directly by the buyer's commercial requirements and is not dependent upon the exercise of any commodity option by the contracting parties.

Accordingly, full requirements contracts, as described above, appear not to contain embedded volumetric options. Therefore, a full requirements contract may qualify for the forward exclusion under the same facts and circumstances analysis applicable to all other agreements, contracts, and transactions that might be forwards. The same analysis would apply to an output

---

[343] In evaluating whether the predominant feature of a transaction is actual delivery, the CFTC will look at the contract as a whole. Thus, with respect to this contract, the CFTC would consider the intent element of the forward exclusions to be satisfied because the contract requires the seller to deliver a non-nominal volume of a commodity (i.e., 10,000 bushels of wheat), viewing the contract as a whole. As a result, if the other elements of the guidance above are satisfied, this contract would be a forward contract, even if the party did not exercise the option for the additional 5,000 bushels.

[344] The fact that the CFTC is expressly including the fourth through sixth elements in the embedded optionality guidance for volumetric options but not elsewhere does not mean that intent to deliver and the ability to make or take delivery expressed in these elements are not part of the facts and circumstances the CFTC will consider in the context of determining whether other agreements, contracts, and transactions qualify for the forward exclusions. Intent to deliver and the ability to make or take delivery have long been a part of the CFTC's facts-and-circumstances approach to making that determination, and they remain so. The CFTC is emphasizing these elements in this guidance because the CFTC has not previously expressed the view that an agreement, contract, or transaction with embedded volumetric optionality which affects the delivery term may qualify as a forward if these facts and circumstances are present.

[345] See, e.g., AGA Letter (advising that "[i]n general, retail demand for natural gas is weather driven * * * as a result [of which], a gas utility's peaking supplies must have significant flexibility * * * [and gas utilities * * * use a variety of contracts with gas suppliers to physically deal with peak periods of demand"); BGA Letter (citing gas supply curtailment due to a pipeline outage and power generation curtailment by an Independent System Operator for operational reasons as factors outside the control of energy suppliers and which could impact the amount of a commodity delivered). The CFTC understands BGA's comment to address involuntary curtailments, but also recognizes that power buyers may agree in advance that the relevant Regional Transmission Organization or Independent System Operator may, in order to maintain system reliability, curtail power deliveries to the buyers. While voluntary curtailments are within the control of the power buyer, the potential system reliability issue is not. Therefore, such voluntary curtailments would be within the guidance because, if triggered, they would be based on a physical factor (e.g., supply constraints).

[346] See Letter from Keith M. Sappenfield, II, Director, US Regulatory Affairs, Encana Marketing (USA) Inc. ("Encana"), dated July 22, 2011 ("Encana Letter").

[347] See ONEOK Letter. The CFTC notes that this commenter discussed full requirements contracts in the context of supply agreements between one of its affiliates and retail customers. If such customers are non-commercial customers, such contracts are not forwards, but nevertheless they may not be swaps under the Commissions' guidance regarding the non-exhaustive list of consumer transactions, or otherwise if they have characteristics or factors described under the consumer transaction interpretation, see infra part II.B.3.

[348] See, e.g., NY UCC § 2–306(1) (stating that "[a] term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith. * * *"). This commenter cited Corbin on Contracts for the proposition that the mere fact that the quantity term of the contract is "the buyer's needs or requirements" does not render the requirements contract "a mere options contract" because "the buyer's promise is not illusory * * * [but] is conditional upon the existence of an objective need for the commodity." See ONEOK Letter (citing Corbin on Contracts § 6.5 at 240–53 (1995)).

contract satisfying the terms of this interpretation.[349]

With respect to capacity contracts, transmission (or transportation) services agreements, and tolling agreements, the CFTC understands that: (i) Capacity contracts are generally products designed to ensure that sufficient physical generation capacity is available to meet the needs of an electrical system;[350] (ii) transmission (or transportation) services agreements are generally agreements for the use of electricity transmission lines (or gas pipelines) that allow a power generator to transmit electricity (or gas supplier to transport gas) to a specific location;[351] and (iii) tolling agreements, as described by commenters, provide a purchaser the right to the capacity, energy, ancillary services and any other product derived from a specified generating unit, all based upon a delivered fuel price and agreed heat rate.[352]

Such agreements, contracts and transactions, may have features that will satisfy the "forwards with embedded volumetric optionality" interpretation discussed above, or, like full requirements contracts, may not contain embedded volumetric options and may satisfy other portions of the forward interpretations herein. For example, according to one commenter, the delivery obligations in some tolling agreements are not optional which is indicative that the predominant feature of such tolling agreements is actual delivery.[353] It is also possible, based on descriptions provided to the CFTC, that tolling agreements could fit within the interpretation concerning certain physical agreements, contracts, or transactions,[354] or other interpretations herein.

Some commenters focused on forwards with embedded volumetric optionality in the natural gas industry. For example, one commenter stated that "peaking supply" natural gas contracts do not render delivery optional. Although the purchaser has the option to specify when and if the quantity of gas will be delivered on any given day, this commenter asserted that there is no

cash settlement alternative. If the purchaser does not exercise the right to purchase, then the right is terminated. The seller under the transaction must deliver the entire quantity of gas that the purchaser specifies, or pay liquidated damages. Moreover, the option is not severable and cannot be marketed separately from the supply agreement itself.[355] Similarly, another commenter said that there is no ability to sever an embedded option from a natural gas forward contract. Moreover, it stated that the ability for a gas purchaser to specify a quantity of gas for a certain day is not to encourage speculative activity; rather, it is because the exact quantity of gas to be needed on that future day is unknown, and many gas purchasers have weather-dependent needs that cannot accurately be predicted in advance.[356]

Depending on the relevant facts and circumstances, these types of agreements, contracts, and transactions—capacity contracts, transmission (or transportation) services agreements, tolling agreements, and peaking supply contracts—may satisfy the elements of the "forwards with embedded volumetric options" interpretation set forth above, or may satisfy other portions of this interpretation. If they do, they would fall within the forward exclusions from the swap and future delivery definitions.

In addition, the CFTC is providing an interpretation in response to a comment that contracts with evergreen or extension terms should be considered forwards.[357] The CFTC is clarifying that an extension term in a commercial contract, such as a renewal term in a five year power purchase agreement (which, due to the renewal, would require additional deliveries), is not an option on the delivery term within the meaning of the CFTC's interpretation, and consequently would not render such a contract ineligible for the forward exclusions from the definitions of the terms "swap" and "future delivery." Similarly, an evergreen provision, which automatically renews a contract (and, as such, would require additional deliveries)[358] absent the parties affirmatively terminating it, would not render such a contract ineligible for the forward exclusions from the swap or future delivery

definitions.[359] When the Proposing Release stated that a forward contract containing an embedded option that does not "target the delivery term" is an excluded forward contract,[360] it meant that the embedded option does not affect the delivery amount.[361]

Also, in response to a commenter,[362] the CFTC clarifies that embedded optionality as to delivery points and delivery dates will not cause a transaction that otherwise qualifies as a forward contract to be considered a swap. The CFTC emphasizes, however, that delivery must occur at some delivery point and on some date, or the lack of delivery must be due to the transaction being booked out or otherwise be consistent with the CFTC's interpretation regarding the forward exclusions from the swap and future delivery definitions.

Comments

Commenters generally supported the CFTC's proposed interpretation regarding forwards with embedded options, but many believed that it should be modified or expanded. As noted above, several commenters believed that forward contracts with embedded options that contain optionality as to the quantity/volume of the nonfinancial commodity to be delivered should qualify as forwards, and that the CFTC's proposed interpretation (which only mentions price optionality) should be modified accordingly.[363] In this regard, several commenters focused on forwards with embedded volumetric options in the natural gas industry.[364] One commenter noted that, although the 1985 CFTC OGC Interpretation distinguishes forward contracts from trade options, it is based on a limited number of agricultural contract examples, so additional guidance is needed, particularly in light of the wide range of cash market and commercial merchandising contracting practices in

[349] See Letter from Phillip g. Lookadoo, Esq., Reed Smith LLP and Jeremy D. Weinstein, Esq. on behalf of IECA dated May 23, 2012 (suggesting that output contracts, in addition to full requirements contracts, should be within the forward exclusion). An output contract has been defined as "a contract pursuant to which the obligor's duty to supply the promised commodity is quantified (and therefore limited) by reference to its production thereof." See Boyd v. Kmart Corp., 110 F.3d 73 (10th Cir. 1997).

[350] See California Utilities Letter.

[351] See NEMA Letter.

[352] See California Utilities Letter.

[353] Id.

[354] See infra part II.B.2.(b)(iii).

[355] See AGA Letter.

[356] See Atmos Letter.

[357] See IECA Letter.

[358] The CFTC refers in this and the prior sentence to "additional deliveries" because the IECA's example involves an agreement calling for delivery of a physical nonfinancial commodity.

[359] Using extension or evergreen provisions to avoid delivery, however, as was the case with the "rolling spot" contracts at issue in CFTC v. Zelener, 373 F.3d 861 (7th Cir. 2004), could constitute evasion or violate other provisions of the CEA (e.g., CEA section 4(a), 7 U.S.C. 6(a)). This interpretation does not limit the CFTC's other interpretations in this release regarding when delivery does not occur (e.g., the Brent Interpretation).

[360] See NGSA/NCGA Letter (requesting clarification of the phrase "target the delivery term.").

[361] See Proposing Release at 29830, n.81.

[362] See COPE Letter.

[363] See AGA Letter; API Letter; Atmos Letter; ONEOK Letter; NGSA/NCGA Letter; WGCEF Letter.

[364] See AGA Letter; Atmos Letter.

which delivery terms and amounts vary.[365]

In addition, another commenter requested more generally that any embedded option (for example, price, quantity, delivery point, delivery date, contract term) that does not permit a unilateral election of financial settlement based upon the value change in an underlying cash market should not render the contract a swap.[366]

As discussed above, the CFTC has provided an additional interpretation with respect to forwards with embedded volumetric options to address commenters' concerns. The CFTC also has provided an interpretation above, regarding price optionality, optionality with respect to delivery points and delivery dates specifically in response to this commenter, and optionality as to certain contract terms (such as evergreen and renewal provisions) to address particular concerns raised by commenters. The CFTC declines to adopt a more expansive approach with respect to "any" embedded option.

One commenter requested that an option to purchase or sell a physical commodity, whether embedded in a forward contract or stand alone, should either (i) fall within the statutory forward exclusion from the swap definition, or (ii) alternatively, if deemed by the CFTC to be a swap, should be exempt from the swap definition pursuant to a modified trade option exemption pursuant to CEA section 4c(b).[367] The CFTC has modified its proposed interpretation regarding forwards with embedded options as discussed above; contracts with embedded options that are swaps under this final interpretation may nevertheless qualify for the modified trade option exemption recently adopted by the CFTC and discussed above.[368]

Another commenter urged the CFTC to broadly exempt commercial forward contracting from swap regulation by generally excluding from the swap definition any forward contract with embedded optionality between end users "whose primary purpose is consistent with that of an 'end user', and in which any embedded option is directly related to 'end use.' "[369] The CFTC believes that this interpretation is vague and overbroad, and declines to adopt it.

Another commenter believed that the CFTC's "facts and circumstances" approach to forwards with embedded options does not provide the legal certainty required by nonfinancial entities engaging in commercial contracts in the normal course of business.[370] This commenter further argued that many option-like contract terms could be determined to "target the delivery term" under a facts and circumstances analysis.[371]

The CFTC has long applied a facts-and-circumstances approach to the forward exclusion, including with respect to forwards with embedded options, and thus it is an approach with which market participants are familiar. That approach balances the need for legal certainty against the risk of providing opportunities for evasion.[372] The CFTC's additional interpretation noted above, including clarification about the meaning of the phrase "target the delivery term," and forwards with embedded volumetric optionality, provides enhanced legal certainty in

response to the commenter's concerns.[373]

Request for Comment

The CFTC's interpretation regarding forwards with volumetric options is an interpretation of the CFTC and may be relied upon by market participants. However, the CFTC believes that it would benefit from public comment about its interpretation, and therefore requests public comment on all aspects of its interpretation regarding forwards with embedded volumetric options,[374] and on the following questions:

1. Are the elements set forth in the interpretation to distinguish forwards with embedded volumetric optionality from commodity options appropriate? Why or why not?

2. Are there additional elements that would be appropriate? Please describe and provide support for why such elements would serve to distinguish forwards with embedded volumetric optionality from commodity options.

3. Is the seventh element that, to ensure that an agreement, contract, or transaction with embedded volumetric optionality is a forward and not an option, the volumetric optionality is based primarily on physical factors, or regulatory requirements, that are outside the control of the parties and are influencing demand for, or supply of, the nonfinancial commodity, necessary and appropriate? Why or why not? Is the statement of this element sufficiently clear and unambiguous? If not, what adjustments would be appropriate?

4. Are there circumstances where volumetric optionality is based on other factors? Please describe. Would such factors, if made a part of the interpretation, serve to distinguish forwards with embedded volumetric optionality from commodity options? If so, how?

5. Does the interpretation provide sufficient guidance as to whether agreements, contracts, or transactions

---

[365] *See* ONEOK Letter. This commenter noted that it offers its customers a number of types of contracts for delivery of natural gas under which the amount called for delivery may vary. In each of these types of contracts, this commenter stated that both parties intend the contracts to result in delivery of the commodity, as needed. The purpose of these contracts is to ensure that customers, most of which are gas or electric utilities, have an adequate supply of natural gas regardless of day-to-day changes in demand that may be caused by variation in weather, operational considerations, or other factors. They are not designed for one-way price protection as would be the case with an option. *See* ONEOK Letter.

[366] *See* COPE Letter, Appendix.

[367] *See* WGCEF Letter; 7 U.S.C. 6c(b).

[368] 77 FR 25320 (Aug. 27, 2012). Encana believed that the guidance on forwards with embedded options should include embedded physical delivery options because it asserted that many of the contracts currently used by participants in the wholesale natural gas market contain an option for the physical delivery of natural gas. *See* Encana

Letter. To the extent that Encana's comment goes beyond volumetric optionality, commodity options are discussed *supra* in section II.B.2(b).

[369] *See* Letter from Roger Cryan, Vice President for Milk Marketing and Economics, National Milk Producers Federation ("NMPF"), dated July 22, 2011 ("NMPF Letter").

[370] *See* ETA Letter. Similarly, COPE comments that a nonfinancial commodity forward contract that, "by its terms," is intended to settle physically should be permitted to contain optionality without being transformed into a swap unless such optionality negates the physical settlement element of the contract. That is, if one party can exercise an option to settle the contract financially based upon the value change in an underlying cash market, then the intent for physical settlement is not contained in "the four corners of the contract" and may render the contract a swap. *See* COPE Letter. As discussed elsewhere in this release, the CFTC historically has eschewed approaches to the forward exclusion that rely on the "four corners of the contract," which can provide a roadmap to evasion of statutory requirements.

[371] Accordingly, this commenter believed that the CFTC should provide in its rules that an embedded option or embedded optionality will not result in a nonfinancial forward being a swap unless: (i) Delivery is optional; (ii) financial settlement is allowed; and (iii) transfer and trading of the option separately from the forward is permitted. *See* ETA Letter.

[372] *See also* NCFC Letter (supporting the CFTC's guidance because it provides legal certainty).

[373] *See also Commodity Options,* 77 FR 25320, 25324 n. 25 (Apr. 27, 2012) (discussing the CFTC's conclusion that an "option[] to redeem" under the USDA Commodity Credit Corporation's marketing loan program constitutes a cotton producer's contractual right to repay its marketing loan and "redeem" the collateral (cotton) to sell in the open market).

[374] Separately, it is expected that CFTC staff will be issuing no-action relief with respect to the conditions of the modified trade option exemption (except the enforcement provisions retained in § 32.3(d)) until December 31, 2012. This extension will afford the CFTC an opportunity to review and evaluate the comments received on both the interpretation above regarding embedded volumetric optionality, and the modified trade option exemption, in order to determine whether any changes thereto are appropriate.

with embedded volumetric optionality permitting a nominal amount, or no amount, of a nonfinancial commodity to be delivered are forwards or options, viewing the agreements, contracts, or transactions as a whole, if they satisfy the seven elements of the interpretation? Why or why not? Does this interpretation encourage evasion, or do the seven elements sufficiently distinguish forwards from agreements, contracts, and transactions that may evade commodity options regulation?

6. Is the interpretation sufficiently clear with respect to capacity contracts, transmission (or transportation) services agreements, peaking supply contracts, or tolling agreements? Why or why not? Do capacity contracts, transmission (or transportation) services agreements, peaking supply contracts, or tolling agreements generally have features that satisfy the forwards with volumetric options interpretation included in this release? If so, which ones? If not, why not? Could these types of agreements, contracts, and transactions qualify for the forward exclusions under other parts of the interpretation set forth above? Are there material differences in the structure, operation, or economic effect of these types of agreements, contracts, and transactions as compared to full requirements contracts that are relevant to whether such agreements, contracts, and transactions are options under the CEA? Please explain. If so, what are the material differences?

7. Do the agreements, contracts, and transactions listed in question No. 6 above have embedded optionality in the first instance? Based on descriptions by commenters, it appears that they may have a binding obligation for delivery, but have no set amount specified for delivery. Instead, delivery (including the possibility of nominal or zero delivery) is determined by the terms and conditions contained within the agreement, contract, or transaction (including, for example, the satisfaction of a condition precedent to delivery, such as a commodity price or temperature reaching a level specified in the agreement, contract, or transaction). That is, the variation in delivery is not driven by the exercise of embedded optionality by the parties. Do the agreements, contracts, and transactions listed in question No. 6 exhibit these kinds of characteristics? If so, should the CFTC consider them in some manner other than its forward interpretation? Why or why not?

(iii) Certain Physical Commercial Agreements, Contracts or Transactions

The CFTC is providing an interpretation in response to comments

regarding certain physical commercial agreements for the supply and consumption of energy that provide flexibility, such as tolls on power plants, transportation agreements on natural gas pipelines, and natural gas storage agreements.[375] Commenters recognized that these types of agreements, contracts or transactions may have option-like features, but analogized them to leases and concluded that they were forwards rather than swaps. One commenter, for example, characterized taking power produced pursuant to a physical tolling agreement—which can involve one party thereto providing fuel for a generation plant and having the exclusive right to take the power produced by that plant from the fuel provided—thus, in effect, "renting" the plant to the extent the plant is used to produce power from the fuel provided— as more akin to a lease than to an option.[376]

The CFTC will interpret an agreement, contract or transaction not to be an option if the following three elements are satisfied: (1) The subject of the agreement, contract or transaction is usage of a specified facility or part thereof rather than the purchase or sale of the commodity that is to be created, transported, processed or stored using the specified facility; (2) the agreement, contract or transaction grants the buyer the exclusive use of the specified facility or part thereof during its term, and provides for an unconditional obligation on the part of the seller to grant the buyer the exclusive use of the specified facility or part thereof;[377] and (3) the payment for the use of the specified facility or part thereof represents a payment for its use rather than the option to use it. In such agreements, contracts and transactions,

while there is optionality as to whether the person uses the specified facility, the person's right to do so is legally established, does not depend upon any further exercise of an option and merely represents a decision to use that for which the lessor already has paid. In this context, the CFTC would not consider actions such as scheduling electricity transmission, gas transportation or injection of gas into storage to be exercising an option if all three elements of the interpretation above are satisfied. As with the interpretation regarding forwards with embedded options generally, discussed above, in evaluating whether flexible physical commercial agreements that meet the 3-part test qualify for the forward exclusions, the CFTC will look to the specific facts and circumstances of the agreement, contract or transaction as a whole to evaluate whether the agreement, contract or transaction qualifies for the forward exclusions from the definitions of "swap" and "future delivery."

However, in the alternative, if the right to use the specified facility is only obtained via the payment of a demand charge or reservation fee, and the exercise of the right (or use of the specified facility or part thereof) entails the further payment of actual storage fees, usage fees, rents, or other analogous service charges not included in the demand charge or reservation fee, such agreement, contract or transaction is a commodity option subject to the swap definition.

Comments

Two commenters addressed "lease-like" physical agreements, contracts or transactions.[378] One of these commenters asserted that there are many physical commercial agreements for the supply and consumption of energy that effectively provide leases on flexible energy assets, such as tolls on power plants, transportation agreements on natural gas pipelines and natural gas storage agreements.[379] According to this commenter, these assets have the capability to be turned on and off to meet fluctuating demand due to weather and other factors; physical contracts around these assets transfer that delivery flexibility to the contract holder. The commenter believed that these types of commercial arrangements should not be considered commodity options, but rather should be excluded forwards. The other commenter described tolling agreements as having the characteristics of a lease, in that the

---

[375] *See* BGA Letter and California Utilities Letter. This interpretation also may apply to firm transmission agreements pursuant to which transmission service may not be interrupted for any reason except during an emergency when continued delivery of power is not possible. *See http://www.interwest.org/wiki/index.php?title=Firm_transmission_service.*

[376] *See* California Utilities Letter.

[377] In this regard, the usage rights offered for sale should be limited to the capacity of the specified facility. While overselling such capacity would not per se be inconsistent with satisfying the terms of this interpretation, the CFTC cautions market participants that overselling not based on reasonable commercial expectations of the use of the specified facility could lead the contract to be deemed evasion and lead to an agreement, contract or transaction being considered a swap, as it would undermine the "right" being offered. For example, given physical constraints of the power grid and gas pipelines, overselling transmission or transportation capacity would be per se inconsistent with satisfying the terms of this interpretation.

[378] *See* BGA Letter and California Utilities Letter.

[379] *See* BGA Letter.

purchasing entity obtains the exclusive right to the use of the power plant during the term of the agreement.[380] This commenter asserted that such agreements should not be considered commodity options, but rather forwards because the obligations are not contingent. The CFTC is providing the above interpretation that these types of agreements, contracts and transactions are not commodity options if the above conditions are satisfied, but may qualify for the forward exclusions under the facts and circumstances, in response to these commenters' concerns.

(iv) Effect of Interpretation on Certain Agreements, Contracts and Transactions

In the Proposing Release,[381] the CFTC requested comment regarding how its proposed interpretation concerning the forward contract exclusion would affect full requirements contracts, reserve sharing agreements, tolling agreements, energy management agreements and ancillary services. The CFTC asked whether such agreements, contracts or transactions have optionality as to delivery and, if so, whether they, or any other agreement, contract or transaction in a nonfinancial commodity, should be excluded from the swap definition.[382]

Commenters generally believed that such types of agreements, contracts and transactions, although they may contain delivery optionality, should be considered forwards rather than swaps or commodity options.[383] By contrast, one commenter believed that traded power markets involve many types of

contracts that are actually exchanges of cash flows based on referenced values and that have no relevant characteristics of physical delivery.[384]

With the exception of energy management agreements, which are discussed below, the interpretations that the CFTC has already provided above may apply to such types of agreements, contracts and transactions. Specifically, to the extent that such types of agreements, contracts and transactions are forwards with embedded volumetric options, the CFTC has provided an additional interpretation in section II.B.2.b(iii) above. To the extent such types of agreements, contracts or transactions are physical commercial agreements, contracts or transactions discussed in section II.B.2.b(iii), *supra,* the CFTC has provided an interpretation in that section. To the extent such types of agreements, contracts and transactions are considered commodity options, the CFTC has addressed commodity options under the separate rulemaking establishing a modified trade option exemption.[385] And to the extent that such types of agreements, contracts, and transactions, such as ancillary services, occur in Regional Transmission Organizations or Independent System Operators, or entered into between entities described in section 201(f) of the Federal Power Act,[386] they may be addressed through the public interest waiver process in CEA section 4(c)(6).[387]

With regard to Energy Management Agreements ("EMAs"), in general, commenters expressed the view that EMAs are forwards, and not swaps, although they did not provide analysis

to support that conclusion.[388] They also did not provide a working definition of EMAs. The CFTC understands that EMAs can cover a number of services and transactions, which can include spot, forward and swap transactions. EMAs can include services such as: (i) Acting as a financial intermediary by substituting one party's credit and liquidity for those of a less credit worthy owner of illiquid energy producing assets (i.e. the other party to the EMA) to facilitate the owner's purchase of fuel and sale of power;[389] (ii) providing market information to assist the owner in developing and refining a risk-management plan for the plant;[390] and (iii) procuring fuel, arranging delivery and storage, selling excess power not needed to serve load for another party.[391] The entity carrying out these activities may receive a portion of the revenue generated from such activities as compensation for its efforts. Because commenters did not provide a working definition of EMAs, the CFTC cannot state categorically that EMAs are or are not swaps. However, if the fuel acquisition, sales of excess generation and any other transactions executed under the auspices of an EMA are not swaps, nothing about the fact that the transactions are executed as a result of or pursuant to an EMA transforms the transactions into swaps. For example, if one party hires another party to enter into spot or forward transactions on its behalf, the fact that their relationship is governed by an EMA does not render those transactions swaps.[392] Conversely, were swaps to be executed by one party on behalf of another party as a result of, or pursuant to, an EMA, the parties thereto would need to consider their respective roles thereunder (*e.g.* principal versus agent) and whether commodity trading advisor, introducing broker, futures commission merchant, or other registration or other elements of the Dodd-Frank Act regime were implicated. At a minimum, the fact that a swap was executed would implicate

---

[380] *See* California Utilities Letter.

[381] *See* Request for Comment 35, which stated: How would the proposed interpretive guidance set forth in this section affect full requirements contracts, capacity contracts, reserve sharing agreements, tolling agreements, energy management agreements, and ancillary services? Do these agreements, contracts, or transactions have optionality as to delivery? If so, should they—or any other agreement, contract, or transaction in a nonfinancial commodity that has optionality as to delivery—be excluded from the swap definition? If so, please provide a detailed analysis of such agreements, contracts, or transactions and how they can be distinguished from options that are to be regulated as swaps pursuant to the Dodd-Frank Act. To what extent are any such agreements, contracts, or transactions in the electric industry regulated by the Federal Energy Regulatory Commission ("FERC"), State regulatory authorities, regional transmission organizations ("RTOs"), independent system operators ("ISOs") or market monitoring units associated with RTOs or ISOs?

*See* Proposing Release at 29832.

[382] *Id.*

[383] *See* Atmos Letter; BGA Letter; California Utilities Letter; COPE Letter; ETA Letter; Encana Letter; FERC Staff Letter; IECA Letter; NEMA Letter; ONEOK Letter; and Letter from Kenneth R. Carretta, General Regulatory Counsel—Markets, PSEG Services Corp., on behalf of the Public Service Electric and Gas Company, PSEG Power LLC, and PSEG Energy Resources & Trade LLC ("PSEG Companies"), dated July 22, 2011 ("PSEG Letter").

[384] *See* Better Markets Letter. This commenter stated that ancillary services are in substance swaps based on congestion costs between two transmission points, measured by the difference between actual prices assigned at those points by the grid operator. Capacity contracts are often documented using trading agreements for transactions in physicals, but this commenter believed that they constitute swaps that are used to hedge the price risk associated with periodic auctions of the contracts to provide reliable capacity to the grid operator. This commenter asserted that such contracts do not meet the CFTC's appropriate tests to exclude them, which should be made explicit in the guidance. This commenter stated that basic power contracts often do not meet the intent to deliver test because power buyers and sellers each schedule delivery to/from the grid, and such transactions can be settled based on readily available price differentials rather than scheduling capacity and load as a pair. At a minimum, this commenter believed that guidance should be provided to require that, in order to demonstrate intent to deliver, secondary delivery-related costs (*e.g.,* congestion charges and penalties to which those scheduling capacity and load on the grid are subject) must be allocated by contract. *Id.*

[385] *See supra* note 317.

[386] 16 U.S.C. 824(f).

[387] 7 U.S.C. 6(c)(6).

[388] *See, e.g.,* Encana Letter and BGA Letter.

[389] *See, e.g.,* The Royal Bank of Scotland Group plc, Order Approving Notice To Engage in Activities Complementary to a Financial Activity, 2008 Federal Reserve Bulletin volume 94.

[390] *Id.*

[391] *See, e.g.,* Energy Management Agreement between Long Island Lighting Company and Long Island Power Authority, available at *http://www.lipower.org/pdfs/company/papers/contract/energy.pdf.*

[392] Similarly, using an EMA would not render swaps entered as a result of or pursuant to an EMA spot or forward transactions.

reporting and recordkeeping requirements.[393]

(v) Liquidated Damages Provisions

The Commissions also received several comments discussing contractual liquidated damages provisions. The CFTC is clarifying that the presence, in an agreement, contract, or transaction involving physical settlement of a nonfinancial commodity, of a liquidated damages provision (which may be referred to by another name, such as a "cover costs" or "cover damages" provision) does not necessarily render such an agreement, contract, or transaction ineligible for the forward exclusion.[394] Such a provision in an agreement, contract, or transaction is consistent with the use of the forward exclusion, provided that the parties intend the transaction to be physically settled.[395] However, liquidated damages provisions can be used to mask a lack of intent to deliver.[396] In light of the possibility for evasion of the Dodd-Frank Act, the CFTC will continue to utilize its historical facts-and-circumstances approach in determining whether the parties to a particular agreement, contract, or transaction with a liquidated damage provision have the requisite intent to deliver.

Comments

One commenter notes that a commercial merchandising arrangement involving a nonfinancial commodity may provide that the remedy for a failure to make or take delivery is the payment of a market-rate replacement price, a payment on a performance guaranty, or "cover damages" to compensate the non-breaching party for the failure of the other party to fulfill its contractual obligations.[397] Such a contractual damages or remedy provision, this commenter contended, is not analogous to a financial settlement option in a trading instrument.[398] This commenter further asserted that one party or the other may be unable to perform, or excused or prevented for commercial reasons from performing, its contractual obligations to make or take delivery of a nonfinancial commodity, and therefore may be liable to the other party for a monetary payment, calculated in accordance with the contract.[399]

Another commenter noted that physically settled gas contracts, including peaking contracts (both for daily and monthly supply), bullet day contracts and weather contracts, use the NAESB Base Contract, which does not provide for financial settlement other than a liquidated damages provision, which would compensate a utility for its cost of obtaining alternative supply at the prevailing market price if the seller fails to deliver.[400] This commenter stated its view that the seller has no real opportunity to arbitrage its obligation to deliver based on changes in price, and the purchaser has no incentive to fail to take delivery of its specified quantities of gas, because they are needed for the physical operations of its system.[401]

The CFTC generally agrees with these comments regarding liquidated damages provisions, and has provided the final interpretation described above to address them.

(c) Security Forwards [402]

As the Commissions stated in the Proposing Release, the Commissions believe it is appropriate to address how the exclusions from the swap and security-based swap definitions apply to security forwards and other purchases and sales of securities.[403] The Commissions are restating the interpretation set out in the Proposing Release without modification.

The Dodd-Frank Act excludes purchases and sales of securities from the swap and security-based swap definitions in a number of different clauses.[404] Under these exclusions, purchases and sales of securities on a fixed or contingent basis [405] and sales of securities for deferred shipment or delivery that are intended to be physically delivered [406] are explicitly excluded from the swap and security-based swap definitions.[407] The exclusion from the swap and security-based swap definitions of a sale of a security for deferred shipment or delivery involves an agreement to purchase one or more securities, or groups or indexes of securities, at a future date at a certain price.

As with other purchases and sales of securities, security forwards are

---

[393] This interpretation is limited to the facts and circumstances described herein; the CFTC is not opining on different facts or circumstances, which could change the CFTC's interpretation.

[394] With respect to performance guarantees, the fact that a failure to deliver a nonfinancial commodity triggers a payment under a performance guaranty does not excuse the performance, nor render delivery optional. Accordingly, such a payment trigger would not itself preclude an agreement, contract, or transaction from being covered by the forward exclusion from the swap or future delivery definitions. *But see supra* part II.B.1.g., which provides that the CFTC is interpreting the term "swap" (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swap position would have recourse to the guarantor in connection with the position.

[395] *See* 1985 CFTC OGC Interpretation, *supra* note 245 (stating generally that while "[s]ome contracts provide for a liquidated damages of penalty clause if the producer fails to deliver, the presence of such clauses in a contract does not change the analysis of the nature of the contract [if] * * * it is intended that delivery of the physical crop occur, absent destruction of all or a portion of the crop by forces which neither party can control"). *See generally* Corbin on Contracts § 58.1 (characterizing liquidated damages provisions as designed to "[d]etermin[e] the amount of damages that are recoverable for a breach of contract").

[396] In that regard, *see* 1985 CFTC OGC Interpretation, *supra* note 245 (stating that "a contract provision which permitted a producer to avoid delivery for a reason other than for an intervening condition not in the control of either party could change any conclusion about the nature of the contract").

[397] *See* ETA Letter.

[398] *Id.* This commenter cited FERC Order No. 890, which recognizes that "[w]hile any party to any contract can choose to fail to perform, that does not convey a contractual right to fail to perform" and that the Edison Electric Institute Master Power Purchase and Sale Agreement ("EEI MPPSA") clearly obligates the supplier to provide power, except in cases of force majeure. As the ETA explains, "[t]he EEI MPPSA is a master agreement frequently used to document transactions for deferred delivery and receipt of nonfinancial electric energy, and the terms of the ISDA North American Power Annex contain substantially identical master agreement provisions * * *." *Id.*

[399] According to this commenter, parties typically include liquidated damages provisions in their agreements, contracts and transactions to address situations in which "one party or the other may be unable, excused or prevented for commercial reasons from performing its contractual obligations to deliver or receive [the relevant commodity]," not to serve as "a financial settlement 'option' analogous to a financial settlement option in a trading instrument." *Id.*

[400] *See* AGA Letter.

[401] *Id. See also* Atmos Letter (stating that there is no financial incentive for a seller to fail to deliver natural gas under contracts used in the natural gas industry, as the standard remedy for such a failure to deliver is to pay liquidated damages sufficient to

compensate the purchaser for having to obtain its required natural gas).

[402] The discussion above regarding the exclusion from the swap definition for forward contracts on nonfinancial commodities does not apply to the exclusion from the swap and security-based swap definitions for security forwards or to the distinction between security forwards and security futures products.

[403] *See* Proposing Release at 29830.

[404] *See* sections 1a(47)(B)(ii), (v), and (vi) of the CEA, 7 U.S.C. 1a(47)(B)(ii), (v), and (vi).

[405] *See* section 1a(47)(B)(v) of the CEA, 7 U.S.C. 1a(47)(B)(v) (excluding from the swap and security-based swap definitions "any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to [the Securities Act and Exchange Act]"); and section 1a(47)(B)(vi) of the CEA, 7 U.S.C. 1a(47)(B)(vi) (excluding from the swap and security-based swap definitions "any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to [the Securities Act and Exchange Act], unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction").

[406] *See* section 1a(47)(B)(ii) of the CEA, 7 U.S.C. 1a(47)(B)(ii).

[407] The Commissions note that calling an agreement, contract, or transaction a swap or security-based swap does not determine its status. *See supra* part II.D.1.

excluded from the swap and security-based swap definitions. The sale of the security in this case occurs at the time the forward contract is entered into with the performance of the contract deferred or delayed.[408] If such agreement, contract, or transaction is intended to be physically settled, the Commissions believe it would be within the security forward exclusion and therefore outside the swap and security-based swap definitions.[409] Moreover, as a purchase or sale of a security, the Commissions believe it also would be within the exclusions for the purchase or sale of one or more securities on a fixed basis (or, depending on its terms, a contingent basis) and, therefore, outside the swap and security-based swap definitions.[410]

In the Proposing Release, the Commissions provided the following specific interpretation in the context of forward sales of mortgage-backed securities ("MBS") guaranteed or sold by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae").[411] The Commissions are restating their interpretation regarding such forward sales.

MBS guaranteed or sold by Fannie Mae, Freddie Mac and Ginnie Mae are eligible to be sold in the "To-Be-Announced" ("TBA") market, which is essentially a forward or delayed delivery market.[412] The TBA market has been described as one that "allows mortgage lenders essentially to sell the loans they intend to fund even before the loans are closed." [413] In the TBA market, the lender enters into a forward contract to sell MBS and agrees to deliver MBS on the settlement date in the future. The specific MBS that will be delivered in the future may not yet be created at the time the forward contract is entered into.[414] In a TBA transaction, the seller and the buyer agree to five terms before entering into the transaction: (i) The type of security, which will usually be a certain type of MBS guaranteed or sold by Fannie Mae, Freddie Mac or Ginnie Mae and the type of mortgage underlying the MBS; (ii) the coupon or interest rate; (iii) the face value (the total dollar amount of MBS the purchaser wishes to purchase); (iv) the price; and (v) the settlement date.[415] The purchaser will contract to acquire a specified dollar amount of MBS, which may be satisfied when the seller delivers one or more MBS pools at settlement.[416]

The Commissions are confirming that such forward sales of MBS in the TBA market would fall within the exclusion for sales of securities on a deferred settlement or delivery basis even though the precise MBS are not in existence at the time the forward MBS sale is entered into.[417] Moreover, as the purchase or sale of a security, the Commissions also are confirming that such forward sales of MBS in the TBA market would fall within the exclusions for the purchase or sale of one or more securities on a fixed basis (or, depending on its terms, a contingent basis) and therefore would fall outside the swap and security-based swap definitions.[418]

Comments

The Commissions received two comments on the interpretation regarding security forwards. One commenter recommended that the Commissions codify in the text of the final rules the interpretation regarding forward sales of MBS in the TBA market.[419] The Commissions are not codifying the interpretation because codification will create a bright-line test. The Commissions note that the analysis as to whether any product falls within the exclusion for sales of securities on a deferred settlement or delivery basis requires flexibility, including the consideration of applicable facts and circumstances. Because the interpretation regarding forward sales of MBS in the TBA market is based on particular facts and circumstances, the Commissions do not believe that a bright-line test is appropriate.

Another commenter suggested that the Commissions narrow the exclusion for contracts for the purchase and sale of securities for subsequent delivery as applied to security-based swaps because parties can use the formal characterization of a delivery contract for securities to disguise a transaction that is substantively a security-based swap.[420] This commenter was concerned because this commenter believes that the securities subject to such a delivery obligation are often easily convertible into cash, which facilitates cash settlement without actual delivery.[421] As such, this commenter suggested that the Commissions should provide a test for determining whether parties have a bona fide intent to deliver.[422] This commenter recommended that such test should prohibit cash settlement options in contracts for subsequent delivery and should not consider a party that frequently unwinds physical positions with cash settlements using side agreements as having the requisite intent to deliver.[423] The Commissions are not providing a test at this time for determining whether parties have a bona fide intent to deliver because the analysis as to whether sales of securities for deferred shipment or delivery are intended to be physically delivered is a facts and circumstances determination and a bright-line test will not allow for the flexibility needed in such analysis. Further, the Commissions note that the purchase and sale of a security occurs at the time the forward contract is entered into.[424]

---

[408] A purchase or sale of a security occurs at the time the parties become contractually bound, not at the time of settlement (regardless of whether cash or physically settled). *See Securities Offering Reform,* 70 FR 44722 (Aug. 3, 2005).

[409] *See* section 1a(47)(B)(ii) of the CEA, 7 U.S.C. 1a(47)(B)(ii).

[410] *See* sections 1a(47)(B)(v) and (vi) of the CEA, 7 U.S.C. 1a(47)(B)(v) and (vi).

[411] The Commissions provided the interpretation in the Proposing Release in response to commenters on the ANPR. *See* Proposing Release at 29830. These commenters requested clarification that forward sales of MBS guaranteed or sold by Fannie Mae, Freddie Mac and Ginnie Mae would not be included in the swap and security-based swap definitions in order to provide the certainty needed to avoid unnecessary disruption of this market. *Id.*

[412] Task Force on Mortgage-Backed Securities Disclosure, "Staff Report: Enhancing Disclosure in the Mortgage-Backed Securities Markets," part II.E.2 (Jan. 2003), which is available at *http://www.sec.gov/news/studies/mortgagebacked.htm* ("MBS Staff Report").

[413] *Id.*

[414] *Id.*

[415] *Id.*

[416] *Id.* The good delivery guidelines, titled "Uniform Practices for the Clearance and Settlement of Mortgage-Backed Securities and Other Related Securities," which govern the mechanics of trading and settling MBS, contain specific guidelines for trading and settling MBS guaranteed or sold by Fannie Mae, Freddie Mac and Ginnie Mae in the TBA market. The good delivery guidelines outline the basic terms and conditions for trading, confirming, delivering and settling MBS. The good delivery guidelines set forth the basic characteristics that MBS guaranteed or sold by Fannie Mae, Freddie Mac and Ginnie Mae must have to be able to be delivered to settle an open TBA transaction. *Id.* The Securities Industry and Financial Markets Association ("SIFMA") is the successor to the Bond Market Association and publishes the good delivery guidelines, which are available at *http://www.sifma.org/services/standard-forms-and-documentation/securitized-products/.*

[417] *See* section 1a(47)(B)(ii) of the CEA, 7 U.S.C. 1a(47)(B)(ii).

[418] *See* sections 1a(47)(B)(v) and (vi) of the CEA, 7 U.S.C. 1a(47)(B)(v) and (vi).

[419] *See* Letter from Lisa M. Ledbetter, Vice President and General Counsel, Legislative & Regulatory Affairs, Freddie Mac, Jul. 21, 2011.

[420] *See* Better Markets Letter.

[421] *Id.*

[422] *Id.*

[423] *Id.*

[424] *See supra* note 408.

3. Consumer and Commercial Agreements, Contracts, and Transactions

The Commissions noted in the Proposing Release that "[c]onsumers enter into various types of agreements, contracts, and transactions as part of their household and personal lives that may have attributes that could be viewed as falling within the swap or security-based swap definition.[425] Similarly, businesses and other entities, whether or not for profit, also enter into agreements, contracts, and transactions as part of their operations relating to, among other things, acquisitions or sales of property (tangible and intangible), provisions of services, employment of individuals, and other matters that could be viewed as falling within the definitions." [426]

Commenters on the ANPR pointed out a number of areas in which a broad reading of the swap and security-based swap definitions could cover certain consumer and commercial arrangements that historically have not been considered swaps or security-based swaps.[427] Examples of such instruments cited by those commenters included evidences of indebtedness with a variable rate of interest; commercial contracts containing acceleration, escalation, or indexation clauses; agreements to acquire personal property or real property, or to obtain mortgages; employment, lease, and service agreements, including those that contain contingent payment arrangements; and consumer mortgage and utility rate caps.[428]

The Commissions also stated in the Proposing Release that they "do not believe that Congress intended to include these types of customary consumer and commercial agreements, contracts, or transactions in the swap or security-based swap definition, to limit the types of persons that can enter into or engage in them, or to otherwise to subject these agreements, contracts, or transactions to the regulatory scheme for swaps and security-based swaps." [429]

Accordingly, the Commissions proposed an interpretation in the Proposing Release to assist consumers and commercial and non-profit entities in understanding whether certain agreements, contracts, or transactions that they enter into would be regulated as swaps or security-based swaps.[430] The Commissions are adopting the interpretation set out in the Proposing Release with certain modifications in response to commenters.[431]

With respect to consumers, the Commissions have determined that the types of agreements, contracts, or transactions that will not be considered swaps or security-based swaps when entered into by consumers (natural persons) as principals (or by their agents)[432] primarily for personal, family, or household purposes, include:[433]

• Agreements, contracts, or transactions to acquire or lease real or personal property, to obtain a mortgage, to provide personal services, or to sell or assign rights owned by such consumer (such as intellectual property rights);

• Agreements, contracts, or transactions to purchase products or services for personal, family or household purposes at a fixed price or a capped or collared price, at a future date or over a certain time period (such as agreements to purchase for personal use or consumption nonfinancial energy commodities, including agreements to purchase home heating fuel or agreements involving residential fuel storage, in either case, where the consumer takes delivery of and uses the fuel, and the counterparty is a merchant that delivers in the service area where the consumer resides);[434]

• Agreements, contracts, or transactions that provide for an interest rate cap or lock on a consumer loan or mortgage, where the benefit of the rate cap or lock is realized only if the loan or mortgage is made to the consumer;

• Consumer loans or mortgages with variable rates of interest or embedded interest rate options, including such loans with provisions for the rates to change upon certain events related to the consumer, such as a higher rate of interest following a default;[435]

• Service agreements, contracts, or transactions that are consumer product warranties, extended service plans, or buyer protection plans, such as those purchased with major appliances and electronics;[436]

• Consumer options to acquire, lease, or sell real or personal property, such as options to lease apartments or purchase rugs and paintings, and purchases made through consumer layaway plans;[437]

• Consumer agreements, contracts, or transactions where, by law or regulation, the consumer may cancel the transaction without legal cause;[438] and

[425] *See* Proposing Release at 29832.

[426] *Id.*

[427] *Id.*

[428] *Id.*

[429] *Id.* If these types of arrangements were subject to Title VII, the persons that could enter into or engage in them could be restricted because Title VII imposes restrictions on entering into swaps and security-based swaps with persons who are not eligible contract participants ("ECPs"). *See* sections 723(1), 763(e), and 768(b) of the Dodd-Frank Act. The Dodd-Frank Act amended the Securities Act and the Exchange Act to require that security-based swap transactions involving a person that is not an ECP must be registered under the Securities Act and effected on a national securities exchange, and also amended the CEA to require that swap transactions

involving a person that is not an ECP must be entered into on, or subject to the rules of, a board of trade designated as a contract market. *Id.* The Commissions note that many consumers and commercial and non-profit entities may not be ECPs. *See* section 1a(18) of the CEA, 7 U.S.C. 1a(18). Further, if these types of agreements were subject to Title VII, they would be subject to the full regulatory scheme for swaps and security-based swaps created by Title VII. These requirements could increase costs for consumers and commercial and non-profit entities and potentially disrupt their ability to enter into these arrangements.

[430] *See* Proposing Release at 29832–33.

[431] *See infra* note 447 and accompanying text.

[432] For example, a mortgage broker may arrange a rate lock on behalf of a consumer borrower.

[433] The Commissions are not addressing here the applicability of any other provisions of the CEA, the Federal securities laws or the Commissions' regulations to such agreements, contracts or transactions.

[434] These agreements, contracts, or transactions require the parties respectively to make and take delivery of the underlying commodity to each other directly; delivery may be deferred for convenience or necessity. *But see* section 2(c)(2)(D) of the CEA, 7 U.S.C. 2(c)(2)(D), generally prohibiting certain leveraged, margined or financed agreements,

contracts and transactions with non-ECPs when actual delivery does not occur within 28 days). The Commissions view consumer agreements, contracts, and transactions involving periodic or future purchases of consumer products and services as transactions that are not swaps. This interpretation does not extend to consumer agreements, contracts or transactions containing embedded optionality or embedded derivatives other than those discussed in the text associated with this footnote. This analysis of consumer contracts is separate from the forward contract analysis for commercial merchandising transactions discussed in *supra* part II.B.2. The CFTC continues to view the forward contract exclusion for nonfinancial commodities as limited to commercial merchandising transactions.

[435] An example of a consumer loan with a variable rate of interest is credit card debt that includes a "teaser" rate. The teaser rate is a low, adjustable introductory interest rate that is temporary.

[436] One commenter indicated that such service agreements, contracts, or transactions may be regulated as insurance in some but not all states. However, the Commissions believe that it is appropriate to address these agreements, contracts, or transactions in the context of their guidance regarding consumer and commercial arrangements. *See* NAIC Letter.

[437] The Commissions believe that options entered into by consumers that result in physical delivery of the commodity, if exercised, are not the type of agreements, contracts or transactions that Congress intended to regulate as swaps or security-based swaps. Conversely, options entered into by consumers that cash settle based on the difference between the market price and the contract price of a commodity are not within the scope of this interpretation.

[438] Examples of these types of transactions include consumer transactions that may be cancelled pursuant to the Federal Reserve Board's Regulation Z, 12 CFR Part 226 (*i.e.* certain consumer credit transactions that involve a lien on the consumer's principal dwelling), consumer mail/telephone orders that may be cancelled when orders have not been filled under 16 CFR Part 435, and other consumer transactions that have cancellations rights conferred by statute or regulation.

• Consumer guarantees of credit card debt, automobile loans, and mortgages of a friend or relative.

The Commissions have included in the interpretation above several additional examples of consumer arrangements that the Commissions do not consider to be swaps or security-based swaps. These additional examples have been included in response to commenters [439] and the Commissions' determination that such additional examples would assist consumers in identifying other agreements, contracts, or transactions that they enter into that would not be regulated as swaps or security-based swaps.[440]

The types of commercial agreements, contracts, or transactions that involve customary business arrangements (whether or not involving a for-profit entity) and will not be considered swaps or security-based swaps under this interpretation include:

• Employment contracts and retirement benefit arrangements;

• Sales, servicing, or distribution arrangements;

• Agreements, contracts, or transactions for the purpose of effecting a business combination transaction;[441]

• The purchase, sale, lease, or transfer of real property, intellectual property, equipment, or inventory;

• Warehouse lending arrangements in connection with building an inventory of assets in anticipation of a securitization of such assets (such as in a securitization of mortgages, student loans, or receivables;[442]

[439] See supra note 96 and accompanying text. See also infra notes 436, 454 and 455 and accompanying text.

[440] The additional example regarding consumer options to acquire, lease, or sell real or personal property was added in response to a commenter on the ANPR. See Letter from White & Case LLP, dated September 20, 2010. The Commissions also are providing as additional examples consumer agreements, contracts, or transactions where, by law or regulation, the consumer may cancel the transaction without legal cause, and consumer guarantees of credit card debt, automobile loans, and mortgages of a friend or relative.

[441] These business combination transactions include, for example, a reclassification, merger, consolidation, or transfer of assets as defined under the Federal securities laws or any tender offer subject to section 13(e) and/or section 14(d) or (e) of the Exchange Act, 15 U.S.C. 78m(e) and/or 78n(d) or (e). These business combination agreements, contracts, or transactions can be contingent on the continued validity of representations and warranties and can contain earn-out provisions and contingent value rights.

[442] The Commissions believe that such lending arrangements included in this category are traditional borrower/lender arrangements documented using, for example, a loan agreement or indenture, as opposed to a synthetic lending arrangement documented in the form of, for example, a total return swap. The Commissions also note that securitization transaction agreements also may contain contingent obligations if the

• Mortgage or mortgage purchase commitments, or sales of installment loan agreements or contracts or receivables;

• Fixed or variable interest rate commercial loans or mortgages entered into by banks [443] and non-banks, including the following:

• Fixed or variable interest rate commercial loans or mortgages entered into by the Farm Credit System institutions and Federal Home Loan Banks;

• Fixed or variable interest rate commercial loans or mortgages with embedded interest rate locks, caps, or floors, provided that such embedded interest rate locks, caps, or floors are included for the sole purpose of providing a lock, cap, or floor on the interest rate on such loan or mortgage and do not include additional provisions that would provide exposure to enhanced or inverse performance, or other risks unrelated to the interest rate risk being addressed;

• Fixed or variable interest rate commercial loans or mortgages with embedded interest rate options, including such loans or mortgages that contain provisions causing the interest rate to change upon certain events related to the borrower, such as a higher rate of interest following a default, provided that such embedded interest rate options do not include additional provisions that would provide exposure to enhanced or inverse performance, or other risks unrelated to the primary reason the embedded interest rate option is included; and

• Commercial agreements, contracts, and transactions (including, but not limited to, leases, service contracts, and employment agreements) containing escalation clauses linked to an underlying commodity such as an interest rate or consumer price index.

In response to commenters,[444] the Commissions have included in the interpretation above several additional examples of commercial arrangements

representations and warranties about the underlying assets are not satisfied.

[443] While the Commissions have included fixed or variable interest rate commercial loans entered into by banks, the Commissions understand that the CEA does not apply to, and the CFTC may not exercise regulatory authority over, identified banking products, and that the definitions of the terms "security-based swap" and "security-based swap agreement" do not include identified banking products. See infra note 488, regarding identified banking products. However, such loans and mortgages provided by certain banks may not qualify as identified banking products because those banks may not satisfy the definition of "bank" for purposes of the "identified banking products" definition. See 7 U.S.C. 27(a).

[444] See infra notes 456 and 461 and accompanying text.

that the Commissions do not consider to be swaps or security-based swaps.

The Commissions intend for this interpretation to enable consumers to engage in transactions relating to their households and personal or family activities without concern that such arrangements would be considered swaps or security-based swaps. Similarly, with respect to commercial business arrangements, this interpretation should allow commercial and non-profit entities to continue to operate their businesses and operations without significant disruption and provide that the swap and security-based swap definitions are not read to include commercial and non-profit operations that historically have not been considered to involve swaps or security-based swaps.

The types of agreements, contracts, and transactions discussed above are not intended to be exhaustive of the customary consumer or commercial arrangements that should not be considered to be swaps or security-based swaps. There may be other, similar types of agreements, contracts, and transactions that also should not be considered to be swaps or security-based swaps. In determining whether similar types of agreements, contracts, and transactions entered into by consumers or commercial entities are swaps or security-based swaps, the Commissions intend to consider the characteristics and factors that are common to the consumer and commercial transactions listed above:

• They do not contain payment obligations, whether or not contingent, that are severable from the agreement, contract, or transaction;

• They are not traded on an organized market or over-the-counter; and

• In the case of consumer arrangements, they:

—Involve an asset of which the consumer is the owner or beneficiary, or that the consumer is purchasing, or they involve a service provided, or to be provided, by or to the consumer, or

• In the case of commercial arrangements, they are entered into:

—By commercial or non-profit entities as principals (or by their agents) to serve an independent commercial, business, or non-profit purpose, and

—Other than for speculative, hedging, or investment purposes.

Two of the key components reflected in these characteristics that distinguish these agreements, contracts, and transactions from swaps and security-based swaps are that: (i) The payment provisions of the agreement, contract, or transaction are not severable; and (ii)

the agreement, contract, or transaction is not traded on an organized market or over-the-counter, and therefore such agreement, contract, or transaction does not involve risk-shifting arrangements with financial entities, as would be the case for swaps and security-based swaps.[445] In response to commenters,[446] the Commissions clarify that merely because an agreement, contract, or transaction is assignable does not mean that it is "traded" or that the agreement, contract, or transaction is a swap or security-based swap. An assignment of a contractual obligation must be analyzed to assure that the result is not to sever the payment obligations.

This interpretation is not intended to be the exclusive means for consumers and commercial or non-profit entities to determine whether their agreements, contracts, or transactions fall within the swap or security-based swap definition. If there is a type of agreement, contract, or transaction that is not enumerated above, or does not have all the characteristics and factors that are listed above (including new types of agreements, contracts, or transactions that may be developed in the future), the agreement, contract, or transaction will be evaluated based on its particular facts and circumstances. Parties to such an agreement, contract or transaction may also seek an interpretation from the Commissions as to whether the agreement, contract or transaction is a swap or security-based swap.

Comments

Eleven commenters provided comments on the proposed interpretation set forth in the Proposing Release regarding consumer and commercial arrangements.[447] While

most commenters supported the proposed interpretation, these commenters suggested certain changes.

Four commenters recommended that the Commissions codify the proposed interpretation regarding consumer and commercial arrangements.[448] The Commissions are not codifying the interpretation. The interpretation is intended to provide guidance to assist consumers and commercial and non-profit entities in evaluating whether certain arrangements that they enter into will be regulated as swaps or security-based swaps. The interpretation is intended to allow the flexibility necessary, including the consideration of the applicable facts and circumstances by the Commissions, in evaluating consumer and commercial arrangements to ascertain whether they may be swaps or security-based swaps. The representative characteristics and factors taken together are indicators that a consumer or commercial arrangement is not a swap or security-based swap and the Commissions have provided specific examples demonstrating how these characteristics and factors apply to some common types of consumer and commercial arrangements. However, as the interpretation is not intended to be a bright-line test for determining whether a particular consumer or commercial arrangement is a swap or security-based swap, if the particular arrangement does not meet all of the identified characteristics and factors, the arrangement will be evaluated based on its particular facts and circumstances.

One commenter was concerned that the interpretation itself implicitly suggests that many types of consumer and commercial arrangements could be swaps, although none of these arrangements historically has been considered a swap.[449] The Commissions do not intend to suggest that many types of consumer and commercial arrangements that historically have not been considered swaps are within the swap or security-based swap definitions. The Commissions provided the interpretation in response to comments received on the ANPR. Commenters on the ANPR identified areas in which a broad reading of the swap and security-based swap definitions could cover certain consumer and commercial arrangements that historically have not been considered swaps or security-based

swaps.[450] The Commissions believe it is appropriate to provide the interpretation to allow consumers and commercial and non-profit entities to engage in such transactions without concern that such arrangements would be considered swaps or security-based swaps.

One commenter requested that the Commissions remove the term "customary" from the description of consumer and commercial arrangements in the interpretation.[451] The Commissions note that the use of the term "customary" was not intended to limit the interpretation, but rather was used to describe certain types of arrangements that consumers and businesses may normally or generally enter into. The Commissions also note that the term "customary" is itself not a separate representative characteristic or factor for purposes of the interpretation.

This commenter also requested that specific examples of consumer and commercial arrangements that are not swaps or security-based swaps include "any other similar agreements, contracts, or transactions."[452] The specific examples are not intended to be an exhaustive list and the Commissions do not believe that it is necessary to include a general catchall provision. The interpretation also includes a list of representative characteristics and factors to be used to analyze other consumer and commercial arrangements.

Several commenters suggested additional examples of consumer and commercial arrangements that the Commissions should not consider to be swaps or security-based swaps.[453] One commenter suggested that the Commissions should expand the example of "consumer agreements, contracts, or transactions to purchase products or services at a fixed price or a capped or collared price, at a future date or over a certain time period (such as agreements to purchase home heating fuel)" to include all nonfinancial energy commodities in the parenthetical example.[454] The Commissions have modified the identified consumer example to include all nonfinancial energy commodities. The parenthetical example was not intended to be limited to agreements to purchase home heating fuel.

One commenter suggested that the Commissions should include as an

---

[445] There also are alternative regulatory regimes that have been enacted as part of the Dodd-Frank Act specifically to provide enhanced protections to consumers relating to various consumer transactions. *See, e.g.,* the Consumer Financial Protection Act of 2010, Public Law 111–203, tit. X, 124 Stat. 1376 (Jul. 21, 2010) (establishing the Bureau of Consumer Financial Protection to regulate a broad category of consumer products and amending certain laws under the jurisdiction of the Federal Trade Commission); the Mortgage Reform and Anti-Predatory Lending Act, Public Law 111–203, tit. XIV, 124 Stat. 1376 (Jul. 21, 2010) (amending existing laws, and adding new provisions, related to certain mortgages). Some of these agreements, contracts, or transactions are subject to regulation by the Federal Trade Commission and state regulators.

[446] *See infra* note 470.

[447] *See* BGA Letter; Letter from The Coalition for Derivatives End-Users, Jul. 22, 2011, ("CDEU Letter"); ETA Letter; Letter from Robbie Boone, Vice President, Government Affairs, Farm Credit Council, Jul. 22, 2011 ("FCC Letter"); FERC Staff Letter; Letter from Warren N. Davis, Of Counsel, Sutherland Asbill & Brennan LLP, on behalf of the Federal Home Loan Banks, Jul. 22, 2011 ("FHLB

Letter"); IECA Letter; ISDA Letter; Just Energy Letter; PMAA/NEFI Letter; and SEIA Letter.

[448] *See* ETA Letter; FERC Letter, IECA Letter; and Just Energy Letter.

[449] *See* IECA Letter.

[450] *See* Proposing Release at 29832.

[451] *See* ISDA Letter.

[452] *Id.*

[453] *See* CDEU Letter; FCC Letter; FERC Letter; FHLB Letter; ISDA Letter; Just Energy Letter; PMAA/NEFI Letter; and SEIA Letter.

[454] *See* Just Energy Letter.

additional example residential fuel storage contracts.[455] The Commissions agree that these arrangements should not be considered swaps or security-based swaps, provided that they are residential fuel storage contracts where the consumer takes delivery of and consumes the fuel, and the counterparty is a merchant (or agent of a merchant) that delivers in the service area where the consumer's residence is located. Although the consumer may not immediately consume the fuel contracted for, because it will ultimately consume the fuel for personal, family, or household purposes, such a transaction is a type of customary consumer transaction excluded from the swap and security-based swap definitions.

Three commenters requested clarification that commercial loans and mortgages would fall within the interpretation regardless of whether entered into by a bank or non-bank.[456] Two of these commenters were concerned that the specific example was limited to commercial loans and mortgages entered into by non-banks and did not address commercial loans and mortgages entered into by financial institutions that are banks but whose loans and mortgages do not qualify as identified banking products.[457] The Commissions are revising the example to clarify that it includes fixed or variable interest rate commercial loans or mortgages entered into by both banks and non-banks, including such loans and mortgages entered into by the Farm Credit System institutions and Federal Home Loan Banks. The Commissions understand that the CEA does not apply to, and the CFTC may not exercise regulatory authority over, and the definitions of the terms "security-based swap" and "security-based swap agreement" do not include, any fixed or variable interest rate commercial loan or mortgage entered into by a bank that is an identified banking product.[458] However, loans and mortgages provided by certain banks may not qualify as identified banking products because those banks do not satisfy the definition of "bank" for purposes of the "identified banking products" definition.[459] According to commenters,[460] while this definition of "bank" includes certain depository institutions, certain foreign banks, credit unions, institutions regulated by the Federal Reserve and trust companies, it does not include certain other financial institutions that provide commercial loans or mortgages, such as government-sponsored enterprises (including the Federal Home Loan Banks) and certain cooperatives (including the Farm Credit System institutions).

Three commenters suggested that the Commissions should include as additional examples commercial rate lock agreements and commercial loans with interest rate caps, floors, or options.[461] The Commissions agree that these arrangements should not be considered swaps or security-based swaps, provided that the interest rate locks, caps, or floors, or interest rate options are embedded in the commercial loans or mortgages and not entered into separately from the commercial loans and mortgages, and are including these arrangements as examples in the interpretation. However, the Commissions are limiting the interpretation to embedded interest rate locks, caps, or floors, and interest rate options because interest rate locks, caps, or floors, or interest rate options that are entered into separately from the commercial loans and mortgages fall within the swap definition.[462] In order to further distinguish these arrangements from swaps and security-based swaps, the interpretation provides the following: (i) The embedded interest rate lock, cap, or floor must be included for the sole purpose of providing a lock, cap, or floor on the interest rate on such loan or mortgage and may not include additional provisions that would provide exposure to enhanced or inverse performance, or other risks unrelated to the interest rate risk being addressed, and (ii) the embedded interest rate option may not include additional provisions that would provide exposure to leverage, inverse performance, or other risks unrelated to the primary reason the embedded interest rate option is included in the commercial loan or mortgage.

Four commenters suggested additional examples of commercial arrangements that relate to nonfinancial energy commodities.[463] These arrangements are more appropriately addressed in the context of the forward contract exclusion for nonfinancial commodities [464] or the trade option exemption.[465]

One commenter supported the representative characteristics and factors the Commissions set forth to distinguish consumer and commercial arrangements from swaps and security-based swaps.[466] Two commenters were concerned with certain of these characteristics and factors because these commenters believed that such characteristics and factors are common in a wide variety of consumer and commercial arrangements.[467] Both commenters suggested that the Commissions remove "for other than speculative, hedging or investment purposes" from the interpretation because many of the types of transactions listed as examples may be undertaken for speculative, hedging or investment purposes and because all commercial merchandising transactions are "risk-shifting" of commercial obligations and risks, and "hedge" the enterprise's commercial risks.[468] The Commissions are not revising the interpretation to remove or otherwise modify this representative characteristic and factor. The Commissions believe that commercial arrangements undertaken for speculative, hedging or investment purposes may be a swap or a security-based swap depending on the particular facts and circumstances of the arrangement.

---

[455] *See* PMAA/NEFI Letter.

[456] *See* CDEU Letter; FCC Letter; and FHLB Letter.

[457] *See* FCC Letter and FHLB Letter.

[458] *See infra* note 488, regarding identified banking products.

[459] *See* 7 U.S.C. 27(a). *See also* FCC Letter and FHLB Letter.

[460] *See supra* note 457.

[461] *See* CDEU Letter; FCC Letter; and FHLB Letter. These commenters indicated that such arrangements are similar to the arrangements included in the list of examples of consumer arrangements that the Commissions would not consider to be swaps or security-based swaps.

[462] *See* section 1a(47)(A)(i) of the CEA, 7 U.S.C. 1a(47)(A)(i). Similarly, with respect to consumer agreements, contracts and transactions providing for an interest rate cap or an interest rate lock on a consumer loan or mortgage, the Commissions are limiting this example to interest rate caps and interest rate locks entered into in connection with the consumer loan or mortgage and prior to closing on the loan or mortgage. For this purpose, both because obtaining a consumer loan or mortgage can involve a great deal of documentation, which can be entered into at different times during the process, and because consumers may have some flexibility as to their deadline for deciding when to include or exclude an interest rate cap or lock in their consumer loans or mortgages, the Commissions will consider an interest rate cap or lock to be entered into in connection with a consumer loan or mortgage if it is included in the final terms of the loan at closing.

[463] *See* BGA Letter (commercial physical transactions in the natural gas and electric power markets should also fall under the category of exemptions from the swap definition); FERC Letter (commercial transactions executed or traded on RTOs/ISOs should be included in the interpretation); Just Energy Letter (commercial arrangements to purchase products or services at a fixed price or a capped or collared price, at a future date or over a certain time period); and PMAA/NEFI Letter (petroleum fuel and gas storage contracts between bona fide commercial market participants or entities other than financial entities).

[464] *See supra* part II.B.2. The Commissions note that they provided the interpretation regarding consumer arrangements because the CFTC in the past has not interpreted the forward contract exclusion for nonfinancial commodities to apply to consumer arrangements. *See supra* note 434.

[465] *See supra* note 317 and accompanying text.

[466] *See* FCC Letter.

[467] *See* ETA Letter and ISDA Letter.

[468] *Id.*

One of these commenters also suggested the Commissions remove "do not contain payment obligations that are severable" from the interpretation because assignment of rights and delegation of obligations are common in a wide variety of consumer and commercial transactions.[469] The Commissions are not revising the interpretation to remove or otherwise modify this representative characteristic and factor. The Commissions believe that the severability of payment obligations could be indicative of a consumer or commercial arrangement that may be a swap or a security-based swap depending on the particular facts and circumstances of the arrangement because the severability of payment obligations could be indicative of an instrument that is merely an exchange of payments, such as is the case with swaps and security-based swaps.

One of these commenters also suggested that the Commissions remove "not traded on an organized market or over the counter" from the interpretation because many of the types of contracts listed as examples are assignable and frequently assigned or traded.[470] The other commenter did not suggest removing this factor, but requested that the factor be modified to provide that the arrangement is not traded on a "registered entity" in order not to include transactions on organized wholesale electricity markets.[471] The Commissions are not revising the interpretation to remove or otherwise modify this representative characteristic and factor. The Commissions believe that the trading of an instrument on an organized market or over the counter could be indicative of a consumer or commercial arrangement that may be a swap or a security-based swap depending on the particular facts and circumstances of the arrangement. However, as noted above, the Commissions are clarifying that merely because an arrangement is assignable does not mean that it is "traded" or that the arrangement is a swap or a security-based swap. An assignment of a contractual obligation must be analyzed to assure that the result is not to sever the payment obligations.

Further, as noted above, the representative characteristics and factors are not intended to be a bright-line test for determining whether a particular consumer or commercial arrangement is a swap or a security-based swap. These representative characteristics and factors taken

together are indicators that a consumer or commercial arrangement is not a swap or security-based swap. These representative characteristics and factors also do not imply or presume that a consumer or commercial arrangement that does not meet all of these characteristics and factors is a swap or security-based swap. As noted above, if a particular arrangement does not meet all of these characteristics and factors, the parties will need to evaluate the arrangement based on the particular facts and circumstances. Moreover, as noted above, if there is a type of consumer or commercial arrangement that does not meet all of these characteristics and factors, a party to the arrangement can seek an interpretation from the Commissions as to whether the arrangement is outside the scope of the swap and security-based swap definitions.

Residential Exchange Program

One commenter requested that the CFTC further define the term "swap" to exclude consumer benefits under the Pacific Northwest Electric Power Planning and Conservation Act of 1980 ("Northwest Power Act")[472] and transactions under the "Residential Exchange Program" ("REP").[473] According to this commenter, the REP was established by Congress "[t]o extend the benefits of low cost Federal System hydro power to residential and small farm electric power consumers throughout the Pacific Northwest Region."[474] Based on the commenter's

description, REP transactions do not appear to be among the types of transactions historically considered swaps or security-based swaps. Although the REP transactions described by the commenter share some features with spread options (e.g., they settle in cash based on the difference between two price sources),[475] in both swaps and security-based swaps, each party assumes market risk.[476] By contrast, neither party assumes or hedges risk in an REP transaction.[477] Instead, the Commissions view an REP transaction essentially as a subsidy provided to residential and small farm utility customers.[478] Accordingly, the Commissions do not consider the REP transactions described by the commenter to be swaps or security-based swaps.

Loan Participations

The Commissions provided an interpretation in the Proposing Release regarding the treatment of loan participations.[479] The Commissions are

---

[469] See ISDA Letter.

[470] Id.

[471] See ETA Letter.

[472] 16 U.S.C. Chapter 12H.

[473] Letter from Virginia K. Schaeffer, Attorney, Office of General Counsel, Bonneville Power Administration, Jul. 22, 2011 ("BPA Letter"). This commenter refers to the implementation of Section 5(c) of the Northwest Power Act, 16 U.S.C. 839c(c), as the "Residential Exchange Program." See Id.

[474] See BPA Letter. This commenter explained that, under the REP: "A Pacific Northwest electric utility has a right to * * * sell power to Bonneville at the utility's average system cost (ASC) of providing that power * * * Bonneville[] is required to purchase that power at the utility's ASC, and then sell an equivalent amount of power back to the utility at Bonneville's rates[,] which are based in substantial part on low cost Federal hydro power. As required by the Residential Exchange Statute, the amount of such power "exchanged" is based on the related utility's residential and small farm customer's power needs (also known as "loads") in the Pacific Northwest Region. Under this "exchange," no actual power is transferred to or from Bonneville. Instead, consistent with Congressional intent, the exchange transaction is implemented as an accounting device that avoids the costs and burdens associated with a physical exchange of power and that results in the payment of funds by Bonneville to the REP exchanging utilities. Reduced to the essentials, the Residential Exchange Statute as implemented in * * * REP contracts results in Bonneville making cash payments for the positive difference between the utility's ASC and Bonneville's lower rate multiplied by the qualifying residential and small farm loads.

And, as required under the Residential Exchange Statute, the entire monetary benefit Bonneville provides to the REP exchanging utilities is in turn passed through to the residential and small farm power consumers of that utility." Id.

[475] A spread option is "an option in which the payout is based on the difference in performance between two assets." Superderivatives, "Spread option in EQ" definition, available at http://www.sdgm.com/Support/Glossary.aspx?letter=S. See also S.J. Denga and S.S. Oren, Electricity derivatives and risk management, Science Direct at 945 (2006), available at http://www.ieor.berkeley.edu/~oren/pubs/Deng%20and%20Oren-86.pdf (defining a spark spread options as "cross-commodity options paying out the difference between the price of electricity sold by generators and the price of the fuels used to generate it"); Chicago Mercantile Exchange, Soybean-Corn Price Ratio Options Fact Card (describing its soybean-corn price ratio option contract as "an option on the ratio between the price of the referencing Soybean futures contract and the price of the referencing Corn futures contract * * *"), available at http://www.cmegroup.com/trading/agricultural/files/AC-440-Soybean-CornRatioOptionsFC.pdf.

[476] Even a hedging party assumes the risk that the market can move against its hedging position, causing the hedge to reduce the profit it otherwise would have made on an unhedged position.

[477] The fact that the Commissions are relying in part on this aspect of REP transactions to interpret such transactions to be neither swaps nor security-based swaps does not mean that market participants should conclude, in other contexts, that a lack of market risk removes an agreement, contract, or transaction from the swap and security-based swap definitions. The Commissions' conclusion as to REP transactions is based on the unique facts and circumstances presented by the commenter.

[478] See, e.g., Paul M. Murphy, Northwest Public Power Association, Background and Summary of the Residential Exchange Program Settlement Agreement, March 16, 2011, available at http://www.nwppa.org/cwt/external/wcpages/wcmedia/documents/background_and_summary_of_rep_settlement_agreement.pdf (characterizing the REP as "require[ing] BPA to subsidize the residential and small farm consumers of the higher cost utilities in the Pacific Northwest").

[479] See Proposing Release at 29834.

restating the interpretation set out in the Proposing Release with certain modifications in response to commenters.[480]

Loan participations arise when a lender transfers or offers a participation in the economic risks and benefits of all or a portion of a loan or commitment it has entered into with a borrower to another party as an alternative or precursor to assigning to such person the loan or commitment or an interest in the loan or commitment.[481] The Commissions understand that two types of loan participations exist in the market today,[482] LSTA-style participations[483] and LMA-style participations.[484] LSTA-style participations transfer a beneficial ownership interest in the underlying loan or commitment to the participant.[485] LMA-style participations do not transfer a beneficial ownership interest in the underlying loan or commitment to the participant, but rather create a debtor-creditor relationship between the grantor and the participant under which a future beneficial ownership interest is conveyed.[486]

Depending on the facts and circumstances, a loan participation may be a security under the Federal securities laws and, as such, the loan participation would be excluded from the swap definition as the purchase and sale of a security on a fixed or contingent basis.[487] In addition, depending on the facts and circumstances, a loan participation may be an identified banking product and, as such, would be excluded from CFTC jurisdiction and from the security-based swap and security-based swap agreement definitions.[488]

The Commissions believe it is important to provide further guidance as to the other circumstances in which certain loan participations would not fall within the swap and security-based swap definitions. Consistent with the proposal, the Commissions do not interpret the swap and security-based swap definitions to include loan participations that reflect an ownership interest in the underlying loan or commitment. The Commissions believe that for a loan participation to not be considered a swap or security-based swap, the loan participation must represent a current or future direct or indirect ownership interest in the loan or commitment that is the subject of the loan participation.

In evaluating whether the loan participation represents such an ownership interest, the Commissions believe the following characteristics should be present:

• The grantor of the loan participation is a lender under, or a participant or sub-participant in, the loan or commitment that is the subject of the loan participation.

• The aggregate participation in the loan or commitment that is the subject of the loan participation does not exceed the principal amount of such loan or commitment. Further, the loan participation does not grant, in the aggregate, to the participant in such loan participation a greater interest than the grantor holds in the loan or commitment that is the subject of the loan participation.

• The entire purchase price for the loan participation is paid in full when acquired and not financed. The Commissions believe a purchase price would not be paid in full if the grantor of the loan participation extends financing to the participant or if such participant levers its purchase, including by posting collateral to secure a future payment obligation.

• The loan participation provides the participant all of the economic benefit and risk of the whole or part of the loan or commitment that is the subject of the loan participation.

These characteristics, which were identified by commenters,[489] are intended to distinguish loan participations from swaps and security-based swaps based on loans. The first characteristic above addresses the ownership of the underlying loan or commitment. Swaps and security-based swaps may be created using a synthetic or derivative structure that does not require ownership of the underlying loan.[490] The second characteristic above addresses the ratio of the participation to the underlying loan or commitment. Swaps and security-based swaps based on loans may involve synthetic exposure to a loan that is a multiple of the principal amount.[491] The third characteristic above addresses leverage in the financing of a loan participation. Leverage could be indicative of an instrument that is merely an exchange of payments and not a transfer of the ownership of the underlying loan or commitment, such as may be the case with a swap or security-based swap.[492] The fourth characteristic above addresses the level of participation in the economic benefits and risks of the underlying loan or commitment. This characteristic is indicative of ownership when analyzed with the other characteristics, and, as noted above, swaps and security-based swaps may be created using a synthetic or derivative structure that does not require ownership of the underlying loan.

The Commissions agree with commenters that the loan participation does not have to be a "true participation," as the Commissions had stated in their interpretation in the Proposing Release,[493] in order for the loan participation to fall outside the swap and security-based swap definitions.[494] The Commissions note that the "true participation" analysis is used to determine whether a transaction has resulted in the underlying assets being legally isolated from a transferor's creditors for U.S. bankruptcy law

[480] See infra note 504 and accompanying text.

[481] See Loan Market Association, "Guide to Syndicated Loans," section 6.2.4 ("A [loan] participation * * * is made between the existing lender and the participant. This creates new contractual rights between the existing lender and the participant which mirror existing contractual rights between the existing lender and the borrower. However this is not an assignment of those existing rights and the existing lender remains in a direct contractual relationship with the borrower."), available at http://www.lma.eu.com/uploads/files/Introductory_Guides/Guide_to_Par_Syndicated_Loans.pdf.

[482] See Letter from R. Bram Smith, Executive Director, The Loan Syndications and Trading Association, Jan. 25, 2011 ("January LSTA Letter"); Letter from Elliot Ganz, General Counsel, The Loan Syndications and Trading Association, Mar. 1, 2011 ("March LSTA Letter"); and Letter from Clare Dawson, Managing Director, The Loan Market Association, Feb. 23, 2011. The Commissions understand that neither type of loan participation is a "synthetic" transaction. See March LSTA Letter. Both types of loan participations are merely transfers of cash loan positions and the ratio of underlying loan to participation is always one to one. Id.

[483] The LSTA is The Loan Syndications and Trading Association.

[484] The LMA is The Loan Market Association.

[485] See Letter from Clare Dawson, Managing Director, The LMA, Jul. 22, 2011 ("July LMA Letter").

[486] See Id. The participant may exercise an "elevation" right and request that the grantor use commercially reasonable efforts to cause the participant to become the legal owner, by assignment, of the underlying loan or commitment. Id.

[487] See sections 1a(47)(B)(v) and (vi) of the CEA, 7 U.S.C. 1a(47)(b)(v) and (vi), as amended by section 721(a)(21) of the Dodd-Frank Act (excluding purchases and sales of a security on a fixed or contingent basis, respectively from the swap definition).

[488] See section 403(a) of the Legal Certainty for Bank Products Act of 2000, 7 U.S.C. 27a(a), as amended by section 725(g)(2) of the Dodd-Frank Act (providing that, under certain circumstances, the CEA shall not apply to, and the CFTC shall not exercise regulatory authority over, identified banking products, and the definitions of the terms "security-based swap" and "security-based swap agreement" shall not include identified banking products).

[489] See infra note 504 and accompanying text. See also infra notes 490, 491, and 492 and accompanying text.

[490] See July LMA Letter.

[491] Id.

[492] Id.

[493] Proposing Release at 29834.

[494] See infra note 503 and accompanying text.

purposes.[495] This analysis is unrelated to and does not inform whether a loan participation is a swap or security-based swap. This analysis also may be subject to varying interpretations.[496] Further, the Commissions understand that this analysis could result in certain loan participations that reflect an ownership interest in the underlying loan or commitment being included in the swap and security-based swap definitions, which the Commissions do not intend.[497]

Rather, as noted above, the Commissions believe that the analysis as to whether a loan participation is outside the swap and security-based swap definitions should be based on whether the loan participation reflects an ownership interest in the underlying loan or commitment. The Commissions understand that the characteristics noted above are indicative, based on comments received,[498] of whether a loan participation represents such an ownership interest. Further, in response to commenters,[499] the Commissions are clarifying that the interpretation applies to loan participations that are entered into both with respect to outstanding loans and with respect to a lender's commitments to lend and fund letters of credit (e.g., under a revolving credit facility).

The Commissions believe that the interpretation will prevent disruption in the syndicated loan market for loan participations. Loan participations facilitate a lender's diversification of its portfolio holdings, provide a key component of the efficient settlement process, and enhance liquidity in the global syndicated loan market.[500] The interpretation will enable this market to continue operating as it did prior to the enactment of Title VII.

Comments

Commenters supported the interpretation that certain loan participations should not be included in the swap and security-based swaps definitions.[501] Commenters agreed with the proposal that a loan participation should represent a current and future

direct or indirect ownership interest in the loan or commitment that is the subject of the loan participation.[502] However, commenters disagreed with the proposal that a loan participation should be required to be a "true participation" in order for the loan participation to fall outside the swap and security-based swap definitions because LMA-style participations do not represent a beneficial ownership in the underlying loan or commitment such that they would be considered a true participation.[503] Commenters requested that the Commissions remove this factor and instead recognize additional factors.[504] The Commissions agree that a loan participation does not have to be a true participation in order for the loan participation to fall outside the swap and security-based swap definitions and

are revising the interpretation as noted above.

One commenter also indicated that loan participations are entered into both with respect to outstanding loans and with respect to a lender's commitments to lend and fund letters of credit (e.g., under a revolving credit facility).[505] This commenter requested that the Commissions revise the proposed interpretation to reflect both outstanding loans and a lender's commitments.[506] The Commissions agree and are revising the interpretation to reflect both outstanding loans and loan commitments as noted above.

*C. Final Rules and Interpretations Regarding Certain Transactions Within the Scope of the Definitions of the Terms "Swap" and "Security-Based Swap"*

1. In General

In light of provisions in the Dodd-Frank Act that specifically address certain foreign exchange products, the Commissions in the Proposing Release proposed rules to clarify the status of products such as foreign exchange forwards, foreign exchange swaps, foreign exchange options, non-deliverable forwards involving foreign exchange ("NDFs"), and cross-currency swaps. The Commissions also proposed a rule to clarify the status of forward rate agreements and provided interpretations regarding: (i) Combinations and permutations of, or options on, swaps or security-based swaps; and (ii) contracts for differences ("CFDs").

The Commissions are adopting the rules as proposed without modification and are restating the interpretations provided in the Proposing Release without modification. In addition, the Commissions are providing additional interpretations regarding foreign exchange spot transactions and retail foreign currency options.

As adopted, rule 1.3(xxx)(2) under the CEA and rule 3a69–2 under the Exchange Act explicitly define the term "swap" to include certain foreign exchange-related products and forward rate agreements unless such products are excluded by the statutory exclusions in subparagraph (B) of the swap definition.[507] In adopting these rules, the Commissions do not mean to suggest that the list of agreements, contracts, and transactions set forth in rule 1.3(xxx)(2) under the CEA and rule

---

[495] *Id.*

[496] *Id.*

[497] *Id.*

[498] *See supra* note 482. *See infra* note 501.

[499] *See infra* note 506 and accompanying text.

[500] *See* January LSTA Letter.

[501] *See* FCC Letter; Letter from Richard M. Whiting, Executive Director and General Counsel, Financial Services Roundtable, Jul. 22, 2011 ("FSR Letter"); July LMA Letter; Letter from R. Bram Smith, Executive Director, The LSTA, Jul. 22, 2011 ("July LSTA Letter"); MFA Letter; and Letter from Kenneth E. Bentsen, Jr., Executive Vice President, Public Policy and Advocacy, SIFMA, Jul. 22, 2011 ("SIFMA Letter").

[502] *See* FSR Letter; July LMA Letter; July LSTA Letter; MFA Letter; and SIFMA Letter. Commenters indicated that both LSTA-style participations and LMA-style participations represent a current or future direct or indirect ownership interest in the related loan or commitment. *Id.*

[503] *See* July LMA Letter; July LSTA Letter; MFA Letter; and SIFMA Letter. These commenters indicated that neither LMA-style participations nor certain LSTA-style participations are true participations. *See* July LMA Letter; July LSTA Letter; and SIFMA Letter. Further, according to the July LSTA Letter, "[l]oan market participants in the United States will likely interpret the 'true participation' requirement as a requirement that loan participations must qualify for 'true sale' treatment in order to avoid classification as a 'swap.' A 'true sale' or 'true participation' analysis is a test aimed at determining whether a transaction has resulted in the underlying assets being legally isolated from the transferor's creditors for U.S. bankruptcy law purposes. Its underlying purpose is to distinguish between a sale and a financing, not between a sale and a swap." If this is the case, certain LSTA-style participations, which typically are offered in the United States, could be determined under a "true sale" analysis to be a financing and not a true participation. *See* July LSTA Letter.

[504] *See* July LMA Letter; July LSTA Letter; MFA Letter; and SIFMA Letter. Commenters recommended that the Commissions revise the interpretation by providing that the Commissions do not interpret the swap and security-based swap definitions to include loan participations in which (1) the participant is acquiring a current or future direct or indirect ownership interest in the related loan or commitment, and (2) the agreement pursuant to which the participant is acquiring such an interest (i) is a participation agreement that is, or any similar agreement of a type that has been, is presently, or in the future becomes, customarily entered into in the primary or secondary loan markets, (ii) requires the grantor to represent that it is a lender under, or a participant or sub-participant in, the loan or commitment, (iii) provides that the participant is entitled to receive from the grantor all of the economic benefit of the whole or part of a loan or commitment to the extent of payments received by the grantor in respect of such loan or commitment, and (iv) requires that 100% of the purchase price calculated with respect to the loan or commitment is paid on the settlement date. *See id.* The characteristics identified by these commenters are reflected in the Commission's revised interpretation.

[505] *See* July LMA Letter.

[506] *Id.*

[507] *See* section 1a(47)(B) of the CEA, 7 U.S.C. 1a(47)(B).

3a69–2(b) under the Exchange Act is an exclusive list.

2. Foreign Exchange Products

(a) Foreign Exchange Products Subject to the Secretary's Swap Determination: Foreign Exchange Forwards and Foreign Exchange Swaps

The CEA, as amended by the Dodd-Frank Act, provides that "foreign exchange forwards" and "foreign exchange swaps" shall be considered swaps under the swap definition unless the Secretary of the Treasury ("Secretary") issues a written determination that either foreign exchange swaps, foreign exchange forwards, or both: (i) Should not be regulated as swaps; and (ii) are not structured to evade the Dodd-Frank Act in violation of any rule promulgated by the CFTC pursuant to section 721(c) of the Dodd-Frank Act.[508] A foreign exchange forward is defined in the CEA as "a transaction that solely involves the exchange of two different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange." [509] A foreign exchange swap, in turn, is defined as "a transaction that solely involves an exchange of 2 different currencies on a specific date at a fixed rate that is agreed upon on the inception of the contract covering the exchange; and a reverse exchange of the 2 currencies described in subparagraph (A) at a later date and at a fixed rate that is agreed upon on the inception of the contract covering the exchange." [510]

Under the Dodd-Frank Act, if foreign exchange forwards or foreign exchange swaps are no longer considered swaps due to a determination by the Secretary, nevertheless, certain provisions of the CEA added by the Dodd-Frank Act would continue to apply to such transactions.[511] Specifically, those transactions still would be subject to certain requirements for reporting swaps, and swap dealers and major swap participants engaging in such transactions still would be subject to certain business conduct standards.[512]

The Commissions are adopting the rules as proposed to explicitly define by rule the term "swap" to include foreign exchange forwards and foreign exchange swaps (as those terms are defined in the CEA),[513] in order to include in one rule the definitions of those terms and the related regulatory authority with respect to foreign exchange forwards and foreign exchange swaps.[514] The final rules incorporate the provision of the Dodd-Frank Act that foreign exchange forwards and foreign exchange swaps will no longer be considered swaps if the Secretary issues the written determination described above to exempt such products from the swap definition.[515] The final rules also reflect the continuing applicability of certain reporting requirements and business conduct standards in the event that the Secretary makes such a determination.[516]

Comments

Two commenters recommended that the Commissions defer action on defining foreign exchange swaps and foreign exchange forwards in their regulations until the Secretary has made his final determination about whether to exempt them.[517] One commenter believed that finalizing the Commissions' proposal prior to the Secretary's final determination would be "premature." [518] The other commenter believed that the industry will be "better positioned" to assess the need to clarify the scope of the swap definition with respect to foreign exchange derivatives after the Secretary has made his determination.[519] The Commissions understand that, if the final rules are effective before the Secretary issues a written determination, market participants entering into foreign exchange forwards and foreign exchange swaps might incur costs in order to comply with the requirements of the CEA (as amended by the Dodd-Frank Act) that could be rendered unnecessary if the Secretary subsequently were to issue a written determination to exempt.[520] The Commissions, however, believe the final rules are necessary because in the event the Secretary issues a written determination to exempt, certain reporting requirements and business conduct standards will continue to apply to the exempted instruments, and the final rules set forth those requirements that will continue to apply.

Further, the Commissions do not believe that adopting the rules is premature, as the Secretary may issue a determination at any time, and the Secretary's authority to do so is independent of the Commissions' authority to issue these rules to further define the term "swap." [521] The

---

[508] *See* section 1a(47)(E)(i) of the CEA, 7 U.S.C. 1a(47)(E)(i). The Secretary published in the **Federal Register** a request for comment as to whether an exemption from the swap definition for foreign exchange swaps, foreign exchange forwards, or both, is warranted, and on the application of the statutory factors that the Secretary must consider in making a determination regarding whether to exempt these products. *See Determinations of Foreign Exchange Swaps and Forwards,* 75 FR 66829 (Oct. 28, 2010). Subsequently, the Secretary published in the **Federal Register** a proposed determination to exempt both foreign exchange swaps and foreign exchange forwards from the definition of the term "swap" in the CEA. *See Determination of Foreign Exchange Swaps and Foreign Exchange Forwards Under the Commodity Exchange Act, Notice of Proposed Determination,* 76 FR 25774 (May 5, 2011) ("Notice of Proposed Determination"). The comment period on the Secretary's proposed determination closed on June 6, 2011. A final determination has not yet been issued.

[509] *See* section 1a(24) of the CEA, 7 U.S.C. 1a(24).

[510] *See* section 1a(25) of the CEA, 7 U.S.C. 1a(25).

[511] The Secretary's determination also does not affect the CFTC's jurisdiction over retail foreign currency agreements, contracts, or transactions pursuant to section 2(c)(2) of the CEA, 7 U.S.C. 2(c)(2). *See* section 1a(47)(F)(ii) of the CEA, 7 U.S.C. 1a(47)(F)(ii).

[512] *See, e.g.,* sections 1a(47)(E)(iii) and (iv) of the CEA, 7 U.S.C. 1a(47)(E)(iii) and (iv) (reporting and business conduct standards, respectively). In addition, a determination by the Secretary does not exempt any foreign exchange forward or foreign exchange swap traded on a designated contract market or a swap execution facility, or cleared by a derivatives clearing organization, from any applicable antifraud or anti-manipulation provision under the CEA. *See* sections 1a(47)(F)(i) and 1b(c) of the CEA, 7 U.S.C. 1a(47)(F)(i) and 1b(c).

[513] *See* rules 1.3(xxx)(3)(iii) and (iv) under the CEA and rule 3a69–2(c)(3) and (4) under the Exchange Act.

[514] *See* rules 1.3(xxx)(2)(i)(C) and (D) under the CEA and rules 3a69–2(b)(1)(iii) and (iv) under the Exchange Act. The rules further provide that foreign exchange forwards and forward exchange swaps are not swaps if they fall within one of the exclusions set forth in subparagraph (B) of the statutory swap definition. *See* rule 1.3(xxx)(2)(ii) under the CEA and rule 3a69–2(b)(2) under the Exchange Act.

[515] *See* rule 1.3(xxx)(3) under the CEA and rule 3a69–2(c) under the Exchange Act.

[516] *See* rule 1.3(xxx)(3)(ii) under the CEA and rule 3a69–2(c)(2) under the Exchange Act. The exclusion of foreign exchange forwards and foreign exchange swaps would become effective upon the Secretary's submission of the determination to exempt to the appropriate Congressional Committees. *See* sections 1a(47)(E)(ii) and 1b of the CEA, 7 U.S.C. 1a(46)(E)(ii) and 1b.

[517] *See* CME Letter and SIFMA Letter.

[518] *See* CME Letter. This commenter also believes that if the Secretary exempts foreign exchange swaps and foreign exchange forwards from the swap definition, it would create an "awkward" situation both for the CFTC and market participants, given that options on such products would be swaps but the products into which they exercise would not be swaps, and would result in a lack of clarity and consistency for market participants. *Id.*

[519] *See* SIFMA Letter.

[520] These costs market participants may incur relate to the upfront and ongoing costs associated with the regulation of Title VII instruments generally. *See infra* parts X and XI, for a discussion of these costs. The Commissions also note that the final rules will reduce (and may eliminate), the costs of determining whether foreign exchange swaps and foreign exchange forwards are subject to Title VII, as well as the costs associated with determining which provisions of the new Title VII regulatory regime will apply to these instruments. *Id.*

[521] Compare section 712(d)(1) of the CEA (Commissions' joint rulemaking authority to further define the term "swap"), with section 1a(47)(E) and 1b of the CEA (Secretary's authority to determine to exempt foreign exchange swaps and foreign exchange forwards from the definition of "swap.").

Commissions' final rules are consistent with this statutory framework by specifically providing that, in the event a determination to exempt is issued, foreign exchange swaps and foreign exchange forwards will not be considered swaps, and will be subject only to those CEA requirements that are specified in the statute.[522] As such, the final rules accommodate the possibility of (rather than the certainty of) an exemptive determination made by the Secretary.

Moreover, commenters provided no support for the assertion that the situation would be awkward for market participants because options on foreign exchange forwards and foreign exchange swaps will be swaps, regardless of whether the Secretary determines to exempt the underlying transactions from the swap definition. The Commissions note that Congress drew the distinction in the statute between foreign currency options and foreign exchange forwards and foreign exchange swaps. The Commissions conclude that adopting these final rules would not contribute to a lack of clarity or consistency for market participants, regardless of any determination the Secretary makes.

(b) Foreign Exchange Products Not Subject to the Secretary's Swap Determination

The Commissions are adopting rules as proposed stating that a determination by the Secretary that foreign exchange forwards or foreign exchange swaps, or both, should not be regulated as swaps would not affect certain other products involving foreign currency, such as foreign currency options, NDFs, currency swaps and cross-currency swaps.[523] The rules explicitly define the term "swap" to include such products, irrespective of whether the Secretary makes a determination to exempt foreign exchange forwards or foreign

exchange swaps from the swap definition.[524]

(i) Foreign Currency Options [525]

As discussed above, the statutory swap definition includes options, and it expressly enumerates foreign currency options. It encompasses any agreement, contract, or transaction that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind.[526] Foreign exchange options traded on a national securities exchange ("NSE"), however, are securities under the Federal securities laws and not swaps or security-based swaps.[527]

Any determination by the Secretary, discussed above, that foreign exchange forwards or foreign exchange swaps should not be regulated as swaps would not impact foreign currency options because a foreign currency option is neither a foreign exchange swap nor a foreign exchange forward, as those terms are defined in the CEA. The Commissions did not receive any comments either on the proposed rule further defining the term "swap" to include foreign currency options or the proposed rule clarifying that foreign currency options are not subject to the Secretary's determination to exempt foreign exchange swaps and foreign exchange forwards.[528] Consequently, the Commissions are adopting rules to explicitly define the term "swap" to include foreign currency options (other

than foreign currency options traded on an NSE).[529] The rules also state that foreign currency options are not foreign exchange forwards or foreign exchange swaps under the CEA.[530]

(ii) Non-Deliverable Forward Contracts Involving Foreign Exchange

As explained by the Commissions in the Proposing Release,[531] an NDF generally is similar to a forward foreign exchange contract,[532] except that at maturity the NDF does not require physical delivery of currencies; rather, the contract typically is settled in a reserve currency, such as U.S. dollars. One of the currencies involved in the transaction, usually an emerging market currency, may be subject to capital controls or similar restrictions, and is therefore said to be "nondeliverable."[533] If the spot market exchange rate on the settlement date is greater (in foreign currency per dollar terms) than the previously agreed forward exchange rate, the party to the contract that is long the nondeliverable (*e.g.* emerging market) currency must pay its counterpart the difference between the contracted forward price and the spot market rate, multiplied by the notional amount.[534]

NDFs are not expressly enumerated in the swap definition, but as was stated in the Proposing Release,[535] they satisfy clause (A)(iii) of the swap definition because they provide for a future

---

[522] *See* rule 1.3(xxx)(3)(ii) under the CEA and rule 3a69–2(c)(2) under the Exchange Act. The statutory requirements that remain applicable, notwithstanding a written determination by the Secretary to exempt, are that foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the CFTC pursuant to section 4r of the CEA, 7 U.S.C. 6r, within such time period as the CFTC may by rule or regulation prescribe, and any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 4s(h) of the CEA, 7 U.S.C. 6s(h). Section 1a(47)(E)(iii) and (iv) of the CEA, 7 U.S.C. 1a(47)(E)(iii) and (iv).

[523] *See* rule 1.3(xxx)(3)(v) under the CEA and rule 3a69–2(c)(5) under the Exchange Act.

[524] *See* rule 1.3(xxx)(2)(i) under the CEA and rule 3a69–2(b)(1) under the Exchange Act. The final rules provide, however, that none of these products are swaps if they fall within one of the exclusions set forth in subparagraph (B) of the statutory swap definition. *See* rule 1.3(xxx)(2)(ii) under the CEA and rule 3a69–2(b)(2) under the Exchange Act. Also, the rules do not define the term "swap" to include currency swaps because they are already included in the statutory definition, but the rules clarify that currency swaps are not subject to the Secretary's determination. *See* section 1a(47)(A)(iii)(VII) of the CEA, 7 U.S.C. 1a(47)(A)(iii)(VII); rule 1.3(xxx)(3)(v)(A) under the CEA; and rule 3a69–2(c)(5)(i) under the Exchange Act.

[525] This discussion is not intended to address, and has no bearing on, the CFTC's jurisdiction over foreign currency options in other contexts. *See, e.g.,* CEA sections 2(c)(2)(A)(iii) and 2(c)(2)(B)–(C), 7 U.S.C. 2(c)(2)(A)(iii) and 2(c)(2)(B)–(C) (off-exchange options in foreign currency offered or entered into with retail customers).

[526] *See* section 1a(47)(A)(i) of the CEA, 7 U.S.C. 1a(47)(A)(i).

[527] *See* section 1a(47)(B)(iv) of the CEA, 7 U.S.C. 1a(47)(B)(iv).

[528] A comment regarding the CFTC's jurisdiction over retail foreign currency options is discussed below.

[529] *See* rule 1.3(xxx)(2)(ii) under the CEA and rule 3a69–2(b)(1) under the Exchange Act. The final rules treat the terms foreign currency options, currency options, foreign exchange options, and foreign exchange rate options as synonymous. Moreover, for purposes of the final rules, foreign currency options include options to enter into or terminate, or that otherwise operate on, a foreign exchange swap or foreign exchange forward, or on the terms thereof. As discussed above, foreign exchange options traded on an NSE are securities and therefore are excluded from the swap definition. *See supra* note 527 and accompanying text.

[530] *See* rule 1.3(xxx)(3)(v) under the CEA and rule 3a69–2(c)(5) under the Exchange Act.

[531] *See* Proposing Release at 29836.

[532] A deliverable forward foreign exchange contract is an obligation to buy or sell a specific currency on a future settlement date at a fixed price set on the trade date. *See* Laura Lipscomb, Federal Reserve Bank of New York, "An Overview of Non-Deliverable Foreign Exchange Forward Markets," 1 (May 2005) (citation omitted) ("Fed NDF Overview").

[533] *See id.* at 1–2 (citation omitted).

[534] *See id.* at 2. Being long the emerging market currency means that the holder of the NDF contract is the "buyer" of the emerging market currency and the "seller" of dollars. Conversely, if the emerging market currency appreciates relative to the previously agreed forward rate, the holder of the contract that is short the emerging market currency must pay its counterparty the difference between the spot market rate and the contracted forward price, multiplied by the notional amount. *See id.* at 2, n.4.

[535] *See* Proposing Release at 29836.

(executory) payment based on an exchange rate, which is an "interest or other rate[ ]" within the meaning of clause (A)(iii).[536] Each party to an NDF transfers to its counterparty the risk of the exchange rate moving against the counterparty, thus satisfying the requirement that there be a transfer of financial risk associated with a future change in rate. This financial risk transfer in the context of an NDF is not accompanied by a transfer of an ownership interest in any asset or liability. Thus, an NDF is a swap under clause (A)(iii) of the swap definition.[537]

Moreover, the Commissions have determined that NDFs do not meet the definitions of "foreign exchange forward" or "foreign exchange swap" set forth in the CEA.[538] NDFs do not involve an "exchange" of two different currencies (element of the definition of both a foreign exchange forward and a foreign exchange swap); instead, they are settled by payment in one currency (usually U.S. dollars).[539]

Notwithstanding their "forward" label, NDFs also do not fall within the

### Comments

Commenters who addressed the nature of NDFs believed that NDFs should not be considered swaps, but rather should be categorized as foreign exchange forwards. In general, commenters maintained that NDFs are functionally and economically equivalent to foreign exchange forwards, and therefore should be treated in the same manner for regulatory purposes.[544] In support of this view, commenters made several arguments, including that both NDFs and foreign exchange forwards require the same net value to be transferred between counterparties; the purpose for using them is the same—to cover foreign currency exchange risk; both are typically short term transactions; and both may be cleared by CLS Bank.[545]

forward contract exclusion of the swap definition because currency is outside the scope of the forward contract exclusion for nonfinancial commodities.[540] Nor have NDFs traditionally been considered commercial merchandising transactions. Rather, as the Commissions observed in the Proposing Release,[541] NDF markets appear to be driven in large part by speculation[542] and hedging,[543] which features are more characteristic of swap markets than forward markets.

In addition, commenters believed that not treating NDFs as foreign exchange forwards or foreign exchange swaps would be contrary to both domestic and international market practices. As specific examples, commenters noted that NDFs typically are traded as part of a bank's or broker's foreign exchange desk; the Federal Reserve Bank of New York has described an NDF in a 1998 publication as an instrument "similar to an outright forward," except that there is no physical delivery or transfer of the local currency; the Bank for International Settlements ("BIS") categorizes NDFs in its "outright forward" category; various European regulations do not distinguish between the two transaction types; standard foreign exchange trading documentation includes both net- and physically-settled foreign exchange transactions in general definitions of foreign exchange transactions; and special rules under the U.S. tax code apply equally to physically settled and cash settled foreign exchange forwards.[546]

Commenters also raised potential negative consequences to certain U.S. market participants if NDFs are not considered to be foreign exchange forwards. For example, one commenter argued that treating NDFs as swaps will put U.S. corporations doing business in emerging markets at a disadvantage relative to U.S. corporations doing business solely in developed markets.[547] This commenter stated that NDFs are widely used by U.S. corporations that do business in emerging markets to hedge their exposure to the currencies of those markets, and that regulating NDFs as swaps would significantly increase the cost of hedging those exposures.[548]

With respect to the Commissions' legal conclusion that NDFs are not foreign exchange forwards, and thus are not subject to the Secretary's determination, one commenter stated that the Commissions' reading of the definition of the term "foreign exchange forward" as not including NDFs is "too restrictive."[549] In this regard, this commenter believed that the term "exchange" should be read to include "the economic exchange that occurs in net settlement rather than being narrowly read as the physical 'exchange' of two different currencies."

One commenter, in contrast, agreed with the Commissions' interpretation that NDFs are not encompassed within the definition of the term "foreign

---

[536] See section 1a(47)(A)(iii) of the CEA, 7 U.S.C. 1a(47)(A)(iii) (providing that a swap is an agreement, contract, or transaction "that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred * * *.").

[537] In addition, as was noted in the Proposing Release, at least some market participants view NDFs as swaps today, and thus NDFs also may fall within clause (A)(iv) of the swap definition as "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." See Proposing Release at 29836. See also section 1a(47)(A)(iv) of the CEA, 7 U.S.C. 1a(47)(A)(iv). Cf. rule 35.1(b)(1)(i) under the CEA, 17 CFR 35.1(b)(1)(i) (providing that the definition of "swap agreement" includes a "forward foreign exchange agreement," without reference to convertibility or delivery).

[538] In the Notice of Proposed Determination, the Secretary stated that his authority to issue a determination "is limited to foreign exchange swaps and forwards and does not extend to other foreign exchange derivatives" and noted that "NDFs may not be exempted from the CEA's definition of "swap" because they do not satisfy the statutory definitions of a foreign exchange swap or forward." See Notice of Proposed Determination.

[539] Likewise, the Commissions have determined that a foreign exchange transaction, which initially is styled or intended to be a "foreign exchange forward," and which is modified so that the parties settle in a reference currency (rather than settle through the exchange of the 2 specified currencies), does not conform with the definition of "foreign exchange forward" in the CEA. See infra note 626.

[540] Currency is an excluded commodity under the CEA. See section 1a(19)(i) of the CEA, 7 U.S.C. 1a(19)(i). In accordance with the interpretation regarding nonfinancial commodities, which as discussed above, see supra part II.B.2(a), are exempt and agricultural commodities that can be physically delivered, currency does not qualify as a nonfinancial commodity for purposes of the forward exclusion from the swap definition.

[541] See Proposing Release at 29836.

[542] See Fed NDF Overview at 5 ("[E]stimates vary but many major market participants estimate as much as 60 to 80 percent of NDF volume is generated by speculative interest, noting growing participation from international hedge funds.") and 4 ("[D]ealers note that much of the volume in Chinese yuan NDFs is generated by speculative positioning based on expectations for an alteration in China's current, basically fixed exchange rate.") (italics in original).

[543] See id. at 4 (noting that "[much of the] Korean won NDF volume[,] * * * estimated to be the largest of any currency, * * * is estimated to originate with international investment portfolio managers hedging the currency risk associated with their onshore investments").

[544] See CDEU Letter; Letter from The Committee on Investment of Employee Benefit Assets, dated Jul. 22, 2011 ("CIEBA Letter"); Letter from Bruce C. Bennett, Covington & Burling LLP, dated Jul. 22, 2011 ("Covington Letter"); and Letter from Karrie McMillan and Cecelia Calaby, the Investment Company Institute/American Bar Association Securities Association, dated Jul. 22, 2011 ("ICI/ABASA Letter").

[545] See Covington Letter and ICI/ABASA Letter. CLS Bank operates the largest multi-currency cash settlement system to eliminate settlement risk in the foreign exchange market.

[546] See Covington Letter and ICI/ABASA Letter.

[547] See Covington Letter.

[548] See supra note 520.

[549] See ICI/ABASA Letter.

exchange forward.''[550] This commenter requested, though, that the CFTC exempt NDFs from the swap definition, using its exemptive authority under section 4(c) of the CEA.[551]

While commenters raised a number of objections to the Commissions' proposal to define NDFs as swaps, these objections primarily raise policy arguments. No commenter has provided a persuasive, alternative interpretation of the statute's plain language in the definition of the term ''foreign exchange forward'' to overcome the Commissions' conclusion that, under the CEA, NDFs are swaps, not foreign exchange forwards.

One commenter believed that the Commissions' interpretation of ''exchange of 2 different currencies'' as used in the foreign exchange forward definition is too restrictive, and that the phrase should be read broadly to mean an economic exchange of value in addition to physical exchange; the Commissions believe that this contention is misplaced.[552] This commenter essentially asks the Commissions to interpret the statutory language to mean an exchange of foreign currencies themselves, as well as an exchange based on the value of such currencies. However, only the word ''exchange'' appears in the relevant definitions, reinforcing the conclusion that Congress intended the definition of ''foreign exchange forward'' to be distinct from other types of transactions covered by the definition of ''swap'' in the CEA. Moreover, the language of each definition emphasizes that these transactions may ''solely'' involve an exchange. The ordinary meaning of the verb ''exchange'' is to ''barter''[553] or ''part with, give or transfer for an equivalent,''[554] *i.e.,* each party is both giving to and receiving from the other party. This does not occur under an NDF, in which only a single party makes a payment.

Elsewhere in the CEA, Congress used explicit language that potentially could provide support for a broader interpretation of the type advocated by this commenter, but such language is absent from the definition of the term ''foreign exchange forward.'' For example, section 2(a)(1)(C)(ii) confers exclusive jurisdiction on the CFTC over ''contracts of sale for future delivery of a group or index of securities (or any interest therein or based upon the value

thereof) [that meet certain requirements]''. If the phrase ''exchange of 2 different currencies'' had been intended to include economic exchanges of value, as suggested by this commenter, that phrase would have included language similar to ''based on the value thereof'' to indicate that other mechanisms of transferring value may occur in these particular types of transactions. Instead, as noted above, Congress limited the scope of each of these particular transactions by using the words ''solely involves the exchange of 2 different currencies''. The Commissions conclude that the use of the word ''solely'' provides further support for the Commissions' interpretation that exchange means an actual interchange of the 2 different currencies involved in the transaction.[555]

### (iii) Currency Swaps and Cross-Currency Swaps

A currency swap[556] and a cross-currency swap[557] each generally can be described as a swap in which the fixed legs or floating legs based on various interest rates are exchanged in different currencies. Such swaps can be used to

reduce borrowing costs, to hedge currency exposure, and to create synthetic assets[558] and are viewed as an important tool, given that they can be used to hedge currency and interest rate risk in a single transaction.

Currency swaps and cross-currency swaps are not foreign exchange swaps as defined in the CEA because, although they may involve an exchange of foreign currencies, they also require contingent or variable payments in different currencies. Because the CEA defines a foreign exchange swap as a swap that ''solely'' involves an initial exchange of currencies and a reversal thereof at a later date, subject to certain parameters, currency swaps and cross-currency swaps would not be foreign exchange swaps. Similarly, currency swaps and cross-currency swaps are not foreign exchange forwards because foreign exchange forwards ''solely'' involve an initial exchange of currencies, subject to certain parameters, while currency swaps and cross-currency swaps contain additional elements, as discussed above.

Currency swaps are expressly enumerated in the statutory definition of the term ''swap.''[559] Cross-currency swaps, however, are not.[560] Accordingly, based on the foregoing considerations, the Commissions are adopting rules explicitly defining the term ''swap'' to include cross-currency swaps.[561] The rules also state that neither currency swaps nor cross-currency swaps are foreign exchange forwards or foreign exchange swaps as those terms are defined in the CEA. The Commissions did not receive any comments either on the rule further defining the term ''swap'' to include cross-currency swaps or the rule clarifying that cross-currency swaps and currency swaps are not subject to the Secretary's determination to exempt foreign exchange swaps and foreign exchange forwards.

### (c) Interpretation Regarding Foreign Exchange Spot Transactions

The CEA generally does not confer regulatory jurisdiction on the CFTC with respect to spot transactions.[562] In

---

[550] *See* CIEBA Letter.

[551] 7 U.S.C. 6(c).

[552] *See* ICI/ABASA Letter.

[553] *See* Webster's New World Dictionary (3d College Ed. 1988).

[554] *See* Black's Law Dictionary.

[555] This commenter's request that the CFTC exempt NDFs from the swap definition using its exemptive authority under section 4(c) of the CEA, 7 U.S.C. 6(c), and that the CFTC exercise its exemptive authority under section 36 of the Exchange Act, 78 U.S.C. 78mm, with respect to NDFs, is beyond the scope of this rulemaking.

[556] A swap that exchanges a fixed rate against a fixed rate is known as a currency swap. *See* Federal Reserve System, ''Trading and Capital-Markets Activities Manual,'' section 4335.1 (Jan. 2009).

[557] Cross-currency swaps with a fixed leg based on one rate and a floating leg based on another rate, where the two rates are denominated in different currencies, are generally referred to as cross-currency coupon swaps, while those with a floating leg based on one rate and another floating leg based on a different rate are known as cross-currency basis swaps. *Id.* Cross-currency swaps also include annuity swaps and amortizing swaps. In cross-currency annuity swaps, level cash flows in different currencies are exchanged with no exchange of principal; annuity swaps are priced such that the level payment cash flows in each currency have the same net present value at the inception of the transaction. An amortizing cross-currency swap is structured with a declining principal schedule, usually designed to match that of an amortizing asset or liability. *Id.*

See also Derivatives ONE, ''Cross Currency Swap Valuation'' (''A cross currency swap is swap of an interest rate in one currency for an interest rate payment in another currency * * * This could be considered an interest rate swap with a currency component.''), available at *http://www.derivativesone.com/cross-currency-swap-valuation/*; Financial Accounting Standards Board, ''Examples Illustrating Application of FASB Statement No. 138,'' Accounting for Certain Derivative Instruments and Certain Hedging Activities, section 2, Example 1, at 3 (''The company designates the cross-currency swap as a fair value hedge of the changes in the fair value of the loan due to both interest and exchange rates.''), available at *http://www.fasb.org/derivatives/examples.pdf.*

[558] BMO Capital Markets, ''Cross Currency Swaps,'' available at *http://www.bmocm.com/products/marketrisk/intrderiv/cross/default.aspx.*

[559] *See* section 1a(47)(A)(iii)(VII) of the CEA, 7 U.S.C. 1a(47)(A)(iii)(VII).

[560] Clause (A)(iii) of the swap definition expressly refers to a cross-currency rate swap. *See* section 1a(47)(A)(iii)(V) of the CEA, 7 U.S.C. 1a(47)(A)(iii)(V). Although the swap industry appears to use the term ''cross-currency swap,'' rather than ''cross-currency rate swap'' (the term used in section 1a(47)(A)(iii)(V) of the CEA), the Commissions interpret these terms as synonymous.

[561] *See* rule 1.3(xxx)(2)(i)(A) under the CEA and rule 3a69–2(b)(1)(i) under the Exchange Act.

[562] *But see supra* note 227.

the context of foreign currency, spot transactions typically settle within two business days after the trade date ("T+2").[563] The accepted market practice of a two-day settlement for spot foreign currency transactions has been recognized by the CFTC [564] and the courts.[565]

The Commissions recognize that the new foreign exchange forward definition in the CEA, which was added by the Dodd-Frank Act and which applies to an exchange of two different currencies "on a specific future date," could be read to apply to any foreign exchange transaction that does not settle on the same day. Such a reading could render most foreign exchange spot transactions foreign exchange forwards under the CEA; as a result, such transactions would be subject to the CEA reporting and business conduct standards requirements applicable to foreign exchange forwards even if the Secretary determines to exempt foreign exchange forwards from the definition of "swap." The Commissions do not believe that Congress intended, solely with respect to foreign exchange transactions, to extend the reach of the CEA to transactions that historically have been considered spot transactions. At the same time, however, the Commissions do not want to enable market participants simply to label as "spot" foreign exchange transactions that regularly settle after the relevant foreign exchange spot market settlement deadline, or with respect to which the parties intentionally delay settlement, both of which would be properly categorized as foreign exchange forwards, or CEA section 2(c)(2) transactions (discussed separately below), in order to avoid applicable foreign exchange regulatory requirements.

Accordingly, the Commissions are providing an interpretation that a bona fide foreign exchange spot transaction, *i.e.,* a foreign exchange transaction that is settled on the customary timeline of the relevant spot market, is not within the definition of the term "swap." In general, a foreign exchange transaction will be considered a bona fide spot transaction if it settles via an actual delivery of the relevant currencies within two business days. In certain circumstances, however, a foreign exchange transaction with a longer settlement period concluding with the actual delivery of the relevant currencies may be considered a bona fide spot transaction depending on the customary timeline of the relevant market.[566] In particular, as discussed below, the Commissions will consider a foreign exchange transaction that is entered into solely to effect the purchase or sale of a foreign security to be a bona fide spot transaction where certain conditions are met.

The CFTC will consider the following to be a bona fide spot foreign exchange transaction: An agreement, contract or transaction for the purchase or sale of an amount of foreign currency equal to the price of a foreign security with respect to which (i) the security and related foreign currency transactions are executed contemporaneously in order to effect delivery by the relevant securities settlement deadline and (ii) actual delivery of the foreign security and foreign currency occurs by such deadline (such transaction, a "Securities Conversion Transaction").[567] For Securities Conversion Transactions, the CFTC will consider the relevant foreign exchange spot market settlement deadline to be the same as the securities settlement deadline. As noted above, while the CFTC will look at the relevant facts and circumstances, it does not expect that an unintentional settlement failure or delay for operational reasons or due to a market disruption will undermine the character of a bona fide spot foreign exchange transaction as such.

The CFTC also will interpret a Securities Conversion Transaction as not leveraged, margined or financed within the meaning of section 2(c)(2)(C)

of the CEA.[568] While it is possible to view the fact that the buyer of a currency in such a transaction does not pay for the currency until it is delivered as leverage (in that the buyer puts nothing down until taking delivery, thus achieving 100% leverage) or a financing arrangement, the CFTC does not interpret it as such for purposes of CEA section 2(c)(2)(C).[569] Congress recognized that settlement of bona fide spot foreign exchange transactions typically takes two days.[570] The fact that Congress expressly excluded these types of bona fide spot foreign exchange transactions does not mean that Congress intended to subject Security Conversion Transactions to regulation under the retail foreign exchange regime.[571] For the foregoing reasons, the CFTC will interpret a Securities Conversion Transaction as not leveraged, margined or financed within the meaning of section 2(c)(2)(C) of the CEA.[572]

Comments

One commenter requested clarification regarding the status of foreign exchange spot transactions.[573] This commenter recommended that the Commissions clarify that foreign exchange spot transactions, which this commenter defined as "transactions of

---

[563] Bank for International Settlements, Triennial Central Bank Survey, Report on Global Foreign Exchange Market Activity in 2010 at 32 (Dec. 2010) (defining a foreign exchange spot transaction to provide for cash settlement within 2 business days); Sam Y. Cross, Federal Reserve Bank of New York, "All About * * *. The Foreign Exchange Market in the United States" at 31–32 (1998).

[564] *See* CFTC Division of Trading and Markets, Report on Exchange of Futures for Physicals at 124– 127 (1987) (noting that foreign currency spot transactions settle in 2 days).

[565] *See CFTC* v. *Frankwell Bullion, Ltd.,* 99 F.3d 299, 300 (9th Cir. 1996) ("Spot transactions in foreign currencies call for settlement within two days."); *CFTC* v. *Int'l Fin. Servs. (NewYork), Inc.,* 323 F. Supp. 2d 482, 495 (S.D.N.Y. 2004) (noting that spot transactions ordinarily call for settlement within two days); *Bank Brussels Lambert, S.A.* v. *Intermetals Corp.,* 779 F.Supp. 741, 742 (S.D.N.Y. 1991) (same). But the Commissions understand that the settlement cycle for spot transactions exchanging Canadian dollars for U.S. dollars (or vice versa) is T+1. *See* Cross, *supra* 563, at 31.

[566] In this regard, while the Commissions will look at the relevant facts and circumstances, they will not expect that an unintentional settlement failure or delay for operational reasons or due to a market disruption will undermine the character of a bona fide spot foreign exchange transaction as such.

[567] The interpretation herein with respect to Security Conversion Transactions is limited to such transactions.

[568] 7 U.S.C. 2(c)(2)(C). Similarly, a Securities Conversion Transaction is not an option, option on a futures contract or futures contract and thus would not be subject to CEA section 2(c)(2)(B), 7 U.S.C. 2(c)(2)(B). Of course, optionality as to settlement would render the transaction an option and is inconsistent with a "spot" characterization.

[569] *Cf.* 12 CFR 220.8(b)(1) under Regulation T (12 CFR Part 220) (generally permits a customer to purchase a security (including a foreign security) in a cash account, rather than a margin account, even if the customer has no collateral in the account, if payment for the security is made within the appropriate payment period). Similarly, if a foreign exchange buyer in a Securities Conversion Transaction posts no margin or collateral on the trade date, the CFTC does not consider that transaction to be "margined" within the meaning of 7 U.S.C. 2(c)(2)(C)(i)(I)(bb).

[570] *See* section 2(c)(2)(C)(i)(II) of the CEA, 7 U.S.C. 2(c)(2)(C) ("[s]ubclause (I) of this clause shall not apply to * * * a contract of sale that * * * results in delivery within 2 days").

[571] The CFTC notes, for example, that Congress recognized that settlement in various spot markets in commodities other than foreign exchange can be longer than two days. *See* CEA section 2(c)(2)(D)(ii)(III)(aa) (disapplying the DCM-trading requirement for certain commodity transactions with non-ECPs when the contract "results in actual delivery within 28 days or such other longer period as the [CFTC] may determine by rule or regulation based on the typical commercial practice in cash or spot markets for the commodity involved").

[572] This interpretation is not intended to address, and has no bearing on, the CFTC's interpretation of the term "actual delivery" as set forth in section 2(c)(2)(D)(ii)(III)(aa), 7 CFR 2(c)(2)(D)(ii)(III)(aa). *See* Retail Commodity Transactions under the Commodity Exchange Act, 76 FR 77670, Dec. 14, 2011.

[573] *See* SIFMA Letter.

one currency into another that settle within a customary settlement cycle,'' are neither foreign exchange forwards nor swaps.[574] Another commenter indicated that the customary settlement cycle for purchases of most non-U.S. denominated securities is "T+3" (in some securities markets, such as South Africa, the settlement cycle can take up to seven days), and requires the buyer to pay for the securities in the relevant foreign currency.[575] Typically, according to this commenter, a broker-dealer or bank custodian acting on behalf of the buyer or seller will enter into a foreign currency transaction to settle on a T+3 basis (or the relevant settlement period) as well. Timing the foreign exchange transaction to settle at the same time as the securities transaction benefits the customer by reducing his or her exposure to currency risk on the securities transaction between trade date and settlement date. The Commissions have provided the interpretation described above regarding the interplay between the foreign exchange forward definition, the meaning of "leveraged, margined or financed" under section 2(c)(2)(C) of the CEA, and bona fide foreign exchange spot transactions to address these commenters' concerns.

### (d) Retail Foreign Currency Options

The CFTC is providing an interpretation regarding the status of retail foreign currency options that are described in section 2(c)(2)(B) of the CEA.[576] As noted above, the Commissions proposed to include foreign currency options generally within the definition of the term "swap," subject to the statutory exclusions in subparagraph (B) of the definition. The statutory exclusions from the swap definition encompass transactions described in sections 2(c)(2)(C) and (D) of the CEA, but not those in section 2(c)(2)(B) of the CEA.[577] Section 2(c)(2)(B) of the CEA applies to futures, options on futures and options on foreign currency (other than foreign currency options executed or traded on a national securities exchange), and permits such transactions to be entered into with counterparties who are not ECPs[578] on an off-exchange basis by certain enumerated regulated entities.[579] No issue arises with respect to futures or options on futures in foreign currency that are covered by section 2(c)(2)(B) of the CEA, because they are expressly excluded from the statutory swap definition.[580] Commodity options, including options on foreign currency, however, are not excluded from the swap definition (other than foreign currency options executed or traded on a national securities exchange).

The CFTC notes that, in further defining the term "swap" to include foreign currency options, the Proposing Release stated that the proposal was not intended to address, and had no bearing on, the CFTC's jurisdiction over foreign currency options in other contexts, specifically citing section 2(c)(2)(B) of the CEA.[581] Nonetheless, the CFTC acknowledges the ambiguity in the statute regarding the status of off-exchange foreign currency options with non-ECPs that are subject to section 2(c)(2)(B) of the CEA. While foreign currency options are swaps, they also are subject to section 2(c)(2)(B) of the CEA when entered into off-exchange with non-ECPs, and there is no statutory exclusion from the swap definition for section 2(c)(2)(B) transactions. If foreign currency options were deemed to be swaps, then, pursuant to section 2(e) of the CEA, as added by the Dodd-Frank Act,[582] they could not be entered into by non-ECP counterparties, except on a DCM. This would render the provisions of section 2(c)(2)(B) of the CEA, permitting off-exchange foreign currency options with non-ECPs by enumerated regulated entities, a nullity.

The CFTC believes that Congress did not intend the swap definition to overrule and effectively repeal another provision of the CEA in such an oblique fashion.[583] Nor is there anything in the legislative history of the Dodd-Frank Act to suggest a congressional intent to prohibit only one type of off-exchange foreign currency transaction with non-ECPs (out of the three types of off-exchange foreign currency transactions with non-ECPs that are addressed in CEA section 2(c)(2)(B)). The omission of section 2(c)(2)(B) of the CEA from the exclusions set forth in the statutory swap definition appears to be a scrivener's error.[584] Accordingly, the CFTC is applying the exclusion from the swap definition to foreign currency options described in CEA section 2(c)(2)(B).

---

[574] Id. In this commenter's view, such clarification is necessary to avoid the statutory foreign exchange forward definition "unwittingly captur[ing] many typical foreign exchange spot transactions * * * settl[ing] within a customary settlement cycle,'' which this commenter stated is generally "T+2" in the United States, but can be "T+3" in some other countries.

[575] See Letter from Phoebe A. Papageorgiou, Senior Counsel, American Bankers Ass'n and James Kemp, Managing Director, Global Foreign Exchange Division, dated April 18, 2012 ("ABA/Global FX Letter"). This commenter requested clarification that the purchase, sale or exchange of a foreign currency by a bank on behalf of a retail customer for the sole purpose of effecting a purchase or sale of a foreign security or in order to clear or settle such purchase or sale, when the settlement period for such FX transaction is within the settlement cycle for such foreign security, is excluded from the retail foreign exchange under the CEA. The CFTC has provided the clarification regarding the meaning of "leveraged, margined or financed" under section 2(c)(2)(C) of the CEA to address this commenter's concern.

[576] 7 U.S.C. 2(c)(2)(B).

[577] See section 1a(47)(B)(i) of the CEA, 7 U.S.C. 1a(47)(B)(i). Sections 2(c)(2)(B), (C), and (D) of the CEA, 7 U.S.C. 2(c)(2)(B), (C), and (D), govern certain types of off-exchange transactions in commodities, including foreign currency, in which one of the parties to the transaction is not an ECP.

[578] ECPs are defined in section 1a(18) of the CEA, 7 U.S.C. 1a(18).

[579] Section 2(c)(2)(B)(i) of the CEA provides: (i) This Act applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that—(I) is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78f(a)); and (II) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is [certain regulated counterparties enumerated in the statute.] 7 U.S.C. 2(c)(2)(B)(i). Thus, under section 2(c)(2)(B)(i) of the CEA, the CEA's exchange-trading requirement generally applies with respect to futures, options on futures, and options on foreign currency. See section 4(a) of the CEA, 7 U.S.C. 6a (generally requiring futures contracts to be traded on or subject to the rules of a DCM); section 4c(b) of the CEA, 7 U.S.C. 6c(b) (prohibiting trading options subject to the CEA contrary to CFTC rules, regulations or orders permitting such trading); Part 32 of the CFTC's rules, 17 CFR Part 32 (generally prohibiting entering into options subject to the CEA (other than options on futures) other than on or subject to the rules of a DCM); and CFTC Rule 33.3(a), 17 CFR 33.3(a) (prohibiting entering into options on futures other than on or subject to the rules of a DCM). However, if the counterparty to the non-ECP is an enumerated regulated entity identified in section 2(c)(2)(B)(i)(II) of the CEA, 7 U.S.C. 2(c)(2)(B)(i)(II), the CEA's exchange-trading requirement does not apply. Accordingly, an enumerated regulated entity—including a banking institution regulated by the OCC—can, pursuant to section 2(c)(2)(B) of the CEA, lawfully enter into a future, an option on a future, or an option on foreign currency with a non-ECP counterparty on an off-exchange basis.

[580] See section 1a(47)(B)(i) of the CEA, 7 U.S.C. 1a(47)(B)(i).

[581] See Proposing Release at 29835 n.125.

[582] 7 U.S.C. 2(e).

[583] The CFTC notes in this regard that repeals by implication are strongly disfavored by the courts. See, e.g., Village of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 662 (D.C. Cir. 2011) ("Repeals by implication, however, are strongly disfavored 'absent a clearly expressed congressional intention' '') (quoting Branch v. Smith, 538 U.S. 254, 273, 123 S.Ct. 1429 (2003)); Agri Processor Co., Inc. v. N.L.R.B., 514 F.3d 1, 4 (D.C. Cir. 2008) ("[a]mendments by implication, like repeals by implication, are not favored" and "will not be found unless an intent to repeal [or amend] is 'clear and manifest.' '') (quoting United States v. Welden, 377 U.S. 95, 102 n. 12, 84 S.Ct. 1082 (1964) and Rodriguez v. United States, 480 U.S. 522, 524, 107 S.Ct. 1391 (1987)).

[584] See, e.g., Singer and Singer, Sutherland Statutes and Statutory Construction § 47:38 (7th ed. 2011) ("Words may be supplied in a statute * * * where omission is due to inadvertence, mistake, accident, or clerical error").

### 3. Forward Rate Agreements

The Commissions are adopting rules as proposed to explicitly define the term "swap" to include forward rate agreements ("FRAs").[585] The Commissions did not receive any comments on the proposed rules regarding the inclusion of FRAs in the swap definition.

In general, an FRA is an over-the-counter contract for a single cash payment, due on the settlement date of a trade, based on a spot rate (determined pursuant to a method agreed upon by the parties) and a pre-specified forward rate. The single cash payment is equal to the product of the present value (discounted from a specified future date to the settlement date of the trade) of the difference between the forward rate and the spot rate on the settlement date multiplied by the notional amount. The notional amount itself is not exchanged.[586]

An FRA provides for the future (executory) payment based on the transfer of interest rate risk between the parties as opposed to transferring an ownership interest in any asset or liability.[587] Thus, the Commissions believe that an FRA satisfies clause (A)(iii) of the swap definition.[588]

Notwithstanding their "forward" label, FRAs do not fall within the forward contract exclusion from the swap definition. FRAs do not involve nonfinancial commodities and thus are outside the scope of the forward contract exclusion. Nor is an FRA a commercial merchandising transaction, as there is no physical product to be delivered in an FRA.[589] Accordingly, the Commissions believe that the forward contract exclusion from the swap definition for nonfinancial commodities does not apply to FRAs.[590]

Based on the foregoing considerations, the Commissions are adopting rules to provide greater clarity by explicitly defining the term "swap" to include FRAs. As with the foreign exchange-related products discussed above, the final rules provide that FRAs are not swaps if they fall within one of the exclusions set forth in subparagraph (B) of the swap definition.

### 4. Combinations and Permutations of, or Options on, Swaps and Security-Based Swaps

Clause (A)(vi) of the swap definition provides that "any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)" of the definition is a swap.[591] The Commissions provided an interpretation regarding clause (A)(vi) in the Proposing

Release.[592] The Commissions received no comments on the interpretation provided in the Proposing Release regarding combinations and permutations of, or options on, swaps and security-based swaps and are restating their interpretation of clause (A)(vi) of the swap definition with one technical correction and one clarification.

Clause (A)(vi) means, for example, that an option on a swap or security-based swap (commonly known as a "swaption") would itself be a swap or security-based swap, respectively. The Commissions also interpret clause (A)(vi) to mean that a "forward swap" would itself be a swap or security-based swap, respectively.[593] By listing examples here, the Commissions do not intend to limit the broad language of clause (A)(vi) of the swap definition, which is designed to capture those agreements, contracts and transactions that are not expressly enumerated in the CEA swap definition but that nevertheless are swaps.[594]

### 5. Contracts for Differences

As the Proposing Release notes, the Commissions have received inquiries over the years regarding the treatment of CFDs under the CEA and the Federal securities laws.[595] A CFD generally is an agreement to exchange the difference in value of an underlying asset between the time at which a CFD position is established and the time at which it is terminated.[596] If the value increases, the

---

[585] See rules 1.3(xxx)(2)(i)(E) under the CEA and rule 3a69–2(b)(1)(v) under the Exchange Act.

[586] See generally "Trading and Capital-Markets Activities Manual," supra note 556, section 4315.1 ("For example, in a six-against-nine-month (6x9) FRA, the parties agree to a three-month rate that is to be netted in six months' time against the prevailing three-month reference rate, typically LIBOR. At settlement (after six months), the present value of the net interest rate (the difference between the spot and the contracted rate) is multiplied by the notional principal amount to determine the amount of the cash exchanged between the parties * * *. If the spot rate is higher than the contracted rate, the seller agrees to pay the buyer the differences between the prespecified forward rate and the spot rate prevailing at maturity, multiplied by a notional principal amount. If the spot rate is lower than the forward rate, the buyer pays the seller.").

[587] It appears that at least some in the trade view FRAs as swaps today. See, e.g., The Globecon Group, Ltd., "Derivatives Engineering: A Guide to Structuring, Pricing and Marketing Derivatives," 45 (McGraw-Hill 1995) ("An FRA is simply a one-period interest-rate swap."); DerivActiv, Glossary of Financial Derivatives Terms ("A swap is * * * a strip of FRAs."), available at http://www.derivactiv.com/definitions.aspx?search=forward+rate+agreements. Cf. Don M. Chance, et al., "Derivatives in Portfolio Management," 29 (AIMR 1998) ("[An FRA] involves one specific payment and is basically a one-date swap (in the sense that a swap is a combination of FRAs[,] with some variations)."). Thus, FRAs also may fall within clause (A)(iv) of the swap definition, as "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." See section 1a(47)(A)(iv) of the CEA, 7 U.S.C. 1a(47)(a)(iv).

[588] See section 1a(47)(A)(iii) of the CEA, 7 U.S.C. 1a(47)(A)(iii). CFTC regulations have defined FRAs as swap agreements. See rule 35.1(b)(1)(i) under the

CEA, 17 CFR 35.1(b)(1)(i); Exemption for Certain Swap Agreements, 58 FR 5587 (Jan. 22, 1993). The CFTC recently repealed that rule and amended Part 35 of its rules in light of the enactment of Title VII of the Dodd-Frank Act. See Agricultural Swaps, 76 FR 49291 (Aug. 10, 2011).

[589] See Regulation of Hybrid and Related Instruments, 52 FR 47022, 47028 (Dec. 11, 1987) (stating "[FRAs] do not possess all of the characteristics of forward contracts heretofore delineated by the [CFTC]").

[590] The Commissions note that Current European Union law includes FRAs in the definition of "financial instruments." See Markets in Financial Instruments Directive (MiFID), "Directive 2004/39/EC of the European Parliament and of the Council," Annex I(C), 4, 5, 10 (Apr. 21, 2004), available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CONSLEG:2004L0039:20070921:EN:PDF. European Commission legislation on derivatives, central clearing, and trade repositories applies to FRAs that are traded over-the-counter and, thus, would subject such transactions to mandatory clearing, reporting and other regulatory requirements. See Regulation of the European Parliament and of the Council on OTC derivatives, central counterparties and trade repositories, tit. I, art. 2 (1(3b)), 7509/1/12 REV 1 (Mar. 19, 2012).

[591] See section 1a(47)(vi) of the CEA, 7 U.S.C. 1a(47)(vi). Clause (A)(vi) of the swap definition refers specifically to other types of swaps in the swap definition. However, because section 3(a)(68) of the Exchange Act defines a security-based swap as a swap [with some connection to a security], clause (A)(vi) of the swap definition is relevant to determining whether any combination or permutation of, or option on, a security-based swap is a security-based swap.

[592] See Proposing Release at 29838.

[593] Forward swaps are also commonly known as forward start swaps, or deferred or delayed start swaps. A forward swap can involve two offsetting swaps that both start immediately, but one of which ends on the deferred start date of the forward swap itself. For example, if a counterparty wants to hedge its risk for four years, starting one year from today, it could enter into a one-year swap and a five-year swap, which would partially offset to create a four-year swap, starting one year forward. A forward swap also can involve a contract to enter into a swap or security-based swap at a future date or with a deferred start date. A forward swap is not a nonfinancial commodity forward contract or security forward, both of which are excluded from the swap definition and discussed elsewhere in this release.

[594] This category could include categories of agreements, contracts or transactions that do not yet exist as well as more esoteric swaps that exist but that Congress did not refer to by name in the statutory swap definition.

[595] See Proposing Release at 29838.

[596] See Ontario Securities Commission, Staff Notice 91–702, "Offerings of Contracts for Difference and Foreign Exchange Contracts to Investors in Ontario," at part IV.1 (defining a CFD as "a derivative product that allows an investor to obtain economic exposure (for speculative, investment or hedging purposes) to an underlying asset * * * such as a share, index, market sector, currency or commodity, without acquiring ownership of the underlying asset"), available at
Continued

seller pays the buyer the difference; if the value decreases, the buyer pays the seller the difference. CFDs can be traded on a number of products, including treasuries, foreign exchange rates, commodities, equities, and stock indexes. Equity CFDs closely mimic the purchase of actual shares. The buyer of an equity CFD receives cash dividends and participates in stock splits.[597] In the case of a long position, a dividend adjustment is credited to the client's account. In the case of a short position, a dividend adjustment is debited from the client's account. CFDs generally are traded over-the-counter (though they also are traded on the Australian Securities Exchange) in a number of countries outside the United States.

The Commissions provided an interpretation in the Proposing Release regarding the treatment of CFDs. The Commissions are restating the interpretation set out in the Proposing Release without modification.

CFDs, unless otherwise excluded, fall within the scope of the swap or security-based swap definition, as applicable.[598] Whether a CFD is a swap or security-based swap will depend on the underlying product of that particular CFD transaction. Because CFDs are highly variable and a CFD can contain a variety of elements that would affect its characterization, the Commissions believe that market participants will need to analyze the features of the underlying product of any particular CFD in order to determine whether it is a swap or a security-based swap. The Commissions are not adopting rules or additional interpretations at this time regarding CFDs.

Comments

Two commenters requested that the Commissions clarify that non-deliverable forward contracts are not

CFDs.[599] These commenters requested that the Commissions determine that NDFs involving foreign exchange are not swaps. Given that the Commissions are defining NDFs as swaps and that CFDs involving foreign currency also would be swaps, there is no need to distinguish NDFs involving foreign exchange from CFDs involving foreign exchange.

*D. Certain Interpretive Issues*

1. Agreements, Contracts, or Transactions That May Be Called, or Documented Using Form Contracts Typically Used for, Swaps or Security-Based Swaps

The Commissions are restating the interpretation provided in the Proposing Release regarding agreements, contracts, or transactions that may be called, or documented using form contracts typically used for, swaps or security-based swaps with one modification in response to a commenter.[600]

As was noted in the Proposing Release,[601] individuals and companies may generally use the term "swap" to refer to certain of their agreements, contracts, or transactions. For example, they may use the term "swap" to refer to an agreement to exchange real or personal property between the parties or to refer to an agreement for two companies that produce fungible products and with delivery obligations in different locations to perform each other's delivery obligations instead of their own.[602] The name or label that the parties use to refer to a particular agreement, contract, or transaction is not determinative of whether it is a swap or security-based swap.[603]

It is not dispositive that the agreement, contract, or transaction is documented using an industry standard form agreement that is typically used for

swaps and security-based swaps,[604] but it may be a relevant factor.[605] The key question is whether the agreement, contract, or transaction falls within the statutory definitions of the term "swap" or "security-based swap" (as further defined and interpreted pursuant to the final rules and interpretations herein) based on its terms and other characteristics. Even if one effect of an agreement is to reduce the risk faced by the parties (for example, the "swap" of physical delivery obligations described above may reduce the risk of non-delivery), the agreement would not be a swap or security-based swap unless it otherwise meets one of those statutory definitions, as further defined by the Commissions. If the agreement, contract, or transaction satisfies the swap or security-based swap definitions, the fact that the parties refer to it by another name would not take it outside the Dodd-Frank Act regulatory regime. Conversely, if an agreement, contract, or transaction is not a swap or security-based swap, as those terms are defined in the CEA and the Exchange Act and the rules and regulations thereunder, the fact that the parties refer to it, or document it, as a swap or security-based swap will not subject that agreement, contract, or transaction to regulation as a swap or a security-based swap.

---

http://www.osc.gov.on.ca/documents/en/Securities-Category9/sn_20091030_91-702_cdf.pdf (Oct. 30, 2009); Financial Services Authority, Consultation Paper 7/20, "Disclosure of Contracts for Difference—Consultation and draft Handbook text," at part 2.2 (defining a CFD on a share as "a derivative product that gives the holder an economic exposure, which can be long or short, to the change in price of a specific share over the life of the contract"), available at http://www.fsa.gov.uk/pubs/cp/cp07_20.pdf (Nov. 2007).

[597] See, e.g., Int'l Swaps and Derivatives Ass'n, "2002 ISDA Equity Derivatives Definitions," art. 10 (Dividends) and 11 (Adjustments and Modifications Affecting Indices, Shares and Transactions).

[598] In some cases, depending on the facts and circumstances, the SEC may determine that a particular CFD on an equity security, for example, should be characterized as constituting a purchase or sale of the underlying equity security and, therefore, be subject to the requirements of the Federal securities laws applicable to such purchases or sales.

[599] See Covington Letter and ICI/ABASA Letter.

[600] See infra note 606.

[601] See Proposing Release at 29839.

[602] For example, a company obligated to deliver its product to a customer in Los Angeles would instead deliver the product in Albany to a different company's customer on behalf of that other company. In return, the company with the obligation to deliver a product to its customer in Albany would deliver the product instead in Los Angeles to the customer of the company obligated to deliver its product to that customer in Los Angeles.

[603] See, e.g., Haekel v. Refco, 2000 WL 1460078, at *4 (CFTC Sept. 29, 2000) ("[T]he labels that parties apply to their transactions are not necessarily controlling"); Reves v. Ernst & Young, 494 U.S. 56, 61 (1990) (stating that the purpose of the securities laws is "to regulate investments, in whatever form they are made and by whatever name they are called") (emphasis in original).

[604] As noted in the Proposing Release, the CFTC consistently has found that the form of a transaction is not dispositive in determining its nature, citing Grain Land, supra note 213, at *16 (CFTC Nov. 25, 2003) (holding that contract substance is entitled to at least as much weight as form); In the Matter of First Nat'l Monetary Corp., [1984–1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,698 at 30,974 (CFTC Aug. 7, 1985) ("When instruments have been determined to constitute the functional equivalent of futures contracts neither we nor the courts have hesitated to look behind whatever self-serving labels the instruments might bear."); Stovall, supra note 63 (holding that the CFTC "will not hesitate to look behind whatever label the parties may give to the instrument"). As also noted in the Proposing Release, the form of a transaction is not dispositive in determining whether an agreement, contract, or transaction falls within the regulatory regime for securities. See SEC v. Merch. Capital, LLC, 483 F.3d 747, 755 (11th Cir. 2007) ("The Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests.") (quoting Williamson v. Tucker, 645 F.2d 404, 418 (5th Cir. 1981); Robinson v. Glynn, 349 F.3d 166, 170 (4th Cir. 2003) ("What matters more than the form of an investment scheme is the 'economic reality' that it represents. * * *") (internal citation omitted); Caiola v. Citibank, N.A., New York, 295 F.3d 312, 325 (2d Cir. 2002) (quoting United Housing Foundation v. Foreman, 421 U.S. 837, 848 (1975) ("In searching for the meaning and scope of the word 'security' * * * the emphasis should be on economic reality")). See Proposing Release at 29839 n. 152.

[605] The Commissions note, though, that documentation is not controlling in evaluating whether an agreement, contract or transaction is a swap, security-based swap, or neither.

## Comments

The Commissions requested comment regarding what agreements, contracts, or transactions that are not swaps or security-based swaps are documented using industry standard form agreements that are typically used for swaps and security-based swaps, and asked for examples thereof and details regarding their documentation, including why industry standard form agreements typically used for swaps and security-based swaps are used. One commenter stated its view that documentation can be a relevant factor in determining whether an agreement, contract or transaction is a swap or security-based swap.[606] The Commissions are persuaded by the commenter and are modifying the interpretation to clarify that in determining whether an agreement, contract or transaction is a swap or security-based swap, documentation may be a relevant (but not dispositive) factor.

## 2. Transactions in Regional Transmission Organizations and Independent System Operators

The CFTC declines to address the status of transactions in Regional Transmission Organizations ("RTOs") and Independent System Operators ("ISOs"), including financial transmission rights ("FTRs") and ancillary services, within this joint definitional rulemaking. As was noted in the Proposing Release, section 722 of the Dodd-Frank Act specifically addresses certain instruments and transactions regulated by FERC that also may be subject to CFTC jurisdiction. Section 722(f) added CEA section 4(c)(6),[607] which provides that, if the CFTC determines that an exemption for FERC-regulated instruments or other specified electricity transactions would be in accordance with the public interest, then the CFTC shall exempt such instruments or transactions from the requirements of the CEA. Given that specific statutory directive, the treatment of these FERC-regulated instruments and transactions should be considered under the standards and procedures specified in section 722 of the Dodd-Frank Act for a public interest waiver, rather than through this joint

rulemaking to further define the terms "swap" and "security-based swap." [608]

The CFTC notes that it has been engaged in discussions with a number of RTOs and ISOs regarding the possibility of a petition seeking an exemption pursuant to CEA section 4(c)(6) for certain RTO and ISO transactions. The CFTC also notes that the status of some RTO and ISO transactions may have been addressed in the interpretation above regarding embedded options and the forward exclusion from the swap definition,[609] and/or indirectly through the CFTC's recent interim final rulemaking relating to trade options.[610]

## Comments

The CFTC received a number of comments discussing transactions in RTOs and ISOs.[611] These commenters argued that the CFTC should further define the term "swap" to exclude transactions executed or traded on RTOs and ISOs.[612] One commenter argued that the CEA section 4(c)(6) exemptive approach will leave regulatory ambiguity for market participants, since the CFTC might not grant an exemption, later revoke an existing exemption, grant a partial or conditional exemption, or limit an exemption to existing products.[613] This commenter also noted that FERC has complete regulatory authority over RTOs and ISOs and their transactions, and that Congress expected the CFTC and FERC to avoid duplicative, unnecessary regulation.[614] Another commenter argued that the CFTC should exclude RTO and ISO transactions in the same manner as insurance has been excluded.[615] A third commenter stated that RTO and ISO transactions are commercial merchandising transactions and thus forwards or, alternatively, that defining them as swaps is inconsistent with the text, goals, and purpose of the Dodd-Frank Act.[616]

By contrast, one commenter asserted that FTRs are in substance swaps and should be regulated as such.[617]

Two commenters supported the CFTC's use of its section 722(f)

authority to exempt FERC-regulated transactions and other transactions in RTOs or ISOs.[618] As discussed above, section 722(f) of the Dodd-Frank Act added new section 4(c)(6) to the CEA specifically addressing how the CFTC should approach certain instruments and transactions regulated by FERC that also may be subject to CFTC jurisdiction. The CFTC continues to believe, as was stated in the Proposing Release, that such an approach is the more appropriate means of considering issues relating to the instruments and transactions specified in CEA section 4(c)(6). One commenter's argument that the CEA section 4(c)(6) exemptive approach will cause regulatory ambiguity is not a convincing basis on which to forego a process specifically designated by Congress for the issue at hand.[619] The CFTC also believes that the ability to tailor exemptive relief, after notice and public comment, to the complex issues presented by transactions on RTOs and ISOs, is further reason to favor such an approach over the more general directive to further define the terms "swap" and "security-based swap" that is the subject of this rulemaking.

In response to one commenter's contentions that FERC has complete regulatory authority over RTOs and ISOs and their transactions, and that Congress expected the CFTC and FERC to avoid duplicative, unnecessary regulation, the CFTC notes that Congress addressed this issue not by excluding RTO and ISO transactions from the comprehensive regime for swap regulation, but rather by enacting the exemptive process in CEA section 4(c)(6).

And in response to another commenter's contention that the CFTC should exclude RTO and ISO transactions in the same manner as insurance has been excluded, the CFTC notes that Congress provided neither an exemptive process equivalent to CEA section 4(c)(6) for insurance, nor an energy market-equivalent to the McCarran-Ferguson Act.[620]

As noted above, FERC staff opines that defining RTO and ISO transactions as swaps would be inconsistent with the text, goals, and purpose of the Dodd-Frank Act. The CFTC can consider concerns of the sort expressed by FERC staff in connection with any petition that

---

[606] *See* IECA Letter. This commenter noted that "[e]ven though swaps are commonly documented on the ISDA Master Agreements without annexes, physical transactions under such agreements with power or natural gas annexes are not swaps because they are physically settled forward contracts that are exempt under 1a47(B)"). *Id.*

[607] 7 U.S.C. 6(c)(6).

[608] The Commissions note that this approach should not be taken to suggest any finding by the Commissions as to whether or not FTRs or any other FERC-regulated instruments or transactions are swaps (or futures contracts).

[609] *See supra* part II.B.2(a).

[610] *See supra* note 317.

[611] *See* COPE Letter; ETA Letter; and FERC Staff Letter.

[612] *Id.*

[613] *See* COPE Letter.

[614] *Id.*

[615] *See* ETA Letter.

[616] *See* FERC Staff Letter.

[617] *See* Better Markets Letter.

[618] *See* NEMA Letter and WGCEF Letter.

[619] *See* COPE Letter.

[620] 15 U.S.C. 1011–1015.

may be submitted to the CFTC.[621] Interested parties on all sides of the issue would receive an opportunity to comment on the scope and other aspects of any proposed exemptive relief at that time.

## III. The Relationship Between the Swap Definition and the Security-Based Swap Definition

### A. Introduction

Title VII of the Dodd-Frank Act defines the term "swap" under the CEA,[622] and also defines the term "security-based swap" under the Exchange Act.[623] Pursuant to the regulatory framework established in Title VII, the CFTC has regulatory authority over swaps and the SEC has regulatory authority over security-based swaps. The Commissions are further defining the terms "swap" and "security-based swap" to clarify whether particular agreements, contracts, or transactions are swaps or security-based swaps based on characteristics including the specific terms and conditions of the instrument and the nature of, among other things, the prices, rates, securities, indexes, or commodities upon which the instrument is based.

Because the discussion below is focused on whether particular agreements, contracts, or transactions are swaps or security-based swaps, the Commissions use the term "Title VII instrument" in this release to refer to any agreement, contract, or transaction that is included in either the definition of the term "swap" or the definition of the term "security-based swap." Thus, the term "Title VII instrument" is synonymous with "swap or security-based swap." [624]

The determination of whether a Title VII instrument is either a swap or a security-based swap should be made based on the facts and circumstances relating to the Title VII instrument prior to execution, but no later than when the parties offer to enter into the Title VII instrument.[625] If the Title VII

instrument itself is not amended, modified, or otherwise adjusted during its term by the parties, its characterization as a swap or security-based swap will not change during its duration because of any changes that may occur to the factors affecting its character as a swap or security-based swap.[626]

Classifying a Title VII instrument as a swap or security-based swap is straightforward for most instruments. However, the Commissions provided an interpretation in the Proposing Release to clarify the classification of swaps and security-based swaps in certain areas and to provide an interpretation regarding the use of certain terms and conditions in Title VII instruments. The Commissions are restating the interpretation set out in the Proposing Release with certain modifications to the interpretation regarding TRS.

### B. Title VII Instruments Based on Interest Rates, Other Monetary Rates, and Yields

Parties frequently use Title VII instruments to manage risks related to, or to speculate on, changes in interest rates, other monetary rates or amounts, or the return on various types of assets. Broadly speaking, Title VII instruments based on interest or other monetary rates would be swaps, whereas Title VII instruments based on the yield or value of a single security, loan, or narrow-based security index would be security-based swaps. However, market participants and financial professionals sometimes use the terms "rate" and "yield" in different ways. The Commissions proposed an interpretation in the Proposing Release regarding whether Title VII instruments that are based on interest rates, other monetary rates, or yields would be swaps or security-based swaps and are restating the interpretation, but with a modification to the list of examples of reference rates to include certain secured lending rates under money

market rates.[627] The Commissions find that this interpretation is an appropriate way to address Title VII instruments based on interest rates, other monetary rates, or yields and is designed to reduce costs associated with determining whether such instruments are swaps or security-based swaps.[628]

1. Title VII Instruments Based on Interest Rates or Other Monetary Rates That Are Swaps

The Commissions believe that when payments exchanged under a Title VII instrument are based solely on the levels of certain interest rates or other monetary rates that are not themselves based on one or more securities, the instrument would be a swap and not a security-based swap.[629] Often swaps on interest rates or other monetary rates require the parties to make payments based on the comparison of a specified floating rate (such as the London Interbank Offered Rate ("LIBOR")) to a fixed rate of interest agreed upon by the parties. A rate swap also may require payments based on the differences between two floating rates, or it may require that the parties make such payments when any agreed-upon events with respect to interest rates or other monetary rates occur (such as when a specified interest rate crosses a threshold, or when the spread between two such rates reaches a certain point). The rates referenced for the parties' obligations are varied, and examples of such rates include the following:

*Interbank Offered Rates:* An average of rates charged by a group of banks for lending money to each other or other banks over various periods of time, and other similar interbank rates,[630] including, but not limited to, LIBOR (regardless of currency);[631] the Euro

---

[621] CEA section 4(c)(6) requires the CFTC to determine that an exemption pursuant to such section "is consistent with the public interest and the purposes of th[e CEA]." 7 U.S.C. 6(c)(6).

[622] *See* section 1a(47) of the CEA, 7 U.S.C. 1a(47).

[623] *See* section 3(a)(68) of the Exchange Act, 15 U.S.C. 78c(a)(68).

[624] In some cases, the Title VII instrument may be a mixed swap. Mixed swaps are discussed further in section IV below.

[625] The determination must be made no later than when the parties offer to enter into the Title VII instrument because persons are prohibited from offering to sell, offering to buy or purchase, or selling a security-based swap to any person who is not an ECP unless a registration statement is in effect as to the security-based swap. *See* section 5(e)

of the Securities Act. This analysis also would apply with respect to mixed swaps and security-based swap agreements. With respect to swaps, the determination also would need to be made no later than the time that provisions of the CEA and the regulations thereunder become applicable to a Title VII instrument. For instance, certain duties apply to swaps prior to execution. *See Daily Trading Records under Rule 23.202 under the CEA,* 17 CFR 23.202, and Subpart H of Part 23 of the CFTC's regulations, 17 CFR Part 23, Subpart H (Business Conduct Standards for Swap Dealers and Major Swap Participants Dealing with Counterparties, Including Special Entities).

[626] *See infra* part III.G.5(a), for a discussion regarding the evaluation of Title VII Instruments on security indexes that move from broad-based to narrow-based or narrow-based to broad-based.

[627] These secured lending rates are the Eurepo, The Depository Trust & Clearing Corporation's General Collateral Finance Repo Index, the Repurchase Overnight Index Average Rate and the Tokyo Repo Rate.

[628] *See supra* part I, under "Overall Economic Considerations".

[629] *See infra* part III.F, regarding the use of certain terms and conditions.

[630] Interbank lending rates are measured by surveys of the loan rates that banks offer other banks, or by other mechanisms. The periods of time for such loans may range from overnight to 12 months or longer.

The interbank offered rates listed here are frequently called either a "reference rate," the rate of "reference banks," or by a designation that is specific to the service that quotes the rate. For some of the interbank offered rates listed here, there is a similar rate that is stated as an interbank bid rate, which is the average rate at which a group of banks bid to borrow money from other banks. For example, the bid rate similar to LIBOR is called LIBID.

[631] Today, LIBOR is used as a rate of reference for the following currencies: Australian Dollar,

Interbank Offered Rate ("Euribor"); the Canadian Dealer Offered Rate ("CDOR"); and the Tokyo Interbank Offered Rate ("TIBOR");[632]

*Money Market Rates:* A rate established or determined based on actual lending or money market transactions, including, but not limited to, the Federal Funds Effective Rate; the Euro Overnight Index Average ("EONIA" or "EURONIA") (which is the weighted average of overnight unsecured lending transactions in the Euro-area interbank market); the EONIA Swap Index; the Eurepo (the rate at which, at 11.00 a.m. Brussels time, one bank offers, in the euro-zone and worldwide, funds in euro to another bank if in exchange the former receives from the latter the best collateral within the most actively-traded European repo market); the Australian dollar RBA 30 Interbank Overnight Cash Rate; the Canadian Overnight Repo Rate Average ("CORRA"); The Depository Trust & Clearing Corporation's General Collateral Finance ("GCF") Repo Index (an average of repo rates collateralized by U.S. Treasury and certain other securities); the Mexican interbank equilibrium interest rate ("TIIE"); the NZD Official Cash Rate; the Sterling Overnight Interbank Average Rate ("SONIA") (which is the weighted average of unsecured overnight cash transactions brokered in London by the Wholesale Markets Brokers' Association ("WMBA")); the Repurchase Overnight Index Average Rate ("RONIA") (which is the weighted average rate of all secured overnight cash transactions brokered in London by WMBA); the Swiss Average Rate Overnight ("SARON"); the Tokyo Overnight Average Rate ("TONAR") (which is based on uncollateralized overnight average call rates for interbank lending); and the Tokyo Repo Rate (average repo rate of active Japanese repo market participants).

*Government Target Rates:* A rate established or determined based on guidance established by a central bank including, but not limited to, the Federal Reserve discount rate, the Bank of England base rate and policy rate, the Canada Bank rate, and the Bank of Japan policy rate (also known as the Mutan rate);

*General Lending Rates:* A general rate used for lending money, including, but not limited to, a prime rate, rate in the commercial paper market, or any similar rate provided that it is not based on any security, loan, or group or index of securities;

*Indexes:* A rate derived from an index of any of the foregoing or following rates, averages, or indexes, including but not limited to a constant maturity rate (U.S. Treasury and certain other rates),[633] the interest rate swap rates published by the Federal Reserve in its "H.15 Selected Interest Rates" publication, the ISDAFIX rates, the ICAP Fixings, a constant maturity swap, or a rate generated as an average (geometric, arithmetic, or otherwise) of any of the foregoing, such as overnight index swaps ("OIS")—provided that such rates are not based on a specific security, loan, or narrow-based group or index of securities;

*Other Monetary Rates:* A monetary rate including, but not limited to, the Consumer Price Index ("CPI"), the rate of change in the money supply, or an economic rate such as a payroll index; and

*Other:* The volatility, variance, rate of change of (or the spread, correlation or difference between), or index based on any of the foregoing rates or averages of such rates, such as forward spread agreements, references used to calculate the variable payments in index amortizing swaps (whereby the notional principal amount of the agreement is amortized according to the movement of an underlying rate), or correlation swaps and basis swaps, including but not limited to, the "TED spread"[634] and the

spread or correlation between LIBOR and an OIS.

As discussed above, the Commissions believe that when payments under a Title VII instrument are based solely on any of the foregoing, such Title VII instrument would be a swap.

Comments

Two commenters believed that constant maturity swaps always should be treated as swaps, rather than mixed swaps, because they generally are viewed by market participants as rates trades instead of trades on securities.[635] According to the commenters, the "bulk" of constant maturity swaps are based on exempted securities, but the commenters noted that the constant maturity leg may be based on a number of different rates or yields, including, among other things, U.S. Treasury yields, Treasury auction rates, yields on debt of foreign governments, and rate related to indices of mortgage-backed securities.[636] As discussed above, the Commissions are adopting the interpretation as proposed. The statutory language of the swap and security-based swap definitions explicitly states that a Title VII instrument that is based on a non-exempted security should be a security-based swap and not a swap.[637]

2. Title VII Instruments Based on Yields

The Commissions proposed an interpretation in the Proposing Release clarifying the status of Title VII instruments in which one of the underlying references of the instrument is a "yield." The Commissions received no comments on the interpretation set out in the Proposing Release regarding Title VII instruments based on yields and are restating the interpretation without modification. In cases when a "yield" is calculated based on the price or changes in price of a debt security, loan, or narrow-based security index, it is another way of expressing the price or value of a debt security, loan, or narrow-based security index. For example, debt securities often are quoted and traded on a yield basis rather than on a dollar price, where the yield relates to a specific date, such as the date of maturity of the debt security (*i.e.,* yield to maturity) or the date upon which the debt security may be redeemed or called by the issuer (*e.g.,* yield to first whole issue call).[638]

Except in the case of certain exempted securities, when one of the underlying

---

Canadian Dollar, Danish Krone, Euro, Japanese Yen, New Zealand Dollar, Pound Sterling, Swedish Krona, Swiss Franc, and U.S. Dollar.

[632] Other interbank offered rates include the following (with the country or city component of the acronym listed in parentheses): AIDIBOR (Abu Dhabi); BAIBOR (Buenos Aires); BKIBOR (Bangkok); BRAZIBOR (Brazil); BRIBOR/BRIBID (Batislava); BUBOR (Budapest); CHIBOR (China); CHILIBOR (Chile); CIBOR (Copenhagen); COLIBOR (Columbia); HIBOR (Hong Kong); JIBAR (Johannesburg); JIBOR (Jakarta); KAIBOR (Kazakhstan); KIBOR (Karachi); KLIBOR (Kuala Lumpur); KORIBOR ((South) Korea); MEXIBOR (Mexico); MIBOR (Mumbai); MOSIBOR (Moscow); NIBOR (Norway); PHIBOR (Philippines); PRIBOR (Prague); REIBOR/REIBID (Reykjavik); RIGIBOR/RIGIBID (Riga); SHIBOR (Shanghai); SIBOR (Singapore); SOFIBOR (Sofia); STIBOR (Stockholm); TAIBOR (Taiwan); TELBOR (Tel Aviv); TRLIBOR and TURKIBOR (Turkey); VILIBOR (Vilnius); VNIBOR (Vietnam); and WIBOR (Warsaw).

[633] A Title VII instrument based solely on the level of a constant maturity U.S. Treasury rate would be a swap because U.S. Treasuries are exempted securities that are excluded from the security-based swap definition. Conversely, a Title VII instrument based solely on the level of a constant maturity rate on a narrow-based index of non-exempted securities under the security-based swap definition would be a security-based swap.

[634] The TED spread is the difference between the interest rates on interbank loans and short-term U.S. government debt (Treasury bills or "T-bills"). The latter are exempted securities that are excluded from the statutory definition of the term "security-based swap." Thus, neither any aspect of U.S. Treasuries nor interest rates on interbank loans can form the basis of a security-based swap. For this reason, a Title VII instrument on a spread between interbank loan rates and T-bill rates also would be a swap, not a security-based swap.

[635] *See* CME Letter and SIFMA Letter.

[636] *Id.*

[637] *See supra* note 633.

[638] *See, e.g., Securities Confirmations,* 47 FR 37920 (Aug. 27, 1982).

references of the Title VII instrument is the "yield" of a debt security, loan, or narrow-based security index in the sense where the term "yield" is used as a proxy for the price or value of the debt security loan, or narrow-based security index, the Title VII instrument would be a security-based swap. And, as a result, in cases where the underlying reference is a point on a "yield curve" generated from the different "yields" on debt securities in a narrow-based security index (*e.g.*, a constant maturity yield or rate), the Title VII instrument would be a security-based swap. However, where certain exempted securities, such as U.S. Treasury securities, are the only underlying reference of a Title VII instrument involving securities, the Title VII instrument would be a swap. Title VII instruments based on exempted securities are discussed further below.

The above interpretation would not apply in cases where the "yield" referenced in a Title VII instrument is not based on a debt security, loan, or narrow-based security index of debt securities but rather is being used to reference an interest rate or monetary rate as outlined above in subsection one of this section. In these cases, this "yield" reference would be considered equivalent to a reference to an interest rate or monetary rate and the Title VII instrument would be, under the interpretation in this section, a swap (or mixed swap depending on other references in the instrument).

3. Title VII Instruments Based on Government Debt Obligations

The Commissions provided an interpretation in the Proposing Release regarding instances in which the underlying reference of the Title VII instrument is a government debt obligation. The Commissions received no comments on the interpretation provided regarding instances in which the underlying reference of the Title VII instrument is a government debt obligation and are restating such interpretation without modification.

The security-based swap definition specifically excludes any agreement, contract, or transaction that meets the definition of a security-based swap only because it "references, is based upon, or settles through the transfer, delivery, or receipt of an exempted security under [section 3(a)(12) of the Exchange Act], as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in [section 3(a)(29) of the Exchange Act] * * *), unless such agreement, contract, or transaction is of the character of, or

is commonly known in the trade as, a put, call, or other option."[639]

As a result of this exclusion in the security-based swap definition for "exempted securities,"[640] if the only underlying reference of a Title VII instrument involving securities is, for example, the price of a U.S. Treasury security and the instrument does not have any other underlying reference involving securities, then the instrument would be a swap. Similarly, if the Title VII instrument is based on the "yield" of a U.S. Treasury security and does not have any other underlying reference involving securities, then the instrument also would be a swap, regardless of whether the term "yield" is a proxy for the price of the security.

Foreign government securities, by contrast, were not "exempted securities" as of the date of enactment of the Futures Trading Act of 1982[641] and thus do not explicitly fall within this exclusion from the security-based swap definition. Therefore, if the underlying reference of the Title VII instrument is the price, value, or "yield" (where "yield" is a proxy for price or value) of a foreign government security, or a point on yield curve derived from a narrow-based security index composed of foreign government securities, then the instrument is a security-based swap.

*C. Total Return Swaps*

The Commissions are restating the interpretation regarding TRS set out in the Proposing Release with certain changes with respect to quanto and compo equity TRS and loan TRS based on two or more loans, and to reflect that TRS can overlie reference items other than securities, loans, and indexes of securities or loans.[642] The Commissions find that this interpretation is an appropriate way to address TRS and is designed to reduce the cost associated

with determining whether a TRS is a swap or a security-based swap.[643]

As was described in the Proposing Release,[644] a TRS is a Title VII instrument in which one counterparty, the seller of the TRS, makes a payment that is based on the price appreciation and income from an underlying security or security index.[645] A TRS also can overlie a single loan, two or more loans and other underliers. The other counterparty, the buyer of the TRS, makes a financing payment that is often based on a variable interest rate, such as LIBOR (or other interbank offered rate or money market rate, as described above), as well as a payment based on the price depreciation of the underlying reference. The "total return" consists of the price appreciation or depreciation, plus any interest or income payments.[646] Accordingly, where a TRS is based on a single security or loan, or a narrow-based security index, the TRS would be a security-based swap.[647]

In addition, the Commissions are providing a final interpretation providing that, generally, the use of a variable interest rate in the TRS buyer's payment obligations to the seller is incidental to the purpose of, and the risk that the counterparties assume in, entering into the TRS, because such payments are a form of financing reflecting the seller's (typically a security-based swap dealer) cost of financing the position or a related hedge, allowing the TRS buyer to receive payments based on the price appreciation and income of a security or security index without purchasing the security or security index. As stated in

---

[639] Section 3(a)(68)(C) of the Exchange Act, 15 U.S.C. 76c(a)(68)(C).

[640] As of January 11, 1983, the date of enactment of the Futures Trading Act of 1982, Public Law 97–444, 96 Stat. 2294, section 3(a)(12) of the Exchange Act, 15 U.S.C. 78c(a)(12), provided that, among other securities, "exempted securities" include: (i) Securities which are direct obligations of, or obligations guaranteed as to principal or interest by, the United States; (ii) certain securities issued or guaranteed by corporations in which the United States has a direct or indirect interest as designated by the Secretary of the Treasury; and (iii) certain other securities as designated by the SEC in rules and regulations.

[641] Public Law 97–444, 96 Stat. 2294 (1983).

[642] While this guidance focuses on TRS overlying securities and loans, TRS also may overlie other commodities. Such TRS may be structured differently due to the nature of the underlying.

[643] *See supra* part I, under "Overall Economic Considerations."

[644] *See* Proposing Release at 29842.

[645] Where the underlying security is an equity security, a TRS is also known as an "equity swap." A bond may also be the underlying security of a TRS.

[646] If the total return is negative, the seller receives this amount from the buyer. TRS can be used to synthetically reproduce the payoffs of a position. For example, two counterparties may enter into a 3-year TRS where the buyer of the TRS receives the positive total return on XYZ security, if any, and the seller of the TRS receives LIBOR plus 30 basis points and the absolute value of the negative total return on XYZ security, if any.

[647] However, if the underlying reference of the TRS is a broad-based security index, it is a swap (and an SBSA) and not a security-based swap. In addition, a TRS on an exempted security, such as a U.S. Treasury, under section 3(a)(12) of the Exchange Act, 15 U.S.C. 78c(a)(12), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Exchange Act, 15 U.S.C. 78c(a)(29), as in effect on the date of enactment of the Futures Trading Act of 1982), is a swap (and an SBSA), and not a security-based swap. Similarly, and as discussed in more detail below, an LTRS based on two or more loans that are not securities ("non-security loans") are swaps, and not security-based swaps.

the Proposing Release, the Commissions believe that when such interest rate payments act merely as a financing component in a TRS, or in any other security-based swap, the inclusion of such interest rate terms would not cause the TRS to be characterized as a mixed swap.[648] Financing terms may also involve adding or subtracting a spread to or from the financing rate,[649] or calculating the financing rate in a currency other than that of the underlying reference security or security index.[650]

However, where such payments incorporate additional elements that create additional interest rate or currency exposures that are unrelated to the financing of the security-based swap, or otherwise shift or limit risks that are related to the financing of the security-based swap, those additional elements may cause the security-based swap to be a mixed swap. For example, where the counterparties embed interest-rate optionality (*e.g.,* a cap, collar, call, or put) into the terms of a security-based swap in a manner designed to shift or limit interest rate exposure, the inclusion of these terms would cause the TRS to be both a swap and a security-based swap (*i.e.,* a mixed swap). Similarly, if a TRS is also based on non-security-based components (such as the price of oil, or a currency), the TRS would also be a mixed swap.[651]

The Commissions also are providing an additional interpretation regarding a quanto equity swap, in response to comments raised by one commenter,[652] and for illustrative purposes, a similar but contrasting product, a compo equity swap. A quanto equity swap, which "can provide a U.S. investor with currency-protected exposure to a non-U.S. equity index by translating the percentage equity return in the currency

of such non-U.S. equity index into U.S. dollars," [653] can be described as:

An equity swap in which [(1)] the underlying is denominated in a currency (the foreign currency) other than that in which the equity swap is denominated (the domestic currency) * * * [and (2) t]he final value of the underlying is denominated in the foreign currency and is converted into the domestic currency using the exchange rate prevailing at inception[,] result[ing in] the investor * * * not [being] exposed to currency risk.[654]

While a quanto equity swap, therefore, effectively "exposes the dealer on the foreign leg of the correlation product to a variable notional principal amount that changes whenever the exchange rate or the foreign index fluctuates," [655] such exposure results from the choice of hedges for the quanto equity swap, not from the cash flows of the quanto equity swap itself.[656] Thus, that exposure could be viewed as created in the seller by the act of entering into the quanto equity swap, rather than as a transfer between the parties, as is required by the third prong of the statutory swap definition. Consequently, the dealer's exchange rate exposure could be seen as incidental to the securities exposure desired by the party initiating the quanto equity swap.

The Commissions view a quanto equity swap as a security-based swap, and not a mixed swap, where (i) the purpose of the quanto equity swap is to transfer exposure to the return of a security or security index without transferring exposure to any currency or exchange rate risk; and (ii) any exchange rate or currency risk exposure incurred by the dealer due to a difference in the currency denomination of the quanto equity swap and of the underlying security or security index is incidental to the quanto equity swap and arises from the instrument(s) the dealer

chooses to use to hedge the quanto equity swap and is not a direct result of any expected payment obligations by either party under the quanto equity swap.[657]

By contrast, in a compo equity swap, the parties assume exposure to, and the total return is calculated based on, both the performance of specified foreign stocks and the change in the relevant exchange rate.[658] Because the counterparty initiating a transaction can choose to avoid currency exposure by entering into a quanto equity swap, the currency exposure obtained via a compo equity swap is not incidental to the equity exposure for purposes of determining mixed swap status. In fact, investors seeking synthetic exposure to foreign securities via a TRS may also be seeking exposure to the exchange rate between the currencies, as evidenced by the fact that a number of mutual funds exist in both hedged and unhedged versions to provide investors exposure to the same foreign securities with or without the attendant currency

---

[648] *See infra* part IV.

[649] *See, e.g.,* Moorad Chowdry, "Total Return Swaps: Credit Derivatives and Synthetic Funding Instruments," at 3–4 (noting that the spread to the TRS financing rate is a function of: The credit rating of the counterparty paying the financing rate; the amount, value, and credit quality of the reference asset; the dealer's funding costs; a profit margin; and the capital charge associated with the TRS), available at *http://www.yieldcurve.com/Mktresearch/LearningCurve/TRS.pdf.*

[650] For example, a security-based swap on an equity security priced in U.S. dollars in which payments are made in Euros based on the U.S. dollar/Euro spot rate at the time the payment is made would not be a mixed swap. As the Commissions stated in the Proposing Release, under these circumstances, the currency is merely referenced in connection with the method of payment, and the counterparties are not hedging the risk of changes in currency exchange rates during the term of the security-based swap *See* Proposing Release at 29842, n. 176.

[651] *See* Mixed Swaps, *infra* part IV.

[652] *See* SIFMA Letter.

[653] *Id.*

[654] *Handbook of Corporate Equity Derivatives and Equity Capital Markets* ("Corporate Equity Derivatives Handbook"), § 1.2.10, at 23, available at *http://media.wiley.com/product_data/excerpt/05/11199759/1119975905-83.pdf* last visited May 4, 2012.

[655] James M. Mahoney, *Correlation Products and Risk Management Issues,* FRBNY Economic Policy Review/October 1995 at 2, available at *http://www.ny.frb.org/research/epr/95v01n3/9510maho.pdf* last visited May 4, 2012.

[656] While applicable in general, this logic, which merely expands upon the principle that the character of a Title VII instrument as either a swap or a security-based swap should follow the underlying factors which are incorporated into the cash flows of the instrument—a security, yield, loan, or other trigger for SEC jurisdiction or as a commodity triggering CFTC jurisdiction (or both for joint jurisdiction), should not be extrapolated to other Title VII instruments, for which other principles may override.

[657] Although the SIFMA Letter describes quanto equity swaps in terms of equity indexes, if the underlying reference of a quanto equity swap is a single security, the result would be the same. The Commissions also note that if a security index underlying a quanto equity swap is not narrow-based, the quanto equity swap is a swap. In that event, it is not a mixed swap because no element of the quanto equity swap is a security-based swap and, to be a mixed swap, a Title VII instrument must have both swap and security-based swap components.

[658] *See generally Corporate Equity Derivatives Handbook, supra* note 654, § 1.2.9, at 21–23.

exposure.[659] Consequently, a compo equity swap is a mixed swap.[660]

In response to comments,[661] the Commissions also are providing an interpretation with respect to the treatment of loan TRS ("LTRS") on two or more loans. As noted above, the second prong of the security-based swap definition includes a swap that is based on "a single security or loan, including any interest therein or on the value thereof." Thus, an LTRS based on a single loan, as mentioned above, is a security-based swap. The Commissions believe, however, that an LTRS based on two or more non-security loans are swaps, and not security-based swaps.[662] An LTRS on a group or index of such non-security loans is not covered by the first prong of the security-based swap definition—swaps based on a narrow-based security index—because the definition of the term "narrow-based

security index" in both the CEA and the Exchange Act only applies to securities, and not to non-security loans.[663] An LTRS, moreover, is not covered by the third prong of the security-based swap definition because it is based on the total return of such loans, and not events related thereto. Accordingly, an LTRS on two or more loans that are non-security loans is a swap and not a security-based swap.[664]

Comments

The Commissions received three comments with respect to the interpretation provided on TRS in the Proposing Release.[665] One of these commenters addressed the Commissions' interpretation on security-based TRS.[666] The other two commenters requested that the Commissions clarify the treatment of LTRS on two or more loans.[667]

One commenter asserted that the terms of a TRS that create interest rate or currency exposures incidental to the primary purpose of the TRS should not cause a transaction that otherwise would be deemed to be a security-based swap to be characterized as a mixed swap.[668] This commenter agreed with the Commissions that the scope of the mixed swap category of Title VII instruments is intended to be narrow and that, when variable interest rates are used for financing purposes incidental to counterparties' purposes, and risks assumed, in entering into a TRS, the TRS is a security-based swap and not a mixed swap.[669]

This commenter also opined that the Commissions' interpretation that "where such payments incorporate additional elements that create additional interest rate or currency exposures * * * unrelated to the financing of the [TRS], or otherwise shift or limit risks that are related to the financing of the [TRS], those additional elements may cause the [TRS] to be a mixed swap" could be seen as requiring a quantitative analysis to determine whether a reference to interest rates or currencies in a TRS is solely for financing purposes or creates additional

exposure that might be construed as extending beyond those purposes.[670]

The Commissions are clarifying that a quantitative analysis is not necessarily required in order to determine whether a TRS is a mixed swap. Any analysis, quantitative or qualitative, clearly demonstrating the nature of a payment (solely financing-related, unrelated to financing or a combination of the two) can suffice.[671]

The Commissions also are clarifying that market participants are not necessarily required to compare their financing rates to market financing rates in order to determine whether the financing leg of a TRS is merely a financing leg or is sufficient to render the TRS a mixed swap. Because a number of factors can influence how a particular TRS is structured,[672] the Commissions cannot provide an interpretation applicable to all situations. If the financing leg of a TRS reflects the dealer's financing costs on a one-to-one basis, the Commissions would view such leg as a financing leg. Adding a spread would not alter that conclusion if the spread is consistent with the dealer's course of dealing generally, with respect to a particular type of TRS or with respect to a particular counterparty. The Commissions believe that this would be the case even if the spread is "off-market," if the deviance from a market spread is explained by factors unique to the dealer (e.g., the dealer has high financing costs), to the TRS (e.g., the underlying securities are highly illiquid, so financing them is more costly than would be reflected in a "typical" market spread for other TRS) or to then-current market conditions (e.g., a share repurchase might make shares harder

---

[659] See, e.g., Descriptive Brochure: The Tweedy, Browne Global Value Fund II—Currency Unhedged at 1, available at *http://www.tweedy.com/resources/gvf2/TBGVF-II_verJuly2011.pdf* (last visited May 4, 2012) (comparing the Tweedy, Browne Global Value Fund II—Currency Unhedged and the Tweedy, Browne Global Value Fund (which hedges its currency exposure) and stating that "[t]he only material difference [between the funds] is that the Unhedged Global Value Fund generally does not hedge currency risk [and] is designed for long-term value investors who wish to focus their investment exposure on foreign stock markets, and their associated non-U.S. currencies" and "[b]y establishing the Tweedy, Browne Global Value Fund II—Currency Unhedged, we were acknowledging that many investors may view exposure to foreign currency as another form of diversification when investing outside the U.S., and/or may have strong opinions regarding the future direction of the U.S. dollar."). See also the PIMCO Foreign Bond Fund (Unhedged) Fact Sheet at 1 (stating that "[t]he fund seeks to capture the returns of non-U.S. bonds including potential returns due to changes in exchange rates. In a declining dollar environment foreign currency appreciation may augment the returns generated by investments in foreign bonds."), available at *http://investments.pimco.com/Shareholder Communications/External%20Documents/Foreign %20Bond%20Fund%20(Unhedged)%20 Institutional.pdf* last visited May 4, 2012 and the PIMCO Foreign Bond Fund (U.S. Dollar-Hedged) INSTL Fact Sheet at 1 (stating that "[t]he fund seeks to capture the returns of non-U.S. bonds but generally hedges out most currency exposure in order to limit the volatility of returns."), available at *http://investments.pimco.com/Shareholder Communications/External%20Documents/Foreign %20Bond%20Fund%20(U.S.%20Dollar-Hedged) %20Institutional.pdf* (last visited May 4, 2012).

[660] Such swaps are examples of swaps with payments that "incorporate additional elements that create additional * * * currency exposures * * * unrelated to the financing of the security-based swap * * * that may cause the security-based swap to be a mixed swap." See Proposing Release at 29842.

[661] See infra note 667 and accompanying text.

[662] Depending on the facts and circumstances loans may be notes or evidences of indebtedness that are securities. See section 3(a)(10) of the Exchange Act. In this section, the Commissions address only groups or indexes of loans that are not securities.

[663] See CEA section 1a(35), 7 U.S.C. 1a(35), and section 3(a)(55) of the Exchange Act, 15 U.S.C. 78c(a)(55).

[664] The same would be true with respect to swaps (e.g., options, CFDs, NDFs), other than LTRS or loan index credit default swaps, on two or more loans that are not securities.

[665] See July LSTA Letter; Letter from David Lucking, Allen & Overy LLP, dated May 26, 2011 ("Allen & Overy Letter"); and SIFMA Letter.

[666] See SIFMA Letter.

[667] See Allen & Overy Letter and July LSTA Letter.

[668] See SIFMA Letter.

[669] Id.

[670] Id. SIFMA added that such a determination could require market participants to determine whether a specific interest rate or spread referenced in the TRS is sufficiently in line with market rates to constitute a financing leg of a transaction under the proposed test. SIFMA continues by noting that there are a number of examples where a TRS can provide for some interest rate or currency exposure incidental to the primary purpose of the TRS, describing a quanto equity swap as an example.

[671] To the extent a market participant is uncertain as to the results of such an analysis, it may seek informal guidance from the Commissions' staffs or use the process established in this release, see infra part VI, for seeking formal guidance from the Commissions as to the nature of a Title VII instrument as a swap, security-based swap or mixed swap.

[672] For example, the Commissions would expect a dealer perceived by the market to constitute a higher counterparty risk to have higher funding costs generally, which might affect its TRS financing costs. To the extent such a dealer passed through its higher TRS financing costs to its TRS counterparty, such a pass-through simply would reflect the dealer's specific circumstances, and would not transform the TRS from a security-based swap into a mixed swap.

for a dealer to procure in order to hedge its obligations under a TRS to pay its counterparty the capital appreciation of a security, resulting in higher financing costs due to the decrease in shares outstanding, assuming demand for the shares does not change). If the spread is designed to provide exposure to an underlying reference other than securities, however, rather than to reflect financing costs, such a TRS is a mixed swap.

Market participants are better positioned than are the Commissions to determine what analysis, and what supporting information and materials, best establish whether the nature of a particular payment reflects financing costs alone, or something more. Moreover, the Commissions expect that a dealer would know if the purpose of the payment(s) in question is to cover its cost of financing a position or a related hedge.[673] In such cases, a detailed analysis should not be necessary.

One commenter noted the nature of quanto equity swaps as TRS and maintained that such a transaction "is equivalent to a financing of a long position in the underlying non-U.S. equity index[]" and that the currency protection is incidental to the financing element, which is the primary purpose of the TRS.[674] As discussed above, the Commissions have provided a final interpretation regarding the appropriate classification of Title VII instruments that are quanto equity swaps and compo equity swaps.

Two commenters requested that the Commissions clarify the status of LTRS on two or more loans.[675] Both commenters stated that while the statutory definition of the term "security-based swap" provides that swaps based on a single loan are security-based swaps, it does not explicitly provide whether swaps on indexes of loans are security-based swaps.[676] They requested clarification regarding the treatment of loan based

swaps, including both LTRS and loan index credit default swaps.[677]

The Commissions have provided the final interpretation discussed above regarding LTRS based on two or more loans that are not securities. The Commissions acknowledge that this interpretation results in different treatment for an LTRS on two non-security loans (a swap), as opposed to a Title VII instrument based on two securities (a security-based swap). This result, however, is dictated by the statute.

### D. Security-Based Swaps Based on a Single Security or Loan and Single-Name Credit Default Swaps

The Commissions provided an interpretation in the Proposing Release regarding security-based swaps based on a single security or loan and single-name CDS [678] and are restating such interpretation with certain modifications in response to commenters.[679] The second prong of the statutory security-based swap definition includes a swap that is based on "a single security or loan, including any interest therein or on the value thereof." [680] The Commissions believe that under this prong of the security-based swap definition, a single-name CDS that is based on a single reference obligation would be a security-based swap because it would be based on a single security or loan (or any interest therein or on the value thereof).

In addition, the third prong of the security-based swap definition includes a swap that is based on the occurrence of an event relating to a "single issuer of a security," provided that such event "directly affects the financial statements, financial condition, or financial obligations of the issuer." [681] This provision applies generally to event-triggered swap contracts. With respect to a CDS, such events could include, for example, the bankruptcy of an issuer, a default on one of an issuer's debt securities, or the default on a non-security loan of an issuer.[682]

The Commissions believe that if the payout on a CDS on a single issuer of

a security is triggered by the occurrence of an event relating to that issuer, the CDS is a security-based swap under the third prong of the statutory security-based swap definition.[683]

In relation to aggregations of transactions under a single ISDA Master Agreement,[684] the Commissions are revising the example that was included in the Proposing Release referring to single-name CDS to clarify that the interpretation regarding aggregations of transactions is non-exclusive and thus not limited to either CDS or single-reference instruments.[685]

The Commissions believe that each transaction under an ISDA Master Agreement would need to be analyzed to determine whether it is a swap or security-based swap. For example, the Commissions believe that a number of Title VII instruments that are executed at the same time and that are documented under one ISDA Master Agreement, but in which a separate confirmation is sent for each instrument, should be treated as an aggregation of such Title VII instruments, each of which must be analyzed separately under the swap and security-based swap definitions.[686] The Commissions believe that, as a practical and economic matter, each such Title VII instrument would be a separate and independent transaction. Thus, such an aggregation of Title VII instruments would not constitute a Title VII instrument based on one "index or group" [687] under the security-based swap definition but instead would constitute multiple Title VII instruments. The Commissions find that this interpretation is an appropriate way to address CDS, TRS or other Title VII instruments referencing a single security or loan or entity that is documented under a Master Agreement or Master Confirmation and is designed to reduce the cost associated with determining

---

[673] The Commissions expect that dealers know their financing costs and can readily explain the components of the financing leg paid by their TRS counterparties.

[674] *Id.* SIFMA distinguished quanto equity swaps from the examples of mixed swaps that the Commissions provided in the Proposing Release, characterizing them as "very different."

[675] *See* Allen & Overy Letter and July LSTA Letter.

[676] *See* Allen & Overy Letter. Allen & Overy notes that a Title VII Instrument that references two securities is a security-based swap. It believes that treating an LTRS on two or more loans as a swap would result in functionally and potentially economically different products being treated in an arbitrarily different way, contrary to the spirit of the Dodd-Frank Act.

[677] The Commissions address the comments regarding loan index credit default swaps below. *See infra* note 768 and accompanying text.

[678] *See* Proposing Release at 29843.

[679] *See infra* note 689 and accompanying text.

[680] Section 3(a)(68)(A)(ii)(II) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(II). The first prong of the security-based swap definition is discussed below. *See infra* part III.G.

[681] Section 3(a)(68)(A)(ii)(III) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(III).

[682] The Commissions understand that in the context of credit derivatives on asset-backed securities or MBS, the events include principal writedowns, failure to pay principal and interest shortfalls.

[683] The Commissions understand that some single-name CDS now trade with fixed coupon payments expressed as a percentage of the notional amount of the transaction and payable on a periodic basis during the term of the transaction. *See* Markit, "The CDS Big Bang: Understanding the Changes to the Global CDS Contract and North American Conventions," 3, available at *http://www.markit.com/cds/announcements/resource/cds_big_bang.pdf.* The Commissions are restating their view that the existence of such single-name CDS does not change their interpretation.

[684] *See* Proposing Release at 29843.

[685] *See infra* note 689 and accompanying text.

[686] *See infra* note 691.

[687] The security-based swap definition further defines "index to include an "index or group of securities." *See* section 3(a)(68)(E) of the Exchange Act, 15 U.S.C. 78c(a)(68)(E).

whether such instruments are swaps or security-based swaps.[688]

Comments

The Commissions received two comments regarding the interpretation regarding aggregation of Title VII instruments under a single ISDA Master Agreement. One commenter requested that the Commissions clarify that the interpretation applies to other types of instruments, such as TRS, in addition to CDS.[689] The commenter also stated that the interpretation should be helpful with respect to use of a "Master Confirmation" structure, which the commenter described as use of general terms in a "Master Confirmation" that apply to a number of instruments with separate underlying references but for which a separate "Supplemental Confirmation" is sent for each separate component.[690]

A second commenter agreed with the Commissions' interpretation that a number of single-name CDS that are executed at the same time and that are documented under a single ISDA Master Agreement, but in which a separate confirmation is sent for each CDS, should not be treated as a single index CDS and stated that this approach is consistent with market practice.[691]

As discussed above, in response to comments the Commissions are expanding the example so it is clear that it applies beyond just CDS.[692]

*E. Title VII Instruments Based on Futures Contracts*

The Commissions proposed an interpretation in the Proposing Release regarding the treatment, generally, of swaps based on futures contracts.[693]

The Commissions are restating the interpretation they provided in the Proposing Release without modification. The Commissions also discussed in the Proposing Release the unique circumstance involving certain futures contracts on foreign government debt securities and requested comment as to how Title VII instruments on these futures contracts should be treated.[694] In response to commenters,[695] the Commissions are adopting a rule regarding the treatment of Title VII instruments on certain futures contracts on foreign government debt securities.[696]

A Title VII instrument that is based on a futures contract will either be a swap or a security-based swap, or both (i.e., a mixed swap), depending on the nature of the futures contract, including the underlying reference of the futures contract. Thus, a Title VII instrument where the underlying reference is a security future is a security-based swap.[697] In general, a Title VII instrument where the underlying reference is a futures contract that is not a security future is a swap.[698] As the Commissions noted in the Proposing Release,[699] Title VII instruments involving certain futures contracts on foreign government debt securities present a unique circumstance, which is discussed below.

Rule 3a12–8 under the Exchange Act exempts certain foreign government debt securities, for purposes only of the offer, sale, or confirmation of sale of futures contracts on such foreign government debt securities, from all provisions of the Exchange Act which by their terms do not apply to an

"exempted security," subject to certain conditions.[700] To date, the SEC has enumerated within rule 3a12–8 the debt securities of 21 foreign governments solely for purposes of futures trading ("21 enumerated foreign governments").[701]

The Commissions recognize that as a result of rule 3a12–8, futures contracts on the debt securities of the 21 enumerated foreign governments that satisfy the conditions of rule 3a12–8 are subject to the CFTC's exclusive jurisdiction and are not considered security futures. As a result, applying the interpretation above to a Title VII instrument that is based on a futures contract on the debt securities of these 21 enumerated foreign governments would mean that the Title VII instrument would be a swap.[702] The Commissions note, however, that the conditions in rule 3a12–8 were established specifically for purposes of the offer and sale of "qualifying foreign futures contracts" (as defined in rule 3a12–8)[703] on the debt securities of the 21 enumerated foreign governments,[704] not Title VII instruments based on futures contracts on the debt securities

---

[688] *See supra* part I, under "Overall Economic Considerations".

[689] *See* July LSTA Letter.

[690] *Id.*

[691] *See* Letter from Richard M. McVey, Chairman and Chief Executive Officer, MarketAxess Holdings, Inc. ("MarketAxess"), July 22, 2011 ("MarketAxess Letter").

[692] The Commissions believe, based on the July LSTA Letter, that the "Master Confirmation" structure the commenter described is the same general structure as the aggregation of single-name CDS the Commissions provided as an example in the Proposing Release, but that a "Master Confirmation" structure may not be limited to single-reference instruments or to CDS and instead may be used for a broader range of instruments. *See* July LSTA Letter. The Commissions note that the following are examples of "Master Confirmation" structure to which the interpretive guidance would apply: 2009 Americas Master Equity Derivatives Confirmation Agreement, Stand-alone 2007 Americas Master Variance Swap Confirmation Agreement, and 2004 Americas Interdealer Master Equity Derivatives Confirmation Agreement and March 2004 Canadian Supplement to the Master Confirmation. The Commissions believe the broader example in this release provides the clarification the commenter requested.

[693] *See* Proposing Release at 29843–44.

[694] *Id.*

[695] *See infra* note 718 and accompanying text.

[696] *See* rule 1.3(bbbb) under the CEA and rule 3a68–5 under the Exchange Act.

[697] A security future is defined in both the CEA and the Exchange Act as a futures contract on a single security or a narrow-based security index, including any interest therein or based on the value thereof, except an exempted security under section 3(a)(12) of the Exchange Act, 15 U.S.C. 78c(a)(12), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Exchange Act, 15 U.S.C. 78c(a)(29), as in effect on the date of enactment of the Futures Trading Act of 1982).

The term security future does not include any agreement, contract, or transaction excluded from the CEA under sections 2(c), 2(d), 2(f), or 2(g) of the CEA, 7 U.S.C. 2(c), 2(d), 2(f), or 2(g), as in effect on the date of enactment of the Commodity Futures Modernization Act of 2000 ("CFMA") or Title IV of the CFMA. *See* section 1a(44) of the CEA, 7 U.S.C. 1a(44), and section 3(a)(55) of the Exchange Act, 15 U.S.C. 78c(a)(55).

[698] Depending on the underlying reference of the futures contract, though, such swaps could be SBSAs. For example, a swap on a future on the S&P 500 index would be an SBSA.

[699] *See* Proposing Release at 29843.

[700] Specifically, rule 3a12–8 under the Exchange Act requires as a condition to the exemption that the foreign government debt securities not be registered under the Securities Act (or be the subject of any American depositary receipt registered under the Securities Act) and that futures contracts on such foreign government debt securities "require delivery outside the United States, [and] any of its possessions or territories, and are traded on or through a board of trade, as defined in [section 2 of the CEA, 7 U.S.C. 2]." *See* rules 3a12–8(a)(2) and 3a12–8(b) under the Exchange Act, 17 CFR 240.3a12–8(a)(2) and 240.3a12–8(b). These conditions were "designed to minimize the impact of the exemption on securities distribution and trading in the United States.
* * *" *See Exemption for Certain Foreign Government Securities for Purposes of Futures Trading,* 49 FR 8595 (Mar. 8, 1984) at 8596–97 (*citing* Futures Trading Act of 1982).

[701] *See* rule 3a12–8(a)(1) under the Exchange Act (designating the debt securities of the governments of the United Kingdom, Canada, Japan, Australia, France, New Zealand, Austria, Denmark, Finland, the Netherlands, Switzerland, Germany, Ireland, Italy, Spain, Mexico, Brazil, Argentina, Venezuela, Belgium, and Sweden).

[702] The Commissions note, by contrast, that a Title VII instrument that is based on the price or value of, or settlement into, a futures contract on the debt securities of one of the 21 enumerated foreign governments and that also has the potential to settle directly into such debt securities would be a security-based swap and, depending on other features of the Title VII instrument, possibly a mixed swap.

[703] Rule 3a12–8(b) under the Exchange Act defines "qualifying foreign futures contracts" as "contracts for the purchase or sale of a designated foreign government security for future delivery, as 'future delivery' is defined in 7 U.S.C. 2, provided such contracts require delivery outside the United States, any of its possessions or territories, and are traded on or through a board of trade, as defined at 7 U.S.C. 2." 17 CFR 240.3a12–8(b).

[704] *See supra* note 700.

of the 21 enumerated governments. Further, the Commissions note that the Dodd-Frank Act did not exclude swaps on foreign government debt securities generally from the definition of the term "security-based swap." Accordingly, a Title VII instrument that is based directly on foreign government debt securities, including those of the 21 enumerated governments, is a security-based swap or a swap under the same analysis as any other Title VII instruments based on securities.

The Commissions indicated in the Proposing Release that they would evaluate whether Title VII instruments based on futures contracts on the debt securities of the 21 enumerated foreign governments that satisfy the conditions of rule 3a12–8 should be characterized as swaps, security-based swaps, or mixed swaps.[705] In response to commenters,[706] the Commissions are adopting rule 1.3(bbbb) under the CEA and rule 3a68–5 under the Exchange Act, which address the treatment of these Title VII instruments.

The final rules provide that a Title VII instrument that is based on or references a qualifying foreign futures contract on the debt securities of one or more of the 21 enumerated foreign governments is a swap and not a security-based swap, provided that the Title VII instrument satisfies the following conditions:

• The futures contract on which the Title VII instrument is based or that is referenced is a qualifying foreign futures contract (as defined in rule 3a12–8)[707] on the debt securities of any one or more of the 21 enumerated foreign governments that satisfies the conditions of rule 3a12–8;

• The Title VII instrument is traded on or through a board of trade (as defined in section 1a(6) of the CEA);

• The debt securities on which the qualifying foreign futures contract is based or referenced and any security used to determine the cash settlement amount pursuant to the fourth condition below are not covered by an effective registration statement under the Securities Act or the subject of any American depositary receipt covered by an effective registration statement under the Securities Act;

• The Title VII instrument may only be cash settled; and

• The Title VII instrument is not entered into by the issuer of the securities upon which the qualifying foreign futures contract is based or referenced (including any security used to determine the cash payment due on

settlement of such Title VII instrument), an affiliate (as defined in the Securities Act and the rules and regulations thereunder)[708] of the issuer, or an underwriter with respect to such securities.

Under the first condition, the final rules provide that the futures contract on which the Title VII instrument is based or referenced must be a qualifying foreign futures contract that satisfies the conditions of rule 3a12–8 and may only be based on the debt of any one or more of the enumerated 21 foreign governments. If the conditions of rule 3a12–8 are not satisfied, then there cannot be a qualifying foreign futures contract, the futures contract is a security future, and a swap on such a security future is a security-based swap.

The second condition of the final rules provides that the Title VII instrument on the qualifying foreign futures contract must itself be traded on or through a board of trade because a qualifying foreign futures contract on the debt securities of one or more of the 21 enumerated foreign governments itself is required to be traded on a board of trade. The Commissions believe that swaps on such futures contracts should be traded subject to rules applicable to such futures contracts themselves.

The third condition of the final rules provides that the debt securities on which the qualifying foreign futures contract is based or referenced and any security used to determine the cash settlement amount pursuant to the fourth condition cannot be registered under the Securities Act or be the subject of any American depositary receipt registered under the Securities Act. This condition is intended to prevent circumvention of registration and disclosure requirements of the Securities Act applicable to foreign government issuances of their securities. This condition is similar to a condition included in rule 3a12–8.[709]

The fourth condition of the final rules provides that the Title VII instrument must be cash settled. Although, as the Commissions recognize, rule 3a12–8 permits a qualifying foreign futures contract to be physically settled so long as delivery is outside the United States, any of its possessions or territories,[710] in the context of Title VII instruments, only cash settled Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments will be considered swaps. The Commissions

believe that this condition is appropriate in order to provide consistent treatment of Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments with the Commissions' treatment of swaps and security-based swaps generally.[711]

The fifth condition of the final rules provides that for a Title VII instrument to be a swap under such rules, it cannot be entered into by the issuer of the securities upon which the qualifying foreign futures contract is based or referenced (including any security used to determine the cash payment due on settlement of such Title VII instrument), an affiliate of the issuer, or an underwriter of the issuer's securities. The Commissions have included this condition to address the concerns raised by the SEC in the Proposing Release that the characterization of a Title VII instrument that is based on a futures contract on the debt securities of one of the 21 enumerated foreign governments may affect Federal securities law provisions relating to the distribution of the securities upon which the Title VII instrument is based or referenced.[712]

The Dodd-Frank Act included provisions that would not permit issuers, affiliates of issuers, or underwriters to use security-based swaps to offer or sell the issuers' securities underlying a security-based swap without complying with the requirements of the Securities Act.[713] This provision applies regardless of whether the Title VII instrument allows the parties to physically settle any such security-based swap. In addition, the Dodd-Frank Act provided that any offer or sale of security-based swaps to non-ECPs would have to be registered under the Securities Act.[714] For example, if a Title VII instrument that is based on a futures contract on the debt securities of one of the 21 enumerated foreign governments is characterized as a swap, and not a security-based swap, then the provisions of the Dodd-Frank Act enacted to ensure that there could not be offers and sales of securities made without compliance with the Securities Act, either by issuers, their affiliates, or underwriters or to non-ECPs, would not apply to such swap transactions.

Only those Title VII instruments that are based on qualifying foreign futures contracts on the debt securities of the 21

---

[705] *See* Proposing Release at 29844.

[706] *See infra* note 718 and accompanying text.

[707] *See supra* note 703.

[708] *See, e.g.,* rule 405 under the Securities Act, 17 CFR 230.405.

[709] *See supra* note 700.

[710] *Id.*

[711] *See infra* part III.H.

[712] *See* Proposing Release at 29844.

[713] *See* section 2(a)(3) of the Securities Act, 15 U.S.C. 77b(a)(3), as amended by the Dodd-Frank Act.

[714] *See* section 5 of the Securities Act, 15 U.S.C. 77e, as amended by the Dodd-Frank Act.

enumerated foreign governments and that satisfy these five conditions will be swaps, not security-based swaps. The Commissions note that the final rules are intended to provide consistent treatment (other than with respect to method of settlement) of qualifying foreign futures contracts and Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments.[715] The Commissions understand that many of the qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments trade with substantial volume through foreign trading venues under the conditions set forth in rule 3a12–8 [716] and permitting swaps on such futures contracts subject to similar conditions would not raise concerns that such swaps could be used to circumvent the conditions of rule 3a12–8 and the Federal securities laws concerns that such conditions are intended to protect.[717] Further, providing consistent treatment for qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments and Title VII instruments based on futures contracts on the debt securities of the 21 enumerated foreign governments will allow trading of these instruments through designated contract markets on which such futures are listed.

The Commissions recognize that the rules may result in a different characterization of a Title VII instrument that is based directly on a foreign government debt security and one that is based on a qualifying foreign futures contract on a debt security of one of the 21 enumerated foreign governments. However, the Commissions note that this is the case today (i.e., different treatments) with respect to other instruments subject to CFTC regulation and/or SEC regulation, such as futures on broad-based security indexes and futures on a single security or narrow-based security index.

Comments

Commenters did not address the interpretation as it applied to Title VII instruments based on futures contracts generally. Two commenters addressed Title VII instruments based on futures contracts on debt securities of the 21 enumerated foreign governments.[718] Both commenters requested that the Commissions treat these Title VII instruments as swaps.[719] The Commissions agree that these instruments should be treated as swaps under certain conditions and, therefore, are adopting rule 1.3(bbbb) under the CEA and rule 3a68–5 under the Exchange Act as discussed above to treat Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments as swaps, provided such Title VII instruments satisfy certain conditions.

*F. Use of Certain Terms and Conditions in Title VII Instruments*

The Commissions provided an interpretation in the Proposing Release regarding the use of certain fixed terms in Title VII instruments and are restating that interpretation without modification.[720] The Commissions are aware that market participants' setting of certain fixed terms or conditions of Title VII instruments may be informed by the value or level of a security, rate, or other commodity at the time of the execution of the instrument. The Commissions believe that, in evaluating whether a Title VII instrument with such a fixed term or condition is a swap or security-based swap, the nature of the security, rate, or other commodity that informed the setting of such fixed term or condition should not itself impact the determination of whether the Title VII instrument is a swap or a security-based swap, provided that the fixed term or condition is set at the time of execution and the value or level of that fixed term or condition may not vary over the life of the Title VII instrument.[721]

For example, a Title VII instrument, such as an interest rate swap, in which floating payments based on three-month LIBOR are exchanged for fixed rate payments of five percent would be a swap, and not a security-based swap, even if the five percent fixed rate was informed by, or quoted based on, the yield of a security, provided that the five percent fixed rate was set at the time of execution and may not vary over the life of the Title VII instrument.[722] Another example would be where a private sector or government borrower that issues a five-year, amortizing $100 million debt security with a semi-annual coupon of LIBOR plus 250 basis points also, at the same time, chooses to enter into a five-year interest rate swap on $100 million notional in which this same borrower, using the same amortization schedule as the debt security, receives semi-annual payments of LIBOR plus 250 basis points in exchange for five percent fixed rate payments. The fact that the specific terms of the interest rate swap (e.g., five-year, LIBOR plus 250 basis points, $100 million notional, fixed amortization schedule) were set at the time of execution to match related terms of a debt security does not cause the interest rate swap to become a security-based swap. However, if the interest rate swap contained additional terms that were in fact contingent on a characteristic of the debt security that may change in the future, such as an adjustment to future interest rate swap payments based on the future price or yield of the debt security, then this Title VII instrument would be a security-based swap that would be a mixed swap.

---

[715] The Commissions note that the final rules provide consistent treatment of qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments and Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments unless the Title VII instrument is entered into by the issuer of the securities upon which the qualifying foreign futures contract is based or referenced (including any security used to determine the cash payment due on settlement of such Title VII instrument), an affiliate of the issuer, or an underwriter with respect to such securities.

[716] For the quarter that ended December 31, 2011, the trading volume reported to the CFTC of qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments made available for trading by direct access from the U.S. on foreign trading venues granted direct access no-action relief by the CFTC that exceeded 100,000 contracts per quarter from the U.S. were as follows: (i) 7,985,959 contracts for 3 Year Treasury Bond Futures on the Australian Securities Exchange's ASX Trade24 platform; (ii) 1,872,592 contracts for 10-Year Government of Canada Bond Futures on the Bourse de Montreal; (iii) 47,874,911 contracts for Euro Bund Futures on Eurex Deutschland ("Eurex"); (iv) 26,434,713 contracts for Euro Bobl Futures on Eurex; (v) 30,489,427 contracts for Euro Schatz Futures on Eurex; and (vi) 8,292,222 contracts for Long Gilt Futures on the NYSE LIFFE.

[717] See supra note 712 and accompanying text.

[718] See CME Letter and SIFMA Letter.

[719] Id. Both commenters stated their belief that the range of factors considered by the SEC in designating the debt securities of the 21 enumerated foreign governments as exempted securities indicated that there is sufficient disclosure about the 21 enumerated foreign governments and their securities such that the further disclosure should not be necessary. Both commenters also indicated that subjecting futures contracts on the debt securities of the 21 enumerated foreign governments to CFTC regulation, while subjecting Title VII instruments based on these futures contracts to SEC regulation, would be problematic. Id.

[720] See Proposing Release at 29845.

[721] This interpretation relates solely to the determination regarding whether a Title VII instrument is a swap or security-based swap. The Commissions are not expressing a view regarding whether such Title VII instrument would be a security-based swap agreement.

[722] However, to the extent the fixed term or condition is set at a future date or at a future value or level of a security, rate, or other commodity rather than the value or level of such security, rate, or other commodity at the time of execution of the Title VII instrument, the discussion above would not apply, and the nature of the security, rate, or other commodity used in determining the terms or conditions would be considered in evaluating whether the Title VII instrument is a swap or security-based swap.

### Comments

One commenter agreed with the Commissions' interpretation generally, but believed that the Commissions should broaden the interpretation to allow a swap to reflect "resets," or changes in the referenced characteristic of a security, where those "resets" or changes are "intended to effect a purpose other than transmitting the risk of changes in the characteristic itself," without causing a Title VII instrument that is not a security-based swap to become a security-based swap.[723]

The Commissions are not expanding the interpretation to allow "resets" of a fixed rate derived from a security. The interpretation is consistent with the statutory swap and security-based swap definitions. The Commissions believe that a Title VII instrument based on a rate that follows a security, and that may "reset" or change in the future based on changes in that security, is a security-based swap. Further, any amendment or modification of a material term of a Title VII instrument would result in a new Title VII instrument and a corresponding reassessment of the instrument's status as either a swap or a security-based swap.[724]

### G. The Term "Narrow-Based Security Index" in the Security-Based Swap Definition

#### 1. Introduction

As noted above, a Title VII instrument in which the underlying reference of the instrument is a "narrow-based security index" is a security-based swap subject to regulation by the SEC, whereas a Title VII instrument in which the underlying reference of the instrument is a security index that is not a narrow-based security index (i.e., the index is broad-based) is a swap subject to regulation by the CFTC. The Commissions proposed an interpretation and rules regarding usage of the term "narrow-based security index" in the security-based swap definition, including:

• The existing criteria for determining whether a security index is a narrow-based security index and the applicability of past guidance of the Commissions regarding those criteria to Title VII instruments;

• New criteria for determining whether a CDS where the underlying reference is a group or index of entities or obligations of entities (typically referred to as an "index CDS") is based on an index that is a narrow-based security index;

• The meaning of the term "index";

• Rules governing the tolerance period for Title VII instruments on security indexes traded on DCMs, SEFs, foreign boards of trade ("FBOTs"), security-based SEFs, or NSEs, where the security index temporarily moves from broad-based to narrow-based or from narrow-based to broad-based; and

• Rules governing the grace period for Title VII instruments on security indexes traded on DCMs, SEFs, FBOTs, security-based SEFs, or NSEs, where the security index moves from broad-based to narrow-based or from narrow-based to broad-based and the move is not temporary.[725]

As discussed below, the Commissions are restating the interpretation set forth in the Proposing Release with certain further clarifications and adopting the rules as proposed with certain modifications.

#### 2. Applicability of the Statutory Narrow-Based Security Index Definition and Past Guidance of the Commissions to Title VII Instruments

The Commissions provided an interpretation in the Proposing Release regarding the applicability of the statutory definition of the term "narrow-based security index" and past guidance of the Commissions relating to such term to Title VII instruments.[726] The Commissions are restating the interpretation set out in the Proposing Release without modification.

As defined in the CEA and Exchange Act,[727] an index is a narrow-based security index if, among other things, it meets any one of the following four criteria:

• It has nine or fewer component securities;

• A component security comprises more than 30 percent of the index's weighting;

• The five highest weighted component securities in the aggregate comprise more than 60 percent of the index's weighting; or

• The lowest weighted component securities comprising, in the aggregate, 25 percent of the index's weighting have an aggregate dollar value of average daily trading volume of less than

$50,000,000 (or in the case of an index with more than 15 component securities, $30,000,000), except that if there are two or more securities with equal weighting that could be included in the calculation of the lowest weighted component securities comprising, in the aggregate, 25 percent of the index's weighting, such securities shall be ranked from lowest to highest dollar value of average daily trading volume and shall be included in the calculation based on their ranking starting with the lowest ranked security.[728]

The first three criteria apply to the number and concentration of the "component securities" in the index. The fourth criterion applies to the average daily trading volume of an index's "component securities." [729]

This statutory narrow-based security index definition focuses on indexes composed of equity securities and certain aspects of the definition, in particular the evaluation of average daily trading volume, are designed to take into account the trading patterns of individual stocks.[730] However, the Commissions, pursuant to authority granted in the CEA and the Exchange Act,[731] previously have extended the definition to other categories of indexes but modified the definition to take into account the characteristics of those other categories. Specifically, the Commissions have previously provided guidance regarding the application of the narrow-based security index definition to futures contracts on volatility indexes [732] and debt security indexes.[733] Today, then, there exists guidance for determining what constitutes a narrow-based security index.

Volatility indexes are indexes composed of index options. The Commissions issued a joint order in

---

[723] See ISDA Letter.

[724] See infra part III.G.5(a).

[725] See Proposing Release at 29845–58.

[726] See Proposing Release at 29845–48.

[727] Sections 3(a)(55)(B) and (C) of the Exchange Act, 15 U.S.C. 78c(a)(55)(B) and (C), include a definition of "narrow-based security index" in the same paragraph as the definition of security future. See also sections 1a(35)(A) and (B) of the CEA, 7 U.S.C. 1a(35)(A) and (B). A security future is a contract for future delivery on a single security or narrow-based security index (including any interest therein or based on the value thereof). See section 3(a)(55) of the Exchange Act, 15 U.S.C. 78c(a)(55), and section 1a(44) of the CEA, 7 U.S.C. 1a(44).

[728] See section 3(a)(55)(B) of the Exchange Act, 15 U.S.C. 78c(a)(55)(B). See also sections 1a(35)(A) and (B) of the CEA, 7 U.S.C. 1a(35)(A) and (B).

[729] The narrow-based security index definition in the CEA and Exchange Act also excludes from its scope security indexes that satisfy certain specified criteria. See sections 3(a)(55)(C)(i)–(vi) of the Exchange Act, 15 U.S.C. 78c(a)(55)(C)(i)–(vi), and sections 1a(35)(B)(i)–(vi) of the CEA, 7 U.S.C. 1a(35)(B)(i)–(vi).

[730] See Joint Order Excluding Indexes Comprised of Certain Index Options From the Definition of Narrow-Based Security Index, 69 FR 16900 (Mar. 31, 2004) ("March 2004 Index Options Joint Order").

[731] See section 1a(35)(B)(vi) of the CEA, 7 U.S.C. 1a(35)(B)(vi), and section 3(a)(55)(C)(vi) of the Exchange Act, 15 U.S.C. 78c(a)(55)(C)(vi).

[732] See March 2004 Index Options Joint Order.

[733] See Joint Final Rules: Application of the Definition of Narrow-Based Security Index to Debt Securities Indexes and Security Futures on Debt Securities, 71 FR 39434 (Jul. 13, 2006) ("July 2006 Debt Index Release").

2004 to define when a volatility index is not a narrow-based security index. Under this joint order, a volatility index is not a narrow-based security index if the index meets all of the following criteria:

• The index measures the magnitude of changes (as calculated in accordance with the order) in the level of an underlying index that is not a narrow-based security index pursuant to the statutory criteria for equity indexes discussed above;

• The index has more than nine component securities, all of which are options on the underlying index;

• No component security of the index comprises more than 30 percent of the index's weighting;

• The five highest weighted component securities of the index in the aggregate do not comprise more than 60 percent of the index's weighting;

• The average daily trading volume of the lowest weighted component securities in the underlying index (those comprising, in the aggregate, 25 percent of the underlying index's weighting) have a dollar value of more than $50,000,000 (or $30,000,000 in the case of an underlying index with 15 or more component securities), except if there are 2 or more securities with equal weighting that could be included in the calculation of the lowest weighted component securities comprising, in the aggregate, 25 percent of the underlying index's weighting, such securities shall be ranked from lowest to highest dollar value of average daily trading volume and shall be included in the calculation based on their ranking starting with the lowest ranked security;

• Options on the underlying index are listed and traded on an NSE registered under section 6(a) of the Exchange Act;[734] and

• The aggregate average daily trading volume in options on the underlying index is at least 10,000 contracts calculated as of the preceding 6 full calendar months.[735]

With regard to debt security indexes, the Commissions issued joint rules in 2006 ("July 2006 Debt Index Rules") to define when an index of debt securities[736] is not a narrow-based security index. The first three criteria of that definition are similar to the statutory definition for equities and the order regarding volatility indexes in that a debt security index would not be narrow-based if:

• It is comprised of more than nine debt securities that are issued by more than nine non-affiliated issuers;

• The securities of any issuer included in the index do not comprise more than 30 percent of the index's weighting; and

• The securities of any five non-affiliated issuers in the index do not comprise more than 60 percent of the index's weighting.

In the July 2006 Debt Index Rules, instead of the statutory average daily trading volume test, however, the Commissions adopted a public information availability requirement. Under this requirement, assuming the aforementioned number and concentration criteria were satisfied, a debt security index would not be a narrow-based security index if the debt securities or the issuers of debt securities in the index met any one of the following criteria:

• The issuer of the debt security is required to file reports pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934;[737]

• The issuer of the debt security has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more;

• The issuer of the debt security has outstanding securities that are notes, bonds, debentures, or evidence of indebtedness having a total remaining principal amount of at least $1 billion;

• The security is an exempted security as defined in section 3(a)(12) of the Securities Exchange Act of 1934[738] and the rules promulgated thereunder; or

• The issuer of the security is a government of a foreign country or a political subdivision of a foreign country.[739]

In the Dodd-Frank Act, Congress included the term "narrow-based security index" in the security-based swap definition, and thus the statutory definition of the term "narrow-based security index"[740] also applies in distinguishing swaps (on security indexes that are not narrow-based, also known as "broad-based") and security-based swaps (on narrow-based security indexes).[741] The Commissions have determined that their prior guidance with respect to what constitutes a narrow-based security index in the context of volatility indexes[742] and debt security indexes[743] applies in determining whether a Title VII instrument is a swap or a security-based swap, except as the rules the Commissions are adopting provide for other treatment with respect to index CDS as discussed below.[744]

To make clear that the Commissions are applying the prior guidance and rules to Title VII instruments, the Commissions are adopting rules to further define the term "narrow-based security index" in the security-based swap definition. Under paragraph (1) of rule 1.3(yyy) under the CEA and paragraph (a) of rule 3a68–3 under the Exchange Act, for purposes of the security-based swap definition, the term "narrow-based security index" has the same meaning as the statutory definition set forth in section 1a(35) of the CEA and section 3(a)(55) of the Exchange Act,[745] and the rules, regulations, and orders issued by the Commissions relating to such definition. As a result, except as the rules the Commissions are adopting provide for other treatment with respect to index CDS as discussed below,[746] market participants generally may use the Commissions' past guidance in determining whether certain Title VII instruments based on a security index are swaps or security-based swaps.

The Commissions also are providing an interpretation and adopting additional rules establishing criteria for indexes composed of securities, loans, or issuers of securities referenced by an

---

[734] 15 U.S.C. 78f(a).

[735] See March 2004 Index Options Joint Order. In 2009, the Commissions issued a joint order that provided that, instead of the index options having to be listed on an NSE, the index options must be listed on an exchange and pricing information for the index options, and the underlying index, must be computed and disseminated in real time through major market data vendors. See Joint Order To Exclude Indexes Composed of Certain Index Options From the Definition of Narrow-Based Security Index, 74 FR 61116 (Nov. 23, 2009) (expanding the criteria necessary for exclusion under the March 2004 Index Options Joint Order to apply to volatility indexes for which pricing information for the underlying broad-based security index, and the options that compose such index, is current, accurate, and publicly available).

[736] Under the rules, debt securities include notes, bonds, debentures or evidence of indebtedness. See rule 41.15(a)(1)(i) under the CEA, 17 CFR 41.15(a)(1)(i) and rule 3a55–4(a)(1)(i) under the Exchange Act, 17 CFR 240.3a55–4(a)(1)(i). See also July 2006 Debt Index Release.

[737] 15 U.S.C. 78m or 78o(d).

[738] 15 U.S.C. 78c(a)(12).

[739] See July 2006 Debt Index Rules. The July 2006 Debt Index Rules also provided that debt securities in the index must satisfy certain minimum outstanding principal balance criteria, established certain exceptions to these criteria and the public information availability requirement, and provided for the treatment of indexes that include exempted securities (other than municipal securities).

[740] See sections 3(a)(55)(B) and (C) of the Exchange Act, 15 U.S.C. 78c(a)(55)(B) and (C). See also sections 1a(35)(A) and (B) of the CEA, 7 U.S.C. 1a(35)(A) and (B).

[741] The statutory definition of the term "narrow-based security index" for equities, and the Commissions' subsequent guidance as to what constitutes a narrow-based security index with respect to volatility and debt indexes, is applicable in the context of distinguishing between futures contracts and security futures products.

[742] See March 2004 Index Options Joint Order.

[743] See July 2006 Debt Index Rules.

[744] See infra part III.G.3.

[745] 7 U.S.C. 1a(35) and 15 U.S.C. 78c(a)(55).

[746] See infra part III.G.3.

index CDS.[747] The interpretation and rules also address the definition of an "index"[748] and the treatment of broad-based security indexes that become narrow-based and narrow-based indexes that become broad-based, including rule provisions regarding tolerance and grace periods for swaps on security indexes that are traded on CFTC-regulated trading platforms and security-based swaps on security indexes that are traded on SEC-regulated trading platforms.[749] These rules and interpretation are discussed below.

### 3. Narrow-Based Security Index Criteria for Index Credit Default Swaps

#### (a) In General

The Commissions provided an interpretation in the Proposing Release regarding the narrow-based security index criteria for index CDS and are restating it without modification.[750] While the Commissions understand that the underlying reference for most cleared CDS is a single entity or an index of entities rather than a single security or an index of securities, the underlying reference for CDS also could be a single security or an index of securities.[751] A CDS where the underlying reference is a single entity (*i.e.*, a single-name CDS), a single obligation of a single entity (*e.g.*, a CDS on a specific bond, loan, or asset-backed security, or any tranche or series of any bond, loan, or asset-backed security), or an index CDS where the underlying reference is a narrow-based security index or the issuers of securities in a narrow-based security index is a security-based swap. An index CDS where the underlying reference is not a narrow-based security index or the

issuers of securities in a narrow-based security index (*i.e.*, a broad-based index) is a swap.[752]

The statutory definition of the term "narrow-based security index," as explained above, was designed with the U.S. equity markets in mind.[753] Thus, the statutory definition is not necessarily appropriate for determining whether an index underlying an index CDS is broad or narrow-based. Nor is the guidance that the Commissions have previously issued with respect to the narrow-based security index definition discussed above necessarily appropriate, because that guidance was designed to address and was uniquely tailored to the characteristics of volatility indexes and debt security indexes in the context of futures. Accordingly, the Commissions are clarifying that the guidance that the Commissions have previously issued with respect to the narrow-based security index definition discussed above does not apply to index CDS. Instead, the Commissions are adopting rules as discussed below that include separate criteria for determining whether an index underlying an index CDS is a narrow-based security index.

The Commissions are further defining the term "security-based swap," and the use of the term "narrow-based security index" within that definition, to modify the criteria applied in the context of index CDS in assessing whether the index is a narrow-based security index. The third prong of the security-based swap definition includes a Title VII instrument based on the occurrence of an event relating to the "issuers of securities in a narrow-based security index," provided that such event directly affects the "financial statements, financial condition, or financial obligations of the issuer."[754] The first prong of the security-based swap definition includes a Title VII instrument that is based on a narrow-based security-index.[755] Because the third prong of the security-based swap definition relates to issuers of securities, while the first prong of such definition

relates to securities, the Commissions are further defining both the term "narrow-based security index" and the term "issuers of securities in a narrow-based security index" in the context of the security-based swap definition as applied to index CDS. The Commissions believe it is important to further define both terms in order to assure consistent analysis of index CDS.[756] While the wording of the two definitions as adopted differs slightly, the Commissions expect that they will yield the same substantive results in distinguishing narrow-based and broad-based index CDS.[757]

#### (b) Rules Regarding the Definitions of "Issuers of Securities in a Narrow-Based Security Index" and "Narrow-Based Security Index" for Index Credit Default Swaps

The Commissions proposed rules to further define the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" in order to provide appropriate criteria for determining whether an index composed of issuers of securities referenced by an index CDS and an index composed of securities referenced by an index CDS are narrow-based security indexes.[758] The Commissions are adopting rules 1.3(zzz) and 1.3(aaaa) under the CEA and rules 3a68–1a and 3a68–1b under the Exchange Act as proposed with certain modifications.[759]

In formulating the criteria in the final rules, and consistent with the guidance and rules the Commissions have

---

[747] *Id.*

[748] *See infra* part III.G.4.

[749] *See infra* part III.G.5.

[750] *See* Proposing Release at 29847–48.

[751] *See, e.g.*, Markit, "Markit CDX" (describing the Markit CDX indexes and the number of "names" included in each index), available at *http://www.markit.com/en/products/data/indices/credit-and-loan-indices/cdx/cdx.page*; Markit, "Markit iTraxx Indices," (stating that the "Markit iTraxx indices are comprised of the most liquid names in the European and Asian markets") (emphasis added), available at *http://www.markit.com/en/products/data/indices/credit-and-loan-indices/itraxx/itraxx.page* . Examples of indexes based on securities include the Markit ABX.HE and CMBX indexes. *See* Markit, "Markit ABX.HE," (describing the Markit ABX.HE index as "a synthetic tradeable index referencing a basket of 20 subprime mortgage-backed securities"), available at *http://www.markit.com/en/products/data/indices/structured-finance-indices/abx/abx.page*; and Markit, "Markit CMBX," (describing the Markit CMBX index as "a synthetic tradeable index referencing a basket of 25 commercial mortgage-backed securities"), available at *http://www.markit.com/en/products/data/indices/structured-finance-indices/cmbx/cmbx.page*.

[752] Similarly, an option to enter into a single-name CDS or a CDS referencing a narrow-based security index as described above would be a security-based swap, while an option to enter into a CDS on a broad-based security index or the issuers of securities in a broad-based security index would be a swap. Index CDS where the underlying reference is a broad-based security index would be SBSAs. The SEC has enforcement authority with respect to swaps that are SBSAs, as discussed further in section V., *infra*.

[753] *See* July 2006 Debt Index Rules.

[754] Section 3(a)(68)(A)(ii)(III) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(III).

[755] Section 3(a)(68)(A)(ii)(I) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(I).

[756] Because they apply only with respect to index CDS, the definitions of "issuers of securities in a narrow-based security index" and "narrow-based security index" as adopted do not apply with respect to other types of event contracts, whether analyzed under the first or third prong.

[757] For example, if the reference entities included in one index are the same as the issuers of securities included in another index, application of the two definitions should result in both indexes being either broad-based or narrow-based.

[758] *See* Proposing Release at 29848.

[759] The discussion throughout this section refers to "reference entities" and "issuers" in discussing the final rules. The term "reference entity" is defined in paragraph (c)(3) of rule 1.3(zzz) under the CEA and rule 3a68–1a under the Exchange Act and the term "issuer" is defined in paragraph (c)(3) of rule 1.3(aaaa) under the CEA and rule 3a68–1b under the Exchange Act. The final rules provide that the term "reference entity" includes: (i) An issuer of securities; (ii) an issuer of securities that is an issuing entity of asset-backed securities is a reference entity or issuer, as applicable; and (iii) an issuer of securities that is a borrower with respect to any loan identified in an index of borrowers or loans is a reference entity. The final rules provide that the term "issuer" includes: (i) An issuer of securities; and (ii) an issuer of securities that is an issuing entity of asset-backed securities is a reference entity or issuer, as applicable. *See* paragraph (c)(3) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

previously issued and adopted regarding narrow-based security indexes in the context of security futures, the Commissions believe that there should be public information available about a predominant percentage of the reference entities included in the index, or, in the case of an index CDS on an index of securities, about the issuers of the securities or the securities underlying the index, in order to reduce the likelihood that non-narrow-based indexes referenced in index CDS or the component securities or issuers of securities in that index would be readily susceptible to manipulation, as well as to help prevent the misuse of material non-public information through the use of CDS based on such indexes.

To satisfy these objectives, the Commissions are adopting rules that are based on the criteria developed for debt indexes discussed above [760] but that tailor these criteria to address index CDS.[761] These criteria are included solely for the purpose of defining the terms "narrow-based security index" and "issuers of securities in a narrow-based security index" in the first and third prongs of the security-based swap definition with respect to index CDS and will not affect any other interpretation or use of the term "narrow-based security index" or any other provision of the Dodd-Frank Act, the CEA, or the Exchange Act.

Further, in response to commenters,[762] the Commissions are clarifying that if an index CDS is based on an index of loans that are not securities,[763] an event relating to a loan in the index, such as a default on a loan,

is an event "relating to" the borrower.[764] To the extent that the borrower is an issuer of securities, the index CDS based on such index of loans will be analyzed under the third prong of the security-based swap definition in the same manner as any other index CDS.

### Comments

The Commissions received two general comments requesting that the proposed rules further defining the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" be simplified.[765] One commenter believed that the rules were exceedingly complicated.[766] Another commenter thought that the criteria should allow transactions to be readily and transparently classifiable as a swap or security-based swap.[767] The commenters did not provide analysis supporting their comments or recommend language changes.

The Commissions are adopting the rules regarding index CDS essentially as proposed with certain modifications to address commenters' concerns. While the final rules contain a number of elements that are similar or identical to elements contained in the statutory narrow-based security index definition, in order to enable the narrow-based security index definition to apply appropriately to index CDS, the final rules contain some alternative tests to those set forth in the statutory definition.

The Commissions also recognize the diversity of Title VII instruments. While the final rules for index CDS are based on the July 2006 Debt Index Rules, the substantive differences between the final rules in the index CDS and the equity or debt security contexts are intended to reflect the particular characteristics of the CDS marketplace, in which, for example, index components may be entities (issuers of securities) as well as specific equity and debt securities.

The Commissions also received three comments requesting clarification regarding the applicability of the index CDS rules to CDS based on indexes of loans.[768] One commenter noted that the

Commissions did not address in the Proposing Release the question of whether an index composed exclusively of loans should be treated as a narrow-based security index.[769] This commenter noted that because the first and third prongs of the statutory security-based swap definition do not explicitly reference loans, the statutory definition does not expressly categorize Title VII instruments based on more than one loan, or contingent on events that occur with respect to more than one loan borrower, unless such borrowers are also "issuers of securities." [770] Based on this commenter's view of the statutory definition, this commenter requested that the Commissions clarify the treatment of indexes composed exclusively of loans.[771] Another commenter provided similar comments and also requested clarification regarding the treatment of CDS based on indexes of loans.[772] A third commenter stated its view that the third prong of the statutory security-based swap definition implies that Title VII instruments on a basket of loans are security-based swaps if the lenders would satisfy the criteria for issuers of a "narrow-based security index" and encouraged the Commissions to clarify this issue.[773] The Commissions agree with commenters that an index CDS based on an index of loans that are not securities is analyzed under the third prong of the statutory security-based swap definition and, therefore, are clarifying the treatment of these Title VII instruments above.[774]

#### (i) Number and Concentration Percentages of Reference Entities or Securities

The Commissions believe that the first three criteria of the debt security index test (which are based on the statutory narrow-based security index definition) discussed above (*i.e.,* the number and concentration weighting requirements) are appropriate to apply to index CDS,

---

[760] *See* discussion of July 2006 Debt Index Rules.

[761] The Commissions note that the language of the rules is intended, in general, to be consistent with the criteria developed for debt indexes discussed above. Certain changes from the criteria developed for debt indexes are necessary to address differences between futures on debt indexes and index CDS. Certain other changes are necessary because the rules for debt indexes define under what conditions an index is not a narrow-based security index, whereas the rules for index CDS define what is a narrow-based security index. For example, an index is not a narrow-based security index under the rule for debt indexes if it is not a narrow-based security index under either subparagraph (a)(1) or paragraph (a)(2) of the rule. *See* July 2006 Debt Index Rules. Under the rules for index CDS, however, an index is a narrow-based security index if it meets the requirements of both of the counterpart paragraphs in the rules regarding index CDS (paragraphs (1)(i) and (1)(ii) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and paragraph (a)(1) and paragraph (a)(2) of rules 3a68–1a and 3a68–1b under the Exchange Act), even though the criteria in the debt index rules and the rules for index CDS include generally the same criteria and structure.

[762] *See infra* note 768 and accompanying text.

[763] If the loans underlying the index of loans are securities, the index CDS would be analyzed in the same manner as any other index CDS based on an index of securities.

[764] An index CDS referencing loans also may be based on events relating to the borrower, such as bankruptcy, and to defaults on any obligation of the borrower.

[765] *See* ISDA Letter and MarketAxess Letter.

[766] *See* MarketAxess Letter. This commenter stated that "The Proposed Rules layout an exceedingly complex process for determining whether an index CDS is broad-based or narrow-based." *Id.*

[767] *See* ISDA Letter.

[768] *See* Allen & Overy Letter; July LSTA Letter; and SIFMA Letter.

[769] *See* Allen & Overy Letter.

[770] *Id.*

[771] *Id.*

[772] *See* July LSTA Letter. This commenter noted that prong (III) of the statutory security-based swap definition does not clearly reference borrowers of loans or indexes of borrowers. However, this commenter noted that because most borrowers that are named as reference entities in loan CDS transactions are corporate entities that issue equity interests to one or more shareholders (although they may not issue public securities or become subject to public reporting requirements), this commenter believes that prong (III) can be interpreted to include swaps that reference a single borrower or borrowers of loans in an index. *Id.*

[773] *See* SIFMA Letter.

[774] The Commissions also are providing guidance with respect to TRS based on two or more loans that are not securities. *See supra* part III.C.

whether CDS on indexes of securities or indexes of issuers of securities.[775] Accordingly, the Commissions are adopting the first three criteria of rule 1.3(zzz) under the CEA and rule 3a68–1a under the Exchange Act as proposed with certain modifications in response to commenters' comments.[776] These rules contain the same number and concentration criteria as proposed, but modify the method of calculating affiliation among issuers and reference entities in response to commenters.[777] Further, in response to commenters,[778] the Commissions are providing an additional interpretation with respect to the application of these criteria to two particular types of CDS, commonly known as "nth-to-default CDS" and "tranched CDS."

The first three criteria provide that, for purposes of determining when an index CDS is a security-based swap under section 3(a)(68)(A)(ii)(III) of the Exchange Act,[779] the term "issuers of securities in a narrow-based security index" includes issuers of securities identified in an index (including an index referencing loan borrowers) in which:

• *Number:* There are nine or fewer non-affiliated issuers of securities that are reference entities included in the index, provided that an issuer of securities shall not be deemed a reference entity included in the index unless (i) a credit event with respect to such reference entity would result in a payment by the credit protection seller under the index CDS based on the related notional amount allocated to such reference entity; or (ii) the fact of such credit event or the calculation in accordance with clause (i) above of the amount owed with respect to such credit event is taken into account in determining whether to make any future payments under the index CDS with respect to any future credit events;

• *Single Component Concentration:* The effective notional amount allocated to any reference entity included in the index comprises more than 30 percent of the index's weighting; or

• *Largest Five Component Concentration:* The effective notional amount allocated to any five non-affiliated reference entities included in

the index comprises more than 60 percent of the index's weighting.[780]

Similarly, the Commissions are adopting as proposed the first three criteria of rule 1.3(aaaa) under the CEA and rule 3a68–1b under the Exchange Act. These three criteria provide that, for purposes of determining whether an index CDS is a security-based swap under section 3(a)(68)(A)(ii)(I) of the Exchange Act,[781] the term "narrow-based security index" includes an index in which essentially the same criteria apply, substituting securities for issuers. Under these criteria, the term "narrow-based security index" would mean an index in which:

• *Number:* There are nine or fewer securities, or securities that are issued by nine or fewer non-affiliated issuers, included in the index, provided that a security shall not be deemed a component of the index unless (i) a credit event with respect to the issuer of such security or a credit event with respect to such security would result in a payment by the credit protection seller to the credit protection buyer under the index CDS based on the related notional amount allocated to such security, or (ii) the fact of such credit event or the calculation in accordance with clause (i) above of the amount owed with respect to such credit event is taken into account in determining whether to make any future payments under the index CDS with respect to any future credit events;

• *Single Component Concentration:* The effective notional amount allocated to the securities of any issuer included in the index comprises more than 30 percent of the index's weighting; or

• *Largest Five Component Concentration:* The effective notional amount allocated to the securities of any five non-affiliated issuers included in the index comprises more than 60 percent of the index's weighting.

Thus, the applicability of the final rules depends on conditions relating to

the number of non-affiliated reference entities or issuers of securities, or securities issued by non-affiliated issuers, as applicable, included in an index and the weighting of notional amounts allocated to the reference entities or securities included in the index, as applicable. These first three criteria of the final rules evaluate the number and concentration of the reference entities or securities included in the index, as applicable, and ensure that an index with a small number of reference entities, issuers, or securities or concentrated in only a few reference entities, issuers, or securities is narrow-based, and thus where such index is the underlying reference of an index CDS, the index CDS is a security-based swap. Further, as more fully described below,[782] the final rules provide that a reference entity or issuer of securities included in an index and any of that reference entity's or issuer's affiliated entities (as defined in the final rules) that also are included in the index are aggregated for purposes of determining whether the number and concentration criteria are met.

Specifically, the final rules provide that an index meeting any one of certain identified conditions would be a narrow-based security index. The first condition in paragraph (1)(i)(A) of rule 1.3(zzz) under the CEA and paragraph (a)(1)(i) of rule 3a68–1a under the Exchange Act is that there are nine or fewer non-affiliated issuers of securities that are reference entities in the index. An issuer of securities counts toward this total only if a credit event with respect to such entity would result in a payment by the credit protection seller to the credit protection buyer under the index CDS based on the notional amount allocated to such entity, or if the fact of such a credit event or the calculation of the payment with respect to such credit event is taken into account when determining whether to make any future payments under the index CDS with respect to any future credit events.

Similarly, the first condition in paragraph (1)(i)(A) of rule 1.3(aaaa) under the CEA and paragraph (a)(1)(i) of rule 3a68–1b under the Exchange Act provides that a security counts toward the total number of securities in the index only if a credit event with respect to such security, or the issuer of such security, would result in a payment by the credit protection seller to the credit

---

[775] *See infra* notes 792 and 793 and accompanying text.

[776] *See* paragraphs (a)(1)(i)–(iii) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rules 3a68–1a and 3a68–1b under the Exchange Act.

[777] *See infra* note 804 and accompanying text.

[778] *See infra* notes 795 and 796 and accompanying text.

[779] 15 U.S.C. 78c(a)(68)(A)(ii)(III).

[780] These rules refer to the "effective notional amount" allocated to reference entities or securities in order to address potential situations in which the means of calculating payout across the reference entities or securities is not uniform. Thus, if one or more payouts is leveraged or enhanced by the structure of the transaction (*i.e.,* 2x recovery rate), that amount would be the "effective notional amount" for purposes of the 30 percent and 60 percent tests in paragraphs (1)(i)(B) and (1)(i)(C) of rules 1.3(zzz) and 1.3(aaaa) and paragraphs (a)(1)(ii) and (a)(1)(iii) of rules 3a68–1a and 3a68–1b. Similarly, if the aggregate notional amount under a CDS is not uniformly allocated to each reference entity or security, then the portion of the notional amount allocated to each reference entity or security (which may be by reference to the product of the aggregate notional amount and an applicable percentage) would be the "effective notional amount."

[781] 15 U.S.C. 78c(a)(68)(A)(ii)(I).

[782] *See infra* part III.G.3(b)(ii), for a discussion of the affiliation definition applicable to calculating the number and concentration criteria. As noted above, the Commissions are modifying the method of calculating affiliation for purposes of these criteria.

protection buyer under the index CDS based on the notional amount allocated to such security, or if the fact of such a credit event or the calculation of the payment with respect to such credit event is taken into account when determining whether to make any future payments under the index CDS with respect to any future credit events.

These provisions are intended to ensure that an index concentrated in a few reference entities or securities, or a few reference entities that are affiliated (as defined in the final rules) or a few securities issued by issuers that are affiliated, are within the narrow-based security index definition.[783] These provisions also are intended to ensure that an entity is not counted as a reference entity included in the index, and a security is not counted as a security included in the index, unless a credit event with respect to the entity, issuer, or security affects payout under a CDS on the index.[784]

Further, as this condition is in the alternative (i.e., either there must be a credit event resulting in a payment under the index CDS or a credit event is considered in determining future CDS payments), the tests encompass all index CDS. For example, and in response to a commenter,[785] the test would cover an nth-to-default CDS,[786] in which default with respect to a specified component of an index (such as the first default or fifth default) triggers the CDS payment, even if the CDS payment is not made with respect to such particular credit event. As another example, and in response to another commenter,[787] the test applies to a tranched CDS [788] if the payments are made on only a tranche, or portion, of the potential aggregate notional amount of the CDS (often expressed as

a percentage range of the total notional amount of the CDS) because the CDS payment takes into account a credit event with respect to an index component, even if the credit event itself does not result in such a payment.

The second condition, in paragraphs (1)(i)(B) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and paragraphs (a)(1)(ii) of rules 3a68–1a and 3a68–1b under the Exchange Act, is that the effective notional amount allocated to any reference entity or security of any issuer included in the index comprises more than 30 percent of the index's weighting.

The third condition, in paragraphs (1)(i)(C) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and paragraphs (a)(1)(iii) of rules 3a68–1a and 3a68–1b under the Exchange Act, is that the effective notional amount allocated to any five non-affiliated reference entities, or to the securities of any five non-affiliated issuers, included in the index comprises more than 60 percent of the index's weighting.

Given that Congress determined that these concentration percentages are appropriate to characterize an index as a narrow-based security index, and the Commissions have determined they are appropriate for debt security indexes in the security futures context,[789] the Commissions believe that these concentration percentages are appropriate to apply to the notional amount allocated to reference entities and securities in order to apply similar standards to indexes that are the underlying references of index CDS. Moreover, with respect to both the number and concentration criteria, the markets have had experience with these criteria with respect to futures on equity indexes, volatility indexes, and debt security indexes.[790]

## Comments

One commenter expressed its view that the Commissions should increase the percentage test in the largest five component concentration.[791] The Commissions are adopting the number and concentration criteria as proposed. The statutory definition of the term "security-based swap" references the definition of the term "narrow-based security index" contained in the

Exchange Act and the CEA,[792] which includes the same number and concentration percentages as the Commissions are adopting in this release. The Commissions are not modifying the statutory definition to change the percentages. The statutory definition included the concentration percentages, which the Commissions understand are intended to assure that a security index could not be used as a surrogate for the underlying securities in order to avoid application of the Federal securities laws. The Commissions also previously determined to retain these statutory percentages in connection with rules relating to debt security indexes in the security futures context.[793] The Commissions believe that these percentages are similarly appropriate to apply to indexes on which index CDS are based. Moreover, with respect to the number and concentration criteria, as these are in the statutory definition of the term "narrow-based security index" applicable to security futures, market participants have experience in analyzing indexes, including equity, volatility and debt security indexes, to determine compliance with these criteria. As discussed below,[794] though, the Commissions are modifying the affiliation definition used in analyzing the number and concentration criteria for an index.

Two commenters requested clarification regarding nth-to-default CDS, stating their view that such CDS should be treated as security-based swaps to reflect their single-entity triggers.[795] Two commenters requested clarification regarding tranched index CDS, including whether the CDS would be classified based on the underlying index.[796] As discussed above, the Commissions are providing an interpretation on the applicability of the first three criteria of the rules to nth-to-default CDS and tranched CDS. As noted above, the Commissions believe the rules encompass all index CDS, regardless of the type or payment

[783] This requirement is generally consistent with the definition of "narrow-based security index" in section 1a(35)(A) of the CEA, 7 U.S.C. 1a(35)(A), and section 3(a)(55)(B) of the Exchange Act, 15 U.S.C. 78c(a)(55)(B), and the July 2006 Debt Index Rules.

[784] *Id.*

[785] *See infra* note 795 and accompanying text.

[786] An "nth-to-default CDS" is a CDS in which the payout is linked to one in a series of defaults (such as first-, second- or third-to-default), with the contract terminating at that point. *See* SIFMA Letter.

[787] *See infra* note 796 and accompanying text.

[788] A "tranched CDS" is a CDS in which the counterparties agree to buy and sell credit protection on only a portion of the potential losses that could occur on an underlying portfolio of reference entities. The portion is typically denoted as a specified percentage range of aggregate losses (*e.g.*, 2 percent to 5 percent, meaning the credit protection seller would not make payments until aggregate losses exceed 2 percent of the notional of the transaction, and would no longer be obligated to make payments after aggregate losses reach 5 percent). *See* SIFMA Letter.

[789] *See* July 2006 Debt Index Rules.

[790] As noted above, the Commissions are modifying the method of calculating affiliation for purposes of the number and concentration criteria. *See infra* part III.G.3(b)(ii).

[791] *See* ISDA Letter. According to this commenter, the "operational complexity" of the number and concentration criteria will increase costs and compliance risks. *Id.*

[792] *See* 15 U.S.C. 78c(a)(55)(B) and 7 U.S.C. 1a(35).

[793] *See* July 2006 Debt Index Rules.

[794] *See infra* part III.G.3(b)(ii).

[795] *See* ISDA Letter and SIFMA Letter. One of these commenters noted that such an approach also made sense for nth-to-default CDS because they are typically based on baskets of less than 10 securities. *See* ISDA Letter.

[796] *See* Markit Letter and SIFMA Letter. One of these commenters stated that classifying tranches underlying index CDS according to attachment or detachment points is not appropriate because it is impossible to know for certain at inception of the CDS the number of credit events that will ultimately affect actual payments, which typically depend on the severity of loss associated with each credit event. *See* SIFMA Letter.

structure, such as whether there is a single-entity payment based on credit events of other index components or whether the payment is based on a specific entity.

(ii) Affiliation of Reference Entities and Issuers of Securities With Respect to Number and Concentration Criteria

The Commissions are adopting the affiliation definition that applies when calculating the number and concentration criteria with certain modifications from the proposal to address commenters' concerns.[797] The final rules provide that the terms "reference entity included in the index" and "issuer of the security included in the index" include a single reference entity or issuer of securities included in an index, respectively, or a group of affiliated reference entities or issuers included in an index, respectively.[798] For purposes of the rules, affiliated reference entities or issuers of securities included in an index or securities included in an index issued by affiliated issuers will be counted together for determining whether the number and concentration criteria are met. However, with respect to asset-backed securities, the final rules provide that each reference entity or issuer of securities included in an index that is an issuing entity of an asset-backed security is considered a separate reference entity or issuer, as applicable, and will not be considered affiliated with other reference entities or issuers of securities included in the index.

The final rules provide that a reference entity or issuer of securities included in an index is affiliated with another reference entity or issuer of securities included in the index if it controls, is controlled by, or is under common control with, that other reference entity or issuer.[799] The final rules define control, solely for purposes of this affiliation definition, to mean ownership of more than 50 percent of a reference entity's or issuer's equity or the ability to direct the voting of more than 50 percent of a reference entity's or issuer's voting equity.[800] The affiliation definition in the final rules differs from the definition included in the proposal, which provided for a control threshold

of 20 percent ownership.[801] This change is based on the Commissions' consideration of comments received.[802] By using a more than 50 percent (i.e., majority ownership) test rather than a 20 percent ownership test for the control threshold, there is a greater likelihood that there will be an alignment of economic interests of the affiliated entities that is sufficient to aggregate reference entities or issuers of securities included in an index for purposes of the number and concentration criteria.[803]

As the affiliation definition is applied to the number criterion, affiliated reference entities or issuers of securities included in an index will be viewed as a single reference entity or issuer of securities to determine whether there are nine or fewer non-affiliated reference entities included in the index or securities that are issued by nine or fewer non-affiliated issuers. Similarly, as the affiliation definition is applied to the concentration criteria, the notional amounts allocated to affiliated reference entities included in an index or the securities issued by a group of affiliated issuers of securities included in an index must be aggregated to determine the level of concentration of the components of the index for purposes of the 30-percent and 60-percent concentration criteria.

Comments

Three commenters requested that the Commissions revise the affiliation definition that applies when calculating the number and concentration criteria to increase the control threshold from 20 percent ownership to majority ownership.[804] These commenters noted

that majority ownership is consistent with current market practice, including the definition of affiliate included in the 2003 ISDA Credit Derivatives Definitions.[805] One commenter also stated its belief that affiliated entities should only be aggregated where the reference entities' credit risks are substantially similar and credit decisions are made by the same group of individuals.[806] This commenter stated its view that 20 percent ownership is too low and that majority ownership is necessary for credit risk and credit decisions to be aligned enough as to warrant collapsing two issuers into one for purposes of the number and concentration criteria.[807]

As stated above, the Commissions are modifying the affiliation definition that applies when calculating the number and concentration criteria in response to commenters to use an affiliation test based on majority ownership. Based on commenters' letters, the Commissions understand that the current standard CDS documentation and the current approach used by certain index providers for index CDS with respect to the inclusion of affiliated entities in the same index use majority ownership rather than 20 percent ownership to determine affiliation. The Commissions are persuaded by commenters that, in the case of index CDS only it is more appropriate to use majority ownership because majority-owned entities are more likely to have their economic interests aligned and be viewed by the market as part of a group. The Commissions believe that revising the affiliation definition in this manner for purposes of calculating the number and concentration criteria responds to commenters' concerns that the percentage control threshold may inadvertently include entities that are not viewed as part of a group. Thus, as revised, the affiliation definition will include only those reference entities or issuers included in an index that satisfy the more than 50 percent (i.e., majority ownership) control threshold. The

[797] See infra note 804 and accompanying text.
[798] See paragraph (c)(4) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.
[799] See paragraph (c)(1) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rules 3a68–1a and 3a68–1b under the Exchange Act.
[800] See paragraph (c)(2) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rules 3a68–1a and 3a68–1b under the Exchange Act.

[801] See Proposing Release at 29849.
[802] See infra note 804 and accompanying text. The Commissions note that another alternative would have been to include a requirement that the entities satisfy the 20 percent control threshold and also be consolidated with each other in financial statements. The Commissions did not include a requirement that the entities be consolidated with each other in financial statements because they do not believe that the scope of the affiliation definition should be exposed to the risk of future changes in accounting standards. Further, the use of a majority ownership control threshold (more than 50 percent) is generally consistent with consolidation under generally accepted accounting principles. See FASB ASC section 810–10–25, Consolidation—Overall—Recognition (stating that consolidation is appropriate if a reporting entity has a controlling financial interest in another entity and a specific scope exception does not apply).
[803] In such a case, as noted by commenters, the affiliated entities are viewed as part of group for which aggregation of these entities is appropriate. See infra note 806 and accompanying text.
[804] See ISDA Letter (requesting a threshold of at least 50 percent); Markit Letter (requesting a threshold of at least 50 percent); and SIFMA Letter (requesting a threshold of majority ownership, or 51 percent). One commenter also requested that the

Commissions clarify the application of the affiliation definition. See Markit Letter. The Commissions have provided above and in infra part III.G.3(b)(ii), several examples illustrating the application of the affiliation definition in response to this commenter.
[805] Id.
[806] See SIFMA Letter. The ISDA Letter provides a similar rationale that "the control threshold was too low and potentially disruptive when viewed against entities that the swap markets now trade as separate entities. In the CDS market, for example, entities that share ownership ties of substantially more than 20 percent trade quite independently. These entities may have completely disparate characteristics for the purpose of an index grouping of one sort or another." See ISDA Letter.
[807] See SIFMA Letter.

Commissions believe that determining affiliation in this manner for purposes of calculating the number and concentration criteria responds to the commenters' concerns.

The Commissions also believe that the modified affiliation definition addresses commenters' concerns noted above [808] that the rules further defining the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" should be simplified. The modified affiliation definition enables market participants to make an affiliation determination for purposes of calculating the number and concentration criteria by measuring the more than 50 percent (i.e., majority ownership) control threshold.

### (iii) Public Information Availability Regarding Reference Entities and Securities

In addition to the number and concentration criteria, the debt security index test also includes, as discussed above, a public information availability test. The public information availability test is intended as the substitute for the average daily trading volume ("ADTV") provision in the statutory narrow-based security index definition. An ADTV test is designed to take into account the trading of individual stocks and, because Exchange Act registration of the security being traded is a listing standard for equity securities, the issuer of the security being traded must be subject to the reporting requirements under the Exchange Act. Based on the provisions of the statutory ADTV test, the Commissions have determined that the ADTV test is not useful for purposes of determining the status of the index on which the index CDS is based because index CDS most commonly reference entities, which do not "trade," or debt instruments, which commonly are not listed, and, therefore, do not have a significant trading volume. However, the underlying rationale of such provision, that there is sufficient trading in the securities and therefore public information and market following of the issuer of the security, applies to index CDS.

In general, if an index is not narrow-based under the number and concentration criteria, it will be narrow-based if one of the reference entities or securities included in the index fails to meet at least one of the criteria in the public information availability test. This test was designed to reduce the likelihood that broad-based debt security indexes or the component securities or issuers of securities in that

index would be readily susceptible to manipulation. The fourth condition in the index CDS rules sets out a similar public information availability test that is intended solely for purposes of determining whether an index underlying a CDS is narrow-based. [809] The Commissions are adopting the public information availability test essentially as proposed with certain modifications to address commenters' concerns, including modifications to the definition of affiliation for purposes of satisfying certain criteria of the public information availability test. [810]

The Commissions are adopting final rules under which an index CDS will be considered narrow-based (except as discussed below) if a reference entity or security included in the index does not meet any of the following criteria: [811]

- The reference entity or the issuer of the security included in the index is required to file reports pursuant to the Exchange Act or the regulations thereunder;
- The reference entity or the issuer of the security included in the index is eligible to rely on the exemption provided in rule 12g3–2(b) under the Exchange Act; [812]
- The reference entity or the issuer of the security included in the index has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more; [813]
- The reference entity or the issuer of the security included in the index (other than a reference entity or an issuer of the security included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Exchange Act [814]) has outstanding notes, bonds, debentures, loans, or evidences of indebtedness (other than revolving credit facilities) having a total remaining principal amount of at least $1 billion; [815]
- The reference entity included in the index is an issuer of an exempted security, or the security included in the index is an exempted security, each as defined in section 3(a)(12) of the

Exchange Act [816] and the rules promulgated thereunder (except a municipal security);

- The reference entity or the issuer of the security included in the index is a government of a foreign country or a political subdivision of a foreign country; or
- If the reference entity or the issuer of the security included in the index is an issuing entity of asset-backed securities as defined in section 3(a)(77) of the Exchange Act, [817] such asset-backed security was issued in a transaction registered under the Securities Act and has publicly available distribution reports.

However, so long as the effective notional amounts allocated to reference entities or securities included in the index that satisfy the public information availability test comprise at least 80 percent of the index's weighting, failure by a reference entity or security included in the index to satisfy the public information availability test will be disregarded if the effective notional amounts allocated to that reference entity or security comprise less than five percent of the index's weighting. [818] In this situation, the public information availability test for purposes of the index would be satisfied.

The determination as to whether an index CDS is narrow-based is conditioned on the likelihood that information about a predominant percentage of the reference entities or securities included in the index is publicly available. [819] For example, a reference entity or an issuer of securities

---

[808] See supra note 765 and accompanying text.

[809] See Proposing Release at 29850.

[810] See infra notes 845, 847, 849 and 867 and accompanying text.

[811] See paragraphs (a)(1)(iv)(A)–(G) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[812] 17 CFR 240.12g3–2(b).

[813] See July 2006 Debt Index Rules (noting that issuers having worldwide equity market capitalization of $700 million or more are likely to have public information available about them).

[814] 15 U.S.C. 78c(a)(77).

[815] See July 2006 Debt Index Rules (noting that issuers having at least $1 billion in outstanding debt are likely to have public information available about them).

[816] 15 U.S.C. 78c(a)12.

[817] 15 U.S.C. 78c(a)(77).

[818] See paragraph (b) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[819] Most of the thresholds in the public information availability test are similar to those the Commissions adopted in their joint rules regarding the application of the definition of the term "narrow-based security index" to debt security indexes and security futures on debt securities. See July 2006 Debt Index Rules. The July 2006 Debt Index Rules also included an additional requirement regarding the minimum principal amount outstanding for each security in the index. The Commissions have not included this requirement in rule 1.3(zzz) under the CEA and rule 3a68–1a under the Exchange Act. That requirement was intended as a substitute criterion for trading volume because the trading volume of debt securities with a principal amount outstanding above that minimum amount was found to be generally larger than debt securities with a principal amount outstanding below that minimum amount. See July 2006 Debt Index Release. There is no similar criterion that would be applicable in the context of index CDS. The numerical thresholds also are similar to those the SEC adopted in other contexts, including in the existing definitions of "well-known seasoned issuer" and "large accelerated filer." See rule 405 under the Securities Act, 17 CFR 230.405, and rule 12b–2 under the Exchange Act, 17 CFR 240.12b–2.

included in the index that is required to file reports pursuant to the Exchange Act or the regulations thereunder makes regular and public disclosure through those filings. Moreover, a reference entity or an issuer of securities included in the index that does not file reports with the SEC but that is eligible to rely on the exemption in rule 12g3–2(b) under the Exchange Act (*i.e.*, foreign private issuers) is required to make certain types of financial information publicly available in English on its Web site or through an electronic information delivery system generally available to the public in its primary trading markets.[820]

The Commissions believe that other reference entities or issuers of securities included in the index that do not file reports with the SEC, but that have worldwide equity market capitalization of $700 million or more, have at least $1 billion in outstanding debt obligations (other than in the case of issuing entities of asset-backed securities), issue exempted securities (other than municipal securities), or are foreign sovereign entities either are required to or are otherwise sufficiently likely, solely for purposes of the "narrow-based security-index" and "issuers of securities in a narrow-based security index" definitions, to have public information available about them.[821]

In response to commenters,[822] the Commissions are modifying the outstanding debt threshold criterion in the public information availability test to include any indebtedness, including loans, so long as such indebtedness is not a revolving credit facility. The Commissions believe that expanding the definition of indebtedness to include loans (other than revolving credit) for purposes of the debt threshold determination is consistent with the view that entities that have significant outstanding indebtedness will likely have public information available about them.[823]

As more fully described below,[824] for purposes of satisfying one of these issuer eligibility criteria, the final rules provide that a reference entity or an issuer of securities included in an index may rely upon the status of an affiliated entity as an Exchange Act reporting company or foreign private issuer or may aggregate the worldwide equity market capitalization or outstanding indebtedness of an affiliated entity, regardless of whether such affiliated entity itself or its securities are included in the index.

In the case of indexes including asset-backed securities, or reference entities that are issuing entities of asset-backed securities, information about the reference entity or issuing entity of the asset-backed security will not alone be sufficient and, consequently, the rules provide that the public information availability test will be satisfied only if certain information also is available about the asset-backed securities. An issuing entity (whether or not a reference entity) of asset-backed securities will meet the public information availability test if such asset-backed securities were issued in a transaction for which the asset-backed securities issued (which includes all tranches)[825] were registered under the Securities Act and distribution reports about such asset-backed securities are publicly available. In response to commenters,[826] the Commissions note that distribution reports, which sometimes are referred to as servicer reports, delivered to the trustee or security holders, as the case may be, are filed with the SEC on Form 10–D. In addition, because of the lack of public information regarding many asset-backed securities, despite the size of the outstanding amount of securities,[827] the rules do not permit such reference entities and issuers to satisfy the public information availability test by having at least $1 billion in outstanding indebtedness. Characterizing an index with reference entities or securities for which public information is not likely to be available as narrow-based, and

thus index CDS where the underlying references or securities are such indexes as security-based swaps, should help to ensure that the index cannot be used to circumvent the Federal securities laws, including those relating to Securities Act compliance and the antifraud, antimanipulation and insider trading prohibitions with respect to the index components or the securities of the reference entities.

As noted above, if an index is not narrow-based under the volume and concentration criteria, it will be narrow-based if one of the reference entities or securities included in the index fails to meet at least one of the criteria in the public information availability test. However, even if one or more of the reference entities or securities included in the index fail the public information availability test, the final rules provide that the index will not be considered "issuers of securities in a narrow-based security index" or a "narrow-based security index," so long as the applicable reference entity or security that fails the test represents less than five percent of the index's weighting, and so long as reference entities or securities comprising at least 80 percent of the index's weighting satisfy the public information availability test.

An index that includes a very small proportion of reference entities or securities that do not satisfy the public information availability test will be treated as a broad-based security index if the other elements of the definition, including the five percent and 80 percent thresholds, are satisfied prior to execution, but no later than when the parties offer to enter into the index CDS.[828] The five-percent weighting threshold is designed to provide that reference entities or securities not satisfying the public information availability test comprise only a very small portion of the index, and the 80-percent weighting threshold is designed to provide that a predominant percentage of the reference entities or securities in the index satisfy the public information availability test. As a result, these thresholds provide market participants with flexibility in constructing an index. The Commissions believe that these thresholds are appropriate and that providing such flexibility is not likely to increase the likelihood that an index that satisfies these provisions or the component securities or issuers of securities in that index would be readily susceptible to manipulation or that there would be misuse of material non-public information about the component

---

[820] 17 CFR 240.12g3–2(b).

[821] It is important to note that the public information availability test is designed solely for purposes of distinguishing between index CDS that are swaps and index CDS that are security-based swaps. The proposed criteria are not intended to provide any assurance that there is any particular level of information actually available regarding a particular reference entity or issuer of securities. Meeting one or more of the criteria for the limited purpose here—defining the terms "narrow-based security index" and "issuers of securities in a narrow-based security index" in the first and third prongs of the security-based swap definition with respect to index CDS—would not substitute for or satisfy any other requirement for public disclosure of information or public availability of information for purposes of the Federal securities laws.

[822] *See infra* note 845 and accompanying text.

[823] *See* July 2006 Debt Index Release.

[824] *See infra* part III.G.3(b)(iv), for a discussion regarding the affiliation definition applicable to the public information availability test. As noted above, the Commissions are modifying the method of calculating affiliation for purposes of this test.

[825] Under this part of the public information availability test, all offerings of the asset-backed securities will have to be covered by a registration statement under the Securities Act, including all tranches, so that public information would exist for any tranche included in an index. However, as noted below, CDS that are offered to ECPs only may rely on alternatives to satisfy the public information test for asset-backed securities.

[826] *See infra* note 849 and accompanying text.

[827] *See generally Asset-Backed Securities*, 75 FR 23328 (May 3, 2010).

[828] *See supra* note 625 and accompanying text.

securities or issuers of securities in that index through the use of CDS based on such indexes.

The final rules also provide that, for index CDS entered into solely between ECPs, there are alternative means to satisfy the public information availability test. Under the final rules, solely for index CDS entered into between ECPs, an index will be considered narrow-based if a reference entity or security included in the index does not meet (i) any of the criteria enumerated above or (ii) any of the following criteria: [829]

• The reference entity or the issuer of the security included in the index (other than a reference entity or issuer included in the index that is an issuing entity of an asset-backed security) makes available to the public or otherwise makes available to such ECP information about such reference entity or issuer pursuant to rule 144A(d)(4) under the Securities Act; [830]

• Financial information about the reference entity or the issuer of the security included in the index (other than a reference entity or issuer included in the index that is an issuing entity of an asset-backed security) is otherwise publicly available; or

• In the case of an asset-backed security included in the index, or a reference entity included in the index that is an issuing entity of an asset-backed security, information of the type and level included in public distribution reports for similar asset-backed securities is publicly available about both the reference entity or issuing entity and the asset-backed security.

As more fully described below, for purposes of satisfying either the rule 144A information criterion or the financial information otherwise publicly available criterion, the final rules provide that a reference entity or an issuer of securities included in an index may look to an affiliated entity to determine whether it satisfies one of these criterion, regardless of whether such affiliated entity itself or its securities are included in the index. [831]

In response to commenters, [832] the Commissions are revising the rule 144A information criterion of the public information availability test applicable to index CDS entered into solely between ECPs to clarify that the rule 144A information must either be made publicly available or otherwise made available to the ECP. In addition, the Commissions are clarifying that financial information about the reference entity or the issuer of the security may otherwise be publicly available through an issuer's Web site, through public filings with other regulators or exchanges, or through other electronic means. This method of satisfying the public information availability test does not specify the precise method by which financial information must be available.

As with other index CDS, with respect to index CDS entered into solely with ECPs, if the percentage of the effective notional amounts allocated to reference entities or securities satisfying this expanded public information availability test comprise at least 80 percent of the index's weighting, then a reference entity or security included in the index that fails to satisfy the alternative public information test criteria will be disregarded so long as the effective notional amount allocated to that reference entity or security comprises less than five percent of the index's weighting.

Comments

The Commissions received a number of general and specific comments regarding the public information availability test.

A number of commenters believed that the public information availability test should not be included in the final rules for various reasons, including the potential disparate treatment between products based on indexes due to changes in index components, [833] the impact of the migration of indexes from narrow-based to broad-based and vice-versa, [834] and assertions that the test was not needed due to the types of participants engaged in swap and security-based swap transactions. [835] One commenter suggested replacing the public information availability test with a volume trading test. [836]

The Commissions are adopting the public information availability test as proposed with certain modifications described above. As discussed above, the public information availability test is intended as the substitute for the ADTV provision in the statutory narrow-based security index definition, which the Dodd-Frank Act included as the method for determining whether index CDS are swaps or security-based swaps. Based on the reasons discussed above, the Commissions have retained the public information availability test as the underlying rationale of such provision, that there is sufficient trading in the securities and therefore public information and market following of the issuer of the securities, applies to index CDS. Accordingly, the Commissions believe that there should be public information available about a predominant percentage of the reference entities or issuers of securities underlying the index in order to prevent circumvention of other provisions of the Federal securities laws through the use of CDS based on such indexes, to reduce the likelihood that the index, the component securities, or the named issuers of securities in the index could be readily susceptible to manipulation, and to prevent the misuse of material non-public information about such an index, the component securities, or the reference entities.

The Commissions understand that the characterization of an index underlying a CDS as broad-based or narrow-based may change because of changes to the index, such as addition or removal of components, or changes regarding the

[829] *See* paragraph (a)(1)(iv)(H) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[830] 17 CFR 230.144A(d)(4).

[831] *See infra* part III.G.3(b)(iv), for a discussion regarding the affiliation definition applicable to the public information availability test applicable to index CDS entered into solely between ECPs. As noted above, the Commissions are modifying the method of calculating affiliation for purposes of this test.

[832] *See infra* note 847 and accompanying text.

[833] *See* SIFMA Letter. This commenter expressed its concern that transactions on the same or similar indexes may result in differing regulatory treatment due to changes in index components as a result of component adjustments or as the availability of information relating to a component issuer changes over time. *Id.*

[834] *See* Markit Letter. According to this commenter, determining whether an index of loans or borrowers meets the public information availability test would be more difficult and more costly than making the same determination for an index of securities, which "are generally subject to national or exchange-based reporting and disclosure regimes" and could create regulatory uncertainty. *Id.* This commenter also expressed its belief that the public information availability test would cause indexes to switch between a narrow-based and broad-based classification, which could result in unnecessary cost, confusion, and market disruption. *Id.*

[835] *See* ISDA Letter. This commenter expressed its belief that the public information availability test is not needed given the largely institutional nature of the existing over-the-counter market. *Id. See also* July LSTA Letter.

[836] *See* Markit Letter. This commenter expressed its belief that a volume-based classification process would be preferable to the public information availability test for several reasons. First, the statutory definition of "narrow-based security index" includes a volume-based factor. Second, a volume-based factor could be applied easily and transparently because the outstanding notional volume of CDS referencing each index constituent is captured by the Trade Information Warehouse. Third, an index classification based on outstanding notional amount as opposed to the public information availability test would result in less indices migrating from broad- to narrow-based classifications, and vice versa. This commenter also expressed its belief that a volume-based test would ensure that broad-based indices are not readily susceptible to manipulation because indexes based on constituents with high volumes are likely to have significant public information available. *Id.*

specific components of the index, such as a decrease in the amount of outstanding common equity for a component. However, these types of changes are contemplated by the statutory narrow-based security index definition, which the Dodd-Frank Act used to establish whether index CDS are swaps or security-based swaps.[837] Moreover, the Commissions have provided that the determination of whether a Title VII instrument is a swap, security-based swap or mixed swap is made prior to execution, but no later than when the parties offer to enter into the Title VII instrument,[838] and does not change if a security index underlying such instrument subsequently migrates from broad to narrow (or vice versa) during its life. Accordingly, even if the public information availability test would cause indexes underlying index CDS to migrate as suggested by a commenter, that will not affect the classification of outstanding index CDS entered into prior to such migration. However, if an amendment or change is made to such outstanding index CDS that would cause it to be a new purchase or sale of such index CDS, that could affect the classification of such outstanding index CDS. Further, as is true for other products using the narrow-based security index definition, the Commissions also believe that the effects of changes to an index underlying a CDS traded on an organized platform are addressed through the tolerance period and grace period rules the Commissions are adopting, which rules are based on tolerance period and grace period rules for security futures to which the statutory narrow-based security index definition applies.[839]

The Commissions are not adopting a volume-based test based on the trading of the CDS or the trading of the index, either as a replacement for the public information availability test or as an alternative means of satisfying it, as one commenter suggested.[840] The Commissions believe that using a volume-based test based on the trading of the CDS or the trading of the index would not work in the index CDS context because the character of the

index CDS would have to be determined before any trading volume could exist and, therefore, the index CDS would fail a volume-based test. The Commissions also believe that a volume-based test based either on the CDS components of the index or the index itself would not be an appropriate substitute for or an alternative to a public information availability test with respect to the referenced entity, issuer of securities, or underlying security because such a volume-based test would not provide transparency on such underlying entities, issuers of securities or securities.[841]

The Commissions believe that the public information availability test in the index CDS rules allows more flexibility with respect to the types of components included in indexes underlying index CDS. For many indexes, such as bespoke indexes, trading volume for CDS on individual components may not be significant even though the index component would otherwise have no trouble satisfying one of the criteria of the public information availability test. The public information availability test in the index CDS rules also is very similar to the test in the rules for debt security indexes, which, as noted above, apply in the context of Title VII instruments, thus providing a consistent set of rules under which index compilers and market participants can analyze the characterization of CDS.

One commenter also had concerns regarding specific types of indexes and specific types of index components, including the applicability of the public information availability test to indexes of loans or borrowers.[842] As discussed above, however, the Commissions believe that index CDS based on indexes of loans or borrowers should be analyzed under the third prong of the statutory security-based swap definition in the same manner as any other index CDS. Although this commenter noted such indexes may include a higher proportion of "private" borrowers (those borrowers who are not public reporting companies or that do not register offerings of their securities) and thus may themselves not satisfy any of the

criteria for the public information availability test,[843] the Commissions believe that the information tests of the rule as modified will address these concerns. The modified rule will add loans to the categories of instruments to be aggregated for purposes of the outstanding indebtedness criterion and, as discussed below, will aggregate outstanding indebtedness of affiliates.[844] As a result of these modifications, the Commissions believe that the indexes the commenter was concerned about may be more likely to satisfy the public information availability test.

One commenter agreed with including an outstanding debt threshold as a criterion in the public information availability test, but requested that the Commissions change this criterion to include loans that are not within the definition of security, as well as affiliate debt guaranteed by the issuer of securities or reference entity, and to reduce the required outstanding debt threshold from $1 billion to $100 million.[845] As discussed above, the Commissions are revising the rules to expand the types of debt that are counted toward the $1 billion debt threshold to include any indebtedness, including loans, so long as such indebtedness is not a revolving credit facility. The Commissions have made no other changes to the $1 billion debt threshold.

The Commissions believe that the fact that an entity has guaranteed the obligations of another entity will not affect the likelihood that public information is available about either the borrower on the guaranteed obligation or on the guarantor entity. However, the Commissions note that they are providing an additional interpretation on the affiliation definition of the index CDS rules, including modifying the method of calculating affiliation, that should address this commenter's concerns regarding guaranteed affiliate

---

[837] The index migration issue exists for all products in which the "narrow-based security index" definition is used. Thus, as is true for security futures, the migration issue exists for debt security indexes and the statutory definition of the term "narrow-based security index," under which an index's characterization may be affected by a change to the index itself or to the components of the index.

[838] *See supra* note 625 and accompanying text.

[839] *See infra* part III.G.6.

[840] *See supra* note 836 and accompanying text.

[841] In the context of equity securities indexes to which the ADTV test applies, there likely is information regarding the underlying entities, issuers of securities or securities because, as noted above, Exchange Act registration of the security being traded is a listing standard for equity securities and, therefore, the issuer of the security being traded must be subject to the reporting requirements under the Exchange Act. However, in the context of index CDS, there are no comparable listing standards that would be applicable to provide transparency on the underlying entities, issuers of securities or securities.

[842] *See* July LSTA Letter.

[843] *Id.*

[844] As noted above, the Commissions are modifying the method of calculating affiliation for purposes of certain criteria of the public information availability test. *See infra* part III.G.3(b)(iv).

[845] *See* Markit Letter. This commenter suggested that the debt threshold should be reduced to $100 million because debt issuances in some debt markets, such as the high yield markets, tend to be relatively small. This commenter also suggested that the debt threshold should include debt guaranteed by the issuer of the securities or reference entity because in many cases the issuer of the securities or reference entity is merely guaranteeing debt of its affiliates and not issuing the debt. Finally, this commenter requested clarification as to whether the debt threshold included loans and leveraged loans.

debt.[846] The Commissions also believe that the $1 billion debt threshold, which is the same amount as the outstanding debt threshold in the rules for debt security indexes, is set at the appropriate level to achieve the objective that such entities are likely to have public information available about them.

One commenter suggested that the proposed rule 144A information criterion of the public information availability test applicable to index CDS entered into solely between ECPs should be satisfied if the issuer made the rule 144A information available upon request to the public or to the ECP in question, rather than being required to provide the information.[847] In response to this commenter, the Commissions are revising the rule 144A information criterion of the public information availability test applicable to index CDS entered into solely between ECPs to clarify that the rule 144A information must be made publicly available or otherwise made available to the ECP.

The Commissions received one comment regarding the criteria of the public information availability test that relate specifically to asset-backed securities.[848] The commenter was concerned that the test for asset-backed securities underlying an index may be difficult to apply because all asset-backed securities underlying an index are not always registered under the Securities Act.[849] This commenter also was concerned that the term "distribution reports" may not be the same as monthly service reports, which this commenter indicated are available through the deal trustee and/or the SEC Web site.[850] This commenter also believed that it was unclear whether these monthly service reports would qualify as "distribution reports" for purposes of the public information availability test and whether information regarding Agency MBS pools, which are available on Agency Web sites, would be sufficient to satisfy the public information availability test.[851] In addition, this commenter requested that the Commissions clarify that not all tranches of a transaction need to be registered under the Securities Act to satisfy the publicly available distribution report requirement.[852]

The Commissions are adopting as proposed the provisions of the public information availability test applicable to indexes based on asset-backed securities. The Commissions note that there are two possible ways to satisfy the public information availability test for index CDS based on asset-backed securities or asset-backed issuers. For index CDS available to non-ECPs, all asset-backed securities in the index or of the issuer in the index must have been sold in registered offerings under the Securities Act and have publicly available distribution reports. The Commissions are clarifying that monthly service reports filed with the SEC will satisfy the requirement for publicly available distribution reports.[853] However, for index CDS being sold only to ECPs, the public information availability test with respect to the index components is satisfied, regardless of whether the asset-backed securities have been sold in registered offerings under the Securities Act, if information of the type and level included in public distribution reports for similar asset-backed securities is publicly available about both the issuing entity and such asset-backed securities. The Commissions believe that requiring such information about the asset-backed securities and the assets in the pools underlying such asset-backed securities is consistent with existing disclosure requirements for asset-backed securities and existing practices of ABS issuers.

*(iv) Affiliation of Reference Entities and Issuers of Securities With Respect to Certain Criteria of the Public Information Availability Test*

The Commissions are adopting the affiliation definition that applies to certain criteria of the public information availability test with certain modifications from the proposals to address commenters' concerns.[854] The Commissions are making modifications to this affiliation definition that are the same as the modifications the Commissions are making to the affiliation definition that applies when calculating the number and concentration criteria.[855]

This affiliation definition applies for purposes of determining whether a reference entity or issuer of securities included in an index satisfies one of the following four criteria of the public information availability test: (i) The

reference entity or issuer of the security included in the index is required to file reports pursuant to the Exchange Act or the regulations thereunder; [856] (ii) the reference entity or issuer of the security included in the index is eligible to rely on the exemption provided in rule 12g3–2(b) under the Exchange Act for foreign private issuers; [857] (iii) the reference entity or issuer of the security included in the index has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more; [858] and (iv) the reference entity or issuer of the security included in the index has outstanding notes, bonds, debentures, loans, or evidences of indebtedness (other than revolving credit facilities) having a total remaining principal amount of at least $1 billion.[859] This affiliation definition also applies for purposes of determining whether a reference entity or issuer of securities included in an index satisfies one of the following two criteria of the alternative public information availability test applicable to index CDS entered into solely between ECPs: (i) The reference entity or issuer of the security included in the index makes available rule 144A information; [860] and (ii) financial information about the reference entity or issuer of the security included in the index is otherwise publicly available.[861]

The final rules provide that the terms "reference entity included in the index" and "issuer of the security included in the index" include a single reference entity or issuer of securities included in an index, respectively, or a group of affiliated entities.[862] For purposes of the rules, a reference entity or issuer of securities included in an index may rely upon an affiliated entity to satisfy certain criteria of the public information availability test. However, with respect to asset-backed securities, the final rules provide that each reference entity or issuer of securities included in an index

---

[846] *See infra* part III.G.3(b)(iv).

[847] *See* SIFMA Letter.

[848] *See* Markit Letter.

[849] *Id.*

[850] *Id.*

[851] *Id.*

[852] *Id.*

[853] Distribution reports, which sometimes are referred to as servicer reports, delivered to the trustee or security holders, as the case may be, are filed with the SEC on Form 10–D.

[854] *See infra* note 867 and accompanying text.

[855] *See supra* part III.G.3(b)(ii).

[856] *See* paragraph (a)(1)(iv)(A) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[857] *See* paragraph (a)(1)(iv)(B) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[858] *See* paragraph (a)(1)(iv)(C) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[859] *See* paragraph (a)(1)(iv)(D) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[860] *See* paragraph (a)(1)(iv)(H)(1) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[861] *See* paragraph (a)(1)(iv)(H)(2) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[862] *See* paragraph (c)(4) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

that is an issuing entity of an asset-backed security is considered a separate reference entity or issuer, as applicable, and will not be considered affiliated with any other entities.

The final rules provide that a reference entity or issuer of securities included in an index is affiliated with another entity if it controls, is controlled by, or is under common control with, that other entity.[863] The final rules define control, solely for purposes of this affiliation definition, to mean ownership of more than 50 percent of a reference entity's or issuer's equity or the ability to direct the voting of more than 50 percent of a reference entity's or issuer's voting equity.[864] This revision is the same as the modification the Commissions are making to the affiliation definition that applies when calculating the number and concentration criteria, which is discussed above.[865]

As the Commissions noted above, this change is based on the Commissions' consideration of comments received. By using a more than 50 percent (i.e., majority ownership) test rather than a 20 percent ownership test for the control threshold, there is a greater likelihood that there will be information available about the reference entity or issuer of securities included in the index because the market likely will view the affiliated entity and the reference entity or issuer of securities included in the index as a single company or economic entity.[866] Accordingly, to the extent information regarding the affiliated entity is publicly available, there may be information regarding the reference entity or issuer of securities included in the index that also is publicly available. This modified control threshold will permit such

reference entity or issuer of securities to rely upon an affiliated entity to satisfy one of the criteria of the public information availability test. Further, unlike the affiliation definition that applies when calculating the number and concentration criteria, the affiliation definition that applies to certain criteria of the public information availability test does not require that the affiliated entity or its securities be included in the index.

As the affiliation definition applies to the Exchange Act reporting company and foreign private issuer criteria of the public information availability test, a reference entity or an issuer of securities included in an index that itself is not required to file reports pursuant to the Exchange Act or the regulations thereunder or is not eligible to rely on the exemption provided in rule 12g3–2(b) under the Exchange Act for foreign private issuers may rely upon the status of an affiliated entity as an Exchange Act reporting company or foreign private issuer, regardless of whether that affiliated entity itself or its securities are included in the index, to satisfy one of these criteria. For example, a majority-owned subsidiary included in an index may rely upon the status of its parent, which may or may not be included in the index, to satisfy the issuer eligibility criteria if the parent is required to file reports under the Exchange Act or is a foreign private issuer.

Similarly, as the affiliation definition applies to the worldwide equity market capitalization and outstanding indebtedness criteria of the public information availability test, a reference entity or an issuer of securities included in an index that itself does not have a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more or outstanding notes, bonds, debentures, loans, or evidences of indebtedness (other than revolving credit facilities) having a total remaining principal amount of at least $1 billion, may aggregate the worldwide equity market capitalization or outstanding indebtedness of an affiliated entity, regardless of whether that affiliated entity itself or its securities are included in the index, to satisfy one of these criteria. For example, a majority-owned subsidiary included in an index may aggregate the worldwide equity market capitalization or outstanding indebtedness of its parent and/or other affiliated entities, such as other majority-owned subsidiaries of the parent, to satisfy one of these criteria.

Finally, as the affiliation definition applies to the rule 144A information and financial information otherwise

publicly available criteria of the alternative public information availability test applicable to index CDS entered into solely between ECPs, a reference entity or an issuer of securities included in an index that itself does not make available rule 144A information or does not have financial information otherwise publicly available may rely upon an affiliated entity, regardless of whether that affiliated entity itself or its securities are included in the index, to satisfy one of these criteria.

*Comments*

One commenter requested that the Commissions revise the affiliation definition that applies for purposes of the public information availability test to increase the threshold from 20 percent ownership to majority ownership.[867] This commenter noted that majority ownership is consistent with current market practice, including the definition of affiliate included in the 2003 ISDA Credit Derivatives Definitions.[868] This commenter also noted that the current approach with respect to the inclusion of affiliated entities in the same index uses majority ownership rather than 20 percent ownership to determine affiliation.[869] This commenter also requested that the Commissions clarify the application of the affiliation definition to the public information availability test.[870] Further, this commenter requested that the worldwide equity market capitalization criterion should include all affiliated entities because the reference entity included in the index may not be the member of a corporate group that issues public equity.[871] Finally, this commenter was concerned that the outstanding indebtedness criterion would not include affiliate debt guaranteed by the reference entity or issuer of securities included in the index.[872] Further, as noted above,[873] another commenter was concerned that index CDS may include a higher proportion of "private" borrowers (those borrowers that are not public reporting companies or that do not register offerings of their securities) and thus may themselves not satisfy each of the

---

[863] *See* paragraph (c)(1) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[864] *See* paragraph (c)(2) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

[865] *See supra* part III.G.3(b)(ii).

[866] The more than 50 percent (i.e., majority ownership) test is generally consistent with consolidation under U.S. generally accepted accounting principles. *See* FASB ASC section 810–10–25, Consolidation—Overall—Recognition (stating that consolidation is appropriate if a reporting entity has a controlling financial interest in another entity and a specific scope exception does not apply). Accordingly, using a more than 50 percent (i.e., majority ownership) test will make it more likely that the reference entity or issuer of securities included in the index and the affiliated entity will be consolidated with each other in financial statements. Consolidated financial statements present the financial position and results of operations for a parent (controlling entity) and one or more subsidiaries (controlled entities) as if the individual entities actually were a single company or economic entity.

[867] *See* Markit Letter (requesting a threshold of at least 50 percent).

[868] *Id.*

[869] *Id.*

[870] *Id.*

[871] *Id.* This commenter provided Kinder Morgan Kansas Inc. (CDS) and Kinder Morgan Inc. (equity) as an example of where the reference entity and issuer of equity among a corporate group are not the same. *Id.*

[872] *Id.*

[873] *See supra* note 842 and accompanying text.

criteria for the public information availability test.[874]

The Commissions note the commenters' concerns. The Commissions are modifying the method of determining affiliation that applies for purposes of satisfying certain criteria of the public information availability test. The final rules provide that a reference entity or issuer of securities included in an index may rely upon an affiliated entity (meeting the more than 50 percent control threshold) to satisfy one of the criterion of the public information availability test. This modification is similar to the one the Commissions are making to the affiliation definition that applies for purposes of calculating the number and concentration criteria. As noted above, based on commenters' letters, the Commissions understand that the current standard CDS documentation and the current approach with respect to the inclusion of affiliated entities in the same index use majority ownership rather than 20 percent ownership to determine affiliation. The Commissions agree with commenters that in the case of index CDS only it is more appropriate to use a more than 50 percent (i.e., majority ownership) test rather than a 20 percent ownership test. The Commissions believe that because reference entities or issuers of securities included in an index may rely on an affiliated entity to help satisfy the public information availability test a threshold of majority ownership rather than 20 percent ownership will increase the likelihood that there is information available about the reference entity or issuer of securities included in the index. The Commissions believe that determining affiliation in this manner for purposes of the public availability of information test responds to the commenter's concerns.

Further, the Commissions are providing several illustrative examples of the way in which the affiliation definition works in the context of the public availability of information criteria to address the commenter's concerns regarding the application of the affiliation definition in that context. The Commissions also note that the final rules respond to the commenter's concerns regarding the applicability of the affiliation definition to the worldwide equity market capitalization criterion by providing that the worldwide market capitalization of an affiliate can be counted in determining whether the reference entity or issuer of securities included in the index meets the worldwide equity market

capitalization criterion. Moreover, the Commissions note that the final rules respond to the commenter's concerns regarding affiliate debt by providing that indebtedness of an affiliate can be counted in determining whether the reference entity or issuer of securities included in the index meets the outstanding indebtedness criterion. Finally, the Commissions note that the affiliation definition as modified responds to the commenter's concerns regarding "private" borrowers because the modified affiliation definition will allow a reference entity or issuer of securities included in an index to consider the indebtedness, the outstanding equity, and the reporting status of an affiliate in determining whether the public information availability test is satisfied.

As noted above, the Commissions also believe that the modified affiliation definition responds to commenters' concerns noted above that the rules further defining the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" should be simplified. The modified affiliation definition enables market participants to make an affiliation determination for purposes of the public information availability test criteria by measuring the more than 50 percent (i.e., majority ownership) control threshold.

(v) Application of the Public Information Availability Requirements to Indexes Compiled by a Third-Party Index Provider

The Commissions requested comment in the Proposing Release as to whether the public information availability test should apply to an index compiled by an index provider that is not a party to an index CDS ("third-party index provider") that makes publicly available general information about the construction of the index, index rules, identity of components, and predetermined adjustments, and which index is referenced by an index CDS that is offered on or subject to the rules of a DCM or SEF, or by direct access in the U.S. from an FBOT that is registered with the CFTC.[875] Two commenters stated that the presence of a third-party index provider would assure that sufficient information is available regarding the index CDS itself.[876] Neither commenter provided any analysis to explain how or whether a third-party index provider would be able to provide information about the underlying securities or issuers of

securities in the index. The Commissions are not revising the rules to exclude from the public information availability test any index compiled by a third-party index provider.

(vi) Treatment of Indexes Including Reference Entities That Are Issuers of Exempted Securities or Including Exempted Securities

The Commissions are adopting the rules regarding the treatment of indexes that include exempted securities or reference entities that are issuers of exempted securities as proposed without modification.[877] The Commissions believe such treatment is consistent with the objective and intent of the statutory definition of the term "security-based swap," as well as the approach taken in the context of security futures.[878] Accordingly, paragraph (1)(ii) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and paragraph (a)(2) of rules 3a68–1a and 3a68–1b under the Exchange Act provide that, in the case of an index that includes exempted securities, or reference entities that are issuers of exempted securities, in each case as defined as of the date of enactment of the Futures Trading Act of 1982 (other than municipal securities), such securities or reference entities are excluded from the index when determining whether the securities or reference entities in the index constitute a "narrow-based security index" or "issuers of securities in a narrow-based security index" under the rules.

Under paragraph (1)(ii) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and paragraph (a)(2) of rules 3a68–1a and 3a68–1b) under the Exchange Act, an index composed solely of securities that are, or reference entities that are issuers of, exempted securities (other than municipal securities) will not be a

---

[874] See July LSTA Letter.

[875] See Proposing Release at 29851–52.
[876] See ISDA Letter and SIFMA Letter.

[877] See rules 1.3(zzz)(1)(i) and 1.3(aaaa)(1)(i) under the CEA and rules 3a68–1a(a)(2) and 3a68–1b(a)(2) under the Exchange Act; and July 2006 Debt Index Rules. The Commissions did not receive any comments on the proposed rules regarding the treatment of indexes that include exempted securities or reference entities that are issuers of exempted securities.

[878] See section 3(a)(68)(C) of the Exchange Act, 15 U.S.C. 78c(a)(68)(C) (providing that "[t]he term 'security-based swap' does not include any agreement, contract, or transaction that meets the definition of a security-based swap only because such agreement, contract, or transaction references, is based upon, or settles through the transfer, delivery, or receipt of an exempted security under paragraph [12] [of the Exchange Act], as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in paragraph (29) [of the Exchange Act] as in effect on the date of enactment of the Futures Trading Act of 1982), unless such agreement, contract, or transaction is of the character of, or is commonly known in the trade as, a put, call, or other option").

"narrow-based security index" or an index composed of "issuers of securities in a narrow-based security index." In the case of an index where some, but not all, of the securities or reference entities are exempted securities (other than municipal securities) or issuers of exempted securities (other than municipal securities), the index will be a "narrow-based security index" or an index composed of "issuers of securities in a narrow-based security index" only if the index is narrow-based when the securities that are, or reference entities that are issuers of, exempted securities (other than municipal securities) are disregarded. The Commissions believe this approach should result in consistent treatment for indexes regardless of whether they include securities that are, or issuers of securities that are, exempted securities (other than municipal securities) while helping to ensure that exempted securities (other than municipal securities) and issuers of exempted securities (other than municipal securities) are not included in an index merely to make the index either broad-based or narrow-based under the rules.

### 4. Security Indexes

The Dodd-Frank Act defines the term "index" as "an index or group of securities, including any interest therein or based on the value thereof." [879] The Commissions provided an interpretation in the Proposing Release regarding how to determine when a portfolio of securities is a narrow-based or broad-based security index, and the circumstances in which changes to the composition of a security index (including a portfolio of securities) [880] underlying a Title VII instrument would affect the characterization of such Title VII instrument. [881] The Commissions are restating the interpretation set forth in the Proposing Release with one clarification in response to a commenter. [882] Specifically, the Commissions are clarifying what is

meant by "predetermined" for purposes of whether criteria or a self-executing formula for adjusting the security index underlying a Title VII instrument qualify under the interpretation. The Commissions find that this interpretation is an appropriate way to address how to determine when a portfolio of securities is a narrow-based or broad-based security index, and the circumstances in which changes to the composition of a security index (including a portfolio of securities) underlying a Title VII instrument would affect the characterization of such Title VII instrument, and is designed to reduce costs associated with making such a determination. [883]

A security index in most cases is designed to reflect the performance of a market or sector by reference to representative securities or interests in securities. There are several well-known security indexes established and maintained by recognized index providers currently in the market. [884] However, instead of using these established indexes, market participants may enter into a Title VII instrument where the underlying reference of the Title VII instrument is a portfolio of securities selected by the counterparties or created by a third-party index provider at the behest of one or both counterparties. In some cases, the Title VII instrument may give one or both of the counterparties, either directly or indirectly (e.g., through an investment adviser or through the third-party index provider), discretionary authority to change the composition of the security portfolio, including, for example, by adding or removing securities in the security portfolio on an "at-will" basis during the term of the Title VII instrument. [885] Where the counterparties, either directly or indirectly (e.g., through an investment adviser or through the third-party index provider), have this discretionary authority to change the composition or weighting of securities in a security portfolio, that security portfolio will be treated as a narrow-based security index, and therefore a Title VII

instrument on that security portfolio is a security-based swap. [886]

However, not all changes that occur to the composition or weighting of a security index underlying a Title VII instrument will always result in that security index being treated as a narrow-based security index. Many security indexes are constructed and maintained by an index provider pursuant to a published methodology. [887] For instance, the various Standard & Poor's security indexes are reconstituted and rebalanced as needed and on a periodic basis pursuant to published index criteria. [888] Such indexes underlying a Title VII instrument would be broad-based or narrow-based depending on the composition and weighting of the underlying security index.

In addition, counterparties to a Title VII instrument frequently agree to use as the underlying reference of a Title VII instrument a security index based on predetermined criteria where the security index composition or weighting may change as a result of the occurrence of certain events specified in the Title VII instrument at execution, such as "succession events." Counterparties to a Title VII instrument also may use a predetermined self-executing formula to make other changes to the composition or weighting of a security index underlying a Title VII instrument. In either of these situations, the composition of a security index may

---

[879] See section 3(a)(68)(E) of the Exchange Act, 15 U.S.C. 78c(a)(68)(E).

[880] The Commissions noted in the Proposing Release that a "portfolio" of securities could be a group of securities and therefore an "index" for purposes of the Dodd-Frank Act. See Proposing Release at 29854. To the extent that changes are made to the securities underlying the Title VII instrument and each such change is individually confirmed, then those substituted securities are not part of a security index as defined in the Dodd-Frank Act, and therefore a Title VII instrument on each of those substituted securities is a security-based swap.

[881] Solely for purposes of the discussion in this section, the terms "security index" and "security portfolio" are intended to include either securities or the issuers of securities.

[882] See infra note 891 and accompanying text.

[883] See supra part I, under "Overall Economic Considerations".

[884] One example is the S&P 500® Index, an index that gauges the large cap U.S. equities market.

[885] Alternatively, counterparties may enter into Title VII instruments where a third-party investment manager selects an initial portfolio of securities and has discretionary authority to change the composition of the security portfolio in accordance with guidelines agreed upon with the counterparties. Under the final guidance the Commissions are issuing today, such security portfolios are treated as narrow-based security indexes, and Title VII instruments on those security portfolios are security-based swaps.

[886] The Commissions understand that a security portfolio could be labeled as such or could just be an aggregate of individual Title VII instruments documented, for example, under a master agreement or by amending an annex of securities attached to a master trade confirmation. If the security portfolio were created by aggregating individual Title VII instruments, each Title VII instrument must be evaluated in accordance with the guidance to determine whether it is a swap or a security-based swap. For the avoidance of doubt, if the counterparties to a Title VII instrument exchanged payments under that Title VII instrument based on a security index that was itself created by aggregating individual security-based swaps, such Title VII instrument would be a security-based swap. See supra part III.D.

[887] See, e.g., NASDAQ, "NASDAQ–100 Index" ("The NASDAQ–100 Index is calculated under a modified capitalization-weighted methodology. The methodology generally is expected to retain the economic attributes of capitalization-weighting while providing enhanced diversification. To accomplish this, NASDAQ will review the composition of the NASDAQ–100 Index on a quarterly basis and adjust the weightings of Index components using a proprietary algorithm, if certain pre-established weight distribution requirements are not met."), available at *http://dynamic.nasdaq.com/dynamic/nasdaq100_activity.stm.*

[888] Information regarding security indexes and their related methodologies may be widely available to the general public or restricted to licensees in the case of proprietary or "private label" security indexes. Both public and private label security indexes frequently are subject to intellectual property protection.

change pursuant to predetermined criteria or predetermined self-executing formulas without the Title VII instrument counterparties, their agents, or third-party index providers having any direct or indirect discretionary authority to change the security index.

In general, and by contrast to Title VII instruments in which the counterparties, either directly or indirectly (*e.g.*, through an investment adviser or through the third-party index provider), have the discretion to change the composition or weighting of the referenced security index, where there is an underlying security index for which there are predetermined criteria or a predetermined self-executing formula for adjusting the security index that are not subject to change or modification through the life of the Title VII instrument and that are set forth in the Title VII instrument at execution (regardless of who establishes the criteria or formula), a Title VII instrument on such underlying security index is based on a broad-based or narrow-based security index, depending on the composition and weighting of the underlying security index. Subject to the interpretation discussed below regarding security indexes that may shift from being a narrow-based security index or broad-based security index during the life of an existing Title VII instrument, the characterization of a Title VII instrument based on a security index as either a swap or a security-based swap will depend on the characterization of the security index using the above interpretation.[889]

The Commissions are clarifying in response to a commenter that, for purposes of this interpretation, criteria or a self-executing formula regarding composition of a security index underlying a Title VII instrument shall be considered "predetermined" if it is bilaterally agreed upon pre-trade by the parties to a transaction.[890] In order to qualify under this interpretation, however, the Commissions reiterate that the "predetermined" criteria or self-executing formula, as described above, must not be subject to change or modification through the life of the Title VII instrument and must be set forth in the Title VII instrument at execution (regardless of who establishes the criteria or formula).

Comments

The Commissions requested comment on a number of issues regarding the interpretation contained in this section

as it was proposed, including whether the terms "predetermined criteria" and "predetermined self-executing formula" are clear, and whether additional interpretations should be provided with respect to these terms. The Commissions received one comment on the interpretation provided in the Proposing Release, in which the commenter requested clarification that criteria affecting the composition of an index, when such criteria are agreed bilaterally, pre-trade, by the counterparties to a bespoke index trade, are "predetermined" for purposes of determining whether the index is treated as narrow-based or broad-based.[891]

The Commissions are restating the interpretation set forth in the Proposing Release with one clarification in response to the commenter's concerns. As discussed above, the Commissions are providing that not all changes that occur to the composition or weighting of a security index underlying a Title VII instrument will result in that security index being treated as a narrow-based security index. Foremost among these examples is a security index that is constructed and maintained by an index provider pursuant to a published methodology.[892] Changes to such an index pursuant to such a methodology are not the type of discretionary changes that will render an otherwise broad-based security index a narrow-based security index. The Commissions believe this clarification addresses the commenter's concerns.

5. Evaluation of Title VII Instruments on Security Indexes That Move from Broad-Based to Narrow-Based or Narrow-Based to Broad-Based

(a) In General

The determination of whether a Title VII instrument is a swap, a security-based swap, or both (*i.e.*, a mixed swap), is made prior to execution, but no later than when the parties offer to enter into the Title VII instrument.[893] If the security index underlying a Title VII instrument migrates from being broad-based to being narrow-based, or vice versa, during the life of a Title VII instrument, the characterization of that Title VII instrument will not change from its initial characterization regardless of whether the Title VII instrument was entered into bilaterally or was executed through a trade on or subject to the rules of a DCM, SEF, FBOT, security-based SEF, or NSE. For example, if two counterparties enter into a swap based on a broad-based security index, and three months into the life of the swap the security index underlying that Title VII instrument migrates from being broad-based to being narrow-based, the Title VII instrument will remain a swap for the duration of its life and will not be recharacterized as a security-based swap.

If the material terms of a Title VII instrument are amended or modified during its life based on an exercise of discretion and not through predetermined criteria or a predetermined self-executing formula, the Commissions view the amended or modified Title VII instrument as a new Title VII instrument.[894] As a result, the characteristics of the underlying security index must be reassessed at the time of such an amendment or modification to determine whether the security index has migrated from broad-based to narrow-based, or vice versa. If the security index has migrated, then the characterization of the amended or

---

[889] *See supra* note 886, regarding the aggregation of separate trades.

[890] *See infra* note 891 and accompanying text.

[891] *See* ISDA Letter. While this commenter agrees with the guidance that the predetermined changes described in this section should not alter the character of an index (or the classification of a Title VII instrument based thereon), this commenter disagrees that the ability to make discretionary changes should cause an otherwise broad-based security index to be a narrow-based security index. This commenter requested that the Commissions classify transactions "at inception and upon actual change in respect of any classification-related characteristic, be that change the product of a renegotiation or a unilateral exercise of discretion." *Id.* The Commissions note that if material terms of a Title VII instrument are amended or modified during its life based on an exercise of discretion and not through predetermined criteria or a predetermined self-executing formula, the Commissions view the amended or modified Title VII instrument as a new Title VII instrument. *See infra* part III.G.5.

[892] Indeed, the Commissions specifically mentioned in this regard, and have included in the final guidance above, the various Standard & Poor's security indexes—some of which may be described as "common equity indices" as alluded to in ISDA's comment—that are reconstituted and rebalanced as needed and on a periodic basis pursuant to published index criteria.

[893] *See supra* note 625 and accompanying text.

[894] For example, if, on its effective date, a Title VII instrument tracks the performance of an index of 12 securities but is amended during its term to track the performance of only 8 of those 12 securities, the Commissions would view the amended or modified Title VII instrument as a new Title VII instrument. Because it is a new Title VII instrument, any regulatory requirements regarding new Title VII instruments apply. Conversely, if, on its effective date, a Title VII instrument tracks the performance of an index of 12 securities but is amended during its term to reflect the replacement of a departing "key person" of a hedge fund that is a counterparty to the Title VII instrument with a new "key person," the Commissions would not view the amended or modified Title VII instrument as a new Title VII instrument because the amendment or modification is not to a material term of the Title VII instrument.

modified Title VII instrument will be determined by evaluating the underlying security index at the time the Title VII instrument is amended or modified. Similarly, if a security index has migrated from broad-based to narrow-based, or vice versa, any new Title VII instrument based on that security index will be characterized pursuant to an evaluation of the underlying security index at the execution of that new Title VII instrument.

The Commissions provided an interpretation in the Proposing Release regarding circumstances in which the character of a security index on which a Title VII instrument is based changes according to predetermined criteria or a predetermined self-executing formula set forth in the Title VII instrument (or in a related or other agreement entered into by the counterparties or a third-party index provider to the Title VII instrument) at execution. The Commissions are restating this interpretation with one clarification in response to a commenter.[895]

Where at the time of execution such criteria or such formula would cause the underlying broad-based security index to become or assume the characteristics of a narrow-based security index or vice versa during the duration of the instrument,[896] then the Title VII instrument based on such security index is a mixed swap during the entire life of the Title VII instrument.[897] Although at certain points during the life of the Title VII instrument, the underlying security index would be broad-based and at other points the underlying security index would be narrow-based, regulating such a Title VII instrument as a mixed swap from the execution of the Title VII instrument and throughout its life reflects the appropriate characterization of a Title VII instrument based on a security index that migrates pursuant to predetermined criteria or a predetermined self-executing formula.

The Commissions are clarifying what is meant by whether the pre-determined criteria or pre-determined self-executing formula "would cause" the underlying broad-based security index to become or assume the characteristics of a narrow-based security index, or vice versa, as noted above in the interpretation. The Commissions believe that, unless the criteria or formula were intentionally designed to change the index from narrow to broad, or vice versa, Title VII instruments based on indexes that may, but will not necessarily, change from broad to narrow (or vice versa) under such criteria or formula should be considered swaps or security-based swaps, as appropriate, at execution and for the term thereof, and not mixed swaps. In such circumstances, it is not the case that the criteria or formula "would cause" the change within the meaning of the Commission's interpretation.

The Commissions believe that this interpretation regarding the use of predetermined criteria or a predetermined self-executing formula will prevent potential gaming of the Commissions' interpretation regarding security indexes, and prevent potential regulatory arbitrage based on the migration of a security index from broad-based to narrow-based, or vice versa. In particular, predetermined criteria and predetermined self-executing formulas can be constructed in ways that take into account the characteristics of a narrow-based security index and prevent a narrow-based security index from becoming broad-based, and vice versa.

### Comments

The Commissions received two comments on the proposed interpretation in this section regarding the classification of Title VII Instruments based on security indexes that change from narrow-based to broad-based, or vice versa, under predetermined criteria or a predetermined self-executing formula, as mixed swaps. One commenter requested that the Commissions clarify that a Title VII instrument based on a security index that may, but will not necessarily, change from narrow-based to broad-based, or vice versa, under predetermined criteria or a predetermined self-executing formula should be characterized at execution as a swap or security-based swap, as applicable, and not as a mixed swap.[898] This commenter believed that the

Commissions' interpretation should capture as mixed swaps only those Title VII instruments on indexes that will change with certainty, and not those that might change given specific market circumstances.[899] Moreover, this commenter believed that the Commissions' statement that a Title VII instrument on a security index governed by a pre-determined self-executing formula that "would cause" a change from broad to narrow, or narrow to broad, means that the change in character must be a certainty for the instrument to be classified as a mixed swap.[900] The Commissions have clarified their interpretation in response to this commenter's concerns as discussed above.

Another commenter disagreed with the Commissions' proposed interpretation that transactions on indexes under predetermined criteria or a predetermined self-executing formula that would change from broad to narrow, or narrow to broad, should be classified as mixed swaps at inception.[901] This commenter does not believe that regulatory arbitrage is such a significant concern in this context that would justify the challenges to market participants if these transactions were treated as mixed swaps subject to the dual regulatory authority of the Commissions.[902]

The Commissions believe that regulatory arbitrage is a sufficient concern to justify mixed swap status and dual regulatory oversight for Title VII instruments where the index would change from broad to narrow, or narrow to broad, under the pre-determined criteria or predetermined self-executing formula. Counterparties that are concerned about regulatory burdens associated with mixed swap status can redesign their formula to avoid the result, or enter into another swap or security-based swap that is structured to achieve the same economic result without mixed swap status.

### (b) Title VII Instruments on Security Indexes Traded on Designated Contract Markets, Swap Execution Facilities, Foreign Boards of Trade, Security-Based Swap Execution Facilities, and National Securities Exchanges

As was recognized in the Proposing Release, security indexes underlying Title VII instruments that are traded on DCMs, SEFs, FBOTs, security-based SEFs, or NSEs raise particular issues if an underlying security index migrates

---

[895] See infra note 898 and accompanying text.

[896] Thus, for example, if a predetermined self-executing formula agreed to by the counterparties of a Title VII instrument at or prior to the execution of the Title VII instrument provided that the security index underlying the Title VII instrument would decrease from 20 to 5 securities after six months, such that the security index would become narrow-based as a result of the reduced number of securities, then the Title VII instrument is a mixed swap at its execution. The characterization of the Title VII instrument as a mixed swap will not change during the life of the Title VII instrument.

[897] As discussed in section III.G.4., supra, to the extent a Title VII instrument permits "at-will" substitution of an underlying security index, however, as opposed to the use of predetermined criteria or a predetermined self-executing formula, the Title VII instrument is a security-based swap at its execution and throughout its life regardless of whether the underlying security index was narrow-based at the execution of the Title VII instrument.

[898] See SIFMA Letter.

[899] Id.

[900] Id.

[901] See ISDA Letter.

[902] Id.

from broad-based to narrow-based, or vice versa.[903] The Commissions are adopting as proposed their interpretation clarifying that the characterization of an exchange-traded Title VII instrument based on a security index at its execution will not change through the life of the Title VII instrument, regardless of whether the underlying security index migrates from broad-based to narrow-based, or vice versa. Accordingly, a market participant who enters into a swap on a broad-based security index traded on or subject to the rules of a DCM, SEF or FBOT that migrates from broad-based to narrow-based may hold that position until the swap's expiration without any change in regulatory responsibilities, requirements, or obligations; similarly, a market participant who enters into a security-based swap on a narrow-based security index traded on a security-based SEF or NSE that migrates from narrow-based to broad-based may hold that position until the security-based swap's expiration without any change in regulatory responsibilities, requirements, or obligations.

In addition, the Commissions are adopting, as proposed, final rules providing for tolerance and grace periods for Title VII instruments on security indexes that are traded on DCMs, SEFs, FBOTs, security-based SEFs and NSEs.[904] As was noted in the Proposing Release,[905] in the absence of any action by the Commissions, if a market participant wants to offset a swap or enter into a new swap on a DCM, SEF or FBOT where the underlying security index has migrated from broad-based to narrow-based, or to offset a security-based swap or enter into a new security-based swap on a security-based SEF or NSE where the underlying security index has migrated from narrow-based to broad-based, the participant would be prohibited from doing so. That is because swaps may trade only on DCMs, SEFs, and FBOTs, and security-based swaps may trade only on registered NSEs and security-based SEFs.[906] The rules being adopted by the Commissions address how to treat Title VII instruments traded on

trading platforms where the underlying security index migrates from broad-based to narrow-based or narrow-based to broad-based, so that market participants will know where such Title VII instruments may be traded and can avoid potential disruption of their ability to offset or enter into new Title VII instruments on trading platforms when such migration occurs.[907]

As was noted in the Proposing Release,[908] Congress and the Commissions addressed a similar issue in the context of security futures, where the security index on which a future is based may migrate from broad-based to narrow-based or vice versa. Congress provided in the definition of the term ''narrow-based security index'' in both the CEA and the Exchange Act[909] for a tolerance period ensuring that, under certain conditions, a futures contract on a broad-based security index traded on a DCM may continue to trade, even when the index temporarily assumes characteristics that would render it a narrow-based security index under the statutory definition.[910] In general, an index is subject to this tolerance period, and therefore is not a narrow-based security index, if: (i) A futures contract on the index traded on a DCM for at least 30 days as a futures contract on a broad-based security index before the index assumed the characteristics of a narrow-based security index; and (ii) the index does not retain the characteristics of a narrow-based security index for more than 45 business days over 3 consecutive calendar months. Pursuant to these statutory provisions, if the index becomes narrow-based for more than 45 business days over 3 consecutive calendar months, the index is excluded from the definition of the term ''narrow-based security index'' for

the following 3 calendar months as a grace period.

The Commissions believe that a similar tolerance period should apply to swaps traded on DCMs, SEFs, and FBOTs and security-based swaps traded on security-based SEFs and NSEs. Accordingly, the Commissions are adopting the rules, as proposed, providing for tolerance periods for swaps that are traded on DCMs, SEFs, or FBOTs[911] and for security-based swaps traded on security-based SEFs and NSEs.[912]

The final rules provide that to be subject to the tolerance period, a security index underlying a swap executed on or subject to the rules of a DCM, SEF, or FBOT must not have been a narrow-based security index[913] during the first 30 days of trading.[914] If the index becomes narrow-based during the first 30 days of trading, the index must not have been a narrow-based security index during every trading day of the 6 full calendar months preceding a date no earlier than 30 days prior to the commencement of trading of a swap on such index.[915] If either of these alternatives is met, the index will not be a narrow-based security index if it has been a narrow-based security index for no more than 45 business days over 3 consecutive calendar months.[916] These provisions apply solely for purposes of swaps traded on or subject to the rules of a DCM, SEF, or FBOT.

Similarly, the rules provide a tolerance period for security-based swaps traded on security-based SEFs or NSEs. To be subject to the tolerance period, a security index underlying a security-based swap executed on a security-based SEF or NSE must have

---

[903] See Proposing Release at 29856.

[904] See paragraphs (2), (3) and (4) of rule 1.3(yyy) under the CEA and paragraphs (b), (c) and (d) of rule 3a68–3 under the Exchange Act.

[905] See Proposing Release at 29857.

[906] If a swap were based on a security index that migrated from broad-based to narrow-based, a DCM, SEF, or FBOT could no longer offer the Title VII instrument because it is now a security-based swap. Similarly, if a security-based swap were based on a security index that migrated from narrow-based to broad-based, a security-based SEF or NSE could no longer offer the Title VII instrument because it is now a swap.

[907] The rules apply only to the particular Title VII instrument that is traded on or subject to the rules of a DCM, SEF, FBOT, security-based SEF, or NSE. As the Commissions noted in the Proposing Release, to the extent that a particular Title VII instrument is not traded on such a trading platform (even if another Title VII instrument of the same class or type is traded on such a trading platform), the rules do not apply to that particular Title VII instrument. See Proposing Release at 29857 n. 259.

[908] See Proposing Release at 29857.

[909] CEA section 1a(35)(B)(iii), 7 U.S.C. 1a(35)(B)(iii); section 3(a)(55)(C)(iii) of the Exchange Act, 15 U.S.C. 78c(a)(55)(C)(iii).

[910] By joint rules, the Commissions have provided that ''[w]hen a contract of sale for future delivery on a security index is traded on or subject to the rules of a foreign board of trade, such index shall not be a narrow-based security index if it would not be a narrow-based security index if a futures contract on such index were traded on a designated contract market * * *.'' See rule 41.13 under the CEA, 17 CFR 41.13, and rule 3a55–3 under the Exchange Act, 17 CFR 240.3a55–3. Accordingly, the statutory tolerance period applicable to futures on security indexes traded on DCMs applies to futures traded on FBOTs as well.

[911] See paragraph (2) of rule 1.3(yyy) under the CEA and paragraph (b) of rule 3a68–3 under the Exchange Act.

[912] See paragraph (3) of rule 1.3(yyy) under the CEA and paragraph (c) of rule 3a68–3 under the Exchange Act.

[913] For purposes of these rules, the term ''narrow-based security index'' shall also mean ''issuers of securities in a narrow-based security index.'' See supra part III.G.3(b), (discussing the rules defining ''issuers of securities in a narrow-based security index'').

[914] This provision is consistent with the provisions of the CEA and the Exchange Act applicable to futures contracts on security indexes. CEA section 1a(35)(B)(iii)(I), 7 U.S.C. 1a(35)(B)(iii)(I); section 3(a)(55)(C)(iii)(I) of the Exchange Act, 15 U.S.C. 78c(a)(55)(C)(iii)(I).

[915] This alternative test is the same as the alternative test applicable to futures contracts in CEA rule 41.12, 17 CFR 41.12, and rule 3a55–2 under the Exchange Act, 17 CFR 240.3a55–2.

[916] These provisions are consistent with the parallel provisions in the CEA and Exchange Act applicable to futures contracts on security indexes traded on DCMs. See CEA section 1a(35)(B)(iii)(II), 7 U.S.C. 1a(35)(B)(iii)(II), and section 3(a)(55)(C)(iii)(II) of the Exchange Act, 15 U.S.C. 78c(a)(55)(C)(iii)(II).

been a narrow-based security index during the first 30 days of trading. If the index becomes broad-based during the first 30 days of trading, paragraph (3)(i)(B) of rule 1.3(yyy) under the CEA and paragraph (c)(1)(ii) of rule 3a68–3 under the Exchange Act provide that the index must have been a non-narrow-based (*i.e.,* a broad-based) security index during every trading day of the 6 full calendar months preceding a date no earlier than 30 days prior to the commencement of trading of a security-based swap on such index. If either of these alternatives is met, the index will be a narrow-based security index if it has been a security index that is not narrow-based for no more than 45 business days over 3 consecutive calendar months.[917] These provisions apply solely for purposes of security-based swaps traded on security-based SEFs or NSEs.

In addition, the Commissions are adopting rules as proposed that, once the tolerance period under the rules has ended, there will be a grace period during which a Title VII instrument based on a security index that has migrated from broad-based to narrow-based, or vice versa, will be able to trade on the platform on which Title VII instruments based on such security index were trading before the security index migrated and can also, during such period, be cleared.[918] The final rules provide for an additional three-month grace period applicable to a security index that becomes narrow-based for more than 45 business days over three consecutive calendar months, solely with respect to swaps that are traded on or subject to the rules of DCMs, SEFs, or FBOTs. During the grace period, such an index will not be considered a narrow-based security index. The rules apply the same grace period to a security-based swap on a security index that becomes broad-based for more than 45 business days over 3 consecutive calendar months, solely with respect to security-based swaps that are traded on a security-based SEF or NSE. During the grace period, such an index will not be considered a broad-based security index.[919] As a result, this

rule provides sufficient time for a Title VII instrument based on a migrated security index to satisfy listing and clearing requirements applicable to swaps or security-based swaps, as appropriate.

As was noted in the Proposing Release,[920] there will be no overlap between the tolerance and the grace periods under the rules and no "re-triggering" of the tolerance period. For example, if a security index becomes narrow-based for more than 45 business days over 3 consecutive calendar months, solely with respect to swaps that are traded on or subject to the rules of DCMs, SEFs, or FBOTs, but as a result of the rules is not considered a narrow-based security index during the grace period, the tolerance period provisions will not apply, even if the security-index migrated temporarily during the grace period. After the grace period has ended, a security index will need to satisfy anew the requirements under the rules regarding the tolerance period in order to trigger a new tolerance period.

The rules will not result in the re-characterization of any outstanding Title VII instruments. In addition, the tolerance and grace periods as adopted will apply only to Title VII instruments that are traded on or subject to the rules of DCMs, SEFs, FBOTs, security-based SEFs, and NSEs.

## Comments

The Commissions received one comment on the proposed rules described in this section.[921] This commenter stated its view that extending the "grace period" from three months to six months would ease any disruption or dislocation associated with the delisting process with respect to an index that has migrated from broad to narrow, or narrow to broad, and that has failed the tolerance period.[922] This commenter also stated its view that where an index CDS migrates, for entities operating both a SEF and a security-based SEF, such entities should be permitted to move the index from one platform to the other simply by providing a notice to the SEC and CFTC.[923]

As discussed above, the Commissions are adopting the proposed rules without modification. The Commissions note that the three-month grace period applicable to security futures was mandated by Congress in that

context,[924] and the commenter has provided no data or evidence for its request that the Commissions diverge from that grace period and provide for a longer grace period with respect to swaps and security-based swaps. The Commissions believe that the three-month grace period is similarly appropriate to apply in the context of a Title VII instrument based on an index that has migrated to provide sufficient time to execute off-setting positions. With respect to the commenter's other suggestion that entities operating both a SEF and a security-based SEF should be able to move the index from one platform to another where an index CDS migrates simply by filing a notice with the SEC and CFTC, the Commissions do not believe that this proposal is within the scope of this rulemaking.

## H. Method of Settlement of Index CDS

The method that the parties have chosen or use to settle an index CDS following the occurrence of a credit event under such index CDS also can affect whether such index CDS would be a swap, a security-based swap, or both (*i.e.,* a mixed swap). The Commissions provided an interpretation in the Proposing Release regarding the method of settlement of index CDS and are restating the interpretation without modification. The Commissions find that this interpretation is an appropriate way to address index CDS with different settlement methods and is designed to reduce the cost associated with determining whether such an index CDS is a swap or a security-based swap.[925]

If an index CDS that is not based on a narrow-based security index under the Commissions' rules includes a mandatory physical settlement provision that would require the delivery of, and therefore the purchase and sale of, a non-exempted security[926]

---

[917] These provisions are consistent with the parallel provisions in the CEA and the Exchange Act applicable to futures contracts on security indexes traded on DCMs. *See* CEA section 1a(35)(B)(iii), 7 U.S.C. 1a(35)(B)(iii); section 3(a)(55)(C)(iii) of the Exchange Act, 15 U.S.C. 78c(a)(55)(C)(iii).

[918] *See* paragraph (4) of rule 1.3(yyy) under the CEA and paragraph (d) of rule 3a68–3 under the Exchange Act.

[919] These provisions are consistent with the parallel provisions in the CEA and the Exchange Act applicable to futures contracts on security indexes traded on DCMs. *See* CEA section

1a(35)(D), 7 U.S.C. 1a(35)(D); section 3(a)(55)(E) of the Exchange Act, 15 U.S.C. 78c(a)(55)(E).

[920] *See* Proposing Release at 29858.

[921] *See* MarketAxess Letter.

[922] *Id.*

[923] *Id.*

[924] *See* July 2006 Debt Index Rules. The Commissions are not aware of any disruptions caused by the three-month grace period in the context of security futures.

[925] *See supra* part I, under "Overall Economic Considerations".

[926] The Commissions note that section 3(a)(68)(C) of the Exchange Act, 15 U.S.C. 78c(a)(68)(C), provides that "[t]he term 'security-based swap' does not include any agreement, contract, or transaction that meets the definition of a security-based swap only because such agreement, contract, or transaction references, is based upon, or settles through the transfer, delivery, or receipt of an exempted security under paragraph (12) [of the Exchange Act], as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in paragraph (29) [of the Exchange Act] as in effect on the date of enactment of the Futures Trading Act of 1982), unless such agreement, contract, or transaction is of the character of, or is commonly known in the trade as, a put, call, or other option."

or a loan in the event of a credit event, such an index CDS is a mixed swap.[927] Conversely, if an index CDS that is not based on a narrow-based security index under the Commissions' rules includes a mandatory cash settlement[928] provision, such index CDS is a swap, and not a security-based swap or a mixed swap, even if the cash settlement were based on the value of a non-exempted security or a loan.

An index CDS that is not based on a narrow-based security index under the Commissions' rules and that provides for cash settlement in accordance with the 2009 ISDA Credit Derivatives Determinations Committees and Auction Settlement Supplement to the 2003 Definitions (the "Auction Supplement") or with the 2009 ISDA Credit Derivatives Determinations Committees and Auction Settlement CDS Protocol ("Big Bang Protocol")[929] is a swap, and will not be considered a security-based swap or a mixed swap solely because the determination of the cash price to be paid is established through a securities or loan auction.[930] In 2009, auction settlement, rather than physical settlement, became the default method of settlement for, among other types of CDS, index CDS on corporate issuers of securities.[931] The amount of the cash settlement is determined through an auction triggered by the occurrence of a credit event.[932] The Auction Supplement "hard wired" the mechanics of credit event auctions into the 2003 Definitions.[933] The Commissions understand that the credit event auction process that is part of the ISDA terms works as follows.

Following the occurrence of a credit event under a CDS, a determinations committee ("DC") established by ISDA, following a request by any party to a credit derivatives transaction that is subject to the Big Bang Protocol or Auction Supplement, will determine, among other matters: (i) Whether and when a credit event occurred; (ii) whether or not to hold an auction to enable market participants to settle those of their credit derivatives transactions covered by the auction; (iii) the list of deliverable obligations of the relevant reference entity; and (iv) the necessary auction specific terms. The credit event auction takes place in two parts. In the first part of the auction, dealers submit physical settlement requests, which are requests to buy or sell any of the deliverable obligations (based on the dealer's needs and those of its counterparties), and an initial market midpoint price is created based on dealers' initial bids and offers. Following the establishment of the initial market midpoint, the physical settlement requests are then calculated to determine the amount of open interest.

The aggregate amount of open interest is the basis for the second part of the auction. In the second part of the auction, dealers and investors can determine whether to submit limit orders and the levels of such limit orders. The limit orders, which are irrevocable, have a firm price in addition to size and whether it is a buy or sell order. The auction is conducted as a "dutch" auction, in which the open buy interests and open sell interests are matched.[934] The final price of the auction is the last limit order used to match against the open interest. The final price in the auction is the cash price used for purposes of calculating the settlement payments in respect of the orders to buy and sell the deliverable obligations and it is also used to determine the cash settlement payment under the CDS.

Comments

One commenter believed that a mandatory physical settlement provision in an index CDS based on a broad-based security index should not transform a swap into a mixed swap because (i) the SEC would retain jurisdiction over a transfer of securities as part of such settlement and (ii) application of the interpretation would be difficult since many instruments contemplate physical settlement but have a cash settlement option, or vice versa.[935]

As discussed above, the Commissions are restating the interpretation regarding mandatory physical settlement as provided in the Proposing Release. The Commissions' interpretation assures that the Federal securities laws apply to the offer and sale of the underlying securities at the time the index CDS is sold.[936] The Commissions note the commenter's concerns but believe that as a result of the Commissions' understanding of the auction settlement process for index CDS, which is the primary method by which index CDS are settled and which addresses circumstances in which securities may be tendered in the auction process separate from the CDS settlement payment, it is not clear that there is in fact any significant number of circumstances in which such index CDS may be optionally physically settled. The Commissions note that this commenter did not elaborate on the

---

[927] The SEC also notes that there must either be an effective registration statement covering the transaction or an exemption under the Securities Act would need to be available for such physical delivery of securities and compliance issues under the Exchange Act would also need to be considered.

[928] The Commissions are aware that the 2003 Definitions include "Cash Settlement" as a defined term and that such "Settlement Method" (also a defined term in the 2003 Definitions) works differently than auction settlement pursuant to the "Big Bang Protocol" or "Auction Supplement" (each as defined below). The Commissions' use of the term "cash settlement" in this section includes "Cash Settlement," as defined in the 2003 Definitions, and auction settlement, as described in the "Big Bang Protocol" or "Auction Supplement." *See infra* note 929 and accompanying text.

[929] *See* ISDA, "2009 ISDA Credit Derivatives Determinations Committees and Auction Settlement CDS Protocol," available at *http://www.isda.org/bigbangprotf/docs/Big-Bang-Protocol.pdf.*

[930] The possibility that such index CDS may, in fact, be physically settled if an auction is not held or if the auction fails would not affect the characterization of the index CDS.

[931] The Commissions understand that the Big Bang Protocol is followed for index CDS involving corporate debt obligations but is not followed for index CDS based on asset-backed securities, loan-only CDS, and certain other types of CDS contracts. To the extent that such other index CDS contain auction procedures similar to the auction procedures for corporate debt to establish the cash price to be paid, the Commissions also would not consider such other index CDS that are not based on narrow-based security indexes under the Commissions' rules to be mixed swaps.

[932] The Commissions understand that other conditions may need to be satisfied as well for an auction to be held.

[933] *See supra* note 48.

[934] The second part of the credit event auction process involves offers and sales of securities that must be made in compliance with the provisions of the Securities Act and the Exchange Act. First, the submission of a physical settlement request constitutes an offer by the counterparty to either buy or sell any one of the deliverable obligations in the auction. Second, the submission of the irrevocable limit orders by dealers or investors are sales or purchases by such persons at the time of submission of the irrevocable limit order. Through the auction mechanism, where the open interest (which represents physical settlement requests) is matched with limit orders, buyers and sellers are matched. Finally, following the auction and determination of the final price, the counterparty who has submitted the physical delivery request decides which of the deliverable obligations will be delivered to satisfy the limit order in exchange for the final price. The sale of the securities in the auction occurs at the time the limit order is submitted, even though the identification of the specific deliverable obligation does not occur until the auction is completed.

[935] *See* ISDA Letter.

[936] With respect to the applicability of the Federal securities laws, the Commissions are concerned about the use of index CDS to effect distributions of securities without compliance with the requirements of the Securities Act. The Commissions recognize that with respect to transactions in security-based swaps by an issuer of an underlying security, an affiliate of the issuer, or an underwriter the offer and sale of the underlying security (in this case the security to be delivered) occur at the time that the security-based swap is offered and sold, not at the time of settlement. Further, the Commissions note the restrictions on offers and sales of security-based swaps to non-ECPs without compliance with the registration requirements of the Securities Act. *See* section 5(e) of the Securities Act, 15 U.S.C. 77e(d).

circumstances in which the auction process would not apply.

## I. Security-Based Swaps as Securities Under the Exchange Act and Securities Act

Pursuant to the Dodd-Frank Act, a security-based swap is defined as a "security" under the Exchange Act[937] and Securities Act.[938] As a result, security-based swaps are subject to the Exchange Act and the Securities Act and the rules and regulations promulgated thereunder.[939]

The SEC did not provide interpretations in the Proposing Release on the application of the Exchange Act and the Securities Act, and the rules and regulations thereunder, to security-based swaps. However, the SEC solicited comment on whether additional interpretations may be necessary regarding the application of certain provisions of the Exchange Act and the Securities Act, and the rules and regulations promulgated thereunder, to security-based swaps. The SEC did not receive any comments with respect to this issue in the context of this rulemaking and is not providing any interpretations in this release.

## IV. Mixed Swaps

### A. Scope of the Category of Mixed Swap

The category of mixed swap is described, in both the definition of the term "security-based swap" in the Exchange Act and the definition of the term "swap" in the CEA, as a security-based swap that is also based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence

(other than an event described in subparagraph (A)(ii)(III) [of section 3a(a)(68) of the Exchange Act]).[940]

A mixed swap, therefore, is both a security-based swap and a swap.[941] As stated in the Proposing Release, the Commissions believe that the scope of mixed swaps is, and is intended to be, narrow.[942] Title VII establishes robust and largely parallel regulatory regimes for both swaps and security-based swaps and directs the Commissions to jointly prescribe such regulations regarding mixed swaps as may be necessary to carry out the purposes of the Dodd-Frank Act.[943] More generally, the Commissions believe the category of mixed swap was designed so that there would be no gaps in the regulation of swaps and security-based swaps. Therefore, in light of the statutory scheme created by the Dodd-Frank Act for swaps and security-based swaps, the Commissions believe the category of mixed swap covers only a small subset of Title VII instruments.

For example, a Title VII instrument in which the underlying references are the value of an oil corporation stock and the price of oil would be a mixed swap. Similarly, a Title VII instrument in which the underlying reference is a portfolio of both securities (assuming the portfolio is not an index or, if it is an index, that the index is narrow-based) and commodities would be a mixed swap. Mixed swaps also would include certain Title VII instruments called "best of" or "out performance" swaps that require a payment based on the higher of the performance of a security and a commodity (other than a security). As discussed elsewhere in this release, the Commissions also believe that certain Title VII instruments may be mixed swaps if they meet specified conditions.

The Commissions also believe that the use of certain market standard agreements in the documentation of Title VII instruments should not in and of itself transform a Title VII instrument into a mixed swap. For example, many instruments are documented by incorporating by reference market standard agreements. Such agreements typically set out the basis of establishing a trading relationship with another party but are not, taken separately, a

swap or security-based swap. These agreements also include termination and default events relating to one or both of the counterparties; such counterparties may or may not be entities that issue securities.[944] The Commissions believe that the term "any agreement * * * based on * * * the occurrence of an event relating to a single issuer of a security," as provided in the definition of the term "security-based swap," was not intended to include such termination and default events relating to counterparties included in standard agreements that are incorporated by reference into a Title VII instrument.[945] Therefore, an instrument would not be simultaneously a swap and a security-based swap (and thus not a mixed swap) simply by virtue of having incorporated by reference a standard agreement, including default and termination events relating to counterparties to the Title VII instrument.

### Comments

While the Commissions did not receive any comments on the interpretation regarding the scope of the category of mixed swaps, one commenter recommended that the Commissions require that market participants disaggregate mixed swaps and enter into separate simultaneous transactions so that they cannot employ mixed swaps to obscure the underlying substance of transactions.[946] The Commissions are not adopting any rules or interpretations to require disaggregation of mixed swaps into their separate components, as the Dodd-Frank Act specifically contemplated that there would be mixed swaps comprised of both swaps and security-based swaps.

### B. Regulation of Mixed Swaps

#### 1. Introduction

The Commissions are adopting as proposed paragraph (a) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act to define a "mixed swap" in the same manner as the term is defined in both the CEA and the Exchange Act. The Commissions also are adopting as proposed two rules to address the regulation of mixed swaps. First, paragraph (b) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act will provide a regulatory framework with which parties to bilateral uncleared mixed swaps (i.e.,

---

[937] See section 761(a)(2) of the Dodd-Frank Act (inserting the term "security-based swap" into the definition of "security" in section 3a(10) of the Exchange Act, 15 U.S.C. 78c(a)(10)).

[938] See section 768(a)(1) of the Dodd-Frank Act (inserting the term "security-based swap" into the definition of "security" in section 2(a)(1) of the Securities Act, 15 U.S.C. 77b(a)(1)).

[939] Sections 761(a)(3) and (4) of the Dodd-Frank Act amend sections 3(a)(13) and (14) of the Exchange Act, 15 U.S.C. 78c(a)(13) and (14), and section 768(a)(3) of the Dodd-Frank Act adds section 2(a)(18) to the Securities Act, 15 U.S.C. 77b(a)(18), to provide that the terms "purchase" and "sale" of a security-based swap shall mean the "the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap, as the context may require."

[940] Section 3(a)(68)(D) of the Exchange Act, 15 U.S.C. 78c(a)(68)(D); section 1a(47)(D) of the CEA, 7 U.S.C. 1a(47)(D).

[941] Id. The exclusion from the definition of the term "swap" for security-based swaps does not include security-based swaps that are mixed swaps. See section 1a(47)(B)(x) of the CEA, 7 U.S.C. 1a(47)(B)(x).

[942] See Proposing Release at 29860.

[943] See section 712(a)(8) of the Dodd-Frank Act.

[944] Those standard events include inter alia bankruptcy, breach of agreement, cross default to other indebtedness, and misrepresentations.

[945] See section 3(a)(68)(A)(ii)(III) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(III).

[946] See Better Markets Letter.

mixed swaps that are neither executed on or subject to the rules of a DCM, NSE, SEF, security-based SEF, or FBOT nor cleared through a DCO or clearing agency), as to which at least one of the parties is dually registered with both Commissions, will need to comply. Second, paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act establishes a process for persons to request that the Commissions issue a joint order permitting such persons (and any other person or persons that subsequently lists, trades, or clears that class of mixed swap)[947] to comply, as to parallel provisions[948] only, with specified parallel provisions of either the CEA or the Exchange Act, and related rules and regulations (collectively "specified parallel provisions"), instead of being required to comply with parallel provisions of both the CEA and the Exchange Act.

## 2. Bilateral Uncleared Mixed Swaps Entered Into by Dually-Registered Dealers or Major Participants

Swap dealers and major swap participants will be comprehensively regulated by the CFTC, and security-based swap dealers and major security-based swap participants will be comprehensively regulated by the SEC.[949] The Commissions recognize that there may be differences in the requirements applicable to swap dealers and security-based swap dealers, or major swap participants and major security-based swap participants, such that dually-registered market participants may be subject to potentially conflicting or duplicative regulatory requirements when they engage in mixed swap transactions. In order to assist market participants in addressing such potentially conflicting or duplicative requirements, the Commissions are adopting, as proposed with one modification explained below, rules that will permit dually-registered swap dealers and security-based swap participants and dually-registered major swap participants and major security-based swap participants to comply with an alternative regulatory regime when

they enter into certain mixed swaps under specified circumstances. The Commissions received no comments on the proposed rules.

Accordingly, as adopted, paragraph (b) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act provide that a bilateral uncleared mixed swap,[950] where at least one party is dually-registered with the CFTC as a swap dealer or major swap participant and with the SEC as a security-based swap dealer or major security-based swap participant, will be subject to all applicable provisions of the Federal securities laws (and SEC rules and regulations promulgated thereunder). The rules as adopted also provide that such mixed swaps will be subject to only the following provisions of the CEA (and CFTC rules and regulations promulgated thereunder):

• Examinations and information sharing: CEA sections 4s(f) and 8;[951]

• Enforcement: CEA sections 2(a)(1)(B), 4(b), 4b, 4c, 4s(h)(1)(A), 4s(h)(4)(A), 6(c), 6(d), 6c, 6d, 9, 13(a), 13(b) and 23;[952]

• Reporting to an SDR: CEA section 4r;[953]

• Real-time reporting: CEA section 2(a)(13);[954]

• Capital: CEA section 4s(e);[955] and

• Position Limits: CEA section 4a.[956]

The Commissions are modifying proposed rule 1.9(b)(3)(i) under the CEA and Rule 3a68–4(b)(3)(i) to include additional "enforcement" authority. Specifically, as adopted, the rules provide that such swaps will be subject to the anti-fraud, anti-manipulation, and other provisions of the business conduct standards in CEA sections 4s(h)(1)(A) and 4s(h)(4)(A) and the rules promulgated thereunder for mixed swaps.[957] Rule 23.410 under the CEA,[958] adopted under CEA section

4s(h)(1)(A), applies to swap dealers and major swap participants and prohibits fraud, manipulation, and other abusive practices and also imposes requirements regarding the confidential treatment of counterparty information, which will apply to mixed swaps.[959]

As discussed in the Proposing Release, the Commissions believe that paragraph (b) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act will address potentially conflicting or duplicative regulatory requirements for dually-registered dealers and major participants that are subject to regulation by both the CFTC and the SEC, while requiring dual registrants to comply with the regulatory requirements the Commissions believe are necessary to provide sufficient regulatory oversight for mixed swap transactions entered into by such dual registrants. The CFTC also believe that paragraph (b) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act will provide clarity to dually-registered dealers and major participants, who are subject to regulation by both the CFTC and the SEC, as to the requirements of each Commission that will apply to their bilateral uncleared mixed swaps.

## 3. Regulatory Treatment for Other Mixed Swaps

Because mixed swaps are both security-based swaps and swaps,[960] absent a joint rule or order by the Commissions permitting an alternative regulatory approach, persons who desire or intend to list, trade, or clear a mixed swap (or class thereof) will be required to comply with all the statutory provisions in the CEA and the Exchange Act (including all the rules and regulations thereunder) that were added or amended by Title VII with respect to swaps or security-based swaps.[961] Such

---

[947] All references to Title VII instruments in parts IV and VI shall include a class of such Title VII instruments as well. For example, a "class" of Title VII instrument would include instruments that are of similar character and provide substantially similar rights and privileges.

[948] As stated in paragraph (c) of proposed rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act, "parallel provisions" means comparable provisions of the CEA and the Exchange Act that were added or amended by Title VII with respect to security-based swaps and swaps, and the rules and regulations thereunder.

[949] Section 712(a)(7)(A) of the Dodd-Frank Act requires the Commissions to treat functionally or economically similar entities in a similar manner.

[950] Under paragraph (b) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act, a "bilateral uncleared mixed swap" will be a mixed swap that: (i) Is neither executed on nor subject to the rules of a DCM, NSE, SEF, security-based SEF, or FBOT; and (ii) will not be submitted to a DCO or registered or exempt clearing agency to be cleared. To the extent that a mixed swap is subject to the mandatory clearing requirement (see section 2(h)(1)(A) of the CEA, 7 U.S.C. 2(h)(1)(A), and section 3C(a)(1) of the Exchange Act) (and where a counterparty is not eligible to rely on the end-user exclusion from the mandatory clearing requirement (see section 2(h)(7) of the CEA, 7 U.S.C. 2(h)(7), and section 3C(g) of the Exchange Act)), this alternative regulatory treatment will not be available.

[951] 7 U.S.C. 6s(f) and 12, respectively.

[952] 7 U.S.C. 2(a)(1)(B), 6(b), 6b, 6c, 6s(h)(1)(A), 6s(h)(4)(A), 9 and 15, 13b, 13a–1, 13a–2, 13, 13c(a), 13c(b), and 26, respectively.

[953] 7 U.S.C. 6r.

[954] 7 U.S.C. 2(a)(13).

[955] 7 U.S.C. 6s(e).

[956] 7 U.S.C. 6a.

[957] 7 U.S.C. 6s(h)(1)(A) and 6s(h)(4)(A).

[958] 17 CFR 23.410.

[959] *Business Conduct Standards for Swap Dealers and Major Swap Participants With Counterparties,* 77 FR 9734, 9751–9755 (Feb. 17, 2012). The Commissions note that, while the introductory text of rule 1.9(b)(3)(i)(A) through (F) under the CEA and rule 3a68–4(b)(3)(i)(A) through (F) under the Exchange Act characterizes the cited CEA sections (*e.g.,* "enforcement," "capital," etc.), such characterization is meant as guidance only. For example, final rule 1.9(b)(3)(i)(B) uses the word "enforcement" to characterize certain of the cited CEA sections and the rules and regulations promulgated thereunder that prohibit fraud, manipulation, or abusive practices. Other cited provisions, such as the Whistleblower protections under CEA section 23, or the related rules and regulations, such as requirements to keep counterparty information confidential under rule 23.410(c) under the CEA, 17 CFR 23.410(c), are similarly enforcement provisions in that they protect market participants from fraudulent or other abusive practices.

[960] *See supra* note 10.

[961] Because security-based swaps are also securities, compliance with the Federal securities

dual regulation may not be appropriate in every instance and may result in potentially conflicting or duplicative regulatory requirements. However, before the Commissions can determine the appropriate regulatory treatment for mixed swaps (other than the treatment discussed above), the Commissions will need to understand better the nature of the mixed swaps that parties want to trade. As a result, the Commissions proposed paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act to establish a process pursuant to which any person who desires or intends to list, trade, or clear a mixed swap (or class thereof) that is not subject to the provisions of paragraph (b) of the rules (*i.e.*, bilateral uncleared mixed swaps entered into by at least one dual registrant) may request the Commissions to publicly issue a joint order permitting such person (and any other person or persons that subsequently lists, trades, or clears that class of mixed swap) to comply, as to parallel provisions only, with the specified parallel provisions, instead of being required to comply with parallel provisions of both the CEA and the Exchange Act.[962] The Commissions received no comments on the proposed rules and are adopting the rules as proposed.

As adopted, paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act further provide that a person submitting such a request to the Commissions must provide the Commissions with:

(i) All material information regarding the terms of the specified, or specified class of, mixed swap;

(ii) the economic characteristics and purpose of the specified, or specified class of, mixed swap;

(iii) the specified parallel provisions, and the reasons the person believes such specified parallel provisions would be appropriate for the mixed swap (or class thereof);

(iv) an analysis of (1) the nature and purposes of the parallel provisions that are the subject of the request; (2) the comparability of such parallel provisions; and (3) the extent of any conflicts or differences between such parallel provisions; and

(v) such other information as may be requested by either of the Commissions.

This provision is intended to provide the Commissions with sufficient information regarding the mixed swap (or class thereof) and the proposed regulatory approach to make an informed determination regarding the appropriate regulatory treatment of the mixed swap (or class thereof).

As adopted, paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act also will allow a person to withdraw a request regarding the regulation of a mixed swap at any time prior to the issuance of a joint order by the Commissions. This provision is intended to permit persons to withdraw requests that they no longer need. This, in turn, will save the Commissions time and staff resources.

As adopted, paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act further provide that in response to a request pursuant to the rules, the Commissions may jointly issue an order, after public notice and opportunity for comment, permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that class of mixed swap) to comply, as to parallel provisions only, with the specified parallel provisions (or another subset of the parallel provisions that are the subject of the request, as the Commissions determine is appropriate), instead of being required to comply with parallel provisions of both the CEA and the Exchange Act. In determining the contents of such a joint order, the Commissions can consider, among other things:

(i) The nature and purposes of the parallel provisions that are the subject of the request;

(ii) the comparability of such parallel provisions; and

(iii) the extent of any conflicts or differences between such parallel provisions.

Finally, as adopted, paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act require the Commissions, if they determine to issue a joint order pursuant to these rules, to do so within 120 days of receipt of a complete request (with such 120-day period being tolled during the pendency of a request for public comment on the proposed interpretation). If the Commissions do not issue a joint order within the prescribed time period, the rules require that each Commission publicly provide the reasons for not having done so. Paragraph (c) of rule 1.9 under the CEA and rule 3a68–4 under the Exchange Act makes clear that nothing in the rules requires either Commission to issue a requested joint order regarding the regulation of a particular mixed swap (or class thereof).

These provisions are intended to provide market participants with a prompt review of requests for a joint order regarding the regulation of a particular mixed swap (or class thereof). The rules also will provide transparency and accountability by requiring that at the end of the review period, the Commissions issue the requested order or publicly state the reasons for not doing so.

## V. Security-Based Swap Agreements

### A. Introduction

SBSAs are swaps over which the CFTC has regulatory and enforcement authority but for which the SEC also has antifraud and certain other authority.[963] The term "security-based swap agreement" is defined as a "swap agreement" (as defined in section 206A of the GLBA [964]) of which "a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, including any interest therein" but does not include a security-based swap.[965]

---

[962] Other than with respect to the specified parallel provisions with which such persons may be permitted to comply instead of complying with parallel provisions of both the CEA and the Exchange Act, any other provision of either the CEA or the Federal securities laws that applies to swaps or security-based swaps will continue to apply.

[963] *See* section 3(a)(78) of the Exchange Act, 15 U.S.C. 78c(a)(78); CEA section 1a(47)(A)(v), 7 U.S.C. 1a(47)(A)(v). The Dodd-Frank Act provides that certain CFTC registrants, such as DCOs and SEFs, will keep records regarding SBSAs open to inspection and examination by the SEC upon request. *See, e.g.,* sections 725(e) and 733 of the Dodd-Frank Act. The Commissions are committed to working cooperatively together regarding their dual enforcement authority over SBSAs.

[964] 15 U.S.C. 78c note. The Dodd-Frank Act amended the definition of "swap agreement" in section 206A of the GLBA to eliminate the requirements that a swap agreement be between ECPs, as defined in section 1a(18)(C) of the CEA, 7 U.S.C. 1a(18)(C), and subject to individual negotiation. *See* section 762(b) of the Dodd-Frank Act. Sections 762(c) and (d) of the Dodd-Frank Act also made conforming amendments to the Exchange Act and the Securities Act to reflect the changes to the regulation of "swap agreements" that are either "security-based swaps" or "security-based swap agreements" under the Dodd-Frank Act.

[965] *See* section 3(a)(78) of the Exchange Act, 15 U.S.C. 78c(a)(78). The CFMA amended the Exchange Act and the Securities Act to exclude swap agreements from the definitions of security in those statutes but subjected "security-based swap agreements," as defined in section 206B of the GLBA, 15 U.S.C. 78c note, to the antifraud, anti-manipulation, and anti-insider trading provisions of the Exchange Act and Securities Act. *See* CFMA, *supra* note 697, title III.

The CEA does not contain a stand-alone definition of "security-based swap agreement," but includes the definition instead in subparagraph (A)(v) of the swap definition in CEA section 1a(47), 7 U.S.C. 1a(47). The only difference between these definitions is that the definition of SBSA in the Exchange Act specifically excludes security-based
Continued

## B. Swaps That are Security-Based Swap Agreements

Although the Commissions believe it is not possible to provide a bright line test to define an SBSA, the Commissions believe that it is possible to clarify that certain types of swaps clearly fall within the definition of SBSA. For example, as the Commissions noted in the Proposing Release, a swap based on an index of securities that is not a narrow-based security index (*i.e.*, a broad-based security index) would fall within the definition of an SBSA under the Dodd-Frank Act.[966] Similarly, an index CDS that is not based on a narrow-based security index or on the "issuers of securities in a narrow-based security index," as defined in rule 1.3(zzz) under the CEA and rule 3a68–1a under the Exchange Act, would be an SBSA. In addition, a swap based on a U.S. Treasury security or on certain other exempted securities other than municipal securities would fall within the definition of an SBSA under the Dodd-Frank Act.[967]

The Commissions received no comments on the examples provided in the Proposing Release regarding SBSAs. Accordingly, the Commissions are not further defining SBSA beyond restating the examples above.[968]

## C. Books and Records Requirements for Security-Based Swap Agreements

The Commissions are adopting rule 1.7 under the CEA and rule 3a68–3 under the Exchange Act, as proposed, to clarify that there will not be additional books and records requirements regarding SBSAs other than those that are required for swaps. The Dodd-Frank Act provides that the Commissions shall adopt rules regarding the books and records required to be kept for SBSAs.[969] As discussed above, SBSAs are swaps over which the CFTC has regulatory authority, but for which the SEC has antifraud, anti-manipulation, and certain other authority. In the Proposing Release, the Commissions noted that the CFTC had proposed rules governing books and records for swaps, which would apply to swaps that also are SBSAs.[970] The Commissions further stated their belief that those proposed rules would provide sufficient books and records regarding SBSAs, and that additional books and records

requirements were not necessary for SBSAs.[971] The Commissions received no comments on the proposed rules.

Accordingly, rule 1.7 under the CEA and rule 3a68–3 under the Exchange Act provide that persons registered as SDRs under the CEA and the rules and regulations thereunder are not required to (i) keep and maintain additional books and records regarding SBSAs other than the books and records regarding swaps that SDRs would be required to keep and maintain pursuant to the CEA and rules and regulations thereunder; and (ii) collect and maintain additional data regarding SBSAs other than the data regarding swaps that SDRs are required to collect and maintain pursuant to the CEA and rules and regulations thereunder. In addition, rule 1.7 under the CEA and rule 3a68–3 under the Exchange Act provide that persons registered as swap dealers or major swap participants under the CEA and the rules and regulations thereunder, or registered as security-based swap dealers or major security-based swap participants under the Exchange Act and the rules and regulations thereunder, are not required to keep and maintain additional books and records, including daily trading records, regarding SBSAs other than the books and records regarding swaps that those persons are required to keep and maintain pursuant to the CEA and the rules and regulations thereunder.[972]

## VI. Process for Requesting Interpretations of the Characterization of a Title VII Instrument

The Commissions recognize that there may be Title VII instruments (or classes of Title VII instruments) that may be difficult to categorize definitively as swaps or security-based swaps. Further, because mixed swaps are both swaps and security-based swaps, identifying a mixed swap may not always be straightforward.

Section 712(d)(4) of the Dodd-Frank Act provides that any interpretation of, or guidance by, either the CFTC or SEC regarding a provision of Title VII shall be effective only if issued jointly by the Commissions (after consultation with the Board) on issues where Title VII requires the CFTC and SEC to issue joint regulations to implement the provision. The Commissions believe that any interpretation or guidance regarding whether a Title VII instrument is a

---

swaps (*see* section 3(a)(78)(B) of the Exchange Act, 15 U.S.C. 78c(a)(78)(B)), while the definition of SBSA in the CEA does not contain a similar exclusion. Instead, the exclusion for security-based swaps is placed in the general exclusions from the swap definition in the CEA (*see* CEA section 1a(47)(B)(x), 7 U.S.C. 1a(47)(B)(x)).

[966] *See* Proposing Release at 29863. Swaps based on indexes that are not narrow-based security indexes are not included within the definition of SBSA. *See* section 3(a)(68)(A)(ii)(I) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(I), and discussion *supra* part III.G. However, such swaps have a material term that is "based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein," and therefore such swaps fall within the SBSA definition.

[967] Swaps on U.S. Treasury securities that do not have any other underlying references involving securities are expressly excluded from the definition of the term "security-based swap" under the Dodd-Frank Act. *See* section 3(a)(68)(C) of the Exchange Act, 15 U.S.C. 78c(a)(68)(C) (providing that an agreement, contract, or transaction that would be a security-based swap solely because it references, is based on, or settles through the delivery of one or more U.S. Treasury securities (or certain other exempted securities) is excluded from the security-based swap definition). However, swaps on U.S. Treasury securities or on other exempted securities covered by subparagraph (C) of the security-based swap definition have a material term that is "based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein," and therefore fall within the SBSA definition.

[968] The Commissions noted that certain transactions that were not "security-based swap agreements" under the CFMA are nevertheless included in the definition of security-based swap

under the Dodd-Frank Act—including, for example, a CDS on a single loan. Accordingly, although such transactions were not subject to insider trading restrictions under the CFMA, under the Dodd-Frank Act they are subject to the Federal securities laws, including insider trading restrictions.

[969] Specifically, section 712(d)(2)(B) of the Dodd-Frank Act requires the Commissions, in consultation with the Board, to jointly adopt rules governing books and records requirements for SBSAs by persons registered as SDRs under the CEA, including uniform rules that specify the data elements that shall be collected and maintained by each SDR. Similarly, section 712(d)(2)(C) of the Dodd-Frank Act requires the Commissions, in consultation with the Board, to jointly adopt rules governing books and records for SBSAs, including daily trading records, for swap dealers, major swap participants, security-based swap dealers, and major security-based swap participants.

[970] *See Swap Data Recordkeeping and Reporting Requirements,* 75 FR 76573 (Dec. 8, 2010) (proposed rules regarding swap data recordkeeping and reporting requirements for SDRs, DCOs, DCMs, SEFs, swap dealers, major swap participants, and swap counterparties who are neither swap dealers nor major swap participants); *See Reporting, Recordkeeping, and Daily Trading Records Requirements for Swap Dealers and Major Swap Participants,* 75 FR 76666 (Dec. 9, 2010) (proposed rules regarding reporting and recordkeeping requirements and daily trading records requirements for swap dealers and major swap participants). These rules have been adopted by the CFTC. *See Swap Data Recordkeeping and Reporting Requirements,* 77 FR 2136 (Jan. 13, 2012) (final rules regarding swap data recordkeeping and reporting requirements for SDRs, DCOs, DCMs, SEFs, swap dealers, major swap participants, and swap counterparties who are neither swap dealers or major swap participants); *See Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants,* 77 FR 20128 (Apr. 3, 2012) (final rules regarding reporting and recordkeeping requirements and daily trading records requirements for swap dealers and major swap participants).

[971] *See* Proposing Release at 29863.

[972] Rule 1.7 under the CEA and Rule 3a69–3 under the Exchange Act provide that the term "security-based swap agreement" has the meaning set forth in CEA section 1a(47)(A)(v), 7 U.S.C. 1a(47)(A)(v), and section 3(a)(78) of the Exchange Act, 15 U.S.C. 78c(a)(78), respectively.

swap, a security-based swap, or both (i.e., a mixed swap), must be issued jointly pursuant to this requirement.

The Commissions proposed rules in the Proposing Release to establish a process for interested persons to request a joint interpretation by the Commissions regarding whether a particular Title VII instrument (or class of Title VII instruments) is a swap, a security-based swap, or both (i.e., a mixed swap).[973] The Commissions are adopting the rules as proposed.

Section 718 of the Dodd-Frank Act establishes a process for determining the status of "novel derivative products" that may have elements of both securities and futures contracts. Section 718 of the Dodd-Frank Act provides a useful model for a joint Commission review process to appropriately categorize Title VII instruments. As a result, the final rules include various attributes of the process established in section 718 of the Dodd-Frank Act. In particular, to permit an appropriate review period that provides sufficient time to ensure Federal regulatory interests are satisfied that also does not unduly delay the introduction of new financial products, the adopted process, like the process established in section 718, includes a deadline for responding to a request for a joint interpretation.[974]

The Commissions are adopting rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act that establish a process for parties to request a joint interpretation regarding the characterization of a particular Title VII instrument (or class thereof). Specifically, the final rules provide that any person may submit a request to the Commissions to provide a public joint interpretation of whether a particular Title VII instrument is a swap, a security-based swap, or both (i.e., a mixed swap).[975]

The final rules afford market participants with the opportunity to obtain greater certainty from the Commissions regarding the regulatory status of particular Title VII instruments under the Dodd-Frank Act. This provision should decrease the possibility that market participants inadvertently might fail to meet the regulatory requirements applicable to a particular Title VII instrument.

The final rules provide that a person requesting an interpretation as to the characterization of a Title VII instrument as a swap, a security-based swap, or both (i.e., a mixed swap), must provide the Commissions with the person's determination of the characterization of the instrument and supporting analysis, along with certain other documentation.[976] Specifically, the person must provide the Commissions with the following information:

• All material information regarding the terms of the Title VII instrument;

• A statement of the economic characteristics and purpose of the Title VII instrument;

• The requesting person's determination as to whether the Title VII instrument should be characterized as a swap, a security-based swap, or both (i.e., a mixed swap), including the basis for such determination; and

• Such other information as may be requested by either Commission.

This provision should provide the Commissions with sufficient information regarding the Title VII instrument at issue so that the Commissions can appropriately evaluate whether it is a swap, a security-based swap, or both (i.e., a mixed swap).[977] By requiring that requesting persons furnish a determination regarding whether they believe the Title VII instrument is a swap, a security-based swap, or both (i.e., a mixed swap), including the basis for such determination, this provision also will assist the Commissions in more quickly identifying and addressing the relevant issues involved in arriving at a joint interpretation of the characterization of the instrument.

The final rules provide that a person may withdraw a request at any time prior to the issuance of a joint interpretation or joint notice of proposed rulemaking by the Commissions.[978] Notwithstanding any such withdrawal, the Commissions may provide an interpretation regarding the characterization of the Title VII instrument that was the subject of a withdrawn request.

This provision will permit parties to withdraw requests for which the party

no longer needs an interpretation. This, in turn, should save the Commissions time and staff resources. If the Commissions believe such an interpretation is necessary regardless of a particular request for interpretation, however, the Commissions may provide such a joint interpretation of their own accord.

The final rules provide that if either Commission receives a proposal to list, trade, or clear an agreement, contract, or transaction (or class thereof) that raises questions as to the appropriate characterization of such agreement, contract, or transaction (or class thereof) as a swap, security-based swap, or both (i.e., a mixed swap), the receiving Commission promptly shall notify the other.[979] This provision of the final rules further provides that either Commission, or their Chairmen jointly, may submit a request for a joint interpretation to the Commissions as to the characterization of the Title VII instrument where no external request has been received.

This provision is intended to ensure that Title VII instruments do not fall into regulatory gaps and will help the Commissions to fulfill their responsibility to oversee the regulatory regime established by Title VII of the Dodd-Frank Act by making sure that Title VII instruments are appropriately characterized, and thus appropriately regulated. An agency, or their Chairmen jointly, submitting a request for an interpretation as to the characterization of a Title VII instrument under this paragraph will be required to submit the same information as, and could withdraw a request in the same manner as, a person submitting a request to the Commissions. The bases for these provisions are set forth above with respect to paragraphs (b) and (c) of the final rules.

The final rules require that the Commissions, if they determine to issue a joint interpretation as to the characterization of a Title VII instrument, do so within 120 days of receipt of the complete external or agency submission (unless such 120-day period is tolled during the pendency of a request for public comment on the proposed interpretation).[980] If the Commissions do not issue a joint interpretation within the prescribed time period, the final rules require that each Commission publicly provide the reasons for not having done so within

---

[973] *See* Proposing Release at 29864–65.

[974] The Commissions note that section 718 of the Dodd-Frank Act is a separate process from the process the Commissions are adopting, and that any future interpretation involving the process under section 718 would not affect the process being adopted here, nor will any future interpretation involving the process adopted here affect the process under section 718.

[975] *See* paragraph (a) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act.

[976] *See* paragraph (b) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act.

[977] The Commissions also may use this information to issue (within the timeframe for issuing a joint interpretation) a joint notice of proposed rulemaking to further define one or more of the terms "swap," "security-based swap," or "mixed swap." *See* paragraph (f) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act, which are discussed below.

[978] *See* paragraph (c) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act.

[979] *See* paragraph (d) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act.

[980] *See* paragraph (e) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act. This 120-day period is based on the timeframe set forth in section 718(a)(3) of the Dodd-Frank Act.

such prescribed time period. This provision of the final rules also incorporates the mandate of the Dodd-Frank Act that any joint interpretation by the Commissions be issued only after consultation with the Board of Governors of the Federal Reserve System.[981] Finally, the rules make clear that nothing requires either Commission to issue a requested joint interpretation regarding the characterization of a particular instrument.

These provisions are intended to assure market participants a prompt review of submissions requesting a joint interpretation of whether a Title VII instrument is a swap, a security-based swap, or both (i.e., a mixed swap). The final rules also provide transparency and accountability by requiring that at the end of the review period, the Commissions issue the requested interpretation or publicly state the reasons for not doing so.

The final rules permit the Commissions, in lieu of issuing a requested interpretation, to issue (within the timeframe for issuing a joint interpretation) a joint notice of proposed rulemaking to further define one or more of the terms ''swap,'' ''security-based swap,'' or ''mixed swap.''[982] Under the final rules, the 120-day period to provide a response will be tolled during the pendency of a request for public comment on any such proposed interpretation. Such a rulemaking, as required by Title VII, would be required to be done in consultation with the Board of Governors of the Federal Reserve System. This provision is intended to provide the Commissions with needed flexibility to address issues that may be of broader applicability than the particular Title VII instrument that is the subject of a request for a joint interpretation.

### Comments

Three commenters discussed the proposed process for requesting interpretations of the characterization of a Title VII instrument,[983] and while supporting such joint interpretive process, suggested certain changes, including extending it to SBSAs,[984] mandating that the Commissions issue a response to a request,[985] and suggesting

that the Commissions should seek expedited judicial review in the event the Commissions do not agree on the interpretation.[986]

The Commissions are adopting the final rules as proposed and are not including SBSAs in the process. The joint interpretive process is intended to decrease the possibility that market participants inadvertently might fail to meet regulatory requirements that are applicable to swaps, security-based swaps, or mixed swaps and, as such, provides a mechanism for market participants to request whether an instrument will be regulated by the CFTC, the SEC, or both. However, the Commissions do not believe it is appropriate to predetermine whether particular swaps also are SBSAs as SBSAs are already swaps over which the CFTC has regulatory and enforcement authority and as to which the SEC has antifraud and certain other related authorities.[987] Predetermining whether particular swaps may be SBSAs under this process is not needed to provide certainty as to the applicable regulatory treatment of these instruments.

The Commissions also are retaining in the final rules the framework for providing or not providing joint interpretations. As noted above, section 718 of the Dodd-Frank Act contains a framework for evaluating novel derivative products that may have elements of both securities and futures contracts (other than swaps, security-based swaps or mixed swaps). The Commissions believe that establishing a joint interpretive process for swaps, security-based swaps and mixed swaps that is modeled in part on this statutory framework should facilitate providing interpretations to market participants in a timely manner, if the Commissions determine to do so. Establishing a process by rule will provide market participants with an understandable method by which they can request an interpretation from the Commissions. As the Commissions have the authority, but not the obligation, under the Dodd-Frank Act to further define the terms ''swap,'' ''security-based swap,'' and ''mixed swap,'' the Commissions are

retaining the flexibility in the interpretive process rules to decide whether or not to issue joint interpretations. The Commissions believe, however, that it is appropriate to advise market participants of the reasons why such interpretation is not being issued and the final rules retain the requirement that the Commissions publicly explain the reasons for not issuing a joint interpretation.

Further, the Commissions are not revising the final rules to provide for expedited judicial review. The Dodd-Frank Act does not contain any provision that provides for expedited judicial review if the Commissions do not issue a joint interpretation with respect to a Title VII instrument. Although the Commissions note that section 718 of the Dodd-Frank Act contains a statutorily mandated expedited judicial review of one of the Commission's actions (if sought by the other Commission) regarding novel derivative products that may have elements of both securities and futures contracts, such statutory provision does not apply to Title VII instruments.[988] Further, Title VII provides flexibility to the Commissions to determine the methods by which joint interpretations are provided. Title VII does not contain any required expedited judicial review of Commission actions, and the Commissions do not have the authority to require expedited judicial review under Title VII, with respect to a Title VII instrument. Accordingly, the Commissions do not believe that including such a provision is appropriate in the context of providing interpretations to market participants regarding the definitions of swap, security-based swap, or mixed swap.

Two commenters were concerned about the length of the review period and believed that the Commissions should shorten such time period.[989] The

[981] *See* section 712(d)(4) of the Dodd-Frank Act.

[982] *See* paragraph (f) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act.

[983] *See* Better Markets Letter; CME Letter; and SIFMA Letter.

[984] *See* Better Markets Letter.

[985] *See* CME Letter and SIFMA Letter. These commenters suggested that the Commissions should be required to issue a joint interpretation for all joint interpretive requests that are not withdrawn. *Id.*

[986] *See* CME Letter. This commenter suggested that the Commissions should seek expedited judicial review to determine the characterization of a Title VII instrument if the Commissions cannot agree on a joint interpretation. *Id.*

[987] *See* section 3(a)(78) of the Exchange Act, 15 U.S.C. 78c(a)(78), and section 1a(47)(A)(v) of the CEA, 7 U.S.C. 1a(47)(A)(v). The Dodd-Frank Act provides that certain CFTC registrants, such as DCOs and SEFs, will keep records regarding security-based swap agreements open to inspection and examination by the SEC upon request. *See, e.g.,* sections 725(e) and 733 of the Dodd-Frank Act.

[988] The Commissions note that judicial review provisions in section 718 relating to the status of novel derivative products only provide that either Commission (either the SEC or the CFTC) has the right to petition for review of a final order of the other Commission with respect to novel derivative products that may have elements of both securities and futures that affects jurisdictional issues. Nothing in section 718 requires that the Commissions issue exemptions or interpretations pursuant to such section or provides any person other than the Commissions the right to petition for Court review of a Commission order issued pursuant to section 718.

[989] *See* CME Letter and Markit Letter. One of these commenters suggested that the Commissions should reduce the 120-day review period to 30 days because the value of receiving a joint interpretation would be negated if a market participant had to wait 120 days. This commenter also suggested that foreign competitors will gain a competitive advantage to U.S. market participants because they will not need to wait for a joint interpretation before

Commissions are not modifying the final rules from those proposed with respect to the length of the review period. The 120-day review period is based on a timeframe established by Congress with respect to determining the status of novel derivative products.[990] The Commissions believe that this length of the review period also is appropriate for other derivative products such as swaps, security-based swaps, and mixed swaps. Further, the Commissions believe the 120-day review period is necessary to enable the Commissions to obtain the necessary information regarding a Title VII instrument, thoroughly analyze the instrument, and formulate any joint interpretation regarding the instrument. In a related comment, one commenter suggested that the Commissions allow a requesting party, while awaiting a joint interpretation, to make a good faith characterization of a particular Title VII instrument and engage in transactions based on such characterization.[991] The Commissions believe that it is essential that the characterization of an instrument be established prior to any party engaging in the transactions so that the appropriate regulatory schemes apply. The Commissions do not believe that allowing market participants to make such a determination as to the status of a product is either appropriate or consistent with the statutory provisions providing for the Commissions to further define the terms "swap," "security-based swap" and "mixed swap." Further, allowing market participants to determine the status of a product could give rise to regulatory arbitrage and inconsistent treatment of similar products.

Finally, some commenters expressed concern about the public availability of information regarding the joint interpretive process and asked that the parties be able to seek confidential treatment of their submissions.[992] The Commissions note that under existing rules of both Commissions, requesting parties may seek confidential treatment for joint interpretive requests from the SEC and the CFTC in accordance with the applicable existing rules relating to confidential treatment of information.[993] The Commissions also note that even if confidential treatment has been requested, all joint interpretive requests, as well all joint interpretations and any decisions not to issue a joint interpretation (along with the explanation of the grounds for such decision), will be made publicly available at the conclusion of the review period.[994]

## VII. Anti-Evasion

### A. CFTC Anti-Evasion Rules

#### 1. CFTC's Anti-Evasion Authority

#### (a) Statutory Basis for the Anti-Evasion Rules

Pursuant to the authority in sections 721(c) and 725(g)(2) of the Dodd-Frank Act and CEA sections 1a(47)(E) and 2(i),[995] the CFTC is promulgating the anti-evasion rules as they were proposed and restating the accompanying interpretation with modifications in response to commenters. The CFTC also is providing an additional interpretation regarding rules 1.3(xxx)(6) and 1.6 under the CEA.

Section 721(c) of the Dodd-Frank Act requires the CFTC to further define the terms "swap," "swap dealer," "major swap participant," and "eligible contract participant," in order "[t]o include transactions and entities that have been structured to evade" subtitle A of Title VII (or an amendment made by subtitle A of the CEA). Moreover, as the CFTC noted in the Proposing Release,[996] several other provisions of Title VII reference the promulgation of anti-evasion rules, including:

- Subparagraph (E) of the definition of "swap" provides that foreign exchange swaps and foreign exchange forwards shall be considered swaps unless the Secretary of the Treasury makes a written determination that either foreign exchange swaps or foreign exchange forwards, or both, among other things, "are not structured to evade the [Dodd-Frank Act] in violation of any rule promulgated by the [CFTC] pursuant to section 721(c) of that Act;"[997]

- Section 722(d) of the Dodd-Frank Act provides that the provisions of the CEA relating to swaps shall not apply to activities outside the United States unless those activities, among other things, "contravene such rules or regulations as the [CFTC] may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of [the CEA] that was enacted by the [Title VII];"[998] and

- Section 725(g) of the Dodd-Frank Act amends the Legal Certainty for Bank Products Act of 2000 to provide that,

---

[990] See section 718(a)(3) of the Dodd-Frank Act.

[991] See SIFMA Letter. This commenter also suggested that while the requesting party, and all other market participants, would be bound by the joint interpretation when issued, they should not face retroactive re-characterization of a transaction executed during the review period and prior to the issuance of the joint interpretation. Id.

[992] One commenter suggested that the Commissions should permit the parties seeking a joint interpretation to request confidential treatment from the Commissions during the course of the review period in order to protect proprietary information and deal structures. See SIFMA Letter. Another commenter suggested that the Commissions should make public all requests for joint interpretations, any guidance actually provided in response to such requests, and any decisions not to provide guidance in response to such requests (along with an explanation of the grounds for any such decision). See Better Markets Letter.

[993] See 17 CFR 200.81 and 17 CFR 140.98. The Commissions note that the joint interpretive process is intended to provide, among other things, notification to all market participants as to the regulatory classification of a particular Title VII instrument. In this regard, the Commissions do not believe it is appropriate to provide a joint interpretation only to the market participants requesting the interpretation, while delaying publication of the same joint interpretation to market participants generally. Therefore, CFTC staff will not exercise its discretion under 17 CFR 140.98(b) to delay publication of a joint interpretation. SEC staff does not have discretion under 17 CFR 200.81(b) to delay publication of a joint interpretation.

[994] The CFTC's publication of any joint interpretive request and the joint interpretation itself will be subject to the restrictions of section 8 of the CEA. See 7 U.S.C. 12. Subject to limited exceptions, CEA section 8 generally restricts the CFTC from publishing "data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers…" Id. The CFTC and its staff have a long history of providing interpretive guidance with respect to the regulatory status of specific proposed transactions in compliance with CEA section 8. However, market participants making a joint interpretive request should be aware that the SEC is not subject to CEA section 8 and, therefore, is not subject to the restrictions of CEA section 8. The CFTC anticipates that most joint interpretive requests will not contain CEA section 8 information. However, given that the SEC is not subject to the restrictions of CEA section 8, the CFTC intends to work with requesting parties to assure that joint interpretive requests do not include CEA section 8 information. Nevertheless, given the foregoing, market participants should not submit CEA section 8 information in their joint interpretive requests.

[995] 7 U.S.C. 1a(47)(E) and 2(i).

[996] Proposing Release at 29866.

[997] CEA section 1a(47)(E), 7 U.S.C. 1a(47)(E).

[998] CEA section 2(i), 7 U.S.C. 2(i). New CEA section 2(i), as added by section 722(d) of the Dodd-Frank Act, also provides that the provisions of Title VII relating to swaps shall not apply to activities outside the United States unless those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States."

---

trading similar or identical products. See CME Letter. The Commissions note that to the extent foreign competitors are engaging in swap and security-based swap transactions subject to either Commission's jurisdiction, they will be subject to the same process for requesting interpretations of the characterization of Title VII instruments as U.S. market participants. The other commenter requested that the Commissions issue a joint interpretation for each "widely-utilized index," at the time of the index series' launch, within a two-week period rather than the proposed 120-day period for novel derivative products under section 718 of the Dodd-Frank Act. This commenter did not recognize that the joint interpretive process would be available in this case, and that it may be initiated by an index provider. See paragraph (a) of rule 1.8 under the CEA and rule 3a68–2 under the Exchange Act (providing that "[a]ny person" may submit a request for a joint interpretation). See Markit Letter.

although identified banking products generally are excluded from the CEA, that exclusion shall not apply to an identified banking product that is a product of a bank that is not under the regulatory jurisdiction of an appropriate Federal banking agency,[999] meets the definition of a "swap" or "security-based swap," and "has been structured as an identified banking product for the purpose of evading the provisions of the [CEA], the [Securities Act], or the [Exchange Act]." [1000]

## Comments

One commenter asserted the CFTC has no statutory basis to promulgate the anti-evasion rules, as proposed.[1001] Specifically, this commenter stated that neither CEA sections 2(h)(4)(A) nor 6(e) grant the CFTC authority to prescribe an anti-evasion rule and interpretation as described in the Proposing Release.[1002] Moreover, this commenter argued that CEA section 2(i) limits the CFTC to prescribing anti-evasion rules related only to activities occurring outside of the United States.[1003] The CFTC finds these comments misplaced because CEA sections 2(h)(4)(A) and 6(e) provide the CFTC with additional authority to prescribe anti-evasion rules for specific purposes above and beyond the authority provided by sections 721(c) and 725(g) of the Dodd-Frank Act and CEA sections 1a(47)(E) and 2(i), upon which the CFTC is relying in this rulemaking.[1004] In addition, section 2(i)

of the CEA provides that activities conducted outside the United States, including entering into agreements, contracts and transactions or structuring entities, which willfully evade or attempt to evade any provision of the CEA, shall be subject to the provisions of Subtitle A of Title VII of the Dodd-Frank Act; it does not limit the CFTC's other authorities cited above. Accordingly, nothing in CEA sections 2(h)(4)(A), 2(i) or 6(e) prevent the CFTC from prescribing rules 1.3(xxx)(6) and 1.6.

Two commenters supported the proposal's "principles-based" approach to anti-evasion,[1005] while several others suggested modifications.[1006] Two commenters believed that the Proposing Release is overly broad and that, if the CFTC does finalize anti-evasion rules, such rules should be narrower in scope.[1007] Similarly, one other commenter asserted that the CFTC erred in the Proposing Release by placing too great an emphasis on the flexibility of the rules as opposed to providing clarity for market participants.[1008] The CFTC continues to believe a "principles-based" approach to its anti-evasion rules is appropriate. The CFTC is not adopting an alternative approach, whereby it provides a bright-line test of non-evasive conduct, because such an approach may provide potential wrongdoers with a roadmap for structuring evasive transactions. Notwithstanding this concern, as described below, the CFTC is providing an additional interpretation and examples of evasion in order to provide clarity to market participants.[1009]

One commenter suggested an alternative standard for a finding of evasion should be "whether the transaction is lawful or not" under the CEA, CFTC rules and regulations, orders, or other applicable federal, state or other laws.[1010] The CFTC is not adopting this suggested alternative standard for evasion because to adopt

this standard would blur the distinction between whether a transaction (or entity) is lawful and whether it is structured in a way to evade the Dodd-Frank Act and the CEA. The anti-evasion rules provided herein are concerned with the latter conduct, not the former.[1011] Thus, the CFTC does not believe it is appropriate to limit the enforcement of its anti-evasion authority to only unlawful transactions.

## 2. Final Rules

### (a) Rule 1.3(xxx)(6)

The CFTC is adopting the Rule 1.3(xxx)(6) as proposed. As adopted, Rule 1.3(xxx)(6)(i) under the CEA generally defines as swaps those transactions that are willfully structured to evade the provisions of Title VII governing the regulation of swaps. Furthermore, rules 1.3(xxx)(6)(ii) and (iii) effectuate CEA section 1a(47)(E)(i) and section 725(g) of the Dodd-Frank Act, respectively, and will be applied in a similar fashion as rule 1.3(xxx)(6)(i). Rule 1.3(xxx)(6)(ii) applies to currency and interest rate swaps that are willfully structured as foreign exchange forwards or foreign exchange swaps to evade the new regulatory regime for swaps enacted in Title VII. Rule 1.3(xxx)(6)(iii) applies to transactions of a bank that are not under the regulatory jurisdiction of an appropriate Federal banking agency and where the transaction is willfully structured as an identified banking product to evade the new regulatory regime for swaps enacted in Title VII.

Rule 1.3(xxx)(6)(iv) provides that in determining whether a transaction has been willfully structured to evade rules 1.3(xxx)(6)(i) through (iii), the CFTC will not consider the form, label, or written documentation dispositive.[1012] This approach is intended to prevent evasion through clever draftsmanship of a form, label, or other written documentation.

Rule 1.3(xxx)(6)(v) further provides that transactions, other than transactions structured as securities, willfully structured to evade (as provided in rules 1.3(xxx)(6)(i) through (iii)) will be considered in determining whether a person is a swap dealer or major swap participant.

Lastly, rule 1.3(xxx)(6)(vi) provides that rule 1.3(xxx)(6) will not apply to any agreement, contract or transaction structured as a security (including a security-based swap) under the

---

[999] The term "identified banking product" is defined in section 402 of the Legal Certainty for Bank Products Act of 2000, 7 U.S.C. 27. The term "appropriate Federal banking agency" is defined in CEA section 1a(2), 7 U.S.C. 1a(2), and section 3(a)(72) of the Exchange Act, 15 U.S.C. 78c(a)(72), which were added by sections 721(a) and 761(a) of the Dodd-Frank Act, respectively.

[1000] Section 741(b) of the Dodd-Frank Act amends section 6(e) of the CEA, 7 U.S.C. 9a, to provide that any DCO, swap dealer, or major swap participant "that knowingly or recklessly evades or participates in or facilitates an evasion of the requirements of section 2(h) [of the CEA] shall be liable for a civil monetary penalty in twice the amount otherwise available for a violation of section 2(h) [of the CEA]." This anti-evasion provision is not dependent upon the promulgation of a rule under section 721(c) of the Dodd Frank Act, and hence the proposed rule and interpretive guidance is not meant to apply to CEA section 6(e).

[1001] See IECA Letter.
[1002] Id.; 7 U.S.C. 2(h)(4)(A) and 9a.
[1003] See IECA Letter; 7 U.S.C. 2(i).
[1004] CEA section 2(h)(4)(A), 7 U.S.C. 2(h)(4)(A), provides: The Commission shall prescribe rules under this subsection (and issue interpretations of rules prescribed under this subsection) as determined by the Commission to be necessary to prevent evasions of the mandatory clearing requirements under this Act.

CEA section 6(e), 7 U.S.C. 9a, in relevant part, provides: (4) Any designated clearing organization that knowingly or recklessly evades or participates in or facilitates an evasion of the requirements of section 2(h) shall be liable for a civil money penalty

in twice the amount otherwise available for a violation of section 2(h). (5) Any swap dealer or major swap participant that knowingly or recklessly evades or participates in or facilitates an evasion of the requirements of section 2(h) shall be liable for a civil money penalty in twice the amount otherwise available for a violation of section 2(h).

[1005] See Barnard Letter and Better Markets Letter.
[1006] See CME Letter; ISDA Letter; and SIFMA Letter.
[1007] See ISDA Letter and SIFMA Letter.
[1008] See CME Letter.
[1009] Examples described in the guidance are illustrative and not exhaustive of the transactions, instruments or entities that could be considered evasive. In considering whether a transaction, instrument or entity is evasive, the CFTC will consider the facts and circumstances of each situation.
[1010] See WGCEF Letter.

[1011] If a transaction is unlawful, the CFTC (or another authority) may be able to bring an action alleging a violation of the applicable rule, regulation, order or law.
[1012] See supra part II.D.1.

securities laws as defined in section 3(a)(47) of the Exchange Act.[1013]

**(b) Rule 1.6**

The CFTC is adopting rule 1.6 as proposed. Section 2(i) of the CEA states that the provisions of the CEA relating to swaps that were enacted by Title VII (including any rule prescribed or regulation promulgated thereunder) shall not apply to activities outside the United States unless, among other things, those activities "contravene such rules or regulations as the [CFTC] may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of [the CEA] that was enacted by [Title VII]."

Pursuant to this authority, rule 1.6(a), as adopted, makes it unlawful to conduct activities outside the United States, including entering into transactions and structuring entities, to willfully evade or attempt to evade any provision of the CEA as enacted under Title VII or the rules and regulations promulgated thereunder.

In addition, rule 1.6(b) provides that in determining whether a transaction or entity has been entered into or structured willfully to evade, as provided in rule 1.6(a), the CFTC will not consider the form, label, or written documentation as dispositive.

Rule 1.6(c) provides that an activity conducted outside the United States to evade, as described in proposed rule 1.6(a), shall be subject to the provisions of Subtitle A of Title VII of the Dodd-Frank Act. As the CFTC explained in the Proposing Release,[1014] such provisions are necessary to fully prevent those who seek to willfully evade the regulatory requirements established by Congress in Title VII relating to swaps from enjoying any benefits from their efforts to evade.

Lastly, rule 1.6(d) provides that no agreement, contract or transaction structured as a security (including a security-based swap) under the securities laws shall be deemed a swap pursuant to rule 1.6.

**(c) Interpretation of the Final Rules**

The CFTC is providing an interpretation of the final rules in response to commenters, addressing (i) the applicability of the anti-evasion rules to transactions that qualify for the forward exclusion, (ii) the applicability of the anti-evasion rules to transactions executed on a SEF, (iii) the treatment of evasive transactions after they are discovered, and (iv) documentation considerations.[1015]

With regard to the forward exclusion, the CFTC is clarifying, in response to a commenter,[1016] that entering into transactions that qualify for the forward exclusion from the swap definition shall not be considered evasive. However, in circumstances where a transaction does not, in fact, qualify for the forward exclusion, the transaction may or may not be evasive depending on an analysis of all relevant facts and circumstances.[1017]

Concerning the applicability of the anti-evasion rules to transactions executed on a SEF, the CFTC is clarifying, in response to comments,[1018] that a transaction that has been self-certified by a SEF (or a DCM), or that has received prior approval from the CFTC, will not be considered evasive.[1019]

With respect to the treatment of evasive transactions after they are discovered, the CFTC is clarifying, in response to comments,[1020] that in instances where one party willfully structures a transaction to evade but the counterparty does not, the transaction, which meets the swap definition under rule 1.3(xxx)(6), or is subject to the provisions of Subtitle A of Title VII pursuant to rule 1.6, will be subject to all CEA provisions and the regulations thereunder (as applied to the party who willfully structures a transaction to evade). In rare situations where there is a true "innocent party,"[1021] it will likely be due to fraud or misrepresentation by the evading party and the business consequences and remedies will be the same as for any such victim.[1022] The CFTC will impose appropriate sanctions only on the willful evader for violations of the relevant provisions of the CEA and CFTC regulations since the individual agreement, contract or transaction was (and always should have been) subject to them.[1023] Further, on a prospective basis for future transactions or instruments similar to those of the particular evasive swap, the CFTC will consider these transactions or instruments to be swaps within the meaning of the Dodd-Frank Act (as applied to both the party who willfully structures a transaction to evade and the "innocent party").

Moreover, evasive transactions will count toward determining whether each evading party with the requisite intent is a swap dealer or major swap participant.[1024] In response to a commenter's suggestion that, as proposed, rule 1.3(xxx)(6)(v) should require a pattern of transactions,[1025] the CFTC is not requiring a pattern of evasive transactions as a prerequisite to prove evasion, although such a pattern may be one factor in analyzing whether evasion has occurred under rules 1.3(xxx)(6) or 1.6. Further, in

---

[1013] 15 U.S.C. 78c(a)(47).

[1014] Proposing Release at 29866.

[1015] The CFTC also is adopting the interpretive guidance from the Proposing Release, as proposed, but with certain clarifications. *See infra* part VII.A.3.

[1016] *See* COPE Letter (requesting clarification that transacting in the physical markets (*e.g.*, entering into nonfinancial commodity forward contracts), as opposed to executing a swap, would not be considered evasion).

[1017] The CFTC is aware that there are circumstances where a forward contract can perform the same or a substantially similar economic function as a swap through alternative delivery procedures. Further, there are circumstances where a person who deals in both forwards and swaps may make decisions regarding financial risk assessment that will involve the consideration of regulatory obligations. The CFTC will carefully scrutinize the facts and circumstances associated with forward contracts.

[1018] *See* MarketAxess Letter (commenting that the anti-evasion rules should not apply to transactions executed on, or subject to the rules of, a SEF, because before a SEF may list a swap, it must self-certify or voluntarily obtain CFTC approval to list the product).

[1019] Pursuant to part 40 of the CFTC's regulations, 17 CFR Part 40, registered SEFs and DCMs must self-certify with the CFTC that any products that they list "[comply] with the [CEA] and regulations thereunder" and are liable for any false self-certifications. Therefore, market participants that have entered into such transactions will not be considered to be engaging in evasion, while a SEF or DCM could be found to have falsely self-certified.

[1020] *See* WGCEF Letter (generally expressing concern that the penalty for anti-evasion is "draconian") and IECA Letter (commenting that the non-evading party should not become a party to an evasive "swap" transaction, and thus subject to the regulatory requirements of the Dodd-Frank Act.) .

[1021] The analysis of whether a party is "innocent" is based on the facts and circumstances of a particular transaction as well as a course of dealing by each of the parties.

[1022] This is not dissimilar to an enforcement action for trading illegal off-exchange futures contracts in violation of CEA section 4(a), 7 U.S.C. 6(a). The CFTC regularly seeks restitution for victims in enforcement actions where applicable. Additionally, victims retain their private rights of action for breach of contract and any related equitable remedies.

[1023] In considering which provisions of the CEA and CFTC regulations are relevant, the CFTC will evaluate which CEA provisions and CFTC regulations the evasive swap would have had to comply with had it not evaded the definition of swap (*e.g.*, reporting, recordkeeping, clearing, etc.). However, where both parties have willfully structured to evade or attempted to evade the requirements of the Dodd-Frank Act, the CFTC may subject the agreement, contract, instrument, or transaction itself to the full regulatory regime and the willful evaders to applicable sanctions.

[1024] In other words, the evasive transaction would count toward the relevant thresholds (*e.g.*, de minimis (with respect to determining swap dealer status, if the evasive transaction constituted dealing activity) and substantial position (with respect to determining major swap participant status)).

[1025] *See* IECA Letter. This same commenter suggested that rule 1.3(xxx)(6)(v) should be applied only to the authorities regarding evasion provided by Congress and refer to the entity structuring the evading transaction have been addressed above.

determining whether such a transaction is a swap, the CFTC will consider whether the transaction meets the definition of the term "swap" as defined by statute and as it is further defined in this rulemaking.[1026]

As an illustration of some of the foregoing concepts, if the market for foreign exchange forwards on a particular currency settles on a T+4 basis, but two counterparties agree to expedite the settlement of an foreign exchange forward on such currency to characterize the transaction falsely as a spot transaction in order to avoid reporting the transaction, rule 1.3(xxx)(6)(i) would define the transaction as a swap. In this example, both parties may be subject to sanctions if they both have the requisite intent (i.e., willfully evaded). However, had the counterparty with the reporting obligation in this example convinced the other counterparty, by using a false rationale unrelated to avoiding reporting, to expedite the foreign exchange forward settlement in order to avoid reporting, then the only party that would be at risk for sanctions (i.e., the only party with the requisite intent) would be the counterparty with the reporting obligation who deceived the other counterparty.

With regard to documentation considerations, as discussed above, the CFTC is adopting rules 1.3(xxx)(6)(iv) and 1.6(b), as proposed,[1027] but is providing the following interpretation. As stated in the Proposing Release,[1028] the structuring of instruments, transactions, or entities to evade the requirements of the Dodd-Frank Act may be "limited only by the ingenuity of man."[1029] Therefore, the CFTC will look beyond manner in which an instrument, transaction, or entity is documented to examine its actual substance and purpose to prevent any evasion through clever draftsmanship—an approach consistent with the CFTC's case law in the context of determining whether a contract is a futures contract and the CFTC's interpretations in this release regarding swaps.[1030] The documentation of an instrument,

## Comments

The CFTC received a number of comments on various aspects of proposed rules 1.3(xxx)(6) and 1.6.

Several commenters requested clarity as to what types of transactions might be considered evasive under proposed rule 1.3(xxx)(6) and 1.6.[1031] One commenter requested that the CFTC clarify that transacting in the physical markets (e.g., entering into nonfinancial commodity forward contracts), as opposed to executing a swap, would not be considered evasion.[1032] As discussed above, the CFTC has provided an interpretation regarding the applicability of the anti-evasion rules to transactions that qualify for the forward exclusion. Another commenter requested that the CFTC clarify that the anti-evasion rules would not apply to transactions executed on a SEF because, before a SEF may list a swap, it must self-certify or voluntarily obtain CFTC permission to list that product.[1033] The CFTC has provided an interpretation discussed above to address this comment.

Two commenters expressed concern regarding the penalty to the counterparties to a transaction that is deemed to violate the CFTC's anti-evasion provisions.[1034] Pursuant to the final rule, when a transaction violates the anti-evasion rules, the CFTC will consider the transaction a swap. One of these commenters said that the non-evading party should not unilaterally become a party to a swap, and thus be subject to the regulatory requirements of the Dodd-Frank Act.[1035] This commenter believed the rule should be clear that only the "evading" party would become a party to a swap, but the "non-evading" party would not.[1036] The other comments believed that a transaction that is determined to have violated the CFTC's anti-evasion rules should be considered a swap only if it meets all other aspects of the statutory definition of the term "swap."[1037] The CFTC agrees that the anti-evasion rules are not meant to "punish the innocent," but rather to appropriately address the evading counterparty's or counterparties' failure to meet the

requirements of the Dodd-Frank Act. Therefore, the CFTC has provided an interpretation described above about how a transaction, discovered to have evaded the CEA or the Dodd-Frank Act (and therefore, a swap under rule 1.3(xxx)(6) or subject to the provisions of Subtitle A under rule 1.6) will be treated after the evasion is discovered.

Furthermore, the CFTC agrees that a transaction that is determined to have violated the CFTC's anti-evasion rules will be considered a swap only if it meets the definition of the term "swap," and has provided an interpretation to address this comment. In response to both comments, the CFTC also has provided an example to illustrate the concepts in the interpretation.

The CFTC received one comment regarding rules 1.3(xxx)(6)(iv) and 1.6(b). This commenter believed that a difference exists between "documentation," which contains terms, conditions, etc. of an agreement, and the "form or label."[1038] Thus, because a form or label may be duplicitously assigned to a transaction, this commenter agreed that neither the form nor the label should be dispositive.[1039] However, because documentation contains the substance of an agreement, this commenter believed that documentation should be dispositive in determining whether a given contract has been entered to willfully evade because the substance of a contract is derived from its documentation.[1040] Alternatively, this commenter requested that if the CFTC does not amend its proposal, the CFTC clarify what evidence or subject matter would be dispositive of willful evasion.[1041] The CFTC disagrees with these comments and has provided an interpretation discussed above that the documentation of an instrument, transaction, or entity is a relevant, but not dispositive, factor. This view not only is consistent with CFTC case law, and the CFTC's interpretations herein, but reduces the possibility of providing a potential roadmap for evasion.

Two commenters raised issues applicable to proposed rule 1.6 alone. One commenter believed that proposed rule 1.6 should not be adopted until the cross-border application of the swap provisions of Title VII is addressed.[1042] The CFTC disagrees and believes that the rule provides sufficient clarity to market participants even though the CFTC has not yet finalized guidance

---

[1026] Thus, for example, if a person, in seeking to evade Title VII, structures a product that is a privilege on a certificate of deposit, the CFTC's anti-evasion rules would not be implicated because CEA section 1a(47)(B)(iii), 7 U.S.C. 1a(47)(B)(iii), excludes such a product from the swap definition.

[1027] Rules 1.3(xxx)(6)(iv) and 1.6(b) provide that "in determining whether a transaction has been willfully structured to evade, neither the form, label, nor written documentation of the transaction shall be dispositive."

[1028] Proposing Release at 29866.

[1029] Cargill v. Hardin, 452 F.2d 1154, 1163 (8th Cir. 1971).

[1030] See supra part II.D.1.

[1031] See CME Letter; COPE Letter; IECA Letter; MarketAxess Letter; and WGCEF Letter.

[1032] See COPE Letter.

[1033] See MarketAxess Letter.

[1034] See IECA Letter and WGCEF Letter.

[1035] See IECA Letter.

[1036] Id.

[1037] See WGCEF Letter.

[1038] See CME Letter.

[1039] Id.

[1040] Id.

[1041] Id.

[1042] See ISDA Letter.

regarding the cross-border application of the swap provisions of the Dodd-Frank Act. The other commenters believed that the proposed rule text and interpretation does not fully explain how the CFTC would apply proposed rule 1.6 in determining whether a swap subject to foreign jurisdiction and regulated by a foreign regulator is evasive.[1043] As stated above, an agreement, contract, instrument or transaction that is found to have been willfully structured to evade will be subject to CEA provisions and the regulations thereunder pursuant to rule 1.6(c).

### 3. Interpretation Contained in the Proposing Release

The CFTC is restating the interpretation contained in the Proposing Release,[1044] but is providing additional clarification regarding certain types of circumstances that may (or may not) constitute an evasion of the requirements of Title VII. However, the CFTC notes that each activity will be evaluated on a case-by-case basis with consideration given to all relevant facts and circumstances.

In developing its interpretation, the CFTC considered legislative, administrative, and judicial precedent with respect to the anti-evasion provisions in other Federal statutes. For example, the CFTC examined the anti-evasion provisions in the Truth in Lending Act,[1045] the Bank Secrecy Act,[1046] and the Internal Revenue Code.[1047]

The CFTC will not consider transactions, entities, or instruments structured in a manner solely motivated by a legitimate business purpose to constitute willful evasion ("Business Purpose Test"). Additionally, relying on Internal Revenue Service ("IRS") concepts, when determining whether particular conduct is an evasion of the Dodd-Frank Act, the CFTC will consider the extent to which the conduct involves deceit, deception, or other unlawful or illegitimate activity.

### (a) Business Purpose Test

#### Interpretation

Consistent with the Proposing Release,[1048] the CFTC recognizes that transactions may be structured, and entities may be formed, in particular ways for legitimate business purposes, without any intention of circumventing the requirements of the Dodd-Frank Act with respect to swaps. Thus, in evaluating whether a person is evading or attempting to evade the swap requirements with respect to a particular instrument, entity, or transaction, the CFTC will consider the extent to which the person has a legitimate business purpose for structuring the instrument or entity or entering into the transaction in that particular manner. Although different means of structuring a transaction or entity may have differing regulatory implications and attendant requirements, absent other indicia of evasion, the CFTC will not consider transactions, entities, or instruments structured in a manner solely motivated by a legitimate business purpose to constitute evasion. However, to the extent a purpose in structuring an entity or instrument or entering into a transaction is to evade the requirements of Title VII with respect to swaps, the structuring of such instrument, entity, or transaction may be found to constitute willful evasion.[1049]

Although some commenters suggest that the determination that there is a legitimate business purpose, and the use of that concept as a relevant fact in the determination of the possibility of evasion, will not provide appropriate clarity, it is a recognized analytical method and would be useful in the overall analysis of potentially willful evasive conduct.

The CFTC fully expects that a person acting for legitimate business purposes within its respective industry will naturally weigh a multitude of costs and benefits associated with different types of financial transactions, entities, or instruments, including the applicable regulatory obligations. In that regard, and in response to commenters, the CFTC is clarifying that a person's specific consideration of regulatory burdens, including the avoidance thereof, is not dispositive that the person is acting without a legitimate business purpose in a particular case. The CFTC will view legitimate business purpose considerations on a case-by-case basis in conjunction with all other relevant facts and circumstances.

Moreover, the CFTC recognizes that it is possible that a person intending to willfully evade Dodd-Frank may attempt to justify its actions by claiming that they are legitimate business practices in its industry; therefore, the CFTC will retain the flexibility, via an analysis of all relevant facts and circumstances, to confirm not only the legitimacy of the business purpose of those actions but whether the actions could still be determined to be willfully evasive. For example, a person may attempt to disguise a product that may be a swap by employing accounting practices that are not appropriate for swaps. Whether or not the method of

---

[1043] *See* CME Letter.

[1044] *See* Proposing Release at 29865.

[1045] 15 U.S.C. 1604(a) provides, in relevant part, that the Federal Reserve Board shall prescribe regulations to carry out the purposes of this subchapter * * *. [T]hese regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

In affirming the Board's promulgation of Regulation Z, the Supreme Court noted that anti-evasion provisions such as section 1604(a) evince Congress's intent to "stress[] the agency's power to counteract attempts to evade the purposes of a statute." *Mourning v. Family Publ'ns Serv., Inc.,* 411 U.S. 356, 370 (1973) (citing *Gemsco v. Walling,* 324 U.S. 244 (1945) (giving great deference to a regulation promulgated under similar prevention-of-evasion rulemaking authority in the Fair Labor Standards Act)).

[1046] 31 U.S.C. 5324 (stating, in pertinent part, that "[n]o person shall, for the purpose of evading the reporting requirements of [the Bank Secrecy Act (BSA) or any regulation prescribed thereunder] * * * . structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions"). The Federal Deposit Insurance Corporation regulations implementing the BSA require banks to report transactions that "the bank knows, suspects, or has reason to suspect" are "designed to evade any regulations promulgated under the Bank Secrecy Act." 12 CFR 353.3 (2010).

[1047] The Internal Revenue Code makes it unlawful for any person willfully to attempt "in any manner to evade or defeat any tax * * *." 26 U.S.C. 7201. While a considerable body of case law has developed under the tax evasion provision, the statute itself does not define the term, but generally prohibits willful attempts to evade tax.

[1048] Proposing Release at 29867.

[1049] As the CFTC observed in the Proposing Release, a similar concept applies with respect to tax evasion. *See* Proposing Release at 29867 n. 324. A transaction that is structured to avoid the payment of taxes but that lacks a valid business purpose may be found to constitute tax evasion. *See, e.g., Gregory v. Helvering,* 293 U.S. 465, 469 (1935) (favorable tax treatment disallowed because transaction lacked any business or corporate purpose). Under the "sham-transaction" doctrine, "a transaction is not entitled to tax respect if it lacks economic effects or substance other than the generation of tax benefits, or if the transaction serves no business purpose." *Winn-Dixie Stores, Inc. v. Comm'r,* 254 F.3d 1313, 1316 (11th Cir. 2001) (citing *Knetsch v. United States,* 364 U.S. 361 (1960)). "The doctrine has few bright lines, but 'it is clear that transactions whose sole function is to produce tax deductions are substantive shams.'" *Id.* (quoting *United Parcel Serv. of Am., Inc. v. Comm'r,* 254 F.3d 1014, 1018 (11th Cir. 2001)). To be clear, though, while the Proposing Release references the use of the business purpose test in tax law, the CFTC is not using the legitimate business purpose consideration in the same manner as the IRS.

accounting or employed accounting practices are determined to be for legitimate business purposes, that alone will not be dispositive in determining whether it is willfully evasive according to either rule 1.3(xxx)(6) or 1.6.

Because transactions and instruments are regularly structured, and entities regularly formed, in a particular way for various, and often times multiple, reasons, it is essential that all relevant facts and circumstances be considered. Where a transaction, instrument, or entity is structured solely for legitimate business purposes, it is not willfully evasive. By contrast, where a consideration of all relevant facts and circumstances reveals the presence of a purpose that is not a legitimate business purpose, evasion may exist.

Comments

Two commenters believed the proposed business purpose test is inappropriate for determining if a transaction is structured to evade Title VII.[1050] One of these commenters stated that the CFTC misunderstood how the "business purpose" test is applied by the IRS in the tax evasion context resulting in misguided proposed interpretive guidance.[1051] As stated above, the CFTC believes that it is appropriate to consider legitimate business purposes in determining if a transaction is structured to evade Title VII. In response to this comment, although the interpretation references the use of legitimate business purpose in tax law, the CFTC is not bound to use the legitimate business purpose consideration in the same manner as the IRS and, accordingly, is not adopting the IRS's interpretation.

Two commenters urged the CFTC to clarify that considering the costs of regulation is a legitimate business purpose when structuring a transaction. Accordingly, they request that the CFTC clarify that entering into a transaction to avoid costly regulations, even though that transaction could otherwise be structured as a swap, will not be considered *per se* evasion/evasive.[1052] Finally, one commenter took issue with the statement that "absent other indicia of evasion, [the CFTC] would not consider transactions, entities, or instruments in a manner solely motivated by a legitimate business purpose to constitute evasion."[1053] Because "transactions, entities, or instruments" are rarely structured a certain way solely for one purpose, this

commenter believed such a statement does not give market participants any relief or guidance.[1054] The CFTC has addressed these comments received on the business purpose test through the clarifications to its interpretation discussed above and reiterates that the CFTC will consider all relevant facts and circumstances in determining whether an action is willfully evasive.

(b) Fraud, Deceit or Unlawful Activity

Interpretation

When determining whether a particular activity constitutes willful evasion of the CEA or the Dodd-Frank Act, the CFTC will consider the extent to which the activity involves deceit, deception, or other unlawful or illegitimate activity. This concept was derived from the IRS's delineation of what constitutes tax evasion, as elaborated upon by the courts. The IRS distinguishes between tax evasion and legitimate means for citizens to minimize, reduce, avoid or alleviate the tax that they pay under the Internal Revenue Code.[1055] Similarly, persons that craft derivatives transactions, structure entities, or conduct themselves in a deceptive or other illegitimate manner in order to avoid regulatory requirements should not be permitted to enjoy the fruits of their deceptive or illegitimate conduct.

Although it is likely that fraud, deceit, or unlawful activity will be present where willful evasion has occurred, the CFTC does not believe that these factors

are prerequisites to an evasion finding. As stated throughout this release, the presence or absence of fraud, deceit, or unlawful activity is one fact (or circumstance) the CFTC will consider when evaluating a person's activity. That said, the anti-evasion rules do require willfulness, *i.e.* "scienter." In response to the commenter who requests the CFTC define "willful conduct," the CFTC will interpret "willful" consistent with how the CFTC has in the past, that a person acts "willfully" when they act either intentionally or with reckless disregard.[1056]

Comments

One commenter, although generally supportive of the use of the IRS "tax evasion" concept as a guidepost for this criterion, requested the CFTC provide examples of legitimate versus evasive conduct in a manner similar to what is contained in the Internal Revenue Manual.[1057] The CFTC does not believe it is appropriate to provide an example because such an example may provide a guidepost for evasion.

Two commenters suggested that a finding of fraud, deceit, or unlawful activity should be a prerequisite to any finding of evasion.[1058] As noted above, the CFTC disagrees that such activity should be a prerequisite to a finding of evasion, but its presence or absence is one relevant fact and circumstance the CFTC will consider. Finally, one commenter requested further guidance defining willful conduct in the context of deliberate and knowing wrongdoing.[1059] As noted above, the CFTC has considered the suggestion that the CFTC provide guidance on what defines "willful behavior," with some commenters submitting that some definitional guidance should be offered or that the standard should be whether or not a transaction is "lawful." [1060] The CFTC agrees with the need for legal clarity and believes that the concept of willfulness is a well-recognized legal concept of which there is substantial case law and legal commentary familiar to the financial industry.[1061]

---

[1050] *See* CME Letter and WGCEF Letter.

[1051] *See* CME Letter.

[1052] *See* ISDA Letter and WGCEF Letter.

[1053] *See* SIFMA Letter.

[1054] *Id.*

[1055] Whereas permissible means of reducing tax (or "tax avoidance," as the IRS refers to the practice) is associated with full disclosure and explanation of why the tax should be reduced under law, tax evasion consists of the willful attempt to evade tax liability, and generally involves "deceit, subterfuge, camouflage, concealment, or some attempt to color or obscure events or to make things seem other than they are." The IRS explains:

Avoidance of taxes is not a criminal offense. Any attempt to reduce, avoid, minimize, or alleviate taxes by legitimate means is permissible. The distinction between avoidance and evasion is fine, yet definite. One who avoids tax does not conceal or misrepresent. He/she shapes events to reduce or eliminate tax liability and, upon the happening of the events, makes a complete disclosure. Evasion, on the other hand, involves deceit, subterfuge, camouflage, concealment, some attempt to color or obscure events or to make things seem other than they are. For example, the creation of a bona fide partnership to reduce the tax liability of a business by dividing the income among several individual partners is tax avoidance. However, the facts of a particular investigation may show that an alleged partnership was not, in fact, established and that one or more of the alleged partners secretly returned his/her share of the profits to the real owner of the business, who, in turn, did not report this income. This would be an instance of attempted evasion. IRS, *Internal Revenue Manual*, part 9.1.3.3.2.1, available at *http://www.irs.gov/irm/part9/irm_09-001-003.html#d0e169.*

[1056] *See In re Squadrito,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,262 (CFTC Mar. 27, 1992) (adopting definition of "willful" in *McLaughlin* v. *Richland Shoe Co.,* 486 U.S. 128 (1987)).

[1057] *See* CME Letter.

[1058] *See* ISDA Letter and SIFMA Letter.

[1059] *See* ISDA Letter (citing *U.S.* v. *Tarallo,* 380 F.3d 1174, 1187 (9th Cir. 2004), and *Merck & Co.* v. *Reynolds,* 130 S. Ct. 1784, 1796 (2010)).

[1060] *See* CME Letter; ISDA Letter; and WGCEF Letter.

[1061] *See supra* note 1056.

## B. SEC Position Regarding Anti-Evasion Rules

Section 761(b)(3) of the Dodd-Frank Act grants discretionary authority to the SEC to define the terms ''security-based swap,'' ''security-based swap dealer,'' ''major security-based swap participant,'' and ''eligible contract participant,'' with regard to security-based swaps, ''for the purpose of including transactions and entities that have been structured to evade'' subtitle B of Title VII (or amendments made by subtitle B).

The SEC did not propose rules under section 761(b)(3) regarding anti-evasion but requested comment on whether SEC rules or interpretive guidance addressing anti-evasion with respect to security-based swaps, security-based swap dealers, major security-based swap participants, or ECPs were necessary. Two commenters responded to the request for comment and recommended that the SEC adopt anti-evasion rules and interpretive guidance.[1062] One commenter suggested that the SEC model its anti-evasion rules and interpretive guidance on the CFTC's anti-evasion rules.[1063]

The SEC is not adopting anti-evasion rules under section 761(b)(3) at this time. The SEC notes that since security-based swaps are ''securities'' for purposes of the Federal securities laws, unless the SEC grants a specific exemption,[1064] all of the SEC's existing regulatory authority will apply to security-based swaps. Since existing regulations, including antifraud and anti-manipulation provisions, will apply to security-based swaps, the SEC believes that it is unnecessary to adopt additional anti-evasion rules for security-based swaps under section 761(b)(3) at this time.

## VIII. Miscellaneous Issues

### A. Distinguishing Futures and Options From Swaps

The Commissions did not propose rules or interpretations in the Proposing Release regarding distinguishing futures from swaps. One commenter requested that the CFTC clarify that nothing in the release was intended to limit a DCM's ability to list for trading a futures contract regardless of whether it could be viewed as a swap if it traded over-the-counter or on a SEF, since futures and swaps are indistinguishable in material economic effects.[1065] This commenter further recommended that the CFTC

adopt a final rule that further interprets the statutory ''swap'' definition.[1066]

The CFTC declines to provide the requested clarification or adopt a rule. Prior distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps may no longer be relevant.[1067] As a result, it is difficult to distinguish between futures and swaps on a blanket basis as the commenter suggested. However, a case-by-case approach for distinguishing these products may lead to more informed decision-making by the CFTC. Moreover, the CFTC notes that a DCM may self-certify its contracts pursuant to Part 40 of the CFTC's rules,[1068] subject to the CFTC's oversight authority. If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view. The DCM also has a number of other options, including seeking prior approval from the CFTC, requesting an interpretation, or requesting a rulemaking if it is in doubt about whether a particular agreement, contract or transaction should be classified as a futures contract or a swap.

### B. Transactions Entered Into by Foreign Central Banks, Foreign Sovereigns, International Financial Institutions, and Similar Entities

The swap definition excludes ''any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States.''[1069] Some commenters to the ANPR suggested that the Commissions should exercise their authority to further define the terms ''swap'' to similarly exclude transactions in which a counterparty is a foreign central bank, a foreign sovereign, an international financial institution (''IFI''),[1070] or similar

organization. ANPR commenters advanced international comity, national treatment, limited regulatory resources, limits on the Commissions' respective extraterritorial jurisdiction, and international harmonization as rationales for such an approach. The Proposing Release was silent on this issue.[1071]

Comments

Several commenters asserted that swaps transactions to which an IFI is a counterparty should be excluded from the swap and security-based swap definitions.[1072] In addition to the arguments noted above, commenters asserted that certain IFIs have been granted certain statutory immunities by the United States, and that regulation under the Dodd-Frank Act of their

---

[1062] See Barnard Letter and Better Markets Letter.

[1063] See Barnard Letter.

[1064] See Effective Date and Implementation *infra* part IX.

[1065] See CME Letter.

[1066] *Id.* CME suggested that the CFTC modify the futures contract exclusion in CEA Section 1a(47)(B)(i) so that the modified language would read as follows: (B) EXCLUSIONS.—The term 'swap' does not include— (i) any contract for the sale of a commodity for future delivery listed for trading by a designated contract market (or option on such contract) * * * CME believes that such a rule would clarify the scope of Section 4(a) of the CEA, which makes it illegal to trade a futures contract except on or subject to the rules of a DCM.

CME believed that such a modification would clarify the scope of Section 4(a) of the CEA, 7 U.S.C. 6(a), which makes it unlawful to trade a futures contract except on or subject to the rules of a DCM.

[1067] See, e.g., Swap Policy Statement, *supra* note 214.

[1068] 17 CFR Part 40.

[1069] CEA section 1a(47)(B)(ix), 7 U.S.C. 1a(47)(B)(ix).

[1070] For this purpose, we consider the ''international financial institutions'' to be those

institutions defined as such in 22 U.S.C. 262r(c)(2) and the institutions defined as ''multilateral development banks'' in the Proposal for the Regulation of the European Parliament and of the Council on OTC Derivative Transactions, Central Counterparties and Trade Repositories, Council of the European Union Final Compromise Text, Article 1(4a(a)] (March 19, 2012). There is overlap between the two definitions, but together they include the following institutions: the International Monetary Fund, International Bank for Reconstruction and Development, European Bank for Reconstruction and Development, International Development Association, International Finance Corporation, Multilateral Investment Guarantee Agency, African Development Bank, African Development Fund, Asian Development Bank, Inter-American Development Bank, Bank for Economic Cooperation and Development in the Middle East and North Africa, Inter-American Investment Corporation, Council of Europe Development Bank, Nordic Investment Bank, Caribbean Development Bank, European Investment Bank and European Investment Fund. (The term international financial institution includes entities referred to as multilateral development banks. The International Bank for Reconstruction and Development, the International Finance Corporation and the Multilateral Investment Guarantee Agency are parts of the World Bank Group.) The Bank for International Settlements, which also submitted a comment, is a bank in which the Federal Reserve and foreign central banks are members. Another commenter, KfW, is a corporation owned by the government of the Federal Republic of Germany and the German State governments and backed by the ''full faith and credit'' of the Federal Republic of Germany.

[1071] *But see* Dissent of Commissioner Sommers, Proposing Release at 29899.

[1072] *See* Letter from Günter Pleines and Diego Devos, Bank for International Settlements, dated July 20, 2011; Letter from Jacques Mirante-Péré and Jan De Bel, Council of Europe Development Bank, dated July 22, 2011; Letter from Isabelle Laurant, European Bank for Reconstruction and Development, dated July 22, 2011; Letter from A. Querejeta and B. de Mazières, European Investment Bank, dated July 22, 2011; Letter from J. James Spinner and Søren Elbech, Inter-American Development Bank, dated July 22, 2011; Letter from Lutze-Christian Funke and Frank Czichowski, KfW, dated August 12, 2011; Letter from Heikki Cantell and Lars Eibeholm, Nordic Investment Bank, dated August 2, 2011; and Letter from Vicenzo La Via, World Bank Group, dated July 22, 2011.

activities would be inconsistent with the grant of these immunities.

The CFTC declines to provide an exclusion from the swap definition along the lines suggested by these commenters.[1073] An exclusion from the swap definition for swap transactions entered into by foreign sovereigns, foreign central banks, IFIs and similar entities, would mean that swaps entered into by such entities would be completely excluded from Dodd-Frank regulation. Their counterparties, who may be swap dealers or major swap participants, or security-based swap dealers or major security-based swap participants, would have no regulatory obligations with respect to such swaps. These regulated counterparties could develop significant exposures to the foreign sovereigns, foreign central banks, IFIs and similar entities, without the knowledge of the Commissions.

In addition, swaps entered into by foreign sovereigns, foreign central banks, IFIs and similar entities undeniably are swaps. To be sure, the Commissions have adopted rules and interpretations to further define the term "swap" to exclude certain transactions, which prior to the enactment of the Dodd-Frank Act generally would not have been considered swaps. However, the CFTC is not using its authority to further define the term "swap" to effectively exempt transactions that are, in fact, swaps. While, as noted above, Congress included a counterparty-specific exclusion for swaps entered into by the Federal Reserve Board, the Federal government and certain government agencies, Congress did not provide a similar exemption for foreign central banks, foreign sovereigns, IFIs, or similar organizations.

### C. Definition of the Terms "Swap" and "Security-Based Swap" as Used in the Securities Act

The SEC is adopting a technical rule that provides that the terms "swap" and "security-based swap" as used in the Securities Act[1074] have the same meanings as in the Exchange Act[1075] and the rules and regulations thereunder.[1076] The SEC is adopting

such technical rule to assure consistent definitions of these terms under the Securities Act and the Exchange Act.

### IX. Effective Date and Implementation

Consistent with sections 754 and 774 of the Dodd-Frank Act, the final rules and interpretations will be effective October 12, 2012. The compliance date for the final rules and interpretations also will be October 12, 2012; with the following exceptions:

• The compliance date for the interpretation regarding guarantees of swaps will be the effective date of the rules proposed in the separate CFTC release when such rules are adopted by the CFTC.

• Solely for the purposes of the Order Granting Temporary Exemptions under the Securities Exchange Act of 1934 in Connection with the Pending Revision of the Definition of "Security" to Encompass Security-Based Swaps[1077] and the Exemptions for Security-Based Swaps,[1078] the compliance date for the final rules further defining the term "security-based swap" will be February 11, 2013.

The CFTC believes that it is appropriate to make the compliance date for the interpretation regarding guarantees of swaps the same as the effective date of the rules proposed in the separate CFTC release when such rules are adopted by the CFTC in order to relieve market participants from compliance obligations that would arise as a result of the interpretation. As described in the Exchange Act

Exemptive Order and as provided in the SB Swaps Interim Final Rules, the exemptions granted pursuant to the Exchange Act Exemptive Order and the SB Swaps Interim Final Rules will expire upon the compliance date of the final rules further defining the terms "security-based swap" and "eligible contract participant." The final rules further defining the term "eligible contract participant," adopted in the Entity Definitions Release,[1079] were published in the **Federal Register** on May 23, 2012. The compliance date and the effective date for such final rules is the same, July 23, 2012. The SEC believes that establishing a compliance date for the definition of "security-based swap" solely for purposes of the Exchange Act Exemptive Order and the SB Swaps Interim Final Rules that is February 11, 2013 (i.e. 120 days after the effective date) is appropriate because doing so will leave in place the exemptions granted by the Exchange Act Exemptive Order and the SB Swaps Interim Final Rules for a period of time that is sufficient to facilitate consideration of that order and rule. Specifically, the SEC will consider the appropriate treatment of security-based swaps under the provisions of the Exchange Act not amended by the Dodd-Frank Act before expiration of the exemptions set forth in the Exchange Act Exemptive Order, and will consider the appropriate treatment of security-based swaps for purposes of the registration provisions of the Securities Act, the registration provisions of the Exchange Act, and the indenture qualification provisions of the Trust Indenture Act of 1939 before the expiration of the exemptions set forth in the SB Swaps Interim Final Rules.[1080]

If any provision of these final rules or interpretations, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be

---

[1073] The commenters' suggested exclusion from the swap definition would also exclude their transactions from the security-based swap definition, which is based on the definition of swap.

[1074] *See* section 2(a)(17) of the Securities Act, 15 U.S.C. 77b(a)(17).

[1075] *See* sections 3(a)(69) of the Exchange Act, 15 U.S.C. 78c(a)(69), and 3(a)(68) of the Exchange Act, 15 U.S.C. 78c(a)(68). The definitions of the terms "swap" and "security-based swap" in the Exchange Act are the same as the definitions of these terms in the CEA. *See* section 1a of the CEA, 7 U.S.C. 1a.

[1076] *See* rule 194 under the Securities Act.

---

[1077] 76 FR 39927 (Jul. 7, 2011) ("Exchange Act Exemptive Order"). The Exchange Act Exemptive Order grants temporary relief and provides interpretive guidance to make it clear that a substantial number of the requirements of the Exchange Act do not apply to security-based swaps as a result of the revised definition of "security" going into effect on July 16, 2011. The Exchange Act Exemptive Order also provided temporary relief from provisions of the Exchange Act that allow the voiding of contracts made in violation of those laws.

[1078] Rule 240 under the Securities Act, 17 CFR 230.240, rules 12a–11 and 12h–1(i) under the Exchange Act 1934, 17 CFR 240.12a–11 and 240.12h–1(i), and Rule 4d–12 under the Trust Indenture Act of 1939, 17 CFR 260.4d–12 ("SB Swaps Interim Final Rules"). *See also* 76 FR 40605 (Jul. 11, 2011). The SB Swaps Interim Final Rules provide exemptions under the Securities Act, the Exchange Act, and the Trust Indenture Act of 1939 for those security-based swaps that prior to July 16, 2011, were security-based swap agreements and are defined as "securities" under the Securities Act and the Exchange Act as of July 16, 2011, due solely to the provisions of the Dodd-Frank Act. The SB Swaps Interim Final Rules exempt offers and sales of these security-based swaps from all provisions of the Securities Act, other than the Section 17(a) anti-fraud provisions, as well as exempt these security-based swaps from Exchange Act registration requirements and from the provisions of the Trust Indenture Act of 1939, provided certain conditions are met.

---

[1079] *See supra* note 12.

[1080] The SEC has received a request for certain permanent exemptions upon the expiration of the exemptions contained in the Exchange Act Exemptive Order. *See SIFMA SBS Exemptive Relief Request* (Dec. 5, 2011), which is available at *http://www.sec.gov/comments/s7-27-11/s72711-10.pdf.* The SEC also has received comments regarding the exemptions under the Securities Act, the Exchange Act, and the Trust Indenture Act of 1939. *See* Letter from Kenneth E. Bentsen, Jr., Executive Vice President, Public Policy and Advocacy, SIFMA, and Robert Pickel, Chief Executive Officer, ISDA, dated Apr. 20, 2012, which is available at *http://www.sec.gov/comments/s7-26-11/s72611-5.pdf.* The SEC is reviewing the request for exemptive relief and each related comment and will consider any appropriate actions regarding such request.

given effect without the invalid provision or application.

## X. Administrative Law Matters—CEA Revisions

### A. Paperwork Reduction Act

#### 1. Introduction

The Paperwork Reduction Act of 1995 ("PRA") imposes certain requirements on Federal agencies in connection with their conducting or sponsoring any collection of information as defined by the PRA.[1081] An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. Certain provisions of this rule will result in new collection of information requirements within the meaning of the PRA. With the exception of the new "book-out" confirmation requirement discussed below, the CFTC believes that the burdens that will be imposed on market participants under rules 1.8 and 1.9 already have been accounted for within the SEC's calculations regarding the impact of this collection of information under the PRA and the request for a control number submitted by the SEC to OMB for rule 3a68–2 ("Interpretation of Swaps, Security-Based Swaps, and Mixed Swaps") and rule 3a68–4 ("Regulation of Mixed Swaps: Process for Determining Regulatory Treatment for Mixed Swaps"). In response to this submission, OMB issued control number 3235–0685. The responses to these collections of information will be mandatory.[1082] The CFTC will protect proprietary information according to the Freedom of Information Act and 17 CFR part 145, headed "Commission Records and Information." In addition, the CFTC emphasizes that section 8(a)(1) of the CEA [1083] strictly prohibits the Commission, unless specifically authorized by the CEA, from making public "data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers." The CFTC also is required to protect certain information contained in a government system of records pursuant to the Privacy Act of 1974.

#### 2. Rules 1.8 and 1.9

As discussed in the proposal, Rules 1.8 and 1.9 under the CEA will result in new "collection of information"

requirements within the meaning of the PRA. Rule 1.8 under the CEA will allow persons to submit a request for a joint interpretation from the Commissions regarding whether an agreement, contract or transaction (or a class thereof) is a swap, security-based swap, or mixed swap. Rule 1.8 provides that a person requesting an interpretation as to the nature of an agreement, contract, or transaction as a swap, security-based swap, or mixed swap must provide the Commissions with the person's determination of the nature of the instrument and supporting analysis, along with certain other documentation, including a statement of the economic purpose for, and a copy of all material information regarding the terms of, each relevant agreement, contract, or transaction (or class thereof). The Commissions also may request the submitting person to provide additional information. In response to the submission, the Commissions may issue a joint interpretation regarding the status of that agreement, contract, or transaction (or class of agreements, contracts, or transactions) as a swap, security-based swap, or mixed swap.

Rule 1.9 of the CEA enables persons to submit requests to the Commissions for joint orders providing an alternative regulatory treatment for particular mixed swaps. Under rule 1.9, a person will provide to the Commissions a statement of the economic purpose for, and a copy of all material information regarding, the relevant mixed swap. In addition, the person will provide the specific alternative provisions that the person believes should apply to the mixed swap, the reasons the person believes it would be appropriate to request an alternative regulatory treatment, and an analysis of: (i) The nature and purposes of the specified provisions; (ii) the comparability of the specified provisions to other statutory provisions of Title VII of the Dodd-Frank Act and the rules and regulations thereunder; and (iii) the extent of any conflicting or incompatible requirements of the specified provisions and other statutory provisions of Title VII and the rules and regulations thereunder. The Commissions also may request the submitting person to provide additional information.

#### (a) Information Provided by Reporting Entities

The burdens imposed by rules 1.8 and 1.9 under the CEA are the same as the burdens imposed by the SEC's rules 3a68–2 and 3a68–4. Therefore, the burdens that will be imposed on market participants under rules 1.8 and 1.9 already have been accounted for within

the SEC's calculations regarding the impact of this collection of information under the PRA and the request for a control number submitted by the SEC to OMB.[1084]

#### (b) Information Collection Comments

In the Proposing Release, the CFTC invited public comment on the reporting and recordkeeping burdens discussed above with regard to rules 1.8 and 1.9. Pursuant to 44 U.S.C. 3506(c)(2)(B), the CFTC solicited comments in order to: (i) Evaluate whether the proposed collections of information are necessary for the proper performance of the functions of the CFTC, including whether the information will have practical utility; (ii) evaluate the accuracy of the CFTC's estimate of the burden of the proposed collections of information; (iii) determine whether there are ways to enhance the quality, utility, and clarity of the information to be collected; and (iv) minimize the burden of the collections of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology.

No comments were received with respect to the reporting and recordkeeping burdens discussed in the proposing release. In response to the request for a control number by the SEC, OMB issued control number 3235–0685.

#### 3. Book-Out Confirmation

As noted above, the CFTC believes that its interpretation which clarifies that oral book-out agreements must be followed in a commercially reasonable timeframe by a confirmation in some type of written or electronic form would result in a new "collection of information" requirement within the meaning of the PRA. Therefore, the CFTC is submitting the new "book-out" information collection to OMB for review in accordance with 44 U.S.C. 3506(c)(2)(A) and 5 CFR 1320.8(d). The CFTC will, by separate action, publish in the **Federal Register** a notice on the paperwork burden associated with the interpretation's requirement that oral book-outs are followed in a commercially reasonable timeframe by confirmation in some type of written or electronic form in accordance with 5 CFR 1320.8 and 1320.10. If approved, this new collection of information will be mandatory.

---

[1081] 44 U.S.C. 3501 *et seq.*

[1082] As discussed below, the "collection of information" related to the new "book-out" confirmation requirement was not included in the SEC's submission and will be the subject of a request for a control number by the CFTC to OMB.

[1083] 7 U.S.C. 12(a)(1).

[1084] 44 U.S.C. 3501–3521. *See also* 44 U.S.C. 3509 and 3510.

## B. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires that agencies consider whether the rules they propose will have a significant economic impact on a substantial number of small entities and, if so, provide a regulatory flexibility analysis respecting the impact.[1085] A regulatory flexibility analysis or certification typically is required for "any rule for which the agency publishes a general notice of proposed rulemaking pursuant to" the notice-and-comment provisions of the Administrative Procedure Act, 5 U.S.C. 553(b).

With respect to the proposed release, while the CFTC provided an RFA statement that the proposed rule would have a direct effect on numerous entities, specifically DCMs, SDRs, SEFs, SDs, MSPs, ECPs, FBOTs, DCOs, and certain "appropriate persons" who relied on the Energy Exemption,[1086] the Chairman, on behalf of the CFTC, certified that the rulemaking would not have a significant economic effect on a substantial number of small entities. Comments on that certification were sought.

In the Proposing Release, the CFTC provided that it previously had established that certain entities subject to the CFTC's jurisdiction—namely, DCMs, DCOs and ECPs—are not small entities for purposes of the RFA.[1087] As the CFTC previously explained, because of the central role they play in the regulatory scheme concerning futures trading, the importance of futures trading in the national economy, and the financial requirements needed to comply with the regulatory requirements imposed on them under the CEA, DCMs and DCOs have long been determined not to be small entities.[1088] Based on the definition of ECP in the Commodity Futures Modernization Act of 2000 ("CFMA") and the legislative history underlying that definition, the CFTC determined that ECPs were not small entities.[1089] In light of its past determination, and the increased thresholds on ECPs added by the Dodd-Frank Act making it more difficult for entities to qualify as an ECP, the CFTC determined in its proposed rulemakings that ECPs are not small entities.

Furthermore, the CFTC provided that certain entities that would be subject to the proposed rule—namely SDs, MSPs, SDRs, SEFs, and FBOTs—are entities for which the CFTC had not previously made a size determination for RFA purposes. The CFTC determined that these entities should not be considered small entities based on their size and characteristics analogous to non-small entities that pre-dated the adoption of Dodd-Frank,[1090] and certified in rulemakings that would have an economic impact on these entities that these entities are not small entities for RFA purposes.[1091]

Finally, the CFTC recognized that, in light of the CFTC's proposed withdrawal of the Energy Exemption, the proposed rule could have an economic impact on certain "appropriate persons" who relied on the Energy Exemption. The Energy Exemption listed certain "appropriate persons" that could rely on the exemption and also required that, to be eligible for this exemption, an "appropriate person must have demonstrable capacity or ability to make or take delivery." The Energy Exemption stated: "in light of the general nature of the current participants in the market, the CFTC believes that smaller commercial firms, which cannot meet [certain] financial criteria, should not be included." [1092] Therefore, the CFTC did not believe that the "appropriate persons" eligible for the Energy Exemption, and who may be affected by its withdrawal, are "small entities" for purposes of RFA. Moreover, as previously discussed, the CFTC is expanding the Brent Interpretation to all nonfinancial commodities for both swaps and future delivery definitions and is clarifying that certain alternative delivery procedures discussed in the Energy Exemption will not disqualify a transaction from the forward contract exclusion under the Brent Interpretation.[1093] Thus, to the extent any entities, small or otherwise, relied on the Energy Exemption, such entities can now rely on the expanded Brent Interpretation to qualify for the forward contract exclusion. Accordingly, the withdrawal of the Energy Exemption will not result in a significant economic impact on any entities.

With respect to this rulemaking, which includes interpretations, as well as general rules of construction and definitions that will largely be used in other rulemakings, the CFTC received one comment respecting its RFA certification. The commenter, an association that represents producers, generators, processors, refiners, merchandisers and commercial end users of nonfinancial energy commodities, including energy and natural gas, contended that the CFTC's overall new jurisdiction under the Dodd-Frank Act over "swaps" and the burdens that the CFTC's rules place on nonfinancial entities, including small entities such as its members[1094] that execute such swaps, can only be determined after the rules and interpretations in the product definitions rulemaking are finalized. Moreover, the commenter asserted that its small entity members seek to continue their use of nonfinancial commodity "swaps" only to hedge the commercial risks of their not-for profit public service activities. The commenter concluded that the CFTC should conduct a regulatory flexibility analysis for the entire mosaic of its rulemakings under the Dodd-Frank Act, taking into consideration the products definition rulemaking.

The commenter did not provide specific information on how the further defining of the terms swap, security-based swap and security-based swap agreement, providing regulations regarding mixed swaps, and providing regulations governing books and records requirements for security-based swap agreements would have a significant impact on a substantial number of small entities. Nonetheless, the CFTC has reevaluated this rulemaking in light of the commenter's statements. Upon consideration, the CFTC declines to consider the economic impacts of the entire mosaic of rules under the Dodd-

---

[1085] 5 U.S.C. 601 *et seq.*

[1086] *See* 76 FR 29868–89.

[1087] *See respectively,* Policy Statement and Establishment of Definitions of "Small Entities" for Purposes of the Regulatory Flexibility Act, *supra* note 331, at 18619 (DCMs); *A New Regulatory Framework for Clearing Organizations,* 66 FR 45604, 45609 (Aug. 29, 2001) (DCOs); *Opting Out of Segregation,* 66 FR 20740, 20743 (Apr. 25, 2001) (ECPs).

[1088] *See respectively,* Policy Statement and Establishment of Definitions of "Small Entities" for Purposes of the Regulatory Flexibility Act, *supra* note 331, at 18619 (DCMs); A New Regulatory Framework for Clearing Organizations, 66 FR 45604, 45609, Aug. 29, 2001 (DCOs).

[1089] *See* Opting Out of Segregation. 66 FR 20740, 20743, Apr. 25, 2001 (ECPs).

[1090] *See* 76 FR 29868–89.

[1091] *See* respectively, Registration of Swap Dealers and Major Swap Participants, 77 FR 2613, 2620, Jan. 19, 2012 (swap dealers and major swap participants); Requirements for Derivatives Clearing Organizations, Designated Contract Markets, and Swap Execution Facilities Regarding the Mitigation of Conflicts of Interest, 75 FR 63732, 63745, Oct. 18, 2010 (SEFs); Swap Data Repositories, 76 FR 54538, 54575, Sept. 1, 2011; Registration of Foreign Boards of Trade, 76 FR 80674, 80698, Dec. 23, 2011 (FBOTs).

[1092] Energy Exemption, *supra* note 207.

[1093] *See supra* part II.B.2.(a)(i)(C).

[1094] *See* ETA Letter. In general, ETA states that the Small Business Administration ("SBA") has determined that many of its members are "small entities" for purposes of the RFA. *Id.* (references the comment letter filed by the NRECA, APPA and LLPC as the "Not-for-Profit Electric Coalition" in response to the Commodity Option NOPR's (76 FR 6095) assertion that there are no ECPs that are "small entities" for RFA purposes).

Frank Act, since an agency is only required to consider the impact of how it exercises its discretion to implement the statute through a particular rule. In all rulemakings, the CFTC performs an RFA analysis for that particular rule.

Moreover, as the commenter mentioned, most of the transactions into which its members enter are based on nonfinancial commodities. The CFTC has provided interpretations in this release clarifying the forward exclusion in nonfinancial commodities from the swap definition (and the forward exclusion from the definition of "future delivery"), including forwards with embedded volumetric options, and separately, has provided for a trade option exemption.[1095] The CFTC also has provided an interpretation that certain customary commercial transactions are excluded from the swap definition.[1096]

Accordingly, for the reasons stated in the proposal and the foregoing discussion in response to the comment received, the CFTC continues to believe that the rulemaking will not have a significant impact on a substantial number of small entities. Therefore, the Chairman, on behalf of the CFTC, hereby certifies pursuant to 5 U.S.C. 605(b) that the rules will not have a significant impact on a substantial number of small entities.

## C. Costs and Benefits Considerations

Section 15(a) of the CEA requires the CFTC to consider the costs and benefits of its actions before promulgating a regulation or issuing certain orders under the CEA.[1097] Section 15(a) further specifies that the costs and benefits shall be evaluated in light of the following five broad areas of market and public concern: (1) Protection of market participants and the public; (2) efficiency, competitiveness, and financial integrity of markets; (3) price discovery; (4) sound risk management practices; and (5) other public interest considerations. The CFTC considers the costs and benefits resulting from its discretionary determinations with respect to the Section 15(a) factors. The CFTC also considers, qualitatively, costs and benefits relative to the status quo, that is, the pre-Dodd Frank Act

regulatory regime, for historical context to help inform the reader.

In the Proposing Release, the CFTC assessed the costs and benefits of the proposed rules in general, followed by assessments of the costs and benefits of each of the rules, taking into account the considerations described above. The CFTC also requested comment on these assessments, and a number of comments were received. In this Adopting Release, the CFTC will again assess the costs and benefits of the rules in general followed by the individual rules in this rulemaking, for each case taking into account the above considerations and the comments received. These costs and benefits, to the extent identified and, where possible, quantified have helped to inform the decisions of and the actions taken by the CFTC that are described throughout this release.

### 1. Introduction

Prior to the adoption of Title VII, swaps and security-based swaps were by and large unregulated. The Commodity Futures Modernization Act of 2000 ("CFMA") excluded financial over-the-counter swaps from regulation under the CEA, provided that trading occurred only among "eligible contract participants." [1098] Swaps based on exempt commodities—including energy and metals—could be traded among ECPs without CFTC regulation, but certain CEA provisions against fraud and manipulation continued to apply to these markets. No statutory exclusions were provided for swaps on agricultural commodities by the CFMA, although they could be traded under certain regulatory exemptions provided by the CFTC prior to its enactment. Swaps based on securities were subject to certain SEC enforcement authorities, but the SEC was prohibited from prophylactic regulation of such swaps.

In the fall of 2008, an economic crisis threatened to freeze U.S. and global credit markets. The Federal government intervened to buttress the stability of the U.S. financial system.[1099] The crisis revealed the vulnerability of the U.S. financial system and economy to widespread systemic risk resulting from, among other things, poor risk

management practices of certain financial firms and the lack of supervisory oversight for financial institutions as a whole.[1100] More specifically, the crisis demonstrated the need for regulation of the over-the-counter derivatives markets.[1101]

On July 21, 2010, President Obama signed the Dodd-Frank Act into law. Title VII of the Dodd-Frank Act established a comprehensive new regulatory framework for swaps and security-based swaps. As discussed above, the legislation was enacted, among other reasons, to reduce risk, increase transparency, and promote market integrity within the financial system, including by: (i) Providing for the registration and comprehensive regulation of swap dealers, security-based swap dealers, major swap participants, and major security-based swap participants; (ii) imposing clearing and trade execution requirements on swaps and security-based swaps, subject to certain exceptions; (iii) creating rigorous recordkeeping and real-time reporting regimes; and (iv) enhancing the rulemaking and enforcement authorities of the Commissions with respect to, among others, all registered entities and intermediaries subject to the Commissions' oversight.[1102]

---

[1095] *See* Commodity Options, 77 FR 25320, Apr. 27, 2012.

[1096] To the extent the transactions entered into by ETA members are traded or executed on Regional Transmission Organizations and Independent System Operators, or entered into between entities described in section 201(f) of the Federal Power Act, they may be addressed through the public interest waiver process described in CEA section 4(c)(6).

[1097] 7 U.S.C. 19(a).

[1098] *See* 7 U.S.C. 1a(12) (2006).

[1099] On October 3, 2008, President Bush signed the Emergency Economic Stabilization Act of 2008, which was principally designed to allow the U.S. Treasury and other government agencies to take action to help to restore liquidity and stability to the U.S. financial system (*e.g.,* the Trouble Asset Relief Program—also known as TARP—under which the U.S. Treasury was authorized to purchase up to $700 billion of troubled assets that weighed down the balance sheets of U.S. financial institutions). *See* Public Law 110–343, 122 Stat. 3765 (2008).

[1100] *See* Financial Crisis Inquiry Commission, "The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States," Jan. 2011, at xxvii, available at *http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.*

[1101] *Id.* at 25 (concluding that "enactment of * * * [the Commodity Futures Modernization Act of 2000 ("CFMA")] to ban the regulation by both the Federal and State governments of over-the-counter (OTC) derivatives was a key turning point in the march toward the financial crisis."). See also id. at 343 ("Lehman, like other large OTC derivatives dealers, experienced runs on its derivatives operations that played a role in its failure. Its massive derivatives positions greatly complicated its bankruptcy, and the impact of its bankruptcy through interconnections with derivatives counterparties and other financial institutions contributed significantly to the severity and depth of the financial crisis.") and *id.* at 353 ("AIG's failure was possible because of the sweeping deregulation of [OTC] derivatives, [* * *] including capital and margin requirements that would have lessened the likelihood of AIG's failure. The OTC derivatives market's lack of transparency and of effective price discovery exacerbated the collateral disputes of AIG and Goldman Sachs and similar disputes between other derivatives counterparties.").

[1102] The CFTC has provided a table in the Appendix that cross-references the costs and benefits considerations of the final rules effectuated by the Product Definitions in order to provide more transparency with respect to this qualitative assessment of the programmatic costs. *See* Appendix, "Rules Effectuated by Product Definitions." The CFTC is not providing a quantitative estimate of total programmatic costs, because it cannot be reliably estimated at this time. Many rules have not been finalized, including
Continued

Section 721 of the Dodd-Frank Act amends the Commodity Exchange Act ("CEA") by adding definitions of the terms "swap," "security-based swap," and "security-based swap agreement." Section 712(d)(1) provides that the CFTC and the SEC, in consultation with the Federal Reserve Board, shall jointly further define those terms. Section 712(a)(8) provides further that the Commissions shall jointly prescribe such regulations regarding "mixed swaps" as may be necessary to carry out the purposes of Title VII of the Dodd-Frank Act ("Title VII"). Section 712(d)(2) requires the Commissions, in consultation with the Federal Reserve Board, to jointly adopt rules governing books and records requirements for security-based swap agreements.

Under the comprehensive framework for regulating swaps and security-based swaps established in Title VII, the CFTC is given regulatory authority over swaps, the SEC is given regulatory authority over security-based swaps, and the Commissions jointly are to prescribe such regulations regarding mixed swaps as may be necessary to carry out the purposes of Title VII. In addition, the SEC is given antifraud authority over, and access to information from, certain CFTC-regulated entities regarding security-based swap agreements, which are a type of swap related to securities over which the CFTC is given regulatory and enforcement authority.

The statutory definitions of "swap" and "security-based swap" in Title VII are detailed and comprehensive. The Dodd-Frank Act directs the Commissions, among other things, to "further define" these terms; it does not direct the Commissions to provide definitions for them, which are already provided for in the statute. Thus, even in the absence of these rules, the Dodd-Frank Act would require regulating products that meet the statutory definitions of these terms as swaps and security-based swaps. Consequently, a large part of the costs and benefits resulting from the regulation of swaps and security-based swaps derives from the Dodd-Frank Act itself and not from these rules that further define swaps.

Several commenters to the ANPR issued by the Commissions regarding the definitions expressed a concern that the product definitions could be read broadly to include certain types of transactions that previously had never been considered swaps or security-based swaps. In response to those

comments, the rules and interpretations clarify that certain traditional insurance products, consumer and commercial agreements, and loan participations are not swaps or security-based swaps, which will increase legal certainty and lower the costs of assessing whether a product is a swap or security-based swap for market participants. In this regard, the rules and interpretations are intended to reduce unnecessary burdens on persons using such agreements, contracts, or transactions, the regulation of which under Title VII may not be necessary or appropriate to further the purposes of Title VII.

In addition, the CFTC is clarifying the scope of the forward contract exclusion [1103] for nonfinancial commodities from the statutory swap definition to provide legal certainty for market participants as to which transactions will qualify for the exclusion. In this regard, the CFTC is clarifying the circumstances under which market participants may rely on past CFTC guidance regarding the forward exclusion from the definition of "future delivery," and in particular the Brent Interpretation for booked-out transactions,[1104] with respect to the forward exclusion from the swap definition. The CFTC is extending the Brent Interpretation to all nonfinancial commodities, and is withdrawing the Energy Exemption as proposed, [1105] with certain clarifications. The final interpretation with clarifications in response to comments should enhance legal certainty regarding the forward exclusions.

While the statutory definitions of swap and security-based swap are detailed and comprehensive, the rules further clarify whether particular types of transactions are swaps or security-based swaps. For example, foreign exchange forwards and swaps are defined as swaps, subject to the Treasury Secretary's determination to exempt them from the swap definition. The statute provides that certain provisions of the CEA apply to foreign exchange forwards and swaps, even if the Treasury Secretary determines to exempt them, and the rules reflect this. Specifically, these transactions still would be subject to certain requirements for reporting swaps, and swap dealers and major swap participants engaging in such transactions still would be subject to certain business conduct standards. The rules also clarify that, because certain foreign exchange products do not fall

within the definitions of foreign exchange swap and forward, such products are not subject to the Treasury Secretary's determination to exempt. Outside of the foreign exchange suite of products, the rules and interpretations clarify that certain transactions are swaps or security-based swaps. These products include forward rate agreements, certain contracts for differences, swaptions and forward swaps. The rules and the interpretations are intended to increase clarity and legal certainty for market participants with respect to these products.

Next this release addresses the relationship between swaps and security-based swaps and how to distinguish them. The Commissions are clarifying whether particular agreements, contracts or transactions that are subject to Title VII of the Dodd-Frank Act (which are referred to as "Title VII Instruments" in this release) are swaps, security-based swaps or both (i.e., mixed swaps). In addition, the Commissions are clarifying the use of the term "narrow-based security index" in the security-based swap definition. In general, the CFTC has jurisdiction over Title VII instruments on broad-based security indexes, while the SEC has jurisdiction over Title VII instruments on narrow-based security indexes. This release clarifies that the existing criteria for determining whether a security index is narrow-based, and the past guidance of the Commissions regarding those criteria in the context of security futures, apply to Title VII instruments. Credit default swaps ("CDS") also are subject to this same jurisdictional division—CDS on broad-based security indexes are regulated by the CFTC, while CDS on narrow-based security indexes (as well as CDS on single name securities or loans) generally are regulated by the SEC. This release provides new criteria tailored to CDS for determining whether a CDS is based on an index that is a narrow-based security index. Also, it explains the term "index" and adopts a final rule governing tolerance and grace periods for Title VII instruments on security indexes traded on trading platforms. These rules and interpretations generally are designed to provide clarity and enhanced legal certainty regarding the appropriate classification of Title VII instruments as swaps, security-based swaps or mixed swaps, so that market participants may ascertain the applicable regulatory requirements more easily.

This release anticipates that mixed swaps, which are both swaps and security-based swaps, will be a narrow category, but lists a few examples of

---

capital and margin which may have significant costs. Any estimate made of the programmatic costs of the Product Definitions would be unreliable and therefore may be misleading.

[1103] *See supra* part II.B.2.a).

[1104] *See supra* part II.B.2.a)i)(B).

[1105] *See supra* part II.B.2.a)i)(C).

mixed swaps and interprets how to distinguish one type of TRS that is a mixed swap from another that is not. This release addresses the regulatory treatment of bilateral, uncleared mixed swaps where one counterparty is a dual registrant with the CFTC and SEC. It also establishes a process for requesting a joint order from the Commissions to determine the appropriate regulatory treatment of mixed swaps that do not fall into the category of mixed swaps where one counterparty is a dual registrant. Concerning "security-based swap agreements" (or SBSAs), this release explains what types of transactions are SBSAs and includes rules that provide that there will not be additional books and records requirements regarding SBSAs other than those that have been proposed by the CFTC for swaps in order to avoid duplicative regulation and costs.

This release also includes rules establishing a process for members of the public to request a joint interpretation from the Commissions regarding whether a Title VII instrument is a swap, security-based swap or a mixed swap. The process includes a deadline for a decision, as well as a requirement that if the Commissions do not issue a joint interpretation within the prescribed time period, each Commission must publicly provide the reasons for not having done so.

Finally, this release includes anti-evasion rules and related interpretations adopted by the CFTC, which in general would apply to agreements, contracts, transactions and entities that are willfully structured to evade Dodd-Frank requirements.

### 2. Costs and Benefits of the Definitions—In General

The rules and interpretations in this Adopting Release: further define the terms "swap," "security-based swap," and "security-based swap agreement;" provide for the regulation of "mixed swaps;" and address books and records requirements for security-based swap agreements. In the discussion that follows, the CFTC considers the costs and benefits resulting from its own discretionary determinations with respect to the section 15(a) factors.

There are "programmatic" costs and benefits as well as "assessment" costs of the Product Definitions. Programmatic costs result from subjecting certain agreements, contracts, or transactions to the regulatory regime of Title VII.[1106] Effectiveness of the Products Definitions will trigger effectiveness of any statutory

provision or regulation that depends, in whole or in part, on the effectiveness of this final rulemaking. By fulfilling the statutory mandate, many of the programmatic benefits of Title VII and the CFTC's implementing regulations are triggered, including risk reduction, increasing transparency, and promoting market integrity and, by extension, the increased possibility of preventing or reducing the severity of another global financial crisis such as occurred in 2008. Delimiting the scope of the terms "swap," "security-based swap," "security-based swap agreement," and "mixed swaps" also helps to determine the scope of activities and entities that will be subject to the various Title VII regulatory requirements. Requirements for clearing and trade execution, capital and margin, business conduct, and reporting and recordkeeping, all of which have been or will be implemented in other CFTC rules, will lead to programmatic costs that have been or will be addressed in the CFTC's rules to implement those requirements. When considering the programmatic costs and benefits of the Product Definitions, the CFTC recognizes the scope of activities and entities affected by the further Product Definitions by reference to the other final rulemakings under Title VII accomplished to date. The costs that parties will incur to assess whether certain agreements, contracts, or transactions are "swaps," "security-based swaps," "security-based swap agreements," or "mixed swaps" that are subject to the Title VII regulatory regime, and, if so, costs to assess whether such Title VII instrument is subject to the regulatory regime of the SEC or the CFTC are referred to herein as assessment costs.

In general, many commenters have suggested that the statutory definitions of swap and security-based swap are overbroad in that they could be viewed to include agreements, contracts, and transactions that the market had not considered to be swaps or security-based swaps prior to the enactment of the Dodd-Frank Act, are (or could be) swaps or security-based swaps. Thus, in response to these comments, the CFTC has engaged in a qualitative analysis of various agreements, contracts, and transactions of which the CFTC is aware and that commenters have brought to its attention. Based on this analysis, the CFTC has established rules and interpretations to identify agreements, contracts, and transactions that are swaps or security-based swaps where the statutory definition may be inadequate or ambiguous. In developing the further definitions, the CFTC has

endeavored to narrow the scope of the terms "swap" and "security-based swap" without excluding agreements, contracts and transactions that the CFTC has determined should be regulated as swaps and security-based swaps. Narrowing the scope of the statutory definitions should reduce the overall programmatic costs of Title VII because fewer agreements, contracts, and transactions will be subject to the full panoply of Title VII regulation. Narrowing the scope of the statutory definitions should also increase the net programmatic benefits of the CFTC's Title VII regulations because the CFTC is targeting in the Product Definitions rulemaking agreements, contracts and transactions that the CFTC has determined, after considering comments received and undertaking a qualitative analysis, are swaps or security-based swaps. The CFTC anticipates that applying the full panoply of Title VII regulation to only those agreements, contracts or transactions that the CFTC has determined are swaps or security-based swaps will be most effective in achieving the net benefits of Title VII regulation under the Dodd-Frank Act.

### (a) Costs

The scope of the terms "swap," "security-based swap," "security-based swap agreement," and "mixed swap" is an important factor in determining the range of activities and entities that will be subject to various requirements set forth in the Dodd-Frank Act, such as trade execution, clearing, reporting, registration, business conduct, and capital requirements. Complying with these requirements, which will be implemented in other rules by the CFTC, are programmatic costs, which also have been or will be addressed in the CFTC's rules to implement those requirements.[1107]

The CFTC believes that the rulemaking to further define the terms "swap," "security-based swap," "security-based swap agreement," and "mixed swap" is consistent with how market participants understand these products. The further definitions increase legal certainty and thereby reduce assessment costs by clarifying that certain products that meet the requirements of the applicable rules and interpretations, such as traditional insurance products, are not swaps.

### (b) Benefits

Many of the benefits of Title VII and the CFTC's implementing regulations, including risk reduction, increasing

---

[1106] *See* Appendix, "Rules Effectuated by Product Definitions."

[1107] *See* Appendix, "Rules Effectuated by Product Definitions."

transparency, and promoting market integrity are programmatic benefits of the Products Definitions since they are effectuated by Product Definitions. These programmatic benefits are difficult to quantify and measure. Moreover, these benefits can be expected to manifest themselves over the long run and be distributed over the market as a whole.

The CFTC believes that the final rules and interpretations can be consistently applied by substantially all market participants to determine which agreements, contracts, or transactions are, and which are not, swaps, security-based swaps, security-based swap agreements, or mixed swaps. The benefits of the individual rules and interpretations are discussed in their respective sections below.

(c) Comments and Consideration of Alternatives

The CFTC requested comment on the costs and benefits of the proposed rules and interpretations regarding the definitions in general for market participants, markets and the public. Further, the CFTC requested comment as to whether there are any aspects of the proposed rules and interpretive guidance regarding the definitions that are both burdensome to apply and not helpful to achieving clarity as to the scope of the defined terms, and whether there are less burdensome means of providing clarity as to the scope of the defined terms.

A commenter [1108] argued that a proper cost-benefit analysis can only be performed once an integrated and complete mosaic of rules is available for analysis and doubted that the definitions impose no independent costs. The CFTC has considered, qualitatively, the costs and benefits of the entire mosaic of CFTC rules under the Dodd-Frank Act in this rulemaking. Due to data limitations and other uncertainty, the CFTC cannot perform a meaningful quantitative analysis, yet. The CFTC considers in this rulemaking the costs and benefits of how the Commissions are exercising their discretion in further defining the Product Definitions because Congress included in the Dodd-Frank Act statutory definitions of these terms, over which the CFTC has no discretion. Moreover, the CFTC has considered the independent costs (i.e. costs imposed through exercising its discretion) that the Products Definitions may impose

through its determinations as discussed below.

Another commenter [1109] contended that the costs and benefits considerations in the Proposing Release were not based on any empirical data and are not consistent with the expected costs of compliance anticipated by market participants. However, the CFTC cannot do a comprehensive empirical analysis regarding costs and benefits of the Products Definitions before actual data is available when the swap regulatory regime has been implemented in full. Moreover, the CFTC did use some empirical estimates in its costs and benefits considerations in the Proposing Release, namely in assessment costs for the process to seek an interpretation of whether a product is a swap, security-based swap, or mixed swap, as well as in the process to determine regulatory treatment for mixed swaps.[1110] Commenters did not submit data or other information to support an argument that the CFTC's estimates were inaccurate.

Commenters [1111] expressed concern about costs from regulatory uncertainty imposed on swaps market participants resulting from other Title VII rulemakings not yet being final. The consideration of thousands of letters and the process of due deliberation and reasoned decision-making by the CFTC has caused delays. Nevertheless, the CFTC is working with deliberate speed to complete the rulemakings, and eventually this particular type of legal uncertainty will be eliminated.

A commenter [1112] requested that inter-affiliate swaps be exempt from the swap definition, arguing that regulating such swaps may increase costs to consumers and undermine efficiencies from the use of centralized hedging affiliates. The CFTC anticipates that it will address inter-affiliate swaps in a subsequent rulemaking.

Several commenters [1113] argued that foreign central banks, foreign sovereigns, international financial institutions, such as multilateral development banks, and similar organizations should be exempt from swap regulations, since regulations would impose costs on these entities. Specifically, a commenter [1114] asserted that multilateral development banks should not have to register or be subject to clearing and margin requirements and

requested that multilateral development banks' transactions be exempted from the definition of a swap. As explained above, these transactions are swaps. In addition, the proposed exclusion is overbroad because it would mean that swaps and security-based swaps entered into by foreign central banks, foreign sovereigns, international financial institutions, and similar organizations would be completely excluded from Dodd-Frank regulation. Their counterparties, who may be swap dealers and other regulated entities, would have no regulatory obligations with respect to such swaps, and could develop significant exposures without the knowledge of the CFTC, other regulators and market participants. If these transactions were not swaps, then no market participant would be obligated to report them to a U.S.-registered swap data repository or real-time report them. This lack of transparency might distort swap pricing and impede proper risk management in as much as the market may not be aware of the risk entailed in these opaque transactions and might thwart price discovery.

The Commissions did not propose rules or interpretations on how to distinguish futures from swaps. A commenter requested that the CFTC clarify that nothing in the release was intended to limit a DCM's ability to list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a SEF, since futures and swaps are "indistinguishable in material economic effects." [1115] The commenter further recommended that the CFTC adopt a final rule that amends the statutory definition of the term "swap" by adding to the futures contract exclusion in CEA Section 1a(47)(B)(i) the following language after the word "delivery": "Listed for trading by a designated contract market." The same commenter believed that such a rule would clarify the scope of Section 4(a) of the CEA,[1116] which makes it illegal to trade a futures contract except on or subject to the rules of a DCM.[1117]

Although it is potentially more costly to a DCM in terms of providing additional analysis to support listing a futures contract on its exchange, the CFTC is not adopting the distinction the commenter advocates. Prior distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps

---

[1108] See ETA Letter. See also IECA Letter II (requesting a comprehensive costs benefits analysis on all of Title VII).

[1109] See WGCEF Letter.
[1110] See Proposing Release at 29874.
[1111] See FIA Letter; IIB Letter; and ISDA Letter.
[1112] See Shell Trading Letter.
[1113] See CEB Letter; EIB Letter; and World Bank Letter.
[1114] See World Bank Letter.

[1115] See CME Letter.
[1116] 7 U.S.C. 6a(a).
[1117] See CME Letter.

may no longer be relevant.[1118] As a result, it is difficult to distinguish between futures and swaps on a blanket basis as the commenter suggested. However, a case-by-case approach for distinguishing these products may lead to more informed decision-making by the CFTC.

The CFTC notes that a DCM may self-certify its contracts pursuant to Part 40 of the CFTC's rules,[1119] subject to the CFTC's oversight authority. If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view. The DCM also has a number of other options, including seeking prior approval from the CFTC, requesting an interpretation, or requesting a rulemaking if it is in doubt about whether a particular agreement, contract or transaction should be classified as a futures contract or a swap.

3. Costs and Benefits of Rules and Interpretations Regarding Insurance

Rule 1.3(xxx)(4)(i) under the CEA clarifies that agreements, contracts or transactions that satisfy its provisions will not be swaps or security-based swaps. Specifically, the term ''swap'' and ''security-based swap'' does not include an agreement, contract, or transaction under rule 1.3(xxx)(4)(i)(A) that, by its terms or by law, as a condition of performance on the agreement, contract, or transaction: (i) Requires the beneficiary of the agreement, contract, or transaction to have an insurable interest that is the subject of the agreement, contract, or transaction and thereby carry the risk of loss with respect to that interest continuously throughout the duration of the agreement, contract, or transaction; (ii) requires that loss to occur and be proved, and that any payment or indemnification therefor be limited to the value of the insurable interest; (iii) is not traded, separately from the insured interest, on an organized market or over-the-counter; and (iv) with respect to financial guaranty insurance only, in the event of payment default or insolvency of the obligor, any acceleration of payments under the policy is at the sole discretion of the insurer (the ''Product Test'').

Rule 1.3(xxx)(4)(i)(B) under the CEA provides that for an agreement, contract, or transaction that meets the Product Test to be excluded from the swap and security-based swap definitions as insurance, it must be provided: (i) By a person that is subject to supervision by the insurance commissioner (or similar official or agency) of any State or by the United States or an agency or instrumentality thereof, and such agreement, contract, or transaction is regulated as insurance applicable State law or the laws of the United States (the ''first prong''); (ii) directly or indirectly by the United States, any State, or any of their respective agencies or instrumentalities, or pursuant to a statutorily authorized program thereof (the ''second prong''); (iii) in the case of reinsurance only, by a person to another person that satisfies the Provider Test, provided that: such person is not prohibited by applicable State law or the laws of the United States from offering such agreement, contract, or transaction to such person that satisfies the Provider Test; the agreement, contract, or transaction to be reinsured satisfies the Product Test or is one of the Enumerated Products; and except as otherwise permitted under applicable State law, the total amount reimbursable by all reinsurers for such agreement, contract, or transaction may not exceed the claims or losses paid by the cedant; or (iv) in the case of non-admitted insurance by a person who: is located outside of the United States and listed on the Quarterly Listing of Alien Insurers as maintained by the International Insurers Department of the National Association of Insurance Commissioners; or meets the eligibility criteria for non-admitted insurers under applicable State law (the ''Provider Test'').

In response to commenters' requests that the Commissions codify the proposed interpretation regarding certain enumerated types of insurance products in the final rules, the interpretation is being codified in paragraph (i)(C) of rule 1.3(xxx)(4) under the CEA. In addition, in response to comments, the Commissions are expanding and revising the list of traditional insurance products. As adopted, the rule provides that the terms ''swap'' and ''security-based swap'' will not include an agreement, contract, or transaction that is provided in accordance with the conditions set forth in the Provider Test and is one of the following types of products (collectively, ''Enumerated Products''): surety bonds; fidelity bonds; life insurance; health insurance; long-term care insurance; title insurance; property and casualty insurance; annuities; disability insurance; insurance against default on individual residential mortgages (commonly known as private mortgage insurance, as distinguished from financial guaranty of mortgage pools); and reinsurance (including retrocession) of any of the foregoing. Based on comments received, the Commissions are adding three products to the list of products as proposed, adding reinsurance (including retrocession) of any of the traditional insurance products included in the list, and deleting a requirement applicable to annuities that they must be subject to tax treatment under section 72 of the Internal Revenue Code.

The Commissions are also clarifying that the Product Test, the Provider Test and the Enumerated Products in the rules are a non-exclusive safe harbor (the ''Insurance Safe Harbor''), such that if a product fails the Insurance Safe Harbor, that does not necessarily mean that the product is a swap or security-based swap—further analysis may be required in order to make that determination.

Rule 1.3(xxx)(4)(ii) provides a ''grandfather'' for insurance transactions (as opposed to insurance products), pursuant to which transactions that are entered into on or before the effective date of the Product Definitions will not fall within the definition of swap or security-based swap, provided that, at such time that it was entered into, the transaction was provided in accordance with the Provider Test.

The CFTC is interpreting the term ''swap'' (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swap position would have recourse to the guarantor in connection with the position. The CFTC is persuaded that when a swap has the benefit of a guarantee, the guarantee is an integral part of that swap. The CFTC finds that a guarantee of a swap (that is not a security-based swap or mixed swap) is a term of that swap that affects the price or pricing attributes of that swap. When a swap counterparty typically provides a guarantee as credit support for its swap obligations, the market will not trade with that counterparty at the same price, on the same terms, or at all without the guarantee. The guarantor's resources are added to the analysis of the swap; if the guarantor is financially more capable than the swap counterparty, the analysis of the swap becomes more dependent on the creditworthiness of the guarantor. The CFTC anticipates that a ''full recourse'' guarantee would have a greater effect on the price of a swap than a ''limited'' or ''partial recourse'' guarantee; nevertheless, the CFTC is determining that the presence of any guarantee with recourse, no matter how robust, is price forming and an integral part of a guaranteed swap. The CFTC's

---

[1118] *See, e.g.,* Swap Policy Statement, *supra* note 214.

[1119] 17 CFR Part 40.

interpretation of the term "swap" to include guarantees of swap does not limit or otherwise affect in any way the relief provided by the Insurance Grandfather. In a separate release, the CFTC will address the practical implications of interpreting the term "swap" to include guarantees of swaps (the "separate CFTC release").

### (a) Costs

A market participant will need to ascertain whether an agreement, contract, or transaction satisfies the criteria set forth in rule 1.3(xxx)(4). This analysis will have to be performed prior to entering into the agreement, contract, or transaction to ensure that the relief provided by the Insurance Safe Harbor is available. The CFTC expects that potential costs associated with any possible uncertainty cited by commenters as to whether an agreement, contract, or transaction that the participants consider to be insurance could instead be regulated as a swap would be greater without the Insurance Safe Harbor than the cost of the analysis under the final rule herein.

Although the Insurance Safe Harbor is designed to mitigate costs associated with legal uncertainty and misclassification of products, to the extent that it inadvertently fails to exclude certain types of insurance products from the definitions, these failures could lead to costs for market participants entering into agreements, contracts, or transactions. Some insurance products might inadvertently be subjection to regulation as swaps. To the extent that the Insurance Safe Harbor leads to the inadvertent misclassification of some swaps as insurance, costs for market participants entering into agreements, contracts, or transactions that are inadvertently regulated as insurance products, and not as swaps, may increase.[1120] Similarly, insurance products inadvertently mischaracterized as swaps could impose additional costs on market participants, who could be required to meet certain regulatory requirements applicable to swaps.

Assessment costs should be minimal or non-existent for traditional insurance products,[1121] but for a new and novel insurance product that is more complex, the costs of analysis may be greater.

Nevertheless, it is anticipated that such cases will be infrequent. Moreover, it may be difficult to assess whether products that do not fall within the Insurance Safe Harbor are swaps or security-based swaps rather than insurance. Market participants may need to request an interpretation from the Commissions regarding such products, or obtain an opinion of counsel, which will involve certain costs.[1122] However, the CFTC expects such cases will arise less frequently in light of the increased clarity provided by the rule. An alternative to a safe harbor approach under the rule—that failure to meet the rule and interpretation would automatically mean that the product is a swap and not insurance—would likely impose greater costs on market participants and result in more frequent misclassification of products.

The CFTC is interpreting the term "swap" (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swap position would have recourse to the guarantor in connection with the position. The CFTC anticipates minimal or no assessment costs from the interpretation with respect to guarantees of swaps.[1123] The

CFTC does, however, anticipate that there will be some programmatic costs associated with the requirements that it will propose for guarantees of swaps in the separate CFTC release.[1124] The CFTC will carefully consider those costs in that rulemaking.

### (b) Benefits

Subjecting traditional insurance products to Title VII could, absent exception, prevent individuals who are not ECPs from obtaining insurance to protect their properties or families against accidental hazards or risks,[1125] or require insurance sold to individuals who are not ECPs to be traded on exchanges and to be cleared. The Commissions have found no evidence that Congress intended them to be regulated as swaps or security-based swaps. In light of the above considerations, the Commissions have determined to provide the Insurance Safe Harbor and Insurance Grandfather in the final rules in order to assure market participants that those agreements, contracts, or transactions that meet their conditions will not fall within the swap or security-based swap definitions. Limiting the number of unexpected product classification outcomes for market participants provides the benefit of predictability when entering into their transactions

The business of insurance is already subject to established pre-Dodd-Frank Act regulatory regimes. Requirements that may work well for swaps and security-based swaps may not be appropriate for traditional insurance products. To the extent that the final rules distinguish insurance from swaps and security-based swaps, the CFTC should be able to tailor rules for specific

---

[1120] Improperly characterizing swaps as insurance may theoretically cause market participants that are not licensed insurance companies to become licensed insurance companies, if applicable, thus imposing costs of complying with state insurance regulation.

[1121] The CFTC anticipates that traditional insurance products will either be easy to identify from the list of Enumerated Products or will unambiguously satisfy the Products Test.

[1122] The CFTC believes that $27,000 represents a reasonable estimate of the upper end of the range of the costs to undertake the legal analysis of the status of an agreement, contract, or transaction as a swap or security-based swap. The average cost incurred by market participants in connection with assessing whether an agreement, contract, or transaction is a swap or security-based swap is based upon the estimated amount of time that staff believes will be required for both in-house counsel and outside counsel to apply the definition. Staff estimates that some agreements, contracts, or transactions will clearly satisfy the Insurance Safe Harbor, Insurance Grandfather and an in-house attorney, without the assistance of outside counsel, will be able to make a determination in less than one hour. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by SEC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead), staff estimates that the average national hourly rate for an in-house counsel is $378. If an agreement, contract, or transaction is more complex, the CFTC estimates the analysis will require approximately 30 hours of in-house counsel time and 40 hours of outside counsel time. The CFTC estimates the costs for outside legal services to be $400 per hour. This is based on an estimated $400 per hour cost for outside legal services. This is the same estimate used by the SEC for these services in the release involving Exemptions For Security-Based Swaps Issued By Certain Clearing Agencies, Release No. 33–9308 (Mar. 30, 2012), 77 FR 20536 (Apr. 5, 2012). Accordingly, on the high end of the range the CFTC estimates the cost to be $27,340 ($11,340 (based on 30 hours of in-house counsel time ✖ $378) + $16,000 (based on 40 hours of outside counsel ✖ $400). The estimate is rounded to two significant digits to avoid the impression of false precision of the estimate.

[1123] Because a guarantee is a common and well-understood product, that has been used in

commerce since long before the existence of swaps markets, the CFTC anticipates that whether a guarantee is present or not will be obvious.

[1124] As a result of interpreting the term "swap" (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swap position would have recourse to the guarantor in connection with the position, and based on the reasoning set forth in the Entity Definitions Release in connection with major swap participants, the CFTC will not deem holding companies to be swap dealers as a result of guarantees to certain U.S. entities that are already subject to capital regulation. This interpretation mitigates the programmatic costs imposed on swap dealers by not attributing to a guarantor swap positions of a guaranteed entity that is already subject to capital regulation.

[1125] An individual is considered an ECP if the individual "has amounts invested on a discretionary basis, the aggregate of which is in excess of—(i) $10,000,000; or (ii) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonable likely to be owned or incurred, by the individual." Section 1a(18)(A)(xi) of the CEA, 7 U.S.C. 1a(18)(A)(xi).

products that are swaps or security-based swaps to achieve Title VII regulatory objectives. In adopting the Insurance Safe Harbor, the CFTC has sought to achieve those net benefits that may be obtained from not supplanting existing insurance regulation that are consistent with the regulatory objectives of Title VII.

Without the Insurance Safe Harbor, market participants might be more uncertain about whether an agreement, contract, or transaction is an insurance product rather than a swap. Rule 1.3(xxx)(4) is intended to reduce the potential uncertainty of what constitutes a swap by setting forth clear and objective criteria for distinguishing an agreement, contract, or transaction that is insurance from a swap. Providing such an objective rule and explanation mitigates the potential additional costs of petitioning the Commissions, or obtaining an opinion of counsel, about whether an agreement, contract, or transaction is insurance or a swap.

The objective criteria provided by the rule also will aid sound risk management practices because it will be easier for market participants to decide whether a particular agreement, contract, or transaction is insurance or a swap.

Further, the CFTC anticipates that the interpretation of the term "swap" to include guarantees of swaps and the separate CFTC release will provide programmatic benefits by enabling the CFTC and market participants to receive more price-forming data about swaps, which may help improve price discovery for swaps. The CFTC will carefully consider these and other benefits in the separate CFTC release.

(c) Comments and Consideration of Alternatives

The CFTC requested comment on the costs and benefits of proposed rule 1.3(xxx)(4) and interpretive guidance to distinguish between insurance products and swaps for market participants, markets, and the public. Several commenters [1126] argued that any additional requirement beyond the requirement of the rules that a product is a regulated insurance product creates legal uncertainty and imposes costs. Specifically, a commenter [1127] asserted that it is a burden to introduce conditions that are neither universal nor fundamental, such as showing a continuing risk of loss for some insurance contracts. Another commenter [1128] argued that legal

uncertainty may result in conflicting interpretations, which can be a significant burden for financial guaranty transactions that typically require the delivery of a legal opinion.

The Commissions have expanded the list of insurance products excluded from the swap definition to cover certain traditional insurance products that commenters have brought to their attention and that the Commissions have determined are not swaps. The Commissions are also clarifying that the Insurance Safe Harbor does not imply or presume that an agreement, contract or transaction that does not meet its requirements is a swap or security-based swap, but will require further analysis of the applicable facts and circumstances, including the form and substance of the agreement, contract, or transaction, to determine whether it is insurance, and thus not a swap or security-based swap. With regard to financial guaranty in particular, the acceleration of payment criterion is designed to reflect market practice and aid appropriate product classification. The Commissions are stating that they intend to interpret concepts upon which the Product Test relies that are derived from state law consistently with the existing and developing laws of the relevant state(s) governing the agreement, contract, or transaction in question. However, the Commissions note their authority to diverge from state law if the Commissions become aware of evasive conduct. While the CFTC cannot anticipate under what circumstances or how often the Commissions might diverge from state law, the CFTC believes that there will be more consistent than inconsistent interpretations. Accordingly, the rules do not present the increased burden or legal uncertainty that these commenters suggested.

Several commenters also requested that the Commissions codify the proposed interpretive guidance regarding enumerated insurance products in rule text on the basis that codification would enhance legal certainty, and thereby reduce costs. [1129] The Commissions have decided to include a list of products in rule text in response to these commenters concerns.

A commenter proposed that the sole test for determining whether an agreement, contract or transaction is insurance should be whether it is subject to regulation as insurance by the insurance commissioner of the applicable state(s). [1130] While the

commenter's test is potentially easier and thus may be less costly to apply than the Commissions' test, it would be inadequate because, as explained in section II.B.1.(d) above, it would essentially delete the product prong of the insurance safe harbor, and thus begging the question of how to distinguish insurance from swaps and security-based swaps and allowing state insurance regulators to supplant the Commissions' role in further defining, or determining what is, a swap. Further, market participants might misconstrue the commenter's test in close cases to mean that any activity permitted by the insurance commissioner of the relevant state(s) may not be regulated as swaps or security-based swaps. However, insurance companies are in many circumstances permitted by state insurance regulators to enter into swaps or security-based swaps, illustrating that the fact that while an insurance company may enter into an agreement, contract or transaction, it does not necessarily mean that such agreement, contract or transaction is insurance. Further, the domain of insurance regulation may change and then this commenter's test would induce an evolving boundary between state and CFTC regulation.

Several commenters suggested an approach in which insurance products that qualify for the exclusion contained in section 3(a)(8) of the Securities Act of 1933 would be excluded from the swap definition. [1131] One commenter argued that "Section 3(a)(8) has long been recognized as the definitive provision as to where Congress intends to separate securities products that are subject to SEC regulation from 'insurance' and 'annuity' products that are to be left to state insurance regulation" and that the section 3(a)(8) criteria are well understood and have a long history of interpretation by the SEC and the courts. [1132] Other commenters suggest that because section 3(a)(8) includes both a product and a provider requirement, if the Commissions include it in their final rules, it should be a requirement separate from the Product Test and the Provider Test, and should extend to insurance products that are securities. [1133]

While the Commissions agree that the section 3(a)(8) criteria have a long history of interpretations by the SEC and the courts, the Commissions find that it is inappropriate to apply the section 3(a)(8) criteria in this context. Although section 3(a)(8) contains some

---

[1126] See AFGI Letter; AIA Letter; and ISDA Letter.
[1127] See ISDA Letter.
[1128] See AFGI Letter.

[1129] See ACLI Letter; NAIC Letter; and RAA Letter.
[1130] See MetLife Letter.

[1131] See supra note 162
[1132] See supra note 163.
[1133] See supra note 164.

conditions applicable to insurance providers that are similar to the prongs of the Provider Test, it does not contain any conditions that are similar to the prongs of the Product Test. Moreover, section 3(a)(8) provides an exclusion from the Securities Act and the CFTC has no jurisdiction under the Federal securities laws. Congress directed both agencies to further define the terms "swap" and "security-based swap." As such, the Commissions find that it is more appropriate to have a standalone rule that incorporates features that distinguish insurance products from swaps and security-based swaps and over which both Commissions will have joint interpretative authority.

Another commenter proposed the following test for an agreement, contract, or transaction to be insurance:

[It] [e]xists for a specified period of time; Where the one party to the contract promises to make one or more payments such as money, goods or services;
In exchange for another party's promise to provide a benefit of pecuniary value for the loss, damage, injury, or impairment of an identified interest of the insured as a result of the occurrence of a specified event or contingency outside of the parties' control; and
Where such payment is related to a loss occurring as a result of a contingency or specified event.[1134]

This test may not represent a less costly alternative to the Commissions' test in light of its complexity, and in any event would not distinguish swaps and security-based swaps from insurance more effectively than the Commissions' test for two reasons. The requirements of a specified term and the payment of premiums are present in both insurance products and in agreements, contracts, or transactions that are swaps or security-based swaps, and therefore such requirements do not help to distinguish between them. A test based solely on these requirements, then, would be over-inclusive and exclude from the Dodd-Frank regulatory regime agreements, contacts, and transactions that have not traditionally been considered insurance. Also, the third and fourth requirements of the commenter's test collapse into the Product Prong's requirement that the loss must occur and be proved, and any payment or indemnification therefor must be limited to the value of the insurable interest.

Another commenter offered a 3-part test[1135] in lieu of the Commissions' test:

(1) The insurance contract must be issued by an insurance company and subject to state insurance regulation;

(2) The insurance contract must be the type of contract issued by insurance companies; and

(3) The insurance contract must not be of a type that the CFTC and SEC determine to regulate.[1136]

The commenter stated that its approach does not contain a definition of insurance, and for that reason believes that is preferable to the Commissions' approach, which it believes creates legal uncertainty because any attempted definition of insurance has the potential to be over- or under-inclusive.[1137]

While the commenter's test may appear simpler on its face, the CFTC does not believe that it represents a less costly alternative. The first two requirements of the commenter's test do not help to distinguish swaps from insurance; the third provides no greater certainty than the Commissions' facts and circumstances approach. Moreover, as discussed in section II.B.1(d) above, the Commissions' rules and related interpretations are not intended to define insurance. Rather, they provide a safe harbor for certain types of traditional insurance products by reference to factors that may be used to distinguish insurance from swaps and security-based swaps. Agreements, contracts, and transactions that do not qualify for the Insurance Safe Harbor may or may not be swaps, depending upon the facts and circumstances. Thus, the Commissions' test neither creates legal uncertainty as suggested by the commenter, nor the costs associated with such uncertainty.

Another commenter proposed different approaches for existing products and new products. According to the commenter, if an existing type of agreement, contract or transaction is currently reportable as insurance in the provider's regulatory and financial reports under a state or foreign jurisdiction's insurance laws, then that agreement, contract or transaction would be insurance rather than a swap or security-based swap. On the other hand, for new products, if this approach is inconclusive, the commenter recommended that the Commissions use the product prong of the Commissions' test only.[1138]

The commenter's proposal may represent a less costly alternative than the Commissions' test. However, rather than treating existing products and new products differently, the Commissions as discussed above are providing "grandfather" protection for agreements,

contracts, and transactions entered into on or before the effective date of the Products Definitions. Moreover, the commenter's test would eliminate the provider test for new products, which the Commissions believe is important to help prevent products that are swaps or security-based swaps from being characterized as insurance.

In sum, the CFTC finds that, while some of the alternatives proposed by commenters may appear less costly to apply than the Commissions' test, in all cases they would sweep out of the Dodd-Frank Act regulatory regime for swaps agreements, contracts, and transactions that have not historically been considered insurance, and that should, in appropriate circumstances, be regulated as swaps or security-based swaps. Accordingly, the CFTC does not find these alternative tests proposed by commenters to be better tools than the Insurance Safe Harbor for limiting the scope of the statutory definitions of swap and security-based swap. Excluding agreements, contracts, and transactions that are, in fact, swaps from the further definition of the term "swap" is inconsistent with the CFTC's regulatory objectives and could increase risk to the U.S. financial system.

Three commenters provided comments regarding the treatment of guarantees of swaps. Two commenters[1139] opposed treating insurance or guarantees of swaps as swaps. Suggesting that the products are not economically similar, one commenter argued that insurance wraps of swaps do not "necessarily replicate the economics of the underlying swap, and only following default could the wrap provider end up with the same payment obligations as a wrapped defaulting swap counterparty."[1140] This commenter also stated that the non-insurance guarantees are not swaps because the result of most guarantees is that the guarantor is responsible for monetary claims against the defaulting party, which in this commenter's view is a different obligation than the arrangement provided by the underlying swap itself.[1141]

One commenter supported treating financial guaranty insurance of a swap or security-based swap as itself a swap or a security-based swap. This commenter argued that financial guaranty insurance of a swap or security-based swap transfers the risk of counterparty non-performance to the guarantor, making it an embedded and essential feature of the insured swap or

[1134] *See* NAIC Letter.
[1135] *See also* CAI Letter and Nationwide Letter.
[1136] *See* ACLI ANPR Letter.
[1137] *See* ACLI Letter.
[1138] *See* AIA Letter.
[1139] *See* AFGI Letter, ISDA Letter.
[1140] ISDA Letter.
[1141] *Id.*

security-based swap. This commenter further argued that the value of such swap or security-based swap is largely determined by the likelihood that the proceeds from the financial guaranty insurance policy will be available if the counterparty does not meet its obligations.[1142] This commenter maintained that financial guaranty insurance of swaps and security-based swaps serves a similar function to credit default swaps in hedging counterparty default risk.[1143]

While the CFTC is not further defining guarantees of swaps to be swaps, the CFTC is persuaded that when a swap (that is not a security-based swap or mixed swap) has the benefit of a guarantee, the guarantee and related guaranteed swap should be analyzed together. The events surrounding the failure of AIG Financial Products ("AIGFP") highlight how guarantees can cause major risks to flow to the guarantor.[1144] The CFTC finds that the regulation of swaps and the risk exposures associated with them, which is an essential concern of the Dodd-Frank Act, would be less effective if the CFTC did not interpret the term "swap" to include a guarantee of a swap.

Two commenters cautioned against unnecessary and duplicative regulation. One commented that, because the underlying swap, and the parties to it, will be regulated and reported to the extent required by Title VII, there is no need for regulation of non-insurance guarantees.[1145] The other commented that an insurance policy on a swap would be subject to state regulation; without addressing non-insurance guarantees, this commenter stated that additional Federal regulation would be duplicative.[1146] The CFTC disagrees with these arguments. As stated above, the CFTC is treating financial guaranty insurance of swaps and all other guarantees of swaps in a similar manner because they are functionally or economically similar products. If a guarantee of a swap is not treated as an integral part of the underlying swap, price forming terms of swaps and the risk exposures associated with the guarantees may remain hidden from regulators and may not be regulated appropriately. Moreover, treating

guarantees of swaps as part of the underlying swaps ensures that the CFTC will be able to take appropriate action if, after evaluating information collected with respect to the guarantees and the underlying swaps, such guarantees of swaps are revealed to pose particular problems in connection with the swaps markets. The separate CFTC release clarifies the limited practical effects of the CFTC's interpretation, which should address industry concerns regarding duplicative regulation.

One commenter also argued that regulating financial guaranty of swaps as swaps would cause monoline insurers to withdraw from the market, which could adversely affect the U.S. and international public finance, infrastructure and structured finance markets, given that insuring a related swap often is integral to the insurance of municipal bonds and other securities.[1147] The CFTC finds this argument unpersuasive. The CFTC understands that the 2008 global financial crisis severely affected most monolines and only one remains active in U.S. municipal markets. Thus, it appears that the monolines have, for the most part, already exited these markets. In addition, as stated above, the separate CFTC release clarifies the limited practical effects of the CFTC's interpretation, which should address industry concerns.

### 4. Costs and Benefits of the Withdrawing the Energy Exemption and Interpretation Regarding the Forward Contract Exclusion From the Swap Definition

The CFTC is clarifying that the forward contract exclusion from the swap definition for nonfinancial commodities should be read consistently with the forward contract exclusion from the CEA definition of the term "future delivery." In that regard, the CFTC is retaining the Brent Interpretation and extending it to apply to all nonfinancial commodities, and withdrawing the Energy Exemption, which had extended the Brent Interpretation regarding the forward contract exclusion from the term "future delivery" to energy commodities other than oil, as it is no longer necessary. Although the CFTC is withdrawing the Energy Exemption, the CFTC is providing that certain alternative delivery procedures, such as physical netting agreements, that are mentioned in the Energy Exemption, are consistent

with the intent of the book out provision in the Brent Interpretation—provided that the parties had a bona fide intent, when entering into the transactions, to make or take (as applicable) delivery of the commodity covered by those transactions. The CFTC also is providing an interpretation regarding documentation of orally booked-out transactions.

In addition, the CFTC is clarifying that its prior guidance regarding commodity options embedded in forward contracts should be applied as well to the treatment of forward contracts in nonfinancial commodities that contain embedded options under the Dodd-Frank Act. The final interpretation also explains the CFTC's position with regard to forwards with embedded volumetric optionality, including an explanation of how it would treat some of the specific contracts described by commenters, such as full requirements contracts. It also explains the CFTC's view with respect to certain contractual provisions, such as liquidated damages and renewable/evergreen provisions that do not disqualify the transactions in which they are contained from the forward exclusions. The CFTC has also provided an interpretation regarding nonfinancial commodities, including environmental commodities, and interpretations concerning physical exchange transactions, fuel delivery agreements, certain physical commercial agreements, and energy management agreements.

### (a) Costs

The CFTC's statement that it will construe the forward contract exclusion consistently with respect to the definitions of the terms "swap" and "future delivery," as discussed herein, will not impose any new material costs on market participants. It also will establish a uniform interpretation of the forward contract exclusion from the definitions of both statutory terms, which will avoid the significant costs that some commenters state would result if the forward contract exclusion were construed differently in these two contexts.[1148] In addition, the CFTC's

[1142] See Better Markets Letter.
[1143] See Better Markets Letter.
[1144] "AIGFP's obligations were guaranteed by its highly rated parent company * * * an arrangement that facilitated easy money via much lower interest rates from the public markets, but ultimately made it difficult to isolate AIGFP from its parent, with disastrous consequences." Congressional Oversight Panel, *The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* 20 (2010).
[1145] See ISDA Letter.
[1146] See AFGI Letter.

[1147] See AFGI Letter. Of the members of AFGI, only Assured Guaranty (or its affiliates) is currently writing financial guaranty insurance policies on U.S. municipal obligations.

[1148] See EEI Letter ("Without legal certainty as to the regulatory treatment of their forward contracts, EEI's members and other end users who rely on the forward contract exclusion likely will face higher transaction costs due to greater uncertainty. These increased transaction costs may include: (i) More volatile or higher commodity prices; and (ii) increased credit costs, in each case caused by changes in market liquidity as end users change the way they transact in the commodity markets. A single regulatory approach that uses the same criteria to confirm that a forward contract is Continued

clarification regarding the continued viability of the alternative delivery procedures in the Energy Exemption should reduce costs to the industry by conferring legal certainty that their transactions may continue to have these procedures without losing their eligibility for the forward exclusions.

As noted in section II.B.2.(a)(ii) above, the CFTC has explained its position regarding nonfinancial commodities. This should help the industry to determine whether their transactions are eligible for the forward exclusions, and consequently reduce costs to the industry for transactions involving nonfinancial commodities such as renewable energy credits that may be eligible for the forward exclusions. The final interpretation regarding forwards with embedded volumetric optionality should reduce costs to the industry, because these transactions may qualify for the forward exclusions from the swap and "future delivery" definitions. The explanation of how the CFTC will view specific contracts mentioned by commenters under this interpretation should enhance legal certainty and thereby reduce costs.

The clarification that certain contractual provisions do not disqualify transactions from the forward exclusion also should reduce costs to the industry by providing increased legal certainty that these provisions will not render their transactions subject to Dodd-Frank Act regulation. Similar cost reductions should be achieved through enhanced legal certainty provided by the CFTC's interpretations of physical exchange transactions, fuel delivery agreements, and certain physical commercial agreements, all of which may qualify for the forward exclusions under these interpretations. The interpretation regarding energy management agreements, which provides that the fact that a particular transaction is done under the auspices of such agreements does not alter the nature of that transaction, should likewise enhance legal certainty and reduce costs. While the CFTC's interpretation regarding documentation of oral book-outs—that an oral book-out be followed by a confirmation in a commercially reasonable time in written or electronic form—may impose costs for industries that do not document their orally booked out transactions, the CFTC believes that this requirement is consistent with prudent business

practices and is necessary to prevent abuse of the Brent safe harbor.

Market participants will need to assess whether products are forward contracts that qualify for the forward exclusions from the swap and future delivery definitions, and may need to request an interpretation regarding such products, or obtain an opinion of counsel, which will involve certain costs. [1149]

(b) Benefits

The CFTC's interpretations regarding the forward exclusions should provide market participants with greater legal certainty regarding whether their transactions qualify for the forward exclusion from the swap definition, which should facilitate commercial merchandising activity. For example, the interpretation regarding forwards with embedded volumetric options should facilitate commercial merchandising activity of the electricity, natural gas, and other industries that employ these contracts where delivery quantities are flexible, while the conditions in the interpretations should help to assure that these contracts are bona fide forwards.

In addition, the interpretation should result in the appropriate classification of transactions as commercial merchandising transactions (and thus forward contracts) that are not subject to Title VII regulation. This will enhance

[1149] The CFTC believes that $20,000 represents a reasonable estimate of the upper end of the range of the costs to undertake the legal analysis of the status of an agreement, contract, or transaction as a forward contract that qualifies for the forward exclusions. The average cost incurred by market participants in connection with assessing whether an agreement, contract, or transaction is a forward contract is based upon the estimated amount of time that staff believes will be required for both in-house counsel and outside counsel to apply the definition. The staff estimates that costs associated with determining whether an agreement, contract, or transaction is a forward contract will range up to $20,000 after rounding to two significant digits. Staff estimates that some agreements, contracts, or transactions will clearly fall within the Brent safe harbor, and an internal attorney, without the assistance of outside counsel, will be able to make a determination in less than one hour. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by CFTC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead), staff estimates that the average national hourly rate for an internal attorney is $378. If an agreement, contract, or transaction is more complex, the CFTC estimates the analysis will require approximately 20 hours of in-house counsel time and 30 hours of outside counsel time. The CFTC estimates the costs for outside legal services to be $400 per hour. Accordingly, on the high end of the range the CFTC estimates the cost to be $19,560 ($7,560 (based on 20 hours of in-house counsel time × $378) + $12,000 (based on 30 hours of outside counsel × $400) which is then rounded to two significant digits to $20,000.

market participants' efficient use of the swaps markets and, as described above, reduce costs on industry. Documenting oral book-outs should promote good business practices and aid the CFTC in preventing evasion through abuse of the forward exclusion. Finally, the CFTC's interpretation regarding commercial market participants should ensure that the forward exclusions may only be used for commercial merchandising activity and not for speculative purposes. [1150]

The CFTC's position regarding nonfinancial commodities should help the industry to determine whether their transactions are eligible for the forward exclusions, which should facilitate commercial merchandising activity for transactions involving non-financial commodities such as renewable energy credits that may be eligible for the forward exclusions.

(c) Comments and Consideration of Alternatives

The CFTC requested comment in the Proposing Release on the costs and benefits of the proposed interpretive guidance regarding the forward contract exclusion and the withdrawal of the Energy Exemption for market participants, markets and the public.

Several commenters requested that the CFTC codify its proposed guidance regarding the forward contract exclusion in rule text to provide greater legal certainty, which they argued may mitigate costs. [1151] However, upon consideration, the CFTC is not codifying its interpretation in rule text. As discussed in section II.B.2.(a)(i), above, the CFTC has never codified its prior interpretations of the forward contract exclusion with respect to the future delivery definition as a rule or regulation. Publishing an interpretation in this release is consistent with the manner in which the CFTC has interpreted the forward exclusion in the past. The additional research costs associated with an interpretation as opposed to codification in the Code of Federal Regulations will be small, because the CFTC has placed this interpretation, and all other product interpretations, in this adopting release for the convenience of practitioners. Moreover, courts may rely upon agency interpretations; thus, the CFTC believes that codification would not mitigate costs much.

[1150] If contracts are being used for speculative purposes they are probably swaps and should be subject regulation under Title VII.

[1151] *See* BGA Letter; COPE Letter; ETA Letter; FERC Staff Letter; and Just Energy Letter.

excluded from the Commission's jurisdiction over swaps and futures will reduce this uncertainty and the associated costs to end users." (footnote omitted)).

Some commenters[1152] argued that physical options should be considered forward contracts excluded from the definition of a swap, because increased regulation would cause harm to physical commodity markets without providing significant benefits. The statutory definition of ''swap'' provides that options—including physical options—are swaps. Accordingly, the CFTC may not exclude such options from the swap definition. Further, treating physical options as forward contracts would be inconsistent with longstanding CFTC precedent. Nonetheless, the CFTC has provided relief using its plenary authority under CEA Section 4c(b)[1153] over commodity options through the trade option exemption. While certain capacity contracts on RTOs and ISOs and certain contracts entered into by section 201(f) entities may be considered options and therefore would be swaps, regulation of these contracts may be addressed through the public interest waiver process in CEA section 4(c)(6).

Several commenters[1154] argued that renewable energy credits should not be swaps; rather, renewable energy credits should be considered nonfinancial commodities eligible for the forward exclusion from the swap definition. They asserted that swap regulations would raise transaction costs making it more difficult and expensive to support renewable energy. The CFTC is clarifying that renewable energy credits are nonfinancial commodities and that transactions therein are eligible for the forward exclusion if they satisfy the terms thereof. So if these transactions meet the forward exclusion, they will bear no increased costs.

A commenter[1155] requested that tolling contracts be considered forwards and not swaps, seeking to avoid unnecessary cost of regulatory uncertainty and unintended conflict between the CFTC and other regulators. The CFTC has not provided blanket interpretations regarding particular products in the rulemaking, but has provided an interpretation regarding the forward contract exclusions provided above in section II.B.2. To the extent a commenter still is uncertain about the treatment of a specific type of transaction, the commenter may request an interpretation from the CFTC.

Another commenter argued more generally that any embedded option (for example, price, quantity, delivery point, delivery date, contract term) that does not permit a unilateral election of financial settlement based upon the value change in an underlying cash market should not render the contract a swap.[1156] While the commenter's approach with respect to ''any'' embedded option may result in lower costs for market participants because more contracts likely would be excluded as forwards from the swap definition and thus not be subject to regulation under the Dodd-Frank Act, such an expansive approach may inappropriately classify contracts as forwards. The CFTC is providing an interpretation with respect to forwards with embedded volumetric options to address commenters' concerns. The CFTC is also explaining its position above regarding price optionality, optionality with respect to delivery points and delivery dates specifically in response to the commenter's letter, and optionality as to certain contract terms (such as evergreen and renewal provisions) to address particular concerns raised by commenters.

Another commenter suggested that an option to purchase or sell a physical commodity, whether embedded in a forward contract or stand alone, should either (i) fall within the statutory forward exclusion from the swap definition, or (ii) alternatively, if deemed by the CFTC to be a swap, should be exempt from the swap definition pursuant to a modified trade option exemption pursuant to CEA Section 4c(b).[1157] Although this proposal may on its face appear to be simpler than the CFTC's, it is substantively similar to the one the CFTC is adopting. The CFTC has modified the proposed interpretive guidance regarding forwards with embedded options as discussed in section II.B.2.(b)(ii) above; contracts with embedded options that are swaps under the final interpretation may nevertheless qualify for the modified trade option exemption recently adopted by the CFTC.[1158] The CFTC is not adopting an approach that forwards with any type of embedded option should fall within the statutory forward exclusion from the swap definition. Such an approach would be overbroad because it would exclude contracts that are not appropriately classified as forwards. The commenter also requested that trade option exemptions be granted for physical commodities. The costs and benefits of the trade option exemption are addressed in that rulemaking.

Another commenter urged the CFTC to broadly exempt commercial forward contracting from swap regulation by generally excluding from the swap definition any forward contract with embedded optionality between end users ''whose primary purpose is consistent with that of an 'end user', and in which any embedded option is directly related to 'end use.' ''[1159]

While this alternative may appear to be less costly than the CFTC's interpretation, its vagueness may create significant legal uncertainty about the scope of the forward exclusion, which may increase costs on market participants. Even if this approach does represent a lower cost alternative, however, it is overbroad and likely would result in the inappropriate classification of transactions as forward contracts, and thus would not achieve the CFTC's objective of appropriately classifying transactions that should qualify for the forward exclusions.

Another commenter believed that the CFTC's ''facts and circumstances'' approach to forwards with embedded options does not provide the legal certainty required for nonfinancial entities engaging in commercial contracts in the normal course of business.[1160] The commenter further argued that many option-like contract terms could be determined to ''target the delivery term'' under a facts and circumstances analysis. Accordingly, the commenter believed that the CFTC should provide in its rules that an embedded option or embedded optionality will not result in a nonfinancial forward being a swap

---

[1152] *See* Just Energy Letter; NEMA Letter; NGSA/NCGA Letter; ONEOK Letter; and WGCEF Letter.

[1153] 7 U.S.C. 6c(b).

[1154] *See* 3Degrees Letter; AWEA Letter; CERP Letter; EMA Letter; GreenX Letter; PMAA/NEFI Letter; REMA Letter; and WGCEF Letter.

[1155] *See* California Utilities Letter.

[1156] *See* COPE Letter, Appendix.

[1157] *See* WGCEF Letter; 7 U.S.C. 6c(b).

[1158] *See Commodity Options*, 77 FR 25320, April 27, 2012. 17 CFR 32.3. Encana Marketing (USA) Inc. (''Encana'') believes that the guidance on forwards with embedded options should include embedded physical delivery options because it asserts that many of the contracts currently used by participants in the wholesale natural gas market contain an option for the physical delivery of natural gas. *See* Encana Letter. To the extent that Encana's comment goes beyond volumetric optionality, commodity options are discussed above in section II.B.2.(b)(i).

[1159] *See* NMPF Letter.

[1160] *See* ETA Letter at 19 n. 47. Similarly, COPE comments that a nonfinancial commodity forward contract that, ''by its terms,'' is intended to settle physically should be permitted to contain optionality without being transformed into a swap unless such optionality negates the physical settlement element of the contract. That is, if one party can exercise an option to settle the contract financially based upon the value change in an underlying cash market, then the intent for physical settlement is not contained in ''the four corners of the contract'' and may render the contract a swap. COPE Letter. While COPE's approach may impose less costs on market participants (as more transactions likely would qualify for the forward exclusion, as discussed in section II.B.2(b)(ii), above, the CFTC has eschewed approaches to the forward exclusion that rely on the ''four corners of the contract,'' which can provide a roadmap to evasion of statutory requirements.

unless: (1) Delivery is optional; (2) financial settlement is allowed; and (3) transfer and trading of the option separately from the forward is permitted.[1161]

The CFTC has long applied a facts and circumstances approach to the forward exclusion, including with respect to forwards with embedded options, an approach with which market participants are familiar. That approach balances the need for legal certainty against protecting market participants, market integrity and the risk of providing opportunities for evasion.[1162] By contrast, the commenter's bright-line approach may be simpler to apply, but could undermine market integrity and creates greater evasion opportunities. Moreover, the CFTC's additional interpretation noted above, including clarification about the meaning of the phrase "target the delivery term," and forwards with embedded volumetric optionality, provides enhanced legal certainty in response to the commenter's concerns, which should mitigate the costs of the CFTC's approach to market participants.[1163]

Another commenter[1164] stated its view that the full costs of applying the Dodd-Frank regulatory apparatus to physical energy transactions, or of energy companies being forced to abandon full-requirements bilateral contracting will significantly increase the costs to be paid by U.S. consumers. The CFTC is sensitive to these concerns. The CFTC is providing relief for full-requirements contracts so long as they satisfy the conditions set forth in the interpretation.

The CFTC is also providing relief for other types of physical energy contracts that may qualify for the forward exclusions. Separately, the CFTC has provided relief for trade options in another rulemaking.[1165]

### 5. Loan Participations

In the Proposing Release, the Commissions proposed guidance that they do not interpret the swap and security-based swap definitions to include loan participations in which: (i) The purchaser is acquiring a current or

[1161] See ETA Letter.

[1162] See also NCFC Letter (supporting the CFTC's guidance because it provides legal certainty).

[1163] See also Commodity Options, 77 FR 25320, 25324 n. 25, April 27, 2012 (discussing the CFTC's conclusion that an "option[] to redeem" under the USDA Commodity Credit Corporation's marketing loan program constitutes a cotton producer's contractual right to repay its marketing loan and "redeem" the collateral (cotton) to sell in the open market).

[1164] See IECA II Letter.

[1165] See Commodity Options, 77 FR 25320, April 27, 2012.

future direct or indirect ownership interest in the related loan; and (ii) the loan participations are "true participations" (the participant acquires a beneficial ownership interest in the underlying loans). One commenter expressed concern with the second prong of the proposed guidance. Specifically, the commenter said that the "true participation" requirement may result in the improper classification of loan participations as swaps, because LMA-style loan participations may not qualify. Moreover, because of legal uncertainty associated with the "true participation" terminology derived from U.S. bankruptcy law, LSTA-style loan participations may be subject to improper classification as well. The commenter proposed an alternative test described in section II.B.3., above.

The Commissions largely are adopting the recommendation from the commenter regarding the Commissions' proposed guidance concerning loan participations as not swaps or security-based swaps, with certain modifications. This reduces costs for market participants because the Commissions' test for loan participations from the proposal included a "true participation" requirement that commenters suggested is subject to legal uncertainty. Benefits of the rule include enhanced legal certainty that loan participations that meet the requirements of the interpretation are not swaps, which should facilitate loan participation market activity.

### 6. Interpretation Regarding Commercial/Consumer Transactions

The Commissions are stating that certain customary consumer and commercial transactions that have not previously been considered swaps or security-based swaps do not fall within the statutory definitions of those terms. Specifically with regard to consumer transactions, the Commissions are adopting as proposed the interpretation that certain transactions entered into by consumers (natural persons) as principals or their agents primarily for personal, family or household purposes would not be considered swaps or security-based swaps. The Commissions have added to the list of consumer transactions certain residential fuel storage contracts; service contracts; consumer options to buy, sell or lease real or personal property; and certain consumer guarantees of loans (credit cards, automobile, and mortgage). The Commissions have also clarified that consumer transactions used to purchase nonfinancial energy commodities are not swaps or security-based swaps. With

respect to commercial transactions, the Commissions are adopting as proposed the interpretation that certain commercial transactions involving customary business arrangements (whether or not involving a for-profit entity) would not be considered swaps or security-based swaps. The Commissions also are clarifying that commercial loans by the Federal Home Loan Banks and Farm Credit Institutions are not swaps. Finally, the Commissions are explaining the factors characteristic of consumer and commercial transactions that the Commissions will consider in determining whether other consumer and commercial transactions that are not specifically listed in the interpretation should be considered swaps or security-based swaps.

#### (a) Costs

The CFTC believes that the forgoing interpretation should mitigate costs because it increases legal certainty that specific customary consumer and commercial transactions are not swaps or security-based swaps subject to Dodd-Frank regulation. As a result of this interpretation, consumers and industry participants will not have to seek legal advice regarding whether these transactions are swaps or security-based swaps. The interpretation regarding commercial loans made by the Federal Home Loan Banks and Farm Credit Institutions also reduces costs by not subjecting these transactions to additional Dodd-Frank Act regulation. To the extent a customary consumer or commercial transaction is not included in the interpretation, consumers and market participants may incur costs in seeking an interpretation from the Commissions regarding the status of their transactions or an opinion of counsel. However, the CFTC has emphasized that the lists are not exclusive, and has provided the factors it will consider for determining whether other consumer and commercial transactions that are not specifically listed in the interpretation should be considered swaps or security-based swaps, which should assist consumers and market participants in deciding whether to seek an interpretation and thus mitigate these costs.

#### (b) Benefits

The foregoing interpretation provides increased legal certainty benefits for market participants and should ensure that customary consumer and commercial transactions, which have never been considered swaps or security-based swaps, will not be subject to Dodd-Frank Act regulation, and may facilitate consumer and

commercial activity. As discussed above, the interpretation regarding the factors that the Commissions will consider in determining whether transactions that are not listed in the interpretation are swaps or security-based swaps should assist market participants in determining whether to seek an interpretation regarding such transactions. Therefore, this interpretation helps to mitigate costs of legal uncertainty.

### (c) Comments and Consideration of Alternatives

Several commenters believed that the proposed interpretive guidance regarding consumer/commercial transactions does not provide sufficient legal certainty and request that the Commissions codify such guidance in regulations in order to provide greater legal certainty, which may mitigate costs.[1166] The Commissions decline to codify the interpretation into rule text. The interpretation is intended to provide guidance to assist consumers and commercial and non-profit entities in evaluating whether certain arrangements that they enter into will be regulated as swaps or security-based swaps. The interpretation is intended to allow the flexibility necessary, including the consideration of the applicable facts and circumstances by the Commissions, in evaluating consumer and commercial arrangements to ascertain whether they may be swaps or security-based swaps. The representative characteristics and factors taken together are indicators that a consumer or commercial arrangement is not a swap or security-based swap, and the Commissions have provided specific examples demonstrating how these characteristics and factors apply to some common types of consumer and commercial arrangements. However, as the interpretation is not intended to be a bright-line test for determining whether a particular consumer or commercial arrangement is a swap or security-based swap, if the particular arrangement does not meet all of the identified characteristics and factors, the arrangement will be evaluated based on its particular facts and circumstances. Also, the courts may rely on the interpretation and as such, the CFTC does not believe that the adoption of rule text as opposed to an interpretation will mitigate costs associated with perceived legal uncertainty.[1167]

A commenter [1168] asserted that Federal courts will have to hear more disputes, because proposed CFTC jurisdiction would pre-empt significant aspects of state and Federal law concerning the purchase and sale of goods and services. This rulemaking includes safe-harbors from the definition of a swap for customary consumer and commercial transactions. The Commissions have expanded the list of consumer transactions that are excluded from the swap definition. While it may be possible that Federal courts will nevertheless hear more disputes, that would be a result of the statutory swap definition and not from the interpretation being adopted by the Commissions (which should reduce the number of such disputes).

Another commenter [1169] agreed with the general factors proposed for identifying agreements, contracts, or transactions that are not swaps, but requested additional clarity with respect to particular transactions. Specifically, the commenter requested that commercial loans and financing facilities with embedded interest rate options should not be considered swaps. To clarify, interest rate options are swaps. As discussed in section II.B.3. above, plain vanilla interest rate options embedded in a loan, such as rate locks, rate caps and rate collars, are not swaps. If a product is more complex, it may be appropriate for the CFTC to consider it in response to a specific request for interpretation.

### 7. Residential Exchange Program ("REP")

The REP [1170] was established by Congress "[t]o extend the benefits of low cost Federal System hydro power to residential and small farm electric power consumers throughout the Pacific Northwest Region." [1171] A commenter requests that the CFTC further define the term "swap" to exclude consumer benefits under the Pacific Northwest Electric Power Planning and Conservation Act of 1980 ("Northwest Power Act") [1172] and transactions under the REP [1173] to allow a subsidy to continue to be received by residential and small farm utilities.

The Commissions do not consider the REP transactions described by the commenter to be swaps or security-based swaps. Consequently, this rulemaking clarifies that Dodd-Frank regulatory costs will not be imposed on REPs and allows the subsidy to continue to be provided to residential and small farm utilities.

### 8. Costs and Benefits of Rule Regarding Foreign Exchange Products and Forward Rate Agreements

CFTC rule 1.3(xxx)(2) under the CEA explicitly defines the term "swap" to include an agreement, contract, or transaction that is a cross-currency swap, currency option, foreign currency option, foreign exchange option, foreign exchange rate option, foreign exchange forward, foreign exchange swap, forward rate agreement, and non-deliverable forward involving foreign exchange, unless such agreement, contract, or transaction is otherwise excluded by section 1a(47)(B) of the CEA. Rule 1.3(xxx)(3) provides that: (i) A foreign exchange forward or a foreign exchange swap shall not be considered a swap if the Secretary of the Treasury makes the determination described in CEA section 1a(47)(E)(i); and (ii) notwithstanding any such determination, certain provisions of the CEA will apply to such a foreign exchange forward or foreign exchange swap (specifically, the reporting requirements in section 4r of the CEA [1174] and regulations thereunder and, in the case of a swap dealer or major swap participant that is a party to a foreign exchange swap or foreign exchange forward, the business conduct standards in section 4s of the CEA [1175] and regulations thereunder). Rule 1.3(xxx)(3) further clarifies that a currency swap, cross-currency swap, currency option, foreign currency option, foreign exchange option, foreign exchange rate option, or non-deliverable forward involving foreign exchange is not a foreign exchange forward or foreign exchange swap subject to a determination by the Secretary of the Treasury as described in the preamble.

The Commissions are also clarifying that a bona fide foreign exchange spot transaction, *i.e.,* a foreign exchange transaction that is settled on the customary timeline [1176] of the relevant

---

[1166] *See* ETA Letter; ICEA Letter; and Just Energy Letter.

[1167] The additional research costs associated with an interpretation as opposed to codification in the Code of Federal Regulations will be small, because the CFTC has placed this interpretation, and all other products interpretations, in this adopting release for the convenience of practitioners.

[1168] *See* IECA Letter.

[1169] *See* FCC Letter.

[1170] The BPA refers to the implementation of Section 5(c) of the Northwest Power Act, 16 U.S.C. 839c(c), as the "Residential Exchange Program."

[1171] *Id.* at 3.

[1172] 16 U.S.C. Chapter 12H.

[1173] *See* Bonneville Letter.

[1174] 7 U.S.C. 6r.

[1175] 7 U.S.C. 6s.

[1176] As discussed in section II.C.2.(c) above, in general, a foreign exchange transaction will be considered a bona fide spot transaction if it settles via an actual delivery of the relevant currencies within two business days. However a foreign exchange transaction with a longer settlement
Continued

spot market, is not within the definition of the term "swap." In addition, the interpretation clarifies that retail foreign currency options described in CEA Section 2(c)(2)(B) are not swaps. This clarification allows market participants to engage in these transactions with non-ECP customers who would otherwise have to engage in on-exchange transactions.

(a) Costs

In complying with rule 1.3(xxx)(2), a market participant will need to ascertain whether an agreement, contract, or transaction is a swap under the definition. This analysis will have to be performed upon entering into the agreement, contract, or transaction. However, any costs associated with this analysis are expected to be less than the costs of doing the same analysis absent the rule, particularly given potential confusion in the event of a determination by the Secretary of the Treasury that foreign exchange forwards and/or foreign exchange swaps not be considered swaps. To the extent that rule 1.3(xxx)(2) improperly includes certain types of agreements, contracts, and transactions in the swap definition, and therefore the imposition of additional requirements and obligations, these requirements and obligations could lead to costs for market participants entering into such agreements, contracts, or transactions. However, the CFTC has carefully considered each of the agreements, contracts and transactions described above that it is further defining as swaps under rule 1.3(xxx)(2) and believe that they are appropriately classified as such, subject to the statutory exclusions.

(b) Benefits

Because the statutory definition of the term "swap" includes a process by which the Secretary of the Treasury may determine that certain agreements, contracts, and transactions that meet the statutory definition of a "foreign exchange forward" or "foreign exchange swap," respectively,[1177] shall not be considered swaps, the CFTC is concerned that application of the definition, without further clarification, may cause uncertainty about whether, if

the Secretary of the Treasury makes such a determination, certain agreements, contracts, or transactions would be swaps. Rule 1.3(xxx)(3) increases legal certainty that a currency swap, cross-currency swap, currency option, foreign currency option, foreign exchange option, foreign exchange rate option, or non-deliverable forward involving foreign exchange, is a swap (unless it is otherwise excluded by the statutory definition of the term "swap"). The rule also increases legal certainty that reporting requirements, and business conduct requirements for swap dealers and major swap participants, are applicable to foreign exchange forwards and foreign exchange swaps even if the Secretary of the Treasury determines that they should not be considered swaps, and is consistent with the statute. The CFTC also is concerned that confusion could be generated by the "forward" label of non-deliverable forwards involving foreign exchange, and forward rate agreements. Rule 1.3(xxx)(2) increases legal certainty that these types of agreements, contracts, and transactions are swaps.

Providing such a rule to market participants to determine whether certain types of agreements, contracts, or transactions are swaps alleviates additional costs to persons of inquiring with the Commissions, or obtaining an opinion of counsel, about whether such agreements, contracts, or transactions are swaps. In addition, such a rule regarding the requirements that apply to foreign exchange forwards and foreign exchange swaps that are subject to a determination by the Secretary of the Treasury similarly alleviates additional costs to persons of inquiring with the Commissions, or obtaining an opinion of counsel, to determine the requirements that are applicable to such foreign exchange forwards and foreign exchange swaps. As with the other rules comprising the Product Definitions, enhanced legal certainty will help market participants to engage in sound risk management practices, which will benefit both market participants and the public.

The interpretation concerning bona fide foreign exchange spot transactions should result in the appropriate classification of such transactions as not subject to Dodd-Frank Act regulation. The interpretation regarding retail foreign currency options subject to CEA Section 2(c)(2)(B) as not swaps provides clarity and reduces costs for market participants, who could not offer the product to non-ECP customers off-exchange in accordance with the provisions of CEA Section 2(c)(2)(B).

In addition, including certain FX transactions, forward rate agreements and certain other transactions in the swap definition protects the public by explicitly subjecting these transactions to Dodd-Frank regulation.

(c) Comments and Consideration of Alternatives

The CFTC requested comment as to the costs and benefits of proposed rules 1.3(xxx)(2) and (3). As discussed in the preamble, some commenters [1178] argued that non-deliverable foreign exchange forward transactions should be regulated as foreign exchange forwards, because regulating them as swaps would increase the cost of hedging foreign currency exposures in emerging markets.

Non-deliverable forward transactions do not satisfy the statutory definition of foreign exchange forwards, as explained in section II.C.2.(b)(ii), *supra*. They do satisfy the swap definition, however. Accordingly, the CFTC lacks discretion not to define them as swaps.

9. Costs and Benefits of Rule Regarding Title VII Instruments on Futures on Foreign Sovereign Debt Under Exchange Act Rule 3a12–8

Rule 1.3(bbbb) provides that a Title VII instrument that is based on or references a qualifying foreign futures contract on the debt securities of one or more of the 21 enumerated foreign governments is a swap and not a security-based swap if the Title VII instrument satisfies the following conditions:

• The futures contract on which the Title VII instrument is based or that is referenced must be a qualifying foreign futures contract (as defined in rule 3a12–8) on the debt securities of any one or more of the 21 enumerated foreign governments that satisfies the conditions of rule 3a12–8;

• The Title VII instrument is traded on or through a board of trade (as defined in section 1a(6) of the CEA);

• The debt securities on which the qualifying foreign futures contract is based or referenced and any security used to determine the cash settlement amount pursuant to the fourth condition below are not registered under the Securities Act or the subject of any American depositary receipt registered under the Securities Act;

• The Title VII instrument may only be cash settled; and

• The Title VII instrument is not entered into by the issuer of the securities upon which the qualifying

---

[1177] CEA section 1a(24), 7 U.S.C. 1a(24)(definition of a "foreign exchange forward"); CEA section 1a(25), 7 U.S.C. 1a(25)(definition of a "foreign exchange swap").

*period concluding with the actual delivery of the relevant currencies may be considered a bona fide spot transaction depending on the customary timeline of the relevant market. In particular, a foreign exchange transaction that is entered into solely to effect the purchase or sale of a foreign security is a bona fide spot transaction where certain conditions are met.*

[1178] *See* CEIBA Letter; Covington Letter; ISDA Letter; and MFA Letter.

foreign futures contract is based or referenced (including any security used to determine the cash payment due on settlement of such Title VII instrument), an affiliate (as defined in the Securities Act and the rules and regulations thereunder) [1179] of the issuer, or an underwriter with respect to such securities.

Only those Title VII instruments that are based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments and that satisfy these five conditions will be swaps. The final rules are intended to provide consistent treatment (other than with respect to method of settlement) of qualifying foreign futures contracts and Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments.[1180] The Commissions understand that many of the qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments trade with substantial volume through foreign trading venues under the conditions set forth in rule 3a12–8 [1181] and permitting swaps on such futures contracts subject to similar conditions would not raise concerns that such swaps could be used to circumvent the conditions of rule 3a12–8 and the Federal securities laws concerns that such conditions are intended to protect.[1182] Further, providing consistent treatment for qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments and Title VII instruments based on futures contracts on the debt securities of the 21 enumerated foreign governments will allow trading of these instruments through DCMs on which such futures are listed. There may also be cross-margining benefits when different contracts are margined at the same derivatives clearing organization, such as may be the case if a swap on a futures contract and a corresponding futures contract trade on the same DCM. This cross-margining would enhance sound risk management practices.

The CFTC believes that the assessment cost associated with determining whether a swap on certain futures contracts on foreign government securities constitute a swap or security-based swap under rule 1.3(bbbb) should be minimal. Currently, qualifying foreign futures contracts on debt securities of the 21 enumerated foreign governments are traded on exchanges or boards of trade. Market participants may look at the exchange or board of trade listing to determine what they are. Therefore, the assessment, in accordance with the rule, would primarily focus on whether such swap itself is traded on or through a board of trade; whether the swap is cash-settled; whether the futures is traded on a board of trade; whether any security used to determine the cash settlement amount are not registered under the Securities Act or the subject of any American depositary receipt registered under the Securities Act; and whether the swap is entered into by the foreign government issuing the debt securities upon which the qualifying futures contract is based or referenced, an affiliate of such foreign government or an underwriter of such foreign government securities. All of these determinations may be readily and quickly ascertained by the parties entering into the agreement, contract, or transaction. Therefore, the assessment costs associated with rule 1.3(bbbb) should be nominal because parties should be able to make assessments in less than an hour.

### 10. Costs and Benefits of Rules and Interpretations Regarding Title VII Instruments Where the Underlying Reference Is a Security Index

Historically, the market for index CDS did not divide along jurisdictional divisions between the CFTC and SEC; [1183] however, the Dodd-Frank Act created a jurisdictional divide between swaps and security-based swaps. Under the jurisdictional division, the CFTC has jurisdiction over Title VII instruments based on non-narrow-based security indexes while the SEC has jurisdiction over Title VII instruments based on narrow-based security indexes. The SEC also has jurisdiction over Title VII instruments based on a single security or loan, and certain events related to an issuer of securities or issuers of securities in a narrow-based security index.

Rule 1.3(yyy)(1) under the CEA provides that, for purposes of the security-based swap definition, the term "narrow-based security index" would have the same meaning as the statutory definition set forth in CEA section 1a(35), and the rules, regulations, and orders issued by the Commissions relating to such definition. As a result, except where the new rules the Commissions are adopting provide for other treatment, market participants generally will be able to use the Commissions' past guidance in determining whether certain Title VII instruments based on a security index are swaps or security-based swaps.

The Commissions are promulgating additional rules and providing interpretations regarding Title VII instruments based on a security index. The interpretations and additional rules set forth new narrow-based security index criteria with respect to indexes composed of securities, loans, or issuers of securities referenced by an index CDS. The interpretations and rules also address the definition of an "index" and the treatment of broad-based security indexes that become narrow-based and narrow-based indexes that become broad-based, including rule provisions regarding tolerance and grace periods for swaps on security indexes that are traded on CFTC-regulated and SEC-regulated trading platforms.

#### (a) Costs

In complying with the rules and interpretations, a market participant will need to ascertain whether a Title VII instrument is a swap or a security-based swap according to the criteria set forth in the definitions of the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" as used in the security-based swap definition. This analysis will have to be performed prior to the execution of, but no later than an offer to enter into, a Title VII instrument, and when the material terms of a Title VII instrument are amended or modified, to ensure compliance with rules 1.3(yyy), 1.3(zzz) or 1.3(aaaa).

However, any such costs are expected to be less than the costs of doing the same analysis absent the rules, which the CFTC believes would be more difficult and lead to greater uncertainty. In particular, rule 1.3(yyy) allows market participants to reduce the costs of determining whether a Title VII instrument based on a security index, is a swap or security-based swap by clarifying that they will be able to use the

---

[1179] *See, e.g.,* rule 405 under the Securities Act, 17 CFR 230.405.

[1180] The Commissions note that the final rules provide consistent treatment of qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments and Title VII instruments based on qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments unless the Title VII instrument is entered into by the issuer of the securities upon which the qualifying foreign futures contract is based or referenced (including any security used to determine the cash payment due on settlement of such Title VII instrument), an affiliate of the issuer, or an underwriter with respect to such securities.

[1181] *See supra* note 716 and accompanying text.

[1182] *See supra* note 712 and accompanying text.

[1183] For example, index CDS and single name CDS have typically been traded on the same trading desk, and customers have typically held their positions in a single account. The CFTC notes that the jurisdictional divide will impact among other things portfolio margining.

Commissions' past guidance regarding narrow-based security index in making that determination. In the context of index CDS, the Commissions' past guidance regarding narrow-based security indexes does not establish criteria on whether index CDS is a swap or a security-based swap. Accordingly, without further explanation, it would not be clear on which side of the CFTC/ SEC jurisdictional divide index CDS would fall. CFTC rules 1.3(zzz) and 1.3(aaaa) allow market participants to reduce the costs of determining whether an index CDS is a swap or a security-based swap by providing a test with objective criteria that is similar to a test with which they already are familiar in the security futures context, yet tailored to index CDS in particular.

Additionally, absent rule 1.3(yyy), which applies the tolerance period rules, if a security index underlying a Title VII instrument traded on a trading platform migrated from being broad-based to being narrow-based, market participants may suffer disruption of their ability to offset or enter into new Title VII instruments, and incur additional costs as a result.

DCMs and SEFs will incur costs in assessing whether an index underlying a Title VII instrument is broad-based, in monitoring the index for migration from broad to narrow-based. There will also be other costs resulting from the migration such as delisting costs. Such migration costs are mitigated by the tolerance period of 45 business days over three calendar months which should reduce the incidence of migration. Similarly, the three-month grace period following an indexes failure of the tolerance period should mitigate delisting and other costs. There will be a range of assessment costs depending on how customized the index underlying an index CDS is.[1184]

In determining whether a Title VII instrument is a swap or a security-based swap, market participants will need to apply the criteria found in CFTC rules 1.3(yyy), 1.3(zzz) and 1.3(aaaa). Market participants may conduct such analysis in-house or employ outside third-party service providers to conduct such analysis. The costs associated with obtaining such outside professional services would vary depending on the relevant facts and circumstances, particularly the composition of the index. The CFTC believes, however, that $20,000 represents a reasonable estimate of the upper end of the range of the

costs of obtaining the services of outside professional in undertaking the analysis.[1185] The CFTC believes that some index CDS based on an established index would not need the assistance of outside counsel, and a determination can be made in less than one hour. If an agreement, contract, or transaction is more complex, the CFTC estimates the analysis will require up to approximately 20 hours of in-house counsel time and 30 hours of outside counsel time.

(b) Benefits

Rules 1.3(zzz) and 1.3(aaaa) clarify the treatment of an index CDS as either a swap or a security-based swap by setting forth objective criteria for meeting the definition of the terms "issuers of securities in a narrow-based security index" and "narrow-based security index," respectively. These objective rules alleviate additional costs to persons trading index CDS of inquiring with the Commissions, or obtaining an opinion of counsel, to make complex determinations regarding whether an index is broad- or narrow-based, and whether an index CDS based on such an underlying index is a swap or security-based swap.

Also, rules 1.3(zzz) and 1.3(aaaa) should reduce the potential for market participants to use an index CDS to evade regulations, because they set objective requirements relating to the concentration of the notional amount allocated to each reference entity or security included in the index, as well as the eligibility conditions for reference entities and securities. Finally, these

rules benefit the public by requiring that the providers of index CDS make publicly available sufficient information regarding the reference entities in an index underlying the index CDS. By requiring that such information be made publicly available, rules 1.3(zzz) and 1.3(aaaa) seek to assure the transparency of the index components that will be beneficial to market participants who trade such instruments and to the public.

Separately, rule 1.3(yyy) addresses exchange-traded swaps based on security indexes where the underlying index migrates from broad-based to narrow-based. The rule includes provisions that many market participants are familiar with from security futures trading. The CFTC believes that by using a familiar regulatory scheme, market participants will be able to more readily understand the rule as compared to a wholly new regulatory scheme. Also, the use of a "tolerance period" for swaps on security indexes that migrate from broad-based to narrow-based also creates greater clarity by establishing a 45-day timeframe (and subsequent grace period) on which market participants may rely. This tolerance period results in cost savings when compared to the alternative scenario where no tolerance period is provided and a migration of an index from broad-based to narrow-based would result in potential impediments to the ability of market participants to offset their swap positions.

Finally, the Commissions are stating that the determination of whether a Title VII instrument is a swap, a security-based swap, or both (*i.e.,* a mixed swap), is made prior to the execution of, but no later than an offer to enter into, the Title VII instrument. If the security index underlying a Title VII instrument migrates from being broad-based to being narrow-based, or vice versa, during the life of a Title VII instrument, the characterization of that Title VII instrument would not change from its initial characterization regardless of whether the Title VII instrument was entered into bilaterally or was executed through a trade on or subject to the rules of a DCM, SEF, FBOT, security-based SEF, or NSE. Absent this interpretation, market participants potentially would need to expend additional resources to continually monitor their swaps to see if the indexes on which they are based have migrated from broad-based to narrow-based. Since the rule provides that the initial determination prevails regardless of whether the underlying index migrates from broad-based to narrow-based, market participants do

---

[1184] Additionally, the number of components in an index may impact the assessment costs based on having to determine whether the indexes components satisfy the various tests within the rule.

[1185] The average cost incurred by market participants in connection with assessing whether an agreement, contract, or transaction is a swap or security-based swap is based upon the estimated amount of time that staff believes will be required for both in-house counsel and outside counsel to apply the definition. The staff estimates that costs associated with determining whether an agreement, contract, or transaction is a swap or security-based swap will range up to $20,000 after rounding to two significant digits. Staff estimates that some index CDS will be standard and an internal attorney, without the assistance of outside counsel will be able to make a determination in less than one hour. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by CFTC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead), staff estimates that the average national hourly rate for an internal attorney is $378. If an agreement, contract, or transaction is more complex, the CFTC estimates the analysis will require approximately 20 hours of in-house counsel time and 30 hours of outside counsel time. The CFTC estimates the costs for outside legal services to be $400 per hour. Accordingly, on the high end of the range the CFTC estimates the cost to be $19,560 ($7,560 (based on 20 hours of in-house counsel time × $378) + $12,000 (based on 30 hours of outside counsel x $400) which is then rounded to two significant digits to $20,000.

not need to expend these monitoring costs.

(c) Comments and Consideration of Alternatives

A commenter asserted that the regulatory complexity for index CDS is not worth the high compliance costs.[1186] The statute provides that the CFTC has jurisdiction over swaps on broad-based security indices, and the SEC has jurisdiction over swaps on narrow-based security indices, single securities or loans, and certain events related to the issuers of securities. The Commissions need to establish criteria for index CDS, because their past guidance regarding narrow-based security indices does not address them. Without further explanation, it would not be clear on which side of the CFTC/SEC jurisdictional division certain products would fall. The number and concentration limits are derived from criteria that Congress has imposed in the security futures context. The public information availability test does not require that index constituents satisfy all of its requirements; rather, the constituents may satisfy any one of them for the index to be broad-based, and there is a de minimis level for noncompliance.

Another commenter[1187] stated that the proposed interpretation needs to be clearer on loan-based swap transactions and that it is costly to determine whether a particular set of loans or borrowers meets the Commissions' public information availability requirement. The Commissions are clarifying that a TRS on two or more loans is not subject to the broad-based/narrow-based jurisdictional divide, but is a swap under the CFTC's jurisdiction. With respect to loan index CDS, the Commissions believe that the index CDS rules, including the public information availability requirement, should apply to indexes of loans underlying index CDS. However, the Commissions are amending the proposed rules to include loans within the categories of instruments to be aggregated for the total principal amount of debt outstanding threshold of the public information availability requirement, and will aggregate outstanding debt of affiliates for purposes of the test, which the CFTC believes should address the commenter's concerns.

A commenter[1188] pointed out that there may be costs to relist index-based CDS when the index stops being, or becomes, broad-based. Another commenter[1189] believed that the public information availability test will cause indices to switch between narrow-based and broad-based classification, which could result in unnecessary cost, confusion, and market disruption.

The statutory framework requires delisting and relisting. These costs are mitigated by the tolerance period for migration, which may help to prevent frequent migration of indices from broad-based to narrow-based or vice versa. Moreover, it is the case for both on and off-exchange Title VII instruments that the Commissions are stating that the determination of whether a Title VII instrument on a security index is a swap or security-based swap is made prior to execution, but no later than the offer to enter into the instrument, and remains the same throughout the life of the instrument. Accordingly, even if the public information availability test would cause indexes underlying index CDS to migrate as suggested by a commenter, that will not affect the classification of outstanding index CDS entered into prior to such migration. However, if an amendment or change is made to such outstanding index CDS that would cause it to be a new purchase or sale of such index CDS, that could affect the classification of such outstanding index CDS.

A commenter asserted that extending the "grace period" from three months to six months would ease any disruption or dislocation associated with the delisting process with respect to an index that has migrated from broad to narrow, or narrow to broad, and that has failed the tolerance period.[1190] The commenter further suggested that where an index CDS migrates, for entities operating both a SEF and a security-based SEF, such entities should be permitted to move the index from one platform to the other simply by providing a notice to the SEC and CFTC.

The Commissions are adopting the proposed rules without modification. As discussed in Section III.G.5(b) above, the Commissions note that the three-month grace period applicable to security futures was mandated by Congress in that context,[1191] and the commenter has provided no data or evidence for its request that the Commissions diverge from that grace period and provide for a longer grace period with respect to swaps and security-based swaps. The Commissions

believe that the three-month grace period is similarly appropriate to apply in the context of an index that has migrated to provide sufficient time to execute off-setting positions. With respect to the commenter's other suggestion that entities operating both a SEF and a security-based SEF should be able to move the index from one platform to another where an index CDS migrates simply by filing a notice with the SEC and CFTC, the Commissions do not believe that this proposal is within the scope of this rulemaking.

Many commenters offered alternatives to the various tests in proposed rules 1.3(zzz) and 1.3(aaaa).[1192] As discussed more fully above in Section III.G.3.(b), the Commissions have incorporated many of the suggested alternatives into the final rules and interpretations and rejected, after careful consideration, other suggested alternatives. For example, three commenters requested that the Commissions revise the affiliation definition that applies when calculating the number and concentration criteria to require a majority control affiliation threshold, rather than the 20 percent threshold in the proposed rules.[1193] As discussed in section III.G.3.(b) above, the Commissions are modifying the affiliation definition that applies when calculating the number and concentration criteria in response to commenters to use an affiliation test based on majority ownership. Based on commenters' letters, the Commissions understand that the current standard CDS documentation and the current approach used by certain index providers for index CDS with respect to the inclusion of affiliated entities in the same index use majority ownership rather than 20 percent ownership to determine affiliation. The Commissions are persuaded by commenters that in the case of index CDS only it is more appropriate to use majority ownership because majority-owned entities are more likely to have their economic interests aligned and be viewed by the market as part of a group. The Commissions believe that revising the affiliation definition in this manner for purposes of calculating the number and concentration criteria responds to commenters' concerns that the percentage control threshold may inadvertently include entities that are not viewed as part of a group. Thus, as revised, the affiliation definition will include only those reference entities or issuers included in an index that satisfy

---

[1186] See ISDA Letter.

[1187] See LSTA Letter.

[1188] See MarketAxess Letter.

[1189] See Markit Letter.

[1190] See MarketAxess Letter.

[1191] See July 2006 Debt Index Rules. The Commissions are not aware of any disruptions caused by the three-month grace period in the context of security futures.

[1192] See section III.G.3.(b).

[1193] See ISDA Letter; Markit Letter; and SIFMA Letter.

the more than 50 percent (i.e., majority ownership) control threshold.

Due to the high compliance costs resulting from the public information availability test in particular, a commenter [1194] argued that the Commissions should abandon that test. The final rules retain the public information availability test, which does not present significant compliance costs because it does not require that constituents satisfy all of the requirements and permits a de minimis level of noncompliance.

One commenter offered an alternative to the public information availability test based on the volume of trading.[1195] After careful consideration and as described more fully above in section II.G.3.(b), above, the Commissions are not adopting a volume based test either as a replacement or alternative for the public information availability test. A volume based test would not be readily ascertainable with respect to certain underlying components which are not exchange traded or do not satisfy listing standards. The public information availability test allows for more flexibility with respect to the components included in indexes underlying index CDS than a volume-based test. Individual components in an index CDS may not satisfy a volume-based test but could otherwise satisfy one of the criteria of the public information availability test. The public information availability test is similar to the test in the rules for debt security indexes, which, as noted above, apply in the context of Title VII Instruments. The public information availability test, accordingly, provides a consistent set of rules under which index compilers and market participants can analyze the characterization of index CDS.

In the public information availability test, one commenter proposed moving the outstanding debt threshold from $1 billion to $100 million.[1196] As stated above, the CFTC believes that the $1 billion debt threshold, which is the same amount as the outstanding debt threshold in the rules for debt security indexes, is set at the appropriate level to achieve the objective that such entities are likely to have public information available about them.[1197] However, the adopted rules expand on the types of debt that are counted

toward the $1 billion debt threshold to include any indebtedness, including loans, so long as such indebtedness in not a revolving credit facility.

In response to a request for comment by the Commissions, two commenters believed that the presence of a third-party index provider would assure that sufficient information was available regarding the index CDS itself, but neither commenter provided an analysis to explain how or whether a third-party index provider would be able to provide information about the underlying securities or issuers of securities in the index.[1198] Accordingly, the Commissions are not adopting this alternative.

A commenter [1199] argued that legal uncertainty would present a burden to market participants absent the Commissions clarifying the status of swaps on shares of exchange traded funds that reference broad-based security indices. However, market participants can request a clarification through the interpretation process established herein by the Commissions.

## II. Costs and Benefits of Processes To Determine Whether a Title VII Instrument is a Swap, Security-Based Swap, or Mixed Swap, and To Determine Regulatory Treatment for Mixed Swaps

### (a) Costs

Rule 1.8 under the CEA allows persons to submit a request for a joint interpretation from the Commissions regarding whether an agreement, contract or transaction (or a class of agreements, contracts, or transactions) is a swap, security-based swap, or mixed swap. The CFTC estimates the cost of submitting a request for a joint interpretation pursuant to rule 1.8 would be a cost of about $7,700 for internal company or individual time and associated costs of $12,000 for the services of outside professionals.[1200]

Once such a joint interpretation is made, however, other market participants that seek to transact in the same agreement, contract, or transaction (or class thereof) would have regulatory clarity about whether it is a swap, security-based swap, or mixed swap, so the CFTC expects the aggregate costs of submitting joint interpretations to decrease over time as joint interpretations are issued and the number of new requests decrease as a result.

Separately, CFTC rule 1.9 under the CEA allows persons to submit a request for a joint order from the Commissions regarding an alternative regulatory treatment for particular mixed swaps. This process applies except with respect to bilateral, uncleared mixed swaps where one of the parties to the mixed swap is dually registered with the CFTC as a swap dealer or major swap participant and with the SEC as a security-based swap dealer or major security-based swap participant. With respect to bilateral uncleared mixed swaps where one of the parties is a dual registrant, the rule provides that such mixed swaps would be subject to the regulatory scheme set forth in rule 1.9 in order to provide clarity as to the regulatory treatment of such mixed swaps.

The CFTC estimates that the cost of submitting a request for a joint order seeking an alternative regulatory treatment for a particular mixed swap would be approximately $31,000.[1201] Absent such a process, though, market participants that desire or intend to enter into such a mixed swap (or class thereof) would be required pursuant to

---

[1194] See SIFMA Letter.

[1195] See Markit Letter.

[1196] Id.

[1197] See supra part III.G.3(b)(iii); See Securities Offering Reform, Release No. 33–8591 (Jul. 19, 2005), 70 FR 44722 (Aug. 3, 2005) (discussing economic analysis involved in determining the $1 billion threshold for non-convertible securities in the context of well-known seasoned issuers).

[1198] See ISDA Letter and SIFMA Letter.

[1199] See Anon. Letter.

[1200] This estimate is based on information indicating that the average costs associated with preparing and submitting a no-action request to the SEC staff in connection with the identification of whether certain products are securities, which the CFTC believes is a process similar to the process under rule 1.8. The staff estimates that costs associated with such a request will cost approximately $20,000. The CFTC estimates the analysis will require approximately 20 hours of in-house counsel time and 30 hours of outside counsel time. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by CFTC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead), staff estimates that the average national hourly rate for an internal attorney is $378. The CFTC estimates the costs for outside legal

services to be $400 per hour. Accordingly, the CFTC estimates the cost to be $20,000 ($7,560 (based on 20 hours of in-house counsel time × $378) + $12,000 (based on 30 hours of outside counsel × $400) rounded to two significant digits to $20,000 to submit a joint request for interpretation.

[1201] This estimate is based on information indicating that the average costs associated with preparing and submitting a no-action request to the SEC staff in connection with the identification of whether certain products are securities, which the CFTC believes is a process similar to the process under rule 3a68–4(c). The staff estimates that costs associated with such a request will cost approximately $31,000. The CFTC estimates the analysis will require approximately 30 hours of in-house counsel time and 50 hours of outside counsel time. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by CFTC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead), staff estimates that the average national hourly rate for an internal attorney is $378. The CFTC estimates the costs for outside legal services to be $400 per hour. Accordingly, the CFTC estimates the cost to be $31,000 ($11,340 (based on 30 hours of in-house counsel time × $378) + $20,000 (based on 50 hours of outside counsel × $400) rounded to two significant digits to submit a joint request for interpretation.

Title VII of the Dodd-Frank Act to comply with all applicable requirements applicable to both swaps and security-based swaps. The CFTC believes that the cost of such dual regulation would likely be at least as great, if not greater, than the costs of the process set forth in rule 1.9 to request an alternative regulatory treatment for such mixed swap. The rule regarding bilateral uncleared mixed swaps where at least one party is a dual registrant does not entail any additional costs, and may reduce costs for dual registrants that enter into such mixed swaps by eliminating potentially duplicative or inconsistent regulation.

(b) Benefits

The CFTC believes that the rules that enable market participants to submit requests for joint interpretations regarding the nature of various agreements, contracts, or transactions, and requests for joint orders regarding the regulatory treatment of mixed swaps will help to create a more level playing field (since the joint interpretations and joint orders will be available to all market participants) regarding which agreements, contracts, or transactions constitute swaps, security-based swaps, or mixed swaps, and the regulatory treatment applicable to particular mixed swaps. The joint interpretations and joint orders will be available to all market participants. The availability of such joint interpretations and joint orders regarding the scope of the definitions and the regulatory treatment of mixed swaps will reduce transaction costs and thereby promote the use of Title VII instruments for risk management and other purposes.

The product interpretation process established by the Commissions has a 120-day deadline. This deadline will facilitate new products coming to market relatively quickly. Further, the process holds the Commissions accountable because they will have to state why they are not providing an interpretation when they decline to do so.

(c) Comments and Consideration of Alternatives

A commenter [1202] recommended that the Commissions require that market participants disaggregate mixed swaps and enter into separate simultaneous transactions so that they cannot employ mixed swaps to obscure the underlying substance of transactions.[1203] The Commissions are not adopting any rules or interpretations to require

disaggregation of mixed swaps into their separate components, as the Dodd-Frank Act specifically contemplated that there would be mixed swaps comprised of both swaps and security-based swaps. Moreover, the CFTC believes that requiring market participants to disaggregate their agreements, contracts, or transactions into swaps and security-based swaps may limit the freedom of contract or discourage innovation of financial products and potentially increase transaction costs for swap market participants.

12. Costs and Benefits of SBSA Books and Records, and Data, Requirements

CFTC rule 1.7 under the CEA would clarify that there would not be books and records or data requirements regarding SBSAs other than those that would exist for swaps. The rule alleviates any additional books and records or information costs to persons who are required to keep and maintain books and records regarding, or collect and maintain data regarding, SBSAs because the rule does not require such persons to keep or maintain any books and records, or collect and maintain any data, regarding SBSAs that differs from the books, records, and data required regarding swaps.

Specifically, rule 1.7 would require persons registered as SDRs to: i) keep and maintain books and records regarding SBSAs only to the extent that SDRs are required to keep and maintain books and records regarding swaps; and ii) collect and maintain data regarding SBSAs only to the extent that SDRs are required to collect and maintain data regarding swaps. In addition, rule 1.7 would require persons registered as swap dealers or major swap participants to keep and maintain books and records, including daily trading records, regarding SBSAs only to the extent that those persons would be required to keep and maintain books and records regarding swaps.

Because rule 1.7 imposes no requirements with respect to SBSAs other than those that exist for swaps, rule 1.7 would impose no costs other than those that are required with respect to swaps in the absence of rule 1.7. Rule 1.7 provides clarity by establishing uniform requirements regarding books and records, and data collection, requirements for swaps and for SBSAs. No comments were received with respect to Rule 1.7.

13. Costs and Benefits of the Anti-Evasion Rules and Interpretation

The CFTC is exercising the anti-evasion rulemaking authority granted to it by the Dodd-Frank Act. Generally,

CFTC rule 1.3(xxx)(6) under the CEA defines as a swap any agreement, contract, or transaction that is willfully structured to evade the provisions of Title VII governing the regulation of swaps. Further, CFTC rule 1.6 under the CEA would prohibit activities conducted outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade any provision of the CEA as enacted by Title VII or the rules and regulations promulgated thereunder.

As opposed to providing a bright-line test, rule 1.3(xxx)(6) would apply to agreements, contracts, and transactions that are willfully structured to evade and rule 1.6 would apply to entering into agreements, contracts, or transactions to evade (or as an attempt to evade) and structuring entities to evade (or as an attempt to evade) subtitle A of Title VII governing the regulation of swaps. Although this test does not provide a bright line, it helps ensure that would-be evaders cannot willfully structure their transactions or entities for the purpose of evading the requirements of subtitle A of Title VII. The CFTC also is explaining some circumstances that may constitute an evasion of the requirements of subtitle A of Title VII, while at the same time preserving the CFTC's ability to determine, on a case-by-case basis, with consideration given to all the facts and circumstances, that other types of transactions or actions constitute an evasion of the requirements of the statute or the regulations promulgated thereunder.

(a) Costs

Market participants may incur costs when deciding whether a particular transaction or entity could be construed as being willfully structured to evade subtitle A of Title VII of the Dodd-Frank Act; however, the rules and related interpretations explain what constitutes evasive conduct, which should serve to mitigate such costs.

(b) Benefits

Absent the proposed anti-evasion rules and related interpretations, price discovery might be impaired because markets would not be informed about those transactions, since through evasion such transactions would not comply with Dodd-Frank Act regulatory requirements. Additionally, certain risks could increase in a manner that the CFTC would not be able to measure accurately. The anti-evasion rules and related interpretations will bring the appropriate scope of transactions and

---

[1202] *See* Better Markets Letter.
[1203] *Id.*

entities within the regulatory framework established by the Dodd-Frank Act, which will better allow the CFTC to assure transparency and protect the U.S. financial system from certain risks that could go undetected through evasive conduct.

### (c) Comments and Consideration of Alternatives

A commenter [1204] asserted that a market participant should be able to enter into a transaction or structure an instrument or entity to avoid higher regulatory burdens and attendant costs as long as the transaction or entity has an overriding business purpose. Another commenter [1205] noted that the CFTC recognized in the Proposing Release that choosing to do a security-based swap over a swap to lessen a regulatory burden does not constitute evasion in itself, but expressed the view that this should not be limited to a choice between structuring a transaction as a swap and security. In this commenter's view, parties must be able to legitimately consider all relevant factors, including the cost and burden of regulation, in making their structuring choices. Another commenter [1206] requested that the CFTC make clear that movements away from swaps towards physical trades that reduce regulatory burdens will not be considered evasion under the final rule. A different commenter [1207] argued that the anti-evasion proposal is overly broad and unnecessarily limits the ability of market participants to choose between legitimate structuring alternatives. Finally, another commenter [1208] believes that the proposed rules will create an "impossible burden" on the innocent (non-evading) party.

Activity conducted solely for a legitimate business purpose, absent other indicia of evasion, does not constitute evasion as described in the CFTC's interpretation. The CFTC has clarified that consideration of regulatory burdens, including evidence of regulatory avoidance, is not dispositive of whether there has been evasion or not, but should be considered along with all other relevant facts and circumstances. For example, activities structured as securities instead of swaps and transactions that meet the forward exclusion are not evasion per se. The CFTC has clarified that it will impose appropriate sanctions on the willful evader for violation of the CEA and CFTC regulations and not on non-evading parties.

A commenter suggests that an alternative standard for a finding of evasion should be "whether the transaction is lawful or not" under the CEA, CFTC rules and regulations, orders, or other applicable federal, state or other laws.[1209] While the commenter's alternative standard for evasion may impose lower costs on market participants because it is a bright-line test, the CFTC is not adopting it. The commenter's alternative standard would blur the distinction between whether a transaction (or entity) is lawful and whether it is structured in a way to evade Dodd-Frank and the CEA. The anti-evasion rules provided herein are concerned with the latter conduct, not the former.[1210] Thus, the CFTC does not believe it is appropriate to limit the enforcement of its anti-evasion authority to only unlawful transactions.

### CEA Section 15(a) Summary:

#### (1) Protection of Market Participants and the Public

Including certain foreign exchange transactions, forward rate agreements and certain other transactions in the swap definition protects the public by subjecting these transactions to Dodd-Frank regulation. Similarly, the anti-evasion rules protect market participants against evasive conduct that would take away the protection afforded to them under Dodd-Frank regulation.

#### (2) Efficiency, Competitiveness, and the Financial Integrity of Markets

The CFTC believes that the final rules and interpretations can be consistently applied by substantially all market participants to determine which agreements, contracts, or transactions are, and which are not, swaps, security-based swaps, security-based swap agreements, or mixed swaps. This may improve resource allocation efficiency as market participant may not have to incur the cost of petitioning the Commissions or obtaining an opinion of counsel to determine the status of agreements, contracts or transactions as frequently as would be necessary without the rules or interpretations.

Moreover, the Commissions' statement that the determination of whether a Title VII instrument is a swap, a security-based swap, or both (*i.e.*, a mixed swap), is made prior to the execution of, but no later than an offer to enter into, the Title VII instrument, and remains the same throughout the instrument's life (absent amendment of the instrument), improves resource allocation efficiency because, without this interpretation, market participants potentially would need to expend additional resources to continually monitor their swaps to see if the indexes on which they are based have migrated from broad-based to narrow-based. The tolerance and grace periods for index CDS traded on CFTC and SEC-regulated trading platforms should lower the frequency of index migration and attendant costs, also improving resource allocation efficiency.

#### (3) Price Discovery

Not exempting swaps from foreign central banks, foreign sovereigns, international financial institutions, such as multilateral development banks, and similar organizations helps improve transparency and price discovery through disclosure that might otherwise not occur. Market participants will be informed about the prices of these transactions. Furthermore, they will be better informed about the risks that these transactions entail.

The CFTC's interpretation of the term "swap" to include guarantees of swaps that are not security-based swaps or mixed swaps and the separate CFTC release will enable the CFTC and market participants to receive more price-forming data about such swaps, which help improve price discovery for swaps. Without anti-evasion rules, price discovery might be impaired, since market participants would otherwise not be informed about relevant but evasive swap transactions.

#### (4) Sound Risk Management Practices

Properly classifying transactions as swaps or not swaps may lead to sound risk management practices, because the added clarity provided by the rules and interpretations herein will enable market participants to consider whether a particular agreement, contract, or transaction is a swap, prior to entering into such agreement, contract or transaction.

The business of insurance is already subject to established pre-Dodd-Frank Act regulatory regimes. Requirements that may work well for swaps and security-based swaps may not be appropriate for traditional insurance products. To the extent that the final rules distinguish insurance from swaps and security-based swaps, the CFTC believes that the Commissions should be able to tailor rules for specific

---

[1204] *See* CME Letter.
[1205] *See* ISDA Letter.
[1206] *See* COPE Letter.
[1207] *See* SIFMA Letter.
[1208] *See* IECA Letter II.

[1209] *See* WGCEF Letter.
[1210] If a transaction is unlawful, the CFTC (or another authority) may be able to bring an action alleging a violation of the applicable rule, regulation, order or law.

products that are swaps or security-based swaps to achieve Title VII regulatory objectives. In adopting the Insurance Safe Harbor, the CFTC believes that the Commissions seek to achieve those net benefits that may be obtained from not supplanting existing insurance regulation.

Documenting oral book-outs should promote good business practices and aid the CFTC in preventing evasion through abuse of the forward exclusion.

Title VII instruments on qualifying foreign futures contracts on debt securities of one of the 21 enumerated foreign governments is a swap and not

a security-based swap if the Title VII instrument satisfies certain conditions. The classification may provide cross-margining benefits when swap contracts and the futures contract are margined at the same derivatives clearing organization, and thus, may enhance sound risk management practices.

Other Public Interest Considerations

Documenting oral book-outs should promote good business practices and aid the CFTC in preventing evasion through abuse of the forward exclusion.

The product interpretation process established by the Commissions has a

120-day deadline. This deadline will facilitate new products coming to market relatively quickly. Further, the process holds the Commissions accountable, because they will have to state why they are not providing an interpretation when they decline to do so.

The rule for books and records requirements for SBSAs does not impose new recordkeeping requirements on SBSAs, but relies on existing recordkeeping requirements for swaps, which avoids unnecessary regulation.

### Appendix—Rules Effectuated by the Product Definitions

| | | |
|---|---|---|
| Agricultural Swaps | Makes no distinction between agricultural swaps and other swaps. | 76 FR 49291, 49297, Aug. 10, 2011 |
| Commodity Options | Exempts subject to conditions certain options on physical commodities where parties are commercials or ECPs. The option results in physical delivery of the underlying. | 77 FR 25320, 25331, Apr. 27, 2012 |
| CPO/CTA compliance obligations | Rescinds the exemption from CPO registration; rescinds relief from the certification requirement for annual reports provided to operators of certain pools offered only to qualified eligible persons (QEPs; modifies the criteria for claiming relief); and require the annual filing of notices claiming exemptive relief under several sections of the Commission's regulations. Finally, the adopted amendments include new risk disclosure requirements for CPOs and CTAs. | 77 FR 11252, 11275, Feb. 24, 2012 |
| Business Conduct Standards for SDs and MSPs With Counterparties. | Applies to SDs and (except where indicated) MSPs and prohibits certain abusive practices, requires disclosures of material information to counterparties and requires SDs/MSPs to undertake certain due diligence relating to their dealings with counterparties. Certain rules do not apply to transactions initiated on a swap execution facility (SEF) or designated contract market (DCM) when the SD/MSP does not know the identity of the counterparty prior to execution. | 77 FR 9734, 9805, Feb. 17, 2012 |
| SD and MSP Recordkeeping, Reporting, and Duties Rules; FCMs and IBs Conflicts of Interest Rules; and Chief Compliance Officer Rules for SDs, MSPs, and FCMs. | Establishes reporting, recordkeeping, and daily trading records requirements for SDs and MSPs; establishes and governs the duties of SDs and MSPs; establishes conflicts of interest requirements for SDs, MSPs, FCMs, and IBs; establishes the designation, qualifications, and duties of the chief compliance officers (CCOs) of FCMs, SDs, and MSPs and describes the required contents of the annual report detailing a registrant's compliance policies and activities, to be prepared by the chief compliance officer and furnished to the CFTC. | 77 FR 20128, 20166, Apr. 3, 2012 |
| Position Limits for Futures and Swaps | Establishes limits on speculative positions in 28 selected physical commodity futures and swaps. | 76 FR 71626, 71662, Nov. 18, 2011 |
| Real-Time Public Reporting of Swap Transaction Data. | Establishes regulations concerning the real-time public reporting of swap transactions and pricing data. | 77 FR 1182, 1232, Jan. 9, 2012 |
| Swap Data Recordkeeping and Reporting Requirements. | Establishes swap data recordkeeping and reporting requirements for registered entities and counterparties. | 77 FR 2136, 2176, Jan. 13, 2012 |
| Swap Data Repositories: Registration Standards, Duties and Core Principles. | Establishes regulations concerning the registration and regulation of swap data repositories. | 76 FR 54538, 54572, Sept. 1, 2011 |
| Registration of SDs and MSPs | Establishes the process for the registration of SDs and MSPs .. | 77 FR 2613, 2623, Jan. 19, 2012 |

## XI. Administrative Law Matters— Exchange Act Revisions

### A. Economic Analysis

#### 1. Overview

The SEC is sensitive to the costs and benefits of its rules. In adopting the final rules in this release, the SEC has been mindful of the costs and benefits associated with these rules which provide fundamental building blocks for

the Title VII regulatory regime established by Congress. In addition, section 3(f) of the Exchange Act requires the SEC, whenever it engages in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote competition,

efficiency, and capital formation.[1211] Moreover, section 23(a)(2) of the Exchange Act requires the SEC, when adopting rules under the Exchange Act, to consider the impact such rules would have on competition. Section 23(a)(2) also prohibits the SEC from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the

---

[1211] 15 U.S.C. 78c(f).

purposes of the Exchange Act.[1212] The SEC requested comment on all aspects of the costs and benefits of the proposed rules in the Proposing Release,[1213] and any effect these rules may have on competition, efficiency, and capital formation.

These final rules implement the mandate of Title VII that the CFTC and the SEC, in consultation with the Federal Reserve Board, jointly further define the terms "swap," "security-based swap," and "security-based swap agreement." [1214] The rules adopted in this release may be divided into three categories:

First, the Commissions are adopting rules that will assist market participants in determining whether particular agreements, contracts, and transactions fall within or outside the swap and security-based swap definitions (i.e., identifying products subject to Title VII). The final rules provide: (1) An Insurance Safe Harbor for those agreements, contracts, and transactions that the Commissions believe Congress does not intend to be Title VII instruments; [1215] (2) a "grandfather" for those insurance agreements, contracts, or transactions (as opposed to insurance product categories) entered into on or before the effective date of the Product Definitions provided that, when the parties entered into such agreement, contract, or transaction, it was provided in accordance with the Provider Test; [1216] and (3) further definition of the term "swap" to specifically list certain enumerated products and not include certain foreign exchange forwards and foreign exchange swaps.[1217]

Second, the Commissions are adopting rules that will assist market participants in determining whether a particular Title VII instrument is a swap subject to CFTC regulation, a security-based swap subject to SEC regulation, or a mixed swap subject to regulation by the CFTC and the SEC (i.e., mapping the jurisdictional divide between the CFTC and the SEC). Specifically, Title VII instruments that are CDS referencing a security index or a group or index of issuers of securities or obligations of issuers of securities may be swaps subject to CFTC regulation or security-based swaps subject to SEC regulation, depending on whether such Title VII instruments are based on events relating to "issuers of securities in a narrow-based security index" or events relating to securities in a "narrow-based security index".[1218] The final rules further define the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" for purposes of this analysis.[1219] Further, the Commissions are adopting rules that provide tolerance and grace periods for Title VII instruments based on a security index that are traded on certain trading platforms where the security index may temporarily move from being within the "narrow-based security index" definition to being outside (e.g.,. moving from narrow-based to broad-based, or vice versa.) [1220] Additionally, the Commissions are providing clarification that a Title VII instrument based on a qualifying foreign futures contract on the debt securities of one or more of the 21 enumerated foreign governments is a swap and not a security-based swap, if certain conditions are met.[1221]

Third, the Commissions are adopting rules that provide: (1) A regulatory framework for certain mixed swaps and a process for market participants to request that the Commissions issue a joint order determining the appropriate regulatory treatment of certain other mixed swaps [1222] and (2) a process for market participants to request a joint interpretation from the Commissions regarding whether a particular Title VII instrument is a swap, security-based swap, or mixed swap.[1223] The final rules also provide that market participants have no additional books and records requirements for SBSAs other than those for swaps.[1224]

In considering the economic consequences of the final rules, the SEC acknowledges the regulatory regime that was in place prior to the enactment of Title VII. Prior to the enactment of Title VII, swaps and security-based swaps were by-and-large unregulated. The Commodity Futures Modernization Act of 2000 ("CFMA") created a regulatory regime that prohibited the SEC from regulating security-based swap agreements,[1225] though it provided the

SEC with limited enforcement authority over such instruments with respect to fraud, manipulation, and insider trading.[1226] Title VII created an entirely new regulatory regime to regulate swaps, security-based swap agreements and security-based swaps.

2. Economic Analysis Considerations

The rules adopted in this release implicate different types of potential costs and benefits. First, there are costs,

---

[1212] 15 U.S.C. 78w(a)(2).

[1213] See Proposing Release at 29885.

[1214] See section 712(d)(1) of the Dodd-Frank Act.

[1215] See supra part II.B.1.

[1216] See supra part II.B.1.c).

[1217] See supra part II.C.2.

[1218] See section 3(a)(68)(A)(ii)(III) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(ii)(III).

[1219] See supra part III.G.

[1220] See supra part III.G.5.

[1221] See supra part III.E.

[1222] See supra part IV.

[1223] See supra part VI.

[1224] See supra part V.

[1225] The CFMA added section 206A to the GLBA, 15 U.S.C. 78c note, to define the term "swap agreement" to mean any agreement, contract, or transaction between ECPs, the material terms of which (other than price and quantity) are subject to individual negotiation, that fall within certain categories of transactions. Additionally, the CFMA added section 206B to the GLBA, 15 U.S.C. 78c note, which defined a "security-based swap

agreement" to mean a swap agreement (as defined in section 206A of the GLBA) on which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein. Furthermore, the CFMA added section 206C to the GLBA, 15 U.S.C. 78c note, which defined a "non-security-based swap agreement" to mean any swap agreement (as defined in section 206A of the GLBA) that is not a security-based swap agreement (as defined in section 206B of the GLBA). Title VII amended the definition of the term "swap agreement" (discussed in footnote 1284) and repealed the definition of the terms "security-based swap agreement" and "non-security-based swap agreement." See sections 762(a) and (b) of the Dodd-Frank Act. However, Title VII also added a new definition of the term "security-based swap agreement" in section 3(a)(78) of the Exchange Act, 15 U.S.C. 78c(a)(78), that is generally consistent with the repealed definition, except that the new definition excludes security-based swaps. Accordingly, Title VII provides jurisdiction to the CFTC for security-based swap agreements, such as Title VII Instruments based on broad-based securities indexes, and also retains the SEC's jurisdiction over such instruments in instances of fraud, manipulation, or insider trading.

[1226] The CFMA excluded from the definition of the term "security" the term "security-based swap agreement" as well as the term "non-security-based swap agreement" (as those terms are defined in section 206B and 206C (respectively) of the GLBA, 15 U.S.C. 78c note). See sections 2A(a) and (b)(1) of the Securities Act, 15 U.S.C. 77b–1(a) and (b)(1), and sections 3A(a) and (b)(1) of the Exchange Act, 15 U.S.C. 78c–1(a) and (b)(1). Furthermore, the CFMA explicitly prohibited the SEC from registering, or requiring, recommending, or suggesting the registration under the Securities Act or the Exchange Act of any security-based swap agreement (as defined in section 206B of the GLBA). See section 2A(b)(2) of the Securities Act, 15 U.S.C. 77b–1(b)(2), and section 3A(b)(2) of the Exchange Act, 15 U.S.C. 78c–1(b)(2). The CFMA also made explicit that the SEC is prohibited from either (1) promulgating, interpreting, or enforcing rules or (2) issuing orders of general applicability under the Securities Act or Exchange Act in a manner that imposes or specifies reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading with respect to any security-based swap agreement (as defined in section 206B of the GLBA). However, the CFMA did provide the SEC with limited enforcement authority under section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and the rules promulgated thereunder that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or record-keeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading). Furthermore, the CFMA applies judicial precedents under sections 9, 10(b), 15, 16, 20, and 21A of the Exchange Act, 15 U.S.C. 78i, 78j(b), 78o, 78p, 78t, and 78u–1, as well as section 17(a) of the Securities Act, 15 U.S.C. 77q(a), to security-based swap agreements (as defined in section 206B of the GLBA) to the same extent as they apply to securities.

as well as benefits, arising from subjecting certain agreements, contracts, or transactions to the regulatory regime of Title VII. The SEC refers to these costs and benefits as ''programmatic'' costs and benefits. Additionally, there are costs that parties will incur to assess whether certain agreements, contracts, or transactions are indeed subject to the Title VII regulatory regime, and, if so, costs to assess whether such Title VII instrument is subject to the regulatory regime of the SEC or the CFTC. The SEC refers to these costs as ''assessment'' costs.[1227]

The programmatic costs and benefits and the assessment costs raise distinct analytic issues. First, the SEC recognizes that the Product Definitions, while integral to the regulatory requirements that will be imposed on the swap and security-based swap markets pursuant to Title VII, do not themselves establish the scope or nature of those substantive requirements or their related costs and benefits. The SEC anticipates that the rules implementing the substantive requirements under Title VII will be subject to their own economic analysis, but final rules have not yet been adopted that would subject agreements, contracts, or transactions, or entities that act as intermediaries (such as security-based swap dealers (''SBS dealers'') or major security-based swap participants (''MSBSPs'')) or provide market infrastructures (such as clearing agencies, trade repositories and trade execution facilities), to such substantive requirements. The costs and benefits described below are therefore those that may arise in connection with: (1) Determining whether certain agreements, contracts, or transactions are Title VII instruments (*i.e.*, the assessment costs) and (2) subjecting those agreements, contracts, or transactions that are Title VII instruments, determined based on the statutory definitional lines that the Commissions are further defining, to a complete and fully effective complement of Title VII statutory and regulatory requirements. In addition, the discussion below addresses the costs and benefits arising from security-based swaps being within the definition of security under the Securities Act and the Exchange Act. Once a Title VII Instrument is determined to be a

security-based swap, the security-based swap will be a security subject to the full panoply of the Federal securities laws. Such treatment will give rise to costs and benefits, including those that apply to securities generally. Security-based swaps may be subject to additional costs to the extent that there are overlapping regulatory requirements arising from the Title VII regulatory requirements and those Federal securities laws requirements that apply to securities generally. The SEC has already taken action to address some of such overlapping or inconsistent requirements [1228] and will continue to evaluate other needed actions, if any, to minimize any such overlapping regulatory implications.

Second, in determining the appropriate scope of these rules, the SEC considers the types of agreements, contracts, or transactions that should be regulated as swaps, security-based swaps, or mixed swaps under Title VII in light of the purposes of the Dodd-Frank Act, the overall regulatory framework, the historical treatment of the instruments and other regulatory frameworks, and the data currently available to the SEC. The SEC has sought to further define the terms ''swap,'' ''security-based swap,'' and ''mixed swap'' to address the status of agreements, contracts, and transactions that are appropriate to regulate as swaps, security-based swaps and mixed swaps within the purposes of Title VII and not to include those agreements, contracts, and transactions that historically have not been considered to be swaps or security-based swaps thereby not imposing unnecessary or inappropriate Title VII costs and burdens on parties engaging in agreements, contracts, and transactions. In addition, the SEC recognizes that these rules may have effects on competition, efficiency, and capital formation as a result of certain agreements, contracts, and transactions being determined to fall under or outside the Title VII regulatory regime, or as a result of the jurisdictional divide between the SEC and CFTC as mandated by the statute.

In the sections below, the SEC begins by recognizing that the Title VII regulatory regime has programmatic benefits and costs, as well as assessment

costs. These costs and benefits have informed the decisions and the actions taken that are described throughout the release. Accordingly, the analysis below includes references to the discussions of the decisions and actions taken by the Commissions set forth above in other parts of this release. Finally the SEC discusses the effects of these rules on competition, efficiency, and capital formation.

### 3. Programmatic Benefits and Costs

By enacting Title VII, Congress created a regulatory regime for swaps and security-based swaps that previously did not exist.[1229] Title VII amendments to the Exchange Act impose, among other requirements, the following: (1) Registration and comprehensive oversight of SBS dealers and MSBSPs;[1230] (2) reporting of security-based swaps to a registered security-based swap data repository (''SB SDR''), or to the SEC (if the security-based swap is uncleared and no SB SDR will accept the security-based swap for reporting), and dissemination of the security-based swap market data to the public;[1231] (3) clearing of security-based swaps at a registered clearing agency (or a clearing agency that is exempt from registration) if the SEC makes a determination that such security-based swaps are required to be cleared, unless an exception from the mandatory clearing requirement applies;[1232] and (4) if a security-based

---

[1227] The SEC expects that the benefits resulting from further defining the terms ''swap,'' ''security-based swap,'' and ''mixed swap'' will likely accrue primarily at the programmatic level. To the extent appropriate, given the purposes of Title VII, the Commissions have sought to mitigate the costs persons will incur in connection with determining whether the instrument is a swap, security-based swap, or mixed swap.

[1228] *See Order Pursuant to Sections 15F(b)(6) and 36 of the Securities Exchange Act of 1934 Granting Temporary Exemptions and Other Temporary Relief, Together With Information on Compliance Dates for New Provisions of the Securities Exchange Act of 1934 Applicable to Security-Based Swaps, and Request for Comment,* Release No. 34–64678 (June 15, 2011), 76 FR 36287 (June 22, 2011); *Exchange Act Exemptive Order;* and *SB Swaps Interim Final Rules.*

[1229] *See supra* part XI.A.1.

[1230] *See* section 15F of the Exchange Act, 15 U.S.C. 78o–10.

[1231] *See* section 3a(75) of the Exchange Act, 15 U.S.C. 78c(a)(75) (defining the term ''security-based swap data repository''); section 13(m) of the Exchange Act, 15 U.S.C. 78m(m) (regarding public availability of security-based swap data); section 13(n) of the Exchange Act, 15 U.S.C. 78m(n) (regarding requirements related to SB SDRs); and section 13A of the Exchange Act, 15 U.S.C. 78m–1 (regarding reporting and recordkeeping requirements for certain security-based swaps). *See also Security-Based Swap Data Repository Registration, Duties, and Core Principles,* Release No. 34–63347 (Nov. 19, 2010), 75 FR 77306 (Dec. 10, 2010); corrected at 75 FR 79320 (Dec. 20, 2010) and 76 FR 2287 (Jan. 13, 2011) (''SDR Proposing Release''); and *Regulation SBSR—Reporting and Dissemination of Security-Based Swap Information,* Release No. 34–63346 (Nov. 19, 2010), 75 FR 75208 (Dec. 2, 2010) (''Regulation SBSR Proposing Release''). In each proposing release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1232] *See* section 3C(a)(1) of the Exchange Act, 15 U.S.C. 78c–3(a)(1). *See also Process for Submissions for Review of Security-Based Swaps for Mandatory Clearing and Notice Filing Requirements for Clearing Agencies; Technical Amendments to Rule 19b–4 and Form 19b–4 Applicable to All Self-*

Continued

swap is subject to the clearing requirement, execution of the security-based swap transaction on an exchange, on a security-based swap execution facility ("SB SEF") registered under the Exchange Act,[1233] or on an SB SEF that has been exempted from registration by the SEC under the Exchange Act,[1234] unless no SB SEF or exchange makes such security-based swap available for trading.[1235] In addition, Title VII amends the Securities Act and the Exchange Act to include security-based swaps in the definition of "security" for the purposes of those statutes.[1236] As a result, security-based swaps are subject to the full panoply of the Federal securities laws. Title VII also added specific provisions to the Securities Act and Exchange Act affecting how security-based swaps may be sold. For example, Title VII amended section 5 of the Securities Act to require that a registration statement meeting the requirements of the Securities Act be in effect before there can be an offer to sell, offer to buy, purchase or sale of a security-based swap from or to any person who is not an ECP.[1237] In addition, Title VII added section 6(l) to the Exchange Act to require that any

security-based swap transaction with or for a person that is not an ECP must be effected on a national securities exchange.[1238]

The creation of regulatory regimes for agreements, contracts, or transactions that are defined as a swap or security-based swap will result in an array of programmatic benefits. However, if an agreement, contract or transaction falls within the swap or security-based swap definition, the parties to the agreement, contract, or transaction also may incur a number of upfront and ongoing costs associated with the regulation of Title VII instruments and transactions. These programmatic benefits and costs, discussed in more detail below, relate to Title VII registration; business conduct standards, compliance, operation and governance; clearing, trade execution, and reporting and processing; investor protection provisions of Title VII and the application of the Federal securities laws.[1239]

### (a) Title VII Registration of Entities Involved in Security-Based Swaps

As a result of Title VII imposing a new regulatory regime on security-based swaps, in addition to making such security-based swaps securities under the Securities Act and the Exchange Act, Title VII will require the registration of entirely new types of registrants with the SEC, including SBS

dealers and MSBSPs,[1240] SB SEFs,[1241] SB SDRs,[1242] and clearing agencies registered to clear security-based swaps.[1243] The SEC expects that registrants will incur costs in gathering information, accurately completing forms and filing these forms with the SEC.[1244] Registration will provide the SEC with information regarding registrants which will enable the SEC to oversee the SEC's security-based swap registrants.

### (b) Business Conduct Standards, Compliance, Operation, and Governance

Title VII imposes requirements on registrants that did not exist prior to the adoption of Title VII, including core principles, duties and/or standards that are related to the type of registrant and its function.[1245] For example, Title VII includes core principles for SB SEFs, many of which require SB SEFs to establish and enforce rules specific to the trading of security-based swaps.[1246] Similarly, Title VII assigns duties (in addition to core principles) that are specific to the nature of SB SDRs, e.g. the acceptance and maintenance of data related to security-based swaps.[1247] The

---

*Regulatory Organizations,* 75 FR 82490 (Dec. 30, 2010) ("Clearing Procedures Proposing Release"). In the Clearing Procedures Proposing Release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1233] *See* section 3D of the Exchange Act, 15 U.S.C. 78c–4.

[1234] *See* section 3D(e) of the Exchange Act, 15 U.S.C. 78c–4(e).

[1235] *See* sections 3C(g) and (h) of the Exchange Act, 15 U.S.C. 78c–3(g) and (h). *See also* section 3(a)(77) of the Exchange Act, 15 U.S.C. 78c(77) (defining the term "security-based swap execution facility"). *See also Registration and Regulation of Security-Based Swap Execution Facilities,* Release No. 34–63825 (Feb. 2, 2011), 76 FR 10948 (Feb. 28, 2011) ("SB SEF Proposing Release"). In the SB SEF Proposing Release each proposing release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1236] *See* sections 761(a)(2) and 768(a)(1) of the Dodd-Frank Act (amending sections 3(a)(10) of the Exchange Act, 15 U.S.C. 78c(a)(10), and 2(a)(1) of the Securities Act, 15 U.S.C. 77b(a)(1), respectively). The Dodd-Frank Act also amended the Securities Act to provide that any offer or sale of a security-based swap by or on behalf of the issuer of the securities upon which such security-based swap is based or is referenced, an affiliate of the issuer, or an underwriter, shall constitute a contract for sale of, sale of, offer for sale, or offer to sell such securities. *See* section 768(a) of the Dodd-Frank Act (amending section 2(a)(3) of the Securities Act, 15 U.S.C. 77b(a)(3)).

[1237] 15 U.S.C. 77e.

[1238] *See* section 6(l) of the Exchange Act, 15 U.S.C. 78f(l).

[1239] *See* For example, dealers and major participants will be subject to business conduct requirements of section 15F of the Exchange Act, and thus will be required, among other things, to determine that their counterparty meets certain eligibility standards before entering into security-based swaps with them and to disclose information about material risks and characteristics, material incentives, conflicts of interest, the daily mark, and clearing rights. *See Business Conduct Standards for Security-Based Swaps Dealer and Major Security-Based Swap Participants,* Release No. 34–64766 (June 29, 2011), 76 FR 42396, 42406, 42410 (July 18, 2011) ("Business Conduct Standards Proposing Release"). Also, for example, in connection with registration requirements the SEC expects security-based swap dealers and major security-based swap participants to incur costs in connection with completing and filing forms, providing related certifications, addressing additional requirements in connection with associated persons, as well as certain additional costs. *See Registration of Security-Based Swap Dealers and Major Security-Based Swap Participants,* Release No. 34–65543 (Oct. 12, 2011), 76 FR 65784, 65813–18 (Oct. 24, 2011) ("SB Swap Participant Registration Proposing Release"). In each proposing release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1240] *See* section 15F(b)(5) of the Exchange Act, 15 U.S.C. 78o–10(b)(5).

[1241] *See* section 3D(a) of the Exchange Act, 15 U.S.C. 78c–4.

[1242] *See* section 13(n)(1) of the Exchange Act, 15 U.S.C. 78m(n)(1).

[1243] *See* section 17A(g) of the Exchange Act, 15 U.S.C. 78q–1(g).

[1244] The SEC has proposed rules related to the registration requirements for each of these new registrants. *See* SB Swap Participant Registration Proposing Release; SB SEF Proposing Release; SDR Proposing Release; and *Clearing Agency Standards for Operation and Governance,* Release No. 34–64017 (Mar. 3, 2011), 76 FR 14472 (Mar. 16, 2011) ("Clearing Agency Standards Proposing Release"). In each proposing release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1245] *See* sections 3D(d), 13(n)(5) and (7), and 15F(h) and (j) of the Exchange Act, 15 U.S.C. 78c–4(d), 78m(n)(5) and (7), and 78o–10(h) and (j).

[1246] *See* sections 3D(d)(2), (3), (4), (6), and (8) of the Exchange Act, 15 U.S.C. 78c–4(d)(2), (3), (4), (6), and (8). *See also* SB SEF Proposing Release. In the SB SEF Proposing Release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1247] *See* section 13(n)(5) of the Exchange Act, 15 U.S.C. 78m(n)(5). *See also* SDR Proposing Release. In the SDR Proposing Release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in

provisions of Title VII related to SB SEFs and SB SDRs are designed to provide transparency in the security-based swap market.

Title VII also imposes a number of requirements on registered SBS dealers and MSBSPs, such as external business conduct requirements.[1248] Specifically, section 15F(h)(3)(B) of the Exchange Act establishes certain disclosure requirements for SBS dealers and MSBSPs,[1249] and section 15F(h)(3)(C) of the Act requires that communications by these entities meet certain standards of fairness and balance.[1250] The level of protection becomes higher for special entities [1251] to whom dealers offer security-based swaps.[1252] For example, an SBS dealer that acts as an advisor to a special entity has a duty to act in the best interest of the special entity and is required to make reasonable efforts to obtain such information as is necessary for the SBS dealer to make a reasonable determination that any security-based swap recommended by the SBS dealer is in the best interests of the special entity.[1253] In addition, section 15F(j)(5) of the Exchange Act imposes requirements intended to address potential conflicts of interest that may arise in transactions between a SBS dealer or MSBSP and its counterparty.[1254] Title VII also imposes upon SBS dealers and MSBSPs requirements to implement risk management policies and procedures that are designed to prevent them from taking on excessive risk and to enable them to better deal with market fluctuations that might otherwise endanger their financial health.[1255]

Section 15F(e) of the Exchange Act as added by section 764(a) of the Dodd Frank Act, imposes capital and margin requirements on dealers and major participants,[1256] which are designed to reduce the financial risks of these institutions and contribute to the stability of the security-based swap market in particular and the U.S. financial system more generally.[1257] With respect to a security-based swap submitted for clearing, counterparties will be required to post initial margin and maintenance margin to secure its obligations under the trade.

Section 3E of the Exchange Act, among other things, requires registered brokers, dealers and SBS dealers that collect initial and variation margin from counterparties to cleared security-based swap transactions to maintain that collateral in segregated accounts.[1258] With respect to uncleared swaps, section 3E gives a counterparty to a SBS dealer or MSBSP that collects collateral the right to request segregation of initial margins and maintenance of such initial margins in accordance with rules promulgated by the SEC.[1259] These protections provide market participants who enter into transactions with these entities confidence that their collateral accounts will remain separate from the SBS dealer or MSBSP's assets in the event of bankruptcy.[1260]

(c) Clearing, Trade Execution, Reporting and Processing

Section 763 of the Dodd-Frank Act adds section 3C to the Exchange Act, which deals with clearing for security-based swaps.[1261] Prior to the enactment of Title VII, swaps which traded on a bilateral basis were subject to counterparty credit risk, which may not have been fully mitigated by the posting of collateral.[1262] Section 3C of the Exchange Act requires that security-based swaps, with some exceptions, be cleared through a central counterparty ("CCP") registered with the SEC.[1263] Clearing a security-based swap places a CCP between the parties to a trade and reduces the counterparty risk.

Title VII also requires the execution of clearable security-based swaps on exchanges or SB SEFs if such security-based swaps are available to trade and the reporting of trades to an SB SDR and dissemination of trading data to the public.[1264] Title VII also imposes requirements relating to the operations of the SB SEFs and SDRs.[1265] Section 15F(i) of the Exchange Act establishes regulatory standards for certain [registered security-based swap entities] related to the confirmation, processing, netting, documentation, and valuation of security-based swaps, which should enhance the efficiency of the trade execution and processing of security-based swaps.[1266]

Furthermore, sections 15F(f), (g), and (j)(3) of the Exchange Act impose certain reporting, recordkeeping, and regulatory disclosure requirements on SBS dealers

---

more detail in connection with the applicable rulemakings.

[1248] The SEC has proposed rules regarding business conduct standards for security-based swap dealers and major security-based swap participants. *See* Business Conduct Standards Proposing Release. In the Business Conduct Standards Proposing Release the SEC invited comment regarding the costs and benefits associated with the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1249] *See* section 15F(h)(3)(B) of the Exchange Act, 15 U.S.C. 78o–10(h)(3)(B).

[1250] *See* section 15F(h)(3)(C) of the Exchange Act, 15 U.S.C. 78o–10(h)(3)(C).

[1251] Title VII amends the Exchange Act to define a special entity as: (1) A Federal agency; (2) a State, State agency, city, county, municipality, or other political subdivision of a State; (3) any employee benefit planned, as defined in section 3 of the Employee Retirement Income Security Act of 1974; or (4) any governmental plan, as denied in section 3 of the Employee Retirement Income Security Act of 1974; or any endowment, including an endowment that is an organization in section 501(c)(3) of the Internal Revenue Code of 1986. *See* section 15F(h)(2)(C) of the Exchange Act, 15 U.S.C. 78o–10(h)(2)(C).

[1252] *See* sections 15F(h)(2), (h)(4), and (h)(5) of the Exchange Act, 15 U.S.C. 78o–10(h)(2), (h)(4), and (h)(5).

[1253] *See* section 15F(h)(4)(B) and (C) of the Exchange Act, 15 U.S.C. 78o–10(h)(4)(B) and (C).

[1254] *See* section 15F(j)(5) of the Exchange Act, 15 U.S.C. 78o–10(j)(5).

[1255] *See* section 15F(j)(2) of the Exchange Act, 15 U.S.C. 78o–10(j)(2).

[1256] *See* section 15F(e) of the Exchange Act, 15 U.S.C. 78o–10(e).

[1257] *See* Entity Definitions Release at 30723, *supra* note 12.

[1258] *See* 15 U.S.C. 78c–5.

[1259] *Id.*

[1260] *Id.*

[1261] *See* 15 U.S.C. 78c–3. *See also* Clearing Procedures Proposing Release; Clearing Agency Standards Proposing Release; *End-User Exception of Mandatory Clearing of Security-Based Swaps,* Release No. 34–63556 (Dec. 15, 2010), 75 FR 79992 (Dec. 21, 2010) ("End-User Exception Proposing Release"); and *Ownership Limitations and Governance Requirements for Security-Based Swap Clearing Agencies, Security-Based Swap Execution Facilities, and National Securities Exchanges with Respect to Security-Based Swaps under Regulation MC,* Release No. 34–63107, (Oct. 14, 2010), 75 FR 65882 (Oct. 26, 2010) ("Proposed Regulation MC"). In each proposing release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The SEC has received comments on the cost and benefits of these proposed rules. The costs associated with these and other substantive rules are being addressed in more detail in connection with the applicable rulemakings.

[1262] *See* U.S. Gov't Accountability Office, *Systemic Risk: Regulatory Oversight and Recent Initiatives to Address Risk Posed by Credit Default Swaps,* GAO–09–397T, at 13 (Mar. 5, 2009).

[1263] 15 U.S.C. 78c–3. Such clearing agencies also are required to register. *See* section 17A(g) of the Exchange Act, 15 U.S.C. 78q–1(g).

[1264] *See* sections 3C(h) and 13(m) of the Exchange Act, 15 U.S.C. and 13m(m). *See also* Regulation SBSR Proposing Release; and SDR Proposing Release.

[1265] *See* SDR Proposing Release; and SB SEF Proposing Release. In each proposing release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1266] *See* section 15F(i) of the Exchange Act, 15 U.S.C. 78o–10(i). *See also Trade Acknowledgment and Verification on Security-Based Swap Transactions,* Release No. 34–63727 (Jan. 14, 2011), 76 FR 3859 (Jan. 21, 2011) ("Trade Documentation Proposing Release"). In the Trade Documentation Proposing Release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

and MSBSPs.[1267] Specifically, Title VII imposes on parties to a security-based swap the responsibility to "report security-based swap transaction information to the appropriate registered entity in a timely manner as may be prescribed by the [SEC]." [1268] Title VII's reporting, recordkeeping, and disclosure requirements should enhance the volume and quality of information available in the market and facilitate effective oversight by the SEC.

(d) Investor Protection Provisions of Title VII and the Application of the Federal Securities Laws

Prior to the enactment of Title VII, the SEC had the ability to bring actions based on fraud, manipulation or insider trading relating to security-based swap agreements (as defined in section 206B of the GLBA [1269]) but did not have any other regulatory authority over swaps, security-based swaps or market participants involved in security-based swap transactions.[1270] Title VII provides the SEC with antifraud enforcement authority over SBSAs under Title VII and gives the SEC the authority to regulate security-based swap transactions and the security-based swaps market, including the authority to prevent or deter fraud, manipulation or deceptive conduct and take other actions.[1271]

By including security-based swaps in the definition of security under the Securities Act and the Exchange Act and repealing the restrictions on regulating security-based swap agreements as securities, Title VII extended the investor protections under the Federal securities laws to security-based swaps. In particular, Title VII amends the Exchange Act and the Securities Act to include security-based swaps within the definition of the term "security." [1272] Accordingly, security-based swaps are securities and benefit from the investor protections provided by the Federal securities laws.[1273] In addition to the antifraud and anti-manipulation provisions, these protections include the registration, disclosure and civil liability provisions of the Securities Act and the disclosure provisions of the Exchange Act. Title VII specifically provides protections to non-ECPs by adding section 5(e) to the Securities Act, which requires that a registration statement must be in effect before a person can offer to sell, offer to purchase from, or otherwise enter into security-based swaps with non-ECPs.[1274] Any security-based swap with or for a person that is not an ECP must be effected on a national securities exchange.[1275] Furthermore, Title VII ensures that a security-based swap cannot be used to avoid registration or investor protection under the Securities Act by providing that if a security-based swap is entered into by an issuer's affiliate or underwriter, the offer and sale of the underlying security must comply with the Securities Act.[1276]

The programmatic benefits related to investor protection under the Federal securities laws have corresponding costs including costs associated with compliance with the registration and disclosure regime of the Securities Act

if an exemption from such registration provisions is not available.[1277]

The above programmatic benefits and costs that will flow from regulation of the security-based swap market mandated by Title VII will be significant, although very difficult to quantify and measure.[1278] Moreover, the benefits can be expected to manifest themselves over the long run and be distributed over the market as a whole. The programmatic costs and benefits associated with substantive rules applicable to security-based swaps under Title VII are being addressed in more detail in connection with the applicable rulemakings implementing Title VII. There are programmatic costs that may arise from the application of other provisions of the Federal securities laws to security-based swaps, security-based swap transactions and market participants involved in such security-based swap transactions, including costs arising from potential overlapping regulatory requirements. The SEC already has taken interim actions to mitigate such overlapping and potentially conflicting regulatory requirements and will be carefully evaluating any future actions that may be necessary and appropriate to address such overlapping or conflicting requirements.

---

[1267] *See* section 15F(f) of the Exchange Act, 15 U.S.C. 78o–10(f) (reporting and recordkeeping requirements); section 15F(g) of the Exchange Act, 15 U.S.C. 78o–10(g) (daily trading records requirements); section 15F(j)(3) of the Exchange Act, 15 U.S.C. 78o–10(j)(3) (requirements related to the disclosure of information to regulators). *See also* Regulation SBSR Proposing Release. In the Regulation SBSR Proposing Release the SEC invited comment with respects to the costs and benefits of each of the rules proposed in the release. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1268] *See* section 13(m)(1)(F) of the Exchange Act, 15 U.S.C. 13m(m)(1)(F). *See also* Regulation SBSR Proposing Release. In the Regulation SBSR Proposing Release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in more detail in connection with the applicable rulemakings.

[1269] 15 U.S.C. 78c note.

[1270] *See supra* part XI.A.1, notes 1225 and 1226.

[1271] *See supra* part XI.A.1, notes 1225 and 1226 and part I. *See also Prohibition Against Fraud, Manipulation, and Deception in Connection with Security-Based Swaps,* Release No. 34–63236 (Nov. 3, 2010), 75 FR 68560 (Nov. 8, 2010) ("SB Swap Antifraud Proposing Release"). In the SB Swap Antifraud Proposing Release the SEC invited comment with respects to the costs and benefits of each of the proposed rules. The costs associated with these and other substantive rules, along with any comments received by the SEC addressing the costs of the proposed rules, are being addressed in

more detail in connection with the applicable rulemakings.

[1272] *See* section 2(a)(1) of the Securities Act and section 3(a)(10) of the Exchange Act, 15 U.S.C. 77b(a)(1) and 15 U.S.C. 78c(a)(10).

[1273] *See, e.g., Order Granting Temporary Exemptions under the Securities Exchange Act of 1934 in Connection with the Pending Revision of the Definition of "Security" to Encompass Security-Based Swaps, and Request for Comment,* 76 FR 39927 (July 7, 2011) (discussing the effect of the amendment to the definition of the term "security" to include security-based swaps under the Exchange Act and granting certain temporary relief and providing interpretive guidance).

[1274] *See* section 768(b) of the Dodd Frank Act (adding section 5(e) of the Securities Act, 15 U.S.C. 77e(d)).

[1275] *See* section 6(l) of the Exchange Act, 15 U.S.C. 78f(l).

[1276] *See* section 768(a) of the Dodd-Frank Act (amending section 2(a)(3) of the Securities Act, 15 U.S.C. 77b(a)(3)).

[1277] For offers and sales to non-ECPs, the statute requires registration of the security-based swap transaction.

[1278] One commenter suggested that the best measure of the benefits of the Dodd-Frank Act is the cost of the 2008 financial crisis. This commenter provided, as an example, an estimate from the Bank of England that the cost of the 2008 financial crisis in terms of lost output was between $60 trillion and $200 trillion. *See* Letter from Dennis Kelleher, Better Markets to the CFTC, June 3, 2011, regarding the reopening and extension of comment periods for rulemaking implementing the Dodd-Frank Wall Street Reform and Consumer Protection Act. The SEC recognizes that this estimate addresses the aggregate cost of the financial crisis. It is also recognized that others have expressed concern regarding the potential cost of the requirements of Dodd-Frank. *See, e.g.,* letters from SIFMA, the American Bankers Association, the Financial Services Roundtable and the Clearing House Association, dated February 13, 2012 (commenting on *Prohibitions and Restrictions on Proprietary Trading and Certain Interests in, and Relationships With, Hedge Funds and Private Equity Funds,* 76 FR 68846 (Nov. 7, 2011)) and The Financial Services Roundtable, dated October 17, 2011 (commenting on *Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant,"* 75 FR 80174 (Dec. 21, 2010)).

4. Costs and Benefits Associated With Specific Rules

(a) Insurance Safe Harbor and Grandfather for Insurance Products (Rules 3a69–1 Under the Exchange Act)

(i) Programmatic Benefits and Costs

The Commissions are adopting rules that establish an Insurance Safe Harbor and an Insurance Grandfather for certain agreements, contracts, and transactions that meet the conditions and tests set forth in rule 3a69–1 under the Exchange Act.[1279] The agreements, contracts, and transactions that satisfy the Insurance Safe Harbor or Insurance Grandfather under the Exchange Act will fall outside the statutory swap and security-based swap definitions.[1280] The SEC believes that the conditions and tests set forth in the Insurance Safe Harbor represent the characteristics of many types of traditional insurance products.[1281] As stated above, the Commissions are not aware of anything in the legislative history or Title VII itself to suggest that Congress intended for traditional insurance products to be regulated as swaps or security-based swaps.[1282]

Typically, insurance has not been regulated under the Federal securities laws; although variable life insurance and annuities are securities and are regulated under the Federal securities laws.[1283] Although a broad reading of the swap definition could encompass traditional insurance, the SEC does not believe that such a reading is consistent with Congressional intent.[1284] To

include products that meet the Insurance Safe Harbor or Insurance Grandfather in the swap or security-based swap definition would subject traditional insurance products to the Title VII regime which the SEC does not believe is intended by Congress. Imposing programmatic costs on the insurance industry, such as those associated with compliance with the registration, compliance, and operation and governance requirements as described above, in addition to the Securities Act and Exchange Act requirements applicable to security-based swap transactions involving non-ECPs, would increase the business costs of insurance providers, which costs could be passed on to the consumers who need such insurance. In addition, because of the above costs as well as the Securities Act and Exchange Act restrictions applicable to offers and sales of security-based swaps to non-ECPs, including products that meet the Insurance Safe Harbor in the swap or security-based swap definition could potentially affect the ability of insurance providers to continue to offer insurance products and disrupt contracts that satisfy the Insurance Grandfather that are used every day in the American economy. For example, if Title VII applied to traditional insurance products, people who purchased insurance to protect their property or families against accidental hazards or risks would need to be qualified as ECPs [1285] or the offer and sale of the insurance products that were security-based swaps would need to be registered with the SEC [1286] and traded on an exchange;[1287] and for swaps that are under the CFTC jurisdiction would only be able to be sold on or subject to the rules of a board of trade. In addition, insurance providers that offer insurance products exceeding the de minimis threshold (as adopted in the Entities Release) applicable to swap dealers and

security-based swap dealers would be required to register as swap dealers or SBS dealers [1288] and be subject to the substantive requirements that result from such registration.

The rules adopted in this release provide continuity in the regulatory treatment of agreements, contracts, and transactions that are insurance and fall outside the swap and security-based swap definitions. Market participants will be able to continue to rely on their existing understanding of insurance laws and regulations to engage in business activities relating to the insurance agreements, contracts, and transactions that satisfy the Insurance Safe Harbor or Insurance Grandfather.

(ii) Assessment Costs

Market participants will need to assess whether a particular agreement, contract, or transaction satisfies the Insurance Safe Harbor or Insurance Grandfather, prior to execution, but no later than when the parties offer to enter into the agreement, contract, or transaction. If such agreement, contract, or transaction satisfies rules 3a69–1 under the Exchange Act, it would fall outside the swap and security-based swap definitions. If such agreement, contract, or transaction does not satisfy the Insurance Safe Harbor or Insurance Grandfather, it would need to be analyzed based upon its own facts and circumstances in order to determine whether it falls within or outside the swap or security-based swap definition. For agreements, contracts, or transactions entered into subsequent to the effective date of such rule, this analysis will have to be performed prior to execution but no later than when the parties offer to enter into the agreement, contract, or transaction to customers to ensure compliance with Title VII. Incurring these assessment costs with respect to these agreements, contracts, or transactions would not have been required in most cases prior to Title VII for two primary reasons. First, as security-based swaps were not regulated prior to Title VII, there was no need to determine whether an agreement, contract or transaction fell within or outside the definition of security-based swap agreement in the CFMA. Second, the need for parties to assess individual types of insurance for purposes of determining whether the Federal securities laws apply would be limited because, as previously stated, typically,

---

[1279] See supra part II.B.1.

[1280] Id.

[1281] Id.

[1282] Id.

[1283] See generally section 3(a)(8) of the Securities Act, 15 U.S.C. 77c(a)(8), and section 12(g) of the Exchange Act, 15 U.S.C. 78l(g). The SEC has previously stated its view that Congress intended any insurance contract falling within section 3(a)(8) to be excluded from all provisions of the Securities Act notwithstanding the language of the Securities Act indicating that section 3(a)(8) is an exemption from the registration but not the antifraud provisions. See Definition of "Annuity Contract or Optional Annuity Contract", 49 FR 46750, 46753 (Nov. 28, 1984). See also Tcherepnin v. Knight, 389 U.S. 332, 342 n.30 (1967) (Congress specifically stated that "insurance policies are not to be regarded as securities subject to the provisions of the [Securities] act," (quoting H.R. Rep. 85, 73rd Cong., 1st Sess. 15 (1933)). See also supra note 42.

[1284] Section 206A of the GLBA, 15 U.S.C. 78c note defined the term "swap agreement" and the CFMA had two requirements in addition to the definition of "swap" itself: (1) The transaction is between ECPs (as defined prior to enactment of the Dodd-Frank Act); and (2) the material terms of the swap agreement (other than price and quantity) are subject to individual negotiation. Section 762 of the Dodd-Frank Act removed these requirements from the definition of swap agreement. See supra part XI.A.1, notes 1225 and 1226. The definition of swap in Title VII of the Dodd-Frank Act is not conditioned on the existence of either of the two requirements, although swap or security-based

swap transactions with non-ECPs are subject to additional restrictions under the Federal securities laws and the Commodity Exchange Act. See CEA section 1a(47), 7 U.S.C. 1a(47). Insurance policies are typically not subject to individual negotiation. Additionally, the average insurance purchaser may not qualify as an ECP. See CEA section 1a(18)(A)(xi), 7 U.S.C. 1a(18)(A)(xi).

[1285] An individual is considered an ECP if the individual "has amounts invested on a discretionary basis, the aggregate of which is in excess of—(i) $10,000,000; or (ii) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonable likely to be owned or incurred, by the individual." CEA section 1a(18)(A)(xi), 7 U.S.C. 1a(18)(A)(xi).

[1286] See section 5(e) of the Securities Act, 15 U.S.C. 77e(d).

[1287] See CEA section 2(e), 7 U.S.C. 2(e), and section 6(l) of the Exchange Act, 15 U.S.C. 78f(l).

[1288] See Registration of Swap Dealers and Major Swap Participants, 77 FR 2613, corrected at 77 FR 3590 (regarding swap dealers and major swap participants); SB Swap Participant Proposing Release, supra note 1239, (regarding SBS dealers and MSBSPs).

insurance has not been regulated under the Federal securities laws, although variable life insurance and annuities are securities and are regulated under the Federal securities laws.[1289]

The SEC believes that rule 3a69–1 under the Exchange Act reduces the assessment costs that would otherwise exist without these rules. Without rule 3a69–1 under the Exchange Act, market participants would still need to assess whether or not the agreement, contract, or transaction they are offering falls within the swap or security-based swap definition. More time and effort would likely be spent on the assessment because of lack of any safe harbor or grandfather to rely on. Without rule 3a69–1 under the Exchange Act, market participants may feel the need to request joint interpretations from the Commissions before they invest resources in insurance business, even with respect to agreements, contracts, or transactions that would otherwise meet the Insurance Safe Harbor or Insurance Grandfather.

The SEC recognizes that the assessment costs associated with rule 3a69–1 under the Exchange Act may include costs related to obtaining legal advice on whether an agreement, contract, or transaction meets the requirements of the Insurance Safe Harbor or Insurance Grandfather. The SEC has sought to minimize the costs of this analysis by adopting an approach that incorporates the characteristics of traditional insurance into the straightforward Product Test and Provider Test, as described in the discussions of relevant rules above.

The SEC believes there will be minimal assessment costs for parties to determine whether an agreement, contract, or transaction is among those specifically enumerated in rule 3a69–1 under the Exchange Act [1290] or that falls within the Insurance Grandfather.[1291]

With respect to rule 3a69–1 under the Exchange Act, the SEC believes that at least some market participants are likely to seek legal counsel for interpretation of various aspects of the rule, particularly when structuring new or novel insurance products. The costs associated with obtaining such legal counsel would vary depending on the relevant facts and circumstances, including the complexity of the agreement, contract, or transaction and whether an interpretation from the Commissions is requested. The SEC believes that the range of costs to undertake the legal analysis required to

determine whether the Insurance Safe Harbor or Insurance Grandfather applies to an agreement, contract, or transaction will range from $378 to $27,000, with $27,000 representing a reasonable estimate of the upper end of the range of the costs.[1292]

### (iii) Alternatives

The SEC could have determined to not further define the terms "swap" and "security-based swap" to address the status of traditional insurance products. If the Commissions did not further define the terms "swap" and "security-based swap" to address the status of traditional insurance products by adopting the Insurance Safe Harbor or the Insurance Grandfather certain insurance providers would have treated their insurance products as swaps or security-based swap, thereby incurring programmatic costs that would otherwise be avoidable. Other insurance providers could misinterpret the application of the definition of swap to certain agreements, contracts, or transactions to determine that they fall outside such definition of swap or security-based swap, in which case the amount of Title VII programmatic benefits and costs with respect to such products may potentially decrease. As stated above, without rule 3a69–1 under the Exchange Act, there also would be higher assessment costs to determine whether an agreement, contract, or transaction falls within or outside the

swap or security-based swap definition.[1293]

The Commissions received several comments in support of alternatives to rule 3a69–1 under the Exchange Act as proposed.[1294] The alternatives suggested by commenters include:

• A test based on whether the agreement, contract, or transaction is subject to regulation as insurance by the insurance commissioner of the applicable state(s).[1295]

• A test based on the application of section 3(a)(8) of the Securities Act [1296] to the agreement, contract, or transaction.[1297]

• Various alternative tests that add (or exclude) requirements to the Product Test and the Provider Test.[1298]

The Commissions have considered each of these alternatives proposed by commenters and are adopting the final rule as discussed above.[1299] The Commissions are not adopting the specific alternative tests as proposed by commenters. In considering each of these alternatives, the SEC has taken into account the costs and benefits associated with each alternative.

In the SEC's view, as discussed above,[1300] because these alternative tests do not adequately distinguish traditional insurance products from Title VII instruments, they could result in an over-inclusive Insurance Safe Harbor or Insurance Grandfather and fail to include in the Title VII regulatory regime agreements, contracts, and transactions that Congress intended to be regulated as swaps or security-based swaps.[1301] Therefore, the programmatic benefits of the Title VII regime would not be fully realized if any of the alternatives were adopted.

### (b) Narrow-Based Security Index Rules (Rules 3a68–1a, 3a68–1b, and 3a68–3(a) Under the Exchange Act)

### (i) Programmatic Costs and Benefits

As previously stated, Title VII created a jurisdictional division between the CFTC and the SEC. The CFTC has jurisdiction over swaps, whereas the SEC has jurisdiction over security-based

---

[1289] *See supra* note 1283.

[1290] *See supra* part II.B.1.

[1291] *See supra* part II.B.1.c).

[1292] The average cost incurred by market participants in connection with assessing whether an agreement, contract, or transaction is a swap or security-based swap is based on the estimated amount of time that staff believes will be required for both in-house counsel and outside counsel to apply rule 3a69–1. Staff estimates that some agreements, contracts, or transactions will clearly satisfy the Insurance Safe Harbor, Insurance Grandfather and an in-house attorney, without the assistance of outside counsel, will be able to make a determination in one hour. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by SEC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead), staff estimates that the average national hourly rate for an in-house counsel is $378. If an agreement, contract, or transaction is more complex, the SEC estimates the analysis will require approximately 30 hours of in-house counsel time and 40 hours of outside counsel time. The SEC estimates the costs for outside legal services to be $400 per hour. This is based on an estimated $400 per hour cost for outside legal services. This is the same estimate used by the SEC for these services in the release involving Exemptions for Security-Based Swaps Issued By Certain Clearing Agencies, Release No. 33–9308 (Mar. 30, 2012), 77 FR 20536 (Apr. 5, 2012). Accordingly, on the high end of the range the SEC estimates the cost to be $27,340 ($11,340 (based on 30 hours of in-house counsel time x $378) + $16,000 (based on 40 hours of outside counsel x $400). This estimate is rounded by two significant digits to avoid the impression of false precision of the estimate.

[1293] *See supra* part XI.A.4(a)(ii).

[1294] *See supra* part II.B.1.d), for a discussion of each of the proposed alternatives.

[1295] *See* ACLI Letter; AFGI Letter; AIA Letter; MetLife Letter and Travelers Letter.

[1296] 15 U.S.C. 77c(a)(8).

[1297] *See* ACLI Letter at 7; AFGI Letter at 3; CAI Letter at 21–25 and Nationwide Letter at 4.

[1298] *See* ACLI Letter; AIA Letter; Nationwide Letter and NAIC Letter.

[1299] *See supra* part II.B.1.

[1300] *See supra* part II.B.1.d).

[1301] For a more detailed discussion of the comments, including those that suggested alternatives, and the Commissions' response, *see supra* part II.B.1.d).

swaps. In most instances it is clear based on a plain reading of the statute whether a Title VII instrument is a swap or security-based swap (*e.g.*, a CDS referencing a single security or issuer is a security-based swap).[1302] In other instances, such as index CDS, whether a Title VII instrument is a swap or security-based swap depends on whether such instrument is based on a "narrow-based security index" or events relating to "issuers of securities in a narrow-based security index".[1303] The Commissions are adopting rules 3a68–1a and 3a68–1b under the Exchange Act to further define the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" for purposes of analyzing CDS.[1304] Additionally, the Commissions are adopting rule 3a68–3(a) under the Exchange Act to define narrow-based security index, except as otherwise provided in rules 3a68–1a and 3a68–1b, consistent with the statutory definition set forth in section 3(a)(55) of the Exchange Act and the rules, regulations and orders of the SEC thereunder.

As discussed above, there are programmatic costs and benefits that flow from being a Title VII instrument.[1305] The overall programmatic costs and benefits flowing from an agreement, contract, or transaction being a swap or a security-based swap may be impacted by the similarities and differences in the Commissions' regulatory programs for swaps and security-based swaps. Generally, the Title VII regulatory regimes of the CFTC and SEC are expected to be broadly similar and complementary. Title VII requires the SEC and the CFTC to consult and coordinate for the purposes of assuring regulatory consistency and comparability with respect to rules adopted and orders issued pursuant to Title VII to the extent possible.[1306] Title VII provides that the Commissions should treat functionally or economically similar products or entities in a similar manner in such rules or orders, but does not require identical rules.[1307] The Commissions may, therefore, diverge substantively on certain rulemakings. In certain areas, the SEC believes it may be appropriate for Title VII's application to security-based

swaps to be different from its application to the swaps that will be regulated by the CFTC, as the relevant products, entities and market themselves are different, or because the relevant statutory provisions are different. The SEC believes, however, that the programmatic costs and benefits (which will be discussed in subsequent releases adopting substantive rules) that will flow from the application of rules under either jurisdiction as a result of applying rules 3a68–1a, 3a68–1b, and 3a68–3(a) under the Exchange Act are expected to be broadly similar and complementary.

In addition, since Title VII specifically provides that security-based swaps are securities and grants the SEC the exclusive authority to regulate security-based swaps (other than as to mixed swaps for which the SEC shares jurisdiction with the CFTC), in adopting rules 3a68–1a, 3a68–1b, and 3a68–3(a) under the Exchange Act to further define the terms "narrow-based security index," and "issuers of securities in a narrow-based security index", the SEC is mindful of the programmatic costs and benefits specifically associated with security-based swaps falling under the Federal securities laws regime and being regulated by the SEC. These programmatic benefits include, for example, the applicability of the Securities Act registration, disclosure, and civil liability scheme, as well as the SEC's authority to take action to protect investors and prevent fraud and market manipulation. These benefits could in some cases have corresponding costs associated with the application of the Securities Act related to registration, disclosure and civil liability scheme and the registration, disclosure and liability provisions of the Exchange Act. For example, if an issuer of an underlying security enters into a security-based swap it will have to comply with the Securities Act registration requirements both for the security-based swap and the underlying security unless an exemption from registration is available. As another example, if market participants wish to sell security-based swaps to non-ECPs they will have to comply with the registration requirements of the Securities Act. Any person that would be required to comply with the registration requirements of the Securities Act with respect to security-based swaps will incur the costs of such registration, including legal and accounting costs. Additionally, such person will become subject to the periodic reporting requirements of the Exchange Act, unless already subject to such

requirements, and incur the costs associated with such Exchange Act periodic reporting.

(ii) Assessment Costs

Market participants will need to ascertain whether an agreement, contract or transaction based on an index is a swap or a security-based swap, prior to execution, but no later than when the parties offer to enter into it, according to the criteria set forth in the definitions of the terms "narrow-based security index" and "issuers of securities in a narrow-based security index." The SEC expects that this assessment will be made each time an index is considered to be used or created for purposes of transactions based on such index, and each time the material terms of the index on which the agreement, contract, or transaction is based are amended or modified.[1308] These assessment costs with respect to agreements, contracts, or transactions based on indexes did not arise prior to the enactment of Title VII. The SEC believes that such assessment costs may vary depending on the composition of the index that may underlie agreement, contract, or transaction. For example, the number of components in an index may impact the assessment costs because of the need to determine whether the index's components satisfy the various tests within the rule. However, once such assessment is performed and the narrow-based or broad-based characteristics have been established with respect to an index, unless the characteristic of such index changes, any market participants engaging in agreements, contracts, or transactions referencing such index would not need to incur any material assessment costs, other than to confirm that the index has not changed in a way that would change its classification from narrow-based to broad-based or vice versa.

Although the assessment cost associated with rules 3a68–1a, 3a68–1b, and 3a68–3(a) under the Exchange Act may vary, the SEC estimates that costs associated with undertaking the determination of whether an agreement, contract or transaction based on an index is a swap or security-based swap will range from $378 to $20,000.[1309] The

---

[1302] *See* section 3(a)(68)(A)(II) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(II).

[1303] *See* section 3(a)(68)(A)(I) and (III) of the Exchange Act, 15 U.S.C. 78c(a)(68)(A)(I) and (III).

[1304] *See supra* part III.G.3.b).

[1305] *See supra* part XI.A.3.

[1306] *See* section 712(a)(1) and (a)(2) of the Dodd-Frank Act.

[1307] *See* section 712(a)(7)(A) and (B) of the Dodd-Frank Act.

[1308] *See generally supra* part III.G.

[1309] The average cost incurred by market participants in connection with assessing whether an agreement, contract, or transaction is a swap or security-based swap is based on the estimated amount of time that staff believes will be required for both in-house counsel and outside counsel to apply the definition. Staff estimates that the average national hourly rate for an in-house counsel is $378 based on data from SIFMA's *Management &*

Continued

SEC believes that some agreements, contracts, or transactions based on an established index would not need the assistance of outside counsel, and a determination can be made in one hour. If an agreement, contract, or transaction is more complex, the SEC estimates the analysis will require approximately 20 hours of in-house counsel time and 30 hours of outside counsel time. Accordingly, if an agreement, contract or transaction is based on a newly structured customized index or basket to suit a particular investment or hedging need, the SEC estimates that the assessment may be at or close to the upper end of the estimated range, as part of the structuring of such customized index or basket.[1310]

(iii) Alternatives

The Commissions received many comments on proposed rules 3a68–1a and 3a68–1b and have incorporated many of the suggested alternatives into the final rules and rejected, after careful consideration, other suggested alternatives, as fully discussed in section III.G.3.b. The policy choices made with respect to accepting or rejecting the alternatives suggested by the commenters have been informed by the cost and benefit considerations. In particular, as stated above, the SEC is mindful of the programmatic costs and benefits specifically associated with security-based swaps falling under the Federal securities laws regime.[1311]

One alternative to rules 3a68–1a and 3a68–1b is for the Commissions to not further define the terms "issuers of securities in a narrow-based security index" or "narrow-based security

index." The SEC believes the assessment cost associated with determining whether an index CDS is a swap or security-based swap would be greater in the absence of rules 3a68–1a and 3a68–1b. Without these rules, market participants would still need to analyze index components and it would be difficult to apply the statutory language of "issuer of securities in a narrow-based security index" in section 3(a)(68)(A)(ii)(III) of the Exchange Act to index CDS, given that the existing statutory definition of "narrow-based security index" and the past guidance are focused on equity security indexes, volatility indexes and debt security indexes, none of which are specifically tailored for index CDS.[1312] Absent rules 3a68–1a and 3a68–1b, it is very likely that market participants would need to request interpretations from the Commissions. Rules 3a68–1a and 3a68–1b provide tailored and objective criteria, similar to the criteria used in the context of futures contracts on volatility indexes and debt security indexes, to assist market participants in determining whether an index CDS is based on issuers of securities in a narrow-based security index.[1313] These rules will allow market participants to make determinations without requesting interpretations from the Commissions and, therefore, should reduce the assessment costs.

Commenters expressed concern associated with the public information availability test and suggested that the public information availability test not be incorporated into the final rule for various reasons.[1314] As discussed above[1315], the Commissions are adopting the public information availability test with some modifications.

The SEC believes there are many programmatic benefits associated with the public information availability test. As noted above, the public information availability test is intended as the substitute test for the ADTV provision in the statutory narrow-based security index definition.[1316] The ADTV test is designed to take into account the trading of equity securities and, because the listing standards for equity securities require that the security be registered under the Exchange Act, the issuer of the equity security will be subject to the periodic reporting requirements of the Exchange Act. Due

to the specific provisions of the statutory ADTV test, the Commissions have determined that the ADTV test is not a useful test for purposes of determining whether an index of reference entities or debt securities is a "narrow-based security index" because the components of the index are either reference entities, which do not "trade," or debt instruments, which commonly are not listed, and, therefore, do not have a significant trading volume.[1317] Applying the ADTV test in the existing statutory narrow-based security index definition would not serve any purposes. However, the basis for such provision, that there is sufficient trading in the securities, public information about, and therefore market following of, the issuer of the securities, applies to index CDS. As a substitute for such ADTV test, the SEC believes that there should be public information available about a predominant percentage of the reference entities included in the index, or, in the case of an index CDS on an index of securities, about the issuers of the securities or the securities underlying the index. The SEC believes that this should reduce the likelihood that non-narrow-based indexes referenced in index CDS, or the component securities, or the named issuers of securities in that index would be used as a surrogate for the reference entities securities without complying with the Federal securities laws. In particular, the SEC believes that the public information availability test should reduce the likelihood that the index CDS could be used to circumvent the registration provisions of the Securities Act and provisions of the Exchange Act through the use of CDS based on such indexes, manipulate the reference entities securities or the securities in the index and reduce the potential for misuse of material non-public information through the use of CDS based on such indexes.[1318] If a CDS is based on an index that does not satisfy the public information availability test,[1319] such index CDS will be a security-based swap and thus

---

*Professional Earnings in the Securities Industry 2011* (modified by SEC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead). The SEC estimates the costs for outside legal services to be $400 per hour. This is the same estimate used by the SEC for these services in the release involving *Exemptions for Security-Based Swaps Issued By Certain Clearing Agencies*, Release No. 33–9308 (Mar. 30, 2012), 77 FR 20536 (Apr. 5, 2012). Accordingly, on the high end of the range the SEC estimates the cost to be $19,560 ($7,560 (based on 20 hours of in-house counsel time x $378) + $12,000 (based on 30 hours of outside counsel x $400). This estimate is rounded by two significant digits to avoid the impression of false precision of the estimate.

[1310] For example, the legal costs associated with the analysis of whether an index or basket CDS is a swap or security-based swap will include, among other things, analysis of the weighting of each index or basket component, the aggregate weighting of any five non-affiliated reference entities included in the index or basket, whether a predominant percentage (by weighting) of the issuers included in the index or basket satisfy the public information availability test and whether any issuer included in the index or basket with 5% or more weighting satisfies the public information availability test.

[1311] *See supra* part XI.4.(b)(i).

[1312] *See supra* part III.G.3.

[1313] *Id.*

[1314] *See* LSTA Letter (with respect to loans), Markit Letter, ISDA Letter and SIFMA Letter.

[1315] *See supra* part III.G.3.b(iii).

[1316] *Id.*

[1317] *Id.*

[1318] *Id.*

[1319] So long as the effective notional amounts allocated to reference entities or securities included in the index that satisfy the public information availability test comprise at least 80 percent of the index's weighting, failure by a reference entity or security included in the index to satisfy the public information availability test would be disregarded if the effective notional amounts allocated to that reference entity or security comprise less than 5 percent of the index's weighting. *See* paragraph (b) of rules 1.3(zzz) and 1.3(aaaa) under the CEA and rule 3a68–1a and 3a68–1b under the Exchange Act.

subject to the Federal securities laws and the SEC's oversight.[1320]

Some commenters indicated that the determinations of public availability of information would be costly but did not quantify such costs or explain the difficulty in making an assessment of whether information was publicly available.[1321] The SEC recognizes that there will be assessment costs associated with application of the public information availability test. The SEC notes that the public information availability test applies only for purposes of determining whether an index is a "narrow-based security index." The SEC would expect that market participants would look to the index provider to make the assessment or, if the index or basket is customized by the market participant that the creator of the index would take into account the public information availability of the index components in creating the custom index or basket. As a result, while the SEC recognizes that there will be costs in evaluating whether the index components satisfy the tests, including the public information availability test, the SEC believes that the index provider (or the creator of the custom index or basket) would already be evaluating the index components to determine whether the provider's index criteria were satisfied and, as part of such evaluation, would be able to ascertain whether the public information availability test is satisfied.

One commenter raised a specific concern about the assessment cost relating to applying the public information availability test to indexes of loans or borrowers and stated that unlike index of securities, which are generally subject to national or exchange-based reporting and disclosure regimes, a higher proportion of the components of an index of loans or borrowers may not be registered securities or reporting companies under the Exchange Act and therefore, this commenter stated that it would be more difficult or costly to determine whether an index of loans or borrowers meets the public information availability test.[1322] The SEC has modified the public information availability test to expand the categories of instrument to be aggregated for purposes of the outstanding indebtedness criterion and to change the method of calculating affiliation for purposes of the public information availability test. The SEC

believes that these modifications will mitigate the assessment costs that the commenter is concerned about.[1323]

The SEC believes that the overall assessment costs of including a public information availability test are justified in light of its benefits of preventing the index CDS from being used as a surrogate for the underlying securities or securities of the referenced issuer of securities. This should, in turn, prevent circumvention of the application of the Securities Act to index CDS transactions, and prevent fraud, manipulation and misuse of material non-public information.

One commenter suggested replacing the public information availability test with a volume trading test.[1324] The Commissions are not adopting a volume-trading test based on the CDS components of the index or on the index itself, either as a replacement for the public information availability test or as an alternative means of satisfying it. A volume trading test based on CDS is not practicable to use to determine the character of such index CDS because the character of the index CDS would have to be determined prior to any transaction in the Title VII Instrument. Given that there would be no trading volume at the time such determination is made, the index CDS would fail a volume-trading test in all cases[1325] and the assessment costs incurred in connection with such test would not serve any purpose. There also would be assessment costs in determining how many transactions in the CDS index or each CDS component of the index existed, and it is not apparent that any such trade information is either publicly available or verifiable at this time. In addition, the SEC also believes that a volume test based either on the CDS components of the index or the CDS index itself would not be an appropriate substitute for or an alternative to a public information availability test with respect to the referenced entity, issuer of securities, or underlying security because such a volume-based test would not provide transparency on such underlying entities, issuers of securities or securities.[1326] The volume of transactions in a particular CDS or the CDS index does not relate to whether there is public information about the reference entity or reference security underlying the CDS or CDS index. Therefore, a volume-trading test would not achieve the programmatic benefits

described above with respect to the public information availability test.

Similarly, the Commissions also rejected commenters' suggestion that the presence of a third-party index provider would assure that sufficient information is available regarding the index CDS itself without the need for a public information availability test.[1327] As stated above, the public information availability test is intended to assure the availability of information about the components of the index, the underlying securities and issuers of the securities.[1328] The existence of a third-party index provider does not imply any greater likelihood that such public information is available.[1329] Although the existence of a third-party index provider as a substitute for the public information availability test would reduce assessment costs of the market participants using such an index (other than the index provider who must evaluate compliance with index criteria), the SEC does not believe that the existence of the third party index provider is a substitute for the public information availability test. The SEC believes that the information a third-party index provider makes available about the construction of an index, index rules, components, and predetermined adjustments provides information only about the index and is not a substitute for the public availability of information about the issuers of the securities or the securities in the index.[1330] In addition, the SEC does not believe that the existence of a third-party index provider indicates any likelihood that such public information is available about the components of the index, which the SEC believes is important to reduce the potential for manipulation of the component securities of an index, or the named issuers of securities in an index, the misuse of non-public information about such an index, the component securities or the reference entities and circumvention of other provisions of the Federal securities laws through the use of CDS based on such an index.[1331] Further, the SEC notes that a third-party index provider may create customized indexes at the behest of market participants, including as part of its regular business and be paid by such market participants for its index

[1320] See id.

[1321] See LSTA Letter (with respect to loans); and SIFMA Letter

[1322] See July LSTA Letter. See also supra part III.G.3(b)(iii).

[1323] See supra part III.G.3.b)iii).

[1324] See Markit Letter.

[1325] See supra part III.G.3.b)iii).

[1326] Id.

[1327] See ISDA Letter; and SIFMA Letter. Neither commenter provided any analysis to explain how or whether a third-party index provider would be able to provide information about the underlying securities or issuers of securities in the index.

[1328] See supra part III.G.3.b)iii).

[1329] Id.

[1330] Id.

[1331] Id.

customization and creation services.[1332] Accordingly, the SEC does not believe that a third party index test is an appropriate alternative for the public information availability test and the costs to market participants is justified by the programmatic benefits such test provides.[1333]

As more fully discussed above in section III.G.3.b.iii, in considering other alternatives, including whether to revise or maintain the public information availability test, the SEC has consistently considered the programmatic benefits described above and the importance of assuring that there is information available with respect to the issuers of securities constituting a predominant percentage of an index on which a CDS is based if such index is not going to be considered a "narrow-based security index."

### (c) Swaps on Certain Futures Contracts on Foreign Sovereign Debt (Rule 3a68–5 Under the Exchange Act)

#### (i) Programmatic Benefits and Costs

Rule 3a68–5 provides that a Title VII instrument that is based on qualifying foreign futures contracts on debt securities of one of the 21 enumerated foreign governments is a swap and not a security-based swap if the Title VII instrument satisfies certain conditions.[1334] This rule is intended to prevent such Title VII instruments from being used to circumvent both the conditions of rule 3a12–8 and the Federal securities laws protections underlying such conditions.[1335] The conditions provided in rule 3a68–5 are intended to address these concerns. As discussed above, certain of the qualifying foreign futures contracts on the debt securities of one of the 21 enumerated foreign governments that satisfy the conditions of rule 3a12–8 trade with significant volume through foreign trading venues.[1336] Treating Title VII Instruments on such qualifying foreign futures contracts, subject to the conditions provided in rule 3a68–5, as swaps and not security-based swaps would not raise the concerns that such swaps could be used to circumvent rule 3a12–8, the Federal securities laws concerns that such conditions are intended to protect, or allow circumvention of the provisions of the Securities Act applicable to security-based swaps (including those applicable to security-based swaps entered into by issuer of securities underlie such

security-based swaps, their affiliates, or underwriters of their securities).[1337] There are certain programmatic costs associated with the rule that market participants will need to be cognizant of. For example, although rule 3a12–8 allows qualifying foreign futures to be physically settled outside the United States, the conditions of rule 3a68–5 require that the swap be cash settled in order to be a swap and not a security-based swap. This has the potential of not permitting settlement on the same terms as the qualifying foreign future. However, the SEC believes that, as with other Title VII Instruments, if the Title VII Instrument can be physically settled with securities, it will be a security-based swap. The other condition in rule 3a68–5 that may impact the characterization of the Title VII Instrument is that the Title VII Instrument cannot be entered into by the foreign government, its affiliates, or an underwriter of its securities. This condition is intended to preserve the programmatic benefit of the application of the Securities Act to transactions in Title VII Instruments entered into by issuers of securities, their affiliates and underwriters. Moreover, the final rule provides consistent treatment of qualifying foreign futures contracts on the debt securities of the 21 enumerated foreign governments and Title VII instruments based on such futures contracts on the debt securities of the 21 enumerated foreign governments, which will allow instruments to trade through designated contract markets.

#### (ii) Assessment Costs

The SEC believes that the assessment cost associated with determining whether a swap on certain futures contracts on foreign government securities constitute a swap or security-based swap under rule 3a68–5 should be minimal. Currently, qualifying foreign futures contracts on debt securities of the 21 enumerated foreign governments are traded on exchanges or boards of trade. Market participants may look at the exchange or board of trade listing to determine what they are. Therefore, the assessment, in accordance with the rule, would primarily focus on whether such swap itself is traded on or through a board of trade; whether the swap is cash-settled; whether the futures is traded on a board of trade; whether any security used to determine the cash settlement amount are not registered under the Securities Act or the subject of any American depositary receipt registered under the Securities Act; and whether the swap is

entered into by the foreign government issuing the debt securities upon which the qualifying futures contract is based or referenced, an affiliate of such foreign government or an underwriter of such foreign government securities. All of these determinations may be readily ascertained by the parties entering into the agreement, contract, or transaction. Therefore, the assessment costs associated with rule 3a68–5 under the Exchange Act should be nominal because parties should be able to make assessments under rule 3a68–5 in less than an hour.

### (d) Tolerance and Grace Period for Swaps and Security-Based Swaps Traded on Regulated Trading Platforms (Rule 3a68–3 Under the Exchange Act)

#### (i) Programmatic Benefits and Costs

In addition to defining narrow-based security index consistent with the statutory definition set forth in section 3(a)(55) of the Exchange Act and the rules, regulations and orders of the SEC thereunder, Rule 3a68–3 under the Exchange Act establishes a tolerance and grace period for swaps and security-based swaps to address the treatment of indexes that migrate from broad-based to narrow-based or narrow-based to broad-based, so that market participants will know which regulatory jurisdiction will apply to such Title VII instruments.[1338]

There are programmatic costs and benefits associated with tolerance and grace periods. Because swaps may only trade on designated contract markets ("DCM"), swap execution facilities ("SEF"), and foreign boards of trade ("FBOT"), and security-based swaps may trade only on registered national securities exchanges ("NSE") and SB SEFs, a tolerance and grace period creates the benefit of permitting the index provider to substitute certain index components in order to maintain the characteristic of such index being narrow-based or broad-based and allow market participants to continue to enter into the Title VII instrument on which such index is based.[1339] The associated programmatic costs are primarily related to the monitoring of index migrations performed by various trading platforms. Such monitoring costs would be part of the operation costs that a trading platform would incur in connection with implementing Title VII regardless of whether rule 3a68–3 under the Exchange Act is adopted. Absent rule 3a68–3 under the Exchange Act, trading platforms still need to have the

---

[1332] *Id. See also* Proposing Release at 29852.
[1333] *Id.*
[1334] *See supra* part III.E.
[1335] *See supra* note 717 and accompanying text.
[1336] *Id.*

[1337] *Id.*

[1338] *See supra* part III.G.5.
[1339] *Id.*

technology necessary to monitor and conduct surveillance for index migration, as well as create internal policies and procedures relating to such migration. On the other hand, without a tolerance and grace period, if a market participant wishes to offset a security-based swap to hedge its index CDS position on an SEC-regulated trading platform where the underlying security index has migrated from narrow-based to broad-based, the participant would be prohibited from doing so because a Title VII instrument based on the index would be a swap, and is ineligible for trading on an NSE or SB SEF.

### (ii) Assessment Costs

Rule 3a68–3 under the Exchange Act provides a tolerance and grace period and does not require any determination to be made beyond the programmatic cost to monitor for migration as described above. The SEC believes that the assessment costs associated with rule 3a68–3 under the Exchange Act should be nominal on the parties entering into an agreement, contract, or transaction.

### (iii) Alternatives

One commenter stated its view that extending the "grace period" from three months to six months would ease any disruption or dislocation associated with the delisting process with respect to an index that has migrated from broad-based to narrow-based, or narrow-based to broad-based, and such migration is not reversed during the tolerance period.[1340] The commenter did not provide any data, evidence, or other justification for its request. The Commissions are adopting the three-month grace period as proposed, which was the time frame used by Congress in the context of migration of indexes underlying security futures to address the same issue caused by index migration.[1341] The SEC believes that the three-month grace period gives parties to a swap or security-based swap on an index that has migrated sufficient time to execute offsetting positions and believes that it is appropriate to maintain the three-month period that is the applicable grace period for security futures.

### (e) Request for Interpretation Process (Rule 3a68–2 Under the Exchange Act)

(i) Programmatic Benefits and Costs

Rule 3a68–2 under the Exchange Act allows persons to submit a request for a joint interpretation from the Commissions regarding whether an agreement, contract or transaction (or a class of agreements, contracts, or transactions) is a swap, security-based swap, or mixed swap. As stated above,[1342] if an agreement, contract, or transaction is a swap or a security-based swap the overall programmatic costs and benefits that may arise from the Commissions' regulatory programs are expected to be broadly similar and complementary.[1343] However, in implementing Title VII the Commissions may diverge on rules and requirements stemming from the Title VII regulatory regime. Accordingly, a party to an agreement, contract, or transaction will need to know the appropriate classification, *e.g.* whether it is a swap or security-based swap, in order to know which regulatory regime and corresponding requirements is applicable. The Dodd-Frank Act requires that, with respect to the definitions of swaps, security-based swaps, and mixed swaps, the Commissions must jointly interpret such definitions. This rule, by providing a mechanism for the Commissions to provide such joint interpretations, allows parties to understand the timing and process for seeing such joint interpretation. Regardless of this rule, the programmatic costs and benefits that flow from being a swap or security-based swap remain the same for parties requesting a joint interpretation. But, the rule allows for parties to the agreement, contract, or transaction to request through a joint interpretation from the Commissions, what regulatory regime would apply or whether the agreement, contract, or transaction is within the definition of swap or security-based swap.

### (ii) Assessment Costs

The SEC estimates the costs of submitting a request for a joint interpretation pursuant to rule 3a68–2 under the Exchange Act would be approximately $20,000.[1344] The use of inside counsel in lieu of outside counsel would reduce this estimate. Once such a joint interpretation is made, however, other market participants that seek to transact in the same agreement, contract, or transaction (or class thereof) would be able to rely on such interpretation in determining whether their agreement, contract, or transaction is a swap, security-based swap, or mixed swap. Accordingly, assessment costs may be affected by the number of parties seeking an interpretation or whether prior interpretations with respect to the same or similar agreements, contracts, or transactions have been sought.

### (f) Definition of Swap (Rule 3a69–2 Under the Exchange Act)

(i) Programmatic Benefits and Costs

Rule 3a69–2(a) under the Exchange Act states that the term swap has the meaning set forth in section 3(a)(69) of the Exchange Act.[1345] Rule 3a69–2(b) under the Exchange Act explicitly defines the term "swap" to include an agreement, contract, or transaction that is a cross-currency swap, currency option, foreign currency option, foreign exchange option, foreign exchange rate option, foreign exchange forward, foreign exchange swap, forward rate agreement, or non-deliverable forward involving foreign exchange, unless such agreement, contract, or transaction is otherwise excluded by section 1a(47)(B) of the CEA.[1346] Rule 3a69–2(c) under the Exchange Act provides that: (1) A foreign exchange forward or a foreign exchange swap shall not be considered a swap if the Secretary of the Treasury makes the determination described in section 1a(47)(E)(i) of the CEA;[1347] and (2) notwithstanding any such determination, certain provisions of the CEA will apply to such a foreign exchange forward or foreign exchange swap (specifically, the reporting requirements in section 4r of the CEA[1348] and regulations thereunder

---

[1340] *See* MarketAxess Letter. *See also supra* part III.G.5.b).

[1341] *See* section 3(a)(55)(C)(iii)(II) of the Exchange Act, 15 U.S.C. 77c(a)(55)(C)(iii)(II).

[1342] *See supra* part X.4(b)(i).

[1343] *Id.*

[1344] As stated in the Proposing Release at 29878, n. 354, this estimate is based on information indicating that the average costs associated with preparing and submitting a no action request to the SEC staff, which the SEC believes is a process similar to the process under rule 3a68–2 under the Exchange Act. The staff estimates that costs associated with a request pursuant to rule 3a68–2 will cost approximately $19,560. The SEC estimates the analysis will require approximately 20 hours of in-house counsel time and 30 hours of outside counsel time. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by SEC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits, and overhead), staff estimates that the average national hourly rate for an in-house attorney is $378. The SEC estimates the costs for outside legal services to be $400 per hour. This is the same estimate used by the SEC for these services in the release involving *Exemptions for Security-Based Swaps Issued By Certain Clearing Agencies,* Release No. 33–9308 (Mar. 30, 2012), 77 FR 20536 (Apr. 5, 2012). Accordingly, the SEC estimates the cost to be $19,560 ($7,560 (based on 20 hours of in-house counsel time × $378) + $12,000 (based on 30 hours of outside counsel × $400)) to submit a joint request for interpretation. This estimate is rounded by two significant digits to avoid the impression of false precision of the estimate.

[1345] 15 U.S.C. 78c(a)(69).

[1346] 7 U.S.C. 1a(47)(B).

[1347] 7 U.S.C. 1a(47)(E)(i).

[1348] 7 U.S.C. 6r.

and, in the case of a swap dealer or major swap participant that is a party to a foreign exchange swap or foreign exchange forward, the business conduct standards in section 4s of the CEA [1349] and regulations thereunder). Rule 3a69–2(c) under the Exchange Act further clarifies that a currency swap, cross-currency swap, currency option, foreign currency option, foreign exchange option, foreign exchange rate option, or non-deliverable forward involving foreign exchange is not a foreign exchange forward or foreign exchange swap subject to a determination by the Secretary of the Treasury as described in the preamble.

Rule 3a69–2 is parallel to rule 1.3(xxx)(2) under the CEA. In order to determine whether an agreement, contract, or transaction is a "swap" or "security-based swap", it is necessary for the Commissions to adopt parallel rules that will apply to a Title VII instrument. Therefore, rule 3a69–2 is included under the Exchange Act. The definition of swap is the starting point for determining the status of a Title VII Instrument as a swap, security-based swap, or mixed swap. To the extent that the specific agreements, contracts, and transactions listed in section 1a(47)(B) of the CEA are swaps, the programmatic costs and benefits that flow from such agreements, contracts or transactions being a Title VII instrument under rule 3a69–2 will be determined by the substantive rules adopted by the CFTC mandated by Title VII. If any such agreements, contracts, or transactions are security-based swaps, the programmatic costs and benefits will be the same as with other security-based swaps.

(ii) Assessment Costs

Since this rule lists some of the types of agreements, contracts or transactions already listed in section 1a(47)(B) of the CEA [1350] and the determination made by the Secretary of the Treasury, the SEC does not believe there would be assessment costs in addition to those incurred by market participants in determining whether an agreement, contract or transaction falls within the definition of swap.

(g) Mixed Swaps (Rule 3a68–4 Under the Exchange Act)

(i) Programmatic Benefits and Costs

Rule 3a68–4(a) defines a "mixed swap" in the same manner as the term is defined in both the CEA and Exchange Act. Furthermore, rule 3a68–4(b) under the

Exchange Act establishes the regulatory framework for mixed swaps with which parties to bilateral uncleared mixed swaps (*i.e.*, mixed swaps that are neither executed on or subject to the rules of a DCM, NSE, SEF, SB SEF, or FBOT nor cleared through a DCO or clearing agency), as to which at least one of the parties is dually registered with both the CFTC and the SEC, will need to comply. The SEC believes that paragraph (b) of rule 3a68–4 under the Exchange Act will augment the programmatic benefits of the Title VII regulatory regime. The rule addresses potentially duplicative regulatory requirements for dually-registered dealers and major participants that are subject to regulation by both the CFTC and the SEC, while requiring dual registrants to comply with the regulatory requirements the Commissions believe are necessary to provide sufficient regulatory oversight for mixed swaps transactions entered into by such dual registrants. It eliminates potentially duplicative regulation and reduces the programmatic costs associated with regulatory implementation and compliance in the context of mixed swaps by providing that a bilateral uncleared mixed swap would be subject to all applicable provisions of the Federal securities laws (and the SEC rules and regulations promulgated thereunder) but would be subject only to certain CEA provisions (and the CFTC rules and regulations promulgated thereunder).

Rule 3a68–4(c) under the Exchange Act establishes a process for persons to request that the Commissions issue a joint order, with respect to parallel provisions [1351] applicable to mixed swaps, to permit such persons (and any other person or persons that subsequently lists, trades, or clears that class of mixed swap) to comply with the parallel provisions of either the CEA or the Exchange Act and related rules and regulations (collectively "specified parallel provisions"), instead of being required to comply with parallel provisions in both the CEA and the Exchange Act. This process applies except with respect to bilateral, uncleared mixed swaps where one of the parties to the mixed swap is dually registered with the CFTC as a swap dealer or major swap participant and with the SEC as a security-based swap dealer or major security-based swap participant, for which the regulatory

framework is established under rule 3a68–4(c). The SEC has recognized the programmatic benefits associated with rule 3a68–4(c) and believes that in the mixed swap area, the process established by rule 3a68–4(c) would eliminate potentially duplicative regulatory requirements and reduce the compliance costs associated with mixed swaps.

(ii) Assessment Costs

With respect to rule 3a68–4(b) under the Exchange Act, one cost is that parties to a mixed swap would need to determine whether they satisfy the conditions set forth in such rule in order to ascertain the regulatory treatment of the mixed swap. Such assessment includes determining whether the mixed swap is neither executed on nor subject to the rules of a DCM, NSE, SEF, SB SEF, or FBOT, whether the mixed swap will not be submitted for clearing, and whether one party to the mixed swap is a dually registered dealer or major participant. The SEC believes that the above determinations would be based on readily ascertainable facts and the assessment costs associated with such determinations should be minimal.

With respect to rule 3a68–4(c) under the Exchange Act, parties to mixed swaps have the option to decide whether to submit a request for issuing a joint order, weighing the benefits realized from the joint order against the cost of submitting such request. If parties to mixed swaps decide to submit a request, the SEC estimates the total costs of preparing and submitting a party's request to the Commissions pursuant to rule 3a68–4(c) under the Exchange Act will be $31,000 per request for mixed swaps for which a request for a joint interpretation pursuant to rule 3a68–4(c) was not previously made.[1352] The use of inside

---

[1349] 7 U.S.C. 6s.

[1350] 7 U.S.C. 1a(47)(B).

[1351] For purposes of paragraph (c) of rule 3a68–4 under the Exchange Act, "parallel provisions" means comparable provisions of the CEA and the Exchange Act that were added or amended by Title VII with respect to security-based swaps and swaps, and the rules and regulations thereunder.

[1352] As discussed in the Proposing Release at 29878, note 356, this estimate is based on information indicating that the average costs associated with preparing and submitting a no-action request to the SEC staff, which the SEC believes is a process similar to the process under rule 3a68–4(c). The staff estimates that costs associated with such a request will cost approximately $31,340. The SEC estimates the analysis will require approximately 30 hours of in-house counsel time and 50 hours of outside counsel time. Based upon data from SIFMA's *Management & Professional Earnings in the Securities Industry 2011* (modified by SEC staff to account for an 1800-hour-work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits, and overhead), staff estimates that the average national hourly rate for an in-house attorney is $378. The SEC estimates the costs for outside legal services to be $400 per hour. This is the same estimate used by the SEC for these services in the release involving *Exemptions for Security-Based Swaps Issued By Certain Clearing Agencies*, Release No. 33–9308 (Mar. 30, 2012), 77 FR 20536 (Apr. 5,

counsel in lieu of outside counsel would reduce this estimate. Absent such a process, though, market participants that desire or intend to offer or enter into such a mixed swap (or class thereof) would not have the option to request for the Commissions' joint interpretation and absent a joint interpretation, they would be required pursuant to Title VII to comply with all regulatory requirements applicable to both swaps and security-based swaps.

### (iii) Alternatives

One commenter recommended that the Commissions require that market participants disaggregate mixed swaps and enter into separate simultaneous transactions so that they cannot employ mixed swaps to obscure the underlying substance of transactions.[1353] This commenter stated that "the regulatory complexity of dealing with a mixed swap far outweighs the legitimate benefits to counterparties from documenting the transactions as mixed swaps."[1354] This commenter asserted that some benefits of requiring disaggregation include more useful price reporting; increased transparency; regulatory reporting and monitoring that will align with the transaction database of the counterparties; and the thwarting of illegitimate motivations, such as obfuscation of prices and fees. Regardless of the benefits of disaggregation raised by the commenter, Title VII specifically contemplates that there would be mixed swaps comprised of both swaps and security-based swaps. The SEC believes that requiring parties to disaggregate mixed swaps into separate components is not consistent with congressional intent and may result in certain programmatic costs, such as limiting the types of derivatives products and transactions market participants may offer and enter into and increasing transaction costs (such as documentation costs) by disaggregating a mixed swap into multiple separate transactions.

### (h) Books and Records Requirement for SBSAs (Rule 3a69–3 Under the Exchange Act)

#### (i) Programmatic Benefits and Costs

Rule 3a69–3 under the Exchange Act provides that there are no additional books and records, or data, requirements regarding SBSAs beyond those required for swaps. The SEC recognized the following programmatic benefits and costs in adopting this rule.

As discussed above, SBSAs are swaps over which the CFTC has primary regulatory authority, but for which the SEC has antifraud, anti-manipulation, and certain other authority.[1355] There will be programmatic benefits and costs as a result of the SDRs, swap dealers, and major swap participants implementing and complying with the books and records requirements provided in sections 21 and 4s of the CEA.[1356] The programmatic benefits and costs will flow from the substantive rules adopted by the CFTC regarding record keeping requirements for swaps. SBSAs are swaps and will be subject to these books and records requirements. The SEC believes that the rules proposed by the CFTC would provide sufficient books and records regarding SBSAs,[1357] and that additional books and records requirements for SBSAs may be duplicative and would not produce corresponding benefits warranting such additional costs. Rule 3a69–3 under the Exchange Act avoids any additional programmatic costs, especially the additional compliance and operation costs that would be incurred by SDRs, swap dealers, and major swap participants in the area of data maintenance and recordkeeping, beyond those which have already been prescribed by the CFTC's rules.

#### (ii) Assessment Costs

The SEC does not believe that any assessment costs associated with rule 3a69–3 under the Exchange Act would be material.

### 5. Effects on Competition, Efficiency, and Capital Formation

Section 3(f) of the Exchange Act requires the SEC, whenever it engages in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action would promote efficiency, competition, and capital formation.[1358] In addition, section 23(a)(2) of the Exchange Act [1359] requires the SEC, when adopting rules under the Exchange Act, to consider the impact such rules would have on competition. Section 23(a)(2) of the Exchange Act also prohibits the SEC from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

The Commissions are further defining "swap" and "security-based swap" pursuant to section 712(d)(1) of the Dodd-Frank Act.[1360] In the Proposing Release, the SEC stated that the SEC preliminarily believed that the proposed Exchange Act rules would not impose significant burden on competition, that they would create efficient processes, and that they would not have adverse effects on capital formation.[1361] In the Proposing Release, the SEC requested comment on each of these issues,[1362] and no commenters responded to specifically address these issues.

The SEC recognizes that the most significant impact of the swap and security-based swap definitions will derive from these definitions serving as the foundation for implementing the Title VII regulatory regime, particularly given the significant impacts that Title VII will have on the security-based swap market. In adopting these definitional rules, the SEC has sought to fairly reflect the statutory definitions and their underlying intent to implement the regulatory framework Congress intended to impose on the derivatives markets by enacting Title VII.

The scope of the definitions will affect the ultimate regulatory effects on competition, efficiency, and capital formation that will accompany the full implementation of Title VII. The SEC anticipates analyzing these effects in the adopting releases for the particular regulations. Below is a general discussion of the impacts on competition, efficiency, and capital formation as a result of the rules being adopted in this release.

The final rules being adopted relate primarily to further defining the terms "swap," "security-based swap," and "mixed swap" to determine (i) the instruments that will be subject to the Title VII regulatory regime and (ii) the jurisdictional line between Title VII

---

2012). Accordingly, the SEC estimates the cost to be $31,340 ($11,340 (based on 30 hours of in-house counsel time × $378) + $20,000 (based on 50 hours of outside counsel × $400)) to submit a joint request for interpretation. This estimate is rounded by two significant digits to avoid the impression of false precision of the estimate.

[1353] *See* Better Markets Letter.

[1354] *Id.*

[1355] *See supra* part V.

[1356] 7 U.S.C. 24a and 6s. Pursuant to sections 21(b)(2) and 4s(f)(1)(B)(ii) of the CEA, the CFTC has adopted rules with respect to data collection and maintenance by SDR and books and records requirements for swap dealers and major swap participants. *See* Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 FR 20128 (April 3, 2012); and Swap Data Recordkeeping and Reporting Requirements, 77 FR 2136 (January 13, 2012).

[1357] *See* Proposing Release at 29863. *See also supra* part V.

[1358] 15 U.S.C. 78c(f).

[1359] 15 U.S.C. 78w(a)(2).

[1360] The SEC is also acting pursuant to its rulemaking authority provided by sections 3 and 23(a) of the Exchange Act.

[1361] *See* Proposing Release at 29885–87.

[1362] *Id.* at 29887.

instruments regulated by the SEC and those regulated by the CFTC. There also are procedural rules regarding interpretive requests and joint orders from the Commissions, and recordkeeping relating to SBSAs. The SEC believes that these procedural rules are related to the status of a product and the regulatory treatment of a mixed swaps, and therefore, the effects of these rules on competition, efficiency, and capital formation are subsumed in the overall impact of the rules defining the perimeter of the Title VII regulatory regime, and those of the rules relating to the jurisdictional line between the SEC and CFTC.

(a) The Status of Products

The status of products as inside the Title VII regulatory perimeter (i.e., swaps and security-based swaps) or outside the regulatory perimeter will have impacts on market participants. These rules will impact the status of certain market participants currently acting as intermediaries in the security-based swap market, subjecting them to regulatory oversight and registration. As the SEC has noted, the market among intermediaries for security-based swaps is highly concentrated. The concentration in large part appears to reflect the fact that larger entities possess competitive advantages in engaging in over-the-counter security-based swap dealing activities, particularly with respect to having sufficient financial resources to provide potential counterparties with adequate assurances of financial performance.[1363] At the same time, as noted by commenters to the Entity Definition Release, some entities engage in smaller volumes of security-based swap dealing activity.[1364] Some small and mid-size banks, for example, routinely provide such services involving relatively small notional amounts to their customers.[1365] Although these relatively small dealers in general may not compete directly with the largest dealers (because they service a different segment of the market), they may be expected to play a role in helping certain types of customers (such as customers with a relatively small need for security-based swaps) enter into security-based swaps, thus promoting the availability of these products.[1366] This availability may assist market participants (as end users), as discussed below, in engaging security-based swap activities that may

be related to their businesses or financing needs.

As the SEC has noted before, persons who fall within the definitions of ''security-based swap dealer'' and ''major security-based swap participant'' will incur a range of programmatic costs by virtue of their status as a registered dealer or major participant and certain assessment costs regarding their security-based swap activities. To the extent the costs associated with these statutorily mandated requirements are relatively fixed or large enough, they may negatively affect competition within the security-based swap market.[1367] This may, for example, lead smaller dealers or entities for whom dealing is not a core business to keep their security-based swap dealing activity below the volume threshold required to be registered with the SEC or exit the market if the profit from the security-based swap dealing activity cannot justify the cost incurred to comply with the Title VII requirements; both scenarios could cause customers to have less access to the market or to incur higher costs in accessing the market. Such costs might also deter the entry of new firms into the market. If sufficiently high, these costs of compliance may increase concentration among dealers.[1368]

Certain aspects of the regulation of products defined as security-based swaps may enhance competition in the market for security-based swaps. For example, the proposed business conduct standards, if adopted as proposed, including those for disclosure of material risks and for fair and balanced communications, may reduce information asymmetries between security-based swap dealers, major security based swap participants, and their counterparties. The reduction of information asymmetries should promote price efficiency, promote more informed decision-making, and reduce the incidence of fraudulent or misleading representations.[1369]

In addition, as the SEC noted in the Entity Definitions Release, the current security-based swap market is subject to the potential for risk spillovers and systemic risk, which can occur when the financial sector as a whole (or certain key segments) is exposed to a significant amount of concentrated financial risk, either through direct counterparty relationships or the deterioration of asset values, and such

exposure gives rise to the systemic chain effect of one firm's financial distress or losses leading to financial distress or losses of the entire financial sector as a whole.[1370] With respect to transactions involving security-based swaps, security-based swap dealers and major security-based swap participants will be regulated and, as noted in the Entity Definitions Release, such regulation and requirements are expected to increase market participants' confidence in the dealers' and major participants' ability to perform their obligations.[1371]

The effect of the definitions on efficiency and capital formation is linked to their effect on competition. Markets that are competitive, with fair and transparent pricing and equal access to security-based swaps, may be expected to promote the efficient allocation of capital. Similarly, definitions that promote, or do not unduly restrict, competition can be accompanied by regulatory benefits that minimize the risk of market failure and thus promote efficiency and capital formation within the market.[1372]

As discussed above, certain Title VII requirements and rules relating to intermediaries, such as internal and external business conduct standards, if adopted as proposed, are expected to reduce information asymmetries and promote price efficiency. These business conduct standards, if adopted as proposed, would also help regulators perform their functions in an effective manner. The resulting increase in market integrity could affect capital formation in U.S. capital markets positively.[1373]

Other entities also will be affected by the scope of the security-based swap definition, including clearing agencies that currently, and in the future will, clear security-based swaps, the security-based swap data repositories that collect security-based swap data, and the SB SEFs and exchanges that are transaction venues for security-based swaps, subjecting these entities to regulation and oversight by the SEC.[1374] For example, The SEC has noted that the intent of the proposed rules concerning standards for clearing agency operations and governance standards of clearing agencies is to promote the prompt and accurate clearance and settlement of securities transactions, including security-based swap transactions, by

---

[1363] *See* Entity Definitions Release, at 30740.
[1364] *Id.*
[1365] *Id.*
[1366] *Id.*

[1367] *Id.*
[1368] *Id.*
[1369] *See* Business Conduct Standards Proposing Release, 76 FR 42396–42459, at 42452. *See also supra* part XI.A.3.

[1370] *See* Entity Definitions Release, at 30740.
[1371] *Id.* at 30723–30724.
[1372] *See* Entity Definitions Release, at 30742.
[1373] *See* Business Conduct Standards Proposing Release, at 42452; SDR Proposing Release, at 77365.
[1374] *See supra* part XI.A.3.

requiring certain minimum standards at clearing agencies.[1375] The SEC stated that it preliminarily believes that these requirements would ensure resilient and cost-effective clearing agency operations as well as promote transparent and effective clearing agency governance that would consequently support confidence among market participants in clearing agencies' ability to serve as efficient mechanisms for clearance and settlement and to facilitate capital formation.[1376]

Similarly, the SEC has previously stated that the core principles, duties, and requirements imposed by Title VII and the proposed rules on SB SEFs will foster innovation in the security-based swap market by allowing entities that seek to become SB SEFs to structure diverse platforms for the trading of security-based swaps,[1377] increase pre-trade price transparency, and establish fair, objective, and not unreasonably discriminatory standards for granting impartial access to trading on the SB SEFs,[1378] thereby furthering higher efficiency, promoting competition, and encouraging capital formation.[1379] The SEC also noted that any resulting increase in market integrity proceeding from the rules intended to support the statutorily-mandated regulatory obligations of SB SEFs would likely increase market participants' confidence in the soundness and fairness of the security-based swap market.[1380] Such increased confidence likely would stimulate financial investment in SB swaps by corporate entities and others that may find that more transparent venues for the trading of SB swaps would allow them to purchase SB swaps to offset business risks and to meet hedging objectives.[1381] Further, to the extent that market participants utilize SB swaps to better manage portfolio risks with respect to positions in underlying securities, the extent that they are willing to participate in the SB swap market may impact their willingness to participate in the underlying asset's market.[1382] Therefore, the Commission stated its preliminary belief that the proposed rules would help encourage capital formation.[1383]

Furthermore, in the proposing release regarding SDRs,[1384] the SEC noted that, by allowing multiple SDRs to provide data collection, maintenance, and recordkeeping services, the rules are intended to promote competition among SDRs. The SEC also stated that the proposed rules promote data collection, maintenance, and recordkeeping according to existing best practices that are used in similar capital market institutions and are likely to positively affect transparency in credit markets and would help capital formation in the broader capital markets whose participants rely on security-based swap markets to meet their hedging objectives.[1385]

Other parties to security-based swap transactions may be affected by the definitions as well. Title VII amends the Exchange Act and the Securities Act to include security-based swap within the definition of the term "security."[1386] End-users will have the benefit and protection of the existing Federal securities laws, including the Exchange Act and Securities Act provisions added by Title VII. As a result of the amendment to the Securities Act regarding security-based swap transactions entered into by issuers of the securities underlying the security-based swap, and their affiliates and underwriters,[1387] such issuers, affiliates, and underwriters cannot use security-based swaps without also complying with the Securities Act provisions with respect to the underlying securities. Furthermore, Title VII provides protections to non-ECPs by adding provisions to both the Securities Act and the Exchange Act that require security-based swap transactions with such non-ECPs to be covered by an effective registration statement under the Securities Act and traded on a national securities exchange, and for brokers and dealers engaging in transactions with non-ECPs to be registered as such under section 15 of the Exchange Act. To the extent counterparties, including issuers of the underlying securities, or their affiliates or underwriters, determine to engage in such transactions, other counterparties may have a greater willingness to engage in such transactions because of the protections afforded by the Securities Act registration, disclosure, and civil liability scheme. An increased interest

by end-users may create effects on competition.

While other securities-related derivatives have the same limitations on issuers, affiliates, and underwriters using the derivative to avoid the Securities Act application to the underlying securities at the time the transaction is entered into, these other derivatives, such as security options and security futures, do not contain the same limitation on transactions with non-ECPs. Although security options and security futures must be traded on a national securities exchange as one condition to avail themselves of an exemption from registration under the Securities Act,[1388] other exemptions from registration under the Securities Act may be available for transactions in security options sold to non-ECPs that are not available to security-based swap transactions with non-ECPs.

There also may be effects on efficiency and capital formation by facilitating end-users' use of security-based swaps for investment or hedging of risks relating to investments or business operations, thereby affecting liquidity and costs in connection with the issuance of equity and debt securities. The further definitions may promote capital formation by facilitating these hedging and investment activities. For example, in the context of CDS, as credit risk is correlated, lenders who made loans and investors in debt securities may find it desirable to hedge credit risks on their loan or securities portfolios by purchasing protection through single-name or index CDS.[1389] Although basis risk may exist in this type of trade, it should be effective at reducing counterparty exposure.[1390]

### (b) Jurisdictional Divide Impacts

There may be competitive impacts that arise due to the jurisdictional divide between the CFTC and the SEC that Congress imposed in Title VII. While the competitive impacts of the substantive rules will be addressed as part of each substantive rulemaking, the SEC acknowledges that such competitive effects may exist as a consequence of the statutory jurisdictional divide. These competitive impacts may arise due to capital and margin treatment, for example, which may affect demand for security-based swaps as compared to other types of security instruments. In addition, to the extent there are differences in regulatory treatment between security-based swaps

---

[1375] *See* Clearing Agency Standards Proposing Release, at 14535.

[1376] *Id.*

[1377] *See* SB SEF Proposing Release, at 11049.

[1378] *Id.*

[1379] *Id.* at 11049–50.

[1380] *Id.* at 11049.

[1381] *Id.*

[1382] *Id.* at 11050.

[1383] *Id.*

[1384] *See* SDR Proposing Release, at 77365.

[1385] *Id.*

[1386] *See* section 2(a)(1) of the Securities Act and section 3(a)(10) of the Exchange Act, 15 U.S.C. 77b(a)(1) and 15 U.S.C. 78c(a)(10).

[1387] *See supra* part XI.A.3.

[1388] *See* section 3(a)(14) of the Securities Act and Rule 238 under the Securities Act.

[1389] *See* Entity Definitions Release, at 30742.

[1390] *Id.*

and other securities-based or securities-related instruments, there will be competition across the markets affecting all market participants.

As one example of the possible competitive effects of the jurisdictional divide, section 3E(a) of the Exchange Act provides that only a registered broker, dealer, or security-based swap dealer may accept margin from customers to secure cleared security-based swap transactions,[1391] and that the broker, dealer, or security-based swap dealer shall treat and deal with all margin received from a customer as belonging to the customer.[1392] Similarly, section 4d(f) of the Commodity Exchange Act requires that only a registered futures commission merchant may accept margin from customers to secure cleared swaps transactions [1393] and that the futures commissions merchant shall treat and deal with margin received from a customer as belonging to the customer.[1394] The SEC understands that many members of clearing agencies are dually-registered broker-dealers and futures commission merchants and that much of the clearing of security-based swaps may occur through such dually-registered entities.[1395] Because collateral for swaps and security-based swaps are required under applicable statutory requirements to be maintained in two separate accounts under the CEA and Exchange Act, respectively, the derivatives portfolio of a customer will be separated into a swap portfolio and a security-based swap portfolio, with two separate margin accounts and without the benefits of netting swaps against security-based swaps for purposes of calculating margin requirements. Absent the adoption of a margin and segregation approach that would permit a customer to hold both swaps and security-based swaps in a single customer account, a customer who clears swaps and security-based swaps through a clearing member who is dually-registered as a futures commission merchant with the CFTC and a broker-dealer with the SEC may have to deliver collateral to the clearing member with respect to the customer's cleared swap portfolio and also deliver collateral as margin to the clearing member with respect to its security-based swap portfolio even if the positions in the swap portfolio offset the risk arising from the positions in the security-based swap portfolio. This will impact customers' liquidity, as opposed to holding swap and security-based swap positions in one single account,[1396] and increase customers' transaction costs. Such an increase will affect customers' ability to use security-based swaps and may drive them to seek less expensive alternatives. Decrease in demand for security-based swaps may increase dealer competition in the security-based swap market for the remaining business, or result in dealers exiting the market.

In addition, there may be competitive impacts on security-based swap dealers, major security-based swap participants, clearing agencies, security-based swap data repositories and security-based swap execution facilities (or national securities exchanges) if they provide services for both security-based swaps and swaps, as their businesses will be divided based on the jurisdictional line between swaps and security-based swaps. For registered entities whose derivatives activities involve products that reference indexes or baskets, they will incur assessment costs [1397] and, to the extent that SEC and CFTC regulations diverge, they will incur additional regulatory compliance costs [1398] to implement two sets of regulations that would not otherwise be incurred if the jurisdictional divide did not exist. The SEC recognizes that these costs may affect existing market participants' considerations whether to continue to operate their business, and new entrants' desire to enter into new business, across two separate regulatory regimes and if they determine that the incremental costs of operating the derivatives business under two separate regulatory regimes would outweigh potential revenues, they may exit certain products to limit the application of regulatory requirements to solely those of the CFTC or the SEC. This could result in a redistribution of the swaps or security-based swaps dealing activity in the derivatives market and lead to further concentration of security-based swap dealing activity.

The SEC understands that Congress intended to create two parallel regulatory regimes for the derivatives market that complement each other. Each regulatory regime will have the benefit of the regulatory expertise of the respective agency. The rules further defining swap, security-based swap, and mixed swap do not by themselves create negative competitive impacts other than those which potentially could be imposed if the Commissions' substantive requirements differ substantially.

Finally, the rules being adopted may have effects on efficiency and capital formation. For example, the rules defining the terms "issuers of securities in a narrow-based security index" and "narrow-based security index" for purposes of the jurisdictional divide are intended to, among other things, minimize the likelihood that an index on which a CDS is based that is outside of the SEC's jurisdiction can be used as a surrogate or substitute for the underlying security, or with respect to securities of the referenced issuer, or to manipulate the market for such securities. Such provisions will provide greater protection to the reference issuers or the issuers of the securities in the index that the index CDS cannot be used in a manner that will adversely affect such issuers and their ability to raise capital.

In conclusion, the SEC believes the rules and interpretations adopted here would not have overall adverse effects on efficiency, competition, or capital formation.

## B. Paperwork Reduction Act

### 1. Background

Rules 3a68–2 and 3a68–4(c) under the Exchange Act contain new "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995.[1399] The SEC has submitted them to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[1400] The titles

---

[1391] See section 3E(a) of the Exchange Act, 15 U.S.C. 78c–5(a).

[1392] See section 3E(b)(1) of the Exchange Act, 15 U.S.C. 78c–5(b)(1).

[1393] See section 4d(f)(1) of the CEA, 7 U.S.C. 6d(f)(1).

[1394] See section 4d(f)(2)(A) of the CEA, 7 U.S.C. 6d(f)(2)(A).

[1395] See, e.g., letter to the SEC from ICE Clear Credit LLC, dated November 7, 2011 ("ICE Clear Credit Letter"), available at *http://www.sec.gov/rules/petitions/2011/petn4-641.pdf* (requesting exemptive relief from the application of section 15(c)(3) of the Exchange Act and Rule 15c3–3 thereunder to allow ICE Clear Credit, and its members that are dually-registered broker-dealers and futures commission merchants, to, among other things: (1) Hold customer assets used to margin, secure, or guarantee customer positions consisting of cleared credit default swaps that include swaps and security-based swaps in a commingled customer omnibus account subject to section 4d(f) of the CEA; and (2) calculate margin for this commingled customer account on a portfolio margin basis); see also section 4d(F)(1) of the CEA (making it unlawful for any person to, among other things, accept money and securities from a swaps customer for a cleared swap unless such person has registered with the CFTC as a futures commission merchant).

[1396] See ICE Clear Credit Letter at 6, 13–14. See also Statement of General Policy on the Sequencing of the Compliance Dates for Final Rules Applicable to Security-Based Swaps Adopted Pursuant to the Securities Exchange Act of 1934 and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 77 FR 35625 n.138 (June 14, 2012).

[1397] See the discussion of assessment costs of various rules and interpretations, *supra* part XI.A.4.

[1398] See supra parts XI.A.3 and XI.A.4.

[1399] 44 U.S.C. 3501 et seq.

[1400] 44 U.S.C. 3507(d) and 5 CFR 1320.11.

for the collections of information are: (1) Interpretation of Swaps, Security-Based Swaps, and Mixed Swaps and (2) Regulation of Mixed Swaps: Process for determining regulatory treatment for mixed swaps (OMB Control No. 3235–0685). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

The rules containing these two collections of information are being adopted pursuant to the Exchange Act. The rules establish a process through which a person can submit a request to the Commissions that the Commissions provide a joint interpretation of whether an agreement, contract, or transaction (or class thereof) is a swap, security-based swap, or both (*i.e.*, a mixed swap). The rules also establish a process with respect to mixed swaps through which a person can submit a request to the Commissions that the Commissions issue a joint order permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that class of mixed swap) to comply, as to parallel provisions only, with specified parallel provisions, instead of being required to comply with parallel provisions of both the CEA and the Exchange Act. The hours and costs associated with preparing and sending these requests will constitute reporting and cost burdens imposed by each collection of information.

In the Proposing Release, the SEC requested comment on the collection of information requirements.[1401] As discussed in connection with rules 3a68–2 and 3a68–4(c) under the Exchange Act, under the Exchange Act the final rules require the same information to be collected as proposed.[1402] As noted above, the Commissions received approximately 86 comment letters on the Proposing Release.[1403] The SEC did not receive any comments that directly address its Paperwork Reduction Act analysis or its burden estimates. However, the SEC did receive comments regarding confidentiality of information submitted as a result of the collection of information requirements. These comments do not directly address the SEC's Paperwork Reduction Act analysis, but they do implicate those aspects of the analysis regarding

confidentiality. These comments are discussed below.[1404]

## 2. Summary of Collection of Information Under Rules 3a68–2 and 3a68–4(c) Under the Exchange Act

First, the SEC is adopting new rule 3a68–2 under the Exchange Act, which will allow persons to submit a request for a joint interpretation from the Commissions regarding whether an agreement, contract, or transaction (or a class thereof) is a swap, security-based swap, or both (*i.e.*, a mixed swap). Under rule 3a68–2 under the Exchange Act, a person will provide to the Commissions all material information regarding the terms of, and a statement of the economic characteristics and purpose of, each relevant agreement, contract, or transaction (or class thereof), along with that person's determination as to whether each such agreement, contract, or transaction (or class thereof) should be characterized as a swap, security-based swap, or both (*i.e.*, a mixed swap), including the basis for such a determination. The Commissions also may request the submitting person to provide additional information.

The Commissions may issue in response a joint interpretation or joint notice of proposed rulemaking regarding the status of that agreement, contract, or transaction (or class thereof) as a swap, security-based swap, or both (*i.e.*, a mixed swap). Any joint interpretation, like any joint notice of proposed rulemaking, will be public and may discuss the material information regarding the terms of the relevant agreement, contract, or transaction (or class thereof), as well as any other information the Commissions deem material to the interpretation. Requesting persons also will be permitted to withdraw a request made pursuant to rule 3a68–2 under the Exchange Act at any time before the Commissions have issued a joint interpretation or joint notice of proposed rulemaking in response to the request.

Persons will submit requests pursuant to rule 3a68–2 under the Exchange Act on a voluntary basis. However, if a person submits a request, all of the information required under the rule, including any additional information requested by the Commissions, must be submitted to the Commissions, except to the extent a person withdraws the request pursuant to the rule.

Second, the SEC is adopting rule 3a68–4(c) under the Exchange Act, which will allow persons to submit

requests to the Commissions for joint orders regarding the regulation of a particular mixed swap (or class thereof). Under rule 3a68–4(c) under the Exchange Act, a person will provide to the Commissions all material information regarding the terms of, and the economic characteristics and purpose of, the specified (or specified class of) mixed swap. In addition, a person will provide the specified parallel provisions, the reasons the person believes such specified parallel provisions are appropriate for the mixed swap (or class thereof), and an analysis of: (1) The nature and purposes of the parallel provisions that are the subject of the request; (2) the comparability of such parallel provisions; and (3) the extent of any conflicts or differences between such parallel provisions. The Commissions also may request the submitting person to provide additional information.

The Commissions may issue in response a joint order, after public notice and opportunity for comment, permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that class of mixed swap) to comply, as to parallel provisions only, with the specified parallel provisions (or another subset of the parallel provisions that are the subject of the request, as the Commissions determine is appropriate), instead of being required to comply with parallel provisions of both the CEA and the Exchange Act. Any joint order will be public and may discuss the material information regarding the terms of the relevant agreement, contract, or transaction (or class thereof), as well as any other information the Commissions deem material to the interpretation. Requesting persons also will be permitted to withdraw a request made pursuant to rule 3a68–4(c) under the Exchange Act at any time before the Commissions have issued a joint order in response to the request.

Persons will submit requests pursuant to rule 3a68–4(c) under the Exchange Act on a voluntary basis. However, if a person submits a request, all of the information required under the rule, including any additional information requested by the Commissions, must be submitted to the Commissions, except to the extent a person withdraws the request pursuant to the rule.

## 3. Reasons for and Use of Information

The SEC will use the information collected pursuant to rule 3a68–2 under the Exchange Act to evaluate agreements, contracts, or transactions (or classes thereof) in order to provide joint interpretations or joint notices of

---

[1401] *See* Proposing Release at 29877, 29879.

[1402] *See* discussion of rules 3a68–2 and 3a68–4(c) *supra* parts VI and IV.B.3.

[1403] *See supra* part I.

[1404] *See infra* part XI.B.3.

proposed rulemaking with the CFTC regarding whether these agreements, contracts, or transactions (or classes thereof) are swaps, security-based swaps, or both (*i.e.*, mixed swaps) as defined in the Dodd-Frank Act. The SEC will use the information collected pursuant to rule 3a68–4(c) under the Exchange Act to evaluate a specified, or a specified class of, mixed swap in order to provide joint orders or joint notices of proposed rulemaking with the CFTC regarding the regulation of that particular mixed swap or class of mixed swap. The information provided to the SEC pursuant to rules 3a68–2 and 3a68–4(c) under the Exchange Act also will allow the SEC to monitor the development of new OTC derivatives products in the marketplace and determine whether additional rulemaking or interpretive guidance is necessary or appropriate.

As discussed above, some commenters expressed concern about the public availability of information regarding the joint interpretive process and asked that the parties be able to seek confidential treatment of their submissions.[1405] As stated above, under existing rules of both Commissions, requesting parties may seek confidential treatment for joint interpretive requests from the SEC and the CFTC in accordance with the applicable existing rules relating to confidential treatment of information.[1406] Also as stated above, even if confidential treatment has been requested, all joint interpretive requests, as well all joint interpretations and any decisions not to issue a joint interpretation (along with the explanation of the grounds for such decision), will be made publicly available at the conclusion of the review period.[1407]

### 4. Respondents

As discussed in the Proposing Release, the SEC believes that the relevant categories of persons that will submit requests under rule 3a68–2 under the Exchange Act will be swap dealers, security-based swap dealers, major swap participants, and major security-based swap participants; SEFs, security-based SEFs and DCMs trading swaps; and SDRs, SBSDRs, DCOs clearing swaps, and clearing agencies clearing security-based swaps.[1408] The SEC estimates that the total number of such persons will be 475.[1409] Similarly,

the SEC believes that the relevant categories of persons that will submit a request under rule 3a68–4(c) under the Exchange Act will be SEFs, security-based SEFs, and DCMs trading swaps and estimates that the total number of such persons will be 72.[1410]

However, based on the SEC's experience and information received from commenters to the ANPR[1411] and during meetings with the public to discuss the Product Definitions generally, and taking into consideration the certainty provided by the rules and interpretive guidance in this release, the SEC believes that the number of requests for a joint interpretation to the Commissions pursuant to rule 3a68–2 under the Exchange Act will be small.[1412] With respect to proposed rule 3a68–4(c) under the Exchange Act, the SEC also estimates the number of requests for joint orders will be small.[1413] Pursuant to the Commissions' rules and interpretive guidance, a number of persons that engage in agreements, contracts, or transactions that are swaps, security-based swaps, or both (*i.e.*, a mixed swap) will be certain that their agreements, contracts, or transactions are, indeed, swaps, security-based swaps, or both, (*i.e.*, mixed swaps) and will not request an interpretation pursuant to rule 3a68–2 under the Exchange Act. Also, as the Commissions provide joint interpretations regarding whether agreements, contracts, or transactions (or classes thereof) are or are not swaps, security-based swaps, or both (*i.e.*, mixed swaps), the SEC expects that the number of requests for interpretation will decrease over time. The SEC

believes that the rules and interpretive guidance regarding swaps, security-based swaps, and mixed swaps the Commissions are adopting, as well as the additional guidance issued pursuant to joint interpretations and orders under rules 3a68–2 and 3a68–4(c) under the Exchange Act, will result in a narrow pool of potential respondents, approximately 50,[1414] to the collection of information requirements of proposed rule 3a68–2 under the Exchange Act. Although the SEC does not have precise figures for the number of requests that persons will submit after the first year, the SEC believes it is reasonable to estimate that there likely will be fewer than 10 requests on average in each ensuing year.

Similarly, because the SEC believes that both the category of mixed swap transactions and the number of market participants that engage in mixed swap transactions are small, the SEC believes that the pool of potential persons requesting a joint order regarding the regulation of a specified, or specified class of, mixed swap pursuant to proposed rule 3a68–4(c) under the Exchange Act will be small. In addition, depending on the characteristics of a mixed swap (or class thereof), a person may choose not to submit a request pursuant to rule 3a68–4(c) under the Exchange Act. The SEC also notes that any joint order issued by the Commissions will apply to any person that subsequently lists, trades, or clears that specified, or specified class of, mixed swap, so that requests for joint orders could diminish over time. Also, persons may submit requests for an interpretation under rule 3a68–4(c) under the Exchange Act that do not result in an interpretation that the agreement, contract, or transaction (or class thereof) is a mixed swap.[1415] Also, those requests submitted pursuant to rule 3a68–2 under the Exchange Act that result in an interpretation that the agreement, contract, or transaction (or class thereof) is not a mixed swap will reduce the pool of possible persons submitting a request regarding the regulation of particular mixed swaps (or class thereof) pursuant to rule 3a68–4(c) under the Exchange Act.

Furthermore, although certain requests made pursuant to rule 3a68–

---

[1405] *See supra* part VI.

[1406] *See* 17 CFR 200.81 and 17 CFR 140.98. *See also supra* part VI.

[1407] *See supra* part VI.

[1408] *See* Proposing Release at 29876.

[1409] This total number includes an estimated 250 swap dealers, 50 major swap participants, 50

security-based swap dealers, 10 major security-based swap participants, 35 SEFs, 20 security-based SEFs, 12 DCOs, 17 DCMs, 15 SDRs, 10 SBSDRs, and 6 clearing agencies, as set forth by the CFTC and SEC, respectively, in their other Dodd-Frank Act rulemaking proposals. *See* Entity Definitions Release, *supra* note 12 (regarding security-based swap dealers and major security-based swap participants); Registration of Swap Dealers and Major Swap Participants, *supra* note 1288 (regarding swap dealers and major security-based swap participants); SDR Proposing Release, *supra* note 1231 (regarding SBSDRs); Swap Data Repositories, *supra* note 6 (regarding SDRs); *Core Principles and Other Requirements for Swap Execution Facilities,* 76 FR 1214, Jan. 7, 2011 (regarding SEFs); *Registration and Regulation of Security-Based Swap Execution Facilities,* 76 FR 10948, Feb. 28, 2011 (regarding security-based SEFs); *Derivatives Clearing Organization General Provisions and Core Principles,* 76 FR 69334 (Nov. 8, 2011); *Core Principles and Other Requirements for Designated Contract Markets,* 75 FR 80572, Dec. 22, 2010 (regarding DCMs); *Clearing Agency Standards for Operation and Governance,* 76 FR 14472, Mar. 16, 2011 (regarding clearing agencies).

[1410] *Id.*

[1411] *See supra* note 12 and accompanying text.

[1412] *See infra* note 1414 and accompanying text.

[1413] *See infra* note 1415 and accompanying text.

[1414] The SEC believes that there will be approximately 50 requests in the first year. *See* discussion *infra* part XI.B.5. The SEC recognizes that one person might submit more than one request but for purposes of the PRA is considering the submitter of each such request as a separate person.

[1415] The SEC believes it is reasonable to estimate that it will receive 20 requests in the first year and, as with rule 3a68–2 under the Exchange Act, it will count the submitter of each request as a separate person. *See id.*

4(c) under the Exchange Act may be made without a previous request for a joint interpretation pursuant to rule 3a68–2 under the Exchange Act, the SEC believes that most requests under rule 3a68–2 under the Exchange Act that result in the interpretation that an agreement, contract, or transaction (or class thereof) is a mixed swap will result in a subsequent request for alternative regulatory treatment pursuant to rule 3a68–4(c) under the Exchange Act. The SEC believes that 90 percent, or 18 of the estimated 20 requests pursuant to rule 3a68–4(c) under the Exchange Act in the first year would be such "follow-on" requests.

In addition, not only the requesting party, but also any other person that subsequently lists, trades, or clears that mixed swap, will be subject to, and must comply with, the joint order regarding the regulation of the specified, or specified class of, mixed swap, as issued by the Commissions. Therefore, the SEC believes that the number of requests for a joint order regarding the regulation of mixed swaps, particularly involving specified classes of mixed swaps, will decrease over time. As discussed above, the SEC believes that as the Commissions provide joint orders regarding alternative regulatory treatment, the number of requests received will decrease over time. The SEC believes it is reasonable to estimate that there likely will be five requests on average in each ensuing year.

### 5. Paperwork Reduction Act Burden Estimates

Rules 3a68–2 and 3a68–4(c) under the Exchange Act require submission of certain information to the Commissions to the extent persons elect to request an interpretation and/or alternative regulatory treatment. Rules 3a68–2 and 3a68–4(c) under the Exchange Act each require certain information that a requesting party must include in its request to the Commissions in order to receive a joint interpretation or order, as applicable.

### (a) Rule 3a68–2 Under the Exchange Act

Rule 3a68–2 will apply only to requests made by persons that desire an interpretation from the Commissions. For each agreement, contract, or transaction (or class thereof) for which a person requests the Commissions' joint interpretation under rule 3a68–2 under the Exchange Act, the requesting person will be required to provide certain information, as discussed above.[1416]

[1416] See discussion supra part VI.

As discussed above, the SEC believes it is reasonable to estimate that 50 requests will be received in the first year. For purposes of the PRA, the SEC estimates the total paperwork burden associated with preparing and submitting a person's request to the Commissions pursuant to rule 3a68–2 under the Exchange Act will be 20 hours per request and associated costs of $12,000 for outside professionals, which the SEC believes will consist of services provided by attorneys.[1417] These total costs include all collection burdens associated with the rule, including burdens related to the initial determination requirements.

Assuming 50 requests in the first year, the SEC estimates that this will result in an aggregate burden for the first year of 1000 hours of company time (50 requests × 20 hours/request) and $600,000 for the services of outside professionals (e.g., attorneys) (50 requests × 30 hours/request × $400). The estimated internal or company time burden for rule 3a68–2 under the Exchange Act has not changed from that included in the Proposing Release.[1418] However, the estimated burden of the cost for outside professionals for rule 3a68–2 under the Exchange Act has been revised from that included in the Proposing Release to reflect updated data regarding the hourly cost for an attorney.[1419]

As discussed above, the SEC believes that there will be 10 requests on average in each ensuing year, which results in an aggregate burden in each ensuing year of 200 hours of company time (10 requests × 20 hours/request) and $120,000 for the services of outside

[1417] See discussion supra part XI.A.4.e(ii). This estimate is based on information indicating that the average burden associated with preparing and submitting a no-action request to the SEC staff in connection with the identification of whether certain products are securities, which the SEC believes is a process similar to the process under rule 3a68–2 under the Exchange Act, is approximately 20 hours and associated costs of $12,000. Assuming these costs correspond to legal fees, which the SEC estimates at an hourly cost of $400, the SEC estimates that this cost is equivalent to approximately 30 hours ($12,000/$400). The estimated internal or company time burden for rule 3a68–2 under the Exchange Act has not changed from that included in the Proposing Release, but the estimated burden of the cost for outside professionals for rule 3a68–2 under the Exchange Act has been revised from that included in the Proposing Release to reflect updated data regarding hourly costs for the services of outside professionals. The estimate of the dollar burden for rule 3a68–2 under the Exchange Act in the Proposing Release was based on data from SIFMA's "Management & Professional Earnings in the Securities Industry 2009." See Proposing Release at 29876, note 345. The hourly rate used to estimate the PRA burdens is discussed above. See supra note 1344.

[1418] See Proposing Release at 29876, 29877–78.

[1419] See id.

professionals (e.g., attorneys) (10 requests × 30 hours/request × $400).[1420]

### (b) Rule 3a68–4(c) Under the Exchange Act

Rule 3a68–4(c) under the Exchange Act will require any party requesting a joint order regarding the regulation of a specified, or specified class of, mixed swap under the rule to include certain information about the agreement, contract, or transaction (or class thereof) that is a mixed swap, including the specified parallel provisions that the person believes should apply to the mixed swap (or class thereof), the reasons the person believes the specified parallel provisions will be appropriate for the mixed swap.[1421]

As discussed above, the SEC believes the number of requests that persons will submit pursuant to rule 3a68–4(c) under the Exchange Act is quite small given the limited types of agreements, contracts, and transactions (or classes thereof) the Commissions believe will constitute mixed swaps and that it will receive 20 requests in the first year.[1422] For purposes of the PRA, the SEC estimates the total paperwork burden associated with preparing and submitting a party's request to the Commissions pursuant to rule 3a68–4(c) under the Exchange Act will be 30 hours and associated costs of $20,000 for the services of outside professionals, which the SEC believes will consist of services provided by attorneys,[1423] per request for mixed swaps for which a request for a joint interpretation pursuant to rule 3a68–4(c) under the Exchange Act was not previously made.[1424] These total costs include all collection burdens associated with the rule, including burdens related to the initial determination requirements.

[1420] See discussion supra part XI.B.4.

[1421] See discussion supra part IV.B.3.

[1422] See supra note 1415 and accompanying text.

[1423] See supra note 1352.

[1424] This estimate is based on information indicating that the average burden associated with preparing and submitting a no-action request to the SEC staff in connection with the regulatory treatment of certain securities products, which the SEC believes is a process similar to the process under rule 3a68–4(c) under the Exchange Act, is approximately 30 hours and associated costs of $20,000. Assuming these costs correspond to legal fees, which the SEC estimates at an hourly cost of $400 as discussed above, the SEC estimates that this cost is equivalent to approximately 50 hours ($20,000/$400). As with rule 3a68–2 under the Exchange Act, the estimated internal or company time burdens for rule 3a68–4(c) under the Exchange Act have not changed from those included in the Proposing Release, but the estimated burdens of the cost for outside professionals for rule 3a68–4(c) under the Exchange Act have been revised from those included in the Proposing Release to reflect updated hourly costs for the services of outside professionals.

Assuming 20 requests in the first year, the SEC estimates that this will result in an aggregate burden for the first year of 600 hours of company time (20 requests × 30 hours/request) and $400,000 for the services of outside professionals (20 requests × 50 hours/request × $400).[1425]

As discussed above, the SEC believes that most requests under rule 3a68–2 under the Exchange Act that result in the interpretation that an agreement, contract, or transaction (or class thereof) is a mixed swap will result in a subsequent request for alternative regulatory treatment pursuant to rule 3a68–4(c) under the Exchange Act.

Also as discussed above, the SEC believes that 90 percent, or 18 of the estimated 20 requests pursuant to rule 3a68–4(c) under the Exchange Act in the first year, as discussed above will be "follow-on" requests. For mixed swaps for which a request for a joint interpretation pursuant to rule 3a68–2 under the Exchange Act was previously made, the SEC estimates the total paperwork burden under the PRA associated with preparing and submitting a party's request to the Commissions pursuant to rule 3a68–4(c) under the Exchange Act will be 10 hours fewer and $6,000 less per request than for mixed swaps for which a request for a joint interpretation pursuant to rule 3a68–2 under the Exchange Act was not previously made because certain, although not all, of the information required to be submitted and necessary to prepare pursuant to rule 3a68–4(c) under the Exchange Act will have been required to be submitted and necessary to prepare pursuant to rule 3a68–2 under the Exchange Act.[1426] The SEC estimates that this will result in an aggregate burden for such "follow-on" requests in the first year of 360 hours of company time (18 requests × 20 hours/request) and $252,000 for the services of outside professionals (18 requests × 35 hours/request × $400) and an aggregate burden for all requests in the first year of 420 hours of company time (2 requests × 30 hours/request and

18 requests × 20 hours/request) and $292,000 for the services of outside professionals (2 requests × 50 hours/request × $400 and 18 requests × 35 hours/request × $400).

The estimated internal or company time burden for rule 3a68–4(c) under the Exchange Act has not changed from that included in the Proposing Release.[1427] However, the estimated burden of the cost for outside professionals for rule 3a68–4(c) has been revised from that included in the Proposing Release to reflect updated data regarding the hourly cost for an attorney.[1428]

As discussed above, the SEC believes that there will be five requests on average in each ensuing year. Assuming five requests in each ensuing year, the SEC estimates that this will result in an aggregate burden in each ensuing year of 150 hours of company time (5 requests × 30 hours/request) and $100,000 for the services of outside professionals (5 requests × 50 hours/request × $400). As discussed above, however, assuming that approximately 90 percent, or 4 of the estimated 5 requests pursuant to rule 3a68–4(c) under the Exchange Act in each ensuing year are "follow-on" requests to requests for joint interpretation from the Commissions under rule 3a68–4(c) under the Exchange Act, the SEC estimates that this will result in an aggregate burden for such "follow-on" requests in each ensuing year of 80 hours of company time (4 requests × 20 hours/request) and $56,000 for the services of outside professionals (4 requests × 35 hours/request × $400) and an aggregate burden for all requests in each ensuing year of 110 hours of company time (1 request × 30 hours/request and 4 requests × 20 hours/request) and $76,000 for the services of outside professionals (1 request × 50 hours/request ×$40] and 4 requests × 35 hours/request × $400).

## C. Regulatory Flexibility Act Certification

The Regulatory Flexibility Act ("RFA")[1429] requires Federal agencies, in promulgating rules, to consider the impact of those rules on small entities. Section 603(a)[1430] of the Administrative Procedure Act,[1431] as amended by the RFA, generally requires the SEC to undertake a regulatory flexibility analysis of all proposed rules, or proposed rule amendments, to determine the impact of such

rulemaking on "small entities."[1432] Section 605(b) of the RFA provides that this requirement shall not apply to any proposed rule or proposed rule amendment, which if adopted, would not have a significant economic impact on a substantial number of small entities.[1433]

For purposes of SEC rulemaking in connection with the RFA, a small entity includes: (1) When used with reference to an "issuer" or a "person," other than an investment company, an "issuer" or "person" that, on the last day of its most recent fiscal year, had total assets of $5 million or less[1434] and (2) a broker-dealer with total capital (net worth plus subordinated liabilities) of less than $500,000 on the date in the prior fiscal year as of which its audited financial statements were prepared pursuant to rule 17a–5(d) under the Exchange Act,[1435] or, if not required to file such statements, a broker-dealer with total capital (net worth plus subordinated liabilities) of less than $500,000 on the last day of the preceding fiscal year (or in the time that it has been in business, if shorter); and is not affiliated with any person (other than a natural person) that is not a small entity.[1436] Under the standards adopted by the Small Business Administration, small entities in the finance and insurance industry include the following: (1) For entities engaged in credit intermediation and related activities, entities with $175 million or less in assets;[1437] (2) for entities engaged in non-depository credit intermediation and certain other activities, entities with $7 million or less in annual receipts;[1438] (3) for entities engaged in financial investments and related activities, entities with $7 million or less in annual receipts;[1439] (4) for insurance carriers and entities engaged in related activities, entities with $7 million or less in annual receipts;[1440] and (5) for funds, trusts, and other financial

---

[1425] *See supra* note 1415 and accompanying text.

[1426] This estimate takes into account that certain information regarding the mixed swap (or class thereof), namely the material terms and the economic purpose, will have already been gathered and prepared as part of the request submitted pursuant to proposed rule 3a68–2 under the Exchange Act. The SEC estimates that these items constitute approximately 10 hours fewer and a reduction in associated costs of $6,000. Assuming these costs correspond to legal fees, which the SEC estimates at an hourly cost of $400, the SEC estimates that this cost is equivalent to approximately 15 hours ($6,000/$400). As noted above, these amounts are revised from those included in the Proposing Release to reflect updated data regarding the hourly costs for the services of outside professionals.

[1427] *See* Proposing Release at 29876, 29878–79.

[1428] *See id.*

[1429] 5 U.S.C. 601 *et seq.*

[1430] 5 U.S.C. 603(a).

[1431] 5 U.S.C. 551 *et seq.*

[1432] Although section 601(b) of the RFA defines the term "small entity," the statute permits the Commissions to formulate their own definitions. The SEC has adopted definitions for the term small entity for the purposes of SEC rulemaking in accordance with the RFA. Those definitions, as relevant to this proposed rulemaking, are set forth in Rule 0–10, 17 CFR 240.0–10. *See Statement of Management on Internal Accounting Control*, 47 FR 5215, Feb. 4, 1982.

[1433] *See* 5 U.S.C. 605(b).

[1434] *See* 17 CFR 240.0–10(a).

[1435] *See* 17 CFR 240.17a–5(d).

[1436] *See* 17 CFR 240.0–10(c).

[1437] *See* 13 CFR 121.201 (Subsector 522).

[1438] *See id.* at Subsector 522.

[1439] *See id.* at Subsector 523.

[1440] *See id.* at Subsector 524.

vehicles, entities with $7 million or less in annual receipts.[1441]

The Proposing Release stated that, based on the SEC's existing information about the swap markets, the SEC believed that the swap markets, while broad in scope, are largely dominated by entities such as those that would qualify as swap dealers, security-based swap dealers, major swap participants, and major security-based swap participants (collectively, ''swap market dealers and major participants'') and that the SEC believed that such entities exceed the thresholds defining ''small entities'' set out above.[1442]

The Proposing Release also stated that, although it is possible that other persons may engage in swap and security-based swap transactions, the SEC did not believe that any of these entities would be ''small entities'' as defined in rule 0–10 under the Exchange Act[1443] and that feedback from industry participants about the swap markets indicates that only persons or entities with assets significantly in excess of $5 million (or with annual receipts significantly in excess of $7 million) participate in the swap markets.[1444]

The Proposing Release further stated that, to the extent that a small number of transactions did have a counterparty that was defined as a ''small entity'' under SEC rule 0–10, the SEC believed it is unlikely that the proposed rules and interpretive guidance would have a significant economic impact on that entity because the proposed rules and interpretive guidance simply would address whether certain products fall within the swap definition, address whether certain products are swaps, security-based swaps, SBSAs, or mixed swaps, provide a process for requesting interpretations of whether agreements, contracts, and transactions are swaps, security-based swaps, and mixed swaps, provide a process for requesting alternative regulatory treatment for mixed swaps, and specify that the books and records for SBSAs are those that are applicable to all entities.[1445]

As a result, the SEC certified that the proposed rules and interpretive guidance would not have a significant economic impact on a substantial number of small entities for purposes of the RFA, and requested written comments regarding this certification.[1446]

In response to the Proposing Release, one commenter, representing a number of market participants, submitted a comment to the CFTC related to the RFA.[1447] The commenter did not address the letter to the SEC or provide comments regarding the SEC's RFA analysis.[1448]

The SEC continues to believe that the types of entities that would participate in the swap markets—which generally would be swap market dealers and major participants—would not be ''small entities'' for purposes of the RFA. The final rules and interpretive guidance do not themselves impose any compliance obligations. Instead they describe the categories of agreements, contracts, and transactions that are outside the scope of the Product Definitions and delineate the jurisdictional divide between the SEC's and the CFTC's regulatory regime. Accordingly, the SEC certifies that the final rules and interpretive guidance would not have a significant economic impact on a substantial number of small entities for purposes of the RFA.

## XII. Statutory Basis and Rule Text

### List of Subjects

#### 17 CFR Part 1

Definitions, General swap provisions.

#### 17 CFR Parts 230 and 240

Reporting and recordkeeping requirements, Securities.

#### 17 CFR Part 241

Securities.

### Commodity Futures Trading Commission

Pursuant to the Commodity Exchange Act, 7 U.S.C. 1 *et seq.,* as amended by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010) (''Dodd-Frank Act''), and sections 712(a)(8), 712(d), 721(a), 721(b), 721(c), 722(d), and 725(g) of the Dodd-Frank Act, the CFTC is adopting rules 1.3(xxx) through 1.3(bbbb) and 1.6 through 1.9 under the Commodity Exchange Act.

### Text of Final Rules

For the reasons stated in the preamble, the CFTC is amending Title 17, Chapter I, of the Code of Federal Regulations, as follows:

## PART 1—GENERAL REGULATIONS UNDER THE COMMODITY EXCHANGE ACT

■ 1. The authority citation for part 1 is revised to read as follows:

**Authority:** 7 U.S.C. 1a, 2, 5, 6, 6a, 6b, 6c, 6e, 6f, 6g, 6h, 6i, 6j, 6k, 6l, 6m, 6n, 6o, 6p, 6r, 7, 7a, 7b, 8, 9, 10, 12, 12a, 12c, 13a, 13a–1, 16, 16a, 21, 23, and 24.

■ 2. Amend § 1.3 by:
■ a. Adding and reserving paragraphs (nnn) through (www); and
■ b. Adding paragraphs (xxx), (yyy), (zzz), (aaaa) and (bbbb).

The additions read as follows:

### § 1.3   Definitions.

\*      \*      \*      \*      \*

(nnn)–(www) [Reserved]

(xxx) *Swap.* (1) *In general.* The term swap has the meaning set forth in section 1a(47) of the Commodity Exchange Act.

(2) *Inclusion of particular products.* (i) The term swap includes, without limiting the meaning set forth in section 1a(47) of the Commodity Exchange Act, the following agreements, contracts, and transactions:

(A) A cross-currency swap;

(B) A currency option, foreign currency option, foreign exchange option and foreign exchange rate option;

(C) A foreign exchange forward;

(D) A foreign exchange swap;

(E) A forward rate agreement; and

(F) A non-deliverable forward involving foreign exchange.

(ii) The term swap does not include an agreement, contract, or transaction described in paragraph (xxx)(2)(i) of this section that is otherwise excluded by section 1a(47)(B) of the Commodity Exchange Act.

(3) *Foreign exchange forwards and foreign exchange swaps.* Notwithstanding paragraph (xxx)(2) of this section:

(i) A foreign exchange forward or a foreign exchange swap shall not be considered a swap if the Secretary of the Treasury makes a determination described in section 1a(47)(E)(i) of the Commodity Exchange Act.

(ii) Notwithstanding paragraph (xxx)(3)(i) of this section:

(A) The reporting requirements set forth in section 4r of the Commodity Exchange Act and regulations promulgated thereunder shall apply to a foreign exchange forward or foreign exchange swap; and

(B) The business conduct standards set forth in section 4s(h) of the Commodity Exchange Act and regulations promulgated thereunder shall apply to a swap dealer or major

---

[1441] *See id.* at Subsection 525.

[1442] *See* Proposing Release at 29887.

[1443] *See* 17 CFR 240.0–10(a).

[1444] *See* Proposing Release at 29887.

[1445] *See* Proposing Release at 29887–88.

[1446] *See* Proposing Release at 29888.

[1447] *See* Letter from the National Rural Electric Cooperative Association, the American Public Power Association, the Large Public Power Council, the Edison Electric Institute, and the Electric Power Supply Association (July 22, 2011).

[1448] *See id.*

swap participant that is a party to a foreign exchange forward or foreign exchange swap.

(iii) For purposes of section 1a(47)(E) of the Commodity Exchange Act and this paragraph (xxx), the term *foreign exchange forward* has the meaning set forth in section 1a(24) of the Commodity Exchange Act.

(iv) For purposes of section 1a(47)(E) of the Commodity Exchange Act and this paragraph (xxx), the term *foreign exchange swap* has the meaning set forth in section 1a(25) of the Commodity Exchange Act.

(v) For purposes of sections 1a(24) and 1a(25) of the Commodity Exchange Act and this paragraph (xxx), the following transactions are not foreign exchange forwards or foreign exchange swaps:

(A) A currency swap or a cross-currency swap;

(B) A currency option, foreign currency option, foreign exchange option, or foreign exchange rate option; and

(C) A non-deliverable forward involving foreign exchange.

(4) *Insurance.* (i) This paragraph is a non-exclusive safe harbor. The terms *swap* as used in section 1a(47) of the Commodity Exchange Act and *security-based swap* as used in section 1a(42) of the Commodity Exchange Act do not include an agreement, contract, or transaction that:

(A) By its terms or by law, as a condition of performance on the agreement, contract, or transaction:

(*1*) Requires the beneficiary of the agreement, contract, or transaction to have an insurable interest that is the subject of the agreement, contract, or transaction and thereby carry the risk of loss with respect to that interest continuously throughout the duration of the agreement, contract, or transaction;

(*2*) Requires that loss to occur and to be proved, and that any payment or indemnification therefore be limited to the value of the insurable interest;

(*3*) Is not traded, separately from the insured interest, on an organized market or over-the-counter; and

(*4*) With respect to financial guaranty insurance only, in the event of payment default or insolvency of the obligor, any acceleration of payments under the policy is at the sole discretion of the insurer; and

(B) Is provided:

(*1*)(*i*) By a person that is subject to supervision by the insurance commissioner (or similar official or agency) of any State or by the United States or an agency or instrumentality thereof; and

(*ii*) Such agreement, contract, or transaction is regulated as insurance under applicable State law or the laws of the United States;

(*2*)(*i*) Directly or indirectly by the United States, any State or any of their respective agencies or instrumentalities; or

(*ii*) Pursuant to a statutorily authorized program thereof; or

(*3*) In the case of reinsurance only, by a person to another person that satisfies the conditions set forth in paragraph (xxx)(4)(i)(B) of this section, provided that:

(*i*) Such person is not prohibited by applicable State law or the laws of the United States from offering such agreement, contract, or transaction to such person that satisfies the conditions set forth in paragraph (xxx)(4)(i)(B) of this section;

(*ii*) The agreement, contract, or transaction to be reinsured satisfies the conditions set forth in paragraph (xxx)(4)(i)(A) or paragraph (xxx)(4)(i)(C) of this section; and

(*iii*) Except as otherwise permitted under applicable State law, the total amount reimbursable by all reinsurers for such agreement, contract, or transaction may not exceed the claims or losses paid by the person writing the risk being ceded or transferred by such person; or

(*4*) In the case of non-admitted insurance, by a person who:

(*i*) Is located outside of the United States and listed on the Quarterly Listing of Alien Insurers as maintained by the International Insurers Department of the National Association of Insurance Commissioners; or

(*ii*) Meets the eligibility criteria for non-admitted insurers under applicable State law; or

(C) Is provided in accordance with the conditions set forth in paragraph (xxx)(4)(i)(B) of this section and is one of the following types of products:

(*1*) Surety bond;

(*2*) Fidelity bond;

(*3*) Life insurance;

(*4*) Health insurance;

(*5*) Long term care insurance;

(*6*) Title insurance;

(*7*) Property and casualty insurance;

(*8*) Annuity;

(*9*) Disability insurance;

(*10*) Insurance against default on individual residential mortgages; and

(*11*) Reinsurance of any of the foregoing products identified in paragraphs (xxx)(4)(i)(C)(*1*) through (*10*) of this section; or

(ii) The terms *swap* as used in section 1a(47) of the Commodity Exchange Act and *security-based swap* as used in section 1a(42) of the Commodity

Exchange Act do not include an agreement, contract, or transaction that was entered into on or before the effective date of paragraph (xxx)(4) of this section, and that, at such time that it was entered into, was provided in accordance with the conditions set forth in paragraph (xxx)(4)(i)(B) of this section.

(5) *State.* For purposes of paragraph (xxx)(4) of this section, the term *State* means any state of the United States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, or any other possession of the United States.

(6) *Anti-Evasion:*

(i) An agreement, contract, or transaction that is willfully structured to evade any provision of Subtitle A of the Wall Street Transparency and Accountability Act of 2010, including any amendments made to the Commodity Exchange Act thereby (*Subtitle A*), shall be deemed a swap for purposes of Subtitle A and the rules, regulations, and orders of the Commission promulgated thereunder.

(ii) An interest rate swap or currency swap, including but not limited to a transaction identified in paragraph (xxx)(3)(v) of this section, that is willfully structured as a foreign exchange forward or foreign exchange swap to evade any provision of Subtitle A shall be deemed a swap for purposes of Subtitle A and the rules, regulations, and orders of the Commission promulgated thereunder.

(iii) An agreement, contract, or transaction of a bank that is not under the regulatory jurisdiction of an appropriate Federal banking agency (as defined in section 1a(2) of the Commodity Exchange Act), where the agreement, contract, or transaction is willfully structured as an identified banking product (as defined in section 402 of the Legal Certainty for Bank Products Act of 2000) to evade the provisions of the Commodity Exchange Act, shall be deemed a swap for purposes of the Commodity Exchange Act and the rules, regulations, and orders of the Commission promulgated thereunder.

(iv) The form, label, and written documentation of an agreement, contract, or transaction shall not be dispositive in determining whether the agreement, contract, or transaction has been willfully structured to evade as provided in paragraphs (xxx)(6)(i) through (xxx)(6)(iii) of this section.

(v) An agreement, contract, or transaction that has been willfully structured to evade as provided in paragraphs (xxx)(6)(i) through (xxx)(6)(iii) of this section shall be considered in determining whether a

person that so willfully structured to evade is a swap dealer or major swap participant.

(vi) Notwithstanding the foregoing, no agreement, contract, or transaction structured as a security (including a security-based swap) under the securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47))) shall be deemed a swap pursuant to this paragraph (xxx)(6) or shall be considered for purposes of paragraph (xxx)(6)(v) of this section.

(yyy) *Narrow-based security index as used in the definition of "security-based swap."*

(1) *In general.* Except as otherwise provided in paragraphs (zzz) and (aaaa) of this section, for purposes of section 1a(42) of the Commodity Exchange Act, the term *narrow-based security index* has the meaning set forth in section 1a(35) of the Commodity Exchange Act, and the rules, regulations and orders of the Commission thereunder.

(2) *Tolerance period for swaps traded on designated contract markets, swap execution facilities, and foreign boards of trade.* Notwithstanding paragraph (yyy)(1) of this section, solely for purposes of swaps traded on or subject to the rules of a designated contract market, swap execution facility, or foreign board of trade, a security index underlying such swaps shall not be considered a narrow-based security index if:

(i)(A) A swap on the index is traded on or subject to the rules of a designated contract market, swap execution facility, or foreign board of trade for at least 30 days as a swap on an index that was not a narrow-based security index; or

(B) Such index was not a narrow-based security index during every trading day of the six full calendar months preceding a date no earlier than 30 days prior to the commencement of trading of a swap on such index on a market described in paragraph (yyy)(2)(i)(A) of this section; and

(ii) The index has been a narrow-based security index for no more than 45 business days over three consecutive calendar months.

(3) *Tolerance period for security-based swaps traded on national securities exchanges or security-based swap execution facilities.* Notwithstanding paragraph (yyy)(1) of this section, solely for purposes of security-based swaps traded on a national securities exchange or security-based swap execution facility, a security index underlying such security-based swaps shall be considered a narrow-based security index if:

(i)(A) A security-based swap on the index is traded on a national securities exchange or security-based swap execution facility for at least 30 days as a security-based swap on a narrow-based security index; or

(B) Such index was a narrow-based security index during every trading day of the six full calendar months preceding a date no earlier than 30 days prior to the commencement of trading of a security-based swap on such index on a market described in paragraph (yyy)(3)(i)(A) of this section; and

(ii) The index has been a security index that is not a narrow-based security index for no more than 45 business days over three consecutive calendar months.

(4) *Grace period.*

(i) Solely with respect to a swap that is traded on or subject to the rules of a designated contract market, swap execution facility, or foreign board of trade, an index that becomes a narrow-based security index under paragraph (yyy)(2) of this section solely because it was a narrow-based security index for more than 45 business days over three consecutive calendar months shall not be a narrow-based security index for the following three calendar months.

(ii) Solely with respect to a security-based swap that is traded on a national securities exchange or security-based swap execution facility, an index that becomes a security index that is not a narrow-based security index under paragraph (yyy)(3) of this section solely because it was not a narrow-based security index for more than 45 business days over three consecutive calendar months shall be a narrow-based security index for the following three calendar months.

(zzz) Meaning of "issuers of securities in a narrow-based security index" as used in the definition of "security-based swap" as applied to index credit default swaps.

(1) Notwithstanding paragraph (yyy)(1) of this section, and solely for purposes of determining whether a credit default swap is a security-based swap under the definition of "security-based swap" in section 3(a)(68)(A)(ii)(III) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)(ii)(III), as incorporated in section 1a(42) of the Commodity Exchange Act, the term *issuers of securities in a narrow-based security index* means issuers of securities included in an index (including an index referencing loan borrowers or loans of such borrowers) in which:

(i)(A) There are nine or fewer non-affiliated issuers of securities that are reference entities included in the index,

provided that an issuer of securities shall not be deemed a reference entity included in the index for purposes of this section unless:

(*1*) A credit event with respect to such reference entity would result in a payment by the credit protection seller to the credit protection buyer under the credit default swap based on the related notional amount allocated to such reference entity; or

(*2*) The fact of such credit event or the calculation in accordance with paragraph (zzz)(1)(i)(A)(*1*) of this section of the amount owed with respect to such credit event is taken into account in determining whether to make any future payments under the credit default swap with respect to any future credit events;

(B) The effective notional amount allocated to any reference entity included in the index comprises more than 30 percent of the index's weighting;

(C) The effective notional amount allocated to any five non-affiliated reference entities included in the index comprises more than 60 percent of the index's weighting; or

(D) Except as provided in paragraph (zzz)(2) of this section, for each reference entity included in the index, none of the criteria in paragraphs (zzz)(1)(i)(D)(*1*) through (*8*) of this section is satisfied:

(*1*) The reference entity included in the index is required to file reports pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d));

(*2*) The reference entity included in the index is eligible to rely on the exemption provided in rule 12g3–2(b) under the Securities Exchange Act of 1934 (17 CFR 240.12g3–2(b));

(*3*) The reference entity included in the index has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more;

(*4*) The reference entity included in the index (other than a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)) has outstanding notes, bonds, debentures, loans, or evidences of indebtedness (other than revolving credit facilities) having a total remaining principal amount of at least $1 billion;

(*5*) The reference entity included in the index is the issuer of an exempted security as defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)) (other than any municipal security as defined in section

3(a)(29) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(29)));

(*6*) The reference entity included in the index is a government of a foreign country or a political subdivision of a foreign country;

(*7*) If the reference entity included in the index is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)), such asset-backed security was issued in a transaction registered under the Securities Act of 1933 (15 U.S.C. 77a *et seq.*) and has publicly available distribution reports; and

(*8*) For a credit default swap entered into solely between eligible contract participants as defined in section 1a(18) of the Commodity Exchange Act:

(*i*) The reference entity included in the index (other than a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77))) makes available to the public or otherwise makes available to such eligible contract participant information about the reference entity included in the index pursuant to rule 144A(d)(4) under the Securities Act of 1933 (17 CFR 230.144A(d)(4));

(*ii*) Financial information about the reference entity included in the index (other than a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77))) is otherwise publicly available; or

(*iii*) In the case of a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)), information of the type and level included in publicly available distribution reports for similar asset-backed securities is publicly available about both the reference entity included in the index and such asset-backed security; and

(ii)(A) The index is not composed solely of reference entities that are issuers of exempted securities as defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(29)), as in effect on the date of enactment of the Futures Trading Act of 1982; and

(B) Without taking into account any portion of the index composed of

reference entities that are issuers of exempted securities as defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(29))), the remaining portion of the index would be within the term "issuer of securities in a narrow-based security index" under paragraph (zzz)(1)(i) of this section.

(2) Paragraph (zzz)(1)(i)(D) of this section will not apply with respect to a reference entity included in the index if:

(i) The effective notional amounts allocated to such reference entity comprise less than five percent of the index's weighting; and

(ii) The effective notional amounts allocated to reference entities included in the index that satisfy paragraph (zzz)(1)(i)(D) of this section comprise at least 80 percent of the index's weighting.

(3) For purposes of this paragraph (zzz):

(i) A reference entity included in the index is affiliated with another reference entity included in the index (for purposes of paragraph (zzz)(3)(iv) of this section) or another entity (for purposes of paragraph (zzz)(3)(v) of this section) if it controls, is controlled by, or is under common control with, that other reference entity included in the index or other entity, as applicable; provided that each reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)) will not be considered affiliated with any other reference entity included in the index or any other entity that is an issuing entity of an asset-backed security.

(ii) Control for purposes of this section means ownership of more than 50 percent of the equity of a reference entity included in the index (for purposes of paragraph (zzz)(3)(iv) of this section) or another entity (for purposes of paragraph (zzz)(3)(v) of this section), or the ability to direct the voting of more than 50 percent of the voting equity of a reference entity included in the index (for purposes of paragraph (zzz)(3)(iv) of this section) or another entity (for purposes of paragraph (zzz)(3)(v) of this section).

(iii) In identifying a reference entity included in the index for purposes of this section, the term reference entity includes:

(A) An issuer of securities;

(B) An issuer of securities that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)); and

(C) An issuer of securities that is a borrower with respect to any loan identified in an index of borrowers or loans.

(iv) For purposes of calculating the thresholds in paragraphs (zzz)(1)(i)(A) through (1)(i)(C) of this section, the term reference entity included in the index includes a single reference entity included in the index or a group of affiliated reference entities included in the index as determined in accordance with paragraph (zzz)(3)(i) of this section (with each reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate reference entity included in the index).

(v) For purposes of determining whether one of the criterion in either paragraphs (zzz)(1)(i)(D)(*1*) through (zzz)(1)(i)(D)(*4*) of this section or paragraphs (zzz)(1)(iv)(D)(*8*)(*i*) and (a)(1)(iv)(D)(*8*)(*ii*) of this section is met, the term reference entity included in the index includes a single reference entity included in the index or a group of affiliated entities as determined in accordance with paragraph (zzz)(3)(i) of this section (with each issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate entity).

(aaaa) Meaning of "narrow-based security index" as used in the definition of "security-based swap" as applied to index credit default swaps.

(1) Notwithstanding paragraph (yyy)(1) of this section, and solely for purposes of determining whether a credit default swap is a security-based swap under the definition of "security-based swap" in section 3(a)(68)(A)(ii)(I) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)(ii)(I), as incorporated in section 1a(42) of the Commodity Exchange Act, the term narrow-based security index means an index in which:

(i)(A) The index is composed of nine or fewer securities or securities that are issued by nine or fewer non-affiliated issuers, provided that a security shall not be deemed a component of the index for purposes of this section unless:

(*1*) A credit event with respect to the issuer of such security or a credit event with respect to such security would result in a payment by the credit protection seller to the credit protection buyer under the credit default swap

based on the related notional amount allocated to such security; or

(*2*) The fact of such credit event or the calculation in accordance with paragraph (aaaa)(1)(i)(A)(*1*) of this section of the amount owed with respect to such credit event is taken into account in determining whether to make any future payments under the credit default swap with respect to any future credit events;

(B) The effective notional amount allocated to the securities of any issuer included in the index comprises more than 30 percent of the index's weighting;

(C) The effective notional amount allocated to the securities of any five non-affiliated issuers included in the index comprises more than 60 percent of the index's weighting; or

(D) Except as provided in paragraph (aaaa)(2) of this section, for each security included in the index, none of the criteria in paragraphs (aaaa)(1)(i)(D)(*1*) through (*8*) is satisfied:

(*1*) The issuer of the security included in the index is required to file reports pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d));

(*2*) The issuer of the security included in the index is eligible to rely on the exemption provided in rule 12g3–2(b) under the Securities Exchange Act of 1934 (17 CFR 240.12g3–2(b));

(*3*) The issuer of the security included in the index has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more;

(*4*) The issuer of the security included in the index (other than an issuer of the security that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77))) has outstanding notes, bonds, debentures, loans or evidences of indebtedness (other than revolving credit facilities) having a total remaining principal amount of at least $1 billion;

(*5*) The security included in the index is an exempted security as defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)) (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(29)));

(*6*) The issuer of the security included in the index is a government of a foreign country or a political subdivision of a foreign country;

(*7*) If the security included in the index is an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)), the security was

issued in a transaction registered under the Securities Act of 1933 (15 U.S.C. 77a *et seq.*) and has publicly available distribution reports; and

(*8*) For a credit default swap entered into solely between eligible contract participants as defined in section 1a(18) of the Commodity Exchange Act:

(*i*) The issuer of the security included in the index (other than an issuer of the security that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77))) makes available to the public or otherwise makes available to such eligible contract participant information about such issuer pursuant to rule 144A(d)(4) of the Securities Act of 1933 (17 CFR 230.144A(d)(4));

(*ii*) Financial information about the issuer of the security included in the index (other than an issuer of the security that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77))) is otherwise publicly available; or

(*iii*) In the case of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)), information of the type and level included in public distribution reports for similar asset-backed securities is publicly available about both the issuing entity and such asset-backed security; and

(ii)(A) The index is not composed solely of exempted securities as defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(29))), as in effect on the date of enactment of the Futures Trading Act of 1982; and

(B) Without taking into account any portion of the index composed of exempted securities as defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(29))), the remaining portion of the index would be within the term "narrow-based security index" under paragraph (aaaa)(1)(i) of this section.

(2) Paragraph (aaaa)(1)(i)(D) of this section will not apply with respect to securities of an issuer included in the index if:

(i) The effective notional amounts allocated to all securities of such issuer included in the index comprise less than five percent of the index's weighting; and

(ii) The securities that satisfy paragraph (aaaa)(1)(i)(D) of this section comprise at least 80 percent of the index's weighting.

(3) For purposes of this paragraph (aaaa):

(i) An issuer of securities included in the index is affiliated with another issuer of securities included in the index (for purposes of paragraph (aaaa)(3)(iv) of this section) or another entity (for purposes of paragraph (aaaa)(3)(v) of this section) if it controls, is controlled by, or is under common control with, that other issuer or other entity, as applicable; provided that each issuer of securities included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)) will not be considered affiliated with any other issuer of securities included in the index or any other entity that is an issuing entity of an asset-backed security.

(ii) Control for purposes of this section means ownership of more than 50 percent of the equity of an issuer of securities included in the index (for purposes of paragraph (aaaa)(3)(iv) of this section) or another entity (for purposes of paragraph (aaaa)(3)(v) of this section), or the ability to direct the voting of more than 50 percent of the voting equity an issuer of securities included in the index (for purposes of paragraph (aaaa)(3)(iv) of this section) or another entity (for purposes of paragraph (aaaa)(3)(v) of this section).

(iii) In identifying an issuer of securities included in the index for purposes of this section, the term issuer includes:

(A) An issuer of securities; and

(B) An issuer of securities that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(77)).

(iv) For purposes of calculating the thresholds in paragraphs (zzz)(1)(i)(A) through (1)(i)(C) of this section, the term issuer of the security included in the index includes a single issuer of securities included in the index or a group of affiliated issuers of securities included in the index as determined in accordance with paragraph (aaaa)(3)(i) of this section (with each issuer of securities included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Securities Exchange Act of 1934 (15

U.S.C. 78c(a)(77)) being considered a separate issuer of securities included in the index).

(v) For purposes of determining whether one of the criterion in either paragraphs (aaaa)(1)(i)(D)(1) through (aaaa)(1)(i)(D)(4) of this section or paragraphs (aaaa)(1)(iv)(D)(*8*)(*i*) and (aaaa)(1)(iv)(D)(*8*)(*ii*) of this section is met, the term issuer of the security included in the index includes a single issuer of securities included in the index or a group of affiliated entities as determined in accordance with paragraph (aaaa)(3)(i) of this section (with each issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate entity).

(bbbb) Futures contracts on certain foreign sovereign debt. The term *security-based swap* as used in section 3(a)(68) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)), as incorporated in section 1a(42) of the Commodity Exchange Act, does not include an agreement, contract, or transaction that is based on or references a qualifying foreign futures contract (as defined in rule 3a12–8 under the Securities Exchange Act of 1934 (17 CFR 240.3a12–8)) on the debt securities of any one or more of the foreign governments enumerated in rule 3a12–8 under the Securities Exchange Act of 1934 (17 CFR 240.3a12–8), provided that such agreement, contract, or transaction satisfies the following conditions:

(1) The futures contract that the agreement, contract, or transaction references or upon which the agreement, contract, or transaction is based is a qualifying foreign futures contract that satisfies the conditions of rule 3a12–8 under the Securities Exchange Act of 1934 (17 CFR 240.3a12–8) applicable to qualifying foreign futures contracts;

(2) The agreement, contract, or transaction is traded on or through a board of trade (as defined in the Commodity Exchange Act);

(3) The debt securities upon which the qualifying foreign futures contract is based or referenced and any security used to determine the cash settlement amount pursuant to paragraph (bbbb)(4) of this section were not registered under the Securities Act of 1933 (15 U.S.C. 77 *et seq.*) or the subject of any American depositary receipt registered under the Securities Act of 1933;

(4) The agreement, contract, or transaction may only be cash settled; and

(5) The agreement, contract or transaction is not entered into by the issuer of the debt securities upon which

the qualifying foreign futures contract is based or referenced (including any security used to determine the cash payment due on settlement of such agreement, contract or transaction), an affiliate (as defined in the Securities Act of 1933 (15 U.S.C. 77 *et seq.*) and the rules and regulations thereunder) of the issuer, or an underwriter of such issuer's debt securities.

■ 3. Add §§ 1.6 through 1.9 to read as follows:

Sec.
1.6    Anti-evasion.
1.7    Books and records requirements for security-based swap agreements.
1.8    Requests for interpretation of swaps, security-based swaps, and mixed swaps.
1.9    Regulation of mixed swaps.

*    *    *    *    *

## § 1.6    Anti-evasion.

(a) It shall be unlawful to conduct activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade any provision of the Commodity Exchange Act as enacted by Subtitle A of the Wall Street Transparency and Accountability Act of 2010 or the rules, regulations, and orders of the Commission promulgated thereunder (*Subtitle A*).

(b) The form, label, and written documentation of an agreement, contract, or transaction, or an entity, shall not be dispositive in determining whether the agreement, contract, or transaction, or entity, has been entered into or structured to willfully evade as provided in paragraph (a) of this section.

(c) An activity conducted outside the United States to evade as provided in paragraph (a) of this section shall be subject to the provisions of Subtitle A.

(d) Notwithstanding the foregoing, no agreement, contract, or transaction structured as a security (including a security-based swap) under the securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47))) shall be deemed a swap pursuant to this section.

## § 1.7    Books and records requirements for security-based swap agreements.

(a) A person registered as a swap data repository under section 21 of the Commodity Exchange Act and the rules and regulations thereunder:

(1) Shall not be required to keep and maintain additional books and records regarding security-based swap agreements other than the books and records regarding swaps required to be kept and maintained pursuant to section 21 of the Commodity Exchange Act and

the rules and regulations thereunder; and

(2) Shall not be required to collect and maintain additional data regarding security-based swap agreements other than the data regarding swaps required to be collected and maintained by such persons pursuant to section 21 of the Commodity Exchange Act and the rules and regulations thereunder.

(b) A person shall not be required to keep and maintain additional books and records, including daily trading records, regarding security-based swap agreements other than the books and records regarding swaps required to be kept and maintained by such persons pursuant to section 4s of the Commodity Exchange Act and the rules and regulations thereunder if such person is registered as:

(1) A swap dealer under section 4s(a)(1) of the Commodity Exchange Act and the rules and regulations thereunder;

(2) A major swap participant under section 4s(a)(2) of the Commodity Exchange Act and the rules and regulations thereunder;

(3) A security-based swap dealer under section 15F(a)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o-10(a)(1)) and the rules and regulations thereunder; or

(4) A major security-based swap participant under section 15F(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78o-10(a)(2)) and the rules and regulations thereunder.

(c) The term *security-based swap agreement* has the meaning set forth in section 1a(47)(A)(v) of the Commodity Exchange Act.

## § 1.8    Requests for interpretation of swaps, security-based swaps, and mixed swaps.

(a) *In general.* Any person may submit a request to the Commission and the Securities and Exchange Commission to provide a joint interpretation of whether a particular agreement, contract, or transaction (or class thereof) is:

(1) A swap, as that term is defined in section 1a(47) of the Commodity Exchange Act and the rules and regulations promulgated thereunder;

(2) A security-based swap, as that term is defined in section 1a(42) of the Commodity Exchange Act and the rules and regulations promulgated thereunder; or

(3) A mixed swap, as that term is defined in section 1a(47)(D) of the Commodity Exchange Act and the rules and regulations promulgated thereunder.

(b) *Request process.* In making a request pursuant to paragraph (a) of this section, the requesting person must

provide the Commission and the Securities and Exchange Commission with the following:

(1) All material information regarding the terms of the agreement, contract, or transaction (or class thereof);

(2) A statement of the economic characteristics and purpose of the agreement, contract, or transaction (or class thereof);

(3) The requesting person's determination as to whether the agreement, contract, or transaction (or class thereof) should be characterized as a swap, a security-based swap, or both, (*i.e.*, a mixed swap), including the basis for such determination; and

(4) Such other information as may be requested by the Commission or the Securities and Exchange Commission.

(c) *Request withdrawal.* A person may withdraw a request made pursuant to paragraph (a) of this section at any time prior to the issuance of a joint interpretation or joint proposed rule by the Commission and the Securities and Exchange Commission in response to the request; provided, however, that notwithstanding such withdrawal, the Commission and the Securities and Exchange Commission may provide a joint interpretation of whether the agreement, contract, or transaction (or class thereof) is a swap, a security-based swap, or both (*i.e.*, a mixed swap).

(d) *Request by the Commission or the Securities and Exchange Commission.* In the absence of a request for a joint interpretation under paragraph (a) of this section:

(1) If the Commission or the Securities and Exchange Commission receives a proposal to list, trade, or clear an agreement, contract, or transaction (or class thereof) that raises questions as to the appropriate characterization of such agreement, contract, or transaction (or class thereof) as a swap, a security-based swap, or both (*i.e.*, a mixed swap), the Commission or the Securities and Exchange Commission, as applicable, promptly shall notify the other of the agreement, contract, or transaction (or class thereof); and

(2) The Commission or the Securities and Exchange Commission, or their Chairmen jointly, may submit a request for a joint interpretation as described in paragraph (a) of this section; such submission shall be made pursuant to paragraph (b) of this section, and may be withdrawn pursuant to paragraph (c) of this section.

(e) *Timeframe for joint interpretation.* (1) If the Commission and the Securities and Exchange Commission determine to issue a joint interpretation as described in paragraph (a) of this section, such joint interpretation shall be issued

within 120 days after receipt of a complete submission requesting a joint interpretation under paragraph (a) or (d) of this section.

(2) The Commission and the Securities and Exchange Commission shall consult with the Board of Governors of the Federal Reserve System prior to issuing any joint interpretation as described in paragraph (a) of this section.

(3) If the Commission and the Securities and Exchange Commission seek public comment with respect to a joint interpretation regarding an agreement, contract, or transaction (or class thereof), the 120-day period described in paragraph (e)(1) of this section shall be stayed during the pendency of the comment period, but shall recommence with the business day after the public comment period ends.

(4) Nothing in this section shall require the Commission and the Securities and Exchange Commission to issue any joint interpretation.

(5) If the Commission and the Securities and Exchange Commission do not issue a joint interpretation within the time period described in paragraph (e)(1) or (e)(3) of this section, each of the Commission and the Securities and Exchange Commission shall publicly provide the reasons for not issuing such a joint interpretation within the applicable timeframes.

(f) *Joint proposed rule.* (1) Rather than issue a joint interpretation pursuant to paragraph (a) of this section, the Commission and the Securities and Exchange Commission may issue a joint proposed rule, in consultation with the Board of Governors of the Federal Reserve System, to further define one or more of the terms swap, security-based swap, or mixed swap.

(2) A joint proposed rule described in paragraph (f)(1) of this section shall be issued within the timeframe for issuing a joint interpretation set forth in paragraph (e) of this section.

**§ 1.9  Regulation of mixed swaps.**

(a) *In general.* The term mixed swap has the meaning set forth in section 1a(47)(D) of the Commodity Exchange Act.

(b) *Regulation of bilateral uncleared mixed swaps entered into by dually-registered dealers or major participants.* A mixed swap that is neither executed on nor subject to the rules of a designated contract market, national securities exchange, swap execution facility, security-based swap execution facility, or foreign board of trade; that will not be submitted to a derivatives clearing organization or registered or exempt clearing agency to be cleared;

and where at least one party is registered with the Commission as a swap dealer or major swap participant and also with the Securities and Exchange Commission as a security-based swap dealer or major security-based swap participant, shall be subject to:

(1) The following provisions of the Commodity Exchange Act, and the rules and regulations promulgated thereunder:

(i) Examinations and information sharing: sections 4s(f) and 8 of the Commodity Exchange Act;

(ii) Enforcement: sections 2(a)(1)(B), 4(b), 4b, 4c, 4s(h)(1)(A), 4s(h)(4)(A), 6(c), 6(d), 6c, 6d, 9, 13(a), 13(b), and 23 of the Commodity Exchange Act;

(iii) Reporting to a swap data repository: section 4r of the Commodity Exchange Act;

(iv) Real-time reporting: section 2(a)(13) of the Commodity Exchange Act;

(v) Capital: section 4s(e) of the Commodity Exchange Act; and

(vi) Position Limits: section 4a of the Commodity Exchange Act; and

(2) The provisions of the Federal securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), and the rules and regulations promulgated thereunder.

(c) *Process for determining regulatory treatment for other mixed swaps*—(1) *In general.* Any person who desires or intends to list, trade, or clear a mixed swap (or class thereof) that is not subject to paragraph (b) of this section may request the Commission and the Securities and Exchange Commission to issue a joint order permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that mixed swap) to comply, as to parallel provisions only, with specified parallel provisions of either the Commodity Exchange Act or the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), and the rules and regulations thereunder (collectively, *specified parallel provisions*), instead of being required to comply with parallel provisions of both the Commodity Exchange Act and the Securities Exchange Act of 1934. For purposes of this paragraph (c), *parallel provisions* means comparable provisions of the Commodity Exchange Act and the Securities Exchange Act of 1934 that were added or amended by the Wall Street Transparency and Accountability Act of 2010 with respect to swaps and security-based swaps, and the rules and regulations thereunder.

(2) *Request Process.* A person submitting a request pursuant to

paragraph (c)(1) of this section must provide the Commission and the Securities and Exchange Commission with the following:

(i) All material information regarding the terms of the specified, or specified class of, mixed swap;

(ii) The economic characteristics and purpose of the specified, or specified class of, mixed swap;

(iii) The specified parallel provisions, and the reasons the person believes such specified parallel provisions would be appropriate for the mixed swap (or class thereof); and

(iv) An analysis of:

(A) The nature and purposes of the parallel provisions that are the subject of the request;

(B) The comparability of such parallel provisions;

(C) The extent of any conflicts or differences between such parallel provisions; and

(D) Such other information as may be requested by the Commission or the Securities and Exchange Commission.

(3) *Request withdrawal.* A person may withdraw a request made pursuant to paragraph (c)(1) of this section at any time prior to the issuance of a joint order under paragraph (c)(4) of this section by the Commission and the Securities and Exchange Commission in response to the request.

(4) *Issuance of orders.* In response to a request under paragraph (c)(1) of this section, the Commission and the Securities and Exchange Commission, as necessary to carry out the purposes of the Wall Street Transparency and Accountability Act of 2010, may issue a joint order, after notice and opportunity for comment, permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that mixed swap) to comply, as to parallel provisions only, with the specified parallel provisions (or another subset of the parallel provisions that are the subject of the request, as the Commissions determine is appropriate), instead of being required to comply with parallel provisions of both the Commodity Exchange Act and the Securities Exchange Act of 1934. In determining the contents of such joint order, the Commission and the Securities and Exchange Commission may consider, among other things:

(i) The nature and purposes of the parallel provisions that are the subject of the request;

(ii) The comparability of such parallel provisions; and

(iii) The extent of any conflicts or differences between such parallel provisions.

(5) *Timeframe.* (i) If the Commission and the Securities and Exchange Commission determine to issue a joint order as described in paragraph (c)(4) of this section, such joint order shall be issued within 120 days after receipt of a complete request for a joint order under paragraph (c)(1) of this section, which time period shall be stayed during the pendency of the public comment period provided for in paragraph (c)(4) of this section and shall recommence with the business day after the public comment period ends.

(ii) Nothing in this section shall require the Commission and the Securities and Exchange Commission to issue any joint order.

(iii) If the Commission and the Securities and Exchange Commission do not issue a joint order within the time period described in paragraph (c)(5)(i) of this section, each of the Commission and the Securities and Exchange Commission shall publicly provide the reasons for not issuing such a joint order within that timeframe.

**Securities and Exchange Commission**

Pursuant to the Securities Act, 15 U.S.C. 77a *et seq.,* and particularly, sections 19 and 28 thereof, and the Exchange Act, 15 U.S.C. 78a *et seq.,* and particularly, sections 3 and 23 thereof, and sections 712(a)(8), 712(d), 721(a), 761(a) of the Dodd-Frank Act, the SEC is adopting rule 194 under the Securities Act and rules 3a68–1a through 3a68–5 and 3a69–1 through 3a69–3 under the Exchange Act.

**Text of Final Rules**

For the reasons stated in the preamble, the SEC is amending Title 17, Chapter II of the Code of the Federal Regulations as follows:

## PART 230—GENERAL RULES AND REGULATIONS, SECURITIES ACT OF 1933

■ 1. The authority citation for Part 230 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77b, 77b note, 77c, 77d, 77f, 77g, 77h, 77j, 77r, 77s, 77z–3, 77sss, 78c, 78d, 78j, 78l, 78m, 78n, 78o, 78o–7 note, 78t, 78w, 78ll(d), 78mm, 80a–8, 80a–24, 80a–28, 80a–29, 80a–30, 80a–37, and Pub. L. 111–203, § 712, 124 Stat. 1376 (2010) unless otherwise noted.

*       *       *       *       *

■ 2. Section 230.194 is added to read as follows:

**§ 230.194 Definitions of the terms "swap" and "security-based swap" as used in the Act.**

(a) The term *swap* as used in section 2(a)(17) of the Act (15 U.S.C. 77b(a)(17)) has the same meaning as provided in

section 3(a)(69) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(69)) and 17 CFR 240.3a69–1 through 240.3a69–3.

(b) The term *security-based swap* as used in section 2(a)(17) of the Act (15 U.S.C. 77b(a)(17)) has the same meaning as provided in section 3(a)(68) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)) and 17 CFR 240.3a68–1a through 240.3a68–5.

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

■ 3. The general authority citation for Part 240 is revised to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77jjj, 77kkk, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78l, 78m, 78n, 78n–1, 78o, 78o–4, 78o–8, 78p, 78q, 78s, 78u–5, 78w, 78x, 78dd(b), 78dd(c), 78ll, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 *et seq.,* and 8302; 18 U.S.C. 1350; 12 U.S.C. 5221(e)(3), and Pub. L. 111–203, Sec. 712, 124 Stat. 1376 (2010), unless otherwise noted.

*       *       *       *       *

■ 4. Add an undesignated center heading and §§ 240.3a68–1a through 240.3a68–5 and §§ 240.3a69–1 through 240.3a69–3 to read as follows:

**Further Definition of Swap, Security-Based Swap, and Security-Based Swap Agreement; Mixed Swaps; Security-Based Swap Agreement Recordkeeping**

240.3a68–1a   Meaning of "issuers of securities in a narrow-based security index" as used in section 3(a)(68)(A)(ii)(III) of the Act.

240.3a68–1b   Meaning of "narrow-based security index" as used in section 3(a)(68)(A)(ii)(I) of the Act.

240.3a68–2   Requests for interpretation of swaps, security-based swaps, and mixed swaps.

240.3a68–3   Meaning of "narrow-based security index" as used in the definition of "security-based swap."

240.3a68–4   Regulation of mixed swaps.

240.3a68–5   Regulation of certain futures contracts on foreign sovereign debt.

240.3a69–1   Safe Harbor Definition of "security-based swap" and "swap" as used in sections 3(a)(68) and 3(a)(69) of the Act—insurance.

240.3a69–2   Definition of "swap" as used in section 3(a)(69) of the Act—additional products.

240.3a69–3   Books and records requirements for security-based swap agreements.

*       *       *       *       *

**§ 240.3a68–1a   Meaning of "issuers of securities in a narrow-based security index" as used in section 3(a)(68)(A)(ii)(III) of the Act.**

(a) Notwithstanding § 240.3a68–3(a), and solely for purposes of determining

whether a credit default swap is a security-based swap under section 3(a)(68)(A)(ii)(III) of the Act (15 U.S.C. 78c(a)(68)(A)(ii)(III)), the term *issuers of securities in a narrow-based security index* as used in section 3(a)(68)(A)(ii)(III) of the Act means issuers of securities included in an index (including an index referencing loan borrowers or loans of such borrowers) in which:

(1)(i) There are nine or fewer non-affiliated issuers of securities that are reference entities included in the index, provided that an issuer of securities shall not be deemed a reference entity included in the index for purposes of this section unless:

(A) A credit event with respect to such reference entity would result in a payment by the credit protection seller to the credit protection buyer under the credit default swap based on the related notional amount allocated to such reference entity; or

(B) The fact of such credit event or the calculation in accordance with paragraph (a)(1)(i)(A) of this section of the amount owed with respect to such credit event is taken into account in determining whether to make any future payments under the credit default swap with respect to any future credit events;

(ii) The effective notional amount allocated to any reference entity included in the index comprises more than 30 percent of the index's weighting;

(iii) The effective notional amount allocated to any five non-affiliated reference entities included in the index comprises more than 60 percent of the index's weighting; or

(iv) Except as provided in paragraph (b) of this section, for each reference entity included in the index, none of the criteria in paragraphs (a)(1)(iv)(A) through (a)(1)(iv)(H) of this section is satisfied:

(A) The reference entity included in the index is required to file reports pursuant to section 13 or section 15(d) of the Act (15 U.S.C. 78m or 78o(d));

(B) The reference entity included in the index is eligible to rely on the exemption provided in § 240.12g3–2(b);

(C) The reference entity included in the index has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more;

(D) The reference entity included in the index (other than a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77))) has outstanding notes, bonds, debentures, loans, or evidences of indebtedness (other than

revolving credit facilities) having a total remaining principal amount of at least $1 billion;

(E) The reference entity included in the index is the issuer of an exempted security as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12)) (other than any municipal security as defined in section 3(a)(29) of the Act (15 U.S.C. 78c(a)(29)));

(F) The reference entity included in the index is a government of a foreign country or a political subdivision of a foreign country;

(G) If the reference entity included in the index is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)), such asset-backed security was issued in a transaction registered under the Securities Act of 1933 (15 U.S.C. 77a *et seq.*) and has publicly available distribution reports; and

(H) For a credit default swap entered into solely between eligible contract participants as defined in section 3(a)(65) of the Act (15 U.S.C. 78c(a)(65)):

(*1*) The reference entity included in the index (other than a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77))) makes available to the public or otherwise makes available to such eligible contract participant information about the reference entity included in the index pursuant to § 230.144A(d)(4)) of this chapter;

(*2*) Financial information about the reference entity included in the index (other than a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77))) is otherwise publicly available; or

(*3*) In the case of a reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)), information of the type and level included in publicly available distribution reports for similar asset-backed securities is publicly available about both the reference entity included in the index and such asset-backed security; and

(2)(i) The index is not composed solely of reference entities that are issuers of exempted securities as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Act (15 U.S.C. 78c(a)(29))), as in effect on the date of enactment of the Futures Trading Act of 1982); and

(ii) Without taking into account any portion of the index composed of reference entities that are issuers of exempted securities as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Act (15 U.S.C. 78c(a)(29)), the remaining portion of the index would be within the term ''issuer of securities in a narrow-based security index'' under paragraph (a)(1) of this section.

(b) Paragraph (a)(1)(iv) of this section will not apply with respect to a reference entity included in the index if:

(1) The effective notional amounts allocated to such reference entity comprise less than five percent of the index's weighting; and

(2) The effective notional amounts allocated to reference entities included in the index that satisfy paragraph (a)(1)(iv) of this section comprise at least 80 percent of the index's weighting.

(c) For purposes of this section:

(1) A reference entity included in the index is affiliated with another reference entity included in the index (for purposes of paragraph (c)(4) of this section) or another entity (for purposes of paragraph (c)(5) of this section) if it controls, is controlled by, or is under common control with, that other reference entity included in the index or other entity, as applicable; provided that each reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) will not be considered affiliated with any other reference entity included in the index or any other entity that is an issuing entity of an asset-backed security.

(2) Control for purposes of this section means ownership of more than 50 percent of the equity of a reference entity included in the index (for purposes of paragraph (c)(4) of this section) or another entity (for purposes of paragraph (c)(5) of this section), or the ability to direct the voting of more than 50 percent of the voting equity of a reference entity included in the index (for purposes of paragraph (c)(4) of this section) or another entity (for purposes of paragraph (c)(5) of this section).

(3) In identifying a reference entity included in the index for purposes of this section, the term *reference entity* includes:

(i) An issuer of securities;

(ii) An issuer of securities that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)); and

(iii) An issuer of securities that is a borrower with respect to any loan identified in an index of borrowers or loans.

(4) For purposes of calculating the thresholds in paragraphs (a)(1)(i) through (a)(1)(iii) of this section, the term *reference entity included in the index* includes a single reference entity included in the index or a group of affiliated reference entities included in the index as determined in accordance with paragraph (c)(1) of this section (with each reference entity included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate reference entity included in the index).

(5) For purposes of determining whether one of the criterion in either paragraphs (a)(1)(iv)(A) through (a)(1)(iv)(D) of this section or paragraphs (a)(1)(iv)(H)(*1*) and (a)(1)(iv)(H)(*2*) of this section is met, the term *reference entity included in the index* includes a single reference entity included in the index or a group of affiliated entities as determined in accordance with paragraph (c)(1) of this section (with each issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate entity).

## § 240.3a68–1b  Meaning of "narrow-based security index" as used in section 3(a)(68)(A)(ii)(I) of the Act.

(a) Notwithstanding § 240.3a68–3(a), and solely for purposes of determining whether a credit default swap is a security-based swap under section 3(a)(68)(A)(ii)(I) of the Act (15 U.S.C. 78c(a)(68)(A)(ii)(I)), the term *narrow-based security index* as used in section 3(a)(68)(A)(ii)(I) of the Act means an index in which:

(1)(i) The index is composed of nine or fewer securities or securities that are issued by nine or fewer non-affiliated issuers, provided that a security shall not be deemed a component of the index for purposes of this section unless:

(A) A credit event with respect to the issuer of such security or a credit event with respect to such security would result in a payment by the credit protection seller to the credit protection buyer under the credit default swap based on the related notional amount allocated to such security; or

(B) The fact of such credit event or the calculation in accordance with paragraph (a)(1)(i)(A) of this section of the amount owed with respect to such credit event is taken into account in determining whether to make any future payments under the credit default swap with respect to any future credit events;

(ii) The effective notional amount allocated to the securities of any issuer included in the index comprises more than 30 percent of the index's weighting;

(iii) The effective notional amount allocated to the securities of any five non-affiliated issuers included in the index comprises more than 60 percent of the index's weighting; or

(iv) Except as provided in paragraph (b) of this section, for each security included in the index none of the criteria in paragraphs (a)(1)(iv)(A) through (a)(1)(iv)(H) of this section is satisfied:

(A) The issuer of the security included in the index is required to file reports pursuant to section 13 or section 15(d) of the Act (15 U.S.C. 78m or 78o(d));

(B) The issuer of the security included in the index is eligible to rely on the exemption provided in § 240.12g3–2(b);

(C) The issuer of the security included in the index has a worldwide market value of its outstanding common equity held by non-affiliates of $700 million or more;

(D) The issuer of the security included in the index (other than an issuer of the security that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77))) has outstanding notes, bonds, debentures, loans, or evidences of indebtedness (other than revolving credit facilities) having a total remaining principal amount of at least $1 billion;

(E) The security included in the index is an exempted security as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12)) (other than any municipal security as defined in section 3(a)(29) of the Act (15 U.S.C. 78c(a)(29)));

(F) The issuer of the security included in the index is a government of a foreign country or a political subdivision of a foreign country;

(G) If the security included in the index is an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)), the security was issued in a transaction registered under the Securities Act of 1933 (15 U.S.C. 77a *et seq.*) and has publicly available distribution reports; and

(H) For a credit default swap entered into solely between eligible contract participants as defined in section 3(a)(65) of the Act (15 U.S.C. 78c(a)(65)):

(*1*) The issuer of the security included in the index (other than an issuer of the security that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77))) makes available to the public or otherwise makes available to such eligible contract participant information about such issuer pursuant to § 230.144A(d)(4)) of this chapter;

(*2*) Financial information about the issuer of the security included in the index (other than an issuer of the security that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77))) is otherwise publicly available; or

(*3*) In the case of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)), information of the type and level included in public distribution reports for similar asset-backed securities is publicly available about both the issuing entity and such asset-backed security; and

(2)(i) The index is not composed solely of exempted securities as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Act (15 U.S.C. 78c(a)(29)), as in effect on the date of enactment of the Futures Trading Act of 1982); and

(ii) Without taking into account any portion of the index composed of exempted securities as defined in section 3(a)(12) of the Act (15 U.S.C. 78c(a)(12)), as in effect on the date of enactment of the Futures Trading Act of 1982 (other than any municipal security as defined in section 3(a)(29) of the Act (15 U.S.C. 78c(a)(29)), the remaining portion of the index would be within the term "narrow-based security index" under paragraph (a)(1) of this section.

(b) Paragraph (a)(1)(iv) of this section will not apply with respect to securities of an issuer included in the index if:

(1) The effective notional amounts allocated to all securities of such issuer included in the index comprise less than five percent of the index's weighting; and

(2) The securities that satisfy paragraph (a)(1)(iv) of this section comprise at least 80 percent of the index's weighting.

(c) For purposes of this section:

(1) An issuer of securities included in the index is affiliated with another issuer of securities included in the index (for purposes of paragraph (c)(4) of this section) or another entity (for purposes of paragraph (c)(5) of this section) if it controls, is controlled by, or is under common control with, that other issuer or other entity, as applicable; provided that each issuer of securities included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of

the Act (15 U.S.C. 78c(a)(77)) will not be considered affiliated with any other issuer of securities included in the index or any other entity that is an issuing entity of an asset-backed security.

(2) Control for purposes of this section means ownership of more than 50 percent of the equity of an issuer of securities included in the index (for purposes of paragraph (c)(4) of this section) or another entity (for purposes of paragraph (c)(5) of this section), or the ability to direct the voting of more than 50 percent of the voting equity an issuer of securities included in the index (for purposes of paragraph (c)(4) of this section) or another entity (for purposes of paragraph (c)(5) of this section).

(3) In identifying an issuer of securities included in the index for purposes of this section, the term *issuer* includes:

(i) An issuer of securities; and

(ii) An issuer of securities that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)).

(4) For purposes of calculating the thresholds in paragraphs (a)(1)(i) through (a)(1)(iii) of this section, the term *issuer of the security included in the index* includes a single issuer of securities included in the index or a group of affiliated issuers of securities included in the index as determined in accordance with paragraph (c)(1) of this section (with each issuer of securities included in the index that is an issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate issuer of securities included in the index).

(5) For purposes of determining whether one of the criterion in either paragraphs (a)(1)(iv)(A) through (a)(1))(iv)(D) of this section or paragraphs (a)(1)(iv)(H)(*1*) and (a)(1)(iv)(H)(*2*) of this section is met, the term *issuer of the security included in the index* includes a single issuer of securities included in the index or a group affiliated entities as determined in accordance with paragraph (c)(1) of this section (with each issuing entity of an asset-backed security as defined in section 3(a)(77) of the Act (15 U.S.C. 78c(a)(77)) being considered a separate entity).

§ 240.3a68–2  Requests for interpretation of swaps, security-based swaps, and mixed swaps.

(a) *In general.* Any person may submit a request to the Commission and the Commodity Futures Trading Commission to provide a joint interpretation of whether a particular agreement, contract, or transaction (or class thereof) is:

(1) A swap, as that term is defined in section 3(a)(69) of the Act (15 U.S.C. 78c(a)(69)) and the rules and regulations promulgated thereunder;

(2) A security-based swap, as that term is defined in section 3(a)(68) of the Act (15 U.S.C. 78c(a)(68)) and the rules and regulations promulgated thereunder; or

(3) A mixed swap, as that term is defined in section 3(a)(68)(D) of the Act and the rules and regulations promulgated thereunder.

(b) *Request process.* In making a request pursuant to paragraph (a) of this section, the requesting person must provide the Commission and the Commodity Futures Trading Commission with the following:

(1) All material information regarding the terms of the agreement, contract, or transaction (or class thereof);

(2) A statement of the economic characteristics and purpose of the agreement, contract, or transaction (or class thereof);

(3) The requesting person's determination as to whether the agreement, contract, or transaction (or class thereof) should be characterized as a swap, a security-based swap, or both (i.e., a mixed swap), including the basis for such determination; and

(4) Such other information as may be requested by the Commission or the Commodity Futures Trading Commission.

(c) *Request withdrawal.* A person may withdraw a request made pursuant to paragraph (a) of this section at any time prior to the issuance of a joint interpretation or joint proposed rule by the Commission and the Commodity Futures Trading Commission in response to the request; provided, however, that notwithstanding such withdrawal, the Commission and the Commodity Futures Trading Commission may provide a joint interpretation of whether the agreement, contract, or transaction (or class thereof) is a swap, a security-based swap, or both (i.e., a mixed swap).

(d) *Request by the Commission or the Commodity Futures Trading Commission.* In the absence of a request for a joint interpretation under paragraph (a) of this section:

(1) If the Commission or the Commodity Futures Trading Commission receives a proposal to list, trade, or clear an agreement, contract, or transaction (or class thereof) that raises questions as to the appropriate characterization of such agreement, contract, or transaction (or class thereof) as a swap, a security-based swap, or both (i.e., a mixed swap), the Commission or the Commodity Futures Trading Commission, as applicable, promptly shall notify the other of the agreement, contract, or transaction (or class thereof); and

(2) The Commission or the Commodity Futures Trading Commission, or their Chairmen jointly, may submit a request for a joint interpretation as described in paragraph (a) of this section; such submission shall be made pursuant to paragraph (b) of this section, and may be withdrawn pursuant to paragraph (c) of this section.

(e) *Timeframe for joint interpretation.* (1) If the Commission and the Commodity Futures Trading Commission determine to issue a joint interpretation as described in paragraph (a) of this section, such joint interpretation shall be issued within 120 days after receipt of a complete submission requesting a joint interpretation under paragraph (a) or (d) of this section.

(2) The Commission and the Commodity Futures Trading Commission shall consult with the Board of Governors of the Federal Reserve System prior to issuing any joint interpretation as described in paragraph (a) of this section.

(3) If the Commission and the Commodity Futures Trading Commission seek public comment with respect to a joint interpretation regarding an agreement, contract, or transaction (or class thereof), the 120-day period described in paragraph (e)(1) of this section shall be stayed during the pendency of the comment period, but shall recommence with the business day after the public comment period ends.

(4) Nothing in this section shall require the Commission and the Commodity Futures Trading Commission to issue any joint interpretation.

(5) If the Commission and the Commodity Futures Trading Commission do not issue a joint interpretation within the time period described in paragraph (e)(1) or (e)(3) of this section, each of the Commission and the Commodity Futures Trading Commission shall publicly provide the reasons for not issuing such a joint interpretation within the applicable timeframes.

(f) *Joint proposed rule.* (1) Rather than issue a joint interpretation pursuant to paragraph (a) of this section, the Commission and the Commodity Futures Trading Commission may issue a joint proposed rule, in consultation with the Board of Governors of the Federal Reserve System, to further

define one or more of the terms swap, security-based swap, or mixed swap.

(2) A joint proposed rule described in paragraph (f)(1) of this section shall be issued within the timeframe for issuing a joint interpretation set forth in paragraph (e) of this section.

### § 240.3a68–3 Meaning of "narrow-based security index" as used in the definition of "security-based swap."

(a) *In general.* Except as otherwise provided in § 240.3a68–1a and § 240.3a68–1b, for purposes of section 3(a)(68) of the Act (15 U.S.C. 78c(a)(68)), the term *narrow-based security index* has the meaning set forth in section 3(a)(55) of the Act (15 U.S.C. 78c(a)(55)), and the rules, regulations, and orders of the Commission thereunder.

(b) *Tolerance period for swaps traded on designated contract markets, swap execution facilities and foreign boards of trade.* Notwithstanding paragraph (a) of this section, solely for purposes of swaps traded on or subject to the rules of a designated contract market, swap execution facility, or foreign board of trade pursuant to the Commodity Exchange Act (7 U.S.C. 1 *et seq.*), a security index underlying such swaps shall not be considered a narrow-based security index if:

(1)(i) A swap on the index is traded on or subject to the rules of a designated contract market, swap execution facility, or foreign board of trade pursuant to the Commodity Exchange Act (7 U.S.C. 1 *et seq.*) for at least 30 days as a swap on an index that was not a narrow-based security index; or

(ii) Such index was not a narrow-based security index during every trading day of the six full calendar months preceding a date no earlier than 30 days prior to the commencement of trading of a swap on such index on a market described in paragraph (b)(1)(i) of this section; and

(2) The index has been a narrow-based security index for no more than 45 business days over three consecutive calendar months.

(c) *Tolerance period for security-based swaps traded on national securities exchanges or security-based swap execution facilities.* Notwithstanding paragraph (a) of this section, solely for purposes of security-based swaps traded on a national securities exchange or security-based swap execution facility, a security index underlying such security-based swaps shall be considered a narrow-based security index if:

(1)(i) A security-based swap on the index is traded on a national securities exchange or security-based swap execution facility for at least 30 days as

a security-based swap on a narrow-based security index; or

(ii) Such index was a narrow-based security index during every trading day of the six full calendar months preceding a date no earlier than 30 days prior to the commencement of trading of a security-based swap on such index on a market described in paragraph (c)(1)(i) of this section; and

(2) The index has been a security index that is not a narrow-based security index for no more than 45 business days over three consecutive calendar months.

(d) *Grace period.* (1) Solely with respect to a swap that is traded on or subject to the rules of a designated contract market, swap execution facility or foreign board of trade pursuant to the Commodity Exchange Act (7 U.S.C. 1 *et seq.*), an index that becomes a narrow-based security index under paragraph (b) of this section solely because it was a narrow-based security index for more than 45 business days over three consecutive calendar months shall not be a narrow-based security index for the following three calendar months.

(2) Solely with respect to a security-based swap that is traded on a national securities exchange or security-based swap execution facility, an index that becomes a security index that is not a narrow-based security index under paragraph (c) of this section solely because it was not a narrow-based security index for more than 45 business days over three consecutive calendar months shall be a narrow-based security index for the following three calendar months.

### § 240.3a68–4 Regulation of mixed swaps.

(a) *In general.* The term mixed swap has the meaning set forth in section 3(a)(68)(D) of the Act (15 U.S.C. 78c(a)(68)(D)).

(b) *Regulation of bilateral uncleared mixed swaps entered into by dually-registered dealers or major participants.* A mixed swap:

(1) That is neither executed on nor subject to the rules of a designated contract market, national securities exchange, swap execution facility, security-based swap execution facility, or foreign board of trade;

(2) That will not be submitted to a derivatives clearing organization or registered or exempt clearing agency to be cleared; and

(3) Where at least one party is registered with the Commission as a security-based swap dealer or major security-based swap participant and also with the Commodity Futures Trading Commission as a swap dealer or

major swap participant, shall be subject to:

(i) The following provisions of the Commodity Exchange Act (7 U.S.C. 1 *et seq.*), and the rules and regulations promulgated thereunder, set forth in the rules and regulations of the Commodity Futures Trading Commission:

(A) Examinations and information sharing: 7 U.S.C. 6s(f) and 12;

(B) Enforcement: 7 U.S.C. 2(a)(1)(B), 6(b), 6b, 6c, 6s(h)(1)(A), 6s(h)(4)(A), 9, 13b, 13a–1, 13a–2, 13, 13c(a), 13c(b), 15 and 26;

(C) Reporting to a swap data repository: 7 U.S.C. 6r;

(D) Real-time reporting: 7 U.S.C. 2(a)(13);

(E) Capital: 7 U.S.C. 6s(e); and

(F) Position Limits: 7 U.S.C. 6a; and

(ii) The provisions of the Federal securities laws, as defined in section 3(a)(47) of the Act (15 U.S.C. 78c(a)(47)), and the rules and regulations promulgated thereunder.

(c) *Process for determining regulatory treatment for other mixed swaps*—(1) *In general.* Any person who desires or intends to list, trade, or clear a mixed swap (or class thereof) that is not subject to paragraph (b) of this section may request the Commission and the Commodity Futures Trading Commission to issue a joint order permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that mixed swap) to comply, as to parallel provisions only, with specified parallel provisions of either the Act (15 U.S.C. 78a *et seq.*) or the Commodity Exchange Act (7 U.S.C. 1 *et seq.*), and the rules and regulations thereunder (collectively, *specified parallel provisions*), instead of being required to comply with parallel provisions of both the Act and the Commodity Exchange Act. For purposes of this paragraph (c), *parallel provisions* means comparable provisions of the Act and the Commodity Exchange Act that were added or amended by the Wall Street Transparency and Accountability Act of 2010 with respect to security-based swaps and swaps, and the rules and regulations thereunder.

(2) *Request process.* A person submitting a request pursuant to paragraph (c)(1) of this section must provide the Commission and the Commodity Futures Trading Commission with the following:

(i) All material information regarding the terms of the specified, or specified class of, mixed swap;

(ii) The economic characteristics and purpose of the specified, or specified class of, mixed swap;

(iii) The specified parallel provisions, and the reasons the person believes

such specified parallel provisions would be appropriate for the mixed swap (or class thereof); and

(iv) An analysis of:

(A) The nature and purposes of the parallel provisions that are the subject of the request;

(B) The comparability of such parallel provisions;

(C) The extent of any conflicts or differences between such parallel provisions; and

(D) Such other information as may be requested by the Commission or the Commodity Futures Trading Commission.

(3) *Request withdrawal.* A person may withdraw a request made pursuant to paragraph (c)(1) of this section at any time prior to the issuance of a joint order under paragraph (c)(4) of this section by the Commission and the Commodity Futures Trading Commission in response to the request.

(4) *Issuance of orders.* In response to a request under paragraph (c)(1) of this section, the Commission and the Commodity Futures Trading Commission, as necessary to carry out the purposes of the Wall Street Transparency and Accountability Act of 2010, may issue a joint order, after notice and opportunity for comment, permitting the requesting person (and any other person or persons that subsequently lists, trades, or clears that mixed swap) to comply, as to parallel provisions only, with the specified parallel provisions (or another subset of the parallel provisions that are the subject of the request, as the Commissions determine is appropriate), instead of being required to comply with parallel provisions of both the Act (15 U.S.C. 78a *et seq.*) and the Commodity Exchange Act (7 U.S.C. 1 *et seq.*). In determining the contents of such joint order, the Commission and the Commodity Futures Trading Commission may consider, among other things:

(i) The nature and purposes of the parallel provisions that are the subject of the request;

(ii) The comparability of such parallel provisions; and

(iii) The extent of any conflicts or differences between such parallel provisions.

(5) *Timeframe.* (i) If the Commission and the Commodity Futures Trading Commission determine to issue a joint order as described in paragraph (c)(4) of this section, such joint order shall be issued within 120 days after receipt of a complete request for a joint order under paragraph (c)(1) of this section, which time period shall be stayed during the pendency of the public

comment period provided for in paragraph (c)(4) of this section and shall recommence with the business day after the public comment period ends.

(ii) Nothing in this section shall require the Commission and the Commodity Futures Trading Commission to issue any joint order.

(iii) If the Commission and the Commodity Futures Trading Commission do not issue a joint order within the time period described in paragraph (c)(5)(i) of this section, each of the Commission and the Commodity Futures Trading Commission shall publicly provide the reasons for not issuing such a joint order within that timeframe.

## § 240.3a68–5 Regulation of certain futures contracts on foreign sovereign debt.

The term *security-based swap* as used in section 3(a)(68) of the Act (15 U.S.C. 78c(a)(68)) does not include an agreement, contract, or transaction that is based on or references a qualifying foreign futures contract (as defined in § 240.3a12–8 on the debt securities of any one or more of the foreign governments enumerated in § 240.3a12–8, provided that such agreement, contract, or transaction satisfies the following conditions:

(a) The futures contract that the agreement, contract, or transaction references or upon which the agreement, contract, or transaction is based is a qualifying foreign futures contract that satisfies the conditions of § 240.3a12–8 applicable to qualifying foreign futures contracts;

(b) The agreement, contract, or transaction is traded on or through a board of trade (as defined in 7 U.S.C. 2);

(c) The debt securities upon which the qualifying foreign futures contract is based or referenced and any security used to determine the cash settlement amount pursuant to paragraph (d) of this section were not registered under the Securities Act of 1933 (15 U.S.C. 77 *et seq.*) or the subject of any American depositary receipt registered under the Securities Act of 1933;

(d) The agreement, contract, or transaction may only be cash settled; and

(e) The agreement, contract, or transaction is not entered into by the issuer of the debt securities upon which the qualifying foreign futures contract is based or referenced (including any security used to determine the cash payment due on settlement of such agreement, contract or transaction), an affiliate (as defined in the Securities Act of 1933 (15 U.S.C. 77 *et seq.*) and the rules and regulations thereunder) of the

issuer, or an underwriter of such issuer's debt securities.

## § 240.3a69–1 Safe Harbor Definition of "security-based swap" and "swap" as used in sections 3(a)(68) and 3(a)(69) of the Act— insurance.

(a) This paragraph is a non-exclusive safe harbor. The terms *security-based swap* as used in section 3(a)(68) of the Act (15 U.S.C. 78c(a)(68)) and *swap* as used in section 3(a)(69) of the Act (15 U.S.C. 78c(a)(69)) do not include an agreement, contract, or transaction that:

(1) By its terms or by law, as a condition of performance on the agreement, contract, or transaction:

(i) Requires the beneficiary of the agreement, contract, or transaction to have an insurable interest that is the subject of the agreement, contract, or transaction and thereby carry the risk of loss with respect to that interest continuously throughout the duration of the agreement, contract, or transaction;

(ii) Requires that loss to occur and to be proved, and that any payment or indemnification therefor be limited to the value of the insurable interest;

(iii) Is not traded, separately from the insured interest, on an organized market or over the counter; and

(iv) With respect to financial guaranty insurance only, in the event of payment default or insolvency of the obligor, any acceleration of payments under the policy is at the sole discretion of the insurer; and

(2) Is provided:

(i)(A) By a person that is subject to supervision by the insurance commissioner (or similar official or agency) of any State, as defined in section 3(a)(16) of the Act (15 U.S.C. 78c(a)(16)), or by the United States or an agency or instrumentality thereof; and

(B) Such agreement, contract, or transaction is regulated as insurance under applicable State law or the laws of the United States;

(ii)(A) Directly or indirectly by the United States, any State or any of their respective agencies or instrumentalities; or

(B) Pursuant to a statutorily authorized program thereof; or

(iii) In the case of reinsurance only by a person to another person that satisfies the conditions set forth in paragraph (a)(2) of this section, provided that:

(A) Such person is not prohibited by applicable State law or the laws of the United States from offering such agreement, contract, or transaction to such person that satisfies the conditions set forth in paragraph (a)(2) of this section;

(B) The agreement, contract, or transaction to be reinsured satisfies the

conditions set forth in paragraph (a)(1) or (3) of this section; and

(C) Except as otherwise permitted under applicable State law, the total amount reimbursable by all reinsurers for such agreement, contract, or transaction may not exceed the claims or losses paid by the person writing the risk being ceded or transferred by such person; or

(iv) In the case of non-admitted insurance by a person who:

(A) Is located outside of the United States and listed on the Quarterly Listing of Alien Insurers as maintained by the International Insurers Department of the National Association of Insurance Commissioners; or

(B) Meets the eligibility criteria for non-admitted insurers under applicable State law; or

(3) Is provided in accordance with the conditions set forth in paragraph (a)(2) of this section and is one of the following types of products:

(i) Surety bond;
(ii) Fidelity bond;
(iii) Life insurance;
(iv) Health insurance;
(v) Long term care insurance;
(vi) Title insurance;
(vii) Property and casualty insurance;
(viii) Annuity;
(ix) Disability insurance;
(x) Insurance against default on individual residential mortgages; and
(xi) Reinsurance of any of the foregoing products identified in paragraphs (i) through (x) of this section.

(b) The terms security-based swap as used in section 3(a)(68) of the Act (15 U.S.C. 78c(a)(68)) and swap as used in section 3(a)(69) of the Act (15 U.S.C. 78c(a)(69)) do not include an agreement, contract, or transaction that was entered into on or before the effective date of this section and that, at such time that it was entered into, was provided in accordance with the conditions set forth in paragraph (a)(2) of this section.

**§ 240.3a69–2 Definition of "swap" as used in section 3(a)(69) of the Act—additional products.**

(a) *In general.* The term *swap* has the meaning set forth in section 3(a)(69) of the Act (15 U.S.C. 78c(a)(69)).

(b) *Inclusion of particular products.* (1) The term *swap* includes, without limiting the meaning set forth in section 3(a)(69) of the Act (15 U.S.C. 78c(a)(69)), the following agreements, contracts, and transactions:

(i) A cross-currency swap;
(ii) A currency option, foreign currency option, foreign exchange option and foreign exchange rate option;
(iii) A foreign exchange forward;

(iv) A foreign exchange swap;
(v) A forward rate agreement; and
(vi) A non-deliverable forward involving foreign exchange.

(2) The term *swap* does not include an agreement, contract, or transaction described in paragraph (b)(1) of this section that is otherwise excluded by section 1a(47)(B) of the Commodity Exchange Act (7 U.S.C. 1a(47)(B)).

(c) *Foreign exchange forwards and foreign exchange swaps.* Notwithstanding paragraph (b)(2) of this section:

(1) A foreign exchange forward or a foreign exchange swap shall not be considered a swap if the Secretary of the Treasury makes a determination described in section 1a(47)(E)(i) of the Commodity Exchange Act (7 U.S.C. 1a(47)(E)(i)).

(2) Notwithstanding paragraph (c)(1) of this section:

(i) The reporting requirements set forth in section 4r of the Commodity Exchange Act (7 U.S.C. 6r) and regulations promulgated thereunder shall apply to a foreign exchange forward or foreign exchange swap; and

(ii) The business conduct standards set forth in section 4s(h) of the Commodity Exchange Act (7 U.S.C. 6s) and regulations promulgated thereunder shall apply to a swap dealer or major swap participant that is a party to a foreign exchange forward or foreign exchange swap.

(3) For purposes of section 1a(47)(E) of the Commodity Exchange Act (7 U.S.C. 1a(47)(E)) and this section, the term *foreign exchange forward* has the meaning set forth in section 1a(24) of the Commodity Exchange Act (7 U.S.C. 1a(24)).

(4) For purposes of section 1a(47)(E) of the Commodity Exchange Act (7 U.S.C. 1a(47)(E)) and this section, the term *foreign exchange swap* has the meaning set forth in section 1a(25) of the Commodity Exchange Act (7 U.S.C. 1a(25)).

(5) For purposes of sections 1a(24) and 1a(25) of the Commodity Exchange Act (7 U.S.C. 1a(24) and (25)) and this section, the following transactions are not foreign exchange forwards or foreign exchange swaps:

(i) A currency swap or a cross-currency swap;

(ii) A currency option, foreign currency option, foreign exchange option, or foreign exchange rate option; and

(iii) A non-deliverable forward involving foreign exchange.

**§ 240.3a69–3 Books and records requirements for security-based swap agreements.**

(a) A person registered as a swap data repository under section 21 of the Commodity Exchange Act (7 U.S.C. 24a) and the rules and regulations thereunder:

(1) Shall not be required to keep and maintain additional books and records regarding security-based swap agreements other than the books and records regarding swaps required to be kept and maintained pursuant to section 21 of the Commodity Exchange Act (7 U.S.C. 24a) and the rules and regulations thereunder; and

(2) Shall not be required to collect and maintain additional data regarding security-based swap agreements other than the data regarding swaps required to be collected and maintained by such persons pursuant to section 21 of the Commodity Exchange Act (7 U.S.C. 24a) and the rules and regulations thereunder.

(b) A person shall not be required to keep and maintain additional books and records, including daily trading records, regarding security-based swap agreements other than the books and records regarding swaps required to be kept and maintained by such persons pursuant to section 4s of the Commodity Exchange Act (7 U.S.C. 6s) and the rules and regulations thereunder if such person is registered as:

(1) A swap dealer under section 4s(a)(1) of the Commodity Exchange Act (7 U.S.C. 6s(a)(1)) and the rules and regulations thereunder;

(2) A major swap participant under section 4s(a)(2) of the Commodity Exchange Act (7 U.S.C. 6s(a)(2)) and the rules and regulations thereunder;

(3) A security-based swap dealer under section 15F(a)(1) of the Act (15 U.S.C. 78o–10(a)(1)) and the rules and regulations thereunder; or

(4) A major security-based swap participant under section 15F(a)(2) of the Act (15 U.S.C. 78o–10(a)(2)) and the rules and regulations thereunder.

(c) The term *security-based swap agreement* has the meaning set forth in section 3(a)(78) of the Act (15 U.S.C. 78c(a)(78)).

**PART 241—INTERPRETATIVE RELEASES RELATING TO THE SECURITIES EXCHANGE ACT OF 1934 AND GENERAL RULES AND REGULATIONS THEREUNDER**

■ 5. Part 241 is amended by adding Release No. 34–67453 and the release date of July 18, 2012, to the list of interpretative releases.

Dated: July 18, 2012.

By the Commodity Futures Trading Commission.

**David A. Stawick,**
*Secretary.*

By the Securities and Exchange Commission.

Dated: July 18, 2012.

**Elizabeth M. Murphy,**
*Secretary.*

## Product Definitions Contained in Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act—CFTC Voting Summary and Statements of CFTC Commissioners

**Note:** The following appendices will not appear in the Code of Federal Regulations.

### CFTC Voting Summary

On this matter, Chairman Gensler and Commissioners Sommers, O'Malia and Wetjen voted in the affirmative; Commissioner Chilton voted in the negative.

### Statement of CFTC Chairman Gary Gensler

I support the final rulemaking to implement the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) requirement to further define "swap" and other products that come under swaps market reform. The Commodity Futures Trading Commission (CFTC) worked closely with the Securities and Exchange Commission (SEC), in consultation with the Federal Reserve, on the final rules and interpretations to further define "swaps," "security-based swaps," "mixed swaps" and "security-based swap agreements."

The statutory definition as laid out by Congress of swap is very detailed. These final rules and interpretations are consistent with that detailed definition and Congressional intent. For example, interest rate swaps, currency swaps, commodity swaps, including energy, metals and agricultural swaps, and broad-based index swaps, such as index credit default swaps, are all swaps. Consistent with Congress's definition of swaps, the rule also defines options as swaps.

In preparing this final rulemaking, staff worked to address the more than 140 comments that were submitted by the public in response to the product further definition proposal. Many of the commenters asked the Commissions to specifically provide guidance on what is not a swap or security-based swap.

For example, under the Commodity Exchange Act, the CFTC does not regulate forward contracts. Over the decades, there have been a series of orders, interpretations and cases that market participants have come to rely upon regarding the exception from futures regulation for forwards and forwards with embedded options. Consistent with that history, the Dodd-Frank Act excluded from the definition of a swap "any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled." The Commission is interpreting that exclusion in a manner that is consistent with Commission precedent and, in response to

commenters, is providing increased clarity on the forward exclusion from futures regulation. The final release provides guidance regarding forwards with embedded volumetric options, like those used within the electricity markets, and is requesting comment on this interpretation.

Further, consistent with the Dodd-Frank Act, insurance products will not be regulated as swaps. Similarly, this final rulemaking clarifies that certain consumer and commercial arrangements that historically have not been considered swaps, such as consumer mortgage rate locks, contracts to lock in the price of home heating oil and contracts relating to inventory or equipment, also will not be regulated as swaps.

The rule provides clarity on the dividing line between "swaps" and "security-based swaps" or both, i.e. mixed swaps. The rule also provides a process for requesting joint interpretations in circumstances where there are questions. These dividing lines and the process will benefit market participants, as they will provide greater clarity as to what regulatory requirements apply when they transact in the derivatives markets.

Lastly, the final release includes specific provisions that guard against transactions that are willfully structured to evade Dodd-Frank Act swaps market reforms.

I'd like to express my appreciation for their dedication to completing this rule to Chairman Mary Schapiro and her fellow Commissioners at the SEC, as well as the staff, including Robert Cook, Brian Bussey, Amy Starr, Donna Chambers, Christie March, Andy Schoeffler, Wenchi Hu, John Guidroz and Sarah Otte.

I'd also like to thank the CFTC's hardworking staff: Julian Hammar, Lee Ann Duffy, David Aron, Terry Arbit, Eric Juzenas and Stephen Kane.

### Dissent of CFTC Commissioner Chilton on Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement;" Mixed Swaps; Security-Based Swap Agreement Recordkeeping

I respectfully dissent from this joint final rule and interpretive guidance because I have reservations about certain aspects of the Commodity Futures Trading Commission's ("Commission") interpretive guidance on forward contracts. Apart from this specific area, I agree with the joint release and support its adoption.

I am dissenting from the interpretive guidance for two chief reasons. First, I believe that the Commission should make stronger efforts to ensure market participants claim the forward contract exclusion only under appropriate circumstances, consistent with its interpretive guidance. The Commission should apply a rebuttable presumption that contracts do not have as their predominant feature actual delivery in instances where market participants often do not follow the delivery settlement term in a contract. The Commission set forth the conditions for a safe harbor, consistent with its interpretation of the forward contract exclusion, for market participants that do not terminate "forward" contracts through physical delivery that includes some affirmative statement to the Commission

explaining the circumstances leading to non-delivery. This safe harbor, in my view, would encourage market participants to submit information that would vastly improve the ability of the Commission to ensure that market participants claiming the forward contract exclusion are doing so appropriately, consistent with the law and Commission and staff interpretation of the law.

Second, the Commission has failed to provide adequate legal certainty to market participants engaging in contracts with embedded volumetric commodity options, particularly those that can terminate without physical delivery. Contracts with embedded commodity options that can negate the physical delivery term have optionality that targets the delivery term of the contract and therefore cannot be seen as having as a predominant feature actual delivery, a necessary element in any forward contract under applicable Commission precedent. The Commission has failed to perform an analysis of these types of contracts in an excess of caution that may invite confusion, at best, and evasion, at worst.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act")[1] imposes new safeguards on hitherto unregulated markets. These safeguards increase the integrity of the markets by, e.g., improving market transparency and thereby deterring abuses of the sorts seen in recent decades. These safeguards inevitably increase compliance costs, particularly in the initial phase of implementation. As I can predict with absolute certainty, bad actors (à la Amaranth) will be drawn to dark markets in search of spoils. Less ill-intentioned or "grey" actors may follow them in search of lower compliance costs. The Commission should not cede swaths of jurisdiction because such markets have not hitherto given rise to concerns.[2]

The Commission proposed[3] and is now adopting an approach to the forward contract exclusion that draws on "the principles underlying" the Brent Interpretation.[4] I agree

---

[1] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010). The text of the Dodd-Frank Act may be accessed at *http://www.cftc.gov/LawRegulation/OTCDERIVATIVES/index.htm.*

[2] *See* Financial Crisis Inquiry Commission, "The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States," Jan. 2011, at 25, available at *http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf* ("concluding that "enactment of * * * [the Commodity Futures Modernization Act of 2000 ("CFMA")] to ban the regulation by both the Federal and State governments of over-the-counter (OTC) derivatives was a key turning point in the march toward the financial crisis.").

[3] *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 76 FR 29818, 29829, May 23, 2011.

[4] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 FR ___, ___ ("Adopting Release"); Statutory Interpretation Concerning Forward Transactions, 55 FR 39188, Sept. 25, 1990

Continued

generally with this approach (I voted in the affirmative on releasing the proposal). In addition, the Commission recognizes that the underlying purpose of a transaction is a critical factor in determining whether a given transaction is more appropriately classified as a forward or swap (or commodity option).[5] I commend this clarification and hope it is applied or further clarified in a way that affirms the principles underlying the Brent Interpretation without endorsing the outcome of the Brent Interpretation.

## 1. Safe Harbor for "Forwards" That Often Do Not Terminate With Actual Delivery

I believe that the Commission should make stronger efforts to ensure market participants claim the forward contract exclusion only under appropriate circumstances. I am concerned that the forward contract exclusion may be abused if not intentionally evaded by the lack of safeguards to ensure its appropriate application.[6] This concern is exacerbated by the fact that actors claiming the forward contract exclusion are not subject to any reporting requirements, nor have we even provided for a safe harbor that encourages such reporting. In light of the transparency the CEA now provides for futures, options, and swaps markets, the regulatory differential between these regulated markets and unregulated markets, like forward markets, is going to encourage regulatory arbitrage. Despite substantial progress in improving the Commission's visibility into regulated markets, the Commission has failed to set forth interpretive guidance that ensures that, at the minimum, it can see and understand the

transactions that market participants claim as being subject to the forward contract exclusion. I believe the Commission should be more active when it comes to ensuring that the forward contract exclusion is properly applied, particularly in instances where an ostensible "forward" closely resembles, in form, purpose, or economic substance regulated products.

The Commission has endorsed the purpose of a transaction as a factor in determining a contract's eligibility for the forward contract exclusion.[7] The Brent Interpretation or the Commission's re-interpretation of it notwithstanding, I believe that when few "forward" contracts for a given market participant result in delivery, then there is sufficient ground for the Commission to have doubt about the appropriateness of the forward contract exclusion claim. Moreover, under such circumstances the Commission should have doubt about the underlying purpose of the claimed "forwards." Therefore, the Commission should apply a rebuttable presumption that the market participant may not be engaging in transactions that have as their predominant feature actual delivery.

At the same time, the Commission should specify the means by which this presumption may be rebutted. I believe that the Commission provide for a safe harbor for market participants that regularly engage in transactions they believe to qualify for the forward contract exclusion that, nonetheless, often do not terminate with delivery (e.g., in less than 20% of instances as measured by number of "forward" contracts or by potential total quantity under all "forward" contracts). This non-delivery could be the result of, for example, exercised embedded volumetric optionality or through book-outs. Market participants claiming this safe harbor should include a brief, periodic statement that explains the reason why their forward transactions, in general terms or with more specificity as is necessary for the Commission to determine whether the presumption that the market participant is inappropriately claiming the forward contract exclusion is rebutted.

I request comment on my proposed safe harbor concept. I encourage the Commission to adopt some version of this safe harbor in order to allay the very real concerns I and, indeed, many market participants and many in the public have expressed to me that unregulated forwards markets could become a refuge for those that thrive in opacity. Our regulations implementing the Dodd-Frank Act will vastly improve transparency in regulated futures, options, and swaps markets. Unfortunately, our interpretive guidance today does little to ensure even any visibility for regulators in how players in the physical commodity markets, so critical to the Commission's mission, are claiming the forward contract exclusion: the unwatched back door out of the transparency-related requirements of the CEA.

## 2. Legal Certainty for Certain Commodity Options

Section 4c(b) of the CEA provides:

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. Any such order, rule, or regulation may be made only after notice and opportunity for hearing, and the Commission may set different terms and conditions for different markets.[8] Through this decades-old provision, Congress gave the Commission jurisdiction and plenary rulemaking authority over physical commodity option transactions.[9] The Dodd-Frank Act not only preserved this plenary authority over commodity options, but also reaffirmed the reach of the CEA over commodity options. Section 721 of the Dodd-Frank Act added section 1a(47) to the CEA, defining "swap" to include not only "any agreement, contract, or transaction commonly known as," among other things, "a commodity swap,"[10] but also "[an] option of any kind that is for the purchase or sale, or based on the value, of 1 or more * * * commodities * * *,"[11] i.e. commodity options.[12] While commodity options are subject to the Commission's plenary jurisdiction, the Commission has limited jurisdiction over forward contracts.[13]

---

("Brent Interpretation"). I note that the Commission did not endorse the outcome of the Brent Interpretation.

[5] I recognize (and perhaps the Commission has quietly recognized as well) the merit in the dissent of former Commissioner Fowler West to the Brent Interpretation and am heartened to find elements of his analytical approach in this release. Commissioner West, among other things, emphasized the importance of the underlying purpose of a transaction in a forward contract analysis. Id., Dissent of Commissioner Fowler West, available at *http://www.cftc.gov/ucm/groups/ public/@aboutcftc/documents/file/ fwestdissent092090.pdf* (because, among other things, 15-day Brent contracts are entered into for the purpose of hedging or speculation rather than for the purpose of transferring ownership in crude oil they do not sufficiently resemble forward contracts to be excluded from the CEA) citing *CFTC v. Co. Petro Marketing Group, Inc.,* 680 F.2d 573, 580 (9th Cir. 1982). Commissioner West's dissent presaged the Brent market aberrations of the 1990s and early 2000s that some tied to squeezes of the Brent delivery complex through a hoarding of "forwards" that made leveraged cash-settled contract positions designed to benefit from such aberrations very profitable. While I endorse the Commission's approach to affirming the principles contained in the Brent Interpretation, I believe future interpretive guidance should apply the lessons of the past two-plus decades of market and regulatory history and apply the Brent Interpretation principles in that light. In this dissent, however, I do not need to go so far as to reinterpret the principles underlying the Brent Interpretation: even based on a conservative review of our precedent I feel we did not provide the market adequate clarity.

[6] *See* Adopting Release.

[7] *See* Adopting Release.

[8] CEA section 4c(b), 7 U.S.C. 6c(b).

[9] CEA section 4c(b) has been in the Act in substantially the same form since it was added by the Commodity Futures Trading Commission Act of 1974. See Public Law 93–463, October 23, 1974.

[10] *See* CEA section 1a(47)(A)(iii), 7 U.S.C. 1a(47)(A)(iii).

[11] *See* CEA section 1a(47)(A)(i), 7 U.S.C. 1a(47)(A)(i). Note that the swap definition excludes options on futures (which must be traded on a DCM pursuant to part 33 of the Commission's regulations) (*see* CEA section 1a(47)(B)(i), 7 U.S.C. 1a(47)(B)(i)), but it includes options on physical commodities (whether or not traded on a DCM) (*see* CEA section 1a(47)(A)(i), 7 U.S.C. 1a(47)(A)(i)).

[12] The Commission's regulations define a commodity option transaction or commodity option as "any transaction or agreement in interstate commerce which is or is held out to be of the character of, or is commonly known to the trade as, an option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'call,' 'put,' 'advance guaranty' or 'decline guaranty'." 17 CFR 1.3(hh).

[13] *See* CEA section 1a(47)(B)(ii), 7 U.S.C. 1a(47)(B)(ii) (excluding from the definition of "swap" contracts involving "any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled."). *See also* CEA section 8(d), 7 U.S.C. 12(d), which directs the CFTC to investigate the marketing conditions of commodities and commodity products and byproducts, including supply and demand for these commodities, cost to the consumer, and handling and transportation charges; CEA sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. 9, 13b, and 13(a)(2), which proscribe any manipulation or attempt to manipulate the price of any commodity in interstate commerce; and CEA section 6(c) as amended by section 753 of the Dodd-Frank Act, which contains prohibitions regarding manipulation and false reporting with respect to any commodity in

In the Brent Interpretation, the Commission found certain Brent oil contracts to be eligible for the forward contract exclusion, notwithstanding the fact that such transactions "may ultimately result in performance through the payment of cash as an alternative to actual physical transfer or delivery of the commodity." The Commission found that when delivery obligations under a forward were terminated pursuant to a separate and individually negotiated "book-out" agreement, the parties escaped the physical delivery obligation traditionally required to claim the forward contract exclusion. The Commission also emphasized two features (among others) of the Brent oil contracts at issue: (1) The absence of a contractual right to offset (or to terminate without delivery) the transaction "by the terms of the contracts as initially entered into" and (2) the counterparties had to incur "substantial economic risks of a commercial nature" relating to actual delivery in order to claim the exclusion. Underlying the Brent Interpretation, other CFTC precedent, and the Commission's approach to the interpretive guidance on the forward contract exclusion is the essential feature of forward contracts: actual delivery (and not potential delivery).[14]

The Commission has failed to provide adequate legal certainty to market participants engaging in contracts with embedded volumetric commodity options, particularly those that can terminate without physical delivery. Contracts that are composed of a forward delivery obligation component combined with an embedded commodity option that can render delivery optional ("zero-delivery" embedded volumetric options) are not forwards because the predominant feature of the contract cannot be actual delivery under these circumstances (more literally, the predominant feature is potential delivery which is an essential characteristic of commodity options). Such contracts include a contractual right to offset through the exercise of the volumetric option that can extinguish the delivery obligation. Because such contracts have a commodity option component that mitigates the risk incurred from an underlying forward delivery obligation, these contracts may fail to meet the incurring "economic risks of a commercial nature" element. Moreover, the purpose of the delivery optionality in these

types of contracts shares a common purpose with commodity options: To provide market participants a means to hedge commodity quantity risk of a commercial nature. The Commission should therefore clarify, in any future interpretive guidance, that zero-delivery embedded volumetric options are generally commodity options because the delivery obligation is not obligatory.

The confluence of these features, as analyzed under a conservative reading of the Brent Interpretation, leads me to conclude that contracts with embedded zero-delivery option components cannot be said to have actual delivery as their essential feature. Other relevant Commission precedent is consistent with this analysis. Most recently, in *In re Wright,* a forward contract containing pricing optionality was found to be a forward contract because the optionality:

(i) May be used to adjust the forward contract price, but do not undermine the overall nature of the contract as a forward contract; (ii) *do not target the delivery term, so that the predominant feature of the contract is actual delivery; and* (iii) cannot be severed and marketed separately from the overall forward contract in which they are embedded.[15]

*In re Wright* is distinguishable because it involves pricing optionality, not volumetric optionality–the latter a feature the Commission has not hitherto opined on in the context of the forward contract exclusion. As the emphasized section of the block quote immediately above discusses, the interpretation there turned on the fact that the optionality in the *In re Wright* options did "not target the delivery term." Optionality that can result in zero delivery "targets the delivery term," in direct contrast to the *In re Wright* options. I commend the Commission for not overextending (to put it charitably) *In re Wright* to cover zero-delivery volumetric optionality, as argued by some commenters. Nonetheless, the Commission did not clarify that a contract that provides for optionality that can render delivery optional cannot therefore have as its predominant feature actual delivery because the optionality "targets the delivery term."[16]

Instead of, in my opinion, a proper application of the statute and precedent, the Commission has adopted a seven-element interpretation that applies to contracts with embedded volumetric optionality. This interpretative approach would potentially allow contracts with zero-delivery option components to nonetheless claim the forward contract exclusion when:

1. The embedded optionality does not undermine the overall nature of the agreement, contract, or transaction as a forward contract;

2. The predominant feature of the agreement, contract, or transaction is actual delivery;

3. The embedded optionality cannot be severed and marketed separately from the overall agreement, contract, or transaction in which it is embedded;

4. The seller of a nonfinancial commodity underlying the agreement, contract, or transaction with embedded volumetric optionality intends, at the time it enters into the agreement, contract, or transaction, to deliver the underlying nonfinancial commodity if the optionality is exercised;

5. The buyer of a nonfinancial commodity underlying the agreement, contract or transaction with embedded volumetric optionality intends, at the time it enters into the agreement, contract, or transaction, to take delivery of the underlying nonfinancial commodity if it exercises the embedded volumetric optionality;

6. Both parties are commercial parties; and

7. The exercise or non-exercise of the embedded volumetric optionality is based primarily on physical factors, or regulatory requirements, that are outside the control of the parties and are influencing demand for, or supply of, the nonfinancial commodity.

The first two elements, in particular, invoke the Brent Interpretation and related precedent.[17] The seventh and most problematic element seems to imply that supply and demand, *i.e.,* economic factors, could be a primary factor in the exercise or non-exercise of an embedded volumetric option. I fear how broadly this element could be interpreted by those predisposed to interpret the CEA in an opportunistic light. When can supply and demand factors not be correlated with physical factors? Does this mean that if delivery renders such a contract unprofitable for a party to such a contract that they can elect not to deliver? If that is the case, then the contract is a commodity option.[18]

I would amend the seventh element by making it clear the exercise or non-exercise for physical factors that influence demand and supply can negate the delivery obligation only in exceptional circumstances. If delivery renders a contract merely unprofitable and the contract permits a party to elect not to deliver, such a contract is not a forward and is a commodity option.

In addition, I would require, consistent with the third, "severability," element, that in order to claim the forward contract exclusion where the contract at issue contains a zero-delivery embedded volumetric option, the parties must sever the forward contract component, which has as its purpose the delivery of commodities, from the remaining commodity option component, which has as its purpose the management of the commodity quantity risk associated with operating a commercial enterprise.[19] The

---

[14] *See* Adopting Release.

interstate commerce, including prohibiting any person to (i) "use or employ, or attempt to use or employ * * * any manipulative or deceptive device or contrivance" (section 6(c)(1)); (ii) "to make any false or misleading statement of material fact" to the CFTC or "omit to state in any such statement any material fact that is necessary to make any statement of material fact made not misleading in any material respect" (section 6(c)(2)); and (iii) "manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce * * *" (section 6(c)(3)). *See also* Rule 180.1(a) under the CEA, 17 CFR 180.1(a) (broadly prohibiting in connection with a commodity in interstate commerce manipulation, false or misleading statements or omissions of material fact to the Commission, fraud or deceptive practices or courses of business, and false reporting).

[15] *See In re Wright,* CFTC Docket No. 97–02, 2010 WL 4388247 (Oct. 25, 2010) (emphasis added). *See also* Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options, 50 FR 39656 (Sept. 30, 1985) (finding that hedge-to-arrive contracts with pricing optionality could be categorized as forwards so long as it created a binding delivery obligation that could only be annulled in the event of a crop failure, in which case liquidated damages may apply).

[16] *In re Wright,* CFTC Docket No. 97–02, 2010 WL 4388247 (Oct. 25, 2010).

[17] *See* Adopting Release.

[18] *See, e.g.,* 50 FR 39656, 39660.

[19] These forward contract and commodity option hybrid contracts can, as I understand it, generally be severed into two separate forward and commodity option contracts. Some commenters suggested that many "peaking" contracts involve volumetric optionality that cannot be severed, but
Continued

commodity option component of these transactions could be eligible for a trade option exemption [20] that exempts (and importantly, does not exclude) them from many CEA requirements.[21]

Moreover, while the Adopting Release's guidance is the first of its kind and therefore an incremental step toward more legal certainty, it doesn't directly address embedded zero-delivery volumetric optionality specifically or any of the conceivable specific variations of such contracts. I believe this to be a flaw; a flaw that did not exist in a previous version of this document.

The Commission should affirm in any relevant future interpretive guidance the formal features in the Brent Interpretation's forward contract exclusion, *e.g.,* that the delivery obligation cannot be offset based on terms contained in the contract, that any delivery obligation be appropriately booked-out (in a separate transaction), or that the contract involve incurring "substantial

_____

I have yet to be convinced that the same party that is the "seller" under these contracts cannot simply become the appropriate counterparty when such contracts are severed into a forward contract component and a commodity option component that can offset or book-out the buyer's obligation to take delivery.

[20] Commodity Options, 77 FR 25320, Apr. 27, 2012, codified at 17 CFR 32.3.

[21] As of July 10, 2012, the Commission has received 12 comments on the interim final rule setting forth the trade option exemption.

economic risks of a commercial nature." [22] In the absence of the Commission's courage to provide for more legal certainty on these kinds of transactions, I stress the application of the third, severability, element in the Commission's seven-element interpretation and note that as long as a market participant can decompose a pre-Dodd-Frank Act transaction into components, such action would not be in violation of the CEA if the resulting agreements, contracts, or transactions (1) neatly fall into forward, commodity option, or other swap contract buckets and (2) are dealt with as such.[23]

I look forward to receiving and reviewing comments on the Commission's interpretation, in particular those submitted in response to Question Seven.[24] I also

_____

[22] The Commission's inclusion of the underlying purpose of a transaction as a factor in determining its classification as a forward, commodity option, or other form of swap. The Commission will, under the interpretive guidance, consider the "purpose of the claimed forward" and whether its purpose is to sell physical commodities, hedge risk, or speculate. *See* Adopting Release.

[23] *See* Adopting Release, fn 337 ("When a forward contract includes an embedded option that is severable from the forward contract, the forward can remain subject to the forward contract exclusion, if the parties document the severance of the embedded option component and the resulting transactions, i.e. a forward and an option. Such an option would be subject to the CFTC's regulations applicable to commodity options.").

[24] *Id.* ("Do the agreements, contracts, and transactions listed in question no. 6 above have embedded optionality in the first instance? Based

welcome comments on this statement too, of course, particularly as it relates to zero-delivery embedded volumetric options. I am particularly interested in understanding under what circumstances such embedded option contracts and other contracts can be structured to evade Dodd-Frank Act requirements in a way that creates plausible deniability for one or both counterparties that they did not "willfully" intend to structure a transaction in a manner intended to evade. Should the Commission, instead of my proposed approach, follow a rebuttable presumption approach with respect to zero-delivery embedded option contracts whereby the presumption can be rebutted by a certification of facts that indicate a true commercial purpose for the transaction?

[FR Doc. 2012–18003 Filed 8–10–12; 8:45 am]

**BILLING CODE 8011–01– 6351–01–P**

_____

on descriptions by commenters, it appears that they may have a binding obligation for delivery, but have no set amount specified for delivery. Instead, delivery (including the possibility of nominal or zero delivery) is determined by the terms and conditions contained within the agreement, contract, or transaction (including, for example, the satisfaction of a condition precedent to delivery, such as a commodity price or temperature reaching a level specified in the agreement, contract, or transaction). That is, the variation in delivery is not driven by the exercise of embedded optionality by the parties. Do the agreements, contracts, and transactions listed in question no. 6 exhibit these kinds of characteristics? If so, should the CFTC consider them in some manner other than its forward interpretation? Why or why not?").

# EXHIBIT D


## COMMODITY FUTURES TRADING COMMISSION

### 17 CFR Chapter I

### RIN 3038–AD85

### Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Interpretive Guidance and Policy Statement.

---

**SUMMARY:** On July 12, 2012, the Commodity Futures Trading Commission ("Commission" or "CFTC") published for public comment its proposed interpretive guidance and policy statement ("Proposed Guidance") regarding the cross-border application of the swaps provisions of the Commodity Exchange Act ("CEA"), as added by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act" or "Dodd-Frank"). On December 21, 2012, the Commission also proposed further guidance on certain aspects of the Proposed Guidance ("Further Proposed Guidance").

The Commission has determined to finalize the Proposed Guidance with certain modifications and clarifications to address public comments. The Commission's Interpretive Guidance and Policy Statement ("Guidance") addresses the scope of the term "U.S. person," the general framework for swap dealer and major swap participant registration determinations (including the aggregation requirement applicable to the de minimis calculation with respect to swap dealers), the treatment of swaps involving certain foreign branches of U.S. banks, the treatment of swaps involving a non-U.S. counterparty guaranteed by a U.S. person or "affiliate conduit," and the categorization of the Dodd-Frank swaps provisions as "Entity-Level Requirements" or "Transaction-Level Requirements."

**DATES:** *Effective Date:* This Guidance will become effective July 26, 2013.

**FOR FURTHER INFORMATION CONTACT:** Gary Barnett, Director, Division of Swap Dealer and Intermediary Oversight, (202) 418–5977, *gbarnett@cftc.gov;* Sarah E. Josephson, Director, Office of International Affairs, (202) 418–5684, *sjosephson@cftc.gov;* Mark Fajfar, Assistant General Counsel, Office of General Counsel, (202) 418–6636, *mfajfar@cftc.gov;* Laura B. Badian, Counsel, Office of General Counsel, (202) 418–5969, *lbadian@cftc.gov;*

Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW., Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Introduction
  A. The Dodd-Frank Wall Street Reform and Consumer Protection Act
  B. The Proposed Guidance and Further Proposed Guidance
II. Scope of This Guidance
III. Interpretation of Section 2(i)
  A. Comments
  B. Statutory Analysis
  C. Principles of International Comity
IV. Guidance
  A. Interpretation of the Term "U.S. Person"
  1. Proposed Interpretation
  2. Comments
  a. Phase-In Interpretation
  b. Comments on Particular Prongs of the Proposed Interpretation of the Term "U.S. Person"
  c. Commenters' Proposed Alternatives
  d. Due Diligence
  e. Non-U.S. Person That Is Affiliated, Guaranteed, or Controlled by U.S. Person
  f. Foreign Branch of U.S. Person
  g. Regulation S
  h. Other Clarifications
  3. Commission Guidance
  a. Due Diligence
  b. Foreign Branch of U.S. Person
  c. Regulation S
  d. Other Clarifications
  4. Summary
  B. Registration
  1. Proposed Guidance
  2. Comments
  3. Commission Guidance
  a. Registration Thresholds for U.S. Persons and Non-U.S. Persons, Including Those Guaranteed by U.S. Persons
  b. Aggregation
  c. Exclusion of Certain Swaps by Non-U.S. Persons From the Swap Dealer De Minimis Threshold
  d. Exclusion of Certain Swaps by Non-U.S. Persons From the MSP Calculation
  e. Exclusion of Certain Swaps Executed Anonymously on a SEF, DCM, or Foreign Board of Trade ("FBOT") and Cleared
  f. MSP-Parent Guarantees
  4. Summary
  C. Interpretation of the Term "Foreign Branch;" When a Swap Should Be Considered To Be With the Foreign Branch of a U.S. Person That Is a Swap Dealer or MSP
  1. Interpretation of the Term "Foreign Branch" and Treatment of Foreign Branches
  2. Comments
  3. Commission Guidance
  a. Scope of the Term "Foreign Branch"
  b. Commission Consideration of Whether a Swap Is With a Foreign Branch of a U.S. Bank
  D. Description of the Entity-Level and Transaction-Level Requirements
  1. Description of the Entity-Level Requirements
  a. First Category of Entity-Level Requirements

  i. Capital Adequacy
  ii. Chief Compliance Officer
  iii. Risk Management
  iv. Swap Data Recordkeeping (Except Certain Aspects of Swap Data Recordkeeping Relating to Complaints and Sales Materials)
  b. Second Category of Entity-Level Requirements
  i. SDR Reporting
  ii. Swap Data Recordkeeping Relating to Complaints and Marketing and Sales Materials
  iii. Physical Commodity Large Swaps Trader Reporting (Large Trader Reporting)
  2. Description of the Transaction-Level Requirements
  a. Category A: Risk Mitigation and Transparency
  i. Required Clearing and Swap Processing
  ii. Margin and Segregation Requirements for Uncleared Swaps
  iii. Trade Execution
  iv. Swap Trading Relationship Documentation
  v. Portfolio Reconciliation and Compression
  vi. Real-Time Public Reporting
  vii. Trade Confirmation
  viii. Daily Trading Records
  b. Category B: External Business Conduct Standards
  E. Categorization of Entity-Level and Transaction-Level Requirements
  1. Categorization Under the Proposed Guidance
  2. Comments
  a. Reporting and Trade-Execution Requirements
  b. Swap Trading Relationship Documentation, Portfolio Reconciliation and Compression, Daily Trading Records and External Business Conduct Standards
  c. Internal Conflicts of Interest Requirement
  d. Position Limits and Anti-Manipulation Rules
  3. Commission Guidance
  a. Entity-Level Requirements
  i. The First Category—Capital Adequacy, Chief Compliance Officer, Risk Management, and Swap Data Recordkeeping (Except for Certain Recordkeeping Requirements)
  ii. The Second Category—SDR Reporting, Certain Swap Data Recordkeeping Requirements and Large Trader Reporting
  b. Transaction-Level Requirements
  i. The Category A Transaction-Level Requirements
  ii. The Category B Transaction-Level Requirements (External Business Conduct Standards)
  F. Substituted Compliance
  1. Proposed Guidance
  2. Comments
  3. Overview of the Substituted Compliance Regime
  4. Process for Comparability Determinations
  5. Conflicts Arising Under Privacy and Blocking Laws
  6. Clearing

a. Clearing Venues
b. Foreign End-Users
G. Application of the Entity-Level and Transaction-Level Requirements To Swap Dealers and MSPs
1. Comments
2. Commission Guidance
3. Application of the Entity-Level Requirements To Swap Dealers and MSPs the Commission's policy on
a. To U.S. Swap Dealers and MSPs
b. To Non-U.S. Swap Dealers and MSPs
4. Application of the "Category A" Transaction-Level Requirements To Swap Dealers and MSPs
a. Swaps With U.S. Swap Dealers and MSPs
b. Swaps With Non-U.S. Swap Dealers and Non-U.S. MSPs
c. Swaps With a Non-U.S. Person Guaranteed by a U.S. Person
i. Proposed Guidance
ii. Comments
iii. Commission Guidance
d. Swaps With a Non-U.S. Person That Is an Affiliate Conduit
i. Proposed Guidance
ii. Comments
iii. Commission Guidance
5. Application of the "Category B" Transaction-Level Requirements To Swap Dealers and MSPs
a. Swaps With U.S. Swap Dealers and U.S. MSPs
b. Swaps With Foreign Branches of a U.S. Bank That Is a Swap Dealer or MSP
c. Swaps With Non-U.S. Swap Dealers and Non-U.S. MSPs
H. Application of the CEA's Swap Provisions and Commission Regulations to Market Participants That Are Not Registered as a Swap Dealer or MSP
1. Swaps Between Non-Registrants Where One or More of the Non-Registrants Is a U.S. Person
2. Swaps between Non-Registrants That Are Both Non-U.S. Persons
a. Large Trader Reporting
b. Swaps Where Each of the Counterparties Is Either a Guaranteed or Conduit Affiliate
c. Swaps Where Neither or Only One of the Parties Is a Guaranteed or Conduit Affiliate
V. Appendix A—The Entity-Level Requirements
A. First Category of Entity-Level Requirements
1. Capital Adequacy
2. Chief Compliance Officer
3. Risk Management
4. Swap Data Recordkeeping (Except Certain Aspects of Swap Data Recordkeeping Relating to Complaints and Sales Materials)
B. Second Category of Entity-Level Requirements
1. SDR Reporting
2. Swap Data Recordkeeping Relating to Complaints and Marketing and Sales Materials
3. Physical Commodity Large Swaps Trader Reporting (Large Trader Reporting)
VI. Appendix B—The Transaction-Level Requirements

A. Category A: Risk Mitigation and Transparency
1. Required Clearing and Swap Processing
2. Margin and Segregation Requirements for Uncleared Swaps
3. Trade Execution
4. Swap Trading Relationship Documentation
5. Portfolio Reconciliation and Compression
6. Real-Time Public Reporting
7. Trade Confirmation
8. Daily Trading Records
B. Category B: External Business Conduct Standards
VII. Appendix C—Application of the Entity-Level Requirements to Swap Dealers and MSPs*
VIII. Appendix D—Application of the Category A Transaction-Level Requirements to Swap Dealers and MSPs*
IX. Appendix E—Application of the Category B Transaction-Level Requirements to Swap Dealers and MSPs*
X. Appendix F—Application of Certain Entity-Level and Transaction-Level Requirements to Non-Swap Dealer/Non-MSP Market Participants*

# I. Introduction

## A. The Dodd-Frank Wall Street Reform and Consumer Protection Act

On July 21, 2010, President Obama signed the Dodd-Frank Act,[1] Title VII of which amended the CEA to establish a new regulatory framework for swaps. The legislation was enacted to reduce systemic risk (including risk to the U.S. financial system created by interconnections in the swaps market), increase transparency, and promote market integrity within the financial system by, among other things: (1) Providing for the registration and comprehensive regulation of swap dealers [2] and major swap participants (each, an "MSP"); (2) imposing clearing and trade execution requirements on standardized derivatives products; (3) creating rigorous recordkeeping and data reporting regimes with respect to swaps, including real-time public reporting; and (4) enhancing the Commission's rulemaking and enforcement authorities over all registered entities, intermediaries, and swap counterparties subject to the Commission's oversight.

Section 722(d) of the Dodd-Frank Act amended the CEA by adding section 2(i),[3] which provides that the swaps provisions of the CEA (including any

CEA rules or regulations) apply to cross-border activities when certain conditions are met, namely, when such activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or when they contravene Commission rules or regulations as are necessary or appropriate to prevent evasion of the swaps provisions of the CEA enacted under Title VII of the Dodd-Frank Act.[4]

The potential for cross-border activities to have a substantial impact on the U.S. financial system was apparent in the fall of 2008, when a series of large financial institutional failures threatened to freeze foreign and domestic credit markets. In September 2008, for example, U.S.-regulated insurance company American International Group ("AIG") nearly failed as a result of risk incurred by the London swap trading operations of its subsidiary AIG Financial Products ("AIGFP").[5] Enormous losses on credit default swaps entered into by AIGFP and guaranteed by AIG led to a credit downgrade for AIG, triggering massive collateral calls and an acute liquidity crisis for both entities. AIG only avoided default through more than $112.5

---

[1] Public Law 111–203, 124 Stat. 1376 (2010). The text of the Dodd-Frank Act may be accessed at *http://www.cftc.gov/LawRegulation/OTCDERIVATIVES/index.htm.*

[2] For purposes of this Guidance, the term "swap dealer" means any swap dealer registered with the Commission. Similarly, the term "MSP" means any MSP registered with the Commission.

[3] 7 U.S.C. 2(i).

[4] *Id.* Section 2(i) of the CEA states that the provisions of the Act relating to swaps that were enacted by the Wall Street Transparency and Accountability Act of 2010 (including any rule prescribed or regulation promulgated under that Act), shall not apply to activities outside the United States unless those activities have a direct and significant connection with activities in, or effect on, commerce of the United States; or contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of this Act that was enacted by the Wall Street Transparency and Accountability Act of 2010.

[5] *See, e.g.,* Congressional Oversight Panel, June Oversight Report, The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy, (Jun. 10, 2010), available at *http://www.gpo.gov/fdsys/pkg/CPRT–111JPRT56698/pdf/CPRT–111JPRT56698.pdf* ("AIG Report"); Office of the Special Inspector General for the Troubled Asset Relief Program, Factors Affecting Efforts to Limit Payments to AIG Counterparties (Nov. 17, 2009), available at *http://www.sigtarp.gov/Audit%20Reports/Factors_Affecting_Efforts_to_Limit_Payments_to_AIG_Counterparties.pdf.* AIGFP was a Delaware corporation based in Connecticut that was an active participant in the credit default swap ("CDS") market in the years leading up to the crisis. *See id.* at 23. AIGFP's CDS activities benefited from credit support provided by another Delaware corporation, American International Group, Inc., AIGFP's highly-rated parent company. Although both AIG and AIGFP were incorporated and headquartered in the U.S., much of AIGFP's CDS business was conducted through its London office and involved non-U.S. counterparties and credit exposures. *Id.* at 18. See also Office of the Special Inspector General for the Troubled Asset Relief Program, Factors Affecting Efforts to Limit Payments to AIG Counterparties, at 20 (Nov. 17, 2009) (listing AIGFP's CDS counterparties, including a variety of U.S. and foreign financial institutions), available at *http://www.sigtarp.gov/Audit%20Reports/Factors_Affecting_Efforts_to_Limit_Payments_to_AIG_Counterparties.pdf.*

billion in support from the Federal Reserve Bank of New York and nearly $70 billion from the U.S. Department of the Treasury and the Federal Reserve.

A global, complex, and highly integrated business model also played a role in, and complicated, the bankruptcy of former U.S.-based multinational corporation Lehman Brothers Holding Inc. ("LBHI") in September 2008. In addition to guaranteeing certain swaps for its subsidiary Lehman Brothers International Europe ("LBIE"), estimated at nearly 130,000 OTC derivatives contracts at the time LBIE was placed into administration on September 15, 2008, LBHI and its global affiliates relied on each other for many of their financial and operational services, including treasury and depository functions, custodial arrangements, trading facilitation, and information management.[6] The complexity of the financial and operational relationships of LBHI and its domestic and international affiliates, including with respect to risk associated with swaps, provides an example of how risks can be transferred across multinational affiliated entities, in some cases in non-transparent ways that make it difficult for market participants and regulators to fully assess those risks.

Even in the absence of an explicit business arrangement or guarantee, U.S. companies may for reputational or other reasons choose, or feel compelled, to assume the cost of risks incurred by foreign affiliates. In 2007, U.S.-based global investment firm Bear Stearns decided to extend loans secured by assets of uncertain value to two Cayman Islands-based hedge funds it sponsored after they suffered substantial losses due to their investments in subprime mortgages, even though Bear Stearns was not legally obligated to support those funds.[7] Shortly thereafter, the funds, filed for bankruptcy protection.[8]

Although the Dodd-Frank Act was enacted in the wake of the 2008 financial crisis, the impact of cross-border activities on the health and stability of U.S. companies and financial markets is not new. A decade before the AIG and Lehman collapses, a Cayman Islands hedge fund managed by Connecticut-based Long-Term Capital Management L.P. ("LTCM") nearly failed.[9] The hedge fund had a swap book of more than $1 trillion notional and only $4 billion in capital. The hedge fund avoided collapse only after the Federal Reserve Bank of New York intervened and supervised a financial rescue and reorganization by creditors of the fund.[10] While the fund was a Cayman Island partnership, its default would have caused significant market disruption in the United States.[11]

More recently, J.P. Morgan Chase & Co. ("J.P. Morgan"), the largest U.S. bank, disclosed a multi-billion dollar trading loss stemming in part from positions in a credit-related swap portfolio managed through its London Chief Investment Office.[12] The relationship between the New York and London offices of J.P. Morgan that were involved in the credit swaps that were the source of this loss demonstrates the close integration among the various branches, agencies, offices, subsidiaries and affiliates of U.S. financial institutions, which may be located both inside and outside the United States. Despite their geographic expanse, the branches, agencies, offices, subsidiaries and affiliates of large U.S. financial institutions in many cases effectively operate as a single business.[13]

Efforts to regulate the swaps market in the wake of the 2008 financial crisis are

underway not only in the United States, but also abroad. In 2009, leaders of the Group of 20 ("G20")—whose membership includes the European Union ("EU"), the United States, and 18 other countries—agreed that: (i) OTC derivatives contracts should be reported to trade repositories; (ii) all standardized OTC derivatives contracts should be cleared through central counterparties and traded on exchanges or electronic trading platforms, where appropriate, by the end of 2012; and (iii) non-centrally cleared contracts should be subject to higher capital requirements. In line with the G20 commitment, much progress has been made to coordinate and harmonize international reform efforts, but the pace of reform varies among jurisdictions and disparities in regulations remain due to differences in cultures, legal and political traditions, and financial systems.[14]

---

[6] "The global nature of the Lehman business with highly integrated, trading and non-trading relationships across the group led to a complex series of inter-company positions being outstanding at the date of Administration. There are over 300 debtor and creditor balances between LBIE and its affiliates representing $10.5B of receivables and $11.0B of payables as of September 15 2008." *See* Lehman Brothers International (Europe) in Administration, Joint Administrators' Progress Report for the Period 15 September 2008 to 14 March 2009 (Apr. 14, 2009) ("Lehman Brothers Progress Report"), available at *http://www.pwc.co.uk/en_uk/uk/assets/pdf/lbie-progress-report-140409.pdf*.

[7] *See In re Bear Sterns High-Grade Structured Credit Strategies Master Funds, Ltd.,* 374 B.R. 122 (Bankr. S.D.N.Y. 2007), available at *http://www.nysb.uscourts.gov/opinions/brl/158971_25_opinion.pdf*.

[8] *See id.*

[9] *See* The President's Working Group on Financial Markets, Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management (April 1999), available at *http://www.treasury.gov/resource-center/fin-mkts/Documents/hedgfund.pdf*.

[10] *See id.* at 13.

[11] *See id.* at 17.

[12] *See* Sen. Permanent Subcomm. on Investigations, 113th Cong., Majority and Minority Staff Report, JPMorgan Chase Whale Trades: A Case History of Derivatives Risks and Abuses (March 15, 2013), available at *http://www.levin.senate.gov/download/?id=bfb5cd04-41dc-4e2d-a5e1-ab2b81abfaa8-2560k. See also* Dodd-Frank Statement ("[A]ny suggestion that U.S. financial entities learned enough from AIG's devastating misjudgments are [sic] undercut by the multi-billion dollar loss incurred by a bank generally considered to be among the most careful—J.P.Morgan Chase—in its London derivative trading.").

[13] *See* Letter from Sen. Carl Levin, Chairman of the Permanent Subcommittee on Investigations at 4 (Apr. 23, 2013) ("Letter from Sen. Levin"), available at *http://www.levin.senate.gov/download/levin_comment_letter_cftc_042313. See also* Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 FR 41214, 41216 (Jul. 12, 2012) ("Proposed Guidance").

[14] Legislatures and regulators in a number of foreign jurisdictions are undertaking significant regulatory reforms over the swaps market and its participants. *See* CFTC and SEC, Joint Report on International Swap Regulation Required by Section 719(c) of the Dodd-Frank Wall Street Reform and Consumer Protection Act at 13 (Jan. 31, 2012), available at *http://www.cftc.gov/ucm/groups/public/@swaps/documents/file/dfstudy_isr_013112.pdf*.

For example, the European Commission released a public consultation on revising the Markets in Financial Instruments Directive ("MiFID") in December 2010. *See* "European Commission Public Consultation: Review of the Markets in Financial Instruments Directive" (Dec. 8, 2010), available at *http://ec.europa.eu/internal_market/consultations/docs/2010/mifid/consultation_paper_en.pdf*.

In October 2011, the European Commission released two public consultations, one to revise MiFID and the other for creating a new regulation entitled the Markets in Financial Instruments Regulation ("MiFIR"). *See* European Commission, Proposal for a Directive of the European Parliament and of the Council on markets in financial instruments repealing Directive 2004/39/EC of the European Parliament and of the Council, COM (2011) 656 final (Oct. 20, 2011), available at *http://ec.europa.eu/internal_market/securities/docs/isd/mifid/COM_2011_656_en.pdf*; European Commission, Proposal for a Regulation of the European Parliament and of the Council on markets in financial instruments and amending regulation [EMIR] on OTC derivatives, central counterparties and trade repositories, COM (2011) 652 final (Oct. 20, 2011), available at *http://ec.europa.eu/internal_market/securities/docs/isd/mifid/COM_2011_652_en.pdf*.

As of March 15, 2013, the majority of the regulatory technical standards (*i.e.*, rulemakings) of the European Market Infrastructure Regulation ("EMIR") entered into force. The EMIR and the related regulatory technical standards generally regard requirements for clearinghouses, clearing, data repositories, regulatory reporting, and uncleared OTC transactions. Certain technical standards under EMIR have yet to be developed and completed. These standards regard margin and capital for uncleared transactions and contracts that have a "direct, substantial and foreseeable effect within the [European] Union." *See* EMIR Article 11(14)(o).

The Japanese legislature passed the Amendment to the Financial Instruments and Exchange Act

The failures of Lehman Brothers and the Bear Stearns hedge funds, and the near failures of LTCM's hedge fund and AIG (which required intervention by the government and Federal Reserve), and their collateral effects on the broader economy and U.S. commerce,[15] provide examples of how risks that a large financial institution takes abroad in swap transactions or otherwise can result in or contribute to substantial losses to U.S. persons and threaten the financial stability of the entire U.S. financial system. These failures and near failures revealed the vulnerability of the U.S. financial system and economy to systemic risk resulting from, among other things, poor risk management practices of certain financial firms, the lack of supervisory oversight for certain financial institutions as a whole, and the overall interconnectedness of the global swap business.[16] These failures and near failures demonstrate the need for and potential implications of cross-border swaps regulation.

*B. The Proposed Guidance and Further Proposed Guidance*

To address the scope of the cross-border application of the Dodd-Frank Act, the Commission published the Proposed Guidance on July 12, 2012, setting forth its proposed interpretation of the manner in which it intends that section 2(i) of the CEA would apply Title VII's swaps provisions to cross-border activities.[17] In view of the complex legal and policy issues involved, the Commission published the Proposed Guidance to solicit comments from all interested persons and to further inform the Commission's deliberations. Specifically, the Proposed Guidance addressed the general manner in which the Commission proposed to consider: (1) When a non-U.S. person's swap dealing activities would justify registration as a "swap dealer," [18] as further defined in a joint release adopted by the Commission and the Securities and Exchange Commission ("SEC"); [19] (2) when a non-U.S. person's swaps positions would justify registration as a "major swap participant," [20] as further defined in the Final Entities Rules; and (3) how foreign branches, agencies, affiliates, and subsidiaries of U.S. swap dealers generally should be treated. The Proposed Guidance also generally described the policy and procedural framework under which the Commission would consider compliance with a comparable and comprehensive regulatory requirement of a foreign jurisdiction as a reasonable substitute for compliance with the attendant requirements of the CEA. Last, the Proposed Guidance set forth the manner in which the Commission proposed to interpret section 2(i) of the CEA as it would generally apply to clearing, trading, and certain reporting requirements under the Dodd-Frank Act with respect to swaps between counterparties that are not swap dealers or MSPs.

The public comment period on the Proposed Guidance ended on August 27, 2012. The Commission received approximately 290 comment letters on the Proposed Guidance from a variety of interested parties, including major U.S. and non-U.S. banks and financial institutions that conduct global swap business, trade associations, clearing organizations, law firms (representing international banks and dealers), public interest organizations, and foreign regulators.[21]

The Further Proposed Guidance, issued on December 21, 2012,[22] reflected the Commission's determination that further consideration of public comments regarding the Commission's proposed interpretation of the term "U.S. person," and its proposed guidance regarding aggregation for purposes of swap dealer registration, would be helpful to the Commission in issuing final interpretive guidance. In order to facilitate the Commission's further consideration of these issues, in the Further Proposed Guidance the Commission sought public comment on: (1) An alternative interpretation of the aggregation requirement for swap dealer registration in Commission regulation 1.3(ggg)(4); [23] (2) an alternative "prong" of the proposed interpretation of the term "U.S. person" in the Proposed Guidance which relates to U.S. owners that are responsible for the liabilities of a non-U.S. entity; and (3) a separate alternative prong of the proposed interpretation of the term "U.S. person" which relates to commodity pools and funds with majority-U.S. ownership.

The public comment period on the Further Proposed Guidance ended on February 6, 2013. The Commission received approximately 24 comment letters on the Further Proposed Guidance from interested parties including major U.S. and non-U.S. banks and financial institutions, trade associations, law firms (representing international banks and dealers), public interest organizations, and foreign regulators.[24] With respect to both the Proposed Guidance and the Further Proposed Guidance and throughout the process of considering this Guidance,

---

("FIEA") in May 2010. *See* Japan Financial Services Agency, Outline of the bill for amendment of the Financial Instruments and Exchange Act (May 2010), available at *http://www.fsa.go.jp/en/refer/diet/174/01.pdf.*

[15] On October 3, 2008, President Bush signed the Emergency Economic Stabilization Act of 2008, which was principally designed to allow the U.S. Treasury and other government agencies to take action to restore liquidity and stability to the U.S. financial system (*e.g.,* the Troubled Asset Relief Program—also known as TARP—under which the U.S. Treasury was authorized to purchase up to $700 billion of troubled assets that weighed down the balance sheets of U.S. financial institutions). *See* Public Law 110–343, 122 Stat. 3765 (2008).

[16] *See* Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States at xvi-xxvii (Jan. 21, 2011), available at *http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.*

[17] *See* Proposed Guidance, 77 FR 41214. Simultaneously with publication of the Proposed Guidance, the Commission published a proposed exemptive order providing time-limited relief from certain cross-border applications of the swaps provisions of Title VII and the Commission's regulations. *See* Proposed Exemptive Order Regarding Compliance with Certain Swap Regulations, 77 FR 41110 (July 12, 2012) ("Proposed Order"). The Commission approved a final exemptive order on December 21, 2012, which reflected certain modifications and clarifications to the Proposed Order to address public comments. *See* Final Exemptive Order Regarding Compliance with Certain Swap Regulations, 78 FR 858 (Jan. 7, 2013) ("January Order").

[18] *See* 7 U.S.C. 1a(49) (defining the term "swap dealer").

[19] *See* Further Definition of 'Swap Dealer,' 'Security-Based Swap Dealer,' 'Major Swap Participant,' 'Major Security-Based Swap Participant' and 'Eligible Contract Participant,' 77 FR 30596 (May 23, 2012) ("Final Entities Rules").

[20] *See* 7 U.S.C. 1a(33) (defining the term "major swap participant").

[21] The Commission also received approximately 26 comment letters on the Proposed Order. Because the Proposed Guidance and Proposed Order were substantially interrelated, many commenters submitted a single comment letter addressing both the Proposed Order and Proposed Guidance. The comment letters submitted in response to the Proposed Order and Proposed Guidance may be found on the Commission's Web site at *http://comments.cftc.gov/PublicComments/CommentList.aspx?id=1234.*

Approximately 200 individuals submitted substantially identical letters to the effect that oversight of the $700 trillion global derivatives market is the key to meaningful reform. The letters state that because the market is inherently global, risks can be transferred around the world with the touch of a button. Further, according to these letters, loopholes in the Proposed Guidance could allow foreign affiliates of Wall Street banks to escape regulation. Lastly, the letters request that the Proposed Guidance be strengthened to ensure that the Dodd-Frank derivatives protections will directly apply to the full global activities of all important participants in the U.S. derivatives markets.

[22] *See* Further Proposed Guidance Regarding Compliance With Certain Swap Regulations, 78 FR 909, 913 (Jan. 7, 2013) ("Further Proposed Guidance").

[23] 17 CFR 1.3(ggg)(4). The Commission's regulations are codified at 17 CFR Ch. I.

[24] The comment letters submitted in response to the Further Proposed Guidance are available on the Commission's Web site at *http://comments.cftc.gov/PublicComments/CommentList.aspx?id=1315.*

the Commission (and Commission's staff) held numerous meetings and discussions with various market participants, domestic bank regulators, and other interested parties.[25]

Further, the Commission's staff closely consulted with the staff of the SEC in an effort to increase understanding of each other's regulatory approaches and to harmonize the cross-border approaches of the two agencies to the greatest extent possible, consistent with their respective statutory mandates.[26] The Commission is cognizant of the value of harmonization by the Commission and the SEC of their cross-border policies to the fullest extent possible. The staffs of the Commission and the SEC have participated in numerous meetings to work jointly toward this objective. The Commission expects that this consultative process will continue as each agency works towards implementing its respective cross-border policy.

The SEC recently published for public comment proposed rules and interpretive guidance to address the application of the provisions of the Exchange Act, added by Subtitle B of Title VII of the Dodd-Frank Act, that relate to cross-border security-based swap activities.[27] The Commission has considered the SEC's cross-border proposal and has taken it into account in the process of considering this Guidance. The SEC's proposal acknowledges the statutory provisions and regulatory precedents that are relevant to security-based swaps by virtue of the fact that security-based swaps are securities.[28] For example, the SEC's proposed rules regarding registration of security-based swap dealers and dealers build from the SEC's traditional approach to the registration of brokers and dealers under the Exchange Act.[29] The SEC's proposal also notes the SEC's belief that Congress intended the territorial application of Title VII to entities and transactions in the security-based swaps market to follow similar principles to those applicable to the securities market under the Exchange Act.[30] The Commission believes that one factor in harmonization of the two agencies' approaches is that Congress did not express a similar intent that the application of Title VII to entities and transactions in the swaps market should follow principles that preceded the Dodd-Frank Act, but rather mandated a new regulatory regime for swaps.[31]

The Commission also recognizes the critical role of international cooperation and coordination in the regulation of derivatives in the highly interconnected global market, where risks are transmitted across national borders and market participants operate in multiple jurisdictions. Close cooperative relationships and coordination with other jurisdictions take on even greater importance given that, prior to the recent reforms, the swaps market has largely operated without regulatory oversight, and given that many jurisdictions are in differing stages of implementing their regulatory reform. To this end, the Commission's staff has actively engaged in discussions with their foreign counterparts in an effort to better understand and develop a more harmonized cross-border regulatory framework. The Commission expects that these discussions will continue as it implements the cross-border interpretive guidance and as other jurisdictions develop their own regulatory approaches to derivatives.[32]

In general, many of the financial institutions and law firms (representing financial institutions) that commented on the Proposed Guidance and Further Proposed Guidance stated that the Commission's proposed interpretation of the extraterritorial application of Title VII of the Dodd-Frank Act was overly broad and unnecessarily complex and unclear.[33] Among the issues they raised were concerns relating to the interpretation of the term "U.S. person," aggregation for purposes of swap dealer registration, lack of parity in the treatment of foreign branches and affiliates of U.S. persons, the approach to guaranteed non-U.S. affiliates and non-U.S. affiliate "conduits," and the "comparability" assessment for purposes of substituted compliance. The commenters also urged the Commission to allow sufficient time after the publication of the final interpretive guidance for market participants to understand and implement any new policies of the Commission, before the Commission begins to apply such policies.

Other commenters disagreed that the Commission's proposed interpretation of its extraterritorial authority was overly broad, instead arguing that the Commission had not gone far enough.[34]

---

[25] The records of these meetings and communications are available on the Commission's Web site at *http://www.cftc.gov/LawRegulation/ DoddFrankAct/Rulemakings/Cross-Border ApplicationofSwapsProvisions/index.htm.*

[26] Sections 722 and 772 of the Dodd-Frank Act establish the scope of the Commission's and SEC's jurisdiction over cross-border swaps and security-based swaps, respectively. CEA section 2(i), which was added by section 722 of the Dodd-Frank Act, is discussed above. Section 30(c) of the Securities Exchange Act of 1934 ("Exchange Act"), which was added by section 772 of the Dodd-Frank Act, provides that the swaps provisions of the Exchange Act added by Title VII do not apply "to any person insofar as such person transacts a business in security-based swaps without the jurisdiction of the United States, unless such person transacts such business in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate to prevent the evasion of any provision [added by Title VII of the Dodd-Frank Act] . . . ." *See* 15 U.S.C. 78dd(c).

[27] *See* Cross-Border Security-Based Swap Activities; Re-Proposal of Regulation SBSR and Certain Rules and Forms Relating to the Registration of Security-Based Swap Dealers and Major Security-Based Swap Participants, 78 FR 30968 (May 23, 2013) ("SEC Cross-Border Proposal").

[28] The SEC Cross-Border Proposal notes that the definition of "security" in the Exchange Act includes security-based swaps, which raises issues related to the statutory definitions of "broker" and "dealer," the statutory exchange registration requirement, and other statutory requirements related to securities. *Id.* at 30972.

[29] *Id.* at 30990.

[30] *Id.* at 30983–84.

[31] One commenter expressed the view that the CFTC's statutory mandate to regulate the risks from cross border derivatives trading and related activities. This commenter stated that the SEC was given very limited statutory authority in the Dodd-Frank Act related solely to anti-evasion, in contrast to the Commission, which was given the same anti-evasion authority plus an affirmative statutory mandate to regulate cross-border derivative activities that "have a direct an significant connection with activities in, or effect on, commerce of the United States." This commenter further stated that a broader statutory mandate makes sense because the Commission "has decades of expertise and jurisdiction for virtually the entire derivatives markets," whereas the SEC has "jurisdiction for no more than 3.5 percent of those markets." *See* Better Markets Inc. ("Better Markets") (Jun. 24, 2013) at 2.

[32] This is one aspect of the Commission's on-going bilateral and multilateral efforts to promote international coordination of regulatory reform. The Commission's staff is engaged in consultations with Europe, Japan, Hong Kong, Singapore, Switzerland, Canada, Australia, Brazil, and Mexico on derivatives reform. In addition, the Commission's staff is participating in several standard-setting initiatives, co-chairs the IOSCO Task Force on OTC Derivatives, and has created an informal working group of derivatives regulators to discuss implementation of derivatives reform. *See also* Joint Press Statement of Leaders on Operating Principles and Areas of Exploration in the Regulation of the Cross-border OTC Derivatives Market, published as CFTC Press Release 6439–12, Dec. 4, 2012, available at *http://www.cftc.gov/PressRoom/PressReleases/ pr6439-12;* OTC Derivatives Regulators Group Report to the G–20 Meeting of Finance Ministers and Central Bank Governors of 18–19 April 2013, linked to CFTC Press Release ODRG Report to G–20, Apr. 16, 2013, available at *http://www.cftc.gov/ PressRoom/PressReleases/odrg_report top20release.*

[33] *See, e.g.,* Securities Industry and Financial Markets Association ("SIFMA") (Aug. 27, 2012); Institute of International Bankers ("IIB") (Aug. 27, 2012); Sullivan & Cromwell, on behalf of Bank of America Corp., Citi, and J.P. Morgan ("Sullivan & Cromwell") (Aug. 13, 2012); Bank of America Merrill Lynch, Barclays Capital, and PNB Paribas et al., submitted by Cleary Gottlieb Steen & Hamilton LLP ("Cleary") (Aug. 16, 2012).

[34] *See, e.g.,* Americans for Financial Reform, submitted by Marcus Stanley ("AFR") (Aug. 27, 2012); Better Markets (Aug. 16, 2012); Michael Greenberger, Francis King Cary School of Law,

For example, AFR stated that the Proposed Guidance "takes some real positive steps in affirming CFTC jurisdiction over a variety of cross-border transactions," but "falls well short of closing potential cross-border loopholes." [35] Senator Levin wrote that although "members of the financial industry have filed comment letters urging the CFTC to weaken its proposals . . . American families and businesses deserve strong protections against the risks posed by derivatives trading, including from cross-border swaps, and . . . the Proposed Guidance should be strengthened rather than weakened." [36]

## II. Scope of This Guidance

After carefully reviewing and considering the comments on the Proposed Guidance and the Further Proposed Guidance, the Commission has determined to finalize the Proposed Guidance. This Guidance sets forth the general policy of the Commission in interpreting how section 2(i) of the CEA provides for the application of the swaps provisions of the CEA and Commission regulations to cross-border activities when such activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or when they contravene Commission rulemaking.[37] Unlike a binding rule adopted by the Commission, which would state with precision when particular requirements do and do not apply to particular situations, this Guidance is a statement of the Commission's general policy regarding cross-border swap activities [38] and allows for flexibility in application to various situations, including consideration of all relevant facts and circumstances that are not explicitly discussed in the guidance. The Commission believes that the statement of its policy in this Guidance will assist market participants in understanding how the Commission intends that the registration and certain other substantive requirements of the Dodd-Frank Act generally would apply to their cross-border activities.[39]

This release is intended to inform the public of the Commission's views on how it ordinarily expects to apply existing law and regulations in the cross-border context. In determining the application of the CEA and Commission regulations to particular entities and transactions in cross-border contexts, the Commission will apply the relevant statutory provisions, including CEA section 2(i), and regulations to the particular facts and circumstances. Accordingly, the public has the ability to present facts and circumstances that would inform the application of the substantive policy positions set forth in this release.

The Commission understands the complex and dynamic nature of the global swap market and the need to take an adaptable approach to cross-border issues, particularly as it continues to work closely with foreign regulators to address potential conflicts with respect to each country's respective regulatory regime. Although the Commission is issuing the Guidance at this time, the Commission will continue to follow developments as foreign regulatory regimes and the global swaps market continue to evolve. In this regard, the Commission will periodically review this Guidance in light of future developments.

This release is organized into four main sections. Section III sets forth the Commission's interpretation of CEA section 2(i) and the general manner in which it intends to apply the swaps provisions of the Dodd-Frank Act to activities outside the United States. Section IV addresses the public comments and Commission Guidance on: (A) The Commission's interpretation of the term "U.S. person"; (B) swap dealer and MSP registration; (C) the scope of the term "foreign branch" of a U.S. bank and consideration of when a swap should be considered to be with the foreign branch of a U.S. bank; (D) a description of the entity-level requirements and transaction-level requirements under Title VII and the Commission's related regulations ("Entity-Level Requirements" and "Transaction-Level Requirements," respectively); (E) the categorization of Title VII swaps provisions (and Commission regulations) as either Entity-Level or Transaction-Level Requirements; (F) substituted compliance, including an overview of the principles guiding substituted

compliance determinations for Entity-Level and Transaction-Level Requirements, a general description of the process for comparability determinations, and a discussion of conflicts arising under foreign privacy and blocking laws; (G) application of the Entity-Level Requirements and "Category A" and "Category B" Transaction-Level Requirements to swap dealers and MSPs; and (H) application of the CEA's swaps provisions and Commission regulations where both parties to a swap are neither swap dealers nor MSPs.[40]

In addition, this Guidance includes the following Appendices, which should be read in conjunction with (and are qualified by) the remainder of the Guidance: (1) Appendix A—The Entity-Level Requirements; (2) Appendix B—The Transaction-Level Requirements; (3) Appendix C—Application of the Entity-Level Requirements; (4) Appendix D—Application of the Category A Transaction-Level Requirements to Swap Dealers and MSPs; (5) Appendix E—Application of the Category B Transaction-Level Requirements to Swap Dealers and MSPs; and (6) Appendix F—Application of Certain Entity-Level and Transaction-Level Requirements to Non-Swap Dealer/Non-MSP Market Participants.

## III. Interpretation of Section 2(i)

CEA section 2(i) provides that the swaps provisions of Title VII shall not apply to activities outside the United States unless those activities—

• Have a direct and significant connection with activities in, or effect on, commerce of the United States; or

• contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of [the CEA] that was enacted by the [Dodd-Frank Act].

In the Proposed Guidance, the Commission noted that section 2(i) provides the Commission express authority over swap activities outside the United States when certain conditions are met, but it does not require the Commission to extend its reach to the outer bounds of that authority. Rather, in exercising its authority with respect to swap activities outside the United States, the Commission will be guided by international comity principles.

University of Maryland ("Greenberger") (Aug. 13, 2012).

[35] AFR (Aug. 27, 2012) at 2.

[36] Letter from Sen. Levin at 3.

[37] *See* 7 U.S.C. 2(i).

[38] The Commission notes that part 23 of its regulations defines "swaps activities" to mean, "with respect to a [registered swap dealer or MSP], such registrant's activities related to swaps and any product used to hedge such swaps, including, but not limited to, futures, options, other swaps or security-based swaps, debt or equity securities, foreign currency, physical commodities, and other derivatives." *See* 17 CFR 23.200(j); 23.600(a)(7).

[39] In this regard, the Commission notes that it would consider codifying certain aspects of the

Guidance in future rulemakings, as appropriate; but at this time, this guidance is intended to provide an efficient and flexible vehicle to communicate the agency's current views on how the Dodd-Frank swap requirements would apply on a cross-border basis.

[40] Certain provisions of Title VII apply regardless of whether a swap dealer or MSP is a counterparty to the swap. These provisions include the clearing requirement (7 U.S.C. 2(h)(1)), the trade execution requirement (2(h)(8)), reporting to SDRs (2(a)(13)(G)), and real-time public reporting (2(a)(13)).

## A. Comments

Some commenters addressing the interpretation of section 2(i) in the Proposed Guidance stated that the activities of the non-U.S. branches and subsidiaries of U.S. persons outside the United States with respect to swaps with non-U.S. persons should not be subject to Dodd-Frank requirements. Sullivan & Cromwell asserted that the non-U.S. branches and subsidiaries generally do not enter into swaps with U.S. persons and therefore the jurisdictional nexus with the United States that would justify application of the Dodd-Frank Act is absent.[41] Sullivan & Cromwell stated that there are legitimate business reasons for U.S. persons to establish non-U.S. branches and subsidiaries, so doing so should not be interpreted to mean that the U.S. person is using the branch to evade application of the Dodd-Frank Act.[42] Sullivan & Cromwell argued that the Dodd-Frank Act's application outside the United States should be narrowly construed because it includes only specific exceptions to the judicial precedent that U.S. laws should be interpreted to apply outside the United States only when such application is clearly expressed in the law.[43] Similarly, SIFMA argued that the Commission's proposal asserted a broad jurisdictional scope that is inconsistent with the congressional intent expressed in section 2(i) of the CEA.[44]

Sullivan & Cromwell cited past instances where the Commission has not applied its regulations to firms that deal solely with foreign customers and do not conduct business in or from the United States or to the non-U.S. subsidiaries of entities registered with the Commission.[45] Sullivan & Cromwell and SIFMA stated that the application of Dodd-Frank requirements to non-U.S. swap activities would be contrary to principles of international comity and cooperation with foreign regulators, would lead to less efficient use of regulatory resources, and would subject the affected entities to potentially conflicting regulations and increased costs of compliance.[46] SIFMA asserted that the jurisdictional scope in the Commission's proposal is not necessary to prevent evasive activity, because the Commission already has broad authority to address evasion.[47] Sullivan & Cromwell and SIFMA also argued that

imposing the Dodd-Frank requirements on non-U.S. branches and subsidiaries of U.S. persons would put those entities at a disadvantage compared to competitors in foreign jurisdictions, while other federal laws and banking regulations (such as the Edge Act[48]) indicate that Congress wishes to promote such entities' ability to compete in foreign jurisdictions.[49]

By contrast, Senator Levin stated that the J.P. Morgan "whale trades" provide an example of how major U.S. financial institutions have integrated their U.S. and non-U.S. swap activities, and therefore supports the application of the swaps provisions of Title VII and Commission regulations to the non-U.S. offices of U.S. financial institutions.[50] He explained that a Senate investigation found that J.P. Morgan personnel in London executed the "whale trades" using money from the U.S. bank's excess deposits, and while traders in London conducted the trades, the trades were attributed to a U.S. affiliate of J.P. Morgan through back-to-back arrangements between the London branch and New York branch.[51] He also stated the whale trades were entered into with counterparties including major U.S. banks and J.P. Morgan's own investment bank.[52] Senator Levin concluded that because of the integration of U.S. and non-U.S. offices and affiliates of U.S. financial institutions, it is critical that the non-U.S. offices and affiliates of U.S. financial institutions follow the same Dodd-Frank requirements as are applicable to the U.S. financial institutions.[53]

## B. Statutory Analysis

In interpreting the phrase "direct and significant," the Commission has examined the plain language of the statutory provision, similar language in other statutes with cross-border application, and the legislative history of section 2(i).

The statutory language in new CEA section 2(i) is structured similarly to the statutory language in the Foreign Trade Antitrust Improvements Act of 1982 (the "FTAIA"),[54] which provides the standard for the cross-border application of the Sherman Antitrust

Act.[55] The FTAIA, like CEA section 2(i), excludes certain non-U.S. commercial transactions from the reach of U.S. law. It provides that the antitrust provisions of the Sherman Act "shall not apply to [anti-competitive] conduct involving trade or commerce . . . with foreign nations."[56] However, like paragraph (1) of CEA section 2(i), the FTAIA also creates exceptions to the general exclusionary rule and thus brings back within antitrust coverage any conduct that: (1) has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce;[57] and (2) "such effect gives rise to a [Sherman Act] claim."[58] In *F. Hoffman-LaRoche, Ltd.* v. *Empagran S.A.*, the Supreme Court stated that "this technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.,* it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.,* the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'"[59]

It is appropriate, therefore, to read section 2(i) of the CEA as a clear expression of congressional intent that the swaps provisions of Title VII of the Dodd-Frank Act apply to activities beyond the borders of the United States when certain circumstances are present. These circumstances include, pursuant to paragraph (1) of section 2(i), when activities outside the United States meet the statutory test of having a "direct and significant connection with activities in, or effect on," U.S. commerce.

An examination of the language in the FTAIA, however, does not provide an unambiguous roadmap for the Commission in interpreting section 2(i) of the CEA. There are both similarities, and a number of significant differences, between the language in CEA section 2(i) and the language in the FTAIA. Further, the Supreme Court has not provided definitive guidance as to the meaning of the "direct, substantial, and reasonably foreseeable" test in the FTAIA, and the lower courts have interpreted the individual terms in the FTAIA differently.

Although a number of courts have interpreted the various terms in the

---

[41] Sullivan & Cromwell (Aug. 13, 2012) at 6–7.

[42] *Id.* at 8.

[43] *Id.* at 9.

[44] SIFMA (Aug. 27, 2012) at 2.

[45] Sullivan & Cromwell (Aug. 13, 2012) at 10.

[46] *Id.* at 11; SIFMA (Aug. 27, 2012) at 3 and A55.

[47] SIFMA (Aug. 27, 2012) at 3.

[48] 12 U.S.C. 611–31.

[49] *Id.;* Sullivan & Cromwell (Aug. 13, 2012) at 12–14.

[50] Letter from Sen. Levin at 4.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 7. *See also* Dodd-Frank Statement ("An exemption for foreign derivatives activity by the [ ] affiliates of American institutions is a free pass no matter where that activity is located.").

[54] 15 U.S.C. 6a.

[55] 15 U.S.C. 1–7.

[56] 15 U.S.C. 6a.

[57] 6a(1).

[58] 6a(2).

[59] 542 U.S. 155, 162 (2004) (emphasis in original).

FTAIA, only the term "direct" appears in both CEA section 2(i) and the FTAIA. Relying upon the Supreme Court's definition of the term "direct" in the Foreign Sovereign Immunities Act ("FSIA"),[60] the U.S. Court of Appeals for the Ninth Circuit construed the term "direct" in the FTAIA as requiring a "relationship of logical causation,"[61] such that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity."[62] However, in an en banc decision, the U.S. Court of Appeals for the Seventh Circuit held that "the Ninth Circuit jumped too quickly on the assumption that the FSIA and the FTAIA use the word 'direct' in the same way."[63] After examining the text of the FTAIA as well as its history and purpose, the Seventh Circuit found persuasive the "other school of thought [that] has been articulated by the Department of Justice's Antitrust Division, which takes the position that, for FTAIA purposes, the term 'direct' means only 'a reasonably proximate causal nexus.'"[64] The Seventh Circuit rejected interpretations of the term "direct" that included any requirement that the consequences be foreseeable, substantial, or immediate.[65]

Other terms in the FTAIA differ from the terms used in section 2(i) of the CEA. First, the FTAIA test explicitly requires that the effect on U.S. commerce be a "reasonably foreseeable" result of the conduct.[66] Section 2(i) of the CEA, by contrast, does not provide that the effect on U.S. commerce must be foreseeable. Second, whereas the FTAIA solely relies on the "effects" on U.S. commerce to determine cross-border application of the Sherman Act, section 2(i) of the CEA refers to both "effect" and "connection." "The FTAIA says that the Sherman Act applies to foreign 'conduct' with a certain kind of harmful domestic effect."[67] Section 2(i), by contrast, applies more broadly—not only to particular instances of conduct that have an effect on U.S. commerce, but also to activities that have a direct and significant "connection with activities in" U.S. commerce. Unlike the FTAIA, section 2(i) applies the swaps provisions of the CEA to activities outside the United States that have the requisite connection with activities in U.S. commerce, regardless of whether a "harmful domestic effect" has occurred.

As the foregoing textual analysis indicates, Congress crafted section 2(i) differently from its analogue in the antitrust laws. Congress delineated the cross-border scope of the Sherman Act in section 6a of the FTAIA as applying to conduct that has a "direct" and "substantial" and "reasonably foreseeable" "effect" on U.S. commerce. In section 2(i), on the other hand, Congress did not include a requirement that the effects or connections of the activities outside the United States be "reasonably foreseeable" for the Dodd-Frank swaps provisions to apply. Further, Congress included language in section 2(i) to apply the Dodd-Frank swaps provisions in circumstances in which there is a direct and significant connection with activities in U.S. commerce, regardless of whether there is an effect on U.S. commerce. The different words that Congress used in paragraph (1) of section 2(i), as compared to its closest statutory analogue in section 6a of the FTAIA, inform the Commission in construing the boundaries of its cross-border authority over swap activities under the CEA.[68] Accordingly, the Commission believes it is appropriate to interpret section 2(i) such that it applies to activities outside the United States in circumstances in addition to those that would be reached under the FTAIA standard.

As further described in the Proposed Guidance, one of the principal rationales for the enactment of the Dodd-Frank derivatives reforms was the need for a comprehensive scheme of regulation to prevent systemic risk in the U.S. financial system.[69] More particularly, a primary purpose of Title VII of the Dodd-Frank Act is to address risk to the U.S. financial system created by interconnections in the swaps market.[70] Title VII of the Dodd-Frank Act gave the Commission new and broad authority to regulate the swaps market to address and mitigate risks arising from swap activities that in the future could cause a financial crisis.

In global markets, the source of such risk is not confined to activities within U.S. borders. Due to the interconnectedness between firms, traders, and markets in the U.S. and abroad, a firm's failure, or trading losses overseas, can quickly spill over to the United States and affect activities in U.S. commerce and the stability of the U.S. financial system. Accordingly, Congress did not limit the application of the Dodd-Frank Act to activities within the United States. Rather, in recognition of the global nature of the swaps market, and the fact that risks to the U.S. financial system may arise from activities outside the United States, as well as from activities within the United States, Congress explicitly provided for cross-border application of Title VII to activities outside the United States that pose risks to the U.S. financial system.[71]

---

[60] See 28 U.S.C. 1605(a)(2).

[61] United States v. LSL Biotechnologies, 379 F.3d 672, 693 (9th Cir. 2004). "As a threshold matter, many courts have debated whether the FTAIA established a new jurisdictional standard or merely codified the standard applied in [United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945)] and its progeny. Several courts have raised this question without answering it. The Supreme Court did as much in [Harford Fire Ins. Co. v. California, 509 U.S. 764 (1993)]." Id. at 678.

[62] Id. at 692–3, quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992) (providing that, pursuant to the FSIA, 28 U.S.C. 1605(a)(2), immunity does not extend to commercial conduct outside the United States that "causes a direct effect in the United States").

[63] Minn-Chem, Inc. v. Agrium, Inc., 683 F.3d 845, 857 (7th Cir. 2012) (en banc).

[64] Id.

[65] Id. at 856–57.

[66] See, e.g., Animal Sciences Products. v. China Minmetals Corp., 654 F.3d 462, 471 (3d Cir. 2011) ("[T]he FTAIA's 'reasonably foreseeable' language imposes an objective standard: the requisite 'direct' and 'substantial' effect must have been 'foreseeable' to an objectively reasonable person.").

[67] Hoffman-LaRoche, 452 U.S. at 173.

[68] The provision that ultimately became section 722(d) of the Dodd-Frank Act was added during consideration of the legislation in the House of Representatives. See 155 Cong. Rec. H14685 (Dec. 10, 2009). The version of what became Title VII that was reported by the House Agriculture Committee and the House Financial Services Committee did not include any provision addressing cross-border application. See 155 Cong. Rec. H14549 (Dec. 10, 2009). The Commission finds it significant that, in adding the cross-border provision before final passage, the House did so in terms that, as discussed in text, were different from, and broader than, the terms used in the analogous provision of the FTAIA.

[69] See Proposed Guidance, 77 FR at 41215–41216.

[70] Cf. 156 Cong. Rec. S5818 (July 14, 2010) (statement of Sen. Lincoln) ("In 2008, our Nation's economy was on the brink of collapse. America was being held captive by a financial system that was so interconnected, so large, and so irresponsible that our economy and our way of life were about to be destroyed."), available at http://www.gpo.gov/fdsys/pkg/CREC-2010-07-14/pdf/CREC-2010-07-14.pdf; 156 Cong. Rec. S5888 (July 15, 2010) (statement of Sen. Shaheen) ("We need to put in place reforms to stop Wall Street firms from growing so big and so interconnected that they can threaten our entire economy."), available at http://www.gpo.gov/fdsys/pkg/CREC-2010-07-15/pdf/CREC-2010-07-15-senate.pdf; 156 Cong. Rec. S5905 (July 15, 2010) (statement of Sen. Stabenow) ("For too long the over-the-counter derivatives market has been unregulated, transferring risk between firms and creating a web of fragility in a system where entities became too interconnected to fail."), available at http://www.gpo.gov/fdsys/pkg/CREC-2010-07-15/pdf/CREC-2010-07-15-senate.pdf.

[71] The legislative history of the Dodd-Frank Act shows that in the fall of 2009, neither the Over-the-Counter Derivatives Markets Act of 2009, H.R. 3795, 111th Cong. (1st Sess. 2009), reported by the Financial Services Committee chaired by Rep. Barney Frank, nor the Derivatives Markets Transparency and Accountability Act of 2009, H.R. 977, 111th Cong. (1st Sess. 2009), reported by the Agriculture Committee chaired by Rep. Collin Peterson, included a general territoriality limitation that would have restricted Commission regulation of transactions between two foreign persons located outside of the United States. During the House Financial Services Committee markup on October 14, 2009, Rep. Spencer Bachus offered an

Continued

Therefore, upon consideration of the statutory language, as well as the prophylactic purpose of the CEA and the amendments made to it by Title VII, the Commission construes section 2(i) to apply the swaps provisions of the CEA to activities outside the United States that have either: (1) A direct and significant effect on U.S. commerce; or, in the alternative, (2) a direct and significant connection with activities in U.S. commerce, and through such connection present the type of risks to the U.S. financial system and markets that Title VII directed the Commission to address. The Commission interprets section 2(i) in a manner consistent with the overall goals of the Dodd-Frank Act to reduce risks to the U.S. financial system and avoid future financial crises.[72]

Consistent with this overall interpretation, the Commission believes that the term "direct" in CEA section 2(i) should be interpreted in a manner consistent with the position of the Department of Justice Antitrust Division with respect to the meaning of the same term in the FTAIA, and as recently adopted by the Seventh Circuit.[73] The Commission therefore interprets the term "direct" in section 2(i) so as to require "a reasonably proximate causal nexus" and not to require foreseeability, substantiality, or immediacy.[74]

Consistent with the purpose of Title VII to protect the U.S. financial system against the build-up of systemic risks, the Commission does not read section 2(i) so as to require a transaction-by-transaction determination that a specific swap outside the United States has a "direct and significant connection with activities in, or effect on, commerce of the United States" in order to apply the swaps provisions of the CEA to such transactions. Rather, it is the connection of swap activities, viewed as a class or in the aggregate, to activities in commerce of the United States that must be assessed to determine whether application of the CEA swaps provisions is warranted.[75]

This conclusion is bolstered by similar interpretations of other federal statutes regulating interstate commerce. Recently, the Supreme Court reaffirmed a similar "aggregate effects" approach in *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*.[76] In that case, the Court phrased the holding in the seminal "aggregate effects" decision, *Wickard* v. *Filburn*,[77] in this way: "[The farmer's] decision, when considered in the aggregate along with similar decisions of others, would have had a substantial effect on the interstate market for wheat."[78] In

another recent case, *Gonzales v Raich*,[79] the Court adopted similar reasoning to uphold the application of the Controlled Substance Act[80] to prohibit the intrastate use of medical marijuana for medicinal purposes. In *Raich*, the Court held that Congress could regulate purely intrastate activity if the failure to do so would "leave a gaping hole" in the federal regulatory structure. These cases support the Commission's cross-border authority over swap activities that as a class, or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce—whether or not an individual swap may satisfy the statutory standard.[81]

### C. Principles of International Comity

The case law in the antitrust area also teaches the importance of recognizing the laws and interests of other countries in applying an ambiguous federal statute across borders; in such circumstances, principles of international comity counsel courts and agencies to act reasonably in exercising jurisdiction with respect to activity that takes place elsewhere. In *Hoffman-LaRoche*, an antitrust class action lawsuit alleging an international price-fixing conspiracy by foreign and domestic vitamin manufacturers and distributors, the Supreme Court held that ambiguous statutes should be construed to "avoid unreasonable interference with the sovereign authority of other nations."[82] The Court explained that this rule of construction "reflects customary principles of international law" and "helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world."[83]

In determining whether the exercise of jurisdiction by one nation over activities in another nation would be reasonable, the courts and agencies are guided by the Restatement (Third) of Foreign Relations Law of the United States (the "Restatement"). Drawing upon traditional principles of international law, the Restatement provides bases of jurisdiction to prescribe law, as well as limitations on the exercise of jurisdiction. In addition

---

amendment that would have restricted the jurisdiction of the Commission over swaps between non-U.S. resident persons transacted without the use of the mails or any other means or instrumentality of interstate commerce. Chairman Frank opposed the amendment, noting that there may well be cases where non-U.S. residents are engaging in transactions that have an effect on the United States and that are insufficiently regulated internationally and that he would not want to prevent U.S. regulators from stepping in. Chairman Frank expressed his commitment to work with Rep. Bachus going forward, and Rep. Bachus withdrew the amendment. *See* H. Fin. Serv. Comm. Mark Up on Discussion Draft of the Over-the-Counter Derivatives Markets Act of 2009, 111th Cong., 1st Sess. (Oct. 14, 2009) (statements of Rep. Bachus and Rep. Frank), available at *http://financialservices. house.gov/calendar/eventsingle.aspx?Event ID=231922.*

[72] The Commission also notes that the Supreme Court has indicated that the FTAIA may be interpreted more broadly when the government is seeking to protect the public from anticompetitive conduct than when a private plaintiff brings suit. *See Hoffman-LaRoche,* 452 U.S. at 170 ("A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out its mission.").

[73] See note 63 and accompanying text, *supra.*

[74] The Seventh Circuit's rationale for rejecting the Ninth Circuit's interpretation applies with at least equal, if not greater, force to the interpretation of the word "direct" in section 2(i) of the CEA. As discussed in note 68 and the accompanying text, *supra,* Congress expressly declined to import the FTAIA standards of substantiality, immediacy, or

foreseeability into section 2(i). The Commission believes that the terms included in section 2(i) that are the same as the terms in the FTAIA should be interpreted in a manner consistent with Congress's determination to not import other, different standards from the FTAIA into section 2(i). Where Congress has included in a new statute one term but not another from an existing statute, it is reasonable to conclude that Congress did not want the other existing standards included in the new statute.

[75] The Commission believes this interpretation is supported by Congress's use of the plural term "activities" in CEA section 2(i), rather than the singular term "activity." The Commission believes it is reasonable to interpret the use of the plural term "activities" in section 2(i) to require not that each particular activity have the requisite connection with U.S. commerce, but rather that swap activities in the aggregate, or a class of activity, have the requisite nexus with U.S. commerce. This interpretation is consistent with the overall objectives of Title VII, as described above. Further, the Commission believes that a swap-by-swap approach to jurisdiction would be "too complex to prove workable." *See Hoffman-LaRoche,* 542 U.S. at 168.

[76] 132 S. Ct. 2566 (2012).

[77] 317 U.S. 111 (1942).

[78] 132 S. Ct. 2566, 2588 (2012). At issue in *Wickard* was the regulation of a farmer's production and use of wheat even though the wheat was "not intended in any part for commerce but wholly for consumption on the farm." 317 U.S. at 118. The Supreme Court upheld the application of the regulation, stating that although the farmer's "own contribution to the demand for wheat may be trivial by itself," the federal regulation could be applied when his contribution "taken together with that of many others similarly situated, is far from trivial." *Id.* at 128–29. The Court also stated it had "no doubt that Congress may properly have considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose . . . ." *Id.*

[79] 545 U.S. 1 (2005).

[80] 21 U.S.C. 801 *et seq.*

[81] In *Sebelius,* the Court stated, "Where the class of activities is regulated, and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." 132 S. Ct. at 2587 (*quoting Perez* v. *United States,* 402 U.S. 146, 154 (1971).

[82] 542 U.S. at 164.

[83] *Id.* at 165.

to recognizing territoriality and nationality as bases for jurisdiction, the Restatement expressly provides that a country has jurisdiction to prescribe law with respect to "conduct outside its territory that has or is intended to have substantial effect within its territory." [84]

The Restatement also provides that even where a country has a basis for jurisdiction, it should not prescribe law with respect to a person or activity in another country when the exercise of such jurisdiction is unreasonable.[85] The reasonableness of such an exercise of jurisdiction, in turn, is to be determined by evaluating all relevant factors, including certain specifically enumerated factors where appropriate:

(a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the persons principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.[86]

Notably, the Restatement does not preclude concurrent regulation by multiple jurisdictions. However, where concurrent jurisdiction by two or more jurisdictions creates conflict, the Restatement recommends that each country evaluate both its interests in exercising jurisdiction and those of the other jurisdiction, and where possible, to consult with each other.[87]

---

[84] *See* Restatement sec. 402(1)(c). A comment to the Restatement also identifies jurisdiction with respect to activity outside the country, but having or intended to have substantial effect within the country's territory, as an aspect of jurisdiction based on territoriality. *See* Restatement sec. 402 cmt. d.

[85] Restatement sec. 403(1).

[86] Restatement sec. 403(2).

[87] With regard to conflicting exercises of jurisdiction, section 403(3) of the Restatement states:

(3) When it would not be unreasonable for each of the two states to exercise jurisdiction over a

Consistent with the Restatement, in determining the extent to which the Dodd-Frank swaps provisions apply to activities abroad, the Commission has strived to protect U.S. interests as determined by Congress in Title VII, and minimize conflicts with the laws of other jurisdictions. The Commission has carefully considered, among other things, the level of the home jurisdiction's supervisory interests over the subject activity and the extent to which the activity takes place within the foreign territory.[88] At the same time, the Commission has also considered the potential for cross-border activities to have substantial connection to or impact on the U.S. financial system and the global, highly integrated nature of today's swap business; to fulfill the purposes of the Dodd-Frank swaps reform, the Commission's supervisory oversight cannot be confined to activities strictly within the territory of the United States.

The Commission believes that the Guidance strikes the proper balance between these competing factors to ensure that the Commission can discharge its responsibilities to protect

---

person or activity, but the prescriptions by the two states are in conflict, each state has an obligation to evaluate its own as well as the other state's interest in exercising jurisdiction, in light of all the relevant factors, including those set out in Subsection (2), a state should defer to the other state if that state's interest is clearly greater.

Comment e. to section 403 of the Restatement states:

*Conflicting exercises of jurisdiction.* Subsection (3) applies when an exercise of jurisdiction by each of two states is not unreasonable, but their regulations conflict. In that case, each state is required to evaluate both its interests in exercising jurisdiction and those of the other state. When possible, the two states should consult with each other. If one state has a clearly greater interest, the other should defer, by abandoning its regulation or interpreting or modifying it so as to eliminate the conflict. When neither state has a clearly stronger interest, states often attempt to eliminate the conflict so as to reduce international friction and avoid putting those who are the object of the regulations in a difficult situation. Subsection (3) is addressed primarily to the political departments of government, but it may be relevant also in judicial proceedings.

Subsection (3) applies only when one state requires what another prohibits, or where compliance with the regulations of two states exercising jurisdiction consistently with this section is otherwise impossible. It does not apply where a person subject to regulation by two states can comply with the laws of both; for example, where one state requires keeping accounts on a cash basis, the other on an accrual basis. It does not apply merely because one state has a strong policy to permit or encourage an activity which another state prohibits, or one state exempts from regulation an activity which another regulates. Those situations are governed by Subsection (2), but do not constitute conflict within Subsection (3).

[88] For purposes of this Guidance, the terms "home jurisdiction" or "home country" are used interchangeably and refer to the jurisdiction in which the person or entity is established, including the European Union.

the U.S. markets, market participants, and financial system, consistent with the traditions of the international system and comity principles, as set forth in the Restatement. Of particular relevance is the Commission's approach to substituted compliance, which would be expected to mitigate any burden associated with potentially conflicting foreign regulations and would generally be appropriate in light of the supervisory interests of foreign regulators in entities domiciled and operating in its jurisdiction.[89]

In addition, recognizing that close cooperation and coordination with other jurisdictions is vital to the regulation of derivatives in the highly interconnected global market, the Commission's staff expects to remain actively engaged in discussions with foreign regulators as the Commission implements the cross-border interpretive guidance and as other jurisdictions develop their own regulatory requirements for derivatives. The Commission recognizes that conflicts of law may exist and is ready to address those issues as they may arise. In that regard, where a real conflict of laws exists, the Commission strongly encourages regulators and registrants to consult directly with its staff.

## IV. Guidance

### A. Interpretation of the Term "U.S. Person"

#### 1. Proposed Interpretation

Under the Proposed Guidance, the term "U.S. person" identifies those persons who, under the Commission's interpretation, could be expected to satisfy the jurisdictional nexus under section 2(i) of the CEA based on their swap activities either individually or in the aggregate.[90] As proposed, the Commission's interpretation of the term "U.S. person" would generally encompass: (1) persons (or classes of persons) located within the United

---

[89] As discussed in section IV.F, *infra*, the Commission's recognition of substituted compliance would be based on an evaluation of whether the requirements of the foreign jurisdiction are comparable and comprehensive compared to the applicable requirement(s) under the CEA and Commission regulations, based on a consideration of all relevant factors, including among other things: (i) the comprehensiveness of the foreign regulator's supervisory compliance program, and (ii) the authority of such foreign regulator to support and enforce its oversight of the registrant's branch or agency with regard to such activities to which substituted compliance applies.

[90] *See* Proposed Guidance, 77 FR at 41218. The discussion of the term "U.S. person" in this Guidance is limited to the relevance of this term for purposes of the Commission regulations promulgated under Title VII. The Commission does not intend that this discussion would apply to other uses of the term "person" in the CEA.

States; and (2) persons that may be domiciled or operate outside the United States but whose swap activities nonetheless have a "direct and significant connection with activities in, or effect on, commerce of the United States" within the meaning of CEA section 2(i).

Specifically, as set forth in the Proposed Guidance, the Commission's interpretation of the term "U.S. person" would generally include, but not be limited to:

(i) any natural person who is a resident of the United States;

(ii) any corporation, partnership, limited liability company, business or other trust, association, joint-stock company, fund or any form of enterprise similar to any of the foregoing, in each case that is either (A) organized or incorporated under the laws of the United States or having its principal place of business in the United States (legal entity) or (B) in which the direct or indirect owners thereof are responsible for the liabilities of such entity and one or more of such owners is a U.S. person;

(iii) any individual account (discretionary or not) where the beneficial owner is a U.S. person;

(iv) any commodity pool, pooled account, or collective investment vehicle (whether or not it is organized or incorporated in the United States) of which a majority ownership is held, directly or indirectly, by a U.S. person(s);

(v) any commodity pool, pooled account, or collective investment vehicle the operator of which would be required to register as a commodity pool operator under the CEA;

(vi) a pension plan for the employees, officers or principals of a legal entity with its principal place of business inside the United States; and

(vii) an estate or trust, the income of which is subject to U.S. income tax regardless of source.

Under the proposed interpretation, a "U.S. person" would include a foreign branch of a U.S. person; on the other hand, a non-U.S. affiliate guaranteed by a U.S. person would not be within the Commission's interpretation of the term "U.S. person."

The Further Proposed Guidance included alternatives for two "prongs" of the proposed interpretation of the term "U.S. person" in the Proposed Guidance: prong (ii)(B), which relates to U.S. owners that are responsible for the liabilities of a non-U.S. entity; and prong (iv), which relates to commodity pools and funds with majority-U.S. ownership.

The alternative version of prong (ii)(B) in the Further Proposed Guidance would limit its scope to a non-U.S. legal entity that is directly or indirectly majority-owned by one or more natural persons or legal entities that meet prong (i) or (ii) of the interpretation, in which

such U.S. person(s) bears unlimited responsibility for the obligations and liabilities of the legal entity. This alternative prong (ii)(B) would generally not include an entity that is a corporation, limited liability company or limited liability partnership where shareholders, members or partners have limited liability. Further, the Commission stated in the Further Proposed Guidance that the majority-ownership criterion would be intended to avoid capturing those legal entities that have negligible U.S. ownership interests. Unlimited liability corporations where U.S. persons have majority ownership and where such U.S. persons have unlimited liability for the obligations and liabilities of the entity generally would be covered under this alternative to prong (ii)(B).

The alternative prong (ii)(B) in the Further Proposed Guidance was as follows:

(ii) A corporation, partnership, limited liability company, business or other trust, association, joint-stock company, fund or any form of enterprise similar to any of the foregoing, in each case that is either (A) organized or incorporated under the laws of a state or other jurisdiction in the United States or having its principal place of business in the United States or (B) directly or indirectly majority-owned by one or more persons described in prong (i) or (ii)(A) and in which such person(s) bears unlimited responsibility for the obligations and liabilities of the legal entity (other than a limited liability company or limited liability partnership where partners have limited liability);

The Further Proposed Guidance explained that this alternative proposed prong would generally treat an entity as a U.S. person if one or more of its U.S. majority owners has unlimited responsibility for losses of, or nonperformance by, the entity. This prong would reflect that when the structure of an entity is such that the U.S. direct or indirect owners are ultimately liable for the entity's obligations and liabilities, the connection to activities in, or effect on, U.S. commerce would be expected to satisfy the requisite jurisdictional nexus. This "look-through" requirement also would serve to discourage persons from creating such indirect ownership structures for the purpose of engaging in activities outside of the Dodd-Frank regulatory regime. Under the Further Proposed Guidance, this alternative proposed prong generally would not render a legal entity organized or domiciled in a foreign jurisdiction a "U.S. person" simply because the entity's swaps obligations are guaranteed by a U.S. person.

With respect to prong (iv) of the interpretation of the term "U.S. person" in the Proposed Guidance, the Further Proposed Guidance set forth an alternative under which any commodity pool, pooled account, investment fund or other collective investment vehicle generally would be within the interpretation of the term "U.S. person" if it is (directly or indirectly) majority-owned by one or more natural persons or legal entities that meet prong (i) or (ii) of the interpretation of the term "U.S. person." The Further Proposed Guidance explained that for purposes of this alternative prong (iv), the Commission would interpret "majority-owned" to mean the beneficial ownership of 50 percent or more of the equity or voting interests in the collective investment vehicle. Similar to the alternative prong (ii)(B) discussed above, the Commission generally would not interpret the collective investment vehicle's place of organization or incorporation to be determinative of its status as a U.S. person. The Further Proposed Guidance clarified that under alternative prong (iv), the Commission would interpret the term "U.S. person" to include a pool, fund, or other collective investment vehicle that is publicly traded only if it is offered, directly or indirectly, to U.S. persons.

The alternative prong (iv) in the Further Proposed Guidance was as follows:

(iv) A commodity pool, pooled account, investment fund, or other collective investment vehicle that is not described in prong (ii) and that is directly or indirectly majority-owned by one or more persons described in prong (i) or (ii), except any commodity pool, pooled account, investment fund, or other collective investment vehicle that is publicly-traded but not offered, directly or indirectly, to U.S. persons;

The Further Proposed Guidance explained that this alternative proposed prong (iv) is intended to capture collective investment vehicles that are created for the purpose of pooling assets from U.S. investors and channeling these assets to trade or invest in line with the objectives of the U.S. investors, regardless of the place of the vehicle's organization or incorporation. These collective investment vehicles may serve as a means to achieve the investment objectives of their beneficial owners, rather than being separate, active operating businesses. As such, the beneficial owners would be directly exposed to the risks created by the swaps that their collective investment vehicles enter into.

## 2. Comments

In general, commenters stated that the proposed "U.S. person" interpretation presented significant interpretive issues and implementation challenges.[91] The commenters contended that it would be difficult to determine U.S. person status because of the breadth of the proposed interpretation, potential ambiguities it contains, and the collection of information its application may require. The commenters, therefore, urged the Commission to consider how the proposed interpretation could be stated in a simpler and more easily applied manner.[92] While a number of commenters stated that the Commission's construction of the term "U.S. person" in the Proposed Guidance was overbroad,[93] several commenters on the Further Proposed Guidance advocated for a broader reading of the term than any of those proposed by the Commission.[94]

### a. Phase-in Interpretation

A number of commenters requested that the Commission adopt an interim interpretation of "U.S. person" that would allow firms to rely on their existing systems and classifications and avoid the need to develop systems to follow a temporary interpretation of the term "U.S. person" that may change in the near future.[95] IIB explained that applying any interpretation of "U.S. person" that departs from status based on residence or jurisdiction of organization, and in some cases principal place of business, will require sufficient time to implement relevant documentation conventions and diligence procedures.[96] IIB, therefore, requested that the Commission implement a phased-in approach to the "U.S. person" interpretation that would encompass, in general, (1) a natural person who is a U.S. resident and (2) a corporate entity that is organized or incorporated under the laws of the United States or has its place of business in the United States.[97]

SIFMA also urged the Commission to phase in the "U.S. person" interpretation, citing the implementation difficulties identified by IIB. Specifically, SIFMA recommended that the Commission allow market participants to apply an interim interpretation of "U.S. person" until 90 days after the final interpretation of "U.S. person" is published.[98] SIFMA stated that the interim interpretation—which was identical to IIB's interim interpretation—should identify "core" U.S. persons and would allow its members to phase in compliance with the Dodd-Frank requirements without building new systems that might have to be changed when the Commission states a final interpretation of the term.[99]

### b. Comments on Particular Prongs of the Proposed Interpretation of the Term "U.S. Person"

Commenters' concerns were primarily (though not exclusively) directed to three prongs of the proposed "U.S. person" interpretation: prong (ii)(B) relating to U.S. owners that are responsible for the liabilities of a non-U.S. company; prong (iv) relating to commodity pools and funds with majority-U.S. ownership; and prong (v) relating to registered commodity pool operators. Below, the Commission describes the main comments to all the prongs of the proposed interpretation of "U.S. person" in greater detail.

Commenters generally did not comment on prong (i).

With respect to prong (ii)(A), the Investment Industry Association of Canada (IIAC) stated that the Commission should look to the location of a legal entity's management (or the majority of its directors and executive officers), instead of the location of organization.[100] Two commenters stated that the "principal place of business" element of the interpretation was ambiguous and difficult to administer and thus recommended that it be removed.[101]

On the other hand, Senator Levin supported an inclusive interpretation of the term "U.S. person" that would encompass foreign offices and affiliates of U.S. financial institutions and corporations, because requiring a case-by-case analysis of whether they should be subject to the Dodd-Frank Act would be complicated, burdensome, and susceptible to gamesmanship.[102] He also suggested that, since it appears that typically foreign affiliates and subsidiaries operate not as independent actors but are closely integrated with their parent corporations, obtaining from them the financial backing needed for their derivative trades, the Commission's interpretation should presume that a foreign affiliate engaged in swap activity is an extension of the parent corporation, unless the parent can demonstrate that the foreign affiliate should be treated as independent.[103] Senator Levin also stated that the Commission's interpretation should include as a U.S. person any foreign affiliate under common control with a U.S. person, based on factors such as common management, funding, systems, and financial reporting.[104]

With respect to prong (ii)(B) of the interpretation, which addresses situations where the direct or indirect owners of an entity are responsible for its liabilities, several commenters stated that the phrase "responsible for the liabilities" was vague. For example, the Committee on Capital Markets Regulation ("Capital Markets") stated that the phrase "responsible for the liabilities" was open to interpretation and requested that the Commission provide more details regarding its interpretation of this phrase.[105] SIFMA sought clarification on whether the Commission intended to capture partnerships where the partners have unlimited liability.[106] The International Swaps and Derivatives Association Inc. ("ISDA") stated that it was not clear whether the concept includes

[91] See SIFMA (Aug. 27, 2012) at 5; Societe Generale ("SocGen") (Aug. 8, 2012) at 4; IIB (Aug. 27, 2012) at 4–14; Deutsche Bank AG ("Deutsche Bank") (Aug. 27, 2012) at 1–4; Goldman Sachs "(Goldman") (Aug. 27, 2012) at 3; The Hong Kong Association of Banks ("Hong Kong Banks") (Aug. 27, 2012) at 3–4; Australian Bankers Association Inc. ("Australian Bankers") (Aug. 27, 2012) at 4.

[92] SIFMA (August 27, 2012) at A10.

[93] See, e.g., European Commission (Aug. 24, 2012) at 1–2; Hong Kong Banks (Aug. 27, 2012) at 4; J.P. Morgan (Aug. 13, 2012) at 9.

[94] See Better Markets (Feb. 15, 2013) at 4–8; Michael Greenberger and Brandy Bruyere, University of Maryland, and AFR ("Greenberger/AFR") (Feb. 6, 2013) at 3 (stating that none of the definitions of U.S. person proposed by the CFTC are sufficient to protect U.S. taxpayers from the risks of foreign subsidiaries and affiliates of U.S. financial institutions). See also Letter from Sen. Levin at 7–8.

[95] See, e.g., Cleary (Aug. 16, 2012) at 6; SIFMA (Aug. 27, 2012) at A8–9; IIB (Aug. 9, 2012) at 4; Deutsche Bank (Aug. 13, 2012) at 2; State Street Corporation ("State Street") (Aug. 27, 2012) at 2; Goldman (Aug. 27, 2012) at 3.

[96] See IIB (Aug. 9, 2012) at 4.

[97] For purposes of IIB's definition, a foreign branch of a U.S. swap dealer would be considered a non-U.S. person. IIB added that it believes that the Commission should adopt a final definition of "U.S. person" that is consistent with its proposed interim definition. Id.

[98] See SIFMA (Aug. 25, 2012) at A8.

[99] Id. at A8.

[100] See IIAC (Aug. 27, 2012) at 3–5.

[101] See Lloyds Banking Group ("Lloyds") (Aug. 24, 2012) at 3; Managed Fund Association and Alternative Investment Management Association ("MFA/AIMA") (Aug. 28, 2012) at 6.

[102] See Letter from Sen. Levin at 7–8.

[103] Id. (stating that it "makes little economic sense, given the insubstantial reality of many foreign affiliates and subsidiaries in the financial industry" to "view a foreign affiliate or subsidiary as a non-U.S. person even if it were fully integrated with its U.S. parent, operated as a wholly owned shell operation with no offices or employees of its own, and functioned in the same way as a branch or agency office").

[104] Id. at 8.

[105] See Capital Markets (Aug. 24, 2012) at 5.

[106] See SIFMA (Aug. 27, 2012) at A13 and A19.

guarantees, sureties, simple risk of loss of equity, or other type of exposure.[107] Deutsche Bank further noted that the language in prong (ii)(B) could be read to include an entity guaranteed by a U.S. person, which appears at odds with possibly varying policies elsewhere in the Proposed Guidance for entities guaranteed by U.S. persons.[108]

Commenters also expressed concerns about the lack of a minimum U.S.-ownership threshold. For example, Sumitomo Mitsui Trust Bank Ltd. ("Sumitomo") stated that there should be a minimum level of ownership of the entity in question by one or more U.S. persons for this prong to apply, and suggested that the majority ownership threshold used in prong (iv) apply here as well.[109] ISDA emphasized a different point, stating that without clear thresholds, a non-U.S. business would be within the Commission's interpretation of the term "U.S. person" by virtue of even negligible ownership interests by U.S. persons.[110] The Financial Services Roundtable ("FSR") stated that prong (ii) is overbroad because it would cover even minority-U.S. owned institutions based only on a pro-rata (or less) parent liability guarantee.[111]

Capital Markets raised a concern that whether a conclusion that the direct or indirect owners of a U.S. legal entity are "responsible for the liabilities" of such entity requires knowledge of each counterparty's legal and ownership structure.[112] FSR stated that interpretation of prong (ii)(B) would depend on a reevaluation of most, if not all, counterparty relationships in order to determine what type of liability guarantees exist between an entity and its parent.[113] Both Capital Markets and

FSR stated that firms do not currently have any reasonable means to obtain information necessary to assess this element of the interpretation, particularly within the short time frame prior to the registration date.

One commenter supported finalization of the alternative prong (ii)(B) in the Further Proposed Guidance, with minor clarifying changes. The Commercial Energy Working Group ("CEWG") stated that the words "all of" should be added to clarify that this prong would generally apply when U.S. persons that are majority owners bear "unlimited responsibility for all of the obligations and liabilities of the legal entity . . . ."[114] The CEWG also stated that the Guidance should reaffirm that a guarantee of a non-U.S. person by a U.S. person, in and of itself, generally would not invoke U.S. person status.[115] Other commenters that supported the principles of the alternative prong (ii)(B) thought that the interpretation of "U.S. person" in this regard should be restructured. The Investment Company Institute ("ICI") stated that the Commission should clarify that collective investment vehicles would not fall within the alternative prong (ii)(B) because the investors' liabilities are limited to the amount of their investment.[116] Thus, ICI stated that it believes the alternative prong (ii)(B) would be superfluous with respect to collective investment vehicles because the alternative prong (iv) in the Further Proposed Guidance would address these entities if they are majority-owned by U.S. persons.[117] MFA/AIMA, on the other hand, supported the combination of majority ownership and unlimited liability elements in the alternative prong (ii)(B) and recommended that collective investment vehicles be considered under that prong.[118]

Other commenters stated that the Commission should clarify that the language at the end of the proposed alternative prong (ii)(B), which refers to limited liability companies and limited liability partnerships, would generally also apply to other types of entities where owners have limited liability but where the entities have different names

in foreign legal jurisdictions.[119] MFA/AIMA and SIFMA AMG stated that the Commission should clarify how frequently an entity should consider (e.g., annually) whether U.S. persons are its direct or indirect majority owners, and provide for a transition period after an entity falls within this prong of the interpretation for the first time.[120]

Other commenters were critical of the alternative prong (ii)(B). Greenberger/AFR and Better Markets stated that this proposed prong is too narrow, because it appears to require that U.S. persons be both the majority owners of an entity and bear unlimited responsibility for the entity's obligations and liabilities, in order for the entity to be within the Commission's interpretation of the term "U.S. person" based solely on ownership by U.S. persons.[121] Greenberger/AFR pointed out that a U.S. person could be the majority owner of an entity organized outside the United States, and be responsible for 99% of the entity's obligations, yet the entity would not fall within the Commission's interpretation under the proposed prong.[122]

Other commenters suggested that the alternative prong (ii)(B) is too broad, recommending that the ownership element be limited to when a majority of the direct owners of an entity are U.S. persons, because considering the indirect ownership of an entity will be unworkable for many entities.[123] ISDA also stated that the concept of "unlimited responsibility" is too amorphous to be a basis for the Commission's interpretation, because it could turn on fact-sensitive and

---

[107] See ISDA (Aug. 27, 2012) at 9; MFA/AIMA (Aug. 28, 2012) at 6.

[108] See Deutsche Bank (Aug. 27, 2012) at 3. See also Peabody Energy Corporation ("Peabody")(Aug. 28, 2012) at 2–3 ("By contrast, a foreign affiliate or subsidiary of a U.S. person would be considered a non-U.S. person, even where such an affiliate or subsidiary has certain or all of swap-related obligations guaranteed by the U.S. person.") (citing Proposed Guidance, 77 FR at 41218); SIFMA (Aug. 27, 2012) at A2 (stating that the Commission should clarify that prong (ii)(B) of the interpretation is not meant to capture an entity merely because it is guaranteed by a U.S. person).

[109] See Sumitomo (Aug. 24, 2012) at 2.

[110] See ISDA (Aug. 10, 2012) at 8 (recommending that regardless of the nature of the "responsibilities for the liabilities," only direct owners of apparent non-U.S. persons should be considered, and that the Commission should adopt a presumptive control threshold of 25% direct ownership for distinguishing between control persons and owners that need not be considered in assessing the status of an entity as a U.S. person).

[111] See FSR (Aug. 27, 2012) at 3.

[112] See Capital Markets (Aug. 24, 2012) at 5.

[113] See FSR (Aug. 27, 2012) at 3.

[114] See CEWG, submitted by Sutherland Asbill & Brennan LLP (Feb. 25, 2013) at 5.

[115] Id.

[116] See ICI (Feb. 6, 2013) at 3.

[117] See id. at 2. See also IIB (Feb 6, 2013) at 10–11 (collective investment vehicles should be excluded from prong (ii) and addressed only in prong (iv)).

[118] See MFA/AIMA (Feb. 6, 2013) at 7–8. Thus under MFA/AIMA's approach, the status of collective investment vehicles would be determined by reference to only the tests in alternative prong (ii)(B).

[119] Id. at 10–11; Asociación Bancaria y de Entidades Financieras de Colombia ("Colombian Bankers") (Feb. 6, 2013) at 1–2; IIB (Feb. 6, 2013) at 10; ISDA (Feb. 6, 2013) at 5–6.

[120] See MFA/AIMA (Feb. 6, 2013) at 12; SIFMA/AMG (Feb. 14, 2013) at 6. ISDA stated that the Commission should clarify how the prong would apply to an entity where some but not all of the owners have unlimited responsibility. In this case, the Commission should clarify whether the U.S. owners with majority ownership of the entity also each must bear unlimited responsibility for the entity's obligations and liabilities or, rather, whether it suffices that a single U.S. owner has unlimited responsibility once U.S. majority ownership is established. See ISDA (Feb. 6, 2013) at 5–7.

[121] See Greenberger/AFR (Feb. 6, 2013) at 7; Better Markets (Feb. 15, 2013) at 7–8.

[122] See Greenberger/AFR (Feb. 6, 2013) at 7.

[123] See MFA/AIMA (Feb. 6, 2013) at 7; SIFMA, The Clearing House, Association LLC ("The Clearing House"), and FSR ("SIFMA/CH/FSR") (Feb. 6, 2013) at 2, A8–9; ISDA (Feb. 6, 2013) at 5. IIB and SIFMA/AMG made similar comments and questioned whether extending this prong to entities where a majority of indirect owners are U.S. persons would be consistent with the "direct and significant connection" language in CEA section 2(i). See IIB (Feb. 6, 2013) at 10; SIFMA/AMG (Feb. 14, 2013) at 3–4.

uncertain legal judgments under doctrines such as "veil-piercing" or "alter ego" entities.[124] Moreover, ISDA asserted that the Commission has not justified the treatment of unlimited liability entities in the proposed alternative prong (ii)(B) by demonstrating how such entities are more susceptible to being used to evade Dodd-Frank regulations or otherwise raise the concerns addressed by the Commission's regulations.[125]

Commenters were also critical of the element of the alternative prong (ii)(B) that would treat a collective investment vehicle as a U.S. person if its principal place of business is in the United States. They stated that application of this element would be very unclear and difficult on an operational level.[126] Commenters also stated that a collective investment vehicle should be treated as a U.S. person if it is organized in the U.S., not if its manager or operator is in the U.S.[127]

Peabody Energy Corporation ("Peabody") and SIFMA/AMG stated the Commission should adopt the interpretation of U.S. person in the January Order, which does not include all the elements of the proposed alternative prong (ii)(B).[128]

Commenters generally did not comment on prong (iii) of the proposed interpretation of the term "U.S. person."

With respect to prong (iv) relating to majority direct- or indirect-owned commodity pools, pooled accounts, or collective investment vehicles, several commenters stated that this prong was unworkable because the proposed interpretation would require potentially unascertainable information.[129]

According to SIFMA, reliance on representations would be the only practical way to consider the status of counterparties as U.S. persons under this prong since other types of information, such as the direct and indirect ownership of any commodity pool, pooled account or collective investment vehicle with which a market participant transacts, may be unavailable, non-public or otherwise sensitive.[130] Moreover, a fund would be required to monitor its level of U.S. ownership on an on-going basis, and this prong could result in frequent changes in the fund's U.S. person status.[131] The Clearing House argued that the interpretation should not look through direct investors to indirect investors, unless there is evidence of evasion.[132] Other commenters questioned whether the proposed interpretation of "U.S. person" for commodity pools, pooled accounts, and collective investment vehicles meets the "direct and significant" jurisdictional nexus applicable to the Commission's application of Title VII to transactions with such persons.[133]

Cleary urged that the Commission not adopt an interpretation of "U.S. person" based on the composition of fund ownership, at least prior to finalizing the interpretation.[134] As it explained, even if the Commission's interpretation would allow for reasonable reliance on counterparty representations, fund counterparties would not be able to provide any representation except with respect to funds formed after the finalization of the interpretation for which the fund's subscription materials could have been modified to capture the relevant information.[135] If the Commission nevertheless decided to adopt an interpretation based on investor composition, Cleary argued against including a fund in the interpretation on the basis of indirect ownership at any level less than a majority-ownership.[136]

Consideration of majority-ownership is particularly problematic with respect to funds that are publicly traded, according to several commenters.[137] For example, ICI explained that U.S. persons typically purchase shares in non-U.S. funds through intermediaries, and that such shares are registered and held in nominee/street name accounts.[138] In such cases, the fund manager/operator would not have information regarding the underlying investors.[139] SIFMA recommended that publicly offered and listed commodity pools organized in foreign jurisdictions be excluded from the interpretation.[140] Credit Suisse stated that a fund should not be considered a U.S person to the extent that it is organized outside the United States and is subject to foreign regulation that is comparable to U.S. law. To the extent the fund is not so regulated, then the fund would be within the U.S. person interpretation only where it is organized under the laws of the United States or marketed to U.S. residents.[141]

One commenter strongly supported the alternative prong (iv) in the Further Proposed Guidance. Citadel stated that since the Dodd-Frank clearing and reporting requirements will mitigate systemic risk, increase transparency and promote competition, the U.S. person interpretation should encompass offshore collective investment vehicles that have a sufficient U.S. nexus.[142] If it did not, then a core, active portion of the swaps market would fall outside the scope of the transaction level requirements, including clearing, which would undermine central objectives of Dodd-Frank, create opportunities for regulatory arbitrage, and risk fragmenting the swaps markets.[143]

Other commenters argued that the entities that would be covered by the alternative prong (iv) should not be covered by the interpretation of "U.S. person," which should cover only entities that are directly majority-owned by U.S. persons. For example, SIFMA/

---

[124] *See* ISDA (Feb. 6, 2013) at 6. ISDA also stated that the Commission should make clear that the reference to "unlimited responsibility" does not include responsibility arising out of separate contractual arrangements or extraordinary circumstances, such as conduct by owners that results in veil piercing or limited partner participation in management of a partnership. *See id.* ISDA/CH/FSR made similar points and stated that this prong is not necessary because market participants have not used unlimited liability entities to avoid Dodd-Frank regulations. *See* SIFMA/CH/FSR (Feb. 6, 2013) at A12.

[125] *See* ISDA (Feb. 6, 2013) at 6.

[126] *Id.* at 6–7; SIFMA/CH/FSR (Feb. 6, 2013) at A1, A5–6, B5; IIB (Feb. 6, 2013) at 7–8, 10.

[127] *See* MFA/AIMA (Feb. 6, 2013) at 8; SIFMA/AMG (Feb. 6, 2013) at A7–8. The Japanese Bankers Association made similar comments and stated that the Commission should clarify whether the location of the principal place of business of a subsidiary that is controlled by its parent is the location of the subsidiary's headquarters or the parent's headquarters. Japanese Bankers Association (Feb. 6, 2013) at 7.

[128] *See* Peabody (Feb. 5, 2013) at 1–2; SIFMA/AMG (Feb. 6, 2013) at 1–3.

[129] *See, e.g.,* ISDA (Aug. 10, 2012) at 8; SIFMA (Aug. 27, 2012) at A17; Credit Suisse (Aug. 27, 2012) at 3–4; The Clearing House Association LLC

("The Clearing House") (Aug. 27, 2012) at 12–13; Cleary (Aug. 16, 2012) at 7; IIB (Aug. 27, 2012) at 6–7.

[130] *See* SIFMA (Aug. 27, 2012) at A17–18. *See also* IIB (Aug. 27, 2012) at 7 (arguing that since pools cannot ascertain or control the status of their indirect investors, the reference to indirect ownership should be removed).

[131] SIFMA (Aug. 27, 2012) at A17.

[132] *See* The Clearing House (Aug. 13, 2012) at 15 to 20.

[133] *See, e.g.,* SIFMA/AMG (Aug. 27, 2012) at 2–3; MFA/AIMA (Aug. 28, 2012) at 4–5; ICI (Aug. 23, 2012) at 4.

[134] *See* Cleary (Aug. 16, 2012) at 6–7.

[135] *Id.*

[136] *Id.* IIB also noted that fund sponsors/operators verify investor status through subscription materials provided at the time of initial investment. Therefore, they request that any test based on fund

ownership apply only to funds formed after the effective date of the final "U.S. person" interpretation. IIB also agreed that majority ownership is the minimum threshold under which a foreign fund should be included in the interpretation of the term "U.S. person." *See* IIB (Aug. 27, 2012) at 6–7.

[137] *See, e.g.,* SIFMA (Aug. 27, 2012) at A20; ICI (Aug. 23, 2012) at 3–7; MFA/AIMA (Aug. 28, 2012) at 4; Credit Suisse (Aug. 27, 2012) at 3–4.

[138] *See* ICI (Aug. 23, 2012) at 3.

[139] ICI also noted that certain jurisdictions may prohibit disclosure by intermediaries of beneficial owner information. *Id.*

[140] *See* SIFMA (Aug. 27, 2012) at A19–20.

[141] *See* Credit Suisse (Aug. 27, 2012) at 3–4.

[142] *See* Citadel (Feb. 6, 2013) at 1.

[143] *See id.*

CH/FSR stated that consideration of indirect ownership could require ongoing monitoring of ownership, which is burdensome or even impossible, and would not necessarily reflect a sufficient jurisdictional nexus to the United States.[144] SIFMA/CH/FSR also stated that if consideration of majority ownership is included in the interpretation, it should reflect an objective statement of the ownership level that the Commission would consider relevant to U.S.-person status, so as to exclude entities that are owned by U.S. persons only to a de minimis extent and allow an annual consideration of ownership.[145] MFA/AIMA and the Investment Adviser Association ("IAA") also provided reasons that there is not a sufficient jurisdictional nexus with the United States to include in the Commission's interpretation of the term "U.S. person" collective investment vehicles that are indirectly majority-owned by U.S. persons.[146]

Some commenters stated that whether a collective investment vehicle would be included in the interpretation of U.S. person should depend on whether the fund or other collective investment vehicle is being offered to U.S. persons, arguing that the interpretation should cover collective investment vehicles that are targeted to the U.S. market or to U.S. investors by focusing on

activities within the control of the vehicle's manager.[147]

Commenters also stated that regardless of the policy adopted in this regard, in the consideration of whether an entity is a U.S. person, only information that is available to third parties or other parties should be considered relevant, and the Commission's policy should contemplate that market participants would rely on a representation of U.S. person status. Also, the Commission's policy should clarify how it would apply during the transition period immediately after expiration of the January Order.[148]

Addressing prong (v) relating to registered commodity pool operators, many commenters stated that the Commission should not adopt an interpretation that looks to the registration status of a fund's operator, because this interpretation could capture a non-U.S. fund that does not itself trigger registration as a commodity pool operator and has a minimal U.S. nexus.[149] A number of commenters

urged the Commission not to adopt an interpretation that looks to the nationality of the fund's manager/operator since this would place U.S.-based investment managers at a competitive disadvantage, without addressing the Commission's regulatory objectives.[150] IIB generally agreed with these commenters and stated that the commodity pool operator registration prong would be over-inclusive because, under the Commission's current rules, an operator of a foreign pool may be required to register as a commodity pool operator with less than 50 percent U.S. ownership; at the same time, the prong also would be under-inclusive because it would not cover funds whose operators are eligible for relief from commodity pool operator registration.

ICI recommended that the Commission, instead, interpret the term "U.S. person" to include a commodity pool, pooled account, or collective investment vehicle that is "offered publicly, directly or indirectly" by the manager/sponsor to U.S. persons.[151] As ICI explained, this alternative approach would base a fund's U.S. person status on more workable considerations, and not on changes in investor status that are beyond the control of a fund or its manager/operator. In the consideration of whether a fund is making a public offering to U.S. persons, ICI recommended that the Commission look to SEC Regulation S.[152]

IIAC recommended that prong (vi) relating to pension plans be modified so that pension plans designed exclusively for foreign employees of a U.S.-based entity are not within the interpretation of the term "U.S. person." Further, IIAC urged the Commission to clarify that U.S. investment advisers or other fiduciaries not be considered to be within the interpretation of the term "U.S. person" when they are acting on behalf of non-U.S. accounts.[153]

IIB stated that prong (vii) relating to an estate or trust should be replaced, explaining that market participants do not typically identify an estate's or trust's regulatory status on the basis of its tax status. Instead, it recommended that the Commission's interpretation look to the status of the executor, administrator, or trustee. Specifically,

[144] See SIFMA/CH/FSR (Feb. 6, 2013) at A8–9. See also IIB (Feb. 6, 2013) at 11 (systems to track indirect ownership would be difficult and expensive to implement).

[145] See SIFMA/CH/FSR (Feb. 6, 2013) at A8–9. ISDA stated that the lack of an objective policy regarding the interpretation of majority ownership would lead to arbitrary or indeterminate results for many collective investment vehicles due to their varied capital structures (citing, for example, structured finance vehicles, which merit further analysis due not only to their complex capital structures but also to practical difficulties in monitoring ownership of their securities), and the practical consequences of the alternative interpretations can be considered only following a more concrete proposal offered for public comment. See ISDA (Feb. 6, 2013) at 6–7.

[146] MFA/AIMA stated that since interactions between collective investment vehicles and registered swap dealers are expected to be covered by Dodd-Frank requirements or comparable foreign regulations, the inclusion of collective investment vehicles as "U.S. persons" is less important to achieve regulatory coverage. See MFA/AIMA (Feb. 6, 2013) at 7–8. MFA/AIMA also disputed whether the pooling of assets in a collective investment vehicle is a fundamental difference that denotes a greater U.S. nexus than the pooling of assets by corporations or other financial entities, and therefore it is problematic that alternative prong (iv) is more onerous (in MFA/AIMA's view) for non-U.S collective investment vehicles than alternative prong (ii) is for corporate or other financial entities. See id. IAA stated that it is inappropriate to define an entity as a U.S. person based on characteristics of investors in the entity rather than the characteristics of the entity itself. See IAA (Feb. 6, 2013) at 4.

[147] See Invesco Advisers Inc. ("Invesco") (Feb. 6, 2013) at 11 (manager of collective investment vehicle determines whether to make offering in the United States; subsequent purchases by non-U.S. persons who have relocated to the U.S. should not alone constitute offering in the U.S.); IIB (Feb. 6, 2013) at 11. Invesco, ICI and IAA each stated that the language at the end of alternative prong (iv) (if it is adopted) should be interpreted to cover collective investment vehicles that are "publicly-offered" only to non-U.S. persons, even if the vehicles are not publicly-traded. See Invesco (Feb. 6, 2013) at 2; ICI (Feb. 6, 2013) at 3; IAA (Feb. 6, 2013) at 4. See also ICI (Jul. 5, 2013) at 3 n. 9 ("There is an important distinction between publicly-traded funds and publicly-offered funds: publicly-offered funds are those that are broadly available to retail investors; publicly-traded funds are simply a subset of publicly-offered funds that trade on exchanges or other secondary markets. Excluding from the U.S. person definition only publicly-traded funds would capture only a subset of non-U.S. regulated funds. We note that, by contrast, hedge funds are neither publicly offered nor publicly traded and, unlike non-U.S. retail funds, are not subject to substantive government regulation and oversight similar in scope to that provided by the U.S. Investment Company Act.").

ICI and IAA stated that the Commission should interpret whether an offer is made to U.S. persons in accordance with precedents under the SEC's Regulation S. See ICI (Feb. 6, 2013) at 4–5 n. 14; IAA (Feb. 6, 2013) at 4. ISDA stated that the Commission's interpretation should specifically exclude any collective investment vehicle that offers its securities in accordance with local law and customary documentation practices in a local market, as well as offerings conducted in accordance with the Regulation S. See ISDA (Feb. 6, 2013) at 7.

[148] See SIFMA/AMG (Feb. 14, 2013) at 4 n. 8; IIB (Feb. 6, 2013) at 7; ISDA (Feb. 6, 2013) at 7; Japanese Bankers Association (Feb. 6, 2013) at 5.

[149] See, e.g., SIFMA (Aug. 27, 2012) at A21; ICI (Aug. 23, 2012) at 3–7; IIB (Aug. 9, 2012) at 3; MFA/AIMA (Aug. 28, 2012) at 4–5; IIAC (Aug. 27, 2012) at 4, 5. As IIB explained, even a fund that lacks a sufficient U.S. connection can be considered a U.S. person where its commodity pool operator is

required to register. IIB (Aug. 9, 2012) at 3. Under Commission regulation 3.10, the operator of a non-U.S. fund with even one U.S.-based owner is required to register as a commodity pool operator.

[150] See SIFMA (Aug. 27, 2012) at A13; ICI (Aug. 23, 2012) at 4; Cleary (Aug. 16, 2012) at 7; The Clearing House (Aug. 27, 2012) at 13–14.

[151] See ICI (Aug. 23, 2012) at 5–6.

[152] Id. at 6–7. Regulation S is codified at 17 CFR 230.901 through 230.905.

[153] IIAC (Aug. 27, 2012) at 4.

IIB recommended that the Commission's interpretation of the term "U.S. person" include an estate or trust that is organized in the United States "unless (A) an executor, administrator or trustee that is not a U.S. person has sole or shared investment discretion with respect to the assets of the trust or estate, (B) in the case of an estate, the estate is governed by foreign law and (C) in the case of a trust, no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person . . . ." [154]

c. Commenters' Proposed Alternatives

A number of commenters provided substantially different alternative interpretations of the term "U.S. person." [155] Most notably, the commenters' alternatives would not encompass persons by virtue of "indirect" U.S. ownership. For example, SIFMA's proposed "U.S. person" interpretation would include only those commodity pools or collective investment vehicles that are organized or incorporated under U.S. law or are (1) directly majority owned by "U.S. persons" or, in the case of ownership by a pool, a pool that is organized in the United States and (2) not publicly offered. [156] IIB submitted an alternative "U.S. person" interpretation that generally tracked SIFMA's proposed interpretation. [157]

d. Due Diligence

Many commenters stated that the Commission's policy in this regard should contemplate that a firm would reasonably rely on counterparty representations regarding their U.S. person status. [158] For example, SIFMA stated that the Commission's policy should be consistent with a determination by the swap counterparty itself of its U.S.-person status, but in the alternative, SIFMA recommended that the Commission's policy contemplate reasonable reliance on counterparty representations. [159] According to these commenters, counterparty representations are the only practical means of determining counterparty status as firms do not currently collect the information necessary to evaluate counterparty status under the proposed interpretation. The commenters also were concerned that certain prongs of

the proposed interpretation (e.g., "look-through" obligations associated with the "direct and indirect ownership" criterion in prong (iv)) would render it difficult, if not impossible, for market participants to directly consider whether their counterparties would be within the Commission's interpretation of the term "U.S. person." SIFMA and Cleary further pointed out that the Commission has accepted reasonable reliance on counterparty representations in the context of the external business conduct standards. [160]

e. Non-U.S. Person That Is Affiliated, Guaranteed, or Controlled by U.S. Person

Viewed as a whole, the proposed interpretation of the term "U.S. person" would generally not include a non-U.S. affiliate of a U.S. person, even if all of such affiliate's swaps are guaranteed by the U.S. person. [161] The Commission, nevertheless, raised a concern regarding risks associated with a U.S. person providing a guarantee to its non-U.S. affiliates and requested comments on whether the term "U.S. person" should, in fact, be interpreted to generally include a non-U.S. affiliate guaranteed by a U.S. person. [162] In addition, the Commission sought comments on whether the term "U.S. person" also should be interpreted to generally include any non-U.S. persons controlled by or under common control with a U.S. person. [163]

Responding to the Commission's request for comments on this issue, many commenters stated that Title VII requires the Commission to interpret the term "U.S. person" to include foreign affiliates of U.S. persons, and U.S. affiliates of foreign persons, in order to protect U.S. taxpayers from the risks posed by the global swaps market. [164] Senator Levin urged that "[a]t a minimum, it is essential that [the Guidance] . . . include as a U.S. person any foreign affiliate or subsidiary under common control with a U.S. person." [165] He also agreed with statements in the Proposed Guidance that non-U.S. affiliates guaranteed by U.S. persons effectively transfer the risks of their swaps to the U.S. guarantor, and

therefore the guaranteed non-U.S. affiliates should be subject to U.S. safeguards. [166] Public Citizen stated that not interpreting the term "U.S. person" to include a foreign affiliate of a U.S. person "hides the rabbit in the hat" for Title VII purposes. [167] It argued that Congress intended financial entities that are controlled by U.S. financial institutions or that could adversely impact the U.S. economy to be regulated as U.S. persons under Title VII in order to fully protect American taxpayers from the threat of "future financial bailouts."

Greenberger also expressed support for including foreign swap entities controlled by U.S. parents in the interpretation of the term "U.S. person." In his view, the Commission's distinction between guaranteed and non-guaranteed foreign subsidiaries is arbitrary, as the absence of a U.S. guarantee does not insulate the U.S. parent from risk exposure. [168] Other commenters argued that the Commission's interpretation of the term "U.S. person" should include foreign affiliates whose swaps are guaranteed by a U.S. person. [169]

Other commenters objected to including a non-U.S. entity in the interpretation of the term "U.S. person" solely on the basis of affiliation with a U.S. person or having its swaps guaranteed by a U.S. person. Sullivan & Cromwell argued that foreign operations of a U.S.-based bank do not have a "direct and significant connection with activities in, or effect on," U.S. commerce based solely on affiliation with or guarantee by a U.S. parent bank. [170] It stated that overseas operations usually have a non-U.S. orientation (i.e., transactions with non-U.S. counterparties for non-U.S. business purposes), and thus the connection to U.S. commerce is indirect and, further, transactions with non-U.S. counterparties will not have a significant effect on U.S. commerce. Other commenters raised similar concerns about the lack of jurisdictional nexus. For example, The Clearing House stated that the Commission must conclude that the risk to the U.S. entity is "significant" before designating a non-U.S. guaranteed entity a "U.S. person," and further stated that a non-U.S. entity that is subject to local capital

[154] IIB (Aug. 27, 2012) at 14.

[155] See, e.g., SIFMA (Aug. 27, 2012); IIB (Aug. 27, 2012); The Clearing House (Aug. 27, 2012).

[156] See SIFMA (Aug. 27, 2012) at A10–11.

[157] See IIB (Aug. 27, 2012) at 13–14.

[158] See, e.g., SIFMA (Aug. 27, 2012) at A16–17; Deutsche Bank (Aug. 27, 2012) at 4; Capital Markets (Aug. 24, 2012) at 5; SIFMA/AMG (Aug. 27, 2012) at 4–5.

[159] SIFMA (Aug. 27, 2012) at A16–18.

[160] SIFMA/AMG (Aug. 27, 2012) at 4–5; Cleary (Aug. 16, 2012) at 6.

[161] See Proposed Guidance, 77 FR at 41218. For purposes of this Guidance, the Commission generally interprets the term "affiliates" to include an entity's parent entity and subsidiaries, if any, unless stated otherwise.

[162] Id.

[163] Id.

[164] See Public Citizen's Congress Watch ("Public Citizen") (Aug. 14, 2012) at 9–10; IATP (Aug. 27, 2012) at 4; Better Markets (Aug. 27, 2012) at 6.

[165] See Letter from Sen. Levin at 8.

[166] See id. (citing Proposed Guidance, 77 FR at 41218).

[167] Public Citizen (Aug. 14, 2012) at 3.

[168] Greenberger (Aug. 27, 2012) at 6–7.

[169] See Better Markets (Aug. 27, 2012) at 6–7; Public Citizen (Aug. 14, 2012) at 3.

[170] See Sullivan & Cromwell (Aug. 13, 2012) at A2–3. See also Hong Kong Banks (Aug. 27, 2012) at 4.

rules or swap dealer registration should be excluded from the interpretation of "U.S. person."[171] SIFMA, addressing the control issue, objected to including a non-U.S. person that is controlled by, or under common control with, such person in the interpretation of the term "U.S. person" since such control is insufficient to satisfy the jurisdictional nexus required by section 2(i).[172]

Japanese Bankers Association did not agree that these situations effect a risk transfer to the U.S. person, arguing that the risk would ultimately be incurred by the non-U.S. person and not by the U.S. guarantor; thus, it believed that the term "U.S. person" should not be interpreted to include a non-U.S. person guaranteed by a U.S. person.[173] The Coalition for Derivatives End-Users ("End-Users Coalition") expressed concerns about competitive implications, stating that imputing U.S. status to a non-U.S. person guaranteed by a U.S. person may disadvantage the non-U.S. affiliates of U.S. end-users, since those non-U.S. affiliates may need to be guaranteed to enter into swaps with non-U.S. counterparties.[174]

### f. Foreign Branch of U.S. Person

In the Proposed Guidance, the Commission stated that a foreign branch of a U.S. swap dealer should be included in the Commission's interpretation of the term "U.S. person" because it is a part of, or an extension, of a U.S. person.[175] Several commenters agreed with the Commission's interpretation.[176] Senator Levin asserted that the "JP Morgan whale trades provide strong factual support for an inclusive definition of U.S. person, in particular when it comes to the foreign branch or agency of a U.S. corporation."[177] Other commenters recommended that a foreign branch of a U.S. swap dealer be excluded from the interpretation. Sullivan & Cromwell argued that a foreign branch should not be included in the interpretation solely

on the basis that it is a part of a U.S. bank.[178] Citi recommended that the Commission's policy should be that a foreign branch of a U.S. swap dealer is generally considered a non-U.S. person, so long as the branch remains subject to Entity-Level Requirements and obtains substituted compliance for Transaction-Level Requirements for transactions with non-U.S. persons.[179] In Citi's view, this would address comments by the foreign branch's non-U.S. clients that they would have to register as swap dealers or MSPs, while assuring that such non-U.S. clients' swaps with the foreign branch would generally be covered by the Transaction-Level Requirements or substituted compliance.

### g. Regulation S

Some commenters believed that the Commission's policy should explicitly adopt the SEC's Regulation S definition of a "U.S. person." MFA/AIMA stated that Regulation S eliminates problems and inconsistencies in the Commission's proposed interpretation.[180] J.P. Morgan stated that Regulation S would facilitate compliance by non-U.S. market participants since they are familiar with the SEC's approach.[181] On the other hand, the Institute for Agriculture and Trade Policy ("IATP") argued against incorporating the Regulation S definition, stating that it predates the prominence of the swaps market.[182]

### h. Other Clarifications

A number of commenters voiced concerns regarding potential expansion of the Commission's interpretation of the term "U.S. person," which they thought could result from the prefatory phrase "includes, but is not limited to," and requested that the Commission affirmatively state that non-U.S. persons are any persons that would not be covered by the interpretation of the term "U.S. person."[183] A non-exhaustive "U.S. person" interpretation, they contended, would create unnecessary uncertainty.

A number of commenters further stated that the interpretation of the term "U.S. person" should be applied only for purposes of the registration and regulation of swap dealers and MSPs.[184] The Futures Industry Association ("FIA") argued that the interpretation of the term "U.S. person" should not extend to those provisions of the CEA governing the activities of futures commission merchants ("FCMs") with respect to either exchange-traded futures (whether executed on a designated contract market or a foreign board of trade) or cleared swaps.[185] SIFMA similarly requested that the Commission clarify that the final interpretation of the term "U.S. person" does not override existing market practice as it relates to futures or FCMs, including with respect to clearing.[186] SIFMA also requested that the Commission clarify that the final interpretation of the term "U.S. person" for cross-border swaps regulation is the single interpretation for all Dodd-Frank swaps regulation purposes.[187] Finally, SIFMA requested that supranational organizations, such as the World Bank and International Monetary Fund (and their affiliates) be excluded from the interpretation.[188]

### 3. Commission Guidance

The Commission has carefully reviewed and considered the comments received and is finalizing a policy that will generally set forth an interpretation of the term "U.S. person," as used in this Guidance, with certain modifications to the proposed definition as described below. As explained in the Proposed Guidance, the term "U.S. person," as used in the context of CEA section 2(i), generally encompasses those persons whose activities—either individually or in the aggregate—have the requisite "direct and significant" connection with activities in, or effect on, U.S. commerce within the meaning of section 2(i).[189] The various prongs of

---

[171] See The Clearing House (Aug. 27, 2012) at 17.

[172] See SIFMA (Aug. 27. 2012) at A20. See also Australian Bankers (Aug. 27. 2012) at 4 (stating that the control concept should not be relevant in the definition of "U.S. person," and while common control may potentially indicate common risk, the Commission's focus on the ultimate location of the risk is a more relevant to the interpretation of the term "U.S. person.").

[173] See Japanese Bankers Association (Aug. 27. 2012) at 8.

[174] See End-Users Coalition (Aug. 27, 2012) at 3 (urging the Commission to exclude a foreign affiliate of a U.S. end-user, guaranteed by that end-user, from its interpretation).

[175] See Proposed Guidance, 77 FR at 41218.

[176] See, e.g., Public Citizen (Aug. 27, 2012) at 5; Greenberger (Aug. 27, 2012) at 3; Better Markets (Aug. 27, 2012) at 2, 6–7.

[177] See Letter from Sen. Levin at 7.

[178] See Sullivan & Cromwell (Aug. 13, 2012) at A6–7.

[179] See Citi (Aug. 27, 2012) at 2–4 (stating that foreign branches of U.S.-based swap dealers should not be considered "U.S. persons," but should still be subject to the Commission's Entity-Level and Transactional-Level Requirements). See also State Street (Aug. 27, 2012) at 3; IIB (Aug. 27, 2012) at 8.

[180] See MFA/AIMA (Aug. 28, 2012) at 8–9.

[181] See J.P. Morgan (Aug. 13, 2012) at 9.

[182] See IATP (Aug. 27, 2012) at 4.

[183] See SIFMA (Aug. 27, 2012) at A15; IIB (Aug. 27, 2012) at 11–12; EC (Aug. 24, 2012) at 1–2; Australian Bankers (Aug. 27, 2012) at 4.

[184] See, e.g., The Futures and Options Association Ltd. ("FOA") (Aug. 13, 2012) at 10–11; SIFMA (Aug. 27, 2012); IIB (Aug. 27, 2012); EC (Aug. 24, 2012).

[185] See FIA (Aug. 27, 2012) at 2–3.

[186] See SIFMA (Aug. 27, 2012) at A14–15.

[187] Id.

[188] Id. at A21.

[189] For purposes of this Guidance, the Commission interprets the term "U.S. person" by reference to the extent to which swap activities or transactions involving one or more such persons have the relevant jurisdictional nexus. For example, this interpretation would help determine whether non-U.S. persons engaging in swap dealing transactions with "U.S. persons" in excess of the de minimis level would be required to register and be regulated as a swap dealer. In addition, for the same reasons, the term "U.S. person" can be helpful in determining the level of U.S. interest for purposes of

the Commission's interpretation are intended to identify persons for which, in practice, the connection or effects required by section 2(i) are likely to exist and thereby inform the public of circumstances in which the Commission expects that the swaps provisions of the CEA and the Commission's regulations would apply pursuant to the statute. In this respect, the Commission will consider not only a person's legal form and its domicile (or location of operation), but also the economic reality of a particular structure or arrangement, along with all other relevant facts and circumstances, in order to identify those persons whose activities meet the "direct and significant" jurisdictional nexus. Below, the Commission discusses each prong of its proposed interpretation of the term "U.S. person."

First, the Commission will include in its consideration the elements in prongs (i) and (ii)(A), as proposed, renumbered as prongs (i) and (iii).[190] These prongs of the "U.S. person" interpretation generally incorporate a "territorial" concept of a U.S. person.[191] That is, these are natural persons and legal entities that are physically located or incorporated within U.S. territory and, consequently, the Commission would generally consider swap activities involving such persons to satisfy the "direct and significant" test under section 2(i).[192] The Commission clarifies that it expects that prong (iii) would encompass legal entities that engage in non-profit activities, as well as U.S. state, county and local governments and their agencies and instrumentalities. Under prong (iii), the Commission would generally interpret the term "U.S. person" to include also a legal entity that is not incorporated in the United States if it has its "principal place of

business" in the United States. The Commission intends that this interpretation would generally include those entities that are organized outside the United States but have the center of direction, control, and coordination of their business activities in the United States.

The concept of an operating company having a principal place of business has been addressed by the Supreme Court. In a recent case, the Supreme Court described a corporation's principal place of business as the "place where the corporation's high level officers direct, control, and coordinate the corporation's activities."[193] The Supreme Court explained that "'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's 'nerve center.' And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control and coordination, *i.e.,* the 'nerve center,' and not simply an office where the corporation holds its board meetings."[194] The Commission notes that commenters on the Proposed Guidance and Further Proposed Guidance generally did not object to the inclusion in the interpretation of the term "U.S. person" of an entity that has its principal place of business in the United States.

The Commission is of the view that the application of the principal place of business concept to a collective investment vehicle may require consideration of additional factors beyond those applicable to operating companies. A collective investment vehicle is an entity or group of related entities created for the purpose of pooling assets of one or more investors and channeling these assets to trade or invest to achieve the investment objectives of the investor(s), rather than being a separate, active operating business.[195] In this context, the determination of where the collective investment vehicle's "high level officers direct, control, and coordinate the [vehicle's] activities"—to apply the *Hertz* decision noted above—can involve several different factors.[196]

The Commission is aware that the formation and structure of collective investment vehicles involve a great deal of variability, including with regard to the formation of the legal entities that will hold the relevant assets and enter into transactions (including swaps) in order to achieve the investors' objectives. Legal, regulatory, tax and accounting considerations may all play a role in determining how the collective investment vehicle is structured and the jurisdictions in which the legal entities will be incorporated.[197] Many legal jurisdictions around the world have promulgated specialized regimes for the formation of collective investment vehicles, which offer various legal, regulatory, tax and accounting efficiencies.[198]

In view of these circumstances, the Commission believes that for a collective investment vehicle, the locations where the relevant legal entities have registered offices, hold board meetings or maintain books and records are generally not relevant in determining the principal place of business of the collective investment vehicle. Instead, as stated in the *Hertz* case cited above, the determination should generally depend on the location of the "actual center of direction, control and coordination," *i.e.,* the "nerve center," of the collective investment vehicle.

*Hertz* focuses on the place where the "high level officers direct, control, and coordinate" the entity's activities.[199] In this regard, the Commission believes that the focus should not necessarily be

---

[190] For clarity, the Commission has reordered the prongs of its interpretation of the term "U.S. person."

[191] For purposes of this Guidance, the Commission would interpret the term "United States" to include the United States, its states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and any other territories or possessions of the United States government, or enclave of the United States government, its agencies or instrumentalities.

[192] In this respect, the Commission declines to adopt a commenter's recommendation that IRS regulations should be relevant in considering whether a person is included in the interpretation of the term "U.S. person." The Commission believes that adopting the IRS's approach in the Commission's policy would be inappropriate; rather, consistent with CEA section 2(i), the Commission's interpretation of the term "U.S. person" focuses on persons whose swap activities meet the "direct and significant" nexus.

[193] *See Hertz Corp.* v. *Friend,* 559 U.S. 77, 80 (2010) (determining a corporation's principal place of business for purposes of diversity jurisdiction).

[194] *Id.* at 92–93.

[195] *See* Further Proposed Guidance, 78 FR at 913.

[196] As mentioned in the Introduction, Long-Term Capital Portfolio LP, a Cayman Islands hedge fund advised by LTCM, collapsed in 1998, leading a

number of creditors to provide LTCM substantial financial assistance under the supervision of the Federal Reserve Bank of New York. High level officers at LTCM's offices in Greenwich, Connecticut, directed, controlled and coordinated the activities of Long-Term Capital Portfolio LP. This hedge fund, with approximately $4 billion in capital and a balance sheet of just over $100 billion had a swap book in excess of $1 trillion notional. Federal Reserve Chairman Alan Greenspan testified that "[h]ad the failure of LTCM triggered the seizing up of markets, substantial damage could have been inflicted on many market participants, including some not directly involved with the firm, and could have potentially impaired the economies of many nations, including our own." Systemic Risks to the Global Economy and Banking System from Hedge Fund Operations: Hearing Before the House Banking and Fin. Services Comm., 105th Cong., 2nd sess. (Oct. 1, 1998) (statement of Alan Greenspan, Chairman, Federal Reserve), available at 1998 WL 694498.

[197] This discussion regarding the location of a collective investment vehicle's principal place of business is solely for purposes of applying Commission swaps regulations promulgated under Title VII. The Commission does not intend to address here the interpretation of "principal place of business" for any other purpose.

[198] *See* Gerald T. Lins, et al., Hedge Funds and Other Private Funds: Regulation and Compliance § 9:1 (Thomson Reuters 2012–2013 ed. 2012).

[199] *See* note 193 and accompanying text, *supra.*

on the persons who are named as directors or officers of the legal entities that comprise the collective investment vehicle.[200] As noted above, these legal entities are merely the legal structure through which the investment objectives of the collective investment vehicle are implemented. Rather, the analysis should focus on the persons who are the equivalent for the collective investment vehicle to the "high level officers" of an operating company because they direct, control and coordinate key functions of the vehicle, such as formation of the vehicle or its trading and investment.

The "high level officers [who] direct, control and coordinate" the collective investment vehicle may be those senior personnel who implement the investment and trading strategy of the collective investment vehicle and manage its risks, and the location where they conduct the activities necessary to implement the investment strategies of the vehicle may be its center of direction, control and coordination. In this regard, the Commission notes that the achievement of the investment objectives of a collective investment vehicle typically depends upon investment performance and risk management. Investors in a collective investment vehicle seek to maximize the return on their investment while remaining within their particular tolerance for risk. Thus, the key personnel relevant to this aspect of the analysis are those senior personnel responsible for implementing the vehicle's investment strategy and its risk management. Depending on the vehicle's investment strategy, these senior personnel could be those responsible for investment selections, risk management decisions, portfolio management, or trade execution.[201]

The achievement of a collective investment vehicle's investment objectives may be closely linked to its formation. Decisions made in the structuring and formation of the collective investment vehicle may have a significant effect on the performance of the vehicle. Thus, for purposes of identifying the vehicle's principal place of business, the Commission may also consider the location of the senior personnel who direct, control and coordinate the formation of the vehicle (*i.e.*, the promoters).[202] The location of the promoters of the collective investment vehicle is relevant, particularly where the vehicle has a specialized structure or where the promoters of the vehicle continue to be integral to the ongoing success of the fund, including by retaining overall control of the vehicle. The location where the promoters of the collective investment vehicle act to form the vehicle and bring it to commercial life is relevant in determining the center of direction, control and coordination of the vehicle, and those promoters may be the "high level officers" of the vehicle referred to in *Hertz*.[203]

[200] In many cases, the entities that comprise the collective investment vehicle may not have "high level officers" as contemplated by *Hertz*, and the directors of the entities may be individuals who are affiliated with a firm that is the legal counsel or administrator of the collective investment vehicle and who may serve as directors for many different vehicles. *See* Lins, *supra* note 198, at § 9:4.

[201] The Commission understands that the collective investment vehicle may obtain the services of the relevant personnel through a variety of arrangements, including contracting with an asset manager that employs the personnel, contracting with other employers, or retaining the personnel as independent contractors. Thus, in this analysis, the Commission would generally expect to consider the location of the personnel who undertake the relevant activities, regardless of their particular employment arrangements.

[202] The promoters who form a collective investment vehicle may be integral to the ongoing success of the collective investment vehicle. In fact, the importance of the role played by the promoters of a legal entity has long been recognized. *See generally* 1A Fletcher Cyc. Corp. § 189. For example, in *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, the court drew upon English law in describing the promoters as follows:

In a comprehensive sense promoter includes those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business. Their work may begin long before the organization of the corporation, in seeking the opening for a venture and projecting a plan for its development, and it may continue after the incorporation by attracting the investment of capital in its securities and providing it with the commercial breath of life.

203 Mass. 159, 177 (1909), *aff'd*, 225 U.S. 111 (1912).

Modern law continues to refer to the responsibility of promoters of legal entities. *See, e.g.*, SEC Form D, instructions to Item 3 (requiring information regarding the "promoters" of a securities issuer). *See also In Re Charles Schwab Corp. Sec. Litig.*, 2010 WL 1261705 (N.D. Cal. Mar. 30, 2010) (discussing responsibility of "fund managers and promoters" to operate a collective investment vehicle in accordance with its formation documents).

The Commission generally does not intend that when the promoters of a collective investment vehicle serve an administrative, purely ministerial function of handling the flow of funds from investors into the vehicle, the location of these personnel would be relevant in this context.

[203] The Commission is aware that the boards of directors (or equivalent corporate bodies) of the legal entities that comprise a collective investment vehicle typically have the authority to appoint or remove the legal entity's investment manager, administrator, and auditor, and to approve major transactions involving the legal entity and the legal entity's audited financial statements. But since these functions are not key to the actual implementation of the investment objectives of the collective investment vehicle, and noting that *Hertz* focuses on the "high level officers" of the entity rather than its directors, the Commission would

Accordingly, the Commission will generally consider the principal place of business of a collective investment vehicle to be in the United States if the senior personnel responsible for either (1) the formation and promotion of the collective investment vehicle or (2) the implementation of the vehicle's investment strategy are located in the United States, depending on the facts and circumstances that are relevant to determining the center of direction, control and coordination of the vehicle.

Since the Commission recognizes that the structures of collective investment vehicles vary greatly, the Commission believes it is useful to provide examples to illustrate how the Commission's approach could apply to a consideration of whether the "principal place of business" of a collective investment vehicle is in the United States in particular hypothetical situations. However, because of variations in the structure of collective investment vehicles as well as the factors that are relevant to the consideration of whether a collective investment vehicle has its principal place of business in the United States under this Guidance, these examples are for illustrative purposes only. In addition, these examples are not intended to be exclusive or to preclude a determination that any particular collective investment vehicle has its principal place of business in the United States.

*Example 1.* An asset management firm located in the United States establishes a collective investment vehicle outside the United States ("Fund A").[204] Typically, the formation of the collective investment vehicle by the personnel of the asset management firm involves the selection of firms to be the administrator, prime broker, custodian and placement agent for the

generally not view the boards of directors of the legal entities to be key personnel for the collective investment vehicle.

[204] The collective investment vehicle could be a hedge fund, a private equity fund, or other type of investment fund. The Commission is aware that the asset management firm may use any of a variety of structures to form the collective investment vehicle, which may involve one or more legal entities. In a common hedge fund structure, the asset management firm forms a legal entity outside the United States which holds the collective investment vehicle's assets and is the legal counterparty in its investment transactions, including swaps (a "master fund"). If this structure is used, then typically the equity of the master fund is held by several "feeder funds," each of which is a separate legal entity formed by the asset management firm with characteristics that are important to a different type of investor. Each investor in the collective investment vehicle obtains an equity interest in one of the feeder funds and thereby holds an indirect interest in the master fund. The Commission intends that this Example 1 would encompass, but not be limited to, a collective investment vehicle using a master/feeder structure such as this.

collective investment vehicle.[205] The legal entities comprising the collective investment vehicle enter into agreements retaining the asset management firm as investment manager. Personnel of the asset management firm who are located in the United States will be responsible for implementing Fund A's investment and trading strategy and its risk management. Based on the above facts, the Commission would be inclined to view the principal place of business of Fund A as being in the United States,[206] and therefore

[205] The collective investment vehicle's administrator generally handles day-to-day administrative activities, such as operating the vehicle's bank account, issuing payment instructions, providing net asset calculations, calculating fees, receiving and processing subscriptions, preparing accounts, maintaining the shareholder register, arranging payments of redemption proceeds, coordinating communications with shareholders, and overseeing anti-money laundering compliance. *See id.* at § 9:6. The prime broker facilitates the execution of the vehicle's investment transactions, including swaps. The custodian is responsible for holding the vehicle's assets. The placement agent markets and sells shares to investors.

The Commission generally considers all of these functions, although important to the collective investment vehicle, to be ministerial functions that are generally not relevant to the determination of the location of a collective investment vehicle's principal place of business. Thus, even if all of these firms and all the personnel performing these functions were outside the United States, the Commission would nonetheless be inclined to view the principal place of business of Fund A as within the United States.

Additional elements that could be relevant to the determination include the location of the collective investment vehicle's primary assets, and the location of the collective investment vehicle's counterparties. However, the Commission believes that the location of these additional elements outside the United States should generally not preclude an interpretation that the collective investment vehicle's principal place of business is in the United States.

[206] The Commission notes that elements of Example 1 are similar to the facts of a recent court case involving a similar issue—the location of a collective investment vehicle's "center of main interest" for purposes of bankruptcy law. *See Bear Stearns*, note 7 and accompanying text, *supra.* In *Bear Stearns*, the collective investment vehicle's "center of main interest" was found to be in the United States even though its registered office was in the Cayman Islands, because it had no employees or managers in the Cayman Islands, and its investment manager was located in New York. *Id.,* 374 B.R. at 129–30. The court further observed that the administrator that ran the back-office operations was in the United States, the collective investment vehicle's books and records were in the United States before the foreign proceedings began, and all of its liquid assets were located in the United States. *Id.* at 130. In addition, investor registries were maintained in Ireland; accounts receivables were located throughout Europe and the United States; and counterparties to master repurchase and swap agreements were based both inside and outside the Cayman Islands—but none were claimed to be in the Cayman Islands. *Id.*

The Commission believes that *Bear Stearns* aligns with its view that the principal place of business of a collective investment vehicle should not be determined based on where it is organized or has its registered office, but rather should be based on an analysis of the relevant facts and circumstances. However, the Commission notes that under bankruptcy law various factors, particularly factors

each of the legal entities that comprise Fund A would be within the interpretation of the term "U.S. person."

*Example 2.* An asset management firm located outside the United States establishes a collective investment vehicle located outside the United States ("Fund B"). Personnel of the asset management firm who are located outside the United States will be responsible for implementing Fund B's investment and trading strategy and its risk management. However, personnel in two offices of the asset management firm—one of which is located outside the United States and the other of which is located in the United States—will be involved in managing Fund B's investment portfolio. Although the personnel in the U.S. office may act autonomously on a day-to-day basis, they will be under the direction of senior personnel in the non-U.S. office regarding how they are implementing the investment objectives of Fund B. In terms of the asset management firm's internal organization, the personnel in the U.S. office report to the personnel in the non-U.S. office, who also generally hold higher positions within the firm. Because the personnel located inside the United States merely facilitate the implementation of the investment objectives of Fund B, for which senior personnel outside the United States are responsible, the Commission would be inclined to view the principal place of business of Fund B as not being in the United States.[207] As a result, assuming that Fund B is not majority-owned by U.S. persons (as discussed further below), Fund B would not be within the interpretation of the term "U.S. person," and none of the legal entities that comprise Fund B would be U.S. persons (unless the legal entity was actually incorporated or organized in the United States).

*Example 3.* A financial firm located in the United States establishes a collective investment vehicle outside the United States ("Fund C"). The collective investment vehicle includes a single legal entity organized outside the United States, the assets of which are segregated into several

relating to the debtor's assets and creditors, may be relevant to the determination of where a debtor has its "center of main interest" for purposes of determining whether a U.S. bankruptcy court has jurisdiction over the matter. *See, e.g., In re SPhinX, Ltd.,* 351 B.R. 103 (Bankr. S.D.N.Y. 2006) (including various factors in the determination of center of main interest, including the location of the debtor's primary assets and the location of the majority of the debtor's creditors). The Commission believes that the factors that are relevant in such bankruptcy jurisdictional cases differ from those that are relevant to the consideration of whether a collective investment vehicle has its principal place of business in the United States for purposes of this Guidance.

[207] The Commission expects that in this example, this result would be the same if the asset management firm entered into a subadvisory agreement with an independent firm that employed the personnel in the U.S. office described in this example. That is, regardless of whether the U.S. personnel are employed by the asset management firm or a third party employer, the relevant issue is whether the personnel who fulfill the key functions relating to its formation or the achievement of its investment objectives are located in, or outside of, the United States.

separate classes.[208] The U.S. financial firm arranges with several unaffiliated investment management firms to manage the assets in the various classes; an investment management firm affiliated with the U.S. financial firm may also manage the assets in one or more of the classes. Some of these investment management firms are located in, and others outside, the United States. Under the terms of the contracts between Fund C, the U.S. financial firm and these investment management firms, Fund C has delegated responsibility for the overall control of its investment strategies to the U.S. financial firm that established Fund C, and the U.S. financial firm will have rights to reallocate Fund C's assets among the investment management firms for various reasons, including the U.S. financial firm's discretion regarding Fund C's investment strategies. Based on the above facts, the Commission would be inclined to view the principal place of business of Fund C as being in the United States, even though some of the investment managers involved in implementing Fund C's investment and trading strategy are located outside the United States. Therefore, Fund C (including each of the legal entities that comprise Fund C) would be within the interpretation of the term "U.S. person."[209]

The Commission recognizes that the structures of collective investment vehicles are complex and varied, and it does not intend to establish bright line tests for when the principal place of business of a collective investment vehicle would or would not be within the United States. Rather, the Commission's examples above are intended to illustrate the considerations that would be relevant to whether a collective investment vehicle's principal place of business is in the United States, within the framework of reviewing all the relevant facts and circumstances.[210]

The Commission also understands that non-U.S. individuals, institutions, pension plans or operating companies may retain asset management firms in the United States to provide a range of asset management and other investment-related services. Where the individual, institution, pension plan or operating company is not within any

[208] Legal entities that may be formed with separate classes are known in various jurisdictions as segregated portfolio companies, protected cell companies or segregated accounts companies. A collective investment vehicle with a structure such as this is typically referred to as a "hedge fund platform" or an "umbrella" or "multi-series" hedge fund.

[209] The Commission expects that the result would generally be the same where the assets of Fund C are not segregated into separate classes.

[210] The Commission believes that Commission regulation 140.99, which provides for persons to request that the staff of the Commission provide written advice or guidance, would be an appropriate mechanism for a collective investment vehicle to seek guidance as to whether the principal place of business of the vehicle is in the United States for purposes of applying the Commission swaps regulations promulgated under Title VII.

prong of the interpretation of the term "U.S. person" described in this Guidance (including prongs (iii) and (vi) which relate to collective investment vehicles), then the Commission generally believes that the person would not come within the "U.S. person" interpretation solely because it retains an asset management firm located in the United States to manage its assets or provide other financial services.[211]

Second, the Commission will include in its consideration the elements in the alternative version of prong (ii)(B) that was described in the Further Proposed Guidance (and renumbered in the Guidance as prong (vii)). The relevant elements in the alternative version are whether a legal entity is directly or indirectly majority-owned by one or more U.S. persons,[212] in which one or more of these U.S. person(s) bears unlimited responsibility for the obligations and liabilities of such legal entity, and the entity is not a corporation, limited liability company, limited liability partnership or similar entity where shareholders, members or partners have limited liability.

In response to comments on the Proposed Guidance, the Commission intends that this prong would cover entities that are directly or indirectly majority-owned by U.S. person(s), but not those legal entities that have negligible U.S. ownership interests. In the Commission's view, where the structure of an entity is such that the U.S. owners are ultimately liable for the entity's obligations and liabilities, the connection to activities in, or effect on, U.S. commerce would generally satisfy section 2(i), irrespective of the fact that the ownership is indirect. The Commission expects that this "look-through" aspect of the interpretation also would serve to discourage persons from engaging in activities outside of the Dodd-Frank regulatory regime by creating such indirect ownership structures.

In the Commission's view, where one or more U.S. owners has unlimited responsibility for losses or nonperformance by its majority-owned

affiliate, there is generally a direct and significant connection with activities in, or effect on, commerce of the United States within the meaning of section 2(i). Therefore, for purposes of section 2(i), the majority-owned entity would appropriately be considered a "U.S. person." [213] Unlimited liability corporations where U.S. persons have direct or indirect majority ownership and any such U.S. persons have unlimited liability for the obligations and liabilities of the entity would generally be covered under this prong.[214] By contrast, a limited liability corporation or limited liability partnership would generally not be covered under this prong; the Commission also clarifies, in response to comments on the Further Proposed Guidance, that it intends that entities in other jurisdictions that are similar to limited liability corporations or limited liability partnerships in that none of the owners of such entities bear unlimited liability for the entity's obligations and liabilities would generally be excluded from this prong.

The Commission has considered the comments requesting that the interpretation include consideration of whether the U.S. person majority owners have unlimited responsibility for "all of" the obligations and liabilities of the entity in connection with this prong of the interpretation. The Commission believes that even if there are some potential obligations and liabilities of the entity that may not flow to the U.S. persons, the risk of unlimited responsibility for other obligations and liabilities would generally be a sufficient nexus to the United States for purposes of section 2(i). Similarly, it would generally not be necessary for all

the U.S. persons who are majority owners to bear unlimited responsibility (as some commenters suggested). Rather, if any of the U.S. persons who are direct or indirect majority owners bears unlimited responsibility for the obligations and liabilities of the entity, it would generally be covered by this prong of the interpretation.

In response to requests from commenters on the Proposed Guidance, the Commission clarifies that it does not intend that prong (vii) would cover legal entities organized or domiciled in a foreign jurisdiction but whose swaps obligations are guaranteed by a U.S. person.[215] To be clear, the Commission remains concerned, as explained in the Proposed Guidance, about the risks to a U.S. guarantor that flow from its guarantee of the swaps obligations of an entity that is organized or domiciled abroad.[216] Yet, a guarantee does not necessarily provide for "unlimited responsibility for the obligations and liabilities of the guaranteed entity" in the same sense that the owner of an unlimited liability corporation bears such unlimited liability.[217] The Commission believes, therefore, that its concern regarding the risks associated with guarantee arrangements can, consistent with CEA section 2(i) and in the interests of international comity, appropriately be addressed in a more targeted fashion without broadly treating such guaranteed entities as U.S. persons at this time.

Thus, for example, as set forth below, where a non-U.S. affiliate of a U.S. person has its swap dealing obligations with non-U.S. counterparties guaranteed by a U.S. person,[218] the guaranteed affiliate generally would be required to count those swap dealing transactions with non-U.S. counterparties (in addition to its swap dealing transactions with U.S. persons) for purposes of

---

[211] However, this policy (that non-U.S. persons generally do not become U.S. persons solely by retaining U.S. asset management firms) would not apply to the legal entities comprising a collective investment vehicle that is within the interpretation of the term "U.S. person." Rather, those legal entities would be within the interpretation of the term "U.S. person" for other reasons (*e.g.*, because the vehicle has its principal place of business in the United States or a majority of its direct or indirect owners are U.S. persons)—not solely because they had retained a U.S. asset management firm.

[212] In this context, the term "U.S. person" refers to those natural persons or legal entities that meet prong (i), (ii), (iii), (iv), or (v) of the interpretation of "U.S. person."

[213] When Lehman Brothers collapsed in 2008, it had a complex web of affiliates. This included LBIE, an unlimited liability company in London. At that time, it had more than 300 outstanding creditor and debtor balances with its affiliates amounting to more than $21 billion in total. What happened to LBIE is directly relevant to the current discussions about cross-border application of swaps reforms, as LBIE had more than 130,000 swaps contracts outstanding when it failed. Many of the Lehman Brothers entities were guaranteed by the parent, Lehman Brothers Holdings, in the United States. More than $28 billion in client assets and money were caught up in the bankruptcy of the UK entity. This uncertainty led, further, to a run on many other financial institutions when customers feared for their positions and collateral housed in overseas affiliates of other U.S. financial institutions. *See* Lehman Brothers Progress Report, note 6 and accompanying text, *supra*.

[214] Unlimited liability corporations include, solely by way of example, entities such as an unlimited company formed in the U.K., *see* Brian Stewart, Doing Business in the United Kingdom § 18.02[2][c], or an unlimited liability company formed under the law of Alberta, British Columbia, or Nova Scotia, *see* Richard E. Johnston, Doing Business in Canada § 15.04[5].

[215] Also, the Commission does not interpret section 2(i) to require that it treat as non-U.S. person as a "U.S. person" solely because it is controlled by or under common control with a U.S. person.

[216] *See, e.g.*, Letter from Sen. Levin at 10 ("If a U.S.-based parent company provides an implicit or explicit guarantee, regardless of the form of the guarantee, to a non-U.S. subsidiary or affiliate, the risk is effectively transferred to the U.S. person. In such circumstances, the exact form of the guarantee should not prevent the CFTC from demanding compliance with the CFTC's derivatives safeguards.").

[217] Since a guarantee is treated in law as a contract, a guarantor may be protected by legal defenses to the enforcement of the contract. Also, in some circumstances, a guarantee may not be enforceable with respect to underlying obligations that are materially altered without the guarantor's consent. *See, e.g.*, Debtor-Creditor Law § 44.04 (Theodore Eisenberg ed., Matthew Bender 2005).

[218] *See* note 267 and accompanying text, *supra*, for guidance regarding the Commission's interpretation of the term "guarantee."

determining whether the affiliate exceeds a de minimis amount of swap dealing activity and must register as a swap dealer. The Commission notes that where a non-U.S. affiliate of a U.S. person has its swap dealing obligations with non-U.S. counterparties guaranteed by a U.S. person, the guarantee creates a significant risk transfer into the United States. In the absence of such guarantees, non-U.S. counterparties may be unwilling to enter into swaps with such non-U.S. affiliates. As for the substantive swaps requirements, as discussed below, Transaction-Level Requirements generally would apply to swaps between a non-U.S. swap dealer or non-U.S. MSP on the one hand, and a U.S.-guaranteed affiliate on the other hand, though such swaps may be subject to substituted compliance, as appropriate. The Commission generally expects that, in considering international comity and the factors set forth in the Restatement (*e.g.,* the character of the activity to be regulated, the existence of justified expectations, the likelihood of conflicts with regulation by foreign jurisdictions), this approach would strike a reasonable balance in assuring that the swaps market is brought under the new regulatory regime as directed by Congress, consistent with section 2(i) of the CEA.

Third, the Commission will include in its interpretation of the term "U.S. person" the elements in prong (iii), (renumbered as prong (viii)), substantially as proposed. Commenters did not comment on, nor object to, this prong. The Commission clarifies that it expects that this prong would encompass a joint account where any one of the beneficial owners is a U.S. person.

Fourth, the Commission will include in its interpretation of the term "U.S. person" the elements in the alternative prong (iv) that was described in the Further Proposed Guidance (renumbered in the Guidance as prong (vi)), with some modifications. The Commission understands from commenters that the determination by some collective investment vehicles of whether they are majority-owned by U.S. persons may pose practical difficulties. In response to these practical difficulties, the Commission has eliminated the reference to "indirect" majority ownership in this prong. As revised, this prong no longer refers to "direct or indirect" majority ownership by U.S. persons.

Under alternative prong (vi), any commodity pool, pooled account, investment fund or other collective investment vehicle that is majority-owned by one or more U.S. person(s) [219] would be deemed a U.S. person. For purposes of this prong, majority-owned means the beneficial ownership of more than 50 percent of the equity or voting interests in the collective investment vehicle. The Commission expects that the collective investment vehicle would: (1) Determine whether its direct beneficial owners are U.S. persons described in prong (i), (ii), (iii), (iv), or (v) of the term "U.S. person," and (2) "look-through" the beneficial ownership of any other legal entity invested in the collective investment vehicle that is controlled by or under common control with the collective investment vehicle in determining whether the collective vehicle is majority-owned by U.S. persons.

For example, a limited company is formed under the laws of the Cayman Island as a collective investment vehicle that engages in swap transactions. It has a single investor, which is an investment company registered with the Securities and Exchange Commission under the Investment Company Act of 1940. Shares in the registered investment company are only owned by United States persons and both the Cayman Island limited company and the registered investment company are sponsored by the same investment adviser. The Cayman Island limited company would be viewed as a "controlled foreign corporation" of the registered investment company. Because the Cayman Island limited company is controlled by the same investment adviser as the investor registered investment company, the Cayman Island limited company would be required to "look through" the registered investment company and would be considered majority owned by U.S. persons. Therefore, under revised prong (vi), the Cayman Island limited company generally would be a U.S. person, subject to consideration of all the facts and circumstances.

As another example, a limited company is formed under the laws of the Cayman Island by an investment manager as a collective investment vehicle that engages in swap transactions as part of its investment strategy ("Master Fund"). It has two investors, which are also collective investment vehicles that were formed by the same investment manager for the purpose of investing in the Master Fund. One collective investment vehicle is formed under the laws of the state of Delaware and the other investor collective investment vehicle is a limited company formed under the laws of the Cayman Island. Because Master Fund and the two investor collective investment vehicles are under common control by the investment manager, the Master Fund is required to "look through" the two investor vehicles to their beneficial owners to determine whether it is majority owned by U.S. persons. Whether the Master Fund is a U.S. person will require the assessment of whether the majority of its equity is held indirectly by U.S. persons through the two investor vehicles.

However, where a collective investment vehicle is owned in part by an unrelated investor collective investment vehicle, the collective investment vehicle need not "look through" the unrelated investor entity, but may reasonably rely upon written, bona fide representations from the unrelated investor entity regarding whether it is a U.S. person,[220] unless the investee collective investment vehicle has reason to believe that such unrelated investor entity was formed or is operated principally for the purpose of avoiding looking through to the ultimate beneficial owners of that entity.[221] The Commission expects that the collective investment vehicle would take reasonable "due diligence" steps with respect to its investors in making this determination, along the lines of the verifications that the collective investment vehicle may conduct in connection with other regulatory requirements.[222]

The Commission is also including a minor modification to clarify that it expects that the interpretation in prong (vi) would apply irrespective of whether the collective investment vehicle is organized or incorporated in the United States. Similar to the Commission's analysis with respect to prong (vii) discussed above, the Commission's

---

[219] The term "U.S. person," as used in this context, refers to those natural persons or legal entities that meet (i), (ii), (iii), (iv), or (v) of the interpretation of "U.S. person."

[220] The ability of the collective investment vehicle to rely on the bona fide representation of the unrelated investor entity does not affect the due diligence that the unrelated investor entity should conduct in order to make such representation to the collective investment vehicle.

[221] The Commission has applied similar anti-evasion standards in other contexts. *See, e.g.,* 17 CFR 4.7(a)(1)(iv)(D) (providing that a passive investment vehicle will be considered a non-U.S. person for purposes of section 4.7 under certain circumstances provided that the entity was "not formed principally for the purpose of facilitating investment by persons who do not qualify as Non-United States persons in a pool" whose operator is claiming relief under that section).

[222] *See* the discussion of due diligence below, which the Commission believes is generally applicable to the "due diligence" required by the collective investment vehicle in this context.

policy is that the place of a collective investment vehicle's organization or incorporation would not necessarily be determinative of its status as a "U.S. person" for purposes of CEA section 2(i). As noted above, collective investment vehicles are created for the purpose of pooling assets from investors and channeling these assets to trade or invest in line with the objectives of the investors. In the Commission's view, these are generally passive investment vehicles that serve as a means to achieve the investment objectives of their beneficial owners, rather than being separate, active operating businesses. As such, the beneficial owners would be directly exposed to the risks created by the swaps that their collective investment vehicles enter into.[223] Therefore, the Commission's policy is that if U.S. persons beneficially own more than 50 percent of the equity or voting interests in a collective investment vehicle, then the collective investment vehicle would ordinarily satisfy the "direct and significant" standard of CEA section 2(i).

The Commission is also revising its interpretation in prong (vi) to exclude non-U.S. publicly-offered, as opposed to publicly-traded, collective investment vehicles. That is, a collective investment vehicle that is publicly offered to non-U.S. persons, but not offered to U.S. persons, would generally not be included within the interpretation of the term U.S. person. This revision is intended to address comments that publicly-traded funds are only a subset of non-U.S. regulated collective

---

[223] A collective investment vehicle is an arrangement pursuant to which funds of one or more investors are pooled together and invested on behalf of such investors by a manager. Typically, investors do not have day-to-day control over the management or operation of the vehicle and are essentially passive, beneficial owners of the vehicle's assets. Prior to participating in a collective investment vehicle, an investor enters into an arrangement with the vehicle which governs the fees collected by the manager of the vehicle and the investor's payout from the vehicle, which may include periodic payments. Typically a limited liability entity such as a corporation, limited partnership or limited liability company is used as part of the arrangement so that investor liability is limited to the investor's beneficial interest in the vehicle's assets.

With respect to a swap between a collective investment vehicle and a non-U.S. swap dealer, the Commission believes that losses borne by the vehicle upon a default by the non-U.S. swap dealer are better seen as losses incurred by the investors in the collective investment vehicle rather than by the vehicle itself. In contrast with a collective investment vehicle, when an operating company enters into a swap with a non-U.S. swap dealer, losses borne by the operating company upon a default by the non-U.S. swap dealer are better seen as losses incurred by the operating company and only indirectly by its shareholders. Therefore, prong (vi) only relates to collective investment vehicles and does not extend to operating companies.

investment vehicles and that ownership verification is expected to be particularly difficult for pools, funds, and other collective investment vehicles that are publicly offered.[224]

In addition, a collective investment vehicle that is publicly offered only to non-U.S. persons and not offered to U.S. persons generally would not fall within any of the prongs of the interpretation of the term "U.S. person."

Fifth, the Commission will not include in its interpretation of the term "U.S. person" the elements in proposed prong (v), which related to registered commodity pool operators. The Commission agrees with commenters that neither the location (nor the nationality), nor the registration status, of the pool operator would normally, without more, be determinative of whether the underlying pool(s) should be included in its interpretation of the term "U.S. person." The Commission has further considered that, as discussed above, the relevant elements for a commodity pool or other collective investment vehicle would generally be whether or not its principal place of business is in the United States or it is majority owned by U.S. persons. The Commission believes that proposed prong (v) could be overly broad and have the effect of capturing commodity pools with minimal participation of U.S. persons and a minimal U.S. nexus.

Sixth, the Commission will include in its interpretation of the term "U.S. person" the elements in prong (vi) (renumbered as prong (iv)) relating to pension plans. In response to comments, though, the Commission is clarifying that it does not intend that its interpretation encompass pension plans that are primarily for foreign employees of U.S.-based entities described in prong (iii) of the interpretation. Also, as noted above in the discussion of collective investment vehicles, the Commission does not generally expect that a pension plan which is not a U.S. person would become a U.S. person simply because some of the individuals or entities that manage the investments of the pension plan are located or organized in the United States.

Finally, the Commission will include in its interpretation of the term "U.S. person" the elements in prong (vii)

---

[224] The publicly-offered collective investment vehicle could be a UCITS (Undertakings for Collective Investment in Transferable Securities). *See* Directive 2009/65/EC of the European Parliament and of the Council (Jul. 13, 2009), available at *http://eur-lex.europa.eu/LexUriServ/ LexUriServ.do?uri=OJ:L:2009:302:0032:0096: EN:PDF*. Under the Commission's interpretation of section 2(i), a UCITS would not be included in the term "U.S. person," provided it is not offered, directly or indirectly, to U.S. persons.

(renumbered as prongs (ii) and (v)) pertaining to an estate or trust, with certain modifications to take into account the views of commenters who addressed this issue, and the legal and practical considerations that are relevant to the treatment of estates and trusts for purposes of the Dodd-Frank Act. The Commission agrees with the commenters who stated that treatment of an estate or trust should generally not depend on whether the income of the estate or trust is subject to U.S. tax. The Commission understands that whether income is subject to U.S. tax can depend on a variety of factors, including the source of the income, which may not be relevant to whether the Dodd-Frank Act should apply to swaps entered into by the estate or trust.

After further consideration, the Commission will include in its interpretation of the term "U.S. person" (a) an estate if the decedent was a U.S. person at the time of death and (b) a trust if it is governed by the law of a state or other jurisdiction in the United States and a court within the United States is able to exercise primary supervision over the administration of the trust. For what it expects to be the relatively few estates that would use swaps (most likely for purposes of investment hedging), the Commission believes that the treatment of such swaps should generally be the same as for swaps entered into by the decedent during life. If the decedent was a party to any swaps at the time of death, then those swaps should generally continue to be treated in the same way after the decedent's death, when the swaps would most likely pass to the decedent's estate. Also, the Commission expects that this element of the interpretation will be predictable and easy to apply for natural persons planning for how their swaps will be treated after death, for executors and administrators of estates, and for the swap counterparties to natural persons and estates.

With respect to trusts, the Commission expects that its approach would be in line with how trusts are treated for other purposes under law. The Commission has considered that each trust is governed by the laws of a particular jurisdiction, which may depend on steps taken when the trust was created or other circumstances surrounding the trust. The Commission believes that if a trust is governed by U.S. law (*i.e.,* the law of a state or other jurisdiction in the United States), then it would generally be reasonable to treat the trust as a U.S. person for purposes of the Dodd-Frank Act. Another relevant element in this regard would be whether a court within the United States is able

to exercise primary supervision over the administration of the trust.[225] The Commission expects that including this element of the interpretation would generally align the treatment of the trust for purposes of the Dodd-Frank Act with how the trust is treated for other legal purposes. For example, the Commission expects that if a person could bring suit against the trustee for breach of fiduciary duty in a U.S. court (and, as noted above, the trust is governed by U.S. law), then treating the trust as a U.S. person would generally be in line with how it is treated for other purposes.

The Commission disagrees with commenters that the status of an estate or trust should be based solely on the status of the executor, administrator or trustee.[226] For one thing, this would mean that the treatment of the estate or trust could change if, for example, the executor or trustee relocates its offices. The Commission also does not believe it would be appropriate that the treatment of a trust would depend solely on the identity of the beneficiaries to the trust because, among other reasons, the beneficiaries may be described as a class of persons, rather than particular persons. In the Commission's view, more important considerations in formulating its policy are whether the treatment of the estate or trust is predictable and whether it is in line with how the entity is treated for other purposes. The Commission would also consider other facts and circumstances related to the estate or trust that could be relevant to whether the entity should be within the interpretation of the term "U.S. person" in the context of section 2(i).

a. Due Diligence

As described above, many commenters indicated that the information necessary to accurately assess the status of their counterparties as U.S. persons may not be available, or may be available only through overly burdensome due diligence, particularly where the interpretation includes a "look-through" element that considers "direct and indirect" ownership. For this reason, these commenters requested that the Commission's policy contemplate reasonable reliance on counterparty representations as to the relevant elements of the interpretation of the term "U.S. person."

The Commission agrees with the commenters that a party to a swap should generally be permitted to reasonably rely on its counterparty's written representation in determining whether the counterparty is within the Commission's interpretation of the term "U.S. person." In this context, the Commission's policy is to interpret the "reasonable" standard to be satisfied when a party to a swap conducts reasonable due diligence on its counterparties, with what is reasonable in a particular situation to depend on the relevant facts and circumstances. The Commission notes that under the External Business Conduct Rules, a swap dealer or MSP generally meets its due diligence obligations if it reasonably relies on counterparty representations, absent indications to the contrary.[227] As in the case of the External Business Rules, the Commission believes that allowing for reasonable reliance on counterparty representations encourages objectivity and avoids subjective evaluations, which in turn facilitates a more consistent and foreseeable determination of whether a person is within the Commission's interpretation of the term "U.S. person" and the extent to which the Title VII requirements

apply to certain cross-border activities.[228]

b. Foreign Branch of U.S. Person

The Commission is confirming its interpretation, as proposed, that a foreign branch of a U.S. person is itself a "U.S. person." As the Commission explained in the Proposed Guidance, a branch does not have a legal identity separate from that of its principal entity. In this respect, the Commission notes that branches are neither separately incorporated nor separately capitalized and, more generally, the rights and obligations of a branch are the rights and obligations of its principal entity (and vice versa). Under these circumstances, the Commission views the activities of a foreign branch as the activities of the principal entity, and thus a foreign branch of a U.S. person is a U.S. person.

Accordingly, the Commission declines to recognize foreign branches of U.S. persons separately from their U.S. principal for purposes of registration. That is, if the foreign branch were to be a swap dealer or MSP, as discussed further below, the U.S. person would be required to register, and the registration would encompass the foreign branch. Upon consideration of principles of international comity and the factors set forth in the Restatement, though, the Commission has calibrated the requirements otherwise applicable to such foreign branches in respects other than broadly excluding them from the U.S. person interpretation. For example, as discussed further below, foreign branches of U.S. persons may comply with Transaction-Level Requirements through substituted compliance, where appropriate, with respect to swaps with foreign counterparties, as well as with a foreign branch of another U.S. person. Further, non-U.S. persons may exclude swaps with foreign branches of registered swap dealers for purposes of determining whether they have exceeded the de minimis level of swap dealing activity under the swap dealer definition.

The types of offices the Commission would consider to be a "foreign branch" of a U.S. bank, and the circumstances in which a swap is with such foreign branch, are discussed further below in section C below.

---

[225] The Commission is aware that one element applied by the Internal Revenue Service to determine if a trust is a U.S. person for tax purposes depends on whether a court within the United States is able to exercise primary supervision over the administration of the trust. *See* 26 CFR 301.7701–7(a)(1)(i). The Commission believes that precedents developed under tax law could be relevant, as appropriate, in applying this aspect of its interpretation of the term "U.S. person." However, the Commission does not intend to formally adopt the Internal Revenue Service test for this purpose.

[226] The Commission does not intend to preclude considerations relating to the trustee in determining whether the trust is governed by U.S. law or subject to the jurisdiction of U.S. courts, if any such considerations are relevant. Rather, the Commission believes that the status of the trustee would generally not be directly relevant to determining if a trust should be treated as a U.S. person.

[227] *See* Business Conduct Standards for Swap Dealers and Major Swap Participants with Counterparties, 77 FR 9734 (Feb. 17, 2012) ("External Business Conduct Rules"). Consistent with the "reasonable reliance" standard in the External Business Conduct Rules, a swap dealer or MSP may rely on the written representations of a counterparty to satisfy its due diligence requirements. However, a swap dealer or MSP should not rely on a written representation if it has information that would cause a reasonable person to question the accuracy of the representation. In other words, a swap dealer or MSP should not ignore red flags when relying on written representations to satisfy its due diligence obligations. Further, if agreed to by the counterparty, the written representations may be included in counterparty relationship documentation. However, a swap dealer or MSP may only rely on such representations in the counterparty relationship documentation if the counterparty agrees to timely update any material changes to the representations. In addition, the Commission expects swap dealers and MSPs to review the written representations on a periodic basis to ensure that they remain appropriate for the intended purpose.

[228] This approach is generally consistent with suggestions provided by commenters. For example, SIFMA suggested that the determination of whether a counterparty is a U.S. person should be made at the inception of the swap transaction based on the most recent representation from the counterparty, which should be renewed by the counterparty once per calendar year. *See* SIFMA (Aug. 27, 2012) at A17.

c. Regulation S

The Commission has considered the recommendation by several commenters that the Commission follow, entirely or to some extent, the definition of "U.S. person" in the SEC's Regulation S.[229] With respect to the treatment of foreign branches in particular, Regulation S excludes from its definition of "U.S. person" any agency or branch of a U.S. person located outside the United States if (1) the agency or branch operates for valid business reasons; and (2) the agency or branch is engaged in the business of insurance or banking, and is subject to substantive insurance or banking regulation in the jurisdiction where it is located.[230] As the Commission noted in the Proposed Guidance, however, Regulation S addresses the level of activities (*i.e.,* offerings of securities) conducted within the United States, and related customer protection issues.[231] As such, the regulation's territorial approach to determining U.S. person status is, in the Commission's view, unsuitable for purposes of interpreting section 2(i), which addresses the connection with activities in and the risks to U.S. commerce arising from activities outside the United States.

Similarly, Regulation S and the Dodd-Frank swaps provisions also serve fundamentally different regulatory objectives with respect to the treatment of collective investment vehicles. Under Regulation S, the SEC will consider certain investment funds and securities issuers that are organized in foreign jurisdictions, but owned by U.S. investors, to be U.S. persons unless the U.S. investors are accredited investors.[232] The accredited investor condition provides a level of assurance that U.S. investors are entities that understand the consequences of investing through a foreign entity and, in effect, may be deemed to have waived the benefits of the U.S. securities laws. In contrast, the focus of Title VII is not limited to customer protection. Whether or not the investors in a collective investment vehicle are accredited investors, in the Commission's view, is irrelevant; rather, under section 2(i), the focus is whether the swap activities of a collective investment vehicle have a direct and significant connection with activities in, or effect on, U.S. commerce.

The Commission understands that the Regulation S definition of "U.S. person" is generally understood and applied by market participants. However, as the foregoing examples demonstrate, the Regulation S definition of "U.S. person" could fail to capture persons whose activities, the Commission believes, meet the "direct and significant" jurisdictional test of CEA section 2(i)—and whose activities present the type of risk that Congress addressed in Title VII. This potential for underinclusion, together with the fact that the Commission has addressed commenter concerns by providing further details and guidance about its interpretation of the term "U.S. person," which the Commission expects will facilitate a more consistent understanding of that term among market participants, provides the basis for not importing the Regulation S definition into the Commission's interpretation of CEA section 2(i).

d. Other Clarifications

The Commission continues to include the prefatory phrase "include, but not be limited to" in its interpretation of the term "U.S. person," as it appeared in the Proposed Guidance. While the Commission's policy generally is to limit its interpretation of this term, for purposes of this Guidance, to persons encompassed within the several prongs discussed above, the Commission also expects that there may be circumstances that are not fully addressed by those prongs, or other situations where the interpretation discussed above does not appropriately resolve whether a person should be included in the interpretation of the term "U.S. person." Thus, the Commission continues to include the prefatory phrase to indicate that there may be situations where a person not fully described in the interpretation above is appropriately treated as a "U.S. person" for purposes of this Guidance in view of the relevant facts and circumstances and a balancing of the various regulatory interests that may apply. In these situations, the Commission anticipates that the relevant facts and circumstances may generally include the strength of the connections between the person's swap-related activities and U.S. commerce; the extent to which such activities are conducted in the United States; the importance to the United States (as compared to other jurisdictions where the person may be active) of regulating the person's swap-related activities; the likelihood that including the person within the interpretation of "U.S. person" could lead to regulatory conflicts; and considerations of international comity.[233] The Commission anticipates that it would also likely be helpful to consider how the person (and in particular its swap activities) is currently regulated, and whether such regulation encompasses the person's swap activities as they relate to U.S. commerce.

Finally, in response to commenters' requests for clarification regarding the scope of the applicability of the "U.S. person" interpretation,[234] the Commission confirms that its policy is to apply its interpretation of the term "U.S. person" only to swaps regulations promulgated under Title VII, unless provided otherwise in any particular regulation. Therefore, for example, the Commission does not intend that this Guidance address how the term "person" or "U.S. person" should be interpreted in connection with any other CEA provisions or Commission regulations promulgated thereunder.

4. Summary

In summary, for purposes of the application of CEA section 2(i), the Commission will interpret the term "U.S. person" generally to include, but not be limited to:[235]

(i) Any natural person who is a resident of the United States;

(ii) any estate of a decedent who was a resident of the United States at the time of death;

(iii) any corporation, partnership, limited liability company, business or other trust, association, joint-stock company, fund or any form of enterprise similar to any of the foregoing (other than an entity described in prongs (iv) or (v), below) (a "legal entity"), in each case that is organized or incorporated under the laws of a state or other jurisdiction in the United States or having its principal place of business in the United States;

(iv) any pension plan for the employees, officers or principals of a legal entity described in prong (iii), unless the pension

---

[229] *See, e.g.,* MFA/AIMA (Aug. 28, 2012) at 4, 8–9; IIAC (Aug. 27, 2012) at 3; J.P. Morgan (Aug. 27, 2012) at 3, 8–9; SocGen (Aug. 8, 2012) at 5; ISDA (Aug. 10, 2012) at 9. *See also* IIB (Aug. 9, 2012) at 3 (noting that the proposed interpretation is more expansive than other Commission and SEC definitions of "U.S. person" and makes it difficult to assess U.S. person status). Regulation S is codified at 17 CFR 230.901 through 230.905.

[230] *See* 17 CFR 230.902(k)(2)(v).

[231] *See* Offshore Offers and Sales, 55 FR 18306 (May 2, 1990).

[232] *See* 17 CFR 230.902(k)(1)(viii). Also, the exception from the Regulation S definition of "U.S. person" is not available if any of such accredited investors are natural persons, estates or trusts. *Id.*

[233] These factors are among those relevant to whether a country has a basis to assert jurisdiction over an activity under the Restatement. *See generally* note 86 and accompanying text, *supra.*

[234] *See, e.g.,* Goldman (Aug. 27, 2010) at 3, FOA (Aug. 13, 2012) at 10–11; SIFMA (Aug. 27, 2012) at A14–15, FIA (Aug. 27, 2012) at 2–5.

[235] The Commission believes that Commission regulation 140.99, which provides for persons to request that the staff of the Commission provide written advice or guidance, would be an appropriate mechanism for a person to seek guidance as to whether it is a U.S. person for purposes of applying the Commission swaps regulations promulgated under Title VII.

plan is primarily for foreign employees of such entity;

(v) any trust governed by the laws of a state or other jurisdiction in the United States, if a court within the United States is able to exercise primary supervision over the administration of the trust;

(vi) any commodity pool, pooled account, investment fund, or other collective investment vehicle that is not described in prong (iii) and that is majority-owned by one or more persons described in prong (i), (ii), (iii), (iv), or (v), except any commodity pool, pooled account, investment fund, or other collective investment vehicle that is publicly offered only to non-U.S. persons and not offered to U.S. persons;

(vii) any legal entity (other than a limited liability company, limited liability partnership or similar entity where all of the owners of the entity have limited liability) that is directly or indirectly majority-owned by one or more persons described in prong (i), (ii), (iii), (iv), or (v) and in which such person(s) bears unlimited responsibility for the obligations and liabilities of the legal entity; and

(viii) any individual account or joint account (discretionary or not) where the beneficial owner (or one of the beneficial owners in the case of a joint account) is a person described in prong (i), (ii), (iii), (iv), (v), (vi), or (vii).

Under this interpretation, the term "U.S. person" generally means that a foreign branch of a U.S. person would be covered by virtue of the fact that it is a part, or an extension, of a U.S. person.

For convenience of reference, this Guidance uses the terms "U.S. swap dealer" and "U.S. MSP" to refer to swap dealers and MSPs, respectively, that are within the Commission's interpretation of the term "U.S. person" under this Guidance. The terms "non-U.S. swap dealer" and "non-U.S. MSP" refer to swap dealers and MSPs, respectively, that are not within the Commission's interpretation of the term "U.S. person" under this Guidance; and the term "non-U.S. person" refers to a person that is not within the Commission's interpretation of the term "U.S. person" under this Guidance.

### B. Registration

#### 1. Proposed Guidance

Under section 2(i) of the CEA, the Dodd-Frank swaps provisions, including the swap dealer and MSP registration provisions, do not apply to activities overseas unless such activities have a "direct and significant connection with activities in, or effect on," U.S. commerce. In the Proposed Guidance, the Commission addressed the general manner in which a person's overseas swap dealing activities or positions may require registration as a swap dealer or MSP, respectively.

Specifically, under the Proposed Guidance, the Commission would expect that a non-U.S. person whose swap dealing transactions with U.S. persons exceed the de minimis threshold would register as a swap dealer.[236] Likewise, under the Proposed Guidance, the Commission would expect that a non-U.S. person who holds swaps positions where one or more U.S. persons are counterparties above the specified MSP thresholds would register as an MSP.[237] As explained in the Proposed Guidance, the Commission believes that, consistent with section 2(i), the level of swap dealing or positions that is sufficient to require a person to register as a swap dealer or MSP when conducted by a person located in the United States would generally also meet the "direct and significant" nexus when such activities are conducted by a non-U.S. person with a U.S. person and in some other limited circumstances.

In the consideration of whether a non-U.S. person is engaged in more than a de minimis level of swap dealing, the Proposed Guidance would generally include the notional value of any swaps between such non-U.S. person (or any of its non-U.S. affiliates under common control) and a U.S. person (other than a foreign branch of a registered swap dealer).[238] Further, where the potential non-U.S. swap dealer's obligations are guaranteed by a U.S. person, the Commission would expect that the non-U.S. person would register with the Commission as a swap dealer when the aggregate notional value of its swap dealing activities (along with the swap dealing activities of its non-U.S. affiliates that are under common control and also guaranteed by a U.S. person) with U.S. persons and non-U.S. persons exceeds the de minimis threshold. Additionally, the Proposed Guidance clarified that the Commission would not expect a non-U.S. person without a guarantee from a U.S. person to register as a swap dealer if it does not engage in swap dealing with U.S. persons as part of "a regular business" with U.S. persons, even if the non-U.S. person engages in dealing with non-U.S. persons.

Following a similar rationale, under the Proposed Guidance if a non-U.S person holds swaps positions above the requisite threshold, the Commission would expect such non-U.S. person to register as an MSP. In considering whether a non-U.S. person that is a

potential MSP meets the applicable threshold, under the Proposed Guidance, the non-U.S. person would have included the notional value of: (1) any swaps entered into between such non-U.S. person and a U.S. person (provided that if the non-U.S. person's swaps are guaranteed by a U.S. person, then such swaps will be attributed to the U.S. guarantor and not the potential non-U.S. MSP); and (2) any swaps between another non-U.S. person and a U.S. person that if the potential non-U.S. MSP guarantees the obligations of the other non-U.S. person thereunder.[239]

#### 2. Comments

In general, commenters on the Proposed Guidance did not raise concerns or objections to the Commission's interpretation that non-U.S. persons who engage in more than a de minimis level of swap dealing with U.S. persons should be expected to register as swap dealers.[240] A number of commenters argued, however, that a non-U.S. person should not be expected to register as a swap dealer solely by reason of being guaranteed by a U.S. person.[241] SIFMA stated that the "connection between a non-U.S. swap dealing entity and its U.S. guarantor creates too tenuous a nexus to justify registration on the basis of this relationship alone."[242] As an alternative, SIFMA posited that only guarantees by a U.S. person for which there is a material likelihood of payment by the U.S. guarantor should be counted towards the de minimis calculation. To implement this recommendation, SIFMA suggested that the Commission establish how to determine whether the likelihood of payment is remote, such as a comparison of the aggregate contingent liability of the U.S. person

---

[236] *See* Proposed Guidance, 77 FR at 41218–41219.

[237] *Id.*

[238] *Id.* at 41218–20.

[239] *Id.* at 41221.

[240] One commenter, Japanese Bankers Association, stated that the cross-border application of Dodd-Frank is overbroad because it would capture even hedging transactions made by a non-U.S. swap dealer with a U.S. swap dealer that is making a market. The definition of "dealing activity" is ambiguous, this commenter asserted, and might require the non-U.S. swap dealer to register. *See* Japanese Bankers Association (Aug. 27, 2012) at 1.

[241] *See, e.g.,* Goldman (Aug. 27, 2012) at 5; ISDA (Aug. 10, 2012) at 12 (stating that, in the typical case, an intra-group guarantee allocates risks and activities within the corporate group and is not a dealing activity of the non-U.S. person); CEWG (Aug. 27, 2012) at 6–7 (stating that the Proposed Guidance should not include swap guarantees for aggregation purposes because it is contrary to the Final Entities Rules; jurisdiction should not be extended to transactions between two non-U.S. persons if the swaps obligations of one party are guaranteed by a U.S. person because U.S. jurisdiction in these circumstances is not supported by law or existing conventions of international jurisdiction).

[242] SIFMA (Aug. 27, 2012) at A29.

guarantor to the net equity of that guarantor.[243]

Similarly, Goldman argued that it would be inconsistent with the Dodd-Frank Act to expect non-U.S. persons to register as swap dealers solely on the basis of guarantees by a U.S. parent, absent any showing of a "direct and significant" jurisdictional nexus. Goldman recommended that any concerns regarding potential evasion of the registration requirement be addressed through the Commission's exercise of its anti-evasion authority.[244] ISDA agreed, suggesting that rather than protecting the U.S. guarantor by encouraging swap dealer registration of the guaranteed non-U.S. person, a better course is addressing the question of when (if ever) the U.S. guarantor must register as a swap dealer.[245] Australian Bankers stated that the considerations relevant to whether a non-U.S. person (without a guarantee from a U.S. affiliate) is expected to register as a swap dealer should relate to the aggregate notional amount of swap dealing activities with U.S. persons within a particular asset class.[246]

IIAC requested that the Commission confirm that a guarantee by a foreign holding company would not be deemed to be a guarantee by all of its subsidiaries, including U.S. entities, solely as a result of the indirect ownership.[247] J.P. Morgan raised concerns regarding the scope of the interpretation of the term a "guarantee." Specifically, it argued that the term "guarantee" should not be interpreted to include keepwells and liquidity puts because these agreements do not create the same types of third-party rights as traditional guarantees and may be unenforceable by third parties.[248] CEWG objected to the broader interpretation of the term "guarantee" in the Proposed Guidance than under the Final Product

Definitions Rules,[249] stating that the Commission "must undertake a more thorough regulatory analysis with respect to guarantees of swaps obligations."[250]

On the other hand, Senator Levin stated that guarantees are central to concerns regarding cross-border swaps, and that any guarantee, implicit or explicit, by a U.S. parent company to its non-U.S. affiliates effectively transfers risk to the U.S. parent.[251] Therefore, Senator Levin stated that the exact form of the guarantee should not limit compliance with Dodd-Frank requirements, and the list of relevant guarantee arrangements should be expanded to include arrangements involving total return swaps, credit default swaps or customized options that result in the foreign affiliate's activities creating off balance sheet liabilities for a U.S. person.[252] Eight Senators commented that focusing on whether affiliates are explicitly "guaranteed" by a U.S. affiliate does not go far enough. They expressed concern that market pressures cause U.S. parent firms to stand behind their foreign affiliates even if explicit guarantees are not in place. The Senators suggested that other factors be considered to determine whether risk is effectively guaranteed such as: limitations on permissible transactions between the parent and affiliate; explicit non-guarantee disclosures to investors, regulators and counterparties; restrictions on operating under a common name or sharing employees and officers; and whether comprehensive resolution protocols exist in the foreign jurisdiction.[253]

AFR stated that the Commission's failure to clarify its interpretation of when affiliates of a "U.S. person" would be treated as guaranteed, or to capture "the large grey area" between explicit and informal guarantees, among other things, creates opportunities to escape Dodd-Frank requirements by shifting business overseas.[254] AFR stressed that the Commission should clarify in the guidance that it "intends to follow through on properly implementing these principles and will not enable a 'race to the bottom' in which incentives are

created for derivatives affiliates of global banks . . . to relocate to areas of lax regulation to take advantage of an inadequate 'substituted compliance' regime."[255]

### 3. Commission Guidance

a. Registration Thresholds for U.S. Persons and Non-U.S. Persons, Including Those Guaranteed by U.S. Persons

Under the Final Entities Rules, a person is required to register as a swap dealer if its swap dealing activity activities over the preceding 12 months exceeds the de minimis threshold of swap dealing. In addition, Commission regulation 1.3(ggg)(4) requires that a person include, in determining whether its swap dealing activities exceed the de minimis threshold, the aggregate notional value of swap dealing transactions entered by its affiliates under common control.[256]

For purposes of determining whether a U.S. person is required to register as a swap dealer, a U.S. person should count all of its swap dealing activity, whether with U.S. or non-U.S. counterparties. This interpretation reflects that swaps markets are global, and therefore, in the Commission's view, all of a U.S. person's swap dealing activities, whether with U.S. persons or non-U.S. persons, have the requisite jurisdictional nexus and potential to impact the U.S. financial system. Similarly, the Commission believes that all of the swap dealing activities of a non-U.S. person that is an affiliate of a U.S. person and that is guaranteed by a U.S. person (a "guaranteed affiliate"),[257] or that is an "affiliate conduit" of a U.S. person,[258] have the requisite statutory

---

[243] *Id.* at A29–30.

[244] Goldman (Aug 27, 2012) at 5. *See also* CEWG (Aug. 27, 2012) 6–7 (stating that because there is no legal basis under section 2(i) for asserting jurisdiction based on a guaranty, the Commission should amend the Proposed Guidance to clarify that a non-U.S. person is not subject to Commission regulation, even where a U.S. person guarantees either counterparty; swap dealing activity outside the United States that does not involve a U.S. person should not be subject to the Commission's jurisdiction; guarantees do not alter the location of activity, nor should they alter a participant's residency; Hong Kong Banks (Aug. 27, 2012) at 8 (arguing that swaps between non-U.S. persons should be excluded from the de minimis determination regardless of whether a counterparty is guaranteed).

[245] ISDA (Aug. 10, 2012) at 12.

[246] Australian Bankers (Aug. 27, 2012) at 4.

[247] IIAC (Aug. 27, 2012) at 6, 8.

[248] J.P. Morgan (Aug. 27, 2012) at 10.

[249] *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule, 77 FR 48208 (Aug. 13, 2012) ("Final Swap Definition").

[250] CEWG (Aug. 27, 2012) at 5.

[251] Letter from Sen. Levin at 10.

[252] *Id.* at 11.

[253] Letter from Senators Blumenthal, Boxer, Feinstein, Harkin, Merkley, Shaheen, and Warren (Jul. 3, 2013).

[254] AFR (Aug. 27, 2012) at 4.

[255] *Id.* at 4.

[256] As discussed in greater detail below, in light of the global nature of the swaps markets, the Commission's policy is to interpret the aggregation requirement in Commission regulation 1.3(ggg)(4) in a manner that applies the same aggregation principles to all affiliates in a corporate group, whether they are U.S. or non-U.S. persons.

[257] See note 267 and accompanying text, *supra,* for guidance regarding the Commission's interpretation of the term "guarantee."

[258] When a non-U.S. person generally would be considered to be an affiliate conduit is discussed below in section G. As discussed below, for the purposes of the Commission's interpretation of CEA section 2(i), the Commission believes that certain factors are relevant to considering whether a non-U.S. person is an "affiliate conduit." Such factors include whether: The non-U.S. person is a majority-owned affiliate of a U.S. person; the non-U.S. person is controlling, controlled by or under common control with the U.S. person; the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person; and the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third-parties for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into

nexus and potential to impact the U.S. financial system. Therefore, under the Commission's interpretation of 2(i), a guaranteed or conduit affiliate [259] should count swap dealing transactions towards the de minimis threshold for swap dealer registration in the same manner as a U.S. person. That is, in light of the global nature of the swaps markets, a guaranteed or conduit affiliate should count all of its swap dealing transactions, whether with U.S. or non-U.S. counterparties, towards the de minimis threshold for swap dealer registration.

However, under the Commission's interpretation of section 2(i), a more circumscribed registration policy applies to non-U.S. persons that are not guaranteed or conduit affiliates. In this case, the Commission believes that the non-U.S. person should count only its swap dealing transactions with U.S. persons (other than foreign branches of swap dealers that are registered with the Commission), and with guaranteed affiliates towards the de minimis thresholds for swap dealer registration, with three exceptions, which are described below. Non-U.S. persons that are not guaranteed or conduit affiliates are not required to count swaps with a conduit affiliate towards the swap dealer de minimis calculation.

Similarly, for purposes of determining whether a U.S. person is required to register as an MSP, as the Commission interprets section 2(i), a U.S. person and a guaranteed or conduit affiliate should include all of swap positions with counterparties, whether they are U.S. or non-U.S. persons. With respect to whether a non-U.S. person must calculate whether its swap positions create exposures above the relevant MSP thresholds, the Commission believes, for policy reasons and consistent with principles of international comity, that CEA section 2(i) should not be interpreted to require non-U.S. persons that are not financial entities to include for MSP calculation purposes certain swap positions as explained below.

As the Commission explained in the Proposed Guidance, in the event of a default or insolvency of a non-U.S. swap dealer with more than a de minimis level of swap dealing with U.S. persons, or a non-U.S. MSP with more than the

threshold level of swaps positions with U.S. persons, the swap dealer's or MSP's U.S. counterparties could be adversely affected. Such an event may adversely affect numerous persons engaged in commerce within the United States, disrupt such commerce, and increase the risk of a widespread disruption to the financial system in the United States.

Similar effects on U.S. persons and on the U.S. financial system may occur in the event of a default or insolvency of certain non-U.S. person with respect to swap dealing transactions in excess of the de minimis level, or swaps positions above the MSP threshold, entered into such non-U.S. persons with other non-U.S. persons whose swaps obligations are guaranteed by a U.S. person. The Commission interprets section 2(i) of the CEA to encompass swaps entered into by guaranteed or conduit affiliates in addition to encompassing swaps entered into by U.S. persons. In the final rule to further define the term "swap," the Commission found that a guarantee of a swap is a term of that swap that affects the price or pricing attributes of that swap, and that when a swap has the benefit of a guarantee, the guarantee is an integral part of that swap.[260] The Commission therefore interprets the term "swap" (that is not a security-based swap or mixed swap) "to include a guarantee of such swap, to the extent that a counterparty to a swaps position would have recourse to the guarantor in connection with the position."[261] Because a guarantee of a swap is an integral part of the swap, and counterparties may not otherwise be willing to enter into a swap with the guaranteed affiliate, the affiliate would

not have significant swap business if not for the guarantee. The Commission believes that swap activities outside the United States that are guaranteed by U.S. persons would generally have a direct and significant connection with activities in, or effect on, U.S. commerce in a similar manner as the underlying swap would generally have a direct and significant connection with activities in, or effect on, U.S. commerce if the guaranteed counterparty to the underlying swap were a U.S. person.[262] Similarly, the Commission believes that swap activities outside the United States of an affiliate conduit would generally have a direct and significant connection with activities in, or effect on, U.S. commerce in a similar manner as would be the case if the affiliate conduit's U.S. affiliates entered into the swaps directly.

Accordingly, under section 2(i), the Commission intends to interpret section 2(i) as applying the swaps provisions of the CEA to swaps that are entered into by guaranteed or conduit affiliates in a manner similar to how section 2(i) would apply if a U.S. person had entered into the swap (subject to appropriate considerations of international comity for non-guaranteed, non-U.S. persons facing such guaranteed or conduit affiliates, as discussed below).

Thus, in the case of a guaranteed or conduit affiliate, the Commission interprets CEA section 2(i) to provide that the guaranteed or conduit affiliate is expected to count toward the swap dealer de minimis threshold all of its swap dealing activities.[263] Following a

---

[offsetting swaps or other arrangements with its U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-parties to its U.S. affiliates. The term "conduit affiliate" generally would not include swap dealers or affiliates thereof.

[259] This Guidance uses the term "guaranteed or conduit affiliate" to refer to a non-U.S. person whose swap obligations are guaranteed by a U.S. person or that is an affiliate conduit.

[260] *See* Final Swap Definition, 77 FR at 48225–48226. The Commission explained that when a swap counterparty typically uses a guarantee as credit support for its swaps obligations, the guarantor's resources are added to the analysis of the swap because "the market will not trade with that counterparty at the same price, on the same terms, or at all without the guarantee." *Id.* The Commission stated that it viewed a guarantee as, generally, "a collateral promise by a guarantor to answer for the debt or obligation of a counterparty obligor under a swap." *Id.*

[261] *Id.* at 48226 n. 187. In response to a comment that guarantees are contingent obligations that do not necessarily replicate the economics of the underlying swap, the Commission stated:

The CFTC is persuaded that when a swap (that is not a security-based swap or mixed swap) has the benefit of a guarantee, the guarantee and related guaranteed swap must be analyzed together. The events surrounding the failure of [AIGFP] highlight how guarantees can cause major risks to flow to the guarantor. The CFTC finds that the regulation of swaps and the risk exposures associated with them, which is an essential concern of the Dodd-Frank Act, would be less effective if the CFTC did not interpret the term "swap" to include a guarantee of a swap.

*Id.* at 48226.

[262] Congress has recognized the significance of guarantees of swaps obligations with respect to the activities of financial entities in section 210(c)(16) of the Dodd-Frank Act. There, Congress specifically addressed guarantees in the context of a Title II resolution proceeding. Section 210(c)(16) provides that, where a financial institution is in FDIC receivership, a "qualified financial contract" (or "QFC," which includes swaps) with a subsidiary of that financial institution that is guaranteed by the financial institution cannot be terminated by a counterparty facing that subsidiary pursuant to the QFC based solely on the insolvency or receivership of the financial institution if certain conditions are satisfied.

[263] The Commission notes that the SEC Cross-Border Proposal agrees that "[i]n a security-based swap transaction between two non-U.S. persons where the performance of at least one side of the transaction is guaranteed by a U.S. person, . . . the guarantee creates risk to the U.S. financial system and counterparties (including U.S. guarantors) to the same degree as if the transaction were entered into directly by a U.S. person." SEC Cross-Border Proposal, 78 FR at 30986. However, the SEC does not propose to address the risk posed by the guarantee through requiring the non-U.S. guaranteed affiliate to register as a security-based swap dealer, but rather through the application of principles of attribution in the major security-based swap participant definition. *See id.* at 31006.

Continued

similar rationale, the Commission interprets CEA section 2(i) to provide that a guaranteed or conduit affiliate, in calculating whether the applicable MSP threshold is met, would be expected to include, and attribute to the U.S. guarantor, the notional value of: (1) All swaps with U.S. and non-U.S. counterparties, and (2) any swaps between another non-U.S. person and a U.S. person or guaranteed affiliate, if the potential non-U.S. MSP guarantees the obligations of the other non-U.S. person thereunder.

In the Final Swap Definition, the Commission also acknowledged that a "full recourse" guarantee would have a greater effect on the price of a swap than a "limited" or "partial recourse" guarantee, yet nevertheless determined that the presence of any guarantee with recourse, no matter how robust, is price forming and an integral part of a guaranteed swap.[264] Moreover, as the recent financial crisis has demonstrated, in a moment of crisis—whether at the firm-level or more generally, market-wide—it matters little whether the parent guarantees are capped or otherwise qualified. In the face of solvency concerns, the parent guarantor will find it necessary to assume the liabilities of its affiliates.[265] For these reasons, the Commission declines to incorporate in the Guidance commenters' suggestions that only certain types of guarantees (*e.g.*, under which there is a material likelihood of

---

The Commission believes that while the SEC's proposed approach may be appropriate for the securities-based swaps market, it would not be desirable to follow a similar approach for the swaps markets within the Commission's jurisdiction. Due to the differing characteristics of the markets, such as the involvement of a much larger and more diverse number of commercial companies using swaps as compared to security-based swaps, the risks that may be transmitted through the interconnected financial system from the non-U.S. guaranteed affiliate operating as a swap dealer to the U.S. swaps market may not be adequately managed by the MSP structure, which has relatively high exposure thresholds before registration is required.

[264] Final Swap Definition, 77 FR at 48226.

[265] According to one commenter, these concerns may be present even where a guarantee is implicit, but not explicitly provided:

A recent example of the importance of implicit guarantees is the collapse of Bear Stearns, which was brought down by the failure of non-guaranteed hedge fund affiliates. These hedge funds were foreign affiliates technically not guaranteed by the parent, and the investment by the parent company in the funds was minimal. However, the firm was forced to try to save the funds for reputational reasons and also because a fire sale of subsidiary assets could have seriously impacted correlated positions held by the parent company. . . . The example of Bear Stearns is only one among many instances where parent companies have been forced to rescue failing affiliates even in the absence of an explicit guarantee.

AFR (Aug. 27, 2012) at 8. *See also* Letter from Sen. Levin, note 216, *supra.*

---

liability) should be considered for purposes of registration determinations for non-U.S. persons.

Finally, with respect to the Japanese Bankers Association's concern about potential constraints on their hedging activities, the Commission contemplates that swaps that are between foreign branches of U.S. swap dealers and dealing non-U.S. persons generally will be excluded from the swap dealer registration determination, as further described below. The Commission believes that under section 2(i) of the CEA, it would generally be appropriate for non-U.S. market participants, such as members of the Japanese Bankers Association, to engage in hedging activities with foreign branches of U.S. swap dealers without being expected to count such transactions for purposes of the swap dealer registration determination.

The Commission also is affirming that, for purposes of this Guidance, the Commission would interpret the term "guarantee" generally to include not only traditional guarantees of payment or performance of the related swaps, but also other formal arrangements that, in view of all the facts and circumstances, support the non-U.S. person's ability to pay or perform its swap obligations with respect to its swaps.[266] The Commission believes that it is necessary to interpret the term "guarantee" to include the different financial arrangements and structures that transfer risk directly back to the United States. In this regard, it is the substance, rather than the form, of the arrangement that determines whether the arrangement should be considered a guarantee for purposes of the application of section 2(i).[267]

### b. Aggregation

Commission regulation 1.3(ggg)(4) requires that a person include, in determining whether its swap dealing activities exceed the de minimis threshold, the aggregate notional value of swap dealing transactions entered by

---

[266] *See* Proposed Guidance, 77 FR at 41221 n. 47.

[267] Thus, for example, while keepwells and liquidity puts, certain types of indemnity agreements, master trust agreements, liability or loss transfer or sharing agreements, and any other explicit financial support arrangements may provide for different third-party rights and/or address different risks than traditional guarantees, the Commission does not believe that these differences would generally be relevant for purposes of section 2(i). Under these agreements or arrangements, one party commits to provide a financial backstop or funding against potential losses that may be incurred by the other party, either from specific contracts or more generally. In the Commission's view, this is the essence of a guarantee.

---

its affiliates under common control.[268] Additionally, under the Proposed Guidance, a non-U.S. person, in determining whether its swap dealing transactions exceed the de minimis threshold, would include the aggregate notional value of swap dealing transactions entered into by its non-U.S. affiliates under common control but would not include the aggregate notional value of swap dealing transactions entered into by its U.S. affiliates.

Numerous commenters objected to the aggregation interpretation regarding swap dealer registration in the Proposed Guidance.[269] IIB and Cleary, while acknowledging the Commission's evasion concerns, contended that the aggregation interpretation in the Proposed Guidance would effectively eliminate the the de minimis exemption for any affiliate of a registered swap dealer.[270] IIB further stated that the proposed aggregation interpretation would require a significant amount of coordination among entities within a corporate group in order to gather the relevant information and to reconfigure their registration plans. These difficulties, according to IIB, would be compounded by uncertainties in the proposed interpretation of the term "U.S. person."[271]

Cleary argued that the positions of a registered swap dealer should be excluded from the de minimis calculation by its affiliate and further added that such aggregation relief should be available to any U.S. or non-U.S. affiliates of any U.S.- or non-U.S. registered swap dealer.[272] FOA recommended that the Commission consider a policy that would permit non-U.S. persons to not aggregate the swap dealing activities of their non-U.S. swap dealing affiliates under common control and to require aggregation only

---

[268] For purposes of this Guidance regarding the application of Commission regulation 1.3(ggg)(4), the Commission construes the phrase "affiliates under common control" with respect to affiliates as stated in the Final Entities Rules, which defines control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." *See* Final Entities Rules, 77 FR at 30631 n. 437. Thus, for purposes of this Guidance, a reference to "affiliates under common control" with a person includes affiliates that are controlling, controlled by, or under common control with such person.

[269] *See, e.g.,* Cleary (Aug. 16, 2012) at 9–10; IIB (Aug. 27, 2012) at 22–24; FOA (Aug. 13, 2012) at 11–12; ISDA (Aug. 10, 2012) at 11–12; SocGen (Aug. 8, 2012) at 8; Deutsche Bank (Aug. 27, 2012) at 4–5, FSR (Aug. 27, 2012) at 4–6.

[270] Cleary (Aug. 16, 2012) at 9–10; IIB (Aug. 27, 2012) at 22.

[271] IIB (Aug. 9, 2012) at 6.

[272] Cleary (Aug. 16, 2012) at 9–10.

where there is evidence that a group of non-U.S. swap dealing affiliates sufficiently coordinate their swap dealing activities.[273] ISDA asserted that the proposed asymmetric application of aggregation (*i.e.*, U.S. affiliates aggregate the entire worldwide group, but non-U.S. affiliates aggregate only non-U.S. affiliates) would produce arbitrary results, citing, as an example, a group that has a U.S. affiliate with $500 million of swaps and a non-U.S. affiliate with $7.6 billion of swaps with non-U.S. persons. In that scenario, the U.S. affiliate must register; the non-U.S. affiliate is not required to register.[274]

In the Further Proposed Guidance, the Commission proposed an alternative interpretation of the aggregation requirement in Commission regulation 1.3(ggg)(4). Under this alternative, a non-U.S. person would be expected, in the consideration of whether its swap dealing transactions exceed the de minimis threshold, to include the aggregate notional value of swap dealing transactions entered into by all its affiliates under common control (*i.e.*, both non-U.S. affiliates and U.S. affiliates), but not include the aggregate notional value of swap dealing transactions of any non-U.S. affiliate under common control that is registered as a swap dealer.[275] The Commission noted that the application of the aggregation requirement in Commission regulation 1.3(ggg)(4) to non-U.S. affiliates of non-U.S. swap dealers may, in certain circumstances, impose significant burdens on such non-U.S. affiliates without advancing significant regulatory interests of the Commission. Because the conduct of swap dealing business through locally-organized affiliates may in some cases be required in order to comply with legal requirements or business practices in foreign jurisdictions, such non-U.S. affiliates may be numerous and it could be impractical to require all such non-U.S. affiliates to register as swap

dealers. Further, the Commission's interest in registration may be reduced for a non-U.S. affiliate of a registered non-U.S. swap dealer where the non-U.S. affiliate (or group of such affiliates) engages in only a small amount of swap dealing activity with U.S. persons.

On the other hand, the Commission also noted in the Further Proposed Guidance that, given the borderless nature of swap dealing activities, a swap dealer may conduct swap dealing activities through various affiliates in different jurisdictions, which suggests that its interpretation should take into account the applicable swap dealing transactions entered by all of a non-U.S. person's affiliates under common control worldwide. Otherwise, affiliated persons may not register solely because their swap dealing activities are divided, such that each affiliate falls below the de minimis level. The Commission noted its concern that a policy under which such affiliates whose swap dealing activities individually fall below the de minimis level, but whose swap dealing activities in the aggregate exceed the de minimis level, would not register as swap dealers could provide an incentive for firms to spread their swap dealing activities among several unregistered affiliates rather than centralize their swap dealing in registered firms. Such a result would increase systemic risks to U.S. market participants and impede the Commission's ability to protect U.S. markets.

Two commenters supported the alternative interpretation of the aggregation requirement set out in the Further Proposed Guidance. Greenberger/AFR stated that the aggregation requirement helps to prevent the spreading of risk, because without aggregation U.S. persons could avoid registration as swap dealers by routing their swap activity through non-U.S. affiliates and thereby remain under the de minimis threshold.[276] Better Markets supported the alternative interpretation in the Further Proposed Guidance because it contemplates that non-U.S. persons would aggregate all swap dealing of all affiliates, including U.S. affiliates, except where the affiliate is registered as a swap dealer.[277]

Other commenters were opposed to the alternative interpretation in the Further Proposed Guidance. SIFMA/CH/FSR stated that aggregation of swap dealing activity across affiliates is not appropriate in any circumstance.[278] ISDA stated that application of the

aggregation principle to non-U.S. affiliates may impose significant burdens on the non-U.S. affiliates without advancing significant regulatory interests, and expanding the scope of aggregation to include swaps of U.S. affiliates would exacerbate this disproportionality.[279]

Mitsubishi UFJ Financial Group Inc. ("Mitsubishi UFJ") asked the Commission to clarify its interpretation of the term "control" in the context of a non-U.S. joint venture where only one owner controls and operates, and financially consolidates, the joint venture entity.[280] Mitsubishi UFJ stated that in this case the joint venture should be linked for aggregation purposes to the owner that has operational control, provided that the owner has at least one affiliate that is a registered swap dealer.[281]

In the Further Proposed Guidance, the Commission asked commenters to address several questions regarding the aggregation provision. In particular, the Commission asked whether the alternative interpretation of the aggregation requirement should apply to non-U.S. persons that are guaranteed by a U.S. person with respect to their swaps obligations in the same way that it applies to non-U.S. persons that are not so guaranteed, and if so, should the Commission continue to construe the term "guarantee" for this purpose to mean any collateral promise by a guarantor to answer for the debt or obligation of an obligor under a swap and should the term include arrangements such as keepwells and liquidity puts.

Greenberger/AFR replied to this question affirmatively, stating that the Commission should establish a rebuttable presumption that foreign affiliates are guaranteed by the parent company, and require clear evidence that the market has been explicitly informed that the parent will not stand behind affiliate liabilities in the event of

[273] FOA (Aug. 13, 2012) at 11–12. FOA argued that the Proposed Guidance would have a disproportionate effect by providing that a non-U.S. person engaging in a de minimis amount of U.S.-facing swap dealing activities should register as a swap dealer simply because its other non-U.S. affiliates under common control, in the aggregate, exceed the de minimis threshold, even though there is no coordinated effort. *Id.*

[274] ISDA (Aug. 10, 2012) at 12 (noting that if an exclusion from aggregation for an affiliated swap dealer's swaps were in place, then the group in the above example could decide which entity registers and thereby bring the swaps attributable to the other entity under the threshold).

[275] Also, under this alternative approach, a non-U.S. person would not be expected to include the aggregate notional value of swap dealing transactions of any of its non-U.S. affiliates under common control where the counterparty to such affiliate is also a non-U.S. person.

[276] Greenberger/AFR (Feb. 6, 2013) at 8–9.

[277] Better Markets (Feb. 15, 2013) at 8–9.

[278] SIFMA/CH/FSR (Feb. 6, 2013) at A2–3

[279] ISDA (Feb. 6, 2013) at 3–4 (relevant affiliates are unlikely to have systems to monitor U.S. person status of swap counterparties). *See also* European Federation of Energy Traders ("EFET") (Feb. 6, 2013) at 3–4 (arguing that cost of system to monitor aggregation would be substantial and relative benefits of requiring aggregation already applies, or soon will apply, in non-U.S. jurisdictions). ISDA, IIB and CEWG all stated that the treatment in the January Order of grandfathered affiliates (*i.e.*, those affiliates engaged in swap dealing with U.S. persons on December 21, 2012) should be made permanent in order to avoid disrupting established transactional relationships. *See* ISDA (Feb. 6, 2013) at 3; IIB (Feb. 6, 2013) at 6; CEWG (Feb. 25, 2013) at 2–4.

[280] Mitsubishi UFJ (Feb. 1, 2013) at 3–4.

[281] *Id.* at 5.

a default or bankruptcy.[282] To do otherwise, they stated, would encourage swap activity through non-U.S. affiliates rather than U.S. persons.[283]

Other commenters stated that the alternative interpretation should not apply to non-U.S. persons that are guaranteed by a U.S. person in the same way that it applies to non-U.S. persons that are not so guaranteed. SIFMA/CH/FSR stated that a guarantee by a U.S. person is not, in itself, a sufficient nexus for jurisdiction under section 2(i) of the CEA, since swaps may be guaranteed for a number of reasons that do not necessarily implicate U.S. jurisdiction.[284] Thus, there may be no importation of risk to the United States through the guarantee and, in any event, concern about importation of risk is appropriately addressed where the guarantor is a prudentially regulated entity, and the Commission should rely on its anti-evasion authority to prevent use of guarantees to evade registration requirements.[285] ISDA also stated that a guarantee constitutes an insufficient jurisdictional nexus, and that it would be consistent with international comity and regulatory reciprocity to regulate swaps between two non-U.S. persons primarily under non-U.S. regulation.[286] Regarding the potential for risk transfer across borders, ISDA stated that much of the regulation applicable to swap dealers is not relevant to this concern— external and internal business conduct rules, for example, cannot assure the ultimate solvency of a swap dealer, and it is unclear that encouraging further capitalization of overseas affiliates of a U.S. guarantor, causing financial resources to be contributed overseas, would advance the stability of the U.S. financial system.[287] The Financial Services Agency, Government of Japan ("Japan FSA") also thought that a guarantee from a U.S. person should not, in itself, cause swaps with a non-U.S. person to be included in the de minimis calculation.[288]

The Commission also asked if non-U.S. persons should not be expected to include in the de minimis calculation the swap dealing transactions of their U.S. affiliates under common control, or, alternatively, should the policy of the Commission contemplate that they would exclude from the de minimis calculation the swap dealing transactions of their U.S. affiliates under common control that are registered as swap dealers.

Responding to this question, Greenberger/AFR stated it is important in any case to require aggregation across all non-U.S. affiliates of a global bank, in order to effectively capture transactions spread across multiple foreign affiliates; otherwise, it would be much easier to avoid registration as a swap dealer.[289] They believe that the second alternative—excluding only the swap dealing transactions of U.S. affiliates that are registered as swap dealers—is much preferable to the first, because the first alternative would permit two groups of affiliates, one within the U.S. and another non-U.S., to both engage in swap dealing up to the de minimis level, which would create an incentive to split a swap dealing business between U.S. and non-U.S. affiliates.[290] The second alternative would effectively allow a group of affiliates that individually and collectively fall below the de minimis threshold to forego registration, which they believed could be a sensible compromise, so long as aggregation across foreign affiliates is maintained.[291]

Several commenters were opposed to a policy under which non-U.S. persons would aggregate the swap dealing activities of U.S. affiliates that are registered swap dealers. CEWG argued that this policy could lead to registration of non-U.S. persons as swap dealers because of the activities of their U.S. affiliates, which it asserted would be contrary to the separation sometimes maintained between U.S. and non-U.S. affiliates and unsupported by any policy rationale.[292] ISDA and SIFMA/CH/FSR were of the view that all persons (both U.S. and non-U.S.) should be able to exclude from their de minimis calculations the swaps of any affiliate (whether U.S. or non-U.S.) that is registered with the Commission as a swap dealer, because swaps by a registered swap dealer are subject to Dodd-Frank protections and no purpose would be served by attributing them to affiliated entities in order to impose swap dealer registration on those affiliates.[293]

The Mizuho Corporate Bank, Ltd. ("Mizuho") and Sumitomo submitted a joint letter arguing that the swap dealing activity of U.S. affiliates that are registered as swap dealers should be excluded from aggregation because otherwise the de minimis exception would be effectively unavailable to non-U.S. based firms that conduct U.S.-facing swap dealing activity through a U.S. affiliate that is registered as a swap dealer.[294] This result, in turn, would inappropriately disfavor these firms as compared to firms that conduct the same business through non-U.S. affiliates registered as swap dealers; the Commission's interpretation should encourage, rather than disfavor, registration of U.S. affiliates as swap dealers.[295] IIB stated that the policy reasons for allowing the exclusion of swap dealing by non-U.S. affiliates registered as swap dealers also applies to the dealing activity of U.S affiliates that are registered.[296]

Other commenters went further, stating that non-U.S. persons should not be required to aggregate the swap dealing activities of any of their U.S. affiliates. The Japanese Bankers Association stated U.S. affiliates should be excluded from the non-U.S. person's calculations because the U.S. persons are already subject to Dodd-Frank regulation as warranted by their activities.[297] EDF Trading stated that non-U.S. persons that maintain minimal contacts with the United States should not be required to register as swap dealers due to the activities of their U.S. affiliates, because such a requirement would be inconsistent with the jurisdictional limitation in section 2(i) of the CEA; result in duplicative and potentially inconsistent regulatory requirements of multiple jurisdictions applying to the same swap activity; and encourage commercial firms to cease potential swap dealing activity in the U.S., resulting in reduced U.S. swaps market liquidity and fragmentation of the global swaps markets.[298]

Last, the Commission solicited commenters' views on whether a person

---

[282] Greenberger/AFR (Feb. 6, 2013) at 5–6.

[283] *Id.* at 6.

[284] SIFMA/CH/FSR (Feb. 6, 2013) at A4.

[285] *Id.*

[286] ISDA (Feb. 6, 2013) at 2–3.

[287] *Id.* at 3.

[288] Japan FSA (Feb. 6, 2013) at 2.

[289] Greenberger/AFR (Feb. 6, 2013) at 9.

[290] *Id.*

[291] *Id.*

[292] CEWG (Feb. 25, 2013) at 2–4.

[293] ISDA (Feb. 6, 2013) at 4; SIFMA/CH/FSR (Feb. 6, 2013) at B11–12. CEWG and ISDA also both stated that U.S. persons should in no event be required to aggregate swaps of non-U.S. affiliates with non-U.S. persons, because such swaps have insufficient nexus to the United States. CEWG (Feb. 25, 2013) at 2; ISDA (Feb. 6, 2013) at 4.

[294] Mizuho/Sumitomo (Feb. 6, 2013) at 3.

[295] *Id. See also* Japan FSA (Feb. 6, 2013) at 2 (arguing that the swap dealing activity of U.S. affiliates that are registered as swap dealers should be excluded because the affiliates are subject to supervision by the Commission).

[296] IIB (Feb. 6, 2013) at 5–6.

[297] Japanese Bankers Association (Feb. 6, 2013) at 2–3. *See also* Japan FSA (Feb. 6, 2013) at 2 (arguing that all affiliates of Japanese financial institutions should be excluded from the de minimis calculation because the affiliates are supervised by Japan FSA on a consolidated basis).

[298] EDF Trading (Feb. 6, 2013) at 1–4. *See also* Brigard & Urrutia Abogados (Feb. 6, 2013) at 2 (non-U.S. persons should be allowed to exclude from the de minimis calculation the swap dealing activities of U.S. affiliates, and of any affiliate (U.S. or non-U.S.) that is a registered swap dealer).

engaged in swap dealing activities could take advantage of an interpretation of the aggregation provision that allows a person to exclude the swap dealing activities of one or more of its affiliates under common control. The Commission asked whether, under such an interpretation, a person could spread its swap dealing activities into multiple affiliates, each under the de minimis threshold, and therefore avoid the registration requirement, even though the aggregate level of swap dealing by the affiliates exceeds the de minimis threshold. In this regard, the Commission asked if any such interpretation should include any conditions or limits on the overall amount of swap dealing engaged in by unregistered persons within an affiliated group.

Greenberger/AFR opined that any approach that did not require significant aggregation of swap dealing activities across affiliates would create the danger of risk spreading outlined in the Further Proposed Guidance.[299] They stated that financial institutions could easily remain under the de minimis threshold and thereby avoid registration by routing swaps through their non-U.S. affiliates.[300]

The Japanese Bankers Association stated that while the approach in the Further Proposed Guidance could potentially prevent evasion, it would do so at the cost of requiring multiple non-U.S. affiliates to register as swap dealers even if the group of affiliates concentrated its U.S. swap dealing activity in one U.S. entity.[301] In fact, they argued, concentrating U.S. swap dealing activity in a U.S. entity should be encouraged because it facilitates Commission supervision of that activity.[302] Further, they stated that to expect non-U.S. persons to register as swap dealers as a result of dealing activity by their U.S. affiliates undermines the regulatory independence of different jurisdictions and international understandings on regulatory harmonization.[303] Similarly, EDF Trading stated that expecting multiple entities within a corporate group to register as swap dealers would be burdensome and may not advance

regulatory interests, and the alternative in the Further Proposed Guidance would merely increase economic and regulatory burdens without achieving a significant reduction in systemic risk, because it would encourage the concentration of swap dealing activity in non-U.S affiliates.[304]

SIFMA/CH/FSR were of the view that it would be burdensome for market participants to use multiple affiliates to avoid swap dealer registration, because moving swap dealing activity between affiliates requires a significant legal, technological and operational investment, and fragmenting the activity among affiliates may make it harder for a multinational institutions to manage risk efficiently.[305] Along the same lines, IIB stated that where one entity in a corporate group is registered as a swap dealer, there are substantial commercial and credit risk incentives to centralize swap dealing in the registered entity, because doing so maximizes the potential to net offsetting transactions, uses capital more efficiently, and is operationally efficient.[306] On the other hand, IIB stated that using unregistered entities for swap dealing would not reduce the fixed costs incurred in registration and that the unregistered entities in the group would still be subject to swap costs such as clearing, reporting and trade execution.[307]

Based on the comments received on the Proposed Guidance and the Further Proposed Guidance, and its further review of issues related to the aggregation requirement, the Commission's policy is to interpret the aggregation requirement in Commission regulation 1.3(ggg)(4) in a manner that applies the same aggregation principles to all affiliates in a corporate group, whether they are U.S. or non-U.S. persons. Further, the Commission will generally apply the aggregation principle (as articulated in the Final Entities Rules) such that, in considering whether a person is engaged in more than a de minimis level of swap dealing, a person (whether U.S. or non-U.S.) should generally include all relevant dealing swaps of all its U.S. and non-U.S. affiliates under common control,[308]

except that swaps of an affiliate (either U.S. or non-U.S.) that is a registered swap dealer are excluded, as discussed below. The Commission notes that this policy would ensure that the aggregate notional value of applicable swap dealing transactions of all such unregistered U.S. and non-U.S. affiliates does not exceed the de minimis level.

Stated in general terms, the Commission's interpretation allows both U.S. persons and non-U.S. persons in an affiliated group to engage in swap dealing activity up to the de minimis threshold. When the affiliated group meets the de minimis threshold in the aggregate, one or more affiliate(s) (inside or outside the United States) would generally have to register as swap dealer(s) so that the relevant swap dealing activity of the unregistered affiliates remains below the threshold.

The Commission recognizes the borderless nature of swap dealing activities, in which a dealer may conduct swap dealing business through its various affiliates in different jurisdictions, and the Commission believes that its policy on aggregation outlined above addresses the concern that an affiliated group of U.S. and non-U.S. persons with significant swap dealing transactions with U.S. persons or guaranteed affiliates may not be required to register solely because such swap dealing activities are divided between affiliates that each fall below the de minimis level.

c. Exclusion of Certain Swaps by Non-U.S. Persons From the Swap Dealer De Minimis Threshold

The Proposed Guidance would generally allow a non-U.S. person to exclude from its de minimis threshold calculation its swaps with foreign branches of U.S. swap dealers. This exclusion was intended to allow non-U.S. persons to continue their inter-dealer swap activities with foreign branches of U.S. swap dealers without exceeding the de minimis threshold, thereby triggering a requirement to register as a swap dealer.

Commenters on the Proposed Guidance, such as Goldman Sachs, argued that the rationale for this exclusion is equally applicable when non-U.S. persons that are banks or broker-dealers engage in swap dealing transactions with U.S. swap dealers that do not conduct overseas business through foreign branches. Absent a similar interpretation in these circumstances, the commenters argued, U.S. swap dealers would be at a

---

[299] Greenberger/AFR (Feb. 6, 2013) at 8–9.

[300] See id. (citing press reports that U.S. banks such as Morgan Stanley and Goldman Sachs are using foreign entities "in seriatim fashion to avoid going over the $ 8 billion test"). Making a similar point, Better Markets emphasized that market participants may be expected to implement the lowest-cost structure, considering all regulatory costs. Better Markets (Feb. 6, 2013) at 15.

[301] Japanese Bankers Association (Feb. 6, 2013) at 3.

[302] Id.

[303] Id. at 3–4.

[304] EDF Trading (Feb. 6, 2013) at 5.

[305] SIFMA/CH/FSR (Feb. 6, 2013) at A3.

[306] IIB (Feb. 6, 2013) at 3.

[307] Id.

[308] For purposes of this Guidance, the Commission clarifies that a reference to "affiliates under common control" with a person includes affiliates that are controlling, controlled by, or under common control with such person. See note 268, supra. Further, in response to a question from a commenter, the Commission clarifies that for this purpose, the term "affiliates under common control" includes parent companies and subsidiaries, and is not limited to "sister

companies" at the same organizational level. See David Mu (Jan. 8, 2013).

competitive disadvantage vis-à-vis foreign branches of U.S. swap dealers since non-U.S. persons would be incentivized to limit their dealing activities to foreign branches of U.S. swap dealers.[309]

The Commission's policy is to generally allow non-U.S. persons that are not guaranteed or conduit affiliates of U.S. persons not to count toward their de minimis thresholds their swap dealing transactions with (i) A foreign branch of a U.S. swap dealer, (ii) a guaranteed affiliate of a U.S. person that is a swap dealer, and (iii) a guaranteed or conduit affiliate that is not a swap dealer and itself engages in de minimis swap dealing activity and which is affiliated with a swap dealer.[310] The Commission believes that where the guaranteed affiliate of a U.S. person is registered as a swap dealer, or where the foreign branch is included within the swap dealer registration of its U.S. home office, then it is appropriate to generally permit such non-U.S. not to count its swap dealing transactions with those entities against the non-U.S. person's de minimis threshold, because in these cases one counterparty to the swap is a swap dealer subject to comprehensive swap regulation and operating under the oversight of the Commission.

The Commission understands that commenters are concerned that foreign entities, in order to avoid swap dealer status, may decrease their swap dealing business with foreign branches of U.S. registered swap dealers and guaranteed affiliates that are swap dealers. Therefore, the Commission's policy, based on its interpretation of section 2(i) of the CEA will be that swap dealing transactions with a foreign branch of a U.S. swap dealer or with guaranteed affiliates that are swap dealers should generally be excluded from the de minimis calculations of non-U.S. persons that are not guaranteed or conduit affiliates.[311] However, the Commission is not persuaded that similar concerns arise regarding foreign entities that may engage in swap dealing business with such persons.[312]

With regard to non-U.S. persons that are not guaranteed or conduit affiliates of U.S. persons, such non-U.S. persons also generally would not count toward their de minimis thresholds their swap dealing transactions with a guaranteed affiliate that is not a swap dealer and itself engages in de minimis swap dealing activity and which is affiliated with a swap dealer. This interpretation reflects the Commission's view that when the aggregate level of swap dealing by a non-U.S. person that is not a guaranteed affiliate, considering both swaps with U.S. persons and swaps with unregistered guaranteed affiliates (together with any swap dealing transactions that the non-U.S. person aggregates for purposes of the de minimis calculation as described below) exceeds the de minimis level of swap dealing, the non-U.S. person's swap dealing transactions have the requisite "direct and significant connection with activities in, or effect on, commerce of the United States." [313] The Commission believes, however, that where the counterparty to a swap is a guaranteed affiliate and is not a registered swap dealer, the Commission's regulatory concerns are addressed because the guaranteed affiliate engages in a level of swap dealing below the de minimis threshold and is part of an affiliated group with a swap dealer.

In addition, non-U.S. persons that are not guaranteed or conduit affiliates of U.S. persons also generally would not count toward their de minimis thresholds their swap dealing transactions with a guaranteed affiliate where the guaranteed affiliate is guaranteed by a non-financial entity.[314] This exception is appropriate given that the risks to the U.S. financial markets are mitigated because the U.S. guarantor is a non-financial entity.

The Commission notes that under its interpretation of section 2(i), a non-U.S. person that is not a guaranteed or conduit affiliate would not have to count its swap dealing transactions with other non-U.S. persons that are not guaranteed affiliates because, in the Commission's view, such swap dealing activity would not have the requisite "direct and significant connection with

activities in, or effect on, U.S. commerce."

d. Exclusion of Certain Swaps by Non-U.S. Persons From the MSP Calculation

Related to their discussion of the swap dealer de minimis threshold, some commenters, such as SIFMA and Citi, stated that a non-U.S. person should not have to include swaps with foreign branches of U.S. swap dealers towards the MSP calculation.[315]

The Commission has considered whether, under section 2(i), the swaps that a non-U.S. person that is not a guaranteed or conduit affiliate enters into with a foreign branch of a U.S. swap dealer or a guaranteed affiliate that is a swap dealer should be excluded from the calculation of the non-U.S. person's MSP registration threshold. The Commission notes that its policy regarding such swaps for purposes of the MSP registration may reasonably be distinguished from its policy for purposes of the swap dealer registration threshold calculation. As described in the Final Entities Rules, MSP registration is required for non-dealers with swaps positions so large as to pose systemic risk. This is in contrast to swap dealer registration, which is a functional test focused on the nature of activities conducted by a potential registrant. Consequently, if all swaps between a non-U.S. person and foreign branches of U.S. swap dealers or swap dealers that are guaranteed affiliates were generally excluded under the Commission's policy with respect to MSP registration, a market participant that poses systemic risk within the meaning of the MSP definition could potentially be relieved of the requirement to register as an MSP. The Commission believes that such an outcome could undermine the MSP registration scheme. However, the Commission is persuaded that it is possible to control the potential risk of the non-U.S. person's risk with foreign branches of U.S. swap dealers and guaranteed affiliates that are swap dealers under certain limited circumstances and therefore that limited interpretive relief from the MSP calculation requirement is appropriate.[316] Thus, a non-U.S. person that is not a guaranteed affiliate of a U.S. person and is a financial entity generally does not have to count toward

[309] Goldman (Aug. 27, 2012) at 5–6.

[310] Note that if a non-U.S. person that is not a guaranteed or conduit affiliate of a U.S. person engages in a swap dealing transaction with another non-U.S. person that is not a guaranteed affiliate of a U.S. person (including such non-U.S. person that is a swap dealer), then such swap dealing transaction does not count toward the de minimis threshold of the unregistered, swap dealing party.

[311] The types of offices the Commission would generally consider in this regard to be a "foreign branch" of a U.S. bank, and the circumstances in which a swap would generally be treated as being with such foreign branch, are discussed further in section C, *infra.*

[312] *See* Goldman (Aug. 27, 2012) at 3–4.

[313] In the Proposed Guidance, the Commission asked whether the place of execution or clearing is relevant to the determination of whether a non-U.S. person should be required to register as a swap dealer. The Commission's policy is that a person generally would not be required to register as a swap dealer if the person's only connection to the United States is that the person uses a U.S.-registered swap execution facility ("SEF")or designated contract market ("DCM") in connection with its swap dealing activities.

[314] *See* CEA section 2(h)(7)(C) for a definition of financial entity.

[315] *See* SIFMA (Aug. 27, 2012) at A28–29; Citi (Aug. 27, 2012) at 2–3.

[316] The interpretation applies to non-U.S. persons that are not guaranteed by U.S. persons. Non-U.S. financial entities would be required to include swaps positions with foreign branches and guaranteed affiliates of U.S. persons unless they choose to comply with voluntary margining requirements, discussed below.

its MSP threshold its exposure under swaps with foreign branches of a U.S. swap dealer or guaranteed affiliates that are swap dealers; provided, that the swap is either cleared, or the documentation of the swap requires the foreign branch or guaranteed affiliate to collect daily variation margin, with no threshold, on its swaps with such non-U.S. person. When this condition is met, the Commission believes that it would generally be appropriate for the non-U.S. person not to count its exposure under such swaps against its MSP threshold.

The Commission notes that a non-U.S. person's swaps positions with guaranteed affiliates that are swap dealers and foreign branches of U.S. swap dealers in the latter entities' risk management programs. Such programs must account for, among other things, overall credit exposures to non-U.S. persons.[317] Second, the Commission notes that a non-U.S. person's swaps with a guaranteed affiliate that is a swap dealer would be included in exposure calculations and attributed to the U.S. guarantor for purposes of determining whether the U.S. guarantor's swap exposures are systemically-important on a portfolio basis and therefore require the protections provided by MSP registration.[318]

Finally, a non-U.S. person that is not a guaranteed affiliate and is not a financial entity[319] would generally not have to count toward its MSP thresholds its exposure under swaps with a foreign branch of a U.S. swap dealer or guaranteed affiliate that is a swap dealer. This exclusion reflects the Commission's recognition of the more modest risk to the U.S. financial markets from swaps activities with non-financial entities organized outside the United

States.[320] Further, the Commission notes that the Basel Committee on Banking Supervision ("BCBS") and the International Organization of Securities Commissions ("IOSCO") have recently issued a second consultative document under which, if finalized, would not apply margin requirements to the non-centrally cleared derivatives of non-financial entities, given that such transactions are viewed as posing little or no systemic risk and are exempt from clearing mandates in most jurisdictions.[321]

e. Exclusion of Certain Swaps Executed Anonymously on a SEF, DCM, or Foreign Board of Trade ("FBOT") and Cleared

The Commission believes that when a non-U.S. person that is not a guaranteed or conduit affiliate enters into swaps anonymously on a registered DCM, SEF, or FBOT[322] and such swaps are cleared, the non-U.S. person would generally not have to count such swaps against its de minimis threshold. The Commission understands that in these circumstances, the non-U.S. person would not have any prior information regarding its counterparty to the swap. Also, as discussed below, the

Commission is interpreting CEA section 2(i) such that, where a swap between such a non-U.S. person and a U.S. person is executed anonymously on a registered DCM, SEF, or FBOT and cleared the non-U.S. person generally will satisfy all of the applicable Category A Transaction-Level Requirements[323] that pertain to such a swap transaction. The Commission believes that the regulatory interest in including such swaps in the non-U.S. person's de minimis calculation is outweighed by the practical difficulties involved in determining whether the non-U.S. person should include the swap in the calculation, given that the non-U.S. person would have no information regarding its swap counterparty prior to execution of the swap.

The Commission also believes that when a non-U.S. person that is not a guaranteed or conduit affiliate clears a swap through a registered derivatives clearing organization ("DCO"), such non-U.S. person would generally not have to count the resulting swap (i.e., the novated swap) against its swap dealer de minimis threshold or MSP threshold.[324] Where a swap is created by virtue of novation, such swap does not implicate swap dealing, and therefore it would not be appropriate to include such swaps in determining whether a non-U.S. person should register as a swap dealer.

f. MSP-Parent Guarantees

While under the Proposed Guidance swaps conducted by a non-U.S. person, where guaranteed by a U.S. person, would generally be attributed only to the U.S. person in determining who must register as an MSP, the Commission did not expressly address a guarantee by a non-U.S. person of the swaps obligations of its U.S. subsidiary. In SIFMA's view, the Proposed Guidance created ambiguity as to the treatment of guarantees between other types of entities (e.g., where a U.S. person is guaranteed by a non-U.S. person or where a non-U.S. person is guaranteed by a non-U.S. person).[325] In

[317] See Commission regulation 23.600(c)(4)(ii), requiring swap dealers and MSPs to have credit risk policies and procedures that account for daily measurement of overall credit exposure to comply with counterparty credit limits, and monitoring and reporting of violations of counterparty credit limits performed by personnel that are independent of the business trading unit. See also Commission regulation 23.600(c)(1)(i), requiring the senior management and the governing body of each swap dealer and MSP to review and approve credit risk tolerance limits for the swap dealer or MSP.

[318] See Final Entities Rules at 30689, stating the Commission's interpretation that "an entity's swap . . . positions in general would be attributed to a parent, other affiliate or guarantor for purposes of the major participant analysis to the extent that the counterparties to those position would have recourse to that other entity in connection with the position." The Commission stated further that "entities will be regulated as major participants when they pose a high level of risk in connection with the swap . . . positions they guarantee."

[319] See CEA section 2(h)(7)(C) for a definition of financial entity.

[320] Based on data the Bank for International Settlements obtained from thirteen reporting countries (Australia, Belgium, Canada, France, Germany, Italy, Japan, the Netherlands, Spain, Sweden, Switzerland, the United Kingdom and the United States), at the end of December 2012, notional amounts outstanding for OTC foreign exchange derivatives, interest rate derivatives, and credit default swaps with non-financial customers accounted for an average of less than 8 percent of the total aggregate amounts outstanding for these asset classes. See Bank for International Settlements, Statistical release: OTC derivatives statistics at end-December 2012 (May 2013), available at http://www.bis.org/publ/otc_hy1305.pdf.

[321] See BCBS IOSCO, Margin Requirements for Non-Centrally Cleared Derivatives, Second Consultative Document, at 7 (issued for comment March 15, 2013), available at http://www.bis.org/publ/bcbs242.pdf.

[322] As used herein, a registered FBOT means an FBOT that is registered with the Commission pursuant to part 48 of the regulations in order to permit direct access to the FBOT's order entry and trade matching system from within the U.S. Among others, 16 FBOTs that currently permit direct access for the trading of futures and option contracts, but not swaps, pursuant to no-action relief letters issued by Commission staff have submitted complete applications for registration. In light of the fact that registered FBOTs can also list swaps for trading by direct access and in view of the time required to properly assess registration applications and the interest on the part of certain FBOTs operating pursuant to the no-action relief in listing swaps for trading by direct access, the Division of Market Oversight has determined to amend the 16 no-action letters to permit those FBOTs, subject to certain conditions, to also list swaps for trading by direct access. Accordingly, all provisions in this document that apply to registered FBOTs also apply to the 16 FBOTs permitting trading by direct access pursuant to the amended no-action relief.

[323] The Commission notes that while the real-time reporting requirement will be satisfied for swaps executed anonymously on a DCM or SEF, absent further affirmative actions by an FBOT, the requirement will not be satisfied through FBOT execution alone. See section G, infra.

[324] A swap that is submitted for clearing is extinguished upon novation and replaced by new swap(s) that result from novation. See Commission regulation 39.12(b)(6). See also Derivatives Clearing Organization General Provisions and Core Principles, 76 FR 69334, 69361 (Nov. 8, 2011).

[325] SIFMA (Aug. 27, 2012) at A32. Along similar lines, IIB commented that there might be Continued

addition, Cleary noted that the Commission determined in the Final Entities Rules not to include a parental guarantee of a subsidiary's swaps in the computation of the parent's outward exposure under the MSP definition where the subsidiary is subject to capital oversight by the Commission, SEC, or an appropriate banking regulator. They asked that the Commission consider extending comparable treatment for parental guarantees where the non-U.S. subsidiary is subject to Basel-compliant capital oversight by another G20 prudential supervisor.[326]

Under the Commission's interpretation of section 2(i) of the CEA, the discussion in the Final Entities Rules regarding attribution of swaps positions of guaranteed persons for purposes of the MSP definition should generally apply to non-U.S. persons. That is, as applied to non-U.S. persons, where there is no guarantee or recourse to another person under the swap, the swap should generally be attributed to the person who enters into the swap, and there generally would be no attribution or aggregation of the swaps position with the swaps positions of the person's affiliates.[327] On the other hand, where the counterparty to the swap would have recourse to another person, such as a parent guarantor, the swap should generally be attributed to the person to whom there is recourse. Thus, if a U.S. person enters into a swap guaranteed by a non-U.S. person, the swap should generally be attributed to the non-U.S. person, and if a non-U.S. person enters into a swap guaranteed by a U.S. person, the swap should generally be attributed to the U.S. person.

However, the Commission is also cognizant that, as a matter of international comity, regulation of non-U.S. persons can be less preferable where the same regulatory outcomes can be achieved by regulating an affiliated U.S. person. So where the swaps of a U.S. person are guaranteed by a non-U.S. person, the Commission would consider the possibility that registration of the non-U.S. person would not be required if the U.S. person registers as an MSP, and there may be circumstances where registration of the U.S. person would be preferable. Also, the same considerations of international comity suggest that regulation of non-

U.S. persons should be effected in a manner that generally does not interfere with non-U.S. regulation. Thus, the Commission would be willing to consider that the swaps positions of non-U.S. persons that are guaranteed by other non-U.S. persons may be attributed to either the non-U.S. guarantor or the guaranteed non-U.S. person so long as all of the swaps positions that would trigger MSP registration are subject to the MSP registration and regulatory requirements. Thus, in IIB's scenario, the non-U.S.-based bank may consult with the Commission and decide to register itself—or its subsidiaries—as an MSP. The Commission would generally not expect both the parent guarantor bank and the guaranteed bank to register as MSPs. In the Commission's view, the related risk concerns should be adequately addressed by requiring either the guarantor or the guaranteed person to register, provided that the swap activities giving rise to MSP registration are regulated under Dodd-Frank.

As to Cleary's request regarding comparable treatment for certain parental guarantees, the Commission agrees that, as a matter of policy, it would generally be appropriate to extend similar treatment to parental guarantees of a subsidiary that is subject to comparable and comprehensive capital oversight by a G20 prudential supervisor. In this respect, the Commission views Basel-compliant capital standards as sufficiently comparable and comprehensive to capital oversight by the Commission, SEC, or banking regulator. Thus, where a subsidiary is subject to Basel-compliant capital standards and oversight by a G20 prudential supervisor, the subsidiary's positions would generally not be attributed to a parental guarantor in the computation of the parent's outward exposure under the MSP definition.

### 4. Summary

The Commission's policy under this Guidance may be summarized as follows.

The Commission will generally apply the aggregation principle (as articulated in the Final Entities Rules) such that, in considering whether a person is engaged in more than a de minimis level of swap dealing, a person (whether U.S. or non-U.S.) should generally include all relevant dealing swaps of all its U.S. and non-U.S. affiliates under common control, except that swaps of an affiliate (either U.S. or non-U.S.) that is a registered swap dealer are excluded. For this purpose, consistent with the

Commission's policy on counting swap transactions towards the de minimis threshold for swap dealer registration detailed above, the dealing swaps of an affiliate under common control with such person would include:

(i) In the case of a U.S. person or a guaranteed or conduit affiliate, all its swap dealing transactions; and

(ii) in the case of a non-U.S. person that is not a guaranteed or conduit affiliate:

a. all dealing swaps with counterparties who are U.S. persons (other than foreign branches of U.S. swap dealers); and

b. all dealing swaps with guaranteed affiliates except:

i. guaranteed affiliates that are swap dealers;

ii. guaranteed affiliates that are not swap dealers but which are affiliated with a swap dealer and where the guaranteed affiliate itself engages in de minimis swap dealing activity;

iii. guaranteed affiliates that are guaranteed by a non-financial entity.

In addition, a non-U.S. affiliate that is not a guaranteed or conduit affiliate may exclude any swaps that are entered into anonymously on a registered DCM, SEF, or FBOT and cleared, as more fully discussed above.

The Commission's interpretation would allow both U.S. persons and non-U.S. persons in an affiliated group to engage in unregistered swap dealing activity up to the de minimis level for the entire group. When the affiliated group nears the de minimis threshold in the aggregate, it would have to register a number of affiliates (inside or outside the United States) as swap dealers sufficient to maintain the relevant dealing swaps of the unregistered affiliates below the threshold.

In determining whether a non-U.S. person holds swap positions above the MSP thresholds, the non-U.S. person should consider the aggregate notional value of:

(i) Any swap position between it and a U.S. person;

(ii) any swap position between it and a guaranteed affiliate (but its swap positions where its own obligations thereunder are guaranteed by a U.S. person should be attributed to that U.S. person and not included in the non-U.S. person's determination); and

(iii) any swap position between another (U.S. or non-U.S.) person and a U.S. person or guaranteed affiliate, where it guarantees the obligations of the other person thereunder.

A non-U.S. person that is not a guaranteed affiliate of a U.S. person and is a financial entity would generally not have to count toward its MSP thresholds its exposure under swaps with foreign branches of U.S. swap dealers or guaranteed affiliates that are swap dealers, provided that the swap is either cleared, or the documentation of the

---

circumstances under which a wholly-owned subsidiary of a person already registered as a swap dealer enters into swaps with U.S. persons where its obligations are guaranteed by the swap dealer. IIB (Aug. 27, 2012) at 25.

[326] Cleary (Aug. 16, 2012) at 12.

[327] See Final Entities Rules, 77 FR at 30689.

swap requires the foreign branch or guaranteed affiliate to, and the swap dealer actually does, collect daily variation margin, on its swaps with the non-U.S. person.

In addition, a non-U.S. person that is not a guaranteed affiliate and is not a financial entity [328] would generally not have to count toward its MSP thresholds its exposure under swaps with a foreign branch or guaranteed affiliate, in each case that is a swap dealer.

*C. Interpretation of the Term ''Foreign Branch;'' When a Swap Should Be Considered To Be With the Foreign Branch of a U.S. Person That Is a Swap Dealer or MSP*

1. Interpretation of the Term ''Foreign Branch'' and Treatment of Foreign Branches

As discussed above, the Commission considers a foreign branch of a U.S. person to be a part of the U.S. person. Thus, in the Proposed Guidance, the Commission proposed that the U.S. person would be legally responsible for complying with all applicable Entity-Level Requirements. Under this approach, the foreign branch of the U.S. person would not register separately as a swap dealer. The Commission believes that this approach is appropriate because a foreign branch of a U.S. swap dealer is an integral part of a U.S. swap dealer and not a separate legal entity.

In the Proposed Guidance, the Commission also proposed interpreting 2(i) so that where a swap is with a foreign branch of a U.S.-based swap dealer, irrespective of whether the counterparty is a U.S. person or non-U.S. person, the foreign branch would be expected to comply with most of the Transaction-Level Requirements. The Commission stated that this proposed approach is appropriate in light of the Commission's strong supervisory interests in entities that are a part or an extension of a U.S.-based swap dealer. The Commission also proposed interpreting 2(i) so that swaps between a foreign branch of a U.S. person and a non-U.S. person counterparty (irrespective of whether that non-U.S. person counterparty's obligations under the swap are guaranteed by a U.S. person or not) would be eligible for substituted compliance with respect to Category A Transaction-Level Requirements. As discussed further below, where the counterparty to a swap with a foreign branch is a non-U.S. person (whether or not swaps such non-U.S. person is guaranteed or otherwise supported by, or is an affiliate conduit

of, a U.S. person), the Commission continues to be of the view that the swap should be eligible for substituted compliance with respect to Category A Transaction-Level Requirements, to the extent applicable, in light of the supervisory interest of the foreign jurisdiction in the execution and clearing of trades occurring in that jurisdiction. As discussed further in section F below, the Commission's recognition of substituted compliance would be based on an evaluation of whether the requirements of the home jurisdiction are comparable and comprehensive to the applicable requirement(s) under the CEA and Commission regulations based on a consideration of all relevant factors, including among other things: (i) The comprehensiveness of the foreign regulator's supervisory compliance program and (ii) the authority of such foreign regulator to support and enforce its oversight of the registrant's branch or agency with regard to such activities to which substituted compliance applies.

In the January Order, the Commission gave exemptive relief from Transaction-Level Requirements during the pendency of the January Order for swaps between a foreign branch of a U.S. swap dealer or U.S. MSP and a non-U.S. counterparty (including a non-U.S. swap dealer or non-U.S. MSP). Thus, notwithstanding the Commission's view that the foreign branch of a U.S. swap dealer is a U.S. person, the Commission granted temporary relief during the pendency of the January Order for swaps between a foreign branch of a U.S. registrant and a non-U.S. swap dealer, allowing the non-U.S. swap dealer to treat the foreign branch as a non-U.S. person.

In the January Order, the Commission also stated that because it believes a swap between two foreign branches of U.S. registrants is a swap between two U.S. persons, such swaps are fully subject to the Transaction-Level Requirements. Nevertheless, during the pendency of the January Order, the Commission determined it would be appropriate to permit foreign branches of U.S. registrants to comply only with transaction-level requirements required in the location of the foreign branch while the Commission further considered, and worked with international regulators regarding, the treatment of foreign branches of U.S. registrants. However, for purposes of this relief, the Commission stated that for a swap between foreign branches of U.S. registrants, the swap would be treated as with the foreign branch of a U.S. person when: (i) The personnel negotiating and agreeing to the terms of

the swap are located in the jurisdiction of such foreign branch; (ii) the documentation of the swap specifies that the counterparty or ''office'' for the U.S. person is such foreign branch; and (iii) the swap is entered into by such foreign branch in its normal course of business (collectively the ''January Order Criteria''). If the swap failed to satisfy all three of the January Order Criteria, the Commission stated that the swap would be treated as a swap of the U.S. person and not as a swap of the foreign branch of the U.S. person, and would not be eligible for relief from transaction-level requirements under the January Order.[329]

The Commission also stated in the January Order that as part of the Commission's further consideration of this issue, additional factors may be relevant to the consideration of whether a swap is with the foreign branch of a U.S. person. These factors could include, for example, that:

(i) The foreign branch is the location of employment of the employees negotiating the swap for the U.S. person or, if the swap is executed electronically, the employees managing the execution of the swap;

(ii) the U.S. person treats the swap as a swap of the foreign branch for tax purposes,

(iii) the foreign branch operates for valid business reasons and is not only a representative office of the U.S. person; and

(iv) the branch is engaged in the business of banking or financing and is subject to substantive regulation in the jurisdiction where it is located (collectively the ''Additional Factors'').[330]

The Commission also sought comment from market participants and other interested parties regarding whether it is appropriate to include these or other factors in the consideration of when a swap is with the foreign branch of a U.S. person.

2. Comments

The Commission received several comments on how the Commission should determine whether a swap is ''with a foreign branch,'' both with regard to swaps between a foreign branch and a non-U.S. swap dealer and swaps between two foreign branches of U.S. swap dealers. In addition, several organizations commented on the term ''foreign branch'' of a U.S. bank.

Commenters stated that in determining whether a swap between a non-U.S. swap dealer and a non-U.S. branch of a U.S. bank is bona fide with the non-U.S. branch, the Commission should look to whether the swap is booked in the foreign branch (as defined in Regulation K), and that the four

---

[328] *See* CEA section 2(h)(7)(C) for a definition of financial entity.

[329] *See* the January Order, 78 FR at 873 n. 123.

[330] *Id.* at 873.

additional factors that the Commission stated it was considering are unnecessary.[331] These commenters stated that the first Additional Factor being considered (*i.e.*, that the foreign branch is the location of employment of the employees negotiating the swap for the U.S. person or, if the swap is executed electronically, the employees managing the execution of the swap) should be deleted because employees that negotiate and agree to the terms of a swap may be located outside of the non-U.S. branch that books the trade for a variety of valid reasons.[332] Similar arguments were made with regard to the first prong of the January Order Criteria (*i.e.*, that the personnel negotiating and agreeing to the terms of the swap are located in the jurisdiction of such foreign branch).[333] As noted above, State Street stated that in a global economy, foreign exchange swaps are negotiated 24 hours a day, by parties in various locations. Therefore, the physical location of employees has little connection to the legal jurisdiction of the branch in which the swaps are booked. Determination of the branch in which the swap is booked is influenced by a number of factors, including the convenience of the swap counterparty and agreements between counterparties to book swaps to mutually agreeable and preferred locations. State Street further stated that limiting the ability to book transactions to a foreign branch would be inappropriate for U.S. dealers in foreign exchange because foreign exchange transactions are typically negotiated in large blocks, which combine the orders of a variety of asset owners, and which can include both U.S. persons and non-U.S. persons. Once negotiated and executed, these blocks are allocated to the various asset owners, and booked to the location preferred by the asset owner or in some cases the dealer's non-U.S. branch. This allows managers to trade foreign exchange more efficiently, using a single point of dealer contact, and ensures that all asset owners on whose behalf they are trading receive the same price. State Street also stated that the approach outlined in proposal would place U.S. businesses at a competitive disadvantage, as non-U.S. owners would be unwilling to do business that would subject them to the U.S. regulatory requirements.[334]

A commenter stated that it does not strongly object to prongs 2, 3 and 4 of the Additional Factors (that the swap is treated as a swap of the foreign branch for tax purposes, that the branch operates for valid business reasons and is not only a representative office, and that the branch is engaged in banking or financing and subject to substantive local regulation) since they could "be reasonable indicia of a *bona fide* non-U.S. branch of a U.S. swap dealer." However, this commenter stated that each of these prongs may be challenging to properly define and evaluate.[335]

With respect to the proposed tax prong (prong 2 of the Additional Factors), other commenters stated that the income from a swap that is booked in a foreign branch of a U.S. person is subject to taxation in the local jurisdiction in which the foreign branch is resident, which demonstrates that such swaps are bona fide with the non-U.S. branch. The commenters further noted that a foreign tax credit is generally allowed for income taxes paid locally.[336]

With regard to prong 3 of the Additional Factors (that the branch operates for valid business reasons and is not only a representative office), as noted earlier, SIFMA/CH/FSR argued that the only criteria that is relevant in determining whether a swap is bona fide with a foreign branch of a U.S. swap dealer is whether the swap is booked in the foreign branch (as reflected in the trade confirm), with the term "foreign branch" defined with reference to Regulation K. These commenters stated that the definition of a foreign branch in Regulation K makes it clear that a foreign branch of a U.S. bank is not a "representative office." In addition, Regulation K is a comprehensive regulation of the Federal Reserve Board that ensures that foreign branches operate for valid reasons.[337]

With regard to prong 4 of the Additional Factors (that the branch is engaged in banking or financing and subject to substantive local regulation), SIFMA/CH/FSR argue that this prong is unnecessary because, in addition to being regulated under Regulation K by the Federal Reserve, foreign branches are also subject to substantive local regulation and supervision, including licensing requirements and potentially local derivatives rules that the Commission could find to constitute substituted compliance. Although these commenters acknowledged that the

nature and scope of these regulations will vary by jurisdiction, they state that many foreign jurisdictions require the same level of compliance with local regulations that U.S. regulators require of U.S. branches of foreign banks with regards to U.S. laws and regulations. They also stated that requiring foreign branches to show that they are subject to substantive regulation in their local jurisdiction so as to determine whether each swap they enter into is bona fide would be overly burdensome and unnecessary. In their view, the only relevant factor that the Commission should consider is whether the swap has been booked into the foreign branch, which the trade confirm would reflect.[338]

Conversely, one commenter argued that, consistent with clear evidence from the last crisis that the risks accrued by foreign branches, guaranteed subsidiaries, and even non-guaranteed subsidiaries all flow back to the parent entity, foreign branches of U.S. persons should under no circumstances be subject to weaker regulation than the parent company. This commenter also argues that there is no substantive difference between a branch and a subsidiary of a U.S. person in terms of covering derivatives losses, and that both must be held to the same high standards as apply to the U.S. person itself. Otherwise, the U.S. taxpayer will be exposed to the risk of another massive bailout.[339] In addition, this commenter stated that claims made by industry groups that foreign branches of U.S. entities should not be classified as U.S. persons or they will find no foreign counterparties willing to do business with them are absurd and unsubstantiated, and taken literally, seem to suggest that the Commission should exempt all overseas swap activity from the requirements of Title VII of the Dodd-Frank Act, which would directly violate Congress's clear intent.

### 3. Commission Guidance

In preparing the Guidance, the Commission has carefully considered commenters' concerns and recommendations related to both the appropriate scope of the term "foreign branch" for purposes of this Guidance and Commission consideration of when a swap should be considered to be "with the foreign branch" of a U.S. bank that is a swap dealer or MSP.

### a. Scope of the Term "Foreign Branch"

The Commission notes that foreign branches of a U.S. bank are part of a

---

[331] *See* SIFMA/CH/FSR (Feb. 6, 2013) at B18–20; State Street (Feb. 6, 2013) at 2–4.

[332] *See, e.g.*, SIFMA/CH/FSR (Feb. 6, 2013) at B18.

[333] *Id.* at B17.

[334] State Street (Feb. 6, 2013) at 3–4.

[335] State Street (Feb. 6, 2013) at 2.

[336] *See* SIFMA/CH/FSR (Feb. 6, 2013) at B18; State Street (Feb. 6, 2013) at 2.

[337] *See* SIFMA/CH/FSR (Feb. 6, 2013) at B19.

[338] *See id.* at B19–20.

[339] Better Markets (Feb. 15, 2013) at 2, 4–5.

U.S. bank rather than a separate legal entity, and are therefore "U.S. persons." Nevertheless, as a policy matter, the Commission believes that CEA section 2(i) should be interpreted so as to exclude swap dealing transactions with a foreign branch of a U.S. swap dealer from the de minimis calculations for swap dealer or MSP registration. In addition, the Commission believes that CEA section 2(i) should be interpreted so that swaps between a foreign branch of a U.S. swap dealer or MSP and a non-U.S. person should be eligible for substituted compliance with regard to Category A Transaction-Level Requirements.[340] The Commission believes that CEA section 2(i) should be interpreted in this manner in order to avoid the potential result that foreign entities would cease doing swap dealing business with foreign branches of U.S. registered swap dealers. However, the Commission notes that interpreting CEA section 2(i) in this manner creates a distinction between swaps with foreign branches of U.S. banks and swaps with the U.S. principal bank. Therefore, the Commission also believes that Commission consideration of both the scope of the term "foreign branch" and when a swap is with the foreign branch of a U.S. bank should be construed under CEA section 2(i) in a manner that does not create unnecessary distinctions between otherwise similar activities.

Therefore, the Commission interprets CEA section 2(i) such that, for purposes of this Guidance, the Commission will generally consider a "foreign branch" of a U.S. swap dealer or U.S. MSP to be any "foreign branch" (as defined in the applicable banking regulation) of a U.S. bank that is: (i) Subject to Regulation K[341] or the FDIC International Banking

Regulation,[342] or otherwise designated as a "foreign branch" by the U.S. bank's primary regulator, (ii) maintains accounts independently of the home office and of the accounts of other foreign branches with the profit or loss accrued at each branch determined as a separate item for each foreign branch,[343] and (iii) subject to substantive regulation in banking or financing in the jurisdiction where it is located (the "Foreign Branch Characteristics"). However, in addition to the foregoing Foreign Branch Characteristics, the Commission will consider other relevant facts and circumstances in considering whether a foreign office of a U.S. bank is a "foreign branch" of a U.S. bank for purposes of this Guidance.

Further, for purposes of this Guidance, the Commission interprets CEA section 2(i) so that generally a foreign branch of a U.S. bank could include an office of a foreign bank that satisfies the foregoing Foreign Branch Characteristics. However, a foreign branch of a U.S. bank would generally not include an affiliate of a U.S. bank that is incorporated or organized as a separate legal entity.

In considering the scope of the term "foreign branch," the Commission agrees with commenters that stated that Regulation K of the Federal Reserve Board's regulations provides a useful reference because Regulation K provides a comprehensive regime for regulation of foreign branches that ensures that foreign branches of U.S. banks operate for valid reasons and are not "representative offices." Similarly, the Commission believes that the FDIC International Banking Regulation provides a useful reference for U.S. banks that have foreign branches which are subject to FDIC jurisdiction.[344]

In addition, regardless of a foreign branch of a U.S. bank is subject to Regulation K or the FDIC International Banking Regulation or is otherwise designated as a "foreign branch" by the U.S. bank's primary regulator, the Commission believes that CEA section 2(i) should be interpreted so that, for purposes of this Guidance, a foreign branch of a U.S. bank should generally also be subject to substantive regulation in banking or financing in the jurisdiction where it is located. Finally, the Commission believes that in order for a foreign office of a U.S. bank to be viewed as a "foreign branch" for purposes of this Guidance, another factor should generally be present—the foreign branch should maintain its accounts independently of the home office and of the accounts of other foreign branches, and at the end of each fiscal period the U.S. bank should transfer to its general ledger the profit or loss accrued at each branch as a separate item.[345]

### b. Commission Consideration of Whether a Swap Is With a Foreign Branch of a U.S. Bank

With regard to Commission consideration of whether a swap by a U.S. bank through a foreign office should be considered to be "with a foreign branch" of the U.S. person for purposes of the de minimis calculations for swap dealer and MSP registration[346] or application of the Transaction-Level Requirements[347] under this Guidance, the Commission has carefully considered the comments submitted on this question.

SIFMA/CH/FSR stated that the only criteria that is relevant in determining whether a swap is bona fide with a foreign branch of a U.S. swap dealer is whether the swap is booked in the foreign branch (as reflected in the trade confirmation), with the term "foreign branch" defined with reference to Regulation K. However, the

---

[340] As discussed further in section G, under the Commission's interpretation of 2(i), in the case of a swap with a U.S. swap dealer or U.S. MSP (including an affiliate of a non-U.S. person, and including a foreign branch of a U.S. bank that is a swap dealer or MSP), the parties to the swap generally would not be eligible for substituted compliance with one exception—where the swap is between the foreign branch of a U.S. bank that is a swap dealer or MSP and a non-U.S. person (regardless of whether the non-U.S. person is guaranteed or otherwise supported by, or is an affiliate conduit of, a U.S. person).

[341] Regulation K is a regulation issued by the Board of Governors of the Federal Reserve ("Federal Reserve Board") under the authority of the Federal Reserve Act ("FRA") (12 U.S.C. 221 *et seq.*); the Bank Holding Company Act of 1956 ("BHC Act") (12 U.S.C. 1841 *et seq.*) and the International Banking Act of 1978 ("IBA") (12 U.S.C. 3101 *et seq.*). Regulation K sets forth rules governing the international and foreign activities of U.S. banking organizations, including procedures for establishing foreign branches to engage in international banking.

Under Regulation K, 12 CFR part 211, a "foreign branch" is defined as "an office of an organization (other than a representative office) that is located outside the country in which the organization is

legally established and at which a banking or financing business is conducted. *See* 17 CFR 211.2(k).

[342] 12 CFR part 347 is a regulation issued by the Federal Deposit Insurance Corporation under the authority of the Federal Deposit Insurance Act (12 U.S.C. 1828(d)(2)), which sets forth rules governing the operation of foreign branches of insured state nonmember banks ("FDIC International Banking Regulation"). Under 12 CFR 347.102(j), a "foreign branch" is defined as "an office or place of business located outside the United States, its territories, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, or the Virgin Islands, at which banking operations are conducted, but does not include a representative office."

[343] The Commission notes that national banks operating foreign branches are required under section 25 of the Federal Reserve Act, 12 U.S.C. 604a, to conduct the accounts of each foreign branch independently of the accounts of other foreign branches established by it and of its home office, and are required at the end of each fiscal period to transfer to its general ledger the profit or loss accrued at each branch as a separate item.

[344] *See* notes 341 and 342 above and accompanying text for additional information

regarding the definition of a "foreign branch" in Regulation K and the FDIC International Banking Regulation.

[345] The Commission notes that section 25 of the Federal Reserve Act, 12 U.S.C. 604a, states that national banking associations with $1 million or more in capital and surplus may file an application with the Board of Governors of the Federal Reserve System for permission to exercise certain powers, including establishment of foreign branches. In addition, section 25(9) requires that every national banking association operating foreign branches conduct the accounts of each foreign branch independently of the accounts of other foreign branches established by it and of its home office, and at the end of each fiscal period transfer to its general ledger the profit or loss accrued at each branch as a separate item.

[346] *See* section B, *supra.*

[347] *See* section G, *infra.*

Commission's view is that the trade confirmation generally is not relevant for purposes of determining whether to treat a swap as being with a foreign branch of a U.S. bank rather than with the U.S. principal bank. In reality, because the foreign branch of a U.S. bank is not a separate legal entity, the U.S. principal bank would generally be the party that is ultimately responsible for a swap with its foreign branch. The Commission's view is that a foreign branch of a U.S. bank should be considered a "U.S. person" under this Guidance because it is a part of the U.S. bank. Moreover, Better Markets has argued that foreign branches of U.S. banks as well as foreign subsidiaries and affiliates should be treated exactly the same as U.S. persons in all respects under this Guidance.

However, in light of principles of international comity and giving consideration to comments that state that foreign branches of U.S. banks will be at a competitive disadvantage if foreign branches of U.S. banks are not treated the same as non-U.S. persons, the Commission believes that in considering whether a swap should be considered as being with the foreign branch of a U.S. bank under this Guidance, all of the facts and circumstances are relevant. In particular, the Commission's view is that if all of the following factors are present, generally the swap should be considered to be with the foreign branch of a U.S. bank for purposes of this Guidance:

(i) The employees negotiating and agreeing to the terms of the swap (or, if the swap is executed electronically, managing the execution of the swap), other than employees with functions that are solely clerical or ministerial, are located in such foreign branch or in another foreign branch of the U.S. bank;

(ii) the foreign branch or another foreign branch is the office through which the U.S. bank makes and receives payments and deliveries under the swap on behalf of the foreign branch pursuant to a master netting or similar trading agreement, and the documentation of the swap specifies that the office for the U.S. bank is such foreign branch;

(iii) the swap is entered into by such foreign branch in its normal course of business;

(iv) the swap is treated as a swap of the foreign branch for tax purposes; and

(v) the swap is reflected in the local accounts of the foreign branch.

However, if material terms of the swap are negotiated or agreed to by employees of the U.S. bank located in the United States, the Commission believes that generally the swap should be considered to be with the U.S.

principal bank, rather than its foreign branch, for purposes of this Guidance.

The Commission also believes that the factors enumerated above would be relevant both to an analysis of whether a swap should be considered to be between a foreign branch of a U.S. bank and a non-U.S. swap dealer and an analysis of whether a swap should be considered to be between two foreign branches of U.S. banks. The Commission discusses each of the enumerated factors in more detail below.

The first of the five factors enumerated above is similar to prong 1 of the Additional Factors (whether the employees negotiating the swap for the U.S. person are located in the foreign branch, or if the swap is executed electronically, the employees managing the execution of the swap); however, the first factor above considers whether the employees negotiating and agreeing to the terms of the swap are located in any foreign branch of the U.S. bank. This modification addresses the objection of commenters that stated that employees that negotiate and agree to swaps are often located outside the foreign branch for bona fide reasons.[348] However, to the extent that material terms of the swap are negotiated or agreed by employees of the U.S. bank located in the United States, the Commission believes that generally the swap should be considered to be with the U.S. principal bank for purposes of this Guidance.

The second factor above is similar to prong (ii) of the January Order Criteria (that the documentation of the swap specifies that the counterparty or "office" for the U.S. person is such foreign branch). However, because a foreign branch of a U.S. bank is not a separate legal entity, the Commission believes that the U.S. principal bank generally should be considered to be the counterparty for purposes of this Guidance irrespective of whether the foreign branch is named as the counterparty in the swap documentation. Therefore, the Commission has modified the second factor, consistent with its other interpretations of section 2(i), so that it makes no reference to the foreign branch as counterparty. Rather, the second factor above relates to whether the foreign branch or another foreign branch is the office through which the U.S. bank makes and receives payments and deliveries under the swap on behalf of the foreign branch pursuant to a master netting or similar trading agreement, and whether the documentation of the

swap specifies that the office for the U.S. bank is such foreign branch. This modification is consistent with the ISDA Master Agreement, which requires that each party specify an "office" for each swap, which is where a party "books" a swap and/or the office through which the party makes and receives payments and deliveries.

The third factor above (whether the swap is entered into by such foreign branch in its normal course of business) is the same as prong (iii) in the January Order Criteria discussed above. The Commission is concerned about the material terms of a swap being negotiated or agreed by employees of the U.S. bank that are located in the United States and then routed to a foreign branch in order for the swap to be treated as a swap with the foreign branch for purposes of the de minimis calculations for swap dealer and MSP registration or application of the Transaction-Level Requirements under this Guidance.

The fourth factor above (whether the swap is treated as a swap of the foreign branch for tax purposes) is the same as prong 2 of the Additional Factors. The Commission notes that State Street stated that it does not strongly object to prongs 2, 3 and 4 of the Additional Factors (that the swap is treated as a swap of the foreign branch for tax purposes, that the branch operates for valid business reasons and is not only a representative office, and that the branch is engaged in banking or financing and subject to substantive local regulation) since they could "be reasonable indicia of a bona fide non-U.S. branch of a U.S. swap dealer." However, State Street stated that each of these prongs may be challenging to properly define and evaluate.[349] Other commenters stated that the income from a swap that is booked in a foreign branch of a U.S. person is subject to taxation in the local jurisdiction in which the foreign branch is resident, which demonstrates that such swaps are bona fide with the non-U.S. branch.[350] The Commission notes that the fourth factor above only refers to whether the tax treatment of the swap is consistent with the swap being treated as a swap of the foreign branch for tax purposes.

The fifth factor above focuses on whether the swap is reflected in the accounts of the foreign branch. The Commission believes that where a swap is bona fide with the foreign branch of a U.S. bank, it generally would be

---

[348] See, e.g., SIFMA/CH/FSR (Feb. 6, 2013) at B18; State Street (Feb. 6, 2013) at 2–4.

[349] See State Street (Feb. 6, 2013) at 2.

[350] See, e.g., SIFMA/CH/FSR (Feb. 6, 2013) at B18.

reflected in the foreign branch's accounts.

## D. Description of the Entity-Level and Transaction-Level Requirements

Title VII of the Dodd-Frank Act establishes a comprehensive new regulatory framework for swap dealers and MSPs that Congress enacted with the goal of reducing systemic risk and enhancing market transparency. Under this framework, a swap dealer or MSP must, among other things, comport with certain standards (and regulations as the Commission may promulgate) governing risk management, internal and external business conduct, and reporting. Further, swap dealers and MSPs are required to comply with all of the requirements applicable to swap dealers and MSPs for all their swaps, not just the swaps that make them a swap dealer or MSP.

Even before the Commission published the Proposed Guidance, a number of commenters recommended that the Commission, in interpreting the cross-border applicability of the Dodd-Frank Act swaps provisions, should distinguish between requirements that apply at an entity level (*i.e.,* to the firm as a whole) as compared to those that apply at a transactional level (*i.e.,* to the individual swap transaction or trading relationship).[351] These commenters argued that requirements that relate to the core operations of a firm should be applied to the entity as a whole would include the capital and related prudential requirements and recordkeeping, as well as certain risk mitigation requirements (*e.g.,* information barriers and the designation of a chief compliance officer). The commenters stated that other requirements, such as margin, should apply on transaction-by-transaction basis and only to swaps with U.S. counterparties.

Commenters on the Proposed Guidance generally supported the division of Dodd-Frank's swaps provisions (and Commission regulations thereunder) into Entity-Level and Transaction-Level Requirements.[352] Certain of these commenters, however,

made specific recommendations for reclassification of some of these Requirements, which are discussed in section E below.

The Commission agrees with the commenters that the various Dodd-Frank Act swaps provisions applicable to swap dealers and MSPs can be conceptually separated into Entity-Level Requirements, which apply to a swap dealer or MSP firm as a whole, and Transaction-Level Requirements, which apply on a transaction-by-transaction basis. Descriptions of each of the Entity-Level Requirements under this Guidance are set out immediately below, followed by descriptions of the Transaction-Level Requirements. Additional information related to the categorization of Entity-Level and Transaction-Level Requirements is discussed in section E.

### 1. Description of the Entity-Level Requirements

The Entity-Level Requirements under Title VII of the Dodd-Frank Act and the Commission's regulations promulgated thereunder relate to: (i) Capital adequacy; (ii) chief compliance officer; (iii) risk management; (iv) swap data recordkeeping; (v) swap data repository reporting ("SDR Reporting"); and (vi) physical commodity large swaps trader reporting ("Large Trader Reporting"). The Entity-Level Requirements apply to registered swap dealers and MSPs across all their swaps without distinctions as to the counterparty or the location of the swap (although under this Guidance in some circumstances the availability of substituted compliance may vary based on whether the counterparty is a U.S. person or a non-U.S. person).

The Entity-Level Requirements are split into two categories. The first category of Entity-Level Requirements includes capital adequacy, chief compliance officer, risk management, and swap data recordkeeping under Commission regulations 23.201 and 23.203 (except certain aspects of swap data recordkeeping relating to complaints and sales materials) ("First Category"). The second category of Entity-Level Requirements includes SDR Reporting, certain aspects of swap data recordkeeping relating to complaints and marketing and sales materials under Commission regulations 23.201(b)(3) and 23.201(b)(4) and Large Trader Reporting ("Second Category").

Each of the Entity-Level Requirements is discussed in the subsections that follow.

### a. First Category of Entity-Level Requirements

### i. Capital Adequacy

Section 4s(e)(2)(B) of the CEA specifically directs the Commission to set capital requirements for swap dealers and MSPs that are not subject to the capital requirements of U.S. prudential regulators (hereinafter referred to as "non-bank swap dealers or MSPs").[353] With respect to the use of swaps that are not cleared, these requirements must: "(1) [h]elp ensure the safety and soundness of the swap dealer or major swap participant; and (2) [be] appropriate for the risk associated with the non-cleared swaps held as a swap dealer or major swap participant." [354] Pursuant to section 4s(e)(3), the Commission proposed regulations, which would require non-bank swap dealers and MSPs to hold a minimum level of adjusted net capital (*i.e.,* "regulatory capital") based on whether the non-bank swap dealer or MSP is: (i) Also a FCM; (ii) not an FCM, but is a non-bank subsidiary of a bank holding company; or (iii) neither an FCM nor a non-bank subsidiary of a bank holding company.[355] The primary

---

[351] *See, e.g.,* SIFMA (Feb. 3, 2011); ISDA (Jan. 24, 2011); Cleary (Sept. 20, 2011); Barclays Bank PLC, BNP Paribas S.A., Deutsche Bank AG, Royal Bank of Canada, The Royal Bank of Scotland Group PLC, Societe Generale, and UBS AG (Jan. 11, 2011); Barclays Bank PLC, BNP Paribas S.A., Credit Suisse AG, Deutsche Bank AG, HSBC, Nomura Securities International, Inc., Rabobank Nederland, Royal Bank of Canada, The Royal Bank of Scotland Group PLC, Societe Generale, The Toronto-Dominion Bank, and UBS AG (Feb. 17, 2011).

[352] *See, e.g.,* SocGen (Aug. 8, 2012) at 6; IIB (Aug. 27, 2012) at 2; Clearing House (Aug. 27, 2012) at 22.

[353] *See* 7 U.S.C. 6s(e)(2)(B). Section 4s(e) of the CEA explicitly requires the adoption of rules establishing capital and margin requirements for swap dealers and MSPs, and applies a bifurcated approach that requires each swap dealer and MSP for which there is a U.S. prudential regulator to meet the capital and margin requirements established by the applicable prudential regulator, and each swap dealer and MSP for which there is no prudential regulator to comply with the Commission's capital and margin regulations. *See* 7 U.S.C. 6s(e). Further, systemically important financial institutions ("SIFIs") that are not FCMs would be exempt from the Commission's capital requirements, and would comply instead with Federal Reserve Board requirements applicable to SIFIs, while nonbank (and non-FCM) subsidiaries of U.S. bank holding companies would calculate their Commission capital requirement using the same methodology specified in Federal Reserve Board regulations applicable to the bank holding company, as if the subsidiary itself were a bank holding company. The term "prudential regulator" is defined in CEA section 1a(39) as the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Farm Credit Administration, and the Federal Housing Finance Agency. *See* 7 U.S.C. 1a(39). In addition, in the proposed capital regulations for swap dealers and MSPs, the Commission solicited comment regarding whether it would be appropriate to permit swap dealers and MSPs to use internal models for computing market risk and counterparty credit risk charges for capital purposes if such models had been approved by a foreign regulatory authority and were subject to periodic assessment by such foreign regulatory authority. *See* Capital Requirements of Swap Dealers and Major Swap Participants, 76 FR 27802 (May 12, 2011) ("Proposed Capital Requirements").

[354] *See* 7 U.S.C. 6s(e)(3)(A).

[355] *See* 7 U.S.C. 6s(e). *See also* Proposed Capital Requirements, 76 FR at 27817 ("The Commission's capital proposal for [swap dealers] and MSPs

Continued

purpose of the capital requirement is to reduce the likelihood and cost of a swap dealer's or MSP's default by requiring a financial cushion that can absorb losses in the event of the firm's default.

### ii. Chief Compliance Officer

Section 4s(k) requires that each swap dealer and MSP designate an individual to serve as its chief compliance officer ("CCO") and specifies certain duties of the CCO.[356] Pursuant to section 4s(k), the Commission adopted regulation 3.3, which requires swap dealers and MSPs to designate a CCO who would be responsible for administering the firm's compliance policies and procedures, reporting directly to the board of directors or a senior officer of the swap dealer or MSP, as well as preparing and filing with the Commission a certified report of compliance with the CEA. The chief compliance function is an integral element of a firm's risk management and oversight and the Commission's effort to foster a strong culture of compliance within swap dealers and MSPs.

### iii. Risk Management

Section 4s(j) of the CEA requires each swap dealer and MSP to establish internal policies and procedures designed to, among other things, address risk management, monitor compliance with position limits, prevent conflicts of interest, and promote diligent supervision, as well as maintain business continuity and disaster recovery programs.[357] The Commission adopted implementing regulations 23.600, 23.601, 23.602, 23.603, 23.605, and 23.606).[358] The Commission also adopted regulation 23.609, which requires certain risk management procedures for swap dealers or MSPs that are clearing members of a DCO.[359] Collectively, these requirements help to establish a robust and comprehensive internal risk management program for swap dealers and MSPs, which is critical to effective systemic risk management for the overall swaps market.

### iv. Swap Data Recordkeeping (Except Certain Aspects of Swap Data Recordkeeping Relating to Complaints and Sales Materials)

CEA section 4s(f)(1)(B) requires swap dealers and MSPs to keep books and records for all activities related to their business.[360] Sections 4s(g)(1) and (4) require swap dealers and MSPs to maintain trading records for each swap and all related records, as well as a complete audit trail for comprehensive trade reconstructions.[361] Pursuant to these provisions, the Commission adopted regulations 23.201and 23.203, which require swap dealers and MSPs to keep records including complete transaction and position information for all swap activities, including documentation on which trade information is originally recorded. Pursuant to Commission regulation 23.203, records of swaps must be maintained for the duration of the swap plus 5 years, and voice recordings for 1 year, and records must be "readily accessible" for the first 2 years of the 5 year retention period. Swap dealers and MSPs also must comply with Parts 43, 45 and 46 of the Commission's regulations, which, respectively, address the data recordkeeping and reporting requirements for all swaps subject to the Commission's jurisdiction, including swaps entered into before the date of enactment of the Dodd-Frank Act ("pre-enactment swaps") and swaps entered into on or after the date of enactment of the Dodd-Frank Act but prior to the compliance date of the swap data reporting rules ("transition swaps").[362]

### b. Second Category of Entity-Level Requirements

#### i. SDR Reporting

CEA section 2(a)(13)(G) requires all swaps, whether cleared or uncleared, to be reported to a registered SDR.[363] CEA section 21 requires SDRs to collect and maintain data related to swaps as prescribed by the Commission, and to make such data electronically available to particular regulators under specified conditions related to confidentiality.[364] Part 45 of the Commission's regulations (and Appendix 1 thereto) sets forth the specific swap data that must be reported to a registered SDR, along with attendant recordkeeping requirements; and part 46 addresses recordkeeping and reporting requirements for pre-enactment and transition swaps ("historical swaps"). The fundamental goal of part 45 of the Commission's regulations is to ensure that complete data concerning all swaps subject to the Commission's jurisdiction is maintained in SDRs where it will be available to the Commission and other financial regulators for fulfillment of their various regulatory mandates, including systemic risk mitigation, market monitoring and market abuse prevention. Part 46 supports similar goals with respect to pre-enactment and transition swaps and ensures that data needed by regulators concerning "historical" swaps is available to regulators through SDRs. Among other things, data reported to SDRs will enhance the Commission's understanding of concentrations of risks within the market, as well as promote a more effective monitoring of risk profiles of market participants in the swaps market. The Commission also believes that there are benefits that will accrue to swap dealers and MSPs as a result of the timely reporting of comprehensive swap transaction data and consistent data standards for recordkeeping, among other things. Such benefits include more robust risk monitoring and management capabilities for swap dealers and MSPs, which in turn will improve the monitoring of their current swaps market positions.

---

includes a minimum dollar level of $20 million. A non-bank [swap dealer] or MSP that is part of a U.S. bank holding company would be required to maintain a minimum of $20 million of Tier 1 capital as measured under the capital rules of the Federal Reserve Board. [A swap dealer] or MSP that also is registered as an FCM would be required to maintain a minimum of $20 million of adjusted net capital as defined under [proposed] section 1.17. In addition, [a swap dealer] or MSP that is not part of a U.S. bank holding company or registered as an FCM would be required to maintain a minimum of $20 million of tangible net equity, plus the amount of the [swap dealer's] or MSP's market risk exposure and OTC counterparty credit risk exposure.").

[356] *See* 7 U.S.C. 6s(k).

[357] 7 U.S.C. 6s(j).

[358] Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 FR 20128 (Apr. 3, 2012) ("Final Swap Dealer and MSP Recordkeeping Rule") (relating to risk management program, monitoring of position limits, business continuity and disaster recovery, conflicts of interest policies and procedures, and general information availability, respectively).

[359] Customer Clearing Documentation, Timing of Acceptance for Clearing, and Clearing Member Risk Management, 77 FR 21278 (Apr. 9, 2012) ("Final Customer Documentation Rules"). Also, swap dealers must comply with Commission regulation 23.608, which prohibits swap dealers providing clearing services to customers from entering into agreements that would: (i) disclose the identity of a customer's original executing counterparty; (ii) limit the number of counterparties a customer may trade with; (iii) impose counterparty-based position limits; (iv) impair a customer's access to execution of a trade on terms that have a reasonable relationship to the best terms available; or (v) prevent compliance with specified time frames for acceptance of trades into clearing.

[360] 7 U.S.C. 6s(f)(1)(B).

[361] 7 U.S.C. 6s(g)(1).

[362] *See* 17 CFR part 46; Swap Data Recordkeeping and Reporting Requirements: Pre-Enactment and Transition Swaps, 76 FR 22833 (Apr. 25, 2011) ("Proposed Data Rules").

[363] 7 U.S.C. 2(a)(13)(G).

[364] 7 U.S.C. 24a.

ii. Swap Data Recordkeeping Relating to Complaints and Marketing and Sales Materials

CEA section 4s(f)(1) requires swap dealers and MSPs to "make such reports as are required by the Commission by rule or regulation regarding the transactions and positions and financial condition of the registered swap dealer or MSP." [365] Additionally, CEA section 4s(h) requires swap dealers and MSPs to "conform with such business conduct standards . . . as may be prescribed by the Commission by rule or regulation." [366] Pursuant to these provisions, the Commission promulgated final rules that set forth certain reporting and recordkeeping for swap dealers and MSPs.[367] Commission Regulation 23.201 states that "[e]ach swap dealer and major swap participant shall keep full, complete, and systematic records of all activities related to its business as a swap dealer or major swap participant." Such records must include, among other things, "[a] record of each complaint received by the swap dealer or major swap participant concerning any partner, member, officer, employee, or agent," [368] as well as "[a]ll marketing and sales presentations, advertisements, literature, and communications." [369]

iii. Physical Commodity Large Swaps Trader Reporting (Large Trader Reporting)

CEA section 4t authorizes the Commission to establish a large trader reporting system for significant price discovery swaps (of which the economically equivalent swaps subject to part 20 of the Commission's regulations are a subset).[370] Pursuant thereto, the Commission adopted its Large Trader Reporting rules (part 20 of the Commission's regulations), which require routine reports from swap dealers, among other entities, that hold significant positions in swaps that are linked, directly or indirectly, to a prescribed list of U.S.-listed physical commodity futures contracts.[371]

Additionally, Large Trader Reporting requires that swap dealers, among other entities, comply with certain recordkeeping obligations.

2. Description of the Transaction-Level Requirements

The Transaction-Level Requirements include: (i) Required clearing and swap processing; (ii) margining (and segregation) for uncleared swaps; (iii) mandatory trade execution; (iv) swap trading relationship documentation; (v) portfolio reconciliation and compression; (vi) real-time public reporting; (vii) trade confirmation; (viii) daily trading records; and (ix) external business conduct standards.

The Transaction-Level Requirements—with the exception of external business conduct standards—relate to both risk mitigation and market transparency. Certain of these requirements, such as clearing and margining, serve to lower a firm's risk of failure. In that respect, these Transaction-Level Requirements could be classified as Entity-Level Requirements. Other Transaction-Level Requirements—such as trade confirmation, swap trading relationship documentation, and portfolio reconciliation and compression—also serve important risk mitigation functions, but are less closely connected to risk mitigation of the firm as a whole and thus are more appropriately applied on a transaction-by-transaction basis. Likewise, the requirements related to trade execution, trade confirmation, daily trading records, and real-time public reporting have a closer nexus to the transparency goals of the Dodd-Frank Act, as opposed to addressing the risk of a firm's failure.

As a result, whether a particular requirement of Title VII should apply on a transaction-by-transaction basis in the context of cross-border activity for purposes of section 2(i) of the CEA requires the Commission to exercise some degree of judgment. Nevertheless, in the interest of comity principles, the Commission believes that the Transaction-Level Requirements may be applied on a transaction-by-transaction basis. The Transaction-Level Requirements are split into two categories. All of the Transaction-Level Requirements except external business conduct standards are in Category A.

The external business conduct standards are in Category B.

Each of the Transaction-Level Requirements is discussed below.

a. Category A: Risk Mitigation and Transparency

i. Required Clearing and Swap Processing

Section 2(h)(1) of the CEA requires a swap to be submitted for clearing to a DCO if the Commission has determined that the swap is required to be cleared, unless one of the parties to the swap is eligible for an exception from the clearing requirement and elects not to clear the swap.[372] Clearing via a DCO mitigates the counterparty credit risk between swap dealers or MSPs and their counterparties.

Commission regulations implementing the first designations of swaps for required clearing were published in the **Federal Register** on December 13, 2012.[373] Under Commission regulation 50.2, all persons executing a swap that is included in a class of swaps identified under Commission regulation 50.4 must submit such swap to an eligible DCO for clearing as soon as technologically practicable after execution, but in any event by the end of the day of execution.

Regulation 50.4 establishes required clearing for certain classes of swaps. Currently, those classes include, for credit default swaps: Specified series of untranched North American CDX indices and European iTraxx indices; and for interest rate swaps: Fixed-to-floating swaps, basis swaps, forward rate agreements referencing U.S. Dollar, Euro, Sterling, and Yen, and overnight index swaps referencing U.S. Dollar, Euro, and Sterling. Each of the six classes is further detailed in Commission regulation 50.4. Swaps that have the specifications identified in the regulation are required to be cleared and must be cleared pursuant to the rules of any eligible DCO [374] unless an exception or exemption specified in the CEA or the Commission's regulations applies.

Generally, if a swap is subject to CEA section 2(h)(1)(A) and part 50 of the Commission's regulations, it must be cleared through an eligible DCO, unless: (i) One of the counterparties is eligible for and elects the end-user exception

---

[365] 7 U.S.C. 6s(f)(1).

[366] 7 U.S.C. 6s(h)(1); *see* 7 U.S.C. 6s(h)(3).

[367] Final Swap Dealer and MSP Recordkeeping Rule, 77 FR 20128.

[368] 17 CFR 23.201(b)(3)(i).

[369] 17 CFR 23.201(b)(4).

[370] 7 U.S.C. 6t.

[371] Large Trader Reporting for Physical Commodity Swaps, 76 FR 43851 (July 22, 2011). The rules require routine position reporting by clearing organizations, as well as clearing members and swap dealers with reportable positions in the covered physical commodity swaps. The rules also establish recordkeeping requirements for clearing organizations, clearing members and swap dealers, as well as traders with positions in the covered physical commodity swaps that exceed a prescribed

threshold. In general, the rules apply to swaps that are linked, directly or indirectly, to either the price of any of the 46 U.S. listed physical commodity futures contracts the Commission enumerates (Covered Futures Contracts) or the price of the physical commodity at the delivery location of any of the Covered Futures Contracts.

[372] 7 U.S.C. 2(h)(1), (7).

[373] Clearing Requirement Determination Under Section 2(h) of the CEA, 77 FR 74284 (Dec. 13, 2012) ("Clearing Requirement Determination").

[374] A DCO's eligibility to clear swaps that are required to be cleared pursuant to section 2(h)(1)(A) of the CEA and part 50 of the Commission's regulations is governed by regulation 39.5(a), relating to DCO eligibility.

under Commission regulation 50.50;[375] or (ii) both counterparties are eligible for and elect an inter-affiliate exemption under Commission regulation 50.52.[376] To elect either the End-User Exception or the Inter-Affiliate Exemption, the electing party or parties and the swap must meet certain requirements set forth in the regulations.

Closely connected with the clearing requirement are the following swap processing requirements: (i) Commission regulation 23.506, which requires swap dealers and MSPs to submit swaps promptly for clearing; and (ii) Commission regulations 23.610 and 39.12, which establish certain standards for swap processing by DCOs and/or swap dealers and MSPs that are clearing members of a DCO.[377] Together, required clearing and swap processing requirements promote safety and soundness of swap dealers and MSPs, and mitigate the credit risk posed by bilateral swaps between swap dealers or MSPs and their counterparties.[378]

### ii. Margin and Segregation Requirements For Uncleared Swaps

Section 4s(e) of the CEA requires the Commission to set margin requirements for swap dealers and MSPs that trade in swaps that are not cleared.[379] The margin requirements ensure that outstanding current and potential future risk exposures between swap dealers and their counterparties are collateralized, thereby reducing the

possibility that swap dealers or MSPs take on excessive risks without having adequate financial backing to fulfill their obligations under the uncleared swap. In addition, with respect to swaps that are not submitted for clearing, section 4s(l) requires that a swap dealer or MSP notify the counterparty of its right to request that funds provided as margin be segregated, and upon such request, to segregate the funds with a third-party custodian for the benefit of the counterparty. In this way, the segregation requirement enhances the protections offered through margining uncleared swaps and thereby provides additional financial protection to counterparties. The Commission is working with foreign and domestic regulators to develop and finalize appropriate regulations for margin and segregation requirements.

### iii. Trade Execution

Integrally linked to the clearing requirement is the trade execution requirement, which is intended to bring the trading of swaps that are required to be cleared and are made available to trade onto regulated exchanges or execution facilities. Specifically, section 2(h)(8) of the CEA provides that unless a clearing exception applies and is elected, a swap that is subject to a clearing requirement must be executed on a DCM or SEF, unless no such DCM or SEF makes the swap available to trade.[380] Commission regulations implementing the process for a DCM or SEF to make a swap available to trade were published in the **Federal Register** on June 4, 2013.[381] Under Commission regulations 37.10 and 38.12, respectively, a SEF or DCM may submit a determination for Commission review that a mandatorily cleared swap is available to trade based on enumerated factors. By requiring the trades of mandatorily cleared swaps that are made available to trade to be executed on an exchange or an execution facility—each with its attendant pre- and post-trade transparency and safeguards to ensure market integrity—the trade execution requirement furthers the statutory goals of financial stability, market efficiency, and enhanced transparency.

### iv. Swap Trading Relationship Documentation

CEA section 4s(i) requires each swap dealer and MSP to conform to Commission standards for the timely and accurate confirmation, processing, netting, documentation and valuation of swaps. Pursuant thereto, Commission regulation 23.504(a) requires swap dealers and MSPs to "establish, maintain and enforce written policies and procedures" to ensure that the swap dealer or MSP executes written swap trading relationship documentation.[382] Under Commission regulation 23.504(b), the swap trading relationship documentation must include, among other things: All terms governing the trading relationship between the swap dealer or MSP and its counterparty; credit support arrangements; investment and re-hypothecation terms for assets used as margin for uncleared swaps; and custodial arrangements.[383] Further, the swap trading relationship documentation requirement applies to all swaps with registered swap dealers and MSPs. In addition, Commission regulation 23.505 requires swap dealers and MSPs to document certain information in connection with swaps for which exceptions from required clearing are elected.[384] Swap documentation standards facilitate sound risk management and may promote standardization of documents and transactions, which are key conditions for central clearing, and lead to other operational efficiencies, including improved valuation.

### v. Portfolio Reconciliation and Compression

CEA section 4s(i) directs the Commission to prescribe regulations for the timely and accurate processing and netting of all swaps entered into by swap dealers and MSPs. Pursuant to CEA section 4s(i), the Commission adopted regulations (23.502 and 23.503), which require swap dealers and MSPs to perform portfolio reconciliation and compression, for all swaps.[385] Portfolio reconciliation is a

---

[375] See End-User Exception to the Clearing Requirement for Swaps, 77 FR 42560 (July 19, 2012) ("End-User Exception").

[376] The Commission has adopted an exemption from required clearing for swaps between certain affiliated entities. Exemption for Swaps Between Certain Affiliated Entities, 78 FR 21750 (Apr. 11, 2013) ("Inter-Affiliate Exemption").

[377] 17 CFR 23.506 and 23.610. See also Final Customer Documentation Rules, 77 FR 21278.

[378] See section H regarding the application of required clearing rules to market participants that are not registered as swap dealers or MSPs, including the circumstances under which the parties to such swaps would be eligible for substituted compliance.

[379] See 7 U.S.C. 6s(e). See also Margin Requirements for Uncleared Swaps for Swap Dealers and Major Swap Participants, 76 FR 23732, 23733–23740 (Apr. 28, 2011) ("Proposed Margin Requirements"). Section 4s(e) explicitly requires the adoption of rules establishing margin requirements for swap dealers and MSPs, and applies a bifurcated approach that requires each swap dealer and MSP for which there is a prudential regulator to meet the margin requirements established by the applicable prudential regulator, and each swap dealer and MSP for which there is no prudential regulator to comply with the Commission's margin regulations. In contrast, the segregation requirements in section 4s(l) do not use a bifurcated approach—that is, all swap dealers and MSPs are subject to the Commission's regulations regarding notice and third party custodians for margin collected for uncleared swaps.

[380] See 7 U.S.C. 2(h)(8).

[381] See Process for a Designated Contract Market or Swap Execution Facility To Make a Swap Available to Trade, Swap Transaction Compliance and Implementation Schedule, and Trade Execution Requirement Under the Commodity Exchange Act, 78 FR 33606 (Jun. 4, 2013).

[382] See also Confirmation, Portfolio Reconciliation, Portfolio Compression, and Swap Trading Relationship Documentation Requirements for Swap Dealers and Major Swap Participants; 77 FR 55904 (Sept. 11, 2012) ("Final Confirmation Rules").

[383] The requirement under section 4s(i) relating to trade confirmations is a Transaction-Level Requirement. Accordingly, Commission regulation 23.504(b)(2) requires a swap dealer's and MSP's swap trading relationship documentation to include all confirmations of swaps, will apply on a transaction-by-transaction basis.

[384] See also Final Confirmation Rules, 77 FR 55964.

[385] See id.

post-execution risk management tool to ensure accurate confirmation of a swap's terms and to identify and resolve any discrepancies between counterparties regarding the valuation of the swap. Portfolio compression is a post-trade processing and netting mechanism that is intended to ensure timely, accurate processing and netting of swaps.[386] Regulation 23.503 requires all swap dealers and MSPs to establish policies and procedures for terminating fully offsetting uncleared swaps, when appropriate, and periodically participating in bilateral and/or multilateral portfolio compression exercises for uncleared swaps with other swap dealers or MSPs or conducted by a third party.[387] The rule also requires policies and procedures for engaging in such exercises for uncleared swaps with non-swap dealers and non-MSPs upon request. Further, participation in multilateral portfolio compression exercises is mandatory for dealer-to-dealer trades.

### vi. Real-Time Public Reporting

Section 2(a)(13) of the CEA directs the Commission to promulgate rules providing for the public availability of swap transaction and pricing data on a real-time basis.[388] In accordance with this mandate, the Commission promulgated part 43, which provides that all "publicly reportable swap transactions" must be reported and publicly disseminated, and which establishes the method, manner, timing and particular transaction and pricing data that must be reported by parties to a swap transaction.[389] Additionally, the Commission adopted regulation 23.205, which directs swap dealers and MSPs to undertake such reporting and to have the electronic systems and procedures necessary to transmit electronically all information and data required to be reported in accordance with part 43.[390]

The real-time dissemination of swap transaction and pricing data supports the fairness and efficiency of markets and increases transparency, which in turn improves price discovery and decreases risk (e.g., liquidity risk).[391]

### vii. Trade Confirmation

Section 4s(i) of the CEA [392] requires that each swap dealer and MSP must comply with the Commission's regulations prescribing timely and accurate confirmation of swaps. The Commission has adopted regulation 23.501, which requires, among other things, a timely and accurate confirmation of swap transactions (which includes execution, termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights or obligations of a swap) among swap dealers and MSPs by the end of the first business day following the day of execution.[393] Timely and accurate confirmation of swaps—together with portfolio reconciliation and compression—are important post-trade processing mechanisms for reducing risks and improving operational efficiency.[394]

### viii. Daily Trading Records

Pursuant to CEA section 4s(g), the Commission adopted regulation 23.202, which requires swap dealers and MSPs to maintain daily trading records, including records of trade information related to pre-execution, execution, and post-execution data that is needed to conduct a comprehensive and accurate trade reconstruction for each swap. The final rule also requires that records be kept of cash or forward transactions used to hedge, mitigate the risk of, or offset any swap held by the swap dealer or MSP.[395] Accurate and timely recordkeeping regarding all phases of a swap transaction can serve to greatly enhance a firm's internal supervision, as well as the Commission's ability to detect and address market or regulatory abuses or evasion.

### b. Category B: External Business Conduct Standards

Pursuant to CEA section 4s(h), the Commission has adopted external business conduct rules, which establish

business conduct standards governing the conduct of swap dealers and MSPs in dealing with their counterparties in entering into swaps.[396] Broadly speaking, these rules are designed to enhance counterparty protection by significantly expanding the obligations of swap dealers and MSPs towards their counterparties. Under these rules, swap dealers and MSPs will be required, among other things, to conduct due diligence on their counterparties to verify eligibility to trade, provide disclosure of material information about the swap to their counterparties, provide a daily mid-market mark for uncleared swaps and, when recommending a swap to a counterparty, make a determination as to the suitability of the swap for the counterparty based on reasonable diligence concerning the counterparty.

### E. Categorization of Entity-Level and Transaction-Level Requirements

As noted above, even before the Commission published the Proposed Guidance, a number of commenters recommended that the Commission, in interpreting the cross-border applicability of the Dodd-Frank Act swaps provisions, should distinguish between requirements that apply at an entity level (i.e., to the firm as a whole) as compared to those that apply at a transactional level (i.e., to the individual swap transaction or trading relationship).[397] The Commission agrees with such commenters, and generally expects that it may apply its policies differently depending on the category (Entity-Level or Transaction-Level) or sub-category (First or Second Category of Entity-Level Requirements or Category A or B of the Transaction-Level Requirements) into which such requirement falls, subject to its further consideration of all of the relevant facts and circumstances.

After giving further consideration to the categorization in the Proposed Guidance, including comments received in this area, this Guidance makes a few minor modifications to the proposed categorization of Entity-Level and Transaction-Level Requirements, as described below.

### 1. Categorization Under the Proposed Guidance

The Proposed Guidance separated the Entity-Level Requirements into two subcategories. The first included capital adequacy, chief compliance officer, risk management, and swap data

---

[386] For example, the reduced transaction count may decrease operational risk as there are fewer trades to maintain, process, and settle.

[387] See Confirmation, Portfolio Reconciliation, and Portfolio Compression Requirements for Swap Dealers and Major Swap Participants, 75 FR 81519 (Dec. 28, 2010) ("Confirmation NPRM").

[388] See 7 U.S.C. 2(a)(13). See also Real-Time Public Reporting of Swap Transaction Data, 77 FR 1182, 1183 (Jan. 9, 2012) ("Final Real-Time Reporting Rule").

[389] Part 43 defines a "publicly reportable swap transaction" as (i) any swap that is an arm's-length transaction between two parties that results in a corresponding change in the market risk position between the two parties; or (ii) any termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights or obligations of a swap that changes the pricing of a swap. See Final Real-Time Reporting Rule, 77 FR 1182.

[390] Final Swap Dealer and MSP Recordkeeping Rule, 77 FR at 20205.

[391] See Final Real-Time Reporting Rule, 77 FR at 1183.

[392] 7 U.S.C. 6s(i).

[393] See also Final Confirmation Rules, 77 FR 55904.

[394] In addition, the Commission notes that regulation 23.504(b)(2) requires that the swap trading relationship documentation of swap dealers and MSPs must include all confirmations of swap transactions.

[395] See Final Swap Dealer and MSP Recordkeeping Rule, 77 FR 20128.

[396] See 7 U.S.C. 6s(h). See also External Business Conduct Rules, 77 FR at 9822–9829.

[397] See note 351, supra.

recordkeeping, all of which relate to risks to a firm as a whole. The second proposed subcategory included SDR Reporting and Large Trader Reporting, which relate directly to the Commission's market oversight.

The Proposed Guidance separated the Transaction-Level Requirements into two subcategories, "Category A" and "Category B." The "Category A" Transaction-Level Requirements relate to risk mitigation and transparency: (1) Clearing and swap processing; (2) margining and segregation for uncleared swaps; (3) trade execution; (4) swap trading relationship documentation; (5) portfolio reconciliation and compression; (6) real-time public reporting; (7) trade confirmation; and (8) daily trading records.

The "Category B" Transaction-Level Requirements—the external business conduct standards—are those requirements that may not be necessary to apply to swaps between non-U.S. persons taking place outside the United States. With respect to these swaps, the Commission believes that foreign regulators may have a relatively stronger supervisory interest in regulating sales practices concerns than the Commission.

### 2. Comments

Commenters generally supported the division of Dodd-Frank's swaps provisions (and Commission regulations thereunder) into Entity-Level and Transaction-Level Requirements.[398] Certain of these commenters, however, made specific recommendations for reclassification of some of these Requirements.

### a. Reporting and Trade-Execution Requirements

With regard to reporting and trade-execution requirements, a number of commenters argued that all forms of swaps reporting, including SDR Reporting and Large Trader Reporting, should be treated as Transaction-Level Requirements and thereby could be eligible for substituted compliance for certain transactions with non-U.S. counterparties.[399] In their view, SDR Reporting—like real-time public reporting—is implemented on a swap-by-swap basis and more closely linked to market transparency than risk mitigation. Credit Suisse noted that the Commission's bifurcated approach to

SDR Reporting and real-time public reporting creates unnecessary complications. It argued that both sets of reporting requirements should apply to a non-U.S. swap dealer only when dealing with U.S. persons (excluding foreign branches of U.S. swap dealers).[400]

ISDA believed that real-time public reporting and trade execution should be treated like the external business conduct rules. It argued that these rules relate to pre-trade price discovery and market structure and client protections.[401] Similarly, J.P. Morgan commented that the real-time public reporting and trade execution requirements should not apply to transactions between non-U.S. swap dealers or non-U.S. MSPs and non-U.S. counterparties, arguing that these requirements do not reduce market risk but rather promote price competition.[402] IIB stated that the Commission should treat mandatory trade execution, real-time public reporting and daily trading records as "Category B" Transaction-Level Requirements, since these requirements are intended to give customers enhanced access to the best pricing and affect not only individual counterparties but the overall market.[403]

On the other hand, Senator Levin stated that reporting and trade execution requirements should be applied broadly to all swaps of non-U.S. swap dealers and non-U.S. MSPs that are affiliates of U.S. financial institutions, so as to provide transparency regarding their swap activities and to protect the U.S.

financial system.[404] He stated that standard trade execution helps to ensure that complex swaps are properly booked, and reporting discourages "below-the-radar" transactions involving complex swaps.[405]

### b. Swap Trading Relationship Documentation, Portfolio Reconciliation and Compression, Daily Trading Records and External Business Conduct Standards

Sumitomo stated that certain Transaction-Level Requirements, including swap trading relationship documentation, portfolio reconciliation and compression, daily trading records, and external business conduct standards, should instead be classified as Entity-Level Requirements. It contended that these are not logically linked to particular transactions and would be required to be conducted on a daily basis per counterparty.[406] IATP stated that portfolio compression and reconciliation requirements are critical to a firm's central risk mitigation functions and therefore should be classified as Entity-Level Requirements. This commenter also argued that margin, segregation and other requirements for swaps that are so designated by non-U.S. affiliates of U.S. persons as to be unclearable should be regulated under the Entity-Level Requirements.[407]

Similarly, Senator Levin stated that clearing, margin and portfolio reconciliation and compression requirements and external business conduct standards should be applied to all swaps of non-U.S. swap dealers and non-U.S. MSPs that are affiliates of U.S. financial institutions.[408] In the Senator's view, margin requirements are critical safeguards against rapidly increasing losses, portfolio reconciliation and compression procedures help to maintain an accurate understanding of the size and nature of a firm's swaps positions, and external business conduct standards encourage integrity in the swaps markets.[409] Societe Generale also stated that rules relating to confirmation processing and portfolio reconciliation and compression should be categorized as Entity-Level Requirements, explaining that these all relate to the functioning of a swap dealer's "back office" operations and are tied to its trading systems. As a result, implementing confirmation rules, for

---

[398] See, e.g., SocGen (Aug. 8, 2012) at 6; IIB (Aug. 27, 2012) at 2; Clearing House (Aug. 27, 2012) at 22.

[399] See, e.g., SIFMA (Aug. 27, 2012) at A4, A34, A35; Credit Suisse (Aug. 27, 2012) at 10; Association for Financial Markets in Europe (AFME) (Aug. 24, 2012) at 8–9.

[400] Credit Suisse (Aug. 27, 2012) at 10.

[401] ISDA (Aug. 27, 2012) at 11. Similarly, Australian Bankers stated that the real-time public reporting and trade execution requirements should be treated in the same manner as the external business conduct standards and have no application to transactions involving a non-U.S. swap dealer and its non-U.S. counterparties. Australian Bankers (Aug. 27, 2012) at 5. See also SIFMA (Aug. 27, 2012) at A37 (stating that real-time public reporting should be treated in the same way as external business conduct standards and, in particular, should not apply to non-U.S. swap entities or non-U.S. branches for transactions with non-U.S. persons).

[402] See also The Clearing House (Aug. 27, 2012) at 22 (stating that no pre- or post-trade transparency rules or conflict of interest rules should apply to transactions with non-U.S. counterparties. These rules should be treated similarly to the external business conduct rules—excluded from the Transaction-Level and Entity-Level categories, and not applied at all to transactions between a non-U.S. entity (including a non-U.S. branch of a U.S. entity) and its non-U.S. counterparty, regardless of whether that counterparty is guaranteed by, or a conduit for, a U.S. person).

[403] IIB (Aug. 27, 2012) at 17, 32–33. IIB further stated that application of these pre- and post-trade requirements to swaps between non-U.S. persons outside the United States would raise "serious, unprecedented" concerns relating to the sovereignty of foreign markets. IIB (Aug. 27, 2012) at 34.

[404] Letter from Sen. Levin at 11–12.

[405] Id.

[406] Sumitomo (Aug. 24, 2012) at 3.

[407] IATP (Aug. 27, 2012) at 7.

[408] Letter from Sen. Levin at 11–12.

[409] Id.

example, for swaps with U.S. persons only is "extremely difficult from a technological standpoint." [410]

IIB recommended that the daily trading records requirements (Commission regulation 23.202) be categorized as a Category B Transaction-Level Requirement. It reasoned that this rule is most relevant when a non-U.S. swap dealer or non-U.S. MSP is trading with a U.S. person to whom it owes U.S. sales practice obligations and for whom the Commission's interest in addressing market abuses is highest. It also noted that the obligation to make and retain records of pre-execution oral conversations, a principal element of the rule, is most likely to give rise to conflicts with foreign privacy laws. [411]

### c. Internal Conflicts of Interest Requirement

IIB noted that the internal conflicts of interest requirement (Commission regulation 23.605) is categorized as an Entity-Level Requirement in the Proposed Guidance. It stated that internal research conflicts of interest procedures are intended to promote the integrity of research reports to customers, and that internal clearing conflicts of interest procedures are intended to promote client access to better pricing on execution and clearing. As a result, IIB views the Commission's interest in applying these requirements to non-U.S. clients as minimal and recommends that the internal conflicts of interest requirement be categorized as a new "Category B" Entity-Level Requirement. [412]

### d. Position Limits and Anti-Manipulation Rules

SIFMA stated that position limits and anti-manipulation rules, which were not addressed in the Proposed Guidance, should be categorized as Transaction-Level Requirements and, therefore, be eligible for relief in some circumstances. They argued that these rules have a close nexus to market transparency, as

opposed to risk mitigation of a firm's failure. [413]

### 3. Commission Guidance

In general, the Commission would apply the Dodd-Frank provisions differently depending on the category (Entity-Level or Transaction-Level) or sub-category (First or Second Category of Entity-Level Requirements or Category A or B of the Transaction-Level Requirements) into which such requirement falls. Therefore, the Commission has carefully reviewed comments on the classification of the Entity-Level Requirements and Transaction-Level Requirements, as well as comments regarding whether and how Entity-Level and Transaction-Level Requirements should apply to swaps between various types of counterparties, and under what circumstances the Commission's policy should contemplate that various swaps should generally be eligible for substituted compliance, or provide that certain of the Commission's requirements would generally not apply.

After careful consideration, the Commission would generally treat swaps requirements as Entity-Level Requirements and Transaction-Level Requirements largely in accordance with the Proposed Guidance, with certain minor modifications described below.

### a. Entity-Level Requirements

Consistent with CEA section 2(i), the Commission would treat the following requirements as Entity-Level Requirements, as proposed: Capital adequacy, chief compliance officer, risk management, swap data recordkeeping, SDR Reporting, and Large Trader Reporting.

At the core of a robust internal risk controls system is the firm's capital—and particularly, how the firm identifies and manages its risk exposure arising from its portfolio of activities. [414] Equally foundational to the financial integrity of a firm is an effective internal risk management process, which must be comprehensive in scope and reliant on timely and accurate data regarding its swap activities. To be effective, such a system must have a strong and independent compliance function. These internal controls-related requirements—namely, the

requirements related to chief compliance officer, risk management, swap data recordkeeping—are designed to serve that end. Given their functions, the Commission's policy is that these requirements should be applied on a firm-wide basis to effectively address risks to the swap dealer or MSP as a whole, and should be classified as Entity-Level Requirements.

SDR Reporting and Large Trader Reporting relate more closely to market transparency and to the Commission's market surveillance program. Among other things, data reported to SDRs will enhance the Commission's understanding of concentrations of risks within the market, as well as promote a more effective monitoring of risk profiles of market participants in the swaps market. Large Trader Reporting, along with an analogous reporting system for futures contracts, is essential to the Commission's ability to conduct effective surveillance of markets in U.S. physical commodity futures and economically equivalent swaps. Given the functions of these reporting requirements, the Commission's view is that each requirement generally should be applied across swaps, irrespective of the counterparty or the location of the swap, in order to ensure that the Commission has a comprehensive and accurate picture of market activities. Otherwise, the intended value of these requirements would be significantly compromised, if not undermined. Therefore, the Commission's policy is to generally treat SDR Reporting and Large Trader Reporting as Entity-Level Requirements.

The Commission did not address in the Proposed Guidance whether position limits and anti-manipulation provisions should fall in the Entity-Level or Transaction-Level Requirements category. It is the Commission's view that these provisions relate more to market integrity, as opposed to the financial integrity of a firm, and it is essential that they apply regardless of the counterparty's status (U.S. person or not) in order to fully achieve the underlying purpose of these respective provisions. Accordingly, these requirements are outside the scope of this Guidance. However, the monitoring of position limits under Commission regulation 23.601 is included in the Entity-Level Requirements under this Guidance.

After considering the input of market participants and others through the comment process, and giving further consideration to how the language in CEA section 2(i) should be interpreted for purposes of applying the Entity-

---

[410] SocGen (Aug. 8, 2012) at 6 (stating that banks with a centralized booking model will face technological difficulties in applying confirmation processing and portfolio reconciliation and compression rules only with respect to U.S. persons, and that a requirement to apply these rules to all customers (even non-U.S. persons) is inconsistent with international comity). *See also* Australian Bankers (Aug. 27, 2012) at 5 (stating that portfolio reconciliation and compression requirements should be categorized as Entity-Level Requirements, as they are critical to risk mitigation and back-office functions).

[411] IIB (Aug. 27, 2012) at 32–33.

[412] IIB (Aug. 27, 2012) at 32. This would render internal conflicts of interest requirements applicable only in connection with personnel of its research department or clearing unit preparing research reports for use with, or providing clearing services to, respectively, U.S. persons.

[413] SIFMA (Aug. 27, 2012) at A35–36.

[414] By way of illustration, consistent with the purpose of the capital requirement, which is to reduce the likelihood and cost of a swap dealer's default by requiring a financial cushion, a swap dealer's or MSP's capital requirements would be set on the basis of its overall portfolio of assets and liabilities.

Level Requirements and permitting substituted compliance, the Commission's policy is to treat the Entity-Level Requirements in subcategories largely as proposed.

As explained above, Entity-Level Requirements ensure that registered swap dealers and MSPs implement and maintain a comprehensive and robust system of internal controls to ensure the financial integrity of the firm, and in turn, the protection of the financial system. In this respect, the Commission has strong supervisory interests in applying the same rigorous standards, or comparable and comprehensive standards, to non-U.S. swap dealers and non-U.S. MSPs whose swap activities or positions are substantial enough to require registration under the CEA. Requiring such swap dealers and MSPs to rigorously monitor and address the risks they incur as part of their day-to-day businesses would lower the registrants' risk of default—and ultimately protect the public and the financial system.

Therefore, the Commission contemplates that non-U.S. swap dealers and non-U.S. MSPs will comply with all of the First Category of Entity-Level Requirements. In addition, consistent with principles of international comity, substituted compliance may be available for these Entity-Level Requirements in certain circumstances, as explained further below. In contrast, with regard to Entity-Level Requirements in the Second Category, substituted compliance should generally be available only where the counterparty is a non-U.S. person.[415]

### i. The First Category—Capital Adequacy, Chief Compliance Officer, Risk Management, and Swap Data Recordkeeping (Except for Certain Recordkeeping Requirements)

The Commission's policy generally is to treat the requirements related to capital adequacy, chief compliance officer, risk management, and swap data recordkeeping (except swap data recordkeeping relating to complaints and marketing and sales materials under Commission regulations 23.201(b)(3) and 23.201(b)(4), respectively) in the First Category. These requirements

address and manage risks that arise from a firm's operation as a swap dealer or MSP. Collectively, they constitute a firm's first line of defense against financial, operational, and compliance risks that could lead to a firm's default.

The First Category is identical to the first subcategory proposed by the Commission in the Proposed Guidance, except that the Commission's policy is to treat swap data recordkeeping under part 43 and part 46 of the Commission's regulations and swap data recordkeeping related to complaints and marketing and sales materials under Commission regulations 23.201(b)(3) and 23.201(b)(4) as part of the "Second Category" of Entity-Level Requirements. As noted above, for Entity-Level Requirements in the First Category, substituted compliance generally would be available for a non-U.S. swap dealer or non-U.S. MSP (including one that is an affiliate of a U.S. person) regardless of whether the counterparty is a U.S. person or a non-U.S. person.[416] In contrast, for Entity-Level Requirements in the Second Category, substituted compliance generally would be available for a non-U.S. swap dealer or MSP only where the counterparty is a non-U.S. person.

### ii. The Second Category—SDR Reporting, Certain Swap Data Recordkeeping Requirements and Large Trader Reporting

The Commission's policy retains SDR Reporting in the Second Category, as proposed. SDR Reporting furthers the goals of the Dodd-Frank Act to reduce systemic risk, increase transparency and promote market integrity. Specifically, data reported to SDRs under the SDR Reporting rules provide the Commission with information necessary to better understand and monitor concentrations of risk, as well as risk profiles of individual market participants for cleared and uncleared swaps.

The Commission believes that retaining SDR Reporting in the Second Category would be appropriate. Consistent with section 2(i), the Commission's policy is that U.S. swap dealers or MSPs (including those that are affiliates of a non-U.S. person) generally should comply in full with all of the Entity-Level Requirements, including SDR Reporting. Further, non-U.S. swap dealers and non-U.S. MSPs (including those that are affiliates of a U.S. person), generally should comply

with SDR Reporting, and substituted compliance should be available (to the extent applicable) only where the swap counterparty is a non-U.S. person, provided that the Commission has direct access (including electronic access) to the relevant swap data that is stored at the foreign trade repository.[417]

The Commission contemplates treating swap data recordkeeping related to complaints and marketing and sales materials under Commission regulations 23.201(b)(3) and 23.201(b)(4) as part of the "Second Category" because, in the Commission's view, non-U.S. swap dealers and non-U.S. MSPs (including those that are affiliates of a U.S. person) generally should comply with SDR Reporting. Further, substituted compliance should be available for non-U.S. swap dealers or MSPs, to the extent applicable, only where the swap counterparty is a non-U.S. person.

Large Trader Reporting furthers the goals of the Dodd-Frank Act to reduce systemic risk, increase transparency and promote market integrity. Large Trader Reporting, in conjunction with the Commission's large trader reporting system for futures contracts, is essential to the Commission's ability to conduct effective surveillance of markets in U.S. physical commodity futures and economically equivalent swaps. Given the regulatory function of Large Trader Reporting, the Commission's policy is to apply these requirements to non-U.S. persons whose trading falls within its scope to the same extent as U.S. persons. Accordingly, as discussed further in section G below, the Commission would not recognize substituted compliance in place of compliance with Large Trader Reporting.

### b. Transaction-Level Requirements

As previously noted, whether a particular Dodd-Frank Act requirement should apply on a transaction-by-transaction basis in the context of cross-border activity for purposes of section 2(i) of the CEA requires the exercise of some degree of judgment. Nevertheless, bearing in mind principles of international comity, the Commission anticipates that, in general, the Transaction-Level Requirements may be applied on a transaction-by-transaction basis.

The Commission's policy contemplates treating as Transaction-Level Requirements all of the requirements that the Commission proposed to include. Thus, the

---

[415] In addition, as noted in section G below, reflecting its interpretation of CEA section 2(i), the Commission generally contemplates that U.S. swap dealers and MSPs would comply in full with the Entity-Level Requirements (regardless of whether the Entity-Level Requirements are classified as being in the First Category or Second Category), without substituted compliance available. This interpretation also applies to swaps with U.S. swap dealers or U.S. MSPs that are affiliates of non-U.S. persons.

[416] As explained in section G below, the Commission's policy is that where a swap dealer or MSP is a U.S. person, all of the entity-level requirements would generally apply in full (without substituted compliance available), regardless of the type of counterparty.

[417] See section G, infra, for additional information on the application of the Entity-Level Requirements.

Transaction-Level Requirements are: (1) Required clearing and swap processing; (2) margining and segregation for uncleared swaps; (3) trade execution; (4) swap trading relationship documentation; (5) portfolio reconciliation and compression; (6) real-time public reporting; (7) trade confirmation; (8) daily trading records; and (9) external business conduct standards.

The Commission contemplates treating the Transaction-Level Requirements in two subcategories, designated as Category A and Category B, largely as proposed. Generally, these categories reflect how the Commission generally contemplates applying various Transaction-Level Requirements to various types of counterparties, and in guiding the consideration of when substituted compliance will be available under this Guidance.[418]

i. The Category A Transaction-Level Requirements

The "Category A" Transaction-Level Requirements relate to risk mitigation and transparency, and included the first eight Transaction-Level requirements referenced above.

The Commission does not believe it would be appropriate to treat, as suggested by commenters, swap trading relationship documentation, portfolio reconciliation and compression, daily trading records and external business conduct standards as Entity-Level Requirements. The Commission recognizes that firms may find a certain degree of operational efficiency in applying these requirements on a firm-wide basis. On the other hand, the Commission expects that treatment of these as Transaction-Level Requirements should allow for greater flexibility in terms of whether and how Dodd-Frank requirements apply. For example, under the Proposed Guidance, the Commission would not interpret section 2(i) generally to apply the Dodd-Frank's clearing requirement to a swap between a non-U.S. swap dealer and a non-U.S. counterparty. In the Commission's judgment, allowing swap trading relationship documentation, portfolio reconciliation and compression and external business conduct standards to be applied on a transaction basis would not undermine

the underlying regulatory objectives and, yet, will give due recognition to the home jurisdiction's supervisory interest. Consistent with this rationale, the Commission would treat margin, segregation, and related requirements as Transaction-Level Requirements.

The Commission also is retaining the trade execution requirement, as proposed, in Category A. The trade execution requirement is intended to bring the trading of mandatorily cleared swaps that are made available to trade onto regulated exchanges or execution facilities. By requiring the trades of mandatorily cleared swaps that are made available to trade to be executed on an exchange or an execution facility—each with its attendant pre- and post-trade transparency and safeguards to ensure market integrity—the trade execution requirement furthers the statutory goals of promoting financial stability, market efficiency and enhanced transparency.

The Commission's policy will treat real-time public reporting as a Transaction-Level Requirement. However, for the reasons discussed below, the Commission clarifies that it does not intend that its policy would preclude a market participant from applying real-time public reporting with respect to swap transactions that are not necessarily subject to this Transaction-Level Requirement if doing so would be more efficient for the market participant.

Part 43 of the Commission's regulations and part 45 of the Commission's regulations, respectively, prescribe the data fields that are to be included in real-time public reporting and SDR Reporting reports with respect to a reportable swap transaction.[419]

The Commission understands from commenters that in certain circumstances, reporting part 43 and part 45 data for the same swap transaction in separate reports ("two stream reporting") could accommodate market participants that have a transactional structure and/or systems that are designed or suited to send

separate submissions.[420] However, the Commission also recognizes that in other circumstances, permitting market participants to include part 43 and part 45 data for the same swap transaction in a single report ("single stream reporting") could optimize efficiency.[421]

The Commission anticipated that reporting parties might elect to use one data reporting stream for both SDR Reporting and real-time public reporting under part 45 and part 43 respectively, to reduce costs and optimize efficiency, and many market participants have chosen to build and integrate single stream reporting systems.[422] The Commission is aware that, as commenters have stated, categorizing SDR Reporting under part 45 as an Entity-Level requirement and real-time public reporting under part 43 as a Transaction-Level requirement could, in certain circumstances, negate the benefits of single stream reporting, and could present challenges to market participants who have built single stream reporting infrastructure.

In view of these concerns, the Commission would, in general, treat real-time public reporting as a Transaction-Level Requirement. However, the Commission does not intend that its policy would preclude a market participant from applying real-time public reporting with respect to swap transactions that are not necessarily subject to this Transaction-Level Requirement if, for example, this would allow the market participant to realize efficiency gains from single stream reporting or otherwise as discussed above.

---

[418] Substituted compliance is discussed in section F, *infra*. The application of the Category A Transaction-Level Requirements and eligibility for substituted compliance is discussed in section IV.G.4. The application of the Category B Transaction-Level Requirements is discussed in section IV.G.5. The application of certain CEA provisions and certain Entity and Transaction-Level Requirements to non-registrants is discussed in section IV.H.

[419] *See generally* Final Real-Time Reporting Rule, 77 FR at 1250–1266; Swap Data Recordkeeping and Reporting Requirements, 77 FR 2136, 2210–2224 (Jan. 13, 2012) ("Final Data Rules"). Part 43 applies to reports of swap transaction and pricing data to a registered SDR, in order that the SDR can publicly disseminate such data pursuant to part 43 and Appendix A to part 43 as soon as technologically practicable after execution of the publicly reportable swap. Final Real-Time Reporting Rule, 77 FR 1249. Under part 45, counterparties report creation data for the swap—including all primary economic terms ("PET") data and confirmation data—as well as continuation data also as soon as technologically practicable. *See* Final Data Rules, 77 FR at 2149–2151, 2199–2202.

[420] *See* Final Real-Time Reporting Rule, 77 FR 1237 (Jan. 9, 2012) (noting that ". . . coordination is expected to reduce costs by allowing reporting parties, SEFs and DCMs to send one set of data to an SDR for the purpose of satisfying the requirements of both rules."); *id.* at 1210 (noting that ". . . although reporting parties may use the same data stream for reporting regulatory data and real-time data, Commission regulation 43.4(d)(2) clarifies the intent of the Proposing Release: The reporting requirements for SEFs, DCMs and reporting parties for real-time public reporting purposes are separate from the requirement to report to an SDR for regulatory purposes.").

[421] Final Data Rules, 77 FR 2150, 2182. If SDR Reporting and real-time public reporting do not both apply to a swap transaction, market participants that have connected to registered SDRs and employed single stream reporting infrastructure and systems may be required to change such systems to bifurcate the part 43 and part 45 data sets, which are generated and transmitted in a single report. The Commission understands that such bifurcation could occur due to the manner with which Transaction-Level and Entity-Level requirements apply to the particular swap transaction.

[422] Real-Time Public Reporting of Swap Transaction Data, 77 FR 1217. *See also* Final Data Rules, 77 FR at 2182.

## ii. The Category B Transaction-Level Requirements (External Business Conduct Standards)

As proposed, the Commission's policy will treat external business conduct standards as a "Category B" Transaction-Level Requirement for purposes of the general application of this Transaction-Level Requirement to various categories of swap counterparties.[423] External business conduct standards are oriented toward customer-protection. Among other obligations, the external business conduct rules generally require registrants to conduct due diligence on their counterparties to verify eligibility to trade (including eligible contract participant status), refrain from engaging in abusive market practices, provide disclosure of material information about the swap to their counterparties, provide a daily mid-market mark for uncleared swaps and, when recommending a swap to a counterparty, make a determination as to the suitability of the swap for the counterparty based on reasonable diligence concerning the counterparty. In the Commission's view, such rules have an attenuated link to, and are distinguishable from, market-oriented protections such as the trade execution mandate. Additionally, the Commission believes that the foreign jurisdictions in which non-U.S. persons are located are likely to have a significant interest in the type of business conduct standards that would be applicable to transactions with such non-U.S. persons within their jurisdiction. Because the Commission believes that foreign regulators may have a relatively stronger supervisory interest in regulating sales practices concerns related to swaps between non-U.S. persons taking place outside the United States than the Commission, the Commission believes that generally it is appropriate that the business conducts standards of the home jurisdiction, rather than those established by the Commission, apply to such transactions between non-U.S. persons.

After reviewing the comments on internal conflicts of interest procedures, the Commission has given consideration to whether to treat internal conflicts of interest rules relating to clearing under Commission regulation 23.605 under Category B of the Transaction-Level Requirements. The Commission considered the views of commenters that stated that this particular requirement is generally more akin to the external business conduct standards and, as

such, can reasonably be expected to be narrowly targeted to apply only with respect to U.S. clients, without undermining the regulatory benefits associated with the rule. However, because the Commission believes that internal conflicts of interest related to clearing should be applied on a firm-wide basis, the Commission's policy is that this requirement generally should be treated as an Entity-Level Requirement as proposed.

The Commission also has considered whether internal conflicts of interest procedures relating to research should be treated as Entity-Level Requirements as proposed. These informational and supervisory firewalls are designed to ensure that research reports are free from undue influence by the firm's trading personnel. As a practical matter, it is generally difficult, if not impossible, to establish and maintain such safeguards on a transaction or client basis. Because the Commission believes that these firewalls, in order to achieve their regulatory purpose, should be applied on a firm-wide basis, the Commission's policy is that internal conflicts of interest procedures relating to research generally should be treated as Entity-Level Requirements.

### F. Substituted Compliance

#### 1. Proposed Guidance

In the Proposed Guidance, the Commission stated that a cross-border policy that allows for flexibility in the application of the CEA while ensuring the high level of regulation contemplated by the Dodd-Frank Act and avoiding potential conflicts between U.S. regulations and foreign law is consistent with principles of international comity. To that end, the Commission set forth a general framework for substituted compliance. Under this "substituted compliance" regime, the Commission may determine that certain laws and regulations of a foreign jurisdiction are comparable to and as comprehensive as a corresponding category of U.S. laws and regulations. If the Commission makes such a determination, then an entity or transaction in that foreign jurisdiction that is subject to the category of U.S. laws and regulations for which comparability is determined will be deemed to be in compliance therewith if that entity or transaction complies with the corresponding foreign laws and regulations.

#### 2. Comments

Several commenters urged the Commission to use a principles-based approach and to review the legal regime

as a whole, rather than evaluate comparability on an issue-by-issue basis.[424] A commenter supported the Commission's view that comparable does not mean identical, and urged the Commission to place an emphasis on shared principles and mutual recognition.[425]

Some commenters stated that foreign jurisdiction laws and regulations are unlikely to be identical to those in the United States and that they thus support the Commission's proposed "outcomes based approach" to evaluating whether foreign regulatory requirements meet Dodd-Frank normative objectives.[426] One of these commenters stated that in some cases foreign regulators would be faced with several challenges, noting that in "light touch" or principle-based regulatory jurisdictions, commodity derivatives data collection and surveillance is weak or even non-existent, as is concomitant enforcement.[427]

Commenters stressed the need to avoid imposing duplicative or conflicting regulatory requirements which could result in unnecessary costs.[428] Commenters urged the Commission to engage in a dialogue with other regulators[429] and to build on work done at the international level.[430]

Some commenters expressed the view that substituted compliance should not require Commission approval if the applicable foreign regulator promulgates applicable regulations in accordance with G20 commitments, or that a presumption that foreign rules are comparable should apply if the rules are consistent with G20 principles.[431] Some commenters urged the Commission to take what they described as an

---

[423] The application of the Category B Transaction-Level Requirements to swap dealers and MSPs is discussed in section IV.G.5.

[424] See, e.g., SIFMA. (Aug. 27, 2012) at 3, A46; State Street (Aug. 27, 2012) at 3; Global Financial Markets Association ("GFMA") (Aug. 27, 2012) at 2; Association for Financial Markets in Europe ("AFME") (Aug. 27, 2012) at 2; J.P. Morgan (Aug. 13, 2012) at 5; Australian Bankers (Aug. 27, 2012) at 2; Japanese Bankers Association (Aug. 27, 2012) at 3; Comissao de Valores Mobiliarios ("CVM") (Aug. 27, 2012) at 2.

[425] See, e.g., FSR (Aug. 27, 2012) at 6–7.

[426] See IATP (Aug. 27, 2012) at 11–12; IIAC (Aug. 27, 2012) at 2, 9–11.

[427] See IATP (Aug. 27, 2012) at 11–12.

[428] See, e.g., ICI (Aug. 23, 2012) at 7–11; Capital Markets (Aug. 24, 2012) at 5–6.

[429] See Deutsche Bank, Aug. 27, 2012 at 5–6; Lloyds (Aug. 24, 2012) at 2.

[430] See Australian Securities and Investments Commission; Hong Kong Monetary Authority; Monetary Authority of Singapore; Reserve Bank of Australia; Securities and Futures Commission, Hong Kong (Aug. 27, 2012) at 3–4.

[431] See CEWG (Aug. 27, 2012) at 7; CVM (Aug. 27, 2012) at 2; ICI (Aug. 23, 2012) at 9; IIB (Aug. 27, 2012) at 38–39; Hong Kong Banks (Aug. 27, 2012) at 2, 10, 14, 15; Korea Federation of Banks ("Korea Banks") (Aug. 27, 2012) at 2–3; The Clearing House (Aug. 27, 2012) at 3–4, 31–35.

"equivalence approach" similar to EMIR in the European Union,[432] by making substituted compliance determinations based on recognition of "equivalent" jurisdictions and not of individual firms.[433] The European Commission stated that EU firms dealing with U.S. counterparties would always be subject to the Dodd-Frank Act, while U.S. firms dealing with EU counterparties could not be subject to EU rules if the EU decides to grant equivalence to the United States. The European Commission stated that it is difficult to understand why comparable foreign legislation in the EU should not be sufficient.[434]

Commenters, including foreign regulators, requested that the Commission more clearly outline the circumstances under which a particular foreign jurisdiction would be acceptable for substituted compliance purposes.[435] Commenters stressed the need for comparability determinations to be transparent.[436] One commenter stated that comparability determinations should allow for notice and comment.[437] Another commenter stated that there should be a procedure for appeals, that memoranda of understanding ("MOUs") should form the framework for comparability determinations, and that the Commission should develop a process for periodic review of comparability determinations.[438]

Some commenters found the Commission's proposed approach to substituted compliance too narrow or limiting. The European Securities and Markets Authority ("ESMA") stated that when equivalence or substituted compliance is granted for an entire jurisdiction, registration should not be a prerequisite before substituted compliance can apply. ESMA also stated that the Commission's approach is quite limited because it is applied not uniformly but "chapter by chapter," which ESMA represents contradicts what they described as EMIR's concepts of equivalence and mutual

recognition.[439] Japan FSA and Bank of Japan expressed concern that the scope of application of substituted compliance is too narrow and requested that it be extended to avoid overlap or conflict with foreign regulations.[440] Other commenters stated that the approach being taken toward substituted compliance was narrow and not in accordance with comity.[441] However, another commenter stated that substituted compliance procedures are an inferior option to direct compliance with Commission regulations. This commenter stated that the Commission does not violate principles of international comity by extending the cross-border application to cover how "U.S. persons" operate in foreign jurisdictions, particularly when those jurisdictions lack the laws and/or regulatory capacity to prevent damage to the U.S. economy resulting from counterparty defaults originating in foreign affiliate swaps.[442]

Another commenter stated that substituted compliance should be expanded to a broader category of swap transactions, specifically, to the trade execution requirement.[443]

Some commenters urged the Commission to clarify which law is "substituted" for U.S. law and allow swap entities to determine which jurisdictions' laws apply where it could be more than one.[444]

Some commenters expressed concern regarding the timing of reform in other jurisdictions, urging the Commission to delay substituted compliance implementation or provide a grace period for these jurisdictions.[445]

Some commenters urged the Commission not to allow substituted compliance or to use it only sparingly, pointing out the risks of substituted compliance by the Commission. For example, one commenter contended that substituted compliance fails to ensure rigorous regulation of derivatives markets and so should not be allowed for foreign subsidiaries of U.S. parents as these subsidiaries pose a severe risk to the U.S. economy.[446] This commenter

also stated that substituted compliance should only be used in "rare circumstances" and only after such rules in foreign jurisdictions have come into existence,[447] stating that the Commission "cannot, through its use of comity, consider other countries' interests to the total derogation of Congress's intent to protect U.S. taxpayers."[448] Citizen and taxpayer groups contended that substituted compliance should not be permitted when the swap transaction is with a U.S. counterparty,[449] including subsidiaries of a U.S. person.[450]

Commenters also urged that, to the extent substituted compliance is permitted, a rigorous approach be applied, including examining the history of enforcement in a foreign jurisdiction, the ability to revoke substituted compliance where necessary, the ability of the public to comment on substituted compliance applications, periodic review of the application of substituted compliance and a requirement that the applicant immediately inform the Commission of any material changes in its jurisdiction.[451]

With regard to SDR Reporting, some commenters disagreed with the Commission that a foreign trade repository must allow Commission access to information to be considered comparable, arguing that comparability should be based solely on the foreign jurisdiction's regulatory regime,[452] or that access is unnecessary where swaps are between non-U.S. counterparties.[453] In contrast, another commenter stated that open access to foreign swap data repositories is necessary to ensure that foreign surveillance of transaction-level swaps data flow requirements is comparable and comprehensive.[454]

International regulators have continued to express commitment to the Pittsburgh G20 reforms of OTC derivatives regulation, including a commitment to harmonize cross-border regulations and allow for substituted compliance or equivalence arrangements when appropriate. However, no international consensus has emerged regarding the implementation of such reforms or the

---

[432] *See* Australian Securities and Investments Commission; Hong Kong Monetary Authority; Monetary Authority of Singapore; Reserve Bank of Australia; Securities and Futures Commission, Hong Kong (Aug. 27, 2012) at 2–3.

[433] *See* Deutsche Bank (Aug. 27, 2012) at 6.

[434] *See* European Commission (Aug. 24, 2012) at 4.

[435] *See., e.g.,* Financial Services Authority (United Kingdom) (Aug. 24, 2012) at 3.

[436] *See* IIB (Aug. 27, 2012) at 40; American Bankers Association, (Aug. 27, 2012) at 2; IATP (Aug. 27, 2012) at 11.

[437] *See* American Bankers Association (Aug. 27, 2012) at 2.

[438] *See* IATP (Aug. 27, 2012) at 11–13.

[439] *See* ESMA (Aug. 27, 2012) at 3–4.

[440] *See* Japan FSA and Bank of Japan (Aug. 13, 2012) at 2–3.

[441] *See* SIFMA (Aug. 27, 2012) at 3, A46; Futures Industry Association (FIA), (Aug. 27, 2012) at 5–7.

[442] *See* IATP (Aug. 27, 2012) at 2–3.

[443] *See* Tradeweb Markets LLC (Aug. 27, 2012) at 4.

[444] *See* SIFMA (Aug. 27, 2012) at A48; Deutsche Bank (Aug. 27, 2012) at 6.

[445] *See., e.g.,* CFA Institute (Aug. 27, 2012) at 3; Financial Services Authority (United Kingdom) (Aug. 24, 2012) at 3; Barclays (Aug. 27, 2012) at 2; ICAP Group (Aug. 27, 2012) at 2; IIB (Aug. 27, 2012) at 39.

[446] *See* Greenberger (Aug. 27, 2012) at 20–24.

[447] *See* Greenberger (Aug. 27, 2012) at 3, 19, 22–23.

[448] *See* Greenberger (Aug. 27, 2012) at 19.

[449] *See* Public Citizen (Aug. 27, 2012) at 13, 16, 19.

[450] *See* Better Markets (Aug. 27, 2012) at 10.

[451] *See, e.g.,* Better Markets (Aug. 27, 2012) at 10–11; Public Citizen (Aug. 27, 2012) at 13, 16, 19.

[452] *See* Deutsche Bank (Aug. 27, 2012) at 6.

[453] *See* Japanese Bankers Association (Aug. 27, 2012) at 10.

[454] *See* IATP (Aug. 27, 2012) at 6–7.

circumstances under which substituted compliance should be permitted. In an April 18, 2013 letter to Treasury Secretary Lew, nine international financial regulators expressed concern about fragmentation in the OTC derivatives market as a result of lack of regulatory coordination, noting that "[a]n approach in which jurisdictions require that their own domestic regulatory rule be applied to their firms' derivatives transactions taking place in broadly equivalent regulatory regimes abroad is not sustainable." [455] The letter expressed concern that such an approach would lead the global derivatives market to "recede into localized and less efficient structures, impairing the ability of business across the globe to manage risk." The letter also suggested, among other things, that cross-border rules be adopted that would not result in duplicative or conflicting requirements through substituted compliance or equivalence arrangements, and that a reasonable transition period and measures be provided to foreign entities to ensure a smooth transition.[456]

A group of 25 organizations from numerous nations responded by asserting that the letter to Treasury Secretary Lew "appears to place a higher priority on preventing 'fragmentation' in global financial markets than on effective management of global financial risks." [457]

Emphasizing that the global financial crisis of 2008–2009 caused "mass unemployment, home foreclosures, and cutbacks in key public services," these organizations argued that "[s]ince G–20 nations have not yet met their 2009 Pittsburgh commitment to put in place effective derivatives regulation by the close of 2012, the first priority should be to complete this crucial element of financial oversight." [458] Although these organizations recognized the challenge of effectively regulating the global financial markets, they asserted that "the path to addressing these challenges does not lie in further delays that prevent any nation from acting until every jurisdiction globally has agreed on a similar approach." [459] Instead, these organizations urged the international community "to coordinate around a shared high level of financial oversight, and in the meantime to support the efforts of individual nations to ensure that the scope of their financial regulation properly captures all transactions, wherever conducted, that affect the safety and stability of each national financial system." [460]

### 3. Overview of the Substituted Compliance Regime

Once registered, a non-U.S. swap dealer or non-U.S. MSP would become subject to all of the substantive requirements under Title VII of the Dodd-Frank Act that apply to registered swap dealers or MSPs. In other words, the requirements under Title VII of the Dodd-Frank Act related to swap dealers and MSPs apply to all registered swap dealers and MSPs, irrespective of where they are based.

Consistent with CEA section 2(i) and comity principles, the Commission's policy generally is that eligible entities may comply with a substituted compliance regime under certain circumstances, subject, however, to the Commission's retention of its examination authority [461] and its

enforcement authority. To the extent that the substituted compliance regime applies, the Commission generally would permit a non-U.S. swap dealer or MSP, U.S. bank that is a swap dealer or MSP with respect to its foreign branches,[462] or non-U.S. non-registrant that is a guaranteed or conduit affiliate, as applicable, to substitute compliance with the requirements of the relevant home jurisdiction's law and regulations (or in the case of foreign branches of a bank, the foreign location of the branch) in lieu of compliance with the attendant Entity-Level Requirements and/or Transaction-Level Requirements under the CEA and Commission regulations, provided that the Commission finds that such home jurisdiction's requirements (or in the case of foreign branches of a bank, the foreign location of the branch) are comparable with and as comprehensive as the corollary area(s) of regulatory obligations encompassed by the Entity- and Transaction-Level Requirements. Significantly, the Commission will rely upon an outcomes-based approach to determine whether these requirements achieve the same regulatory objectives of the Dodd-Frank Act. An outcomes-based approach in this context means that the Commission is likely to review the requirements of a foreign jurisdiction for rules that are comparable to and as comprehensive as the requirements of the Dodd-Frank Act, but it will not require that the foreign jurisdiction have identical requirements to those

---

[455] *See* letter to Treasury Secretary Lew regarding cross-border OTC derivatives regulation from Deputy Prime Minister Taro Aso, Minister of State for Finance Services, Government of Japan; Commissioner Michel Barnier, Commissioner for Internal Markets and Services, European Commission; Minister Pravin Gordhan, Minister of Finance, Government of South Africa; Minister Guido Mantega, Ministry of Finance, Government of Brazil; Minister Pierre Moscovici, Ministry of Finance, Government of France; Chancellor George Osborne, Chancellor of the Exchequer, Government of the United Kingdom; Minister Wolfgang Schäuble, Ministry of Finance, Government of Germany; Minister Anton Siluanov, Minister of Finance, Government of Russia; and Minister Eveline Widmer-Schlumpf, Finance Minister, Government of Switzerland ("Nine International Regulators") (Apr. 18, 2013). *See also* letter to Treasury Secretary Lew from Sens. Kirsten E. Gillibrand, Thomas R. Carper, Kay R. Hagan, Heidi Heitkamp, Michael F. Bennet, and Charles E. Schumer (June 26, 2013) (advocating domestic and international harmonization of derivatives regulation).

[456] *Id.*

[457] *See* letter to Nine International Regulators from ActionAid International; AFL–CIO (American Federation of Labor And Congress of Industrial Organizations); Americans for Financial Reform; Berne Declaration; Center of Concern; The Centre for Research on Multinational Corporations (SOMO); Centre national de coopération au développement, CNCD–11.11.11; CGIL—Italian General Confederation of Labour; Consumer Federation of America; Global Progressive Forum; IBON International; The International Institute for Monetary Transformation; Institute for Agriculture

and Trade Policy (IATP); Institute for Policy Studies, Global Economy Project; Jubilee Debt Campaign, UK; Kairos Europe (Brussels); Missionary Oblates—USP (Washington, DC); Oxfam; Red Latinoamericana sobre Deuda, Desarrollo y Derechos—LATINDADD; Stamp Out Poverty; Tax Justice Network; UBUNTU Forum; War on Want; WEED (World Economy, Ecology, and Development); and World Development Movement (Jul. 1, 2013).

[458] *Id.*

[459] *Id.*

[460] *Id.*

[461] Under Commission regulations 23.203 and 23.606, all records required by the CEA and the Commission's regulations to be maintained by a registered swap dealer or MSP shall be maintained in accordance with Commission regulation 1.31 and

shall be open for inspection by representatives of the Commission, the United States Department of Justice, or any applicable prudential regulator.

In the January Order, the Commission noted that an applicant for registration as a swap dealer or MSP must file a Form 7–R with the National Futures Association and that Form 7–R was being modified at that time to address existing blocking, privacy or secrecy laws of foreign jurisdictions that applied to the books and records of swap dealers and MSPs acting in those jurisdictions. *See* 78 FR at 871–872 n. 107. The modifications to Form 7–R were a temporary measure intended to allow swap dealers and MSPs to apply for registration in a timely manner in recognition of the existence of the blocking, privacy, and secrecy laws. The Commission clarifies that the change to Form 7–R impacts the registration application only and does not modify the Commission's authority under the CEA and its regulations to access records held by registered swap dealers and MSPs. Commission access to a registrant's books and records is a fundamental regulatory tool necessary to properly monitor and examine each registrant's compliance with the CEA and the regulations adopted pursuant thereto. The Commission has maintained an ongoing dialogue on a bilateral and multilateral basis with foreign regulators and with registrants to address books and records access issues and may consider appropriate measures where requested to do so.

[462] The types of offices which the Commission would consider to be a "foreign branch" of a U.S. bank, and the circumstances in which a swap is with such foreign branch, are discussed further in section IV.C.3, *supra.*

established under the Dodd-Frank Act. This approach builds on the Commission's longstanding policy of recognizing comparable regulatory regimes based on international coordination and comity principles with respect to cross-border activities involving futures (and options on futures).[463] The Commission anticipates that its approach also will require close consultation, cooperation, and coordination among the Commission and relevant foreign regulators regarding ongoing compliance efforts. To date, the Commission notes that it has engaged in many multilateral and bilateral consultations and efforts to coordinate on the substance of OTC derivatives reform efforts.

In part, because many foreign jurisdictions have been implementing OTC derivatives reforms in an incremental manner, the Commission's comparability determinations may be made on a requirement-by-requirement basis, rather than on the basis of the foreign regime as a whole. For example, many jurisdictions have moved more quickly to implement reporting to trade repositories, and so the Commission may focus first on comparability with those requirements. In addition, in making its comparability determinations, the Commission may include conditions that take into account timing and other issues related to coordinating the implementation of reform efforts across jurisdictions.

A non-U.S. swap dealer or non-U.S. MSP, a U.S. bank that is a swap dealer or MSP with respect to its foreign branches, or non-U.S. non-registrant that is a guaranteed or conduit affiliate, to the extent applicable under this Guidance, may comply with regulations in its home jurisdiction (or in the case of foreign branches of a bank, the foreign location of the branch) to the extent that the Commission determines that these requirements are comparable to, and as comprehensive as, the corollary areas of the CEA and Commission regulations.[464] As noted above, however, the home jurisdiction's requirements do not have to be identical to the Dodd-Frank Act requirements. Moreover, the Commission notes, however, that entities relying on substituted compliance may be required to comply with certain of the Dodd-Frank Act requirements where comparable and comprehensive regulation in their home jurisdiction (or in the case of foreign branches of a bank, the foreign locations of the branches) are determined to be lacking.[465]

In evaluating whether a particular category of foreign regulatory requirement(s) is comparable and comprehensive to the applicable requirement(s) under the CEA and Commission regulations, the Commission will take into consideration all relevant factors, including but not limited to, the comprehensiveness of those requirement(s), the scope and objectives of the relevant regulatory requirement(s), the comprehensiveness of the foreign regulator's supervisory compliance program, as well as the home jurisdiction's authority to support and enforce its oversight of the registrant. In this context, comparable does not necessarily mean identical. Rather, the Commission would evaluate whether the home jurisdiction's regulatory requirement is comparable to and as comprehensive as the corresponding U.S. regulatory requirement(s).

In response to comments requesting greater clarity with respect to the substituted compliance determinations, the Commission notes that a comparability analysis would begin with a consideration of the regulatory objectives of a foreign jurisdiction's regulation of swaps and swaps market participants. In this regard, the Commission will first look to foreign regulator's swap-specific regulations. The Commission recognizes, however, that jurisdictions may not have swap-specific regulations in some areas, and instead may have regulatory or supervisory regimes that achieve comparable and comprehensive regulatory objectives as the Dodd-Frank Act requirements, but on a more general, entity-wide, or prudential, basis.[466] In addition, portions of a foreign regulatory regime may have similar regulatory objectives, but the means by which these objectives are achieved with respect to swaps market activities may not be clearly defined, or may not expressly include specific regulatory elements that the Commission concludes are critical to achieving the regulatory objectives or outcomes required under the CEA and the Commission's regulations. In these circumstances, the Commission anticipates that, as part of its broader efforts to consult and coordinate with foreign jurisdictions, it will work with the regulators and registrants in these jurisdictions to consider alternative approaches that may result in a determination that substituted compliance applies.[467]

The approaches used will vary depending on the circumstances relevant to each jurisdiction. One example would include coordinating with the foreign regulators in developing appropriate regulatory

---

[463] For example, under part 30 of the Commission's regulations, if the Commission determines that compliance with the foreign regulatory regime would offer comparable protection to U.S. customers transacting in foreign futures and options and there is an appropriate information-sharing arrangement between the home supervisor and the Commission, the Commission has permitted foreign brokers to comply with their home regulations (in lieu of the applicable Commission regulations), subject to appropriate conditions. *See, e.g.,* Foreign Futures and Options Transactions, 67 FR 30785 (May 8, 2002); Foreign Futures and Options Transactions, 71 FR 6759 (Feb. 9, 2009).

Upon promulgating part 30, the Commission stated that it "intends to monitor closely the application of this regulatory scheme for the offer and sale of foreign futures and foreign options in the U.S. and to make adjustments in these rules, as necessary, based, in part, on it experience in administering the exemptive procedure [*i.e.,* 30.10 relief] as well as other requests for interpretations of the provisions herein." Foreign Futures and Foreign Options Transactions, 52 FR 28980, 28993 (Aug. 5, 1987). For example, the Commission has expanded part 30 to allow 30.10-exempt foreign brokers to act as introducing brokers for the purpose of executing linked U.S. transactions on behalf of U.S. customers under certain circumstances. The Commission also promulgated regulation 30.12 to allow unlicensed "local" brokers located outside the United States to execute trades through the customer omnibus account of an FCM or 30.10 exempt foreign broker, again under certain circumstances. The Commission expects that the substituted compliance process contemplated by this Guidance may similarly evolve.

[464] As stated in note 88, for purposes of this Guidance, the terms "home jurisdiction" or "home country" are used interchangeably and refer to the jurisdiction in which the person or entity is established, including the European Union. Further, the Commission clarifies that where a non-U.S. swap dealer (or non-U.S. MSP), or a non-U.S. non-registrant that is a guaranteed or conduit affiliate, transacts outside the home jurisdiction, substituted compliance is available and they may comply with the comparable and comprehensive requirements of the home jurisdiction, provided that they comply with such requirements in that other jurisdiction.

[465] The Commission recognizes that substantial progress has been made in other jurisdictions towards implementing OTC derivatives reform. For example, EMIR requires financial counterparties, including hedge funds, to clear OTC derivatives contracts subject to the clearing obligation through a central counterparty registered or recognized in accordance with EMIR. EMIR also requires such entities to comply with EMIR's risk mitigation techniques for uncleared OTC derivatives contracts; risk mitigation techniques include, confirmation, portfolio reconciliation, compression, valuation and dispute resolution. Lastly, EMIR requires financial counterparties to report all derivatives contracts to a trade repository registered or recognized in accordance with EMIR.

[466] The Commission notes that, of the 35 provisionally registered non-U.S. swap dealers as of July 12, 2013, all but one of them are banking entities that are subject to prudential supervision by banking supervisors in their home jurisdictions or affiliates of such banks. By comparison, 19 of the provisionally registered U.S. swap dealers and MSPs are not regulated by a prudential supervisor or the SEC.

[467] The Commission notes that such alternatives are available for both Entity- and Transaction-Level Requirements, but are more likely appropriate for Entity-Level Requirements.

changes or new regulations, particularly where changes or new regulations already are being considered or proposed by the foreign regulators or legislative bodies. As another example, the Commission may, after consultation with the appropriate regulators and market participants, include in its substituted compliance determination a description of the means by which certain swaps market participants can achieve substituted compliance within the construct of the foreign regulatory regime. The identification of the means by which substituted compliance is achieved would be designed to address the regulatory objectives and outcomes of the relevant Dodd-Frank Act requirements in a manner that does not conflict with a foreign regulatory regime and reduces the likelihood of inconsistent regulatory obligations. For example, the Commission may specify that swap dealers and MSPs in the jurisdiction undertake certain recordkeeping and documentation for swap activities that otherwise is only addressed by the foreign regulatory regime with respect to financial activities generally. In addition, the substituted compliance determination may include provisions for summary compliance and risk reporting to the Commission to allow the Commission to monitor whether the regulatory outcomes are being achieved. By using these approaches, in the interest of comity, the Commission would seek to achieve its regulatory objectives with respect to the Commission's registrants that are operating in foreign jurisdictions in a manner that works in harmony with the regulatory interests of those jurisdictions.[468]

### 4. Process for Comparability Determinations

Any comparability analysis will be based on a comparison of specific foreign requirements against specific related CEA provisions and Commission regulations in 13 categories of regulatory obligations and will consider the factors described above. After receiving a submission from an applicant, the resulting comparability determination would be made by the Commission with regard to each of the 13 categories of regulatory obligations, as appropriate. More specifically, the Commission

could determine that a particular set of foreign laws and regulations provides a sufficient basis for an affirmative finding of comparability with respect to a relevant area of regulatory obligations. Where no comparability determination can be made,[469] the non-U.S. swap dealer or non-U.S. MSP, U.S. bank that is a swap dealer or MSP with respect to its foreign branches, or non-registrant, to the extent applicable under this Guidance, may be required to comply with the applicable Entity- or Transactional-Level requirements under the CEA and Commission regulations.

Anyone who is eligible for substituted compliance may apply, either individually or collectively, as may foreign regulators. Persons who may request a comparability determination include: (i) Foreign regulators, (ii) an individual non-U.S. entity, or group of non-U.S. entities; (iii) a U.S. bank that is a swap dealer or MSP with respect to its foreign branches;[470] or (iv) a trade association, or other group, on behalf of similarly-situated entities. Persons requesting a comparability determination may want to coordinate their application with other market participants and their home regulators to simplify and streamline the process. Once a comparability determination is made for a jurisdiction, it will apply for all entities or transactions in that jurisdiction to the extent provided in the determination, as approved by the Commission.

Generally, the Commission would expect that the applicant, at a minimum, state with specificity the factual and legal basis for requesting that the Commission find that a particular set of

foreign laws and regulations is comparable to, and as comprehensive as, particular Dodd-Frank Act requirements as described above; include with specificity all applicable legislation, rules, and policies; and provide an assessment whether the objectives of the two regulatory regimes are comparable and comprehensive.[471] If the applicant is a registered swap dealer or MSP, it also would generally be helpful to understand the capacity in which the applicant is licensed with the applicant's regulator(s) in its home country and whether the applicant is in good standing.

The Commission expects that the comparability analysis process would, in most cases, involve consultation with the regulators in each jurisdiction for which a substituted compliance application has been submitted so that the Commission may better analyze the compliance regime of a jurisdiction. Consultations are particularly important in the near future because many jurisdictions are in the process of finalizing and implementing their derivatives reforms incrementally and the Commission's comparability determinations may need to take into account the timing of regulatory reforms that have been proposed or finalized, but not yet implemented.

Further, the Commission expects that, in connection with a determination that substituted compliance is appropriate, it would enter into an appropriate MOU or similar arrangement between the Commission and the relevant foreign regulator(s). Existing information-sharing and/or enforcement arrangements would be indicative of a foreign supervisor's ability to share information and otherwise work with the Commission. However, going forward, the Commission and relevant foreign supervisor(s) would need to establish supervisory MOUs or other arrangements that provide for information sharing and cooperation in the context of supervising swap dealers and MSPs. The Commission contemplates that such a supervisory MOU would establish the type of coordination activities that would continue on an ongoing basis between the Commission and the foreign supervisor(s), including topics such as procedures for confirming continuing oversight activities, access to

---

[468] The Commission anticipates that non-U.S. swap dealers and MSPs may require additional time after a Substituted Compliance Determination in order to phase in compliance with the relevant requirements of the jurisdiction in which the non-US swap dealer or MSP is established. The Commission and its staff intend to address the need for any further transitional relief at the time that the subject Substituted Compliance Determination is made.

[469] A finding of comparability may not be possible for a number of reasons, including the fact that the foreign jurisdiction has not yet implemented of finalized particular requirements.

[470] As previously noted, where the counterparty to a swap with a foreign branch is a non-U.S. person (whether or not such non-U.S. person is guaranteed or otherwise supported by, or is an affiliate conduit of, a U.S. person), the Commission continues to be of the view that compliance with comparable and comprehensive requirements in the foreign jurisdiction should be permitted in light of the supervisory interest of the foreign jurisdiction in the swaps transacted in that jurisdiction, together with the fact that foreign branches of U.S. swap dealers or U.S. MSPs are subject generally to direct or indirect oversight by U.S. regulators because they are part of a U.S. person. As discussed further in section IV.F.3, *supra*, the Commission's recognition of substituted compliance would be based on an evaluation of whether the requirements of the home jurisdiction are comparable and comprehensive to the applicable requirement(s) under the CEA and Commission regulations based on a consideration of all relevant factors, including among other things: (i) The comprehensiveness of the foreign regulator's supervisory compliance program and (ii) the authority of such foreign regulator to support and enforce its oversight of the registrant's branch or agency with regard to such activities to which substituted compliance applies.

[471] The Commission may, as it deems appropriate and necessary, conduct an on-site examination of the applicant, as well as consult with the applicant's home regulator regarding the status of the applicant. For certain matters, the Commission may request an opinion of counsel.

information,[472] on-site visits, and notification procedures in certain situations.[473]

The Commission expects that an applicant would notify the Commission of any material changes to information submitted in support of a comparability determination (including, but not limited to, changes in the relevant supervisory or regulatory regime) as the Commission's comparability determination may no longer be valid.

Within four years of issuing any Substituted Compliance Determination, the Commission will reevaluate its initial determination to ascertain whether any changes should be made to its finding and shall reissue the relevant Commission action, conditionally or unconditionally, as it deems appropriate.

SDR Reporting and real-time public reporting would generally be eligible for substituted compliance, as outlined above, but only if the Commission has direct access to all of the reported swap data elements that are stored in a foreign trade repository. The Commission intends that direct access would generally include, at a minimum, real time, direct electronic access to the data and the absence of any legal impediments to the Commission's access to the data. Due to the technical nature of this inquiry, a comparability evaluation for SDR Reporting and real-time public reporting would generally entail a detailed comparison and technical analysis. The Commission notes that while direct access to swap data is a threshold matter to be addressed in a comparability evaluation, a more particularized analysis would generally be necessary to determine whether the data stored in a foreign trade repository provides for effective Commission use, in furtherance of the regulatory purposes of the Dodd-Frank Act.

Comparability determinations for SDR Reporting and real-time public reporting would generally take into account whether the Commission may effectively access and use data stored in foreign trade repositories, both in

isolation and when compared to and aggregated with swap data from other foreign trade repositories, as well as registered SDRs. At a minimum, effective use would generally require that the data elements stored in foreign trade repositories are sufficient to permit comparison and aggregation, and that all transactions with comparable required data elements, otherwise required to be reported to a registered SDR, are available in the foreign trade repository.

### 5. Conflicts Arising Under Privacy and Blocking Laws

Potential and actual conflicts between the Commission's regulations and the privacy and blocking laws of some non-U.S. jurisdictions may, in certain circumstances, limit or prohibit the disclosure of data that is required to be reported under the Dodd-Frank Act and implementing regulations.[474] For example, the Commission's part 45 and part 46 swap data reporting rules establish swap data recordkeeping and SDR reporting requirements applicable to reporting counterparties. Among other requirements, these rules prescribe certain reporting data fields for all swaps subject to the Commission's jurisdiction, including the identity of each counterparty to a swap. The privacy laws of some non-U.S. jurisdictions may, however, restrict or prohibit the disclosure by a reporting party or registrant of a non-reporting party's identity. In some jurisdictions, this privacy restriction may be overcome if the counterparty consents to the disclosure. In others, the restriction may take the form of a blocking statute which acts as an absolute prohibition to the disclosure of information, creating a direct conflict with the requirements of the Dodd-Frank Act.

The Commission recognizes that, notwithstanding the importance of swap data to its mandate under the Dodd-Frank Act, its regulations may be in conflict with the blocking, privacy, and/or secrecy laws of other jurisdictions. The Commission is mindful of the challenges presented by such circumstances and continues to work on

a bilateral and multilateral basis with foreign regulators to address these issues. Where appropriate, the Commission may consider reasonable alternatives that allow the Commission to fulfill its mandate while respecting the regulatory interests of other jurisdictions. In that regard, where a real conflict of laws exists, the Commission strongly encourages regulators and registrants to consult directly with its staff.

### 6. Clearing

#### a. Clearing Venues

With respect to acceptable clearing venues, the Commission notes that section 2(h)(1) of the CEA provides that swaps subject to the clearing requirement must be submitted for clearing to a registered DCO or a DCO that is exempt from registration under the CEA.[475]

The Commission has previously recognized the role of foreign-based clearing organizations, including in the context of FBOTs. Specifically, in the final rules pertaining to Registration of Foreign Boards of Trade, the Commission required that an FBOT, in order to be registered, clear through a clearing organization that either is registered with the Commission as a DCO or observes the Principles for Financial Market Infrastructures ("PFMIs").[476] Other relevant requirements in the FBOT final rules include, among other things, that the clearing organization be in good regulatory standing in its home country.

In addition, in the final rules adopting the Inter-Affiliate Exemption, the Commission permitted eligible affiliated counterparties that are located in certain jurisdictions to satisfy a condition to electing the exemption (requiring counterparties to clear their swaps with third-parties) by clearing the swap through a registered DCO or a clearing organization that is subject to supervision by appropriate government authorities in the clearing organization's home country and that has been assessed to be in compliance with the PFMIs.[477]

---

[472] As previously noted, the Commission observes that under section 4s(j)(3) and (4) of the CEA and Commission regulation 23.606, a registered swap dealer or MSP must make all records required to be maintained in accordance with Commission regulation 1.31 available to the Commission promptly upon request to representatives of the Commission. The Commission reserves this right to access records held by registered swap dealers and MSPs, including those that are non-U.S. persons who may comply with the Dodd-Frank recordkeeping requirement through substituted compliance. *See also* 7 U.S.C. 6s(f); 17 CFR 23.203.

[473] In this regard, the Commission has started working with foreign regulators to prepare for such arrangements.

[474] Section 727 of the Dodd-Frank Act added to the CEA new section 2(a)(13)(G), which requires all swaps, whether cleared or uncleared, to be reported to registered SDRs. Section 21 of the CEA, added by section 728 of the Dodd-Frank Act, directs the Commission to prescribe standards that specify the data elements for each swap that shall be collected and maintained by each registered SDR. Part 45 of the Commission's regulations establishes swap data recordkeeping and SDR reporting requirements; part 46 establishes similar requirements for pre-enactment and transition swaps (collectively, "historical swaps").

[475] As noted above, EMIR requires financial counterparties, including hedge funds, to clear OTC derivatives contracts subject to the clearing obligation through a CCP registered or recognized in accordance with EMIR.

[476] Registration of Foreign Boards of Trade, 76 FR 80674, 80681–80682 (Dec. 23, 2011) (the PFMIs are the successor standards to the Recommendations for Central Counterparties ("RCCPs"), which were issued jointly by the Committee on Payment and Settlement Systems ("CPSS") and the Technical Committee of IOSCO).

[477] Inter-Affiliate Exemption, 78 FR at 21784 (adopting 17 CFR 50.52(b)(4)(i)(E)).

More recently, in the final rulemaking adopting Core Principles and Other Requirements for Swap Execution Facilities, the Commission noted that under section 5b(h) of the CEA it has discretionary authority to exempt DCOs, conditionally or unconditionally, from the applicable DCO registration requirements.[478] Thus, the Commission has discretion to exempt from registration DCOs that, at a minimum, are subject to comparable and comprehensive supervision by another regulator. The Commission further noted that it had not yet exercised its discretionary authority to exempt DCOs from registration. The Commission explained that, notwithstanding that there were no exempt DCOs at that time, certain swaps executed on a SEF could be cleared at an exempt DCO, if and when the Commission determined to exercise its authority to exempt DCOs from applicable registration requirements, at which time the Commission would likely address, among other things, the conditions and limitations applicable to clearing swaps for customers subject to section 4d(f) of the CEA.[479]

The conditions that may have to be met for a clearing organization to be eligible to qualify as an exempt DCO could include, among other things: (i) The Commission having entered into an appropriate memorandum of understanding or similar arrangement with the relevant foreign supervisor in the clearing organization's home country and (ii) the clearing organization having been assessed to be in compliance with the PFMIs.[480] The use of the PFMIs, an international standard that is substantially similar to the requirements for registered DCOs under part 39 of the Commission's regulations, would be consistent with

the Commission's determination in the context of FBOTs.[481]

The Commission notes that its exemptive authority under CEA section 5b(h) is entirely discretionary. Accordingly, the Commission is not compelled to exempt any clearing organization from the DCO registration requirements, even upon a finding that a facility is "subject to comparable, comprehensive supervision and regulation" by another regulator.

### b. Foreign End-Users

One of the conditions of the Inter-Affiliate Exemption, known as the "treatment of outward-facing swaps" condition, generally requires the clearing of swaps between affiliated counterparties and their unaffiliated counterparties.[482] Pursuant to Commission regulation 50.52(b)(4)(i)(C), eligible affiliate counterparties[483] can satisfy the treatment of outward-facing swaps condition by complying with the requirements of an exception or exemption under section 2(h)(7) of the CEA or part 50 of the Commission's regulations. Pursuant to section 2(h)(7) of the CEA, also known as the end-user exception, a counterparty to a swap that is subject to the clearing requirement[484] may elect not to clear the swap provided that such counterparty meets the conditions of section 2(h)(7)(A)(i)–(iii) of the CEA and the attendant regulations.[485]

For the purposes of the Inter-Affiliate Exemption, consistent with section 2(i), the Commission will permit a non-U.S. person eligible affiliate counterparty to satisfy Commission regulation 50.52(b)(4)(i)(C) for swaps entered into with an unaffiliated non-US person that is not otherwise subject to the CEA ("Foreign End-User"), under certain circumstances. The Foreign End-User may elect the end-user exception as if the provisions of sections 2(h)(7)(A)(i) and (ii) of the CEA apply to the Foreign

End-User and the Foreign End-User elects not to clear the swap.[486]

Accordingly, a Foreign End-User may elect not to clear a swap if (1) the Foreign End-User and non-US person eligible affiliate counterparty are not located in a foreign jurisdiction in which the Commission has determined that a comparable and comprehensive clearing requirement exists and that the exceptions and/or exemptions thereto are comparable and comprehensive;[487] (2) the Foreign End-User is not a financial entity as provided in section 2(h)(7)(A)(i) of the CEA; and (3) the Foreign End-User enters into the swap to hedge or mitigate commercial risk as provided in section 2(h)(7)(A)(ii) of the CEA.[488] In the interests of international comity, the Commission will not require the Foreign End-User to satisfy the provisions of section 2(h)(7)(A)(iii) of the CEA which require the end-user to notify the Commission how it generally meets its financial obligations associated with entering into non-cleared swaps.[489]

### G. Application of the Entity-Level and Transaction-Level Requirements to Swap Dealers and MSPs

This section sets forth the Commission's policy on application of the Entity-Level and Transaction-Level Requirements to swap dealers and MSPs, including when swaps generally would be eligible for substituted compliance.

### 1. Comments

As noted in section E above, commenters generally supported the division of Dodd-Frank's swaps provisions (and Commission regulations thereunder) into Entity-Level and Transaction-Level Requirements for purposes of this Guidance. Certain of these commenters, however, made specific recommendations for

---

[478] Specifically, section 5b(h) of the CEA provides that "[t]he Commission may exempt, conditionally or unconditionally, a derivatives clearing organization from registration under this section for the clearing of swaps if the Commission determines that the [DCO] is subject to comparable, comprehensive supervision and regulation by the Securities and Exchange Commission or the appropriate government authorities in the home country of the organization." 7 U.S.C. 7a–1(h). *See also* Core Principles and Other Requirements for Swap Execution Facilities, 78 FR 33476, 33591 (Jun. 4, 2013) (adopting 17 CFR 37.701) ("Part 37 SEF Regulations").

[479] *Id.* at 33534.

[480] The PFMIs were developed with significant input and public comment from market participants, and benefited from broad participation of market regulators and prudential supervisors from multiple nations. The PFMIs were approved by both IOSCO's Technical Committee and the CPSS and published in April 2012.

[481] The Commission recognizes that certain DCOs registered with the Commission also may be authorized, licensed, or recognized by a foreign authority. The Commission continues to work on a bilateral basis with such non-US authorities with respect to issues of central counterparty supervision. The Commission also participates in multilateral discussions with its foreign counterparts through a number of international groups.

[482] *See* Clearing Exemption for Swaps Between Certain Affiliated Entities, 78 FR 21749; Commission regulation 50.52(b)(4)(i).

[483] As such term is defined in Commission regulation 50.52(a).

[484] *See* Clearing Requirement Determination, 77 FR 74284.

[485] *See* End-User Exception to the Clearing Requirement for Swaps, 77 FR 42560.

[486] If the Foreign End-User is an issuer of securities under, or required to file reports pursuant to, the Securities Exchange Act of 1934 ("SEC Filer"), then the Foreign End-User must obtain the approval to enter into uncleared swaps from an appropriate committee of the SEC Filer's board of directors (or governing body). *See* section 2(j) of the CEA. The Commission considers a counterparty controlled by an SEC Filer to be an SEC Filer itself for the purposes of the end-user exception. *See* 77 FR 42570.

[487] In these situations, the counterparties should comply with laws of the foreign jurisdiction. *See* Commission regulations 50.52(b)(4)(i)(B) and (D).

[488] Foreign End-Users may look to Commission regulation 50.50(c) in order to determine whether a swap hedges or mitigates commercial risk.

[489] This guidance is only applicable to Commission regulation 50.52(b)(4)(i)(C); all other persons electing the End-User Exception must comply with the requirements of section 2(h)(7) of the CEA and Commission regulation 50.50.

reclassification of some of these requirements.[490]

In addition, some commenters addressed perceived disparities in the application of Transaction-Level Requirements to U.S. swap dealers, stating that transactions between U.S. swap dealers and non-U.S. counterparties should be eligible for substituted compliance for Transaction-Level Requirements so as to avoid putting U.S. swap dealers at a competitive disadvantage.[491]

Other commenters supported the Commission's proposed application of the Transaction-Level Requirements to the transactions of U.S. persons with non-U.S. persons.[492] One commenter stated that the Transaction-Level Requirements should apply to transactions by registered swap dealers and MSPs with U.S. persons.[493]

Several commenters objected to the applicability of certain Transaction-Level Requirements to transactions between two non-U.S. parties.[494] One commenter stated that Transaction-Level Requirements should never apply to swaps between counterparties that are both non-U.S. persons.[495]

With respect to external business conduct standards, one commenter stated that these standards should not apply to swaps between U.S. swap entities and non-U.S. persons because the Commission's supervisory interest in these transactions are less implicated when the counterparty is a non-U.S. person.[496] Other commenters also stated that the external business conduct standards should not apply to transactions between two non-U.S. persons.[497]

### 2. Commission Guidance

The Commission has carefully considered the comments on Entity-Level and Transaction-Level Requirements. With regard to U.S. swap dealers and U.S. MSPs, the Commission's policy is that they generally would be expected to comply in full with all of the Entity-Level Requirements and Transaction-Level Requirements, without substituted compliance available. The Commission's policy would apply regardless of whether the counterparty to the swap is a U.S. person or non-U.S. person. This is consistent with the Commission's traditional approach to registered FCMs, wherein a person, once registered as an FCM, is subject to the full panoply of regulations applicable to such registrants, without distinctions based on whether the counterparties are U.S. or non-U.S. counterparties.

Further, the Commission believes that its cross-border policy and interpretation with respect to U.S. swap dealers and MSPs must be informed by the purposes of the Dodd-Frank Act. As discussed earlier, the Dodd-Frank Act was enacted to reduce systemic risk, increase transparency, and promote market integrity within the financial system by, among other things, providing for the comprehensive regulation of swap dealers and MSPs. In doing so, Congress understood the highly integrated nature of the global swaps business, with regard to both individual firms and the market at large, and that risk to U.S. firms and in turn, U.S. financial markets may arise anywhere in the world.

In view of the policy goals underlying the Dodd-Frank Act swaps reforms, the Commission's view is that U.S. swap dealers and MSPs should be fully subject to the robust oversight contemplated by the Dodd-Frank Act, without regard to whether their counterparty is a U.S. or non-U.S person. These firms are conducting their swap dealing business within the territory of the United States. That some of their business may be directed to foreign clients does not diminish the Commission's obligation to ensure that swaps between U.S. swap dealers and MSPs and their counterparties are subject to Dodd-Frank's financial safeguards and transparency requirements, to the fullest extent. Therefore, in the Commission's view, substituted compliance is incompatible with the Commission's ability to effectively discharge its statutory responsibilities.

For substantially the same reasons, the Commission believes that full U.S. regulation of U.S. swap dealers and MSPs, even when they transact swaps with non-U.S. counterparties, is a reasonable exercise of U.S. jurisdiction under the principles of foreign relations law. Among the factors supporting this exercise of U.S. jurisdiction are the links between the U.S. swap dealers and MSPs and their swap activities to U.S. commerce, and the generally accepted importance of regulating the activities of these entities both to the United States and the international financial system.[498] In addition, having an agency of the U.S. government serve as the primary regulator of U.S. entities is generally consistent with normal expectations and with traditions of the international system.[499] To the extent that other countries have an interest in regulating transactions with their nationals, the Commission notes that the U.S. regulatory scheme for swap dealers and MSPs does not preclude other countries from imposing their regulations if they consider it necessary for transactions affecting their interests.[500] As discussed below, the Commission will work with other regulators to avoid, and resolve where necessary, direct conflicts, as well as to reduce unnecessary burdens. The Commission observes that very few conflicts between the foreign regimes and Dodd-Frank Act requirements have been identified as part of many multilateral and bilateral consultations between staff of the CFTC and their foreign counterparts. For these purposes, conflict means that actions required for compliance under one jurisdiction's law are prohibited under the other jurisdiction's law, or compliance with the regulations of both jurisdictions is otherwise impossible.

With regard to non-U.S. swap dealers or MSPs (including those that are affiliates of a U.S. person), the Commission's policy is that these firms should be subject to all of the Entity-Level Requirements, but under certain circumstances substituted compliance should be available (except with regard to Large Trader Reporting). The Commission's policy with regard to the application of Transaction-Level Requirements to non-U.S. swap dealers or MSPs, and the availability of substituted compliance, depends in part on the type of counterparty to the swap transaction.

The foreign branch of a U.S. bank that is a swap dealer or MSP is expected to

---

[490] See section E, supra.

[491] See SIFMA (Aug. 27, 2012) at A36. See also State Street (Aug. 27, 2012) at 2; IIB (Aug. 27, 2012) at 27–28; The Clearing House (Aug. 27, 2012) at 4, 27.

[492] See Public Citizen (Aug. 27, 2012) at 13 (arguing that substituted compliance should not be permitted when the swap involves a U.S. counterparty and that Transaction-Level Requirements should be required for counterparties that are non-U.S. persons). See also IATP (Aug. 27, 2012) at 7–8 (recommending that Transaction-Level Requirements apply to transactions between non-U.S. swap dealers or MSPs and a U.S. person who is not a swap dealer or MSP).

[493] See IIAC (Aug. 27, 2012) at 8.

[494] See, e.g., Clearing House (Aug. 27, 2012) at 22–24 (arguing that pre- and post-trade transparency rules should not apply to interactions with non-U.S. customers); SIFMA (Aug. 27, 2012) at A37 (stating that real-time public reporting requirements would be inappropriate for swaps involving only non-U.S. counterparties).

[495] See Australian Bankers (Aug. 27, 2012) at 5, A8.

[496] See SIFMA (Aug. 27, 2012) at A38.

[497] See Australian Bankers (Aug. 27, 2012) at 4, A10. See also IIAC (Aug. 27, 2012) at 8 (agreeing that external business conduct standards should not apply to swaps between non-U.S. swap dealers and MSPs and non-U.S. counterparties (whether or not guaranteed by a U.S. person)).

[498] See Restatement secs. 403(2)(a)–(c), 403(2)(e).

[499] See Restatement secs. 403(2)(d), 403(2)(f).

[500] See Restatement sec. 403(2)(g).

comply in full with the Entity-Level Requirements, without substituted compliance available, because it is not a separate legal entity.[501] In some circumstances the Commission's policy is that a foreign branch of a U.S. swap dealer or MSP would be expected to comply in full with Category A Transaction-Level Requirements where its counterparty is a U.S. person. However, as further explained below, substituted compliance would generally be available to a foreign branch of a U.S. bank with regard to Category A Transaction-Level Requirements where the counterparty to a swap transaction is a non-U.S. person or a foreign branch of a U.S. bank that is a swap dealer or MSP. In addition, the Commission's policy with regard to the application of the Category B Transaction-Level Requirements is explained below.

Below, the Commission describes its policies regarding how Entity-Level and Transaction-Level Requirements should apply to both U.S. and non-U.S. swap dealers and MSPs, and to foreign branches of a U.S. bank that are swap dealers and MSPs, as well as the circumstances under which substituted compliance would be available.

3. Application of the Entity-Level Requirements to Swap Dealers and MSPs

In this section, the Commission discusses its policy regarding the application of the Entity-Level Requirements to swap dealers and MSPs in cross-border transactions under its interpretation of 2(i), as well as the circumstances under which such swaps would be eligible for substituted compliance.

Section a discusses the Commission's view on the application of Entity-Level Requirements to swaps with U.S. swap dealers and U.S. MSPs, including subsidiaries and affiliates of non-U.S. persons, and foreign branches of U.S. swap dealers or U.S. MSPs, under CEA section 2(i).

Section b discusses the Commission's view on the application of Entity-Level Requirements to swaps with non-U.S. swaps dealers and MSPs, including subsidiaries and affiliates of U.S. persons.

The Commission's policy on application of the Entity-Level Requirements to swap dealers and MSPs, as well as substituted compliance, is discussed below and summarized in Appendix C to this

Guidance, which should be read in conjunction with the rest of the Guidance.

a. To U.S. Swap Dealers and MSPs

As explained above, U.S. swap dealers and U.S. MSPs generally would be expected to comply in full with all of the Entity-Level Requirements, without substituted compliance available. The Commission's policy generally would apply regardless of whether the counterparty to the swap is a U.S. person or non-U.S. person.

Because under this Guidance the term "U.S. person" includes corporations, partnerships, limited liability companies, and other legal entities (as discussed above), the foregoing interpretation also applies to affiliates of non-U.S. persons that are U.S. swap dealers or U.S. MSPs. It also applies to U.S. banks that are swap dealers or MSPs when the swap is with their foreign branch. In this case, because a foreign branch of a U.S. bank is an integral part of the U.S. principal entity and has no separate legal existence, and the U.S. principal bank is the entity that registers as a swap dealer or MSP, under the Commission's interpretation of CEA section 2(i), the U.S. bank (principal entity) would be the party ultimately responsible for compliance with the Entity-Level Requirements for the entire legal entity.

b. To Non-U.S. Swap Dealers and MSPs

Consistent with CEA section 2(i), the Commission would expect non-U.S. swap dealers and non-U.S. MSPs to comply with all of the Entity-Level Requirements. This policy also applies to foreign affiliates of a U.S. person that are independently required to register as swap dealers or MSPs and to comply with applicable Dodd-Frank Act requirements.

However, in considering whether substituted compliance is available to a non-U.S. swap dealer or MSP with respect to particular Entity-Level Requirements, the Commission would consider it relevant whether the Entity-Level Requirement is classified in the First Category or Second Category (and with respect to the Second Category, whether the counterparty is a U.S. person).

The Commission recognizes that non-U.S swap dealers or MSPs are likely to have their principal swap business in their home jurisdiction, and in consideration of international comity principles, is interpreting CEA section 2(i) such that such non-U.S swap dealers or MSPs generally would be eligible for substituted compliance with regard to Entity-Level Requirements in

the First Category (*i.e.,* capital adequacy, chief compliance officer, risk management, and swap data recordkeeping, except certain aspects of swap data recordkeeping relating to complaints and marketing and sales materials [502]).[503]

With respect to Entity-Level Requirements in the First Category, as noted by commenters on the Proposed Guidance, an affiliate of a U.S. swap dealer that is guaranteed by such U.S. swap dealer (or guaranteed by a U.S.-based parent or other affiliate of such swap dealer) may under certain circumstances be required to register as a swap dealer based on its swap dealing activity solely with non-U.S. persons, including those non-U.S. persons that are neither guaranteed affiliates or affiliate conduits of U.S. persons. Commenters have represented that some corporate groups may be required to register many of these guaranteed affiliates as swap dealers, even though such affiliates provide swap dealing services only to non-U.S. markets, and that many of such guaranteed affiliates exist only because the law of the local jurisdiction requires that a subsidiary be incorporated in the jurisdiction in order to enter into swaps with counterparties located in such jurisdiction. The Commission recognizes that certain structural conditions required to comply with the regulatory obligations of swap dealers may be burdensome for a corporate group with many of these guaranteed affiliates due to the requirement that such obligations be complied with at the individual entity level (e.g., Commission regulations §§ 3.3 (Chief compliance officer), 23.600 (Risk Management Program for swap dealers and major swap participants), 23.601 (Monitoring of position limits), 23.602 (Diligent supervision), 23.603 (Business continuity and disaster recovery), and 23.606 (General information: Availability for disclosure and inspection)).

---

[501] The types of offices the Commission would consider to be a "foreign branch" of a U.S. bank, and the circumstances in which a swap is with such foreign branch, are discussed further in section C, *supra.*

[502] *See* 17 CFR 23.201(b)(3), (4).

[503] As noted in the Proposed Guidance, the Commission anticipates that non-U.S. swap dealers and non-U.S. MSPs will likely have their principal swap business in their home jurisdiction. In these circumstances, the Commission notes that the home regulator would have a primary relationship to the swap dealer or MSP, which, coupled with the firm-wide focus of the Entity-Level Requirements, supports generally making the non-U.S. registrant eligible for substituted compliance. Therefore, consistent with the Proposed Guidance, the Commission believes that it is appropriate to make non-U.S. swap dealers and MSPs eligible for substituted compliance with respect to Entity-Level Requirements in the First Category where the non-U.S. swap dealers or non-U.S. MSPs are subject to comparable regulation in their home jurisdiction.

[504] "Swaps activities" are defined in Commission regulation 23.600(a)(7).

Specifically, the Commission notes that Commission regulations §§ 3.3 (Chief compliance officer), 23.600 (Risk Management Program for swap dealers and major swap participants), 23.601 (Monitoring of position limits), 23.602 (Diligent supervision), 23.603 (Business continuity and disaster recovery), and 23.606 (General information: Availability for disclosure and inspection) mandate that each swap dealer in a corporate group under common control individually establish policies, procedures, governance structures, reporting lines, operational units, and systems specified in the rules. Thus, the Commission would consider relief, subject to appropriate conditions and restrictions to be determined, that would permit guaranteed affiliates in a corporate group under common control that do not enter into swaps with U.S. persons to comply with such regulations by establishing consolidated policies, procedures, governance structures, reporting lines, operational units, and systems, thereby increasing operational efficiencies and lessening the economic burden on these groups with respect to their guaranteed affiliates that do not directly face U.S. persons when engaging in swaps activities.[504] The Commission notes, however, that any such relief would require a consolidated program to manage the risks of the included guaranteed affiliates on an individual, rather than a net, basis.

The Commission encourages interested parties to contact the Director of the Division of Swap Dealer and Intermediary Oversight to discuss the necessary conditions and restrictions of appropriate relief.

The Commission clarifies that, in the interest of international comity and for the purpose of permitting efficiencies in compliance programs, it would remain open to considering (or directing its staff to consider) relief, subject to appropriate conditions and restrictions to be determined, that would permit guaranteed affiliates in a corporate group under common control (that do not enter into swaps with U.S. persons or U.S. guaranteed affiliates or affiliate conduits of U.S. persons) to comply with certain of such regulations on a consolidated or group basis. The Commission notes, however, that any such relief would require a consolidated program to manage the risks of the included guaranteed affiliates on an individual, rather than a net, basis.

With respect to one of the Entity-Level Requirements in the Second

Category, SDR Reporting (i.e., SDR Reporting and swap data recordkeeping related to complaints and marketing and sales materials),[505] the Commission interprets CEA section 2(i) such that swap dealers or MSPs that are not U.S. persons generally would be eligible for substituted compliance only with respect to swaps where the counterparty is a non-U.S. person that is not a guaranteed or conduit affiliate.

With respect to the other Entity-Level Requirement in the Second Category (i.e., swap data recordkeeping related to complaints and marketing and sales materials),[506] the Commission interprets CEA section 2(i) such that swap dealers or MSPs that are not U.S. persons generally would be eligible for substituted compliance only with respect to swaps where the counterparty is a non-U.S. person. However, as explained below, with respect to Large Trader Reporting, the Commission's policy would not recognize substituted compliance in place of compliance with Large Trader Reporting.

Specifically, with respect to SDR Reporting, the Commission interprets CEA section 2(i) such that substituted compliance may be available to non-U.S. swap dealers and non-U.S. MSPs (whether or not such swap dealers or MSPs are affiliates of or are guaranteed by U.S. persons) for swaps with non-U.S. counterparties, provided that the Commission has direct access (including electronic access) to the relevant swap data that is stored at the foreign trade repository. The Commission believes that this ensures that the Commission will have access to information that is critical to its oversight of these entities even where substituted compliance with regard to SDR Reporting would be applicable under this Guidance.[507] However, the Commission interprets section 2(i) as applied to these requirements such that

substituted compliance generally would not be available for non-U.S. swap dealers and non-U.S. MSPs (whether or not such swap dealers or MSPs are guaranteed by U.S. persons) with respect to swaps with U.S. counterparties. The Commission believes that in general, application of these requirements, without eligibility for substituted compliance, is appropriate given its strong supervisory interest in a swap between a registered swap dealer or MSP and a U.S. counterparty.

However, with regard to the SDR reporting requirements, for the future, the Commission has agreed to continue to work collaboratively and to consider any unforeseen implementation effects that might arise in the application of our respective rules. The Commission will continue discussions with other international partners with a view to establishing a more generalized system that would allow, on the basis of these countries' implementation of the G–20 commitments, an extension of the treatment the EU and the CFTC will grant to each other.

With regard to certain aspects of swap data recordkeeping that relate to complaints and marketing and sales materials, the Commission interprets CEA section 2(i) such that non-U.S. swap dealers or non-U.S. MSPs generally would be eligible for substituted compliance with respect to swaps with non-U.S. counterparties.[508]

To the extent that swap data reported to a foreign trade repository would include data regarding the physical commodity swaps covered by Large Trader Reporting, the Commission— even if provided with direct access to such data—would still likely be required to convert it to "futures equivalent" positional data in order to render it comparable to the data obtained through Large Trader Reporting, which contemplates conversion by the entity required to

---

[504] "Swaps activities" are defined in Commission regulation 23.600(a)(7).

[505] See 17 CFR 23.201(b)(3), (4).

[506] See id.

[507] As the Commission noted in the Proposed Guidance, data reported to SDRs is critical to ensure that the Commission has a comprehensive and accurate picture of swap dealers and MSPs that are its registrants, including the gross and net counterparty exposures of swaps of all swap dealers and MSPs, to the greatest extent possible. Therefore, the Commission's view is that non-U.S. swap dealers and non-U.S. MSPs generally should be expected to report all of their swaps to a registered SDR. At the same time, the Commission recognized the interests of foreign jurisdictions with respect to swaps between a non-U.S. swap dealer or non-U.S. MSP with a non-U.S. counterparty. Therefore, the Commission would interpret section 2(i) so that swaps between non-U.S. swap dealers or MSPs with non-U.S. counterparties generally are eligible for substituted compliance with regard to SDR Reporting, but only if the Commission has direct access to all of the reported swap data elements that are stored at a foreign trade repository.

[508] In the Proposed Guidance, the Commission included all of the swap data recordkeeping requirements of regulations 23.201 and 23.203 in the proposed first subcategory of Entity-Level Requirements. 77 FR at 41225. In this Guidance, swap data recordkeeping related to complaints and marketing and sales materials under regulations 23.201(b)(3) and 23.201(b)(4), respectively, are being moved from the First Category to the Second Category because the Commission does not believe that substituted compliance generally should be available for requirements relating to complaints and marketing and sales materials where the counterparty is a U.S. person. This policy pertains equally to swaps with foreign affiliates of a U.S. person that are required to independently register as swap dealers and to comply with applicable Entity-Level Requirements.

report data to the Commission.[509] Given that Large Trader Reporting is intended to enable the Commission, in a prompt and efficient manner, to identify significant traders in the covered physical commodity swaps and to collect data on their trading activity in order to reconstruct market events, the time and resources expended by the Commission in conversion could significantly impede its market surveillance efforts.

The Commission notes further that its interpretation of CEA section 2(i) to permit substituted compliance with comparable and comprehensive regimes in certain circumstances recognizes the interests of foreign jurisdictions with respect to swaps between non-U.S. persons. Large Trader Reporting, however, reflects a very specific interest of the Commission in conducting effective surveillance of markets in swaps that have been determined to be economically equivalent to certain U.S.-listed physical commodity futures contracts. In light of this specific Commission interest—which is reflected in the particularized scope and methodology of Large Trader Reporting—and in light of the anticipated impediments to obtaining directly comparable positional data through any foreign swap data reporting regime, the Commission's policy would not recognize substituted compliance in place of compliance with Large Trader Reporting.

### 4. Application of the "Category A" Transaction-Level Requirements to Swap Dealers and MSPs

This section discusses the Commission's guidance on the application of the Category A Transaction Level Requirements to the parties to a swap where one of the parties is a registered swap dealer or MSP,[510] including when substituted compliance may be available to various types of counterparties.

As noted above, the Category A Transaction Level Requirements include: (1) Required clearing and swap processing; (2) margining and segregation requirements for uncleared swaps; (3) trade execution; (4); swap trading relationship documentation; (5) portfolio reconciliation and compression; (6) real-time public reporting; (7) trade confirmation; and (8) daily trading records.[511]

The Commission's policy on application of the Category A Transaction-Level Requirements is summarized in Appendix D to this Guidance, which should be read in conjunction with the rest of the Guidance.

#### a. Swaps With U.S. Swap Dealers and MSPs

As explained above, where one of the counterparties to a swap is a U.S. swap dealer or U.S. MSP, under the Commission's interpretation of CEA section 2(i), the Commission would generally expect the parties to the swap to comply with Category A Transaction-Level Requirements with respect to the transaction, without regard to whether the other counterparty to the swap is a U.S. person or a non-U.S. person.

Because the Commission interprets section 2(i) so that the term "U.S. person" would include any legal entity organized or incorporated under the laws of the United States or having its principal place of business in the United States, this interpretation also would apply where one of the parties to the swap is a U.S. swap dealer or U.S. MSP that is an affiliate of a non-U.S. person.[512] In addition, because the Commission considers a foreign branch of a U.S. person to be a part of the U.S. person, the foregoing interpretation also applies to swaps with foreign branches of a U.S. bank that is a swap dealer or MSP (although in some circumstances substituted compliance may be available as explained below).

Further, as explained above, with regard to substituted compliance, where one of the counterparties to a swap is a U.S. swap dealer or U.S. MSP (including those that are affiliates of a non-U.S. person), other than a foreign branch of a U.S. bank that is a swap dealer or MSP, the Commission's policy is that substituted compliance generally would not be available for the Category A Transaction-Level Requirements, without regard to whether the other counterparty is a U.S. person or a non-U.S. person. The Commission has a strong supervisory interest in ensuring that the Category A Transaction-Level Requirements apply to swaps with a U.S. swap dealer or MSP.[513]

Similarly, under the Commission's interpretation of 2(i), where a swap is between a foreign branch of a U.S. bank that is a swap dealer or MSP, on the one hand, and a U.S. person on the other, the Commission's policy is that substituted compliance generally would not be available with respect to the Category A Transaction-Level Requirements. In this case, the Commission also has a strong supervisory interest in ensuring that the Category A Transaction-Level Requirements fully apply to the transaction because it views the swap transaction as being between two U.S. persons. The Commission believes that this approach is appropriate in light of the Commission's strong supervisory interests in entities that are part or an extension of a U.S. swap dealer or U.S. MSP.

However, where a swap is between two foreign branches of U.S. banks that are both swap dealers or MSPs, the Commission believes that the interests of foreign regulators in applying their transaction-level requirements to a swap taking place in their jurisdiction, together with the fact that foreign branches of U.S. swap dealers or U.S. MSPs are subject generally to direct or indirect oversight by U.S. regulators, weigh in favor of allowing substituted compliance with comparable and comprehensive foreign regulatory requirements (to the extent applicable).

In addition, where a swap is between the foreign branch of a U.S. bank that is a swap dealer or MSP, on the one hand, and a non-U.S. person on the other

---

[509] Large Trader Reporting provides the Commission with data regarding large positions in swaps that are linked, directly or indirectly, to a discrete list of U.S.-listed physical commodity futures contracts, in order to enable the Commission to implement and conduct effective surveillance of these economically equivalent swaps and futures. To facilitate surveillance efforts and the monitoring of trading across the swaps and futures markets, swaps positions must be converted to equivalent positions of the related U.S. futures contract ("futures equivalents") for reporting purposes; reportable thresholds are also defined in terms of "futures equivalents."

[510] Some of the Transaction-Level and Entity-Level Requirements also are applicable to market participants that are not swap dealers or MSPs, which are referred to herein as non-registrants. *See* section H, *infra*, for a discussion of the Commission's interpretation of how these requirements would apply to non-registrants under CEA section 2(i).

[511] The categorization of Transaction-Level Requirements into Categories A and B is discussed in section E, *supra*. See Appendix B for a descriptive list of the Category A and Category B requirements and Appendix D for a table summarizing the application of the Category A Transaction-Level Requirements to Swap Dealers and MSPs.

[512] *See* the Proposed Guidance, 77 FR 1218.

[513] Consistent with the foregoing rationale, the Commission takes the view that a U.S. branch of a non-U.S. swap dealer or MSP would be subject to Transaction-Level requirements, without substituted compliance available. As discussed above, a branch does not have a separate legal identity apart from its principal entity. Therefore, the Commission considers a U.S. branch of a non-U.S. swap dealer or non-U.S. MSP to be a non-U.S. person (just as the Commission considers a foreign branch of a U.S. person to be a U.S. person). Nevertheless, the Commission also recognizes its strong supervisory interest in regulating the dealing activities that occur with the United States, irrespective of the counterparty (just as the Commission allows for substituted compliance for foreign branches in certain instances to take into account the strong supervisory interest of local regulators).

(regardless of whether the non-U.S. person is a guaranteed or conduit affiliate), as a policy matter, the Commission believes that substituted compliance should be available (if otherwise applicable). In this case, even though the Commission considers the foreign branch of a U.S. person to be a U.S. person, the Commission believes that the interests of foreign regulators in applying their transaction-level requirements to a swap taking place in their jurisdiction, together with the fact that foreign branches of U.S. swap dealers or U.S. MSPs are subject generally to direct or indirect oversight by U.S. regulators because they are part of a U.S. person, may weigh in favor of allowing substituted compliance with comparable and comprehensive foreign regulatory requirements (to the extent applicable) where the counterparty to the foreign branch is a non-U.S. person.

In a modification to the Proposed Guidance, where a swap between the foreign branch of a U.S. swap dealer or U.S. MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate) takes place in a foreign jurisdiction other than Australia, Canada, the European Union, Hong Kong, Japan, or Switzerland,[514] the Commission's policy is to interpret CEA section 2(i) so that counterparties may comply with the transaction-level requirements applicable to entities domiciled or doing business in the foreign jurisdiction where the foreign branch is located, rather than the Transaction-Level Requirements that would otherwise be applicable, if two elements are present. First, the aggregate notional value (expressed in U.S. dollars and measured on a quarterly basis) of the swaps of all U.S. swap dealer's foreign branches in foreign jurisdictions other than Australia, Canada, the European Union, Hong Kong, Japan, or Switzerland does not exceed five percent of the aggregate notional value (expressed in U.S. dollars and measured on a quarterly basis) of all of the swaps of the U.S. swap dealer. Second, the U.S. person maintains records with supporting information to verify that the first element is present, as well as to identify, define, and address any significant risk that may arise from the non-application of the Transaction-Level Requirements. The Commission believes this policy is appropriate because U.S. swap dealers' dealing activities through branches or agencies in jurisdictions other than the six jurisdictions referenced above, though not significant in many cases,

may be nevertheless an integral element of their global business. The Commission notes that this exception is not available in the six jurisdictions referenced above because the Commission has received, or expects to receive in the near term, a request for substituted compliance determinations for transactions in these jurisdictions.

Although the foreign branch of a U.S. registrant would not register separately as a swap dealer or MSP, the Commission interprets 2(i) in a manner that would permit the U.S. registrant to task its foreign branch to fulfill its regulatory obligations with respect to the Category A Transaction-Level Requirements. The Commission would generally consider compliance by the foreign branch to constitute compliance with these Transaction-Level Requirements. However, under the Commission's interpretation of 2(i), the U.S. person (principal entity) would remain responsible for compliance with the Category A Transaction-Level Requirements.

### b. Swaps With Non-U.S. Swap Dealers and Non-U.S. MSPs

Under the Commission's interpretation of CEA section 2(i), where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), on the one hand, and a U.S. person (other than a foreign branch of a U.S. swap dealer or MSP), on the other, the Commission would generally expect the parties to comply with Category A Transaction-Level Requirements with respect to the transaction.[515]

The Commission notes, however, that where a swap is executed anonymously between any non-U.S. person, whether a swap dealer or an MSP, and a U.S. person (other than a foreign branch of a U.S. swap dealer or MSP) on a registered DCM or SEF and cleared, the non-U.S. person will generally be considered to have satisfied each of the eight Category A Transaction-Level Requirements that apply to such a swap transaction as a consequence of being so executed on a DCM or SEF. Thus, neither the non-U.S. person (nor its U.S. person counterparty) will need to take any further steps to comply with the Category A Transaction-Level

Requirements in connection with such a transaction.[516]

In making this determination, the Commission observes that where a cleared swap transaction is executed anonymously on a registered DCM or SEF, certain independent requirements that apply to DCM and SEF transactions generally, pursuant to the CEA or the Commission's regulations, will ensure that four of the eight Category A Transaction-Level Requirements will be met for such transactions—required clearing and swap processing,[517] trade execution,[518] real-time public reporting,[519] and trade confirmation.[520]

---

[514] Market participants or regulators in all of these jurisdictions have submitted requests for Substituted Compliance Determinations.

[515] Under the Commission's futures regulatory regime, any person located outside the U.S. that seeks to serve as an intermediary to U.S. persons trading on a U.S. designated contract market or in foreign futures and option contracts is required to register in the appropriate category and comply with related regulations, absent the availability of an exemption from registration (*e.g.*, relief pursuant to Commission regulation 30.10 in the foreign futures and option context)." *See, e.g.*, Commission regulation 30.4.

[516] However, non-U.S. swap dealers and MSPs must satisfy the daily trading record requirement found in Commission regulation 23.202(a)(1).

[517] Pursuant to Commission regulations 37.702 and 38.601, each SEF and DCM must coordinate with each DCO to which it submits transactions for clearing in the development of rules and procedures to facilitate prompt and efficient transaction processing to meet the requirements of Commission regulation 39.12(b)(7). Commission regulation 39.12(b)(7)(ii) requires a DCO to accept or reject swaps executed on a SEF or DCM for clearing "as quickly after execution as would be technologically practicable if fully automated systems were used." *See also* 17 CFR 23.506(a); 39.12(b)(7)(iii); Final Customer Documentation Rules, 77 FR at 21306–21310. As stated in the Final Customer Documentation Rules, these rules, taken as a whole, "require SEFs, DCMs, swap dealers, MSPs, and DCOs to coordinate in order to facilitate real time acceptance or rejection of trades for clearing." *Id.* at 21296.

[518] CEA section 2(h)(8)(A) provides that transactions in swaps subject to the trade execution mandate must be executed on a registered DCM or SEF, or a SEF that has been exempted from registration. The Commission clarifies that the trading mandate under CEA section 2(h)(8)(A) is satisfied by trading on a registered DCM or SEF or a SEF that has been exempted from registration.

[519] Parties that execute a swap transaction on a DCM or SEF meet their real-time public reporting obligations by operation of a set of Commission regulations that essentially delegate the obligations to the DCM or SEF on which the transaction was executed, and the SDR to which the DCM or SEF reports the transaction. Specifically, Commission regulation 43.3(a)(2) provides that a party to a publicly reportable swap transaction satisfies its real-time reporting obligations by executing a publicly reportable swap transaction on or pursuant to the rules of a registered SEF or DCM. In turn, Commission regulation 43.3(b)(1) requires a SEF or DCM to transmit swap transaction and pricing data to a registered SDR, as soon as technically practicable after the publicly reportable swap transaction has been executed on or pursuant to the rules of such trading platform or facility. Finally, Commission regulation 43.3(b)(2) requires a registered SDR to ensure that swap transaction and pricing data is publicly disseminated, as soon as technologically practicable after such data is received from a registered SDR for DCM.

[520] *See* Commission regulation 23.501(a)(4)(i) ("Any swap transaction executed on a swap execution facility or designated contract market shall be deemed to satisfy the requirements of this section, provided that the rules of the swap execution facility or designated contract market establish that confirmation of all terms of the transactions shall take place at the same time as execution"); 37.6(b); Part 37 SEF Regulations, 78 FR at 33585 ("A swap execution facility shall provide
Continued

For a combination of reasons, the Commission also believes that the four remaining Transaction-Level Requirements do not, or should not, apply to cleared, anonymous DCM or SEF transactions. So, for instance, the fact that the DCM or SEF swap transaction will be cleared, obviates the need for margining or segregation requirements applicable to uncleared swaps. Two other Category A Transaction-Level Requirements—swap trading relationship documentation and portfolio reconciliation and compression—would not apply because the Commission regulations that establish these requirements make clear that they do not apply to cleared DCM or SEF transaction.[521] The last requirement—the daily trading records requirement[522]—would only be applicable to the non-U.S. swap dealer and only with regard to pre-trade execution swaps. However, because the non-U.S. swap dealer will have no information about its counterparty where the swap is executed anonymously, the Commission is of the view that, as a matter of international comity, CEA section 2(i) should not be interpreted to apply all of the daily trading records requirements to such a swap.[523]

In addition, the Commission is interpreting CEA section 2(i) such that, where a swap between a non-U.S. person, regardless of its swap dealer or MSP status, and a U.S. person is executed anonymously on an FBOT registered with the Commission pursuant to part 48 and cleared the non-U.S. person will generally be considered to have satisfied the Category A Transaction-Level Requirements that pertain to such a swap transaction. Some of the requirements will be satisfied by requirements levied by regulation on the FBOT and some will be satisfied because a registered FBOT is analogous to a DCM and is subject to comprehensive supervision and regulation in its home country that is comparable to that exercised over a DCM by the Commission. Thus, neither the non-U.S. person (nor its U.S. person counterparty) will need to take any further steps to satisfy the applicable Category A Transaction-Level Requirements in connection with such a transaction.[524]

In making this determination, the Commission observes that where a cleared swap transaction is executed anonymously on a registered FBOT, the FBOT, similar to a DCM, based on certain independent requirements that apply to DCM transactions generally pursuant to the CEA or the Commission's regulations, will ensure that two of the eight Category A Transaction-Level Requirements will be satisfied for such transactions: Required clearing and swap processing[525] and trade execution.[526] The Commission notes that while the real-time reporting requirement will be satisfied for cleared swaps executed anonymously on a DCM by operation of the Commission's real-time reporting regulations, absent further affirmative actions by an FBOT, the real-time public reporting requirements will not be satisfied through FBOT execution alone.[527]

For a combination of reasons, including the fact that the swap will be cleared, the Commission also is of the view that the remaining Transaction-Level Requirements do not apply to such transactions executed on a registered FBOT. For instance, the fact that the swap will be cleared, as required by regulation 48.7(c)(1)(ii), renders inapplicable the margining or segregation requirements for uncleared swaps. As the Commission observed above with respect to swaps executed anonymously on DCMs, certain of the other Category A Transaction-Level Requirements would not apply to the swap. Consistent with this determination, three of the other Category A Transaction-Level Requirements—swap trading relationship documentation, portfolio reconciliation and compression and trade confirmation—would not apply to the swap executed on a registered FBOT because the underlying Commission regulations themselves do not apply those requirements to cleared DCM or SEF transactions. The last requirement—the daily trading records requirement—would only be applicable to the non-U.S. swap dealer and only with regard to pre-trade execution swaps. However, because the non-U.S. swap dealer will have no information about its counterparty where the swap is executed anonymously on a registered FBOT, the Commission is of the view that, as a matter of international comity, CEA section 2(i) should be interpreted such that certain of the daily trading records requirements also would not apply to the swap.[528]

In addition, for the reasons discussed in the next two sections, where a swap is between a non-U.S. swap dealer or non-U.S. MSP, on the one hand, and a U.S. person that is a guaranteed or conduit affiliate, on the other, under the Commission's interpretation of 2(i), the Commission would generally expect the parties to comply with the Category A Transaction-Level Requirements.[529]

However, where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), on the one hand, and a non-U.S. person

---

each counterparty to a transaction that is entered on or pursuant to the rules of the swap execution facility with a written record of all of the terms of the transaction which shall legally supersede any previous agreement and serve as confirmation of the transaction. The confirmation of all terms shall take place at the same time as execution . . . ").

[521] *See* 17 CFR 23.504(a)(1) ("The requirements of this section [swap trading relationship documentation] shall not apply to . . . swaps executed on a board of trade designated as a contract market under section 5 of the Act or to swaps executed anonymously on a swap execution facility under section 5h of the Act, provided that such swaps are cleared by a derivatives clearing organization . . . "); 23.502(d) ("Nothing in this section [portfolio reconciliation] shall apply to a swap that is cleared by a derivatives clearing organization"); 23.503(c) ("Nothing in this section [portfolio compression] shall apply to a swap that is cleared by a derivatives clearing organization.").

[522] *See* 17 CFR 23.202.

[523] The Commission is of the view that CEA section 2(i) should not be interpreted to apply the daily trading records requirements, with the exception of those found in Commission regulation 23.202(a)(1).

[524] However, a non-U.S. swap dealer or non-U.S. MSP must satisfy the daily trading record requirement found in Commission regulation 23.202(a)(1).

[525] As discussed above, pursuant to Commission regulation 48.7(c)(1)(ii), all contracts, including swaps, made available in the U.S. by a registered FBOT must be cleared. The clearing organization must be either a DCO or must observe international clearing standards: The RCCP or the successor standards, PFMI.

[526] *See* discussion of clearing at section IV.F.6, *supra*. The Commission clarifies that the trading mandate under CEA section 2(h)(8)(A) is satisfied by trading on a registered FBOT.

[527] Pursuant to Commission regulation 48.8(a)(9), the registered FBOT must ensure that all transaction data relating to each swap transaction, including price and volume, are reported as soon as technologically practicable after execution of the swap transaction to a SDR that is either registered with the Commission or has an information sharing arrangement with the Commission. While Commission regulation 43(b)(2) requires that an SDR ensure that swap transaction and pricing data is publicly disseminated as soon as technologically practicable after such data is received from a registered SEF, DCM or reporting party, it does not specifically require public dissemination of swap transaction and pricing data from the FBOT. Therefore, in order for the FBOT to ensure that the real-time public reporting requirement is satisfied, the FBOT must either report the data to the public itself or enter into an arrangement with the SDR to which the data are reported pursuant to which the SDR agrees to publicly disseminate the data as soon as technologically practicable.

[528] The Commission is of the view that CEA section 2(i) should not be interpreted to apply the daily trading records requirements, with the exception of those found in Commission regulation 23.202(a)(1).

[529] Where one of the parties to the swap is a conduit affiliate, the Commission would generally expect the parties to the swap only to comply with (to the extent that the Inter-Affiliate Exemption is elected), the conditions of the Inter-Affiliate Exemption, including the treatment of outward-facing swaps condition in Commission regulation 50.52(b)(4)(i). In addition, the part 43 real-time reporting requirements must be satisfied.

that is not a guaranteed or conduit affiliate, on the other, under the Commission's interpretation of 2(i), the Commission would not expect the parties to the swap to comply with the Category A Transaction-Level Requirements.[530] In this case, the Commission believes that generally there may be a relatively greater supervisory interest on the part of foreign regulators with respect to transactions between two counterparties that are non-U.S. persons so that application of the Category A Transaction-Level Requirements may not be warranted.[531]

With regard to substituted compliance, where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), on the one hand, and a U.S. person (other than a foreign branch of a U.S. bank swap dealer or U.S. MSP), on the other, the Commission's policy is that substituted compliance would generally not be available for the Category A Transaction-Level Requirements. The Commission believes that this approach is appropriate in this case because the Commission has a strong interest in ensuring that the swap fully complies with the Category A Transaction Level Requirements, without substituted compliance. A number of related reasons support this conclusion. As discussed above, a major purpose of Title VII is to control the potential harm to U.S. markets that can arise from risks that are magnified or transferred between parties via swaps. As also discussed above, swaps between U.S. persons and non-U.S. persons inherently raise the possibility of such

risk magnification and transfer. The Category A Transaction Level Requirements are designed to constrain such risk magnification and transfer. The United States thus has a strong interest in applying the Dodd-Frank Act requirements, rather than substitute requirements adopted by non-U.S. authorities, to swaps with U.S. persons. Exercise of U.S. jurisdiction with respect to the Category A Transaction Level Requirements over swaps between U.S. persons and non-U.S. persons is a reasonable exercise of jurisdiction because of the strong U.S. interest in minimizing the potential risks that may flow to the U.S. economy as a result of such swaps.[532]

Even though substituted compliance is not available with respect to swaps between a non-U.S. swap dealer or non-U.S. MSP, on the one hand, and a U.S. person (other than a foreign branch of a U.S. bank swap dealer or U.S. MSP), on the other, a market participant would be deemed in compliance with the relevant Dodd-Frank requirements where it complies with requirements in its home jurisdiction that are essentially identical to the Dodd-Frank requirements. Whether the home jurisdiction's requirements are essentially identical to the corollary Dodd-Frank requirements would be evaluated on a provision-by-provision basis. The Commission intends that a finding of essentially identical generally would be made through Commission action but in appropriate cases could be made through staff no-action.

Based on the foregoing principles, the Commission staff issued a no-action letter related to risk mitigation.[533] The Commission staff found that the Commission and the EU have essentially identical rules in important areas of risk mitigation for the largest counterparty swap market participants. Specifically, the Commission staff determined that under the European Market Infrastructure Regulation (EMIR), the EU has adopted risk mitigation rules that are essentially identical to certain provisions of the Commission's business conduct standards for swap dealers and major swap participants. In areas such as confirmation, portfolio reconciliation,

portfolio compression, valuation, and dispute resolution, the Commission staff found that the respective regimes are essentially identical. The Commission staff determined that where a swap/OTC derivative is subject to concurrent jurisdiction under US and EU risk mitigation rules, compliance under EMIR will achieve compliance with the relevant Commission rules because they are essentially identical.[534]

However, where the swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person) and a foreign branch of a U.S. bank that is a swap dealer or MSP, as a policy matter, the Commission believes that substituted compliance should be available for the Category A Transaction-Level Requirements, to the extent applicable. Under substituted compliance, a counterparty can choose to follow a foreign jurisdiction's rules even though those rules are not essentially identical, provided that the regime is comparable and comprehensive. The Commission believes that international comity principles support taking this more flexible approach where the transaction, although it involves a U.S. person, takes place in a foreign jurisdiction.

In addition, where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), on the one hand, and a non-U.S. person that is a guaranteed or conduit affiliate, on the other, substituted compliance may be available to satisfy the Category A Transaction Level Requirements, to the extent applicable, as discussed in the next two sections.

### c. Swaps With a Non-U.S. Person Guaranteed by a U.S. Person

#### i. Proposed Guidance

In the Proposed Guidance, with respect to swaps between a non-U.S. swap dealer or non-U.S. MSP, on the one hand, and a non-U.S. counterparty on the other hand, the Commission proposed to interpret CEA section 2(i) such that a non-U.S. swap dealer or non-U.S. MSP would be expected to comply with the Category A Transaction-Level Requirements for swaps where the non-U.S. counterparty's performance is guaranteed, or otherwise supported by, a U.S. person.[535] In consideration of international comity principles, the Commission further proposed to interpret CEA section 2(i) so as to

---

[530] Thus, for example, a swap between a registered non-U.S. swap dealer and a German person would not be subject to Category A Transaction-Level Requirements.

[531] Where the counterparty to a non-U.S. swap dealer or non-U.S. MSP is an international financial institution such as the World Bank, the Commission also generally would not expect the parties to the swap to comply with the Category A Transaction-Level Requirements, even if the principal place of business of the international financial institution were located in the United States.

For this purpose, the Commission would consider the international financial institutions to be the institutions listed as such in the Final Entities Rules, 77 FR at 30692 n. 1180, which include the International Monetary Fund, International Bank for Reconstruction and Development, International Development Association, International Finance Corporation, Multilateral Investment Guarantee Agency, the Inter-American Development Bank, and the Inter-American Investment Corporation. Even though some or all of these international financial institutions may have their principal place of business in the United States, the Commission would generally not consider the application of the Category A Transaction-Level Requirements to be warranted, for the reasons of the traditions of the international system discussed in the Final Entities Rules.

[532] See Restatement secs. 403(2)(a) (effect on territory of regulating state), 403(2)(c) (importance of regulated activity to the regulating state); 403 cmt. b (weight to be given to reasonableness factors depends on circumstances).

[533] See No-Action Relief for Registered Swap Dealers and Major Swap Participants from Certain Requirements under Subpart I of Part 23 of Commission Regulations in Connection with Uncleared Swaps Subject to Risk Mitigation Techniques under EMIR, CFTC Letter No. 13–45 (Jul. 11, 2013) ("Risk Mitigation Letter").

[534] The Risk Mitigation Letter provides an example of when requirements in a foreign jurisdiction would be essentially identical to Dodd-Frank requirements. See id.

[535] See Proposed Guidance, 77 FR 41288.

permit substituted compliance for these Transaction-Level Requirements.

The Commission explained that it proposed to interpret section 2(i) in this manner because, where a non-U.S. counterparty's swaps obligations are guaranteed by a U.S. person, the risk of non-performance by the counterparty rests with the U.S. person that is the guarantor of performance or payment. If the non-U.S. person defaults on its obligations under the swaps, then the U.S. person guarantor will be held responsible (or would bear the cost) to settle those obligations. In circumstances in which a U.S. person ultimately bears the risk of non-performance of a counterparty to a swap with a non-U.S. swap dealer or non-U.S. MSP, the Commission noted its strong regulatory interest in performance by both parties to the swap, and hence proposed to apply these Transaction-Level Requirements.[536]

ii. Comments

Some commenters concurred in the Commission's emphasis on a guarantee by a U.S. person as an interpretive guidepost. IATP, for example, stated that "the U.S. person's guarantee is a crucial criterion for the Commission's determination of whether a non-U.S. person would be subject to compliance with Dodd-Frank or whether substituted compliance would be appropriate."[537] Similarly, AFR, in commenting on the Proposed Order, expressed concern about U.S. taxpayer exposure to "foreign affiliates of U.S. banks whose liabilities are guaranteed (implicitly or explicitly) by the parent company."[538]

Other commenters, by contrast, stated that: (1) The Transaction-Level Requirements should never apply to swaps between counterparties that are both non-U.S. persons;[539] (2) the Commission should exclude the swap dealing transactions of a non-U.S. person where the counterparties to the swaps are, themselves, non-U.S. persons, irrespective of whether such counterparties' obligations are guaranteed by the U.S. person;[540] and (3) section 2(i) does not provide a legal basis for jurisdiction over a swap between non-U.S. persons based on a guaranty by a U.S. person because guarantees "do not alter the location of activity."[541] In a similar vein, IIB stated

that the Commission's proposed treatment of guarantees based on its concern that the U.S. guarantor is exposed to risks incurred by one of its non-U.S. affiliates, "is unduly broad."[542]

IIB explained that guarantees are a very common way for U.S. multinational corporations (both financial and non-financial) to provide credit support for their non-U.S. subsidiaries. According to IIB, parent credit support enables these subsidiaries to hedge their risks cost-effectively in the markets in which they operate, thereby reducing the cost of risk management and therefore the costs of operations.[543] Citi noted that ordinary course parent support commitments, general payment guarantees and capital maintenance commitments are often necessary to enter foreign banking markets. It added that U.S. multinationals also guarantee obligations of local subsidiaries so that their subsidiaries can effectively hedge risks in local markets.[544]

IIB argued that these arrangements "are in stark contrast to circumstances where an unregulated foreign 'shell' affiliate is used for purposes of entering into significant swap dealing activity outside the scope of Dodd-Frank and systematically transferring the market and credit risks arising from the activity to a U.S. affiliate."[545] Accordingly, IIB maintained that application of Transaction-Level Requirements where a non-U.S. counterparty to a non-U.S. swap dealer or non-U.S. MSP is guaranteed by a U.S. person is unnecessary because the Commission already has adopted an anti-evasion rule to address such schemes.[546]

Commenters stated that in many instances, the Commission's concerns about a guarantee by a U.S. person can be addressed as a safety and soundness matter by the Federal Reserve Board when it supervises both the guarantor and its subsidiaries; further, where the U.S. providing a guarantee is itself a

swap dealer or MSP, it also will be subject to Title VII requirements.[547] In a related vein, the Commission was urged to adopt an exception from its proposed treatment of a non-U.S. counterparty with a guarantee from a U.S. person if either: (1) The counterparty is subject to U.S. capital requirements or comparable foreign (*i.e.,* Basel-compliant) capital requirements; or (2) the guarantor is a U.S. bank holding company.[548]

IIB also stated that the Commission should tie the application of Title VII requirements to the cross-border activities of U.S.-guaranteed foreign subsidiaries to the significance of the risk to the United States arising from the underlying guaranteed activity—that is, where the existence of a guarantee gives rise to direct and significant risks to the United States.[549] Otherwise, IIB stated, "the level of risk to the United States is too contingent, remote or low to justify application of U.S. regulation in the face of strong and more direct non-U.S. regulatory interests."[550] Under such an approach, IIB stated, the Commission should adopt an exception from its proposed treatment of a non-U.S. counterparty with a guarantee from a U.S. person if the non-U.S. counterparty is not a financial entity and is entering into the transaction for hedging or risk mitigation purposes.[551] More particularly, IIB posited, if the level of the non-U.S. counterparty's swap activity is insubstantial in relation to its net equity, or if the aggregate potential liability of the U.S. guarantor with respect to the non-U.S. counterparty's swap activity is insubstantial in relation to the net equity of the guarantor, then the risk to the United States will not be significant and Transaction-Level Requirements should not be applied.[552]

Many of the comments on this topic stated that the Commission's proposal in this regard would result in adverse competitive consequences.[553] Others,

[536] See *id.*

[537] See IATP (Aug. 27, 2012) at 3–4.

[538] See AFR (Aug. 14, 2012) at 1–2.

[539] See Australian Bankers (Aug. 27, 2012) at A8.

[540] See Sumitomo (Aug. 24, 2012) at 3. Sumitomo added that, at a minimum, the Commission should exclude swaps obligations in excess of a capped guaranty. *Id.*

[541] See CEWG (Aug. 27, 2012) at 6–7.

[542] See IIB (Aug. 27, 2012) at 14–15.

[543] *Id.* at 15–16.

[544] See Citi (Aug. 27, 2012) at 4–9.

[545] See IIB (Aug. 27, 2012) at 20.

[546] *Id. See also* Sullivan & Cromwell (Aug. 13, 2012) at 7 ("the counterparty should be considered a non-U.S. person for purposes of the regulatory requirements, provided that the transactions are not being conducted by the non-U.S. persons as an evasion"); The Clearing House (Aug. 27, 2012) at 17 (stating that "[a]ny guaranteed entity of a U.S. Person should only include 'shell' entities that have transferred substantially all of their market and credit risk to a U.S. Person (excluding non-financial entities) or any entities created to evade U.S. swaps rules."); Citi (Aug. 27, 2012) at 4–9 (". . . Title VII should not apply to non-U.S. subsidiaries on the basis of guarantees . . . where such subsidiaries are bona fide companies.").

[547] See Sullivan & Cromwell (Aug. 13, 2012) at 15.

[548] See IIB (Aug. 27, 2012) at 17–18.

[549] *Id.* at 15–16, 18–19.

[550] *Id.* at 4.

[551] *Id.* at 16–17.

[552] *Id.* at 15–16.

[553] See End Users Coalition (Aug. 27, 2012) at 3 (Commission's proposal may disadvantage non-U.S. affiliates of U.S. end-users whose non-U.S. counterparties may require guarantees to do business); Citi (Aug. 27, 2012) at 4–9 (applying Transaction-Level Rules in these circumstances would place U.S. multinationals at a severe competitive disadvantage relative to foreign-based corporations, as their subsidiaries abroad would have to either forgo parent support or comply with different transaction-level rules than those of the local market); IIB (Aug. 27, 2012) at 18 (non-U.S. persons that register as swap dealers due to their trading with U.S. persons would be disadvantaged vis-à-vis non-U.S. firms that do not have a U.S.

though, objected that Transaction-Level Requirements should not apply to entities guaranteed by U.S. persons because non-U.S. counterparties will likely be unwilling to agree to the legal documents necessary to comply with those requirements.[554] And others stated that the proposed interpretation will not achieve the objective of mitigating counterparties' exposure to the credit risks of swap dealers because the U.S. guarantor's exposure in this scenario is to the credit risk of the guaranteed non-U.S. counterparty, not to the non-U.S. swap dealer that is transacting with that guaranteed non-U.S. counterparty.[555]

Citi commented that if Transaction-Level Requirements were to be applied to swaps of non-U.S. persons whose obligations were guaranteed by a U.S. person, then U.S.-based firms may be forced to remove parent support from their overseas subsidiaries in order to remain competitive. It argued that this would cause significant additional capital, resources, and personnel to be moved abroad so that these non-U.S. subsidiaries could manage swap risk on a stand-alone basis which, it averred, would fragment and harm the safety and soundness of U.S.-based firms, U.S. swaps markets, and the U.S. economy.[556] Accordingly, it urged the Commission to further study the issue of guarantees before finalizing its cross-border guidance.[557]

One commenter requested that the Commission clarify the scope of a "guarantee" that can trigger application of Transaction-Level Requirements in these circumstances.[558] Another objected to the scope of the term "guarantee" if it were defined to include not only a guarantee of payment or performance of swaps obligations, but also other formal arrangements to support the ability of a person to perform its obligations (such as liquidity puts and keepwell agreements).[559]

### iii. Commission Guidance

Under this Guidance, with respect to swaps between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person) on the one hand, and a non-U.S. counterparty on the other hand where the non-U.S. counterparty's performance is guaranteed (or otherwise supported by) a U.S. person, the Commission would generally expect the parties to the swap to comply with all of the Category A Transaction-Level Requirements. The Commission believes that this policy is warranted in light of the significant regulatory interest in managing and reducing the risks to U.S. firms, markets and commerce from such transactions. Further, this policy is based on the Commission's view that the failure to apply Category A Transaction-Level Requirements to such swaps could leave a significant gap in the regulation of risks presented by swap activities undertaken by U.S. firms. However, as proposed, the Commission's policy contemplates that substituted compliance (to the extent applicable) could satisfy the Category A Transaction-Level Requirements that otherwise might apply to such swaps, as further discussed below.

In response to commenters that requested clarification of the nature of the guarantee of a non-U.S. counterparty by a U.S. person that will trigger the application of Transaction-Level Requirements to swaps with non-U.S. swap dealers or non-U.S. MSPs, the Commission references the approach set forth in the final rule further defining the term "swap," among others.[560] That is, for this purpose, a guarantee of a swap is a collateral promise by a guarantor to answer for the debt or obligation of a counterparty obligor under a swap.[561] Thus, to the extent that the non-U.S. swap dealer or non-U.S. MSP would have recourse to the U.S. guarantor in connection with its swaps position, the Commission would generally expect such non-U.S. swap dealer or MSP to comply with the Category A Transaction-Level Requirements for such a guaranteed swap (although substituted compliance may satisfy compliance with such requirements to the extent it is applicable, as discussed above). This interpretation also is consistent with the interpretation related to the MSP

definition that the Commission set forth in the Final Entities Rules.[562]

Conversely, where a non-U.S. swap dealer or non-U.S. MSP enters into a swap with a non-U.S. counterparty that does not have a guarantee as so described from a U.S. person and is not an affiliate conduit, the Commission's view is that the Transaction-Level Requirements should not apply.[563] Considerations relevant to application of the Transaction-Level Requirements also relate to persons guaranteeing swaps obligations. As noted in the proposal, the Transaction-Level Requirements with respect to required clearing and swap processing, margin (and segregation), and portfolio reconciliation and compression can serve to significantly mitigate risks to the swap dealer's counterparties, and by extension, the risk to the U.S. person guaranteeing the non-U.S. counterparty's obligations under the swap. Other Transaction-Level Requirements—trade confirmation, swap trading relationship documentation, and daily trading records—protect the counterparties to the swap, and thus also protect a U.S. person that guarantees a non-U.S. counterparty's obligations under the swap, by ensuring that swaps are properly documented and recorded.

In the Commission's view, because Congress directed that the trade execution requirement apply to swaps that are subject to the clearing requirement and made available to trade, it is appropriate for the trade execution requirement to apply to those cross-border swaps that are subject to the clearing mandate and are made available to trade. The Commission believes that both requirements—the clearing mandate and trade execution requirement—are of fundamental importance to the management and reduction of risks posed by swap activities of market participants. Requiring swaps to be traded on a regulated exchange or execution facility provides market participants with

---

swap dealing business because only the former would be obligated to comply with the Transaction-Level Requirements for swaps with U.S.-guaranteed counterparties); Sullivan & Cromwell (Aug. 13, 2012) at 6 (Title VII should not apply to the non-U.S. operations and activities of an entity simply because it has a U.S. parent that provides a guarantee because this would impose duplicative regulation and unnecessary costs on non-U.S. operations that are already subject to local foreign rules and regulations).

[554] *See* Hong Kong Banks (Aug. 27, 2012) at 4–5.

[555] *See, e.g.,* ISDA (Aug. 10, 2012) at 10.

[556] *See* Citi (Aug. 27, 2012) at 4–9.

[557] *Id. See also* CEWG (Aug. 27, 2012) at 4–5 (recommending that the Commission "undertake a more thorough regulatory analysis with respect to guarantees of swaps obligations").

[558] *See* Hong Kong Banks at 4–5.

[559] *See* CEWG (Aug. 27, 2012) at 4–5.

[560] *See* Final Swap Definition, 77 FR at 48225–48227. The interpretation herein applies only to a swap that is not a security-based swap or a mixed swap.

[561] *Id.* at 48226 n.186.

[562] *See* Final Entities Rules, 77 FR at 30689 ("[A]n entity's swap or security-based swaps positions in general would be attributed to a parent, other affiliate or guarantor for purposes of major participant analysis to the extent that counterparties to those positions would have recourse to that other entity in connection with the position. Positions would not be attributed in the absence of recourse.").

[563] The Commission agrees with commenters who stated that Transaction-Level Requirements should not apply if a non-U.S. swap dealer or non-U.S. MSP relies on a written representation by a non-U.S. counterparty that its obligations under the swap are not guaranteed with recourse by a U.S. person. Such an approach is consistent with Commission practice in other contexts such as the external business conduct rules.

greater pre- and post-trade transparency. Real-time public reporting improves price discovery by requiring that swap and pricing data be made publicly available. Taken together, the trade execution and real-time public reporting Transaction-Level Requirements provide important information to market participants and regulators with resulting efficiency in the marketplace. This, in turn, facilitates risk management which benefits swap counterparties and also serves to reduce the likelihood that a U.S. guarantor will be called upon to satisfy a non-U.S. counterparty's swaps obligations.[564]

Further, in the Final Swap Definition, the Commission found that a guarantee of a swap is a term of that swap that affects the price or pricing attributes of that swap. The Commission therefore concluded that when a swap has the benefit of a guarantee, the guarantee is an integral part of that swap. The Commission explained that typically when a swap counterparty uses a guarantee as credit support for its swaps obligations, the guarantor's resources are added to the analysis of the swap because "the market will not trade with that counterparty at the same price, on the same terms, or at all without the guarantee."[565]

For all the foregoing reasons, the Commission disagrees with commenters that asserted that it should not, or lacks the legal authority to, interpret CEA section 2(i) as to apply to swaps where one counterparty is a non-U.S. swap dealer or a non-U.S. MSP and the other counterparty is a non-U.S. person whose obligations under the swap are guaranteed by a U.S. person. Where a U.S. person provides a guarantee of a non-U.S. counterparty's swaps obligations for which there is recourse to the U.S. person, where that guarantee is a term of the swap and affects the price or pricing attributes of that swap, and where the Transaction-Level Requirements serve to protect and mitigate risk to that U.S. person guarantor, the Commission believes that such swaps, either individually or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce.

The application of Dodd-Frank Act requirements to swaps of non-U.S. persons whose swaps obligations are guaranteed by U.S. persons is also consistent with foreign relations law. As noted in the discussion above regarding the application of these requirements to swaps of U.S. persons with non-U.S. persons, a major purpose of Title VII is to control the potential harm to U.S. markets that can arise from risks that are magnified or transferred between parties via swaps. Similarly, a guarantee— which is an integral part of a swap—can lead to the transfer of risk from the guaranteed non-U.S. person to the U.S. guarantor. Because Category A Transaction Level Requirements are designed to mitigate such risk transfer, the Commission believes there is a strong interest in applying the Dodd-Frank Act requirements to swaps of non-U.S. persons that are guaranteed by U.S. persons.[566] However, the Commission also understands the countervailing interest of home country regulators in such swaps, and therefore believes that substituted compliance should generally be available in this context.

The Commission also disagrees with commenters that suggested that its interpretation on this score should apply only to certain guaranteed swaps (*e.g.*, not to swaps by non-financial entities entered into for hedging or risk mitigation purposes), or only to in certain circumstances (*e.g.*, where the guaranteed non-U.S. counterparty's swap activity is a certain percentage of its net equity or the aggregate potential liability of the U.S. guarantor with respect to the non-U.S. counterparty's swaps obligations is a certain percentage of the guarantor's net equity), or only to a certain extent (*e.g.*, to swaps obligations in excess of a capped guarantee). In the Final Swap Definition, the Commission acknowledged that a "full recourse" guarantee would have a greater effect on the price of a swap than a "limited" or "partial recourse" guarantee, yet nevertheless determined that the presence of any guarantee with recourse, no matter how robust, is price forming and an integral part of a guaranteed swap.[567]

The Commission similarly believes that the presence of any guarantee with recourse by a U.S. person of the swaps obligations of a non-U.S. counterparty to a swap with a non-U.S. swap dealer or non-U.S. MSP suffices to justify the application of Transaction-Level

Requirements that swap. Therefore, as noted above, to the extent that a non-U.S. swap dealer or non-U.S. MSP would have recourse to the U.S. guarantor in connection with its swaps position, the Commission would generally expect such non-U.S. swap dealer or non-U.S. MSP to comply with the Category A Transaction-Level Requirements for such a guaranteed swap (although substituted compliance may satisfy compliance with such requirements to the extent it is applicable). Although the Commission believes all relevant facts and circumstances should be analyzed, as a general matter the Commission is of the view that the purpose for which the non-U.S. counterparty is entering into the swap, or the net equity of the non-U.S. counterparty or the guarantor, or the extent of the guarantee, would generally not warrant a different conclusion.

Finally, the Commission disagrees with commenters that urged it to limit its interpretation in this regard to cases of evasion, or to exclude from the scope of its interpretation those swaps in which the non-U.S. counterparty is subject to appropriate capital requirements or the guarantor is a U.S. bank holding company. The events surrounding the collapse of AIGFP highlight how guarantees can cause major risks to flow to the guarantor. "AIGFP's obligations were guaranteed by its highly rated parent company . . . an arrangement that facilitated easy money via much lower interest rates from the public markets, but ultimately made it difficult to isolate AIGFP from its parent, with disastrous consequences."[568]

The Commission's view is that the protections and mitigation of risk exposures afforded by the Category A Transaction-Level Requirements would be rendered far less effective if in the case of swaps where one counterparty is a non-U.S. swap dealer or a non-U.S. MSP and the other counterparty is a non-U.S. person guaranteed by a U.S. person such requirements only apply when such swaps are part of a scheme to evade the Dodd-Frank Act. Further, while capital requirements are an important element of the Title VII regime to reduce systemic risk,[569] the

---

[564] Accordingly, the Commission disagrees with commenters who objected to the proposed interpretation on the ground that it would not advance the goal of mitigating the risk of credit exposure of the guarantor U.S. person to the non-U.S. swap dealer or non-U.S. MSP. The Transaction-Level Requirements also serve to protect against risk to the guarantor U.S. person by reducing the likelihood that its obligations under the guarantee will be called upon in the first instance.

[565] *See* Final Swap Definition, 77 FR 48225–48226.

[566] *See generally* note 532 and related discussion, *supra.*

[567] *Id.* at 48226.

[568] AIG Report, *supra* note 5, at 20.

[569] CEA section 4s(e)(1) provides that each registered swap dealer and MSP for which there is a prudential regulator shall meet such minimum capital requirements as the applicable prudential regulator shall prescribe, but that each registered swap dealer and MSP for which there is not a prudential regulator shall meet such minimum capital requirements as the Commission shall prescribe.

comprehensive regulatory structure established by the Dodd-Frank Act goes beyond such requirements. The CEA, as amended by the Dodd-Frank Act, also requires the imposition of the Transaction-Level Requirements [570] except to the extent that section 2(i) limits their application to cross-border transactions or activities. Therefore, the Commission believes that, rather than excluding the swaps at issue from the scope of the Title VII regulatory regime, with the corresponding increase in risk to U.S. persons and to the U.S. financial system, in most cases compliance with the Category A Transaction-Level Requirements is appropriate where non-U.S. swap dealers and non-U.S. MSPs that enter into swaps with non-U.S. counterparties guaranteed by a U.S. person. Further, the Commission does not believe that a different interpretation should be taken solely because applicable capital requirements are satisfied.[571]

In addition, the Commission believes that this Guidance, which contemplates a system of substituted compliance in accordance with principles of international harmonization, may allow non-U.S. swap dealers and non-U.S. MSPs to comply, in appropriate circumstances, with their home-country requirements when transacting with non-U.S. counterparties whose swaps obligations are guaranteed with recourse by U.S. persons. The Commission believes that the substituted compliance regime contemplated by the Guidance will facilitate equivalent regulatory treatment of equivalent swaps without undermining the swaps reforms enacted by Congress in Title VII.

### d. Swaps With a Non-U.S. Person That is an Affiliate Conduit

#### i. Proposed Guidance

The Commission proposed to interpret CEA section 2(i) such that the Category A Transaction-Level Requirements would apply to a swap if at least one of the parties to the swap is an "affiliate conduit." Under the Proposed Guidance, an affiliate conduit exists when: (1) A non-U.S. person that is majority-owned, directly or indirectly, by a U.S. person; (2) the non-U.S. person regularly enters into swaps with one or more of its U.S. affiliates of its U.S. person owner; and (3) the financial results of such non-U.S. person are included in the consolidated financial statements of its U.S. person owner.[572] The Commission explained that it believed the proposed application of Transaction-Level Requirements was necessary because, "given the nature of the relationship between the conduit and the U.S. person, the U.S. person is directly exposed to risks from and incurred by" the affiliate conduit.[573] The Commission further indicated that it was concerned that a U.S. swap dealer or U.S. MSP would utilize affiliate conduits to conduct swaps outside the Dodd-Frank regulatory regime.

#### ii. Comments

The commenters who addressed the Commission's proposed approach to affiliate conduits expressed concerns about what they felt was an overly broad scope of the term "affiliate conduit." Several of these commenters stated that the non-U.S. affiliate conduit concept should be omitted from the Guidance.[574] SIFMA stated that the term "regular" is too vague in that "it does not account for the purpose of the inter-affiliate swap, the relative amount of the conduit's risk transferred, the nature of the transferred risk, or whether some or all of the risk is transferred."[575] SIFMA also commented that activities of a non-U.S. affiliate conduit do not satisfy the requisite nexus to the United States under section 2(i) to justify different treatment from other non-U.S. counterparties. Further, SIFMA stated that where substituted compliance is unavailable, a non-U.S. swap dealer transacting with an affiliate conduit is subject to applicable Transaction-Level Requirements, which could cause non-U.S. swap dealers to cease doing business with non-U.S. affiliate conduits.[576] As an alternative, SIFMA recommended that the proposed affiliate conduit provision that the conduit "regularly enter into swaps" should be replaced with a provision that the conduit "regularly enter[ ] into swaps with one or more other U.S. affiliates of the U.S. person for the purpose of transferring to that U.S. person all risk of swap activity."

Other commenters raised similar objections concerning the scope of the affiliate conduit provision. Goldman stated that the proposed description of an affiliate conduit was so broad that "an entity could be rendered a conduit by executing even a single trade despite the fact that the entity otherwise would be eligible for substituted compliance, or would not fall within Title VII's jurisdiction at all." [577] Such a broad definition, in Goldman's view, will result in competitive disparities for foreign affiliates of U.S.-based swap dealers and may even cover non-financial entities attempting to hedge risk.[578] SIFMA added that the concept

---

[570] See Appendix B for information regarding the Transaction-Level Requirements and the provisions of the CEA which they implement.

[571] In the Final Entities Rules, the Commission stated that it does "not believe that it is necessary to attribute a person's swap or security-based swaps positions to a parent or other guarantor if the person is already subject to capital regulation by the CFTC or SEC (i.e., swap dealers, security-based swap dealers, MSPs, major security-based swap participants, FCMs and broker-dealers) or if the person is a U.S. entity regulated as a bank in the United States. Positions of those regulated entities already will be subject to capital and other requirements, making it unnecessary to separately address, via major participant regulations, the risks associated with guarantees of those positions." See Final Entities Rules, 77 FR at 30689. The Commission continued, "As a result of this interpretation, holding companies will not be deemed to be major swap participants as a result of guarantees to certain U.S. entities that are already subject to capital regulation." Id. at 30689 n. 1134. Subsequently, in the Final Swap Definition, the Commission stated that "[a]s a result of interpreting the term 'swap' (that is not a security-based swap or mixed swap) to include a guarantee of such swap, to the extent that a counterparty to a swaps position would have recourse to the guarantor in connection with the position, and based on the reasoning set forth [in the Final Entities Rules] in connection with major swap participants, the CFTC will not deem holding companies to be swap dealers as a result of guarantees to certain U.S. entities that are already subject to capital regulation." See Final Swap Definition, 77 FR at 48266 n.188. The Commission's conclusion that capital compliance and prudential regulation, in certain circumstances, can obviate the need for registration as a swap dealer or MSP does not bear upon, and is not inconsistent with, the Commission's interpretation herein that notwithstanding capital compliance and prudential regulation, Transaction-Level Requirements may be applied where a non-U.S. swap dealer or non-U.S. MSP enters into a swap with a non-U.S. counterparty whose obligations under that swap are guaranteed, with recourse, by a U.S. person.

[572] See Proposed Guidance, 77 FR at 41229.

[573] Id.

[574] SIFMA (Aug. 27, 2012) at A22–23; IIB at (Aug. 27, 2012) at 20–21; Hong Kong Banks (Aug. 27, 2012) at 13.

[575] SIFMA (Aug. 27, 2012) at A23. See also IIAC (stating that the Commission should clarify the meaning of "regularly enters into swaps with . . . affiliates" and circumstances under which the Commission would interpret the financials of a non-U.S. counterparty to be combined with the financial statements of the U.S. person for purposes of applying Transaction-Level Requirements to transactions by U.S. persons that might be using conduits to avoid such requirements) (Aug. 27, 2012) at 8.

[576] SIFMA (Aug. 27, 2012) at A22.

[577] Goldman (Aug. 27, 2012) at 6. See also Japanese Bankers Association (Aug. 27, 2012) at 11 (stating that it is difficult to determine under the Proposed Guidance when a counterparty is a conduit for a U.S. person, and that the conduit provisions should not be implemented).

[578] Goldman (Aug. 27, 2012) at 6. See also Peabody (Aug. 27. 2012) at 3 (stating that applying the Dodd-Frank requirements to swaps entered into or booked by affiliates of commercial end-users outside the United States to hedge or mitigate commercial risks of activities outside the United States will create an overlapping (and potentially inconsistent) tangle of international laws that will increase costs and potential liabilities associated with such swaps, and materially undermine their utility and risk mitigation benefits; stating further that foreign entities wishing to avoid becoming subject to Dodd-Frank requirements will decline to enter into swaps with such affiliates, thereby Continued

of indirect majority ownership is imprecise and its application to non-U.S. affiliate conduits is unclear.[579] Hong Kong Banks believed that the conduit proposal is unnecessary since its activities would be captured in the registration process.[580] Peabody stated that the application of Transaction-Level Requirements to affiliate conduits seemingly contradicts the Proposed Guidance's treatment of foreign affiliates as non-U.S. persons.[581] If the affiliate conduit concept remains in the Guidance, SIFMA requested that the Commission clarify whether or not swap dealers may rely on a counterparty's representations as to its non-U.S.-affiliate's conduit status.[582]

IIB stated that the Commission should withdraw its proposal on affiliate conduits and instead, where there is clear circumvention, rely on its existing anti-evasion authority.[583] It added that the Commission's proposal for the "conduit" treatment of a foreign entity that "regularly" engages in back-to-back swaps with a U.S. affiliate is unjustifiably broad. IIB also stated that the proposed standard is inconsistent with statutory standards for the extraterritorial application of Title VII, and that there is no basis to conclude that inter-affiliate swaps create direct and significant risk to the United States simply because they occur "regularly." [584]

iii. Commission Guidance

In the Proposed Guidance, the Commission explained that it believed the proposed application of Transaction-Level Requirements was necessary because, "given the nature of the relationship between the conduit and the U.S. person, the U.S. person is directly exposed to risks from and incurred by" the affiliate conduit.[585] The Commission further indicated that it was concerned that a U.S. swap dealer or U.S. MSP would utilize affiliate

conduits to conduct swaps outside the Dodd-Frank regulatory regime.

For purposes of this policy statement, the Commission is clarifying that an affiliate conduit encompasses those entities that function as a conduit or vehicle for U.S. persons conducting swaps transactions with third-party counterparties. In response to comments received, the Commission is identifying some of the factors that the Commission believes are relevant to determining whether a non-U.S. person is an "affiliate conduit" of a U.S. person. As explained in greater detail below, modifications to the Proposed Guidance with regard to the term "affiliate conduit" are intended to respond to commenters's concerns about a lack of clarity on the scope of the term affiliate conduit and to better identify those non-U.S. affiliates whose swap activities, either individually or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce as a result of their relationship with their U.S. affiliates. Specifically, the Commission is modifying the factors that might be relevant to the consideration of whether a non-U.S. affiliate of a U.S. person is an affiliate conduit by: (1) clarifying the meaning of "regularly enters into swaps," and in particular, the activities of a non-U.S. counterparty that renders it an affiliate conduit; and (2) adding the concept of "control."

As the Commission understands, it is common for large global companies to centralize their hedging or risk-management activities in one or more affiliates (informally referred to as a "treasury conduit" or "conduit"). Under this structure, the conduit may enter into swaps with its affiliates and then enter into offsetting swaps with third-parties. In other cases, the conduit may enter into swaps with third-parties as agent for its affiliates. In either case, the conduit functions as a vehicle by which various affiliates engage in swaps with third-parties (i.e., the market). This paradigm promotes operational efficiency and prudent risk management by enabling a company to manage its risks on a consolidated basis at a group level.[586] Accordingly, based on

comments, rather than considering whether a non-U.S. person "regularly enters into swaps" with one or more of its U.S. affiliates of its U.S. person owner, the Commission will generally consider whether the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third-parties for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliates, and enters into offsetting swaps or other arrangements with its U.S. affiliates in order to transfer the risks and benefits of such swaps with third-parties to its U.S. affiliates.

The Commission recognizes the significant benefits associated with a corporate group's use of a single entity to conduct the group's market-facing swap business. The Commission also believes, though, that in this situation the risks resulting from swaps of the entity that faces the market as a conduit on behalf of its affiliates in fact reside with those affiliates; that is, while the swaps are entered into by the conduit, through back-to-back swaps or other arrangements the conduit passes the risks and benefits of those swaps to its affiliates.[587] Where the conduit is located outside the United States, but is owned and controlled by a U.S. person, the Commission believes that to recognize the economic reality of the situation, the conduit's swaps should be attributed to the U.S. affiliate(s). The fact that the conduit is located outside the United States does not alter the economic reality that its swaps are undertaken for the benefit of, and at the economic risk of, the U.S. affiliate(s), and more broadly, for the corporate group that is owned and controlled by a U.S. person. Under these circumstances, the Commission believes that the swap activities of the non-U.S. conduit may meet the "direct and

---

[579] SIFMA (Aug. 27, 2012) at A24.

[580] Hong Kong Banks (Aug. 27, 2012) at 13.

[581] Peabody (Aug. 28, 2012) at 2–3.

[582] SIFMA (Aug. 27, 2012) at A24. SIFMA stated that the determination of whether a counterparty to a swap is a non-U.S. affiliate conduit should be made at the inception of the swap based on the most recent updated representation from the counterparty, which should be renewed by the counterparty once per calendar year. Id. at A25.

[583] IIB (Aug. 27, 2012) at 20–21.

[584] Id. at 19.

[585] See Proposed Guidance, 77 FR at 41229.

[586] One market participant described the functions of such a conduit and its relationship with respect to other affiliates within the corporate group in the following manner:

Many business enterprises, including [Prudential Financial Inc., or "PFI"], elect to operate in a manner that assigns specific functions to related and commonly-controlled affiliates. With regard to swap transactions, it has long been our practice, as an enterprise-type company with separate legal entities that are commonly owned by PFI to use one affiliate, Prudential Global Funding LLC ("PGF"), to directly face the market as a "conduit" to hedge the

net commercial and financial risk of the various operating affiliates within PFI. Under this practice, only PGF (i.e., the conduit) is required to trade with external market participants, while the internal affiliates within PFI trade directly with the PGF. The use of PGF as the single conduit for the various operating affiliates within PFI diminishes the demands on PFI's financial liquidity, operational assets and management resources, as affiliates within PFI avoid having to establish independent relationships and unique infrastructure to face the market. Moreover, use of PGF as a conduit within PFI permits the netting of our affiliates' trades (e.g., one affiliate is hedging floating rates while another is hedging fixed rates). This effectively reduces the overall risk of PFI and our affiliates, and allows us to manage fewer outstanding positions with external market participants.

The Prudential Insurance Company of America (Feb. 17, 2011) at 2.

[587] See The Prudential Insurance Company of America (Feb. 17, 2011); Kraft Foods ("Kraft") (Feb. 11, 2011).

significant" jurisdictional nexus within the meaning of CEA section 2(i).[588]

Further, in order to facilitate a consistent application of the term affiliate conduit and to mitigate any undue burden or complexity for market participants in assessing affiliate conduit status, the Commission clarifies that its policy contemplates that a market participant may reasonably rely on counterparty representations as to its non-U.S. affiliate conduit status.[589]

Finally, the Commission notes in response to commenters that an affiliate conduit would not necessarily be guaranteed by its parent. As one market participant explained, "centralized hedging centers are generally evaluated as wholly-owned subsidiaries of the corporate group that do not require additional credit support, such as a parent guaranty or collateral." [590] Therefore, the Commission believes that it is reasonable and appropriate to interpret CEA section 2(i) in a manner that recognizes an affiliate conduit as a separate category of counterparty whose swaps with non-U.S. persons may be subject to certain Transaction-Level Requirements. Specifically, where one of the parties to the swap is a conduit affiliate, the Commission would generally expect the parties to the swap only to comply with (to the extent that the Inter-Affiliate Exemption is elected), the conditions of the Inter-Affiliate Exemption, including the treatment of outward-facing swaps condition in Commission regulation 50.52(b)(4)(i). In addition, the part 43 real-time reporting requirements must be satisfied.

In summary, for the purposes of the Commission's interpretation of CEA section 2(i), the Commission believes that certain factors are relevant to considering whether a non-U.S. person is an "affiliate conduit." Such factors include whether:

(i) the non-U.S. person is a majority-owned affiliate [591] of a U.S. person;

(ii) the non-U.S. person is controlling, controlled by or under common control [592] with the U.S. person;

(iii) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person; and

(iv) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third-party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with its U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates.

Other facts and circumstances also may be relevant. The Commission does not intend that the term "conduit affiliate" would include affiliates of swap dealers.

### 5. Application of the "Category B" Transaction-Level Requirements to Swap Dealers and MSPs

This section discusses the Commission's policy on the application of the Category B Transaction-Level Requirements to swaps in which at least one of the parties to the swap is a registered swap dealer or MSP. As noted earlier, the Category B Transaction Level Requirements pertain to external business conduct standards which the Commission adopted pursuant to CEA section 4s(b) as a Category B Transaction-Level Requirement.[593]

Consistent with the Proposed Guidance, the Commission will generally interpret CEA section 2(i) so that the Category B Transaction-Level

Requirements (*i.e.,* the external business conduct standards) either do or do not apply to the swap, based on the counterparties to the swap, as explained below. Under this interpretation, substituted compliance is generally not expected to be applicable with regard to the Category B Transaction-Level Requirements under this Guidance.[594]

In considering whether Category B Transaction-Level Requirements are applicable, the Commission would generally consider whether the swap is with a:

(i) U.S. swap dealer or U.S. MSP (including affiliates of non-U.S. persons);

(ii) foreign branch of a U.S. bank that is a swap dealer or MSP; or

(iii) non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person).

Specifically, as explained more below, where a swap is with a U.S. swap dealer or U.S. MSP, the parties to the swap generally should be subject to the Category B Transaction-Level Requirements in full, regardless of whether the other counterparty to the swap is a U.S. person or a non-U.S. person. However, in the case of a foreign branch of a U.S. bank that is a swap dealer or MSP, or a non-U.S. swap dealer or non-U.S. MSP, the parties to the swap should generally only be subject to the Category B Transaction-Level Requirements when the counterparty to the swap is a U.S. person (other than a foreign branch of a U.S. bank that is a swap dealer or MSP). Conversely, under the Commission's interpretation of 2(i), where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person) and a non-U.S. counterparty (regardless of whether the non-U.S. counterparty is a guaranteed or conduit affiliate), the parties to the swap would not be expected to comply with the Category B Transaction-Level Requirements. The reasons for the Commission's policies are discussed below.

The application of the Category B Transaction-Level Requirements is summarized in Appendix E to this Guidance, which should be read in conjunction with the rest of this Guidance.

#### a. Swaps With U.S. Swap Dealers and U.S. MSPs

As explained above, where a swap is with a U.S. swap dealer or U.S. MSP (including an affiliate of a non-U.S. person), the Commission's policy is that the parties to the swap should be subject

---

[588] In this respect, it is irrelevant whether the risk is wholly or partly transferred back to the U.S. affiliate(s); the jurisdictional nexus is met by reason of the trading relationship between the conduit and the affiliated U.S. persons.

[589] This is consistent with the Commission's approach to the determination of whether a counterparty is a "U.S. person." *See* section IV.A, *supra.*

[590] *See* Kraft (Feb. 11, 2011) at 3.

[591] Commission regulation 1.3(ggg)(6)(i) defines "majority-owned affiliates" as follows:

[C]ounterparties to a swap are majority-owned affiliates if one counterparty directly or indirectly owns a majority interest in the other, or if a third party directly or indirectly owns a majority interest in both counterparties to the swap, where 'majority interest' is the right to vote or direct the vote of a majority of a class of voting securities of an entity, the power to sell or direct the sale of a majority of a class of voting securities of an entity, or the right

to receive upon dissolution or the contribution of a majority of the capital of a partnership.

[592] Commission regulation 1.3(ggg)(6)(i) refers to an "entity controlling, controlled by or under common control with the person." Final Entities Rules elaborated on this provision, stating:

For these purposes, we interpret control to mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. This is consistent with the definition of "control" and "affiliate" in connection with Exchange Act rules regarding registration statements. *See* Exchange Act rule 12b–2. . . .

77 FR 30631 n. 437, and

[I]f a parent entity controls two subsidiaries which both engage in activities that would cause the subsidiaries to be covered by the dealer definitions, then each subsidiary must aggregate the swaps or security-based swaps that result from both subsidiaries' dealing activities in determining if either subsidiary qualifies for the *de minimis* exception.

*Id.* at n. 438.

[593] The categorization of Transaction-Level Requirements into Categories A and B is discussed in section E, *supra. See* Appendix B for a descriptive list of the Category A and Category B requirements and Appendix D for a table summarizing the application of the Category A Transaction-Level Requirements to Swap Dealers and MSPs. The Appendices to this Guidance should be read in conjunction with this section and the rest of the Guidance.

[594] *See* Appendix E to this Guidance for a summary of these requirements and the discussion in section D, *supra.*

to the Category B Transaction-Level Requirements in full, regardless of whether the counterparty is a U.S. person or a non-U.S. person, without substituted compliance available.

### b. Swaps With Foreign Branches of a U.S. Bank That Is a Swap Dealer or MSP

In the case of a swap with a foreign branch of a U.S. bank that is a swap dealer or MSP, the Commission's policy is that the Category B Transaction-Level Requirements should apply only if the counterparty to the swap is a U.S. person (other than a foreign branch of a U.S. bank that is a swap dealer or MSP).[595]

The Commission believes that where a swap is between a foreign branch of a U.S. bank that is a swap dealer or MSP [596] and a U.S. person (other than a foreign branch of a U.S. bank that is a swap dealer or MSP), the swap has a direct and significant connection with activities in, or effect on, U.S. commerce. Because of the significant risks to U.S. persons and the financial system presented by such swap activities, under the Commission's interpretation of CEA section 2(i), generally the parties to the swap should comply with the Category B Transaction Level Requirements. Whenever a swap involves at least one counterparty that is a U.S. person, the Commission believes it has a strong supervisory interest in regulating and enforcing Transaction-Level Requirements, including external business conduct standards. In this case, the Commission believes the transaction should be viewed as being between two U.S. persons. For these reasons, the Commission's policy under section 2(i) is that substituted compliance would not be available.[597]

However, where the swap is between a foreign branch of a U.S. bank that is

a swap dealer or MSP, on the one hand, and a non-U.S. person on the other (whether or not such non-U.S. person is a guaranteed or conduit affiliate), the Commission believes that the interests of the foreign jurisdiction in applying its own transaction-level requirements to the swap are sufficiently strong that the Category B Transaction-Level Requirements generally should not apply under section 2(i). In this case, even though the Commission considers a foreign branch of a U.S. bank that is a swap dealer or MSP to be a U.S. person, the Commission believes that because the counterparty is a non-U.S. person and the swap takes place outside the United States, foreign regulators may have a relatively stronger supervisory interest in regulating and enforcing sales practices related to the swap. Therefore, in light of international comity principles, the Commission believes that application of the Category B Transaction-Level Requirements may not be warranted in this case. Therefore, under the Commission's interpretation of section 2(i), the parties to the swap generally would not be expected to comply with the Category B Transaction-Level Requirements.

The Commission believes that, in the context of the Category B Transaction-Level Requirements, the same reasoning also should apply to a swap between two foreign branches of U.S. banks that are each swap dealers or MSPs. Just as the Commission would have a strong supervisory interest in regulating and enforcing sales practices associated with activities taking place within the United States, the foreign regulators would have a similar claim to overseeing sales practices occurring within their jurisdiction.

Accordingly, the Commission interprets CEA section 2(i) so that where a swap is between the foreign branch of a U.S. bank that is a swap dealer or MSP, on the one hand, and either a non-U.S. person or a foreign branch of a U.S. bank that is a swap dealer or MSP, on the other, the parties to the swap generally would not be expected to comply with the Category B Transaction-Level Requirements.

### c. Swaps With Non-U.S. Swap Dealers and Non-U.S. MSPs

Under the Commission's interpretation of 2(i), where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), on the one hand, and a U.S. person, on the other, the parties to the swap generally would be expected to comply with the Category B

Transaction-Level Requirements.[598] In the Commission's view, in this case, the swap should be subject to the provisions of Title VII of the Dodd-Frank Act and Commission implementing regulations, including the Category B Transaction-Level Requirements. Because of the significant risks to U.S. persons and the financial system presented by swap activities outside the United States where one of the counterparties to the swap is a U.S. person (whether inside or outside the United States), the Commission believes that a U.S. person's swap activities with a non-U.S. counterparty has the requisite direct and significant connection with activities in, or effect on, U.S. commerce under CEA section 2(i) to apply the Category B Transaction-Level Requirements to the transaction.

The Commission observes that, where a swap between a non-U.S. swap dealer and a U.S. person is executed anonymously on a registered DCM or SEF and cleared by a registered DCO,[599] the Category B Transaction-Level Requirements would not be applicable.[600]

Because a registered FBOT is analogous to a DCM, the Commission is of the view that the requirements

[595] For the reasons discussed in note 531, *supra,* where the counterparty to the swap is an international financial institution, the Commission also generally would not expect the parties to the swap to comply with the Category B Transaction-Level Requirements, even if the principal place of business of the international financial institution were located in the United States.

[596] *See* section C, *supra,* regarding the definition of a foreign branch and the determination of when a swap transaction is with a foreign branch for purposes of this Guidance.

[597] In this case, although the foreign branch would not register separately as a swap dealer, the Commission interprets 2(i) in a manner that would permit the U.S. person to task its foreign branch to fulfill its regulatory obligations with respect to the Category B Transaction-Level Requirements. The Commission would consider compliance by the foreign branch or agency to constitute compliance with these Transaction-Level Requirements. However, under the Commission's interpretation of 2(i), the U.S. person (principal entity) would remain responsible for compliance with the Category B Transaction-Level Requirements.

[598] As noted above, for the reasons discussed in note 531, where the counterparty to the swap is an international financial institution, the Commission also generally would not expect the parties to the swap to comply with the Category B Transaction-Level Requirements, even if the principal place of business of the international financial institution were located in the United States.

[599] As discussed in greater detail above, the Commission notes that there are no exempt DCOs at this time. If and when the Commission determines to exercise its authority to exempt DCOs from applicable registration requirements, the Commission would likely address, among other things, the conditions and limitations applicable to clearing swaps for customers subject to section 4d(f) of the CEA.

[600] *See* 17 CFR 23.402(b)–(c) (requiring swap dealers and MSPs to obtain and retain certain information only about each counterparty "whose identity is known to the swap dealer or MSP prior to the execution of the transaction"); 23.430(e) (not requiring swap dealers and MSPs to verify counterparty eligibility when a transaction is entered on a DCM or SEF and the swap dealer or MSP does not know the identity of the counterparty prior to execution); 23.431(c) (not requiring disclosure of material information about a swap if initiated on a DCM or SEF and the swap dealer or MSP does not know the identity of the counterparty prior to execution); 23.450(h) (not requiring swap dealers and MSPs to have a reasonable basis to believe that a Special Entity has a qualified, independent representative if the transaction with the Special Entity is initiated on a DCM or SEF and the swap dealer or MSP does not know the identity of the Special Entity prior to execution); 23.451(b)(2)(iii) (disapplying the prohibition on entering into swaps with a governmental Special Entity within two years after any contribution to an official of such governmental Special Entity if the swap is initiated on a DCM or SEF and the swap dealer or MSP does not know the identity of the Special Entity prior to execution).

likewise would not be applicable where such a swap is executed anonymously on a registered FBOT and cleared.

Conversely, under the Commission's interpretation of 2(i), where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person) and a non-U.S. counterparty (regardless of whether the non-U.S. counterparty is a guaranteed or conduit affiliate), the parties to the swap would not be expected to comply with the Category B Transaction-Level Requirements. The Commission believes that regulators may have a relatively stronger supervisory interest in regulating the Category B Transaction-Level Requirements related to swaps between non-U.S. persons taking place outside the United States than the Commission, and that therefore applying the Category B Transaction-Level Requirements to these transactions may not be warranted. The Commission notes that just as the Commission would have a strong supervisory interest in regulating and enforcing the Category B Transaction-Level Requirements associated with activities taking place in the United States, foreign regulators would have a similar claim to overseeing sales practices for swaps occurring within their jurisdiction.

For the reasons stated in section b above, under the Commission's interpretation of section 2(i), where a swap is between a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), on the one hand, and the foreign branch of a U.S. bank that is a swap dealer or MSP, on the other, the parties to the swap generally would not be expected to comply with the Category B Transaction-Level Requirements.

As noted previously, under the 2(i) interpretations, substituted compliance is generally not expected to be applicable to the Category B Transaction-Level Requirements under this Guidance.[601]

## H. Application of the CEA's Swap Provisions and Commission Regulations to Market Participants That Are Not Registered as a Swap Dealer or MSP

This section sets forth the Commission's general policy on application of the CEA's swaps provisions and Commission regulations to swap counterparties that are not registered as swap dealers or MSPs ("non-registrants"), including the circumstances under which the

counterparties would be eligible for substituted compliance.

Several of the CEA's swaps provisions and Commission regulations—namely, those relating to required clearing, trade execution, real-time public reporting, Large Trader Reporting, SDR Reporting, and swap data recordkeeping (collectively, the "Non-Registrant Requirements")[602]—also apply to persons or counterparties other than a swap dealer or MSP. In this section, the Commission sets forth the Commission's policy on application of these Non-Registrant Requirements to cross-border swaps in which neither counterparty is a swap dealer or MSP (i.e., all other market participants including "financial entities," as defined in CEA section 2(h)(7)(C)).[603]

Section 1 discusses the Commission's policy under CEA section 2(i) with regard to the application of the Non-Registrant Requirements to cross-border swaps between two non-registrants where one (or both) of the counterparties to the swap is a U.S. person. Substituted compliance is not applicable where one (or both) swap counterparties is a U.S. person.

Section 2 discusses the Commission's policy under CEA section 2(i) with regard to the application of the Non-Registrant Requirements to cross-border swaps between two non-registrants where both counterparties to the swap are non-U.S. persons. The eligibility of various counterparties to such swaps for substituted compliance is also addressed in section 2.

The application of the specified Dodd-Frank provisions and Commission regulations specified below to swaps between counterparties that are neither swap dealers nor MSPs is summarized in Appendix F to this Guidance, which should be read in conjunction with the rest of this Guidance.

---

[602] See section IV.D, supra. Part 45 of the Commission's regulations requires swap counterparties that are not swap dealers or MSPs to keep "full, complete and systematic records, together with all pertinent data and memoranda" with respect to each swap to which they are a counterparty. See 17 C.F.R. 45.2. Such records must include those demonstrating that they are entitled, with respect to any swap, to make use of the clearing exception in CEA section 2(h)(7). Swap counterparties that are not swap dealers or MSPs must also comply with the Commission's regulations in part 46, which address the reporting of data relating to pre-enactment swaps and data relating to transition swaps.

[603] Nothing in this Guidance should be construed to address the ability of a foreign board of trade to offer swaps to U.S. persons pursuant to part 48 of the Commission's regulations.

## 1. Swaps Between Non-Registrants Where One or More of the Non-Registrants is a U.S. Person

As noted in the Proposed Guidance, to manage risks in a global economy, U.S. persons may need to, and frequently do, transact swaps with both U.S. and non-U.S. counterparties. The swap activities of U.S. persons, particularly those with global operations, frequently occur outside of U.S. borders.

With regard to cross-border swaps between two non-registrants where one (or both) of the counterparties to the swap is a U.S. person (including an affiliate of a non-U.S. person), the Commission's interprets CEA 2(i) such that the parties to the swap generally would be expected to comply with the Non-Registrant Requirements. As the Commission noted in the Proposed Guidance, the risks to U.S. persons and the U.S. financial system do not depend on the location of the swap activities of U.S. persons.[604] Where one or both of the counterparties to a swap between two non-registrants is a U.S. person, the Commission believes that the U.S. persons' swap activities (whether inside or outside the United States)—due their presence in the U.S. and relationship to U.S. commerce—have a direct and significant connection with activities in, or effect on, U.S. commerce. Therefore, the Commission's policy is that where a swap transaction is between non-registrants, and one or more of the counterparties is a U.S. person, generally the parties to the swap will be expected to comply in full with the Non-Registrant Requirements.[605] In addition, where one or more of the counterparties to a swap between non-registrants is a U.S. person, the Commission's policy generally is that

---

[604] See Proposed Guidance, 77 FR 41234 n. 138. Further, in the Proposed Guidance, the Commission stated that it believes that section 2(i) does not require a transaction-by-transaction determination that a particular swap outside the United States has a direct and significant connection with activities in, or effect on, commerce of the United States in order to apply the swaps provisions of the CEA to such transactions; rather, it is the aggregate of such activities and the aggregate connection of such activities with activities in the U.S. or effect on U.S. commerce that warrants application of the CEA swaps provisions to all such activities. See Hoffmann-La Roche, 542 U.S. at 168 (responding that respondents' recommendation that the court should take account of comity considerations on a case by case basis is "too complex to prove workable").

[605] For the reasons discussed in note 531, supra, one or more of the counterparties to a swap between non-registrants is an international financial institution, the Commission generally would not expect the parties to the swap to comply with the Non-Registrant Requirements, even if the principal place of business of the international financial institution were located in the United States.

---

[601] See Appendix E to this Guidance for a summary of these requirements and the discussion in section E, supra.

substituted compliance is not available, for the reasons discussed below.

As noted in section D above, the Dodd-Frank Act's required clearing and swap processing requirements protect counterparties from the counterparty credit risk of their original counterparties, which in turn, protects against the accumulation of systemic risk because of the risk mitigation benefits offered by central clearing. Similarly, the trade execution and real-time public reporting requirements serve to promote both pre- and post-trade transparency which, in turn, enhance price discovery and decrease risk. Together, these requirements serve an essential role in protecting U.S. market participants and the general market against financial losses. The Commission cannot fully and responsibly fulfill its charge to protect the U.S. markets and market participants through a substituted compliance regime where one counterparty is a U.S. person. Accordingly, the Commission's policy is to expect full compliance with the Non-Registrant Requirements relating to required clearing, trade execution, and real-time public reporting with regard to any swaps between non-registrants where one or both of the counterparties is a U.S. person. For substantially the same reasons, application of U.S. requirements in these transactions is a reasonable exercise of U.S. jurisdiction under principles of foreign relations law.[606]

Large Trader Reporting provides the Commission with data regarding large positions in swaps with a direct or indirect linkage to specified U.S.-listed physical commodity futures contracts, in order to enable the Commission to implement and conduct effective surveillance of these economically equivalent swaps and futures. To facilitate the monitoring of trading across the swaps and futures markets, swaps positions must be converted to futures equivalents for reporting purposes; reportable thresholds are also defined in terms of futures equivalents. As discussed in further detail in section G above, in light of the very specific interest of the Commission in conducting effective surveillance of markets in swaps that have been determined to be economically equivalent to U.S. listed physical commodity futures contracts, and given the anticipated impediments to obtaining directly comparable positional data through any foreign swap data reporting regime, the Commission's policy is to construe CEA section 2(i) in

a manner that would not recognize substituted compliance in lieu of compliance with Large Trader Reporting.

As noted in section E, data reported under the SDR Reporting rules provide the Commission with information necessary to better understand and monitor concentrations of risk, as well as risk profiles of individual market participants. Swap data recordkeeping is an important component of an effective internal risk management process. Therefore, the Commission's policy is that generally both SDR Reporting and swap data recordkeeping should apply in full where one of the counterparties to a swap between two non-registrants (non-swap dealers or non-MSPs) is a U.S. person.

As noted above, the clearing of swaps through a DCO mitigates counterparty credit risk and collateralizes the credit exposures posed by swaps. Section 2(h)(1) of the CEA requires a swap to be submitted for clearing to a registered DCO or a DCO that is exempt from registration under the CEA, if the Commission has determined that the swap is required to be cleared.[607] The Commission has adopted a clearing requirement determination pursuant to the CEA and rules under part 50 of the Commission's regulations such that certain classes of swaps are required to be cleared, unless counterparties to the swap qualify for an exception or exemption from clearing under the CEA or part 50 of the Commission's regulations.[608] In the final rules adopting the Inter-Affiliate Exemption, the Commission stated that a U.S. person that enters into any swap that is

required to be cleared is subject to the clearing requirements of the CEA and part 50 of the Commission's regulations.[609] Accordingly, in the context of this Guidance, the Commission's policy is that the clearing requirement under section 2(h)(1) and part 50 of the Commission's regulations applies in full to a swap where at least one of the counterparties to the swap is a U.S. person, without substituted compliance available. But substituted compliance may be available with respect to the clearing requirement for swaps between, on the one hand, a U.S. swap dealer or U.S. MSP acting through its foreign branch or a non-U.S. person that is a guaranteed or conduit affiliate, and on the other hand, a non-U.S. swap dealer, non-U.S. MSP or other non-U.S. person.

With respect to the clearing requirement, the Commission has previously addressed both the scope and process of a comparability determination, which also would apply to the extent that substituted compliance is applicable under this Guidance.[610]

As for the process for determining comparability of a foreign jurisdiction's clearing mandate, the Commission has also previously stated that it will review the comparability and comprehensiveness of a foreign jurisdiction's clearing mandate by reviewing: (i) The foreign jurisdiction's laws and regulations with respect to its mandatory clearing regime (*i.e.*, jurisdiction-specific review) and (ii) the foreign jurisdiction's clearing determinations with respect to each class of swaps for which the

---

[606] *See* Restatement §§ 403(2)(a)–(c).

[607] The Commission notes that under CEA section 5b(h), the Commission has discretionary authority to exempt DCOs, conditionally or unconditionally, from the applicable DCO registration requirements. Specifically, section 5b(h) of the Act provides that "[t]he Commission may exempt, conditionally or unconditionally, a derivatives clearing organization from registration under this section for the clearing of swaps if the Commission determines that the [DCO] is subject to comparable, comprehensive supervision and regulation by the Securities and Exchange Commission or the appropriate government authorities in the home country of the organization." Thus, the Commission has discretion to exempt from registration DCOs that, at a minimum, are subject to comparable and comprehensive supervision by another regulator. The Commission further notes that it has not yet exercised its discretionary authority to exempt DCOs from registration, and that until such time as the Commission determines to exercise such authority, swaps subject to the clearing requirement must be submitted to registered DCOs for clearing.

[608] In addition to the End-User Exception under CEA section 2(h)(7), which is codified in Commission regulation 50.50, as noted above, the Commission has adopted an exemption from required clearing for swaps between certain affiliated entities, codified at Commission regulation 50.52. *See* Inter-Affiliate Exemption, 78 FR 21750.

[609] *Id.* at 21765 (requiring, among other conditions, that eligible affiliate counterparties electing the exemption from clearing for the inter-affiliate swap must clear their swaps with unaffiliated counterparties, and permitting eligible affiliate counterparties located in foreign jurisdictions to clear such swaps pursuant to their applicable foreign jurisdictions' clearing regime, if the Commission determines that such regime is comparable and comprehensive to the U.S. clearing mandate).

[610] In particular, in the Inter-Affiliate Exemption, the Commission permitted eligible affiliate counterparties located outside of the U.S. to comply with a condition of the exemption to clear their swaps with unaffiliated counterparties (not located in the U.S.), to the extent such swaps are subject to the clearing requirement under section 2(h)(1) of the CEA, by complying with the requirements of a foreign jurisdiction's clearing mandate, including any exception or exemption granted under the foreign clearing mandate, provided that the Commission determines that: (i) such foreign jurisdiction's clearing mandate is comparable and comprehensive, but not necessarily identical, to the clearing requirement established under the CEA and part 50 of the Commission's regulations, and (ii) the exception or exemption is determined to be comparable to an exception or exemption provided under the CEA or part 50 of the Commission's regulations. *See* 17 CFR 50.52(b)(4)(i).

Commission has issued a clearing determination under Commission regulation 50.4 (*i.e.,* product-specific review).[611] In determining whether an exemption or exception under a comparable foreign mandate is comparable to an exception or exemption under the CEA or part 50, the Commission anticipates that it would review, for comparability purposes, the foreign jurisdiction's laws and regulations with respect to its mandatory clearing regime, as well as the relevant exception or exemption, and would exercise broad discretion to determine whether the requirements and objectives of such exemption are consistent with those under the comparable foreign clearing regime.

The Commission is also of the view that where a swap is executed anonymously on a registered DCM or SEF between two non-registrants and cleared by a registered DCO, and one (or both) of the counterparties to the swap is a U.S. person, neither party to the swap should be required to comply with the Non-Registrant Requirements that otherwise apply to the swap, with the exception of Large Trader Reporting,[612] SDR Reporting, and swap data recordkeeping.[613] The Commission

---

[611] The Commission further explained that comparability will not require a regime identical to the clearing framework established under the CEA and the Commission regulations. Rather, the Commission anticipates that it will make jurisdiction-specific comparability determinations by comparing the regulatory requirements of a foreign jurisdiction's clearing regime with the requirements and objectives of the Dodd-Frank Act. The Commission further noted that it anticipates that the product-specific comparability determination will necessarily be made on the basis of whether the applicable swap is included in a class of swaps covered under Commission regulation 50.4.

[612] The Commission's part 20 regulations set forth large trader reporting rules for physical commodity swaps. *See* 76 FR 43851 (Jul. 22, 2011). Part 20 requires swaps position reports from clearing organizations, clearing members and swap dealers, and establishes certain non-routine reporting requirements for large swaps traders. Among other things, part 20 requires that a reporting entity, as defined in Commission regulation 20.1, disclose the identity of the counterparty in respect of which positional information is being reported in large swap trader reports and associated filings. *See* 76 FR 43851 at 43863–4 n.11.

[613] The Dodd-Frank Act added to the CEA provisions requiring the retention and reporting of data related to swap transactions. Section 727 of the Dodd-Frank Act added section 2(a)(13)(g), which requires that all swaps, whether cleared or uncleared, be reported to an SDR. Section 728 of the Dodd-Frank Act added section 21(b), which directs the Commission to prescribe standards for swap data recordkeeping and reporting. Section 723 of the Dodd-Frank Act added section 2(h)(5), which addresses the reporting of swap data for swaps executed before the enactment of the Dodd-Frank Act and swaps executed on or after the date of its enactment. The Commission's swap data reporting and recordkeeping requirements are found in part

---

notes that in this case, the DCM or SEF will fulfill the required clearing, trade execution,[614] and real-time public reporting requirements that apply to the swap.

Further, the Commission is of the view that where a swap is executed anonymously between two non-registrants on a registered FBOT and cleared and one (or both) of the counterparties to the swap is a U.S. person, neither party to the swap (as is the case when the swap is executed anonymously on a DCM) should be required to comply with the Non-Registrant Requirements that otherwise apply to the swap, with the exception of Large Trader Reporting, SDR Reporting and swap data recordkeeping. The Commission notes that in this case, the registered FBOT, as would the DCM, will fulfill the required clearing and trade execution requirements[615] that apply to the swap but not, without further action, the real-time public reporting requirements.

The Commission expects that derivatives markets and regulatory regimes will continue to evolve in the future. In order to ensure a level playing field, promote participation in transparent markets, and promote market efficiency, the Commission will, through staff no action letters, extend appropriate time-limited transitional relief to certain European Union-regulated multilateral trading facilities (MTFs), in the event that the Commission's trade execution requirement is triggered before March 15, 2014. Such relief would be available through March 15th for MTFs that have multilateral trading schemes, a sufficient level of pre- and post-trade

---

45, which establishes swap data recordkeeping and SDR reporting requirements; and part 46, which establishes swap data recordkeeping and SDR reporting requirements for pre-enactment and transition swaps (collectively, "historical swaps"). *See* 77 FR 2136 (Jan. 13, 2012) (part 45); 77 FR 35200 (June 12, 2012) (part 46). Under both part 45 and part 46 (collectively, the "swap data reporting rules") reporting parties have swap data reporting obligations. The swap data reporting rules further prescribe certain data fields that must be included in swap data reporting. *See* Appendix 1 to part 45; Appendix 1 to part 46. For all swaps subject to the Commission's jurisdiction, each counterparty must be identified by means of a single legal entity identifier ("LEI") in all swap data reporting pursuant to parts 45 and 46. A reporting counterparty, as defined in Commission regulations 45.1 and 46.1, respectively, has obligations that include providing certain data to the SDR relating to the primary economic terms ("PET") of the swap, including the LEI of the non-reporting counterparty.

[614] The Commission clarifies that the trading mandate under CEA section 2(h)(8)(A) is satisfied by trading on a registered DCM or SEF or a SEF that is exempt from registration.

[615] The Commission clarifies that the trading mandate under CEA section 2(h)(8)(A) is satisfied by trading on a registered FBOT.

---

price transparency, non-discriminatory access by market participants, and an appropriate level of oversight. In addition, the Commission will consult with the European Commission in giving consideration to extending regulatory relief to European Union-regulated trading platforms that are subject to requirements that achieve regulatory outcomes that are comparable to those achieved by the requirements for SEFs. Both parties will assess progress in January 2014.

2. Swaps Between Non-Registrants That Are Both Non-U.S. Persons

As noted above, where a swap is between two non-U.S. persons and neither counterparty is required to register as a swap dealer or MSP, the Commission proposed interpreting CEA section 2(i) so as not to apply the Non-Registrant Requirements,[616] with the exception of Large Trader Reporting.[617]

Section a discusses the Commission's policy on application of Large Trader Reporting to swaps between two non-registrants that are not U.S. persons. Section b discusses the application of the other Non-Registrant Requirements to swaps between two non-registrants that are not U.S. persons, where each of the counterparties to the swap is a guaranteed or conduit affiliate, and the availability of substituted compliance for the parties to such swaps. Section c discusses the Commission's policy on application of the Non-Registrant Requirements other than Large Trader Reporting to swaps between non-registrants that are not U.S. persons where neither or only one of the counterparties is a guaranteed or conduit affiliate.

a. Large Trader Reporting

Large Trader Reporting requires routine positional reports from clearing members in addition to clearing organizations and swap dealers. As is the case with swap dealers, routine reports are required from clearing members to the extent that they hold significant positions in the swaps subject to Large Trader Reporting—swaps that are directly or indirectly linked to specified U.S.-listed physical commodity futures contracts. Routine reporting provides essential visibility into the trading activity of large market participants, which enables the Commission to conduct effective surveillance of markets in swaps and futures that have been determined to be economically equivalent. Given the

---

[616] *See* the Proposed Guidance, 77 FR 41234–41235.

[617] *See id.* at 41234 n. 139, 41235.

linkage of the swaps covered by Large Trader Reporting to U.S. futures markets, the Commission believes that any non-U.S. clearing member that holds positions in such swaps that are significant enough to trigger routine reporting obligations is engaged in activities that have a direct and significant connection with activities in, or effect on, commerce of the United States. Consistent with the Proposed Guidance, the Commission's policy, in light of its interpretation of CEA section 2(i), is that any such non-U.S. clearing member should report all reportable positions to the Commission.[618]

Large Trader Reporting also establishes recordkeeping requirements for traders with significant positions in the covered physical commodity swaps. Given the vital role that Large Trader Reporting plays in ensuring that the Commission has access to comprehensive data regarding trading activity in swaps linked to U.S. futures, the Commission's policy, in light of its interpretation of CEA section 2(i), is that non-U.S. persons with positions that meet the prescribed recordkeeping thresholds should comply with the prescribed recordkeeping requirements. The Commission notes that traders, which are not swap dealers or clearing members with routine Large Trader Reporting obligations, may generally keep books and records regarding their transactions in the covered physical commodity swaps and produce them for inspection by the Commission in the record retention format that such traders have developed in the normal course of their business operations.

### b. Swaps Where Each of The Counterparties Is Either a Guaranteed or Conduit Affiliate

In contrast to the Proposed Guidance, where a swap is between two non-registrants that are not U.S. persons, and each of the counterparties to the swap is a guaranteed or conduit affiliate,[619] the parties to the swap generally should be expected to comply with the Non-Registrant Requirements with respect to the transaction. However, where at least one of the parties to the swap is an "affiliate conduit," the Commission would generally expect the parties to the swap only to comply with (to the extent that the Inter-Affiliate Exemption

is elected), the conditions of the Inter-Affiliate Exemption, including the treatment of outward-facing swaps condition in Commission regulation 50.52(b)(4)(i). In addition, the part 43 real-time reporting requirements must be satisfied.

The Commission has not interpreted CEA section 2(i) so as to include a guaranteed or conduit affiliate in the interpretation of the term "U.S. person" solely because of the guarantee or affiliation. Where each of the counterparties to the swap are non-registrants that are guaranteed or conduit affiliates, the Commission believes that the risks to U.S. persons and to the U.S. financial system sufficiently increase so that the additional measure of applying the Non-Registrant Requirements to the swap is warranted (but with substituted compliance available, to the extent applicable).[620] The Commission notes that in the case of guarantees by U.S. persons, if there is a default by the non-U.S. person, the U.S. guarantor generally would be held responsible to settle the obligations. In the case of affiliate conduits, a non-U.S. affiliate could effectively operate as a conduit for the U.S. person, and could be used to execute swaps with counterparties in foreign jurisdictions, outside the Dodd-Frank Act regulatory regime.

Therefore, where a swap is between two non-registrants that are guaranteed or conduit affiliates, the Commission believes that the swap has a "direct and significant connection with activities in, or effect on, commerce of the United States" within the meaning of CEA section 2(i) so that certain Entity-Level and Transaction-Level Requirements would apply to the swap counterparties. Consistent with section 2(i), however, the Commission's policy generally is to make the parties to the swap eligible for substituted compliance (except with regard to Large Trader Reporting, and provided that SDR Reporting would be eligible for substituted compliance only if the Commission has direct access to all of the reported swap data elements that are stored at a foreign trade repository).

### c. Swaps Where Neither or Only One of the Parties is a Guaranteed or Conduit Affiliate

With respect to swaps between two non-registrants where neither or only one party is a guaranteed or conduit affiliate, the Commission's policy is that the parties to the swap generally should not be expected to comply with the Non-Registrant Requirements, except as described below.

As discussed above, where a counterparty to a swap is a guaranteed or conduit affiliate, the risks to U.S. persons and to the U.S. financial system increase. In the case of guarantees by U.S. persons, if there is a default by the non-U.S. person, the U.S. guarantor would be held responsible to settle the obligations. In the case of affiliate conduits, a non-U.S. affiliate could effectively operate as a "conduit" for the U.S. person, and could be used to execute swaps with counterparties in foreign jurisdictions, outside the Dodd-Frank Act regulatory regime. Nevertheless, the Commission also recognizes that foreign jurisdictions may have an interest in regulating swaps between two non-registrants where both counterparties to the swap are non-U.S. persons. Therefore, consistent with international comity principles, the Commission would generally expect the parties to the swap only to comply with (to the extent that the Inter-Affiliate Exemption is elected), the conditions of the Inter-Affiliate Exemption, including the treatment of outward-facing swaps condition in Commission regulation 50.52(b)(4)(i), and Large Trader Reporting. The Commission believes that this policy strikes the right balance between U.S. interests in regulating such a swap and the interest of foreign regulators.

## V. Appendix A—The Entity-Level Requirements

### A. First Category of Entity-Level Requirements

The First Category of Entity-Level Requirements includes capital adequacy, chief compliance officer, risk management, and swap data recordkeeping (except certain aspects of swap data recordkeeping relating to complaints and sales materials).

### 1. Capital Adequacy

Section 4s(e)(2)(B) of the CEA specifically directs the Commission to set capital requirements for swap dealers and MSPs that are not subject to the capital requirements of U.S. prudential regulators (hereinafter referred to as "non-bank swap dealers or

---

[618] To the extent that they transact in the physical commodity swaps covered by the Commission's Large Trader Reporting rules, non-U.S. clearing members also should maintain the records required by such rules.

[619] As noted above, this Guidance uses the term "guaranteed or conduit affiliate" to refer to a non-U.S. person that is guaranteed by a U.S. person or that is an affiliate conduit.

[620] The Commission proposed to interpret section 2(i) so that the Non-Registrant Requirements would not apply to swaps between two non-registrants (whether or not one or more counterparties was guaranteed by a U.S. person), with the exception of Large Trader Reporting. The Commission noted in the Proposed Guidance that it intended to review the issue of affiliate conduits. *See* Proposed Guidance, 77 FR 1234–41235.

MSPs").[621] With respect to the use of swaps that are not cleared, these requirements must: "(1) [h]elp ensure the safety and soundness of the swap dealer or major swap participant; and (2) [be] appropriate for the risk associated with the non-cleared swaps held as a swap dealer or major swap participant." [622] Pursuant to section 4s(e)(3), the Commission proposed regulations, which would require non-bank swap dealers and MSPs to hold a minimum level of adjusted net capital (*i.e.,* "regulatory capital") based on whether the non-bank swap dealer or MSP is: (i) also a FCM; (ii) not an FCM, but is a non-bank subsidiary of a bank holding company; or (iii) neither an FCM nor a non-bank subsidiary of a bank holding company.[623] The primary

purpose of the capital requirement is to reduce the likelihood and cost of a swap dealer's or MSP's default by requiring a financial cushion that can absorb losses in the event of the firm's default.

## 2. Chief Compliance Officer

Section 4s(k) requires that each swap dealer and MSP designate an individual to serve as its chief compliance officer ("CCO") and specifies certain duties of the CCO.[624] Pursuant to section 4s(k), the Commission adopted regulation 3.3, which requires swap dealers and MSPs to designate a CCO who would be responsible for administering the firm's compliance policies and procedures, reporting directly to the board of directors or a senior officer of the swap dealer or MSP, as well as preparing and filing with the Commission a certified report of compliance with the CEA. The chief compliance function is an integral element of a firm's risk management and oversight and the Commission's effort to foster a strong culture of compliance within swap dealers and MSPs.

## 3. Risk Management

Section 4s(j) of the CEA requires each swap dealer and MSP to establish internal policies and procedures designed to, among other things, address risk management, monitor compliance with position limits, prevent conflicts of interest, and promote diligent supervision, as well as maintain business continuity and disaster recovery programs.[625] The Commission adopted implementing regulations (23.600, 23.601, 23.602, 23.603, 23.605, and 23.606).[626] The Commission also adopted regulation 23.609, which requires certain risk management procedures for swap dealers or MSPs that are clearing members of a derivatives clearing organization ("DCO").[627] Collectively, these requirements help to establish a robust and comprehensive internal risk management program for swap dealers

and MSPs, which is critical to effective systemic risk management for the overall swaps market.

i. Swap Data Recordkeeping (Except Certain Aspects of Swap Data Recordkeeping Relating to Complaints and Sales Materials)

CEA section 4s(f)(1)(B) requires swap dealers and MSPs to keep books and records for all activities related to their business.[628] Sections 4s(g)(1) and (4) require swap dealers and MSPs to maintain trading records for each swap and all related records, as well as a complete audit trail for comprehensive trade reconstructions.[629] Pursuant to these provisions, the Commission adopted regulations 23.201and 23.203, which require swap dealers and MSPs to keep records including complete transaction and position information for all swap activities, including documentation on which trade information is originally recorded. Pursuant to regulation 23.203, records of swaps must be maintained for the duration of the swap plus 5 years, and voice recordings for 1 year, and records must be "readily accessible" for the first 2 years of the 5 year retention period. Swap dealers and MSPs also must comply with Parts 43, 45 and 46 of the Commission's regulations, which, respectively, address the data recordkeeping and reporting requirements for all swaps subject to the Commission's jurisdiction, including swaps entered into before the date of enactment of the Dodd-Frank Act ("pre-enactment swaps") and swaps entered into on or after the date of enactment of the Dodd-Frank Act but prior to the compliance date of the swap data reporting rules ("transition swaps").[630]

*B. Second Category of Entity-Level Requirements*

The Second Category of Entity-Level Requirements includes SDR Reporting, certain aspects of swap data recordkeeping relating to complaints and marketing and sales materials under Commission regulations 23.201(b)(3) and 23.201(b)(4) and Large Trader Reporting.

1. SDR Reporting

CEA section 2(a)(13)(G) requires all swaps, whether cleared or uncleared, to be reported to a registered SDR.[631] CEA section 21 requires SDRs to collect and maintain data related to swaps as prescribed by the Commission, and to

---

[621] *See* 7 U.S.C. 6s(e)(2)(B). Section 4s(e) of the CEA explicitly requires the adoption of rules establishing capital and margin requirements for swap dealers and MSPs, and applies a bifurcated approach that requires each swap dealer and MSP for which there is a U.S. prudential regulator to meet the capital and margin requirements established by the applicable prudential regulator, and each swap dealer and MSP for which there is no prudential regulator to comply with the Commission's capital and margin regulations. *See* 7 U.S.C. 6s(e). Further, systemically important financial institutions ("SIFIs") that are not FCMs would be exempt from the Commission's capital requirements, and would comply instead with Federal Reserve Board requirements applicable to SIFIs, while nonbank (and non-FCM) subsidiaries of U.S. bank holding companies would calculate their Commission capital requirement using the same methodology specified in Federal Reserve Board regulations applicable to the bank holding company, as if the subsidiary itself were a bank holding company. The term "prudential regulator" is defined in CEA section 1a(39) as the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Farm Credit Administration, and the Federal Housing Finance Agency. *See* 7 U.S.C. 1a(39). In addition, in the proposed capital regulations for swap dealers and MSPs, the Commission solicited comment regarding whether it would be appropriate to permit swap dealers and MSPs to use internal models for computing market risk and counterparty credit risk charges for capital purposes if such models had been approved by a foreign regulatory authority and were subject to periodic assessment by such foreign regulatory authority. *See* Proposed Capital Requirements, 76 FR 27802.

[622] *See* 7 U.S.C. 6s(e)(3)(A).

[623] *See* 7 U.S.C. 6s(e). *See also* Proposed Capital Requirements, 76 FR 27802. "The Commission's capital proposal for [swap dealers] and MSPs includes a minimum dollar level of $20 million. A non-bank [swap dealer] or MSP that is part of a U.S. bank holding company would be required to maintain a minimum of $20 million of Tier 1 capital as measured under the capital rules of the Federal Reserve Board. [A swap dealer] or MSP that also is registered as an FCM would be required to maintain a minimum of $20 million of adjusted net capital as defined under [proposed] section 1.17. In addition, an [swap dealer] or MSP that is not part of a U.S. bank holding company or registered as an FCM would be required to maintain a minimum of $20 million of tangible net equity, plus the amount of the [swap dealer's] or MSP's market risk exposure and OTC counterparty credit risk exposure." *See id.* at 27817.

[624] *See* 7 U.S.C. 6s(k).

[625] 7 U.S.C. 6s(j).

[626] *See* Final Swap Dealer and MSP Recordkeeping Rule, 77 FR 20128 (relating to risk management program, monitoring of position limits, business continuity and disaster recovery, conflicts of interest policies and procedures, and general information availability, respectively).

[627] Customer Documentation Rule, 77 FR 21278. Also, swap dealers must comply with Commission regulation 23.608, which prohibits swap dealers providing clearing services to customers from entering into agreements that would: (i) Disclose the identity of a customer's original executing counterparty; (ii) limit the number of counterparties a customer may trade with; (iii) impose counterparty-based position limits; (iv) impair a customer's access to execution of a trade on terms that have a reasonable relationship to the best terms available; or (v) prevent compliance with specified time frames for acceptance of trades into clearing.

[628] 7 U.S.C. 6s(f)(1)(B).

[629] 7 U.S.C. 6s(g)(1).

[630] 17 CFR part 46; Proposed Data Rules, 76 FR 22833.

[631] 7 U.S.C. 2(a)(13)(G).

make such data electronically available to particular regulators under specified conditions related to confidentiality.[632] Part 45 of the Commission's regulations (and Appendix 1 thereto) sets forth the specific swap data that must be reported to a registered SDR, along with attendant recordkeeping requirements; and part 46 addresses recordkeeping and reporting requirements for pre-enactment and transition swaps ("historical swaps"). The fundamental goal of the part 45 rules is to ensure that complete data concerning all swaps subject to the Commission's jurisdiction is maintained in SDRs where it will be available to the Commission and other financial regulators for fulfillment of their various regulatory mandates, including systemic risk mitigation, market monitoring and market abuse prevention. Part 46 supports similar goals with respect to pre-enactment and transition swaps and ensures that data needed by regulators concerning "historical" swaps is available to regulators through SDRs. Among other things, data reported to SDRs will enhance the Commission's understanding of concentrations of risks within the market, as well as promote a more effective monitoring of risk profiles of market participants in the swaps market. The Commission also believes that there are benefits that will accrue to swap dealers and MSPs as a result of the timely reporting of comprehensive swap transaction data and consistent data standards for recordkeeping, among other things. Such benefits include more robust risk monitoring and management capabilities for swap dealers and MSPs, which in turn will improve the monitoring of their current swaps market positions.

## 2. Swap Data Recordkeeping Relating to Complaints and Marketing and Sales Materials

CEA section 4s(f)(1) requires swap dealers and MSPs to "make such reports as are required by the Commission by rule or regulation regarding the transactions and positions and financial condition of the registered swap dealer or major swap participant." [633] Additionally, CEA section 4s(h) requires swap dealers and MSPs to "conform with such business conduct standards . . . as may be prescribed by the Commission by rule or regulation." [634] Pursuant to those authorities, the Commission promulgated final rules that set forth certain reporting and recordkeeping for swap dealers and MSPs.[635] Commission Regulation 23.201 states that "[e]ach swap dealer and major swap participant shall keep full, complete, and systematic records of all activities related to its business as a swap dealer or major swap participant." Such records must include, among other things, "[a] record of each complaint received by the swap dealer or major swap participant concerning any partner, member, officer, employee, or agent," [636] as well as "[a]ll marketing and sales presentations, advertisements, literature, and communications." [637]

## 3. Physical Commodity Large Swaps Trader Reporting (Large Trader Reporting)

CEA section 4t[638] authorizes the Commission to establish a large trader reporting system for significant price discovery swaps (of which the economically equivalent swaps subject to the Commission's part 20 rules are a subset). Pursuant thereto, the Commission adopted its Large Trader Reporting rules (part 20 of the Commission regulations), which require routine reports from swap dealers, among other entities, that hold significant positions in swaps that are linked, directly or indirectly, to a prescribed list of U.S.-listed physical commodity futures contracts.[639] Additionally, Large Trader Reporting requires that swap dealers, among other entities, comply with certain recordkeeping obligations.

## VI. Appendix B—The Transaction-Level Requirements

The Transaction-Level Requirements cover a range of Dodd-Frank requirements: some of the requirements more directly address financial protection of swap dealers (or MSPs) and their counterparties; others address more directly market efficiency and/or price discovery. Further, some of the Transaction-Level Requirements can be classified as Entity-Level Requirements and applied on a firm-wide basis across all swaps or activities. Nevertheless, in the interest of comity principles, the Commission believes that the Transaction-Level Requirements may be applied on a transaction-by-transaction basis.

### A. Category A: Risk Mitigation and Transparency

#### 1. Required Clearing and Swap Processing

Section 2(h)(1) of the CEA requires a swap to be submitted for clearing to a DCO if the Commission has determined that the swap is required to be cleared, unless one of the parties to the swap is eligible for an exception from the clearing requirement and elects not to clear the swap.[640] Clearing via a DCO mitigates the counterparty credit risk between swap dealers or MSPs and their counterparties.

Commission regulations implementing the first designations of swaps for required clearing were published in the **Federal Register** on December 13, 2012.[641] Under Commission regulation 50.2, all persons executing a swap that is included in a class of swaps identified under Commission regulation 50.4 must submit such swap to an eligible derivatives clearing organization (DCO) for clearing as soon as technologically practicable after clearing, but in any event by the end of the day of execution.

Regulation 50.4 establishes required clearing for certain classes of swaps. Currently, those classes include, for credit default swaps: Specified series of untranched North American CDX indices and European iTraxx indices; and for interest rate swaps: Fixed-to-floating swaps, basis swaps, forward rate agreements referencing U.S. Dollar, Euro, Sterling, and Yen, and overnight index swaps referencing U.S. Dollar, Euro, and Sterling. Each of the six classes is further defined in Commission regulation 50.4. Swaps that have the specifications identified in the regulation are required to be cleared and must be cleared pursuant to the rules of any eligible DCO unless an exception or exemption specified in the CEA or the Commission's regulations applies.

Generally, if a swap is subject to Section 2(h)(1)(A) of the CEA and part 50 of the Commission's regulations, it must be cleared through an eligible DCO, unless: (i) One of the counterparties is eligible for and elects

---

[632] 7 U.S.C. 24a.

[633] 7 U.S.C. 6s(f)(1).

[634] 7 U.S.C. 6s(h)(1). *See* 7 U.S.C. 6s(h)(3).

[635] Final Swap Dealer and MSP Recordkeeping Rule, 77 FR 20128.

[636] 17 CFR 23.201(b)(3)(i).

[637] 17 CFR 23.201(b)(4).

[638] 7 U.S.C. 6t.

[639] Large Trader Reporting for Physical Commodity Swaps, 76 FR 43851. The rules require routine position reporting by clearing organizations, as well as clearing members and swap dealers with reportable positions in the covered physical commodity swaps. The rules also establish recordkeeping requirements for clearing organizations, clearing members and swap dealers, as well as traders with positions in the covered physical commodity swaps that exceed a prescribed threshold. In general, the rules apply to swaps that are linked, directly or indirectly, to either the price of any of the 46 U.S.-listed physical commodity futures contracts the Commission enumerates (Covered Futures Contracts) or the price of the physical commodity at the delivery location of any of the Covered Futures Contracts.

[640] 7 U.S.C. 2(h)(1), (7).

[641] 77 FR 72284.

the End-User Exception under Commission regulation 50.50;[642] or (ii) both counterparties are eligible for and elect an Inter-Affiliate Exemption under Commission regulation 50.52. To elect either the end-user exception or the Inter-Affiliate Exemption, the electing party or parties and the swap must meet certain requirements set forth in the regulations.

Closely connected with the clearing requirement are the following swap processing requirements: (i) Commission regulation 23.506, which requires swap dealers and MSPs to submit swaps promptly for clearing; and (ii) Commission regulations 23.610 and 39.12, which establish certain standards for swap processing by DCOs and/or swap dealers and MSPs that are clearing members of a DCO.[643] Together, required clearing and swap processing requirements promote safety and soundness of swap dealers and MSPs, and mitigate the credit risk posed by bilateral swaps between swap dealers or MSPs and their counterparties.[644]

### 2. Margin and Segregation Requirements for Uncleared Swaps

Section 4s(e) of the CEA requires the Commission to set margin requirements for swap dealers and MSPs that trade in swaps that are not cleared.[645] The margin requirements ensure that outstanding current and potential future risk exposures between swap dealers and their counterparties are collateralized, thereby reducing the possibility that swap dealers or MSPs take on excessive risks without having adequate financial backing to fulfill their obligations under the uncleared swap. In addition, with respect to swaps that are not submitted for clearing, section 4s(l) requires that a swap dealer

or MSP notify the counterparty of its right to request that funds provided as margin be segregated, and upon such request, to segregate the funds with a third-party custodian for the benefit of the counterparty. In this way, the segregation requirement enhances the protections offered through margining uncleared swaps and thereby provides additional financial protection to counterparties. The Commission is working with foreign and domestic regulators to develop and finalize appropriate regulations for margin and segregation requirements.

### 3. Trade Execution

Integrally linked to the clearing requirement is the trade execution requirement, which is intended to bring the trading of mandatorily cleared swaps that are made available to trade onto regulated exchanges or execution facilities. Specifically, section 2(h)(8) of the CEA provides that unless a clearing exception applies and is elected, a swap that is subject to a clearing requirement must be executed on a DCM or SEF, unless no such DCM or SEF makes the swap available to trade.[646] Commission regulations implementing the process for a DCM or SEF to make a swap available to trade were published in the **Federal Register** on June 4, 2013.[647] Under Commission regulations 37.10 and 38.12, respectively, a SEF or DCM may submit a determination for Commission review that a mandatorily cleared swap is available to trade based on enumerated factors. By requiring the trades of mandatorily cleared swaps that are made available to trade to be executed on an exchange or an execution facility—each with its attendant pre- and post-trade transparency and safeguards to ensure market integrity—the trade execution requirement furthers the statutory goals of financial stability, market efficiency, and enhanced transparency.

### 4. Swap Trading Relationship Documentation

CEA section 4s(i) requires each swap dealer and MSP to conform to Commission standards for the timely and accurate confirmation, processing, netting, documentation, and valuation of swaps.[648] Pursuant thereto, Commission regulation 23.504(a) requires swap dealers and MSPs to "establish, maintain and enforce written policies and procedures" to ensure that the swap dealer or MSP executes written swap

trading relationship documentation.[649] Under Commission regulation 23.504, the swap trading relationship documentation must include, among other things: all terms governing the trading relationship between the swap dealer or MSP and its counterparty; credit support arrangements; investment and re-hypothecation terms for assets used as margin for uncleared swaps; and custodial arrangements.[650] Further, the swap trading relationship documentation requirement applies to all swaps with registered swap dealers and MSPs. In addition, Commission regulation 23.505 requires swap dealers and MSPs to document certain information in connection with swaps for which exceptions from required clearing are elected.[651] A robust swap documentation standard may promote standardization of documents and transactions, which are key conditions for central clearing, and lead to other operational efficiencies, including improved valuation and risk management.

### 5. Portfolio Reconciliation and Compression

CEA section 4s(i) directs the Commission to prescribe regulations for the timely and accurate processing and netting of all swaps entered into by swap dealers and MSPs. Pursuant to CEA section 4s(i), the Commission adopted regulations (23.502 and 23.503), which require swap dealers and MSPs to perform portfolio reconciliation and compression, respectively, for all swaps.[652] Portfolio reconciliation is a post-execution risk management tool to ensure accurate confirmation of a swap's terms and to identify and resolve any discrepancies between counterparties regarding the valuation of the swap. Portfolio compression is a post-trade processing and netting mechanism that is intended to ensure timely, accurate processing and netting of swaps.[653] Regulation 23.503 requires all swap dealers and MSPs to participate in bilateral compression exercises and/ or multilateral portfolio compression

---

[642] *See* End-User Exception to the Clearing Requirement for Swaps, 77 FR 42560 (Jul. 19, 2012).

[643] *See* Final Documentation Rules, 77 FR 21278.

[644] *See* section IV.H, *supra,* regarding the application of required clearing rules to market participants that are not registered as swap dealers or MSPs, including the circumstances under which the parties to such swaps would be eligible for substituted compliance.

[645] *See* 7 U.S.C. 6s(e). *See also* Proposed Margin Requirements, 76 FR at 23733–23740. Section 4s(e) explicitly requires the adoption of rules establishing margin requirements for swap dealers and MSPs, and applies a bifurcated approach that requires each swap dealer and MSP for which there is a prudential regulator to meet the margin requirements established by the applicable prudential regulator, and each swap dealer and MSP for which there is no prudential regulator to comply with the Commission's margin regulations. In contrast, the segregation requirements in section 4s(l) do not use a bifurcated approach—that is, all swap dealers and MSPs are subject to the Commission's rule regarding notice and third party custodians for margin collected for uncleared swaps.

[646] *See* 7 U.S.C. 2(h)(8).

[647] 78 FR 33606.

[648] *See* 7 U.S.C. 6s(i).

[649] *See* Final Confirmation Rules, 77 FR 55904.

[650] The requirements under section 4s(i) relating to trade confirmations is a Transaction-Level Requirement. Accordingly, Commission regulation 23.504(b)(2) requires a swap dealer's and MSP's swap trading relationship documentation to include all confirmations of swaps, will apply on a transaction-by-transaction basis.

[651] *See* Final Confirmation Rules, 77 FR at 55964.

[652] *See id.*

[653] For example, the reduced transaction count may decrease operational risk as there are fewer trades to maintain, process, and settle.

exercises conducted by a third party.[654] The rule also requires policies and procedures for engaging in such exercises for uncleared swaps with non-swap dealers and non-MSPs upon request. Further, participation in multilateral portfolio compression exercises is mandatory for dealer-to-dealer trades.

### 6. Real-Time Public Reporting

Section 2(a)(13) of the CEA also directs the Commission to promulgate rules providing for the public availability of swap transaction and pricing data on a real-time basis.[655] In accordance with this mandate, the Commission promulgated part 43 of its regulations, which provide that all "publicly reportable swap transactions" must be reported and publicly disseminated, and which establish the method, manner, timing and particular transaction and pricing data that must be reported by parties to a swap transaction.[656] The real-time dissemination of swap transaction and pricing data supports the fairness and efficiency of markets and increases transparency, which in turn improves price discovery and decreases risk (*e.g.*, liquidity risk).[657]

### 7. Trade Confirmation

Section 4s(i) of the CEA [658] requires that each swap dealer and MSP must comply with the Commission's

regulations prescribing timely and accurate confirmation of swaps. The Commission has adopted regulation 23.501, which requires, among other things, a timely and accurate confirmation of swap transactions (which includes execution, termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights or obligations of a swap) among swap dealers and MSPs by the end of the first business day following the day of execution.[659] Timely and accurate confirmation of swaps—together with portfolio reconciliation and compression—are important post-trade processing mechanisms for reducing risks and improving operational efficiency.[660]

### 8. Daily Trading Records

Pursuant to section CEA 4s(g), the Commission adopted regulation 23.202, which requires swap dealers and MSPs to maintain daily trading records, including records of trade information related to pre-execution, execution, and post-execution data that is needed to conduct a comprehensive and accurate trade reconstruction for each swap. The final rule also requires that records be kept of cash or forward transactions used to hedge, mitigate the risk of, or offset any swap held by the swap dealer or MSP.[661] Accurate and timely recordkeeping regarding all phases of a

swap transaction can serve to greatly enhance a firm's internal supervision, as well as the Commission's ability to detect and address market or regulatory abuses or evasion.

### B. Category B: External Business Conduct Standards

Pursuant to CEA section 4s(h), the Commission has adopted external business conduct rules, which establish business conduct standards governing the conduct of swap dealers and MSPs in dealing with their counterparties in entering into swaps.[662] Broadly speaking, these rules are designed to enhance counterparty protection by significantly expanding the obligations of swap dealers and MSPs towards their counterparties. Under these rules, swap dealers and MSPs will be required, among other things, to conduct due diligence on their counterparties to verify eligibility to trade, provide disclosure of material information about the swap to their counterparties, provide a daily mid-market mark for uncleared swaps and, when recommending a swap to a counterparty, make a determination as to the suitability of the swap for the counterparty based on reasonable diligence concerning the counterparty.

### VII. Appendix C—Application of the Entity-Level Requirements to Swap Dealers and MSPs *

| | |
|---|---|
| U.S. Swap Dealer or MSP (including an affiliate of a non-U.S. person). Also applies when acting through a foreign branch.[1] | Apply. |
| Non-U.S. Swap Dealer or MSP (including an affiliate of a U.S. person). | First Category:[2] Substituted Compliance.<br>Second Category:[3] Apply for U.S. counterparties; Substituted Compliance for SDR reporting with non-U.S. counterparties that are not guaranteed or conduit affiliates; Substituted compliance (except for Large Trader Reporting) with non-U.S. counterparties.[4] |

*The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.

[1] Both Entity-Level and Transaction-Level Requirements are the ultimate responsibilities of the U.S.-based swap dealer or MSP.

[2] First Category is capital adequacy, Chief Compliance Officer, risk management, and swap data recordkeeping (except Commission regulations 23.201(b)(3) and (4)).

[3] Second Category is SDR Reporting, certain aspects of swap data recordkeeping relating to complaints and marketing and sales materials (Commission regulations 23.201(b)(3) and (4)), and Large Trader Reporting.

[4] Substituted compliance does not apply to Large Trader Reporting, *i.e.,* non-U.S. persons that are subject to part 20 would comply with it in the same way that U.S. persons comply. With respect to the SDR Reporting requirement, the Commission may make substituted compliance available only if direct access to swap data stored at a foreign trade repository is provided to the Commission.

---

[654] *See* 17 CFR 23.503(c); Confirmation NPRM, 75 FR 81519.

[655] *See* 7 U.S.C. 2(a)(13). *See also* Real-Time Reporting Rule, 77 FR 1183.

[656] Part 43 defines a "publicly reportable swap transaction" as: (i) Any swap that is an arm's-length transaction between two parties that results in a corresponding change in the market risk position between the two parties; or (ii) any termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights

or obligations of a swap that changes the pricing of a swap. *See* Real-Time Reporting Rule, 77 FR 1182. Additionally, the Commission adopted regulation 23.205, which directs swap dealers and MSPs to undertake such reporting and to have the electronic systems and procedures necessary to transmit electronically all information and data required to be reported in accordance with part 43. *See* Final Swap Dealer and MSP Recordkeeping Rule, 77 FR 20205.

[657] *See* Real-Time Reporting Rule, 77 FR 1183.

[658] 7 U.S.C. 6s(i).

[659] *See* Final Confirmation Rules, 77 FR 55904.

[660] In addition, the Commission notes that regulation 23.504(b)(2) requires that the swap trading relationship documentation of swap dealers and MSPs must include all confirmations of swap transactions.

[661] *See* Final Swap Dealer and MSP Recordkeeping Rule, 77 FR 20128.

[662] *See* 7 U.S.C. 6s(h). *See also* External Business Conduct Rules, 77 FR 9822–9829.

## VIII. Appendix D—Application of the Category A Transaction-Level Requirements to Swap Dealers and MSPs *

(Category A includes (1) Clearing and swap processing; (2) Margining and segregation for uncleared swaps; (3) Trade Execution; (4) Swap trading relationship documentation; (5) Portfolio reconciliation and compression; (6) Real-time public reporting; (7) Trade confirmation; and (8) Daily trading records).**

| | U.S. Person (other than Foreign Branch of U.S. Bank that is a Swap Dealer or MSP) | Foreign Branch of U.S. Bank that is a Swap Dealer or MSP | Non-U.S. Person Guaranteed by, or Affiliate Conduit [1] of, a U.S. Person | Non-U.S. Person *Not* Guaranteed by, and Not an Affiliate Conduit [1] of, a U.S. Person |
|---|---|---|---|---|
| U.S. Swap Dealer or MSP (including an affiliate of a non-3U.S. person). | Apply ...................... | Apply ...................... | Apply ...................... | Apply. |
| Foreign Branch of U.S. Bank that is a Swap Dealer or MSP. | Apply ...................... | Substituted Compliance. | Substituted Compliance.[2] | Substituted Compliance.[2] |
| Non-U.S. Swap Dealer or MSP (including an affiliate of a U.S. person). | Apply ...................... | Substituted Compliance. | Substituted Compliance. | Do Not Apply. |

* The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.

** Where one of the counterparties is electing the Inter-Affiliate Exemption, the Commission would expect the parties to the swap to comply with the conditions of the Inter-Affiliate Exemption, including the treatment of outward-facing swaps condition in Commission regulation 50.52(b)(4)(i).

[1] Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person. Other facts and circumstances also may be relevant.

[2] Under a limited exception, where a swap between the foreign branch of a U.S. swap dealer or U.S. MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate) takes place in a foreign jurisdiction other than Australia, Canada, the European Union, Hong Kong, Japan, or Switzerland, the counterparties generally may comply only with the transaction-level requirements in the foreign jurisdiction where the foreign branch is located if the aggregate notional value of all the swaps of the U.S. swap dealer's foreign branches in such countries does not exceed 5% of the aggregate notional value of all of the swaps of the U.S. swap dealer, and the U.S. person maintains records with supporting information for the 5% limit and to identify, define, and address any significant risk that may arise from the non-application of the Transaction-Level Requirements.

NOTES:

[1] The swap trading relationship documentation requirement applies to all transactions with registered swap dealers and MSPs.

[2] Participation in multilateral portfolio compression exercises is mandatory for dealer to dealer trades.

## IX. Appendix E—Application of the Category B Transaction-Level Requirements to Swap Dealers and MSPs *

(Category B is External Business Conduct Standards).

| | U.S. Person (other than Foreign Branch of U.S. Bank that is a Swap Dealer or MSP) | Foreign Branch of U.S. Bank that is a Swap Dealer or MSP | Non-U.S. Person Guaranteed by, or Affiliate Conduit [1] of, a U.S. Person | Non-U.S. Person *Not* Guaranteed by, and Not an Affiliate Conduit [1] of, a U.S. Person |
|---|---|---|---|---|
| U.S. Swap Dealer or MSP (including an affiliate of a non-U.S. person) | Apply ...................... | Apply ...................... | Apply ...................... | Apply. |
| U.S. Swap Dealer or MSP (when it solicits and negotiates through a foreign subsidiary or affiliate). | Apply ...................... | Do Not Apply ............ | Do Not Apply ............ | Do Not Apply. |
| Foreign Branch of U.S. Bank that is a Swap Dealer or MSP. | Apply ...................... | Do Not Apply ............ | Do Not Apply ............ | Do Not Apply. |
| Non-U.S. Swap Dealer or MSP (including an affiliate of a U.S. person). | Apply ...................... | Do Not Apply ............ | Do Not Apply ............ | Do Not Apply. |

*The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.

[1] Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person. Other facts and circumstances also may be relevant.

## X. Appendix F—Application of Certain Entity-Level and Transaction-Level Requirements to Non-Swap Dealer/Non-MSP Market Participants*

(The relevant Dodd-Frank requirements are those relating to: clearing, trade execution, real-time public reporting, Large Trader Reporting, SDR Reporting and swap data recordkeeping).**

| | U.S. Person (including an affiliate of non-U.S. person) | Non-U.S. Person Guaranteed by, or Affiliate Conduit[1] of, a U.S. Person | Non-U.S. Person *Not* Guaranteed by, or Affiliate Conduit[1] of, by U.S. Person |
|---|---|---|---|
| U.S. Person (including an affiliate of non-U.S. person) .. | Apply ................................ | Apply ................................ | Apply. |
| Non-U.S. Person Guaranteed by, or Affiliate Conduit[1] of, a U.S. person. | Apply ................................ | Substituted Compliance.[2] | Do Not Apply. |
| Non-U.S. Person *Not* Guaranteed by, or Affiliate Conduit[1] of, U.S. Person. | Apply ................................ | Do Not Apply ..................... | Do Not Apply. |

*The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.

**Where one of the counterparties is electing the Inter-Affiliate Exemption, the Commission would generally expect the parties to the swap to comply with the conditions of the Inter-Affiliate Exemption, including the treatment of outward-facing swaps condition in Commission regulation 50.52(b)(4)(i).

[1] Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person are included in the consolidated financial statements of the non-U.S. person. Other facts and circumstances also may be relevant.

[2] Substituted compliance does not apply to Large Trader Reporting, *i.e.*, non-U.S. persons that are subject to part 20 would comply with it in the same way that U.S. persons comply. With respect to the SDR Reporting requirement, the Commission may permit substituted compliance only if direct access to swap data stored at a foreign trade repository is provided to the Commission.

Issued in Washington, DC, on July 17, 2013, by the Commission.

**Melissa D. Jurgens,**

*Secretary of the Commission.*

Appendices to Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations—Commission Voting Summary and Statements of Commissioners

Note: The following appendices do not constitute a part of the Interpretive Guidance and Policy Statement itself.

## Appendix 1—Commission Voting Summary

On this matter, Chairman Gensler and Commissioners Chilton and Wetjen voted in the affirmative; Commissioner O'Malia voted in the negative.

## Appendix 2—Statement of Chairman Gary Gensler

I support the Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations (Guidance) and the related phase-in exemptive order also being adopted today. With this Commission action another important step has been taken to make swaps market reform a reality.

This Guidance is being adopted just shy of the third anniversary of President Obama signing the Dodd-Frank Act, and that law was historic. It was an historic answer to an historic problem: the near collapse of the American economy driven, in part, by the unregulated derivatives marketplace. Congress and the President were clear in their intention to bring transparency to this marketplace, to lower risk to the public, and to ensure the regulation of swap dealers and major swap participants.

In 2008, when both the financial system and the financial regulatory system failed the public, Americans paid the price through the crisis with their jobs, their pensions, and their homes. We lost 8 million jobs in that crisis and thousands of businesses shuttered. The swaps market was central to the crisis and financial institutions operating complicated swaps businesses and offshore entities nearly toppled the economy. Congress responded. Americans are remarkably resilient—but the public really does expect us to learn from the lessons of the crisis, and to do everything possible to prevent this from happening to any of us again.

It's pretty straightforward, I think. Even though we oversee, here at the CFTC, a complex and sometimes difficult to understand market (my mom consistently asks me, "Gary, what are swaps?"), the questions the American people are looking for us to answer are simple: Have we lowered risk? Have we brought transparency to these markets? Have we promoted competition and openness in these markets so that end users can get the greatest benefit when they seek to lower their risk and focus on what they do well—which is employing people, innovating and moving our economy forward? That is why reform matters.

Five years after the crisis and three years after Dodd-Frank passed, market participants are coming into compliance with the common sense reforms that Congress and the President laid out. Through Dodd-Frank and the rules that this agency has put in place, no longer will the markets be opaque and dark, and we will have transparency in the markets. In fact, throughout this year, for the first time, the public and regulators have benefitted from reporting to swap data repositories and reporting to the public. And later this year, starting actually in August, facilities called swap execution facilities will start so that the public can benefit from greater openness and competition before the transaction occurs. And by the end of this year, there are likely to be trade execution mandates for interest rate and credit derivative index products, as well.

Central clearing became required for the broader market earlier this year, with key phase in dates to come this Fall and Winter, as well. We have 80 swap dealers, and, yes, two major swap participants, now provisionally registered. As part of the responsibilities accompanying registration, they're responsible for sales practice, record keeping and other business conduct requirements that help lower the risk to the public.

Yesterday, we took another significant step when we and the European Commission announced a path forward regarding joint understandings regarding the regulation of cross border derivatives. I want to publicly thank Commissioner Michel Barnier, his Director General Jonathan Faull, and their staffs, the staffs at the European Securities Market Authority, and Steven Maijoor's leadership, for collaborating throughout the reform process. This was a significant step forward in harmonizing and giving clarity to the markets as to when there might be jurisdictional overlaps with regard to this reform.

Today, we are considering two important actions, the Guidance, as well as a related

phase-in exemptive order. And as you probably have heard me say before, the nature of modern finance is that financial institutions commonly set up hundreds, even thousands of legal entities around the globe. In fact, the U.S.'s largest banks each have somewhere between 2,000 and 3,000 legal entities around the globe. Some of them have hundreds of legal entities just in the Cayman Islands alone. We have to remind ourselves that the largest banks and institutions are global in nature, and when a run starts on any part of an overseas affiliate or branch of a modern financial institution, risk comes crashing right back to our shores.

Similarly, if it's an EU financial institution and it has some guaranteed affiliate in the U.S. or overseas that gets into trouble, that risk can flow back to their shores. That's why, together both we and Europe recognize the importance of covering guaranteed affiliates, whether they're guaranteed affiliates of a U.S. person or of an EU person.

There's no question to me, at least, that the words of Dodd-Frank addressed this (i.e., risk importation) when they said that a direct and significant connection with activities and/or effect on commerce in the United States covers these risks that may come back to us.

I want to publicly thank Chairman Barney Frank along with Spencer Bachus, Frank Lucas, and Collin Peterson, and their staffs for reaching out to the CFTC and the public to ask how to best address offshore risks that could wash back to our economy in Dodd-Frank.

In addition, we should not forget the actual events over the past several years that remind us of the risks to the U.S. that can be posed by offshore entities:

AIG nearly brought down the U.S. economy. Lehman Brothers had 3,300 legal entities, including a London affiliate that was guaranteed here in the U.S., and it had 130,000 outstanding swap transactions. Citigroup had structured investment vehicles that were set up in the Cayman Islands, run out of London, and yet were central to not one, but two bailouts of that institution. Bear Stearns, in 2007 had two sinking hedge funds that had to be bailed out by Bear Stearns—and, yes, those hedge funds were organized in the jurisdiction of the Cayman Islands.

More than a decade earlier, I was working in my position as Assistant Secretary of the United States Department of the Treasury. I found myself making a call from Connecticut to then Treasury Secretary Robert Rubin to report that Long Term Capital Management's $1.2 trillion swaps book was not only going to go down within a day or two, but that the business—that we thought was in Connecticut—was actually incorporated in the Cayman Islands as a PO Box facility.

Even last year, we had yet another reminder that branches of big U.S. banks can bring risk back to the US. Even though they were not the risks as large as I've just related, JPMorgan Chase's Chief Investment Office's credit default swaps were executed primarily in the U.K. branch.

Each of these examples demonstrated a direct and significant connection with activities and/or an effect on commerce in the United States. Congress knew this painful history when it provided the cross border

provisions of swaps market reform. And as market participants asked the CFTC to provide interpretive guidance on Congress's word, I believe that we have had to keep this painful history in mind. Two and a half years ago, the CFTC started working on guidance, which was published for notice and comment in June 2012, and for which we sought further input on in December 2012. We have greatly benefitted from this public input. The Guidance the Commission will adopt today incorporates the public's input and, I think, appropriately interprets the cross border provisions of Dodd-Frank.

There are four areas that I think really are important:

First, the CFTC interprets the cross-border provisions to cover swaps between non U.S. swap dealers and guaranteed affiliates of U.S. Persons, as well as swaps between two guaranteed affiliates that are not swap dealers. The guidance does, as was proposed, recognize and embrace the concept of substituted compliance where there are comparable and comprehensive rules abroad. But the history of AIG, Lehman Brothers, Citigroup and the others, and of guaranteed affiliates, is a strong lesson that Congress knew when we were approaching these issues.

Second, the definition of U.S. person in this guidance captures offshore hedge funds and collective investment vehicles that have their principal place of business here in the U.S., or that are majority owned by U.S. persons. Addressing ourselves to guidance, and yet forgetting the lessons of Long Term Capital Management or Bear Stearns, is not in my opinion what Congress wanted.

Third, under the guidance, foreign branches, like the JPMorgan's U.K. branch, of U.S. swap dealers may also comply with Dodd-Frank through substituted compliance if they are appropriately ring-fenced—that is, they are truly branches where employees and the booking and the taxes are actually offshore in the foreign branch. The Guidance allows, if there are comparable and comprehensive regimes overseas and supervisory authorities overseas looking at those branches, that those branches can avail themselves to substituted compliance in the manner offshore guaranteed affiliates would.

Lastly, the guidance provides that swap dealers, foreign or U.S., transacting with U.S. persons (whether they be in New Jersey, Maryland, Michigan, Arkansas, Iowa—I have to get all the right states, recognizing where my fellow Commissioners come from) anywhere in the United States, must comply with Dodd-Frank's swap market reform. The guidance does provide, though, that U.S. Persons can meet international people anonymously, and not only on our exchanges called designated contract markets, but also on the new swap execution facilities, as well as foreign boards of trade. International parties trading on those platforms do not have to worry about whether those swaps might make them a swap dealer, or whether they need to worry about certain transaction level requirements. And I think that was important to maintain and promote the liquidity of these three very important types of platforms—foreign boards of trade, swap execution facilities, and designated contract markets.

In conclusion, I will be voting in support of the Guidance and the related phase-in exemptive order also being adopted today. I'll say more about the exemptive order in my statement of support for that document, but I think these are both critical steps for the Commission and swaps reform. They add to the approximately 56 final guidance and rules that this Commission has adopted. We're well over 90 percent through the various rule and guidance writing. And the markets are probably well towards half way implementing these reforms. I have a deep respect for how much work market participants are doing to come into compliance.

So now, 3 years after the passage of financial reform, and a full year after the Commission proposed guidance with regard to the cross border application of reform, it is time for reforms to properly apply to and cover those activities that, as identified by Congress in section 722(d) of the Dodd-Frank Act, have "a direct and significant connection with activities in, or effect on, commerce of the United States." With the additional transitional phase-in period provided by this Order, it is now time for the public to get the full benefit of the transparency and the measures to reduce risk included in Dodd Frank reforms.

## Appendix 3—Dissenting Statement of Commissioner Scott D. O'Malia

I respectfully dissent from the Commodity Futures Trading Commission's (the "Commission" or "CFTC") approval of its interpretive guidance and policy statement ("Guidance") regarding the cross-border application of the swaps provisions of the Commodity Exchange Act ("CEA"), as well as from the Commission's approval of a related exemptive order ("Exemptive Order").

When I voted in July 2012 to issue for public comment the proposed interpretive guidance and policy statement ("Proposed Guidance"),[1] I made clear that if I had been asked to vote on the Proposed Guidance as final, my vote would have been no. I then laid out my concerns with the Proposed Guidance, all relating to the Commission's unsound interpretation of section 2(i) of the CEA,[2] which governs the extraterritorial application of the CEA's swaps provisions. Regrettably, the Guidance fails to address these concerns and constitutes a regulatory overreach based on a weak foundation of thin statutory and legal authority.

Like the Proposed Guidance, the Guidance: (1) Fails to articulate a valid statutory foundation for its overbroad scope and inconsistently applies the statute to different activities; (2) crosses the line between interpretive guidance and rulemaking; and (3) gives insufficient consideration to international law and comity. These shortcomings are compounded by serious procedural flaws in the Commission's treatment of international harmonization and substituted compliance, as well as in its issuance of the Exemptive Order.

---

[1] Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 FR 41214 (July 12, 2012).

[2] 7 U.S.C. 1 *et seq.*

## Lack of Statutory Foundation

Section 2(i) of the CEA [3] as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") [4] provides, in part, that the Commission's swap authority "shall not apply" to activities outside the United States unless those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States . . . ." [5] This provision is clearly a limitation on the Commission's authority. [6] It follows that the Commission must properly articulate how and when the "direct and significant" standard is met in order to apply Commission rules to swap activities that take place outside of the United States.

The Guidance, however, fails to do so. Instead, it treats section 2(i) as a ready tool to expand authority rather than as a limitation. The statutory analysis section of the Guidance is insufficient to support the broad sweep of extraterritorial activities that the Guidance contemplates would fall under the Commission's jurisdiction, relying heavily on a comparison to somewhat similar statutory language whose wholly different context renders the comparison unpersuasive. The Guidance makes no mention of statutes that may be more analogous to the CEA, such as the securities or banking laws. [7] Because the "direct and significant" standard is never defined, the Guidance's attempts to link certain requirements imposed on market participants to the "direct and significant" standard do not establish the requisite jurisdictional nexus. [8]

I would also like to point out that CEA section 2(i) contains a second clause, which allows for the limited application of the Commission's swap rules to activities outside the United States when they violate the Commission's anti-evasion rules. [9] Pursuant to this clause, the Commission promulgated section 1.6 under Part 1 of its regulations. [10]

Rather than relying on section 1.6 to address its concerns about evasion, the Commission chose simply to reference the same concerns in justifying its overbroad reach in the Guidance.

With such an unsound foundation for the Commission's extraterritorial authority under the "direct and significant" standard, I am not surprised that the Guidance often applies section 2(i) of the CEA inconsistently and arbitrarily. Examples of inconsistency abound.

For instance, just as with the Proposed Guidance, the Guidance does not provide a basis for its reasoning that all Transaction-Level Requirements described in the Guidance satisfy the "direct and significant" standard under section 2(i). As I stated in my concurrence to the Proposed Guidance, trade execution and real-time public reporting requirements, although important for transparency purposes, do not raise the same systemic risk concerns that clearing and margining for uncleared swaps do. The Guidance acknowledges this point, but does not go on to sufficiently explain why they should be, and are, treated equally. The Guidance also acknowledges that clearing and margining, because of their implications for systemic risk, could be classified as Entity-Level Requirements, but it does not explain why are they are not. The Guidance's failure to give meaning to the "direct and significant" standard in its discussion of these requirements is glaring.

Inconsistent application can also be seen within a specific Transaction-Level Requirement, for example reporting to swap data repositories ("SDRs"). The Guidance allows non-U.S. swap dealers ("SDs") and major swap participants ("MSPs") to utilize substituted compliance for SDR reporting of their swaps with non-U.S. counterparties, but it does not allow for substituted compliance for non-U.S. SD and MSPs' trades with U.S. counterparties. Again, the Commission fails here to give real meaning to "direct and significant" in order to adequately explain its reasoning for this distinction. The rationale is even weaker given the fact that substituted compliance is available for swaps with non-U.S. counterparties only under the condition that the Commission has direct access to the relevant data at the foreign trade repository. In either case, the Commission will have direct access to the relevant data, whether substituted compliance is available or not. This raises the question: if the outcome is the same, why is the distinction made? If it is different, the Guidance does not explain how or why—despite requiring data at foreign trade repositories to be essentially the same as data at domestic SDRs, before the Commission even contemplates substituted compliance for SDR reporting.

Yet another example of inconsistent application of section 2(i) involves the requirement of physical commodity large swaps trader reporting ("Large Trader Reporting"). In contrast to SDR reporting, the Guidance does not allow substituted compliance for Large Trader Reporting, even for swaps between a non-U.S. registrant and a non-U.S. counterparty. The Commission's flimsy rationale is that Large Trader Reporting involves data conversion to

"futures equivalent" units, and that it would cost too much time and resources for the Commission to conduct this conversion on data that it could access in a foreign trade repository. Here again, the "direct and significant" standard is nowhere to be found. Moreover, the Commission overstates the burden of the "futures equivalent" conversion and, more generally, the significance of Large Trader Reporting in its oversight duties, while understating the availability of data collected through SDR reporting, with its eligibility for substituted compliance, to achieve the same regulatory objectives.

## Interpretive Guidance Versus Rulemaking

The imposition of requirements on market participants raises another of my major concerns with the Guidance. I strongly disagree with the Commission's decision to issue its position on the cross-border application of its swaps regulations in the form of "interpretive guidance" instead of promulgating a legislative rule under the Administrative Procedure Act ("APA"). [11]

Simply putting the guise of "guidance" on this document does not change its content or consequences. Where agency action has the practical effect of binding parties within its scope, it has the force and effect of law, regardless of the name it is given. [12] Legally binding regulations that impose new obligations on affected parties—"legislative rules"—must conform to the APA. [13] On its face, the Guidance sets out standards that it contemplates will be regularly applied by staff to cross-border activities in the swaps markets. Market participants cannot afford to ignore detailed regulations imposed upon their activities that may result in enforcement or other penalizing action. [14] This point is underlined by the fact that, as I discuss below, Commission staff no-action letters have been issued in connection with compliance obligations that have essentially been imposed by the Guidance. [15] All of this leads to the logical conclusion that the Guidance has a practical binding effect and

---

[3] § 2(i).

[4] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010).

[5] § 2(i)(1).

[6] Stated another way, section 2(i)(1) may be read as the following: "[The CEA's swaps provisions enacted by the Dodd-Frank Act] *may* apply to activities outside the United States *only if* those activities have a direct and significant connection with activities in, or effect on, commerce of the United States."

[7] For a recent statutory analysis of the extraterritorial application of the Securities and Exchange Act of 1934, *see Morrison* v. *Nat'l Australia Bank*, 561 U.S. ____ (2010).

[8] *See Appalachian Power Co.* v. *Envtl. Prot. Agency*, 208 F.3d 1015, 1027 (D.C. Cir. 2000) (vacating agency guidance interpreting statutory language with practical binding effect because it did not define subparts of the interpreted term and should have been promulgated as a legislative rule under the APA).

[9] 7 U.S.C. 2(i)(2) ([The CEA's swaps provisions enacted by the Dodd-Frank Act] "shall not apply to activities outside the United States unless those activities . . . contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of [the CEA enacted by the Dodd-Frank Act]").

[10] 17 CFR 1.6.

[11] 5 U.S.C. 551 *et seq.*

[12] *See Gen. Elec. Co.* v. *Envtl. Prot. Agency*, 290 F.3d 377, 380 (D.C. Cir. 2002) (finding that a guidance document is final agency action); *Appalachian Power,* 208 F.3d at 1020–21.

[13] *See Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302–03 (1979) (agency rulemaking with the force and effect of law must be promulgated pursuant to the procedural requirements of the APA).

[14] "A document will have practical binding effect before it is actually applied if the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences . . . ." *Gen. Elec.,* 290 F.3d at 383 (quoting Anthony, Robert A., *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?,* 41 Duke L.J. 1311 (1992)) (vacating an agency's guidance document that the court found to have practical binding effect and where procedures under the APA were not followed).

[15] A no-action letter is issued by a division of the Commission and states that, for the reasons and under the conditions described therein, it will not recommend that the Commission commence an enforcement action against an entity or group of entities for failure to comply with obligations imposed by the Commission.

should have been promulgated as a legislative rule under the APA.

There are important policy and legal considerations that weigh strongly in support of rulemaking in accordance with the APA. Not only do the safeguards enacted by Congress in the APA ensure fair notice and public participation, they help to ensure reasoned decision-making and accountability. In addition, the APA requires that courts take a "hard look" at agency action.[16]

By issuing "interpretive guidance" instead of rulemaking, the Commission has also avoided analyzing the costs and benefits of its actions pursuant to section 15(a) of the CEA,[17] because the CEA requires the Commission to consider costs and benefits only in connection with its promulgation of regulations and orders. Compliance with the Commission's swaps regulations entails significant costs for market participants. Avoiding cost-benefit analysis by labeling the document as guidance is unacceptable.

In my concurrence to the Proposed Guidance, I suggested that the Commission should at least prepare a report analyzing the costs attributable to the breadth of the Commission's new authority under CEA section 2(i). I am disappointed, but not surprised, that the Commission has not taken up my suggestion.

### Insufficient Consideration of Principles of International Comity

Also in my concurrence to the Proposed Guidance, I pointed out that the Commission's approach gave insufficient consideration to principles of international comity. The Guidance suffers from the same shortcoming.

The Commission does describe principles of international comity in the Guidance, as it did in the Proposed Guidance. However, mere citation is meaningless if unaccompanied by adherence. With an interpretation of section 2(i) that essentially views the Commission's jurisdiction as boundless, roping in all transactions with U.S. persons regardless of the location or the regulations that foreign regulators may have

in place, the reality is that the Commission's approach is unilateral and does not give adequate consideration to comity principles.

These principles are crucial given the global, interconnected nature of today's swaps markets. Properly considering these principles—in addition to indicating respect for the international system and the legitimate interests of other jurisdictions—strengthens, not weakens, the Commission's ability to effectively regulate swaps markets.

### On the Path Forward to Harmonization, But a Flawed Process

In order to implement principles of international comity and develop a harmonized global regulatory structure that is both effective and efficient, I have consistently called for meaningful cooperation with foreign regulators. I initially did so in my concurrence to the Proposed Guidance, and the necessity of greater collaboration was subsequently driven home by the number and tone of comment letters on the Proposed Guidance submitted by foreign regulators.[18] Then, when the Commission finalized a cross-border exemptive order last December with an expiration date of July 12,[19] in my concurring statement I again urged the Commission and foreign regulators to engage in meaningful, substantive discussions.

I am pleased that over the past several months, this engagement has taken place and progress has been made toward harmonization. However, we are not where we need to be: many outstanding issues and questions remain, from data privacy concerns, to the implications of other jurisdictions still finalizing their regulations, to a lack of a clear, consistent and transparent framework for substituted compliance. It would have made sense for these issues to be addressed in the Guidance—but they are not. The looming July 12 expiration of the December exemptive order and the resulting time crunch cannot reasonably be cited as the reason for this failure, because July 12 is an

artificial date; it could have been pushed back in order to reach the right outcome with the right process.

Instead, while we are moving toward a workable outcome on harmonization, the process by which we are getting there is patently unacceptable. The most glaring example of this flawed process is this week's publication of a Commission staff no-action letter allowing substituted compliance for certain of the Transaction-Level Requirements.[20] It boggles the mind to think that a staff letter issued by a single division, with no input from the Commission, would be used as the vehicle for addressing such a major issue.[21] Making matters worse, this no-action letter is outside the scope of a forthcoming Commission decision regarding the comparability of European rules. And the relief is not time-limited, thereby creating an effect similar to a rulemaking. Consequently, this indefinite exclusion not only preemptively overrides a Commission decision, but it also seems to provide relief beyond that contemplated by the Guidance, which calls for a re-evaluation of all substituted compliance determinations within four years of the initial determination.

Unfortunately, this is not the first instance in recent times of staff no-action letters being used to issue Commission policy. Not only are they an improper tool to get around formal Commission action, their prolific use is a reflection of the ad-hoc, last-minute approach that has been far too prevalent lately at the Commission. I cannot emphasize this enough: the Commission must stop this approach and get back to issuing policy in a more formal, open and transparent manner.

### Substituted Compliance

In my discussions with fellow regulators abroad and international regulatory bodies, it is clear that there are varying degrees of reforms being developed and implemented in respective jurisdictions: some are comparable to U.S. regulations and some are less stringent, but there are some that exceed the Commission's own requirements. I would have preferred the Commission to take the past year following the release of the Proposed Guidance to engage our international colleagues and to involve the International Organization of Securities Commissions ("IOSCO") in order to resolve the issue of harmonizing our rules. Under this approach, we could finalize our guidance upon completion of the international harmonization process, allowing us to take into account any shortcomings in that process. Instead, we

---

[16] The "arbitrary and capricious" standard of review of agency action under the APA is a rationality analysis also known as the hard-look doctrine:

Under the leading formulation of this doctrine, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" The court "consider[s] whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." In addition, the agency may not "entirely fail[] to consider an important aspect of the problem," may not "offer[] an explanation for its decision that runs counter to the evidence before the agency," nor offer an explanation that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." The agency must also relate the factual findings and expected effects of the regulation to the purposes or goals the agency must consider under the statute as well as respond to salient criticisms of the agency's reasoning.

Stack, Kevin M., *Interpreting Regulations*, 111 Mich. L. Rev. 355, 378–79 (2012) (internal citations omitted).

[17] 7 U.S.C. 19(a).

[18] The Commission received comment letters from, among others: Jonathan Faull, European Commission; Steven Maijoor, European Securities and Markets Authority; David Lawton and Stephen Bland, UK Financial Services Authority; Pierre Moscovici, France Ministry of Economy and Finance, Christian Noyer, Autorite de controle prudential, and Jacques Delmas-Marsalet, Autorite des marches financiers; Patrick Raaflaub and Mark Branson, Swiss Financial Market Supervisory Authority; Masamichi Kono, Japan Financial Services Agency, and Hideo Hayakawa, Bank of Japan; K.C. Chan, Financial Services and Treasury Bureau of the Hong Kong Special Administrative Region; Belinda Gibson, Australian Securities and Investments Commission, Malcolm Edey, Reserve Bank of Australia, Arthur Yuen, Hong Kong Monetary Authority, Keith Lui, Hong Kong Securities and Futures Commission, and Teo Swee Lian, Monetary Authority of Singapore. These and all public comment letters on the Proposed Guidance are available at: *http://comments.cftc.gov/PublicComments/CommentList.aspx?id=1234&ctl00_ctl00_cphContentMain_MainContent_gv CommentList.*

[19] Final Exemptive Order Regarding Compliance With Certain Swap Regulations, 78 FR 858 (January 7, 2013). The document was adopted by the Commission in December 2012 and published in the **Federal Register** in January 2013.

[20] No-Action Relief for Registered Swap Dealers and Major Swap Participants from Certain Requirements under Subpart I of Part 23 of Commission Regulations in Connection with Uncleared Swaps Subject to Risk Mitigation Techniques under EMIR, CFTC Letter No. 13–45 (July 11, 2013).

[21] I have set forth in note 18 some of the comment letters that the Commission has received from foreign supervisors and regulators. By allowing substituted compliance to be addressed through a no-action letter, is the Commission implying that, *e.g.,* the Bank of Japan should accede to, *e.g.,* decisions of the CFTC Division of Swap Dealer and Intermediary Oversight? If so, I find such implication inappropriate.

have chosen the reverse order: to impose statutorily weak guidance, with all its no-action riders and exemptions, with only the promise of further negotiations with our foreign counterparts.

Given the way the Commission has proceeded up to this point, it is my hope that the harmonization work lying ahead will be undertaken in a more transparent manner and not done through the abused no-action process that lacks any formal Commission process or oversight. Further, I hope that the process of substituted compliance will offer the opportunity for other regulatory bodies to engage directly with the full Commission, so that we can better understand how our rules and theirs will work and can minimize the likelihood of regulatory retaliation and inconsistent, duplicative, or conflicting rules. I believe the Commission has worked too hard to develop principles and standards that will encourage greater transparency, open access to clearing and trading and improved market data to let them go to waste due to a lack of global regulatory harmonization.

I want to work with other home country regulators to ensure there is not an opportunity for entities to exploit regulatory loopholes. The stark reality is that this Commission is not the global regulatory authority and does not have the resources to support such a mission. Therefore, our best and most effective solution is to engage in a fully transparent discussion on substituted compliance and to do so immediately.

**Exemptive Order**

In an effort to mitigate the broad reach of the Guidance and accommodate its last-minute finalization, and in a moment of humility, the Commission has agreed to delay the application of certain elements of the Commission's swaps regulations with its approval of the Exemptive Order. The Exemptive Order provides relief ranging from 75 days (for application of the expanded U.S. person definition, for example) to December 21, 2013 (for Entity-Level and Transaction-Level Requirements for non-U.S. SDs and MSPs in certain jurisdictions). The Commission is issuing the Exemptive Order pursuant to section 4(c) of the CEA.[22]

Even though the Exemptive Order goes into effect immediately, the Commission has included a post hoc 30-day comment period. I support the additional time that the Exemptive Order provides for market participants to comply with the Commission's last-minute Guidance, but I cannot support a final order that blatantly ignores the APA-mandated comment periods for Commission action, especially when I advocated for a relief package that would have provided for public comment over a month ago.[23]

**Additional Concerns**

In addition to the above, the Guidance leaves me concerned in a number of other areas. I am concerned about whether the definition of U.S. person contained herein provides the necessary clarity for market participants, particularly as its enumerated prongs are explicitly deemed to form a non-exhaustive list. I question whether the Commission has done enough to harmonize its cross-border approach with that of the Securities and Exchange Commission (which is being issued through notice-and-comment rulemaking instead of interpretive guidance, I should note), in particular with regard to the definitions of U.S. person and foreign

branches. I also am concerned about whether the Guidance creates an uneven playing field for U.S. firms, which would be a plainly unacceptable outcome to me. I am concerned that the Guidance is overlapping, duplicative, and perhaps even contradictory with other provisions in the Dodd-Frank Act that mitigate systemic risk and allocate responsibility for administering its complex and comprehensive regulatory regime to multiple agencies under Title I, Title II, and even within Title VII.[24] In addition, I am concerned that the Guidance practically ignores the hugely important matter of protecting customer funds, specifically in connection with bankruptcies, which has critical cross-border implications as vividly demonstrated by the recent collapse of MF Global.[25] Finally, I am concerned about whether in overreaching to rope in entities into U.S. jurisdiction that would more appropriately be regulated elsewhere pursuant to an effective system of substituted compliance, the Guidance will have the perverse effect of creating more risk to the U.S. system and more risk to U.S. taxpayers.

**Conclusion**

For an administrative agency, good government combines good substance—based on a faithful, appropriate reading of the guiding statute—and good process. The Guidance falls woefully short on both counts. Therefore, I respectfully dissent from the decision of the Commission to approve the Guidance and Exemptive Order for publication in the **Federal Register**.

[FR Doc. 2013–17958 Filed 7–25–13; 8:45 am]

**BILLING CODE 6351–01–P**

---

[22] Section 4(c) of the CEA grants the Commission the authority to "exempt any agreement, contract, or transaction (or class thereof) that is otherwise subject to subsection (a) (including any person or class of persons offering, entering into, rendering advice or rendering other services with respect to, the agreement, contract, or transaction). . . ." 7 U.S.C. 6(c). Section 4(a) applies to "any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of

soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions). . . ." 7 U.S.C. 6(a).

[23] The Exemptive Order claims, unconvincingly, that it falls under a good-cause exception to notice-and-comment requirements provided for by the APA under section 553(b)(B): "*Except when notice and hearing is required by statute,* this subsection does not apply . . . (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B) (emphasis added). However, section 4(c) of the CEA clearly provides that the Commission may grant exemptive relief only by "rule, regulation, or order *after notice and opportunity for hearing*" (emphasis added). 7 U.S.C. 6(c). The APA further provides under section 559 that it does not "limit or repeal additional requirements imposed by statute or otherwise recognized by law." 5 U.S.C. 559. The CEA also grants emergency powers to the Commission under exigent circumstances. *See, e.g.,* 7 U.S.C. 12a(9). In addition, courts have narrowly construed the good-cause exception and placed the burden of proof on the agency. *See Tenn. Gas Pipeline Co.* v. *Fed. Energy Regulatory Comm'n,* 969 F.2d 1141 (D.C. Cir. 1992); *Guardian Fed. Sav. & Loan Ass'n* v. *Fed. Sav. & Loan Ins. Corp.,* 589 F.2d 658, 663 (D.C. Cir. 1978).

[24] *See, e.g.,* 7 U.S.C. 6s(d)(2) ("The Commission may not prescribe rules imposing prudential requirements on swap dealers or major swap participants for which there is a prudential regulator."); 7 U.S.C. 6b–1(b) ("The prudential regulators shall have exclusive authority to enforce the provisions of section 4s(e) with respect to swap dealers or major swap participants for which they are the prudential regulator.")

[25] In a recent op-ed article James Giddens, the bankruptcy trustee for MF Global's U.S.-registered entities, points out that serious concerns regarding the harmonization, or lack thereof, of bankruptcy regimes were identified during the resolution of Lehman Brothers in 2008 (he was then the liquidation trustee for Lehman Brothers's U.S. broker-dealer), only for similar failings to appear with MF Global. He urges clearer and more consistent cross-border rules regarding the protection of customer money in advance of any future multinational financial company meltdown. Giddens, James, *How to Avoid the Next MF Global Surprise: Change Cross-Border Rules to Stop Raids on U.S. Customer Accounts,* Wall St. J., July 9, 2013.

# EXHIBIT E



# Commodity Futures Trading Commission
## Office of Public Affairs
**Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
www.cftc.gov**

# Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations

The Commodity Futures Trading Commission (CFTC or Commission) is adopting interpretive guidance and a policy statement (Guidance) regarding cross-border application of the swaps provisions of Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).

## Dodd-Frank Act

The Dodd-Frank Act amended the Commodity Exchange Act (CEA) to establish comprehensive regulation of swaps by the Commission.  Under section 2(i) of the CEA, as amended, the swaps provisions of the CEA (including any CEA rules or regulations) apply to cross-border activities when certain conditions are met, namely, when such activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or when they contravene Commission rules or regulations as are necessary or appropriate to prevent evasion of the swaps provisions of the CEA enacted under Title VII of the Dodd-Frank Act.  The Guidance sets forth the general policy of the Commission in interpreting how section 2(i) of the CEA provides for the application of the swaps provisions of the CEA and Commission regulations to cross-border activities.

## "U.S. Person" Interpretation

The definition of U.S. person is largely territorial-based. The definition would include collective investment vehicles - including hedge funds - that are directly or indirectly majority-owned by U.S. persons, or that have their principal place of business in the United States based on the relevant facts and circumstances (focusing principally on whether the senior personnel responsible for either the formation and promotion of the fund or the implementation of the fund's investment strategy are located in the United States).

A non-U.S. person that is guaranteed by and is an affiliate of a U.S. person is not included in the definition of U.S. person (a "guaranteed affiliate"), but both "guaranteed affiliates" and "conduit affiliates" are treated the same as a U.S. person in certain respects under the Guidance.

Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person  are included in the consolidated financial statements of the U.S. person.  Other facts and circumstances also may be relevant.

## Swap Dealer De Minimis Threshold and Major Swap Participant (MSP) Calculation

A U.S. person should generally count in its swap dealer de minimis calculations all of its dealing swaps, whether with U.S. or non-U.S. counterparties. A non-U.S. person that is a guaranteed or conduit affiliate also should generally include in its swap dealer calculation all of its dealing swaps, whether with U.S. or non-U.S. counterparties. A non-U.S. person that is not a guaranteed or conduit affiliate should generally count swaps with U.S. persons and swaps with guaranteed affiliates (with some exceptions). However, a non-U.S. person that is not a guaranteed or conduit affiliate may exclude any swaps that are entered into anonymously on a registered DCM, SEF, or FBOT and cleared.

Commission regulation 1.3(ggg)(4) requires that a person include, in determining whether its swap dealing activities exceed the de minimis threshold, the aggregate notional value of swap dealing transactions entered by its affiliates under common control. Under the Guidance, the Commission interprets the aggregation requirement in Commission regulation 1.3(ggg)(4) in a manner that applies the same aggregation principles to all affiliates in a corporate group, whether they are U.S. or non-U.S. persons. Further, the Commission will generally apply the aggregation principle (as articulated in the Final Entities Rules) such that, in considering whether a person is engaged in more than a de minimis level of swap dealing, a person (whether U.S. or non-U.S.) should generally include all relevant dealing swaps of all its U.S. and non-U.S. affiliates under common control, except that swaps of an affiliate (either U.S. or non-U.S.) that is a registered swap dealer are excluded. However, this aspect of the Commission's policy would generally apply only when the aggregate notional value of applicable swap dealing transactions of all such unregistered U.S. and non-U.S. affiliates of such registered swap dealer does not exceed the de minimis level.

Stated in general terms, the Commission's interpretation allows both U.S. persons and non-U.S. persons in an affiliated group to engage in swap dealing activity up to the de minimis threshold. When the affiliated group meets the de minimis threshold in the aggregate, one or more affiliate(s) (inside or outside the United States) would generally have to register as swap dealer(s) so that the relevant swap dealing activity of the unregistered affiliates remains below the threshold.

For purposes of determining whether a non-U.S. person holds swap positions above the MSP thresholds, a non-U.S. person should generally include (1) any swap position between it and a U.S. person, (2) any swap between it and a guaranteed affiliate (but its swap positions where its own obligations thereunder are guaranteed by a U.S. person should be attributed to that U.S. person and not included in the non-U.S. person's determination), and (3) any swap position between another (U.S. or non-U.S.) person and a U.S. person or guaranteed affiliate, where it guarantees the obligations of the other person thereunder. A non-U.S. person may exclude certain transactions from the MSP calculation threshold as further described in the Guidance.

## Transaction-Level and Entity-Level Requirements

The various Dodd-Frank Act swaps provisions applicable to swap dealers and MSPs can be conceptually separated into Entity-Level Requirements, which apply to a swap dealer or MSP firm as a whole, and Transaction-Level Requirements, which apply on a transaction-by-transaction basis.

The Entity-Level Requirements under Title VII of the Dodd-Frank Act and the Commission's regulations promulgated thereunder relate to: (i) capital adequacy; (ii) chief compliance officer; (iii) risk management; (iv) swap data recordkeeping; (v) swap data repository reporting ("SDR Reporting"); and (vi) physical commodity large swaps trader reporting ("Large Trader Reporting"). The Guidance divides these requirements into two categories. The first category of Entity-Level Requirements includes capital adequacy, chief compliance officer, risk management, and swap data recordkeeping under Commission regulations 23.201 and 23.203 (except certain aspects of swap data recordkeeping relating to complaints and sales materials) ("First Category"). The second category of Entity-Level Requirements includes SDR Reporting, certain aspects of swap data recordkeeping relating to complaints and

marketing and sales materials under Commission regulations 23.201(b)(3) and 23.201(b)(4) and Large Trader Reporting ("Second Category").

The Transaction-Level Requirements include: (i) required clearing and swap processing; (ii) margining (and segregation) for uncleared swaps; (iii) mandatory trade execution; (iv) swap trading relationship documentation; (v) portfolio reconciliation and compression; (vi) real-time public reporting; (vii) trade confirmation; (viii) daily trading records; and (ix) external business conduct standards. The Guidance classifies all Transaction-Level Requirements except external business conduct standards as "Category A" Transaction-Level Requirements, and classifies external business conduct standards as "Category B" Transaction-Level Requirements.

## Substituted Compliance

Consistent with CEA section 2(i) and comity principles, the Commission's policy generally is that a non-U.S. swap dealer or MSP may comply with a foreign jurisdiction's law and regulations in lieu of compliance with the attendant Entity-Level Requirements and/or Transaction-Level Requirements under the CEA and Commission regulations.

In issuing comparability determinations (which will be based on whether a foreign regime's requirements are comparable to and as comprehensive as the corollary area(s) of regulatory obligations encompassed by the Entity- and Transaction-Level Requirements), the Commission will rely upon an outcomes-based approach to determine whether foreign requirements achieve the same regulatory objectives as the Dodd-Frank Act. The Commission's comparability determinations may be made on a requirement-by-requirement basis, rather than on the basis of the foreign regime as a whole. The foreign regulations must be comparable and comprehensive but not necessarily identical.

Each of the 13 categories of requirements – five Entity-level, eight Transaction-level – would be subject to separate determinations of substituted compliance. Substituted compliance does not apply to Large Trader Reporting, i.e., non-U.S. persons that are subject to part 20 would comply with it in the same way that U.S. persons comply. In addition, substituted compliance is generally not expected to be applicable with regard to the Category B Transaction-Level Requirements (i.e., the external business conduct standards).

## Application of Entity-Level Requirements and Transaction-Level Requirements

Generally, U.S. swap dealers and U.S. MSPs should comply in full with all of the Entity-Level Requirements, without substituted compliance available. Non-U.S. swap dealers and non-U.S. MSPs should also comply in full with all of the Entity-Level Requirements, except that substituted compliance would generally be available for certain Entity-Level Requirements

U.S. swap dealers and U.S. MSPs should generally comply in full with Category A Transaction-Level Requirements, but a foreign branch of a U.S. bank that is a swap dealer or an MSP would generally be eligible for substituted compliance with respect to Category A Transaction-Level Requirements for swaps with certain counterparties. In addition, under certain circumstances, where a swap between the foreign branch of a U.S. swap dealer or U.S. MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate) takes place in a foreign jurisdiction other than Australia, Canada, the European Union, Hong Kong, Japan, or Switzerland, the Commission's policy is to interpret CEA section 2(i) so that counterparties may comply with the Transaction-Level Requirements applicable to entities domiciled or doing business in the foreign jurisdiction where the foreign branch is located, rather than the Transaction-Level Requirements that would otherwise be applicable.

Under a limited exception, even where there is not a comparable foreign regulatory regime, where a swap is between the foreign branch of a U.S. bank that is swap dealer or MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate), the foreign branch may comply with the transaction-level requirements of the foreign jurisdiction in which it is domiciled or doing business if the aggregate notional value of the swaps of all foreign branches in such countries does not exceed 5% of the aggregate notional value of all the swaps of the U.S. swap dealer, and the U.S.

person maintains records with supporting information, as well as to identify, define, and address any significant risk that may arise from the non-application of the Transaction-Level Requirements. Where a swap between the foreign branch of a U.S. swap dealer or U.S. MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate) takes place in a foreign jurisdiction other than Australia, Canada, the European Union, Hong Kong, Japan, or Switzerland, the counterparties generally may comply only with the transaction-level requirements in the foreign jurisdiction where the foreign branch is located if the aggregate notional value of all the swaps of the U.S. swap dealer's foreign branches in such countries does not exceed 5% of the aggregate notional value of all of the swaps of the U.S. swap dealer, and the U.S. person maintains records with supporting information for the 5% limit and to identify, define, and address any significant risk that may arise from the non-application of the Transaction-Level Requirements."

Non-U.S. swap dealers and non-U.S. MSPs should generally comply with Category A Transaction-Level Requirements for swaps with U.S. persons and with guaranteed or conduit affiliates, but would generally be eligible for substituted compliance for swaps with certain counterparties. Where a swap is executed anonymously between any non-U.S. person, whether a swap dealer or an MSP, and a U.S. person (or a non-U.S. person that is guaranteed by a U.S. person or conduit affiliate) on a registered DCM or SEF and cleared, the non-U.S. person will be considered to have satisfied each of the eight Category A Transaction-Level Requirements that apply to such a swap transaction as a consequence of being so executed on a DCM or SEF.

Generally, where a swap is with a U.S. swap dealer or U.S. MSP (including an affiliate of a non-U.S. person), the Commission's policy is that the parties to the swap should be subject to the Category B Transaction-Level Requirements in full, regardless of whether the counterparty is a U.S. person or a non-U.S. person, without substituted compliance available. On the other hand, where a swap is with a non-U.S. swap dealer or non-U.S. MSP (including an affiliate of a U.S. person), the Commission's policy is that the Category B Transaction-Level Requirements should apply only if the counterparty to the swap is a U.S. person.

## Application of the CEA's Swap Provisions and Commission Regulations to Market Participants That are Not Registered As a Swap Dealer or MSP

Five of the CEA's swaps provisions and Commission regulations promulgated thereunder – namely, those relating to required clearing, trade execution, real-time public reporting, Large Trader Reporting, SDR Reporting, and swap data recordkeeping (collectively, the Non-Registrant Requirements) – also apply to persons or counterparties other than a swap dealer or MSP.

With regard to swaps between two non-registrants where one (or both) of the counterparties to the swap is a U.S. person (including an affiliate of a non-U.S. person), the parties to the swap generally would be expected to comply with the Non-Registrant Requirements. Where both parties are non-U.S. persons, the Non-Registrant Requirements generally will not apply. Additionally, where both parties to a swap are non-registrants and non-U.S. persons but both are also guaranteed or conduit affiliates, the Non-Registrant Requirements will apply to the swap (although substituted compliance will generally be possible for such requirements).

Appendices C through F to the Guidance, which outline the application of the Entity-Level Requirements and Transaction-Level Requirements in various circumstances, are attached. Such Appendices should be read in conjunction with the rest of the Guidance.

**Appendix C – Application of the Entity-Level Requirements to Swap Dealers and MSPs\***

| | |
|---|---|
| **U.S. Swap Dealer or MSP (including an affiliate of a non-U.S. person). Also applies when acting through a foreign branch.**[1] | Apply |
| **Non-U.S. Swap Dealer or MSP (including an affiliate of a U.S. person).** | First Category:[2] Substituted Compliance<br><br>Second Category:[3] Apply for U.S. counterparties; Substituted Compliance for SDR reporting with non-U.S. counterparties that are not guaranteed or conduit affiliates; Substituted compliance (except for Large Trader Reporting) with non-U.S. counterparties[4] |

**\*The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.**

[1]  Both Entity-Level and Transaction-Level Requirements are the ultimate responsibilities of the U.S.-based swap dealer or MSP.

[2]  First Category is capital adequacy, Chief Compliance Officer, risk management, and swap data recordkeeping (except Commission regulations 23.201(b)(3) and (4)).

[3]  Second Category is SDR Reporting, certain aspects of swap data recordkeeping relating to complaints and marketing and sales materials (Commission regulations 23.201(b)(3) and (4)), and Large Trader Reporting.

[4]  Substituted compliance does not apply to Large Trader Reporting, i.e., non-U.S. persons that are subject to part 20 would comply with it in the same way that U.S. persons comply. With respect to the SDR Reporting requirement, the Commission may make substituted compliance available only if direct access to swap data stored at a foreign trade repository is provided to the Commission.

**Appendix D – Application of the Category A Transaction-Level Requirements to Swap Dealers and MSPs***

(Category A includes (1) Clearing and swap processing; (2) Margining and segregation for uncleared swaps; (3) Trade Execution; (4) Swap trading relationship documentation; (5) Portfolio reconciliation and compression; (6) Real-time public reporting; (7) Trade confirmation; and (8) Daily trading records).

| | U.S. Person (other than Foreign Branch of U.S. Bank that is a Swap Dealer or MSP) | Foreign Branch of U.S. Bank that is a Swap Dealer or MSP | Non-U.S. Person Guaranteed by, or Affiliate Conduit[1] of, a U.S. Person | Non-U.S. Person **Not** Guaranteed by, and Not an Affiliate Conduit[1] of, a U.S. Person |
|---|---|---|---|---|
| **U.S. Swap Dealer or MSP (including an affiliate of a non-U.S. person)** | Apply | Apply | Apply | Apply |
| **Foreign Branch of U.S. Bank that is a Swap Dealer or MSP** | Apply | Substituted Compliance | Substituted Compliance[2 3] | Substituted Compliance[2] |
| **Non-U.S. Swap Dealer or MSP (including an affiliate of a U.S. person)** | Apply | Substituted Compliance | Substituted Compliance[3] | Do Not Apply |

***The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.**

[1] Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person. Other facts and circumstances also may be relevant.

[2] Under a limited exception, even where there is not a comparable foreign regulatory regime, where a swap is between the foreign branch of a U.S. bank that is swap dealer or MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate), the foreign branch may comply with the transaction-level requirements of the foreign jurisdiction in which it is domiciled or doing business if the aggregate notional value of the swaps of all foreign branches in such countries does not exceed 5% of the aggregate notional value of all the swaps of the U.S. swap dealer, and the U.S. person maintains records with supporting information, as well as to identify, define, and address any significant risk that may arise from the non-application of the Transaction-Level Requirements. Where a swap between the foreign branch of a U.S. swap dealer or U.S. MSP and a non-U.S. person (that is not a guaranteed or conduit affiliate) takes place in a foreign jurisdiction other than Australia, Canada, the European Union, Hong Kong, Japan, or Switzerland, the counterparties generally may comply only with the transaction-level requirements in the foreign jurisdiction where the foreign branch is located if the aggregate notional value of all the swaps of the U.S. swap dealer's foreign branches in such countries does not exceed 5% of the aggregate notional value of all of the swaps of the U.S. swap dealer, and the U.S. person maintains records with supporting information for the 5% limit and to identify, define, and address any significant risk that may arise from the non-application of the Transaction-Level Requirements."

**Notes**:
[1] The swap trading relationship documentation requirement applies to all transactions with registered swap dealers and MSPs.

[2] Participation in multilateral portfolio compression exercises is mandatory for dealer to dealer trades.

# Appendix E – Application of the Category B Transaction-Level Requirements to Swap Dealers and MSPs*

(Category B is External Business Conduct Standards).

| | U.S. Person (other than Foreign Branch of U.S. Bank that is a Swap Dealer or MSP) | Foreign Branch of U.S. Bank that is a Swap Dealer or MSP | Non-U.S. Person Guaranteed by, or Affiliate Conduit[1] of, a U.S. Person | Non-U.S. Person <u>Not</u> Guaranteed by, and Not an Affiliate Conduit[1] of, a U.S. Person |
|---|---|---|---|---|
| **U.S. Swap Dealer or MSP (including an affiliate of a non-U.S. person)** | Apply | Apply | Apply | Apply |
| **U.S. Swap Dealer or MSP (when it solicits and negotiates through a foreign subsidiary or affiliate)** | Apply | Do Not Apply | Do Not Apply | Do Not Apply |
| **Foreign Branch of U.S. Bank that is a Swap Dealer or MSP** | Apply | Do Not Apply | Do Not Apply | Do Not Apply |
| **Non-U.S. Swap Dealer or MSP (including an affiliate of a U.S. person)** | Apply | Do Not Apply | Do Not Apply | Do Not Apply |

**\*The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.**

---

[1] Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such

swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person. Other facts and circumstances also may be relevant.

**Appendix F – Application of Certain Entity-Level and Transaction-Level Requirements to Non-Swap Dealer/Non-MSP Market Participants\***

(The relevant Dodd-Frank requirements are those relating to: clearing, trade execution, real-time public reporting, Large Trader Reporting, SDR Reporting and swap data recordkeeping).

| | U.S. Person (including an affiliate of non-U.S. person) | Non-U.S. Person Guaranteed by, or Affiliate Conduit[1] of, a U.S. Person | Non-U.S. Person <u>Not</u> Guaranteed by, or Affiliate Conduit[1] of, by U.S. Person |
|---|---|---|---|
| **U.S. Person (including an affiliate of non-U.S. person)** | Apply | Apply | Apply |
| **Non-U.S. Person Guaranteed by, or Affiliate Conduit[1] of, a U.S. person** | Apply | Substituted Compliance[2 3 4] | Do Not Apply[4] |
| **Non-U.S. Person <u>Not</u> Guaranteed by, or Affiliate Conduit[1] of, U.S. Person** | Apply | Do Not Apply[4] | Do Not Apply[4] |

**\*The Appendices to the Guidance should be read in conjunction with the rest of the Guidance.**

[1]   Factors that are relevant to the consideration of whether a non-U.S. person is an "affiliate conduit" include whether: (i) the non-U.S. person is majority-owned, directly or indirectly, by a U.S. person; (ii) the non-U.S. person controls, is controlled by, or is under common control with the U.S. person; (iii) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with such U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates; and (iv) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person.  Other facts and circumstances also may be relevant.

[2]   Substituted compliance does not apply to Large Trader Reporting, <u>i.e.</u>, non-U.S. persons that are subject to part 20 would comply with it in the same way that U.S. persons comply.  With respect to the SDR Reporting requirement, the Commission may permit substituted compliance only if direct access to swap data stored at a foreign trade repository is provided to the Commission.

[3] Large Trader Reporting rules apply if one or both of the counterparties is a non-U.S. clearing member or is otherwise a non-U.S. person that is subject to Large Trader Reporting.

# EXHIBIT F

Page 1

- - - - - - - - - - - - - - - x

In Re.                              :

      BINANCE (A8632)          :

- - - - - - - - - - - - - - - x

                    Thursday, February 10, 2022

Virtual Deposition of:

                    MATTHEW PRICE

called for oral examination by counsel for Commodity

Futures Trading Commission, pursuant to notice, via

virtual means, before Christy McGee, CSR, of Capital

Reporting Company, a Veritext company, a Notary

Public in and for the Commonwealth of Virginia,

beginning at 10:16 a.m., when were present on behalf

of the respective parties:

Page 2

1          A P P E A R A N C E
2  On behalf of CFTC:
3      CANDICE HAAN, ESQUIRE
       ELIZABETH PENDLETON, ESQUIRE
4      JOSEPH PLATT, ESQUIRE
       Commodity Futures Trading Commission
5      525 W. Monroe Street
       Suite 1100
6      Chicago, Illinois 60661
       (312) 596-0629
7      chaan@cftc.gov
8
9  On behalf of Binance:
10     RICHARD GRIME, ESQUIRE
       STEPHANIE BROOKER, ESQUIRE
11     M. KENDALL DAY, ESQUIRE
       TORY ROBERTS, ESQUIRE
12     Gibson Dunn
       1050 Connecticut Avenue, NW
13     Washington, D.C. 20036
       (202) 955-8500
14     rgrime@gibsondunn.com
15
16
17 ALSO PRESENT:
18     Ray Lavko
19     Joe Patrick
20              * * * * *
21
22

Page 3

1          C O N T E N T S
2
3  EXAMINATION BY:                    PAGE
4      Counsel for CFTC (Haan)      4/76/197
       Counsel for CFTC (Platt)      107/220
5      Counsel for CFTC (Pendleton)   73/252
6
7
8  DEPOSITION EXHIBITS:   *           PAGE
9   1  Subpoena with Attachments          31
    2  Binance Holdings Ltd. Structure Chart   37
10  3  Leader's Daily Meeting Invite      89
    4  Binance Academy Article           108
11  5  Binance Blog Article              129
    6  Binance Margin Trading Guide      130
12  7  Binance Margin Account Agreement     147
    8  Bitcoin Options Launch Blog       167
13  9  Futures Official Launch Blog      172
    10 Perpetual Futures Launch Date Blog    173
14  11 Binance Futures Service Agreement  174
    12 Cross Collateral Service Agreement 176
15  13 Liquidation Protocol           183
    14 Transaction Data Dictionary      223
16  15 Short Message Report           244
17
18
19
20
21
22     (* Exhibits attached to transcript.)

Page 4

1          P R O C E E D I N G S
2      (Attorneys stipulate to the remote
3      swearing of the witness.)
4  WHEREUPON,
5              MATTHEW PRICE
6  called as a witness, and having been first duly
7  sworn, was examined and testified as follows:
8          EXAMINATION BY COUNSEL FOR CFTC
9  BY MS. HAAN:
10     Q    Good morning, Mr. Price.  My name is Candy
11 Haan and I am an attorney with the CFTC.
12         Before we begin, I'm going to get on the
13 record the confirmation from Counsel to the witness
14 proceeding with remote testimony today.  On behalf
15 of the CFTC, I confirm that we agree to take this
16 testimony remotely and for you to be sworn in
17 remotely.
18         Mr. Grime, would you do the same?
19         MR. GRIME:  Sure.  This is Richard Grime
20 representing Matt Price.  We also consent to the
21 testimony being done remotely and the witness being
22 sworn in remotely.

Page 5

1  BY MS. HAAN:
2      Q    Thank you.  Mr. Price, would you state and
3  spell your full name for the record, please.
4      A    Sure.  First name is Matthew,
5  M-A-T-T-H-E-W, middle name is Joseph, J-O-S-E-P-H,
6  last name is Price, P-R-I-C-E.
7      Q    Thank you.  This is the investigative
8  corporate testimony of Binance Holding Limited taken
9  via video conference, and today's date is February
10 10, 2022.  Mr. Price, as I mentioned before, my
11 name is Candy Haan.  I am one of the trial attorneys
12 responsible for this matter.  With me today from the
13 CFTC are my colleagues Jody Platt, also a trial
14 attorney with the CFTC; Liz Pendleton, chief trial
15 attorney with the CFTC; Joe Patrick, senior
16 investigator with the CFTC; and Ray Lavko, paralegal
17 with the CFTC.  You will see their names and perhaps
18 images on the screen in front of you.
19         Mr. Price, I see you're represented by
20 counsel today.  Will you identify your counsel.
21     A    Richard Grime, Tory Roberts, Kendall Day
22 and Stephanie -- from Gibson Dunn.

Page 30

1  have your phone near you; is that right?
2        THE WITNESS:  It is here.  I can move it
3  if you'd like.  It's not turned on.
4        MS. PENDLETON:  Okay.  As long as you --
5        THE WITNESS:  I moved it further away.
6        MS. PENDLETON:  No, that's great.  And
7  we'll just ask you at the end of the deposition to
8  confirm that you haven't looked at your phone and
9  you haven't looked at any other documents besides
10  what we discussed during your testimony.
11        THE WITNESS:  Sure.  No, I moved my phone.
12  It's just, you know, I do have young kids.
13        MS. PENDLETON:  I understand, and we
14  appreciate that.  So thank you.
15        And thanks, Candy.
16  BY MS. HAAN:
17     Q   Mr. Price, you were describing to me the
18  steps you took to prepare for today, and we've gone
19  through the interviews that you participated in.
20  You reviewed information on the Binance website, and
21  then you told me you participated in sessions with
22  counsel.  Do I have that right?

Page 31

1     A   That sounds about right.
2     Q   Aside from materials that you may have
3  received from your lawyers, did you collect any
4  documents to prepare yourself for the testimony
5  today?
6     A   I guess define "collect" documents.  I'm a
7  bit confused.
8     Q   Did you retrieve any documents on your
9  own?
10     A   No.  I only viewed essentially videos, web
11  pages, FAQs on the publicly available Binance.com
12  website.
13        MS. HAAN:  Okay.  We are going to attempt
14  this Exhibit Share.  We'll see how it goes.  I am
15  going to introduce our first exhibit.  Let me know
16  if and when you can see it.
17        (Deposition Exhibit Number 1
18        was marked for identification.)
19        MR. GRIME:  Candy, is this going to come
20  across on screen share or do you want us to go to
21  the Exhibit Share function?
22        MS. HAAN:  It's going to be on the Exhibit

Page 32

1  Share function so that's like a separate --
2        THE WITNESS:  Okay.  I see -- in the
3  Marked Exhibit folder, I see a document Exhibit
4  0001.
5  BY MS. HAAN:
6     Q   Okay.  That's correct.  And are you able
7  to click on it or does it just appear?
8     A   I just clicked on it.  Okay.  I see it,
9  yes.
10     Q   Okay.  Mr. Price, have you seen this
11  document before?  Feel free to scroll through it, of
12  course.
13     A   Bear with me.  I'm scrolling through.
14     Q   Take your time.  Understood.
15     A   This does look familiar, yes.
16     Q   This is the subpoena that the CFTC sent to
17  Binance for testimony.  Do you understand that?
18     A   Yes.
19     Q   And are you prepared today to testify
20  regarding Topics 1, 2, 7, 9, 11, and 12?  They
21  appear on pages 7 through 9 if you want to confirm.
22     A   You said 1, 2, 7, 9, 11, and 12?

Page 33

1     Q   Yes.
2     A   Yes.
3     Q   And, Mr. Price, we're about to get into
4  the substance, and I'll say we understand there's
5  a lot to cover today and it's quite possible that
6  notwithstanding your efforts at preparation there
7  will be questions that we ask you that you may not
8  know the answers to.  We don't want you to guess.
9  We don't want you to.  Your lawyers don't want you
10  to.  And so if and when we get to something that you
11  don't know, we will navigate that with Mr. Grime,
12  and we'd prefer for you to say you don't know rather
13  than take a guess.  Okay?
14     A   Got it.
15     Q   Okay.  We're going to begin with Topic 1.
16  And we can leave the subpoena up here, but if you
17  find it distracting, I can also take it down or you
18  can take it down.  It's just there for you.
19     A   No, it's fine.  Leave it up.
20     Q   Mr. Price, what entity or entities operate
21  the Binance.com platform?
22     A   I guess define what you mean "Binance.com

Page 34

1  platform."
2      Q   Well, what does Binance.com platform mean
3  to you?
4      A   To me, it's the -- what I would refer to
5  as the Binance ecosystem, so the exchange and the
6  various products associated with that.
7      Q   Okay.  Let's start with the exchange.
8  What entity or entities operate the Binance.com
9  exchange?
10     A   So it's several different entities.  I
11  think it may be helpful to -- is there a particular
12  chart or reference?  It may be helpful to walk
13  through that, and I can explain to you my
14  understanding of the entities.
15     Q   Do you have a chart, an organizational
16  chart, that you want to provide in order to explain
17  it?
18     A   My understanding is you have a chart that
19  has been provided by counsel, and I think that
20  perhaps may be easier for me to reference to explain
21  to you what is what, at least in my understanding.
22     Q   Okay.  I will show you the chart, but

Page 35

1  before we put it up, what is your understanding of
2  the structure of organization -- of entities that is
3  running the .com platform?
4      A   So my understanding separating -- and I'm
5  sure you'll probably get to it, but my understanding
6  is there are several different entities that run
7  various pieces of the exchange.  My understanding is
8  that the reason for that is that certain
9  jurisdictions require a physical presence or because
10  of a regulatory requirement there may be a
11  requirement to have an entity handle a certain
12  aspect of the business in that jurisdiction.
13     Q   Are you able to provide an exhaustive list
14  of all the entities that play a role in operating
15  the Binance.com exchange?
16     A   Not off the top of my head.  However, I'm
17  sure I could ask for that.
18     Q   You referenced an organizational chart
19  that had previously been provided to us.  Do you
20  know if that's an exhaustive list of all the
21  entities that play a role in operating the
22  Binance.com platform?

Page 36

1      A   As far as I know, yes.
2      Q   As far as you know?  You're testifying on
3  behalf of the company, so it's important that we
4  understand what that means when you say "as far as I
5  know."
6      A   Right.  I mean, that's the chart I've seen
7  and that's the chart that I understand.  I mean, I
8  am aware there are other entities that don't -- you
9  know, for example, Binance Charities.  It is a
10  Binance company, but it really isn't part of the
11  exchange.  I guess I'm just slightly confused at
12  what -- what is your definition?  I just want to
13  make sure I'm kind of answering the question that
14  you're asking me.
15     Q   Sure.  I'm referring only to entities that
16  play a role in operating the .com exchange, not
17  other entities that may play some peripheral role
18  like a charitable organization.
19     A   Okay.
20     Q   Is that understood?
21     A   Yes.
22     Q   Okay.  Let's put up -- I'm going to --

Page 37

1          (Deposition Exhibit Number 2
2          was marked for identification.)
3  BY MS. HAAN:
4      Q   Let me know when you're able to view what
5  I've marked as Exhibit 2.
6      A   Okay.  I see it.
7      Q   You see it?
8      A   I do.
9      Q   Do you recognize this document?
10     A   Are you referring to -- I see Binance
11  Holdings LTD Structure Chart.
12     Q   Correct, it's marked as Exhibit 2 in the
13  bottom right-hand corner.
14     A   Yes.
15     Q   Okay.  Do you recognize Exhibit 2?
16     A   I do.
17     Q   What is it?
18     A   The first page is the Binance Holdings
19  Limited Structure Chart.
20     Q   Okay.  And what does that mean to you?
21     A   My understanding is that Binance Holdings
22  Limited is the company that holds trademarks,

1 intellectual property, as well as the staffing and
2 intercompany agreement with Binance, but it doesn't
3 own the actual platform.
4    Q    Okay.  Does it have a role in operating
5 the platform?
6    A    I guess define "role."  I mean, again, my
7 understanding is that it holds the IT, trademarks,
8 and those things.  I guess if you could just
9 distinguish for me exactly what you mean by "role."
10    Q    What IP does Binance Holdings Limited
11 hold?
12    A    The trademark of Binance.com, the -- my
13 understanding would be kind of technology, I guess.
14 I don't want to speculate beyond, but my
15 understanding is trademarks and things of that
16 nature.
17    Q    When you say "technology," what are you
18 referring to?
19    A    My understanding would be -- and, again, I
20 don't want to -- I am by no means an expert in
21 corporate organization of any sort of how that would
22 work, but, you know, my understanding would be, you

1 know, the original idea behind Binance, things of
2 that nature.
3    Q    Who would be able to provide us with an
4 exhaustive list of the intellectual property being
5 held by Binance Holdings Limited?
6    A    I would guess the Legal department.  I'm
7 not certain.
8    Q    Who leads the Legal department?
9    A    Right now it's Hon Ng.
10    Q    Can you please spell that.
11    A    First name is H-O-N, last name is N-G.
12    Q    And who could provide us with a
13 comprehensive understanding of the technology you
14 referenced that is held by Binance Holdings Limited.
15    A    I speculate Hon.  I'm not certain.
16    Q    So if I understand your testimony so far,
17 Binance Holdings Limited holds intellectual property
18 for the .com platform; is that correct?
19    A    That is my understanding, yes.
20    Q    Does Binance Holdings Limited do anything
21 else?
22    A    Not that I'm aware of.

1    Q    And is Changpeng Zhao the ultimate owner
2 of Binance Holdings Limited?
3    A    I believe he is, yes.
4    Q    I began this line of questioning by asking
5 you about the entities that operate the .com
6 platform, and you referenced this chart.  When I put
7 up the chart, you told me Binance Holdings Limited
8 does not, in fact, participate in the operation of
9 the platform.  So can you point to me where on this
10 document I might find the entities that do operate
11 the .com platform?
12    A    Sure.  The second page of the document you
13 listed.
14    Q    I have now put up page 2 of Exhibit 2.  Is
15 this what you're referring to?
16    A    It is.
17    Q    Okay.  And please explain to me what these
18 entities do to operate the .com platform?
19    A    So my understanding is they -- they are
20 kind of the group of entities that make up the
21 various lines of business.  And as I stated earlier,
22 you know, some are in certain locations due to

1 licensing reasons.  Others handle contracts or
2 vendor contracts.  Others handle employee contracts,
3 things of that nature.
4    Q    If I understood your testimony correctly,
5 the entities that appear on page 2 of Exhibit 2 make
6 up the entities -- they're the group of entities
7 that make up the lines of business for the operation
8 of the .com platform.  They hold the licenses for
9 the .com platform.  They hold the contracts for
10 certain reasons for the .com platform and employment
11 contracts for the .com platform.  Is that accurate?
12    A    That's my understanding.
13    Q    Is there anything else that these entities
14 do to contribute to the operation of the .com
15 platform?
16        MR. GRIME:  Candy, can I just make sure
17 we're clear as to the timing of this, and the timing
18 of the answer, and to the timing of the creation of
19 this chart?
20        MS. HAAN:  Sure.
21        MR. GRIME:  So is the question --
22        MS. HAAN:  Matt, what do you understand --

Page 42

1    MS. PENDLETON: Why don't we let the
2  witness clarify.
3    MR. GRIME: That's fine.
4    THE WITNESS: My understanding is this is
5  as of now, as of today.
6  BY MS. HAAN:
7    Q   When did this -- when you say "as of
8  today," from what point in time does this chart
9  accurately reflect the entities that operate the
10 .com platform?
11   A   I believe as of summer of 2021. I don't
12 remember the exact date.
13   Q   And prior to the summer of 2021, what were
14 the entities that operated the .com platform?
15   A   I wouldn't want to speculate. I don't
16 know. This is what I've seen.
17   Q   Who would know?
18   A   Again, I can speculate general counsel.
19 I'm just not certain.
20   Q   Would Changpeng Zhao know?
21   A   Presumably.
22   Q   Do you understand that the scope of the

Page 43

1  subpoena that was sent to you goes back to 2017?
2    A   That's what the document says, yes.
3    Q   Okay. But you are not prepared to talk
4  about the corporate organization at any time prior
5  to 2021?
6    A   I mean, I can talk based on what I see.
7    Q   What do you see?
8    A   The chart you're referencing.
9    Q   But you told me this is only accurate as
10 of summer 2021.
11   A   I mean, that's just my understanding. I'm
12 trying to provide you with information. I'm not
13 sure.
14   Q   And I'm not trying to being adversarial.
15 I'm trying to be very clear on what you can and
16 cannot testify about. And you can testify as to
17 this chart which reflects the entity, the entities
18 that operate the .com platform from the summer of
19 2021 forward, correct?
20   A   Yep.
21   Q   Okay. And you are not prepared to provide
22 testimony for the time period of 2017 through the

Page 44

1  summer of 2021, correct?
2    A   I mean, I want to make sure I'm going off
3  of accurate information and documentation so, you
4  know --
5    Q   It's just a yes or no. Is that correct?
6    A   Yeah.
7    Q   And the individuals who may be able to
8  testify to that time period are the general counsel
9  and Changpeng Zhao, correct?
10   A   Yeah, that's my assumption. I was not an
11 employee of the company at the time, so I assume so.
12   Q   Okay. Let's turn to the time period of
13 summer of 2021 to the present. Does page 2 of
14 Exhibit 2 represent a complete and exhaustive list
15 of the entities that operate the .com platform?
16   A   That is my understanding.
17   Q   Okay. Which one of those entities
18 operates the matching engine?
19   A   I believe it's Binance Capital Management,
20 but if you allow me a second to confirm. I do have
21 those with me.
22   Q   Okay.

Page 45

1    A   I believe Capital Management.
2    Q   You believe Binance Capital Management is
3  the entity that operates the matching engine?
4    A   I think so, yes.
5    Q   Okay. Where is Binance Capital Management
6  located?
7    A   I believe it's headquartered or registered
8  in the British Virgin Islands.
9    Q   What is the basis of your belief that
10 Binance Capital Management operate the trade
11 matching engine?
12   A   Based on some of the information I've
13 reviewed, I think that's where it is. I mean,
14 again, I think it's probably important to state that
15 Binance as a start-up grew very rapidly and as a
16 part of that created many entities, so there are
17 quite a few. But, again, that is my understanding.
18   Q   When I asked you where Binance Capital
19 Management was located, you provided me with the
20 location of registration. Do you know where Binance
21 Capital Management is headquartered?
22   A   I guess you have to define "headquartered"

1  to me. The company is a largely distributed remote
2  organization. So I don't know exactly how you
3  define that. Is that like a physical building
4  sitting somewhere running with employees creating it
5  or what are you referring to?
6      Q   Is there a physical building running
7  somewhere with employees?
8      A   There are a few, yes.
9      Q   Where are they?
10     A   Bear with me. I have a couple of them I
11  can get you the locations of. I just want to make
12  sure I cover exhaustively the locations. Currently,
13  there are locations -- a location in Singapore, a
14  location in Malta, a location in Taiwan, Columbia,
15  United Arab Emirates, excuse me, France, Canada, and
16  the United Kingdom.
17     Q   And are there employees in any of the
18  locations that you just mentioned to me?
19     A   As far as I know, yes. I think that's --
20     Q   In each of those --
21     A   I'm sorry. Go ahead.
22     Q   I apologize. I spoke over you. You said

1  yes. Does that mean there are employees in each of
2  those locations?
3      A   Yes. I think it's important to
4  understand, again, with the remote environment, when
5  you say employees, yes, employees do go there.
6  However, I don't know for certain whether they go
7  every day or once a week, things of that nature.
8  But, yes, there are offices and there are employees
9  that have access to and do go to those locations.
10     Q   And are there employees that work for
11  Binance Capital Management that are not located in
12  Singapore, Malta, Taiwan, Columbia, UAE, France
13  Canada, or the UK?
14     A   It is possible. Again, the company has
15  employees in approximately 80 countries, so they
16  may. I don't know. I don't know that I can say
17  definitively that everyone works in Singapore, if
18  you understand the kind of distributed nature of the
19  employee work force.
20     Q   And how could one determine where
21  employees who work for Binance Capital Management
22  are located?

1      A   I mean, in reviewing employment records.
2  I guess define what you mean by working for Capital
3  Management. Like, their employment contract is
4  under there?
5      Q   That would certainly be one way, yes.
6      A   Yeah. I mean, I think that's probably the
7  primary way. I do have employment numbers. I don't
8  know if I can in the next minute pull that out for
9  you, but that would be -- we'd be able to do that.
10     Q   You are capable of identifying which
11  employees are employees of Binance Capital
12  Management; is that correct?
13     A   I could, yes. I don't know that I could
14  name everyone, but at least give you numbers.
15     Q   Fair enough. Where is the team that
16  manages Binance Capital Management located?
17     A   My understanding is Singapore. However,
18  again, you know, given the distributed nature, I
19  mean, people work from everywhere, myself included.
20     Q   Who are the members of the team that
21  manage Binance Capital Management?
22     A   I mean, it's ultimately Changpeng Zhao.

1  Give me a second. I want to make sure I give you
2  the right name.
3      So, again, for Binance Capital Management,
4  CZ is the director of that company and 100 percent
5  owner.
6      Q   Are there other directors?
7      A   He is the only director.
8      Q   Are there other members of a management
9  team?
10     A   I guess I don't want to speculate because,
11  again, part of the issue is the employment contract
12  is based on -- you know, for example, my employment
13  contract is with Deel, even though I work for
14  Binance, but that's who pays the salary. So what I
15  don't want to do is incorrectly state that, you
16  know, an individual works for Binance Capital
17  Management when their employment contract may be
18  somewhere else but they work on the product. I
19  think it may be more helpful to kind of more discuss
20  the products or roles of executives. That may
21  better inform kind of what you're looking for, if I
22  understand.

Page 50

1    Q   Sure. I appreciate it. Who are the
2  individuals who perform work on behalf of Binance
3  Capital Management at the leadership level?
4    A   I mean, again, CZ is the ultimate leader.
5  You know, the management team certainly would, and I
6  can provide names. But, again -- just to clarify,
7  again, there are the numerous entities, and as
8  they're interconnected, you know, it's quite
9  possible that an executive oversees roles or touches
10  on seven or eight different entities. I just don't
11  want to, you know, kind of box it in. I just want
12  to make sure I can answer your question accurately.
13    Q   Sure. Who is the management team you
14  referenced for Binance Capital Management?
15    A   Well, I don't feel comfortable saying
16  Binance Capital Management. I view it as
17  Binance.com as a whole. Again, with the various
18  entities, I kind of look at that -- I can give you
19  the entire management team, what I view as the
20  senior team, but I don't feel comfortable saying
21  that Individual A is Binance Capital Management,
22  whereas Individual B is Binance Asia Services.

Page 51

1  Again, I think it's more helpful -- I can certainly
2  identify everyone and their roles. I just don't
3  know that it's -- that I can -- I don't want to give
4  you an inaccurate answer as to this individual is
5  Entity A and this individual is Entity B, et cetera.
6    Q   I appreciate that. Is it more accurate
7  for you to provide the names of the management team
8  for the entire Binance ecosystem, as you defined it,
9  to be the .com platform and the product offered?
10    A   I think that would be, yes.
11    Q   And is that because all of these entities
12  are working together and so it would be impossible
13  to discern which management team member was
14  performing work on behalf of which of those entities
15  and not?
16    A   I mean, impossible? I don't know if --
17  that's kind of a loaded word, but I guess it would
18  be, I would say, more inappropriate given the -- you
19  know, there are multiple entities, but they all kind
20  of eventually make up the larger organization.
21    Q   Okay. Why don't you provide me with the
22  management team for the Binance.com ecosystem?

Page 52

1    A   Okay. The way I view it is essentially
2  what we kind of define as teams or business units,
3  and I think that may be a helpful way to understand
4  it. And I can kind of talk through those. So is
5  there -- do you want me to start anywhere in
6  particular or --
7    Q   Before you do, let's set a date parameter
8  on this. You are providing present-day information
9  with respect to the management team, correct?
10    A   Yes.
11    Q   And this information is accurate as of
12  when?
13    A   As of today. Again, some of these
14  employees have been with the company for a while and
15  some are newer just as the company is being created.
16    Q   Okay. As you walk through the management
17  team, I will ask you if you're aware of predecessors
18  and/or the management team's tenure, just to give
19  you a heads-up. So let's walk through the
20  management team, and you can start -- my preference
21  would be to go in hierarchical order. So we start
22  at the top with Changpeng Zhao, correct?

Page 53

1    A   Yes.
2    Q   And Changpeng Zhao holds what role within
3  the Binance ecosystem?
4    A   He's the CEO.
5    Q   And has he been the CEO of the inception
6  of Binance to the present?
7    A   I believe so, yes.
8    Q   Okay. Who is next?
9    A   So, again, I think it's important to
10  understand that the company has what is termed
11  internally as a very flat organizational structure
12  in that, you know, it's not like obviously coming
13  from a government background where special agent in
14  charge, ASAC, supervisor. It's much more CZ and
15  kind of a flat organization. So I can provide them
16  by kind of what they're responsible for. I just
17  don't know that it's accurate to say -- what I
18  wouldn't want to do is provide an incorrect
19  hierarchy because it's not really -- it's much more
20  of a flat kind of organization.
21    Q   Okay.
22    A   So as I understand what I would define as

14 (Pages 50 - 53)

1  is clear going forward, when you use the term
2  "Binance," are you referring to -- what are you
3  referring to?
4      A   Binance, Binance.com. The Binance
5  ecosystem.
6      Q   And the Binance ecosystem includes what
7  entities?
8      A   The approximately 20 or so entities, the
9  functional -- that are on Exhibit 2, the Functional
10 Structure Chart of Binance Operators.
11     Q   When I use the term "Binance," Mr. Price,
12 going forward, I am adopting your definition of
13 Binance and referring to the Binance operators that
14 are on page 2 of Exhibit 2. Okay?
15     A   Got it.
16     Q   I'm going to ask you some more questions
17 about the organization of Binance. Is there a board
18 of directors?
19     A   Not now. Not currently.
20     Q   Had there previously been?
21     A   I don't believe so.
22     Q   Does Binance have any leadership

1  committees?
2      A   I guess, what do you mean by "leadership
3  committees"?
4      Q   What does that term mean to you?
5      A   I honestly don't know. That's why I'm
6  asking you to explain.
7      Q   Does Binance have an audit committee?
8      A   There's an Internal Audit department or
9  team, I guess.
10     Q   And is there a committee that reviews the
11 Internal Audit team's work.
12     A   I mean, I guess back up. Are you -- it
13 seems to me that you're trying to -- and I don't
14 want to put words in your mouth, but I guess
15 essentially apply a U.S. corporate model with an
16 audit committee and things like that. Am I correct?
17     Q   I'm just asking if they have an audit
18 committee, the company has an audit committee. I'm
19 not implying anything.
20     A   Well, I just want to make sure I answer
21 accurately. And, again, as I mentioned, it's a very
22 flat organization. So there is an Audit team that

1  does internal audits. I don't know if there's a set
2  committee specifically called the audit committee,
3  but they are reviewed by the Audit team and
4  ultimately reported up to CZ at the end of the day.
5      Q   What does the Internal Audit team do?
6      A   My understanding is both, you know, what I
7  would call kind of internal control audits. You
8  know, security check things, access audits of that
9  nature, as well as basically general internal audit
10 functions that run the entire gamut.
11     Q   Who leads that team?
12     A   Bear with me. So, again, I've only really
13 dealt with the internal auditors themselves with the
14 very limited overlap of investigation. So I don't
15 know off the top of my head. I apologize.
16     Q   It's okay.
17     A   I know there's a team I've dealt with.
18 Individuals on the team, very limited capacity, so I
19 don't remember exactly who runs the Audit team.
20     Q   Are you aware of any committees or groups
21 of leaders that are dedicated to the leadership of
22 Binance?

1      A   Dedicated? What do you mean "dedicated to
2  the leadership"?
3      Q   Are there any committees, teams, groups
4  that are comprised of Binance leadership that you're
5  aware of?
6      A   I mean, I don't know that -- I mean, the
7  leadership teams are the individuals I referred to.
8      Q   Any other teams?
9      A   I don't believe so. I mean, that's what
10 I -- that's what I would consider the leadership
11 team. You know, CZ and the individuals that --
12 those are the ones that kind of run, manage, lead
13 the functional kind of teams.
14     Q   That's helpful. I'm going to put up a
15 document that may help us talk through this. Give
16 me just one second.
17         (Deposition Exhibit Number 3
18         was marked for identification.)
19 BY MS. HAAN:
20     Q   Let me know when you're able to see what
21 I've marked as Exhibit 3.
22     A   Okay. I see it.

# EXHIBIT G

# BINANCE HOLDINGS LTD.
# STRUCTURE CHART

*Each of these entities is (directly or indirectly) wholly or majority owned by Changpeng Zhao*



* Binance Holdings Ltd. holds the majority of Binance.com's trademarks and domains and enters into certain related vendor, staffing, and intercompany agreements. It does not own or operate the Binance.com virtual asset trading platform (the "Binance Exchange"), and nor does it hold any of the entities that operate the Binance Exchange. Binance Holdings Ltd. does not have any subsidiaries.

**Exhibit 0002**
2/10/2022

# FUNCTIONAL STRUCTURE CHART
# OF BINANCE OPERATORS*

Binance Operators include the entities that are related to exchange trading activity, including fiat on-ramps/off-ramps. This chart also includes local exchanges (even though those local exchanges are local and, therefore, not technically operating on the .com platform). Binance Operators do not include entities that are involved in creating coins (e.g., stablecoins) or unrelated to exchange trading activity. This chart reflects the entities that either hold the entities in the relevant jurisdiction or that functionally operate the exchange.

> *Each of these entities is (directly or indirectly) wholly or majority owned by Changpeng Zhao*



* In addition to the operators above, there are other entities in existence that are involved in other parts of the business and may share the Binance name. It is our understanding that these other Binance entities do not functionally operate the Binance Exchange.

** Binance (Jersey) Ltd. (Jersey) and Binance Ltd. (Korea) are currently in the process of being wound down.

# EXHIBIT H

# GROUP STRUCTURE

**UBO**

**EMEA Vertical** | **APAC Vertical** | **LATAM Vertical** | **Shared Services Vertical** | **Fiat Vertical** | **Derivatives Vertical** | **Investments Vertical**

## EMEA Vertical

100% — Binance Holdings (IE) Limited (IE)

**Digital Asset / Virtual Asset Service Providers (DASPs / VASPs)**

- 100% Binance Exchange (GIB) Limited (GI)
- 100% Binance Exchange (IE) Limited (IE)
- 100% Binance France S.A.S.*
- 100% BSCN Technology Services (Germany) GmbH
- 100% Binance Austria GmbH
- 100% Binance Switzerland Exchange AG
- 100% Moon Tech Spain Sociedad Limitada (ES)*
- 100% Binance Nederland B.V.
- 100% Binance FZE (UAE - DWTCA)**
- 100% Binance (AD) Limited (Abu Dhabi)***
- 99% Binance Bahrain BSC(c) (BH)****
- 100% Binance Italy S.R.L. (IT)*
- 100% Bn Teknoloji Anonim Siketi (TR)#
- 100% Binance Nordics AB (Sweden)
- 100% Binance Canada Capital Markets Inc
- 100% Binance Futures Limited
- 100% Binance Poland sp. zoo*
- 100% Binance Cyprus Limited*
- 100% *Future EMEA Local Platforms*

**(Traditional) Securities Licensees**

- 100% Binance Markets Limited (UK)
- 100% *Future Securities Licensees*

- 1% Binance Bahrain WLL — 100%
- 100% *Bn Technology Services LLC (Ukraine)*
- Binance Canada Ltd
- Binance Canada Holdings Ltd
- Binance Canada Asset Management Inc.

## APAC Vertical

100% — Binance (AP) Holdings Limited (IE)

- 100% BN KZ Technologies Limited (KZ)
- 100% InvestbyBit Limited (NZ)
- 95% InvestbyBit Pty Ltd (AU)##*****
- 1% Oztures Trading Pty Ltd (AU)******
- 1% BWIN Pte Ltd (SG) - entity for Korean JV
- *Future APAC Local Exchanges*

## LATAM Vertical

100% — Binance Holdings UY SA (UY)

- 100% Binance Exchange UY SA (UY)
- 100% Binance Colombia SAS (CO)
- 99% Bmex Techfin (MX)
- 99% Cuenta de Peru Fintech Express SRL (PE)
- 99% BN Argentina SA (AR)
- 100% Chile Fintech Express SpA (CL)
- 100% *Future LATAM Local Exchanges*

## Shared Services Vertical

100% — Binance (Services) Holdings Limited (IE)

**IP (trademarks & domain):**
- 100% Binance Holdings Limited (KY)

**Tech (development, assets & services) [and Group Data Controller]:**
- 100% Binance Technologies Limited (IE)
- *Tech Hub Intragroup Service Providers (see slide 2)*

**Shared Services Providers for**
- Platform Ops, Custody Ops, Risk & Compliance
- MKT / BD / Growth
- Legal / Finance / HR /CS

- 100% Binance (Switzerland) AG (CH)
- 100% Binance Europe Services Limited (MT)
- 100% *Ops Hub Intragroup Service Providers (see slide 2)*

## Fiat Vertical

100% — Bifinity UAB (LT)*

- Bifinity SAS (France)
- Bifinity UK Limited (UK)
- 100% BN Software Systems (PTY) Ltd (South Africa)
- 100% Bifinity Georgia LLC (Georgia)

## Derivatives Vertical

100% — Brickhouse Trading Limited (SC)

## Investments Vertical

100% — Binance Capital Management Co., Ltd. (BVI)

- *Acquisitions & Investments (PortCos) (see slide 3)*

## Institutional Custody Vertical

100% — Binance Institutional Holdings Limited (IE)

- 100% Block Technologies Pte. Ltd. (SG)
- 100% Binance Institutional SG Pte. Ltd. (SG)

---

**Colour Key:**
Green - Incorporated and in intended vertical
Purple – Incorporated and transfer to intended vertical in progress

**Notes:**
* Currently has a VASP registration (AMLD5 equivalent) for virtual asset exchange and custody. Operating (or can operate) an exchange.
** Final MVP License issued by the Dubai Virtual Assets Regulatory Authority.
*** In-principle approval for an ADGM Financial Services Permission (FSP) for broker-dealer and as custodian.
**** Category 4 Crypto-Asset Service Provider; 1% held by Binance Bahrain WLL (BH).
***** Digital Currency Exchange (DCE) provider registration.
****** Australian Financial Services (AFS) licence to operate as a crypto derivatives broker/dealer.
# Operating an exchange and signing with payment services / EMI licensees. No existing crypto licensing/registration regime.
## The remaining 5% are owned by 3 individuals, the original JV partners.

Last Updated October 18, 2022

# GROUP STRUCTURE

**Shared Services Providers (Tech Hubs / Ops Hubs / Product Hubs)**

UBO

100%

**Binance (Services) Holdings Limited** *(IE)*

---

100% — Binance Holdings Limited (KY969)
Holds registered IP (trademarks & domain) & Tech/Ops Hub (incl CS, Legal and Compliance)

100% — Binance Technologies Limited *(IE)*
Holds primary proprietary tech assets (exchange and products)

100% — Binance Technology Services FZE *(UAE-DWTC)*
To hold futures matching engine IP

100% — Blitz Capital Management Pte. Ltd. *(SGO)*
Holdco for some non-Binance named entities

100% — Binance Blockchain Technology Development Pte. Ltd. *(SGO)*
Reserved for Tech/Ops Hub (currently no personnel)

100% — Binance Asia Services Pte. Ltd. *(SG27)*
Tech/Ops Hub including Compliance & Admin / Back Office Service Provider

100% — Hash Muse Pte. Ltd. *(SG0)*
Key Product: NFT

100% — Tornado Singapore Technologies Pte. Ltd. *(SG1)*
Key Product: EaaS / Cloud exchange (regulated and 3Ps) & customization services

100% — Binance Investments Co.,Ltd. *(SEY)*
Key Product: Launchpad

100% — B Fintech Servicos De Tecnologia Ltda *(BR2)*
Ops Hub (incl CS and "Operations")

100% — Binance Europe Services Limited *(Malta)*
Ops Hub (incl CS and "Operations")

100% — Binance Europe Limited *(UK34)*
Ops Hub (incl Marketing and "Operations")

100% — Binance Switzerland AG *(CHO)*
Ops Hub (no personnel; Compliance vendor contracts; sponsorship agreements)

---

100% — Binary Technology Development Pte. Ltd. *(SG225)*
Tech/Ops Hub (incl "Operations" and Technology)

100% — Unison Technologies (Middle East) Limited *(AE)*
Tech / Ops Hub

100% — Winind Technologies (Middle East) Limited *(AE - DIFC)\**
Tech/Ops Hub

100% — Inforad Technologies W.L.L *(Bahrain)*
Tech/Ops Hub

100% — Unison Technologies FZE *(AE – DWTCA)*
Tech / Ops Hub

100% — Binance Global Sourcing Limited *(Ireland)\**
Group procurement entity

100% — Binance Token Club Co. Ltd. *(BVI)*
Key Product: EaaS / Cloud exchange for unregulated Binance entities

100% — TravelbyBit Pty Ltd *(Australia)* - 40% minority shareholders

60%

---

100% — BPLAY Holdings Group Limited *(SC956)*
Tech/Ops Hub (including Technology and CS)

100% — Broadchains Fintech Pte. Ltd. *(SG21)*
Tech/Ops Hub (incl Technology and Compliance)

100% — Prime Link Management Limited *(BVI)*
Tech/Ops Hub

100% — Biniverse S.A.S. *(FR)*
Tech Hub

100% — Blockone Technologies (Middle East) Limited *(AE - DIFC)\**
Tech Hub

100% — Optic Technologies (Middle East) Limited *(AE - DIFC)\**
Tech Hub

100% — B Fintech Ukraine Limited *(Ukraine)*
Tech / Opd Hub

100% — Chaintecs Consulting Singapore Pte. Ltd. *(SG93)*
Tech/Ops Hub (incl Compliance and "Operations")

100% — Ality Technologies DE LLC *(US)*
U.S. Tech / Ops Hub

100% — BFTMG UAB *(LT)*
Key Product: Fan Tokens

100% — Arclight Technologies Limited *(BC, Canada)*
Tech Hub

100% — Ality Technologies Limited *(Alberta, Canada)*
Tech Hub

100% — InCyber AU Technologies Pty Ltd *(Australia)*
Tech Hub

---

100% — 1305887 B.C. LTD. *(Canada)*
Fiat on ramp

---

Vizor Technology B.V. *(Netherlands)*

Gotechniques Technologies S.R.L. *(Romania)*

Infozone Technologies Pte. Ltd *(SG)*

Cyber Technologies Limited s.r.o. *(CZ)*

Enigma Technologies GmbH *(Germany)*

Montage Technologies Limited *(Ireland)*

Cyper Technologies Sdn Bhd *(Malaysia)*

Titan Technologies, Unipessoal, LDA.*(Portugal)*

Tech Hubs

Last Updated October 18, 2022



**GROUP STRUCTURE**

**Portfolio / JV Entities / Other entities**

Investments Vertical

UBO

- Binance Capital Management Co., Ltd. *(BVI)* — 100%
- Key Vision Development Ltd. *(Seychelles) - fiat on ramp* — 100%
- B Analytics Holdings Ltd *(BVI) - investment / holding company* — 100%
- Cyber Shaft Enterprise Limited *(BVI) - investment / holding company* — 100%
- Merit Peak Limited *(BVI) - spot OTC trader* — 100%
- Sigma Chain AG *(Switzerland) - spot liquidity provider* — 100%

Bifinity Brasil Intermediação Ltda. *(Brazil) - fiat on/off ramp* — 100%

**Under Binance Capital Management Co., Ltd.:**
- B-CMC Holdings Inc. *(Caymans) - Holding company for CoinMarketCap Group* — 100%
- Toko Alpha Pte Ltd *(Singapore) - Indonesian digital exchange - 40% minority investors* — 60%
  - PT. Aset Digital Berkat *(Indonesia) - service company for the Indonesian exchange* — 49%
- BV Investment Holdings Co. *(Caymans) - investment / holding company* — 100%
  - BV Management *(Singapore) Pte Ltd - investment / holding company* — 100%

**Under Cyber Shaft Enterprise Limited:**
- Binance Technology & Innovation Nigeria Ltd *(Nigeria) - JV company [20% minority investor]* — 80%
- Bundle Wallet Technology Ltd *(Seychelles)* — 100%
  - Bundle Wallet Technology Ltd *(Nigeria)* — 100%

**Under B-CMC Holdings Inc. (Caymans):**
- BV Management *(Singapore) Pte Ltd - holding company* — 100%
  - B-CMC Holdings Inc. *(Delaware) - holding company* — 100%
    - CoinMarketCap LLC *(New York) - cryptocurrency data services* — 100%
      - CoinMarketCap OpCo LLC *(Delaware) - cryptocurrency data services* — 100%
        - CoinMarketCap Pte Ltd *(Singapore) - cryptocurrency data services* — 100%
          - Hashtag Software Pte Ltd *(Singapore) - technology services* — 100%

**Swipe entities:**
- Swipewallet Inc. *(Philippines) - Binance Pay* — 100%
  - SwipeWallet AU Pty Ltd *(Australia) - Binance Card* — 100%
- Swipe Technologies Pte. Ltd.*(Singapore) - Binance Card* — 100%
  - Swipe Brasil Intermediação Ltda. *(Brazil) - Binance Card* — 100%
- SwipeWallet Holding Ltd *(Ireland) - future holding company for Binance Card* — 100%
  - SwipeWallet Technology UK Ltd *(UK) - Binance Card* — 100%
  - SwipeWallet EU OU *(Estonia) - Binance Card* — 100%

Last Updated October 18, 2022



# EXHIBIT I



Justin V. Shur
MoloLamken LLP
600 New Hampshire Avenue
Washington, D.C. 20037
T: 202.556.2005
F: 202.536.2015
jshur@mololamken.com
www.mololamken.com

April 21, 2022

Candice Haan
U.S. Commodity Futures Trading Commission
525 W. Monroe Street
Chicago, IL 60661
chaan@cftc.gov

BY EMAIL

Re:     *Purported Service of Subpoenas on Samuel Lim,* ███████████
        ████

Dear Ms. Haan,

We received your April 19, 2022, email purporting to serve subpoenas ad testificandum from the CFTC on our clients, Samuel Lim, ███████████████████████ via email to MoloLamken LLP. Because your email does not constitute proper service, our clients will not appear in response to the subpoenas. As we told you during our call on April 18, 2022, we are not authorized to accept service and will not accept service of these subpoenas on behalf of our clients.[1]

You state, in your April 19 email, that we did not provide you with the "legal basis" for not accepting service of the subpoenas. We have no obligation to do so. But, as the CFTC's own Enforcement Manual recognizes, U.S. counsel may well refuse to accept service of a subpoena directed at a person found outside the CFTC's jurisdiction. *See* CFTC Enforcement Manual § 8.2.2. That is precisely the case here.

The CFTC's recognition that counsel may refuse to accept service under those circumstances makes good sense. It is not reasonable to expect counsel to waive proper service of subpoenas

---

[1] Your April 19 email seems to suggest that the CFTC can circumvent the need to properly serve a subpoena based on our refusal to consent to you contacting our clients directly. Not so. If the CFTC is of the view that it can properly effectuate personal service of these subpoenas and attempts to do so, it does not need our consent. But it would be improper for the CFTC to contact our clients without our consent for any other purpose, including to attempt to secure a waiver of proper service. To be clear, we do not provide such consent.

where, as here, there is a genuine question as to the CFTC's authority to properly effectuate service and compel foreign nationals residing abroad to appear before the CFTC and provide testimony.[2]

Unless and until the CFTC effectuates proper service, our clients will not appear in response to these subpoenas.

Sincerely,

Justin V. Shur
Megan Cunniff Church
Walter H. Hawes IV

---

[2] Despite our request, to date, you have not identified any authority that would permit service of an enforceable subpoena on foreign nationals residing abroad. On our April 18 call, you pointed to the general grant of investigatory subpoena authority found in 17 C.F.R. § 11.4. But that provision fails to account for the unique circumstances associated with serving a foreign national living abroad with compulsory process.