**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>v.<br><br>Changpeng Zhao, Binance Holdings Limited, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited, and Samuel Lim,<br><br>Defendants. | Case No. 1:23-cv-1887<br><br>Judge Manish S. Shah |

# REPLY IN SUPPORT OF BINANCE HOLDINGS LIMITED, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, AND CHANGPENG ZHAO'S MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 3

I. The Complaint Should Be Dismissed for Lack of Personal Jurisdiction ........................ 3

A. No Specific Personal Jurisdiction as to Any Foreign Binance Entity ........................ 3

B. No Specific Personal Jurisdiction as to Mr. Zhao ........................ 4

II. Counts I-VI Should Be Dismissed as Impermissibly Extraterritorial ........................ 6

A. The Domestic Board of Trade Portion of Count I, the Non-Swaps Portions of Counts II-IV, and All of Counts V and VI Fail Because the CFTC Does Not Allege a Domestic Application of the Relevant Statutes ........................ 7

B. The Swaps-Related Claims Under Counts II-IV Fail to Allege a "Direct and Significant Effect" on U.S. Commerce Under Section 2(i)(1) ........................ 12

III. The CFTC's Anti-Evasion Claim Fails ........................ 18

A. The CFTC Alleges No Relevant Swaps Provisions or Evasive Conduct ........................ 18

B. The CFTC Fails to Allege Willful Evasion of a Known Legal Obligation ........................ 20

C. The Complaint Specifies No Swaps to Which Its Anti-Evasion Claim Relates ........................ 22

IV. Count I Should Be Dismissed Because the CFTC Fails to Allege That Defendants Operated a Board of Trade Subject to Registration ........................ 22

V. Counts III, V, and VI Should Be Dismissed Because Binance.com Is Not Adequately Alleged to Be a Futures Commission Merchant ........................ 24

A. The CFTC Does Not Allege That Binance.com Solicits or Accepts Orders Within the Meaning of an FCM ........................ 24

B. The CFTC Fails to Allege That Binance.com Served as a Counterparty in Leveraged Retail Commodity Transactions ........................ 26

CONCLUSION ........................................................................................................ 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
600 U.S. 412 (2023)....................7, 9, 10

*Agbaniyaka v. Dep't of the Treasury*,
484 F. App'x 545 (Fed. Cir. 2012)....................21

*Ala. Educ. Ass'n v. State Superintendent of Educ.*,
746 F.3d 1135 (11th Cir. 2014)....................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7, 10, 26

*B & G Towing, LLC v. City of Detroit*,
828 F. App'x 263 (6th Cir. 2020)....................21

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015)....................12

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021)....................12

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................5

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
334 F.3d 390 (4th Cir. 2003)....................5

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000)....................6

*CFTC v. Garofalo*,
2010 WL 11245430 (N.D. Ill. Dec. 21, 2010)....................9, 11

*CFTC v. Gorman*,
2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023)....................12, 14, 15

*CFTC v. TFS-ICAP, LLC*,
415 F. Supp. 3d 371 (S.D.N.Y. 2019)....................4

*Choi v. Tower Rsch. Cap. LLC*,
890 F.3d 60 (2d Cir. 2018)....................8

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) .......... 9

*Clay v. Blue Hackle N. Am., LLC*,
907 F. Supp. 2d 85 (D.D.C. 2012) .......... 3

*EEOC v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991) .......... 13

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 18, 21

*FEC v. Cruz*,
142 S. Ct. 1638 (2022) .......... 11

*Fletcher v. Bogucki*,
2021 WL 4477968 (N.D. Ill. Sept. 30, 2021) .......... 12

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) .......... 9

*Gerk v. CL Med. SARL*,
2015 WL 7777236 (C.D. Ill. Dec. 2, 2015) .......... 6

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......... 13

*United States ex rel. Hanna v. City of Chi.*,
834 F.3d 775 (7th Cir. 2016) .......... 19

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
935 F.3d 211 (4th Cir. 2019) .......... 6

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) .......... 17

*In re Honey Transshipping Litig.*,
87 F. Supp. 3d 855 (N.D. Ill. 2015) .......... 3

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*,
2017 WL 1349175 (D. Del. Apr. 10, 2017) .......... 12

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .......... 21, 22

*MCI WorldCom Network Servs., Inc. v. Atlas Excavating, Inc.*,
2006 WL 3542332 (N.D. Ill. Dec. 6, 2006) .......... 18

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)....21

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007)....13, 16

*Minn-Chem, Inc. v. Agrium Inc.*,
683 F.3d 845 (7th Cir. 2012)....13, 14

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)....7, 8, 10

*Nestlé USA, Inc. v. Doe*,
141 S. Ct. 1931 (2021)....7

*NFIB v. Sebelius*,
567 U.S. 519 (2012)....16

*Pable v. Chi. Transit Auth.*,
2023 WL 2333414 (N.D. Ill. Mar. 2, 2023)....5

*Page v. Democratic Nat'l Comm.*,
2020 WL 8125551 (N.D. Ill. Aug. 17, 2020), *aff'd as modified*, 2 F.4th 630 (7th Cir. 2021) .3

*Perez v. Bath & Body Works, LLC*,
2022 WL 2756670 (N.D. Cal. July 14, 2022)....3

*Prime Int'l Trading Ltd. v. BP PLC.*,
937 F.3d 94 (2d Cir. 2019)....9, 10

*RAR, Inc. v. Turner Diesel, Ltd.*,
107 F.3d 1272 (7th Cir. 1997)....4

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992)....14

*Riverdale Plating & Heat Treating, LLC v. Andre Corp.*,
2015 WL 5921896 (N.D. Ill. Oct. 9, 2015)....6

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016)....7

*Robinson v. DeVry Educ. Grp., Inc.*,
2018 WL 828050 (N.D. Ill. Feb. 12, 2018)....7

*Taha v. Int'l Bhd. of Teamsters, Local 781*,
947 F.3d 464 (7th Cir. 2020)....5, 26, 27

*Tamari v. Bache & Co. (Lebanon) S.A.L.*,
730 F.2d 1103 (7th Cir. 1984) ....................................................................................11

*United States v. Collins*,
685 F.3d 651 (7th Cir. 2012) ..................................................................................18, 19

*United States v. Pomerantz*,
2017 WL 4418572 (W.D. Wash. Oct. 5, 2017) ...........................................................21

*United States v. Reed*,
2022 WL 597180 (S.D.N.Y. Feb. 28, 2022)..................................................................25

*United States v. Sumeru*,
449 F. App'x 617 (9th Cir. 2011) ..................................................................................10

*Walden v. Fiore*,
571 U.S. 277 (2014)...........................................................................................................4

*Wickard v. Filburn*,
317 U.S. 111 (1942)...................................................................................................14, 16

**Statutes**

7 U.S.C. § 1a(28)(A)(i)(I) ....................................................................................24

7 U.S.C. § 1a(28)(A)(i)(I)(aa)..............................................................................24

7 U.S.C. § 1a(28)(A)(i)(I)(bb) .............................................................................26

7 U.S.C. § 1a(47) ..................................................................................................22

7 U.S.C. § 1a(47)(B)(i) ........................................................................................11

7 U.S.C. § 1a(50) ....................................................................................................8

7 U.S.C. § 2(i) ........................................................................................... *passim*

7 U.S.C. § 2(i)(1) ....................................................................................... *passim*

7 U.S.C. § 2(i)(2) ............................................................................................11, 18

7 U.S.C. § 2(a)(1)(A) ...............................................................................................8

7 U.S.C. § 2(c)(2)(D)(i) ..........................................................................................24

7 U.S.C. § 6.....................................................................................................2, 11, 23

7 U.S.C. § 6(a) ..............................................................................................7, 8, 23

7 U.S.C. § 6(b)(1)(A) ........ 17, 23

7 U.S.C. § 6c ........ 9

7 U.S.C. § 7b-3(a)(1) ........ 8

7 U.S.C. § 12a(8) ........ 7

31 U.S.C. § 5318(l) ........ 7

**Regulations**

17 C.F.R. Part 37 ........ 26

17 C.F.R. Part 38 ........ 26

17 C.F.R. Part 48 ........ 26

17 C.F.R. § 1.3 ........ 24

17 C.F.R. § 1.6(a) ........ 19, 20

17 C.F.R. § 3.4(a) ........ 26

17 C.F.R. § 23.23(a)(23)(i) ........ 17

17 C.F.R. § 37.8 ........ 26

17 C.F.R. § 38.9 ........ 26

**Administrative Materials**

Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924 (Sept. 14, 2020) ........ 13

Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45,292 (July 26, 2013) ........ 16

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, Final Rule, 77 Fed. Reg. 48,208 (Aug. 13, 2012) ........ 20, 21

**Rules**

Fed. R. Civ. P. 9(b) ........ 18, 21

Fed. R. Civ. P. 12(b)(2) ........ 6

Fed. R. Civ. P. 12(b)(6) ........ 7

**Other Authorities**

CFTC Glossary, Self-Regulatory Organization, https://bit.ly/F0PXCIY ......................................25

**GLOSSARY OF TERMS USED**

The following terms are used in this memorandum:

| Term | Definition |
|---|---|
| AML | Anti-Money Laundering |
| CEA | Commodity Exchange Act |
| CFTC | Commodity Futures Trading Commission |
| DCM | Designated contract market |
| FBOT | Foreign board of trade |
| FCM | Futures commission merchant |
| Foreign Binance Entities | Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited |
| KYC | Know Your Customer |
| SEF | Swap execution facility |
| Subtitle A | Subtitle A of the Wall Street Transparency and Accountability Act of 2010 |
| VPN | Virtual private network |

## INTRODUCTION

The CFTC's response brief underscores the pleading deficiencies in the Complaint and confirms that the agency's overreaching theories of its jurisdiction are unfounded. The agency seeks in this action to regulate foreign individuals and corporations that reside and operate *outside* the United States, while ignoring the carefully delineated provisions in the Commodity Exchange Act ("CEA") setting forth narrow exceptions to the fundamental legal principle that U.S. law governs domestically but does not control the world. Congress did not make the CFTC the world's derivatives police, and the Court should reject the agency's effort to expand its territorial reach beyond what is permitted by the law.

In its response, the CFTC relies on new and broad arguments that would allow it to regulate any activity in cryptocurrency (or other assets) related to a derivatives product anywhere on the globe. For example, the CFTC attempts to support its unprecedented positions by relying on expansive and inapposite Commerce Clause jurisprudence, and by inventing a new definition of what it means to be a "U.S. person" that would render geographic limits on the CFTC's authority meaningless. In a telling example of its effort to expand its power overseas, the CFTC argues that foreign businesses must satisfy the agency's "Know-Your-Customer" requirements in order to *avoid* having to comply with those same requirements. That circular logic, like the CFTC's position in the case as a whole, would allow the agency to impose regulatory burdens on companies over which it has no authority.

In place of pleading the necessary elements for its claims, the CFTC resorts to incendiary language about the Foreign Binance Entities' and Mr. Zhao's supposed conduct. But despite the CFTC's apparent dislike of these non-U.S. Defendants, this is not a case about any harm to users of Binance.com, and the agency has not alleged any such harm. This is a case about (deficient) allegations of failure to comply with registration requirements and certain compliance rules. The

Court should reject the CFTC's effort to use its attack on the non-U.S. Defendants in this case as a Trojan horse in order to achieve worldwide regulatory reach—which would have consequences far beyond this case and not intended by Congress.

Against this backdrop, the Complaint should be dismissed for multiple reasons:

*First*, all claims should be dismissed for lack of personal jurisdiction. The Complaint improperly treats the entity defendants as a single unit, and it does not allege that Mr. Zhao personally has the requisite contacts with the United States. The CFTC's arguments in response do not overcome these fundamental failings.

*Second*, the domestic board of trade portion of Count I, and all claims under Counts II through VI, should be dismissed as impermissibly extraterritorial. For those claims that relate to products other than swaps, the Supreme Court's decision in *Morrison* and its progeny require domestic transactions or conduct that the agency has failed to allege. For swaps-related claims, the CEA requires a "direct and significant" effect on U.S. commerce or a violation of the CFTC's anti-evasion rule, both of which are lacking here.

*Third*, the anti-evasion claim itself (Count VII) fails not simply because the CFTC is pursuing a novel theory, but because the Complaint does not plead necessary elements under the plain language of 7 U.S.C. § 2(i) and Regulation 1.6. Nothing in the CFTC's response overcomes its failure to allege evasion of any swaps-related provisions or any willful evasion of a known legal obligation under such provisions.

*Fourth*, Count I should be dismissed for the additional reason that the Complaint fails to allege the basic attributes of a board of trade, whether domestic or foreign, under 7 U.S.C. § 6.

*Finally*, Counts III, V, and VI should be dismissed on the additional ground that the Complaint fails to plead that Binance.com is a futures commission merchant.

## ARGUMENT[1]

## I. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

### A. No Specific Personal Jurisdiction as to Any Foreign Binance Entity

The CFTC acknowledges that the Complaint "lumps" the Foreign Binance Entities together. Resp. at 24. That is fatal to its jurisdictional arguments. *See* Mot. at 10 (citing cases requiring jurisdiction be pled as to each individual defendant). The CFTC asserts that it can treat the Foreign Binance Entities as one because they are engaged in a "common enterprise." Resp. at 24. While the CFTC cites two cases for the proposition that one corporate entity may be liable for another's acts when they operate a common enterprise, *id.*, the CFTC does not cite a single case recognizing that as a theory for personal jurisdiction. In fact, courts have refused to attribute one defendant's contacts to another for jurisdictional purposes, even when a plaintiff alleges a common enterprise. *See, e.g.*, *Perez v. Bath & Body Works, LLC*, 2022 WL 2756670, at *9 (N.D. Cal. July 14, 2022); *Clay v. Blue Hackle N. Am., LLC*, 907 F. Supp. 2d 85, 89 (D.D.C. 2012).

The CFTC's attempt to analogize to personal jurisdiction cases involving conspiracies fares no better. *See* Resp. at 26 n.21. The Complaint has not alleged a conspiracy (a term not found in the CEA), and in any event, "[c]onspiracy theories of jurisdiction are not viable under Seventh Circuit and Illinois law." *See Page v. Democratic Nat'l Comm.*, 2020 WL 8125551, at *3 (N.D. Ill. Aug. 17, 2020), *aff'd as modified*, 2 F.4th 630 (7th Cir. 2021); *see also In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 873 (N.D. Ill. 2015) (similar).

---

[1] Defendants' brief in support of their motion to dismiss (ECF No. 59) is cited herein as "Mot. at __." The CFTC's response to Defendants' motion to dismiss (ECF No. 62) is cited herein as "Resp. at __." For a table summarizing the grounds on which each count of the Complaint should be dismissed, see Appendix A included at the end of this brief.

### B. No Specific Personal Jurisdiction as to Mr. Zhao

With respect to Mr. Zhao, the CFTC concedes that alleged control person status alone cannot establish personal jurisdiction, *see* Resp. at 32 n.25, and that each defendant's purported contacts with the forum must be assessed individually. *See* Mot. at 10, 14 (citing cases). Its residual arguments cannot salvage its deficient pleadings.

*First*, the CFTC points to two instances in which Mr. Zhao allegedly communicated with U.S. users, Resp. at 30-31, both of which happened *before* Binance.com ever offered the derivatives products at issue. The CFTC asserts that the timing is irrelevant for purposes of assessing personal jurisdiction. *Id.* at 31. But the CFTC's own cited authority makes clear that "contacts may so predate the conduct at issue that they do not relate to the suit." *CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 384 n.7 (S.D.N.Y. 2019). Because Mr. Zhao's alleged contacts with U.S. users occurred more than a year before Binance.com allegedly started offering derivatives at all, such contacts do not "relate to" the claims asserted and do not support specific jurisdiction. *See also RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277-78 (7th Cir. 1997) (defendants must be able to conduct business with "confiden[ce] that transactions in one context will not come back to haunt them unexpectedly in another"). That Mr. Zhao allegedly "participated in industry events in the United States," Resp. at 30, is likewise unrelated to, and therefore cannot support jurisdiction for, the agency's registration-based claims. *See* Mot. at 15.

*Second*, apparently recognizing its failure to allege sufficient "suit-related" contacts that create "a substantial connection" with the United States, *Walden v. Fiore*, 571 U.S. 277, 283-84 & n.6 (2014), the CFTC asks the Court to infer that the few instances of alleged communications with alleged U.S. users are not "random" because Mr. Zhao was "act[ing] through others." Resp. at 30 n.23 (conceding "a lack of additional allegations reflecting direct contact between Zhao and his U.S. VIP customers"). But the unspecified contacts of unnamed "others" cannot be imputed

to Mr. Zhao for jurisdictional purposes, particularly when the Complaint makes no effort to allege the requisite agency relationship.[2]

*Third*, the CFTC resorts to allegations that Mr. Zhao "gave his personal credit card to U.S.-based Amazon Web Services . . . which provides Binance with its content distribution network." Resp. at 31. This argument would broadly confer specific jurisdiction over foreign businesses that contract with U.S. service providers, as well as over owners and CEOs of such foreign businesses. In addition to threatening the ability of U.S. service providers like Amazon to compete for global customers, this argument is not the law—contracting with a forum resident does not "establish sufficient minimum contacts" with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985); *see also Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 401 (4th Cir. 2003) (use of in-forum web hosting company insufficient to support specific personal jurisdiction).

*Finally*, the CFTC's conclusory argument that the Foreign Binance Entities' contacts should be imputed to Mr. Zhao on the basis of an agency relationship also fails. Resp. at 31-33. The Complaint never alleges that any Foreign Binance Entity acted as Mr. Zhao's agent to justify such imputation—in fact, it only alleges the opposite, that Mr. Zhao is an agent of "Binance." *See, e.g.*, Compl. ¶¶ 194, 201, 208. Allegations that Mr. Zhao managed and directed aspects of the Foreign Binance Entities' operations, at most, suggest that he acted as a control person, a theory distinct from that of agency and which the CFTC concedes is insufficient to support personal

[2] Contrary to the CFTC's assertions (Resp. at 30 n.23), that an auto-delete feature was allegedly turned on for Mr. Zhao's phone provides no basis to infer that he personally had communications with U.S. users. *See Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (allegations must go beyond "sheer speculation, bald assertions, and unsupported conclusory statements" for a "court to draw [a] reasonable inference") (citation omitted). The CFTC's reliance on *Pable v. Chicago Transit Authority*, 2023 WL 2333414, at *26-30 (N.D. Ill. Mar. 2, 2023), is misplaced because spoliation, even if alleged, is not a pleading doctrine that can overcome deficient jurisdictional allegations.

jurisdiction. Mot. at 12-13 (citing cases). The CFTC cannot repurpose these allegations via a theory of agency. *See Riverdale Plating & Heat Treating, LLC v. Andre Corp.*, 2015 WL 5921896, at *4 (N.D. Ill. Oct. 9, 2015) (position as corporation's president and sole shareholder was "not enough" for personal jurisdiction based on "a corporation's contacts with a State").[3]

## II. COUNTS I-VI SHOULD BE DISMISSED AS IMPERMISSIBLY EXTRATERRITORIAL

The CFTC fails to allege that Counts I through VI have the requisite connection to the United States, so they should be dismissed as impermissibly extraterritorial. The only relevant CEA provision that arguably contains a "clear statement" of extraterritorial application is 7 U.S.C. § 2(i). Section 2(i) extends provisions of the CEA "relating to swaps" and "enacted by" Subtitle A of the Wall Street Transparency and Accountability Act of 2010 ("Subtitle A") extraterritorially only if one of two conditions are met: (i) the alleged activities "have a direct and significant connection with activities in, or effect on, commerce of the United States"; or (ii) the alleged activities violate Regulation 1.6.[4] As Defendants explained in their Motion, (i) the domestic board of trade portion of Count I and the claims that are unrelated to swaps should be dismissed because the CFTC fails to allege a domestic transaction or conduct; and (ii) the swaps-related claims should be dismissed because the CFTC fails to satisfy Section 2(i). Mot. at 16-18.

---

[3] The Court should disregard the CFTC's suggestion that it might later seek to move for jurisdictional discovery. Resp. at 35. The request is premature absent an actual motion from the CFTC, which it has not made, and Defendants reserve all of their arguments with respect to any subsequently filed motion. In any event, such a motion would be unavailing for the same reason the Complaint should be dismissed—failure to establish "a colorable or prima facie showing of personal jurisdiction." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (evaluating Rule 12(b)(2) motion to dismiss and request for jurisdictional discovery under the same standard); *see also Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019) (prima facie standard for personal jurisdiction resembles the plausibility standard under *Iqbal* and *Twombly*); *Gerk v. CL Med. SARL*, 2015 WL 7777236, at *4 (C.D. Ill. Dec. 2, 2015) (similar).

[4] The CFTC does not dispute that the jurisdictional reach of its control person claims extends no further than that of their underlying claims. *See* Mot. at 16 n.14.

The CFTC argues that dismissal on extraterritorial grounds is disfavored because extraterritoriality does not implicate subject-matter jurisdiction and "should rarely be resolved on a Rule 12(b)(6) motion," citing a case that predates the governing *Twombly* and *Iqbal* standard by almost 20 years. Resp. at 36 n.27. That is incorrect as a matter of general pleading rules, which *always* require a plaintiff to allege facts sufficient to state a plausible claim, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), regardless of whether the issue implicates subject-matter jurisdiction. Courts routinely resolve claims on extraterritoriality grounds at the pleading stage, including in at least two of the Supreme Court's recent extraterritoriality decisions. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010); *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016); *see also, e.g.*, *Robinson v. DeVry Educ. Grp., Inc.*, 2018 WL 828050, at *4 (N.D. Ill. Feb. 12, 2018) (Shah, J.). The Court should do so here.

### A. The Domestic Board of Trade Portion of Count I, the Non-Swaps Portions of Counts II-IV, and All of Counts V and VI Fail Because the CFTC Does Not Allege a Domestic Application of the Relevant Statutes

For at least the domestic board of trade portion of Count I (7 U.S.C. § 6(a)), the non-swaps portions of Counts II-IV, and all of Counts V and VI, the CFTC must allege a "domestic application" of the relevant statute, *RJR Nabisco*, 579 U.S. at 337—meaning that "the conduct relevant to the statute's focus occurred in the United States." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936 (2021) (citation omitted); *see also Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023). The CFTC fails to meet this burden.[5]

[5] The CFTC applies the "domestic application" test only to the "alternative pleading theories in Counts I and III," stating that those are "the only claims that are partially based on non-swaps activities." Resp. at 44-45. But Counts II and IV likewise involve non-swaps-related transactions and activities, and the statutory provisions authorizing the regulations at issue in Counts V and VI (7 U.S.C. § 12a(8) and 31 U.S.C. § 5318(l), respectively) were not enacted by Subtitle A (indeed, the regulations were promulgated before 2010). So those counts too must allege a domestic application in order to survive a motion to dismiss.

***Counts I-IV.*** The "focus" of the statutory provisions underlying Counts I through IV is on *transactions*. Mot. at 19. The CFTC does not dispute that transactions occur where irrevocable liability is incurred. In derivatives trading, transactions occur where trades are matched, forming a binding contract. *See* Mot. at 20 (citing *Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67-68 (2d Cir. 2018)). The CFTC points to nothing in the Complaint from which the Court could plausibly infer that any trades were matched in the United States or that irrevocable liability was otherwise incurred here.

Instead, the CFTC contends that the focus of these provisions is not on transactions at all, but on conduct—specifically, "dealing in" and "soliciting and accepting orders for" certain non-swaps derivatives products. Resp. at 46. This argument is foreclosed by *Morrison*. There, the Supreme Court held that the relevant provisions of the Securities Exchange Act are focused on transactions, even though the statute prohibits conduct (namely, deception) because Congress prohibited that conduct *in connection with* buying or selling securities. 561 U.S. at 266-67. The same is true of the relevant provisions of the CEA, which gives the CFTC jurisdiction over transactions involving derivatives "traded or executed" on specific markets. 7 U.S.C. § 2(a)(1)(A). This focus is reflected in the specific provisions at issue here. *See, e.g.*, *id.* § 6(a) (Count I) (imposing obligations on persons who enter into "any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery"); *id.* § 7b-3(a)(1) (Count IV) (requiring registration for a swap execution facility, which is "a trading system or platform" for "execut[ing] or trad[ing] swaps," *id.* § 1a(50)). These provisions, like Section 10(b) of the Exchange Act, are transaction-focused. Defining the CEA's focus as broadly as the CFTC proposes would contradict one of *Morrison*'s key holdings, that U.S. law does not apply overseas simply because "*some* domestic activity is involved in the case." 561 U.S. at 266.

The CFTC's argument also ignores the only analogous in-circuit precedent. In *CFTC v. Garofalo*, 2010 WL 11245430 (N.D. Ill. Dec. 21, 2010), the Court held that "[t]he similarities underlying the Securities Exchange Act and the CEA" mean "that *Morrison*'s transactional test should also be applied under the CEA." *Id.* at *6. The CEA provision at issue in *Garofalo*—7 U.S.C. § 6c, which prohibits "offer[ing] to enter into, enter[ing] into, or confirm[ing] the execution of" certain options contracts—is the same one at issue in Count II here and similar to the provision at issue in Count III. In adopting *Morrison*'s "transactional test" for these provisions of the CEA, the Court held that 7 U.S.C. § 6c is "concerned with where the underlying options contracts were actually traded." *Garofalo*, 2010 WL 11245430, at *6.

Even if the CFTC could somehow satisfy *Morrison* by pointing to some amorphous domestic "conduct," the CFTC still fails to allege plausibly in this case any domestic conduct that is the focus of the statutory provisions it seeks to enforce. For example, the CFTC alleges that "Binance . . . solicits orders for financial derivatives from its U.S. customers via its web-based trading platform." Resp. at 46 n.35. But this allegation is legally insufficient. Long-standing case law holds that the location of a defendant's *customers* is not determinative for the extraterritoriality analysis. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) ("a purchaser's citizenship or residency" does not matter); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *26 (S.D.N.Y. Sept. 20, 2016). Instead, the relevant extraterritoriality analysis turns on the location of the *defendant's* actions, as the Supreme Court recently reiterated. *Abitron*, 600 U.S. at 418-19. The CFTC's reliance on solicitation does not help because the agency does not allege that the solicitation occurred via conduct by Defendants *in the United States*; instead, the CFTC alleges that it occurred abroad and online. Resp. at 46 n.35; *cf. Prime Int'l Trading Ltd. v. BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019)

(there must be "domestic—not extraterritorial—conduct by Defendants that is violative of a substantive provision of the CEA").[6] The CFTC's vague assertion that "Binance conducts business in the United States," Resp. at 46 n.35, is also insufficient both because "*some* domestic activity" is not enough to plead a domestic application, *Morrison*, 561 U.S. at 266, and because conclusory allegations like this cannot state a plausible claim. *Iqbal*, 556 U.S. at 678-79.

***Counts V & VI.*** The CFTC similarly fails to allege a domestic application of Regulation 166.3 (Count V: failure to supervise) or Regulation 42.2 (Count VI: failure to implement KYC and AML procedures). Mot. at 21-22. The CFTC concedes that the focus of these regulations is on compliance with regulatory obligations stemming from Binance.com's alleged status as a futures commission merchant ("FCM"). Resp. at 47. The CFTC identifies no allegations of relevant domestic conduct in the Complaint. Its only response is that because it has pled that Binance.com is an FCM, "these duties automatically apply no matter where they are or are not conducted." Resp. at 47. But extraterritoriality jurisprudence recognizes no such exception. Instead, "to prove that a claim involves a domestic application of a statute, plaintiffs must establish that the conduct relevant to the statute's focus *occurred in the United States*." *Abitron*, 600 U.S. at 418 (emphasis added); *see Prime Int'l*, 937 F.3d at 105. The Complaint does the opposite.

***Regulation 1.6 does not save these claims.*** In a last-ditch effort, the CFTC argues that *none* of its claims can be dismissed as impermissibly extraterritorial because *some of them* "plausibly allege[]" evasion under Regulation 1.6, such that the counts in the Complaint are "at

---

[6] The CFTC attempts to undermine *Prime International* by noting that certain aspects of the decision have been rejected in some circuits. Resp. at 45 n.33. But the principle articulated in *Prime International*—requiring "domestic conduct" that is "violative of a substantive provision"—is entirely consistent with *Abitron*. Moreover, the case cited by the CFTC in support of its view, *United States v. Sumeru*, 449 F. App'x 617, 621 (9th Cir. 2011), is inapposite. *See* Resp. at 46. Even if it could be reconciled with the controlling case law discussed above, *Sumeru* involved allegations that the defendants met with potential investors in the United States, which is not alleged here.

least partially based on provisions of Subtitle A." Resp. at 44. The CFTC appears to argue that *all* of its claims get the benefit of Section 2(i)(2), when that provision on its face only applies to swaps-related provisions enacted by Subtitle A. This sweeping argument fails.

Section 2(i), pursuant to which Regulation 1.6 was promulgated, expressly provides that only *swaps-related* provisions of the CEA that *were enacted by Subtitle A* may have extraterritorial application. Regulation 1.6 cannot extend beyond the scope permitted by its authorizing statute, let alone extend Section 2(i)'s extraterritoriality exception for swaps-related provisions of the CEA to other statutory provisions. *See FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) (an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute"). Thus, claims that (i) are unrelated to swaps (*i.e.*, Count I and portions of Counts II-VI), and/or (ii) are brought under CEA provisions other than those enacted by Subtitle A (*i.e.*, the domestic board of trade claim in Count I and Counts V and VI) cannot survive on the basis of Regulation 1.6.

The CFTC is also wrong to suggest that Regulation 1.6 can reach conduct under Count I that allegedly evaded 7 U.S.C. § 6 (which imposes registration requirements on boards of trade), s*ee* Resp. at 10, 12 n.11, when the Complaint alleges only futures-related conduct for Count I. Because futures are excluded from the statutory definition of "swap," *see* 7 U.S.C. § 1a(47)(B)(i), and thus fall outside the purview of both the anti-evasion rule and Section 2(i), so does Count I.

The CFTC's novel argument also contravenes the principle that the CEA generally has no extraterritorial reach. *See, e.g.*, *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1107 (7th Cir. 1984) (explaining there is "no direct evidence that Congress intended" the CEA to "apply to foreign agents"); *Garofalo*, 2010 WL 11245430, at *5 ("*Tamari*'s interpretation of the CEA's language and legislative history [*i.e.*, that 'neither the CEA nor its legislative history specifically authorizes extraterritorial application of the statute'] remains binding."). Accepting the CFTC's

premise would allow any and all CEA provisions and CFTC regulations—including those not alleged to be related to swaps—to apply extraterritorially as long as the CFTC could recast a substantive violation as an evasion of any underlying statutory provision.

More broadly, the CFTC cannot avoid dismissal by suggesting that the Court lacks authority to dismiss "parts of claims." Resp. at 37. For all of its counts, the CFTC states that each transaction "is alleged as a separate and distinct violation" of the CEA. *See, e.g.*, Compl. ¶ 192. Each must therefore be alleged and proved separately, and those that are not adequately alleged should be dismissed now. *See Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 2017 WL 1349175, at *7 (D. Del. Apr. 10, 2017) ("separate sets of operative facts" make up "what should be separate claims").[7] Further, "considering the viability of individual theories supporting a single claim" can "narrow issues for discovery," as it would here should any claim survive. *Fletcher v. Bogucki*, 2021 WL 4477968, at *4 (N.D. Ill. Sept. 30, 2021). For all of these reasons, the anti-evasion claim cannot save the CFTC's other claims from their pleading deficiencies.

### B. The Swaps-Related Claims Under Counts II-IV Fail to Allege a "Direct and Significant Effect" on U.S. Commerce Under Section 2(i)(1)

Even for the swaps-related claims to which Section 2(i) applies, the CFTC's claims fail. Section 2(i) "expressly limits the Commission's reach as it relates to swaps to domestic conduct," unless the alleged violative activities either (i) "have a direct and significant connection with activities in, or effect on, commerce of the United States," or (ii) violate Regulation 1.6. *See CFTC v. Gorman*, 2023 WL 2632111, at *9 (S.D.N.Y. Mar. 24, 2023) (citing 7 U.S.C. § 2(i)). The CFTC fails to satisfy the second prong for the reasons explained below at 18-22. For the first prong, the

[7] The cases the CFTC cites are inapposite as, unlike here, they involved asserting alternative legal theories premised on the same factual allegations. *See, e.g.*, *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) (asserting theories of actual authority, apparent authority, and ratification based on same facts); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-25 (7th Cir. 2015) (questioning but not deciding whether district court erred by granting judgment on the pleadings on some, but not all, elements of a constitutional "legal test").

Court should reject the CFTC's extreme new vision that would extend its statutory authority over swaps around the globe, to transactions with insufficient connection to the U.S. economy.

As an initial matter, the CFTC is not entitled to *Skidmore* deference to its view of Section 2(i). *See* Resp. at 39. *Skidmore* deference, which applies "only to the extent [that the agency's view] is persuasive," is "tempered" where, as here, the CFTC has no "expertise" regarding the extraterritorial reach of statutes and regulations. *Gonzales v. Oregon*, 546 U.S. 243, 268-69 (2006). Indeed, courts must be vigilant not to let a federal agency intrude into foreign affairs—as the CFTC would do here—absent clear authority from Congress. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 257-58 (1991).

On the merits, the CFTC misconstrues the statutory text. The CFTC does not contest that "significant" means sizable or important. Mot. at 23. It argues instead that "direct" requires only a "reasonably proximate causal nexus with domestic competition." Resp. at 40-41 (citing *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 855 (7th Cir. 2012) (en banc); Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924 (Sept. 14, 2020)). The Cross-Border rule is irrelevant to the Court's interpretation of the statute's extraterritoriality provisions given the absence of clear authority from Congress. Even so, the rule is inapposite because it involves registration categories *not* at issue here (swap dealers and major swap participants). Meanwhile, the CFTC ignores Supreme Court precedent interpreting the plain meaning of "direct" to mean "immediate." *See* Mot. at 23 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618-19 (1992)). The agency's effort to give the word a broader meaning runs headlong into the principle that the presumption against extraterritoriality applies even when "determining the extent of [a] statutory exception" to that rule. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 456 (2007).

*Minn-Chem* is not to the contrary. Resp. at 40-41. That case interpreted a different phrase—"direct, substantial, and reasonably foreseeable effect"—that governs the extraterritorial application of certain antitrust laws under the Foreign Trade Antitrust Improvements Act. 683 F.3d at 857-58. That provision has a significantly different text and context than Section 2(i). In *Minn-Chem*, the court noted that interpreting "direct, substantial, and reasonably foreseeable" to require an *immediate* consequence on import commerce would conflict with the background rule that import commerce is already subject to U.S. law. *Id.* Here, Section 2(i)(1) reaches only foreign activities with a "direct and significant" connection to or effect on U.S. commerce, so interpreting "direct" to mean "immediate" is consistent with the statutory context. Section 2(i)(1) thus more closely resembles the Foreign Sovereign Immunities Act at issue in *Weltover* than the Foreign Trade Antitrust Improvements Act at issue in *Minn-Chem*. *See Weltover*, 504 U.S. at 618-19.

The CFTC's attempted textual innovation also contrasts with precedent properly interpreting the "direct and significant" limitation as implicating *only* conduct that poses " 'systemic risks' to the U.S. financial system." *Gorman*, 2023 WL 2632111, at *9 n.9 (citation omitted). The Complaint falls far short of alleging that Binance.com's purported swaps-related activities pose any such risk.[8]

In an effort to rewrite existing law and drastically expand its authority, the CFTC relies on Commerce Clause jurisprudence—including the famous high-water mark of that doctrine, *Wickard v. Filburn*, 317 U.S. 111, 128 (1942)—to support an aggregation argument. Specifically,

[8] Indeed, even the various bankruptcies the CFTC mentions for the first time in its brief have proceeded without destabilizing the wider U.S. financial system. *See* Resp. at 43. And the CFTC's effort to tie two bank failures to their exposure to the crypto industry (though not to Binance.com) is unavailing, as government investigators have concluded that the cause of their failures in March 2023 was a "rapid increase[ ] in market interest rates." *See Recent Bank Failures and the Federal Regulatory Response*: *Hr'g before the U.S. Sen. Comm. on Banking, Hous., and Urban Affs.*, 117th Cong. 4 (2023) (statement of Martin J. Gruenberg, Chairman, Federal Deposit Insurance Corporation). The absence of such conjecture in the Complaint underscores that none of this has any place in the CFTC's claims against Defendants.

the CFTC argues that (i) the Court should consider "the *aggregate* impact of the class of activities to which [Binance's activities] belong," Resp. at 40 (emphasis added), rather than the *direct* impact of *Defendants'* activities related to each individual claim; and that (ii) "direct and significant" means "ha[ving] the potential to impact the risk profiles of the U.S. financial markets and their interrelated participants." *Id.* at 41. In plain English, the CFTC's view appears to be that so long as *all* of the derivatives activity in the world combined *might* affect U.S. financial markets, the CFTC can regulate any individual piece of that activity wherever it occurs. That cannot be true for several reasons—at the least, Congress would have to act unambiguously to authorize such a dramatic intrusion of U.S. law into foreign jurisdictions, and it has not done so.

The "activities" that must have a "direct and significant" effect on U.S. commerce are *Defendants' swaps-related* activities, not all "digital asset derivatives activities" across the world. Resp. at 40; *see Gorman*, 2023 WL 2632111, at *10-11 ("Here, the Court must determine whether *Gorman's statements* had a 'direct and significant connection' to the United States. They did not." (emphasis added)). Not only is the CFTC's aggregation argument staggering in its breadth, it is also in tension with the agency's own Complaint, which (as noted above) pleads that each transaction individually "is alleged [to be] a *separate and distinct* violation" of the CEA. *See* Compl. ¶ 192 (Count I) (emphasis added); *see also id.* ¶¶ 199, 206, 214, 221, 227, 233 (same).

Further, Congress's vast power under Commerce Clause jurisprudence is inapplicable to the CFTC's attempt to claim power for itself over foreign swaps activities. The Commerce Clause limits the federal government's powers vis-à-vis the states; cases interpreting it therefore set forth the outer limits of Congress's authority to legislate. Here, the question is not whether Congress *could* regulate the conduct in question, but rather whether Congress *did* authorize the CFTC to do so in Section 2(i)(1). Moreover, *Wickard* "has long been regarded as 'perhaps the most far

reaching example of Commerce Clause authority over intrastate activity' " in the constitutional canon. *NFIB v. Sebelius*, 567 U.S. 519, 552 (2012) (citation omitted). Applying *Wickard*'s rationale in this context would contravene the rule that the presumption against extraterritoriality applies to *limit* the reading of any "statutory exception" to the general rule against extraterritorial application. *Microsoft*, 550 U.S. at 456.[9]

The CFTC shows its cards when it posits (without a single citation) that "the only way for an enterprise like Binance to lawfully avoid CFTC jurisdiction is to actually know the true identity of its customers so it in fact restricts U.S. persons from trading on the platform." Resp. at 5 n.4. In other words, in the agency's view, the only way for a foreign business to lawfully *avoid* triggering U.S. laws requiring, among other things, "Know-Your-Customer" procedures is to *implement* those very same procedures. That circular and unprecedented position would impose a significant affirmative duty on every company in the world to police its users according to U.S. standards just to avoid potentially violating U.S. law.

The CFTC's heads-I-win, tails-you-lose view of its international regulatory authority rests not on any statutory authorization from Congress or precedent from a court, but instead on the agency's own interpretive guidance providing that transactions involving "U.S. persons" are relevant to the "direct and significant" test under Section 2(i). *See* Resp. at 42 (citing Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45,292 (July 26, 2013)). The CFTC contends that activities "serv[ing] U.S. persons" through the internet suffice as a "direct connection with U.S. commerce" for the agency to bring

[9] *Wickard* also famously rejected the distinction between "direct" and "indirect" effects on commerce previously endorsed by Commerce Clause jurisprudence. 317 U.S. at 124-25. So it makes no sense to think that Congress intended to invoke *Wickard*'s sweeping test in Section 2(i)(1), when it specifically embraced that distinction by requiring a "direct and significant" effect on U.S. commerce.

enforcement actions challenging conduct in foreign countries. *Id.* But what matters here is the statutory text interpreted in light of the presumption against extraterritoriality and, as explained above, the CFTC's expansive view finds no support in the statutory text.[10]

Even if the CFTC's guidance concerning "U.S. person" status mattered here (it does not) or could change the meaning of Section 2(i) (it cannot), the CFTC's argument still fails. To begin with, the CFTC abandons the novel "real economic party" theory prominently featured in its Complaint, which contradicted the agency's own guidance defining a "U.S. person." Mot. at 25-26 (citing Interpretive Guidance, 78 Fed. Reg. at 45,316); *see also* 17 C.F.R. § 23.23(a)(23)(i)(A), (B) (defining "U.S. person" more narrowly in the context of swap dealers and major swap participants). Instead, the CFTC tries a new maneuver, arguing that *foreign* customers should be treated as "U.S. persons" by disregarding corporate formalities under the " 'nerve center' test from diversity jurisdiction case law." Resp. at 15-17 (citing *Hertz Corp. v. Friend*, 559 U.S. 77 (2010), and other cases from extraneous areas of law). That view makes the CFTC's interpretation of Section 2(i) even more problematic, allowing the applicability of U.S. law to a foreign website to turn on its users' corporate structures and connections to their affiliates. In addition to suffering from the same circular logic as the CFTC's Know-Your-Customer argument (*see supra* at 16-17), that is a far cry from the sort of clear and administrable rule required by Supreme Court precedent. The CFTC's approach to the statute in its brief makes the applicability of U.S. law so unpredictable from the perspective of foreign platforms that it would deprive them of fair notice of being subject to U.S. law. *Cf. FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Court should

[10] The CFTC's view of Section 2(i) would also render superfluous the more specific provision in 7 U.S.C. § 6(b)(1)(A), which permits the CFTC to require registration for a foreign board of trade only when that entity gives people located in the United States "an explicit grant of authority" to access its trading system. *See infra* at 22-23.

not permit the CFTC to broaden the reach of Section 2(i)(1) by relying on extratextual arguments that lead to such extreme results for businesses around the globe.

## III. THE CFTC'S ANTI-EVASION CLAIM FAILS

The CFTC's stand-alone anti-evasion claim (Count VII) should be dismissed, and the Court should reject the CFTC's attempt to use Regulation 1.6 to extend its other claims (swaps-related or otherwise) beyond U.S. borders under Section 2(i)(2).[11]

### A. The CFTC Alleges No Relevant Swaps Provisions or Evasive Conduct

As a threshold matter, the Complaint fails to identify any specific swaps-related provisions underlying its anti-evasion claim. Mot. at 35-36. The CFTC argues in its brief that its claim is premised on purported evasion of the swaps-related portions of CEA provisions at issue in Counts II-IV and the FBOT provision in Count I. Resp. at 10. But nowhere in the Complaint does the CFTC identify those provisions as the basis for its claim. *See* Compl. ¶ 232 (alleging only that Defendants attempted to evade "provisions of the Act and its Regulations"). The CFTC's failure to identify the specific provisions underpinning its anti-evasion claim alone warrants dismissal of Count VII. *See United States ex rel. Hanna v. City of Chi.*, 834 F.3d 775, 779 (7th Cir. 2016) (affirming dismissal of False Claims Act claim under Rule 9(b) where complaint gave "no information about [the specific] regulatory provisions" allegedly flouted).

Even if it had identified such provisions in the Complaint, the CFTC fails to allege any "evasion" of them. The agency concedes that it must allege conduct beyond the underlying registration failures to plead its anti-evasion claim. Resp. at 19-20; *see also United States v. Collins*, 685 F.3d 651, 656 (7th Cir. 2012) (requiring "affirmative step to 'evade or defeat' tax

---

[11] The CFTC does not dispute—and therefore concedes—that Rule 9(b)'s heightened pleading standard applies to its anti-evasion claim. Mot. at 36 n. 31; *see MCI WorldCom Network Servs., Inc. v. Atlas Excavating, Inc.*, 2006 WL 3542332, at *3 (N.D. Ill. Dec. 6, 2006) ("The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession.").

obligations" beyond failing to file a tax return). But the only allegedly evasive conduct it identifies is still the alleged "control subversion." Resp. at 5, 20. This argument fails on multiple grounds.

First, the alleged "control subversion" does not fall within the purview of Regulation 1.6. By its terms, Regulation 1.6 makes it "unlawful to conduct activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade" the CEA. 17 C.F.R. § 1.6(a). These enumerated examples, even if not exhaustive, have "probative force" in defining the Regulation's scope. *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1157 (11th Cir. 2014). Customer use of VPNs or other such approaches to access the Binance.com platform is not an "agreement[], contract[], or transaction[]" as contemplated by Regulation 1.6. The CFTC's reference to Defendants' "contracts" with U.S. customers via the platform's Terms of Use also fails. *See* Resp. at 20. The CFTC does not argue that the terms of such contracts themselves were evasive, especially when its own Complaint concedes that the Terms of Use prohibited U.S. persons from trading on the platform as far back as June 2019. Compl. ¶ 93. Nor is there any basis to think (and the CFTC points to none) that the Terms of Use is the type of "contract" contemplated by Regulation 1.6. To the extent the Complaint relies on decisions by Trading Firms A, B, and C to set up separate corporate entities outside the United States, that was conduct by those Trading Firms and not by Defendants. *See* Mot. at 25-26.

Moreover, alleging that Defendants "help[ed] customers evade Binance's access controls" (Compl. ¶ 3) is not the same as alleging that Defendants evaded swaps-related statutory provisions. The CFTC's contrary view is similar to its overbroad interpretation of Section 2(i)(1) that the extraterritorial reach of the CEA extends whenever there are U.S. users, regardless of where the platform itself is located. As explained above, the CFTC argues that the only way for a foreign

company to avoid the agency's authority is to comply with the agency's requirement that a regulated entity "know the true identity of its customers" and "in fact restrict[ ] U.S. persons from trading on the platform." Resp. at 5 n.4. But nothing in the CEA authorizes the agency to require foreign websites to implement controls affirmatively preventing U.S. persons from trading on their platforms through VPNs or otherwise. *See supra* at 16. Use of a VPN to circumvent a geographic restriction is therefore not a red flag signaling evasion or violation of the CEA, because one cannot evade a legal obligation that does not exist in the first place. Thus, alleged conduct that helps a customer avoid a platform's controls meant to block U.S. users does not constitute evasion of a relevant statutory provision under Regulation 1.6.

The CFTC's broad new theory of evasion also presents due process problems. The CFTC has never before given any examples of evasive conduct because, it says, examples "may provide a guidepost for evasion." *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule, 77 Fed. Reg. 48,208, 48,302 (Aug. 13, 2012). That failure does not give the CFTC free rein to determine—in litigation—what conduct amounts to willful evasion. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417-18 (2019) (courts should decline to defer to a "convenient litigating position" or "post hoc rationalizatio[n] advanced" to "defend past agency action against attack"). The agency's novel approach to evasion deprived Defendants of fair notice of conduct subject to Regulation 1.6. *See Fox Television*, 567 U.S. at 253.

**B. The CFTC Fails to Allege Willful Evasion of a Known Legal Obligation**

The CFTC's anti-evasion argument fails for the additional reason that Regulation 1.6 reaches only *willful* evasion. 17 C.F.R. § 1.6(a). The CFTC contends that "willfulness" encompasses both intentional and reckless conduct. Resp. at 11. Even if correct, the CFTC must

still allege that Defendants had knowledge of the legal duties imposed by the relevant swaps-related CEA provisions. It has not done so, let alone with the particularity required by Rule 9(b).

Contrary to the CFTC's argument, courts have interpreted "willfulness" to require knowledge of a legal duty even in civil contexts. *See, e.g.*, *B & G Towing, LLC v. City of Detroit*, 828 F. App'x 263, 268 (6th Cir. 2020) (dismissing civil claim for willful disclosure of wiretap information because plaintiff failed to allege that city "knowingly or recklessly disregard[ed] a known legal duty"); *Agbaniyaka v. Dep't of the Treasury*, 484 F. App'x 545, 549 (Fed. Cir. 2012) (in civil tax action, willfulness "connotes a voluntary, intentional violation of a known legal duty"); *United States v. Pomerantz*, 2017 WL 4418572, at *3 (W.D. Wash. Oct. 5, 2017) (in civil action for failing to timely report financial interest in foreign bank accounts, applying interpretation of "willfulness" from criminal context which required proof of "a known legal duty to report").

The handful of CFTC administrative decisions cited in a footnote are not to the contrary, as none involved regulations prohibiting willful *evasion*. *See* Resp. at 11 n.10. By definition, a defendant cannot willfully *evade* a regulation without knowing that the regulation (or the obligation it imposes) existed in the first place—a principle well-established by precedent involving evasion claims. *See* Mot. at 37 (citing cases).

Moreover, the CFTC's adopting release for Regulation 1.6 (to which the CFTC urges this Court to defer) relied on the interpretation of "willful" in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). *See* 77 Fed. Reg. at 48,302 n.1056. There, the Supreme Court rejected a standard of willfulness in a civil suit that would have "merely require[d]" the defendant to know the relevant statute was "in the picture," because doing so would "obliterate[ ] any distinction between willful and nonwillful violations." *McLaughlin*, 486 U.S. at 132. The CFTC's new argument is inconsistent with the adopting release and thus constitutes a "convenient litigating position" to

which the Court should not defer. *Kisor*, 139 S. Ct. at 2417. And the agency's interpretation of a well-known legal term such as willfulness in no way "implicate[s] its substantive expertise." *Id.*

Finally, the CFTC's scienter allegations as to Mr. Zhao are particularly deficient. The CFTC does not even contend that he had knowledge of any legal duties imposed by the swaps-related CEA provisions. Instead, the Complaint only suggests purported awareness of U.S. *sanctions* laws that are not at issue. Compl. ¶¶ 109, 113. Though the CFTC references a single statement by Defendant Lim in which Mr. Lim stated, "US users = CFTC = civil case can pay fine and settle," *id.* ¶ 112, the Complaint does not allege that Mr. Lim ever made that statement to Mr. Zhao, that Mr. Zhao was otherwise aware of it, or that either Mr. Lim or Mr. Zhao knew of any specific obligations under the CEA (let alone any swaps-related provision enacted by Subtitle A). The CFTC has failed to allege willfulness as to any Defendant.

### C. The Complaint Specifies No Swaps to Which Its Anti-Evasion Claim Relates

The CFTC's brief does not remedy the Complaint's failure to specify any *swaps* on which its anti-evasion claim is based. Even if the Complaint's passing references to "options" were sufficient to allege swaps, Resp. at 12, the CFTC does not tie its anti-evasion claim to any options transactions. And with respect to the "perpetual" contracts, the Complaint has alleged at most that perpetuals are futures—which are excluded from the statutory definition of swaps. 7 U.S.C. § 1a(47); *see* Mot. at 22 n.19. The anti-evasion claim should be dismissed.

## IV. COUNT I SHOULD BE DISMISSED BECAUSE THE CFTC FAILS TO ALLEGE THAT DEFENDANTS OPERATED A BOARD OF TRADE SUBJECT TO REGISTRATION

The CFTC's response to Defendants' board of trade arguments is cabined to a single footnote, which fails to address the deficiencies in the Complaint. Resp. at 37 n.28. This inadequate response forfeits any argument that Count I plausibly alleges that Defendants operated a domestic or foreign board of trade.

In any event, Count I still fails for at least two reasons. *First*, the domestic board of trade provision under 7 U.S.C. § 6(a) regulates exchanges *located in* the United States. Mot. at 28. The CFTC's reference to a handful of isolated U.S. activities, like occasional events or contracting with certain U.S. vendors or professional services companies, Resp. at 37 n.28, cannot transform a foreign entity into a *domestic* board of trade under the statute. Otherwise any foreign platform that had some presence in the United States would fall under this provision. The CFTC's argument conflates the two registration categories under 7 U.S.C. § 6 and would render the statutory provisions concerning *foreign* boards of trade ("FBOTs") superfluous.

*Second*, the CFTC does not dispute that the definition for FBOTs under 7 U.S.C. § 6(b)(1)(A) requires "an explicit grant of authority" to participants located in the United States to "enter trades directly into the trade matching system." Mot. at 27-28. The CFTC argues that the Court should *infer* explicit grants of authority to U.S. persons because it alleges that "Binance had no geography-based access restrictions" and that Defendants knew there were U.S. users on the platform. Resp. at 37 n.28. But the alleged lack of restrictions is not "an explicit grant of authority," which is an express statutory requirement for a foreign exchange to be subject to CFTC registration. The CFTC does not allege such an authorization.

This limitation on the CFTC's authority regarding foreign exchanges, and its application here, makes sense: foreign platforms need a clear, easily administrable rule so that they know whether they are subject to the CEA and CFTC regulation. Here again, the CFTC's arguments turn Congress's directives into a muddle, despite the international political and economic consequences of subjecting foreign entities to the CEA.

## V. COUNTS III, V, AND VI SHOULD BE DISMISSED BECAUSE BINANCE.COM IS NOT ADEQUATELY ALLEGED TO BE A FUTURES COMMISSION MERCHANT

Under the statutory definition, a futures commission merchant ("FCM") must either (i) solicit or accept orders for derivatives trades on behalf of customers or (ii) "act[] as a counterparty" to customers in "retail commodity transactions." 7 U.S.C. § 1a(28)(A)(i)(I) (cross-referencing 7 U.S.C. § 2(c)(2)(D)(i)). The CFTC has not alleged that Binance.com does either.

### A. The CFTC Does Not Allege That Binance.com Solicits or Accepts Orders Within the Meaning of an FCM

The CFTC does not dispute that it pled that Binance.com is a direct-access trading platform, rather than an intermediary between its customers and an exchange. *See* Resp. at 47-49. Instead, it argues that Binance.com need not have been an intermediary to qualify as an FCM. But the text of the relevant statute and regulation, precedent, and the CEA's regulatory structure belie the CFTC's position.

The text of the CEA and the CFTC's regulation make clear that an FCM is an intermediary. To be an FCM under this prong, an entity must solicit or accept "orders." 7 U.S.C. § 1a(28)(A)(i)(I)(aa). Orders, in turn, are "instruction[s] or authorization[s] . . . regarding trading . . . on behalf of [ ] customer[s]." 17 C.F.R. § 1.3. The Complaint does not allege that Binance.com traded on behalf of customers. Rather, the Complaint alleges that Binance.com's customers place and execute trades themselves *directly* into the platform's trade matching system—the defining feature of a direct-access exchange. Compl. ¶ 42.

The CFTC attempts to brush aside the definition of "order" by arguing that "whether a third party stands between the customer and Binance, each customer order is intended to be placed and executed on Binance on the customer's behalf, not on behalf of some unrelated account." Resp. at 49. This argument might mean that the *customer* is not an intermediary, because he places and

executes trades on his own behalf. But it does not transform a direct-access trading platform, as Binance.com is alleged to be, into an FCM. When customers place trades directly on their own behalf, as they are alleged to do here, there is no such intermediary.

The CFTC also sweeps under the rug longstanding judicial authority and its own pronouncements recognizing that an FCM is a trading intermediary. *See* Mot. at 31-32 & n.25 (citing authorities). The CFTC's only response is an unpublished, out-of-circuit decision denying dismissal of a criminal indictment under a different pleading standard. Resp. at 48 (citing *United States v. Reed*, 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022)); *see* Mot. at 32 n.24 (distinguishing *Reed*). *Reed* does not foreclose this Court's independent assessment based on the CFTC's Complaint in this action under the pleading standard and precedents applicable here.

Further, the CFTC's position in this litigation—that a direct-access exchange is nonetheless executing orders "on the customer's behalf"—does not comport with the regulatory scheme of the CEA. Trading platforms register under other CFTC registration categories, as FBOTs, designated contract markets ("DCMs"), or swap execution facilities ("SEFs"), not as FCMs. The CFTC argues that "the registration categories are not exclusive of one another," Resp. at 49, but this generic response fails to recognize regulatory incompatibilities between (i) FBOTs, DCMs, and SEFs, which as trading platforms are self-regulatory organizations that adopt and enforce rules and requirements for their members, *see* CFTC Glossary, Self-Regulatory Organization, https://bit.ly/F0PXCIY; and (ii) FCMs, which are members of, and regulated by, such self-regulatory organizations. In other words, the CFTC's position would mean that the same entity would be a member of, and regulated by, itself. Tellingly, the CFTC recognized these and other tensions between registration categories in a recent request for comment, which the CFTC's brief simply ignores. Mot. at 33.

Nor does 17 C.F.R. § 3.4(a) support the CFTC's bald assertion that Binance.com should have simultaneously registered as a trading platform and an FCM. Resp. at 49. Rule 3.4 is found in Part 3 of the CFTC's regulations, which governs FCMs and other intermediaries, *not* FBOTs, DCMs, or SEFs. In other words, the quoted language from Rule 3.4(a) that "registration in one capacity under the [CEA] shall not include registration in any other capacity" means that an intermediary may have to register as each type of intermediary under Part 3. But FBOTs, DCMs, and SEFs register under other Parts of the CFTC's regulations. *See* 17 C.F.R. Part 48 (FBOTs), Part 38 (DCMs), Part 37 (SEFs). There are provisions governing dual registration as two types of trading platform—for example as both a DCM and a SEF. *Id.* §§ 37.8, 38.9. The lack of such rules for registration as both a trading platform and an intermediary is telling.

### B. The CFTC Fails to Allege That Binance.com Served as a Counterparty in Leveraged Retail Commodity Transactions

The CFTC also cannot shoehorn Binance.com into the narrow alternative FCM provision. Under that "counterparty" prong, the CFTC must allege that Binance.com "act[ed] as a counterparty" to customers in retail commodity transactions, 7 U.S.C. § 1a(28)(A)(i)(I)(bb)—*i.e.*, that Binance.com was one party to a specific kind of statutorily-defined transaction made on a leveraged or margined basis. Mot. at 34. The CFTC concedes that it has not made any such allegation. Instead, the CFTC asserts that the Court should "draw a reasonable inference that *at least some* U.S. retail customers' leveraged commodity transactions matched against a Binance-controlled account," on the basis of scant allegations that Binance.com "offered leverage to retail customers" and that Defendants "traded on [their] own platform through approximately 300 'house accounts.'" Resp. at 50 (emphasis added) (citing Compl. ¶¶ 56, 69). The Court should decline such an invitation when the CFTC plainly fails to meet its pleading burden. *See Iqbal*, 556 U.S. at 679 ("conclusions" are "not entitled to the assumption of truth"); *Taha*, 947 F.3d at 469 (courts

draw only reasonable inferences and "reject sheer speculation" and "bald assertions"). The CFTC cites no authority for its apparent position that market-making activities by "house accounts" could turn a trading platform into an FCM simply because an unspecified account might have matched with an unspecified customer's leveraged retail trade.

* * *

Finally, the CFTC concedes that Counts V and VI are entirely premised on Binance.com's alleged status as an FCM. Resp. at 47. Because the CFTC has not alleged that Binance.com is an FCM, these secondary claims should be dismissed for this additional reason.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: October 23, 2023

Respectfully submitted,


*/s/ Helgi C. Walker*
Stephanie Brooker*
M. Kendall Day*
Richard Grime*
Helgi C. Walker*
Jeffrey L. Steiner*
Matt Gregory*
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: 202-955-8500

Marshall R. King*
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
Tel: 212-351-3905

John K. Theis (ARDC No. 6287528)
**RILEY SAFER HOLMES & CANCILA LLP**
70 West Madison Street, Suite 2900
Chicago, IL 60602
Tel: 312-471-8700

*Admitted pro hac vice

*Attorneys for Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited*

*/s/ Douglas K. Yatter*
Douglas K. Yatter*
Benjamin Naftalis*
Iris Xie*
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: 212-906-1200

Heather A. Waller (ARDC No. 6302537)
Kirsten C. Lee (ARDC No. 6330011)
**LATHAM & WATKINS LLP**
330 N Wabash Ave, Suite 2800
Chicago, IL 60611
Tel: 312-876-7700

*Admitted pro hac vice

*Attorneys for Changpeng Zhao*

## APPENDIX A
## Grounds for Dismissal of CFTC Claims Based on Defendants' Motion to Dismiss

| Count | Failure to Plead Personal Jurisdiction Over Any Defendant | Extraterritoriality | Failure to Plead Required Elements Under Statute/ Regulation | No Control Person Liability for Mr. Zhao Where Underlying Claim Fails * |
|---|---|---|---|---|
| **Count I**: Execution of futures transactions on an unregistered board of trade (7 U.S.C. § 6(a) or 7 U.S.C. § 6(b); 17 C.F.R. § 48.3) | ✓ | ✓ | ✓ | ✓ |
| **Count II**: Illegal off-exchange commodity options (7 U.S.C. § 6c(b); 17 C.F.R. § 32.2)) | ✓ | ✓ | | ✓ |
| **Count III**: Failure to register as a Futures Commission Merchant (FCM) (7 U.S.C. § 6d) | ✓ | ✓ | ✓ | ✓ |
| **Count IV**: Failure to register as a Designated Contract Market (DCM) or Swap Execution Facility (SEF) (7 U.S.C. § 7b-3(1); 17 C.F.R. § 37.3(a)(1)) | ✓ | ✓ | | ✓ |
| **Count V**: Failure to diligently supervise (17 C.F.R. § 166.3) | ✓ | ✓ | ✓ | ✓ |
| **Count VI**: Failure to implement Customer Identification Program (CIP) and Know Your Customer (KYC) / Anti-Money Laundering (AML) Provisions (17 C.F.R. § 42.2) | ✓ | ✓ | ✓ | ✓ |
| **Count VII**: Anti-evasion (17 C.F.R. § 1.6) | ✓ | | ✓ | ✓ |

* For Counts I-VI, the CFTC alleges that the Foreign Binance Entities are primarily liable and that Mr. Zhao is liable only as a control person. For Count VII, the CFTC alleges primary and control person liability.